**No. 22-01409**

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Alejandro Menocal, *et al.,*

*Plaintiffs-Appellees,*

— v. —

The GEO Group, Inc.,

*Defendant-Appellant.*

On appeal from the United States District Court
for the District of Colorado, No. 1:14-cv-02887 (Hon. John L. Kane)

**APPELLANT'S APPENDIX
VOLUME I OF III**

Scott A. Schipma
Dominic E. Draye
GREENBERG TRAURIG, LLP
2101 L Street, N.W.
Washington, DC 20037
(202) 331-3100
schipmas@gtlaw.com
drayed@gtlaw.com

*Attorneys for Defendant-Appellant*

# INDEX
## VOLUME I

| Docket Number | Description | Appendix Page No. |
|---|---|---|
| | Civil Case Court Docket, Case No. 1:14-cv-02887-JLK-MEH | APP. 1 |
| 1 | Class Action Complaint for Unpaid Wages and Forced Labor, Filed October 22, 2014 | APP. 12 |
| 26 | Answer of GEO Group to Plaintiff's Complaint, Filed July 20, 2015 | APP. 33 |
| 260 | Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense, Filed on April 20, 2020 | APP. 50 |
| 261-8 | Performance-Based National Detention Standards 2011, Filed on April 29, 2020 | APP. 95 |
| 261-9 | Operations Manual ICE Performance Based National Detention Standards (PBNDS), Filed April 29, 2020 | APP. 160 |
| 261-17 | Aurora Ice Processing Center Detainee Handbook, Local Supplement, Filed April 29, 2020 | APP. 225 |

## VOLUME II

| Docket Number | Description | Appendix Page No. |
|---|---|---|
| 270 | Defendant The GEO Group, Inc.'s Response in Opposition to Plaintiffs' Motion for Summary Judgment on Defendant' Affirmative Defense, Filed June 5, 2020 | APP. 253 |
| 284 | Defendant The GEO Group, Inc.'s Cross-Motion for Summary Judgment, Filed June 25, 2020 | APP. 293 |
| 286 | Plaintiff's Reply in Support of Motion for Summary Judgment on Defendant's Affirmative Defense, Filed June 26, 2020 | APP. 322 |

| Docket Number | Description | Appendix Page No. |
|---|---|---|
| 298 | Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense, filed July 31, 2020 | APP. 438 |
| 305 | Defendant's Motion for Summary Judgment, Filed August 17, 2020 | APP. 491 |

### VOLUME III

| Docket Number | Description | Appendix Page No. |
|---|---|---|
| 316 | Defendant The GEO Group, Inc.'s Reply in Support of Its Cross-Motion for Summary Judgment | APP. 530 |
| 336 | Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, Filed October 26, 2020 | APP. 551 |
| 350 | Defendant The GEO Group, Inc.'s Reply in Support of Motion for Summary Judgment, Filed November 18, 2020 | APP. 635 |
| 380 | Order on the Parties' Cross Motions for Summary Judgment (ECF Nos. 260, 284, & 305) And Defendant's Motions to Dismiss (ECF No. 307) And for Decertification of Class (ECF No. 312), Filed October 18, 2022 | APP. 717 |
| 387 | Notice of Appeal, Filed November 16, 2022 | APP. 793 |

Query　　Reports ▾　　Utilities ▾　　Help　　Log Out

APPEAL,MJ CIV PP,NDISPO,STAYDI,STAYED

**U.S. District Court - District of Colorado**
**District of Colorado (Denver)**
**CIVIL DOCKET FOR CASE #: 1:14-cv-02887-JLK-MEH**

Menocal et al v. The GEO Group, Inc.
Assigned to: Judge John L. Kane
Referred to: Magistrate Judge Michael E. Hegarty
Case in other court: USCA, 17-01125
　　　　　　　　　　USCA, 17-00701
　　　　　　　　　　Tenth Circuit, 22-01409
Cause: 05:704 Labor Litigation

Date Filed: 10/22/2014
Jury Demand: Defendant
Nature of Suit: 790 Other Labor Litigation
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 10/22/2014 | 1 | COMPLAINT *CLASS ACTION COMPLAINT FOR UNPAID WAGES AND FORCED LABOR* against The GEO Group, Inc. (Filing fee $ 400,Receipt Number 1082-4105561)Attorney Brandt Powers Milstein added to party Olga Alexakina(pty:pla), Attorney Brandt Powers Milstein added to party Lourdes Argueta(pty:pla), Attorney Brandt Powers Milstein added to party Marcos Brambila(pty:pla), Attorney Brandt Powers Milstein added to party Jesus Gaytan(pty:pla), Attorney Brandt Powers Milstein added to party Hugo Hernandez(pty:pla), Attorney Brandt Powers Milstein added to party Alejandro Menocal(pty:pla), Attorney Brandt Powers Milstein added to party Demetrio Valerga(pty:pla), Attorney Brandt Powers Milstein added to party Dagoberto Vizguerra(pty:pla), Attorney Brandt Powers Milstein added to party Grisel Xahuentitla(pty:pla), filed by Jesus Gaytan, Grisel Xahuentitla, Olga Alexakina, Demetrio Valerga, Marcos Brambila, Hugo Hernandez, Alejandro Menocal, Lourdes Argueta. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Milstein, Brandt) (Entered: 10/22/2014) |
| 10/23/2014 | 2 | Case assigned to Magistrate Judge Craig B. Shaffer. Text Only Entry. (jofox ) (Entered: 10/23/2014) |
| 10/23/2014 | 3 | SUMMONS issued by Clerk. Magistrate Judge Consent Form issued pursuant to Magistrate Judge Direct Pilot Project to Assign Civil Cases to Full Time Magistrate Judges. (Attachments: # 1 Magistrate Judge Consent Form) (jofox ) (Entered: 10/23/2014) |
| 10/23/2014 | 4 | NOTICE of Entry of Appearance *as Counsel for Plaintiffs* by Robert Andrew Free on behalf of All Plaintiffs Attorney Robert Andrew Free added to party Olga Alexakina(pty:pla), Attorney Robert Andrew Free added to party Lourdes Argueta(pty:pla), Attorney Robert Andrew Free added to party Marcos Brambila(pty:pla), Attorney Robert Andrew Free added to party Jesus Gaytan(pty:pla), Attorney Robert Andrew Free added to party Hugo Hernandez(pty:pla), Attorney Robert Andrew Free added to party Alejandro Menocal(pty:pla), Attorney Robert Andrew Free added to party Demetrio Valerga(pty:pla), Attorney Robert Andrew Free added to party Dagoberto Vizguerra(pty:pla), Attorney Robert Andrew Free added to party Grisel Xahuentitla(pty:pla) (Free, Robert) (Entered: 10/23/2014) |
| 10/28/2014 | 5 | SUMMONS Returned Executed by All Plaintiffs. GEO Group, Inc., The served on 10/24/2014, answer due 11/14/2014. (Milstein, Brandt) (Entered: 10/28/2014) |
| 10/31/2014 | 6 | NOTICE of Entry of Appearance by David R. DeMuro on behalf of GEO Group, Inc., TheAttorney David R. DeMuro added to party GEO Group, Inc., The(pty:dft) (DeMuro, David) (Entered: 10/31/2014) |
| 10/31/2014 | 7 | MINUTE ORDER setting a Scheduling Conference on 12/19/2014 at 11:00 AM in Courtroom A 402 before Magistrate Judge Craig B. Shaffer. ORDERED that parties shall adhere to the deadlines and instructions as set forth in Preparation for Rule 16(b) Scheduling Conference, located on the court's website under "Judicial Officers." Text Only Entry by Magistrate Judge Craig B. Shaffer on 10/31/14. (cbssec) (Entered: 10/31/2014) |
| 10/31/2014 | 8 | NOTICE of Entry of Appearance by Shelby Anne Felton on behalf of GEO Group, Inc., TheAttorney Shelby Anne Felton added to party GEO Group, Inc., The(pty:dft) (Felton, Shelby) (Entered: 10/31/2014) |
| 11/14/2014 | 9 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiffs Olga Alexakina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Milstein, Brandt) (Entered: 11/14/2014) |
| 11/14/2014 | 10 | CASE REASSIGNED pursuant to 9 Consent to Jurisdiction of Magistrate Judge. Consent not achieved. This case is reassigned to Judge John L. Kane. All future pleadings should be designated as 14-cv-02887-JLK-CBS. (Text Only Entry) (nmarb, ) (Entered: 11/14/2014) |
| 11/14/2014 | 11 | MOTION to Dismiss by Defendant GEO Group, Inc.. The. (Attachments: # 1 Exhibit A and B, # 2 Exhibit C and D)(Felton, Shelby) (Entered: 11/14/2014) |
| 11/17/2014 | 12 | Unopposed MOTION for Extension of Time to File Response/Reply as to 11 MOTION to Dismiss by Plaintiffs Olga Alexakina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Milstein, Brandt) (Entered: 11/17/2014) |
| 11/17/2014 | 13 | MINUTE ORDER GRANTING Plaintiffs' Motion to Extend Deadline to Respond to Motion to Dismiss (Doc. 12), which is unopposed. ORDERED that the due date for Plaintiffs' response is extended fourteen days to and including December 19, 2014 by Judge John L. Kane on 11/17/14. Text Only Entry (jhawk, ) (Entered: 11/17/2014) |
| 11/21/2014 | 14 | MINUTE ORDER vacating the 12/19/14 Scheduling Conference in light of this case being reassigned per doc. # 10 . Text Only Entry by Magistrate Judge Craig B. Shaffer on 11/21/14. (cbssec) (Entered: 11/21/2014) |
| 12/19/2014 | 15 | RESPONSE to 11 MOTION to Dismiss filed by Plaintiffs Olga Alexakina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Milstein, Brandt) (Entered: 12/19/2014) |
| 12/22/2014 | 16 | Unopposed MOTION for Extension of Time to File Response/Reply as to 11 MOTION to Dismiss by Defendant GEO Group, Inc., The. (Felton, Shelby) (Entered: 12/22/2014) |
| 12/23/2014 | 17 | ORDER granting 16 MOTION for Extension of Time to File Reply. Defendant has up to and including January 16, 2015, to file its reply in support of the Motion to Dismiss, by Judge John L. Kane on 12/23/14. Text Only Entry(jjksec) (Entered: 12/23/2014) |
| 01/16/2015 | 18 | REPLY to Response to 11 MOTION to Dismiss filed by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit E, # 2 Exhibit F)(Felton, Shelby) (Entered: 01/16/2015) |
| 01/23/2015 | 19 | Unopposed MOTION for Leave to *File Sur-reply* to 18 Reply to Response to Motion by Plaintiffs Olga Alexakina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Milstein, Brandt) (Entered: 01/23/2015) |
| 01/27/2015 | 20 | ORDER granting 19 Motion for Leave. Plaintiffs shall file a sur-reply regarding Defendant's McNamara-O'Hara Service Contract Act and Government Contractor defense arguments no later than February 17, 2015, by Judge John L. Kane on 01/27/2015. (athom, ) (Entered: 01/27/2015) |
| 02/17/2015 | 21 | SURREPLY re 11 MOTION to Dismiss filed by Plaintiffs Olga Alexakina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit)(Milstein, Brandt) (Entered: 02/17/2015) |
| 03/20/2015 | 22 | NOTICE of Change of Address/Contact Information by Alexander Neville Hood (Hood, Alexander) (Entered: 03/20/2015) |
| 07/06/2015 | 23 | Memorandum Opinion and ORDER. Plaintiffs' CMWO claims are dismissed, and Defendant's motion is denied with respect to Plaintiffs' TVPA and unjust enrichment claims. Entered by Judge John L. Kane on 07/06/15.(jhawk, ) (Entered: 07/06/2015) |
| 07/10/2015 | 24 | MINUTE ORDER SETTING SCHEDULING CONFERENCE. This case is set for a Scheduling Conference at 11:00 a.m. on Tuesday, August 11, 2015, in Courtroom A802 on the 8th floor of the Alfred A. Arraj U.S. Courthouse, 901 19th Street, Denver. The parties shall prepare and file a Stipulated Scheduling and Discovery Order on or before Tuesday, August 4, 2015. See instructions for proper formatting of this order in Judge Kane's Pretrial and Trial Procedures Memorandum, available on the court's website at http://www.cod.uscourts.gov/Home.aspx (Select Judge Kane under "Judicial Officers," "Senior Article III Judges"). A form of order is also available on the website, and the parties' proposed Scheduling Order should follow the example provided, which is different from those used by magistrate and other judges of this court. Judge Kane requires that an editable version of the Stipulated Scheduling Order be emailed to chambers as well, at Kane_Chambers@cod.uscourts.gov.Counsel and pro se litigants shall read and strictly adhere to all instructions in the Judges Pretrial and Trial Procedures Memorandum. Particular attention is called to Part III, regarding motions for summary judgment. Entered by Judge John L. Kane on 07/10/15. Text Only Entry (jhawk, ) (Entered: 07/10/2015) |
| 07/15/2015 | 25 | NOTICE of Entry of Appearance by Charles A. Deacon on behalf of GEO Group, Inc., TheAttorney Charles A. Deacon added to party GEO Group, Inc., The(pty:dft) (Deacon, Charles) (Entered: 07/15/2015) |
| 07/20/2015 | 26 | ANSWER to 1 Complaint,,,, by GEO Group, Inc., The.(Felton, Shelby) (Entered: 07/20/2015) |
| 07/24/2015 | 27 | NOTICE of Entry of Appearance by Mark Thomas Emery on behalf of GEO Group, Inc., TheAttorney Mark Thomas Emery added to party GEO Group, Inc., The(pty:dft) (Emery, Mark) (Entered: 07/24/2015) |
| 08/04/2015 | 28 | Proposed Scheduling Order by Plaintiffs Olga Alexakina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Milstein, Brandt) (Entered: 08/04/2015) |
| 08/04/2015 | 29 | MOTION for Reconsideration re 23 Order on Motion to Dismiss by Defendant GEO Group, Inc., The. (Deacon, Charles) (Entered: 08/04/2015) |
| 08/11/2015 | 30 | MINUTE ENTRY for Scheduling Conference proceedings held before Judge John L. Kane on 8/11/2015. Scheduling Order NOT approved and signed. Court Reporter: Kara Spitler. (babia) (Entered: 08/11/2015) |
| 08/24/2015 | 31 | MOTION to Strike 29 MOTION for Reconsideration re 23 Order on Motion to Dismiss by Plaintiffs Olga Alexakina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Hood, Alexander) (Entered: 08/24/2015) |
| 08/24/2015 | 32 | MOTION to Stay *PLAINTIFFS' RESPONSE DEADLINE TO DEFENDANT'S MOTION FOR RECONSIDERATION [DOC. 29] PENDING A DECISION ON PLAINTIFFS' MOTION TO STRIKE [DOC. 31]* by Plaintiffs Olga Alexakina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga. (Hood, Alexander) (Entered: 08/24/2015) |

**APP. 1**

| 08/26/2015 | 33 | ORDER on Motion for Reconsideration. Defendant's Motion for Reconsideration 29 is DENIED, and Plaintiffs' Motion to Strike the Motion for Reconsideration 31 and Motion to Stay Plaintiffs' Response Deadline 32 are DENIED AS MOOT. Entered by Judge John L. Kane on 08/26/15.(jhawk, ) (Entered: 08/26/2015) |
| 08/31/2015 | 34 | STIPULATION for Extension of Time *for Discovery Responses* by Defendant GEO Group, Inc., The. (Felton, Shelby) (Entered: 08/31/2015) |
| 09/03/2015 | 35 | MINUTE ORDER. The parties are ORDERED to confer and jointly submit a proposed briefing schedule of Plaintiffs' motion for class certification, as well as a proposed schedule for any discovery on class certification issues to be conducted in connection with that motion, on or before September 11, 2015. The Court will address the balance of the schedule in this case after resolution of Plaintiffs' class certification motion. Entered by Judge John L. Kane on 09/03/15. Text Only Entry. (jhawk, ) (Entered: 09/04/2015) |
| 09/10/2015 | 36 | Joint STATUS REPORT by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Turner, Andrew) (Entered: 09/10/2015) |
| 09/11/2015 | 37 | MINUTE ORDER. Pursuant to the parties' Joint Status Report 36 , it is ORDERED that the parties shall have up to and including December 15, 2015 to complete discovery regarding class certification issues. It is further ORDERED that Plaintiffs' Motion for Class Certification will be filed on or before January 11, 2016, Defendant's response will be filed on or before February 1, 2016, and Plaintiffs' reply will be filed on or before February 25, 2016. Entered by Judge John L. Kane on 09/11/15. Text Only Entry. (jhawk, ) (Entered: 09/11/2015) |
| 09/22/2015 | 38 | MOTION for Order to *Certifying an Interlocutory Appeal and* MOTION to Stay *Litigation Pending Appeal* by Defendant GEO Group, Inc., The. (Deacon, Charles) (Entered: 09/22/2015) |
| 10/13/2015 | 39 | RESPONSE to 38 MOTION for Order to *Certifying an Interlocutory Appeal and* MOTION to Stay *Litigation Pending Appeal* filed by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Free, Robert) (Entered: 10/13/2015) |
| 10/21/2015 | 40 | BRIEF in Support of 38 MOTION for Order to *Certifying an Interlocutory Appeal and* MOTION to Stay *Litigation Pending Appeal* filed by Defendant GEO Group, Inc., The. (Deacon, Charles) (Entered: 10/21/2015) |
| 11/13/2015 | 41 | Unopposed MOTION for Extension of Time to *Complete Class Discovery and Class Certification Briefing* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Milstein, Brandt) (Entered: 11/13/2015) |
| 11/16/2015 | 42 | MINUTE ORDER. Plaintiffs' Unopposed Motion for Extension of Time 41 is GRANTED. It is ORDERED that the parties shall have up to and including January 26, 2016, to complete discovery regarding class certification issues. It is further ORDERED that Plaintiffs' Motion for Class Certification will be filed on or before February 26, 2016; Defendant's response will be filed on or before March 21, 2016; and Plaintiffs' reply will be filed on or before April 7, 2016. Entered by Judge John L. Kane on 11/16/15. Text Only Entry. (jhawk, ) (Entered: 11/16/2015) |
| 02/01/2016 | 43 | NOTICE of Change of Address/Contact Information by Shelby Anne Felton (Felton, Shelby) (Entered: 02/01/2016) |
| 02/05/2016 | 44 | Stipulated MOTION for Protective Order by Defendant GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only))(Felton, Shelby) (Entered: 02/05/2016) |
| 02/08/2016 | 45 | Stipulated Protective Order Concerning Confidential Information re: 44 . Signed by Judge John L. Kane on 02/28/16.(jhawk, ) (Entered: 02/08/2016) |
| 02/10/2016 | 46 | Unopposed MOTION for Extension of Time to *COMPLETE CLASS DISCOVERY and TO FILE A CLASS CERTIFICATION MOTION* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Hood, Alexander) (Entered: 02/10/2016) |
| 02/11/2016 | 47 | MINUTE ORDER. Plaintiffs' Unopposed Motion to Extend Class Discovery and Class Certification Motion Deadline 46 is GRANTED. It is ORDERED that the parties shall have up to and including March 31, 2016, for the taking of a 30 (b)(6) deposition of the defendant. It is further ORDERED that Plaintiffs' Motion for Class Certification will be filed on or before May 6, 2016; Defendant's response will be filed on or before June 1, 2016; and Plaintiffs' reply will be filed on or before June 15, 2016. Entered by Judge John L. Kane on 02/11/16. Text Only Entry.(jhawk, ) (Entered: 02/11/2016) |
| 03/17/2016 | 48 | ORDER on Motion for Interlocutory Appeal. Defendant's Motion for an Interlocutory Appeal (Doc. 38 ) is DENIED and Defendant's request for a stay pending appeal is DENIED AS MOOT. By Judge John L. Kane on 03/17/2016. (athom, ) (Entered: 03/18/2016) |
| 05/06/2016 | 49 | MOTION to Certify Class *UNDER RULE 23(b)(3) and TO APPOINT CLASS COUNSEL UNDER RULE 23(g)* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Ex. 3 - US DOL Wage Determination, # 2 Ex. 5 - Menocal Dec., # 3 Ex. 6 - Xahuentitla Dec., # 4 Ex. 7 - Argueta Dec., # 5 Ex. 8 - Gaytan Dec., # 6 Ex. 9 - Valerga Dec., # 7 Ex. 10 - Ortiz Dec., # 8 Ex. 11 - Hernandez Dec., # 9 Ex. 12 - Mendoza Dec, # 10 Ex. 17 - Plaintiffs' Counsel Decs.) (Hood, Alexander) (Entered: 05/06/2016) |
| 05/06/2016 | 50 | UNRESTRICTED DOCUMENT - Level 1-Exhibits to Motion to Certify 49 by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Ex. 1 - FRCP 30(b)(6) Dep. of Defendant (Dawn Ceja), # 2 Ex. 2 - Policy and Procedure Manual (#1), # 3 Ex. 4 - Detainee Handbook Local Supp., # 4 Ex. 13 - Policy & Procedure Manual (#2), # 5 Ex. 14 - FRCP 30(b)(6) Dep. of Defendant (Melody Jean Furst), # 6 Ex. 15 - Man Days Billing Report Nov. 2012, # 7 Ex. 16 - Detainee Grievances)(Hood, Alexander) Modified on 5/9/2016 to add text (jhawk, ). Modified on 5/23/2016 unrestricted as no motion to restrict was filed (jhawk, ). (Entered: 05/06/2016) |
| 06/01/2016 | 51 | RESPONSE to 49 MOTION to Certify Class *UNDER RULE 23(b)(3) AND TO APPOINT CLASS COUNSEL UNDER RULE 23(g)* filed by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit ICE Aurora Detainee Handbook, # 2 Exhibit PBNDS, # 3 Exhibit ICE National Detainee Handbook, # 4 Exhibit Ceja Declaration, # 5 Exhibit Whyte Decision, # 6 Exhibit VWP Application)(Emery, Mark) (Entered: 06/01/2016) |
| 06/15/2016 | 52 | REPLY to Response to 49 MOTION to Certify Class *UNDER RULE 23(b)(3) AND TO APPOINT CLASS COUNSEL UNDER RULE 23(g)* filed by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Hood, Alexander) (Entered: 06/15/2016) |
| 10/26/2016 | 53 | Unopposed MOTION to Withdraw as Attorney by Defendant GEO Group, Inc., The. (DeMuro, David) (Entered: 10/26/2016) |
| 10/26/2016 | 54 | ORDER granting 53 Motion to Withdraw as Attorney. ORDERED that Attorneys Shelby A. Felton and David R. DeMuro, co-counsel of record for the defendant The Geo Group, Inc., are hereby withdrawn as counsel of record for The Geo Group, Inc. ORDERED that the electronic mail notifications to Shelby A. Felton and David R. DeMuro are terminated in this case. Signed by Judge John L. Kane on 10/26/16.(jhawk, ) (Entered: 10/26/2016) |
| 10/26/2016 | 55 | NOTICE of Entry of Appearance by Dana L. Eismeier on behalf of GEO Group, Inc., TheAttorney Dana L. Eismeier added to party GEO Group, Inc., The(pty:dft) (Eismeier, Dana) (Entered: 10/26/2016) |
| 02/13/2017 | 56 | NOTICE *of Firm Name Change* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla (Turner, Andrew) (Entered: 02/13/2017) |
| 02/27/2017 | 57 | ORDER granting 49 Motion to Certify Class and Appointment of Class Counsel. The classes as proposed in the Motion are certified for Representatives' TVPA and unjust enrichment claims. Alejandro Menocal, Marcos Brambila, Grisel Xahuentitla, Hugo Hernandez, Lourdes Argueta, Jesus Gaytan, Olga Alexalkina, Dagoberto Vizguerra, and Demetrio Valerga are named as representatives of the classes. Attorneys Brandt Milstein, Andrew Turner, Andrew Free, Alexander Hood, David Seligman, Andrew Schmidt, and Hans Meyer are appointed as counsel for the classes. To proceed with this case, the parties shall file a revised Proposed Stipulated Scheduling and Discovery Order by March 27, 2017. Signed by Judge John L. Kane on 02/27/17. (jhawk, ) (Entered: 02/27/2017) |
| 03/14/2017 | 58 | USCA Letter Advising they have docketed permission to appeal pursuant to 28 U.S.C.1292(b) and Fed. R. App. P. 5. USCA Case No 17-701. (Attachments: # 1 Petition for Permission to Appeal Class Certification, # 2 A, # 3 B) (jhawk, ) (Entered: 03/15/2017) |
| 03/27/2017 | 59 | Joint MOTION for Extension of Time to *File Proposed Stipulated Scheduling and Discovery Order* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Hood, Alexander) (Entered: 03/27/2017) |
| 03/28/2017 | 60 | ORDER granting 59 Joint Motion for Extension of Time. The parties shall file a revised Proposed Stipulated Scheduling and Discovery Order by March 31, 2017. Ordered by Judge John L. Kane on 3/28/2017. Text Only Entry (jlksec) (Entered: 03/28/2017) |
| 03/31/2017 | 61 | Proposed Scheduling Order *(Joint, Stipulated)* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Free, Robert) (Entered: 03/31/2017) |
| 04/05/2017 | 62 | ORDER on Proposed Scheduling and Discovery Order 61 . The parties are directed to call in jointly at (303) 844-6118 on or before April 13, 2017, to set a date and time for the conference. The Proposed Order indicates that the parties' dispute the effect of the statutory regulations, 6 C.F.R. 5.41, et seq., on discovery proceedings in this case. Signed by Judge John L. Kane on 04/05/17. (jhawk, ) (Entered: 04/05/2017) |
| 04/11/2017 | 63 | USCA Order. The clerk of this court is directed to open the new appeal once the clerk of the district court notifies this court that the filing fee has been paid. Id. at 5(d)(3). (USCA Case Number 17-701) (jhawk, ) (Entered: 04/12/2017) |
| 04/12/2017 | 64 | MINUTE ORDER SETTING SCHEDULING CONFERENCE. This case is set for an IN PERSON Scheduling Conference before Judge Kane at 11:00 a.m. on Wednesday, June 7, 2017, in Courtroom A802 on the 8th floor of the Alfred A. Arraj U.S. Courthouse, 901 19th Street, Denver. The court will discuss the Proposed Scheduling and Discovery Order (ECF No. 61) at the hearing. Ordered by Judge John L. Kane on 4/12/2017. Text Only Entry (jlksec) (Entered: 04/12/2017) |
| 04/14/2017 | 65 | NOTICE OF APPEAL to re 57 Order on Motion to Certify Class, by Defendant GEO Group, Inc., The. (jhawk, ) (Entered: 04/14/2017) |
| 04/14/2017 | 66 | USCA Appeal Fees received $ 505, receipt number 79387; Full Payment re 65 Notice of Appeal filed by GEO Group, Inc., The. (jhawk, ) (Entered: 04/14/2017) |
| 04/14/2017 | 67 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 65 Notice of Appeal filed by GEO Group, Inc., The to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Docket Sheet, # 2 Preliminary Record)(jhawk, ) (Entered: 04/14/2017) |
| 04/14/2017 | 68 | USCA Case Number 17-1125 for 65 Notice of Appeal filed by GEO Group, Inc., The. (jhawk, ) (Entered: 04/14/2017) |
| 04/25/2017 | 69 | MOTION to Stay *Proceedings Pending Rule 23(f) Review* by Defendant GEO Group, Inc., The. (Emery, Mark) (Entered: 04/25/2017) |
| 04/26/2017 | 70 | TRANSCRIPT ORDER FORM re 65 Notice of Appeal by Defendant GEO Group, Inc., The. (Emery, Mark) (Entered: 04/26/2017) |
| 04/26/2017 | 71 | LETTER TO USCA and all counsel certifying the record is complete as to 65 Notice of Appeal filed by GEO Group, Inc., The. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 17-01125) Text Only Entry (jhawk, ) (Entered: 04/26/2017) |
| 04/26/2017 | 72 | MOTION for Protective Order by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A -- DOJ Letter, # 2 Exhibit B -- DOJ Letter, # 3 Exhibit C -- ICE Letter, # 4 Exhibit D -- ICE Letter) (Eismeier, Dana) (Entered: 04/26/2017) |
| 04/26/2017 | 73 | MOTION to Compel by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit A - Defendant's Disclosures, # 2 Ex. B - Protective Order, # 3 Ex. C - Email from Opposing Counsel, # 4 Ex. D - Defendant's Touhy Correspondence, # 5 Ex. E - Defendant's |

| | | |
|---|---|---|
| | | Discovery Response, # 6 Ex. F - Supplemental Discovery Response)(Hood, Alexander) (Entered: 04/26/2017) |
| 05/10/2017 | 74 | RESPONSE to 72 MOTION for Protective Order filed by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit)(Milstein, Brandt) (Entered: 05/10/2017) |
| 05/11/2017 | 75 | Unopposed MOTION for Extension of Time to File Response/Reply as to 73 MOTION to Compel by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A -- Response to Motion to Compel, # 2 Exhibit A to Response to Motion to Compel - Spreadsheet from AUSA)(Eismeier, Dana) (Entered: 05/11/2017) |
| 05/12/2017 | 76 | MINUTE ORDER GRANTING Doc. 75, Defendant's Unopposed Motion for Permission to File Response out of Time. Doc. [75-1] is accepted as the Response to the Motion to Compel (Doc. 73 ) and Doc. [75-2] is accepted as Exhibit A to the Response to the Motion to Compel. Entered by Judge John L. Kane on 05/12/17. Text Only Entry (jhawk, ) (Entered: 05/12/2017) |
| 05/12/2017 | 77 | RESPONSE to 73 MOTION to Compel filed by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A)(jhawk, ) (Entered: 05/16/2017) |
| 05/16/2017 | 78 | BRIEF in Opposition to 69 MOTION to Stay Proceedings Pending Rule 23(f) Review filed by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Seligman, David) (Entered: 05/16/2017) |
| 05/17/2017 | 79 | REPLY to Response to 72 MOTION for Protective Order filed by Defendant GEO Group, Inc., The. (Eismeier, Dana) (Entered: 05/17/2017) |
| 05/17/2017 | 80 | REPLY to Response to 73 MOTION to Compel filed by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Milstein, Brandt) (Entered: 05/17/2017) |
| 05/22/2017 | 81 | Amicus Curiae Brief filed by Shane Cain (jhawk, ) (Entered: 05/22/2017) |
| 05/30/2017 | 82 | REPLY to Response to 69 MOTION to Stay Proceedings Pending Rule 23(f) Review filed by Defendant GEO Group, Inc., The. (Emery, Mark) (Entered: 05/30/2017) |
| 06/06/2017 | 83 | MOTION to Withdraw as Attorney Substitute Counsel by Defendant GEO Group, Inc., The. (Ley, Michael) (Entered: 06/06/2017) |
| 06/06/2017 | 84 | ORDER Granting Plaintiffs' Motion to Compel 73 and Denying Defendant's Motion for Protective Order 72 . Signed by Judge John L. Kane on 06/06/17. (jhawk, ) (Entered: 06/06/2017) |
| 06/06/2017 | 85 | ORDER Granting in Part and Denying in Part the GEO Group, Inc's Motion to Stay Proceedings Pending Rule 239F0 Review 69 . Specifically, discovery on the class action issues is STAYED, but discovery on the above enumerated issues relating to liability and merits issues shall proceed in accordance with Federal Rule of Civil Procedure 26. Noting GEOs objection to not having been consulted regarding Plaintiffs discovery proposal, the exact number of depositions, requests for production, and interrogatories to be permitted will be addressed at the upcoming scheduling conference on June 7, 2016, at 11 a.m. Signed by Judge John L. Kane on 06/06/17. (jhawk, ) (Entered: 06/06/2017) |
| 06/06/2017 | 86 | MINUTE ORDER GRANTING Motion to Withdraw as Counsel (Doc. 83 ). Given that representation of Defendant will continue through Michael Y. Ley and Dana L. Eismeier of the same law firm, and Charles A. Deacon and Mark Emery of Norton Rose Fulbright US LLP, Attorney Erik Karl Schuessler is authorized to WITHDRAW as counsel. Mr. Schuessler SHALL be REMOVED from future electronic notifications in this case. Entered by Judge John L. Kane on 06/06/17. Text Only Entry (jhawk, ) (Entered: 06/06/2017) |
| 06/07/2017 | 87 | NOTICE of Entry of Appearance by Juno E. Turner on behalf of All Plaintiffs Attorney Juno E. Turner added to party Olga Alexaklina(pty:pla), Attorney Juno E. Turner added to party Lourdes Argueta(pty:pla), Attorney Juno E. Turner added to party Marcos Brambila(pty:pla), Attorney Juno E. Turner added to party Jesus Gaytan(pty:pla), Attorney Juno E. Turner added to party Hugo Hernandez(pty:pla), Attorney Juno E. Turner added to party Alejandro Menocal(pty:pla), Attorney Juno E. Turner added to party Demetrio Valerga(pty:pla), Attorney Juno E. Turner added to party Dagoberto Vizguerra(pty:pla), Attorney Juno E. Turner added to party Grisel Xahuentitla(pty:pla) (Turner, Juno) (Entered: 06/07/2017) |
| 06/07/2017 | 88 | MINUTE ORDER. Directing the parties to submit a revised Proposed Stipulated Scheduling Order on or before June 30, 2017. Entered by Judge John L. Kane on 06/07/17. (jhawk, ) (Entered: 06/07/2017) |
| 06/07/2017 | 89 | MINUTE ENTRY for Scheduling Conference proceedings held before Judge John L. Kane on 6/7/2017. Scheduling Order NOT approved. Court Reporter: Julie Thomas. (babia) (Entered: 06/07/2017) |
| 06/08/2017 | 90 | NOTICE of Entry of Appearance by P. David Lopez on behalf of All Plaintiffs (Lopez, P.) (Entered: 06/08/2017) |
| 06/14/2017 | 91 | NOTICE of Entry of Appearance by Ashley Kathryn Boothby on behalf of All Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla Attorney Ashley Kathryn Boothby added to party Olga Alexaklina(pty:pla), Attorney Ashley Kathryn Boothby added to party Lourdes Argueta(pty:pla), Attorney Ashley Kathryn Boothby added to party Marcos Brambila(pty:pla), Attorney Ashley Kathryn Boothby added to party Jesus Gaytan(pty:pla), Attorney Ashley Kathryn Boothby added to party Hugo Hernandez(pty:pla), Attorney Ashley Kathryn Boothby added to party Alejandro Menocal(pty:pla), Attorney Ashley Kathryn Boothby added to party Demetrio Valerga(pty:pla), Attorney Ashley Kathryn Boothby added to party Dagoberto Vizguerra(pty:pla), Attorney Ashley Kathryn Boothby added to party Grisel Xahuentitla(pty:pla) (Boothby, Ashley) (Entered: 06/14/2017) |
| 06/14/2017 | 92 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES re: 91 Notice of Entry of Appearance, filed by attorneyAshleyK. Boothby. DO NOT REFILE THE DOCUMENT. Action to take - counsel must submit a change of counsel request through the Attorney Services Portal account pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Civil cases).(Text Only Entry) (jhawk, ) (Entered: 06/15/2017) |
| 06/16/2017 | 93 | NOTICE of Entry of Appearance by Elizabeth V. Stork on behalf of All Plaintiffs Attorney Elizabeth V. Stork added to party Olga Alexaklina(pty:pla), Attorney Elizabeth V. Stork added to party Lourdes Argueta(pty:pla), Attorney Elizabeth V. Stork added to party Marcos Brambila(pty:pla), Attorney Elizabeth V. Stork added to party Jesus Gaytan(pty:pla), Attorney Elizabeth V. Stork added to party Hugo Hernandez(pty:pla), Attorney Elizabeth V. Stork added to party Alejandro Menocal(pty:pla), Attorney Elizabeth V. Stork added to party Demetrio Valerga(pty:pla), Attorney Elizabeth V. Stork added to party Dagoberto Vizguerra(pty:pla), Attorney Elizabeth V. Stork added to party Grisel Xahuentitla(pty:pla) (Stork, Elizabeth) (Entered: 06/16/2017) |
| 06/16/2017 | 94 | NOTICE of Entry of Appearance by Ossai Miazad on behalf of All Plaintiffs Attorney Ossai Miazad added to party Olga Alexaklina(pty:pla), Attorney Ossai Miazad added to party Lourdes Argueta(pty:pla), Attorney Ossai Miazad added to party Marcos Brambila(pty:pla), Attorney Ossai Miazad added to party Jesus Gaytan(pty:pla), Attorney Ossai Miazad added to party Hugo Hernandez(pty:pla), Attorney Ossai Miazad added to party Alejandro Menocal(pty:pla), Attorney Ossai Miazad added to party Demetrio Valerga(pty:pla), Attorney Ossai Miazad added to party Dagoberto Vizguerra(pty:pla), Attorney Ossai Miazad added to party Grisel Xahuentitla(pty:pla) (Miazad, Ossai) (Entered: 06/16/2017) |
| 06/20/2017 | 95 | TRANSCRIPT of SCHEDULING CONFERENCE held on 6/7/17 before Judge Kane. Pages: 1-8. <br> **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (Thomas, Julie) (Entered: 06/20/2017) |
| 06/27/2017 | 96 | WITHDRAWN NOTICE of Intent to Request Redaction by Michael York Ley re 95 Transcript,,, (Ley, Michael) Modified to show WITHDRAWN pursuant to ecf 102 on 7/13/2017 (cthom, ). (Entered: 06/27/2017) |
| 06/27/2017 | 97 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES:re: 96 Notice of Intent to Request Redaction filed by attorney Dana L. Eismeier. The s/signature did not match the filers name on the account for which the login and password are registered. DO NOT REFILE THE DOCUMENT. Action to take - future documents must be filed pursuant to D.C.COLO.LCivR 5.1(a) and 4.3(c) of the Electronic Case Filing Procedures (Civil cases).(Text Only Entry) (cthom, ) (Entered: 06/28/2017) |
| 06/30/2017 | 98 | Proposed Scheduling Order by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Hood, Alexander) (Entered: 06/30/2017) |
| 07/11/2017 | 99 | MOTION to Withdraw Notice of Intent to Request Redaction by Defendant GEO Group, Inc., The. (Eismeier, Dana) (Entered: 07/11/2017) |
| 07/13/2017 | 100 | Joint MOTION for Extension of Time to submit Stipulated and Proposed Order Concerning Production of Electronically Stored Information by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Turner, Juno) (Entered: 07/13/2017) |
| 07/13/2017 | 101 | ORDER granting 100 Joint Motion for Extension of Time. The parties will submit to the Court a stipulated ESI Protocol on or before July 28, 2017. Ordered by Judge John L. Kane on 7/13/2017. Text Only Entry (jlkssc) (Entered: 07/13/2017) |
| 07/13/2017 | 102 | ORDER granting 99 Motion to Withdraw Notice of Intent to Request Redaction. The Notice of Intent to Request Redaction 96 is withdrawn. Ordered by Judge John L. Kane on 7/13/2017. Text Only Entry (jlkssc) (Entered: 07/13/2017) |
| 07/14/2017 | 103 | SCHEDULING AND DISCOVERY ORDER by Judge John L. Kane on 7/14/2017. (cthom, ) (Entered: 07/14/2017) |
| 07/28/2017 | 104 | Second MOTION for Extension of Time to File Proposed Stipulated Scheduling and Discovery Order by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Turner, Juno) (Entered: 07/28/2017) |
| 07/28/2017 | 105 | ORDER granting 104 Second Joint Motion for Extension of Time. The parties will submit to the Court a stipulated ESI Protocol on or before August 4, 2017. Ordered by Judge John L. Kane on 7/28/2017. Text Only Entry (jlkssc) (Entered: 07/28/2017) |
| 08/04/2017 | 106 | Third MOTION for Extension of Time to submit Stipulated and Proposed Order Concerning Production of Electronically Stored Information by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Turner, Juno) (Entered: 08/04/2017) |
| 08/04/2017 | 107 | ORDER granting 106 Third Joint Motion for Extension of Time. The parties will submit to the Court a stipulated ESI Protocol on or before August 18, 2017. Ordered by Judge John L. Kane on 8/4/2017. Text Only Entry (jlkssc) (Entered: 08/04/2017) |
| 08/16/2017 | 108 | STIPULATION and Proposed Order Concerning Production of Electronically Stored Information by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Turner, Juno) (Entered: 08/16/2017) |
| 08/22/2017 | 109 | STIPULATION AND ORDER Concerning Production of Electronically Stored Information. ORDERED by Judge John L. Kane on 8/22/2017. (cthom, ) (Entered: 08/22/2017) |
| 09/21/2017 | 110 | Joint MOTION for Order to Entry of Stipulated Order regarding the Disclosure of Privileged Information by Defendant GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only) [Proposed] Stipulated Order regarding the Disclosure of Privileged Information)(Turner, Juno) (Entered: 09/21/2017) |
| 09/21/2017 | 111 | ORDER denying 110 Motion for Order. The parties Joint Motion for Entry of Stipulated Order Regarding the Disclosure of Privileged Information (ECF No. 110) is DENIED. A judicial act requires some basis, even under Federal Rule of Evidence 502(d). Here, the parties offer none. The motion may be re-filed with some justification for issuance of the order. Ordered by Judge John L. Kane on 9/21/2017. Text Only Entry (jlkssc) (Entered: 09/21/2017) |

| 12/18/2017 | 112 | Stipulated MOTION for Extension of Time to *Extend Discovery Cut-Off* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Stork, Elizabeth) (Entered: 12/18/2017) |
|---|---|---|
| 12/18/2017 | 113 | ORDER Amending Scheduling and Discovery Order. IT IS HEREBY ORDERED the 112 Stipulated Motion and Proposed Order to Extend Discovery Cut-off is GRANTED and Plaintiffs shall respond to GEOs Second Set of Written Discovery on or before January 19, 2018. The discovery cut-off is extended to May 4, 2018. ORDERED by Judge John L. Kane on 12/18/2017. (cthom, ) (Entered: 12/19/2017) |
| 02/09/2018 | 114 | USCA Opinion as to 65 Notice of Appeal filed by GEO Group, Inc., The : (USCA Case No. 17-1125) (This document is not the Mandate) (cthom, ) (Entered: 02/12/2018) |
| 02/09/2018 | 115 | USCA Judgment as to 65 Notice of Appeal filed by GEO Group, Inc., The : (USCA Case No. 17-1125) (This document is not the Mandate) "We affirm the district court's certification of both classes. We grant theoutstanding motions for leave to file amicus briefs." (cthom, ) (Entered: 02/12/2018) |
| 02/12/2018 | 116 | MINUTE ORDER In light of the opinion of the Tenth Circuit Court of Appeals, this case is referred to Magistrate Judge Hegarty for him to conduct such conferences and proceedings as he deems appropriate for purposes of settlement. The parties amended Proposed Stipulated Scheduling Order shall be filed on or before March 12, 2018. ORDERED by Judge John L. Kane on 2/12/2018. (cthom, ) (Entered: 02/13/2018) |
| 02/13/2018 | 117 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 02/13/2018. Pursuant to the Order of Reference issued by the Honorable John L. Kane, ECF No. 116, on or before 2/16/2018, counsel for the parties shall first teleconference together, then call my chambers at (303) 844-4507 to schedule a Settlement Conference in this case. (mdave, ) (Entered: 02/13/2018) |
| 02/14/2018 | 118 | NOTICE of Entry of Appearance by Rachel Williams Dempsey on behalf of All Plaintiffs Attorney Rachel Williams Dempsey added to party Olga Alexalkina(pty:pla), Attorney Rachel Williams Dempsey added to party Lourdes Argueta(pty:pla), Attorney Rachel Williams Dempsey added to party Marcos Brambila(pty:pla), Attorney Rachel Williams Dempsey added to party Jesus Gaytan(pty:pla), Attorney Rachel Williams Dempsey added to party Hugo Hernandez(pty:pla), Attorney Rachel Williams Dempsey added to party Alejandro Menocal(pty:pla), Attorney Rachel Williams Dempsey added to party Demetrio Valerga(pty:pla), Attorney Rachel Williams Dempsey added to party Dagoberto Vizguerra(pty:pla), Attorney Rachel Williams Dempsey added to party Grisel Xahuentitla(pty:pla) (Dempsey, Rachel) (Entered: 02/14/2018) |
| 02/16/2018 | 119 | Unopposed MOTION to Withdraw as Attorney *of Record* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Proposed Order (PDF Only))(Stork, Elizabeth) (Entered: 02/16/2018) |
| 02/16/2018 | 120 | ORDER granting 119 Unopposed Motion for Withdrawal of Appearance. Elizabeth V. Stork is withdrawn as counsel of record for the Plaintiffs in the above-captioned matter. The clerk is directed to remove Elizabeth V. Stork from the CM/ECF notification system in connection with this case. ORDERED by Judge John L. Kane on 2/16/2018. (cthom, ) (Entered: 02/16/2018) |
| 02/20/2018 | 121 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 02/20/2018. Settlement Conference set for 5/2/2018 10:00 AM in Courtroom A 501 before Magistrate Michael E. Hegarty. (mdave, ) (Entered: 02/20/2018) |
| 03/05/2018 | 122 | ORDER of USCA as to 65 Notice of Appeal filed by GEO Group, Inc., The. (USCA Case No. 17-1125) (cthom, ) (Entered: 03/06/2018) |
| 03/09/2018 | 123 | Stipulated MOTION for Extension of Time to *File Amended Proposed Stipulated Scheduling Order* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Turner, Juno) (Entered: 03/09/2018) |
| 03/09/2018 | 124 | ORDER granting 123 Motion for Extension of Time to File Amended Proposed Stipulated Scheduling Order. The deadline to file an Amended Proposed Stipulated Scheduling Order is extended to June 1, 2018. Ordered by Judge John L. Kane on 3/9/2018. Text Only Entry (jlksec) (Entered: 03/09/2018) |
| 03/13/2018 | 125 | MANDATE of USCA as to 115 USCA Order/Opinion/Judgment, 65 Notice of Appeal filed by GEO Group, Inc., The : (USCA Case No. 17-1125) (cthom, ) (Entered: 03/13/2018) |
| 03/14/2018 | 126 | Unopposed MOTION for Leave to *Excuse In-Person Attendance at the Settlement Conference* 121 Minute Order by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Milstein, Brandt) (Entered: 03/14/2018) |
| 03/16/2018 | 127 | MINUTE ORDER granting 126 Plaintiffs Unopposed Motion to Excuse In-person Attendance at the Settlement Conference by Magistrate Judge Michael E. Hegarty on 03/16/2018. (mdave, ) (Entered: 03/16/2018) |
| 05/04/2018 | 128 | MINUTE ENTRY FOR SETTLEMENT for proceedings held before Magistrate Judge Michael E. Hegarty: Settlement Conference was held on 5/2/2018 and no settlement was reached as to any claims in this action. (mdave, ) (Entered: 05/04/2018) |
| 05/15/2018 | 129 | NOTICE of Change of Address/Contact Information *for Plaintiffs' Attorney Alexander Hood* by Alexander Neville Hood (Hood, Alexander) (Entered: 05/15/2018) |
| 05/15/2018 | 130 | NOTICE of Change of Address/Contact Information *for Plaintiffs' Attorney David Seligman* by David Hollis Seligman (Seligman, David) (Entered: 05/15/2018) |
| 05/29/2018 | 131 | NOTICE of Change of Address/Contact Information by Rachel Williams Dempsey (Dempsey, Rachel) (Entered: 05/29/2018) |
| 05/31/2018 | 132 | MINUTE ORDER. The deadline to file an Amended Proposed Stipulated Scheduling Order is extended to Monday, June 18, 2018. Ordered by Judge John L. Kane on 5/31/2018. Text Only Entry (jlksec) (Entered: 05/31/2018) |
| 06/11/2018 | 133 | Letter from U.S. Supreme Court regarding Petition for Writ of Certiorari re 65 Notice of Appeal ; assigned Supreme Court No. 17-1648 ( Appeal No. 17-1125) (cthom, ) (Entered: 06/11/2018) |
| 06/18/2018 | 134 | MINUTE ORDER. The deadline to file an Amended Proposed Stipulated Scheduling Order is extended to Monday, July 23, 2018. Ordered by Judge John L. Kane on 6/18/2018. Text Only Entry (jlksec) (Entered: 06/18/2018) |
| 07/23/2018 | 135 | MINUTE ORDER. The deadline to file an Amended Proposed Stipulated Scheduling Order is extended to Wednesday, August 22, 2018. Ordered by Judge John L. Kane on 7/23/2018. Text Only Entry (jlksec) (Entered: 07/23/2018) |
| 08/08/2018 | 136 | NOTICE of Change of Address/Contact Information by Andrew Hess Turner (Turner, Andrew) (Entered: 08/08/2018) |
| 08/16/2018 | 137 | MINUTE ENTRY for proceedings held before Magistrate Judge Michael E. Hegarty. Settlement Conference held on 8/16/2018. FTR: Hegarty (A501). (tsher, ) (Entered: 08/16/2018) |
| 08/20/2018 | 138 | NOTICE of Entry of Appearance by Elizabeth V. Stork on behalf of Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla (Stork, Elizabeth) (Entered: 08/20/2018) |
| 08/22/2018 | 139 | Proposed Scheduling Order by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit B)(Turner, Juno) (Entered: 08/22/2018) |
| 08/24/2018 | 140 | NOTICE of Entry of Appearance *for Naomi Beer* by Naomi G. Beer on behalf of GEO Group, Inc., TheAttorney Naomi G. Beer added to party GEO Group, Inc., The(pty:dft) (Beer, Naomi) (Entered: 08/24/2018) |
| 08/24/2018 | 141 | NOTICE of Entry of Appearance *for David G. Palmer* by David G. Palmer on behalf of GEO Group, Inc., TheAttorney David G. Palmer added to party GEO Group, Inc., The(pty:dft) (Palmer, David) (Entered: 08/24/2018) |
| 08/29/2018 | 142 | MINUTE ORDER. After reviewing the Amended Proposed Stipulated Scheduling Order, I would like to set a Scheduling Conference. Counsel are instructed to call chambers JOINTLY on or before September 12, 2018, to set a date and time for the conference - 303-844-6118. The parties are instructed to refile the Proposed Scheduling Order incorporating Exhibit A dates directly into the order. Ordered by Judge John L. Kane on 8/29/2018. Text Only Entry (jlksec) (Entered: 08/29/2018) |
| 08/30/2018 | 143 | BRIEF *in Support of Defendant's Request for Depositions of Absent Class Members* by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A (Roberts Decision), # 2 Exhibit B (Hayter Declaration))(Eismeier, Dana) (Entered: 08/30/2018) |
| 08/30/2018 | 144 | MOTION for Discovery *Order re Plaintiffs' Opposition to Defendants' Request for Depositions of Absent Class Members* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Affidavit of Juno Turner, # 2 Exhibit A, # 3 Exhibit B, # 4 Certificate of Service) (Turner, Juno) (Entered: 08/30/2018) |
| 09/06/2018 | 145 | MINUTE ORDER SETTING SCHEDULING CONFERENCE. This case is set for a Scheduling Conference at 10:30 a.m. on Wednesday, October 3, 2018, before Judge John L. Kane in Courtroom A802 on the 8th floor of the Alfred A. Arraj U.S. Courthouse, 901 19th Street, Denver, Colorado. Parties wishing to listen in telephonically may call chambers JOINTLY immediately prior to the hearing and the call will be transferred to the courtroom - 303-844-6118. Ordered by Judge John L. Kane on 9/6/2018. Text Only Entry (jlksec) (Entered: 09/06/2018) |
| 09/11/2018 | 146 | NOTICE of Entry of Appearance by Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Turner, Juno) (Entered: 09/11/2018) |
| 09/18/2018 | 147 | ORDER denying Defendant's 143 Request to Depose Absent Class Members. ORDERED by Judge John L. Kane on 9/18/2018. (cthom, ) (Entered: 09/18/2018) |
| 10/01/2018 | 148 | Letter from U.S. Supreme Court regarding Petition for Writ of Certiorari re 65 Notice of Appeal ; assigned Supreme Court No. 17-1648 ( Appeal No. 17-1125) "The petition for a writ of certiorari is denied." (cthom, ) (Entered: 10/02/2018) |
| 10/03/2018 | 149 | AMENDED STIPULATED SCHEDULING AND DISCOVERY ORDER Stipulated Protective Order due on or before October 31, 2018. The parties' proposed notice and plan for notice to the class shall be submitted on or before October 31, 2018 Deadline to Amend Pleadings: November 19, 2018. Discovery Cut-off: August 21, 2019. Expert disclosures: October 7, 2019. Rebuttal experts: November 22, 2019. Dispositive Motion Deadline: March 6, 2020. by Judge John L. Kane on 10/3/2018. (cthom, ) Modified to add dates on 10/3/2018 (cthom, ). (Entered: 10/03/2018) |
| 10/03/2018 | 150 | MINUTE ENTRY for Scheduling Conference proceedings held before Judge John L. Kane on 10/3/2018. Scheduling Order approved and signed. Court Reporter: Terri Lindblom. (babia) (Entered: 10/03/2018) |
| 10/31/2018 | 151 | Joint STATUS REPORT *and Stipulated Motion for Brief Extension* by Defendant GEO Group, Inc., The. (Beer, Naomi) Modified to add motion event on 11/1/2018 . (Entered: 10/31/2018) |
| 11/01/2018 | 152 | ORDER granting 151 Joint Status Report and Stipulated Motion for Brief Extension. The parties shall submit a proposed Rule 502(b) Order and a revised Protective Order on or before November 20, 2018. The deadline to submit a proposed Notice Plan is extended such that the Notice Plan is due two weeks after the Court has approved a revised Protective Order. Ordered by Judge John L. Kane on 11/1/2018. Text Only Entry (jlksec) (Entered: 11/01/2018) |

APP. 4

| 11/12/2018 | 153 | NOTICE of Entry of Appearance by Adam Levin Koshkin on behalf of Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel XahuentitlaAttorney Adam Levin Koshkin added to party Olga Alexaklina(pty:pla), Attorney Adam Levin Koshkin added to party Lourdes Argueta(pty:pla), Attorney Adam Levin Koshkin added to party Marcos Brambila(pty:pla), Attorney Adam Levin Koshkin added to party Jesus Gaytan(pty:pla), Attorney Adam Levin Koshkin added to party Hugo Hernandez(pty:pla), Attorney Adam Levin Koshkin added to party Alejandro Menocal(pty:pla), Attorney Adam Levin Koshkin added to party Demetrio Valerga(pty:pla), Attorney Adam Levin Koshkin added to party Dagoberto Vizguerra(pty:pla), Attorney Adam Levin Koshkin added to party Grisel Xahuentitla(pty:pla) (Koshkin, Adam) (Entered: 11/12/2018) |
|---|---|---|
| 11/20/2018 | 154 | AMENDED Joint Motion for Entry of Stipulated Order Regarding the Disclosure of Privileged Information Pursuant to FRE 502(d) by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A) (Beer, Naomi) Modified to correct title and added motion event on 11/21/2018 (cthom, ). (Entered: 11/20/2018) |
| 11/20/2018 | 155 | Stipulated Motion for Entry of Proposed Amended Protective Order by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit Amended Stipulated Protective Order Concerning Confidential Information)(Beer, Naomi) Modified to correct title and add motion event on 11/21/2018 (cthom, ). (Entered: 11/20/2018) |
| 11/26/2018 | 156 | STIPULATED ORDER Regarding the Disclosure of Privileged Information by Judge John L. Kane on 11/26/2018. (cthom, ) (Entered: 11/26/2018) |
| 11/26/2018 | 157 | AMENDED STIPULATED PROTECTIVE ORDER Concerning Confidential Information. ORDERED by Judge John L. Kane on 11/26/2018. (cthom, ) (Entered: 11/26/2018) |
| 12/10/2018 | 158 | Joint MOTION for Extension of Time to submit a proposed Notice Plan by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Turner, Juno) (Entered: 12/10/2018) |
| 12/11/2018 | 159 | ORDER granting 158 Motion for Extension of Time. The deadline to submit a proposed Notice Plan is extended to January 11, 2019. Ordered by Judge John L. Kane on 12/11/2018. Text Only Entry (jlksec) (Entered: 12/11/2018) |
| 12/17/2018 | 160 | Unopposed MOTION to Withdraw as Attorney by Defendant GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only))(Deacon, Charles) (Entered: 12/17/2018) |
| 12/18/2018 | 161 | ORDER granting 160 Unopposed Motion to Withdraw as Attorney. Charles A. Deacon and Mark Emery of the firm of Norton Rose Fulbright US LLP are withdrawn as counsel of record for the Defendant. ORDERED by Judge John L. Kane on 12/18/2018. (cthom, ) (Entered: 12/18/2018) |
| 01/11/2019 | 162 | Joint MOTION for Issuance of Plaintiffs' Class Notice Distribution Plan by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit A - Class Notice, # 2 Exhibit B - Sample Radio Advertisement Script, # 3 Exhibit C - Sample Online Advertisement Text, # 4 Exhibit D - Proposed Press Release)(Turner, Juno) (Entered: 01/11/2019) |
| 01/14/2019 | 163 | ORDER Approving Plaintiffs' Class Notice Plan by Judge John L. Kane on 1/14/2019. (Attachments: # 1 Class Notice, # 2 Radio Advertisement Script, # 3 Online Advertisement Text, # 4 Press Release) (cthom, ) (Entered: 01/14/2019) |
| 03/12/2019 | 164 | NOTICE of Entry of Appearance by Valerie Eifert Brown on behalf of GEO Group, Inc., TheAttorney Valerie Eifert Brown added to party GEO Group, Inc., The(pty:dft) (Brown, Valerie) (Entered: 03/12/2019) |
| 03/12/2019 | 165 | MOTION to Withdraw as Attorney of Record by Defendant GEO Group, Inc., The. (Beer, Naomi) (Entered: 03/12/2019) |
| 03/13/2019 | 166 | ORDER granting 165 Motion to Withdraw as Attorney. David G. Palmer and Naomi G. Beer of the firm of Greenberg Traurig, LLP are withdrawn as counsel of record for the Defendant in the above-captioned matter. Scott A. Schipma is not an attorney of record in the case. ORDERED by Judge John L. Kane on 3/13/2019. (cthom, ) (Entered: 03/13/2019) |
| 03/14/2019 | 167 | NOTICE of Entry of Appearance by Carolyn Patrice Short on behalf of GEO Group, Inc., TheAttorney Carolyn Patrice Short added to party GEO Group, Inc., The(pty:dft) (Short, Carolyn) (Entered: 03/14/2019) |
| 03/18/2019 | 168 | WITHDRAWN MOTION to Compel by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Affidavit of Juno Turner, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit O)(Turner, Juno) Modified to show withdrawn pursuant to 175 Order on 4/3/2019 (cthom, ). (Entered: 03/18/2019) |
| 03/18/2019 | 169 | (RESTRICTED DOCUMENT - Level 1) Exhibits by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit N)(Turner, Juno) Modified to add title on 3/19/2019 (cthom, ). (Entered: 03/18/2019) |
| 03/20/2019 | 170 | MINUTE ORDER re: 168 Defendant is DIRECTED to file a Response to Plaintiffs' Motion to Compel on or before April 2, 2019. Additionally, the parties are DIRECTED to call chambers JOINTLY at (303) 844-6118 on or before March 26, 2019, to set a date and time for a hearing on the motion. Available dates for the hearing are April 8th, 9th, or 11th. In-person attendance by at least one attorney for each side is required. Ordered by Judge John L. Kane on 3/20/2019. Text Only Entry (jlksec) (Entered: 03/20/2019) |
| 03/22/2019 | 171 | MINUTE ORDER re: 168 Motion to Compel. A Motion Hearing is set for Tuesday, April 9, 2019, at 10:30 AM before Judge John L. Kane in Courtroom A802 of the Alfred A. Arraj U.S. Courthouse, 901 19th Street, Denver, Colorado. Ordered by Judge John L. Kane on 3/22/2019. Text Only Entry (jlksec) (Entered: 03/22/2019) |
| 04/01/2019 | 172 | MOTION for Leave to Restrict by Defendant GEO Group, Inc., The. (Eismeier, Dana) (Entered: 04/01/2019) |
| 04/02/2019 | 173 | ORDER granting 172 Motion for Leave to Restrict. ORDERED by Judge John L. Kane on 4/2/2019. (cthom, ) (Entered: 04/02/2019) |
| 04/02/2019 | 174 | STIPULATION re 168 MOTION to Compel by Defendant GEO Group, Inc., The. (Short, Carolyn) (Entered: 04/02/2019) |
| 04/03/2019 | 175 | ORDER Regarding Plaintiffs' 168 Motion to Compel and 174 Stipulation of Plaintiffs' Motion to Compel Discovery. The 174 Stipulation is construed as a Motion to Withdraw the 168 Motion to Compel and is GRANTED. Plaintiffs' Motion to Compel is WITHDRAWN without prejudice to refile, and the Motion Hearing set for April 9, 2019, at 10:30 a.m. is VACATED. ORDERED by Judge John L. Kane on 4/3/2019. (cthom, ) (Entered: 04/03/2019) |
| 04/04/2019 | 176 | NOTICE of Entry of Appearance by Stacy Delayne Blank on behalf of GEO Group, Inc., TheAttorney Stacy Delayne Blank added to party GEO Group, Inc., The(pty:dft) (Blank, Stacy) (Entered: 04/04/2019) |
| 04/26/2019 | 177 | MOTION to Withdraw Affirmative Defense No. 20 by Defendant GEO Group, Inc., The. (Short, Carolyn) (Entered: 04/26/2019) |
| 04/29/2019 | 178 | ORDER granting 177 Unopposed Motion to Withdraw an Affirmative Defense Stated in Defendant's Answer. ORDERED by Judge John L. Kane on 4/29/2019.(cthom, ) (Entered: 04/29/2019) |
| 05/16/2019 | 179 | NOTICE of Change of Address/Contact Information and Change of Firm by Juno E. Turner (Turner, Juno) (Entered: 05/16/2019) |
| 05/30/2019 | 180 | NOTICE of Entry of Appearance by Michael J. Scimone on behalf of Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel XahuentitlaAttorney Michael J. Scimone added to party Olga Alexaklina(pty:pla), Attorney Michael J. Scimone added to party Lourdes Argueta(pty:pla), Attorney Michael J. Scimone added to party Marcos Brambila(pty:pla), Attorney Michael J. Scimone added to party Jesus Gaytan(pty:pla), Attorney Michael J. Scimone added to party Hugo Hernandez(pty:pla), Attorney Michael J. Scimone added to party Alejandro Menocal(pty:pla), Attorney Michael J. Scimone added to party Demetrio Valerga(pty:pla), Attorney Michael J. Scimone added to party Dagoberto Vizguerra(pty:pla), Attorney Michael J. Scimone added to party Grisel Xahuentitla(pty:pla) (Scimone, Michael) (Entered: 05/30/2019) |
| 05/30/2019 | 181 | MOTION to Compel 30(b)(6) Deposition and Videotaped Inspection by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Affidavit of Michael Scimone, # 2 Affidavit of Alexander Hood, # 3 Index of Exhibits, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # 11 Exhibit H, # 12 Exhibit I, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit L, # 16 Exhibit M, # 17 Exhibit N, # 18 Exhibit O, # 19 Exhibit P, # 20 Exhibit Q, # 21 Exhibit R, # 22 Proposed Order (PDF Only))(Scimone, Michael) (Entered: 05/30/2019) |
| 06/11/2019 | 182 | NOTICE of Entry of Appearance by Patrick J. McCabe on behalf of GEO Group, Inc., TheAttorney Patrick J. McCabe added to party GEO Group, Inc., The(pty:dft) (McCabe, Patrick) (Entered: 06/11/2019) |
| 06/13/2019 | 183 | MOTION to Withdraw as Attorney Ashley K. Boothby by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Turner, Andrew) (Entered: 06/13/2019) |
| 06/14/2019 | 184 | ORDER granting 183 Motion to Withdraw as Attorney Ashley Kathryn Boothby. ORDERED by Judge John L. Kane on 6/14/2019.(cthom, ) (Entered: 06/14/2019) |
| 06/18/2019 | 185 | Unopposed MOTION to Amend/Correct/Modify 163 Order for Issuance by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Proposed Order (PDF Only), # 2 Affidavit of Michael Scimone, # 3 Affidavit of Anna Joseph, # 4 Affidavit of Nicole Ramos, # 5 Affidavit of Nan Schivone, # 6 Affidavit of Scott Simpson)(Scimone, Michael) (Entered: 06/18/2019) |
| 06/20/2019 | 186 | ORDER granting Plaintiffs' 185 Unopposed Motion to Amend Notice Plan. No later than July 22, 2019, Plaintiffs shall distribute notice to the class as ordered for a ninety (90) day period. ORDERED by Judge John L. Kane on 6/20/2019. (cthom, ) (Entered: 06/20/2019) |
| 06/20/2019 | 187 | BRIEF in Opposition to 181 MOTION to Compel 30(b)(6) Deposition and Videotaped Inspection filed by Defendant GEO Group, Inc., The. (Attachments: # 1 Affidavit of Dawn Ceja, # 2 Affidavit of Valerie Brown, # 3 Exhibit Index of Exhibits, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # 11 Exhibit I)(Short, Carolyn) (Entered: 06/20/2019) |
| 06/20/2019 | 188 | NOTICE of Filing of Exhibit H re 187 Brief by Defendant GEO Group, Inc., The. (Short, Carolyn) Modified to add text pursuant to 191 Order on 6/28/2019 (cthom, ). (Entered: 06/20/2019) |
| 06/20/2019 | 189 | (RESTRICTED DOCUMENT - Level 1) Exhibit H to 187 Brief in Opposition by Defendant GEO Group, Inc., The. (Short, Carolyn) Modified to add title on 6/21/2019 (cthom, ). (Entered: 06/20/2019) |
| 06/27/2019 | 190 | MOTION for Leave to Restrict by Defendant GEO Group, Inc., The. (Short, Carolyn) (Entered: 06/27/2019) |
| 06/28/2019 | 191 | ORDER Granting 190 Motion for Leave to Restrict and Directing the Clerk to terminate 188 Motion and modify the text to read "Notice of Filing of Exhibit." ORDERED by Judge John L. Kane on 6/28/2019.(cthom, ) (Entered: 06/28/2019) |
| 07/03/2019 | 192 | REPLY to Response to 181 MOTION to Compel 30(b)(6) Deposition and Videotaped Inspection filed by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Affidavit of Michael Scimone, # 2 Affidavit of Anna Joseph, # 3 Exhibit B)(Scimone, Michael) (Entered: 07/03/2019) |
| 07/11/2019 | 193 | MOTION for Leave to File Surreply to 181 MOTION to Compel 30(b)(6) Deposition and Videotaped Inspection by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A)(Short, Carolyn) (Entered: 07/11/2019) |
| 07/11/2019 | 194 | DECLARATION of Valerie Brown regarding MOTION for Leave to File Surreply to 181 MOTION to Compel 30(b)(6) Deposition and Videotaped Inspection 193 by Defendant GEO Group, Inc., The. (Entered: 07/11/2019) |

1/21/23, 2:19 PM                                                                                                CM/ECF - U.S. District Court:cod

| | | |
|---|---|---|
| 07/19/2019 | 195 | Stipulated MOTION for Extension of Time to *Provide Class Notice* by Plaintiffs Olga Alexaklina, Lourdes Arguita, Marcos Brambula, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Proposed Order (PDF Only))(Stork, Elizabeth) (Entered: 07/19/2019) |
| 07/19/2019 | 196 | ORDER granting 195 Stipulated Motion to Extend the Notice Deadline. No later than August 21, 2019, Plaintiffs shall distribute notice to the class according to the 186 Class Notice Plan approved by the Court. ORDERED by Judge John L. Kane on 7/19/2019.(cthom, ) (Entered: 07/19/2019) |
| 07/29/2019 | 197 | Joint MOTION to Extend Discovery Deadlines by Defendant GEO Group, Inc., The. (Short, Carolyn) Modified on 7/30/2019 to edit title. (sphil, ). (Entered: 07/29/2019) |
| 07/30/2019 | 198 | ORDER granting 197 Joint Motion to Extend Discovery Deadlines. AMENDED STIPULATED SCHEDULING AND DISCOVERY ORDER. The Discovery Cut-off is extended to October 21, 2019; expert disclosures are due November 21, 2019; rebuttal experts disclosures due January 6, 2020; expert witness depositions due by February 7, 2020; and Dispositive Motion Deadline is extended to April 20, 2020. Ordered by Judge John L. Kane on 7/30/2019. Text Only Entry(jlksec) (Entered: 07/30/2019) |
| 08/01/2019 | 199 | NOTICE of Entry of Appearance by Colin Louis Barnacle on behalf of GEO Group, Inc., TheAttorney Colin Louis Barnacle added to party GEO Group, Inc., The(pty:dft) (Barnacle, Colin) (Entered: 08/01/2019) |
| 08/01/2019 | 200 | NOTICE of Entry of Appearance by Christopher John Eby on behalf of GEO Group, Inc., TheAttorney Christopher John Eby added to party GEO Group, Inc., The(pty:dft) (Eby, Christopher) (Entered: 08/01/2019) |
| 08/01/2019 | 201 | NOTICE of Entry of Appearance by Ashley Elizabeth Calhoun on behalf of GEO Group, Inc., TheAttorney Ashley Elizabeth Calhoun added to party GEO Group, Inc., The(pty:dft) (Calhoun, Ashley) (Entered: 08/01/2019) |
| 08/01/2019 | 202 | MOTION to Withdraw as Attorney for GEO Group, Inc., The. (Short, Carolyn) (Entered: 08/01/2019) |
| 08/01/2019 | 203 | MINUTE ORDER. Pursuant to D.C.COLO.LAttyR 5(b), any attorney wanting to withdraw from a case who has already made an appearance must do so by filing a Motion to Withdraw as Counsel, electronically ("s/") signed, using his/her own e/cf account. However, having noticed and reviewed Ms. Short's Motion to Withdraw Appearance 202 and under the circumstances presented, it is ORDERED that the Motion is GRANTED. Carolyn Short, Valerie Brown, Patrick McCabe and Stacy Blank of Holland & Knight LLP are authorized to WITHDRAW as counsel. They shall be removed from future electronic notifications in this case. ORDERED by Judge John L. Kane on 8/1/20199. Text Only Entry(sphil, ) (Entered: 08/01/2019) |
| 08/20/2019 | 204 | Stipulated MOTION for Extension of Time to *Provide Class Notice* by Plaintiffs Olga Alexaklina, Lourdes Arguita, Marcos Brambula, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Proposed Order (PDF Only))(Scimone, Michael) (Entered: 08/20/2019) |
| 08/20/2019 | 205 | ORDER by Judge John L. Kane on 8/20/2019, re 204 Plaintiffs' Stipulated Motion to Extend the Class Notice Deadline is GRANTED and ORDERS as follows: **No later than October 21, 2019**, Plaintiffs shall distribute notice to the class according to the Class Notice Plan approved by the Court No. 186). (sphil, ) (Entered: 08/20/2019) |
| 09/10/2019 | 206 | Supplemental Brief in further support to 181 MOTION to Compel *30(b)(6) Deposition and Videotaped Inspection of Filing of Supplemental Brief in Further Support* by Plaintiffs Olga Alexaklina, Lourdes Arguita, Marcos Brambula, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla (Attachments: # 1 Affidavit of Michael Scimone, # 2 Exhibit A)(Scimone, Michael) Modified on 9/19/2019 to edit document title. (sphil, ). (Entered: 09/10/2019) |
| 09/24/2019 | 207 | Third MOTION to Compel *Production of Documents and Enforce This Courts Prior Order* by Plaintiffs Olga Alexaklina, Lourdes Arguita, Marcos Brambula, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 09/24/2019) |
| 09/24/2019 | 208 | DECLARATION of *Michael J. Scimone* regarding Third MOTION to Compel *Production of Documents and Enforce This Courts Prior Order* 207 by Plaintiffs Olga Alexaklina, Lourdes Arguita, Marcos Brambula, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Scimone, Michael) (Entered: 09/24/2019) |
| 09/24/2019 | 209 | MINUTE ORDER by Judge John L. Kane on 9/24/2019. Upon review of Plaintiffs' Supplemental Brief in Further Support of Motion to Compel (Doc. 206) and Plaintiffs' Motion to Compel Production of Documents and Enforce this Courts Prior Order (Doc. 207), The Motion to Compel responses from Defendant The GEO Group, Inc. are necessary. Consequently, GEO is **DIRECTED** to file a Supplemental Response to Plaintiffs' Supplemental Brief (Doc. 206) and a Response to Plaintiffs newest Motion to Compel (Doc. 207) **on or before October 1, 2019**. The expedited timeline is dictated by the impending depositions. Text Only Entry. (sphil, ) Modified on 9/24/2019 to edit text. (sphil, ) (Entered: 09/24/2019) |
| 10/01/2019 | 210 | RESPONSE to 206 Notice (Other), by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A - ICE Correspondence)(Barnacle, Colin) (Entered: 10/01/2019) |
| 10/01/2019 | 211 | RESPONSE to 207 Third MOTION to Compel *Production of Documents and Enforce This Courts Prior Order* filed by Defendant GEO Group, Inc., The. (Barnacle, Colin) (Entered: 10/01/2019) |
| 10/02/2019 | 212 | REPLY to Response to 207 Third MOTION to Compel *Production of Documents and Enforce This Courts Prior Order and Reply to Response to* 206 *Notice*. filed by Plaintiffs Olga Alexaklina, Lourdes Arguita, Marcos Brambula, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 10/02/2019) |
| 10/02/2019 | 213 | DECLARATION of *Michael J. Scimone* regarding Reply to Response to Motion, 212 by Plaintiffs Olga Alexaklina, Lourdes Arguita, Marcos Brambula, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit A)(Scimone, Michael) (Entered: 10/02/2019) |
| 10/02/2019 | 214 | AMENDED ORDER OF REFERENCE TO MAGISTRATE JUDGE. Pursuant to 28 U.S.C. §636(b) (1)(A) and (B) and Fed.R.Civ.P. 72(a), United States Magistrate Judge Michael Hegarty is designated to conduct proceedings in this civil action as follows: Conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause; Convene such settlement conferences and direct related procedures as may facilitate resolution of this case; Hear and determine pretrial matters, including discovery and other non-dispositive motions; Refer the cases to a special master, if necessary, by Judge John L. Kane on 10/2/2019. (evana, ) (Entered: 10/02/2019) |
| 10/02/2019 | 215 | MEMORANDUM regarding 181 MOTION to Compel *30(b)(6) Deposition and Videotaped Inspection* filed by Lourdes Arguita, Demetrio Valerga, Dagoberto Vizguerra, Hugo Hernandez, Marcos Brambula, Alejandro Menocal, Grisel Xahuentitla, Jesus Gaytan, 207 Third MOTION to Compel *Production of Documents and Enforce This Courts Prior Order* filed by Lourdes Arguita, Demetrio Valerga, Dagoberto Vizguerra, Olga Alexaklina, Marcos Brambula, Hugo Hernandez, Grisel Xahuentitla, Alejandro Menocal, Jesus Gaytan, 193 MOTION for Leave to *File Surreply* to 181 MOTION to Compel *30(b)(6) Deposition and Videotaped Inspection* filed by GEO Group, Inc. Motions referred to Magistrate Judge Michael E. Hegarty by Judge John L. Kane on 10/2/2019. Text Only Entry (jlksec) (Entered: 10/02/2019) |
| 10/03/2019 | 216 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 10/3/2019 denying without prejudice 181 Motion to Compel 30(b)(6) Deposition and Videotaped Inspection and 207 Motion to Compel Production of Documents and Enforce This Courts Prior Order. 193 Motion for Leave to File Surreply is granted in part and denied in part. (tsher, ) (Entered: 10/03/2019) |
| 10/08/2019 | 217 | Stipulated MOTION for Extension of Time to *Complete Discovery* by Plaintiffs Olga Alexaklina, Lourdes Arguita, Marcos Brambula, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 10/08/2019) |
| 10/08/2019 | 218 | MEMORANDUM regarding 217 Stipulated MOTION for Extension of Time to *Complete Discovery* filed by Lourdes Arguita, Demetrio Valerga, Dagoberto Vizguerra, Olga Alexaklina, Hugo Hernandez, Marcos Brambula, Alejandro Menocal, Grisel Xahuentitla, Jesus Gaytan. Motions referred to Magistrate Judge Michael E. Hegarty by Judge John L. Kane on 10/8/2019. Text Only Entry (jlksec) (Entered: 10/08/2019) |
| 10/09/2019 | 219 | MINUTE ORDER granting 217 Stipulated Motion to Extend Discovery Deadlines File by Magistrate Judge Michael E. Hegarty on 10/9/2019. Designation due by 12/23/2019. Discovery due by 11/21/2019. Designation of Rebuttal Experts due 2/6/2020(tsher, ) (Entered: 10/09/2019) |
| 10/11/2019 | 220 | Joint STATUS REPORT by Defendant GEO Group, Inc., The. (Barnacle, Colin) (Entered: 10/11/2019) |
| 10/15/2019 | 221 | Set Hearing: Informal Discovery Conference set for 10/18/2019 10:30 AM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty pursuant to 216 Minute Order. Text Only Entry. (tsher, ) (Entered: 10/15/2019) |
| 10/16/2019 | 222 | NOTICE of Entry of Appearance by Melissa Louise Cizmorris on behalf of GEO Group, Inc., TheAttorney Melissa Louise Cizmorris added to party GEO Group, Inc., The(pty:dft) (Cizmorris, Melissa) (Entered: 10/16/2019) |
| 10/16/2019 | 223 | NOTICE of Entry of Appearance by Allison N. Angel on behalf of GEO Group, Inc., TheAttorney Allison N. Angel added to party GEO Group, Inc., The(pty:dft) (Angel, Allison) (Entered: 10/16/2019) |
| 10/17/2019 | 224 | MOTION for Leave to Appear *Juno Turner* by Plaintiffs Olga Alexaklina, Lourdes Arguita, Marcos Brambula, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Turner, Juno) (Entered: 10/17/2019) |
| 10/17/2019 | 225 | MEMORANDUM regarding 224 MOTION for Leave to Appear *Juno Turner* filed by Lourdes Arguita, Demetrio Valerga, Dagoberto Vizguerra, Olga Alexaklina, Hugo Hernandez, Marcos Brambula, Alejandro Menocal, Grisel Xahuentitla, Jesus Gaytan. Motions referred to Magistrate Judge Michael E. Hegarty by Judge John L. Kane on 10/17/2019. Text Only Entry (jlksec) (Entered: 10/17/2019) |
| 10/18/2019 | 226 | ORDER granting 224 Unopposed Motion for Leave to Appear. Juno Turner of Towards Justice is permitted to join the discovery conference on October 18, 2019 by telephone and shall do so by calling Judge Hegarty's chambers at 303-844-4507 by 10:30 a.m. ORDERED by Magistrate Judge Michael E. Hegarty on 10/18/2019. Text Only Entry. (cthom, ) (Entered: 10/18/2019) |
| 10/18/2019 | 227 | COURTROOM MINUTES for proceedings held before Magistrate Judge Michael E. Hegarty: Discovery Hearing held on 10/18/2019.FTR: A501. (cthom, ) (Entered: 10/18/2019) |
| 11/13/2019 | 228 | STIPULATION *Regarding Depositions of Trial Witnesses* by Plaintiffs Olga Alexaklina, Lourdes Arguita, Marcos Brambula, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 11/13/2019) |
| 12/06/2019 | 229 | Stipulated MOTION for Extension of Time to *Complete Expert Discovery* by Plaintiffs Olga Alexaklina, Lourdes Arguita, Marcos Brambula, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 12/06/2019) |
| 12/09/2019 | 230 | MEMORANDUM regarding 229 Stipulated MOTION for Extension of Time to *Complete Expert Discovery* filed by Lourdes Arguita, Demetrio Valerga, Dagoberto Vizguerra, Olga Alexaklina, Hugo Hernandez, Marcos Brambula, Alejandro Menocal, Grisel Xahuentitla, Jesus Gaytan. Motions referred to Magistrate Judge Michael E. Hegarty, by Judge John L. Kane on 12/9/2019. Text Only Entry (jlksec) (Entered: 12/09/2019) |
| 12/09/2019 | 231 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 12/9/2019 granting 229 Stipulated Motion to Extend Expert Discovery Deadlines. Initial Expert Disclosures Deadline due 2/14/2020.Rebuttal Expert Disclosures Deadline due 3/30/2020.Expert Witness Depositions Deadline due 4/20/2020. (jgonz, ) (Entered: 12/09/2019) |
| 12/19/2019 | 232 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 12/19/2019. Discovery Conference set for 1/21/2020 01:30 PM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. (tsher, ) (Entered: 12/19/2019) |
| 12/31/2019 | 233 | TRANSCRIPT of Discovery Conference held on October 18, 2019 before Magistrate Judge Hegarty. Pages: 1-99.<br>**NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact** |

**APP. 6**

| | | |
|---|---|---|
| | | personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov. <br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (Patterson Transcription Company, ) (Entered: 12/31/2019) |
| 01/10/2020 | 234 | Unopposed MOTION to Withdraw as Attorney by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Proposed Order (PDF Only))(Stork, Elizabeth) (Entered: 01/10/2020) |
| 01/13/2020 | 235 | ORDER Granting 234 the Unopposed Motion for Withdrawal of Appearance of Elizabeth V. Stork. The Court hereby orders that Elizabeth V. Stork is withdrawn as counsel of record for the Plaintiffs in the above-captioned matter. Ms. Stork shall be removed from future electronic notifications in this case, by Judge John L. Kane on 1/10/2020.(evana, ) (Entered: 01/13/2020) |
| 01/21/2020 | 236 | COURTROOM MINUTES for proceedings held before Magistrate Judge Michael E. Hegarty: Discovery Hearing held on 1/21/2020. FTR: A1002. (cthom, ) (Entered: 01/21/2020) |
| 02/04/2020 | 237 | TRANSCRIPT of TRANSCRIPT OF PROCEEDINGS held on 01/21/2020 before Magistrate Judge Hegarty. Pages: 1-38. Prepared by: AB Court Reporting & Video, Inc.. <br> **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** <br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 02/04/2020) |
| 02/10/2020 | 238 | NOTICE of Entry of Appearance by Adrienne Scheffey on behalf of GEO Group, Inc., TheAttorney Adrienne Scheffey added to party GEO Group, Inc., The(pty:dft) (Scheffey, Adrienne) (Entered: 02/10/2020) |
| 02/11/2020 | 239 | NOTICE of Entry of Appearance by Brianne Michelle Power on behalf of All Plaintiffs Attorney Brianne Michelle Power added to party Olga Alexaklina(pty:pla), Attorney Brianne Michelle Power added to party Lourdes Argueta(pty:pla), Attorney Brianne Michelle Power added to party Marcos Brambila(pty:pla), Attorney Brianne Michelle Power added to party Jesus Gaytan(pty:pla), Attorney Brianne Michelle Power added to party Hugo Hernandez(pty:pla), Attorney Brianne Michelle Power added to party Alejandro Menocal(pty:pla), Attorney Brianne Michelle Power added to party Demetrio Valerga(pty:pla), Attorney Brianne Michelle Power added to party Dagoberto Vizguerra(pty:pla), Attorney Brianne Michelle Power added to party Grisel Xahuentitla(pty:pla) (Power, Brianne) (Entered: 02/11/2020) |
| 02/13/2020 | 240 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 2/13/2020. Discovery Conference set for 2/18/2020 01:00 PM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. (tsher, ) (Entered: 02/13/2020) |
| 02/14/2020 | 241 | Stipulated MOTION for Extension of Time to Complete Expert Discovery by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 02/14/2020) |
| 02/14/2020 | 242 | MEMORANDUM regarding 241 Stipulated MOTION for Extension of Time to Complete Expert Discovery filed by Lourdes Argueta, Demetrio Valerga, Dagoberto Vizguerra, Olga Alexaklina, Hugo Hernandez, Marcos Brambila, Alejandro Menocal, Grisel Xahuentitla, Jesus Gaytan. Motions referred to Magistrate Judge Michael E. Hegarty by Judge John L. Kane on 02/14/2020. Text Only Entry (jlksec) (Entered: 02/14/2020) |
| 02/18/2020 | 243 | COURTROOM MINUTES for proceedings held before Magistrate Judge Michael E. Hegarty: Discovery Hearing held on 2/18/2020. 241 Stipulated MOTION for Extension of Time to Complete Expert Discovery is GRANTED. FTR: A501. (cthom, ) (Entered: 02/18/2020) |
| 02/24/2020 | 244 | MOTION to Withdraw as Attorney (Allison N. Angel) by GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only))(Barnacle, Colin) (Entered: 02/24/2020) |
| 02/24/2020 | 245 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 244 MOTION for Withdrawal of Attorney Allison N. Angel filed by Attorney Colin Barnacle. The document is filed incorrectly. REFILE THE DOCUMENT. Action to take - The attorney Allison N. Angel must file a Motion to Withdraw on her own from this case, not another attorney from the same law firm. (Text Only Entry) (evana, ) (Entered: 02/24/2020) |
| 02/24/2020 | 246 | MOTION to Withdraw as Attorney by Defendant GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only))(Angel, Allison) (Entered: 02/24/2020) |
| 02/24/2020 | 247 | ORDER THIS MATTER comes before the Court on the Defendant's Motion for Withdrawal of Attorney Allison N. Angel (ECF No. 246 ). The Motion is GRANTED.The Court orders that Allison N. Angel shall be removed as counsel of record for Defendant and shall be removed from future electronic notifications in this case. The Motion filed on her behalf earlier today is MOOTED (ECF No. 244 ). Ms. Angel is advised to update her contact information through the Attorney Services Portal, by Judge John L. Kane on 2/24/2020.(evana, ) (Entered: 02/25/2020) |
| 03/10/2020 | 248 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 3/10/2020. Settlement Conference set for 3/31/2020 10:30 AM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. (tsher, ) (Entered: 03/11/2020) |
| 03/18/2020 | 249 | Stipulated MOTION for Extension of Time to File Dispositive Motions, Complete Discovery and Designate Experts by Defendant GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only) )(Barnacle, Colin) (Entered: 03/18/2020) |
| 03/18/2020 | 250 | ORDER Granting 249 Stipulated Motion for Extension of Deadlines. The Parties shall file dispositive motions on or before May 20, 2020; complete discovery by May 20, 2020; designate affirmative experts by April 20, 2020, and designate rebuttal experts by June 3, 2020. By Judge John L. Kane on 3/18/2020. (rvill, ) (Entered: 03/18/2020) |
| 03/24/2020 | 251 | Unopposed MOTION for Leave to Excuse In-Person Appearance at Settlement Conference 248 Minute Order by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 03/24/2020) |
| 03/24/2020 | 252 | MEMORANDUM regarding 251 Unopposed MOTION for Leave to Excuse In-Person Appearance at Settlement Conference 248 Minute Order filed by Lourdes Argueta, Demetrio Valerga, Dagoberto Vizguerra, Olga Alexaklina, Hugo Hernandez, Marcos Brambila, Alejandro Menocal, Grisel Xahuentitla, Jesus Gaytan. Motions referred to Magistrate Judge Michael E. Hegarty by Judge John L. Kane on 3/24/2020. Text Only Entry (jlksec) (Entered: 03/24/2020) |
| 03/26/2020 | 253 | MINUTE ORDER granting 251 Motion for Leave to Excuse In-Person Appearance at Settlement Conference, by Magistrate Judge Michael E. Hegarty on 3/26/2020.(tsher, ) (Entered: 03/26/2020) |
| 04/02/2020 | 254 | MINUTE ENTRY for proceedings held before Magistrate Judge Michael E. Hegarty: Settlement Conference held on 3/31/2020. (cthom, ) Modified to correct date on 4/3/2020 (cthom, ). (Entered: 04/03/2020) |
| 04/07/2020 | 255 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 4/7/2020. Status Conference set for 4/8/2020 02:00 PM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. (tsher, ) (Entered: 04/07/2020) |
| 04/08/2020 | 256 | Stipulated MOTION for Extension of Time to Complete Expert Discovery by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 04/08/2020) |
| 04/08/2020 | 257 | MEMORANDUM regarding 256 Stipulated MOTION for Extension of Time to Complete Expert Discovery filed by Lourdes Argueta, Demetrio Valerga, Dagoberto Vizguerra, Olga Alexaklina, Hugo Hernandez, Marcos Brambila, Alejandro Menocal, Grisel Xahuentitla, Jesus Gaytan. Motions referred to Magistrate Judge Michael E. Hegarty by Judge John L. Kane on 4/8/2020. Text Only Entry (jlksec) (Entered: 04/08/2020) |
| 04/08/2020 | 258 | COURTROOM MINUTES for proceedings held before Magistrate Judge Michael E. Hegarty: Status Conference held on 4/8/2020. FTR: A501. (cthom, ) (Entered: 04/08/2020) |
| 04/08/2020 | 259 | ORDER granting 256 Motion to Extend Expert Discovery Deadlines by Magistrate Judge Michael E. Hegarty on 4/8/2020. Designation of Affirmative Experts due 5/4/2020. Designation of Rebuttal Experts due 6/17/2020. (tsher, ) (Entered: 04/08/2020) |
| 04/29/2020 | 260 | MOTION for Summary Judgment as to Defendant's Affirmative Defense by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 04/29/2020) |
| 04/29/2020 | 261 | DECLARATION of Michael J. Scimone regarding MOTION for Summary Judgment as to Defendant's Affirmative Defense 260 by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit E, # 4 Exhibit G, # 5 Exhibit I, # 6 Exhibit J, # 7 Exhibit K, # 8 Exhibit L, # 9 Exhibit M, # 10 Exhibit N, # 11 Exhibit O, # 12 Exhibit P, # 13 Exhibit Q, # 14 Exhibit R, # 15 Exhibit S, # 16 Exhibit T, # 17 Exhibit W, # 18 Exhibit BB, # 19 Exhibit CC)(Scimone, Michael) (Entered: 04/29/2020) |
| 04/29/2020 | 262 | RESTRICTED DOCUMENT - Level 1: EXHIBITS to the 261 Declaration of Michael J. Simone by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Index of Exhibits, # 2 Exhibit B, # 3 Exhibit B.1, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit G, # 7 Exhibit H, # 8 Exhibit U, # 9 Exhibit V, # 10 Exhibit X, # 11 Exhibit Y, # 12 Exhibit Z, # 13 Exhibit AA)(Scimone, Michael) Modified on 4/30/2020 edited to add link to 261 and title of the documents) (evana, ). (Modified on 6/15/2020 Unrestricted as no motion for leave to restrict was filed)(evana). Modified on 10/19/2020 to Re-Restrict pursuant to the [334] Order(evana, ) (Entered: 04/29/2020) |
| 05/14/2020 | 263 | Stipulated MOTION for Extension of Time to File Dispositive Motions and Complete Discovery by Defendant GEO Group, Inc., The. (Barnacle, Colin) (Entered: 05/14/2020) |
| 05/14/2020 | 264 | MEMORANDUM regarding 263 Stipulated MOTION for Extension of Time to File Dispositive Motions and Complete Discovery filed by The GEO Group, Inc. Motions referred to Magistrate Judge Michael E. Hegarty by Judge John L. Kane on 05/14/2020. Text Only Entry (jlksec) (Entered: 05/14/2020) |
| 05/15/2020 | 265 | Joint MOTION for Extension of Time to File Dispositive Motions and Complete Discovery by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit Corrected Stipulation)(Scimone, Michael) (Entered: 05/15/2020) |
| 05/15/2020 | 266 | MEMORANDUM regarding 265 Joint MOTION for Extension of Time to File Dispositive Motions and Complete Discovery filed by Lourdes Argueta, Demetrio Valerga, Dagoberto Vizguerra, Olga Alexaklina, Hugo Hernandez, Marcos Brambila, Alejandro Menocal, Grisel Xahuentitla, Jesus Gaytan. Motions referred to Magistrate Judge Michael E. Hegarty by Judge John L. Kane on 05/15/2020. Text Only Entry (jlksec) (Entered: 05/15/2020) |
| 05/18/2020 | 267 | MINUTE ORDER, by Magistrate Judge Michael E. Hegarty on 5/18/2020. For good cause shown, the parties Corrected Stipulated Motion for Extension of Deadlines1 [filed May 15, 2020; ECF 265 ] is granted. The governing Amended Stipulated Scheduling and Discovery Order (ECF 198) is modified as follows:Fact/expert discovery cutoff: July 31, 2020 Dispositive motions deadline: July 31, 2020. In addition, Defendant shall file a response to Plaintiffs' pending motion for summary judgment on or before June 5, 2020, and Plaintiffs may file a reply in support of the motion on or before June 26, 2020. In light of this order, the original Stipulated Motion for Extension of Deadlines [filed May 14, 2020; ECF 263 ] is denied as moot. (apesa, ) (Entered: 05/18/2020) |
| 05/28/2020 | 268 | MOTION to Withdraw as Attorney by Defendant GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only))(Calhoun, Ashley) (Entered: 05/28/2020) |

| 05/28/2020 | 269 | ORDER Granting 268 Motion to Withdraw as Attorney. Attorney Ashley Elizabeth Calhoun shall be removed as counsel of record for Defendant, by Judge John L. Kane on 5/28/2020.(evana, ) (Entered: 05/28/2020) |
| 06/05/2020 | 270 | RESPONSE to 260 MOTION for Summary Judgment *as to Defendant's Affirmative Defense* filed by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 06/05/2020) |
| 06/05/2020 | 271 | DECLARATION of *Adrienne Scheffey* regarding Response to Motion 270 by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit J, # 6 Exhibit K, # 7 Exhibit M, # 8 Exhibit N, # 9 Exhibit O, # 10 Exhibit P, # 11 Exhibit Q, # 12 Exhibit R)(Scheffey, Adrienne) (Entered: 06/05/2020) |
| 06/05/2020 | 272 | MOTION for Leave to Restrict by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 06/05/2020) |
| 06/05/2020 | 273 | RESTRICTED DOCUMENT - Level 1: Declaration of Adrienne Scheffey in Support of Defendant The GEO Group, Inc., 120 Response in Opposition to Plaintiff's Motion for Summary Judgment on Defendant's Affirmative Defense by Defendant GEO Group, Inc., The.. (Attachments: # 1 Exhibit E, # 2 Exhibit F, # 3 Exhibit G, # 4 Exhibit H, # 5 Exhibit I, # 6 Exhibit L)(Scheffey, Adrienne) (Modified on 6/8/2020 edited to add the name of the Document filed)(evana, ). (Entered: 06/05/2020) |
| 06/10/2020 | 274 | Emergency MOTION for Writ of Habeas Corpus ad testificandum by Plaintiff Hugo Hernandez. (Attachments: # 1 Proposed Order (PDF Only) Granting Motion and Issuing Writ)(Free, Robert) (Entered: 06/10/2020) |
| 06/11/2020 | 275 | ORDER Granting 274 Plaintiffs' Emergency Motion for Writ of Habeas Corpus Ad Testificandum to Produce Plaintiff Hugo Hernandez Ceren for Live Testimony Prior to Removal, by Judge John L. Kane on 6/11/2020.(evana, ) (Entered: 06/11/2020) |
| 06/11/2020 | 276 | WRIT of Habeas Corpus Ad Testificandum issued. This Writ is issued upon Order of the United States District Court for the District of Colorado. I hereby command that you produce the material witness, detainee Hugo Hernandez Ceren, A-073-956-722, for live, videotaped deposition testimony prior to effectuating his removal from the United States to El Salvador. (evana, ) (Entered: 06/11/2020) |
| 06/15/2020 | 277 | ORDER THIS MATTER, coming before the Court upon Defendant's Motion to Restrict (ECF No. 272 ), and being fully advised in the premises, IT IS HEREBY ORDERED that the Motion to Restrict (ECF No. 272 ) is GRANTED. The Clerk is hereby directed to place Exhibits E, F, G, H, I and L (ECF No. 273 ) under Restriction Level 1 pursuant toD.C.COLO.LCivR 7.2, limiting access thereto to the Parties and the Court, by Judge John L. Kane on 6/15/2020.(evana, ) (Entered: 06/15/2020) |
| 06/17/2020 | 278 | TRANSCRIPT of TRANSCRIPT OF PROCEEDINGS held on 02/18/2020 before Magistrate Judge Hegarty. Pages: 1-23. Prepared by: AB Litigation Services.<br>NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 06/17/2020) |
| 06/23/2020 | 279 | Emergency MOTION to Amend/Correct/Modify 276 Writ Issued, by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit Ex 1- Amd Notice of Deposition, # 2 Exhibit Ex 2 - Jafek Email)(Turner, Andrew) (Entered: 06/23/2020) |
| 06/23/2020 | 280 | ORDER Granting 279 Plaintiffs' Emergency Motion to Amend Writ of Habeas Corpus Ad Testificandum. The Writ of Habeas Corpus Ad Testificandum issued June 11, 2020, commanding United States Immigration and Customs Enforcement (ICE), Acting ICE Director Matthew Albence, ICE Louisiana Field Office Director Diane Witte, and any other custodian of detainee and named Plaintiff in this case Hugo Hernandez Ceren, A-073-956-722, to produce him for live, remote, deposition testimony by videotape prior to effectuating his removal to El Salvador is AMENDED to require that Mr. Hernandez Ceren be permitted to give his testimony in court-appropriate civilian attire, specifically a coat, shirt, and tie, by Judge John L. Kane on 6/23/2020.(evana, ) (Entered: 06/23/2020) |
| 06/23/2020 | 281 | MOTION for Reconsideration re 280 Order on Motion to Amend/Correct/Modify,,, *and Response to ECF No. 279* by Interested Party U.S. Immigration and Customs Enforcement. (Attachments: # 1 Reaves Decl., # 2 Lovett v. Cole decision)(Jafek, Timothy) (Entered: 06/23/2020) |
| 06/23/2020 | 282 | RESPONSE to 281 MOTION for Reconsideration re 280 Order on Motion to Amend/Correct/Modify,,, *and Response to ECF No. 279* filed by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit Ex 1 - Jafek Email, # 2 Exhibit Ex 2 - Turner Email)(Turner, Andrew) (Entered: 06/23/2020) |
| 06/23/2020 | 283 | ORDER Denying 281 ICE's Motion to Reconsider Amendment of the Writ of Habeas Corpus Ad Testificandum, by Judge John L. Kane on 6/23/2020.(evana, ) (Entered: 06/23/2020) |
| 06/25/2020 | 284 | Cross MOTION for Summary Judgment by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 06/25/2020) |
| 06/25/2020 | 285 | DECLARATION of *Adrienne Scheffey* regarding Cross MOTION for Summary Judgment 284 by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A)(Scheffey, Adrienne) (Entered: 06/25/2020) |
| 06/26/2020 | 286 | REPLY to Response to 260 MOTION for Summary Judgment *as to Defendant's Affirmative Defense* filed by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 06/26/2020) |
| 06/26/2020 | 287 | DECLARATION of *Michael J. Scimone* regarding Reply to Response to Motion, 286 by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17)(Scimone, Michael) (Entered: 06/26/2020) |
| 06/26/2020 | 288 | Notice of Filing of Exhibit 1 to 287 the Declaration of Michael Scimone in Support of Plaintiffs' Reply in Support of Motion for Summary Judgment by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. **RESTRICTED (Attachments: # 1 Exhibit 1)**(Scimone, Michael) (Modified on 6/30/2020 edited to add the title of the document filed)(evana, ). Modified on 7/29/2020 to un-restrict as no motion to restrict was filed.(sphil, ). Modified on 7/29/2020 (sphil, ). (Modified on 10/19/2020 Re-Restricted pursuant to the 334 Order)(evana, ). (Entered: 06/26/2020) |
| 06/29/2020 | 289 | NOTICE re 281 MOTION for Reconsideration re 280 Order on Motion to Amend/Correct/Modify,,, *and Response to ECF No. 279* by Interested Party U.S. Immigration and Customs Enforcement. (Jafek, Timothy) (Entered: 06/29/2020) |
| 07/01/2020 | 290 | NOTICE of Entry of Appearance by Matthew Fritz-Mauer on behalf of Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel XahuentitlaAttorney Matthew Fritz-Mauer added to party Olga Alexaklina(pty:pla), Attorney Matthew Fritz-Mauer added to party Lourdes Argueta(pty:pla), Attorney Matthew Fritz-Mauer added to party Marcos Brambila(pty:pla), Attorney Matthew Fritz-Mauer added to party Jesus Gaytan(pty:pla), Attorney Matthew Fritz-Mauer added to party Hugo Hernandez(pty:pla), Attorney Matthew Fritz-Mauer added to party Alejandro Menocal(pty:pla), Attorney Matthew Fritz-Mauer added to party Demetrio Valerga(pty:pla), Attorney Matthew Fritz-Mauer added to party Dagoberto Vizguerra(pty:pla), Attorney Matthew Fritz-Mauer added to party Grisel Xahuentitla(pty:pla) (Fritz-Mauer, Matthew) (Entered: 07/01/2020) |
| 07/08/2020 | 291 | NOTICE of Supplemental Authorities re: 286 Reply to Response to Motion, 270 Response to Motion, 260 MOTION for Summary Judgment as to Defendant's Affirmative Defense by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A)(Barnacle, Colin) (Entered: 07/08/2020) |
| 07/13/2020 | 292 | Stipulated MOTION for Extension of Time to *Complete Discovery* by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 07/13/2020) |
| 07/13/2020 | 293 | ORDER granting 292 Stipulated Motion for Extension of Deadlines. The fact/expert discovery cutoff deadline is extended to August 14, 2020; however, the parties may file discovery-related motions regarding third-party discovery from ICE. The Dispositive Motions deadline is extended to August 17, 2020. In addition, Plaintiffs' Response to GEO's Cross Motion for Summary Judgment 284 is due July 31, 2020, and the Reply, if any, is due August 21, 2020. Defendant shall file decertification motions on or before September 28, 2020. Ordered by Judge John L. Kane on 07/13/2020. Text Only Entry.(jiksec) (Entered: 07/13/2020) |
| 07/24/2020 | 294 | RESPONSE to 291 Notice of Supplemental Authorities by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 07/24/2020) |
| 07/24/2020 | 295 | DECLARATION of *Michael J. Scimone* regarding Response, 294 by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 07/24/2020) |
| 07/24/2020 | 296 | RESTRICTED DOCUMENT - Level 1: EXHIBIT to 295 Declaration of Michael J. 294 Plaintiff's Response by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Modified on 7/31/2020 edited to add the title of the document filed)(evana, ). (Entered: 07/24/2020) |
| 07/24/2020 | 297 | NOTICE of Supplemental Authorities *Second Notice of Supplemental Authority* re: 294 Response, 270 Response to Motion, 291 Notice of Supplemental Authorities, by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Scheffey, Adrienne) (Entered: 07/24/2020) |
| 07/31/2020 | 298 | RESPONSE to 284 Cross MOTION for Summary Judgment filed by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 07/31/2020) |
| 07/31/2020 | 299 | DECLARATION of *Michael J. Scimone* regarding Response to Motion, 298 by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 5)(Scimone, Michael) (Entered: 07/31/2020) |
| 07/31/2020 | 300 | RESTRICTED DOCUMENT - Level 1: EXHIBIT to the 299 Declaration of Michael J. Simone by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit 4)(Scimone, Michael) (Modified on 8/3/2020 edited to add the title of the document)(evana, ). (Entered: 07/31/2020) |
| 08/07/2020 | 301 | MOTION for Order to *Authorize the Jury to View the Aurora ICE Processing Center* by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 08/07/2020) |
| 08/07/2020 | 302 | DECLARATION of *Michael J. Scimone* regarding MOTION for Order to *Authorize the Jury to View the Aurora ICE Processing Center* 301 by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 08/07/2020) |
| 08/07/2020 | 303 | DECLARATION of *Rachel Dempsey* regarding MOTION for Order to *Authorize the Jury to View the Aurora ICE Processing Center* 301 by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 08/07/2020) |
| 08/07/2020 | 304 | RESTRICTED DOCUMENT - Level 1: Notice of Filing EXHIBIT to the Declaration of Rachel Dempsey in Support of Plaintiff's Motion for Jury view 303 as Restricted Document. by Plaintiffs Olga Alexaklina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit 1, Transcript |

**APP. 8**

| Date | # | Description |
|---|---|---|
| | | of Video Deposition)(Scimone, Michael) (Modified on 8/10/2020 edited the text to add the title of the document filed)(evana, ) (Entered: 08/07/2020) |
| 08/17/2020 | 305 | MOTION for Summary Judgment by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 08/17/2020) |
| 08/17/2020 | 306 | DECLARATION of *Adrienne Scheffey* regarding MOTION for Summary Judgment 305 by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit F, # 6 Exhibit G, # 7 Exhibit H, # 8 Exhibit I, # 9 Exhibit J, # 10 Exhibit L, # 11 Exhibit M, # 12 Exhibit N, # 13 Exhibit O, # 14 Exhibit P, # 15 Exhibit Q)(Scheffey, Adrienne) (Entered: 08/17/2020) |
| 08/17/2020 | 307 | MOTION to Dismiss *for Failure to Join Required Party* by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 08/17/2020) |
| 08/17/2020 | 308 | DECLARATION of *Adrienne Scheffey* regarding MOTION to Dismiss *for Failure to Join Required Party* 307 by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit C, # 2 Exhibit D, # 3 Exhibit F, # 4 Exhibit G, # 5 Exhibit H, # 6 Exhibit I)(Scheffey, Adrienne) (Entered: 08/17/2020) |
| 08/17/2020 | 309 | MOTION for Leave to Restrict by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 08/17/2020) |
| 08/17/2020 | 310 | RESTRICTED DOCUMENT - Level 1: DECLARATION of Adrienne Scheffey by Defendant GEO Group, Inc., The.. (Attachments: # 1 Exhibit B, National Detainee Handbook # 2 Exhibit K Videotaped deposition of Stuart Grassian, M.D.)(Scheffey, Adrienne) (Modified on 8/18/2020 edited to add the titles of the documents)(evana, ). (Entered: 08/17/2020) |
| 08/17/2020 | 311 | RESTRICTED DOCUMENT - Level 1: Declaration of Adrienne Scheffey by Defendant GEO Group, Inc., The.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit E)(Scheffey, Adrienne) Modified on 8/18/2020 (evana, ). (Entered: 08/17/2020) |
| 08/19/2020 | 312 | MOTION for Order to *Decertify Class* by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 08/19/2020) |
| 08/19/2020 | 313 | DECLARATION of *Adrienne Scheffey* regarding MOTION for Order to *Decertify Class* 312 by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit F, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit W, # 23 Exhibit X)(Scheffey, Adrienne) (Entered: 08/19/2020) |
| 08/19/2020 | 314 | RESTRICTED DOCUMENT - Level 1: Declaration of Adrienne Scheffey in support of Defendant The Geo Group, Inc.'s Motion for Decertification of Class, by Defendant GEO Group, Inc., The.. (Attachments: # 1 Exhibit V)(Scheffey, Adrienne) (Modified on 8/20/2020 edited to add the title of the document)(evana, ). (Entered: 08/19/2020) |
| 08/19/2020 | 315 | MOTION for Leave to Restrict by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 08/19/2020) |
| 08/21/2020 | 316 | REPLY to Response to 284 Cross MOTION for Summary Judgment filed by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 08/21/2020) |
| 08/21/2020 | 317 | DECLARATION of *Adrienne Scheffey* regarding Reply to Response to Motion 316 by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit F, # 6 Exhibit G, # 7 Exhibit H, # 8 Exhibit I, # 9 Exhibit J, # 10 Exhibit K)(Scheffey, Adrienne) (Entered: 08/21/2020) |
| 08/21/2020 | 318 | MOTION for Leave to Restrict by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 08/21/2020) |
| 08/21/2020 | 319 | RESTRICTED DOCUMENT - Level 1: Declaration of Adrienne Scheffey in support of Defendant GEO Inc's 316 Reply in Support of it's Cross Motion for Summary Judgment by Defendant GEO Group, Inc., The.. (Attachments: # 1 Exhibit C)(Scheffey, Adrienne) (Modified on 8/24/2020 edited to add the document filed)(evana, ). (Entered: 08/21/2020) |
| 08/28/2020 | 320 | ORDER Granting Defendant's Motions to Restrict (ECF No. 309 , 315 & 318 ). The Clerk is directed to place Exhibits B and K (ECF Nos. 310-1 and 310-2); Exhibits A, B and E (ECF Nos. 311-1, 311-2, 311-3); Exhibit V (ECF No. 314-1); and Exhibit C (ECF No. 319-1) under Restriction Level 1 pursuant to D.C.COLO.LCivR 7.2, limiting access thereto to the Parties and the Court, by Judge John L. Kane on 8/28/2020.(evana, ) (Entered: 08/28/2020) |
| 08/28/2020 | 321 | MOTION for Extension of Time to File Response/Reply as to 312 MOTION for Order to *Decertify Class,* 305 MOTION for Summary Judgment , 307 MOTION to Dismiss *for Failure to Join Required Party* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Proposed Order (PDF Only))(Dempsey, Rachel) (Entered: 08/28/2020) |
| 08/28/2020 | 322 | RESPONSE to 321 MOTION for Extension of Time to File Response/Reply as to 312 MOTION for Order to *Decertify Class,* 305 MOTION for Summary Judgment , 307 MOTION to Dismiss *for Failure to Join Required Party* filed by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit 1 - Declaration of Adrienne Scheffey)(Scheffey, Adrienne) (Entered: 08/28/2020) |
| 08/28/2020 | 323 | RESPONSE to 301 MOTION for Order to *Authorize the Jury to View the Aurora ICE Processing Center* filed by Defendant GEO Group, Inc., The.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Scheffey, Adrienne) (Entered: 08/28/2020) |
| 08/28/2020 | 324 | ORDER granting 321 Motion for Extension of Deadlines on Motion for Summary Judgement ECF No. 305 , Motion to Dismiss for Failure to Join Required Party ECF No. 307 , and Motion to Decertify Class ECF No. 312 . Responses to the Motions are due on or before October 25, 2020; Replies, if any, are due November 16, 2020. Ordered by Judge John L. Kane on 8/28/2020. Text Only Entry(jlksec) (Entered: 08/28/2020) |
| 09/11/2020 | 325 | REPLY to Response to 301 MOTION for Order to *Authorize the Jury to View the Aurora ICE Processing Center* filed by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Turner, Andrew) (Entered: 09/11/2020) |
| 09/11/2020 | 326 | DECLARATION of *Andrew H Turner* regarding Reply to Response to Motion, 325 by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit Ex A - Pl 2d Supl Resp to Def 6th Interrogatories, # 2 Exhibit Ex B - Dep Tscpt Grisel Xahuentitla, # 3 Exhibit Ex C - Dep Tscpt Jesus Yepez Gaytan, # 4 Exhibit Ex D - Dep Tscpt Demetrio Valerga, # 5 Exhibit Ex E - Dep Tscpt Alejandro Hernandez Torres, # 6 Exhibit Ex F - Decl of Marvin M Rosenbluth)(Turner, Andrew) (Entered: 09/11/2020) |
| 09/25/2020 | 327 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 25 September 2020. At the parties' request, the Court will hold a Discovery Conference in this case on Thursday, October 1, 2020 at 2:00 p.m. in Courtroom A501 on the fifth floor of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado. In advance of the conference, the parties may each prepare a short statement identifying the nature of the dispute(s) and send the statements by email to hegarty_chambers@cod.uscourts.gov. These materials shall be submitted no later than noon on September 30, 2020. (cmadr, ) (Entered: 09/25/2020) |
| 10/01/2020 | 328 | COURTROOM MINUTES for proceedings held before Magistrate Judge Michael E. Hegarty: Discovery Hearing held on 10/1/2020. FTR: A501. (cthom, ) (Entered: 10/01/2020) |
| 10/06/2020 | 329 | TRANSCRIPT of TRANSCRIPT OF PROCEEDINGS held on 10/01/2020 before Magistrate Judge Hegarty. Pages: 1-51. Prepared by: AB Litigation Services.<br>NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 10/06/2020) |
| 10/13/2020 | 330 | Corrected TRANSCRIPT of DISCOVERY HEARING held on 10/01/2020 before Magistrate Judge Hegarty. Pages: 1-51. Prepared by: AB Litigation Services.<br>NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 10/13/2020) |
| 10/16/2020 | 331 | NOTICE of Change of Address/Contact Information *for Towards Justice* by Juno E. Turner (Turner, Juno) (Entered: 10/16/2020) |
| 10/16/2020 | 332 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES.re: 331 Notice of Change of Address/Contact Information filed by attorney Juno Turner. **DO NOT REFILE THE DOCUMENT. Action to take -** counsel must submit a change of contact request through the Attorney Services Portal Account pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Civil cases).(Text Only Entry) (evana, ) (Entered: 10/16/2020) |
| 10/16/2020 | 333 | MOTION for Leave by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A - ICE Correspondence, # 2 Exhibit B - Docket, # 3 Proposed Order (PDF Only))(Scheffey, Adrienne) (Entered: 10/16/2020) |
| 10/19/2020 | 334 | ORDER GRANTING Defendant The GEO Group, Inc.'s ("Defendant") Motion to Restrict (ECF No. 333 ) and being fully advised in the premises, hereby GRANTS the Motion. The Clerk is directed to impose Level 1 restriction on ECF Nos. 262-2, 262-3, 262-4, 262-5, 262-6, 261-9, 262-8, 262-9, 262-10, 262-11, 261-12 and 288. The Court also GRANTS Level 1 restriction for ECF Nos. 296-1, 304, and 300-1 to the extent they have not already been restricted. The parties are reminded to review D.C. Colo.LCivR 72(e). Public Access to Documents and Proceedings. Filing Restricted Documents. A document subject to a motion to restrict shall be filed as a restricted document and shall be subject to restriction until the motion is determined by the court. If a document is filed as a restricted document without an accompanying motion to restrict, it shall retain the restriction selected by the filer for 14 days. If no motion to restrict is filed within such time period, the restriction shall cease to apply and the document shall be open to public inspection, by Judge John L. Kane on 10/19/2020.(evana, ) (Entered: 10/19/2020) |
| 10/26/2020 | 335 | NOTICE of Supplemental Authorities re: 297 Notice of Supplemental Authorities, 305 MOTION for Summary Judgment , 307 MOTION to Dismiss *for Failure to Join Required Party,* 284 Cross MOTION for Summary Judgment , *Defendants' as Defendant's Affirmative Defense,* 260 MOTION for Summary Judgment *as to Defendant's Affirmative Defense,* 291 Notice of Supplemental Authorities, by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Scheffey, Adrienne) (Entered: 10/26/2020) |
| 10/26/2020 | 336 | BRIEF in Opposition to 305 MOTION for Summary Judgment filed by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Declaration of Michael J. Scimone, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25)(Scimone, Michael) (Entered: 10/26/2020) |
| 10/26/2020 | 337 | RESTRICTED DOCUMENT - Level 1: Exhibits to the Declaration of Michael Scimone In Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (ECF No. 336 ) by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit 16, # 2 Exhibit 24, # 3 Exhibit 25, # 4 Exhibit 26)(Scimone, Michael)(Modified on 10/27/2020 edited the text to add the title of the document filed)(evana, ). (Entered: 10/26/2020) |
| 10/26/2020 | 338 | BRIEF in Opposition to 312 MOTION for Summary Judgment filed by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Declaration of Michael J. Scimone, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12)(Scimone, Michael) (Entered: 10/26/2020) |

| 10/26/2020 | 339 | BRIEF in Opposition to 312 MOTION for Order to *Decertify Class* filed by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 13, # 13 Exhibit 15, # 14 Exhibit 16, # 15 Exhibit 17, # 16 Exhibit 18, # 17 Exhibit 19, # 18 Exhibit 20, # 19 Exhibit 21, # 20 Exhibit 22, # 21 Exhibit 23(Scimone, Michael) (Entered: 10/26/2020) |
| 10/26/2020 | 340 | RESTRICTED DOCUMENT - Level 1: Exhibit to the Declaration of Michael J. Scimone in Support of Plaintiffs' Opposition to Defendant's Motion for Decertification (ECF No. 339 ) by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit 14, # 2 Exhibit 14, # 3 Exhibit 24)(Scimone, Michael) (Modified on 10/27/2020 edited to add the title of the document filed)(evana, ). (Entered: 10/26/2020) |
| 10/28/2020 | 341 | MOTION for Leave to Restrict Exhibit documents filed at 337-2 by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Proposed Order (PDF Only))(Scimone, Michael) (Modified on 11/3/2020 edited to add link)(evana, ). (Entered: 10/28/2020) |
| 11/06/2020 | 342 | Unopposed MOTION for Leave to Restrict by Defendant GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only))(Scheffey, Adrienne) (Entered: 11/06/2020) |
| 11/09/2020 | 343 | ORDER The Court, having reviewed Defendant The GEO Group, Inc.'s Unopposed Motion to Restrict Exhibits to Plaintiffs' Opposition to GEO's Motion for Summary Judgment and Opposition to GEO's Motion for Decertification and having considered all arguments raised therein, hereby GRANTS the Motion. This Court shall impose Level 1 restriction on ECF Nos. 337-1 through 337-4 and 340-1 through 340-4, by Judge John L. Kane on 11/9/2020.(evana, ) (Entered: 11/09/2020) |
| 11/09/2020 | 344 | ORDER finding as moot 341 Motion for Leave to Restrict. Order 343 granted restriction to 337-2, by Judge John L. Kane on 11/09/20. Text Only Entry(jlksec) (Entered: 11/09/2020) |
| 11/10/2020 | 345 | RESPONSE to 335 Notice of Supplemental Authorities, by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit A)(Scimone, Michael) (Entered: 11/10/2020) |
| 11/11/2020 | 346 | Unopposed MOTION for Extension of Time to *File Replies*, Unopposed MOTION for Extension of Time to *File Response/Reply as to* 312 MOTION for Order to *Decertify Class*, 305 MOTION for Summary Judgment , 307 MOTION to Dismiss *for Failure to Join Required Party* by Defendant GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only))(Scheffey, Adrienne) (Entered: 11/11/2020) |
| 11/12/2020 | 347 | ORDER granting 346 Defendant The GEO Group, Inc.'s Unopposed Motion for Extension of Deadline to File Replies. GEO shall have through and including November 18, 2020, to file replies supporting its Motion for Summary Judgment 305 , Motion to Dismiss for Failure to Join Required Party 307 , and Motion for Decertification of Class 312 . Ordered by Judge John L. Kane on 11/12/20. Text Only Entry(jlksec) (Entered: 11/12/2020) |
| 11/18/2020 | 348 | REPLY to Response to 307 MOTION to Dismiss *for Failure to Join Required Party* filed by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 11/18/2020) |
| 11/18/2020 | 349 | RESTRICTED DOCUMENT - Level 1: EXHIBIT J to 348 Motion to Dismiss for Failure to Join by Defendant GEO Group, Inc., The.. (Attachments: # 1 Exhibit J - Audit Correspondence)(Scheffey, Adrienne) (Modified on 11/19/2020 edited the title to add the name of the document filed)(evana, ). (Entered: 11/18/2020) |
| 11/18/2020 | 350 | REPLY to Response to 305 MOTION for Summary Judgment filed by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 11/18/2020) |
| 11/18/2020 | 351 | DECLARATION of Adrienne Scheffey regarding Reply to Response to Motion 350 by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit R - Excerpts of Deposition of Hugo Hernandez Ceren, # 2 Exhibit S - Plaintiffs' Responses to GEO's First Set of Written Discovery Requests, # 3 Exhibit T - Exhibit 12 to Deposition of Hugo Hernandez Ceren)(Scheffey, Adrienne) (Entered: 11/18/2020) |
| 11/18/2020 | 352 | REPLY to Response to 312 MOTION for Order to *Decertify Class* filed by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 11/18/2020) |
| 11/18/2020 | 353 | DECLARATION of Adrienne Scheffey regarding Reply to Response to Motion 352 by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit Y - Excerpts of Deposition of Demetrio Valerga, # 2 Exhibit Z - Excerpts of Deposition of Dagoberto Vizguerra, # 3 Exhibit AA - Excerpts of Deposition of Grisel Xahuentitla, # 4 Exhibit BB - Excerpts of Deposition of Jesus Gayten)(Scheffey, Adrienne) (Entered: 11/18/2020) |
| 11/25/2020 | 354 | NOTICE re 348 Reply to Response to Motion *to Dismiss for Failure to Join a Required Party* by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Scheffey, Adrienne) (Entered: 11/25/2020) |
| 12/02/2020 | 355 | NOTICE to Withdraw as Attorney by Defendant GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only))(Barnacle, Colin) (Entered: 12/02/2020) |
| 12/02/2020 | 356 | MOTION to Withdraw as Attorney by Defendant GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only))(Eby, Christopher) (Entered: 12/02/2020) |
| 12/02/2020 | 357 | Unopposed MOTION for Leave to Restrict by Defendant GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only))(Scheffey, Adrienne) (Entered: 12/02/2020) |
| 12/03/2020 | 358 | ORDER Granting 355 Motion to Withdraw as Attorney. Attorney Colin Louis Barnacle terminated as counsel of record and exclude Mr. Barnacle from further service in this case, by Judge John L. Kane on 12/3/2020.(evana, ) (Entered: 12/03/2020) |
| 12/03/2020 | 359 | ORDER Granting 356 Motion to Withdraw as Attorney. Attorney Christopher John Eby terminated as counsel of record and exclude Mr. Eby from further service in this case, by Judge John L. Kane on 12/3/2020.(evana, ) (Entered: 12/03/2020) |
| 12/08/2020 | 360 | ORDER Granting 357 The GEO Group, Inc.'s Unopposed Motion to Restrict and being fully advised in the premises, hereby GRANTS the Motion. The Clerk of Court is directed to maintain a Level 1 restriction on ECF Nos. 349 and 349-1, by Judge John L. Kane on 12/8/2020.(evana, ) (Entered: 12/08/2020) |
| 03/24/2021 | 361 | NOTICE of Supplemental Authorities re: 305 MOTION for Summary Judgment , 307 MOTION to Dismiss *for Failure to Join Required Party* by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A - Ndambi v. CoreCivic)(Scheffey, Adrienne) (Entered: 03/24/2021) |
| 03/26/2021 | 362 | RESPONSE to 361 Notice of Supplemental Authorities, by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 03/26/2021) |
| 05/05/2021 | 363 | ADVISORY NOTICE TO ATTORNEY AND COURT: Under D.C.COLO.LAttyR 3(a), Hans Christopher Meyer was administratively removed from the court's attorney roll and barred from filing electronically under CM/ECF for failing to pay the 2020 Biennial Fee. Counsel must complete a Bar/ECF application through counsel's existing Attorney Services Portal account and pay the full application fee to be restored to the attorney roll and CM/ECF. Counsel, however, need not pay any delinquent biennial fees. Upon reinstatement, counsel must file a Notice of Entry of Appearance in this case. (Text Only Entry) (tnguy) (Entered: 05/05/2021) |
| 05/06/2021 | 364 | ADVISORY NOTICE TO ATTORNEY AND COURT: Under D.C.COLO.LAttyR 3(a), Ossai Miazad was administratively removed from the court's attorney roll and barred from filing electronically under CM/ECF for failing to pay the 2020 Biennial Fee. Counsel must complete a Bar/ECF application through counsel's existing Attorney Services Portal account and pay the full application fee to be restored to the attorney roll and CM/ECF. Counsel, however, need not pay any delinquent biennial fees. Upon reinstatement, counsel must file a Notice of Entry of Appearance in this case. (Text Only Entry) (tnguy) (Entered: 05/06/2021) |
| 05/12/2021 | 365 | ADVISORY NOTICE TO ATTORNEY AND COURT: Under D.C.COLO.LAttyR 3(a), P. David Lopez was administratively removed from the court's attorney roll and barred from filing electronically under CM/ECF for failing to pay the 2020 Biennial Fee. Counsel must complete a Bar/ECF application through counsel's existing Attorney Services Portal account and pay the full application fee to be restored to the attorney roll and CM/ECF. Counsel, however, need not pay any delinquent biennial fees. Upon reinstatement, counsel must file a Notice of Entry of Appearance in this case. (Text Only Entry) (tnguy) (Entered: 05/12/2021) |
| 05/17/2021 | 366 | Notice of Entry of Appearance by Hans Meyer by Plaintiff Alejandro Menocal. (Meyer, Hans) (Modified on 5/17/2021 edited to reflect that this is an Entry of Appearance and not a Motion)(evana, ). (Entered: 05/17/2021) |
| 06/28/2021 | 367 | NOTICE of Supplemental Authorities re: 284 Cross MOTION for Summary Judgment , 260 MOTION for Summary Judgment *as to Defendant's Affirmative Defense* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit A)(Scimone, Michael) (Entered: 06/28/2021) |
| 07/02/2021 | 368 | MOTION to Strike 367 Notice of Supplemental Authorities, by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A - Email)(Scheffey, Adrienne) (Entered: 07/02/2021) |
| 07/23/2021 | 369 | RESPONSE to 368 MOTION to Strike 367 Notice of Supplemental Authorities filed by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 07/23/2021) |
| 08/02/2021 | 370 | REPLY to Response to 368 MOTION to Strike 367 Notice of Supplemental Authorities, filed by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 08/02/2021) |
| 08/31/2021 | 371 | NOTICE of Change of Address/Contact Information by Adrienne Scheffey (Scheffey, Adrienne) (Entered: 08/31/2021) |
| 11/01/2021 | 372 | NOTICE of Change of Address/Contact Information *and Change of Firm* by Rachel Williams Dempsey (Dempsey, Rachel) (Entered: 11/01/2021) |
| 11/01/2021 | 373 | NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 372 Notice of Change of Address/Contact Information filed by attorney Rachel Williams Dempsey. **DO NOT REFILE THE DOCUMENT. Action to take** - counsel must submit a change of contact request through the **Manage my Account** tab at the PACER website at https://www.pacer.gov/, pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Civil cases).(Text Only Entry) (evana, ) (Entered: 11/01/2021) |
| 11/01/2021 | 374 | NOTICE of Supplemental Authorities re: 336 Brief in Opposition to Motion,, 286 Reply to Response to Motion,, 260 MOTION for Summary Judgment *as to Defendant's Affirmative Defense* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 11/01/2021) |
| 11/10/2021 | 375 | RESPONSE to 374 Notice of Supplemental Authorities, by Defendant GEO Group, Inc., The. (Eismeier, Dana) (Entered: 11/10/2021) |
| 02/01/2022 | 376 | MOTION to Withdraw as Attorney by Defendant GEO Group, Inc., The. (Attachments: # 1 Proposed Order (PDF Only))(Cizmorris, Melissa) (Entered: 02/01/2022) |
| 02/02/2022 | 377 | ORDER Granting 376 Motion for Withdrawal of Attorney Melissa I. Cizmorris, by Judge John L. Kane on 2/2/2022.(angar, ) (Entered: 02/02/2022) |
| 02/09/2022 | 378 | NOTICE of Supplemental Authorities re: 336 Brief in Opposition to Motion,, 298 Reply to Response to Motion, 260 MOTION for Summary Judgment *as to Defendant's Affirmative Defense* by Plaintiffs Olga Alexalkina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 A)(Scimone, Michael) (Entered: 02/09/2022) |
| 02/11/2022 | 379 | RESPONSE to 378 Notice of Supplemental Authorities, by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 02/11/2022) |

APP. 10

| 10/18/2022 | 380 | Order on the Parties' Cross Motions for Summary Judgment (ECF Nos. 260 , 284 , & 305 ) and Defendant's Motions to Dismiss (ECF No. 307 ) and for Decertification of Class (ECF No. 312 ). Plaintiffs' Motion for Summary Judgment on GEO's Affirmative Defense (ECF No. 260 ) is GRANTED. GEO's Cross Motion for Summary Judgment (ECF Nos. 284 ), Motion to Dismiss (ECF No. 307 ), and Motion for Decertification of Class (ECF No. 312 ) are DENIED. GEO's Motion for Summary Judgment (ECF No. 305 ) is GRANTED IN PART in that the TVPA class is narrowed to beginning on December 23, 2004, and the Motion is otherwise DENIED. GEOs Motion to Strike (ECF No. 368 ) is DENIED at most. ORDERED by Judge John L. Kane on 10/18/2022.(angar, ) (Entered: 10/18/2022) |
| 10/19/2022 | 381 | MINUTE ORDER. Based on the rulings in 380 , this case is ready to be set for trial. The Parties are DIRECTED to confer and, on October 25, 26, or 27, 2022, to call each other and then JOINTLY call chambers at (303) 844-6118 to set dates and times for the pretrial conference, final trial preparation conference, and trial, by Judge John L. Kane on 10/19/2022. Text Only Entry (angar, ) (Entered: 10/19/2022) |
| 10/20/2022 | 382 | MINUTE ORDER as to 301 Motion for Jury View. The Parties are DIRECTED to meaningfully confer regarding the status of the Motion for Jury View, including whether any circumstances have changed since the motion was filed. The Parties' conferral shall include, but is not limited to, a discussion regarding: (1) whether a videorecording of the Aurora Detention Facility is now available. If a videorecording is available, the Parties shall confer regarding whether the videorecording is sufficient in lieu of a jury view; and (2) if a jury view is permitted, whether U.S. Marshals may accompany the Jurors and, if so, whether the Parties propose any limitations on the U.S. Marshals accompanying the Jury to a jury view. After conferral, Plaintiffs shall file a supplemental brief of no more than five pages, on or before November 4, 2022. Defendant shall file a response of no more than five pages, on or before November 18, 2022. No reply brief will be allowed absent further order of the Court. ORDERED by Judge John L. Kane on 10/20/2022. Text Only Entry (angar, ) (Entered: 10/20/2022) |
| 10/27/2022 | 383 | ORDER SETTING PRETRIAL CONFERENCE, FINAL TRIAL PREPARATION CONFERENCE AND THREE-WEEK JURY TRIAL. This case is set for a three-week Jury Trial beginning Monday, April 24, 2023, at 9:00 a.m., before Judge John L. Kane in Courtroom A802 on the 8th Floor of the Alfred A. Arraj U.S. Courthouse, 901 19th Street, Denver, Colorado. The parties are directed to file a Proposed Pretrial Order on or before January 6, 2023. The Proposed Order shall be submitted via CM/ECF and in an editable format to kane_chambers@cod.uscourts.gov. A Pretrial Conference is set for January 12, 2023, at 10:30 a.m. in the same location as the Jury Trial. Motions in Limine, including motions objecting to expert witness testimony, shall be filed on or before February 10, 2023. Responses to those motions shall be filed on or before March 3, 2023, and any replies shall be filed on or before March 17, 2023. The Proposed Unified Set of Jury Instructions and Verdict Forms are due March 31, 2023, submitted in editable format to kane_chambers@cod.uscourts.gov as well as filed on CM/ECF. Final Witness and Exhibit Lists are due April 12, 2023. A Final Trial Preparation Conference is set Wednesday, April 19, 2023, at 10:30 a.m. in the same location as the Jury Trial. The parties are advised to read Judge Kane's Pretrial and Trial Procedures Memo and use the forms available on the court's website.Ordered by Judge John L. Kane on 10/27/2022. Text Only Entry (jlksec) (Entered: 10/27/2022) |
| 10/27/2022 | 384 | NOTICE of Entry of Appearance by Wayne Howard Calabrese on behalf of GEO Group, Inc., TheAttorney Wayne Howard Calabrese added to party GEO Group, Inc., The(pty:dft) (Calabrese, Wayne) (Entered: 10/27/2022) |
| 10/27/2022 | 385 | NOTICE of Entry of Appearance by Joseph Negron, Jr on behalf of GEO Group, Inc., TheAttorney Joseph Negron, Jr added to party GEO Group, Inc., The(pty:dft) (Negron, Joseph) (Entered: 10/27/2022) |
| 11/04/2022 | 386 | BRIEF in Support of 301 MOTION for Order to *Authorize the Jury to View the Aurora ICE Processing Center Supplemental Brief in Support of Plaintiffs' Motion for Jury View* filed by Plaintiffs Olga Alexakhina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Exhibit 1)(Scimone, Michael) (Entered: 11/04/2022) |
| 11/16/2022 | 387 | NOTICE OF APPEAL as to 380 Order on Motion to Strike,,,,,, Order on Motion to Dismiss,,,,, Order on Motion for Order,,,, by Defendant GEO Group, Inc., The (Filing fee $ 505, Receipt Number ACODC-8784020) (Beer, Naomi) (Entered: 11/16/2022) |
| 11/17/2022 | 388 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 387 Notice of Appeal filed by GEO Group, Inc., The to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Preliminary Record and Docket Sheet)(angar, ) (Entered: 11/17/2022) |
| 11/17/2022 | 389 | USCA Case Number 22-1409 for 387 Notice of Appeal, filed by GEO Group, Inc., The. (angar, ) (Entered: 11/18/2022) |
| 11/18/2022 | 390 | BRIEF in Opposition to 301 MOTION for Order to *Authorize the Jury to View the Aurora ICE Processing Center* filed by Defendant GEO Group, Inc., The. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Scheffey, Adrienne) (Entered: 11/18/2022) |
| 11/18/2022 | 391 | MOTION to Stay *Proceedings Pending Appeal* by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 11/18/2022) |
| 11/30/2022 | 392 | TRANSCRIPT ORDER FORM by Defendant GEO Group, Inc., The. Transcript is not necessary re: 387 Notice of Appeal,. (angar, ) (Entered: 12/01/2022) |
| 12/01/2022 | 393 | LETTER TO USCA and all counsel certifying the record is complete as to 387 Notice of Appeal, filed by GEO Group, Inc., The. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 22-1409) Text Only Entry (angar, ) (Entered: 12/01/2022) |
| 12/01/2022 | 394 | Minute Order by Magistrate Judge Michael E. Hegarty on 1 December 2022. Pursuant to parties' emailed request, this Court will hold a settlement conference in this case on **December 21, 2022, at 11:30 a.m.** in Courtroom A501 on the fifth floor of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado. (cmadr, ) (Entered: 12/01/2022) |
| 12/02/2022 | 395 | RESPONSE to 391 MOTION to Stay *Proceedings Pending Appeal* filed by Plaintiffs Olga Alexakhina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 12/02/2022) |
| 12/05/2022 | 396 | Copy of Transcript Order Form re 387 Notice of Appeal, by Defendant GEO Group, Inc., The. (athom, ) (Entered: 12/05/2022) |
| 12/06/2022 | 397 | MOTION to Appoint Counsel *Outten & Golden LLP as Class Counsel and to Withdraw R. Andrew Free and Matthew Fritz-Mauer* by Plaintiffs Olga Alexakhina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Attachments: # 1 Declaration of Michael Scimone ISO Plaintiffs Motion to Appoint Outten & Golden LLP as Class Counsel and to Withdraw R. Andrew Free and Matthew Fritz-Mauer, # 2 Declaration of R. Andrew Free ISO Plaintiffs Motion to Appoint Outten & Golden LLP as Class Counsel and to Withdraw R. Andrew Free and Matthew Fritz-Mauer, # 3 Declaration of Matthew Fritz-Mauer ISO Plaintiffs Motion to Appoint Outten & Golden LLP as Class Counsel and to Withdraw R. Andrew Free and Matthew Fritz-Mauer, # 4 Proposed Order (PDF Only) Granting Motion to Appoint Outten & Golden LLP as Class Counsel and to Withdraw R. Andrew Free and Matthew Fritz-Mauer)(Scimone, Michael) (Entered: 12/06/2022) |
| 12/06/2022 | 398 | REPLY to Response to 391 MOTION to Stay *Proceedings Pending Appeal* filed by Defendant GEO Group, Inc., The. (Scheffey, Adrienne) (Entered: 12/06/2022) |
| 12/07/2022 | 399 | ORDER Granting 397 Plaintiffs' Unopposed Motion to Appoint Outten & Golden LLP as Class Counsel and to Withdraw R. Andrew Free and Matthew Fritz-Mauer. Having reviewed this motion, the Court finds that Outten & Golden LLP ("O&G") is an adequate representative for the class who will provide fair representation, and O&G is hereby appointed as class counsel. The Court further orders that R. Andrew Free and Matthew Fritz-Mauer are withdrawn as Class Counsel from this action and are no longer counsel of record. By Judge John L. Kane on 12/7/2022.(trvo, ) (Entered: 12/07/2022) |
| 12/07/2022 | 400 | ORDER; On November 16, 2022, Defendant The GEO Group, Inc. filed a Notice of Appeal 387 relating to my Order 380 granting Plaintiffs' Motion for Summary Judgment on GEO's Affirmative Defenses 260 and denying GEO's Cross Motion for Summary Judgment 284 . GEO then filed a Motion to Stay Proceedings Pending Appeal 391 . Plaintiffs' Response to that Motion 395 agrees that a stay is appropriate for matters that are comprehended within the appeal. As a result, GEO's Motion to Stay 391 is GRANTED in that all proceedings in this case related to the appeal are stayed pending further order of the Court. All trial-related deadlines and settings are VACATED. The parties are DIRECTED to confer within 10 days of any jurisdictional opinion issued by the Tenth Circuit and to submit a joint status report within 14 days of any such opinion. The parties shall state in the status report whether the stay should remain in place or whether the stay should be vacated and new trial dates set. Ordered by Judge John L. Kane on 12/7/2022. Text Only Entry (jlksec) (Entered: 12/07/2022) |
| 12/07/2022 | 401 | ORDER: The Motion for Jury View 301 is DENIED WITHOUT PREJUDICE for Plaintiffs to reinstate it once the stay granted in 398 has been lifted. In the meantime, my staff will be in touch with counsel after January 2, 2023, to arrange for me to visit the Aurora Detention Facility, which I find to be necessary based on the issues raised by the parties. Ordered by Judge John L. Kane on 12/7/2022. Text Only Entry(jlksec) (Entered: 12/07/2022) |
| 12/12/2022 | 402 | Unopposed MOTION for Leave to *Excuse In-Person Attendance At The Settlement Conference* 394 Order, by Plaintiffs Olga Alexakhina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. (Scimone, Michael) (Entered: 12/12/2022) |
| 12/13/2022 | 403 | MEMORANDUM regarding 402 MOTION for Leave to Excuse In-Person Attendance At The Settlement Conference 394 Order filed by Plaintiffs Olga Alexakhina, Lourdes Argueta, Marcos Brambila, Jesus Gaytan, Hugo Hernandez, Alejandro Menocal, Demetrio Valerga, Dagoberto Vizguerra, Grisel Xahuentitla. Motion referred to Magistrate Judge Michael E. Hegarty by Judge John L. Kane on 12/13/2022. (angar, ) (Entered: 12/13/2022) |
| 12/15/2022 | 404 | Minute ORDER by Magistrate Judge Michael E. Hegarty on 15 December 2022. For good cause shown, Plaintiffs' Unopposed Motion to Excuse In-Person Attendance at the Settlement Conference 402 is granted. The Representative Plaintiffs are excused from appearing in-person at the settlement conference on December 21, 2022. However, counsel shall ensure that the Representative Plaintiffs are available by telephone during the entirety of the conference.(cmadr, ) (Entered: 12/15/2022) |
| 12/20/2022 | 405 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on December 20, 2022. At the parties' emailed request, the settlement conference set for December 21, 2022 is vacated and rescheduled for January 12, 2023, at 10:30 a.m., in Courtroom A-501, on the fifth floor of the Alfred A. Arraj United States Courthouse located at 901 19th Street, Denver, Colorado. (alave, ) (Entered: 12/20/2022) |
| 01/13/2023 | 406 | MINUTE ENTRY for proceedings held before Magistrate Judge Michael E. Hegarty: Settlement Conference held on 1/13/2023. (cthom, ) (Entered: 01/17/2023) |

**PACER Service Center**

**Transaction Receipt**

01/21/2023 14:09:51

| PACER Login: | mackeymouse | Client Code: | 176629.010900 |
| Description: | Docket Report | Search Criteria: | 1:14-cv-02887-JLK-MEH |
| Billable Pages: | 30 | Cost: | 3.00 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

**CLASS ACTION COMPLAINT FOR UNPAID WAGES AND FORCED LABOR**

---

      The Plaintiffs in this case are current and former civil immigration detainees who were incarcerated and employed by the GEO Group, Inc. (GEO), a for-profit, multinational corporation engaged in the business of incarceration. GEO owns and operates the Aurora Detention Facility, a 1,500 bed detention center located in Aurora, CO. When it built and expanded the Aurora Detention Facility, GEO promised to create of hundreds of quality jobs in Aurora. However, GEO unlawfully uses detainees to clean, maintain, and operate the facility. **GEO pays detainees $1 per day, or no wages at all, for their labor**. In 2013, The GEO Group, Inc. reported $1.52 billion in total revenues.

GEO violated Colorado's Minimum Wage Order when it paid its detained employees **one dollar ($1) per day** for their labor. Plaintiffs seek to recover, on their own behalf and on behalf of all others similarly situated, the difference between the wages they earned and the $1 per day they were paid.

In addition, GEO violated federal law prohibiting forced labor when it forced Plaintiffs and others to work, **for no pay whatsoever,** cleaning the "pods" where they were housed. GEO coerced detainees to clean pods by threatening to put those who refused to work (for no pay) in "the hole," or solitary confinement. In 2011, The United Nations Special Rapporteur on Torture called for the end of solitary confinement, citing the severe mental pain and suffering it causes.[1]

GEO's pay policies violate principles of justice, equity, and good conscience. GEO was unjustly enriched when it paid its employees $1 per day, or nothing at all, for their labor.

### STATEMENT OF THE CASE

1.    In the course of their employment by GEO, Plaintiffs and others scrubbed bathrooms, showers, toilets, and windows throughout GEO's Aurora facility. They cleaned and maintained GEO's on-site medical facility, cleaned the medical facility's toilets, floors and windows, cleaned patient rooms and medical staff offices, swept, mopped, stripped, and waxed the floors of the medical facility, did medical facility laundry, swept, mopped, stripped, and waxed floors throughout the facility, did detainee laundry, prepared and served detainee meals, assisted in preparing catered meals for law enforcement events sponsored by GEO, performed clerical work for GEO, prepared clothing for newly arriving detainees, provided barber services to detainees, ran the

---

[1] *See also,* Rick Raemisch, My Night in Solitary, N.Y. Times, Feb. 20, 2014.

**APP. 13**

facility's law library, cleaned the facility's intake area and solitary confinement unit, deep cleaned and prepared vacant portions of the facility for newly arriving detainees, cleaned the facility's warehouse, and maintained the exterior and landscaping of the GEO building, *inter alia*.

2.     Defendant paid Plaintiffs and all its other detainee-employees one dollar ($1) per day for their above-listed labor.

3.     Defendant thus violated Colorado's Minimum Wage Order ("MWO") because that Order requires employers like GEO to pay their employees at least the statutory minimum wage for each hour worked. 7 CCR 1103-1.

4.     As a result of Defendant's violation of the MWO, Plaintiffs seek actual damages, on their own behalf and on behalf of all Defendant's other similarly-situated employees, as well as costs of suit.

5.     GEO or its agents also randomly selected six detainees per pod each day and forced them to clean the pods. In the handbook that GEO distributed to the detainees, GEO announced a "Housing Unit Sanitation" policy informing the people held at the facility that "[e]ach and every detainee must participate in the facility's sanitation program."

6.     GEO or its agents forced Plaintiffs and other civil immigration detainees to clean the facility's pods for no pay and under threat of solitary confinement as punishment for any refusal to work.

7.     Defendant thus violated federal law prohibiting forced labor. 18 U.S.C. § 1589.

8.     As a result of Defendant's violation of the federal forced labor statute,

**APP. 14**

Plaintiffs seek actual damages, punitive damages, and mandatory restitution, on their own behalf and on behalf of all Defendant's other similarly-situated detainees, as well as attorneys fees and costs, pursuant to 18 U.S.C. §§ 1593 and 1595.

9.    Finally, GEO was unjustly enriched when it paid its employees $1 per day for their labor. GEO's pay policies violate principles of justice, equity, and good conscience.

<u>**PARTIES, JURISDICTION, AND VENUE**</u>

10.    Plaintiff Alejandro Menocal worked at Defendant's facility from approximately June, 2014 through September, 2014.

11.    Plaintiff Marcos Brambila worked at Defendant's facility from approximately December, 2013 through October, 2014.

12.    Plaintiff Grisel Xahuentitla worked at Defendant's facility from approximately May, 2014 through September, 2014.

13.    Plaintiff Hugo Hernandez has been working at Defendant's facility since approximately December, 2013 through the present.

14.    Plaintiff Lourdes Argueta has been working at Defendant's facility since approximately May, 2014 through the present.

15.    Plaintiff Jesus Gaytan has been working at Defendant's facility since approximately April, 2014 through the present.

16.    Plaintiff Olga Alexaklina worked at Defendant's facility from approximately January, 2013 through October, 2014.

17.    Plaintiff Dagoberto Vizguerra has been working at Defendant's facility since approximately April, 2014 through the present.

18.    Plaintiff Demetrio Valerga worked at Defendant's facility from approximately

APP. 15

September, 2013 through July, 2014.

19.    Defendant The GEO Group, Inc. is a registered Florida corporation with a principal office street address of 624 NW 53rd Street, Suite 700, Boca Raton, FL 33487.

20.    Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, this case arising under 18 U.S.C. § 1595.

21.    Jurisdiction is conferred upon this Court by 28 U.S.C. § 1332(d), as the putative members of the alleged classes seek damages in excess of $5,000,000.00.

22.    Plaintiffs request that this Court exercise supplemental jurisdiction over their state law claims arising under the Colorado Minimum Wage Order and the Colorado common law. 28 U.S.C. § 1367.

23.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred in the District of Colorado.

## RULE 23 CLASS ALLEGATIONS AS TO THE "MINIMUM WAGE CLASS"

24.    Plaintiffs bring their Count I MWO claim, below, as a Fed. R. Civ. P. 23 class action, on their own behalf and on behalf of a class for which Plaintiffs seek certification.

25.    Plaintiffs' Count I MWO claim concerns Defendant's employment of the Plaintiffs and others similarly situated in GEO's "Detainee Voluntary Work Program". Plaintiffs' Count I MWO claim does not concern the mandatory, uncompensated work Plaintiffs and others similarly situated performed under Defendant's Housing Unit Sanitation Policy.

26.    Pending any modifications necessitated by discovery, Plaintiffs preliminarily define this Minimum Wage Class as follows:

> All civil immigration detainees who performed work for GEO at the Aurora Detention Facility in the "Detainee Voluntary Work Program" between

**APP. 16**

October 22, 2012 and the present.

27.    This action is properly brought as a class action for the following reasons:

28.    All of Defendant's employees in the "Detainee Voluntary Work Program" were uniformly paid $1/day of work and were thereby denied required minimum wages for all hours worked.

29.    The class is so numerous that joinder of all the potential class members is impracticable.  Plaintiffs do not know the exact size of the class since that information is within the control of Defendant. However, upon information and belief, Plaintiffs allege that the number of class members exceeds 300. Membership in the class is readily ascertainable from Defendant's detention and employment records.

30.    The operative questions of law and fact regarding the liability of Defendant are common to the class and predominate over any individual issues which may exist. Common questions of law and of fact include: whether Plaintiffs and the class members were entitled to the protections of the MWO, whether Plaintiffs and the class members performed compensable work, and whether Plaintiffs and the class members were paid $1 per day for their labor. The claims asserted by Plaintiffs are typical of the claims of all class members. This is an uncomplicated case of unpaid minimum wages. The claim at issue arises from a policy applicable to all members of the class. Each member of the class suffered the same violations that give rise to Plaintiffs' claims. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging identical causes of action would not serve the interests of judicial economy.

31.    The representative Plaintiffs will fairly and adequately protect the interests of

**APP. 17**

the members of the class. Because all class members were subject to the same violations of law perpetrated by Defendant, the interests of absent class members are coincident with, and not antagonistic to, those of Plaintiffs. The representative Plaintiffs will litigate the claims fully.

32.     The representative Plaintiffs are represented by counsel experienced in wage and hour class action litigation.

33.     The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members and would establish incompatible standards of conduct for Defendant. If Defendant's $1 per day policy was unlawful as applied to the representative Plaintiffs, it was unlawful as applied to the absent members of the putative class.

34.     Those class members who worked for Defendant for short periods of time have small claims which they are unlikely to bring individually. All members of the class have claims which are factually very similar and legally identical to Plaintiffs'. Thus, the interest of members of the class in individually controlling the prosecution or defense of separate actions is slight, while the broad remedial purpose of the MWO counsels toward vindicating the rights of those employees with small claims as part of the larger class.

35.     Plaintiffs are unaware of any members of the putative class who are interested in presenting their claims in a separate action.

36.     Plaintiffs are unaware of any pending litigation commenced by members of the class concerning the instant controversy.

37.     It is desirable to concentrate this litigation in this forum because all claims

**APP. 18**

arose in this Judicial District.

38.    This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of wage and hour cases to both class litigation and the use of representative testimony and representative documentary evidence.

39.    The contours of the class will be easily defined by reference to the detention and payroll documents Defendant created and maintained.

**COUNT I**
**Colorado Minimum Wages of Workers Act, § 8-6-101, *et seq.***
**as implemented by the Colorado Minimum Wage Order, 7 CCR 1103-1**

40.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1-23 above as if fully set forth herein.

41.    As set forth in paragraphs 24-39, *supra*, Plaintiffs allege this claim on their own behalf and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23.

42.    This Count concerns Defendant's employment of the Plaintiffs and others similarly situated in GEO's "Detainee Voluntary Work Program". This Count does not concern the mandatory, uncompensated work Plaintiffs and others similarly situated performed under Defendant's Housing Unit Sanitation policy.

43.    Defendant The GEO Group, Inc. was Plaintiffs' and others' "employer" as that term is defined by the MWO because it employed Plaintiffs and others in Colorado. 7 CCR 1103-1(2).

44.    The GEO Group operates a Retail and Service business or enterprise covered by the Wage Order. 7 CCR 1103-1(1)(A). GEO sells the service of incarcerating people. According to GEO, it "is the world's leading provider in the delivery

**APP. 19**

of diversified correctional, detention, and residential treatment services to government agencies around the globe." GEO generates 50% or more of its annual dollar volume of business from the sale of such services.

45.    The GEO Group operates a Health and Medical business or enterprise covered by the Wage Order. 7 CCR 1103-1(1)(D). GEO provides health services to the detainee population at the Aurora Detention Facility.

46.    The GEO Group operates a Food and Beverage business or enterprise covered by the Wage Order. 7 CCR 1103-1(1)(C). GEO prepares and offers for sale food for consumption both on and off the premises of its Aurora facility. GEO produces food at the Aurora Detention Facility for consumption by outside entities, that conduct training exercises at the Aurora Detention Facility. GEO also prepares and offers for sale food and beverages at its on-site commissary.

47.    Plaintiffs were engaged in the performance of work connected with or incidental to GEO's covered business or enterprise.

48.    Plaintiffs and others were GEO's "employees" as that term is defined by the MWO because they performed labor for the benefit of GEO in which GEO commanded when, where, and how much labor they would perform. 7 CCR 1103-1(2).

49.    GEO violated the MWO when it refused to pay Plaintiffs and others minimum wages for all hours worked. 7 CCR 1103-1(4).

50.    Plaintiffs performed numerous hours of work for GEO in GEO's "Detainee Voluntary Work Program". GEO did not compensate Plaintiffs' work at the required Colorado State Minimum Wage rates specified in the applicable, annual Wage Orders. GEO compensated Plaintiffs' work in the "Detainee Voluntary Work Program" at the rate

**APP. 20**

of $1/day.

51.     Plaintiffs and others have suffered lost wages and lost use of those wages in an amount to be determined at trial.

52.     Plaintiffs and others are entitled to recover unpaid minimum wages and costs of the suit.  C.R.S. § 8-6-118; 7 CCR 1103-1(18).

### <u>RULE 23 CLASS ALLEGATIONS AS TO THE "FORCED LABOR CLASS"</u>

53.     Plaintiffs bring their Count II Forced Labor claim, below, as a Fed. R. Civ. P. 23 class action, on their own behalf and on behalf of a class for which Plaintiffs seek certification.

54.     Plaintiffs' Count II Forced Labor claim concerns the mandatory, uncompensated work Plaintiffs and others similarly situated performed under Defendant's Housing Unit Sanitation policy.  Plaintiffs' Count II Forced Labor claim does not concern the work the Plaintiffs and others performed within GEO's "Voluntary Detainee Work Program".

55.     Pending any modifications necessitated by discovery, Plaintiffs preliminarily define this Forced Labor Class as follows:

> All detainees who were forced to perform uncompensated work for GEO at the Aurora Detention Facility under Defendant's Housing Unit Sanitation policy between October 22, 2004 and the present.

56.     This action is properly brought as a class action for the following reasons:

57.     All of the members of the Forced Labor Class were forced to work for GEO for no pay during their detention.

58.     The class is so numerous that joinder of all the potential class members is impracticable.  Plaintiffs do not know the exact size of the class since that information is

APP. 21

within the control of Defendant. However, upon information and belief, Plaintiffs allege that the number of class members exceeds 1000.  Membership in the class is readily ascertainable from Defendant's detention records.

59.    The operative questions of law and fact regarding the liability of Defendant are common to the Class and predominate over any individual issues which may exist. Common questions of law and of fact include: whether Defendant's policy of requiring Plaintiffs and the class members to clean the cells on their pods under threat of solitary confinement violated 18 U.S.C. § 1589 and whether Plaintiffs and the class members were not paid for their work cleaning cells. The claims asserted by Plaintiffs are typical of the claims of all of the Class Members. The claim at issue arises from a policy applicable to all members of the class. Each member of the class suffered the same violations that give rise to Plaintiffs' claims. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging identical causes of action would not serve the interests of judicial economy.

60.    The representative Plaintiffs will fairly and adequately protect the interests of the members of the class. Because all class members were subject to the same violations of law perpetrated by Defendant, the interests of absent class members are coincident with, and not antagonistic to, those of Plaintiffs. The representative Plaintiffs will litigate the claims fully.

61.    The representative Plaintiffs are represented by counsel experienced in class action and labor litigation.

62.    The prosecution of separate actions by individual class members would

**APP. 22**

create a risk of inconsistent or varying adjudications with respect to individual class members which would establish incompatible standards of conduct for Defendant. If Defendant's forced labor policy was unlawful as applied to the representative Plaintiffs, it was unlawful as applied to the absent members of the putative class.

63.     Those class members who worked for Defendant for short periods of time have small claims which they are unlikely to bring individually. All members of the class have claims which are factually very similar and legally identical to Plaintiffs'. Thus, the interest of members of the class in individually controlling the prosecution or defense of separate actions is slight, while the remedial purpose of the Forced Labor Statute counsels toward vindicating the rights of those employees with small claims as part of the larger class.

64.     Plaintiffs are unaware of any members of the putative class who are interested in presenting their claims in a separate action.

65.     Plaintiffs are unaware of any pending litigation commenced by members of the class concerning the instant controversy.

66.     It is desirable to concentrate this litigation in this forum because all claims arose in this Judicial District.

67.     This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of this case to both class litigation and the use of representative testimony and representative documentary evidence.

68.     The contours of the class will be easily defined by reference to the detention records Defendant created and maintained.

**APP. 23**

**COUNT II**
**Forced Labor**
**18 U.S.C. § 1589**

69.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs1-23 above.

70.    As set forth in paragraphs 53-68, *supra*, Plaintiffs allege this claim on their own behalf and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23.

71.    This Count concerns the mandatory, uncompensated work Plaintiffs and others similarly situated performed under Defendant's Housing Unit Sanitation policy. This Count does not concern the work the Plaintiffs and others performed within Defendant's "Voluntary Detainee Work Program".

72.    Defendant violated the federal Forced Labor statute when it coerced Plaintiffs and others to work cleaning pods for no pay.

73.    Defendant coerced this labor through threats that those who refused to perform such uncompensated work would be subjected to discipline, up to and including solitary confinement.

74.    Defendant coerced this labor through a uniform policy subjecting detainees who refused to perform such uncompensated work to discipline, up to and including solitary confinement.

75.    Defendant saved costs associated with paying for custodial work by using the uncompensated and coerced labor of Plaintiffs and others to clean cells and living areas.

**APP. 24**

76.     Defendant provided or obtained the labor or services of Plaintiffs and others by means of physical restraint or threats of physical restraint to Plaintiffs and others.  18 U.S.C. § 1589(a)(1).

77.     Defendant provided or obtained the labor or services of Plaintiffs and others by means of serious harm or threats of serious harm to Plaintiffs and others.   18 U.S.C.§ 1589(a)(2).

78.     Defendant provided or obtained the labor or services of Plaintiffs and others by means of a scheme, plan, or pattern intended to cause the Plaintiffs and others to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint, including solitary confinement.  18 U.S.C. § 1589 (a)(4).

79.     Plaintiffs and others similarly situated were victims of forced labor as defined by 18 U.S.C. § 1589.

80.     Defendant perpetrated the offense of forced labor against the Plaintiffs and others.  18 U.S.C. § 1595(a).

81.     Defendant knowingly benefitted financially from participation in a venture Defendant knew or should have known engaged in unlawful coercion of labor in violation of 18 U.S.C. § 1589.

82.     Plaintiffs and others have suffered damages in an amount to be determined at trial.

83.     Plaintiffs and others are entitled to recover compensatory and punitive damages.  18 U.S.C. § 1595(a).

84.     Plaintiffs and others are entitled to recover mandatory restitution in the full amount of their losses. 18 U.S.C. § 1593.

**APP. 25**

85.    Plaintiffs and others are entitled to recover their reasonable attorneys fees. 18 U.S.C. § 1595(a).

**RULE 23 CLASS ALLEGATIONS AS TO THE "UNJUST ENRICHMENT CLASS"**

86.    Plaintiffs bring their Count III Unjust Enrichment claim, below, as a Fed. R. Civ. P. 23 class action, on their own behalf and on behalf of a class for which Plaintiffs seek certification.

87.    Pending any modifications necessitated by discovery, Plaintiffs preliminarily define this Unjust Enrichment Class as follows:

> All civil immigration detainees who performed work for GEO at the Aurora Detention Facility in the "Detainee Voluntary Work Program" between October 22, 2012 and the present.

88.    This action is properly brought as a class action for the following reasons:

89.    All of Defendant's employees in the "Detainee Voluntary Work Program" were uniformly paid $1/day of work and Defendant was thereby unjustly enriched.

90.    The class is so numerous that joinder of all the potential class members is impracticable.  Plaintiffs do not know the exact size of the class since that information is within the control of Defendant. However, upon information and belief, Plaintiffs allege that the number of class members exceeds 300. Membership in the class is readily ascertainable from Defendant's detention and employment records.

91.    The operative questions of law and fact regarding the liability of Defendant are common to the class and predominate over any individual issues which may exist. Common questions of law and of fact include: whether Defendants' retention of any benefit collected directly and indirectly from Plaintiffs' and others' labor violated principles of justice, equity, and good conscience, and whether Plaintiffs and the class

**APP. 26**

members were paid $1 per day for their labor. The claims asserted by Plaintiffs are typical of the claims of all class members. This is an uncomplicated case of Defendant procuring very nearly free labor from a detained workforce. The claim at issue arises from a policy applicable to all members of the class. Each member of the class suffered the same violations that give rise to Plaintiffs' claims. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging identical causes of action would not serve the interests of judicial economy.

92.    The representative Plaintiffs will fairly and adequately protect the interests of the members of the class. Because all class members were subject to the same violations of law perpetrated by Defendant, the interests of absent class members are coincident with, and not antagonistic to, those of Plaintiffs. The representative Plaintiffs will litigate the claims fully.

93.    The representative Plaintiffs are represented by counsel experienced in labor class action litigation.

94.    The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members and would establish incompatible standards of conduct for Defendant. If Defendant's $1 per day policy was unlawful as applied to the representative Plaintiffs, it was unlawful as applied to the absent members of the putative class.

95.    Those class members who worked for Defendant for short periods of time have small claims which they are unlikely to bring individually. All members of the class have claims which are factually very similar and legally identical to Plaintiffs'. Thus, the

**APP. 27**

interest of members of the class in individually controlling the prosecution or defense of separate actions is slight.

96.    Plaintiffs are unaware of any members of the putative class who are interested in presenting their claims in a separate action.

97.    Plaintiffs are unaware of any pending litigation commenced by members of the class concerning the instant controversy.

98.    It is desirable to concentrate this litigation in this forum because all claims arose in this Judicial District.

99.    This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of labor cases to both class litigation and the use of representative testimony and representative documentary evidence.

100.    The contours of the class will be easily defined by reference to the detention and payroll documents Defendant created and maintained.

**COUNT III**
**Unjust Enrichment**
**Colorado Common Law**

101.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs1-23 above.

102.    As set forth in paragraphs 87-101, *supra*, Plaintiffs allege this claim on their own behalf and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23.

103.    This Count concerns Defendant's employment of the Plaintiffs and others similarly situated in GEO's "Detainee Voluntary Work Program". This Count does not concern the mandatory, uncompensated work Plaintiffs and others similarly situated performed under Defendant's Housing Unit Sanitation policy.

**APP. 28**

104.   By paying Plaintiffs and others $1 per day for all hours worked, Defendant was unjustly enriched at the expense of and to the detriment of Plaintiffs and others.

105.   Defendant's retention of any benefit collected directly and indirectly from Plaintiffs' and others' labor violated principles of justice, equity, and good conscience. As a result, Defendant has been unjustly enriched.

106.   Plaintiffs and others are entitled to recover from Defendant all amounts that Defendant has wrongfully and improperly obtained, and Defendant should be required to disgorge to Plaintiffs and others the benefits it has unjustly obtained.

107.   Plaintiffs and others are entitled to recover exemplary damages.  C.R.S. § 13-21-102.

**WHEREFORE**, Plaintiffs pray that:

As to their Count I Claim brought under the Colorado Minimum Wages of Workers Act, as implemented by the Colorado Minimum Wage Order and described in paragraphs 40-52 above, Plaintiffs respectfully request an Order from the Court that:

    a.  This Count be certified as a class action pursuant to Fed. R. Civ.P. 23;

    b.  Plaintiffs be certified as class representatives of the Minimum Wage Class as defined in ¶ 26 *supra*;

    c.  Undersigned counsel be appointed Rule 23 class counsel;

    d.  Prompt notice of this litigation be sent to all potential Minimum Wage Class members;

    e.  Plaintiffs and the Minimum Wage Class be awarded the unpaid balance of the full amount of wages due, together with the costs of this suit.  C.R.S. § 8-6-118; 7 CCR 1103-1(18).

**APP. 29**

    f.   Plaintiffs and the Minimum Wage Class be awarded such other and further relief as may be necessary and appropriate.

As to their Count II Claim brought pursuant to the Forced Labor Statute 18 U.S.C. § 1589, and described in paragraphs 69-85 above, Plaintiffs respectfully request an Order from the Court that:

    a.   This Count be certified as a class action pursuant to Fed. R. Civ.P. 23;

    b.   Plaintiffs be certified as class representatives of the Forced Labor Class as defined  in ¶ 56 *supra*;

    c.   Undersigned counsel be appointed Rule 23 class counsel;

    d.   Prompt notice of this litigation be sent to all potential Forced Labor Class members;

    e.   Plaintiffs and the Forced Labor Class be awarded compensatory and punitive damages; 18 U.S.C. § 1595.

    f.   Plaintiffs and the Forced Labor Class be awarded mandatory restitution; 18 U.S.C. § 1593.

    g.   Plaintiffs and the Forced Labor Class be awarded their reasonable attorneys fees; 18 U.S.C. § 1595.

    h.   Plaintiffs and the Forced Labor Class be awarded such other and further relief as may be necessary and appropriate.

As to their Count III Claim brought pursuant Colorado common law, and described in paragraphs 102-107 above, Plaintiffs respectfully request an Order from the Court that:

    a.   This Count be certified as a class action pursuant to Fed. R. Civ.P. 23;

    b.   Plaintiffs be certified as class representatives of the Unjust Enrichment Class as defined in ¶ 88 *supra*;

    c.   Undersigned counsel be appointed Rule 23 class counsel;

**APP. 30**

d. Prompt notice of this litigation be sent to all potential Unjust Enrichment Class members;

e. Plaintiffs and the Unjust Enrichment Class be awarded compensatory and exemplary damages.

f. Plaintiffs and the Class be awarded such other and further relief as may be necessary and appropriate.

Respectfully submitted,

*S/ Brandt Milstein*
MILSTEIN LAW OFFICE
595 Canyon Boulevard
Boulder, CO 80302
303.440.8780
brandt@milsteinlawoffice.com

*S/ Andrew Turner*
BUESCHER, KELMAN & PERERA, P.C.
600 Grant St., Suite 450
Denver, CO 80203
303.333.7751
aturner@laborlawdenver.com

*S/ Alexander Hood*
TOWARDS JUSTICE
601 16th St. Suite C #207
Golden, CO 80401
720.239.2606
alex@towardsjustice.org

*S/ Hans Meyer*
Meyer Law Office, P.C.
P.O. Box 40394
Denver, CO 80204
303.831.0817
hans@themeyerlawoffice.com

*S/ R. Andrew Free**
Of Counsel
LAW OFFICE OF R. ANDREW FREE
Bank of America Plaza

20

**APP. 31**

414 Union St., Suite 900
Nashville, TN 37219
615.244.2202
Andrew@ImmigrantCivilRights.com

*Attorneys for Plaintiffs*

\*Motion for *pro hac vice* admittance forthcoming.

**APP. 32**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-CV-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
on their own behalf and on behalf of all others similarly situated,

       Plaintiffs,

vs.

THE GEO GROUP, INC.,

       Defendant.

---

## ANSWER

---

     Defendant THE GEO GROUP, INC., by its attorneys, Vaughan & DeMuro and

Norton Rose Fulbright US LLP, submits this answer to Plaintiffs' Complaint [Doc. 1] as

follows:

     In answer to the unnumbered paragraph on page one of Plaintiffs' Complaint,

Defendant admits that the plaintiffs are former detainees who were detained by the

Department of Homeland Security, Bureau of Immigration and Customs Enforcement

("DHS/ICE") at the Aurora Detention Facility which is owned and operated by Defendant

**APP. 33**

pursuant to a contract with DHS/ICE.  Defendant otherwise denies the allegations in that paragraph.

Defendant denies the allegations contained in the first unnumbered paragraph on page two of Plaintiffs' Complaint and further states that Plaintiffs' claim under Colorado's Minimum Wage Order was dismissed by the Court on July 7, 2015 [Doc. 23].

Defendant denies the allegations contained in the second unnumbered paragraph on page two of Plaintiffs' Complaint.

Defendant denies the allegations contained in the third unnumbered paragraph on page two of Plaintiffs' Complaint.

## STATEMENT OF THE CASE

1.    In answer to paragraph 1 of Plaintiffs' Complaint, Defendant admits that Plaintiffs were detained by DHS/ICE at the Aurora Detention Facility and as part of that detention may have performed duties in accordance with ICE's voluntary detainee work program for detainees and ICE's sanitation policies.  Defendant admits that duties carried out by detainees may sometimes include cleaning bathrooms, showers, toilets, windows, floors (sweeping, mopping, stripping, waxing), housing units, intake area, medical patient rooms and offices; doing laundry; preparing meals; barber services; cleaning and organizing the warehouse; pulling weeds; and planting flowers.  Defendant otherwise denies the allegations in paragraph 1 of Plaintiffs' Complaint.

2.    In answer to paragraph 2 of Plaintiffs' Complaint, Defendant admits that pursuant to ICE's voluntary detainee work program, detainees are paid $1.00 per day for

APP. 34

certain work that they perform.  Defendant otherwise denies the allegations in paragraph 2 of Plaintiffs' Complaint.

3.      Defendant denies the allegations in paragraph 3 of Plaintiffs' Complaint and further states that Plaintiffs' claim under Colorado's Minimum Wage Order was dismissed by the Court on July 7, 2015 [Doc. 23].

4.      Defendant denies the allegations in paragraph 4 of Plaintiffs' Complaint and further states that Plaintiffs' claim under Colorado's Minimum Wage Order was dismissed by the Court on July 7, 2015 [Doc. 23].

5.      In answer to paragraph 5 of Plaintiffs' Complaint, Defendant states that the ICE Detainee Handbook speaks for itself and, therefore, it is not necessary for Defendant to either or admit or deny the allegations in paragraph 5.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 5 of Plaintiffs' Complaint.

6.      Defendant denies the allegations in paragraph 6 of Plaintiffs' Complaint.

7.      Defendant denies the allegations in paragraph 7 of Plaintiffs' Complaint.

8.      Defendant denies the allegations in paragraph 8 of Plaintiffs' Complaint.

9.      In answer to paragraph 9 of Plaintiffs' Complaint, Defendant admits that pursuant to ICE's voluntary detainee work program, detainees are paid $1.00 per day for certain work that they perform.  Defendant otherwise denies the allegations in paragraph 9 of Plaintiffs' Complaint.

**APP. 35**

**PARTIES, JURISDICTION, VENUE**

10.     In answer to paragraph 10 of Plaintiffs' Complaint, Defendant admits that Alejandro Menocal was detained by ICE at the Aurora Detention Facility from approximately June 6, 2014, until September 10, 2014.  Defendant otherwise denies the allegations in paragraph 10 of Plaintiffs' Complaint.

11.     In answer to paragraph 11 of Plaintiffs' Complaint, Defendant admits that Marcos Brambila was detained by ICE at the Aurora Detention Facility from approximately December 26, 2013, until November 5, 2014.  Defendant otherwise denies the allegations in paragraph 11 of Plaintiffs' Complaint.

12.     In answer to paragraph 12 of Plaintiffs' Complaint, Defendant admits that Grisel Xahuentitla was detained by ICE at the Aurora Detention Facility from approximately May 15, 2014, until September 3, 2014.  Defendant otherwise denies the allegations in paragraph 12 of Plaintiffs' Complaint.

13.     In answer to paragraph 13 of Plaintiffs' Complaint, Defendant admits that Hugo Hernandez was detained by ICE at the Aurora Detention Facility from approximately March 8, 2014, until April 3, 2015.   Defendant otherwise denies the allegations in paragraph 13 of Plaintiffs' Complaint.

14.     In answer to paragraph 14 of Plaintiffs' Complaint, Defendant admits that Lourdes Argueta was detained by ICE at the Aurora Detention Facility from approximately

**APP. 36**

September 30, 2013, until February 6, 2015.  Defendant otherwise denies the allegations in paragraph 14 of Plaintiffs' Complaint.

15.     In answer to paragraph 15 of Plaintiffs' Complaint, Defendant admits that Jesus Gaytan was detained by ICE at the Aurora Detention Facility from approximately July 21, 2014, until December 12, 2014.  Defendant otherwise denies the allegations in paragraph 15 of Plaintiffs' Complaint.

16.     In answer to paragraph 16 of Plaintiffs' Complaint, Defendant admits that Olga Alexaklina was detained by ICE at the Aurora Detention Facility from approximately August 13, 2014, until September 29, 2014.  Defendant otherwise denies the allegations in paragraph 16 of Plaintiffs' Complaint.

17.     In answer to paragraph 17 of Plaintiffs' Complaint, Defendant admits that Dagoberto Vizguerra was detained by ICE at the Aurora Detention Facility from approximately October 17, 2014, until November 14, 2014.  Defendant otherwise denies the allegations in paragraph 17 of Plaintiffs' Complaint.

18.     In answer to paragraph 18 of Plaintiffs' Complaint, Defendant admits that Demetrio Valerga was detained by ICE at the Aurora Detention Facility from approximately September 11, 2013, until July 11, 2014.  Defendant otherwise denies the allegations in paragraph 18 of Plaintiffs' Complaint.

19.     Defendant admits the allegations in paragraph 19 of Plaintiffs' Complaint.

20.     In answer to paragraph 20 of Plaintiffs' Complaint, assuming Plaintiffs have standing and a claim under the TVPA, Defendant admits this Court has jurisdiction over

**APP. 37**

this matter pursuant to 28 U.S.C. § 1331. However, if Plaintiff's lack standing to bring a claim under the TVPA or the TVPA provides them no cause of action, there is no federal subject matter jurisdiction, and the Court should deny supplemental jurisdiction over pending state law claims. Defendant otherwise denies the allegations in paragraph 20 of Plaintiffs' Complaint.

21.    Defendant denies the allegations in paragraph 21 of Plaintiffs' Complaint.

22.    In answer to paragraph 22 of Plaintiffs' Complaint, Defendant admits 28 U.S.C. § 1367 addresses supplemental jurisdiction. Defendant otherwise denies the allegations in paragraph 22 of Plaintiffs' Complaint.

23.    To the extent this Court has jurisdiction, Defendant admits the allegations in paragraph 23 of Plaintiffs' Complaint.

**RULE 23 CLASS ALLEGATIONS AS TO THE "MINIMUM WAGE CLASS"**

24-39.    In answer to paragraphs 24-39 of Plaintiffs' Complaint, Defendant states that Plaintiffs' "minimum wage" claim was dismissed by the Court on July 7, 2015 [Doc. 23], as such, it is unnecessary for Defendant to respond to these paragraphs. To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraphs 24-39 of Plaintiffs' Complaint.

**COUNT I**
**Colorado Minimum Wages of Workers Act, § 8-6-101, *et seq.***
**as implemented by the Colorado Minimum Wage Order, 7 CCR 1103-1**

40.    In answer to paragraph 40 of Plaintiffs' Complaint, Defendant incorporates its answers to the allegations contained in paragraphs 1 through 39 of Plaintiffs' Complaint

APP. 38

as though fully set forth herein.

41-52.        In answer to paragraphs 41-52 of Plaintiffs' Complaint, Defendant states that Count I of Plaintiffs' Complaint was dismissed by the Court on July 7, 2015 [Doc. 23]; as such, it is unnecessary for Defendant to respond to these paragraphs.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraphs 41-52 of Plaintiffs' Complaint.

**RULE 23 CLASS ALLEGATIONS AS TO THE "FORCED LABOR CLASS"**

53.        In answer to paragraph 53 of Plaintiffs' Complaint, Defendant admits that Plaintiffs seek to bring this action pursuant to Fed.R.Civ.P. 23.  Defendant denies that this action is appropriately maintained under such provisions of the federal rules and otherwise denies the remaining allegations contained in paragraph 53.

54.        In answer to paragraph 54 of Plaintiffs' Complaint, Defendant admits that it utilizes ICE's sanitation policy and that Plaintiffs' Count II Forced Labor claim does not concern ICE's voluntary detainee work program.   Defendant otherwise denies the allegations in paragraph 54 of Plaintiffs' Complaint.

55.        In answer to paragraph 55 of Plaintiffs' Complaint, Defendant admits that detainees may have performed work under ICE's sanitation policy and that such policy speaks for itself.  Defendant otherwise denies the allegations in paragraph 55 of Plaintiffs' Complaint.

56.        Paragraph 56 of Plaintiffs' Complaint contains no allegations for Defendant to admit or deny.  To the extent it is deemed necessary to admit or deny the same,

7

Defendant denies the allegations in paragraph 56 of Plaintiffs' Complaint.

57.     Defendant denies the allegations in paragraph 57 of Plaintiffs' Complaint.

58.     Defendant is without knowledge regarding the allegations in paragraph 58 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 58.

59.     In answer to paragraph 59 of Plaintiffs' Complaint, Defendant admits that it utilizes ICE's sanitation policy and that such policy speaks for itself.  Defendant otherwise denies the allegations in paragraph 59 of Plaintiffs' Complaint.

60.     Defendant is without knowledge regarding the allegations in paragraph 60 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 60.

61.     Defendant is without knowledge regarding the allegations in paragraph 61 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 61.

62.     Defendant denies the allegations in paragraph 62 of Plaintiffs' Complaint.

63.     Defendant is without knowledge regarding the allegations in paragraph 63 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 63.

64.     Defendant is without knowledge regarding the allegations in paragraph 64 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 64.

65.     Defendant is without knowledge regarding the allegations in paragraph 65 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 65.

66.     To the extent that this matter is allowed to proceed under Fed.R.Civ.P. 23, Defendant admits the allegations in paragraph 66 of Plaintiffs' Complaint.  Defendant otherwise denies the allegations in paragraph 66 of Plaintiffs' Complaint.

67.     Defendant is without knowledge regarding the allegations in paragraph 67 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 67.

68.     Defendant denies the allegations in paragraph 68 of Plaintiffs' Complaint.

## COUNT II
### Forced Labor
### 18 U.S.C. § 1589

69.     In answer to paragraph 69 of Plaintiffs' Complaint, Defendant incorporates its answers to the allegations contained in paragraphs 1 through 68 of Plaintiffs' Complaint as though fully set forth herein.

70.     In answer to paragraph 70 of Plaintiffs' Complaint, Defendant admits that Plaintiffs seek to bring this action pursuant to Fed.R.Civ.P. 23.  Defendant denies that this action is appropriately maintained under such provisions of the federal rules and otherwise denies the remaining allegations contained in paragraph 70.

71.     Paragraph 71 of Plaintiffs' Complaint contains no allegations for Defendant to admit or deny.  To the extent it is deemed necessary to admit or deny the same,

**APP. 41**

Defendant denies the allegations in paragraph 71 of Plaintiffs' Complaint.

72-85.    Defendant denies the allegations in paragraphs 72-85 of Plaintiffs' Complaint.

**RULE 23 CLASS ALLEGATIONS AS TO THE "UNJUST ENRICHMENT CLASS"**

86.    In answer to paragraph 86 of Plaintiffs' Complaint, Defendant admits that Plaintiffs seek to bring this action pursuant to Fed.R.Civ.P. 23.  Defendant denies that this action is appropriately maintained under such provisions of the federal rules and otherwise denies the remaining allegations contained in paragraph 86.

87.    In answer to paragraph 87 of Plaintiffs' Complaint, Defendant admits that detainees may have performed work under ICE's voluntary detainee work program and that such policy speaks for itself.  Defendant otherwise denies the allegations in paragraph 87 of Plaintiffs' Complaint.

88.    Paragraph 88 of Plaintiffs' Complaint contains no allegations for Defendant to admit or deny.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 88 of Plaintiffs' Complaint.

89.    In answer to paragraph 89 of Plaintiffs' Complaint, Defendant admits that detainees may have performed work under ICE's voluntary detainee work program at $1.00 per day and that such policy speaks for itself.  Defendant otherwise denies the allegations in paragraph 89 of Plaintiffs' Complaint.

90.    Defendant is without knowledge regarding the allegations in paragraph 90 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same,

Defendant denies the allegations in paragraph 90.

91.     In answer to paragraph 91 of Plaintiffs' Complaint, Defendant admits that it utilizes ICE's voluntary detainee work program and that such policy speaks for itself. Defendant otherwise denies the allegations in paragraph 91 of Plaintiffs' Complaint.

92.     Defendant is without knowledge regarding the allegations in paragraph 92 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 92.

93.     Defendant is without knowledge regarding the allegations in paragraph 93 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 93.

94.     Defendant denies the allegations in paragraph 94 of Plaintiffs' Complaint.

95.     Defendant is without knowledge regarding the allegations in paragraph 95 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 95.

96.     Defendant is without knowledge regarding the allegations in paragraph 96 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 96.

97.     Defendant is without knowledge regarding the allegations in paragraph 97 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 97.

**APP. 43**

98.     To the extent that this matter is allowed to proceed under Fed.R.Civ.P. 23, Defendant admits the allegations in paragraph 98 of Plaintiffs' Complaint.  Defendant otherwise denies the allegations in paragraph 98 of Plaintiffs' Complaint.

99.     Defendant is without knowledge regarding the allegations in paragraph 99 of Plaintiffs' Complaint.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 99.

100.    Defendant denies the allegations in paragraph 100 of Plaintiffs' Complaint.

**COUNT III**
**Unjust Enrichment**
**Colorado Common Law**

101.    In answer to paragraph 101 of Plaintiffs' Complaint, Defendant incorporates its answers to the allegations contained in paragraphs 1 through 100 of Plaintiffs' Complaint as though fully set forth herein.

102.    In answer to paragraph 102 of Plaintiffs' Complaint, Defendant admits that Plaintiffs seek to bring this action pursuant to Fed.R.Civ.P. 23.  Defendant denies that this action is appropriately maintained under such provisions of the federal rules and otherwise deny the remaining allegations contained in paragraph 102.

103.    Paragraph 103 of Plaintiffs' Complaint contains no allegations for Defendant to admit or deny.  To the extent it is deemed necessary to admit or deny the same, Defendant denies the allegations in paragraph 103 of Plaintiffs' Complaint.

104-107.    Defendant denies the allegations in paragraphs 104-107 of Plaintiffs' Complaint.

**APP. 44**

Defendant denies all of the allegations in the unnumbered "WHEREFORE" paragraphs and their subsections on pages 18-20 of Plaintiffs' Complaint.

## SEPARATE AND AFFIRMATIVE DEFENSES

1.    Defendant denies each and every allegation in Plaintiffs' Complaint not specifically admitted herein.

2.    Plaintiffs and proposed class members have failed to state a claim or cause of action against Defendant upon which relief may be granted.

3.    Plaintiffs and proposed class members may not have standing or otherwise be the real parties in interest to prosecute all or a portion of the claims in question. Therefore, this Court may lack jurisdiction.

4.    The named Plaintiffs' and proposed class members' claims against Defendant are barred because Plaintiffs and proposed class members have an available administrative and/or state remedy.

5.    One or more of Plaintiffs' and/or the proposed class members' claims are barred as moot.

6.    Plaintiffs' and proposed class members' alleged injuries and damages, if any, were proximately caused by the acts of a third party, not a party to this action, over whom Defendant had no control nor right of control.

7.    Plaintiffs and proposed class members assumed the risk of the injury or damages claimed.

**APP. 45**

8.    The claims are barred in whole or in part under the doctrines of release, waiver, estoppel and/or laches.

9.    Plaintiffs and proposed class members have not suffered any losses and Defendant has not been unjustly enriched as a results of any action or inaction by Defendant or its agents and Plaintiffs and the proposed class members are, therefore, not entitled to any disgorgement or damages.

10.    It would be inequitable for any plaintiff to recover any damages because the actions of each plaintiff caused him or her to be placed at the Aurora Detention Center, any work he or she performed was voluntary and/or minor and consistent with that performed by detainees at ICE facilities throughout the United States, and plaintiffs received other benefits such as housing, food, and medical care.

11.    Plaintiffs and proposed class members received all monies due them.

12.    Plaintiffs' and proposed class members were treated fairly and in good faith.

13.    The claims are barred by the government contractor defense.

14.    The claims are barred by the Service Contract Act.

15.    Plaintiffs and proposed class members are not trafficking victims under U.S.C. Title 18, Chapter 77, and that title, including 18 U.S.C. §§ 1589 and 1595, provides no cognizable cause of action for Plaintiffs.

16.    Plaintiffs' and proposed class members' labor was not obtained in violation of 18 U.S.C. § 1589.

APP. 46

17.     Defendant did not benefit financially or receive anything of value from participation in a venture that Defendant knew or should have known was in violation of U.S.C. Title 18, Chapter 77.

18.     Any labor performed by Plaintiffs was pursuant to civic duty.

19.     This suit may not be maintained as a class action because: (a) Plaintiffs have failed to plead, and cannot establish the necessary procedural elements for class treatment; (b) a class action is not an appropriate method for the fair and efficient adjudication of the claims described in the Complaint; (c) common issues of fact do not predominate; to the contrary, individual issues predominate; (d) Plaintiffs' claims are not representative or typical of the claims of the putative class; (e) Plaintiffs are not proper class representatives; (f) the named plaintiffs and alleged putative class counsel are not adequate representatives for the alleged putative class; (g) Plaintiffs cannot satisfy any of the requirements for class action treatment, and class action treatment is not appropriate; (h) there is not a well-defined community of interest in the questions of fact affecting Plaintiffs and the members of the alleged putative class; and (i) the alleged putative class is not ascertainable, nor are its members identifiable.

20.     If any plaintiff recovers on any claim, his or her recovery is subject to set off for the benefits that he or she received while in the Aurora Detention Facility, in law or equity.

21.     The claims for punitive or exemplary damages are barred or subject to the

**APP. 47**

limitations of C.R.S. § 13-21-102 and 13-21-102(5).

22.    The claims for punitive or exemplary damages violates the Excessive Fines clause of the Eighth Amendment to the United States Constitution; the Due Process clause of the Fourteenth Amendment to the United States Constitution; the Equal Protection clause of the United States Constitution; and the Double Jeopardy clause of the Fifth Amendment to the United States Constitution.

23.    Plaintiffs' claims lack substantial justification, are frivolous and groundless, and/or were brought for improper purposes. Plaintiff is liable to Defendant for its costs and attorney fees pursuant to 42 U.S.C. §1988, Fed.R.Civ.P. 11, and any other applicable federal law.

DEFENDANT DEMANDS A JURY ON ALL ISSUES TRIABLE.

Submitted July 20, 2015.

VAUGHAN & DeMURO                        NORTON ROSE FULBRIGHT US LLP

/s/ Shelby A. Felton                          /s/ Charles A. Deacon
David R. DeMuro                               Charles A. Deacon
Shelby A. Felton                               300 Convent Street, Suite 2100,
3900 E. Mexico Ave., Suite 620            San Antonio, Texas 78205-3792
Denver, Colorado 80210                      (210) 270 7133
(303) 837-9200                                  charlie.deacon@nortonrosefulbright.com
Email:sfelton@vaughandemuro.com

APP. 48

**CERTIFICATE OF SERVICE**

I hereby certify that on July 20, 2015, I electronically filed Defendant's **ANSWER** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following

Charles A. Deacon
Mark Emery
charlie.deacon@nortonrolefulbright.com
mark.emery@nortonrosefulbright.com

Brandt Milstein                              Andrew Turner
brandt@milsteinlawoffice.com                 aturner@laborlawdenver.com

Alexander Hood                               Hans Meyer
alex@towardsjustice.org                      hans@themeyerlawoffice.com

R. Andrew Free
Andrew@ImmigrantCivilRights.com

/s/Shelby A. Felton_____
Shelby A. Felton
3900 E. Mexico Ave., Suite 620
Denver, Colorado 80210
(303) 837-9200
(303) 837-9400 fax
Emails:sfelton@vaughandemuro.com

17

**APP. 49**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02887 JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S AFFIRMATIVE DEFENSE

---

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF UNDISPUTED FACTS ................................................... 2

    A.    GEO's Contract to Operate the Aurora Detention Facility. ............................ 2

    B.    The Performance-Based National Detention Standards Govern
         GEO's Contract Performance. ........................................................................ 6

    C.    The PBNDS and Incorporated ACA Standards Contain
         Housekeeping and Voluntary Work Program Requirements. ......................... 8

    D.    GEO's Housekeeping Unit Sanitation Policy Is Not Required or
         Administered by ICE. .................................................................................. 10

    E.    GEO Tells Detainees That They Are Required to Clean Dorm Common
         Areas. ........................................................................................................... 13

    F.    Solitary Confinement at Aurora. .................................................................. 15

    G.    The PBNDS Provide GEO A Wide Range of Options to Punish Offenses. ... 16

    H.    GEO Places Detainees in Solitary Confinement for Refusing
         to Clean the Facility. .................................................................................... 18

    I.    GEO Has Discretion to Set Wages For the Voluntary Work Program. .......... 19

III.  PROCEDURAL BACKGROUND .............................................................. 21

IV.   LEGAL STANDARD .................................................................................. 23

V.    ARGUMENT ............................................................................................... 23

    A.    Derivative Sovereign Immunity Cannot Shield GEO Because
         GEO Developed the Policies Plaintiffs Challenge. ....................................... 24

         1.    The HUSP Violates GEO's Contract With ICE. ................................ 27

         2.    ICE Did Not Direct the HUSP. .......................................................... 29

         3.    Mere Government Authorization Is Not Enough for
              Derivative Sovereign Immunity to Apply. .......................................... 31

         4.    ICE Did Not Direct the Dollar-A-Day Pay Rate Under the VWP. ...... 33

ii

B.    The Government Contractor Defense Does Not Apply Because GEO Had
       Discretion to Develop the Relevant Terms of the VWP. ............................... 34

VI.  CONCLUSION ......................................................................................................... 36

**APP. 52**

## TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE(S)**

*Adler v. Wal-Mart Stores, Inc.*,
   144 F.3d 664 (10th Cir. 1998) ........................................................................ 23

*Bentley v. Cleveland Cty. Bd. of Cty. Comm'rs*,
   41 F.3d 600 (10th Cir. 1994) .......................................................................... 23

*Boyle v. United Techs. Corp.*,
   487 U.S. 500 (1988) ................................................................................. 34, 35

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
   797 F.3d 720 (9th Cir. 2015) ............................................................. 27, 30, 33

*Campbell-Ewald Co. v. Gomez*,
   136 S. Ct. 663 (2016) ............................................................................. *passim*

*Corr. Servs. Corp. v. Malesko*,
   534 U.S. 61 (2001) ......................................................................................... 24

*Cunningham v. General Dynamics Info. Techs., Inc.*,
   888 F.3d 640 (4th Cir. 2018) ............................................................. 26, 27, 29

*Filarsky v. Delia*,
   566 U.S. 377 (2012) ...................................................................................... 24

*Hudgens v. Bell Helicopters/Textron*,
   328 F.3d 1329 (11th Cir. 2003) ..................................................................... 35

*In re Joint E. & S. Dist. N.Y. Asbestos Litig.*,
   897 F.2d 626 (2d Cir. 1990) ........................................................................... 35

*In re Katrina Canal Breaches Litig.*,
   620 F.3d 455 (5th Cir. 2010) .......................................................................... 35

*In re KBR, Inc., Burn Pit Litig.*,
   744 F.3d 326 (4th Cir. 2014) ............................................................. 24, 25, 30

*Menocal v. GEO Grp., Inc.*,
   113 F. Supp. 3d 1125 (D. Colo. 2015) ..................................................... 33, 35

iv

*Myers v. United States*,
    323 F.2d 580 (9th Cir. 1963) ........................................................ 25

*Navajo Nation v. Dalley*,
    896 F.3d 1196 (10th Cir. 2018) ................................................... 29

*Nwauzor v. GEO Group, Inc.*,
    No. 17 Civ. 5769, 2020 WL 1689728 (W.D. Wash, April 7, 2020) ........................ 27, 34

*Salim v. Mitchell*,
    268 F. Supp. 3d 1132 (E.D. Wash. 2017) ........................................ 30, 31, 33

*Trevino v. Gen. Dynamics Corp.*,
    865 F.2d 1474 (5th Cir. 1989) ..................................................... 35

*In re World Trade Center Disaster Site Litig.*,
    456 F. Supp. 2d 520 (S.D.N.Y. 2006) ............................................ 24

*U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.* ............................ 23, 24, 29
    928 F.3d 42 (D.C. Cir. 2019)

*Yearsley v. W.A. Ross Const. Co.*,
    309 U.S. 18 (1940) ...........................................................*passim*

**STATUTES**

6 U.S.C. § 542 ......................................................................... 2

8 U.S.C. § 1555(d) ................................................................... 20

8 U.S.C. §§ 1101 ..................................................................... 2

18 U.S.C. §1589 ............................................................... 21, 27, 28

Pub. L. No. 95-431, 92 Stat. 1021 (1978) .......................................... 20

**RULES**

Fed. R. Civ. P. 56(a) ................................................................ 23

**REGULATIONS**

48 C.F.R. § 52.222-3 .................................................................. 4

**APP. 54**

FAR 52.222-50(b) ....................................................................................... 5, 27

FAR 52.222-50(a).......................................................................................... 28

Federal Acquisition Regulation 52.222-50........................................................ 5

**APP. 55**

## I.    INTRODUCTION

This lawsuit challenges two policies developed and implemented by the GEO Group ("GEO") at its ICE Contract Detention Facility in Aurora, Colorado ("Aurora Facility").  First, Plaintiffs allege that, pursuant to an internal policy called the Housekeeping Unit Sanitation Policy ("HUSP"), GEO compelled detainees at the Aurora Facility to perform necessary janitorial work without pay by threatening anyone who tried to refuse with solitary confinement.  And second, Plaintiffs allege that GEO unjustly enriched itself by paying detainees only a dollar a day to perform much of the other work necessary to run the Aurora Facility, including broader janitorial and maintenance tasks, food preparation, stripping and waxing floors, cutting hair, and doing laundry.  GEO has argued that these practices were required by its contract with Immigration and Customs Enforcement ("ICE"), and that it should therefore enjoy the protection of the government's sovereign immunity.

But the undisputed record shows that it was GEO that developed and implemented both the HUSP and the dollar-a-day reimbursement rate – and in fact, ICE itself has rejected GEO's attempt to blame its actions on the government, calling this litigation a "defense of [GEO's] contract performance," not a consequence of ICE policy.  Statement of Undisputed Facts ("SUF") ¶ 23.  GEO is a private, for-profit firm with discretion to decide how to perform its government contract on a day-to-day basis.  GEO made a business decision to coerce and underpay workers performing essential tasks at Aurora.  That GEO sells detention services to the government does not shield it from liability for its own legal violations.

Because neither the HUSP nor the dollar-a-day payment were "directed by the Government," *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 (2016) (quoting *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940)), as required for a contractor to share in the government's immunity, Plaintiffs respectfully request that the Court grant partial summary judgment as to GEO's government contractor defense.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    GEO's Contract to Operate the Aurora Detention Facility.

1.    ICE is a federal agency tasked with enforcing U.S. immigration laws.  6 U.S.C. § 542

2.    ICE has the authority to detain foreign nationals suspected of entering the United States unlawfully.  Immigration and Nationality Act, codified at 8 U.S.C. §§ 1101 *et seq.*

3.    ICE contracts with GEO to house some of its detainees in detention facilities throughout the country.  *See* https://www.geogroup.com/Locations

4.    Among GEO's portfolio of ICE detention facilities is the Aurora Facility.  *Id.*

5.    GEO continuously operated the Aurora Facility, under contract with ICE, from October 22, 2004 to October 22, 2014.  Ex. A (A. Martin Dep. 58:1-6); Ex. K (Ely Decl. ¶ 7)[1]

---

[1]    All exhibits referenced herein are attached to the Declaration of Michael J. Scimone in Support of Plaintiffs' Motion for Partial Summary Judgment As To Defendant's Affirmative Defense.

6.  Operations for the Aurora Facility are governed by a contract between GEO and ICE.  Ex. B (GEO_MEN 00019613 (2011 Contract)); Ex. C (GEO-MEN 00059635 (2006 Contract)); Ex. D (GEO-MEN 00059744 (2003 Contract)), (collectively "the Contract"); Ex. K (Ely Decl. ¶ 7))

7.  The Contract has been renewed over time by mutual consent of GEO and ICE.  Ex. A (A. Martin Dep. 58:1-10); *see also* Ex. I (Hill Dep. 29:22-30:6)

8.  The Contract may be modified during its term by mutual consent of GEO and ICE.  Ex. A (A. Martin Dep. 17:13-17)

9.  The Contract is a "performance-based contract."  Ex. B (GEO_MEN 00019625 (2011 Contract)); Ex. C (GEO-MEN 00059642 (2006 Contract)); Ex D (GEO-MEN 00059755 (2003 Contract)); Ex. K (Ely Decl. ¶ 1)

10.  Performance-based contracting "is a results-oriented method of contracting focused on outputs, quality, and outcomes."  Ex. E (Declaration of Tae D. Johnson, *State of Washington v. GEO Group, Inc.*, Case No. 17-cv-05806 (W.D. Wash), ECF No. 91 at ¶ 8)

11.  "Performance-based contracts do not designate *how* a contractor is to perform the work, but rather establish[] the expected outcomes and results that the government expects.  It is then the responsibility of the contractor to meet the government's requirements at the price the vendor quoted."  *Id.*

12.  As a performance-based contract, the Contract requires GEO to develop "all plans, policies, and procedures" required by the Contract, and then submit them to ICE for "review and concurrence."  Ex. C (GEO-MEN 00059643 (2006

3

**APP. 58**

Contract); *see also* Ex. B (GEO_MEN 00019814 (2011 Contract) ("It is GEO's policy that each of our facilities develops a manual of uniform policies and procedures" which "appropriately reflect . . . contractual requirements.")); Ex. D (GEO-MEN 00059759 (2003 Contract) ("The Contractor shall prepare and submit all policies, plans, post orders and procedures to INS for review and approval."))

13.     The Contract makes GEO "responsible for all costs associated with and incurred as part of providing the services outlined in this contract."  Ex. C (GEO-MEN 00059642 (2006 Contract)); *see also* Ex. B (GEO_MEN 00019614, 19657 (2011 Contract) (noting that ICE "shall provide fully burdened bed day rates only" and that any costs not covered by that rate are the contractor's to bear)); Ex. D (GEO-MEN 00059748 (2003 Contract) ("[T]he contractor shall provide a detention facility, and all labor, materials and equipment necessary to operate and maintain temporary residential care, and secure detention."))

14.     The Contract provides that detainee labor must be used "in accordance with the detainee work plan developed by" GEO.  Ex. F ((Ragsdale 30(b)(6) Dep. 25:1-18); Ex. C (GEO-MEN 00059662 (2006 Contract)); Ex. G (GEO_MEN 00038529 (2004 Detainee Work Plan)); Ex. H (GEO_MEN 00038563 (2014 Detainee Work Plan))

15.     The Contract requires that the detainee work plan "must be voluntary."  Ex. C (GEO-MEN 00059662 (2006 Contract)); *see also* Ex. B (GEO_MEN 00019643 (2011 Contract) ("Detainees will be able to volunteer for work assignments.")); Ex. D (GEO-MEN 00059796 (2003 Contract) (incorporating 48 C.F.R.

4

**APP. 59**

§ 52.222-3 into contract, which requires work by those in federal custody to be performed "on a voluntary basis."))

16.     The Contract prohibits GEO from using forced labor in performance of the Contract by incorporating Federal Acquisition Regulation 52.222-50.  Ex. B (GEO_MEN 00019697 (2011 Contract) (incorporating Federal Acquisition Regulation ("FAR") 52.222-50)); Ex. C (GEO-MEN 00059684 (2006 Contract) (same))[2]

17.     FAR 52.222-50(b) expresses "a policy prohibiting trafficking in persons," including the "[u]se [of] forced labor in the performance of [a government] contract."

18.     This regulation reflects the federal government's intent to "protect vulnerable individuals" and enforce its "zero-tolerance policy regarding Government employees and contractor personnel engaging in any form" of forced labor.  *See* White House, Executive Order – Strengthening Protections Against Trafficking in Persons In Federal Contracts, No. 13627 (September 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/executive-order-strengthening-protections-against-trafficking-persons-fe

19.     GEO is responsible for the day-to-day performance of the Contract. Ex. F (Ragsdale 30(b)(6) Dep. 52:21-22)

20.     GEO receives a fixed dollar amount from ICE per detainee it houses, per day, under the Contract.  Ex. B (GEO_MEN 00019614 (2011 Contract)); Ex. C

---

[2]     FAR 52.222-50 (codified at 48 C.F.R. § 52.222-50) became effective on April 19, 2006 and was thus not incorporated into the 2003 Contract.

**APP. 60**

(GEO-MEN 00059636 (2006 Contract)); Ex. D (GEO-MEN 00059748 (2003 Contract));
Ex. F (Ragsdale 30(b)(6) Dep. 41:8-16 (defining "bed day rate" as "price per bed per day
at Aurora."))

      21.    The profit GEO receives from the Aurora Facility is the difference
between the amount it receives from ICE and the amount it spends, including on housing
detainees and running the facility.  Ex. I (Hill Dep. 59:18-24); Ex. J (Krumpelmann Dep.
23:23-24:4)

      22.    On April 18, 2018, GEO submitted to ICE a request for an
"equitable adjustment" of its compensation for the 2011 Contract on the basis that the
"contract requirements are incomplete because GEO reasonably believed it could perform
these specifications and contract requirements without incurring legal fees to defend such
specifications and contract requirements."  Ex. K (Ely Decl. ¶ 27)

      23.    On June 21, 2018, ICE declined GEO's request for adjustment,
stating that "GEO's defense of [this lawsuit] is a defense of its contract performance."
*Id*. ¶ 28

    **B.**    **The Performance-Based National Detention Standards Govern GEO's
Contract Performance.**

      24.    The Performance Based National Detention Standards ("PBNDS")
are a series of minimum standards for detention facilities developed by ICE.  Ex. L
(GEO-MEN 00064019 (2011 PBNDS)); Ex. M (GEO-MEN 00062905 (2008 PBNDS));

Ex. N (GEO-MEN 00063383 (INS Detention Standards));[3] Ex. A (A. Martin Dep. 96:19-97:6; 99:5-101:9)

25.     The PBNDS are incorporated into the Contract.  Ex. A (A. Martin Dep. 94:21-95:5); Ex. B (GEO_MEN 00019655-56 (2011 Contract) (identifying the PBNDS as part of the "statutory, regulatory, policy, and operational considerations that will affect the Contractor.")); Ex. C (GEO-MEN 00059644 (2006 Contract) (same, referring to "ICE Detention Standards")); Ex. D (GEO-MEN 00059754 (2003 Contract) ("[T]he contractor is required to perform in continual compliance with the most current editions of the INS Detention Standards."))

26.     Pursuant to the Contract, GEO must abide by the PBNDS.  *Id.*; *see also* Ex. P (Ceja 30(b)(6) Dep. 90:17-20)

27.     A modification to the 2011 Contract incorporated the 2011 PBNDS into that contract.  Ex. B.1 (GEO_MEN 00020406); Ex. P (Ceja 30(b)(6) Dep. 125:10-23)

28.     The PBNDS supersede other sources of authority for operating the Aurora Facility under ICE contract.  Ex. P (Ceja 30(b)(6) Dep. 90:10-16)

29.     If there is a discrepancy between GEO's policy or practice and the PBNDS, the PBNDS control.  Ex. P (Ceja 30(b)(6) Dep. 90:10-16); Ex. F (Ragsdale 30(b)(6) Dep. 66:20-67:1)

---

[3]     The INS Detention Standard manual was the precursor to the PBNDS.  https://www.ice.gov/factsheets/facilities-pbnds.  For ease of reference, "PBNDS" in this Motion is inclusive of the INS Detention Standards unless otherwise specified.

**APP. 62**

30.     The Contract between ICE and GEO provides that "[i]n cases where other standards conflict with DHS/ICE policy or standards, DHS/ICE policy and standards prevail."  Ex. B (GEO_MEN 00019657 (2011 Contract)); Ex. C (GEO-MEN 00059644 (2006 Contract)); Ex. D (GEO_MEN 00059759 (2003 Contract))

### C.     The PBNDS and Incorporated ACA Standards Contain Housekeeping and Voluntary Work Program Requirements.

31.     In the "Environmental Health and Safety" section, under the heading "General Housekeeping," the PBNDS state:

> The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness.  When possible, the use of non-toxic cleaning supplies is recommended.
>
> a.     All horizontal surfaces shall be dampdusted daily with an approved germicidal solution used according to the manufacturer's directions.
> b.     Windows, window frames, and windowsills shall be cleaned on a weekly schedule.
> c.     Furniture and fixtures shall be cleaned daily.
> d.     Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions.
> e.     A clean mop head shall be used each time the floors are mopped.
> f.     Waste containers shall weigh less than 50 lbs., be non-porous and lined with plastic bags; the liner shall be changed daily.
> g.     Waste containers shall be washed weekly at a minimum, or as needed when they become soiled.
> h.     Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

Ex. L (GEO-MEN 00064042 (2011 PBNDS)); *see also* Ex. M (GEO-MEN 00062934-35 (2008 PBNDS)); Ex. N (GEO-MEN 00063790 (INS Detention Standard))

**APP. 63**

32.     The Environmental Health and Safety section of the PBNDS references certain sections of the American Correctional Association ("ACA") Standards for Adult Local Detention Facilities.  *See, e.g*., Ex. L (GEO-MEN 00064041 (2011 PBNDS)); Ex. M (GEO-MEN 00062933 (2008 PBNDS)); Ex. N (GEO-MEN 00063797 (INS Detention Standard))

33.     ACA Standard 4-ALDF-1A-04 requires that: "The facility is clean and in good repair.  A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance."  Ex. Q (ALDF-1A-04); Ex. R (A. Martin 30(b)(6) Dep. 16:11-17:23)

34.     ACA Standard 4-ALDF-1A-01 requires regular sanitation inspections of detention facilities.  Ex. Q (ALDF-1A-01); Ex. R (A. Martin 30(b)(6) Dep. 18:8-19:4)

35.     The Voluntary Work Program ("VWP") section of the PBNDS provides that detainees "shall be provided the opportunity to participate in a voluntary work program."  Ex. L (GEO-MEN 00064345 (2011 PBNDS))

36.     The VWP section of the PBNDS states: "Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.  Detainees are required to maintain their immediate living areas in a neat and orderly manner by: 1. making their beds daily; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture."  Ex. L (GEO-MEN 00064345 (2011 PBNDS); Ex. R (A. Martin 30(b)(6) Dep. 25:25-26:24);

9

**APP. 64**

*see also* Ex. M (GEO-MEN 00063294-95 (2008 PBNDS); Ex. N (GEO-MEN 00063672 (INS Detention Standard))

37.     The Voluntary Work Program section of the 2011 PBNDS requires that detainees in that program be paid "at least $1.00 (USD) per day."  Ex. L (GEO-MEN 00064347 (2011 PBNDS))

38.     The Voluntary Work Program section of the PBNDS references certain sections of the ACA Standards.  Ex. L (GEO-MEN 00064345 (2011 PBNDS)); Ex. M (GEO-MEN 00063294 (2008 PBNDS)); Ex. N (GEO-MEN 00063677 (INS Detention Standard))

39.     ACA Standard 4-ALDF-5C-08 requires that: "Pretrial and unsentenced inmates are not required to work except to do personal housekeeping and to clean their housing area.  Inmates are allowed to volunteer for work assignments."  Ex. S (4-ALDF-5C-08)

**D.     GEO's Housekeeping Unit Sanitation Policy Is Not Required or Administered by ICE.**

40.     GEO's Aurora Facility-level policies are developed by local GEO employees.  Ex. O (K. Martin Dep. 51:22-25)

41.     These policies are reviewed and amended by local GEO employees at Aurora on an annual basis.  Ex. O (K. Martin Dep. 64:17-23); Ex. P (Ceja 30(b)(6) Dep. 33:22-34:1)

**APP. 65**

42.    The annual policy review is conducted by the Aurora Facility's Policy Review Committee, which is made up of local Aurora GEO staff.  Ex. A (A. Martin Dep. 70:20-25); Ex. P (Ceja 30(b)(6) Dep. 34:2-7)

43.    Each policy is also reviewed and approved by an on-site ICE official called the Contracting Officer's Technical Representative ("COTR").  Ex. T (Nelson Dep. 150:22-151:2)

44.    GEO's Policy Number 12.1.4 – AUR, titled "Sanitation Procedures," is intended to "provide staff and detainees with a clean sanitary living environment consistent with all applicable codes, standards and sound detention practices."  Ex. U (GEO_MEN 00038687 (2004); GEO_MEN 00038653 (2004-05); GEO_MEN 00038676 (2005-06); GEO_MEN 00038628 (2006-07); GEO_MEN 00038665 (2007-08); GEO_MEN 00038632 (2008-09) GEO_MEN 00038613 (2009-10); GEO_MEN 00038625 (2010); GEO_MEN 00007203 (2010-11); GEO_MEN 00038649 (2011-12); GEO-MEN 00099980 (2012-13); GEO-MEN 00088208 (2013-14))

45.    GEO's Sanitation Procedures document requires that "[e]ach detainee will be responsible for the cleanliness of his or her cell or living area, including walls, floors, sink, toilet, windows, and other property within the cell, room, or living areas."  *Id*.

46.    GEO's Sanitation Procedures do not specify which aspects of cleaning are the responsibility of HUSP workers and which are the responsibility of VWP workers.  *See generally* Ex. U ((GEO_MEN 00038687-98 (2004); GEO_MEN 00038653-64 (2004-05); GEO_MEN 0003967676-86 (2005-06); GEO_MEN 00038628-

11

**APP. 66**

31 (2006-07); GEO_MEN 00038665-75 (2007-08); GEO_MEN 00038632-39 (2008-09)

GEO_MEN 00038613-15 (2009-10); GEO_MEN 00038625-27 (2010); GEO-MEN

00007203-06 (2010-11); GEO_MEN 00038649-52 (2011-12); GEO-MEN 00099980-83

(2012-13); GEO-MEN 00088208-11 (2013-14))

       47.      In addition to the sanitation procedures described in Policy Number

12.1.4 – AUR, GEO requires detainees to perform a general cleanup after each meal.  Ex.

P (Ceja 30(b)(6) Dep. 37:5-9); Ex. O (K. Martin Dep. 142:24-143:1)

       48.      During a general cleanup, GEO requires detainees "clean up the

tables, wipe down the tables, and sweep and mop the floors."  Ex. P (Ceja 30(b)(6) Dep.

36:24-37:9)

       49.      GEO also tells detainees that they have a "common obligation to

clean . . . the communal areas," including the dayroom and bathrooms, on a rotating

basis.  Ex. F (Ragsdale 30(b)(6) Dep. 16:14-18)

       50.      The general cleanup is not listed among the facility's sanitation

procedures.  *See generally* Ex. U ((GEO_MEN 00038687-98 (2004); GEO_MEN

00038653-64 (2004-05); GEO_MEN 0003967676-86 (2005-06); GEO_MEN 00038628-

31 (2006-07); GEO_MEN 00038665-75 (2007-08); GEO_MEN 00038632-39 (2008-09)

GEO_MEN 00038613-15 (2009-10); GEO_MEN 00038625-27 (2010); GEO_MEN

00007203-06 (2010-11); GEO_MEN 00038649-52 (2011-12); GEO-MEN 00099980-83

(2012-13); GEO-MEN 00088208-11 (2013-14))

       51.      The post-meal cleanup of tables, floors, and other communal areas

that GEO requires is called the Housing Unit Sanitation Policy, or HUSP.  Ex. F

**APP. 67**

(Ragsdale 30(b)(6) Dep. 15:24-16:25); Ex. P (Ceja 30(b)(6) Dep. 84:3-14); Ex. R (A. Martin 30(b)(6) Dep. 11:4-19)

52.    GEO never verified with ICE whether communal areas are part of the "living area" described in the PBNDS.  Ex. A (A. Martin Dep. 196:23-198:6)

53.    Detainees do not receive payment for their work under the HUSP. Ex. P (Ceja 30(b)(6) Dep. 84:8-24)

54.    The HUSP is a "GEO policy, created by GEO."  Ex K (Ely Decl. ¶ 22); Ex. P (Ceja 30(b)(6) Dep. 27:6-28:1)

55.    The HUSP is not created by ICE.  Ex. K (Ely Decl. ¶ 22.)

56.    The HUSP is not required by the Contract.  *Id*.

57.    ICE did not draft or negotiate the HUSP.  *Id*.

**E.    <u>GEO Tells Detainees That They Are Required to Clean Dorm Common Areas</u>**.

58.    GEO's local detainee handbook for the Aurora facility sets out rules for detainees' conduct and privileges within the Aurora facility.  Ex. P (Ceja 30(b)(6) Dep. 29:19-24; 32:23-37:13); Ex. V (GEO_MEN 00040731-75 (Local Detainee Handbook (2002 version))); Ex. W (PL000029-55 (Local Detainee Handbook (2013 version)))

59.    The Aurora Detainee Handbook has been in effect since at least 1995. Ex. P (Ceja 30(b)(6) Dep. 33:22-34:1)

60.    The Aurora Detainee Handbook is issued to all detainees entering Aurora.  Ex. P (Ceja 30(b)(6) Dep. 29:21-24)

13

61.    The Aurora Detainee Handbook communicates the rules and policies of the Aurora Facility to detainees.  Ex. P (Ceja 30(b)(6) Dep. 29:19-24)

62.    Like the PBNDS, GEO's Aurora Detainee Handbook states that detainees are "required to keep [their] personal living area clean and sanitary."  Ex. V (GEO_MEN 00040757 (Local Detainee Handbook (2002 version))); Ex. W (PL000046 (Local Detainee Handbook (2013 version)))

63.    The Aurora Detainee Handbook defines "personal living area" as 1. the detainee's "bunk and immediate floor area around and under [the] bunk," 2. the detainee's locker, and 3. the detainee's personal items.  *Id*.

64.    The HUSP in GEO's Aurora Detainee Handbook also provides: "Each and every detainee must participate in the facility's sanitation program.  A list of detainees is developed each day by staff and is posted [daily] for viewing.  During a general cleanup all detainees must participate.  The assigned Housing Unit [or Dorm] Officer will be responsible for assuring this general cleanup is done on a regular basis." Ex. V (GEO_MEN 00040758 (Local Detainee Handbook (2002 version) (under heading "Dormitory Sanitation"))); Ex. W (PL000047 (Local Detainee Handbook (2013 version) (under heading "Housing Unit Sanitation"))); *see also* Ex. X (GEO_MEN 00052387 (Detainee Orientation Video) at 2)

65.    The Aurora Detainee Handbook states "[a]ll detainees in a housing unit [or dorm] are required to keep clean and sanitary all commonly accessible areas of the housing unit [or dorm], including walls, floors, windows, windows ledges, showers, sinks, toilets, tables, and chairs."  Ex. V (GEO_MEN 00040759 (Local Detainee

Handbook (2002 version))); Ex. W (PL000047 (Local Detainee Handbook (2013 version)))

66.    That section also states that "Detainees will take turns cleaning the [day space]" and the "day room area will be kept clean at all times." *Id.*

**F.    Solitary Confinement at Aurora.**

67.    GEO policy describes segregation as "[c]onfinement in a cell isolated from the general population." Ex. Y (GEO-MEN 00037770 (Policy Number 10.2.11 – AUR))

68.    Disciplinary and administrative segregation are both forms of segregation used at the Aurora Facility. *Id.*

69.    According to ICE standards, administrative segregation should be used only when "restricted conditions of confinement are required [] to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility." Ex. L (GEO_MEN 00064171 (2011 PBNDS)); Ex. M (GEO-MEN 00063097 (2008 PBNDS); *see also* Ex. N (GEO-MEN 00063863-64 (INS Standards))

70.    Administrative segregation may be used to confine detainees prior to a hearing on whether disciplinary segregation will be imposed for a rule violation, but "only as necessary to prevent further violation of those rules or to protect the security and orderly operation of the facility." Ex. L (GEO-MEN 00064172 (2011 PBNDS)); Ex. M (GEO-MEN 00063097 (2008 PBNDS)); *see also* Ex. N (GEO-MEN 00063864 (INS Standards))

71.     Administrative segregation "is not to be used as a punitive measure." *Id.*

72.     Disciplinary segregation, which involves punitive segregation for disciplinary reasons, may only be administered after a detainee has received a disciplinary hearing and been found guilty of an offense authorizing such punishment. Ex. L (GEO-MEN 00064169 (2011 PBNDS)); Ex. M (GEO-MEN 00063090 (2008 PBNDS)); Ex. N (GEO-MEN 00063883 (INS Standards))

73.     Detainees in both administrative and disciplinary segregation are housed in a section of the detention facility called the Special Management Unit ("SMU").  Ex. L (GEO-MEN 00064169 (2011 PBNDS)); Ex. M (GEO-MEN 00063090 (2008 PBNDS)); Ex. N (GEO-MEN 00063863 (INS Standards))

74.     The SMU at Aurora consists entirely of single-occupancy cells.  Ex. P (Ceja 30(b)(6) Dep. 54:17-55:6)

**G.    The PBNDS Provide GEO A Wide Range of Options to Punish Offenses.**

75.     The PBNDS state that "each facility [shall] have graduated severity scales of prohibited acts and disciplinary consequences."  Ex. L (GEO-MEN 00064209 (2011 PBNDS)); Ex. M (GEO-MEN 00063138 (2008 PBNDS)); *see also* Ex. N (GEO-MEN 00063726 (INS Standards))

76.     The PBNDS allow GEO discretion in determining the severity scales that it applies to different offenses. Ex. A (A. Martin Dep. 146:16-147:3); Ex. O (K. Martin Dep. 73:12-80:8)

16

**APP. 71**

77.    The PBNDS authorize up to 72 hours of disciplinary segregation as punishment for certain offenses in what is designated as the "high moderate" offense category.  Ex L (GEO-MEN 00064221 (2011 PBNDS)); Ex. M (GEO-MEN 00063153 (2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards))

78.    High moderate offenses are also referred to as "300-level" offenses because the code numbers for these offenses are in the 300s.  Ex. L (GEO-MEN 00064220-21 (2011 PBNDS)); Ex. M (GEO-MEN 00063152-53 (2008 PBNDS)); Ex. N (GEO-MEN 00063733-34 (INS Standards)); Ex. O. (K. Martin Dep. 75:3-76:15)

79.    "Refus[ing] to clean assigned living area" is among the 300-level offenses.  Ex. L (GEO-MEN 00064220 (2011 PBNDS)); Ex. M (GEO-MEN 00063152 (2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards))

80.    The PBNDS list 13 different sanctions that could be applied to a high moderate offense: (1) initiate criminal proceedings; (2) recommend disciplinary transfer; (3) disciplinary segregation up to 72 hours; (4) make monetary restitution; (5) loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.); (6) change housing; (7) remove from program and/or group activity; (8) loss of job; (9) impound and store detainee's personal property; (10) confiscate contraband; (11) restrict to housing unit; (12) reprimand; (13) warning.  Ex. L (GEO-MEN 00064221-22 (2011 PBNDS); Ex. M (GEO-MEN 00063153 (2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards))

81.    The PBNDS provide that incidents involving "high moderate" offenses (i.e., 300-level offenses) shall be sent to a Unit Disciplinary Committee

17

("UDC").  Ex. L ((GEO-MEN 00064213-14 (2011 PBNDS); Ex. M (GEO-MEN

00063143 (2008 PBNDS)); Ex. N (GEO-MEN 00063721 (INS Standards))

**H.**    **GEO Places Detainees in Solitary Confinement for Refusing to Clean the Facility.**

82.    At orientation, detainees receive an overview of the Aurora

Facility's disciplinary process, including examples of various offenses that could lead to

discipline.  Ex. X (GEO_MEN 00052387 (Detainee Orientation Video) at 4-7; *see also*

Ex. O (K. Martin Dep. 214:10-215:20 (noting that detainees received the orientation

video reflecting the prevailing ICE standards throughout the class period))

83.    One of the specific examples detainees receive of an offense that can

lead to discipline is "failure to follow safety or sanitation rules."  Ex. X (GEO_MEN

00052387 (Detainee Orientation Video) at 7)

84.    According to the Aurora Detainee Handbook, if a dormitory officer

determines the day room area is not sufficiently clean, he or she can instruct the detainees

to clean it, and "[c]ontinued refusal to clean the area will result in further disciplinary

action."  Ex. V (GEO_MEN 00040759 (Local Detainee Handbook (2002 version))); Ex.

W (PL000047 (Local Detainee Handbook (2013 version)))

85.    The UDC has the discretion to choose whether to issue minor

sanctions or refer the case to the Institution Disciplinary Panel for more serious sanctions.

Ex. L (GEO-MEN 00064213-14 (2011 PBNDS); Ex. M (GEO-MEN 00063143 (2008

PBNDS)); Ex. N (GEO-MEN 00063721 (INS Standards)); Ex. O (K. Martin Dep. 73:12-

80:8)

86.     If the UDC chooses to issue sanctions, the UDC staff member has discretion to choose which sanction to issue for the offense based on his or her knowledge and experience.  Ex. O (K. Martin Dep. 77:8-80:8)

87.     The UDC has the authority to impose disciplinary segregation as punishment for a 300-level offense.  Ex. O (K. Martin Dep. 76:16-77:1)

88.     GEO placed detainees in segregation many times during the class period for refusing to clean.  Ex. Z (GEO_MEN 00057697, GEO_MEN 00047810, GEO_MEN 00047812-17, GEO-MEN 00065434, GEO-MEN 00065393, GEO-MEN 00065211, GEO-MEN 00065032-33 (disciplinary charges and reports))

**I.      GEO Has Discretion to Set Wages For the Voluntary Work Program.**

89.     GEO determines the types of jobs available in the VWP on a facility-by-facility basis, and the ICE COTR approves them at the facility level.  Ex. A (A. Martin Dep. 120:1-9)

90.     The Contract does not identify how many detainees will participate in the VWP.  Ex. R (A. Martin 30(b)(6) Dep. 72:13-72:25)

91.     GEO has the discretion to develop the VWP based on its needs and the availability of detainee labor.  *Id.*

92.     The 2011 Contract provides that ICE will reimburse GEO $1.00 per day for each detainee working in the VWP.  Ex. B (GEO_MEN 00019616 (2011 Contract))

**APP. 74**

93.     GEO pays detainees who work in the VWP at the Aurora Facility $1.00 per day.  Ex. A (A. Martin Dep. 104:23-25); Ex. AA (GEO_MEN 00057594 (Detainee Work Detail Application))

94.     ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP.  8 U.S.C. § 1555(d); Appropriations Act, Immigration and Naturalization Service Salaries and Expenses, Pub. L. No. 95-431, 92 Stat. 1021 (1978)

95.     ICE does not prohibit its contractors from *paying* more than $1.00 per day for work performed in the VWP.  Ex. A (A. Martin Dep. 106:11-19; 110:10-13); Ex. L (GEO-MEN 00064347 (2011 PBNDS) (compensation for VWP work is "at *least* $1.00 (USD) per day" (emphasis added)))

96.     GEO pays detainees more than $1.00 per day at other ICE facilities, including $1.00 to $3.00 per day at its South Texas Detention Facility, $1.00 to $2.50 per day at its Folkston ICE Processing Center, $1.00 to $3.00 per day at its Joe Corley Detention Facility, and $1.00 to $4.00 per day at its LaSalle Detention Facility.  Ex. A (A. Martin Dep. 109:15-110:13); Ex. BB (GEO-MEN 00170339 (VWP Pay Rates))

97.     GEO pays detainees more than $1.00 per day at other facilities to incentivize detainee participation in the VWP, such as when the VWP is "undersubscribed."  Ex. F (Ragsdale 30(b)(6) Dep. 155:5-17)

98.     In facilities where GEO pays detainees more than $1.00 per day for VWP work, it does so "on [its] own dime."  Ex. A (A. Martin Dep. 107:18-22)

20

**APP. 75**

III.    PROCEDURAL BACKGROUND

Plaintiffs filed this class action on October 22, 2014, alleging that, *inter alia*, (1) the HUSP and related use of solitary confinement constituted forced labor in violation of the Trafficking Victims' Protection Act ("TVPA"), 18 U.S.C. § 1589, and (2) GEO was unjustly enriched by its policy and practice of paying detainee workers either $1 per day or nothing at all.[4]  ECF No. 1.  GEO moved to dismiss, arguing that it could not be held liable for these claims on the basis of the "government contractor defense."  ECF No. 18 at 5-8, 28.  In support of this argument, GEO cited to case law on derivative sovereign immunity, which is related to but distinct from the government contractor defense.  *Id.*

The Court permitted Plaintiffs' unjust enrichment and TVPA claims to move forward.  ECF No. 23.  The Court held that the government contractor defense was not grounds for dismissal, because the contract between ICE and GEO "does not *prohibit* Defendant from paying detainees in excess of $1/day in order to comply with Colorado labor laws."  *Id.* at 13.  In its subsequently-filed answer, GEO again raised the affirmative defense that Plaintiffs' claims are barred by the government contractor defense.  ECF No. 26 at 14.

On February 27, 2017, the Court granted Plaintiffs' motion for class certification. ECF No. 57.  After GEO lost its interlocutory appeal of that decision before the Tenth Circuit, ECF No. 114, the parties began class discovery.  As part of that process, on October 24, 2019, Plaintiffs served an interrogatory on GEO requesting "all

---

[4]    The Court dismissed Plaintiffs' claim that paying detainees $1 per day for VWP work violated the Colorado Minimum Wage Order.  *See* ECF No. 23.

**APP. 76**

communications, acts, or authorization of any other kind from ICE" that formed the basis

for the government contractor defense as to Plaintiffs' TVPA claims. GEO responded on

February 4, 2020 with several categories of documents and policies on which it purported

to rest its defense, which include:

- the local Aurora policies governing sanitation procedures and the detainee work program;

- the absence of any findings of noncompliance from various audits and oversight personnel;

- the PBNDS;

- ICE's National Detainee Handbook; and

- the ACA standards.

Ex. CC. Plaintiffs also sent GEO a 30(b)(6) notice on November 1, 2019 that requested

testimony as to the following topics:

- Contracts with ICE regarding the use of detainee labor to clean the Aurora Detention Center, and any communications that GEO contends constitute ICE approval, endorsement, or instruction as to the use of detainee labor for these purposes, from October 22, 2004 to the present.

- Contracts with ICE regarding the use of administrative or disciplinary segregation, and any communications that GEO contends constitute ICE approval, endorsement, or instruction as to the use of administrative or disciplinary segregation in response to detainees' refusal to comply with the HUSP.

GEO produced Dan Ragsdale, Executive Vice President for Contract Compliance, to

testify as to these topics on February 27, 2020.

APP. 77

## IV.    LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A fact is material when "under the substantive law it is essential to

the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670

(10th Cir. 1998).  Courts applying the summary judgment standard "view the factual

record and draw all reasonable inferences therefrom most favorably to the nonmovant."

*Id*.

## V.    ARGUMENT

The government contractor defense, and the related (but distinct) concept of

derivative sovereign immunity,[5] are not free passes for government contractors to break

the law.  Rather, they are limited grants of immunity that apply where the government

directs a contractor to perform the specific acts that give rise to the claims.  *See, e.g.*,

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 (2016) (derivative sovereign

immunity is available to a federal contractor who "simply performed as the Government

---

[5]     GEO did not plead derivative sovereign immunity as a defense in its Answer.  *See*
ECF No. 26.  This Motion addresses it regardless, because GEO appears to have
conflated derivative sovereign immunity with the government contractor defense; its
Motion to Dismiss reply referred to the two doctrines interchangeably.  *See* ECF No. 18
at 5-6; *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.* ("*In re OPM*"), 928 F.3d
42, 71 (D.C. Cir. 2019) (the government contractor defense and sovereign immunity are
"apples and oranges").  By failing to plead derivative sovereign immunity, GEO
has waived it, which is an independent ground on which this Motion may be granted.  *See,
e.g.*, *Bentley v. Cleveland Cty. Bd. of Cty. Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994)
("Failure to plead an affirmative defense results in a waiver of that defense").

directed"); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001) (the government contractor defense applies under the "special circumstances" where "the government has directed a contractor to do the very thing that is the subject of the claim").

Here, the undisputed record shows that the policies Plaintiffs challenge were GEO's own, and were not required – or, in the case of the HUSP, even *permitted* – by GEO's contract with ICE. Therefore, GEO cannot hide behind the government to protect it from suit, and the Court should grant summary judgment on GEO's government contractor defense.

### A. Derivative Sovereign Immunity Cannot Shield GEO Because GEO Developed the Policies Plaintiffs Challenge.

Derivative sovereign immunity is a federal common-law principle that provides limited protection to contractors who work under contract with the United States government. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377, 384-89 (2012) (describing history of derivative sovereign immunity). Its "driving purpose . . . is to prevent the contractor from being held liable when the government is actually at fault but is otherwise immune from liability.'" *In re OPM*, 928 F.3d at 70 (quoting *In re World Trade Center Disaster Site Litig.*, 456 F. Supp. 2d 520, 560 (S.D.N.Y. 2006)) (internal quotation marks omitted).

Unlike sovereign immunity, however, derivative sovereign immunity "is not absolute." *Campbell-Ewald*, 136 S. Ct. at 671. Although a contractor who "simply performed as the Government directed" may share the government's immunity, *id.* at 673, derivative sovereign immunity does not protect a contractor that takes steps "over and beyond acts required to be performed by it under the contract," *In re KBR, Inc., Burn*

24

*Pit Litig*., 744 F.3d 326, 345 (4th Cir. 2014) (quoting *Myers v. United States*, 323 F.2d

580, 583 (9th Cir. 1963)).  Here, both the HUSP and the dollar-a-day wage rate were

policies developed by GEO; they were not required by its contract with ICE.

Accordingly, derivative sovereign immunity cannot apply.

     The modern formulation of derivative sovereign immunity began with *Yearsley v.*

*W.A. Ross Construction Co.*, 309 U.S. 18 (1940), where the Supreme Court considered

claims against a contractor who had been hired by the government to build dikes along

the Missouri River.  *Id*. at 19.  This construction caused parts of the petitioners' land to

wash away, leading them to sue the contractor for damages.  *Id*.  The *Yearsley* Court

noted that the work that led to the washout "was all authorized and directed by the

Government of the United States."  *Id*. at 20.  The Court then held that "if th[e] authority

to carry out the project was validly conferred, that is, if what was done was within the

constitutional power of Congress, there is no liability on the part of the contractor for

executing its will."  *Id*. at 20-21.  This conclusion came with the proviso that an agent of

the government could be liable if "he exceeded his authority or . . . it was not validly

conferred."  *Id*. at 21 (citing cases).

     In *Campbell-Ewald*, the Supreme Court clarified that derivative sovereign

immunity does not apply to contractors who fail to follow the government's directives.

136 S. Ct. at 672.  Campbell-Ewald was an advertising and marketing firm that

contracted with the Navy on a campaign to send text messages to young adults

encouraging them to learn more about enlistment.  *Id*. at 667. In support of that

campaign, Campbell-Ewald subcontracted with a firm that generated a list of cell phone

**APP. 80**

numbers to which the text messages would be sent. *Id.* Under the Telephone Consumer Protection Act ("TCPA"), any such text messages require prior express consent from the recipient. *Id*. at 666-67. But some of the recipients had not consented to be messaged, and one of them sued Campbell-Ewald on behalf of a putative class in federal court. *Id.* at 667.

The Supreme Court rejected Campbell-Ewald's argument that its status as a federal contractor provided it immunity from the plaintiff's suit, holding that on the record before it, there was "no basis for arguing that [the plaintiff's] right to remain message-free was in doubt or that Campbell[-Ewald] complied with the Navy's instructions." *Id*. at 674. Specifically, the Court focused on evidence that the Navy authorized Campbell-Ewald "to send text messages only to individuals who had 'opted in' to receive solicitations," and that the Navy "relied on Campbell[-Ewald]'s representation that the list was in compliance" with the TCPA. *Id*. at 673-74. Accordingly, the government contractor defense did not apply. *Id.* at 674.

Two years later, the Fourth Circuit applied that rule in *Cunningham v. General Dynamics Information Technology, Inc.*, 888 F.3d 640, 647-49 (4th Cir. 2018), holding that where the government *does* direct the specific violation at issue in a lawsuit against a government contractor, derivative sovereign immunity may attach. The courts in both *Cunningham* and *Campbell-Ewald* faced the same question: Was a contractor liable under the TCPA for making unauthorized communications in the performance of a government contract? But, whereas in *Campbell-Ewald*, a private subcontractor developed the list of phone numbers at issue, 136 S. Ct. at 673-74, in *Cunningham*, the

**APP. 81**

*government* provided the contractor with the restricted phone numbers, and the contract required the contractor to call them, 888 F.3d at 647. This distinction drove the different outcomes, as derivative sovereign immunity is limited to circumstances where the contractor is following government directions. *Id.* (calling *Cunningham* "vastly distinguishable" from *Campbell-Ewald* because the *Campbell-Ewald* contract placed the responsibility for developing a list of approved numbers onto the contractor, not the government); *see also Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015) ("We have held that derivative sovereign immunity, as discussed in *Yearsley*, is limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications.'"); *Nwauzor v. GEO Group, Inc.*, No. 17 Civ. 5769, 2020 WL 1689728, at *8-9 (W.D. Wash, April 7, 2020) (in a case alleging claims against GEO under Washington State minimum wage law, holding that there was no derivative sovereign immunity because GEO "has not shown that it was directed by the government to pay participants in the VWP only $1 per day").

### 1.    The HUSP Violates GEO's Contract With ICE.

GEO's HUSP is a paradigmatic example of the case contemplated in *Campbell-Ewald* where a contractor violates both federal law and the government's instructions. 136 S. Ct. at 672. The HUSP claim arises under the TVPA, which prohibits labor procured by, *inter alia*, force, threats of force, serious harm, or threats of serious harm. 18 U.S.C. §1589(a). GEO's contract specifically incorporates a nearly identical definition of forced labor in the form of Federal Acquisition Regulation ("FAR") 52.222-50(b), which expresses "a policy prohibiting trafficking in persons," including the "[u]se

27

**APP. 82**

[of] forced labor in the performance of [a government] contract." SUF ¶ 17.[6]  This regulation states the federal government's intent to "protect vulnerable individuals" and enforce its "zero-tolerance policy regarding Government employees and contractor personnel engaging in any form" of forced labor.  SUF ¶ 18.

Like the contract in *Campbell-Ewald*, GEO's contract with ICE – far from directing GEO to violate the TVPA – specifically required GEO to observe the law's prohibitions.  *See* 136 S. Ct. at 673 (contract "noted the importance of ensuring that . . . all recipients had consented to receiving messages like the recruiting text.").  And both the government's interest in enforcing the TVPA and Plaintiffs' right to be free from forced labor are well-established.  *See* SUF ¶¶ 16-18.  Therefore, in the absence of any indication that Plaintiffs' rights under the TVPA are "in doubt or that [GEO] complied with [ICE's] instructions," *Campbell-Ewald*, 136 S. Ct. at 674, derivative sovereign immunity cannot attach.

---

[6]     *Compare* FAR 52.222-50(a) (defining forced labor as "knowingly providing or obtaining the labor or services of a person (1) By threats of serious harm to, or physical restraint against, that person or another person; (2) By means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or (3) By means of the abuse or threatened abuse of law or the legal process.) *with* 18 U.S.C. § 1589 (defining forced labor as that obtained: "(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.").

28

**APP. 83**

GEO's HUSP also violates specific prohibitions against unpaid labor that are incorporated into the Contract.  The HUSP, which requires that detainees perform unpaid work such as cleaning tables, sweeping and mopping floors, and cleaning the common areas of their dormitories after meals, SUF ¶¶ 47-49, conflicts on its face with the PBNDS, which require that "work assignments are voluntary," and list only four specific housekeeping chores that may be required: (1) making beds daily, (2) stacking loose papers, (3) keeping floors and dividers free of debris or clutter, and (4) not hanging anything from the beds, fixtures, or furniture,[7] SUF ¶ 36.

These violations are GEO's, not ICE's, and GEO cannot claim it was merely "executing [the government's] will," *Yearsley*, 309 U.S. at 20-21, or that ICE is "actually at fault" for the offending policies, *In re OPM*, 928 F.3d at 70.  Rather, GEO developed policies that "failed to adhere to the contract" between GEO and ICE.  *Cunningham*, 888 F.3d at 648.  The sovereign immunity of the United States does not protect GEO from liability flowing from such a failure.

### 2.    ICE Did Not Direct the HUSP.

Even if the Contract did not prohibit the HUSP, it is undisputed that the HUSP was "a GEO policy, created by GEO," and was not directed, drafted, or negotiated by

---

[7]    The fact that the PBNDS list these four specific, defined chores as the only form of "personal housekeeping" that detainees are required to perform implies that other, materially different forms of labor are not permitted.  *Cf. Navajo Nation v. Dalley*, 896 F.3d 1196, 1213 (10th Cir. 2018) (describing the *expressio unius est exclusio alterius* canon of interpretation, which provides that "the enumeration of certain things" suggests the absence of "intent of including things not listed or embraced") (internal quotation marks omitted).

29

ICE.  SUF ¶¶ 54-57.  As a performance-based contract, the focus of GEO's contract with

ICE is on the results rather than the methods of implementation, and the day-to-day

performance of the contract is delegated to GEO.  SUF ¶¶ 9-11, 19.  The contract, and the

incorporated PBNDS and ACA Standards, require GEO only to maintain certain levels of

sanitation and hygiene; they do not require it to use the threat of solitary confinement to

procure free labor in doing so.  SUF ¶¶ 16, 31-33, 36, 75-88.

  In other words, ICE "told [GEO] what goals to achieve but not how to achieve

them."  *In re KBR*, 744 F.3d at 339.  Therefore, GEO cannot claim that it actions were

merely "executing [ICE's] will," and derivative sovereign immunity does not apply.

*Yearsley*, 309 U.S. at 20-21; *see also In re KBR*, 744 F.3d at 346 (derivative sovereign

immunity would not apply if the contractor "enjoyed some discretion in how to perform

its contractually authorized responsibilities"); *Cabalce*, 797 F.3d at 732 (no derivative

sovereign immunity where the contractor "designed the [challenged] plan without

government control or supervision"); *Salim v. Mitchell*, 268 F. Supp. 3d 1132, 1149 (E.D.

Wash. 2017) (testimony from the defendant that he could choose which of several

government-approved interrogation techniques to apply supported conclusion that the

government contractor defense did not apply).

### 3. Mere Government Authorization Is Not Enough for Derivative Sovereign Immunity to Apply.

GEO may argue that it is protected by derivative sovereign immunity because ICE officials reviewed and approved the HUSP.[8]  But even close government supervision and approval of a contractor's work does not confer immunity, as long as the contractor exercised its own agency in carrying out the acts challenged by a plaintiff.  For example, in *Salim v. Mitchell*, the court considered whether the psychologists who designed and implemented the CIA's "enhanced interrogation" program could be held liable for injuries and death that occurred as a result.  268 F. Supp. 3d at 1138-39.  It concluded that the psychologists had not acted "merely and solely as directed by the Government," because they "had a role in the design of the Program, trained interrogators for the Program, and exercised some discretion in the application of the Program."  *Id*. at 1150. Even though the CIA had authorized the enhanced interrogation techniques, supervised their implementation, and was fully aware that they were used, the contractors were able to decide which techniques to use and when to use them.  *Id*. at 1150.  This holding reflects the underlying principle that courts applying derivative sovereign immunity require that the government *directed* the challenged decisions, not simply that a government representative signed off on plans developed and implemented by a contractor.  *See, e.g., Yearsley*, 309 U.S. at 20 (governmental immunity applies only

---

[8]     *See* Ex. CC (Defendant The GEO Group Inc's Second Supplemental Responses to Plaintiffs' Fifth Set of Interrogatories).

**APP. 86**

when a contractor's work is "authorized *and directed*" by the government (emphasis added)).

Here, not only is there no evidence that ICE directed the HUSP, there is little evidence that ICE was even *aware* of the details of that policy. ICE places a Contracting Officer's Technical Representative on-site at Aurora to sign off on GEO's formal policies. SUF ¶ 43. But GEO's formal written policy documents do not distinguish between the work assigned to HUSP workers and the work assigned to VWP workers. SUF ¶ 46. This leaves it unclear on the face of the written policy what, if any, work was performed by unpaid detainees, and does not show that the government was aware that the labor was unpaid (as opposed to being performed by VWP workers or GEO employees). Even in the Aurora Detainee Handbook, the policy is described in vague terms that do not make clear that detainees will be required to participate in a rotating clean-up after other detainees in common areas, and not merely "keep clean and sanitary all commonly accessible areas of the dorm." SUF ¶ 65. This vague statement is a far cry from evidence that ICE approved or even was aware of fact that the HUSP required extensive *unpaid* janitorial work cleaning up after others, such as wiping down tables, sweeping and mopping floors, and other cleaning tasks in the common area. SUF ¶ 47-49. And GEO never specifically sought to clarify with ICE whether the scope of the unpaid cleaning it required matched the limited chores permitted by the PBNDS. SUF ¶ 52.

**APP. 87**

###### 4.   ICE Did Not Direct the Dollar-A-Day Pay Rate Under the VWP.

In denying GEO's Motion to Dismiss at the beginning of this litigation, this Court held that "the [ICE-GEO] contract only defines how Defendant will be reimbursed for the Detainee Work Program and does not _prohibit_ Defendant from paying detainees in excess of $1/day." *Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1135 (D. Colo. 2015). Based on that determination, the Court denied GEO's motion to dismiss Plaintiffs' claims under the government contractor defense. *Id.* Since that decision, more evidence has emerged that GEO set the VWP rate at its own discretion. GEO's contract with ICE required it to have a VWP, but ICE delegated the authority to design that program at the Aurora Facility to GEO. SUF ¶¶ 89-92. The PBNDS, which are incorporated into the contract, require that detainees receive "*at least*" a dollar a day, SUF ¶ 37, but they leave the decision of how much to pay above that amount to the discretion of individual facilities. SUF ¶ 96-97. And, most significantly, many facilities run by GEO do, in fact, pay detainees more than a dollar a day, with ICE's consent, even though any amount above a dollar is not reimbursed by ICE. SUF ¶ 96-98.

As discussed above, derivative sovereign immunity applies only to acts that were directed by the government, not to acts the contractor undertook of its own discretion. Therefore, just as with the HUSP claim, the Court should grant summary judgment to Plaintiffs on GEO's derivative sovereign immunity defense to Plaintiffs' VWP claim. *See, e.g.*, *Cabalce*, 797 F.3d at 732 (government contractor defense does not apply where contractor had "discretion in the design process'"); *Salim*, 268 F. Supp. 3d at 1138-39 (defense did not apply where the contractor had discretion in how to implement the

**APP. 88**

challenged torture program); *Nwauzor*, 2020 WL 1689728, at \*8-9 (denying GEO's

motion for summary judgment on derivative sovereign immunity because it had not

shown ICE directed it to pay VWP participants only $1 per day).

**B.    The Government Contractor Defense Does Not Apply Because GEO
Had Discretion to Develop the Relevant Terms of the VWP.**

In contrast to derivative sovereign immunity, which concerns whether contractors

executing the will of the government may claim sovereign immunity, the government

contractor defense addresses whether the common-law immunity doctrine preempts

liability for violations of state law committed by government contractors.  *See Boyle v.*

*United Techs. Corp.*, 487 U.S. 500, 505 n.1 (1988) (limiting case to preemption analysis

and distinguishing that analysis from a decision on the merits of immunity).  Although

related to derivative sovereign immunity, the government contractor defense is more

limited, and does not apply to Plaintiffs' federal TVPA claims.  *Id.*  Even so, the guiding

principles behind derivative sovereign immunity and the government contractor defense

are similar, as both address when government contractors are subject to suit.  Applying

those principles, GEO enjoys no protection from Plaintiffs' unjust enrichment claims

under the government contractor defense.

The government contractor defense was first articulated in *Boyle v. United*

*Technologies*, which addressed when, if ever, government contractors could be liable for

state law torts.  The Supreme Court held that, in the products liability context, immunity

from such claims attaches to government contractors only if "(1) the United States

approved reasonably precise specifications; (2) the equipment conformed to those

**APP. 89**

specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. Subsequent decisions from lower courts have expanded the defense beyond products liability to other state law claims. *See, e.g.*, *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1334 (11th Cir. 2003) (holding that the government contractor defense can apply to service contracts).

The government contractor defense, like derivative sovereign immunity, hinges on to what extent the government directed the actions challenged by the lawsuit. *Boyle*, 487 U.S. at 509 (noting that if a contractor "could comply with both its contractual obligations and [the law it is accused of violating]," the government contractor defense does not apply); *see also Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir. 1989) (defense does not apply when the government "merely accepts, without any substantive review or evaluation, decisions made by a government contractor"). "[S]tripped to its essentials," the government contractor defense "is fundamentally a claim that '[t]he Government made me do it.'" *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 465 (5th Cir. 2010) (quoting *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990)) (internal quotation marks omitted).

Here, as discussed above in the context of derivative sovereign immunity, this Court has already rejected GEO's position that it was forced to reimburse VWP workers at the challenged dollar-a-day rate. *See Menocal*, 113 F. Supp. 3d at 1135 ("[T]here is no 'significant conflict' between a federal interest and state law as required for the assertion of the government contractor defense."). Therefore, for the same reasons that it enjoys

35

**APP. 90**

no protection from derivative sovereign immunity, the undisputed facts show that the government contractor defense does not protect GEO from Plaintiffs' VWP claims.

## VI.  CONCLUSION

This case concerns GEO's own performance as a private prison contractor – not a series of acts that were directed by the government.  In direct contravention of ICE's rules, GEO chose to extract forced labor by threatening Plaintiffs and the Class Members with solitary confinement.  And GEO chose to pay some detainees the bare minimum it could get away with – a dollar a day – to replace labor that it otherwise would have had to purchase by paying fair wages to employees.  GEO cannot blame these choices on the government; it must take responsibility for its own actions.  Plaintiffs' claims should proceed to trial, and summary judgment should be granted as to GEO's immunity defense.

**APP. 91**

Dated: New York, NY
   April 29, 2020

Respectfully submitted,

By: */s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
E-Mail: mscimone@outtengolden.com

Rachel Dempsey
Adam Koshkin
**OUTTEN & GOLDEN LLP**
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
E-Mail: rdempsey@outtengolden.com
E-Mail: akoshkin@outtengolden.com

David Lopez
**OUTTEN & GOLDEN LLP**
601 Massachusetts Avenue NW
Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
E-Mail: pdl@outtengolden.com

Alexander Hood
David Seligman
Andrew Schmidt
Juno Turner
**TOWARDS JUSTICE**
1410 High St., Suite 300
Denver, CO 80218
(720) 441-2236
alex@towardsjustice.org
david@towardsjustice.org
andy@towardsjustice.org
juno@towardsjustice.org

**APP. 92**

R. Andrew Free
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
T: (844) 321-3221
Andrew@ImmigrantCivilRights.com

Brandt Milstein
**MILSTEIN LAW OFFICE**
1123 Spruce Street
Boulder, CO 80302
(303) 440-8780
brandt@milsteinlawoffice.com

Andrew Turner
**THE KELMAN BUESCHER FIRM, P.C.**
600 Grant St., Suite 825
Denver, CO 80203
(303) 333-7751
aturner@laborlawdenver.com

Hans Meyer
**MEYER LAW OFFICE, P.C.**
P.O. Box 40394
Denver, CO 80204
(303) 831-0817
hans@themeyerlawoffice.com

*Class Counsel*

38

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2020, a copy of the foregoing document was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Michael J. Scimone
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
E-Mail: mscimone@outtengolden.com

**APP. 94**

# Exhibit L



# Performance-Based National Detention Standards 2011



U.S. Immigration
and Customs
Enforcement

GEO-MEN 00064018

# Preface

In keeping with our commitment to transform the immigration detention system, U.S. Immigration and Customs Enforcement (ICE) has revised its detention standards. These new standards, known as the Performance-Based National Detention Standards 2011 (PBNDS 2011), are an important step in detention reform.

ICE is charged with removing aliens who lack lawful status in the United States and focuses its resources on removing criminals, recent border entrants, immigration fugitives, and recidivists. Detention is an important and necessary part of immigration enforcement. Because ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care. ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law.

The PBNDS 2011 reflect ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose. The PBNDS 2011 are crafted to improve medical and mental health services, increase access to legal services and religious opportunities, improve communication with detainees with no or limited English proficiency, improve the process for reporting and responding to complaints, and increase recreation and visitation.

The PBNDS 2011 are also drafted to include a range of compliance, from minimal to optimal. As such, these standards can be implemented widely, while also forecasting our new direction and laying the groundwork for future changes.

In closing, I would like to thank the ICE employees and stakeholders who provided significant input and dedicated many hours to revising these standards. I appreciate the collaboration and support in this important mission - reforming the immigration detention system to ensure it comports with our national expectations. The PBNDS 2011 are an important step in a multiyear process and I look forward to continued collaboration within ICE, with state and local governments, nongovernmental organizations, Congress, and all of our stakeholders as we move forward in reforming our detention system.

John Morton
Director

GEO-MEN 00064019

**APP. 97**

# 1.2 Environmental Health and Safety

## I. Purpose and Scope

This detention standard protects detainees, staff, volunteers and contractors from injury and illness by maintaining high facility standards of cleanliness and sanitation, safe work practices and control of hazardous substances and equipment.

This detention standard applies to the following types of facilities housing ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Facility cleanliness and sanitation shall be maintained at the highest level.

2. Compliance with all applicable federal, state and local safety and sanitation laws shall be ensured by documented internal and external inspections, and by corrective action when indicated.

3. Compliance with all applicable fire safety codes and fire safety performance requirements for facility furnishings shall be ensured.

4. Flammable, poisonous, toxic and caustic materials shall be controlled and used in a safe manner.

5. Compliance with fire prevention regulations, inspection requirements and other practices, including periodic fire drills, shall ensure the safety of detainees, staff and visitors.

6. Staff shall be knowledgeable about procedures an.3

7. d responsibilities during emergency situations, including those that require evacuation, in accordance with a written plan and with training at least annually.

8. The facility shall have a written plan for immediate release of detainees from locked areas, and provisions for a back-up system.

9. A sufficient number of properly positioned emergency exits, clear from obstruction, shall be distinctly and permanently marked.

10.                                    Preventive maintenance and regular inspections shall be performed to ensure timely emergency repairs or replacement and to prevent dangerous and life-threatening situations.

11. Potential disease transfer shall be minimized through proper sanitization of barbering equipment and supplies.

12. Pests and vermin shall be controlled and eliminated.

13. Safe, potable water shall be available throughout the facility.

14. Emergency lighting and life-sustaining

GEO-MEN 00064040

**APP. 98**

equipment shall be maintained and periodically tested.

15. Disposal of garbage and hazardous waste shall be in compliance with applicable government regulations.

16. The applicable content and procedures in this standard shall be communicated to the detainee in a language or manner the detainee can understand.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Environmental Health and Safety" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-1A-01, 1A-02, 1A-03, 1A-07, 1A-14, 1A-15, 1A-16, 1A-17, 1A-18, 1A-19, 1A-20,1C-01, 1C-02, 1C-03, 1C-04, 1C-05, IC-07, 1C-08, 1C-09, 1C-10, 1C-11, 1C-12, 1C-13, 1C-14, 1C-15, 4B-07, 4C-18.

Occupational Safety and Health Administration (OSHA) Regulations.

NFPA Standards.

U.S. Public Health Service Report on Carcinogens.

## V. Expected Practices

### A. Environmental Health and Safety

#### 1. General Environmental Health

Environmental health conditions shall be maintained at a level that meets recognized standards of hygiene, including those from the:

a. American Correctional Association;

b. Occupational Safety and Health Administration;

c. Environmental Protection Agency;

d. Food and Drug Administration;

e. National Fire Protection Association's Life Safety Code; and

f. National Center for Disease Control and Prevention.

The health services department or equivalent shall assist in the identification and correction of conditions that could adversely impact the health of detainees, employees and visitors. The facility administrator designee for environmental health is responsible for developing and implementing policies, procedures and guidelines for the environmental health program that are intended to identify and eliminate or control as necessary, sources of injuries and modes of transmission of agents or vectors of communicable diseases.

The facility administrator designee shall:

a. conduct special safety investigations and comprehensive surveys of environmental health conditions; and

b. provide advisory, consultative, inspection and training services regarding environmental health conditions.

The health services administrator or equivalent is responsible for:

a. implementing a program that assists in maintaining a high level of environmental

GEO-MEN 00064041

**APP. 99**

sanitation; and

b. providing recommendations to the facility administrator concerning environmental health conditions, in consultation with the environmental health designee.

### 2. Staff and Detainee Safety

The facility administrator shall ensure that adequate provisions are made for staff and detainee safety, in accordance with these detention standards and applicable law. Standard "7.3 Staff Training" further addresses employee training-related issues. Standard "5.8 Voluntary Work Program" addresses detainee training issues for workers. Detainees shall receive safety instruction as necessary for living area-related assignments, such as working with cleaning products to clean general use areas.

Detainee living area safety shall be emphasized to staff and detainees to include providing, as noted in the standards, a housekeeping plan. For example, when there are safety concerns with a detainee sleeping in a top bunk that is not along a wall and that has no bed rail, accommodations shall be made to ensure safety. (Because of the potential safety risk they pose, bed rails are not common in detention settings except for medical housing units.) In locations where ladders are unavailable, alternate accommodations, such as the use of bottom bunks or the addition of a ladder or step, shall be made for detainees on a case-by-case basis. Detainees who have medical or physical problems that may be aggravated by sleeping on a top bunk shall be referred to the medical unit for consideration of a lower bunk permit.

### 3. General Housekeeping

The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness. When possible, the use of non-toxic cleaning supplies is recommended.

a. All horizontal surfaces shall be dampdusted daily with an approved germicidal solution used according to the manufacturer's directions.

b. Windows, window frames and windowsills shall be cleaned on a weekly schedule.

c. Furniture and fixtures shall be cleaned daily.

d. Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions.

e. A clean mop head shall be used each time the floors are mopped.

f. Waste containers shall weigh less than 50 lbs., be non-porous and lined with plastic bags; the liner shall be changed daily.

g. Waste containers shall be washed weekly at a minimum, or as needed when they become soiled.

h. Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

### 4. Pests and Vermin

The facility administrator shall contract with licensed pest-control professionals to perform monthly inspections to identify and eradicate rodents, insects and other vermin. The contract shall include a preventive spraying program for indigenous insects and a provision for callback services as necessary. Doors to the outside should be tight fitting and door sweeps should be installed to prevent the entry of vermin from outside.

### 5. Certification of Facility Water Supply

At least annually, a state laboratory shall test samples of drinking and wastewater to ensure compliance with applicable standards. A copy of the

GEO-MEN 00064042

**APP. 100**

testing and safety certification shall be maintained on site.

### 6. Emergency Electrical Power Generator

At least every two weeks, emergency power generators shall be tested for one hour, and the oil, water, hoses and belts of these generators shall be inspected for mechanical readiness to perform in an emergency situation.

Power generators are to be inspected weekly and load-tested quarterly at a minimum, or in accordance with manufacturer's recommendations and instruction manual. Technicians shall check starting battery voltage, generator voltage and amperage output at a minimum, and shall perform all other necessary checks as well.

Other emergency equipment and systems shall be tested quarterly, and all necessary follow-up repairs or replacement shall be performed as soon as feasible.

### 7. Garbage and Refuse

a. Garbage and refuse includes all trash, rubbish and other putrescible and non-putrescible solid waste, except the solid and liquid waste discharged into the sanitary sewer system of the facility.

b. Garbage and refuse shall be collected and removed from common areas at least daily to maintain sanitary conditions and to avoid creating health hazards.

c. Facilities shall comply with all federal, state and local environmental regulations and requirements governing methods for handling and disposing of refuse.

## B. Hazardous Materials

Every facility shall establish a system for storing, issuing, using and maintaining inventories of and accountability for hazardous materials. The facility

program shall be supervised by an individual trained in accordance with OSHA standards. The effectiveness of any such system depends not only on written policies, procedures and precautions, but also on adequate supervision and responsible behavior of staff and detainees, including following instructions precisely, taking prescribed precautions and using safety equipment properly.

A list of common flammable, toxic and caustic substances is included at the end of this detention standard as "Appendix 1.2.A: Common Flammable, Toxic and Caustic Substances."

### 1. Personal Responsibility

Every individual who uses a hazardous substance must:

a. be trained in accordance with OSHA standards;

b. be knowledgeable about and follow all prescribed precautions;

c. wear personal protective equipment when indicated; and

d. promptly report hazards or spills to the designated authority.

### 2. Protective Equipment

a. Protective eye, face, and other appropriate equipment (such as footwear, gloves, gowns, and/or aprons) is required where there is a reasonable probability of injury preventable by such equipment. Areas of the facility where such injuries can occur shall be conspicuously marked with eye-hazard warning signs.

b. Eyewash stations that meet OSHA standards shall be installed in designated areas throughout the facility, and all employees and detainees in those areas shall be instructed in their use.

### 3. Inventories

Every area shall maintain a current inventory of the

GEO-MEN 00064043

**APP. 101**

hazardous substances (e.g., flammable, toxic or caustic) used and stored there. Inventory records shall be maintained separately for each substance. Entries for each shall be logged on a separate card (or equivalent), and filed alphabetically by substance. The entries shall contain relevant data, including purchase dates and quantities, use dates and quantities and quantities on hand.

### 4. Material Safety Data Sheet Files

a. Every department or other area of the facility using hazardous substances shall maintain a file of Material Safety Data Sheets (MSDS) that includes a list of the locations where hazardous substances are stored, along with a diagram and legend of these locations. Designated staff from each department or area shall provide a copy of each file to the maintenance supervisor.

b. MSDS are produced by manufacturers and provide vital information on individual hazardous substances, including instructions on safe handling, storage and disposal; prohibited interactions; etc.

c. Staff and detainees shall have ready and continuous access to the MSDS for the substances with which they are working. Staff and detainees who do not read English shall not be authorized to work with these materials.

d. Because changes in MSDS occur often and without notice, staff must:

   1) review the latest issuance from the manufacturers of the relevant substances;

   2) update the MSDS files as necessary; and

   3) forward any changes to the maintenance supervisor, so that the copy is kept current.

### 5. Master Index

The maintenance supervisor or facility administrator designee shall compile:

a. a master index of all hazardous substances in the facility and their locations;

b. a master file of MSDS; and

c. a comprehensive, up-to-date list of emergency phone numbers (e.g., fire department, poison control center, etc.).

The maintenance supervisor shall maintain this information in the safety office (or equivalent) and ensure that a copy is sent to the local fire department.

### 6. General Guidelines Regarding Hazardous Substances

a. Issuance
   Flammable, caustic and toxic substances (hazardous substances) shall be issued (i.e., drawn from supply points to canisters or dispensed) only under the supervision of the designated officer.

b. Amounts
   Hazardous substances shall be issued in single-day increments (the amount needed for one day's work.)

c. Supervision
   Qualified staff shall closely monitor detainees working with hazardous substances.

d. Accountability
   Inventory records for a hazardous substance must be kept current before, during and after each use.

### 7. Flammable and Combustible Liquids

a. As required by the Federal Hazardous Substances Labeling Act, any liquid or aerosol labeled "flammable" or "combustible" must be stored and used as prescribed on the label.

b. Lighting fixtures and electrical equipment installed in flammable liquid storage rooms must

GEO-MEN 00064044

**APP. 102**

meet National Electrical Code requirements in hazardous locations.

c. Every hazardous material storage room shall:

   1) be of fire-resistant construction and properly secured;

   2) have self-closing fire doors at each opening;

   3) be constructed with either a four-inch sill or a four-inch depressed floor; and

   4) have a ventilation system (mechanical or gravity flow), which provides at least six air changes per hour, within 12 inches of the floor.

d. Every storage cabinet shall:

   1) be constructed according to the applicable code and securely locked at all times;

   2) be clear of open passageways, stairways and other emergency exit areas;

   3) be conspicuously labeled: "Flammable—Keep Fire Away"; and

   4) contain not more than 60 gallons of Class I or Class II liquids, or more than 120 gallons of Class III liquids.

e. Storage rooms and cabinets may be entered only under secure conditions and under the supervision of authorized staff.

f. Any portable container that is not the original shipping container must be designated as an approved safety canister, and must be listed or labeled by a nationally recognized testing laboratory. Each container shall bear a legible label that identifies its contents.

g. Excess liquids shall remain in original containers, tightly closed, in the storage room or cabinet.

h. The MSDS shall govern use of particular

flammable or combustible liquids.

i. Only authorized staff may dispense flammable and combustible liquids, using acceptable methods for drawing from or transferring these liquids.

j. Drawing from or transferring any of these liquids into containers indoors is prohibited except:

   1) through a closed piping system;

   2) from a safety can;

   3) by a device drawing through the top; or

   4) by gravity, through an approved self-closing system.

   An approved grounding and bonding system must be used when liquids are dispensed from drums.

k. Without exception, cleaning liquids must have a flash point at or above 100º F (e.g., Stoddard solvents, kerosene). Cleaning operations must be in an approved parts-cleaner or dip tank, fitted with a fusible link lid with a 160 degree F melting-temperature link.

l. Staff shall follow MSDS directions:

   1) when disposing of excess flammable or combustible liquids; or

   2) after a chemical spill.

8. Toxic and Caustic Substances

a. All toxic and caustic materials must be stored in secure areas, in their original containers, with the manufacturer's label intact on each container.

b. Only authorized staff shall draw/dispense these substances, in accordance with the applicable MSDS.

c. Staff shall either return unused amounts to the original container(s) or, under certain circumstances, to another suitable, clearly

GEO-MEN 00064045

labeled container within the storage area.

d. MSDS directions shall determine the disposal and spill procedures for toxic and caustic materials used in the facility.

### 9. Poisonous Substances

Poisonous substances or chemicals (e.g., methyl alcohol, sulfuric acid, muriatic acid, caustic soda or tannic acid, etc.) pose a very high (Class I) caustic hazard due to their toxicity.

Methyl alcohol, variously referred to as wood alcohol and methanol, is commonly found in industrial applications (e.g., shellac thinner, paint solvent, duplicating fluid, solvents for leather cements and dyes, flushing fluid for hydraulic brake systems).

a. If ingested, methyl alcohol can cause permanent blindness or death.

b. Staff must directly supervise the use of any product containing methyl alcohol. Products that contain methyl alcohol in highly diluted amounts (e.g., shoe dye) may be issued to detainees, but only in the smallest workable quantities.

c. Immediate medical attention is vital any time methyl alcohol poisoning is suspected.

### 10. Other Toxic Substances

a. Permanent antifreeze containing ethylene glycol shall be stored in a locked area and dispensed only by authorized staff.

b. Typewriter cleaner containing carbon tetrachloride or trichlorochane shall be dispensed in small quantities and used under direct staff supervision.

c. Cleaning fluids containing carbon tetrachloride or tetrachloride or trichlorochane shall be strictly controlled.

d. Glues of every type may contain hazardous chemicals. Toxic glues must be stored in a locked location, for use only by authorized staff. When use of a nontoxic product is not possible, staff must closely supervise all stages of handling.

e. The use of dyes and cements for leather requires close supervision. Nonflammable types shall be used whenever possible.

f. Ethyl alcohol, isopropyl alcohol and other antiseptic products shall be stored and used only in the medical department and only under close supervision. To the extent practical, such chemicals shall be diluted and issued in small quantities to prevent any injuries or lethal accumulation.

g. Pesticides not currently approved by the Environmental Protection Agency, such as DDT and 1080 (sodium fluoroacetate) are prohibited. The maintenance supervisor is responsible for purchasing, storing (in a locked area) and dispensing all pesticides used in the facility.

h. The maintenance supervisor or other staff members responsible for herbicides must hold a current state license as a certified private applicator. Persons applying herbicides must wear proper clothing and protective gear.

i. Lyes may be used only in dye solutions and only under the direct supervision of staff.

### 11. Labeling of Chemicals, Solvents and Other Hazardous Materials

The facility administrator shall individually assign the following responsibilities associated with the labeling procedure:

a. identifying the nature of potentially hazardous materials adopted for use;

b. overseeing use of properly labeled containers for hazardous materials, including any and all

GEO-MEN 00064046

**APP. 104**

miscellaneous containers into which employees might transfer materials;

c. instructing staff in the meaning of the classification code and the MSDS, including the safe handling procedures for each material;

d. working with staff ensure that containers are properly labeled; and

e. correctly labeling all smaller containers to correspond to the manufacturer-affixed labels on larger shipping containers.

### 12. Controlled Hazardous Materials

Certain substances require special treatment and careful planning and precautions before use. These controlled materials are classified according to the type of hazard and the nature of the restrictions imposed for their safe use, as specified in OSHA regulations.

a. Class I: Industrial Solvents
Industrial solvents and chemicals used as paint thinners, degreasers and cleaning agents may have toxic properties and low flash points, making them dangerous fire hazards.

b. Class II: Restricted Materials
Beryllium and its alloys and compounds, and silver solder containing cadmium, pose a danger to workers, for whom special precautions must be taken.

c. Class III: Recognized Carcinogens
OSHA-listed carcinogens are governed by the OSHA regulations provided in 29 CFR 1910.1000.

Although asbestos appears on the OSHA list, it is exempt from the regulation when:

1) no asbestos fibers shall be released into the air during handling and use; and

2) the asbestos consists of firmly bound fibers

contained in a product such as a transit pipe, wallboard, or tile (except when being sawed or otherwise handled in a way that releases fibers into the air).

d. Class IV: Suspected Carcinogenic, Teratogenic and Mutagenic Materials
Chemical agents, substances, mixtures and exposures are listed in the biennial *Report on Carcinogens* issued by the U.S. Public Health Service, in accordance with the Public Health Service Act. The maintenance supervisor shall ensure that the facility has copies of the report and that there is compliance with the provisions of the latest edition.

## C. Fire Prevention and Control

### 1. Fire Safety Codes

Every facility shall comply with standards and regulations issued by:

a. OSHA;

b. the American Correctional Association "mandatory" Expected Practices [Mandatory ACA Expected Practice 4-ALDF-1C-07 requires that the facility conform to applicable federal, state and/or local fire safety codes, and that of the authority having jurisdiction document compliance. A fire alarm and automatic detection system are required (or else there must be a plan for addressing these or other deficiencies within a reasonable time period), as approved by the authority having jurisdiction. If the authority approves any variance, exceptions or equivalencies, they must not constitute a serious life-safety threat to the occupants of the facility.];

c. local and national fire safety codes; and

d. applicable standards of the American Society for Testing and Materials, American National

GEO-MEN 00064047

**APP. 105**

Standards Institute and Underwriters' Laboratories or Factory Mutual Engineering Corporation.

New construction, alterations and renovations, shall comply with:

a. the latest revision or update of the International Council Codes;

b. the Uniform Building Code; or

c. the Standard Building Code, in accordance with 40 U.S.C § 619 and local law.

If the local government does not mandate adherence to a particular code, construction must conform to the International Council Codes.

In addition, construction shall comply with the latest edition of the National Fire Protection Association (NFPA)'s 101, Life Safety Code and National Fire Codes (NFCs). If the fire protection and life safety requirements of a local building code differ from NFPA 101 or the NFCs, the requirements of NFPA 101 and the NFCs shall take precedence and be recognized as equivalent to those of the local building code.

### 2. Inspections

a. A qualified departmental staff member shall conduct weekly fire and safety inspections.

b. Facility maintenance (safety) staff shall conduct monthly inspections.

c. Written reports of the inspections shall be forwarded to the facility administrator for review and, if necessary, corrective action determinations. The maintenance supervisor shall maintain inspection reports and records of corrective action in the safety office. Fire safety deficiencies shall be promptly addressed.

### 3. Fire Prevention, Control and Evacuation Plan

Every facility shall develop a written fire prevention, control and evacuation plan that includes the following:

a. control of ignition sources;

b. control of combustible and flammable fuel load sources;

c. provisions for occupant protection from fire and smoke;

d. inspection, testing and maintenance of fire protection equipment, in accordance with NFPA codes, etc.;

e. monthly fire inspections;

f. installation of fire protection equipment throughout the facility, in accordance with NFPA codes;

g. accessible, current floor plans (including all buildings and rooms); prominently posted evacuation maps/plans; and exit signs and directional arrows for traffic flow, with a copy of each revision filed with the local fire department; and

h. exit diagrams that shall be conspicuously posted throughout the facility.

### 4. Fire Drills

Fire drills shall be conducted and documented at least quarterly in all facility locations including administrative areas.

a. Fire drills in housing units, medical clinics and other areas occupied or staffed during non-working hours shall be timed so that employees on each shift participate in an annual drill.

b. Detainees shall be evacuated during fire drills, except:

1) in areas where security would be jeopardized;

2) in medical areas where patient health could be jeopardized; or

GEO-MEN 00064048

**APP. 106**

3) in individual cases when evacuation of patients or detainees is logistically not feasible.

Staff shall simulate drills in areas where detainees are not evacuated.

c. Emergency-key drills shall be included in each fire drill, and timed. Emergency keys shall be drawn and used by the appropriate staff to unlock one set of emergency exit doors not in daily use. NFPA recommends a limit of four and one-half minutes for drawing keys and unlocking emergency doors. However, when conducting fire drills, emphasis shall be placed on safe and orderly evacuation rather than speed.

### 5. Exit Diagram

In addition to a general area diagram, the following information must be provided on signs:

a. instructions in English, Spanish and the next most prevalent language at the facility;

b. "You are here" markers on exit maps; and

c. emergency equipment locations.

"Areas of Safe Refuge" shall be identified and explained on diagrams. Diagram posting shall be in accordance with applicable fire safety regulations of the jurisdiction.

## D. Medical Operation

### 1. Needles and Other Sharp Objects

A mandatory, uniform procedure shall be established for the safe handling and disposal of used needles and other potentially sharp objects (sharps) to prevent both mechanical injury and the percutaneous transmission of infectious disease organisms, such as the hepatitis B virus (HBV) and human immunodeficiency virus (HIV). Sharps are defined as all disposable or discarded items derived from detainee care that could potentially transmit disease via direct subdermal inoculation. Items included are: hypodermic needles and syringes, scalpel blades, glass vials or ampules containing materials deemed to be infectious, burrs, glass cartridges and lancets.

Accidental injuries from sharp objects are common in health care programs; most are from needle sticks caused by staff attempting to recap hypodermic needles. A uniform procedure for used needles and other disposable sharps is necessary to reduce the number of such injuries by preventing the secondary handling of needles and other dangerous sharp objects used in the delivery of medical care.

### 2. Standard Precautions (includes "Universal Precautions")

Staff shall frequently wash their hands and take additional routine precautions to prevent contact with blood or other body fluids.

a. Gloves shall be worn: prior to touching blood and body fluids, mucous membranes, or non intact skin of all patients; prior to handling items or surfaces soiled with blood or body fluids; and prior to performing venipuncture and other vascular access procedures.

b. Gloves shall be changed after contact with each detainee.

c. Masks and protective eyewear or face shields shall be worn during procedures that are likely to generate droplets of blood or other body fluids.

d. Gowns and/or aprons shall be worn during procedures that are likely to generate splashes of blood or other body fluids.

e. Hands and other skin surfaces shall be washed immediately and thoroughly if contaminated with blood or other body fluids. Hands shall be washed immediately after gloves are removed.

f. All health-care workers shall take precautions to

GEO-MEN 00064049

**APP. 107**

prevent injuries caused by needles, scalpels and other sharp instruments or devices during procedures, especially at the following times: when cleaning used instruments, during disposal of used needles and when handling sharp instruments after procedures. Instruments and drugs shall be maintained in a secure and sanitary condition.

g. To prevent needle-stick injuries, needles shall not be recapped, purposely bent or broken, removed from disposable syringes, or otherwise manipulated by hand. After use, disposable syringes and needles, scalpel blades and other sharp items shall be placed in puncture-resistant containers for disposal.

h. Large-bore reusable needles shall be placed in a puncture-resistant container for transport to the reprocessing area.

i. To minimize the need for emergency mouth-to-mouth resuscitation, mouthpieces, resuscitation bags or other ventilation devices shall be available for use in areas in which the need for resuscitation is foreseeable.

j. Health-care workers who have exudative lesions or weeping dermatitis shall refrain from all direct patient care and from handling patient care equipment until the condition resolves.

k. Pregnant health-care workers shall strictly adhere to precautions to minimize the risk to the fetus of perinatal transmission of HIV.

l. Isolation precautions shall be used as necessary if associated conditions, such as infectious diarrhea or tuberculosis, are diagnosed or suspected. Implementation of standard blood and body fluid precautions for all detainees eliminates the need for the use of isolation category of "blood and body fluid precautions" previously recommended by the Centers for Disease Control for individuals known or suspected to be infected with blood-borne pathogens.

Staff shall encourage detainees to wash their hands frequently and to take additional routine precautions to prevent contact with blood or other body fluids.

### 3. Accidental Needle Sticks

Any employee or detainee who receives a needle stick or who is cut while handling potentially contaminated sharps shall be counseled regarding baseline testing for HBV and HIV, and referred to his/her usual source of health care. If the injury also involves a person who is a known source of possible infection, that person shall also be tested for HBV and HIV. The incident shall be reported as an occupational injury and documented in accordance with applicable regulations for commissioned officers and civil service employees, respectively.

The leading health service provider's exposure-control plan shall be followed in the event of a needle stick.

### 4. Inventory

Items that pose a security risk, such as sharp instruments, syringes, needles and scissors, shall be inventoried and checked weekly by an individual designated by the medical facility's Health Service Administrator (HSA) or equivalent.

### 5. Handling

Without removing the needles or replacing the needle covers, staff shall place used (disposable) syringes in a plastic disposal box or container.

a. Disposal Containers

1) Use only commercially available, biohazardous-waste sharps containers approved by the National Institute of Safety and Health (e.g., a "Winfield Sharps

GEO-MEN 00064050

APP. 108

Container").

2) Do not use milk cartons or plastic milk jugs or other plastic containers of similar thickness.

3) Use containers with a two-gallon capacity (approximate).

4) Under no circumstances shall an item be removed from the Winfield Sharps Container (Sharps Container).

b. Location
Sharps Containers shall be located on top of counters or, if on the wall, at least five feet above ground. Sharps Containers shall never sit on the floor.

c. Disposal
When the disposal box is one-half to two-thirds full, the lid shall be closed and locked, and tape shall be placed over the top of the lid to indicate that it is ready for disposal. The Sharps Container shall be labeled with the words "infectious waste" or with the universal biohazard symbol, and placed in the proper area for removal and disposal.

Sharps are considered infectious waste, and final disposal of the Sharps Container and contents shall be through a commercial contractor that handles disposal of infectious waste in accordance with all local and federal regulations.

The HSA shall make arrangements for disposal with an approved contractor and is responsible for validating that the contractor's disposal methods are in accordance with all infectious and hazardous waste disposal laws and regulations. Arrangements shall be made with local hospitals, when possible, for disposal with the hospitals' own infectious waste.

6. Environmental Health in Medical Operations

While many of the following considerations, precautions and specific procedures apply to situations that typically arise in medical operations, in many cases they have general application to all facility operations.

a. General Housekeeping
Environmental cleanliness shall reduce, control and prevent nosocomial infections due to contaminated environmental surfaces. The HSA or designee is responsible for ensuring the cleanliness of the medical facility.

Using an acceptable health agency standard as a model, the HSA shall establish:

1) the cleaning equipment, cleansers, disinfectants and detergents to be used;

2) the methods of cleaning; and

3) the frequency of cleaning and inspections.

The HSA or designee shall make a daily visual inspection of the medical facility, noting the condition of floors, walls, windows, horizontal surfaces and equipment.

All surfaces touched by detainees or staff shall be cleaned using fresh solutions of appropriate disinfectant products, applied with clean cloths, mops or wipes. Cleaned surfaces need not be monitored microbiologically since the results of such tests have been shown not to correlate with infection risk. Floors, walls, beds, tables and other surfaces that usually come in contact with intact skin require low-level disinfection

Horizontal surfaces in detainee care areas are cleaned on a regular basis, when soiling or spills occur. Additionally, short-stay units are cleaned when a detainee is discharged. Cleaning of walls, blinds or curtains is required only when visibly soiled.

The Chief Nurse (or equivalent) is responsible for training all staff and detainees in using proper housekeeping procedures and proper handling of

GEO-MEN 00064051

**APP. 109**

hazardous materials and chemicals.

1) General Cleaning

   a) All horizontal surfaces shall be damp dusted daily with an approved germicidal solution.

   b) Windows, window frames and windowsills shall be cleaned on a regular schedule, but do not require daily cleaning.

   c) Furniture and fixtures shall be cleaned daily.

   d) Floors shall be mopped daily and when soiled using the double bucket mopping technique. The cleaning solution shall be a hospital disinfectant-detergent solution mixed according to the manufacturer's directions. A clean mop head shall be used each time the floors are mopped.

   e) Waste containers shall be lined with plastic bags and the liner shall be changed daily. The container itself shall be washed at least weekly, or as needed when it becomes soiled.

   f) Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

2) Isolation Cleaning

   a) An approved germicidal detergent solution shall be freshly prepared in accordance with the manufacturer's specifications for each cleaning.

   b) After cleaning the isolation room, mops and cleaning cloths shall be laundered before being reused.

   c) Dirty water and used disinfecting solutions shall be discarded and the buckets and basins disinfected before being refilled. Items used in cleaning a contaminated isolation room shall never be taken into another area.

   d) Linens shall be carefully removed from the bed and double-bagged for transport.

   e) All waste materials shall be double-bagged and disposed of as contaminated waste.

3) Terminal Cleaning

   a) Every item in the room must be cleaned with an approved hospital germicidal solution.

   b) When applicable, linen shall be stripped from the bed, with care taken not to shake the linen. Linen shall be folded away from the person and folded inward into a bundle, then removed with minimal agitation.

   c) When applicable, all reusable receptacles (e.g., drainage bottles, urinals, bedpans, water pitchers) shall be emptied and rinsed with germicidal solutions.

   d) All equipment that is not to be discarded (e.g., IV poles, respirators, suction machines) shall be washed with an approved germicidal solution following manufacturer's guidelines for cleaning the specific piece of equipment.

   e) When applicable, mattresses and pillows covered with durable plastic covers shall be washed thoroughly with the approved germicidal solution.

   f) When applicable, beds shall be washed thoroughly, using a small brush soaked in germicidal solution to gain access to small holes and crevices, to areas between the springs and to the casters.

   g) All furniture shall be washed with a

GEO-MEN 00064052

**APP. 110**

germicidal detergent solution. Use a small brush if necessary. Outside and underside as well as legs and casters must also be washed.

h)  Wastebaskets shall be thoroughly washed with a germicidal solution after trash and liner have been removed.

i)  Telephones shall be thoroughly cleaned with a clean cloth soaked in the germicidal solution. The earpiece and mouthpiece shall be unscrewed, scrubbed, dried and replaced.

j)  Walls and ceilings need not be washed entirely, but areas that are soiled shall be washed with germicidal solution.

4)  Choice of Disinfecting Materials
Hospital-grade disinfectant detergent formulations registered by the Environmental Protection Agency (EPA) may be used for environmental surface cleaning, but the physical removal of microorganisms by scrubbing is as imperative as any antimicrobial effect of the cleaning agent used.

Cost, safety and acceptance by staff shall be the criteria for selecting any such registered agent. The manufacturer's instructions for use shall be followed exactly.

b.  Blood and Body Fluid Clean-up
Spills of blood and body fluids shall be cleaned up and the surface decontaminated in such a manner as to minimize the possibility of workers becoming exposed to infectious organisms, including HIV and HBV. A suitable cleanup kit shall be maintained for use in cases of spills of blood and body fluids. Cleanup kits may be obtained from commercial sources, or may be compiled by Health Services Department (HSD)

staff or the designated health care provider.

1)  Compiling a Cleanup Kit

To prepare a cleanup kit for blood and body fluid spills, package the following materials in a 12" x 15" clear zip-lock bag:

a)  gloves, rubber or vinyl, household-type (2 pair);

b)  clean absorbent rags (4);

c)  absorbent paper towels (15);

d)  disposable bag marked "contaminated" size 23"x10"x39", minimum thickness 1.5 mils.;

e)  Clear plastic bag 13"x10"x39", minimum thickness 1.5 mils.; and

f)  Bottle of "hospital disinfectant" (containing quaternary ammonium chlorides in at least 0.8% dilution), or a bottle of household bleach such as "Clorox" or "Purex" (5.25% sodium hypochlorite).

2)  Selection of Disinfectants
Dilute solutions of sodium hypochlorite are reported extremely effective against both HIV and the Hepatitis B virus and therefore have been recommended for use in environmental decontamination procedures. Quaternary ammonium compounds are less effective against Hepatitis B. Chlorine in solution inactivates viruses quickly and efficiently, but must reach the virus particles to do so.

Proteinaceous materials may interfere with the ability of the appropriate disinfectant solution to reach the virus particles. Since quaternary disinfecting compounds may act as a detergent as well as a disinfectant, these compounds may be used for cleaning and removal of proteinaceous materials from

GEO-MEN 00064053

**APP. 111**

surfaces. However, when using such a compound to clean a surface, it shall be necessary to follow with the use of chlorine solution for final disinfection.

Most blood or fluids shall be removed from the surface during routine medical cleaning procedures before application of the disinfectant; in such cases, use of sodium hypochlorite solution shall be sufficient.

3) Selection of Gloves

Household or industrial rubber gloves are recommended for use rather than surgical rubber gloves, as surgical gloves are somewhat porous and are less resistant to mechanical damage and punctures during clean-up procedures.

4) Assignment of Cleaning Duties to Detainees in Medical Facilities

Detainee workers may be assigned duties cleaning the medical facility. Detainees are permitted to clean floors and walls and to remove trash, but are not permitted to clean medical equipment.

5) Instructions for Use of Clean-Up Kit

a) Open the bag and remove the supplies.

b) Put on one pair of gloves.

c) Depending on the type of disinfectant in the kit, take out bottle of "hospital disinfectant," or prepare a dilute solution of sodium hypochlorite. To prepare a 1:10 dilution of 5.25% sodium hypochlorite, mix 1 part of 5.25% sodium hypochlorite (common household bleach) with 10 parts water.

d) Open the large clear plastic bag and the large bag marked "contaminated." Place them next to each other.

e) Use paper towels to absorb as much of the spilled fluid as possible; then place soiled paper towels in the large clear plastic bag.

f) Pour the solution carefully onto the spill area. Dispose of the empty bottle in the large, clear plastic bag. Leave disinfectant in place for 15 minutes.

g) Use the rags to clean the area, and place rags in the large clear plastic bag.

h) Tie off the clear plastic bag and place it inside the large plastic bag marked "Contaminated."

i) Remove gloves carefully and place them in the plastic bag marked "Contaminated."

j) Put on the second pair of gloves and tie the "Contaminated" trash bag closed.

k) Properly dispose of the "Contaminated" trash bag in a contaminated-waste receptacle.

l) Properly dispose of the second pair of gloves in the contaminated-waste receptacle.

m) Wash your hands.

n) Prepare a new clean-up kit.

NOTE: Do not place linen or non-disposable articles in the "Contaminated" trash bag.

c. Hazardous and Infectious Waste Disposal

Infectious and hazardous waste generated at a medical facility shall be stored and disposed of safely and in accordance with all applicable federal and state regulations.

For identified wastes that represent sufficient risk of causing infection or injury during handling and disposal, the following precautions shall be applied.

1) Definitions

GEO-MEN 00064054

**APP. 112**

Hazardous or infectious waste is defined as: microbiology laboratory waste; human blood and blood products; sharps (as defined in "Section VIII," "A" above); laboratory and other chemicals; or certain drugs such as antineoplastic.

Miscellaneous biomedical waste is defined as waste materials that are not specifically defined as infectious waste. Such waste includes bandages, dressings, casts, catheters and disposable pads.

Waste from detainees in isolation is not considered to be infectious waste unless it falls within the specific definition of infectious waste as stated above.

2) Collection and Storage

Infectious waste must be separated from the general waste stream and clearly labeled as infectious, adhering to the following practices:

a) Infectious waste shall be double-bagged and tied and labeled "Infectious Waste."

b) The bags used must be impermeable, commercially supplied red bags intended specifically for biohazardous waste storage.

c) Miscellaneous biomedical waste shall be double-bagged and tied but need not be labeled as infectious.

3) Treatment and Disposal

Blood products and designated body fluids shall be poured slowly and carefully down a toilet to prevent splash. Compacting of untreated infectious waste is prohibited. The waste disposal contractor must meet all state and local requirements for transportation and disposal.

## E. Barber Operations

Sanitation in barber operations is imperative because of the possible transfer of diseases through direct contact or by towels, combs and clippers. Towels shall not be reused by other detainees until sanitized. Instruments such as combs and clippers shall not be used successively on detainees without proper cleaning and disinfecting.

1. For sanitation reasons, barbering operations must be located in a room that is not used for any other purpose. The room must have sufficient light, and be supplied with hot and cold running water. The floors, walls and ceilings shall be smooth, nonabsorbent and easily cleaned.

2. Each barbershop shall have all equipment and facilities necessary for maintaining sanitary procedures for hair care, including covered metal containers for waste, disinfectants, dispensable headrest covers, laundered towels and haircloths.

3. After each detainee visit, all hair care tools that came in contact with the detainee shall be cleaned and effectively disinfected. Ultraviolet lights are not appropriate for sterilization but may be used for maintaining tools that have already been properly sterilized.

4. Detailed hair care sanitation regulations shall be conspicuously posted in each barbershop for the use of all hair care personnel and detainees. Cotton pads, absorbent cotton and other single or dispensable toilet articles may not be reused, and shall be placed in a proper waste receptacle immediately after use. The common use of brushes, neck dusters, shaving mugs and shaving brushes is prohibited.

5. Barbers or beauticians shall not provide service to any detainee when the skin of the detainee's face, neck or scalp is inflamed, or when there is scaling, pus or other skin eruptions, unless

GEO-MEN 00064055

**APP. 113**

service of such detainee is performed in accordance with the specific authorization of the chief medical officer. No person who is infested with head lice shall be served.

GEO-MEN 00064056

**APP. 114**

# Appendix 1.2.A: Common Flammable, Toxic and Caustic Substances

## Class I Liquids

Gasoline

Benzene (Petroleum ether)

Acetine

Hexane

Lacquer

Lacquer thinner

Denatured alcohol

Ethyl alcohol

Xylene (Xylol)

Contact cement (flammable)

Toudi (Toluene)

Methyl ethyl ether

Methyl ethyl ketone

Naphtha Y, M and P

## Class II Liquids

Diesel fuel

Motor fuel

Kerosene

Cleaning solvents

Mineral spirits

Agitene

## Class III Liquids

Paint (oil base)

Linseed oil

Mineral oil

Neat's-foot oil

Sunray conditioner

Guardian fluid

## Toxic Substances

Ammonia

Chlorine

Antifreeze

Duplicating fluid

Methyl alcohol

Defoliants

Herbicides

Pesticides

## Caustic Substances

Lye

Muriatic acid

Caustic soda

Sulfuric acid

Tannic acid

GEO-MEN 00064057

**APP. 115**

# 2.12 Special Management Units

## I. Purpose and Scope

This detention standard protects detainees, staff, contractors, volunteers and the community from harm by segregating certain detainees from the general population in Special Management Units with an Administrative Segregation section for detainees segregated for administrative reasons and a Disciplinary Segregation section for detainees segregated for disciplinary reasons.

This detention standard applies to the following types of facilities housing ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (\*\*) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. The facility shall have a Special Management Unit (SMU) with provisions for separating the administrative segregation section, for detainees segregated from the general population for administrative reasons, from the disciplinary segregation section, for detainees segregated from the general population for disciplinary reasons.

2. Detainees housed in the general population, staff, contractors, volunteers and the local community shall be protected from harm by the segregation of certain detainees in an SMU.

3. Any detainee who represents an immediate, significant threat to safety, security or good order shall be immediately controlled by staff and, if cause exists and supervisory approval granted, placed in administrative segregation. ICE and the detainee shall be immediately provided a copy of the administrative segregation order describing the reasons for the detainee's placement in the SMU. The attorney of record shall be notified of the administrative segregation order within 24 hours.

4. Administrative segregation may also be available to detainees for the purpose of providing "protective custody." A detainee shall be placed in "protective custody" status in administrative segregation only when there is documentation and supervisory approval that it is necessary to protect a detainee from harm and that no reasonable alternatives are available.

5. A detainee shall be placed in disciplinary segregation only after a finding by a disciplinary hearing panel that the detainee is guilty of a prohibited act or rule violation classified at a "greatest," "high" or "high-moderate" level, as defined in "Appendix 3.1.A: Prohibited Acts and Sanctions," found in "3.1 Disciplinary System."

6. Health care personnel shall be immediately

GEO-MEN 00064169

**APP. 116**

informed when a detainee is admitted to an SMU and shall conduct an assessment and review of the detainees medical and mental health status and care needs. Health care personnel shall at a minimum conduct a daily assessment of detainees in an SMU. Where reason for concern exists, a qualified medical, or mental health professional shall conduct a complete evaluation.

7. Detainees with serious mental illness may not be automatically placed in an SMU on the basis of such mental illness. Every effort shall be made to place detainees with serious mental illness in a setting in or outside of the facility in which appropriate treatment can be provided, rather than an SMU, if separation from the general population is necessary

8. The status of detainees in SMUs shall be reviewed by supervisory staff in accordance with required time schedules, and the results of those reviews shall be documented.

9. A detainee shall remain in disciplinary segregation for no more than 30 days per violation, and his/her status shall be reviewed by the facility administrator and the Field Office Director after the first 30 days and each 30 days thereafter, to determine whether continued detention in disciplinary segregation is warranted.

10. Detainees in SMU shall be afforded basic living conditions that approximate those provided to the general population, consistent with the safety and security considerations that are inherent in more controlled housing, and in consideration of the purpose for which each detainee is segregated.

11. In general, when a detainee in an SMU is deprived of any usually authorized items or activity, a report of the action shall be forwarded to the facility administrator for notice and review.

12. Detainees in SMU shall have regular access to supervisory, management, program and health care staff.

13. Each detainee in an SMU shall be offered individual recreation or appropriate group recreation time, unless documented security, safety, or medical considerations dictate otherwise.

14. Detainees in SMU shall be able to write, send and receive mail and correspondence as they would otherwise be able to do while detained within the general population.

15. Detainees in SMU shall be provided opportunities for general visitation, including legal visitation, unless there are substantial, documented reasons for withholding those privileges.

16. Detainees in SMU shall have access to personal legal materials, law library materials and legal visits, in accordance with provisions in the PBNDS.

17. Detainees in SMU shall have access to telephones, in accordance with provisions in the PBNDS.

18. Detainees in SMU shall have access to programs and services such as commissary, library, religious guidance and recreation, in accordance with provisions in the PBNDS.

19. Detailed records shall be maintained on the circumstances related to a detainee's confinement to the SMU, through required permanent SMU logs and individual detainee records.

20. The applicable content and procedures in this standard shall be communicated to the detainee in a language or manner the detainee can understand.

GEO-MEN 00064170

**APP. 117**

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Special Management Unit (Administrative Segregation)" and "Special Management Unit (Disciplinary Segregation)," both dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-44 through 2A-66.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.4 Facility Security and Control";
- "2.6 Hold Rooms in Detention Facilities";
- "2.10 Searches of Detainees";
- "2.13 Staff-Detainee Communication";
- "3.1 Disciplinary System";"
- "4.5 Personal Hygiene";
- "4.6 Significant Self-harm and Suicide Prevention and Intervention";
- "5.1 Correspondence and Other Mail";
- "5.4 Recreation";
- "5.6 Telephone Access";
- "5.7 Visitation"; and

- "6.3 Law Libraries and Legal Material."

## V. Expected Practices

### A. Placement in Administrative Segregation

Administrative Segregation status is a nonpunitive status in which restricted conditions of confinement are required only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility. For matters of safety and security, staff may have to take immediate action to control a detainee, including placement in administrative segregation.

Detainees in administrative segregation shall not be commingled with detainees in disciplinary segregation.

Each facility shall develop and follow written procedures, consistent with this standard, governing the management of its administrative segregation unit. These procedures must document detailed reasons for placement of an individual in administrative segregation. Detainees must be provided a copy of the administrative segregation order.

Prior to the detainee's placement in administrative segregation, the facility administrator or designee shall review the case to determine whether administrative segregation is in fact warranted. The facility administrator may delegate to a supervisor the authority to place a detainee in administrative segregation.

#### 1. Reasons for Placement in Administrative Segregation

A detainee may be placed in administrative segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees; for the secure and orderly operation of the facility; for

GEO-MEN 00064171

APP. 118

medical reasons; or under other circumstances as set forth below. Some examples of incidents warranting a detainee's assignment to administrative segregation include, but are not limited to, the following.

a.  A detainee is awaiting an investigation or a hearing for a violation of facility rules. Pre-disciplinary hearing detention shall be ordered only as necessary to prevent further violation of those rules or to protect the security and orderly operation of the facility.

   1) Pre-disciplinary hearing detention is not to be used as a punitive measure.

   2) Time served in pre-hearing detention may be deducted from any time ordered by the Institutional Disciplinary Panel (IDP).

b.  A detainee is a threat to the security of the facility. The facility administrator may determine that a detainee's criminal record, past behavior at other institutions, behavior while in ICE/ERO detention, or other evidence is sufficient to warrant placement of the detainee in administrative segregation. Copies of records supporting this action shall be attached to the administrative segregation order.

c.  A detainee requires protection. Protective custody may be initiated at the detainee's request or by staff as needed to protect the detainee from harm. Each facility shall develop procedures to consider continued placement in protective custody as well as provisions for release from protective custody when appropriate. Frequently, the types of detainees who require this type of treatment include, but are not limited to:

   1) victims of detainee assaults;

   2) detainee informants or witnesses (e.g., detainees who provide information to institutional staff or any law enforcement

agency concerning improper or criminal activities by others);

   3) sexual predators or other detainees charged with a heinous or notorious crime;

   4) detainees who have been pressured by other detainees to participate in sexual activity;

   5) detainees who refuse to enter the general population because of alleged intimidation from other detainees;

   6) detainees who refuse to return to the general population, but who do not provide the reason for refusal;

   7) detainees who appear to be in danger of bodily harm;

   8) detainees who seek protection, claiming to be former law enforcement officers or to have held sensitive law enforcement positions, whether or not there is official information to verify the claim; or

   9) detainees who request protective custody.

   Use of administrative segregation to protect vulnerable populations shall be restricted to those instances where reasonable efforts have been made to provide appropriate housing and shall be made for the least amount of time practicable, and when no other viable housing options exist, and as a last resort. Detainees who have been placed in administrative segregation for protective custody shall have access to programs, services, visitation, counsel and other services available to the general population to the maximum extent possible.

d.  A detainee is scheduled for release, removal, or transfer within 24 hours. Such segregation may be ordered for security reasons or for the orderly operation of the facility.

GEO-MEN 00064172

**APP. 119**

e.  The IDP may order a detainee into administrative segregation following disciplinary segregation if it determines that releasing the detainee into the general population would pose a threat to the detainee or security and orderly operation of the facility. A detainee transferred from disciplinary segregation to administrative segregation shall enjoy the same privileges as all other detainees in administrative segregation, provided receipt of such privileges poses no threat to the safety, security, or orderly operation of the facility.

f.  A medical professional who ordered a detainee removed from the general population shall complete and sign an administrative segregation order (see below), unless the detainee is to stay in the medical department's isolation ward.

### 2. Administrative Segregation Order

A written order shall be completed and approved by the facility administrator or designee before a detainee is placed in administrative segregation, except when exigent circumstances make such documentation impracticable. In such cases, an order shall be prepared as soon as possible.

a.  Prior to a detainee's actual placement in administrative segregation, the facility administrator or designee shall complete the administrative segregation order (Form I-885 or equivalent), detailing the reasons for placing a detainee in administrative segregation.

b.  In an emergency, the detainee's placement in administrative segregation may precede the paperwork, which the facility administrator or designee shall prepare as soon as possible after the detainee's placement.

c.  All memoranda, medical reports and other relevant documents shall be attached to the administrative segregation order.

d.  If the segregation is ordered for protective custody purposes, the order shall state whether the detainee requested the segregation, and whether the detainee requests a hearing concerning the segregation.

e.  The administrative segregation order shall be immediately provided to the detainee in a language or manner the detainee can understand, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate

f.  The order shall remain on file with the SMU until the detainee is returned to the general population.

g.  When the detainee is released from the SMU, the releasing officer shall indicate the date and time of release on the administrative segregation order. The completed order shall then be forwarded to the Chief of Security for inclusion in the detainee's detention file.

### 3. Review of Detainee Status in Administrative Segregation

All facilities shall implement written procedures for the regular review of all detainees held in administrative segregation, consistent with the procedures specified below.

a.  A supervisor shall conduct a review within 72 hours of the detainee's placement in administrative segregation to determine whether segregation is still warranted.

GEO-MEN 00064173

**APP. 120**

1) The review shall include an interview with the detainee.

2) A written record shall be made of the decision and the justification. The administrative segregation review (Form I-885) shall be used for the review.

3) If the detainee has been segregated for his/her own protection, but not at the detainee's request, the signature of the facility administrator or assistant facility administrator is required on the Form I-885 to authorize the alien's continued detention.

b. A supervisor shall conduct an identical review after the detainee has spent seven days in administrative segregation, and every week thereafter, for the first 30 days and every 10 days thereafter, at a minimum.

c. The review shall include an interview with the detainee, and a written record shall be made of the decision and its justification.

d. When the reviewing authority concludes that the detainee should be removed from administrative segregation, he/she shall submit that recommendation to the facility administrator (or designee) for approval.

e. A copy of the decision and justification for each review shall be given to the detainee unless, in exceptional circumstances, this provision would jeopardize the facility's safety, security, or orderly operations. The detainee shall also be given an opportunity to appeal a review decision to the facility administrator.

f. After seven consecutive days in administrative segregation, the detainee may exercise the right to appeal the conclusions and recommendations of any review conducted to the facility administrator. The detainee may use any standard form of written communication, for example, a detainee request, to file the appeal.

g. If a detainee has been in administrative segregation for more than 30 days and objects to that status, the facility administrator shall review the case to determine whether that status should continue. This review shall take into account the detainee's views and shall result in a written record of the decision and its justification. A similar review shall take place each 30 days thereafter.

h. When a detainee has been held in administrative segregation for more than 30 days, the facility administrator shall notify the Field Office Director, who shall notify the ICE/ERO Deputy Assistant Director, Detention Management Division in writing.

## B. Placement in Disciplinary Segregation

To provide detainees in the general population a safe and orderly living environment, facility authorities may discipline anyone whose behavior does not comply with facility rules and regulations. Such discipline may involve temporary confinement in the SMU, apart from the general population. A detainee may be placed in disciplinary segregation only by order of the IDP, or its equivalent, after a hearing in which the detainee has been found to have committed a prohibited act and only when alternative dispositions may inadequately regulate the detainee's behavior.

### 1. Duration

The maximum sanction is 30 days in disciplinary segregation per violation, except in extraordinary circumstances, such as violations of offense 101 through 109 listed in the "Greatest" offense category in Appendix 3.1.A. After the first 30 days, and each 30 days thereafter, the facility administrator shall send a written justification for the continued segregation to the Field Office

GEO-MEN 00064174

**APP. 121**

Director.

### 2. Disciplinary Segregation Order

A written order shall be completed and signed by the chair of the IDP (or disciplinary hearing officer) before a detainee is placed into disciplinary segregation.

a. Prior to a detainee's actual placement in disciplinary segregation, the IDP chairman shall complete the disciplinary segregation order (Form I-883 or equivalent), detailing the reasons for placing a detainee in disciplinary segregation. All relevant documentation must be attached to the order.

b. The completed disciplinary segregation order shall be immediately provided to the detainee in a language or manner the detainee can understand, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

The order shall remain on file with the SMU until the detainee is returned to the general population.

c. When the detainee is released from the SMU, the releasing officer shall indicate the date and time of release on the disciplinary segregation order. The completed order shall then be forwarded to the Chief of Security for inclusion in the detainee's detention file.

### 3. Review of Detainee Status in Disciplinary Segregation

All facilities shall implement written procedures for the regular review of all disciplinary segregation cases, consistent with the following procedures:

a. A security supervisor, or the equivalent, shall interview the detainee and review his/her status in disciplinary segregation every seven days to determine whether the detainee:

1) Abides by all rules and regulations; and,

2) Is provided showers, meals, recreation and other basic living standards, as required by this detention standard.

b. The supervisor shall document his/her findings after every review, by completing a disciplinary segregation review (Form I-887).

1) The supervisor may recommend the detainee's early release from the SMU upon finding that time in disciplinary segregation is no longer necessary to regulate the detainee's behavior.

2) An early-release recommendation must have the facility administrator's approval before the detainee may be returned to the general population. In conducting this review, the facility administrator will consider any request by the detainee to present written evidence or available witnesses. The review shall take into account the detainee's views.

3) The supervisor may shorten, but not extend, the original sanction.

4) All review documents shall be placed in the detainee's detention file.

5) After each formal review, the detainee shall be given a written copy of the reviewing officer's decision and the basis for his/her finding, unless such a copy may result in a compromise of institutional security. If a

GEO-MEN 00064175

**APP. 122**

written copy cannot be delivered, the detainee shall be advised of the decision orally, and the detention file shall so note, identifying the reasons why the notice was not provided in writing.

c. The facility administrator and the Field Office Director shall review the status of a detainee in disciplinary segregation after the first 30 days of segregation, and each 30 days thereafter, to determine whether continued detention in disciplinary segregation is warranted.

## C. Logs and Records

### 1. Permanent SMU Log

A permanent log shall be maintained in the SMU to record all activities concerning SMU detainees (e.g., meals served, recreational time, visitors, etc.).

The SMU log shall record the detainee's name, A-number, housing location, date admitted, reasons for admission, status review dates, tentative release date (for detainees in disciplinary segregation), the authorizing official, and date released.  These logs shall also be used by supervisory staff and other officials to record their visits to the unit.

### 2. Visitors' Log

A separate log shall be maintained in the SMU of all persons visiting the unit. This separate record shall include notation of:

a. the time and date of the visit, and

b. any unusual activity or behavior of an individual detainee, with a follow-up memorandum sent through the facility administrator to the detainee's file.

### 3. Special Management Housing Unit Record

The Special Management Housing Unit Record or comparable form shall be prepared immediately upon the detainee's placement in the SMU.

a. The special housing unit officer shall immediately record:

1) whether the detainee ate, showered, recreated and took any medication; and

2) any additional information, such as whether the detainee has a medical condition, or has exhibited suicidal/assaultive behavior.

3) the officer that conducts the activity shall print his/her name and sign the record.

b. The facility medical officer shall sign each individual's record when he/she visits a detainee in the SMU. The housing officer shall initial the record after the medical visits are completed, but no later than the end of the shift.

c. A new form must be created for each week the detainee is in the SMU. The completed weekly forms shall be retained at the SMU until the detainee is released from the SMU.

d. Upon a detainee's release from the SMU, the releasing officer shall attach that detainee's entire housing unit record to either the administrative segregation order or disciplinary segregation order and forward it to the Chief of Security or equivalent for inclusion into the detainee's detention file.

## D. Basic Requirements for All Special Management Units

Conditions of confinement are based on the amount of supervision required to control a detainee and to safeguard the detainee, other detainees and facility staff.

**Detainees must be evaluated by a medical professional prior to placement in an SMU.*

In every instance, any exceptions to these requirements shall be:

1. made only for the purpose of ensuring detainee

GEO-MEN 00064176

**APP. 123**

and facility staff safety and security (i.e., not for purposes of punishment);

2. approved by a supervisor (or higher official);

3. on a temporary and situational basis, continued only for as long as it is justified by threat to the safety or security of the facility, its staff, or detainee population; and

4. documented in the Permanent SMU Unit log and, under circumstances specified later in this detention standard, documented in a memo which shall be placed in the individual detainee's detention file.

When a detainee in an SMU is deprived of any usual authorized items or activity, a report of the action shall be forwarded to the facility administrator for review. This report shall be made part of the detainee's detention file.

### E. Translation/Interpretation Services

Detainees shall be provided translation or interpretation services while in the SMU, to assist with their understanding of the reason and conditions of confinement as well as their rights and responsibilities while in confinement.

### F. Special Needs

Detainees in the SMU shall be provided appropriate accommodations and professional assistance for special conditions as needed (e.g., medical, therapeutic, or mental health treatment), on an equal basis as those in the general population.

### G. Control of Contraband and Tools

In accordance with procedures detailed in standard "2.4 Facility Security and Control," each facility administrator is required to establish written policy and procedures to control and secure SMU entrances, contraband, tools and food carts.

### H. Cell Occupancy

Ordinarily, the number of detainees confined to each cell or room may not exceed the capacity for which it was designed. Under exigent circumstances, before approving any additional cell occupancy on a temporary basis, the facility administrator shall consult with ICE/ERO Detention Management Division, who shall consult with DHS/ICE legal counsel. If a decision is made to approve such additional cell occupancy, a report of the action shall be filed with the facility and with the Field Office Director.

### I. Cell Condition

Cells and rooms used for purposes of segregation must be well ventilated, adequately lit, appropriately heated/cooled and maintained in a sanitary condition at all times in accordance with the standards for general population, consistent with safety and security.

1. All SMU cells must be equipped with beds that are securely fastened to the cell floor or wall. SMU cells must also be conducive to maintaining a safe and secure environment for all detainees, with particular emphasis on allowing for full visibility and appropriate observation by staff and wherever possible on eliminating potential safety hazards such as sharp edges and anchoring devices.

2. Conditions for close observation in a "dry cell" without water are detailed in standard "2.10 Searches of Detainees."

### J. Personal Property

Each facility shall issue guidelines in accordance with this standard concerning the property detainees may retain in each type of segregation. Generally, detainees in disciplinary segregation shall be subject to more stringent personal property restrictions and control than those in administrative segregation, given the non-punitive nature of administrative

GEO-MEN 00064177

**APP. 124**

segregation.

## K. Privileges

Each facility shall issue guidelines in accordance with this standard concerning the privileges detainees may have in each type of segregation.

### 1. Administrative Segregation

Generally, these detainees shall receive the same privileges available to detainees in the general population, consistent with any safety and security considerations for detainees, facility staff and security.

When space and resources are available, detainees in administrative segregation may be provided opportunities to spend time outside their cells (in addition to the required recreation periods), for such activities as socializing, watching TV and playing board games, and may be assigned to work details (e.g., as orderlies in the SMU).

### 2. Disciplinary Segregation

Generally, these detainees shall have fewer privileges than other detainees in either the general population or in administrative segregation. More specifically, they are subject to more stringent personal property control including, but not limited to, limitations on their reading material and television viewing (which may be completely terminated), and restricted commissary or vending machine purchases.

## L. Close Supervision

Detainees in SMU shall be personally observed and logged at least every 30 minutes on an irregular schedule. For cases that warrant increased observation, the SMU personnel shall personally observe detainees accordingly. (See also standard "4.6 Significant Self-harm and Suicide Prevention and Intervention" and the "Dry Cells" section in standard "2.10 Searches of Detainees.")

## M. Supervisory and Staff Visits

In addition to the direct supervision performed by unit staff:

1. The shift supervisor shall see each segregated detainee daily, including on weekends and holidays.

2. The facility administrator (or designee) shall visit each SMU daily.

3. Program staff may visit a detainee upon his/her request.

The facility administrator may require other staff to visit each detainee daily.

## N. Health Care

Health care personnel shall conduct face-to-face medical assessments at least once daily for detainees in an SMU. Where reason for concern exists, assessments shall be followed up with a complete evaluation by a qualified medical or mental health professional, and indicated treatment.

Detainees with serious mental illness may not be automatically placed in an SMU on the basis of such mental illness. Every effort shall be made to place detainees with serious mental illness in a setting in or outside of the facility in which appropriate treatment can be provided, rather than an SMU, if separation from the general population is necessary.

Medical visits shall be recorded on the SMU housing record or comparable form, and any action taken shall be documented in a separate logbook. A detainee's mental health status shall be reviewed and documented at least once every 30 days.

## O. Meals

Detainees in SMU shall be provided three nutritionally adequate meals per day, according to the general population meal schedule and ordinarily

GEO-MEN 00064178

**APP. 125**

from the same menu. Deviation from meals served to the general population must be documented, including an explanation as to why SMU did not receive the same meal.

### P. Clothing and Personal Hygiene

In accordance with standard "4.5 Personal Hygiene," detainees in SMU may shave and shower at least three times weekly and receive other basic services such as laundry, hair care, barbering, clothing, bedding and linen equivalent to general population detainees and consistent with safety and security of the facility.

1. As needed, staff shall provide toilet tissue, a wash basin, tooth brush and shaving utensils, and may issue retrievable kits of toilet articles.

2. A detainee may be denied such items as clothing, mattress, bedding, linens, or pillow for medical or mental health reasons if his/her possession of such items raises concerns for detainee safety and/or facility security.

   a. All denials of such items shall be documented.

   b. If a detainee is so disturbed that he/ she is likely to destroy clothing or bedding, or create a disturbance by risking harm to self or others, the medical department shall be notified immediately and a regimen of treatment and control shall be instituted by the medical staff, as necessary.

   c. Extreme detainee behavior, such as destroying clothing or bedding or harmful behavior to self or others, must be documented, made part of the detainee's file with the facility, and reported to the Field Office Director to implement necessary efforts to protect and care for the detainee.

### Q. Correspondence

In accordance with standard "5.1 Correspondence and Other Mail," detainees in an SMU may write, send and receive letters and other correspondence, in a manner similar to those housed in the facility's general population.

### R. Visitation

In accordance with standard "5.7 Visitation," while in an SMU, a detainee ordinarily retains visiting privileges.

Segregated detainees may ordinarily use the visiting room during normal visiting hours. However, the facility may restrict or disallow visits for a detainee who violates visitation rules or whose behavior otherwise indicates the detainee would be a threat to the security or the good order of the visiting room.

1. Visitation may be restricted or disallowed when a detainee in administrative segregation is charged with, or has been found to have committed a prohibited act related to visiting privileges, or has otherwise acted in a way that would reasonably indicate that he/she would be a threat to the orderliness or security of the visiting room.

2. Under no circumstances may detainees participate in visitation while in restraints. If the detainee's behavior warrants restraints, the visit may not be granted under general population visiting conditions.

3. Where visits are restricted or disallowed, a report shall be filed with the facility administrator and ICE/ERO, and made part of the detainee's file.

4. Detainees in protective custody, and violent and disruptive detainees, shall not use the visitation room during normal visitation hours. In cases in which a visit would present an unreasonable security risk, visits may be disallowed for a particular detainee.

GEO-MEN 00064179

**APP. 126**

## S. Legal Visits

In accordance with standard "5.7 Visitation," detainees in SMU may not be denied legal visitation. However, the facility administrator or designee may implement whatever security precautions are necessary to protect the detainee and visitors and maintain good order. In such cases, staff shall advise legal service providers and assistants of any security concerns as soon as possible.

## T. Religious Guidance

In accordance with standard "5.5 Religious Practices," detainees in an SMU shall be permitted to participate in religious practices, consistent with the safety, security, and orderly operation of the facility.

Detainees in an SMU shall be allowed visits by members of the clergy or other religious service providers, upon request, unless the supervisor determines that such a visit presents a safety or security risk or would interfere with the orderly operation of the facility. Violent or uncooperative detainees may be temporarily denied access to religious guidance. Staff shall advise the religious service provider of the detainee's present state of behavior before he/she agrees to visit the detainee.

Each facility shall develop procedures to allow detainees to retain religious items within their possession (e.g., religious wearing apparel, religious headwear, prayer rugs, beads, prayer rocks, medallions) consistent with good security practices. (See also standard "5.5 Religious Practices").

## U. Reading Materials (Non-Legal)

Detainees in SMU shall have access to reading materials, including religious materials. The Recreation Specialist shall offer each detainee soft-bound, reading materials of this type on a rotating basis.

## V. Legal Materials

Detainees in SMU shall have access to legal materials in accordance with standard "6.3 Law Libraries and Legal Material."

Detainees may retain all personal legal material upon admittance to an SMU, provided such material does not create a safety, security, or sanitation hazard.

Detainees with a large amount of personal legal material may be required to place a portion with their stored personal property, with access permitted during scheduled hours. Requests for access to such legal material shall be accommodated as soon as possible, but in no case more than 24 hours after receipt of the initial detainee request to retrieve documents, except in the event of documented security reasons.

## W. Law Library and Legal Rights Group Presentations Access

In accordance with standard "6.3 Law Libraries and Legal Material," detainees housed in administrative segregation or disciplinary segregation units shall have the same law library access as the general population, unless compelling security concerns require limitations.

1. Facilities may supervise the library use of a detainee housed in an SMU as warranted by the individual's behavior. Violent or uncooperative detainees may be temporarily denied access to the law library if necessary to maintain security, until such time as their behavior warrants resumed access. In some circumstances, legal material may be brought to individuals in disciplinary segregation.

2. Detainees segregated for protection must be provided access to legal materials. Such

GEO-MEN 00064180

APP. 127

detainees may be required to use the law library separately or, if that is not feasible, legal materials must be brought to them, upon request.

3. Denial of access to the law library must be:

   a. supported by compelling security concerns;

   b. for the shortest period required for security; and

   c. fully documented in the SMU housing logbook.

The facility administrator shall notify ICE/ERO every time access is denied, with documentation placed in the detention file.

In accordance with standard "6.4 Legal Rights Group Presentations," facility staff and/or ICE/ERO shall notify detainees in segregation in advance of legal rights group presentations and provide these detainees an opportunity to attend. Group legal rights presentations shall be open to all detainees, including detainees in SMUs, except when a particular detainee's attendance may pose a security risk. If a detainee in segregation cannot attend for this reason, designated facility staff shall make alternative arrangements to offer a separate presentation and individual consultation to the detainee, if the detainee or the presenter so requests.

## X. Recreation

Recreation for detainees housed in the SMU shall be separate from the general population. As necessary or advisable to prevent assaults and to reduce management problems, recreation for some individuals shall be solitary and shall occur separate from all other detainees. In accordance with standard "5.4 Recreation":

1. Detainees in the SMU for administrative reasons shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least seven days per week.

Detainees in the SMU for disciplinary reasons shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least five days per week.

**\*\*Detainees in the SMU for administrative reasons shall be offered at least two hours of exercise per day, seven days a week, unless documented security, safety or medical considerations dictate otherwise.**

**\*\*Detainees in the SMU for disciplinary reasons shall be offered at least one hour of exercise per day, seven days a week, unless documented security, safety or medical considerations dictate otherwise.**

2. Where cover is not provided to mitigate inclement weather, detainees shall be provided weather-appropriate equipment and attire

3. The recreation privilege shall be denied or suspended only if the detainee's recreational activity may unreasonably endanger safety or security:

   a. A detainee may be denied recreation privileges only with the facility administrator's written authorization, documenting why the detainee poses an unreasonable risk even when recreating alone. However, when necessary to control an *immediate* situation for reasons of safety and security, SMU staff may deny an instance of recreation, upon verbal approval from the shift supervisor, and shall document the reasons in the unit logbook(s). The supervisor may also require additional written documentation from the SMU staff for the facility administrator. When a detainee in an SMU is deprived of recreation (or any usual authorized items or activity), a written report of the action shall be forwarded to the facility administrator. Denial of recreation must be

GEO-MEN 00064181

**APP. 128**

evaluated daily by a shift supervisor.

b. A detainee in disciplinary segregation may temporarily lose recreation privileges upon a disciplinary panel's written determination that he/she poses an unreasonable risk to the facility, himself/herself, or others.

c. When recreation privileges are suspended, the disciplinary panel or facility administrator shall provide the detainee written notification, including the reason(s) for the suspension, any conditions that must be met before restoration of privileges, and the duration of the suspension provided the requisite conditions are met for its restoration.

d. The denial of recreation privileges shall be included as part of the regular reviews required for all detainees in SMU status. In accordance with SMU procedures, and using the forms required by this standard, the reviewer(s) shall state, in writing, whether the detainee continues to pose a threat to self, others, or facility security and, if so, why.

e. Denial of recreation privileges for more than seven days requires the concurrence of the facility administrator and a health care professional. It is expected that such denials shall rarely occur, and only in extreme circumstances.

f. The facility shall notify the Field Office Director in writing when a detainee is denied recreation privileges in excess of seven days.

## Y. Telephone Access

As detailed in standard "5.6 Telephone Access," detainees in SMU shall have access to telephones in a manner that is consistent with the special safety and security requirements of such units. Detainees shall be permitted to place calls to attorneys, other legal representatives, courts, government offices (including the DHS Office of the Inspector General, DHS Office for Civil Rights and Civil Liberties, ICE/OPR Joint Intake Center, and embassies or consulates, according to the facility schedule. Any denial of telephone access shall be documented.

In general, any detainee in an SMU may be reasonably restricted from using or having access to a phone if that access is used for criminal purposes or would endanger any person, or if the detainee damages the equipment provided. In such instances, staff must clearly document why such restrictions are necessary to preserve the safety, security and good order of the facility. Detainees in disciplinary segregation may be restricted, as part of the disciplinary process, from using telephones to make general calls. However, even in disciplinary segregation, detainees shall have telephone access for special purposes.

GEO-MEN 00064182

**APP. 129**

# 3.1 Disciplinary System

## I. Purpose and Scope

This detention standard promotes a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system, requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions to those who do not comply.

This detention standard applies to the following types of facilities housing ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall be informed of facility rules and regulations, prohibited acts, disciplinary sanctions that may be imposed, their rights in the disciplinary system and the procedure for appealing disciplinary findings.

2. Each facility shall have graduated severity scales of prohibited acts and disciplinary consequences.

3. Where permitted by facility policy, staff shall informally settle minor transgressions through mutual consent, whenever possible.

4. Staff who have reason to suspect that a detainee has engaged in a prohibited act or who witness a prohibited act that cannot or should not be resolved informally, shall prepare a clear, concise and complete incident report.

5. Each Incident Report shall be objectively and impartially investigated and reported, ordinarily by a person of supervisory rank.

6. A serious incident that may constitute a criminal act shall be referred to the proper investigative agency as appropriate, and administrative investigations shall be suspended pending the outcome of that referral.

7. At each step of the disciplinary and appeal process, the detainee shall be advised in writing of his/her rights in a language he/she understands, and translation or interpretation services shall be provided as needed.

8. If any staff at any stage of the disciplinary process has reason to believe that the detainee is mentally ill or mentally incompetent, the facility shall provide for an assessment by qualified medical personnel.

9. A Unit Disciplinary Committee (UDC) shall further investigate and adjudicate the incident and may impose minor sanctions or refer the matter to a higher level disciplinary panel.

10. An Institution Disciplinary Panel (IDP) shall conduct formal hearings on Incident Reports referred from UDCs and may impose higher level sanctions for "greatest" and "high" level prohibited acts.

11. Detainees before the IDP shall be afforded a

GEO-MEN 00064209

**APP. 130**

staff representative, upon request, or automatically if the detainee is illiterate, has limited English language skills or otherwise needs special assistance.

12. Actions of the IDP shall be reviewed by the facility administrator, who may concur with the findings and sanctions or modify them.

13. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

14. All steps of the disciplinary process shall be performed within the required time limits.

15. At all steps of the disciplinary process, accurate and complete records shall be maintained. The detainee shall receive copies of all reports, exhibits and other documents considered or generated in the hearing process, except insofar as the disclosure of such documents may pose an imminent threat to the safety, security and orderly conduct of the facility staff or other detainees, or if the document or other evidence is otherwise protected from disclosure.

16. If a detainee is found not guilty at any stage of the disciplinary process, the incident records shall not be placed or retained in the detainee's file, even if these records are retained elsewhere for statistical or historical purposes.

17. Detainees shall be allowed to appeal disciplinary decisions through a formal grievance system. No staff member shall harass, discipline, punish or otherwise retaliate against any detainee for filing a complaint or grievance.

18. Detainees shall be afforded rights including, but not limited to, the following: the right to protection from abuse; the right to freedom from discrimination; the right to pursue a grievance;

the right to correspond with persons or organizations; and the right to due process.

19. The applicable content and procedures in this standard shall be communicated to the detainee in a language or manner the detainee can understand.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Disciplinary Policy" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-3A-01, 3A-02, 6B-05, 6C-01 through 6C-19.

## V. Expected Practices

### A. Guidelines

1. Detainees shall receive translation or interpretation services, including accommodation for the hearing impaired, throughout the investigative, disciplinary and appeal process.

2. Each facility holding ICE/ERO detainees in custody shall have a detainee disciplinary system with progressive levels of reviews, appeals, procedures and documentation procedures. Written disciplinary policy and procedures shall clearly define detainee rights and

GEO-MEN 00064210

**APP. 131**

responsibilities. The policy, procedures and rules shall be reviewed annually at a minimum.

3. Disciplinary action may not be capricious or retaliatory nor based on race, religion, national origin, gender, sexual orientation, disability or political beliefs.

4. Staff may not impose or allow imposition of the following sanctions: corporal punishment; deprivation of food services, to include use of Nutraloaf or "food loaf"; deprivation of clothing, bedding or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal access and legal materials; or deprivation of indoor or outdoor recreation, unless such activity would create a documented unsafe condition within the facility. Any sanction imposed shall be approved by the facility administrator and reviewed by the Field Office Director.

5. The facility shall not hold a detainee accountable for his/her conduct if a medical authority finds him/her mentally incompetent. For purposes of these standards, a mentally incompetent individual is defined as an individual who is unable to appreciate the difference between appropriate and inappropriate behavior, or between "right" and "wrong." Such an individual is not capable of acting in accordance with those norms and therefore, cannot be held responsible for his/her "wrongful" actions

6. A person who cannot assist in his/her own defense because he/she lacks the ability to understand the nature of the disciplinary proceedings, as determined by a medical authority, shall be considered incompetent. Disciplinary proceedings against such a detainee shall be postponed until such time as the detainee is able to understand the nature of the disciplinary proceedings and to assist in his/her own defense. If the detainee's mental status does

not improve within a reasonable amount of time, the officer must find the detainee incompetent to assist in his/her own defense, and note such finding on the Incident Report.

## B. Notice to Detainees

The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of the facility's rules of conduct and prohibited acts, the sanctions imposed for violations of the rules, the disciplinary severity scale, the disciplinary process and the procedure for appealing disciplinary findings. Detainees shall have the following rights and shall receive notice of them in the handbook:

1. The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage and harassment;

2. The right of freedom from discrimination based on race, religion, national origin, gender, sexual orientation, physical or mental ability, or political beliefs;

3. The right to pursue a grievance in accordance with procedures provided in the detainee handbook, without fear of retaliation;

4. The right to pursue a grievance in accordance with standard"6.2 Grievance System" and procedures provided in the detainee handbook.

5. The right to correspond with persons or organizations, consistent with safety, security and the orderly operation of the facility; and

6. The right to due process, including the prompt resolution of a disciplinary matter.

Copies of the rules of conduct, rights and disciplinary sanctions shall be provided to all detainees and posted in English, Spanish, and other languages spoken by significant segments of the population with limited English proficiency. Copies

GEO-MEN 00064211

**APP. 132**

to be provided and posted are as follows:

1. Disciplinary Severity Scale;

2. Prohibited Acts; and

3. Sanctions.

## C. Disciplinary Severity Scale and Prohibited Acts

All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.

*Prohibited acts are divided into four categories: "greatest," "high," "moderate" and "low moderate." The sanctions authorized for each category shall be imposed only if the detainee is found to have committed a prohibited act (see "Appendix 3.1.A: Offense Categories").*

### 1. Greatest Offenses

*The IDP shall impose and execute at least one sanction in the A through E range. Additional sanctions (A through G) may be imposed and either executed or suspended, at the discretion of the panel. The IDP may impose and execute sanctions F and G only in conjunction with sanction A, B, C, D, and/or E.*

### 2. High Offenses

*The IDP shall impose and execute at least one sanction in the A through M range. Additional sanctions (A through M) may be imposed or may be suspended at the discretion of the panel.*

### 3. High Moderate Offenses

*The IDP shall impose at least one sanction in the A through M range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.*

### 4. Low Moderate Offenses

*The IDP shall impose at least one sanction in the E through M range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.*

## D. Incident Reports

Officers who witness a prohibited act, or have reason to suspect one has been committed, shall prepare and submit an Incident Report. All Incident Reports must state facts clearly, precisely and concisely, omitting no details that may prove significant. Reports also shall identify the officer(s), the detainee(s) and all witnesses to the incident.

Minor transgressions shall be settled informally and by mutual consent whenever possible. If however the officer involved thinks an informal resolution is inappropriate or unattainable, he or she shall prepare an Incident Report and submit it to the appropriate supervisor before the end of the assigned shift.

ICE/ERO pre-approval is required for use of ICE Incident Report forms in CDFs and IGSA facilities.

*The Incident Report shall cite the relevant rule or standard without quoting it in its entirety. (For example, in the event of destruction of government property, the report shall cite, briefly, "Code 218—Destroying Government Property," specify the exact manner in which the detainee is alleged to have violated the cited rule or standard, and include all relevant facts such as time, dates and places.)*

*If the officer observes anything unusual in the detainee's behavior or demeanor, he/she shall so note in the report. The reporting officer shall also list all staff, contract officers, and/or detainee witnesses to the incident and the disposition of any physical evidence (e.g., weapons, property, etc.) relating to the incident. The reporting officer shall*

GEO-MEN 00064212

**APP. 133**

*sign the report and include title, date and time the report was signed. The shift supervisor shall review all Incident Reports before going off duty.*

## E. Investigations

IGSAs shall have procedures in place to ensure that all Incident Reports are investigated within 24 hours of the incident.

The investigating officer must have supervisory rank or higher (unless prevented by personnel shortages) and shall have had no prior involvement in the incident, as either witness or officer at the scene. If an officer below supervisory rank conducts the investigation, the shift supervisor shall review his/her report(s) for accuracy and completeness and sign them.

The investigating officer shall:

1. Commence the investigation within 24 hours of receipt of the Incident Report.

2. Advise the detainee of his/her right to remain silent at every stage of the disciplinary process, and ensure that he/she has a complete listing of detainee rights.

3. Provide the detainee a copy of the Incident Report and notice of charges at least 24 hours before the start of any disciplinary proceedings.

4. Terminate the administrative investigation, if the incident is under investigation on different grounds (i.e., the prohibited act is under criminal investigation), unless and until the agency with primary jurisdiction concludes its investigation or indicates it shall not pursue the matter.

   Contraband that may be evidence in connection with a violation of a criminal statute shall be preserved, inventoried, controlled and stored so as to maintain and document the chain of custody. Contraband shall be reported to the appropriate law enforcement authority for action

and possible seizure and prosecution. See "Preservation of Evidence" in standard "2.10 Searches of Detainees"

5. Advise the detainee in writing of the detainee's right, if applicable, to an initial hearing before the Unit Disciplinary Committee (UDC) within 24 hours of his/her notification of charges.

6. Record personal observances and other potentially material information.

7. Prepare a factual report of the investigation, including the location or disposition of any physical evidence.

8. Forward to the UDC all reports relevant to the disciplinary hearing—but do not provide a copy to the detainee at this stage of the disciplinary process, except for a copy of the Incident Report as instructed in #4 above in this section of this standard.

## F. Unit Disciplinary Committee (UDC)

All facilities shall establish an intermediate level of investigation/adjudication process to adjudicate low or moderate infractions. They shall also ensure that the detainee is afforded all the UDC rights listed below.

The UDC administering unit discipline shall comprise up to three members, at least one of whom is a supervisor. The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident, except in the unlikely event that every available officer witnessed or was directly involved in the incident.

The UDC shall conduct hearings and, to the best extent possible, shall informally resolve cases involving high moderate or low moderate charges in accordance with the list of charges and related sanctions noted as "Appendix 3.1.A: Offense

GEO-MEN 00064213

**APP. 134**

Categories." Unresolved cases and cases involving serious charges are forwarded to the institution disciplinary panel.

The UDC shall have authority to:

1. conduct hearings and resolve incidents involving high moderate or low moderate charges;

2. consider written reports, statements and physical evidence;

3. hear pleadings on the part of the detainee;

4. make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence; and

5. impose minor sanctions "E" through "M" in accordance with the table of prohibited acts and associated sanctions later in this document.

The detainee in UDC proceedings shall have the right to:

1. remain silent at any stage of the disciplinary process;

2. due process, which includes:

   a. attending the entire hearing (excluding committee deliberations);

   b. waiving the right to appear; or

   c. having a UDC hearing within 24 hours after the conclusion of the investigation.

   If security considerations prevent detainee attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process via telephonic testimony, document submission, written statements or questions to be asked of witnesses;

3. Present statements and evidence, including witness testimony on his/her own behalf; and

4. Appeal the committee's determination through the detainee grievance process.

The UDC shall:

1. advise the detainee of his/her rights at the hearing;

2. refer to the IDP any incident involving a serious violation associated with an A-through-D-range sanction. This includes code violations in the "greatest" and "high" categories (100s and 200s);

3. serve the detainee with:

   a. a copy of the UDC decision which must contain the reason for the disposition and sanctions imposed; or

   b. written notification of charges and hearing before the IDP; and

4. if the detainee's case is being referred to the IDP, advise the detainee, in writing, of:

   a. The right to call witnesses and present evidence before the IDP, and

   b. The right to a staff representative before the IDP.

## G. Staff Representation for the IDP

The facility administrator shall upon the detainee's request, assign a staff representative to help prepare a defense prior to the commencement of the IDP. This help shall be automatically provided for detainees who are illiterate, have limited English-language skills, or who are without means of collecting and presenting essential evidence. Detainees shall also have the option of receiving assistance from another detainee of their selection rather than a staff representative, subject to approval from the facility administrator.

1. *A staff representative must be a full-time employee.*

GEO-MEN 00064214

**APP. 135**

2. *Because of the potential conflict of interest, the facility administrator, members of the IDP and of the UDC initially involved in the case, eyewitnesses, the reporting and investigating officers and anyone else with a stake in the outcome shall not act as staff representative.*

3. *The detainee may select his/her staff representative, barring those identified in paragraph 2 above.*

4. *The IDP shall arrange for the presence of the staff representative selected by the detainee. If that staff member declines or is unavailable, the detainee may:*

   a. *select a different representative;*

   b. *wait for the unavailable staff member to become available (within a reasonable period); or*

   c. *proceed without a staff representative.*

5. *A staff member who declines to serve must state the reason on the staff representative form.*

6. *If several staff decline, the facility administrator shall assign one.*

7. *The staff representative shall be free to speak to witnesses and to present evidence on the detainee's behalf, including evidence of any mitigating circumstances. The staff representative must act in good faith on behalf of the charged detainee, and interview witnesses and obtain documentary evidence as requested by the detainee or as otherwise reasonably seen as relevant to the defense of the charges or in mitigation of the charges.*

8. *The IDP shall allow the staff representative enough time to speak with the detainee and interview witnesses prior to commencement of the proceeding. The IDP may grant a request for extension of time if required for an adequate defense.*

9. *The IDP shall establish the reliability of information provided by a confidential source before considering it in the disciplinary proceedings.*

10. *The IDP may withhold the confidential source's identity from the staff representative. While the staff representative may challenge the substance of any confidential information the IDP discloses, he/she may not question its reliability (which is pre-established by the IDP).*

11. *In the event that a detainee cannot effectively present his/her own case, the facility administrator shall appoint a staff representative, even if not requested by the detainee.*

## H. Institution Disciplinary Panel

All facilities that house ICE/ERO detainees shall have a disciplinary panel to adjudicate detainee Incident Reports. Only the disciplinary panel may place a detainee in disciplinary segregation.

The term "Institution Disciplinary Panel" or "IDP" refers either to a three-person panel appointed by the facility administrator, or a one-person disciplinary hearing officer, depending on the practice at the facility.

The panel may not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident. Exceptions may occur only if the number of officers required for the panel cannot be filled due their direct involvement in the incident.

The IDP shall have authority to:

1. conduct hearings on all charges and allegations referred by the UDC;

2. call witnesses to testify;

GEO-MEN 00064215

**APP. 136**

3. consider written reports, statements, physical evidence and oral testimony;

4. hear pleadings by detainee and staff representative;

5. make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence; and

6. impose sanctions as listed and authorized in each category.

The detainee in IDP proceedings shall have the right to:

1. remain silent at any stage of the disciplinary process;

2. due process, which includes:

    a. attending the entire hearing (excluding committee deliberations);

    b. waiving the right to appear; or

    c. having an IDP hearing within 24 hours after the conclusion of the investigation.

        If security considerations prevent the detainee's attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process by telephonic testimony, the submission of documents, written statements or questions to be asked of witnesses;

3. present statements and evidence, including witness testimony, on his/her behalf; and

4. appeal the committee's determination through the detainee grievance process.

The IDP shall:

1. verify that the detainee has been advised of and afforded his/her rights, as provided above in this

standard;

2. remind the detainee of his/her right to a staff representative, provide one if requested and verify that a staff representative has been assigned when a representative is requested;

3. advise the detainee of his/her right to waive the hearing and admit having committed the offense;

4. conduct the hearing on the first business day after receiving the UDC referral, unless the detainee waives the 24-hour notification provision and requests an immediate hearing. In cases where a hearing is delayed, the reason(s) must be documented (e.g., a continuing investigation of facts, unavailability of one or more essential witnesses, etc.) and approved by the facility administrator. If the detainee is being held in segregation, the delay shall not exceed 72 hours, barring an emergency;

5. prepare a written record of any hearing. This record must show that the detainee was advised of his/her rights. It must also document the evidence considered by the Panel and subsequent findings and the decision and sanctions imposed, along with a brief explanation;

6. forward the entire record to the facility administrator, who may (a) concur, (b) terminate the proceedings or (c) impose more severe or more lenient sanctions; and

7. serve the detainee with written notification of the decision, which must contain the reason for the decision.

## I. Confidential Information

When a decision relies on information from a confidential source, the UDC or IDP shall disclose as much confidential information as may be disclosed without jeopardizing the safety and security of facility staff and other persons, and shall

GEO-MEN 00064216

**APP. 137**

include in the hearing record the factual basis for finding the information reliable.

## J. Postponement of Disciplinary Proceedings

All facilities shall permit hearing postponements or continuances under certain circumstances.

Circumstances justifying the postponement or continuance of a hearing might include, but are not limited to: defense preparation, physical or mental illness, security, escape, disciplinary transfer or pending criminal prosecution.

An uncooperative detainee may also cause a delay in the proceedings, either because of inappropriate behavior during the hearing process or a refusal to participate in a productive manner.

## K. Duration of Sanctions

The duration of sanctions shall be within established limits. Neither the panel recommending sanctions nor the facility administrator making the final decision shall impose sanctions arbitrarily, beyond these limits.

1. Sanctions range from the withholding of privilege(s) to segregation. Time in segregation or the withholding of privileges after a hearing shall generally not exceed 30 days per violation, except in extraordinary circumstances, such as violations of offenses 101 through 109 listed in the "Greatest" offense category in Appendix 3.1.A.

2. Time served in segregation pending the outcome of the proceedings may be credited to the number of days to be spent in the segregation unit after an adverse decision is announced.

3. The disciplinary report and accompanying documents are not placed in the file of a detainee who is found not guilty. The facility, however, may retain the material in its own files for

Institution statistical or historical purposes.

4. A detainee shall be removed from segregation if a health care professional concludes that continued segregation is detrimental to the detainee's medical or mental health.

## L. Documents

All documents relevant to the incident, subsequent investigation and hearing(s) shall be completed and distributed in accordance with facility procedures.

### 1. Incident Report/Notice of Charges

The officer shall prepare an Incident Report and submit it to the supervisor immediately after the incident takes place. If the incident is resolved informally, the officer shall so note on the original report, which shall then be forwarded to the Chief of Security.

*If the UDC is to be involved, the supervisor shall serve the detainee with a copy of the Notice of Charges upon completion of the investigation, no less than 24 hours before the UDC hearing.*

*The UDC receives the original copy.*

*If the UDC hears the matter, the ranking member of that committee shall serve the detainee with a copy of the Incident Report/Notice of Charges indicating their decision. The UDC, upon conclusion of its proceedings, shall forward the entire record to either the Chief of Security or the IDP, as appropriate.*

### 2. Investigation Report

*The original shall be submitted to the UDC.*

*The detainee does not receive a copy.*

### 3. UDC Report of Findings and Action

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the detainee detention*

GEO-MEN 00064217

**APP. 138**

*file (guilty finding only).*

**4. Notice of IDP Hearing**

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the detainee detention file.*

**5. Detainee Rights at IDP Hearing**

*The original shall be served on the detainee after*

*the committee issues its findings.*

*A copy shall be included in the facility detention file.*

**6. IDP Report**

*The original shall be included in the detainee detention file.*

*A copy shall be provided to the detainee.*

GEO-MEN 00064218

**APP. 139**

## Appendix 3.1.A: Offense Categories

### I. "Greatest" Offense Category

#### A. Prohibited Acts

100    Killing

101    Assaulting any person (includes sexual assault)

102    Escape from escort; escape from a secure facility

103    Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of greatest severity [e.g., a riot or an escape]; otherwise the charge is classified as Code 218 or 321)

104    Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, escape tool, device or ammunition

105    Rioting

106    Inciting others to riot

107    Hostage-taking

108    Assaulting a staff member or any law enforcement officer

109    Threatening a staff member or any law enforcement office with bodily harm

*198    Interfering with a staff member in the performance of duties (conduct must be of the greatest severity; this charge is to be used only if another charge of greatest severity is not applicable)

*199    Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the greatest severity; this charge is to be used only if another charge of greatest severity is not applicable)

#### B. Sanctions

1.    Initiate criminal proceedings

2.    Disciplinary transfer (recommend)

3.    Disciplinary segregation (up to 60 days)

4.    Make monetary restitution, if funds are available

5.    Loss of privileges (e.g., commissary, vending machines, movies, recreation, etc.)

### II. "High" Offense Category

#### A. Prohibited Acts

200    Escape from unescorted activities open or secure facility, proceeding without violence

201    Fighting, boxing, wrestling, sparring and any other form of physical encounter, including horseplay, that causes or could cause injury to another person, except when part of an approved recreational or athletic activity

202    Possession or introduction of an unauthorized tool

203    Loss, misplacement or damage of any restricted tool

204    Threatening another with bodily harm

205    Extortion, blackmail, protection and demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm or avoiding a threat of being informed against

206    Engaging in sexual acts

207    Making sexual proposals or threats

208    Wearing a disguise or mask

209    Tampering with or blocking any lock device

GEO-MEN 00064219

**APP. 140**

210    Adulterating of food or drink

211    Possessing, introducing, or using narcotics, narcotic paraphernalia or drugs not prescribed for the individual by the medical staff

212    Possessing an officer's or staff member's clothing

213    Engaging in or inciting a group demonstration

214    Encouraging others to participate in a work stoppage or to refuse to work

215    Refusing to provide a urine sample or otherwise cooperate in a drug test

216    Introducing alcohol into the facility

217    Giving or offering an official or staff member a bribe or anything of value

218    Giving money to, or receiving money from, any person for an illegal or prohibited purpose (e.g., introducing/conveying contraband)

219    Destroying, altering, or damaging property (government or another person's) worth more than $100

220    Being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days

222    Possessing or introducing an incendiary device (e.g., matches, lighter, etc.)

223    Engaging in any act that could endanger person(s) and/or property

*298    Interfering with a staff member in the performance of duties (conduct must be of highest severity; this charge is to be used only when no other charge of highest severity is applicable)

*299    Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity; this charge is to be used only when no other charge of highest severity is applicable)

**B. Sanctions**

1. Initiate criminal proceedings

2. Disciplinary transfer (recommend)

3. Disciplinary segregation (up to 30 days)

4. Make monetary restitution, if funds are available

5. Loss of privileges (e.g., commissary, vending machines, movies, recreation, etc.)

6. Change housing

7. Remove from program and/or group activity

8. Loss of job

9. Impound and store detainee's personal property

10.    Confiscate contraband

11.    Restrict to housing unit

12.    Warning

### III. "High Moderate" Offense Category

**A. Prohibited Acts**

300    Indecent exposure

301    Stealing (theft)

302    Misusing authorized medication

303    Loss, misplacement or damage of a less restricted tool

304    Lending property or other item of value for profit/increased return

305    Possessing item(s) not authorized for receipt or retention and not issued through regular channels

306    Refusing to clean assigned living area

GEO-MEN 00064220

**APP. 141**

307     Refusing to obey the order of a staff member or officer (may be categorized and charged as a greater or lesser offense, depending on the kind of disobedience: continuing to riot is Code 105—Rioting; continuing to fight Code 201—Fighting; refusing to provide a urine sample, Code 215—Refusing to provide a urine sample or otherwise cooperate in a drug test).

308     Insolence toward a staff member

309     Lying or providing false statement to staff

310     Counterfeiting, forging or other unauthorized reproduction of money proceedings or other official document or item (e.g., security document, identification card, etc.); may be categorized as greater or lesser offense, depending on the nature and purpose of the reproduction (e.g., counterfeiting release papers to effect escape—Code 102 or 200).

311     Participating in an unauthorized meeting or gathering

312     Being in an unauthorized area

313     Failing to stand count

314     Interfering with count

315     Making, possessing, or using intoxicant(s)

316     Refusing a breathalyzer test or other test of alcohol consumption

317     Gambling

318     Preparing or conducting a gambling pool

319     Possessing gambling paraphernalia

320     Unauthorized contact with the public

321     Giving money or another item of value to, or accepting money or another item of value from, anyone, including another detainee, without staff authorization

322     Destroying, altering, or damaging property (government or another person's) worth more than $100

323     Signing, preparing, circulating, or soliciting support for prohibited group petitions

*398    Interfering with a staff member in the performance of duties (offense must be of high moderate severity; this charge to be used only when no other charge in this category is applicable)

*399    Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of high moderate severity; this charge is to be used only when no other charge in this category is applicable)

NOTE: Any combination of high moderate and low moderate offenses during a 90-day period shall constitute a high offense.

**B. Sanctions**

1.  Initiate criminal proceedings

2.  Disciplinary transfer (recommend)

3.  Disciplinary segregation (up to 72 hours)

4.  Make monetary restitution, if funds are available

5.  Loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.)

6.  Change housing

7.  Remove from program and/or group activity

8.  Loss of job

9.  Impound and store detainee's personal property

10.    Confiscate contraband

11.    Restrict to housing unit

12.    Reprimand

GEO-MEN 00064221

**APP. 142**

*13.*    *Warning*

## IV. ""Low Moderate" Offense Category

### A. Prohibited Acts

400    *Possessing property belonging to another person*

401    *Possessing unauthorized clothing*

402    *Malingering; feigning illness*

403    *Smoking where prohibited*

404    *Using abusive or obscene language*

405    *Tattooing, body piercing or self-mutilation*

406    *Unauthorized use of mail or telephone (with restriction or temporary suspension of the abused privileges often the appropriate sanction)*

407    *Conduct with a visitor in violation of rules and regulations (with restriction or temporary suspension of visiting privileges often the appropriate sanction)*

408    *Conducting a business*

409    *Possessing money or currency, unless specifically authorized*

410    *Failing to follow safety or sanitation regulations*

411    *Unauthorized use of equipment or machinery*

412    *Using equipment or machinery contrary to posted safety standards*

413    *Being unsanitary or untidy; failing to keep self and living area in accordance with posted standards*

*498    Interfering with a staff member in the performance of duties (offense must be of low moderate severity; this charge is to be used only when no other charge in this category is applicable)*

*499    Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of low moderate severity; this charge is to be used only when no other charge in this category is applicable)*

### B. Sanctions

1. *Loss of privileges, commissary, vending machines, movies, recreation, etc*

2. *Change housing*

3. *Remove from program and/or group activity*

4. *Loss of job*

5. *Impound and store detainee's personal property*

6. *Confiscate contraband*

7. *Restrict to housing unit*

8. *Reprimand*

9. *Warning*

GEO-MEN 00064222

**APP. 143**

# 5.8 Voluntary Work Program

## I. Purpose and Scope

This detention standard provides detainees opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

While not legally required to do so, ICE/ ERO affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

This detention standard applies to the following types of facilities housing ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

2. Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping.

3. Essential operations and services shall be enhanced through detainee productivity.

4. The negative impact of confinement shall be reduced through decreased idleness, improved morale and fewer disciplinary incidents.

5. Detainee working conditions shall comply with all applicable federal, state and local work safety laws and regulations.

6. There shall be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation or disability.

7. The applicable content and procedures in this standard shall be communicated to the detainee in a language or manner the detainee can understand.

   All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

   Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Voluntary Work Program" dated 12/2/2008.

This detention standard incorporates the requirements regarding detainees' assigned to work

GEO-MEN 00064344

**APP. 144**

outside of a facility's secure perimeter originally communicated via a memorandum to all Field Office Directors from the Acting Director of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) (11/2/2004).

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-5C-06, 5C-08, 5C-11(M), 6B-02.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "1.2 Environmental Health and Safety"; and
- "4.1 Food Service."

## V. Expected Practices

### A. Voluntary Work Program

Detainees who are physically and mentally able to work shall be provided the opportunity to participate in a voluntary work program. The detainee's classification level shall determine the type of work assignment for which he/she is eligible. Generally, high custody detainees shall not be given work opportunities outside their housing units/living areas. Non-dedicated IGSAs will have discretion on whether or not they will allow detainees to participate in the voluntary work program.

### B. Work Outside the Secure Perimeter

ICE detainees may not work outside the secure perimeter of non-dedicated IGSA facilities.

*In SPCs, CDFs, and dedicated IGSAs, low custody detainees may work outside the secure perimeter on facility grounds. They must be directly supervised at a ratio of no less than one staff member to four detainees. The detainees shall be within sight and sound of that staff member at all times.*

### C. Personal Housekeeping Required

Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.

*Detainees are required to maintain their immediate living areas in a neat and orderly manner by:*

1. *making their bunk beds daily;*

2. *stacking loose papers;*

3. *keeping the floor free of debris and dividers free of clutter; and*

4. *refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.*

### D. Detainee Selection

The facility administrator shall develop site-specific rules for selecting work detail volunteers. These site-specific rules shall be recorded in a facility procedure that shall include a voluntary work program agreement. The voluntary work program agreement shall document the facility's program and shall be in compliance with this detention standard.

*The primary factors in hiring a detainee as a worker shall be his/her classification level and the specific requirements of the job.*

1. *Staff shall present the detainee's name to the shift supervisor or the requesting department head.*

2. *The shift supervisor or department head shall review the detainee's classification and other relevant documents in the detainee's detention file.*

3. *The shift supervisor or department head shall*

GEO-MEN 00064345

**APP. 145**

*assess the detainee's language skills because these skills affect the detainee's ability to perform the specific requirements of the job under supervision. To the extent possible, work opportunities shall be provided to detainees who are able to communicate with supervising staff effectively and in a manner that does not compromise safety and security.*

*4. Inquiries to staff about the detainee's attitude and behavior may be used as a factor in the supervisor's selection.*

*Staff shall explain the rules and regulations as well as privileges relating to the detainee worker's status. The detainee shall be required to sign a voluntary work program agreement before commencing each new assignment. Completed agreements shall be filed in the detainee's detention file.*

## E. Special Details

Detainees may volunteer for temporary work details that occasionally arise. The work, which generally lasts from several hours to several days, may involve labor-intensive work.

## F. Discrimination in Hiring Prohibited

Detainees shall not be denied voluntary work opportunities on the basis of such factors as a detainee's race, religion, national origin, gender, sexual orientation or disability.

## G. Physically and Mentally Challenged Detainees

While medical or mental health restrictions may prevent some physically or mentally challenged detainees from working, those with less severe disabilities shall have the opportunity to participate in the voluntary work program in appropriate work assignments.

1. The selecting official must consider the precise limitations of a disabled individual before rejecting that individual for selected work assignments.

2. Expediency or convenience is insufficient justification to reject or "pigeonhole" a detainee who, with reasonable accommodation, can perform essential functions of the work assignment.

3. In disputed cases, the selecting official shall consult medical personnel to ascertain the detainee's suitability for a given project.

## H. Hours of Work

Detainees who participate in the volunteer work program are required to work according to a schedule.

The normal scheduled workday for a detainee employed full time is a maximum of 8 hours. Detainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly.

Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program.

## I. Number of Details in One Day

The facility administrator may restrict the number of work details permitted a detainee during one day.

*In SPCs, CDFs, and dedicated IGSAs a detainee may participate in only one work detail per day.*

## J. Establishing Detainee Classification Level

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

## K. Compensation

Detainees shall receive monetary compensation for

GEO-MEN 00064346

**APP. 146**

work completed in accordance with the facility's standard policy.

The compensation is at least $1.00 (USD) per day. The facility shall have an established system that ensures detainees receive the pay owed them before being transferred or released.

## L. Removal of Detainee from Work Detail

A detainee may be removed from a work detail for such causes as:

1. unsatisfactory performance;

2. disruptive behavior, threats to security, etc.;

3. physical inability to perform the essential elements of the job due to a medical condition or lack of strength;

4. prevention of injuries to the detainee; and/or

5. a removal sanction imposed by the Institutional Disciplinary Panel for an infraction of a facility rule, regulation or policy.

When a detainee is removed from a work detail, the facility administrator shall place written documentation of the circumstances and reasons in the detainee detention file.

Detainees may file a grievance to the local Field Office Director or facility administrator if they believe they were unfairly removed from work, in accordance with standard "6.2 Grievance System."

## M. Detainee Responsibility

The facility administrator shall establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

The detainee is expected to be ready to report for work at the required time and may not leave an assignment without permission.

1. The detainee shall perform all assigned tasks diligently and conscientiously.

2. The detainee may not evade attendance and performance standards in assigned activities nor encourage others to do so.

3. The detainee shall exercise care in performing assigned work, using safety equipment and taking other precautions in accordance with the work supervisor's instructions.

4. In the event of a work-related injury, the detainee shall notify the work supervisor, who shall immediately implement injury-response procedures.

## N. Detainee Training and Safety

All detention facilities shall comply with all applicable health and safety regulations and standards.

The facility administrator shall ensure that all department heads, in collaboration with the facility's safety/training officer, develop and institute appropriate training for all detainee workers.

1. The voluntary work program shall operate in compliance with the following codes and regulations:

   a. Occupational Safety and Health Administration (OSHA) regulations;

   b. National Fire Protection Association 101 Life Safety Code; and

   c. International Council Codes (ICC).

   Each facility administrator's designee is responsible for providing access to complete and current versions of the documents listed above.

   The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

2. Upon a detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if

GEO-MEN 00064347

**APP. 147**

relevant, hazardous materials, including:

a.  safety features and practices demonstrated by the supervisor; and

b.  recognition of hazards in the workplace, including the purpose for protective devices and clothing provided, reporting deficiencies to their supervisors (staff and detainees who do not read nor understand English shall not be authorized to work with hazardous materials).

A detainee shall not undertake any assignment before signing a voluntary work program agreement that, among other things, confirms that the detainee has received and understood training from the supervisor about the work assignment.

The voluntary work program agreement, which each detainee is required to sign prior to commencing each new assignment, shall be placed in the detainee's detention file.

3.  For a food service assignment, medical staff, in conjunction with the U.S. Public Health Service, shall ensure that detainees are medically screened and certified before undertaking the assignment.

4.  The facility shall provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5.  The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

## O. Detainee Injury and Reporting Procedures

The facility administrator shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/ERO.

If a detainee is injured while performing his/her work assignment:

1.  The work supervisor shall immediately notify facility medical staff. In the event the accident occurs in a facility that does not provide 24-hour medical care, the supervisor shall contact the on-call medical officer for instructions.

2.  First aid shall be administered as necessary.

3.  Medical staff shall determine what treatment is necessary and where that treatment shall take place.

4.  The work supervisor shall complete a detainee accident report and submit it to the facility administrator for review and processing and file it in the detainee's detention file and A-file.

GEO-MEN 00064348

APP. 148

## 7.5 Definitions

### A-File, Alien File

The legal file maintained by DHS for each detainee. Contents include but are not limited to the detainee's identification documents (passport, driver's license, other identification cards, etc.), photographs, immigration history, prior criminal record if any, and all documents and transactions relating to the detainee's immigration case.

### ACA

American Correctional Association.

### Administrative Health Authority

The administrative authority is responsible for all access to care, personnel, equipment and fiscal resources to support the delivery of health care services.

### Administrative Segregation

A non-punitive form of separation from the general population used for administrative reasons. Administrative segregation is available only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility, as determined by a facility administrator or supervisor. Administrative segregation may be available, among other reasons, for detainees awaiting investigations or hearings for violations of facility rules, detainees scheduled for release, removal, or transfer within 24 hours, and, under more limited circumstances, detainees who require protective custody or separation from the general population for medical reasons.

### Admission/Admissions Process

In-processing of newly arrived detainees, which includes an orientation to the policies, programs, rules and procedures of the facility. Classification, assignment of living quarters, various inspections, medical screening and safeguarding of funds, valuables and other personal property is completed during this process.

### Ambulatory Restraints

"Soft" or "hard" equipment used to restrict a detainee's movement but leaving him or her able to eat, drink or attend to basic bodily functions without staff intervention.

### Ammunition Control Officer (ACO)

An individual who has been designated in writing as the officer responsible for the physical and administrative control of ammunition in the authorizing official's area of accountability.

### Body-cavity Search

The visual inspection or physical probing of body openings (anus, vagina, ears, nose, mouth, etc) where weapons, drugs, or other contraband could be secreted. This is the most intrusive means of searching an individual, reserved for instances where other search techniques have been considered but rejected as ineffective under the particular circumstances of the case. Body-cavity search procedures govern physical probes, but not visual inspections.

For example, the procedures would not be appropriate for a visual inspection of the inside of the mouth, nose, or ears, unless contraband is found during the course of that inspection. Body-cavity procedures apply whenever contraband is found, because retrieving/seizing the item will involve physical entry into or probing within the cavity (in this example, the mouth, nose, or ear).

### Caustic

Capable of burning, corroding, eroding or destroying by chemical action.

### Census Check

See Informal Count.

GEO-MEN 00064404

**APP. 149**

### Chain of Command

Order of authority (rank); executive, senior management, senior staff, etc. The position titles may vary according to the type of facility (SPC, CDF, or IGSA) and local facility titles. The on-site order of authority at a detention facility descends from the facility administrator to assistant or associate facility administrators to department heads to shift supervisors and other supervisors. Similarly, the ICE/ERO chain-of-command at a detention facility descends from the officer–in-charge (OIC) to the associate OIC to the chief detention enforcement officer/Chief of Security, detention operations supervisor, etc.

### Chemical

A substance with a distinct molecular composition produced by or used in a chemical process.

### Chief of Security

A generic term for the department head in charge of a detention facility's security employees and operations. The position titles may vary according to the type of facility (SPC, CDF, or IGSA) and local facility titles. Ordinarily, a Chief of Security (chief detention enforcement agent, captain, etc.) is organizationally directly under an assistant or associate facility administrator.

### Chronic disease

An illness or condition that affects an individual's well being for an extended interval, usually at least six months, and generally is not curable but can be managed to provide optimum functioning within any limitations the condition imposes on the individual.

### Chronic disease program (care clinic)

Incorporates a treatment plan and regular clinic visits. The clinician monitors the patient's progress during clinic visits and, when necessary changes the treatment. The program also includes patient education for symptom management.

### Class R (Restricted) Tools

Devices to which detainees are forbidden access except in the presence and constant supervision of staff for reasons of safety or security. Class R includes devices that can be used to manufacture or serve as weapons capable of doing serious bodily harm or structural damage to the facility. All portable power tools and accessories are in this category. Class R also includes ladders and other such items that are not inherently dangerous but could prove useful in unauthorized activities, such as escape attempts.

### Classification

A process used to make housing and program assignments by assessing detainees on the basis of objective information about past behavior, criminal records, special needs, etc.

### Clinical Director (CD)

A designated individual licensed to practice medicine and provide health services with final responsibility for decisions related to medical judgments.  A CD and CMA are equivalent positions.

### Clinical Medical Authority (CMA)

The medical authority is responsible for the delivery of all health care services to the detainee population. These services include, but are not limited to, medical, nursing, dental, mental health and nutritional services. A CD and CMA are equivalent positions.

### Combustible Liquid

A substance with a flash point at or above 100° Fahrenheit.

### Commissary

GEO-MEN 00064405

**APP. 150**

An area or system where detainees may purchase approved items.

Contact Visit

A meeting between detainee and another person authorized to take place in an area free of obstacles or barriers that prevent physical contact.

Container

Any bag, barrel, bottle, box, can, cylinder, drum, reaction vessel, storage tank, or other vessel holding a hazardous chemical; does not include pipes or piping systems.

Contraband

Any unauthorized item in the facility: illegal, prohibited by facility rules, or otherwise posing a threat to the security or orderly operation of the facility. This includes unauthorized funds.

Contract Detention Facility (CDF)

A facility that provides detention services under a competitively bid contract awarded by the ICE.

Control Office

An officer who directs security activities from the Control Center.

Count Slip

Documentation of the number of detainees confirmed present during a population count in a specific area, signed by the officers involved in the count.

Correspondence

Letters, postcards and other forms of written material not classified as packages or publications. Large envelopes containing papers qualify as correspondence, but boxes, sacks and other shipping cartons do not. Books, magazines, newspapers and other incoming printed matter are not "correspondence."

Criminal Alien

A foreign national convicted of one or more crimes.

Dedicated IGSA Facility (Dedicated IGSA)

An IGSA facility that solely houses ICE detainees. Also see "IGSA FACILITY" and "INTERGOVERNMENTAL SERVICE AGREEMENT."

Detainee Handbook

The policies and procedures governing detainee life in the facility: daily operations, rules of conduct, sanctions for rule violations, recreation and other programs, services, etc.; defined in writing and provided to each detainee upon admission to the facility.

Detention File

Contents include receipts for funds, valuables and other personal property; documentation of disciplinary action; reports on detainee behavior; detainee's written requests, complaints and other communications; official responses to detainee communications; records from Special Management Unit, etc.

Dietician

A professional trained in foods and the management of diets (dietetics) who is credentialed by the Commission on Dietetic Registration of the American Dietetic Association, or who has the documented equivalent in education, training, or experience, with evidence of relevant continuing education.

Disciplinary Hearing

Non-judicial administrative procedure to determine whether substantial evidence supports finding a detainee guilty of a rule violation.

Disciplinary Committee

One or more impartial staff members who conduct

GEO-MEN 00064406

**APP. 151**

and/or oversee a disciplinary hearing. A lower-level committee (Unit Disciplinary Committee) investigates a formal Incident Report and may impose minor sanctions or refer the matter to a higher-level disciplinary committee. A higher-level committee (Institution Disciplinary Panel) conducts formal hearings on Incident Reports referred from the lower level committee and may impose higher level sanctions for higher level prohibited acts. Also see Institution Disciplinary Panel.

*Disciplinary Segregation*

A punitive form of separation from the general population used for disciplinary reasons.  Disciplinary segregation is available only after a finding by a disciplinary hearing panel that the detainee is guilty of a serious prohibited act or rule violation.

*Dry Cell*

A cell or room without running water where a detainee can be closely observed by staff until the detainee has voided or passed contraband or until sufficient time has elapsed to preclude the possibility that the detainee is concealing contraband. Dry cells may be used when there is reasonable suspicion that a detainee has ingested contraband or concealed contraband in a body cavity.

*Emergency Changes*

Measures immediately necessary to maintain security or to protect the health and safety of staff and detainees.

*Exposure/Exposed*

Subjected or potentially subjected to a hazardous substance by any means (inhalation, ingestion, skin contact, absorption, etc.)

*Face-to-photo Count*

A process that verifies identity of each detainee by

comparing every person present with the photographic likeness on his/her housing card.

*Facility Administrator*

A generic term for the chief executive officer of a detention facility. The formal title may vary (warden, Officer In Charge, sheriff, jail administrator, etc.).

*Field Office Directory (FOD)*

Individual with chief responsibility for facilities in his assigned geographic area.

*Firearms Control Officer (FCO)*

Individual designated responsible for the physical and administrative control of all firearms under the jurisdiction of the authorizing official.

*Flammability Hazard*

Has a flash point below 200 degrees Fahrenheit, closed cup, or is subject to spontaneous heating.

*Flammable Liquid*

A substance with a flash point below 100 degrees Fahrenheit (37.8 Centigrade).

*Flash Point*

The minimum temperature at which the vapor of a combustible liquid can form an ignitable mixture with air.

*Food Service Administrator (FSA)*

The official responsible for planning, controlling, directing and evaluating Food Service Department operations.

*Formal Count*

When the detainee population is assembled at specific times for attendance check, conducted in accordance with written procedures.

*Four/Five-point Restraint*

A restraint system that confines an individual to a

GEO-MEN 00064407

**APP. 152**

bed or bunk in either a supine or prone position. Ordered by the facility administrator when a detainee's unacceptable behavior appears likely to continue risking injury to self or others.

Funds

Cash, checks, money orders and other negotiable instruments.

General Correspondence

All correspondence other than "special correspondence."

General Population

Detainees whose housing and activities are not specially restricted. The term is ordinarily used to differentiate detainees in the "general population" from those in Special Housing Units.

Grievance

A complaint based on a circumstance or incident perceived as unjust.

Hard Contraband

Any item that poses a serious threat to the life, safety or security of the facility detainees or staff.

Health Assessment

The process whereby an individual's health status is evaluated. This process will address the patient's physical, dental and mental health appropriate to the patient's condition and will include, as determined by the health care provider, questioning the patient about symptoms, a physical examination appropriate to the complaint and, as appropriate, review of screening information, collection of additional information relating to mental, dental and medical health issues, immunization histories, laboratory and diagnostic tests, other examinations, review of results, initiation of therapy and development of a treatment plan.

Health Authority

The health services administrator (HSA), clinical director (CD), or agency responsible for the provision of health care services at a facility or system of facilities. The responsible physician may be the health authority. Health authority may also be referred to as the medical department.

Health Care Practitioner

Defined as an individual who is licensed, certified, or credentialed by a state, territory or other appropriate body to provide health care services within the scope and skills of the respective health care profession.

Health Hazard

Includes carcinogens, toxic agents, reproductive toxins, irritants, corrosives, sanitizers, hepatotoxins, nephrotoxins, neurotoxins and other agents that act on the hemopoietic system or damage the lungs, skin, eyes, or mucous membranes.

Health Screening

A system for preliminary screening of the physical and mental condition of individual detainees upon arrival at the facility; conducted by health care personnel or by a specially health trained officer. The combination of structured inquiry and observation is designed to obtain immediate treatment for new arrivals who are in need of emergency health care, identify and meet ongoing current health needs, and isolate those with communicable diseases.

Hold Room

A secure area used for temporary confinement of detainees before in-processing, institutional appointments (court, medical), release, transfer to another facility, or deportation-related transportation.

Hunger Strike

A voluntary fast undertaken as a means of protest or

GEO-MEN 00064408

manipulation. Whether or not a detainee actually declares that he or she is on a hunger strike, staff are required to refer any detainee who is observed to not have eaten for 72 hours for medical evaluation and monitoring.

### IGSA Facility (IGSA)

A state or local government facility used by ERO through an Intergovernmental Service Agreement.  Also see "INTERGOVERNMENTAL SERVICE AGREEMENT."

### Illegal Contraband

Any item prohibited by law, the possession of which constitutes grounds for felony or misdemeanor charges.

### Indigent

Without funds, or with only nominal funds. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account.

### Informal grievance

An oral complaint or concern received from a detainee. Informal grievances may be handled at the lowest level in the organization possible to effectively resolve the complaint with no written response.

### Informal Count

Population count conducted according to no fixed schedule, when detainees are working, engaged in other programs, or involved in recreational activities. Unless a detainee is missing, these counts are not reported; also called "census check" or "irregular count."

### Informal Resolution

Brings closure to a complaint or issue of concern to a detainee, satisfactory to the detainee and staff member involved; does not require filing of a written grievance.

### Informed Consent

An agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature, consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed action is not undertaken.

### In-processing

Administrative processing of a detainee arriving at a detention facility (See "Admissions").

### Institution Disciplinary Panel (IDP)

Review board responsible for conducting disciplinary hearings and imposing sanctions for cases of detainee misconduct referred for disposition following the hearing. The IDP usually comprises a hearing officer and representatives of different departments in the facility.

### Intergovernmental Service Agreement

A cooperative agreement between ICE and any state, territory or political subdivision for the construction, renovation or acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services. ICE may enter into an IGSA with any such unit of government guaranteeing to provide bed space for ICE detainees, and to provide the clothing, medical care, food and drink, security and other services specified in the ICE/ERO detention standards; facilities providing such services are referred to as "IGSA facilities."

### Investigating Officer

An individual of supervisory or higher rank who conducts an investigation of alleged misconduct and was not involved in the incident; usually a supervisory detention enforcement officer or shift supervisor.

### Irregular Count

GEO-MEN 00064409

**APP. 154**

See Informal Count.

*Least Intrusive*

In the context of a search, terminology used to refer to alternative means of finding contraband, such as questions, metal detectors, pat down searches and boss chairs, prior to conducting a strip search.

*Legal Assistant*

An individual (other than an interpreter) who, working under the direction and supervision of an attorney or other legal representative, assists with group presentations and in representing individual detainees. Legal assistants may interview detainees, assist detainees in completing forms and deliver papers to detainees without the supervisory attorney being present.

*Legal Correspondence*

See "special correspondence."

*Legal File*

See A-File.

*Legal Representative*

An attorney or other person representing another in a matter of law, including law students, law graduates not yet admitted to the bar; "reputable individuals"; accredited representatives; accredited officials and attorneys outside the United States (see 8 CFR § 292.1, "Representation and Appearances").

*Leisure-time Activities*

Activities which are designed to provide detainees with recreational opportunities both inside and outside the living area, e.g., soccer, basketball, chess, checkers, television.

*Life-sustaining Procedure (Life Support)*

A medical intervention or procedure that uses artificial means to sustain a vital function.

*Mail Inspection*

Examination of incoming and outgoing letters, packages, etc., for contraband, including cash, checks and money orders.

*Master Count*

Total number of detainees housed at a facility.

*Material Safety Data Sheet (MSDS)*

Basic information about a hazardous chemical, prepared and issued by the manufacturer, in accordance with Occupational Safety and Health Administration regulations (see 29 CFR 1910.1200; see also OSHA Form 174); among other things, specifies precautions for normal use, handling, storage, disposal and spill cleanup.

*Medical Classification System*

A system by which a detainee's medical and mental health  conditions and needs are assessed to allow for appropriate placement in a facility with the resources necessary to provide appropriate level of care to meet those needs.

*Medical Discharge Plan*

The discharge plan includes: admission diagnosis; discharge diagnosis; brief medical history including the chief complaint and any essential physical findings discovered; all diagnostic test (e.g., x-rays, lab results, ECG's, etc) results; list of any medications prescribed; a brief summary of care provided, the detainee's response to treatment, medical complications encountered, any outside health care referrals that may have interrupted the infirmary period or that be pending; and continuity of care plan.

*Medical Personnel*

Includes all qualified health care professionals as well as administrative and support staff (e.g. health record administrators, laboratory technicians, nursing and medical assistants, clerical workers).

*Mental Health Provider*

GEO-MEN 00064410

**APP. 155**

Psychiatrist, clinical or counseling psychologist, physician, psychiatric nurse, clinical social worker or any other mental health professional who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients. .

Messenger

A person (neither a legal representative nor a legal assistant) whose purpose is to deliver or convey documents, forms, etc., to and from the detainee; not afforded the visitation privileges of legal representatives and legal assistants.

Minor

A juvenile; a person under the age of 18.

Mogul keys

Key and knob operated deadlocking latch/ deadbolt for use in detention institutions as well as commercial, government and industrial buildings for utmost physical security. The large-scale design accommodates an oversized latch and deadbolt plus mogul key cylinder. These institutional grade construction features and tamper resistant fittings afford exceptional structural strength to impede forced and surreptitious entry.

National Commission on Correctional Health Care (NCCHC)

Establishes the standards for health service in correctional facilities on which accreditation is based.

National Fire Protection Association

Principal source of fire protection standards and codes.

NCCHC

National Commission on Correctional Health care.

Non-Contact Visit

Visitation with a barrier preventing physical contact between the detainee and his or her visitors.

Non-dedicated IGSA Facility (Non-dedicated IGSA)

An IGSA facility that houses ICE detainees as well as other inmate populations in a shared use facility.  Also see "IGSA FACILITY" and "INTERGOVERNMENTAL SERVICE AGREEMENT."

Non-Medical Emergency Escorted Trip

Authorized detainee visit to a critically ill member of his/her immediate family, or to attend the funeral of a member of his/her immediate family. "Immediate family" member refers to a parent (including stepparent and foster parent), child, spouse, sister, or brother of the detainee.

Non-merit Factor

Any characteristic or factor immaterial to a detainee's mental or physical ability to perform a given assignment.

Non-security Key

A key which if duplicated by unauthorized persons and/or lost, would not constitute an emergency requiring urgent action; not critical to facility safety and security.

Out Count

Detainees temporarily away from the facility, but accounted for by the facility and included in the master count.

Paracentric Keys

Keys designed to open a paracentric lock. It is distinguishable by the contorted shape of its blade, which protrudes past the centre vertical line of the key barrel. Instead of the wards on the outer face of the lock simply protruding into the shape of the key along the spine, the wards protrude into the shape of the key along the entire width of the key, including along the length of the teeth.

GEO-MEN 00064411

APP. 156

### Pat-down Search

Relies on the sensitivity of the officer's hands as they tap or run over the detainee's clothed body; may require the detainee to reveal pocket contents. The least intrusive body search.

### Physical Examination

A thorough evaluation of an individual's physical condition and medical history conducted by or under the supervision of a licensed medical professional acting within the scope of his or her practice.

### Plan of Action

Describes steps the facility will take to convert a condition that has caused a determination of noncompliance with a standard.

### Post Orders

Written orders that specify the duties of each position, hour-by-hour, and the procedures the post officer will follow in carrying out those duties.

### Progressive Restraints

Control the detainee in the least restrictive manner required, until and unless the detainee's behavior warrants stronger and more secure means of inhibiting movement.

### Protective Custody (PC)

Administrative segregation for the detainee's own safety.

### Qualified health care professionals

Include physicians, physicians assistants, nurses, nurse practitioners, dentists, mental health professionals and others who by virtue of their education, credentials and experience are permitted by law and within their scope of practice to evaluate and care for patients.

### Reasonable Suspicion

Not intuition, but specific, articulable facts that would cause a reasonable law enforcement officer to suspect that a particular person is concealing a weapon, contraband, or evidence of a crime.

### Religious Practices

Worship, observances, services, meetings, ceremonies, etc., associated with a particular faith; access to religious publications, religious symbolic items, religious counseling and religious study classes; and adherence to dietary rules and restrictions.

### Sally Port

An enclosure situated in the perimeter wall or fence surrounding the facility, containing double gates or doors, of which one cannot open until the other has closed, to prevent a breach in the perimeter security; handles pedestrian and/or vehicular traffic.

### Sanitation

The creation and maintenance of hygienic conditions; in the context of food, involves handling, preparing, and storing items in a clean environment, eliminating sources of contamination.

### Satellite Feeding

Food served and consumed in a location other than where prepared.

### Security Key

A key which if duplicated by unauthorized persons and/or lost, would jeopardize life, safety, property or security, or would facilitate escape.

### Segregation

Confinement in an individual cell isolated from the general population; for administrative, disciplinary, or protective reasons.

### Service Processing Center (SPC)

A detention facility the primary operator and

GEO-MEN 00064412

**APP. 157**

controlling party of which is ICE.

Shift Supervisor

A generic term for the detention security supervisor in charge of operations during a shift. The position titles may vary according to the type of facility (SPC, CDF, or IGSA) and local facility titles. Ordinarily, a shift supervisor (detention operations supervisor, lieutenant, etc.) is, organizationally, directly under the Chief of Security (chief detention enforcement agent, captain, etc.).

Soft Contraband

Any unauthorized item that does not constitute hard contraband, i.e., does not pose a serious threat to human safety or facility security; includes that quantity of an item possessed in an amount exceeding the established limit.

Special Correspondence or Legal Mail

Detainees' written communications to or from any of the following:

a.  private attorneys and other legal representatives;

b.  government attorneys;

c.  judges and courts;

d.  embassies and consulates;

e.  the president and vice president of the United States;

f.  members of Congress;

g.  the Department of Justice (including the DOJ Office of the Inspector General);

h.  the Department of Homeland Security (including U.S. Immigration and Customs Enforcement, ICE Health Services Corps, the Office of Enforcement and Removal Operations, the DHS Office for Civil Rights and Civil Liberties, and the DHS Office of the Inspector General);

i.  outside health care professionals;

j.  administrators of grievance systems; and

k.  representatives of the news media.

Special Management Unit (SMU)

A housing unit for detainees in administrative or disciplinary segregation.

Special Needs Detainee

A detainee whose mental and/or physical condition requires different accommodations or arrangements than a general population detainee would receive. Special needs detainees include but are not limited to those who are emotionally disturbed, developmentally disabled, mentally ill, physically handicapped, chronically ill, disabled, or infirm and the drug or alcohol addicted.

Strip Search

A visual inspection of all body surfaces and body cavities.

Terminally Ill Detainee

A detainee whose physical condition has deteriorated to the point where the prognosis is less than a year to live.

TJC

The Joint Commission [formerly the Joint Commission on Accreditation of Health care Organizations (JCAHO)]

An independent, not-for-profit organization that evaluates and accredits more than 15,000 health care organizations and programs in the United States. TJC is the Nation's predominant standards-setting and accrediting body in health care.

Toxic

Poisonous; capable of causing injury or death.

Trained Investigators

A person who has been trained in investigative techniques to include interview techniques for

GEO-MEN 00064413

APP. 158

victims and proper procedures for collecting and storing evidence.

*Training*

An organized, planned and evaluated activity designed to achieve specific learning objectives and enhance personnel performance. Training may occur on site, at an academy or training center, an institution of higher learning, professional meetings, or through contract service or closely supervised on-the-job training. Training programs usually include requirements for completion, attendance records and certification of completion. Meetings of professional associations are considered training where there is clear evidence of the direct bearing on job performance. In all cases, the activity must be part of an overall training program.

*Training Coordinator*

A person responsible for ensuring all training requirements are met and documented. This person will often develop and conduct training.

*Transgender*

Transgender people are those whose gender identity or expression is different from their assigned sex at birth.

*Unencumbered Space*

Open, usable space measuring at least seven feet in at least one dimension, free of plumbing fixtures, desk, locker, bed and other furniture and fixtures (measured in operational position).

*Unauthorized Funds*

Negotiable instruments (checks, money orders, etc.) or cash in a detainee's possession exceeding the facility-established limit.

*Unauthorized Property*

Not inherently illegal, but against the facility's written rules.

*Unit Disciplinary Committee*

See Disciplinary Committee.

*Volunteer Group*

Individuals who collectively donate time and effort to enhance the activities and programs offered to detainees; selected on basis of personal qualities and skills (recreation, counseling, education, religion, etc.).

*Work Assignment*

Carpentry, plumbing, food service and other operational activities included in the facility's Voluntary Work Program, for which a detainee may volunteer.

GEO-MEN 00064414

**APP. 159**

# Exhibit M



# Operations Manual ICE Performance Based National Detention Standards (PBNDS)

## Table Of Contents

**PART 1   SAFETY**

  1  **Emergency Plans** (DOC | 227 KB) (PDF | 303 KB)

  2  **Environmental Health and Safety** (DOC | 187 KB) (PDF | 254 KB)

  3  **Transportation (By Land)** (DOC | 128 KB) (PDF | 180 KB)

**PART 2   SECURITY**

  4  **Admission and Release** (DOC | 98 KB) (PDF | 155 KB)

  5  **Classification System** (DOC | 145 KB) (PDF | 220 KB)

  6  **Contraband** (DOC | 68 KB) (PDF | 82 KB)

  7  **Facility Security and Control** (DOC | 101 KB) (PDF | 129 KB)

  8  **Funds and Personal Property** (DOC | 121 KB) (PDF | 151 KB)

  9  **Hold Rooms in Detention Facilities** (DOC | 81 KB) (PDF | 101 KB)

  10  **Key and Lock Control** (DOC | 102 KB) (PDF | 128 KB)

  11  **Population Counts** (DOC | 51 KB) (PDF | 60 KB)

GEO-MEN 00062905

**12  Post Orders** (<u>DOC</u> | 61 KB) (<u>PDF</u> | 71 KB)

**13  Searches of Detainees** (<u>DOC</u> | 104 KB) (<u>PDF</u> | 141 KB)

**14  Sexual Abuse and Assault Prevention and Intervention** (<u>DOC</u> | 151 KB) (<u>PDF</u> | 220 KB)

**15  Special Management Units** (<u>DOC</u> | 130 KB) (<u>PDF</u> | 182 KB)

**16  Staff-Detainee Communication** (<u>DOC</u> | 78 KB) (<u>PDF</u> | 94 KB)

**17  Tool Control** (<u>DOC</u> | 111 KB) (<u>PDF</u> | 145 KB)

**18  Use of Force and Restraints** (<u>DOC</u> | 152 KB) (<u>PDF</u> | 197 KB)

**PART 3   ORDER**

**19  Disciplinary System** (<u>DOC</u> | 137 KB) (<u>PDF</u> | 193 KB)

**PART 4   CARE**

**20  Food Service** (<u>DOC</u> | 225 KB) (<u>PDF</u> | 341 KB)

**21  Hunger Strikes** (<u>DOC</u> | 64 KB) (<u>PDF</u> | 73 KB)

**22  Medical Care** (<u>DOC</u> | 247 KB) (<u>PDF</u> | 296 KB)

**23  Personal Hygiene** (<u>DOC</u> | 69 KB) (<u>PDF</u> | 78 KB)

**24  Suicide Prevention and Intervention** (<u>DOC</u> | 73 KB) (<u>PDF</u> | 73 KB)

**25  Terminal Illness, Advance Directives, and Death** (<u>DOC</u> | 114 KB) (<u>PDF</u> | 130 KB)
See ICE Directive 7-9.0 01 Oct 09

**PART 5   ACTIVITIES**

**26  Correspondence and Other Mail** (<u>DOC</u> | 90 KB) (<u>PDF</u> | 107 KB)

**27  Escorted Trips for Non-Medical Emergencies** (<u>DOC</u> | 62 KB) (<u>PDF</u> | 72 KB)

**28  Marriage Requests** (<u>DOC</u> | 62 KB) (<u>PDF</u> | 69 KB)

**29  Recreation** (<u>DOC</u> | 90 KB) (<u>PDF</u> | 105 KB)

**30  Religious Practices** (<u>DOC</u> | 74 KB) (<u>PDF</u> | 86 KB)

GEO-MEN 00062906

**31  Telephone Access** (<u>DOC</u> | 97 KB) (<u>PDF</u> | 93 KB)

**32  Visitation** (<u>DOC</u> | 138 KB) (<u>PDF</u> | 183 KB)

**33  Voluntary Work Program** (<u>DOC</u> | 81 KB) (<u>PDF</u> | 35 KB)

**PART 6   JUSTICE**

**34  Detainee Handbook** (<u>DOC</u> | 66 KB) (<u>PDF</u> | 71 KB)

**35  Grievance System** (<u>DOC</u> | 88 KB) (<u>PDF</u> | 113 KB)

**36  Law Libraries and Legal Material** (<u>DOC</u> | 133 KB) (<u>PDF</u> | 168 KB)

**37  Legal Rights Group Presentations** (<u>DOC</u> | 84 KB) (<u>PDF</u> | 101 KB)

**PART 7   ADMINISTRATION & MANAGEMENT**

**38  Detention Files** (<u>DOC</u> | 77 KB) (<u>PDF</u> | 90 KB)

**39  News Media Interviews and Tours** (<u>DOC</u> | 60 KB) (<u>PDF</u> | 82 KB)

**40  Staff Training** (<u>DOC</u> | 94 KB) (<u>PDF</u> | 120 KB)

**41  Transfer of Detainees** (<u>DOC</u> | 135 KB) (<u>PDF</u> | 185 KB)

**42  Definitions** (<u>DOC</u> | 81 KB) (<u>PDF</u> | 142 KB)

GEO-MEN 00062907

**APP. 163**

## ICE/DRO DETENTION STANDARD

### ENVIRONMENTAL HEALTH AND SAFETY

**I.  PURPOSE AND SCOPE.  This Detention Standard protects detainees, staff, volunteers, and contractors from injury and illness by maintaining high facility standards of cleanliness and sanitation, safe work practices, and control of hazardous substances and equipment.**

It applies to the following types of facilities housing DRO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by DRO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

***Procedures in italics are specifically required for SPCs and CDFs***.  IGSAs must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Some terms used in this document are defined in the separate **Definitions** Standard.

**II.  EXPECTED OUTCOMES.**  The expected outcomes of this Detention Standard are:

1. Facility cleanliness and sanitation will be maintained at the highest level.

2. Compliance with all applicable safety and sanitation laws will be ensured by documented internal and external inspections and corrective action when indicated.

3. Compliance with all applicable fire safety codes and fire safety performance requirements for the facility furnishings will be ensured.

4. Flammable, poisonous, toxic, and caustic materials will be controlled and used in a safe manner.

5. Compliance with fire prevention regulations, inspection requirements, and practices, including periodic fire drills, will ensure the safety of detainees, staff, and visitors.

6. Staff will be knowledgeable about procedures and responsibilities during emergency situations, including those that require evacuation, in accordance with a written plan and at least annual training.

7. The facility will have a plan for immediate release of detainees from locked areas and provisions for a back-up system

8. A sufficient number of properly positioned emergency exits that are clear from obstruction will be distinctly and permanently marked.

9. Preventive maintenance and regular inspections will be performed to ensure timely emergency repairs or replacement to prevent dangerous and life-threatening situations.

---

GEO-MEN 00062932

**APP. 164**

10. Potential disease transfer will be minimized by the proper sanitization of barbering equipment and supplies.

11. Pests and vermin will be controlled and eliminated.

12. Safe potable water will be available throughout the facility.

13. Emergency lighting and life-sustaining equipment will be maintained and periodically tested.

14. Disposal of garbage and hazardous waste will be in compliance with applicable government regulations.

15. The applicable content and information in this standard will be communicated in a language or manner which the detainee can understand.

**III. DIRECTIVES AFFECTED.**  This Detention Standard replaces **Environmental Health and Safety** dated 9/20/2000.

**IV. REFERENCES**

- American Correctional Association 4th Edition, Standards for Adult Detention Facilities: 4-ALDF-1A-01, 1A-02, 1A-03, 1A-07, 1A-14, 1A-15, 1A-16, 1A-17, 1A-18, 1A-19, 1A-20,1C-01, 1C-02, 1C-03, 1C-04, 1C-05, IC-07, 1C-08, 1C-09, 1C-10, 1C-11, 1C-12, 1C-13, 1C-14, 1C-15, 4B-07, 4C-18.

- Occupational Safety and Health Administration (OSHA) Regulations

- NFPA Standards

- US Public Health Service Report on Carcinogens

**V. EXPECTED PRACTICES – GENERAL ENVIRONMENTAL HEALTH AND SAFETY**

**A. General Environmental Health**

Environmental health conditions shall be maintained at a level that meets recognized standards of hygiene, including those from the:

- American Correctional Association,

- Occupational Safety and Health Administration,

- Environmental Protection Agency,

- Food and Drug Administration,

- National Fire Protection Association's Life Safety Code, and

- National Center for Disease Control and Prevention.

The Health Services Department or IGSA equivalent shall assist in the identification and correction of conditions that could adversely impact the health of detainees, employees, and visitors.  The sanitarian consultant is responsible for developing and implementing

---

*Environmental Health and Safety*                    2                    *December 2, 2008*

GEO-MEN 00062933

**APP. 165**

policies, procedures, and guidelines for the environmental health program that are intended to evaluate and eliminate or control as necessary, sources of injuries and modes of transmission of agents or vectors of communicable diseases.

The consultant shall:

- Conduct special investigations and comprehensive surveys of environmental health conditions, and

- Provide advisory, consultative, inspection, and training services regarding environmental health conditions.

The medical facility's Health Services Administrator is responsible for:

- Implementing a program that assists in maintaining a high level of environmental sanitation, and

- Providing recommendations to the facility administrator concerning environmental health conditions, in consultation with the sanitarian consultant.

### B. Staff and Detainee Safety

The facility administrator shall ensure that adequate provisions are made for staff and detainee safety in accordance with these Detention Standards and applicable law. The Detention Standard on **Staff Training** further addresses employee training related issues. The Detention Standard on **Volunteer Work Program** addresses detainee training issues for workers. Detainees will receive safety instruction where necessary for living area-related assignments such as working with cleaning products to clean general use areas.

Detainee living area safety will be emphasized to staff and detainees to include providing, as noted in the standards, a housekeeping plan. Bed rails are not common in detention settings except for medical housing units because of the potential safety risk they pose. When there are safety concerns with a detainee sleeping in a top bunk that is not along a wall and has no bed rail, accommodations will be made to ensure safety. In locations where ladders are not available, accommodations for detainees, such as the use of bottom bunks or the addition of a ladder or step, will be made on a case by case basis. Detainees who have medical or physical problems that sleeping on a top bunk will aggravate will be referred to the medical unit for consideration of a lower bunk permit.

### C. General Housekeeping

The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness. When possible, the use of non-toxic cleaning supplies is recommended.

1. All horizontal surfaces shall be damp-dusted daily with an approved germicidal solution used according to the manufacturer's directions.

2. Windows, window frames, and windowsills shall be cleaned on a regular

---

GEO-MEN 00062934

schedule, but do not require daily cleaning.

3.  Furniture and fixtures shall be cleaned daily.

4.  Floors shall be mopped daily and when soiled using the double-bucket mopping technique, and with a hospital disinfectant-detergent solution mixed according to the manufacturers directions.

5.  A clean mop head shall be used each time the floors are mopped.

6.  Waste containers shall be non-porous and lined with plastic bags and the liner shall be changed daily.

7.  The container itself shall be washed at least weekly, or as needed when it becomes soiled.

8.  Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

### D.  Pests and Vermin

The facility administrator shall contract with licensed pest-control professionals to perform monthly inspections to identify and eradicate rodents, insects, and vermin. The contract shall include a preventive spraying program for indigenous insects and a provision for callback services as necessary.

### E.  Certification of Facility Water Supply

At least annually, a state laboratory shall test samples of drinking and wastewater to ensure compliance with applicable standards. A copy of the testing and safety certification shall be maintained on-site.

### F.  Emergency Electrical Power Generator

At least every two weeks, emergency power generators shall be tested for one hour, and the oil, water, hoses and belts of these generators shall be inspected for mechanical readiness to perform in an emergency situation .

Power generators are inspected weekly and load tested quarterly at a minimum, or in accordance with manufacturer's recommendations and instruction manual. Among other things, the technicians shall check starting battery voltage, generator voltage and amperage output.

Other emergency equipment and systems shall be tested quarterly, and needed follow-up repairs or replacement shall be accomplished as soon as feasible.

### G.  Garbage and Refuse

▪  Garbage and refuse includes all trash, rubbish, and other putrescible and non-putrescible solid waste, except the solid and liquid waste discharged into the sanitary sewer system of the facility.

▪  Garbage and refuse shall be collected and removed as often as necessary to maintain sanitary conditions and to avoid creating health hazards.

▪  Facilities shall comply with all federal, state and local environmental regulations

GEO-MEN 00062935

**APP. 167**

and requirements governing methods for handling and disposing of refuse.

## VI. – <u>HAZARDOUS MATERIALS</u>

Every facility shall establish a system for storing, issuing, using, and maintaining inventories of and accountability for hazardous materials. The facility program will be supervised by a person who has been trained in accordance with OSHA standards. The effectiveness of any such system depends not only on written policies, procedures, and precautions but also on adequate supervision and responsible behavior of staff and detainees, including following instructions precisely, taking prescribed precautions and using safety equipment properly.

A list of common flammable, toxic, and caustic substances is included at the end of this Detention Standard as Table A.

### A. Personal Responsibility

Every individual who uses a hazardous substance must:

- be trained in accordance with OSHA standards;
- be knowledgeable about and follow all prescribed precautions;
- wear personal protective equipment when indicated; and
- promptly report hazards or spills to the designated authority.

### B. Protective Equipment

- Protective eye and face equipment is required where there is a reasonable probability of injury that can be prevented by such equipment. Areas of the facility where such injuries can occur shall be conspicuously marked with eye hazard warning signs.
- Eyewash stations that meet the standards of the OSHA shall be installed in designated areas throughout the facility, and all employees and detainees in those areas shall be instructed in their use.

### C. Inventories

Every area shall maintain a current inventory of the hazardous substances (flammable, toxic, or caustic) used and stored there. Inventory records shall be maintained separately for each substance. Entries for each shall be logged on a separate card (or equivalent) filed alphabetically by substance. The entries shall contain relevant data, including purchase dates and quantities, use dates and quantities, and quantities on hand.

### D. Material Safety Data Sheets Files

Every department or other area of the facility using hazardous substances shall maintain a file of Material Safety Data Sheets (MSDSs) that includes a list of the locations where hazardous substances are stored, along with a diagram and legend of

---

GEO-MEN 00062936

**APP. 168**

these locations. Designated staff from each department or area shall provide a copy of each file to the Maintenance Supervisor.

- MSDSs are produced by manufacturers and provide vital information on individual hazardous substances, including instructions on safe handling, storage, disposal, prohibited interactions, etc.

- Staff and detainees shall have ready and continuous access to the MSDSs for the substances with which they are working. Staff and detainees that do not read English will not be authorized to work with these materials.

- Because changes in MSDSs occur often and without notice, staff must:

  o review the latest issuance from the manufacturers of the relevant substances;

  o update the MSDS files as necessary; and

  o forward any changes to the Maintenance Supervisor, so that the copy is kept current.

### E. Master Index

The Maintenance Supervisor shall compile:

- a master index of all hazardous substances in the facility and their locations;

- a master file of MSDSs; and

- a comprehensive, up-to-date list of emergency phone numbers (fire department, poison control center, etc.).

The Maintenance Supervisor maintains this information in the safety office (or equivalent) and ensures a copy is sent to the local fire department.

### F. General Guidelines Regarding Hazardous Substances

**Issuance.** Flammable, caustic, and toxic substances (hazardous substances) shall be issued (that is, drawn from supply points to canisters or dispensed) only under the supervision of the designated officer.

**Amounts.** Hazardous substances shall be issued in single-day increments (the amount needed for one day's work.)

**Supervision.** Qualified staff shall closely monitor detainees working with hazardous substances.

**Accountability.** Inventory records for a hazardous substance must be kept current before, during, and after each use.

### G. Flammable and Combustible Liquids

1. Any liquid or aerosol labeled "Flammable" or "Combustible" must be stored and used as prescribed on the label required by the Federal Hazardous Substances Labeling Act.

---

*Environmental Health and Safety*            6            *December 2, 2008*

GEO-MEN 00062937

**APP. 169**

2. Lighting fixtures and electrical equipment installed in flammable liquid storage rooms must meet National Electrical Code requirements in hazardous locations.

3. Every hazardous material storage room shall:
   - Be of fire-resistant construction and properly secured;
   - Have self-closing fire doors at each opening;
   - Be constructed with either a four-inch sill or a four-inch depressed floor; and
   - Have a ventilation system (mechanical or gravity flow) within 12 inches of the floor, which provides at least six air changes per hour.

4. Every storage cabinet shall:
   - Be constructed according to code and securely locked at all times;
   - Be clear of open passageways, stairways, and other emergency exit areas;
   - Be conspicuously labeled: "Flammable -- Keep Fire Away"; and
   - Contain not more than 60 gallons of Class I or Class II liquids, or more than 120 gallons of Class III liquids.

5. Storage rooms and cabinets may be entered only under secure conditions and under the supervision of authorized staff.

6. Any portable container that is not the original shipping container must be designated as an approved safety can, which is listed or labeled by a nationally recognized testing laboratory.  Each container shall bear a legible label that identifies its contents.

7. Excess liquids shall remain in original containers, tightly closed, in the storage room or cabinet.

8. The MSDS shall govern use of a particular flammable or combustible liquid.

9. Only authorized staff may dispense flammable and combustible liquids, using acceptable methods for drawing or transferring these liquids.

   Drawing from or transferring any of these liquids into containers indoors is prohibited except:
   - Through a closed piping system;
   - From a safety can;
   - By a device drawing through the top; or
   - By gravity, through an approved self-closing system.

   An approved grounding and bonding system must be used when liquids are dispensed from drums.

10. Without exception, cleaning liquids must have a flash point at or above 100° F (for example, Stoddard solvents, kerosene).  Cleaning operations must be in an approved parts-cleaner or dip tank fitted with a fusible link lid with a 160° F melting-temperature link.

---

GEO-MEN 00062938

**APP. 170**

11. Staff shall follow MSDS directions:

- When disposing of excess flammable or combustible liquids; or
- After a chemical spill.

### H. Toxic and Caustic Substances

- All toxic and caustic materials must be stored in secure areas, in their original containers, with the manufacturer's label intact on each container.

- Authorized staff only shall draw/dispense these substances, in accordance with the applicable Material Safety Data Sheet(s).

- Staff shall either return unused amounts to the original container(s) or, under certain circumstances, to another suitable, clearly labeled container n the storage area.

- MSDS directions shall determine the disposal and spill procedures for toxic and caustic materials used in the facility.

### I. Poisonous Substances

Poisonous substances or chemicals, such as methyl alcohol, sulfuric acid, muriatic acid, caustic soda or tannic acid, among others, pose a very high (Class I) caustic hazard due to their toxicity.

**Methyl alcohol**, variously referred to as wood alcohol and methanol, is commonly found in industrial applications (for example, shellac thinner, paint solvent, duplicating fluid, solvents for leather cements and dyes, flushing fluid for hydraulic brake systems):

- If ingested, methyl alcohol can cause permanent blindness or death.

- Staff must directly supervise the use of any product containing methyl alcohol. Products containing methyl alcohol in a very diluted state, such as shoe dye, may be issued to detainees, but only in the smallest workable quantities.

- Immediate medical attention is vital any time methyl alcohol poisoning is suspected.

### J. Other Toxic Substances

1. Permanent **antifreeze** containing ethylene glycol shall be stored in a locked area and dispensed only by authorized staff.

2. **Typewriter cleaner** containing carbon tetrachloride or tricholorochane shall be dispensed in small quantities and used under direct staff supervision.

3. **Cleaning fluids** containing carbon tetrachloride or tetrachloride or tricholoroethylene shall be strictly controlled.

4. **Glues** of every type may contain hazardous chemicals. When use of a nontoxic product is not possible, staff must closely supervise all stages of handling. The toxic glues must be stored in a locked location.

5. The use of **dyes and cements for leather** requires close supervision.

---

GEO-MEN 00062939

**APP. 171**

Nonflammable types shall be used whenever possible.

6. **Ethyl alcohol, isopropyl alcohol, and other antiseptic products** shall be stored and used only in the medical department and only under close supervision. To the extent practical, such chemicals shall be diluted and issued in small quantities to prevent any injuries or lethal accumulation.

7. **Pesticides** not currently approved by the Environmental Protection Agency, such as DDT and 1080 (sodium fluoracetate), are prohibited. The Maintenance Supervisor is responsible for purchasing, storing (in a locked area), and dispensing all pesticides used in the facility.

8. The Maintenance Supervisor or other staff members responsible for **herbicides** must hold a current state license as a Certified Private Applicator. Persons applying herbicides must wear proper clothing and protective gear.

9. **Lyes** may be used only in dye solutions and only under the direct supervision of staff.

### K. Labeling of Chemicals, Solvents, and Other Hazardous Materials

The facility administrator shall individually assign the following responsibilities associated with the labeling procedure:

- Identifying the hazardous nature of materials adopted for use;

- Requiring use of properly labeled containers for hazardous materials, including any and all miscellaneous containers into which employees might transfer the material;

- Teaching staff the meaning of the classification code and the MSDS, including the safe handling procedures for each material, and impressing on staff the need to ensure containers are properly labeled; and

- Placing correct labels on all smaller containers when only the larger shipping container bears the manufacturer-affixed label.

### L. Controlled Hazardous Materials

Certain substances require special treatment and careful planning and precautions before use. These controlled materials are classified according to the type of hazard and the nature of the restrictions imposed for their safe use, as specified in OSHA regulations.

**Class I: Industrial Solvents.** Industrial solvents and chemicals used as paint thinners, degreasers, and cleaning agents may have toxic properties and low flash points, making them dangerous fire hazards.

**Class II: Restricted Materials.** Beryllium, its alloys and compounds, and silver solder containing cadmium pose a danger to workers, for whom special precautions must be taken.

**Class III: Recognized Carcinogens.** OSHA-listed carcinogens are governed by the OSHA regulations provided in 29 CFR 1910.1000.

GEO-MEN 00062940

APP. 172

Although asbestos appears on the OSHA list, it is exempt from the regulation when:

- no asbestos fibers will be released into the air during handling and use; and

- the asbestos consists of firmly bound fibers contained in a product such as: a transit pipe, wallboard, or tile (except when being sawed or otherwise handled in a way that releases fibers into the air).

**Class IV: Suspected Carcinogenic, Teratogenic, and Mutagenic Materials.** Chemical agents, substances, mixtures, and exposures are listed in the biennial *Report on Carcinogens* issued by the U.S. Public Health Service, in accordance with the Public Health Service Act.  The Maintenance Supervisor shall ensure the facility has copies of the report and that there is compliance with the provisions of the latest edition.

**VII.    EXPECTED PRACTICES – <u>FIRE PREVENTION AND CONTROL</u>**

### A. Fire Safety Codes

Every facility shall comply with standards and regulations issued by:

- OSHA;

- the American Correctional Association "mandatory" Expected Practices;

  (Mandatory ACA Expected Practice 4-ALDF-1C-07 requires that the facility conform to applicable federal, state, and/or local fire safety codes, and that the authority having jurisdiction document compliance.  A **fire alarm and automatic detection system are required** (or there is a plan for addressing these or other deficiencies within a reasonable time period), as approved by the authority having jurisdiction.  If the authority approves any variance, exceptions, or equivalencies, they must not constitute a serious life-safety threat to the occupants of the facility.)

- local and national fire safety codes, and

- applicable standards of the American Society for Testing and Materials, American National Standards Institute, and Underwriters' Laboratories or Factory Mutual Engineering Corporation.

New construction, alterations, and renovations, shall comply with:

- the latest revision or update of the International Council Codes.

- the Uniform Building Code; or

- the Standard Building Code, in accordance with 40 USC Title 619 and local law.

If the local government does not mandate adherence to a particular code, construction must conform to the International Council Codes.

In addition, the construction shall comply with the latest edition of the National Fire Protection Association's (NFPA) 101, Life Safety Code and National Fire Codes (NFCs). If the fire protection and life safety requirements of a local building code differ

---

*Environmental Health and Safety* *December 2, 2008*

GEO-MEN 00062941

from NFPA 101 or the NFCs, the requirements of NFPA 101 and the NFCs shall take precedence and be recognized as equivalent to the local building code.

### B.  Inspections

A qualified departmental staff member shall conduct weekly fire and safety Inspections.

Facility maintenance (safety) staff shall conduct monthly inspections.

Written reports of the inspections shall be forwarded to the facility administrator for review and, if necessary, corrective action determinations.  The Maintenance Supervisor shall maintain inspection reports and records of corrective action in the safety office.  Fire safety deficiencies shall be promptly addressed.

### C.  Fire Prevention, Control, and Evacuation Plan

Every facility shall develop a fire prevention, control, and evacuation plan that includes the following:

1.  Control of ignition sources;

2.  Control of combustible and flammable fuel load sources;

3.  Provisions for occupant protection from fire and smoke;

4.  Inspection, testing, and maintenance of fire protection equipment, in accordance with NFPA codes, etc.;

5.  Monthly fire inspections;

6.  Installation of fire protection equipment throughout the facility, in accordance with NFPA codes;

7.  Accessible, current floor plans (buildings and rooms); prominently posted evacuation maps/plans; exit signs and directional arrows for traffic flow; with a copy of each revision filed with the local fire department; and

8.  Exit diagrams that shall be conspicuously posted throughout the facility.

### D.  Fire Drills

Fire drills shall be conducted and documented at least quarterly in all facility locations including administrative areas.

1.  Fire drills in housing units, medical clinics, and other areas occupied or staffed during non-working hours shall be timed so that employees on each shift participate in an annual drill.

2.  Detainees shall be evacuated during fire drills, except: in areas where security would be jeopardized; in medical areas where patient health could be jeopardized; or in individual cases when evacuation of patients is logistically not feasible.  Staff shall simulate drills in areas where detainees are not evacuated.

3.  Emergency-key drills shall be included in each fire drill, and timed.  Emergency keys shall be drawn and used by the appropriate staff to unlock one set of emergency exit doors not in daily use.  NFPA recommends a limit of four and one-half minutes for drawing keys and unlocking emergency doors. However,

GEO-MEN 00062942

**APP. 174**

when conducting fire drills emphasis will be placed on safe and orderly evacuation rather than speed.

### E. Exit Diagram

In addition to a general area diagram, the following information must be provided on signs:

- Instructions in English, Spanish and the next most prevalent language at the facility;

- "You Are Here" markers on exit maps; and

- Emergency equipment locations.

"Areas of Safe Refuge" shall be identified and explained on diagrams. Diagram posting will be in accordance with applicable fire safety regulations of the jurisdiction.

## VIII.    EXPECTED PRACTICES – MEDICAL OPERATIONS

### A. Needles and Other Sharp Objects

An established uniform procedure shall be established for the safe handling and disposal of used needles and other potentially sharp objects (sharps) to prevent both mechanical injury and the percutaneous transmission of infectious disease organisms, such as hepatitis B virus (HBV) and human immunodeficiency virus (HIV). Sharps are defined as all disposable or discarded items derived from detainee care that could potentially transmit disease via direct subdermal inoculation. Items included are: hypodermic needles and syringes, scalpel blades, glass vials or ampules containing materials deemed to be infectious, burrs, glass cartridges, and lancets.

Accidental injuries from sharp objects are common in health care programs; most are from needle sticks caused by staff attempting to recap hypodermic needles. A uniform procedure for used needles and other disposable sharps is necessary to reduce the number of such injuries by preventing the secondary handling of needles and other dangerous sharp objects used in the delivery of medical care.

### B. Standard Precautions (includes "Universal Precautions")

Staff shall frequently wash their hands and routinely take precautions to prevent contact with blood or other body fluids.

a. Gloves shall be worn: prior to touching blood and body fluids, mucous membranes, or non-intact skin of all patients; prior to handling items or surfaces soiled with blood or body fluids; and prior to performing venipuncture and other vascular access procedures.

Gloves shall be changed after contact with each detainee.

b. Masks and protective eye wear or face shields shall be worn during procedures that are likely to generate droplets of blood or other body fluids,

---

GEO-MEN 00062943

**APP. 175**

c.  Gowns or aprons shall be worn during procedures that are likely to generate splashes of blood or other body fluids.

d.  Hands and other skin surfaces shall be washed immediately and thoroughly if contaminated with blood or other body fluids.  Hands shall be washed immediately after gloves are removed.

e.  All health-care workers shall take precautions to prevent injuries caused by needles, scalpels, and other sharp instruments or devices during procedures, when cleaning used instruments, during disposal of used needles, and when handling sharp instruments after procedures.  Instruments and drugs will be maintained in a secure and sanitary condition,

f.   To prevent needle stick injuries, needles shall not be recapped, purposely bent or broken by hand, removed from disposable syringes, or otherwise manipulated by hand.  After use, disposable syringes and needles, scalpel blades, and other sharp items shall be placed in puncture-resistant containers for disposal.

g.  Large-bore reusable needles shall be placed in a puncture resistant container for transport to the reprocessing area.

h.  To minimize the need for emergency mouth-to-mouth resuscitation, mouthpieces, resuscitation bags or other ventilation devices shall be available for use in areas in which the need for resuscitation is predictable.

I.   Health-care workers who have exudative lesions or weeping dermatitis shall refrain from all direct patient care and from handling patient care equipment until the condition resolves.

j.   Pregnant health-care workers shall strictly adhere to precautions to minimize the risk to the infant of perinatal transmission of HIV.

k.   Implementation of standard blood and body fluid precautions for all detainees eliminates the need for the use of isolation category of "Blood and Body Fluid Precautions" previously recommended by the Centers for Disease Control for individuals known or suspected to be infected with blood-borne pathogens. Isolation precautions shall be used as necessary if associated conditions, such as infectious diarrhea or tuberculosis, are diagnosed or suspected.

Staff should encourage detainees to frequently wash their hands and routinely take precautions to prevent contact with blood or other body fluids.

### C.  Accidental Needle Sticks

Any employee or detainee who receives a needle stick or who is cut while handling potentially contaminated sharps shall be counseled regarding baseline testing for HBV and HIV and referred to their usual source of health care.  If the injury also involves a person who is a known source of possible infection, that person shall also be tested for HBV and HIV. The incident shall be reported as an occupational injury and documented in accordance with applicable regulations for commissioned officers and civil service employees, respectively.

The leading health service provider's exposure-control plan shall be followed in the event of a needle stick.

GEO-MEN 00062944

**APP. 176**

### D. Inventory

Items that pose a security risk, such as sharp instruments, syringes, needles, and scissors, shall be inventoried and checked weekly by an individual designated by the medical facility's Health Service Administrator (HSA) or equivalent.

### E. Handling

Without removing the needles or replacing the needle covers, staff shall place used (disposable) syringes in a plastic disposal box or container.

#### 1. Disposal Containers

Use only commercially available, biohazardous-waste sharps containers approved by the National Institute of Safety and Health (for example, a "Winfield Sharps Container.").

Do not use milk cartons or plastic milk jugs or other plastic containers of similar thickness.

Use containers with a two-gallon capacity (approximate)

Under no circumstances shall an item be removed from the sharps container.

#### 2. Location

Sharps Containers shall be located on top of counters or, if on the wall, at least five feet above ground. Containers shall never sit on the floor.

#### 3. Disposal

When the disposal box is one-half to two-thirds full, the lid shall be closed and locked, and tape shall be placed over the top of the lid to indicate that it is ready for disposal. The container shall be labeled with the words "infectious waste" or with the universal biohazard symbol, and placed in the proper area for removal and disposal.

Sharps are considered infectious waste, and final disposal of the container and contents shall be through a commercial contractor that handles disposal of infectious waste in accordance with all local and federal regulations.

The HSA shall make arrangements for disposal with an approved contractor and is responsible for validating that the contractor's disposal methods are in accordance with all infectious and hazardous waste disposal laws and regulations. Arrangements shall be made with local hospitals, if possible, for disposal with the hospitals' own infectious waste.

### F. Environmental Health in Medical Operations

While many of the following considerations, precautions, and specific procedures apply to situations that typically arise in medical operations, in many cases they have general application to all facility operations.

#### 1. General Housekeeping

Environmental cleanliness will prevent, reduce and control nosocomial infections due to contaminated environmental surfaces. The HSA or designee is responsible

---

GEO-MEN 00062945

**APP. 177**

for ensuring the cleanliness of the medical facility.

Using an acceptable health agency standard as a model, the HSA shall establish:

- The cleaning equipment; cleansers; disinfectants and detergents to be used,

- The Methods of cleaning, and

- The frequency of cleaning and inspections.

The HSA or designee shall make a daily visual inspection of the medical facility noting the condition of floors, walls, windows, horizontal surfaces, and equipment.

All surfaces touched by detainees or staff shall be cleaned using fresh solutions of appropriate disinfectant products, applied with clean cloths, mops, or wipes. Cleaned surfaces need not be monitored microbiologically since the results of such tests have been shown not to correlate with infection risk. Floors, walls, beds, tables, and other surfaces that usually come in contact with intact skin require low-level disinfection.

Horizontal surfaces in detainee care areas are cleaned on a regular basis, when soiling or spills occur. Additionally, short-stay units are cleaned when a detainee is discharged. Cleaning of walls, blinds, or curtains is required only when visibly soiled.

The Chief Nurse (or equivalent) is responsible for training all staff and detainees in using proper housekeeping procedures and proper handling of hazardous materials and chemicals.

### a. General Cleaning

1. All horizontal surfaces shall be damp-dusted daily with an approved germicidal solution.

2. Windows, window frames, and windowsills shall be cleaned on a regular schedule, but do not require daily cleaning.

3. Furniture and fixtures shall be cleaned daily.

4. Floors shall be mopped daily and when soiled using the double-bucket mopping technique. The cleaning solution shall be a hospital disinfectant-detergent solution mixed according to the manufacturer's directions. A clean mop head shall be used each time the floors are mopped.

5. Waste containers shall be lined with plastic bags and the liner shall be changed daily. The container itself shall be washed at least weekly, or as needed when it becomes soiled.

6. Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

### b. Isolation Cleaning

1. An approved germicidal detergent solution shall be freshly prepared in accordance with the manufacturer's specifications for each cleaning.

---

GEO-MEN 00062946

**APP. 178**

2. After cleaning the isolation room, mops and cleaning cloths shall be laundered before being reused.

3. Dirty water and used disinfecting solutions shall be discarded and the buckets and basins disinfected before being refilled.  Items used in cleaning a contaminated isolation room shall never be taken into another area.

4. Linens shall be carefully removed from the bed and double bagged for transport.

5. All waste materials shall be double bagged and disposed of as contaminated waste.

### c.  Terminal Cleaning

1. Every item in the room must be cleaned with an approved hospital germicidal solution.

2. When applicable, linen shall be stripped from the bed, with care taken not to shake the linen.  Linen shall be folded away from the person and folded inward into a bundle, then removed with minimal agitation.

3. When applicable, all reusable receptacles such as drainage bottles, urinals, bedpans, water pitchers shall be emptied and rinsed with germicidal solutions.

4. All equipment that is not to be discarded, such as IV poles, respirators and suction machines, shall be washed with an approved germicidal solution following manufacturer's guidelines for cleaning the specific piece of equipment.

5. When applicable, mattresses and pillows covered with durable plastic covers shall be thoroughly washed with the approved germicidal solution.

6. When applicable, beds shall be washed thoroughly using a small brush soaked in the germicidal solution to gain access to small holes and crevices, to areas between the springs, and to the casters.

7. All furniture shall be washed with a germicidal detergent solution.  Use a small brush if necessary.  Outside and underside as well as legs and casters must also be washed.

8. Wastebaskets shall be thoroughly washed with a germicidal solution after trash has been removed.

9. Telephones shall be thoroughly cleaned with a clean cloth soaked in the germicidal solution.  The earpiece and mouthpiece shall be unscrewed, scrubbed, dried and replaced.

10. Walls and ceilings need not be washed entirely, but areas that are obviously soiled shall be washed with germicidal solution.

---

GEO-MEN 00062947

**APP. 179**

#### d. Choice of Disinfecting Materials

Hospital-grade disinfectant-detergent formulations registered by the Environmental Protection Agency may be used for environmental surface cleaning, but the physical removal of microorganisms by scrubbing is also as important as any antimicrobial effect of the cleaning agent used.

Cost, safety, and acceptance by staff should be the criteria for selecting any such registered agent.  The manufacturer's instructions for use shall be followed exactly.

### 2. Blood and Body Fluid Clean-up

Spills of blood and body fluids shall be cleaned up and the surface decontaminated in such a manner as to minimize the possibility of workers becoming exposed to infectious organisms, including HIV and HBV.  A suitable cleanup kit shall be maintained for use in cases of spills of blood and body fluids.  Cleanup kits may be obtained from commercial sources, or kits may be put together by ICE/DRO HSD staff or the designated health care provider.

#### a. Making a Clean-up Kit

To prepare a clean-up kit for blood and body fluid spills, package the following materials in a 12" x 15" clear" Ziploc" bag:

> Gloves, rubber or vinyl, household type, (2 pair)

> Clean absorbent rags (4)

> Absorbent paper towels (15)

> Disposable bag marked "Contaminated" size 23"x10"x39", minimum thickness 1.5 mils.

> Clear plastic bag 13"x10"x39", minimum thickness 1.5 mils.

> Bottle of "hospital disinfectant" (containing quaternary ammonium chlorides in at least 0.8% dilution), or a bottle of household bleach such as "Clorox" or "Purex" (5.25 % sodium hypochlorite).

#### b. Selection of Disinfectants

Dilute solutions of sodium hypochlorite are reported extremely effective against both HIV and the Hepatitis B virus and therefore have been recommended for use in environmental decontamination procedures. Quaternary ammonium compounds are less effective against Hepatitis B.  Chlorine in solution inactivates virus quickly and efficiently but must reach the virus particles to do so.

Proteinaceous materials may interfere with the ability of the appropriate disinfectant solution to reach the virus particles.  Since quaternary disinfecting compounds may act as a detergent as well as a disinfectant, their use may help in the cleaning and removal of proteinaceous materials from surfaces.

---

GEO-MEN 00062948

**APP. 180**

A facility may use one of these compounds to help clean the surface, and then follow with the use of chlorine solution for final disinfection. Using one disinfectant compound rather than two would keep the procedure as simple as possible. By following routine medical cleaning procedures, most blood or fluids would be removed from the surface before application of the disinfectant, so the use of sodium hypochlorite solution shall be sufficient.

**c. Selection of Gloves**

Household or industrial rubber gloves have been recommended for use rather than surgical rubber gloves. Surgical gloves are somewhat porous and are less resistant to mechanical damage and punctures during clean-up procedures.

**d. Assignment of Cleaning Duties to Detainees in Medical Facilities**

Detainee workers may be assigned duties cleaning the medical facility. Detainees are permitted to clean floors, walls, and to remove trash, but are not permitted to clean medical equipment.

**e. Instructions for Use of Clean-Up Kit**

1. Open the bag and remove the supplies.

2. Depending on the type of disinfectant in the kit, take out bottle of "hospital disinfectant", or prepare a dilute solution of sodium hypochlorite. To prepare a 1:10 dilution of 5.25% sodium hypochlorite, mix 1 part of 5.25 % sodium hypochlorite (common household bleach) with 10 parts water.

3. Open the large clear plastic bag and the large bag marked "Contaminated". Place them next to each other.

4. Put on one pair of gloves.

5. Use paper towels to absorb as much of the fluid as possible; then place paper towels in the large clear plastic bag.

6. Pour the solution carefully onto the spill area. Dispose of the empty bottle in the large, clear plastic bag. Leave disinfectant in place for 15 minutes.

7. Use the rags to clean the area, and place rags in the large clear plastic bag.

8. Tie off the clear plastic bag and place it inside the large plastic bag marked "Contaminated."

9. Remove gloves carefully and place them in the plastic bag marked "Contaminated."

10. Put on the second pair of gloves and tie the "Contaminated" trash bag closed.

11. Dispose of the "Contaminated" trash bag properly in a contaminated-waste receptacle.

12. Dispose of the second pair of gloves in the contaminated-waste

---

GEO-MEN 00062949

receptacle.

13. Wash your hands.

14. Prepare a new clean-up kit.

NOTE:  Do not place linen or non-disposable articles in the "Contaminated" trash bag.

### 3.  Hazardous and Infectious Waste Disposal

Infectious and hazardous waste generated at a medical facility shall be stored and disposed of safely and in accordance with all applicable federal and state regulations.

For identified wastes that represent sufficient risk of causing infection or injury during handling and disposal, the following precautions shall be applied.

#### a.  Definitions

Hazardous or infectious waste is defined as: microbiology laboratory waste; human blood and blood products; sharps (as defined in Section VIII, A above); laboratory and other chemicals; or certain drugs such as antineoplastic.

Miscellaneous biomedical waste is defined as waste materials that are not specifically defined as infectious waste.  Such waste includes bandages, dressings, casts, catheters, and disposable pads.

Waste from detainees in isolation is not considered to be infectious waste unless it falls within the specific definition of infectious waste as stated above.

#### b.  Collection and Storage

Infectious waste must be separated from the general waste stream and clearly labeled as infectious:

- Infectious waste shall be double-bagged and tied and labeled "Infectious Waste."

- The bags used must be impermeable, commercially supplied red bags intended specifically for biohazardous waste storage.

- Miscellaneous biomedical waste shall be double-bagged and tied but need not be labeled as infectious.

#### c.  Treatment and Disposal

Blood products and designated body fluids shall be poured slowly and carefully down a toilet to prevent splash.  Compacting of untreated infectious waste is prohibited.  The waste disposal contractor must meet all state or and local requirements for transportation and disposal.

## IX. – <u>BARBER OPERATIONS</u>

Sanitation in barber operations is of the utmost concern because of the possible transfer of

GEO-MEN 00062950

**APP. 182**

diseases through direct contact or by towels, combs and clippers.  Towels shall not be reused by other detainees until sanitized. Instruments such as combs and clippers shall not be used successively on detainees without proper cleaning and disinfecting.

1. For sanitation reasons, it is preferable that barbering operations be located in a room that is not used for any other purpose.  The floors, walls, and ceilings should be smooth, nonabsorbent and easily cleaned. There should be sufficient light, and the room shall be supplied with hot and cold running water.

2. Each barbershop should have all equipment and facilities necessary for maintaining sanitary procedures for hair care, including covered metal containers for waste, disinfectants, dispensable headrest covers, laundered towels, and haircloths.

3. After each detainee visit, all hair care tools that came in contact with the detainee shall be cleaned and effectively disinfected.  Ultraviolet lights are not appropriate for sterilization but may be used for maintaining tools that have already been properly sterilized.

4. Detailed hair care sanitation regulations shall be conspicuously posted in each barbershop for the use of all hair care personnel and detainees.  Cotton pads, absorbent cotton and other single or dispensable toilet articles may not be reused, and shall be placed in a proper waste receptacle immediately after use. The common use of brushes, neck duster, shaving mugs and shaving brushes is prohibited.

5. Barbers or beauticians shall not provide service to  any detainee when the skin of the detainee's face, neck, or scalp is inflamed, or when there is scaling, pus, or other skin eruptions, unless service of such detainee is performed in accordance with the specific authorization of the Chief Medical Officer.  No person who is infested with head lice shall be served.

**Standard Approved:**

**James T. Hayes, Jr. /s/**                              **12/5/2008**

_____            _____

**James T. Hayes, Jr.**                                              **Date**
**Director**
**Office of Detention and Removal Operations**

GEO-MEN 00062951

**APP. 183**

**TABLE A**

**Common Flammable, Toxic, and Caustic Substances**

<table>
<tr><td>

**Class I Liquids**

Gasoline
Benzene (Petroleum ether)
Acetine
Hexane
Lacquer
Lacquer thinner
Denatured alcohol
Ethyl alcohol
Xylene (Xylol)
Contact cement (flammable)
Toudi (Toluene)
Methyl ethyl ether
Methyl ethyl ketone
Naphtha Y, M, and P

</td><td>

**Toxic Substances**

Ammonia
Chlorine
Antifreeze
Duplicating fluid
Methyl alcohol
Defoliants
Herbicides
Pesticides

</td></tr>
<tr><td>

**Class II Liquids**

Diesel fuel
Motor fuel
Kerosene
Cleaning solvents
Mineral spirits
Agitene

</td><td>

**Caustic Substances**

Lye
Muriatic acid
Caustic soda
Sulfuric acid
Tannic acid

</td></tr>
<tr><td>

**Class III Liquids**

Paint (oil base)
Linseed oil
Mineral oil
Neat's-foot oil
Sunray conditioner
Guardian fluid

</td><td></td></tr>
</table>

---

*Environmental Health and Safety*                    21

GEO-MEN 00062952

**APP. 184**

## ICE/DRO DETENTION STANDARD

### SPECIAL MANAGEMENT UNITS

**I. PURPOSE AND SCOPE. This Detention Standard protects detainees, staff, contractors, volunteers, and the community from harm by segregating certain detainees from the general population in Special Management Units (SMUs) with an Administrative Segregation section for detainees segregated for administrative reasons and a Disciplinary Segregation section for detainees segregated for disciplinary reasons.**

It applies to the following types of facilities housing DRO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by DRO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

***Procedures in italics are specifically required for SPCs and CDFs.*** IGSAs must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Some terms used in this document may be defined in the separate **Definitions** Standard.

**II. EXPECTED OUTCOMES.** The expected outcomes of this Detention Standard are:

1. Each facility will have Special Management Units with an Administrative Segregation section for detainees segregated from the general population for administrative reasons and a Disciplinary Segregation section for detainees segregated from the general population for disciplinary reasons.

2. Detainees housed in the general population, staff, contractors, volunteers, and the local community will be protected from harm by the segregation of certain detainees in SMUs.

3. Any detainee who represents an immediate, significant threat to safety, security or good order will be immediately controlled by staff and, for cause and with supervisory approval, placed in Administrative Segregation.

4. Health care personnel will be immediately informed when a detainee is admitted to an SMU to provide assessment and review as indicated by health care authority protocols.

5. A detainee will be placed in "protective custody" status in Administrative Segregation only when there is documentation that it is warranted and that no reasonable alternatives are available.

---

GEO-MEN 00063088

**APP. 185**

6. A detainee will be placed in Disciplinary Segregation only after a finding by a Disciplinary Hearing Panel that the detainee is guilty of a prohibited act or rule violation classified at a "Greatest", "High", or "High-Moderate" level, as defined in the Detention Standard on Disciplinary System, Attachment A: Prohibited Acts and Sanctions.

7. The status of detainees in Special Management Units will be reviewed in accordance with required time schedules by supervisory staff and the results of those reviews will be documented.

8. A detainee will remain in Disciplinary Segregation for no more than 60 days for violations associated with a single incident, and his or her status will be reviewed after the first 30 days, and each 30 days thereafter by the facility administrator and the Field Office Director to determine if continued detention in Disciplinary Segregation is still warranted.

9. Detainees in SMUs will be afforded basic living conditions that approximate those provided to the general population, consistent with the safety and security considerations that are inherent in more controlled housing, and in consideration of the purpose for which each detainee is segregated.

10. In general, when a detainee in an SMU is deprived of any usually authorized items or activity, a report of the action is forwarded to the facility administrator for notice and review.

11. Detainees in SMUs will have regular access to supervisory, management, program, and health care staff.

12. Each detainee in an SMU will be offered a minimum of one hour of recreation per day, five days a week, unless documented security or safety considerations dictate otherwise.

13. Detainees in SMUs will be able to write and receive mail and correspondence as they would otherwise be able to do while detained within the general population.

14. Detainees in SMUs will be provided opportunities for general visitation, including legal visitation, unless there are substantial, documented reasons for withholding those privileges.

15. Detainees in SMUs will have access to personal legal materials, law library materials, and legal visits, in accordance with provisions in this Detention Standard.

16. Detainees in SMUs will have access to telephones, in accordance with provisions in this Detention Standard.

17. Detainees in SMUs will have access to programs and services such as commissary, library, religious guidance, and recreation, in accordance with provisions in this Detention Standard.

18. Detailed records will be maintained on the circumstances related to a detainee's confinement to the SMU, through required permanent SMU logs and individual detainee records.

19. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

---

GEO-MEN 00063089

**APP. 186**

**III. DIRECTIVES AFFECTED.** This Detention Standard replaces **Special Management Unit (Administrative Segregation)** and **Special Management Unit (Disciplinary Segregation)**, both dated 9/20/2000.

**IV. REFERENCES**

American Correctional Association 4th Edition Standards for Adult Local Detention Facilities: 4-ALDF-2A-44 through 2A-66.

ICE/DRO Detention Standards on:

> **Correspondence and Other Mail**
> **Disciplinary System**
> **Facility Security and Control**
> **Law Libraries and Legal Material**
> **Personal Hygiene**
> **Recreation**
> **Searches of Detainees, particularly the section on Close Observation in a "Dry Cell"**
> **Staff-Detainee Communication**
> **Telephone Access**
> **Visitation**
> **Hold Rooms in Detention Facilities**
> **Suicide Prevention and Intervention**

**V. EXPECTED PRACTICES**

**A. Overview**

At times, a detainee must be isolated from the general population of ICE detainees for the protection of the detainee, other detainees, and facility staff. Such isolation is generically termed "segregation" and takes two different forms, depending on its intended purpose:

1. **Administrative Segregation** (also referred to as "Administrative Detention" by the Federal Bureau of Prisons), and

2. **Disciplinary Segregation** (also referred to as "Disciplinary Detention" by the ACA Standards).

DRO refers to each of these types of segregated housing as a "Special Management Unit," and in many detention facilities, there is one SMU that has two sections, one for each type of segregation. While many of the standards, requirements, and basic operational procedures are the same for both SMU types, some distinct differences remain and are detailed below under **Basic Requirements for All Special Management Units**.

A detainee may be placed in **Disciplinary Segregation** only after being found guilty, through a formal disciplinary process, of a facility rule violation. Therefore, detainees in **Disciplinary Segregation** generally have fewer privileges than those in non-punitive **Administrative Segregation**. In particular, they are subject to more stringent controls,

---

*Special Management Units*    3    *December 2, 2008*

GEO-MEN 00063090

**APP. 187**

for example, in regard to personal property and reading material. Additional limitations may also be imposed upon their television viewing, commissary/vending machine privileges, etc. Detainees in Administrative Segregation generally will be housed separately from those in Disciplinary Segregation

Because of that basic difference, the procedures for placing a detainee in **Administrative Segregation** are different than those for **Disciplinary Segregation**, as are the requirements for periodic review of each detainee, as detailed below.

### B. Basic Requirements for All Special Management Units

Conditions of confinement are based on the amount of supervision required to control a detainee and safeguard the detainee, other detainees, and facility staff. Therefore, the standard SMU living conditions specified below may not be modified for either disciplinary or punitive purposes. Staff shall treat each detainee in an SMU in a decent and humane manner, regardless of the purpose for which the detainee is segregated.

In every instance, any exceptions to these requirements shall be:

- Made only for the purpose of ensuring detainee and facility staff safety and security (i.e., not for purposes of punishment);

- Approved by a security supervisor (or higher official);

- On a temporary and situational basis, continued only for as long as it is justified by threat to the safety or security of the facility, its staff, or detainee population; and

- Documented in the unit log and, under circumstances specified later in this Detention Standard, documented in a memo which shall be placed in the individual detainee's detention file.

When a detainee in an SMU is deprived of any usual authorized items or activity, a report of the action shall be forwarded to the facility administrator. This report shall be made part of the detainee's facility record or disciplinary file.

1. **Control of Contraband and Tools.** In accordance with procedures detailed in the Detention Standard on **Facility Security and Control**, each facility administrator is required to establish written policy and procedures to control and secure SMU entrances, contraband, tools, and food carts.

2. **Permanent Special Management Unit Logs.** The facility administrator shall ensure that permanent housing logs are maintained in SMUs to record specified data on detainees upon admission to and release from the unit. These logs shall also be used by supervisory staff and other officials to record their visits to the unit**.**

3. **Cell Occupancy.** Ordinarily, the number of detainees confined to each cell or room may not exceed the capacity for which it was designed. Under exigent circumstances, before approving any additional cell occupancy on a temporary basis, the facility administrator shall consult with HQ DRO's Detention Management Division, who shall consult with DHS/ICE legal counsel. If a decision is made to approve such additional cell occupancy, a report of the action should be filed with the facility and with the ICE Field Office Director.

---

GEO-MEN 00063091

**APP. 188**

**4. Cell Condition.** Cells and rooms used for purposes of segregation must be well ventilated, adequately lit, appropriately heated and maintained in a sanitary condition at all times.

> a. All cells must be equipped with beds that are securely fastened to the cell floor or wall.

> b. Conditions for close observation in a "dry cell" without water are detailed in the Detention Standard on **Searches of Detainees**.

**5. Personal Property.** Each facility shall issue guidelines in accordance with this Standard concerning the property detainees may retain in each type of segregation. Generally, detainees in **Disciplinary Segregation** shall be subject to more stringent personal property restrictions and control than those in **Administrative Segregation**, given the non-punitive nature of Administrative Segregation.

**6. Privileges.** Each facility shall issue guidelines in accordance with this Standard concerning the privileges detainees may have in each type of segregation.

> a. **Administrative Segregation** -- Generally, these detainees shall receive the same privileges as are available to detainees in the general population, depending on any safety and security considerations for detainees, facility staff and security. When space and resources are available, detainees in **Administrative Segregation** may be provided opportunities to spend time outside their cells (in addition to the required recreation periods), for such activities as socializing, watching TV, and playing board games and may be assigned to work details (for example, as orderlies in the SMU).

> b. **Disciplinary Segregation** -- Generally, these detainees shall have fewer privileges than other detainees in either the general population or in Administrative Segregation. More specifically, they are subject to more stringent personal property control including, but not limited to, limitations on their reading material and television viewing (which may be completely terminated), and restricted commissary or vending machine purchases.

**7. Close Supervision.** Detainees in SMUs shall be personally observed at least every 30 minutes on an irregular schedule. For cases that warrant increased observation, the SMU personnel will personally observe them accordingly. (See also **Suicide Prevention** and **Searches of Detainees**, section on dry cells.)

**8. Supervisory and Staff Visits.** In addition to the direct supervision performed by unit staff:

a. The shift supervisor shall see each segregated detainee daily, including weekends and holidays.

b. The facility administrator (or designee) shall visit each SMU daily.

c. Program staff may visit a detainee upon his or her request.

d. Field Office staff shall visit a detainee in accordance with the Detention Standard on **Staff-Detainee Communications**.

The facility administrator may require other staff to visit each detainee daily.

**9. Health Care.** A health care provider shall visit every detainee in an SMU at least

GEO-MEN 00063092

**APP. 189**

once daily.  Detainees shall be provided medications as prescribed for them.  Detainees will have access to regularly scheduled sick call regardless of housing assignment.

Any action taken shall be documented in a separate logbook, and the medical visit shall be recorded on the SMU Housing Record (Form I-888) or equivalent form.  A detainee's mental health status shall be reviewed and documented at least once every 30 days.

**10. Meals.** Detainees in SMUs shall be provided three nutritionally adequate meals per day, according to the general population meal schedule and ordinarily from the same menu; however, for reasons of safety and security, detainees in SMUs shall eat with disposable utensils.

**11. Clothing and Personal Hygiene.** In accordance with the Detention Standard on **Personal Hygiene**, detainees in SMUs may shave and shower at least three times weekly and receive other basic services such as laundry, hair care, barbering, clothing, bedding, and linen equivalent to general population detainees and consistent with safety and security of the facility.

a.  As needed, staff shall provide toilet tissue, a wash basin, tooth brush, and shaving utensils, and may issue retrievable kits of toilet articles.

b.  A detainee may be denied such items as clothing, mattress, bedding, linens, or pillow for medical or mental health reasons if his or her possession of such items raises concerns for detainee safety and/or facility security.  All denials of such items shall be documented.  If a detainee is so disturbed that he or she is likely to destroy clothing or bedding or create a disturbance by risking harm to self or others, the medical department shall be notified immediately and a regimen of treatment and control shall be instituted by the medical staff, as necessary.  Extreme detainee behavior, such as destroying clothing or bedding or harmful behavior to self or others, must be documented, made part of the detainee's file with the facility and reported to the ICE Field Office Director to implement necessary efforts to protect and care for the detainee.

**12. Correspondence.** In accordance with the Detention Standard on **Correspondence and Other Mail**, detainees in an SMU may write and receive letters and other correspondence like those housed in the facility's general population.

**13.  Visitation.** In accordance with the Detention Standard on **Visitation**, while in an SMU, a detainee ordinarily retains visiting privileges.

In a facility that allows contact visits, segregated detainees may ordinarily use the visiting room during normal visiting hours.  However, the facility may restrict or disallow general visits for a detainee who violates visitation rules or whose behavior otherwise indicates the detainee would be a threat to the security or the good order of the visiting room.

a. General visitation may be restricted or disallowed when a detainee in **Administrative Segregation** is charged with, or has been found to have committed, a prohibited act related to visiting privileges or has otherwise acted in a way that would reasonably indicate that he or she would be a threat to the orderliness or security of the visiting room.

b.  Under no circumstances may detainees participate in general visitation while in

GEO-MEN 00063093

**APP. 190**

restraints.  If the detainee's behavior warrants restraints, the visit may not be granted under general population visiting conditions.

*In SPCs and CDFs, detainees in protective custody and violent and disruptive detainees shall not use the visitation room during normal visitation hours.  Violent and disruptive detainees may be limited to non-contact visits.  In extreme cases, where a visit would present an unreasonable security risk, even non-contact general visits may be disallowed for a particular detainee.*

**14.  Legal Visits.** In accordance with the Detention Standard on **Visitation**, detainees in SMUs may not be denied legal visitation.  However, the facility administrator, or designee, may implement whatever security precautions are necessary to protect the detainee and visitors and maintain good order.  In such cases, staff shall advise legal service providers and assistants of any security concerns prior to their visits.

**15.  Religious Guidance.** Detainees in SMUs shall be allowed visits by members of the clergy, upon request, unless the supervisor determines such a visit presents a safety or security risk, or would interfere with the orderly operation of the facility.  Violent and uncooperative detainees may be temporarily denied access to religious guidance.  Staff shall advise the clergy member of the detainee's present state of behavior before he or she agrees to visit the detainee. Each facility will develop procedures to allow detainees to retain religious items within their possession consistent with good security practices (e.g., religious wearing apparel, religious headwear, prayer rugs, beads, prayer rocks, medallions).

**16.  Reading Materials (Non-Legal).** Detainees in SMUs shall have access to reading materials, including religious materials.  The Recreation Specialist shall offer each detainee soft-bound, reading materials of this type on a rotating basis

**17. Legal Materials.** Detainees in SMUs shall have access to legal materials, in accordance with the Detention Standard on **Law Libraries and Legal Material**.

Detainees may retain a reasonable amount of personal legal material upon admittance to an SMU, provided such material does not create a safety, security or sanitation hazard.

Detainees with a large amount of legal material may be required to place a portion with their stored personal property, with access permitted during scheduled hours.  Requests for access to such legal material shall be accommodated as soon as possible, but in no case more than 24 hours after receipt of the initial detainee request to retrieve documents, except for documented security reasons.

**18.  Law Library Access.** In accordance with the Detention Standard on **Law Libraries and Legal Material**, detainees housed in **Administrative Segregation** or **Disciplinary Segregation** units shall have the same law library access as the general population, unless compelling security concerns require limitations.

a.  Facilities may supervise the library use by a detainee housed in an SMU as warranted by the individual's behavior.  Detainees segregated for protection must be provided access to legal materials.  Such detainees may be required to use the law library separately or, if that is not feasible, legal materials must be brought to them upon request

---

GEO-MEN 00063094

**APP. 191**

b.  Violent or uncooperative detainees may be temporarily denied access to the law library if necessary to maintain security, until such time as their behavior warrants resumed access.  In some circumstances, legal material may be brought to individuals in **Disciplinary Segregation**.

c.  Denial of access to the law library must be:

- Supported by compelling security concerns;

- For the shortest period required for security; and

- Fully documented in the SMU housing logbook.

d.  The facility administrator shall notify ICE/DRO every time access is denied, with documentation placed in the detention file.

**19.  Recreation.**  Recreation for detainees housed in the SMU shall be separate from the general population.  As necessary or advisable to prevent assaults and reduce management problems, recreation for some individuals will be alone and separate from all other detainees.

a.  The facility administrator shall develop and implement procedures to ensure that detainees who must be kept apart never participate in activities in the same location at the same time as detainees housed in the general population.  For example, recreation for detainees in protective custody shall be separate from other detainees.

Nevertheless, detainees in the SMU shall be offered at least one hour of recreation per day, scheduled at a reasonable time, at least five days per week.  Where cover is not provided to mitigate inclement weather, detainees shall be provided weather-appropriate equipment and attire.

b.  The recreation privilege shall be denied or suspended only if the detainee's recreational activity would unreasonably endanger detainee safety or security. The case of a detainee denied recreation privileges shall be reviewed at least once each week, as part of the reviews required for all detainees in SMU status.

- As part of this process, the reviewer shall document whether the detainee continues to pose a threat to self, others, or facility security and, if so, why.

- The facility shall notify ICE/DRO when a detainee's denied recreation privileges exceeds 7 days.

- Such a denial of recreation privileges (for more than 7 days) requires the concurrence of the facility administrator and a health care professional.  It is expected that such denials shall rarely occur, and only in extreme circumstances.

c.  Ordinarily, a detainee may be denied recreation privileges only with the facility administrator's written authorization, documenting why the detainee poses an unreasonable risk even when recreating alone.  When necessary to control an immediate situation for reasons of safety and security, SMU staff may deny an instance of recreation, upon verbal approval from the shift supervisor, and document the reasons for that denial in the unit logbook(s).  In such a case, the supervisor may also require additional written documentation from the SMU staff for the facility administrator.  When a detainee in an SMU is deprived of recreation (or any other usually authorized items or

GEO-MEN 00063095

**APP. 192**

activity), a report of the action shall be forwarded to the facility administrator.

Examples of such circumstances may include, but are not limited to:

1.  A detainee segregated for specific administrative purposes,

2.  A detainee in protective custody, or

3.  A detainee whose mental and/or physical condition requires special handling and treatment by staff (for example, detainees who are drug or alcohol addicts or abusers, emotionally disturbed, mentally retarded, mentally ill, suicidal, disabled, or infirm).

d.  A detainee in **Disciplinary Segregation** may temporarily lose recreation privileges upon a disciplinary panel's written determination that he or she poses an unreasonable risk to the facility, him/herself, or others.

When his or her recreation privileges are suspended, the disciplinary panel or facility administrator shall provide the detainee with written notification, the reason(s) for the suspension, the duration of the suspension, and any conditions that must be met before the restoration of his or her privileges provided the requisite conditions are met.

**20. Telephone Access.**  As detailed in the Detention Standard on **Telephone Access**, detainees in SMUs shall have access to telephones in a manner that is consistent with the special safety and security requirements of such units.  Telephone access for legal calls will be provided,  including calls to attorneys, other legal representatives, courts, government offices (including the Office of the Inspector General, Office for Civil rights, and Civil Liberties, DHS Joint Intake Center, and DHS Office of Internal Audit), and embassies or consulates, according to the facility schedule.  Any denial of telephone access will be documented.

In general, any detainee in an SMU may be reasonably restricted from using or having access to a phone if that access is used for criminal purposes or would endanger any person, or if the detainee damages the equipment provided.  In such instances, staff must clearly document why such restrictions are necessary to preserve the safety, security, and good order of the facility.

**a. Administrative Segregation**

Ordinarily, staff shall permit detainees in Administrative Segregation to have telephone access similar to detainees in the general population, but in a manner consistent with the special security and safety requirements of detainees in these units.  This requirement applies to a detainee in Administrative Segregation pending a hearing because he or she has been charged with a rule violation, as well as a detainee in Administrative Segregation for other than disciplinary reasons (for example, protective custody, suicide risk, etc.).

**b. Disciplinary Segregation**

Detainees in Disciplinary Segregation may be restricted from using telephones to make general calls as part of the disciplinary process; however, even in Disciplinary Segregation, detainees shall have some telephone access for special purposes.

GEO-MEN 00063096

**APP. 193**

Ordinarily, staff shall permit detainees in Disciplinary Segregation to make direct or free Consular and legal calls as described in the Detention Standard on **Telephone Access**, except for compelling and documented reasons of safety, security, and good order.

### 21. Translation/Interpretation Services

Detainees will be provided translation or interpretation services while in the Special Management Unit to assist with their understanding of conditions of confinement as well as their rights and responsibilities.

### 22. Special Needs

Detainees in the SMU will be provided appropriate accommodations and professional assistance such as medical, therapeutic, or mental health treatment for special needs, as necessary.

### C. Placement in Administrative Segregation

Administrative Segregation status is a non-punitive status in which restricted conditions of confinement are required only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility. For matters of safety and security, staff may have to take immediate action to control a detainee, including placement in Administrative Segregation. Examples include detainees who require protective custody, who cannot be placed in the local population because they are en route to another facility ("holdovers"), who are awaiting a disciplinary hearing, or who require separation for medical reasons.

Each facility shall develop and follow written procedures governing the management of its Administrative Segregation unit that are consistent with this Detention Standard. These procedures must document detailed reasons for placement of an individual in Administrative Segregation. Detainees must be provided with a copy of the Administrative Segregation Order.

Prior to the detainee's placement in Administrative Segregation, the facility administrator and security supervisor, or equivalent, shall review the case to determine whether Administrative Segregation is, in fact, warranted. The facility administrator may delegate to the security supervisor the authority to place a detainee in Administrative Segregation.

**1. Reasons for Placement in Administrative Segregation.** A detainee may be placed in Administrative Segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees, for the secure and orderly operation of the facility, for medical reasons, or other circumstances as set forth below. Some examples of incidents warranting a detainee's assignment to Administrative Segregation include, but are not limited to, the following:

(a) A detainee is awaiting an investigation or a hearing for a violation of facility rules. Pre-disciplinary hearing detention should be ordered only as necessary to prevent further violation of those rules or to protect the security and orderly operation of the facility. It is not to be used as a punitive measure.

Time served in pre-hearing detention may be deducted from any time ordered by the

GEO-MEN 00063097

**APP. 194**

Institutional Disciplinary Panel (IDP).

(b) A detainee is a threat to the security of the facility. The facility administrator may determine that a detainee's criminal record, past behavior at other institutions, behavior while in ICE/DRO detention, or other evidence is sufficient to warrant placement of the detainee in Administrative Segregation. Copies of records supporting this action shall be attached to the Administrative Segregation Order.

(c) A detainee requires protection. Protective Custody may be initiated at the detainee's request or by whoever first ordered his or her segregation to protect the detainee from harm. Each facility will develop procedures to consider continued placement in protective custody as well as provisions for release from protective custody when appropriate. Frequently, the types of detainees who require this type of treatment include, but are not limited to:

▪ Victims of detainee assaults;

▪ Detainee informants or witnesses - detainees who provide information to institutional staff or any law enforcement agency concerning improper or criminal activities by others;

▪ Sexual predators;

▪ Detainees who have been pressured by other detainees to participate in sexual activity;

▪ Detainees who request Protective Custody;

▪ Detainees who refuse to enter the general population because of alleged intimidation from other detainees;

▪ Detainees who refuse to return to the general population, but who do not provide the reason for refusal;

▪ Detainees who appear to be in danger of bodily harm; or

▪ Detainees who seek protection, claiming to be former law enforcement officers or to have held sensitive law enforcement positions, whether or not there is official information to verify the claim.

(d) The IDP may order a detainee into Administrative Segregation following Disciplinary Segregation after determining that releasing the detainee into the general population would pose a threat to the security and orderly operation of the facility. A detainee transferred from Disciplinary Segregation to Administrative Segregation shall enjoy the same privileges as all other detainees in Administrative Segregation.

(e) A medical professional who ordered a detainee removed from the general population shall complete and sign an Administrative Segregation Order (see below), unless the detainee is to stay in the medical department's isolation ward.

(f) A detainee is scheduled for release, removal, or transfer within 24 hours. Such segregation may be ordered for security reasons or for the orderly operation of the facility.

**2. Administrative Segregation Order.** A written order shall be completed and approved by a security supervisor before a detainee is placed in Administrative

---

GEO-MEN 00063098

**APP. 195**

Segregation, except when exigent circumstances make this impracticable. In such cases, an order shall be prepared as soon as possible. A copy of the order shall be given to the detainee within 24 hours, unless delivery would jeopardize the safety, security, or orderly operation of the facility.

a. The facility administrator or designee shall complete the Administrative Segregation Order (Form I-885 or equivalent), detailing the reasons for placing a detainee in Administrative Segregation, before his or her actual placement.

b. An Administrative Segregation Order is not required for a detainee awaiting removal, release, or transfer within 24 hours of its service.

c. In an emergency, the detainee's placement in Administrative Segregation may precede the paperwork, which the facility administrator shall prepare as soon as possible after the detainee's placement.

d. All memoranda, medical reports, and other relevant documents shall be attached to the Administrative Segregation Order.

e. A copy of the completed Administrative Segregation Order shall be given to the detainee within 24 hours of placement in Administrative Segregation, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

f. The order shall remain on file with the SMU until the detainee is returned to the general population.

g. When the detainee is released from the SMU, the releasing officer shall indicate date and time of release on the Administrative Segregation Order. The completed order is then forwarded to the chief of security for inclusion into the detainee's detention file.

h. If the segregation is ordered for protective custody purposes, the order shall state whether the detainee requested the segregation, and whether the detainee requests a hearing concerning the segregation.

**3. Review of Detainee Status in Administrative Segregation.** All facilities shall implement written procedures for the regular review of all detainees held in Administrative Segregation, consistent with the procedures specified below.

a. A security supervisor shall conduct a review within 72 hours of the detainee's placement in Administrative Segregation to determine whether segregation is still warranted. The review shall include an interview with the detainee. A written record shall be made of the decision and the justification. The **Administrative Segregation Review** (Form I-885) shall be used for the review. If the detainee has been segregated for his or her own protection, but **not** at the detainee's request, the signature of the facility administrator or assistant facility administrator is required on the Form I-885 to authorize the alien's continued detention.

b. A security supervisor shall conduct the same type of review after the detainee has spent seven days in Administrative Segregation, and every week thereafter, for the first 60 days and (at least) every 30 days thereafter.

c. The review shall include an interview with the detainee, and a written record shall be made of the decision and its justification.

d. When the reviewing authority concludes that the detainee should be removed from

GEO-MEN 00063099

**APP. 196**

Administrative Segregation, they shall submit that recommendation to the facility administrator (or designee) for approval.

e.   A copy of the decision and justification for each review shall be given to the detainee, unless, in exceptional circumstances, this provision would jeopardize the facility's security.  The detainee shall also be given an opportunity to appeal a review decision to a higher authority within the facility.

f.   After seven consecutive days in Administrative Segregation, the detainee may exercise the right to appeal the conclusions and recommendations of any review conducted to the facility administrator.  The detainee may use any standard form of written communication, for example, detainee request, to file the appeal.

g.   If a detainee has been in Administrative Segregation for more than 30 days and objects to that status, the facility administrator shall review the case to determine whether that status should continue.  This review shall take into account the detainee's views and shall result in a written record of the decision and its justification.  A similar review shall take place every 30 days and each 30 days thereafter.

h.   When a detainee has been held in Administrative Segregation for **more than 30 days**, the facility administrator shall notify the Field Office Director (FOD), who shall notify the ICE/DRO Assistant Director, Detention Management Division in writing.

i.   When a detainee is held in Administrative Segregation for **more than 60 days**, the FOD shall notify in writing, the Deputy Assistant Director, Detention Management Division.  The Deputy Assistant Director shall then consider whether it would be appropriate to transfer the detainee to a facility where s/he may be placed in the general population.

### D.  Placement in Disciplinary Segregation.

To provide detainees in the general population a safe and orderly living environment, facility authorities shall discipline anyone whose behavior does not comply with facility rules and regulations.  Such discipline may involve temporary confinement in the SMU apart from the general population.   A detainee may be placed in Disciplinary Segregation only by order of the Institutional Disciplinary Panel (IDP), or its equivalent, after a hearing in which the detainee has been found to have committed a prohibited act.   Ultimately, the IDP may order the detainee's placement into Disciplinary Segregation, but only when alternative dispositions would inadequately regulate the detainee's behavior.

GEO-MEN 00063100

**APP. 197**

**1.  Duration.** A maximum sanction of 60 days in Disciplinary Segregation shall apply to violations related to a single prohibited incident.  After the first 30 days, and each 30 days thereafter, the facility administrator shall send a written justification to the FOD, who may decide to transfer the detainee to a facility where security is such that he or she could be placed in the general population.

**2.  Disciplinary Segregation Order.** A written order shall be completed and signed by the chair of the IDP (or disciplinary hearing officer) before a detainee is placed into Disciplinary Segregation.  A copy of the order shall be given to the detainee within 24 hours, unless delivery would jeopardize the safety, security, or the orderly operation of the facility or the safety of another detainee.

a.  The IDP chairman shall prepare the **Disciplinary Segregation Order** (Form I-883 or equivalent), detailing the reasons for placing a detainee in Disciplinary Segregation, before his or her actual placement.  All relevant documentation must be attached to the order.

b.  A copy of the completed Disciplinary Segregation Order shall be given to the detainee within 24 hours of placement in Disciplinary Segregation, unless delivery would jeopardize the safe, secure, or orderly operation of the facility. The order shall be maintained on file in the SMU until the detainee is released from the SMU.

When the detainee is released from the SMU, the releasing officer shall indicate date and time of release on the Disciplinary Segregation Order, then forward the completed order to the chief of security for insertion into the detainee's detention file.

**3.  Review of Detainee Status in Disciplinary Segregation.** All facilities shall implement written procedures for the regular review of all Disciplinary Segregation cases, consistent with the following procedures:

a.  A security supervisor, or the equivalent, shall interview the detainee and review his or her status in Disciplinary Segregation every seven days to determine whether the detainee:

▪   Abides by all rules and regulations; and,

▪   Is provided showers, meals, recreation, and other basic living standards, as required by this Detention Standard.

b.  The security supervisor shall document his or her findings after every review, by completing a **Disciplinary Segregation Review** (Form I-887).

▪   The security supervisor may recommend the detainee's early release from the SMU upon finding that time in Disciplinary Segregation is no longer necessary to regulate the detainee's behavior.

▪   An early-release recommendation must have the facility administrator's approval before the detainee may be returned to the general population.

▪   The security supervisor may shorten, but not extend, the original sanction.

▪   All review documents shall be placed in the detainee's detention file.

▪   At each formal review, the detainee shall be given a written copy of the reviewing officer's decision and the basis for his or her finding, unless it would result in a compromise of institutional security.  If for some reason it can not be delivered, then the

GEO-MEN 00063101

**APP. 198**

detainee should be advised of the decision orally and the detention file should be so noted and the reasons identified in writing as to why the notice could not be provided in writing.

### E.  Logs and Records

1.  **Permanent SMU Log.**  A permanent log shall be maintained in the SMU to record all activities concerning the SMU detainees, such as the meals served, recreational time, and visitors.

*In SPCs and CDFs, the SMU log shall record the detainee's name, A-number, housing location, date admitted, reasons for admission, tentative release date (for detainees in Disciplinary Segregation), the authorizing official, and date released.*

**2.  Visitor's Log.**  *In SPCs and CDFs, a separate log shall be maintained in the SMU of all persons visiting the unit.  This separate record shall include notation of:*

- *The time and date of the visit, and*

- *Any unusual activity or behavior of an individual detainee, with a follow-up memorandum sent through the facility administrator to the detainee's file.*

**3.  Individual Special Management Housing Unit Record.**  *In SPCs, **Special Management Housing Unit Record**, (Form I-888) shall be prepared immediately upon a detainee's placement in the SMU.  CDFs and IGSA facilities shall use the Form I-888 or comparable form for this purpose as well.*

*a. The special housing unit officer shall immediately record:*

- *Whether the detainee ate, showered, recreated, and took any medication; and*

- *Any additional information, such as whether the detainee has a medical condition, or has exhibited suicidal/assaultive behavior.*

- *The officer that conducts the activity will print his/her name and  sign the record.*

*b. The facility medical officer shall sign each individual's record when he or she visits a detainee in the SMU.  The housing officer shall initial the record after the medical visits are completed, but no later than the end of the shift.*

*c. A new Form I-888 must be created for each week the detainee is in the SMU. The completed weekly forms shall be retained at the SMU until the detainee is released from the SMU.*

*d. Upon a detainee's release from the SMU, the releasing officer shall attach the entire housing unit record related to that detainee to either the Administrative Segregation Order or Disciplinary Segregation Order and forward it to the chief of security for inclusion into the detainee's detention file.*

**Standard Approved:**

**James T. Hayes, Jr. /s/**                                    **12/5/2008**

_____          _____          _____

GEO-MEN 00063102

**APP. 199**

**James T. Hayes, Jr.**                                    **Date**
**Director**
**Office of Detention and Removal Operations**

GEO-MEN 00063103

**APP. 200**

## ICE/DRO DETENTION STANDARD

### DISCIPLINARY SYSTEM

**I.  PURPOSE AND SCOPE.  This Detention Standard promotes a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system, requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions to those who do not comply.**

It applies to the following types of facilities housing ICE/DRO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by DRO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

***Procedures in italics are specifically required for SPCs and CDFs***.  IGSAs must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Some terms used in this document may be defined in the separate **Definitions** Standard.

**II.  EXPECTED OUTCOMES.**  The expected outcomes of this Detention Standard are:

1.  Detainees will be informed of facility rules and regulations, prohibited acts, disciplinary sanctions that may be imposed, their rights in the disciplinary system and the procedure for appealing disciplinary findings.

2.  Each facility will have graduated severity scales of prohibited acts and disciplinary consequences.

3.  Where permitted by facility policy, staff will informally settle minor transgressions by mutual consent, whenever possible.

4.  Staff who witness a prohibited act that cannot or should not be resolved informally, or have reason to suspect that a detainee has engaged in a prohibited act, will prepare a clear, concise, and complete Incident Report.

5.  Each Incident Report will be objectively and impartially investigated and reported, ordinarily by a person of supervisory rank.

6.  When appropriate, a serious incident that may constitute a criminal act will be referred to the proper investigative agency, and the administrative investigation will be suspended, pending the outcome of that referral.

7.  At each step of the disciplinary and appeal process, the detainee will be advised of his or her rights in a language he or she understands, and translation or interpretation services will be provided as needed.

8.  A Unit Disciplinary Committee (UDC) will further investigate and adjudicate the incident and may impose minor sanctions or refer the matter to a higher level disciplinary panel.

---

GEO-MEN 00063138

**APP. 201**

9. An Institution Disciplinary Panel (IDP) will conduct formal hearings on Incident Reports referred from UDCs and may impose higher level sanctions for "Greatest" and "High" level prohibited acts.

10. Detainees before the IDP will be afforded a staff representative, upon request, or automatically if the detainee is illiterate, has limited English language skills or otherwise needs special assistance.

11. Actions of the IDP will be reviewed by the facility administrator, who may concur with the findings and sanctions or modify them.

12. At all steps in the disciplinary process, any sanctions imposed will be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

13. All steps of the disciplinary process will be done within the required time limits.

14. At all steps of the disciplinary process, accurate and complete records will be maintained. The detainee will receive copies of all reports, exhibits, and other documents considered or generated in the hearing process, except insofar as the disclosure of such documents may pose an imminent threat to the safety and security of the facility staff or other detainees, or if the document or other evidence is otherwise protected from disclosure.

15. If a detainee is found not guilty at any stage of the disciplinary process, the incident records will not be placed or retained in the detainee's file, even if they are retained elsewhere for statistical or historical purposes.

16. Detainees will be able to appeal disciplinary decisions through a formal grievance system. No detainee will be harassed, disciplined, punished or otherwise retaliated against for filing a complaint or grievance.

17. Detainees shall be afforded the following rights: the right to protection from abuse, the right to freedom from discrimination, the right to pursue a grievance, the right to correspond with persons or organizations and the right to due process.

18. The applicable content and procedures in this standard will be communicated to the detainee in a language or manner which the detainee can understand.

**III. DIRECTIVES AFFECTED.** This Detention Standard replaces **Disciplinary Policy** dated 9/20/2000.

**IV. REFERENCES**

American Correctional Association 4th Edition Standards for Adult Local Detention Facilities: 4-ALDF-3A-01, 3A-02, 6B-05, 6C-01 through 6C-19.

**V. EXPECTED PRACTICES**

**A. Guidelines**

1. Detainees will receive translation or interpretation services throughout the investigative, disciplinary, and appeal process, including accommodation for the hearing impaired.

---

GEO-MEN 00063139

**APP. 202**

2.  Each facility holding ICE/DRO detainees in custody shall have a detainee disciplinary system with progressive levels of reviews, appeals, procedures, and documentation procedures.  Written disciplinary policy and procedures shall clearly define detainee rights and responsibilities.  The policy, procedures and rules shall be reviewed at least annually.

3.  Disciplinary action may not be capricious or retaliatory nor based on race, religion, national origin, sex, sexual orientation, disability, or political beliefs.

4.  Staff may not impose or allow imposition of the following sanctions: corporal punishment; deprivation of food services to include use of Nutraloaf or "food loaf"; deprivation of clothing, bedding, or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal access and legal materials; or deprivation of physical exercise unless such activity creates a documented unsafe condition.

5.  The facility shall not hold a detainee accountable for his or her conduct if a medical authority finds him or her mentally incompetent.  For purposes of these standards, a mentally incompetent individual is defined as an individual who is unable to appreciate the difference between appropriate and inappropriate behavior, or between "right" and "wrong."  Such an individual is not capable of acting in accordance with those norms and therefore, cannot be held responsible for his or her "wrongful" actions.

Also, a person who cannot assist in his or her own defense because he or she lacks the ability to understand the nature of the disciplinary proceedings shall be considered incompetent.  Disciplinary proceedings against such a detainee shall be postponed until such time as the detainee is able to understand the nature of the disciplinary proceedings and to assist in his or her own defense.  If the detainee's mental status does not improve within a reasonable amount of time, the officer must find the detainee incompetent to assist in his or her own defense and note such finding on the Incident Report.

**B.  Notice to Detainees**

The Detainee Handbook, or supplement, issued to each detainee upon admittance, shall provide notice of the facility's rules of conduct and prohibited acts, the sanctions imposed for violations of the rules, the disciplinary severity scale, the disciplinary process and the procedure for appealing disciplinary findings.  Detainees shall have the following rights and shall receive notice of them in the Handbook:

- The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage, and harassment;

- The right of freedom from discrimination based on race, religion, national origin, sex, sexual orientation, handicap, or political beliefs;

- The right to pursue a grievance in accordance with procedures provided in the Handbook without fear of retaliation;

- The right to pursue a grievance in accordance with the Grievance System Detention Standard and procedures provided in the handbook.

---

GEO-MEN 00063140

**APP. 203**

- The right to correspond with persons or organizations, consistent with safety, security, and the orderly operation of the facility; and

- The right to due process, including the prompt resolution of a disciplinary matter.

Copies of the rules of conduct, rights, and disciplinary sanctions shall be provided to all detainees and posted in English, Spanish, and/or other languages spoken by significant numbers of detainees, as follows:

1. Disciplinary Severity Scale

2. Prohibited Acts

3. Sanctions

### C. Disciplinary Severity Scale and Prohibited Acts

All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.

*SPCs and CDFs shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section.*

*Prohibited acts are divided into four categories: Greatest, High, Moderate, and Low Moderate. The sanctions authorized for each category shall be imposed only if the detainee is found to have committed a prohibited act. (See Attachment A -- Prohibited Acts and Sanctions.)*

> ***Greatest offenses:*** *The IDP shall impose and execute at least one sanction in the A through E range. Additional sanctions (A through G) may be imposed and either executed or suspended, at the discretion of the panel. The IDP may impose and execute sanctions F and G only in conjunction with sanction A, B, C, D, and/or E.*

> ***High offenses:*** *The IDP shall impose and execute at least one sanction in the A through M range. Additional sanctions (A through M) may be imposed or may be suspended at the discretion of the panel.*

> ***High Moderate offenses:*** *The IDP shall impose at least one sanction in the A through M range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.*

> ***Low Moderate offenses:*** *The IDP shall impose at least one sanction in the E through M range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.*

### D. Incident Reports

Officers who witness a prohibited act or have reason to suspect one has been committed shall prepare and submit an Incident Report. All Incident Reports must state the facts clearly, precisely, and concisely, omitting no details that could prove significant. Reports also shall identify the officer(s), the detainee(s), and all witnesses to the incident.

GEO-MEN 00063141

**APP. 204**

ICE/DRO pre-approval is required for use of ICE Incident Report forms in CDFs and IGSA facilities.

*In SPCs and CDFs, minor transgressions shall be settled informally and by mutual consent whenever possible. If, however, the officer involved thinks an informal resolution is inappropriate or unattainable, he or she shall prepare an Incident Report and Notice of Charges and submit it to the appropriate supervisor before the end of the assigned shift.*

*The Incident Report shall cite the relevant rule or standard without quoting it in its entirety. (For example, for destruction of government property, the report would cite, briefly, "Code 218–Destroying Government Property and specify the exact manner in which the detainee is alleged to have violated the cited rule or standard including all relevant facts as to time, dates, and places.")*

*If the officer observes anything unusual in the detainee's behavior or demeanor, he or she shall so note in the report. The reporting officer shall also list all staff, contract officers or detainee witnesses to the incident, and the disposition of any physical evidence (weapons, property, etc.) relating to the incident. The reporting officer shall sign the report and include title, date and time the report was signed. The shift supervisor shall review all Incident Reports before going off duty.*

### E. Investigations

IGSAs shall have procedures in place to ensure that all Incident Reports are investigated within 24 hours of the incident.

The investigating officer shall have supervisory rank or higher (unless prevented by personnel shortages) and shall have had no prior involvement in the incident, either as witness or officer at the scene. If an officer below supervisory rank conducts the investigation, the shift supervisor shall review his or her report(s) for accuracy and completeness and sign them.

*In SPCs and CDFs, the officer designated to investigate the incident is responsible for completing the necessary interviews, collecting evidence, and submitting written reports.*

*The investigating officer shall:*

1. *Commence the investigation within 24 hours of receipt of the Incident Report.*

2. *Advise the detainee of the right to remain silent at every stage of the disciplinary process and ensure he or she has a complete listing of detainee rights.*

3. *Provide the detainee a copy of the Incident Report and notice of charges at least 24 hours before the start of any disciplinary proceedings.*

4. *Terminate the administrative investigation, if the incident is under investigation on different grounds (that is, the prohibited act is under criminal investigation), unless and until the agency with primary jurisdiction concludes its investigation or indicates it will not pursue the matter.*

   *Contraband that may be evidence in connection with a violation of a criminal statute shall be preserved, inventoried, controlled, and stored so as to*

---

GEO-MEN 00063142

**APP. 205**

*maintain and document the chain of custody. The documentation shall be reported to the appropriate law enforcement authority for action and possible seizure and prosecution. See **Preservation of Evidence** in the Detention Standard on **Searches of Detainees**.*

5. *Advise the detainee of his or her right, if applicable, to an initial hearing before the Unit Disciplinary Committee (UDC) within 24 hours of his or her notification of charges.*

6. *Record personal observances and other potentially material information.*

7. *Prepare a factual report of the investigation, including the location or disposition of any physical evidence.*

8. *Forward to the UDC all reports relevant to the disciplinary hearing – but do **not** provide a copy to the detainee at this stage of the disciplinary process, except for a copy of the Incident Report as instructed in #4 above.*

### F. Unit Disciplinary Committee (UDC)

All facilities shall establish an intermediate level of investigation/adjudication process to adjudicate low or moderate infractions. They shall also ensure that the detainee is afforded all the UDC rights listed below.

The UDC administering unit discipline shall be comprised of one to three members, at least one of whom is a supervisor.

The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident. Only in the unlikely event that practically every available officer witnessed or was directly involved in the incident may an exception occur.

The UDC shall conduct hearings and, to the best extent possible, informally resolve cases involving High Moderate or Low Moderate charges in accordance with the list of charges and related sanctions noted as Attachment A of this Standard. Unresolved cases and cases involving serious charges are forwarded to the Institution Disciplinary Panel.

**The UDC shall have authority to:**

1. Conduct hearings and resolve incidents involving High Moderate or Low Moderate charges.

2. Consider written reports, statements, and physical evidence.

3. Hear pleadings on the part of the detainee.

4. Make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.

5. Impose minor sanctions "E" through "M" in accordance with the table of prohibited acts and associated sanctions later in this document.

**The detainee in UDC proceedings shall have the right to:**

1. Remain silent at any stage of the disciplinary process.

2. Due process, which includes:

GEO-MEN 00063143

**APP. 206**

- Attending the entire hearing (excluding committee deliberations);

- Waiving the right to appear; or

- Having a UDC hearing within 24 hours after the conclusion of the investigation.

If security considerations prevent detainee attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process via telephonic testimony, the submission of documents, written statements, or questions to be asked of witnesses.

3. Present statements and evidence, including witness testimony on his or her own behalf.

4. Appeal the committee's determination through the detainee grievance process.

**The UDC shall:**

1. Advise the detainee of his or her rights at the hearing.

2. Refer to the IDP any incident involving a serious violation associated with an A-through-D-range sanction.  This includes code violations in the "Greatest" and "High" categories (100s and 200s).

3. Serve the detainee with:
   - A copy of the UDC decision which must contain the reason for the disposition and sanctions imposed; or
   - Written notification of charges and hearing before the IDP.

4. If the detainee's case is being referred to the IDP, advise the detainee, in writing, of
   - The right to call witnesses and present evidence before the IDP; and
   - The right to a staff representative before the IDP.

### G.  Staff Representation

*In SPCs and CDFs, the facility administrator shall, upon the detainee's request, assign a staff representative to help prepare a defense.  This help shall be automatically provided for detainees who are illiterate, have limited English-language skills, are without means of collecting and presenting essential evidence, or are in administrative or disciplinary segregation.*

1. *A staff representative must be a full-time employee.*

2. *Because of the potential conflict of interest, the facility administrator, members of the IDP and of the UDC initially involved in the case, eyewitnesses, the reporting and investigating officers, and anyone else with a stake in the outcome shall not act as staff representative.*

3. *The detainee may select his or her staff representative, barring those identified in #2 above.*

4. *The IDP shall arrange for the presence of the staff representative selected by the*

---

GEO-MEN 00063144

**APP. 207**

*detainee. If that staff member declines or is unavailable, the detainee may:*

- *Select a different representative;*
- *Wait for the unavailable staff member to become available (within a reasonable period); or,*
- *Proceed without a staff representative.*

5. *A staff member who declines to serve must state the reason on the staff representative form.*

6. *If several staff decline, the facility administrator shall assign one.*

7. *The staff representative shall be free to speak to witnesses and to present evidence on the detainee's behalf, including any mitigating circumstances. The staff representative must act in good faith on behalf of the charged detainee, and interview witnesses and obtain documentary evidence as is requested by the detainee or is otherwise reasonably seen as relevant to the defense of the charges or in mitigation of the charges.*

8. *The IDP shall allow the staff representative enough time to speak with the detainee and interview witnesses prior to the commencement of the proceeding. The IDP may grant a request for extension of time if required for an adequate defense.*

9. *The IDP shall establish the reliability of information provided by a confidential source before considering it in the disciplinary proceedings.*

10. *The IDP may withhold the confidential source's identity from the staff representative. While the staff representative may challenge the substance of any confidential information the IDP discloses, he or she may not question its reliability (which is pre-established by the IDP).*

11. *When the detainee cannot effectively present his or her own case, the facility administrator shall appoint a staff representative, even if not requested by the detainee.*

**H. Institution Disciplinary Panel**

All facilities that house ICE/DRO detainees shall have a disciplinary panel to adjudicate detainee Incident Reports. Only the disciplinary panel may place a detainee in disciplinary segregation.

The term "Institution Disciplinary Panel" or "IDP" refers either to a **three-person panel** appointed by the facility administrator, or a **one-person disciplinary hearing officer**, depending on the practice at the facility.

The panel may not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident. Exceptions may occur only if the number of officers required for the panel cannot be filled due their direct involvement in the incident. **The IDP shall have authority to:**

1. Conduct hearings on all charges and allegations referred by the UDC.

2. Call witnesses to testify.

GEO-MEN 00063145

**APP. 208**

3.  Consider written reports, statements, physical evidence, and oral testimony.

4.  Hear pleadings by detainee and staff representative.

5.  Make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.

6.  Impose sanctions as listed and authorized in each category.

**The detainee in IDP proceedings shall have the right to:**

1.  Remain silent at any stage of the disciplinary process.

2.  Due process, which includes:

    ▪  Attending the entire hearing (excluding committee deliberations);

    ▪  Waiving the right to appear; or

    ▪  Having an IDP hearing within 24 hours after the conclusion of the investigation.

If security considerations prevent the detainee's attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process by telephonic testimony, the submission of documents, written statements or questions to be asked of witnesses.

3.  Present statements and evidence, including witness testimony, on his or her behalf.

4.  Appeal the committee's determination through the detainee grievance process.

**The IDP shall:**

1.  Verify that the detainee has been advised of and afforded his or her rights, as provided above.

2.  Remind the detainee of his or her right to a staff representative, and provide one if requested.

3.  Advise the detainee of his or her right to waive the hearing and admit having committed the offense.

4.  Conduct the hearing on the first business day after receiving the UDC referral, unless the detainee waives the 24-hour notification provision and requests an immediate hearing.  In cases where a hearing is delayed, the reason(s) must be documented (for example, a continuing investigation of facts, unavailability of one or more essential witnesses, etc.) and approved by the facility administrator.  If the detainee is being held in segregation, the delay shall not exceed 72 hours, barring an emergency.

GEO-MEN 00063146

**APP. 209**

5. Prepare a written record of any hearing. This record must show that the detainee was advised of his or her rights.  It must also document the evidence considered by the Panel and subsequent findings and the decision and sanctions imposed, along with a brief explanation.

6. Forward the entire record to the facility administrator, who may (a) concur; (b) terminate the proceedings; or (c) impose more severe or more lenient sanctions.

7. Serve the detainee with written notification of the decision, which must contain the reason for the decision.

### I.  Confidential Information

When a decision relies on information from a confidential source, the UDC or IDP shall disclose as much of the confidential information as may be disclosed without jeopardizing the safety and security of facility staff and other persons, and shall include in the hearing record the factual basis for finding the information reliable.

### J.  Postponement of Disciplinary Proceedings

All facilities shall permit hearing postponements or continuances under certain circumstances.

*In SPCs and CDFs, circumstances justifying the postponement or continuance of a hearing might include: defense preparation, physical or mental illness, security, escape, disciplinary transfer, deportation, or pending criminal prosecution.*

*An uncooperative detainee may also cause a delay in the proceedings, either because of inappropriate behavior during the hearing process or a refusal to participate in a productive manner.*

### K.  Duration of Sanctions

The duration of sanctions shall be within established limits. Neither the panel recommending sanctions nor the *facility administrator* making the final decision shall impose sanctions arbitrarily, beyond these limits.

1. Sanctions range from the withholding of privilege(s) to segregation.  Time in segregation or the withholding of privileges after a hearing shall generally not exceed 60 days per violation.

2. Time served in segregation pending the outcome of the proceedings may be credited to the number of days to be spent in the segregation unit after an adverse decision is announced.

3. The disciplinary report and accompanying documents are not placed in the file of a detainee who is found not guilty. The facility, however, may retain the material in its own files for Institution statistical or historical purposes.

4. A detainee may be removed from segregation if a health care professional concludes that continued segregation is detrimental to the detainee's medical or mental health.

---

GEO-MEN 00063147

**APP. 210**

**L.  Documents**

All documents relevant to the incident, subsequent investigation and hearing(s), shall be completed and distributed in accordance with facility procedures.

*In SPCs and CDFs, documents shall be prepared and distributed as follows:*

### *Incident Report/Notice of Charges*

*The officer shall prepare an Incident Report and submit it to the ICE/DRO or CDF supervisor immediately after the incident takes place.  If the incident is resolved informally, the officer shall so note on the original report, which shall then be forwarded to the chief of security.*

*If the UDC is to be involved, the supervisor shall serve the detainee with a copy of the Notice of Charges upon completion of the investigation, no less than 24 hours before the UDC hearing.*

*The UDC receives the original copy.*

*If the UDC hears the matter, the ranking member of that committee shall serve the detainee with a copy of the Incident Report/Notice of Charges indicating their decision. The UDC, upon conclusion of its proceedings, shall forward the entire record to either the chief of security or the IDP, as appropriate.*

### *Investigation Report*
*Original – submitted to the UDC.*
*Detainee does not receive a copy*

### *UDC Report of Findings and Action*
*Original – served on the detainee after the committee issues its findings*
*Copy – to the detainee detention file (guilty finding only)*

### *Notice of IDP Hearing*
*Original – served on detainee*
*Copy – detainee detention file*

### *Detainee Rights at IDP Hearing*
*Original – served on detainee*
*Copy – facility detention file*

### *IDP Report*
*Original – detainee detention file*
*Copy – detainee*

**Standard Approved:**

**James T. Hayes, Jr. /s/**                              **12/5/2008**

—————————————————          ———————————

**James T. Hayes, Jr.**                                        **Date**
**Director**
**Office of Detention and Removal Operations**

——————————————————————————————————

GEO-MEN 00063148

**APP. 211**

Attachment A
Prohibited Acts and Sanctions

# "GREATEST" OFFENSE CATEGORY

## PROHIBITED ACTS

100 Killing

101 Assaulting any person (includes sexual assault)

102 Escape from escort; escape from a secure facility

103 Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of greatest severity, e.g., a riot or an escape; otherwise the charge is classified as Code 218 or 321).

104 Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, escape tool, device, or ammunition

105 Rioting

106 Inciting others to riot

107 Hostage-taking

108 Assaulting a staff member or any law enforcement officer

109 Threatening a staff member or any law enforcement office with bodily harm

*198 Interfering with a staff member in the performance of duties (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable.

*199 Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable.

## "GREATEST" OFFENSE CATEGORY SANCTIONS

A. Initiate criminal proceedings

B. Disciplinary transfer (recommend)

C. Disciplinary Segregation (up to 60 days)

D. Make monetary restitution, if funds are available

E. Loss of privileges, e.g., commissary, vending machines, movies, recreation, etc

GEO-MEN 00063149

**APP. 212**

Attachment A
Prohibited Acts and Sanctions

# "HIGH" OFFENSE CATEGORY

## PROHIBITED ACTS

200 Escape from unescorted activities open or secure facility, proceedings without violence

201 Fighting, boxing, wrestling, sparring, and any other form of physical encounter, including horseplay, that causes or could cause injury to another person; except when part of an approved recreational or athletic activity

202 Possession or introduction of an unauthorized tool

203 Loss, misplacement, or damage of any restricted tool

204 Threatening another with bodily harm

205 Extortion, blackmail, protection, demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm, or avoiding a threat of being informed against

206 Engaging in sexual acts

207 Making sexual proposals or threats

208 Wearing a disguise or mask

209 Tampering with or blocking any lock device

210 Adulteration of food or drink

211 Possession, introduction, or use of narcotics, narcotic paraphernalia, or drugs not prescribed for the individual by the medical staff

212 Possessing an officer's or staff member's clothing

213 Engaging in or inciting a group demonstration

214 Encouraging others to participate in a work stoppage or to refuse to work

215 Refusing to provide a urine sample or otherwise cooperate in a drug test

216 Introducing alcohol into the facility

217 Giving or offering an official or staff member a bribe or anything of value

218 Giving money to, or receiving money from, any person for an illegal or prohibited purpose, such as introducing/conveying contraband

219 Destroying, altering, or damaging property (government or another person's) worth more than $100

220 Being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days

221 Signing, preparing, circulating, or soliciting support for prohibited group petitions

GEO-MEN 00063150

**APP. 213**

Attachment A
Prohibited Acts and Sanctions

222 Possessing or introducing an incendiary device, e.g., matches, a lighter, etc.

223 Any act that could endanger person(s) and/or property

*298 Interfering with a staff member in the performance of duties (conduct must be of highest severity).  This charge is to be used only when no other charge of highest severity is applicable.

*299 Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity).  This charge is to be used only when no other charge of highest severity is applicable.


*When the prohibited act is interfering with a staff member in the performance of duties (Code 198, 298, 398 or 498) or conduct that disrupts (Code 199, 299, 399 or 499), the Disciplinary Committee should specify in its findings the severity-level of the conduct, citing a comparable offense in that category. For example, "We find the act of to be of high severity, most comparable to Code 213, "engaging in a group demonstration."

## "HIGH" OFFENSE CATEGORY SANCTIONS

A. Initiate criminal proceedings

B. Disciplinary transfer (recommend)

C. Disciplinary Segregation (up to 30 days)

D. Make monetary restitution, if funds are available

E. Loss of privileges, e.g., commissary, vending machines, movies, recreation, etc

F. Change housing

G Remove from program and/or group activity

H. Loss of job

I. Impound and store detainee's personal property

J. Confiscate contraband

K. Restrict to housing unit

M. Warning

GEO-MEN 00063151

**APP. 214**

Attachment A
Prohibited Acts and Sanctions

# "HIGH MODERATE" OFFENSE CATEGORY

## PROHIBITED ACTS

300 Indecent exposure

301 Stealing (theft)

302 Misuse of authorized medication

303 Loss, misplacement, or damage of a less restricted tool.

304 Lending property or other item of value for profit/increased return

305 Possession of item(s) not authorized for receipt or retention; not issued through regular channels

306 Refusal to clean assigned living area

307 Refusing to obey the order of a staff member or officer's (may be categorized and charged as a greater or lesser offense, depending on the kind of disobedience: continuing to riot is Code 105--Rioting; continuing to fight Code 201--Fighting; refusing to provide a urine sample, Code 215.

308 Insolence toward a staff member

309 Lying or providing false statement to staff

310 Counterfeiting, forging, or other unauthorized reproduction of money proceedings or other official document or item, e.g. security document, identification card, etc. (may be categorized as greater or lesser offense, depending on the nature and purpose of the reproduction, e.g., counterfeiting release papers to effect escape--Code 102 or 200).

311 Participating in an unauthorized meeting or gathering

312 Being in an unauthorized area

313 Failure to stand count

314 Interfering with count

315 Making, possessing, or using intoxicant(s)

316 Refusing a breathalyzer test or other test of alcohol consumption

317 Gambling

318 Preparing or conducting a gambling pool

319 Possession of gambling paraphernalia

320 Unauthorized contact with public

321 Giving money or another item of value to, or accepting money or another item of value from anyone, including another detainee, without staff authorization

---

GEO-MEN 00063152

**APP. 215**

Attachment A
Prohibited Acts and Sanctions

322 Destroying, altering, or damaging property (government or another person's) person's) worth more than $100

*398 Interfering with a staff member in the performance of duties (offense must be of high moderate severity).  This charge to be used only when no other charge in this category is applicable.

*399 Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of high moderate severity).  This charge is to be used only when no other charge in this category is applicable.

NOTE: Any combination of high moderate and low moderate offenses during a 90-day period shall constitute a high offense.

### "HIGH MODERATE" OFFENSE CATEGORY SANCTIONS

A. Initiate criminal proceedings

B. Disciplinary transfer (recommend)

C. Disciplinary Segregation (up to 72 hours)

D. Make monetary restitution, if funds are available

E. Loss of privileges, e.g. commissary, vending machines, movies, recreation, etc

F. Change housing

G Remove from program and/or group activity

H. Loss of job

I. Impound and store detainee's personal property

J. Confiscate contraband

K. Restrict to housing unit

L. Reprimand

M. Warning

GEO-MEN 00063153

**APP. 216**

Attachment A
Prohibited Acts and Sanctions

# "LOW MODERATE" OFFENSE CATEGORY

## PROHIBITED ACTS

400 Possession of property belonging to another person

401 Possessing unauthorized clothing

402 Malingering, feigning illness

403 Smoking where prohibited

404 Using abusive or obscene language

405 Tattooing, body piercing, or self-mutilation

406 Unauthorized use of mail or telephone (with restriction or temporary suspension of the abused privileges often the appropriate sanction)

407 Conduct with a visitor in violation of rules and regulations (with restriction or temporary suspension of visiting privileges often the appropriate sanction)

408 Conducting a business

409 Possession of money or currency, unless specifically authorized

410 Failure to follow safety or sanitation regulations

411 Unauthorized use of equipment or machinery

412 Using equipment or machinery contrary to posted safety standards

413 Being unsanitary or untidy, failing to keep self and living area in accordance with posted standards

498 Interfering with a staff member in the performance of duties (offense must be of low moderate severity).  This charge is to be used only when no other charge in this category is applicable.

*499 Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of low moderate severity).  This charge is to be used only when no other charge in this category is applicable.

GEO-MEN 00063154

**APP. 217**

Attachment A
Prohibited Acts and Sanctions

### "LOW MODERATE" OFFENSE CATEGORY SANCTIONS

E. Loss of privileges, commissary, vending machines, movies, recreation, etc

F. Change housing

G Remove from program and/or group activity

H. Loss of job

I. Impound and store detainee's personal property

J. Confiscate contraband

K. Restrict to housing unit

L. Reprimand

M. Warning

GEO-MEN 00063155

**APP. 218**

## ICE/DRO DETENTION STANDARD

### VOLUNTARY WORK PROGRAM

**I. PURPOSE AND SCOPE.  This Detention Standard provides detainees opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of safety, security and good order.** While not legally required to do so, ICE/DRO affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

This Detention Standard applies to the following types of facilities housing DRO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by DRO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs and CDFs.* IGSAs must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Some terms used in this document may be defined in the separate **Definitions** Standard.

**II. EXPECTED OUTCOMES.** The expected outcomes of this Detention Standard are:

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of safety, security, and good order.

2. Detainees will be able to volunteer for work assignments but otherwise not be required to work, except to do personal housekeeping.

3. Essential operations and services will be enhanced through productivity from detainees.

4. The negative impact of confinement will be reduced through less idleness, improved morale and fewer disciplinary incidents.

5. Detainee working conditions will comply with all applicable federal, state, and local work safety laws and regulations.

6. There will be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation, or disability.

7. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

GEO-MEN 00063293

**APP. 219**

**III. DIRECTIVES AFFECTED.**   This Detention Standard replaces **Voluntary Work Program** dated 9/20/2000.

This Detention Standard incorporates the requirements regarding detainees' being assigned to work outside of a facility's secure perimeter originally communicated via a memorandum to all Field Office Directors from the Acting Director of U.S. Immigration and Customs Enforcement (2/2/2004).

## IV. REFERENCES

American Correctional Association 4th Edition, Standards for Adult Detention Facilities: 4-ALDF-5C-06, 5C-08, 5C-11(M), 6B-02.

Environmental Health and Safety National Detention Standard

Food Service National Detention Standard

## V. EXPECTED PRACTICES

### A. Voluntary Work Program

Detainees who are physically and mentally able to work shall be provided the opportunity to participate in any voluntary work program.

The detainee's classification level shall determine the type of work assignment for which he/she is eligible.

Level 3 detainees shall not be given work opportunities outside their housing units/living areas.

### B. Work Outside the Secure Perimeter

ICE detainees may not work outside the secure perimeter of local jails and facilities used under Intergovernmental Service Agreements.

*In SPCs and CDFs, only detainees classified as Level 1 (or the facility's equivalent "Low" custody designation) may work outside the secure perimeter on facility grounds. They must be directly supervised at a ratio of not less than one staff member to four detainees.  The detainees shall be within sight and sound of that staff member at all times.*

### C. Personal Housekeeping Required

Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.

*In SPCs and CDFs, detainees are required to maintain their immediate living areas in a neat and orderly manner by:*

- *Making their bunk beds daily,*

- *Stacking loose papers,*

- *Keeping the floor free of debris and dividers free of clutter, and*

GEO-MEN 00063294

**APP. 220**

- *Not hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture.*

### D.  Detainee Selection

The facility administrator shall develop site-specific rules for selecting work detail volunteers. These site-specific rules will be recorded in a facility procedure that will include a voluntary work program agreement. The voluntary work program agreement will document the facility's program and will be in compliance with this Detention Standard.

*In SPCs and CDFs, the primary factors in hiring a detainee as a worker shall be his or her classification level and the specific requirements of the job:*

- *Staff shall present the detainee's name and A-number to the shift supervisor or the requesting department head.*

- *The shift supervisor or department head shall review the detainee's classification and other relevant documents in the detainee's detention file and/or A-file.*

- *The shift supervisor or department head shall assess the detainee's language skills as it affects the detainee's ability to perform the specific requirements of the job under supervision.  To the extent possible, work opportunities should be provided to detainees who are able to communicate with supervising staff effectively and in a manner that does not compromise safety and security.*

- *Inquiries to staff about the detainee's attitude and behavior may be used as a factor in the supervisor's selection.*

*Staff shall explain the rules and regulations as well as privileges relating to the detainee worker's status. The detainee is required to sign a* **voluntary work program agreement** *before every new assignment.  Completed agreements shall be filed in the detainee's detention file*

### E.  Special Details

Detainees may volunteer for temporary work details that occasionally arise.  The work, which generally lasts from several hours to several days, may involve such tasks as digging trenches, removing topsoil and other labor-intensive work.

### F.  Discrimination in Hiring Prohibited

Detainees shall not be denied voluntary work opportunities on the basis of such factors as a detainee's race, religion, national origin, gender, sexual orientation or disability.

### G.  Physically and Mentally Challenged Detainees

While medical or mental health restrictions may prevent some physically or mentally challenged detainees from working, those with less severe disabilities shall have the opportunity to participate in the voluntary work program in appropriate work assignments.

- The selecting official must consider the precise limitations of a disabled individual before rejecting that individual for selected work assignments.

---

GEO-MEN 00063295

**APP. 221**

- ▪ Expediency or convenience is insufficient justification to reject or "pigeonhole" a detainee who, with reasonable accommodation, can perform essential functions of the work assignment.

- ▪ In disputed cases, the selecting official shall consult medical personnel to ascertain the detainee's suitability for a given project.

### H.  Hours of Work

Detainees who participate in the volunteer work program are required to work according to a fixed schedule.

*In SPCs and CDFs, the normal scheduled workday for a detainee employed full time is a maximum of 8 hours.  Detainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly.*

*Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program.*

### I.  Number of Details in One Day

The facility administrator may restrict the number of work details permitted a detainee during one day.

*In SPCs and CDFs, a detainee may participate in only one work detail per day.*

### J.  Facilities That Detain Criminal Aliens

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

### K.  Compensation

Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.

*In SPCs and CDFs, the compensation is $1.00 per day.  Ordinarily, it is to be paid daily, unless the facility has a system in place that ensures detainees receive the pay owed them before being transferred or released.*

### L.  Removal of Detainee from Work Detail

A detainee may be removed from a work detail for such causes as:

- ▪ Unsatisfactory performance;

- ▪ Disruptive behavior, threats to security, etc.;

- ▪ Physical inability to perform all functions required by the job, whether because of a lack of strength or a medical condition;

- ▪ Prevention of injuries to the detainee;

- ▪ A removal sanction imposed by the Institutional Disciplinary Panel for an infraction of a facility rule, regulation, or policy.

---

GEO-MEN 00063296

**APP. 222**

When a detainee is removed from a work detail, the facility administrator shall place written documentation of the circumstances and reasons in the detainee detention file.

**M. Detainee Responsibility**

The facility administrator shall establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

*In SPCs and CDFs, the detainee is expected to be ready to report for work at the required time and may not leave an assignment without permission.*

- The detainee shall perform all assigned tasks diligently and conscientiously.

- The detainee may not evade attendance and performance standards in assigned activities or encourage others to do so.

- The detainee shall exercise care in performing assigned work, using safety equipment and taking other precautions in accordance with the work supervisor's instructions.

- In the event of a work-related injury, the detainee shall notify the work supervisor who shall immediately implement injury response procedures.

**N. Detainee Training and Safety**

All detention facilities shall comply with all applicable health and safety regulations and standards.

The facility administrator shall ensure that all department heads develop and institute, in collaboration with the facility's safety/training officer, appropriate training for all detainee workers.

1. *In SPCs and CDFs the voluntary work program shall operate in compliance with:*
   - *Occupational Safety and Health Administration (OSHA) regulations.*
   - *National Fire Protection Association 101 Life Safety Code*
   - *American Correctional Association Standards for Adult Local Detention Facilities, current edition*
   - *International Council Codes (ICC)*

   *Each facility administrator's designee is responsible for providing every SPC and CDF in his or her jurisdiction access to complete and current versions of the documents listed above.*

   *The facility administrator shall ensure that the facility operates in compliance with all applicable standards.*

2. Upon a detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials including:
   - Safety features and practices demonstrated by the supervisor
   - Recognition of hazards in the workplace, including the purpose for protective devices and clothing provided, reporting deficiencies to their supervisors. Staff and detainees that do not read English will not be authorized to work

GEO-MEN 00063297

**APP. 223**

with hazardous materials.

- A detainee shall not undertake any assignment before signing a voluntary work program agreement that, among other things, confirms that the detainee has received and understood training from the supervisor about the work assignment.

The voluntary work program agreement shall be placed in the detainee's detention file.

3. For a food service assignment, medical staff, in conjunction with the Public Health Service, shall ensure that detainees are medically screened and certified before undertaking the assignment.

4. The facility shall provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5. *The facility administrator shall ensure that the facility operates in compliance with all applicable standards.*

## O. Detainee Injury and Reporting Procedures

The facility administrator shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/DRO.

*In SPCs and CDFs, if a detainee is injured while performing his or her work assignment:*

1. *The work supervisor shall immediately notify the facility medical staff.  In the event that the accident occurs in a facility that does not provide 24-hour medical care, the supervisor shall contact the on-call medical officer for instructions.*

2. *First aid shall be administered when necessary.*

3. *Medical staff shall determine what treatment is necessary and where that treatment shall take place.*

4. *The work supervisor shall complete a detainee accident report and submit it to the facility administrator for review and processing and file it in the detainee's detention file and A-file.*

**Standard Approved:**

**James T. Hayes, Jr. /s/                          12/5/2008**

_____          _____
**James T. Hayes, Jr.                          Date
Director
Office of Detention and Removal Operations**

GEO-MEN 00063298

**APP. 224**

# Exhibit W



**The GEO Group, Inc.**

# AURORA ICE

# PROCESSING CENTER

# DETAINEE HANDBOOK

# LOCAL SUPPLEMENT

Revised October 2013                    Number:_____

PL000029

**APP. 226**

PL000030

**APP. 227**

ICE Detainee Handbook

## TABLE OF CONTENTS

| | | |
|---|---|---|
| A. | Introduction/Mission/Purpose | 2 |
| B. | Facility Address, Telephone Number, and Directions | 2 |
| C. | Rights and Responsibilities | 3 |

### SECTION 1 – INITIAL ADMISSION

| | | |
|---|---|---|
| A. | Detainee Phone Calls – Booking | 4 |
| B. | Booking | 4 |
| C. | Classification | 4 |
| D. | Housing and Uniforms | 4 |
| E. | Aurora Detention Center - ID | 4 |
| F. | Property you may Take to the Dorm | 5 |
| G. | Personal Property Storage | 5 |
| H. | Money/Property Release | 5 |
| I. | Release of Funds | 5 |
| J. | Filling Claims | 5 |
| K. | Property Left Upon Discharge/Transfer | 5 |
| L. | Items Left for Detainees | 5 |
| M. | Return of your Money | 6 |
| N. | Money Transactions | 6 |
| O. | Orientation Video | 6 |
| P. | Pro Bono Immigration Law Video | 6 |
| Q. | Detainee Work Program (Voluntary) | 6 |
| R. | Detainee Dress Code | 6 |

### SECTION 2 – ACCESS TO COURT, ICE AND LAW LIBRARY

| | | |
|---|---|---|
| A. | Immigration Law Library Material | 6 |
| B. | Hours of Access | 7 |
| C. | Replacing Damaged Materials | 7 |
| D. | Supervision | 7 |
| E. | Updating Legal Materials | 7 |
| F. | Request for Additional Legal Materials | 7 |
| G. | Photocopying of Legal Documents | 7 |
| H. | Illiterate and Non-English Speaking Detainees | 7 |
| I. | Detainee Retention of Personal Legal Materials | 7 |
| J. | Law Library Access for Segregation/SMU | 7 |
| K. | Attorney Visitation | 8 |
| L. | Requests to Immigration and Courts | 8 |
| M. | Legal Communication | 8 |
| N. | Retaliation Prohibited | 8 |
| O. | Notary Public | 8 |
| P. | Envelopes and Stamps for Legal Documents | 8 |

### SECTION 3 – CORRESPONDENCE (MAIL), VISITATION, AND TELEPHONE ACCESS

| | | |
|---|---|---|
| A. | Correspondence (Mail) | 8 |
| B. | Special Correspondence | 8 |
| C. | Indigent detainees | 8 |
| D. | Incoming Mail | 9 |
| E. | Non – Legal Mail | 9 |
| F. | Legal Mail | 9 |
| G. | Change of Address | 9 |
| H. | Limitations on Publication | 9 |
| I. | Outgoing Mail | 9 |
| J. | Visitation | 9 |
| K. | Contact Visitation | 10 |
| L. | Telephone Access | 11 |
| M. | Unused Phone Time | 12 |

### SECTION 4 – DETAINEE SERVICES

| | | |
|---|---|---|
| A. | Recreation | 12 |
| B. | Television | 12 |
| C. | Smoking Policy | 13 |
| D. | Education | 13 |
| E. | Food Service | 12 |
| F. | Religious Diets | 13 |
| G. | Health Care | 13 |
| H. | Sick Call | 13 |
| I. | Staff Assistance | 14 |
| J. | Health Assessment | 14 |
| K. | Medical Requests | 14 |
| L. | Personal Medication | 14 |
| M. | Eye Care | 13 |
| N. | Facility Prescribed Medication | 13 |
| O. | Refusing Medical Treatment | 14 |
| P. | Communicable Disease Guidelines | 15 |
| Q. | Medical Diets | 15 |
| R. | Barbering Services | 15 |
| S. | Laundry Service | 14 |
| T. | Religious Services | 15 |
| U. | Detainee Library Services | 16 |
| V. | Commissary | 16 |
| W. | Marriage Request | 16 |

### SECTION 5 – SANITATION

| | | |
|---|---|---|
| A. | Personal Hygiene | 16 |
| B. | Living Area/Bed Assignments | 16 |
| C. | Housing Unit Sanitation | 17 |
| D. | Day Space | 17 |

### SECTION 6 – GRIEVANCE PROCEDURES

| | | |
|---|---|---|
| A. | Filing a Grievance | 17 |

PL000031

1

### SECTION 7 – DETAINEE & STAFF SAFETY & SECURITY

| | | |
|---|---|---|
| A. | Personal Safety | 18 |
| B. | Attempted Escapes | 18 |
| C. | Commission of a Crime | 18 |
| D. | Destruction of Property | 18 |
| E. | Official Counts | 19 |
| F. | Contraband | 19 |
| G. | Authorized Items | 19 |
| H. | Prison Rape Elimination Video | 19 |
| I. | Sexual Assault | 19 |
| J. | Report all Assaults | 19 |
| K. | Definitions of Sexual Assault Detainee on Detainee | 20 |
| L. | Definitions of Sexual Assault Staff on Detainee | 20 |
| M. | Prohibited Acts | 20 |
| N. | Detention as a Safe Environment | 20 |
| O. | Avoiding Sexual Assault | 20 |
| P. | The Emotional Consequences of Sexual Assault | 21 |

### SECTION 8 – DISCIPLINARY PROCEDURE/PROHIBITED ACTS

| | | |
|---|---|---|
| A. | Investigation | 21 |
| B. | Unit Disciplinary Committee (UDC) | 21 |
| C. | Institutional Disciplinary Panel (IDP) | 22 |
| D. | Staff Representation | 22 |
| E. | Postponement of Disciplinary Proceedings | 22 |
| F. | Duration of Punishment | 22 |
| G. | Documents | 23 |
| H. | Confidential Information | 23 |
| I. | Disciplinary Severity Scale & Prohibited Acts | 23 |
| J. | Appeal Procedures | 26 |
| K. | Administrative Segregation Order | 26 |

### INTRODUCTION/MISSION

The Aurora Detention Center is a private detention facility operating under a contract with the United States Immigration and Customs Enforcement. (I.C.E.)  the mission of this facility is to provide a safe, clean, and sanitary environment for detainees waiting processing of their administrative hearings and the staff who work here.

This supplement, with rules and regulations contained herein, is adopted and enacted by the Aurora Detention Center Administration pursuant to written guidelines, laws, rules and regulations. **Please read it carefully.**  If you have any questions concerning any aspect of this handbook, please contact a staff member for clarification.

The purpose of this supplement is to explain the specific rules, regulations, policies and procedures that must be followed by detainees while in custody at this facility. The supplement will also help provide you with a general overview of the programs, rules, regulations, and services of the facility.  You will be held accountable for your actions while in custody at this facility.  Therefore, it is each detainee's responsibility to become familiar with the contents of this supplement.

A copy of this supplement will be issued to each detainee upon intake, and certain sections are posted on the bulletin boards in each housing unit.  All detainees are required to acknowledge, by signature, receipt of this supplement.

The information contained in this supplement applies to all detainees and is intended to ensure your safety and the safety of staff, decent living conditions, fair treatment, and the protection of your rights.  It is the policy of this facility that no individual be discriminated against because of age, sex, sexual orientation, race, color, creed, religion, physical challenges (handicap), National origin or political beliefs.

The detention staff is charged with the responsibility of maintaining your safety and security, to provide an appropriate professional response to your needs and to maintain the safe and orderly running of the facility.  The staff/detainee relationship is very important to everyone's well being, and each detainee has an important role in maintaining and improving this relationship.

### FACILITY ADDRESS, TELEPHONE NUMBER & DIRECTIONS

**AURORA DETENTION CENTER**
**3130 N. OAKLAND STRET**
**AURORA, COLORADO 80010-1525**
**303-361-6612 or 303-739-8700**

**ICE/ERO**
**3130 N. OAKLAND STREET**
**AURORA, COLORADO 80010-1525**

### DIRECTIONS:

The Aurora Detention Center is located 1.1 miles south of I-70 and 1.4 miles north of Colfax Avenue.

Exit I-70 onto Peoria Street, south, go approximately 1.1 miles to East 30th Avenue, turn right (west) on 30th Avenue and proceed approximately 1 block. Turn right onto North Oakland Street. The facility will be on the right side of the street.  Parking for visitors (i.e. family or friends) is available on 30th Avenue or N. Oakland Avenue.

If traveling north on Peoria Street, go to East 30th Avenue, turn left (west), and go approximately 1 block. The distance from Colfax and Peoria streets is approximately 1.4 miles.

It is imperative that you notify your family, friends or anyone who might visit, provide you money or want to leave a telephone number message, of your name and A-number.  GEO staff is not responsible for any form of miscommunication resulting from an incomplete detainee's name or inaccurate A-number.  GEO staff cannot provide you're A# over the telephone to those that request it.

## RIGHTS AND RESPONSIBILITIES

You have the right to expect that as a human being all personnel will treat you respectfully, impartially, fairly, and humanely.

You have the right to participate in educational classes, vocational training, and work as far as resources are available and in keeping with your interests, needs, custody status, physical and mental health condition and abilities.

You have the responsibility to take advantage of activities that may help you live a successful and law-abiding life here in this facility, as well as when you return to the community. You will be expected to follow the regulations governing these activities.

You have the right to be informed of the rules, regulations, procedures and schedules of the facility that affect you.

You have a responsibility to know and abide by the rules, regulations, procedures and schedules of the facility.

You have the responsibility to treat others, both employees and detainees, in the same manner.

You have the right to freedom of religious affiliations and voluntary religious worship.

You have the responsibility to recognize and respect the voluntary rights of others in this regard.

You have the right to health care which includes nutritious meals, proper bedding and clothing, a laundry schedule for clean bedding and clothing, an opportunity to shower regularly, proper ventilation for warmth and fresh air, a regular exercise period, toilet articles, and medical and dental treatment.

You have the responsibility to not waste food, follow laundry and shower schedules, maintain neat and clean living quarters, keep your area free of contraband, and seek medical and dental care as you need it.

You have the right to unrestricted and confidential access to courts by correspondence.

You have the responsibility to present honesty and fairly your petitions, questions, and problems to the courts.

You have the right to legal counsel from an attorney of your choice by means of interviews and correspondence at no cost to the United States Government.

It is your responsibility to obtain and use services of an attorney honestly and fairly.

You have the privilege to have family and friends visit with you in keeping with the facility rules and regulations.

It is your responsibility to conduct yourself properly during visits, not to accept or pass contraband, and not violate federal, state or local laws or the policies of the Aurora Detention Center.

You have the right to reading material for educational purposes and for your own enjoyment.

It is your responsibility to seek out and use materials for your benefit, without depriving others of the same benefit.

You have the right to use the law library reference materials to help you resolve legal problems. You also have the right to receive help when it is available through a legal assistance program.

It is your responsibility to use these resources according to the prescribed procedures and schedules, and to respect the rights of others to use the materials.

You have the right to an administrative hearing before an Immigration Judge to determine your status in the United States.

You have the responsibility to seek methods of payments for your bond.

You have the right to apply for political asylum if you believe that you will be persecuted because of your race, religion, nationality, membership in a social group or political opinion.

You have the responsibility to prepare and submit the proper form accurately.

You have the right to receive as correspondence any material reasonably necessary to present your legal claim.

You have the responsibility to request from the Library Officer all special mailing envelopes.

You have the responsibility to prepare all special mailing envelopes accurately and keeping all tracking numbers and receipts.

You have the responsibility to inform persons dropping off legal material for use in your legal claim of procedures and hours.

You have the right to request voluntary departure, if statutorily eligible, prior to a hearing but if you request voluntary departure you waive the right to a hearing.

It is your responsibility to inform an Immigration Officer that you request voluntary departure.

You have the privilege of communication. You can communicate with the consulate or diplomatic officers of the country of your nationality in the United States.

You shall not be harassed, disciplined, punished, or otherwise retaliated against for filing a complaint or grievance.

PL000033

3

**APP. 230**

## SECTION 1 - INITIAL ADMISSION

### PHONE CALLS DURING BOOKING

Upon your arrival at the facility, while in intake, you will be issued a pin # card and will receive a free 3 minute phone call. You will have 72 hours in which to use the free 3 minutes. When you speak with family, friends and attorneys please advise them of your 'A' number and location (Aurora) as this will make it easier for them to locate you.

### BOOKING

You are required to answer questions designed to identify individual characteristics and to aid the facility staff in your proper classification into the institution during the booking process. In addition, you will be photographed. Other information pertaining to you may also be gathered during the booking process.

You will be screened for medical problems. It is important that you answer all questions truthfully and accurately.

During the screening process, you may sign a "Consent to Refuse Medical Treatment." as you have the right to refuse medical treatment at any time.

You will be informed of the procedure to follow in order to obtain subsequent medical attention. If you have a medical problem and do not know what the procedure is, ask a detention officer or other staff member.

### CLASSIFICATION

#### Classification Information

Staff shall use the most reliable, objective information during the classification process. "Objective" information refers to facts, i.e.., current offense, past offenses, escapes, institutional disciplinary history, violent episodes/incidents, medical information or a history of victimization, etc.

#### Classification Levels and Housing Assignments

You will be housed according to your classification level.

#### Classification Levels

   a.   Low Custody – may include detainees with minor criminal records and nonviolent felonies

   b.   Medium Custody – includes detainees with criminal records violent felonies

   c.   High Custody – includes detainees with serious offense history, escape history, pattern of assaults and/or serious institutional disciplinary convictions

#### Reclassification

You may be reclassified any time and the classification level re-determined. The first re-assessment is completed 60 to 90 days after the date of the initial assessment. Subsequent reclassification assessments shall be completed at 90-120 day intervals. A special reassessment is completed within 24 hours before a detainee leaves disciplinary segregation and at any other time when additional relevant information becomes known. The officer assigned to classification will respond to requests for reclassification within 72 hours. A Kite for reclassification consideration needs to be addressed to the Classification Officer.

Any detainee may be reclassified to High if the behavior and threat to the facility, other detainees, and personnel is articulated.

Detainees classified at Medium who exhibit acceptable institutional behavior *may be* reviewed and reclassified to Low. (Detainee must be in custody for a minimum of 60 days before reclassification.)

#### Classification Appeal

All new arrivals classified as level two or three may appeal their classification decision through the detainee grievance system. All such appeals will be directed to, investigated, and reconsidered by Classification.

### HOUSING AND UNIFORMS

You will be placed in living quarters based upon your present classification. **Female detainees** will be detained in a housing unit separate from males.

Housing units for females are dormitory style which provides separate areas for sleeping, activities, restrooms, and showers. Housing units for males are cells that house four or eight detainees with a sink and toilet inside each cell. A separate area for showering and activities is available in each unit.

Following the booking process, you will be issued clothing consisting of 2 uniforms, 5 pair of undergarments, 1 gym shirt, 1 pair of shorts, 1 pair of shower shoes, tennis shoes, two sheets, 1 pillow case, 1 blanket, 1 towel, 1 toothbrush, toothpaste, soap, hand lotion, comb, and headphones for the televisions. Long sleeve shirts will be provided from October to April.

Female detainees will be provided 3 bras, and necessary feminine hygiene items in addition to the above. It is your responsibility to wear the uniform as directed by staff, which includes wearing a Wristband.

The classification process determines the appropriate level of custody for each detainee. Once this is established, staff can issue the detainee clothing and wristband in the appropriate color for his or her classification period.

Dark Red - High Custody
Bright Orange - Medium Custody
Dark Blue - Low Custody

**APP. 231**

### AURORA DETENTION CENTER - ID

All detainees will be issued a facility Identification Wristband. "The wristband must remain on his or her wrist until removed by an officer, and that disregarding this requirement could lead to disciplinary action" Your Identification Wristband provides you access to certain services, i.e., commissary, library, medical services. *If you lose, damage or destroy your Identification Wristband it is your responsibility to contact a housing unit officer and notify them that you need a replacement.* **You may be required to pay for the replacement of your Identification Wristband.**

### PROPERTY YOU MAY TAKE TO THE HOUSING UNIT

The following is a list of property that you may take into the housing unit:

- Legal documents and papers, including property receipts
- Family pictures (not to exceed 10) measuring 5"x7" or smaller
- 1 pair of prescription glasses – regular (no sunglasses)
- Dentures – upper, lower or both plates
- Personal address book or pages
- Wedding band – plain, no stones
- Religious and secular reading material (softbound)
- Small religious item, i.e. religious medallion
- Materials authorized in writing by the Chief of Security

### PERSONAL PROPERTY STORAGE

To protect the property of all detainees, you are not permitted access to your stored personal property except when your requests have been approved by the Intake Officer to obtain legal paper work only. You may have access to pictures, cards, papers, or other items approved by staff out of your wallet or purse, during the admission process, while in the Intake area; however, once you sign surrendering your property to the property section, you lose this option.

No alcoholic beverages, tobacco products or perishable food items will be stored or permitted in this facility. For safety reasons, matches, cigarette lighters, tobacco products and other disposable safety hazards will not be stored in this facility. Such items will be disposed of after you are placed into the facility population.

All detainee requests for property must be pre-approved by ICE. The ICE pre-approved clothing requests may be brought to the facility for detainees but the combined total weight of what you already have in intake property storage and what is being brought/sent in cannot exceed 40 lbs. The 40 lbs. is the maximum amount of weight a detainee can have of property and clothing. All property must fit in the 14"x 14" x 19" size property box or equivalent size suit case but nothing larger. The property being dropped off for detainees should be clothing only. No valuables allowed, i.e. no jewelry, computers, cell phones, etc.
We encourage family and friends to bring the property already boxed up, but not sealed, so it can be inspected and inventoried before it's accepted, although clothing may be mailed in as well. Detainee visitors may bring authorized property on Sunday, Monday, Tuesday and Thursday's from 09:00 a.m. to 7:00 p.m. All property must have prior approval from ICE and the front lobby officer must have the authorization via kite before accepting any property. This is a one-time request only.

### MONEY/PROPERTY RELEASE

You may release all of your property, including your keys and/or money to someone in the community that you designate in writing. To release your property, a **Property Release Form** must be filled out and signed by you. A Property Release Form may be obtained upon request from the housing unit officer assigned to your housing unit.

**The person receiving your property must provide the following information**: If the person does not have the following information, your property will not be released to them. **It is your responsibility to advise the party picking up your property that this information is required.**

- Name
- Address
- Date of Birth
- Official/Valid Picture ID or verifiable identification

### RELEASE OF FUNDS FOR OUTSIDE PURCHASES, FEES, AND OTHER SERVICES

Detainees will use a Property Release Form in conjunction with a Detainee Request Form to request detainee withdrawals from their account. The detainee accounts clerk or designee will review the request for proper approval and completeness also verifying the detainee name and A number issued. The release form must be signed by the detainee and the housing unit officer.

### PROPERTY LEFT UPON DISCHARGE/TRANSFER

You are required to either take your property with you or make prior arrangements for transfer or disposal of it when you discharge from this facility.

If you leave property, a written notice will be sent certified mail to the last known address you provided, notifying you that your property has been considered abandoned and that you have 30 days to make arrangements to contact Immigration and Customs Enforcement to claim your property. If there is no claim, the property will be vested in the U.S. Government and Immigration and Customs Enforcement shall direct its disposal.

### ITEMS LEFT FOR DETAINEES

The only items that may be brought to the facility for you are:

- ICE pre-approved clothing request (40 lbs. total) only in the event of deportation
- Money for detainees will only be accepted Monday-Friday from 1:30-2:30 p.m.
- Legal documents may be left for detainees, staff will inspect the documents for contraband but will not read the documents.

Money that is received at this facility will be credited to your account. If someone leaves money for you at the facility, a receipt will be written and a copy given to you. **No personal checks will be accepted at the facility.**

Deposits on your account must be in the form of U.S. currency, Postal or Western Union money orders, cashier's checks, or checks payable to you from a local, State or Federal agency.

PL000035

**APP. 232**

## RETURN OF YOUR MONEY

Upon discharge or transfer from this facility, all money remaining on your account will be returned to you.

NOTE: If the facility is unable to return your property to you due to loss, theft, or misplacement, and for which you have a legitimate property receipt, the facility staff will reimburse you for the missing personal property, money and/or valuables. In the event this situation occurs, you must fill out a Property Claim Form and provide a copy of your receipt(s) with the form.

## PROCEDURES FOR FILING A CLAIM FOR LOST OR DAMAGED PROPERTY

If property is missing or damaged a Property Claim Form or 1-387 will be provided to the detainee and will be thoroughly investigated. A detainee being transferred, released, or removed from the country with a property claim shall be allowed to initiate the claim before leaving the facility. The facility administrator shall forward the result of the claim to the claimant's forwarding address (provided upon admission or in conjunction with the claim).

## MONEY TRANSACTIONS

There will be no financial transaction between detainees unless approved by the Warden. You must be a verified relative or spouse in order to be considered for a transfer of money between detainees. If you meet the criteria, you must submit a written request to the Warden that provides sufficient information (reason for the request and supporting information).

You are not allowed to have any money in your possession while in the facility i.e. cash, coins, checks or money orders.

## ORIENTATION VIDEO

The facility will show you an orientation video in the Intake area during your initial processing.

## PRO BONO IMMIGRATION LAW VIDEO

You will be shown a legal video provided by the American Immigration Lawyers Association during your initial processing. In addition, you may request these immigration law materials anytime in the future, by using the packet request form available to you in the housing unit or Law Library. The list of detainees who will view the Pro Bono presentation is compiled by the court. If you want to be placed on the list, submit a detainee request to the Programs Coordinator.

A list of Pro Bono legal services is located on the bulletin board and the Talton Communication poster in the housing unit.

## DETAINEE WORK PROGRAM (VOLUNTARY)

The center utilizes detainees to perform such functions as painting, food services, laundry services, barbershop and sanitation.

All work is done on a voluntary basis, except that work which is customarily required for cleaning your living area.

The Classification Officer selects and assigns workers to job vacancies. Your classification level, criminal history, escape history and medical status will be used to determine if you are eligible to work and if eligible, the type of work assignment for which you are eligible.

You may be removed from a work detail for such causes as:

- Disruptive behavior, threats to security, etc.
- Unsatisfactory job performance
- Infraction of a facility rule, regulation or policy, leading to removal from a work detail as a sanction imposed by a disciplinary proceeding  through the Institutional Disciplinary Panel (IDP) or Unit Disciplinary Committee (UDC)
- Physical inability to perform all functions required by the job, whether because of a lack of strength or a medical condition.
- You may be removed from a work detail to prevent future injuries.

You will receive an orientation to your job assignment by your job supervisor. You will be asked to sign a statement that you have received the orientation and that you understand the job requirements. If you refuse to sign the statement, you will be removed from the job assignment.

If you are injured on your job assignment, you are to immediately report the injury to your detail supervisor.

Depending on the jobs, you are required to wear the proper uniform and/or safety related equipment as told to you by your supervisor.

## DETAINEE DRESS CODE

You are required to have your full uniform on whenever you are outside your housing unit when going to court, visitation, and church services etc, except to recreation at which time a t-shirt and shorts will be allowed. When you are inside the housing unit, you are also required to put on your t-shirt, pants or shorts and shoes in the dayroom area.

## SECTION II

## ACCESS TO COURT AND LAW LIBRARY

## IMMIGRATION LAW LIBRARY MATERIAL

The law library is available for detainee use. If you would like to go to the law library fill out a detainee request form (kite).

In addition to the computers, detainee handbooks, law dictionaries, legal research guides and writing materials are also available. The computers are for legal work only.

PL000036

6

### LOCATION AND HOURS OF ACCESS

The law library is located in the North West hall way of the facility.

The facility law library can be accessed Monday – Friday from 7:30am – 10 pm with the exception of count times and religious services. This will enable all detainees regardless of housing or classification to utilize the law library on a regular basis. When requested and where resources permit, you shall be provided with meaningful access to the Law Library, legal materials and related materials on a regular schedule with no less than 15 hours per week.

You will not be required to lose your recreation time in order to use the law library.

### REPLACING DAMAGED MATERIALS

A list of law library holdings is posted in the library. The Law Library Officer is responsible for the law library and will inspect the law library documents at least weekly for missing or damaged materials. You are encouraged to report missing or damaged materials. Damaged or missing materials will be promptly ordered and replaced.

### SUPERVISION

The library staff will monitor your use of legal materials to prevent misuse, damage or destroying of legal materials and/or equipment. You are not permitted to mutilate or destroy legal materials, equipment or to remove legal material or supplies from the law library.

### UPDATING LEGAL MATERIALS

This facility provides detainees with access to law materials using Lexis-Nexis, a web-based research database that provides up-to-date access to legal materials in electronic format.

This facility subscribes to a law library updating service. Out-of-date materials will be disposed of when replaced by new material. Immigration and Customs Enforcement will add information on significant statutory and regulatory changes regarding detention and deportation of aliens in a timely manner, and will provide initial copies to the facility.

### REQUEST FOR ADDITIONAL LEGAL MATERIALS

If you require additional legal material(s) not available in the facility, you need to make a request in writing to the Program Coordinator. Requests for copies of court decisions will normally be available within three (3) business days. If you are making unnecessary requests for material not contained in the law library, the Administration will consult with Immigration and Customs Enforcement staff to determine appropriate action.

### PHOTOCOPYING OF LEGAL DOCUMENTS

You can obtain photocopies of legal materials when such copies are reasonable and necessary for a legal proceeding. You need to request these copies using a "kite" and state the number of copies you need.

- The number of copies made of documents to be filed with a particular court, combined by the number required for Immigration and Customs Enforcement

records and at least one copy for your personal use will determine the number of photocopies required.

### ILLITERATE AND NON-ENGLISH SPEAKING DETAINEES

Unrepresented illiterate and non-English speaking detainees who wish to pursue a legal claim related to their immigration proceedings or their detention will be provided with access to a set of English language law books and Language Line Service for limited English proficient detainees. Assistance will be provided as follows:

- Detainees will be assisted in the use of the law library and the drafting of legal documents from other detainees who have appropriate language and reading/writing abilities.
- Assistance in contacting *pro bono* legal-assistance organizations from the Immigration and Customs Enforcement-provided list. *The Pro Bono list is posted on the bulletin boards in all housing units.*

### DETAINEE RETENTION OF PERSONAL LEGAL MATERIALS

Detainees are permitted to retain all legal materials in both general population and Segregation/SMU provided such material does not create a safety, security or sanitation hazard. Detainees with excess legal material will be required to place such material in personal property storage. If you wish to access the excess legal material, you must provide a request to the Chief of Security for the specific material you need to access. Your request will be answered within 24 hours after the request is made, during designated hours, unless documented security concerns preclude action within this time frame.

Detainees are allowed to utilize an electronic storage device provided by the library to save their legal documents. It will be kept in a locked cabinet in the library and they are not allowed in the housing unit, but will be transferred to a disk given to the detainee upon his or her departure from facility. At no time should information be saved on the library hard drive of the computers. On a daily basis, all computers are checked and cleared of any information not authorized at the closing of the library. No electronic devices will be accepted through the lobby and detainees are not allowed to have personal thumb drives or any other external media in their possession or brought in or mailed in.

### LAW LIBRARY ACCESS FOR SEGREGATION/SPECIAL MANAGEMENT UNIT

Law library access for detainees housed in SEG/SMU is provided as follows:

- SMU - Detainees housed in Administrative Segregation have the same law library access as the general population, consistent with security. Detainees segregated for protection may be required to use the law library separately from other detainees, or where feasible, have legal material brought to them. The level of law library supervision provided will be based on an individual's behavior, attitude, custody level, separation needs or other security concerns.
- Disciplinary Segregation - Detainees housed in disciplinary segregation will be afforded the same legal access as the general population, unless security concerns require limitations. Access will be provided upon request. Violent and/or uncooperative detainees will be temporarily denied access to the law library to maintain security, until such time as their behavior and attitude warrants resumed

**APP. 234**

access.  In some circumstances, where feasible, legal material may be brought to individuals in disciplinary segregation.

**ATTORNEY VISITATION**

Legal assistants may meet with you during legal visitation hours provided that they produce a letter of authorization from the legal representative under whose supervision they are working.  The letter must state that the named legal assistant is working on behalf of the supervising legal representative.  Pre-approved interpreters may accompany legal representatives and legal assistants on visits.

Legal materials (limited to hard copy documents no electronic media) may be provided to you during a legal visit.  Staff will inspect the material for contraband, but will not read the material.

Legal visits authorized hours are from 8am to 9 pm, seven days per week.

**REQUESTS FOR INFORMATION FROM IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE COURT**

If you wish to contact Immigration and Customs Enforcement or court, you will need to submit a completed Detainee Request Form (kite) to request a service or information from the Immigration and Customs Enforcement.  Each kite requires your name, "A" number, housing unit, the date and your signature.  Print clearly on the Kite and submit one Kite for each request.  Questions about Court or for Immigration and Customs Enforcement should be addressed to Immigration and Customs Enforcement, and/or Court, whichever is applicable, on the Kite.  Place the kite in the mailbox labeled "ICE".

**LEGAL COMMUNICATION**

Mail service, attorney visitation and telephone calls are the primary means of access to legal representation and the courts.  Interpretive services for essential communication to GEO, ICE and Courts will be provided upon request by submitting a Detainee Request Form (Kite).

Legal documents will be accepted seven days a week during the hours of 1pm and 5pm.

**RETALIATION PROHIBITED**

You have the right to present to the Court any legal issue regarding your immigration proceedings, basis for your detention, or the conditions of your confinement.

You will not be subjected to reprisals or penalties because of a decision to seek judicial relief on any matter, including the legality of your confinement; the legality of conditions and treatment while under detention or an issue relating to your immigration proceedings; or an allegation that the government is denying you rights protected by law.

**NOTARY PUBLIC**

A notary public is on-site for your assistance.  If you need a document notarized, submit a Detainee Request Form (kite) to your housing unit officer.  There is no charge for this service.  Documents to be notarized are limited to commercial or household related matters only.  **The facility has several notary publics in the facility who are available to assist you.**

**ENVELOPES AND STAMPS FOR LEGAL DOCUMENTS**

If you are indigent, you may request envelopes from the officer assigned to your housing unit.  You may request stamps by submitting a Detainee Request Form (kite), along with the addressed, sealed envelopes to the Library/Mail Officer.

**SECTION III**

**CORRESPONDENCE (MAIL), VISITATION, TELEPHONE ACCESSCORRESPONDENCE (MAIL)**

Mail can be sent to you at this address:

You're Name
You're A Number
Aurora Detention Center
3130 N. Oakland Street Aurora, Colorado 80010
Advise your correspondents to also address any special delivery, FedEx, UPS packets in this manner. If not, there is a possibility that the mail could be returned due to a lack of a sufficient address or detainee information.

**SPECIAL CORRESPONDENCE**

Special correspondence is defined as correspondence sent to or received from private attorneys and legal representatives, government attorneys, judges, courts, embassies and consulates, the President and Vice President of the U.S., members of the U.S. Congress, the U.S. Department of Justice (including the Immigration and Customs Enforcement and the Office of the Inspector General), the U.S. Public Health Service, administrators of grievance systems, and representatives of the news media.  Correspondence will be treated as special only: if the sender-for incoming correspondence or the addressee - for outgoing correspondence - the title and office are CLEARLY identified on the envelope and the correspondence is labeled "Special".  It is your responsibility to inform senders of special mail of this LABELING REQUIREMENT.

Packages may not be sent or received without advance arrangement approved by the Warden or designee.  You must submit a Detainee Request Form (kite) for approval to the Chief of Security.

Postage stamps may be purchased through the commissary.

If you need writing implements, paper and/or envelopes, you may request these materials from the officer assigned to your housing unit.

### INDIGENT DETAINEES

If you are indigent ($15.00 or less consistently on your account for a period of seven (7) days or more), you will be permitted to mail the following:

1.  An unlimited amount of special correspondence or legal mail within reason.
2.  Three (3) pieces for general correspondence upon request

Indigent postage in all cases is generally limited to letters of *one ounce or less*, but exceptions may be made for special correspondence and may be made in compelling circumstances for general correspondence and other mail. You must submit a "kite" with the correspondence you are sending.

### INCOMING MAIL

### NON- LEGAL MAIL

All incoming mail will be opened, inspected and/or read for contraband, if necessary, in your presence by staff. Non-legal mail will be read when the facility personnel have reason to believe that said mail might present a threat to the facility's secure or orderly operation, endanger the recipient or the public or might facilitate criminal activity, such as containing information related to an escape attempt or other illegal activity. If, for any reason, your correspondence is withheld, you shall be informed in writing of the reason such action has been necessary. Incoming mail will be distributed on the day it is delivered by the postal service. Packages will be inventoried and inspected within 48 hours of delivery.

### LEGAL MAIL

Incoming legal mail and special correspondence will be opened and inspected for contraband in your presence by staff unless waived in writing; however, legal mail shall not be read or withheld from you. This is inclusive of letters from the courts, counsel, officials of the confining authority, other government officials, and administrators of grievance systems and members of the Parole Authority. *It is your responsibility to advise the senders, if they are your legal representatives or potential representatives, to clearly mark their mail as "Special or legal" mail on the envelope.*

### CHANGE OF ADDRESS

It is your responsibility to notify the postal service of your change of address should you be transferred or released. In most instances, mail received after you leave, will be returned to sender.

### LIMITATIONS ON POSSESSION OF PUBLICATIONS

You are limited to the following number of items in your possession at any one time from the leisure library:

a.  Three (3) books – hard/soft cover
b.  Two (2) magazines
c.  One Bible, Koran, or similar religious publications
d.  Other items approved by the Warden or designee

It is your responsibility to have excess material placed into your property storage. Excess items, with the exception of legal papers and personal correspondence, will be confiscated as contraband and will be disposed of as the Warden deems appropriate. Legal papers and personal correspondence will be placed in your locker for safe storage.

Subscriptions to publications, magazines and catalogs are not allowed. The facility subscribes to certain magazines that are available to you in the leisure library. Books must be requested in advance via a "Request to Receive a Package or Property" form. The title(s) of the book(s) must appear on the "Request" form. Books must come directly from the publisher or an authorized bookstore / outlet.

### OUTGOING MAIL

All outgoing mail must be placed into ENVELOPES, SEALED, with the proper postage affixed, and placed in the designated mailboxes. All mail picked up by 9:00 a.m. will be sent out the same day. If for any reason your outgoing mail is not sent, you will be informed and the reason why it was not sent will be provided to you. There is no limit on the number of letters you may send out.

All outgoing mail must have a return address with your name; you're a number and the complete address of the facility clearly written on the envelope.

Outgoing general correspondence and other mail may be inspected or read if:
a.  the addressee is another detainee; or
b.  There is evidence the item might present a threat to the facility's secure or orderly operation, endanger the recipient or the public or facilitate criminal activity.

### VISITATION

Visits are 60 minutes in length and done by unit. Visitors must have valid and verifiable identification – a government issued photo identification card. A responsible adult must accompany anyone under 18 years of age.

### Visiting is as follows:

**Legal/Religious visits** - authorized hours are from 8am to 9pm, seven days per week. (Both shall provide proof of endorsement by the appropriate certifying body)

| | Monday Lunes | Tuesday Martes | Wednesday Miércoles | Thursday Miércoles | Friday Viernes | Saturday Sábado | Sunday Domingo |
|---|---|---|---|---|---|---|---|
| A Units | None | 0700-1300 | None | 0700-1300 | 0700-1300 | 0700-1300 | None |
| B1&2 Units | 0700-1300 | None | None | 0700-1300 | None | None | 0700-1300 |
| B3&4 Units | None | 1500-2100 | None | 1500-2100 | None | None | 1500-2100 |
| D Unit | 1500-1800 | None | 1500-1800 | None | None | 1800-2200 | None |
| SHU | None | None | 0700-0900 | None | 1330-1530 | 1330-1530 | None |

9

PL000039

**APP. 236**

A detainee can only have one social visit per day, for example if a detainee has a visit in the early evening, he/she cannot have another visit, later in the evening on that same visiting day.

## VISITING BETWEEN DETAINEES

All visits between persons detained must have prior approval of both the Warden and the Immigration and Customs Enforcement staff. You must submit a "Kite" to the Immigration and Customs Enforcement staff, requesting visitation and provide supporting documentation of your relationship with the person for which the visiting has been requested. Immigration and Customs Enforcement will confer with the Warden and you will be advised of the decision in a reasonable period of time.

## VISITING RESTRICTIONS

- All social visits are Non-contact visits.
- If your visitors appear to be under the influence of alcohol/drugs, the Shift Supervisor will be notified and the visit will be terminated.
- A maximum of 2 visitors at a time (small children not included).
- All visitors are subject to search.
- Visitors are not allowed to pass or attempt to pass any item to you.
- Children must be under control at all times.
- Visitors are not allowed to chew gum in the facility.
- Visitors are not allowed to carry any items into the visiting area.
- If contraband is found on your visitors, such as drugs, alcohol, weapons, they will be subject to prosecution under CRS-18-8-201 and 18-8-204.
- The Chief of Security must approve additional visitation time.

## VISITING RULES

It is your responsibility to advise your visitors to follow the visiting rules and all posted laws, rules, and regulations when they come to visit you.  It is also your responsibility to follow all of the visiting rules and regulations.

### Female Visitors Age 12 and Older

- Shorts shall cover customarily covered areas of the anatomy, including the buttocks and crotch area, when standing and/or sitting. Shorts no higher than mid-thigh comply. Short-shorts, jogging shorts, cut-offs, and other obviously inappropriate short garments are prohibited.
- Skirts and dresses shall extend to mid-thigh, seated.
- Slits in skirts and dresses shall rise no higher then mid-thigh, seated.
- Sheer (see-through) clothing is prohibited.
- The top of clothing shall be no lower than the underarm in front and back, bare midriffs and strapless tops, tube, and swimsuits are prohibited.
- Shoes shall be worn at all times.
- Gang "colors" and other gang displays are prohibited.

### Male Visitors Age 12 and Older

- Shorts shall cover customarily covered areas of the anatomy, including the buttocks, and crotch area when standing and/or sitting. Shorts no higher than mid-thigh comply.  Short-shorts, jogging shorts, cut-offs, and other obviously inappropriate short garments are prohibited.
- Shirts shall be worn at all times. Muscle shirts, bare midriff shirts and sleeveless shirts are prohibited.
- Shoes shall be worn at all times.
- Gang "colors: and other gang displays are prohibited.

## CONTACT VISITS

All requests for contact visits are to be submitted in writing via detainee request form.
A contact visit is defined as a 30 minute visit between a detainee and any visitor, including infants and children, where limited physical contact is allowed.  Limited contact may include a brief embrace at the beginning, and upon completion of the visit.

## CONDUCT DURING VISITATION

a.  All conduct by both detainees and visitors shall be quiet and orderly.
b.  Detainees and visitors shall remain in an upright position.
c.  Detainees will be seated across from all adult visitors without physically touching their adult visitors, but may hold their own children.

The following conduct shall be prohibited:
- Exposure of genitals or breasts;
- Lying on the floor or ground, upon seats or tables or under tables or attempting to conceal the visitor and/or detainee from staff;
- Touching any genital area, breast or buttocks, under or over clothing;
- Use of profanity, making loud noises, disturbing other detainees or visitors, creating a mess or otherwise being a nuisance in the visitation area;

Abuse of these privileges will not be tolerated and immediate suspension of a visit may occur for prolonged hugging and kissing, French kissing, or excessive displays of affection that disrupt the visiting environment.  The exposing of, or physical contact with, the clothed or unclothed sexual body parts of a detainee or a visitor will result in an immediate suspension of the visit and may result in denial of future visitation privileges.

Any disorderly conduct, which includes using hostile, vulgar, or profane language, unruly behavior, engaging in activities that disrupt or disturb others, creating loud noises, creating unsanitary conditions and which disrupts the orderly operation of the visiting room or offends others, is not permitted.

Any attempt to circumvent the regulations outlined in policy statement may result in temporary or permanent suspension of visiting privileges or other administrative or legal remedy by the Warden.

Upon completion of the visit, the detainee shall clean the area adequately.

Detainees will not be allowed to exchange any property with any of the visitors.  Exchange of property may result in suspension or termination of family visits.

Detainees are not permitted to take any personal items into the contact visitation room other than issued identification card. Legal paperwork is permitted for contact visitation with legal representatives.

Detainees needing to utilize the restroom during a visit will be escorted to the adjacent restroom with a pat-search being conducted prior to and after the movement.

## DETAINEE TELEPHONE ACCESS

Calls to "800," "888," "900," and any other toll free numbers are not authorized and will not be made. The authorized "877"prefix is the one for contacting the Consulate office and the "800" prefix DJS's OIG hotline #1-800-323-8603, or a 1-800 number that is verified by staff, in advance of the call as legal, is acceptable.

Any 1-800 number that is legal and verified as legal is acceptable.

No three way calling is allowed.

Your access to telephones will be suspended at count times, in the event of an emergency, and when it is determined by staff to be necessary to protect the good running order and security of the facility. Telephone use time is limited to up to 20 minutes per call in order to provide telephone availability for all residents. During times of high use by housing unit residents, this rule will be enforced.

When you receive your pin number for the phone you must set up your voice recognition. To do that you must do the following: State your name and GEO Aurora ICE clearly – **Example: John Doe *at GEO*** you will be prompted several times to repeat this statement. You must use the same words and tone when setting up your voice and at any time you desire to make a call.

## HEARING OR SPEECH IMPAIRED TELEPHONE

A portable phone for the hearing or speech impaired that complies with the American Disabilities Act is available for use if needed. Complete a Detainee Request Form (kite) if you require this service and send it to the Program Coordinator.

## PRE-PAID PHONE TIME

Phones are available in all living areas and Intake. These phones can be used for personal calls. You must not interfere with another detainee's telephone privilege.

Pre-paid phone time may be ordered via 41 1# on the housing unit phones.

The phone time may be used to make national and international long distance calls in addition to being used for all local calls.

The cost of the phone time will be deducted from your personal account. Local and international phone call rates are posted in your living area.

Phone time cannot be turned in for money. When you leave the facility you will take your "Talton" pin card with you.

Detainees are personally responsible for maintaining their pin card in their locker.

Phone time may be purchased based on funds available – minimum purchase is $5.00. Upon arrival, you will be given the opportunity to request phone time. Phone time (based on your funds) is applied to your account on the first business day following your arrival. Phone time is not posted on weekends or holidays. You may request same day phone time up to 3:45 p.m. Monday thru Friday excluding holidays. Any time requested after 3:45 p.m. on Friday will be applied on the following business day.

You cannot use personal phone cards – only facility purchased time may be used.

Your family and friends can leave you a voicemail by dialing (888) 516-0115 this will cost the person leaving the message $1.00 for each voicemail.

Your family and friends can deposit funds on your phone account from the internet visit: www.Talton.net

## USING THE HOUSING UNIT PHONES

Collect Calls: You need to dial (1) for English or (2) for Spanish directions followed by a (0), then the area code and phone number of the person you wish to contact. Once the number has been dialed, a voice prompt will ask for your name.

Pre-Paid Card: For instructions in English press (1) for instructions in Spanish press (2). After pushing (1) or (2) follow the voice prompted instructions.

## INCOMING CALLS

Staff will take and deliver telephone messages to you as promptly as possible. If an emergency call is received for you, the caller's name will be taken and delivered to you as soon as possible. You will be permitted to return the emergency call as soon as reasonably possible within the constraints of security and safety. If you are indigent, staff will assist you in returning the call.

*It is your responsibility to handle your telephone calls in a responsible manner.* If it is determined that you are abusing this privilege, for example, having someone call in false legal calls in order to circumvent regulations and this is discovered by staff, disciplinary action may be taken against you.

## DIRECT OR FREE CALLS

The telephone service generally available to detainees at this facility is limited to pre-paid time and collects calls. The facility shall provide detainees with the ability to make direct calls in the following circumstances:

- To consular officials.
- Emergency calls and other types of calls where a detainee can demonstrate a compelling need to make a direct call, such as a family emergency.
- To the local immigration courts and the Board of Immigration Appeals.
- To Federal and State courts where the detainee is or may become involved in a legal proceeding.
- To a government office, to obtain documents relevant to his/her immigration case.

PL000041                                                                                  11

**APP. 238**

- Office of the Inspector General of the U.S. Dept. of Homeland Security at 1-800-323-8603
- Legal representatives to obtain legal representation or for consultation when subjected to expedited removal.
- UN High Commissioner for Refugees (UNHCR) 1-888-272-1913

Detainees shall be provided with the ability to make direct or free calls to the following:

1. Consulado de Mexico Denver
2. Pro Bono Denver
3. Metro Volunteer Lawyers
4. Catholic Immigration Services
5. Justice Information Center
6. A Welcome Place (Utah only)
7. Wyoming Legal Services (Wyoming only)

Providing access to a telephone that permits calls at no expense to you

### UNUSED PHONE TIME

Upon departing the facility, you may have unused monies that you have placed on the detainee phone system. TALTON Communications is the company that Immigration and Customs Enforcement (ICE) has contracted with to provide service for the detainee population here. This company is separate and distinct from The GEO Group, and as such we have no control over their policies in this matter. TALTON will not consider a refund of phone monies until you have departed the facility (release or removal). Upon departure you must call TALTON at (866) 348-6231 and provide them with all requested information. Should the balance of your phone monies be less than $50.00 dollars, you will then be provided a prepaid phone card in the amount owed. This prepaid phone card will be issued by TALTON in the form of a pin# that you can use wherever you are located (provided you are not incarcerated). Should the balance of your phone monies be $50.00 dollars or more, then TALTON will send you your unused monies to the address you provide. The only exception to this would be if a credit card was used to purchase phone time, then the refund of phone time would be credited directly to the credit card used. Any further inquiries can be directed to TALTON through the phone system by dialing 211#.

### SECTION IV    DETAINEE SERVICES

The Aurora Detention Center provides various services to the detainees that are designed to take care of basic health, religious and social needs. You will be expected to cooperate with the staff during such times that you take advantage of these services.

### RECREATION

You will be afforded at least four (4) hours a day, seven (7) days a week when housed in General Population. Recreation shall begin after morning count at 07:00 until 21:30 pm. Times are subject to change based on facility needs. You will be afforded the opportunity for recreation in the indoor/outdoor recreation areas, which is adjacent to each housing unit.

A schedule of recreation activities shall be arranged to coincide with normal center operations. Recreational activities in the housing units are limited to television viewing, card and board games, reading, puzzles, self-directed activities such as drawing, limited exercise and occasionally, an event such as bingo for the housing unit residents by the recreation staff.

Rules governing recreation are as follows:

- Your housing unit will announce recreation.
- Tennis shoes, shorts, and t-shirt must be worn.
- You will conduct yourself in an orderly fashion during recreation.
- No food or drink is permitted in the recreational areas.

Detainees in Special Management Unit(SMU) for administrative or disciplinary reasons shall be offered at least two (2) hours of recreation or exercise opportunities per day, seven days a week.

### TELEVISION

Detainees shall be provided a FM wireless radio and headset, and batteries for television viewing. If you request a replacement radio, headphone or batteries you will be charged for it and the batteries can be purchased through commissary. Indigent detainees will be handled on a case-by-case basis.

If you requested batteries from the business office you will have to exchange the old batteries for the new batteries with the housing unit officer. Exchanges are on a one for one basis and you must turn in the same amount of batteries that you are receiving. The maximum amount that can be exchanged at any time is two (2).

Television viewing hours will begin while breakfast is served. However clean up after breakfast must meet the satisfactory level of the officer to have the televisions turned on.

Detainees will be allowed to select the television programs they wish to watch. The housing unit officer will supervise this activity to insure that it is fairly operated and not abused. Abusive use will result in the housing unit officer taking action to discontinue TV viewing for a period of time.

Televisions may be turned off by any staff member in conjunction with the Lieutenant at any time if the detainees in the housing unit are uncooperative with regular operations which must occur in the housing unit, i.e., sanitation and maintenance work and/or if housing unit residents become disorderly, violate security, etc., or if staff determine the need to protect the orderly and safe operation of the housing unit/facility. The television will be turned on once cooperation and order is restored.

The televisions will be turned off at 11:00 p.m. Sunday through Thursday and 12:00 a.m. Friday and Saturday. Headphones are provided to you to hear the televisions and must be turned into your housing officer upon your release.

All activities in the housing unit will cease when the televisions are turned off for the night. Detainees will clear the dayrooms and will go to bed. Detainees will not be permitted to sit in the dayroom or to walk around in the dayrooms once the televisions are turned off, thus allowing other residents the opportunity to sleep without distractions.

Detainees are not authorized television controls in any manner.

PL000042

12

APP. 239

Detainee in Administrative Segregation, not Disciplinary Segregation, will be offered television. If a detainee is housed in Medical, a medical clearance must be given from the medical department first. However, a detainee must have good cell sanitation to be eligible for television viewing in the medical dayroom. There are no food and drinks allowed in the medical dayroom while watching television.

### SMOKING

This is a non-smoking facility. Tobacco products of any kind are prohibited within the facility.

### EDUCATION

If you are interested in sobriety programs or educational programs while you are here, contact the Program Coordinator to discuss your interest and see if you are eligible.

### FOOD SERVICE

The center provides three (3) nutritionally balanced meals per day. All meals are prepared in a clean and sanitary manner, and the kitchen is operated under guidelines set down by the Health Department and is periodically inspected by local health department officials. The use of food, i.e. withholding of, or variation from the standard menu, as a disciplinary measure or reward is prohibited. Special diets as required for medical reasons or adherence to religious dietary law are provided by the Food Service Department. You will be issued an appropriate eating utensil(s) and napkin. Meal times and menus are posted on the bulletin board in your housing unit.

- All menus are screened and approved by a registered dietitian to ensure a balanced diet that provides the proper nutritional value for all meals served.
- If you require a special diet for medical reasons, it will be implemented upon the written notification from the medical department to the kitchen supervisor.
- You are not permitted to barter with food handlers for special or additional food.
- Conduct during meals will be orderly and courteous at all times. There will be no loud talking or disruptive behavior. *Stand back from the food carts to allow food to be served to all detainees without interference. Interference will not be tolerated at any time.*
- You will not store open containers of food in your housing unit. Open food containers are not allowed due to safety and sanitary reasons. Food ordered from the Commissary in closed containers may be stored. Food served during meal service will not be stored in abundance in your living/bed area due to sanitation and health hazards.
- Refusal or bartering of a special diet (religious/medical) will result in a review of the diet request and possible discontinuation of diet.
- When receiving your meals you will be required to have on a minimum of shorts, t-shirts, shower shoes.
- Detainees that are assigned to the food service department shall have a neat and clean appearance
- Upon leaving the kitchen after you have completed your shift, you will be searched before going into your housing unit.
- All detainees working in food service areas shall use hair nets. Persons with hair that cannot be adequately covered up with a hair nets shall be prohibited from food services operations. Beard guards are also available.

- Detainees will receive a medical exam (from the medical department) before entering the kitchen to work.

Meal times are as follows:

Breakfast at approx. 05:30 am
Lunch     at approx. 10:30 am
Dinner   at approx. 5:00  pm

### RELIGIOUS DIETS

GEO facilities provide a pork-free menu which accommodates most religious dietary requirements. A non-flesh (vegetarian) diet may be provided for those who are uncomfortable with or prohibited from eating from the main menu.

Procedures are in place to reasonably accommodate detainees who have special religious dietary requirements. When a detainee's religion requires special food services, either daily or during particular periods of religious fasting, praying or holiday celebration; reasonable accommodations will be made to provide meals not religiously prohibited. If you require a religious diet, you must submit an "Authorization for Common Fare Participation" to the Programs Coordinator requesting the diet. No food items can be substituted from the "Common Fare" menu if you are enrolled.

The Chaplain or his designee may remove a detainee from the diet at the request of the detainee or at the request of the medical department due to medical reasons consistent with maintaining safety or security operational procedures. Detainees who are removed by their personal request from the diet may NOT immediately re-enter the diet process.

The Chaplain or his designee may recommend withdrawal approval for a detainee's religious diet if the detainee is documented as being in violation of the terms of the religious diet program. If a detainee misses three consecutive common-fare meals, the Chaplain or his designee shall recommend in writing that the detainee be removed from the program.

### HEALTH CARE

The facility maintains qualified, licensed medical professionals to attend to health problems.

### REQUESTS

If you have a medical problem, you must fill out a **Medical Request Form**, which may be obtained from a Detention Officer. The request will be screened and scheduled for assessment by the appropriate health professional. Medical requests shall be placed by the detainee in the boxes labeled "Medical Requests/Grievances" that are in the respective housing unit and Segregation/SMU.

When there is an urgent medical request and a delay in medical care will result in a serious medical condition, you should alert a detention officer or speak with a nurse during medication rounds.

Filling out a kite instead of a Medical Request Form may cause a delay in being assessed for a particular medical problem.

PL000043

13

**APP. 240**

### SICK CALL

Sick call is conducted 7 days per week by a licensed nurse. If a particular medical problem falls outside of the scope of practice for either a registered nurse or a licensed practical nurse, you will be referred to a medical doctor, physician's assistant or nurse practitioner according to the schedule of the practitioners.

Should you require emergency medical attention, you will be taken to the nearest facility providing emergency services.

### STAFF ASSISTANCE

If you cannot read or write, a facility staff member may assist you or you may have another detainee help you complete the medical request. Another detainee may not submit a request on your behalf.

### HEALTH ASSESSMENT

You will receive a comprehensive health assessment including a physical exam, dental and mental health screening within the first 14 days of detention and annually. Routine dental treatment may be provided to detainees who have remained in the facility for six months consecutively. TB screening is performed for the safety and well-being of detainees as well as GEO staff. You will receive a screening for Tuberculosis upon arrival regardless of your records or status at a previous facility.

### MEDICAL REQUESTS FOR MEDICAL OR DENTAL ATTENTION

All requests for routine medical or dental attention must be submitted in writing to the medical department on a medical request form. You must be fully dressed and show your Identification when you talk to the nurse, during housing unit medication pass, or are going to the medical department for treatment.

### PERSONAL MEDICATION

All medications that are brought into the facility are to be surrendered to Medical staff for disposition for the time you are here. Please ensure that you retrieve your personal medication before leaving.

### EYE CARE

Family members may bring in prescription eyeglasses with approval of the Health Services Administrator if this is deemed necessary. Optometry referrals will be made if your visual acuity (after an eye exam) is worse than 20/50 in the best eye. Prescription eyeglasses are not available for detainees who have been detained less than one year. After one year, an eye exam will be provided and prescription glasses will be made available if justified by an eye exam. Generic reading glasses may be offered in the case of eye strain after consultation with the Health Services Administrator.

### FACILITY PRESCRIBED MEDICATION

Medications will be administered as frequently as ordered by a health professional. When the nurses come into the housing unit to dispense medications, it is your responsibility to remain at

least 3 feet from the medical cart until the nurse calls you to receive your medication. The nurse must have an order to give medication and only in the doses and times the doctor has ordered. Medication rounds are performed twice a day 7 days per week. In order to receive prescription medications you must be present yourself during Medication Rounds with your identification and be fully dressed. You are responsible for ensuring that you receive your medication as it is not the responsibility of the nursing staff to locate you to take your medication. Touching or crowding the cart, taking medication or other items from the cart, being loud, aggressive, or hindering the nurse in any way is prohibited. You are responsible to report to the nurse to receive your medication. Your name will not be called. The nurse will not come back after leaving your housing unit. You are responsible to be ready to receive your medications. No Aspirin, Tylenol or Motrin will be administered at Medication Rounds unless prescribed by a doctor or dentist. However, these items are available for purchase from the commissary.

You will be asked to review and sign a contract of responsibility for "Keep on Person" medication (as prescribed) and medical devices and/or equipment. You will be asked to sign this document which also includes a waiver. You will be expected to abide by written instructions and rules associated with "Keep on Person" articles by securing them inside your personal bin under your bed. At no point in time are these articles to be lent to or borrowed out to another detainee.

### REFUSING MEDICAL TREATMENT

You may refuse routine medical treatment, but will be administered treatment in the event of a life-threatening emergency. Do not submit a Medical Request unless you have a need for medical care. Should you refuse medical treatment after submitting a Medical Request Form, you will report sign a refusal with a medical professional witnessing your refusal. Should you refuse to be seen by a physician, you will report to the medical department to sign a refusal with medical professional witnessing your refusal. You cannot refuse the 14-day Health Assessment.

If you do not report to the medication cart, you will be reported as a no show. You will be taken to the doctor's appointment to sign a refusal in the doctor's presence.

The medical department will not approve the following:

- Non-medical diets (i.e. vegetarian diets)
- Extra bedding or mattresses (unless medically related)
- Extra or personal clothing
- Protein or herbal supplements
- Any medication not ordered by the Medical Director

### COMMUNICABLE DISEASE GUIDELINES

In order to prevent the spread of communicable diseases, you need to follow basic sanitation rules and guidelines. Do not share eating utensils with other detainees. Do not share razors or towels. Throw used tissues in the trash. Do not spit in the sink, trashcans or on the floor.

Cover all coughs and sneezes with a tissue. Wash your hands with soap and warm water each time after you use the bathroom. Avoid contact with other detainee's body fluids. Do not use needles or allow another detainee to tattoo or pierce you with anything, at any time. Do not

share combs, toothbrushes, or food with other detainees. Wear your shower shoes while taking a shower.

## MEDICAL DIETS

Medical diets are prescribed only by Medical Staff and only addressed specific needs such as diabetes, low salt, low fat, and certain medically proven allergies. Medical will not order a specific food for you or restrict something that you don't like. Medical staff will not prescribe a vegetarian diet or any diet required by religious beliefs. Those requests should be addressed to the Programs Coordinator.

## BARBERING SERVICES

The hours for the barbershop vary, depending on staff and barber availability. Only approved detainees provide haircuts. A schedule will be posted in the housing units to inform you when your unit is scheduled for haircuts. The detainee cutting hair is not allowed to charge any fee, take commissary, phone cards or anything else of value in exchange for a haircut. The detainees cutting hair are only allowed to give regular haircuts; no fades or specialized haircuts.

Hair cutting restrictions are:

The removal or treatment of blackheads, carbuncles, infected hairs, or any sores or lesions is prohibited.

The pulling of hair from ears, eyebrows, and moustaches is prohibited.

No barbers will serve any detainee when the skin of the detainee's face, neck, or scalp is inflamed, scaling, contains pus, or is erupted, unless service of such detainee is performed in accordance with the specific authorization of the Health Services Administrator. No person will be served when infested with head lice.

## LAUNDRY SERVICE

### Mondays and Thursdays:

- Uniform exchange - Units A, D, Segregation and Medical
- Undergarment exchange* – Unit B

### Tuesdays and Fridays:

- Uniform exchange – Unit B
- Undergarment exchange* – Units A, D, Segregation and Medical

### Wednesdays:

- Linen exchange – Units A, D, Segregation and Medical

### Thursdays:

- Linen exchange – Unit B

### Blanket exchange

Blankets will be exchanged once per month on a one-for-one basis

All mesh bags need to be placed near the officer station no later than 0600. Medical and Segregation officers will insure the respective bags are ready for pick-up.

All exchanges will be on a one-for-one basis

All items will be washed, dried and the identical number of items returned to the housing unit.

You are not permitted to wash clothing, bedding, linens, tennis shoes or other items in the living units and you are not permitted to hang any laundry on the walls, beds, or other areas. You will be held accountable for clothing and bedding supplies issued to you. You are not authorized to alter, in any manner, the clothing you receive.

## RELIGIOUS SERVICES AND SPIRITUAL COUNSELING

You have the right to freedom of religious affiliation and you will have the opportunity to practice your religious faith in a manner that is deemed essential by your faith, consistent with the safety, security and the orderly operation of the facility. Attendance at all religious activities is voluntary and open to all. You will be expected to recognize and respect the rights of others. Opportunities for religious activities are open to the entire population, without regard to race, color, nationality, or creed.

Qualified volunteers offer Catholic and Protestant Services along with non-denominational services on a weekly basis. These volunteers may also provide counseling services, provided there are available volunteers. Services may be provided to detainees who are in the SMU/Segregation Unit on an individual basis.

Worship services are conducted on a regular basis. Bibles, religious items and literature are available from the Programs Coordinator or designee upon request. If you have a question concerning your religious activities, contact the Programs Coordinator.

The observance of religious holy days is respected. The Programs Coordinator will work with you to accommodate a proper observance of important religious holy days. You must submit a written request to the Program Coordinator if you wish to participate in a religious holy day observance.

You may be allowed to wear or use personal religious items during religious services, ceremonies, or meetings in the multipurpose room, unless the Warden or Programs Coordinator determines that the wearing or use of such items would threaten facility security, safety or good order. Items of religious wearing includes, but is not limited to:

- Prayer shawls and robes;
- Kurda or ribbon shirts;
- Medals and pendants;
- Beads and various types of head wear

## DETAINEE LIBRARY SERVICES

General library reading materials will be made available Monday through Friday, 7:30am–10:00 pm with the exception of court times and religious services.

**APP. 242**

Leisure library books will be available in each housing unit in the multipurpose room.

You must submit a request (kite) to go to the library. You may have in your possession a maximum of three (3) books (hard or soft cover) and (2) magazine (other than those issued by Religious/Educational Programs). When you are leaving the facility, you must return any books and magazines belonging to the library to the housing unit officer.

## COMMISSARY

You may order commissary throughout the week utilizing the kiosk. You may add to or subtract from your order during the week however the kiosk will be locked on Thursdays at 12:00 noon to finalize your purchase. Orders will be delivered weekly, usually on Fridays. Maximum purchase will be $100.00 not including clothing and headphones. Prices are subject to change without notice as commissary costs increase. If you don't have enough money for the entire order you placed, the commissary department will fill your order based on how much money you have in your account to cover your order. Commissary items **MUST** fit in your locker. You must present your identification and be fully dressed to receive your order.

If you accept your order and leave the delivery area without checking it, items shorted will not be filled. It is your responsibility to check your order prior to leaving the delivery area.

If you are working, in visitation, court, or medical and the housing unit officer is able to verify that, your order will be left with the Lieutenant in a secure area and upon your return your order will be given to you and a signed receipt will be given to the officer.

## MARRIAGE REQUESTS

The following guidelines will be used if you request permission to marry while in the custody of the Immigration and Customs Enforcement: The Immigration and Customs Enforcement will either grant or deny your permission to marry. The Warden will be advised of your request and of the decision of the Immigration and Customs Enforcement.

If permission is granted, you must make all arrangements for the marriage, which includes taking a blood test (if applicable), obtaining a marriage license, paying for all costs associated with the marriage and retaining an official to perform the marriage. GEO staff or the Immigration and Customs Enforcement will not participate in making marriage arrangements. Staff will accommodate arrangements made consistent with the safe, secure and orderly operation of the facility. The Warden reserves the right of final approval concerning the day, time, place and manner of all arrangements.
Only those persons necessary to perform the ceremony will be permitted to attend. Guests will not ordinarily be permitted to attend. Minors under the age of 17 and under will not be permitted to attend unless directly related – i.e., your immediate family. A detainee will not be allowed to leave the facility for the purpose of making marriage arrangements. The detainee or person(s) acting on his/her behalf shall bear all expenses relating to the marriage. Marriage ceremonies will be private, with no media publicity.

## SECTION V    SANITATION

The center will maintain the highest sanitation standards at all times in all locations without exception. There will be an organized, supervised and continuous program of daily cleaning by all detainees to maintain those standards.

## PERSONAL HYGIENE

You are required to keep your body clean and free from offensive odors, lice or other parasites, and you are required to be dressed in a complete uniform during normal working hours when in the dayroom area or outside the housing unit, i.e., shirt, pants.

Personal hygiene items will be exchanged every other Monday. In order to receive a new bottle of lotion and/or shampoo you must exchange your empty bottles. Supplementary items are available for purchase from the commissary.

If you do not have money, you will be issued necessary items for the purpose of personal hygiene, but only the needed items in minimum quantities necessary will be provided.

You will have the opportunity to take at least one (1) shower daily. You are highly encouraged to shower and brush your teeth daily.

If you think you may be infested with "crabs" or other parasites, notify a medical staff person who will take immediate steps for delousing.

Disposable razors will be issued on a daily basis normally around 7:30 am, and only on day shift. If a detainee requests to shave, he or she will sign up on the razor issue form. Detainees will have one hour to use the razor and return it to the officer. Detainees reporting to work in the kitchen on the morning shift are also afforded the opportunity to shave before reporting to work.

If you will be attending a court hearing, you will be afforded the opportunity to shave before appearing.

Fingernail clippers are available for purchase through the commissary.

Flush the toilets after each use. Urinate and defecate in the toilets, not the floors or wall. Toilet paper may be obtained from detention staff.

You must wear shoes or shower shoes except when in your bunk. If you have peeling skin or cracks on your feet, you should notify Medical.

## LIVING AREA/BED ASSIGNMENT

You are required to keep your personal living area clean and sanitary. This includes your bunk and immediate floor area around and under your bunk, locker, and any personal items.

Cleaning supplies will be provided, usually at specific times, as needed by the detention officer.

Housing units and all common areas must be kept clean and should be ready for inspection at any time.

You are required to keep all books, hygiene items and personal items in the storage unit provided.

If you have excessive personal items in your bed area including under your mattress, you will be afforded, during shakedowns, the opportunity to place these items in your personal property or to dispose of the items. The Officers assigned to the housing unit along with the Shift

Supervisor will decide what items are excessive. If personal items are confiscated a receipt will be issued to you.

<u>You are required to make your bunk in a neat and orderly manner by 0730.</u> This means that the bottom and sides will be tucked under the mattress. The sides and ends will not hang down over the edge of the bed.

You may sleep <u>on</u> your bunk after it is made in the mornings, not under the covers/sheets. You may request a second blanket and sleep under the second blanket on the top of your made bed, not under the sheets until after the afternoon count has been completed. When you get up from your nap, you need to neatly fold your blanket and place it on your bed. Your bed is to be made when you are not occupying it.

Your towel needs to be neatly folded and hung on the hook and you may neatly hang your laundry bag over the hook as well.

You are authorized one mattress and one pillow. Excess pillows and mattresses will be removed from your bed.

Blankets, sheets or towels are not to be used as rugs, drapes, pillows, or tenting for purposes of concealment at any time.

Pictures, articles of any kind, or any other items may not be placed on the walls or other fixtures of this facility. This includes graffiti and other drawings or markings on any surface area, for example, the walls, your bed and bed area, bulletin boards, televisions, doors etc.

You will be assigned a bed and a storage unit for the storage of your personal property. *Do not move to another bed unless staff has authorized you to move.* You should also use your storage unit to store all of your personal property, including your commissary. Do not allow other detainees to have access to your personal property. If you do, you increase the probability that your personal items may be stolen. *It is your responsibility to take care of your personal items.*

<u>HOUSING UNIT SANITATION</u>

Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit Officer will be responsible for assuring this general cleanup is done on a regular basis.

<u>DAY SPACE</u>

Day rooms are open spaces in the housing units that are utilized for watching television, playing board games, dominos or cards, as well as for socializing among detainees. Tables with chairs are provided for your use in the dayroom.

All detainees in a housing unit are required to keep clean and sanitary all commonly accessible areas of the housing unit, including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs.

Detainees will take turns cleaning the area. If a detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit officer of the problem. Action will be taken to resolve this problem.

The day room area will be kept clean at all times. Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean the area will result in further disciplinary action.

Walls will be kept free of newspapers, clothing, cups, bowls, and other objects.

Bulletin boards contain information beneficial to you and are not to be defaced in any manner. Posted material is to remain on the boards until staff removes the item(s).

<u>SECTION VI</u>       <u>GRIEVANCE PROCEDURES</u>

A Grievance is a complaint about the substance or application of any written policy, regulation or rule of Aurora Detention Center or the lack of application of a policy, regulation or rule, or a complaint about any behavior or action directed toward any detainee by staff or another detainee, or a violation of civil rights. You have a responsibility to use the program in good faith and in an honest and straightforward manner.

<u>FILING A GRIEVANCE</u>

If you have a grievance, you should first try to <u>informally resolve</u> it by bringing it to the attention of a detention officer, shift supervisor or staff member in charge of the area with which you have a problem. Each grievance filed must contain only one subject, or a group of closely related issues, under one subject. If your grievance contains more than one subject, contains vulgar language, or is submitted as a group grievance, the Grievance Coordinator will reject it without review. Grievances that are medically related must be placed into the mailbox labeled "Medical Requests/Grievances" and all other grievances must be placed into the mailbox labeled "Grievances".

You may obtain a Grievance form from your housing unit officer. You must fill out the form, sign and date it, and explain as best you can what the problem or complaint is and what relief is sought. You may obtain assistance of facility staff or another detainee in preparing your grievance. Another detainee may assist you with your grievance if you are illiterate or unable to communicate in English without charge or obligation of any kind. Another detainee cannot submit a grievance for you or any other detainee.

Grievances that are of an <u>EMERGENCY</u> nature will be responded to on an immediate basis in an effort to prevent problems that may arise due to delay. You must directly submit your grievance to a staff member for it to be treated as an emergency. The staff member will immediately contact the Shift Supervisor. If the Shift Supervisor concurs the grievance represents an emergency, he/she will submit a report to the Warden describing the problem and its resolution. Emergency grievances not resolved at the Shift Supervisor's level will be sent to the Grievance Coordinator for resolution during normal business hours.

If the emergency is medical in nature, the grievance will be submitted to the Health Services Administrator. This grievance will be reviewed within twenty-four hours of receipt. If a Shift Supervisor received the complaint during the absence of the Health Services Administrator, he/she will be contacted and advised of the complaint. The Health Services Administrator will advise the Shift Supervisor and the medical staff on the procedures to resolve the complaint.

If the Warden determines that your grievance is not an emergency, you will be contacted and advised of the non-emergency determination of the complaint and the complaint will be rejected as an emergency.

Detainees shall place completed grievances in the locked "Grievance Drop Box" located in each housing unit. The grievance may be placed in an envelope prior to being placed in the locked Grievance Box.

Each day (excluding weekends and holidays) all grievances will be collected from the grievance drop boxes.

If your written grievance is accepted, it will be forwarded to a department head or management level employee by the Grievance Coordinator to provide review and resolution of your grievance. For example, the Food Service Manager would be assigned to provide review of a grievance in the food service area. This information will be forwarded to the Warden for final review and approval. A written response to your grievance will be given to you within 5 working days excluding weekends and holidays. If you are illiterate or non-English speaking attempts will be made to translate the findings into your language.

The detainee may appeal the Department Head's decision to the Grievance Appeal Board (GAB) designee within five working days. The GAB may call witnesses, inspect evidence or otherwise gather facts essential to an impartial decision. The Board will offer the detainee the opportunity, if determined by the Board that additional information or clarification is required, to appear before the Committee to present his/her case, answer questions and respond to conflicting evidence or testimony. Within five days of reaching a decision, the GAB will provide the detainee with its response to the grievance, in writing. The written response will state the decision and the reason for it.

A final appeal may be filed to the Warden. The form will then be forwarded to the Warden. The Warden will respond to the appeal within five (5) working days for final resolution of the grievance.

Any detainee dissatisfied with facility response may file a grievance appeal and communicate directly with ICE/ERO.

No harassment, punishment or disciplinary action will result simply because you are seeking resolution of a complaint.

Detainees may file a complaint about ICE officer misconduct directly with the U.S. Department of Justice by calling 1-800-323-8603 or by writing to:
DHS OIG Hotline
245 Murray Drive SE
Building 410
Washington, DC 20538

## SECTION VII SECURITY AND SAFETY – DETAINEES AND STAFF

### PERSONAL SAFETY

You will be protected from personal abuse, corporal punishment, unnecessary or excessive use of force, and the right of freedom from discrimination based on sexual orientation or political beliefs, personal injury, disease, and damage to your property and harassment to the fullest extent possible.

You are responsible for your own behavior at all times and are to be courteous and respectful toward the facility staff. You are expected to treat staff, community volunteers and other detainees with respect at all times. Harassing, rude or demanding behavior and profanity toward staff or others will not be tolerated. You shall address all staff members by either their rank, title, or as "Mister", "Miss", or "Officer."

If you have a problem such as conflicts with other detainees, personal problems (family) or questions about this facility operation, ask your housing unit officer for assistance. If you feel that you should be moved from your current housing unit for your safety, notify an officer immediately.

Identification Wristbands will be worn at all times. Removal, loss, or damage of your Identification Wristbands may result in the loss of privileges. If you lose and/or destroy your Identification Wristbands, submit a Detainee Request form. You may be charged a replacement cost.

Do not block exit doors with beds, chairs, lockers or other material or items that could interfere with emergency exit routes.

When you are called for release you will come out of your living area with all of your clothing, Identification and Wristband, bedding, library books and all of your personal belongings. Headphones and detainee handbooks will be given to your housing unit officer when you leave the unit or prior to leaving the unit.

The detention staff will make announcements for meals, recreation, visitation, clothing exchange and medication pass. You are responsible for being prepared to leave the housing unit when the doors are opened. Depending on the activities, you will be moved to various areas of the facility for court, medical appointments, visits and other functions. You are expected to walk in a quiet and orderly manner. Running inside the facility is prohibited, unless you're in the recreation yard. You are subject to a search of your person and your property. Normally you will not be allowed to take anything with you during your movement to and from most activities. You will be allowed to take necessary legal material with you when escorted to legal visits and court.

If you are housed in the SMU/Segregation Unit for any reason, you will normally be moved to the law library and other areas of the facility with your hands handcuffed behind you.

"Horseplay" or other such activities is prohibited at all times. Detainee Workers are not allowed to wear radio headsets or other devices that affect their ability to hear when working due to safety reasons.

### ATTEMPTED ESCAPES

Any attempt to escape from this facility will result in serious disciplinary consequences. Attempted escape may significantly affect your legal standing and status and you may be subject to criminal prosecution.

### COMMISSION OF A CRIME

Crimes committed by a detainee that violate local, State or Federal law, will be investigated and referred to the proper legal authority for action.

## DESTRUCTION OF PROPERTY

If you are found guilty of destroying facility property, you may be charged for both replacing the item damaged or destroyed and the cost of reinstallation as well.

## COUNTS

Official counts are conducted at 6:30 a.m., 2:00 p.m., 10:00 p.m., 1:00 a.m... You are required to be on your bed, sit/lay on your bed and remain stationary whenever a count procedure is taking place. You are also required to stand next to your bed for the 2:00 p.m. face to photos stand up count. You are to stay on your bed until directed by staff to restore movement. You are prohibited from interfering with the officer making the count. During count, all televisions, radios, and telephones will be turned off. All foot traffic will cease – detainees will not use the showers, toilets, urinals, or sinks, while count is in progress.

## CONTRABAND

Contraband is any item or material that is not approved by the facility for possession, not sold in the commissary or not issued by staff. Some examples of contraband are:

- Unauthorized drugs
- Medication distributed by the medical staff not authorized for retention or prescribed for another detainee.
- Chemical intoxicants
- Alcoholic beverages or any other products containing alcohol in any form
- Obscene picture(s) and literature
- Extra food items, which are not from the Commissary or authorized by the medical staff.
- Money, checks, or money orders
- Weapons or items that could be considered a weapon
- Any tobacco product or matches/lighters
- Ammunition or explosives
- Combustible or flammable liquids
- Hazardous or poisonous chemicals or gases
- Tools of any type that could aid in escape

## AUTHORIZED ITEMS

You are allowed to have in your possession the following items:

- Property that staff authorizes you to take to your living area.
- Item(s) pre-approved by the Chief of Security that are left for you.
- Facility items issued to you.
- Items purchased through the Commissary.
- Medication and materials authorized by the medical staff (when medication is authorized for retention).

## PRISON RAPE ELIMINATION ACT (PREA) VIDEO

The facility will show you a PREA video in the Intake area during your initial processing

## SEXUAL ASSAULT AWARENESS

GEO adheres to a standard of zero tolerance for incidents of sexual abuse or assault that may occur in this facility. Sexual assault or abuse of detainees by other detainees, staff, volunteers, or contract personnel is prohibited and subject to administrative disciplinary and criminal sanctions.

## REPORT ALL ASSAULTS

If you become a victim of a sexual assault, report the incident immediately. Individuals who sexually abuse or assault detainees can only be disciplined or prosecuted if the abuse is reported. You can report a sexual assault incident to facility staff, ICE/ERO personnel, or DHS or ICE headquarters, including through the following methods:

Report to the facility:

- Tell any staff member at the facility you trust (for example the PREA/Programs Manager, Medical staff, Chaplains, Housing officer, Supervisors, etc).
- File an informal or formal grievance (including emergency grievance) with the facility

Report to the ICE Field Office:

- Tell an ICE/ERO staff member who visits the facility;
- File a written informal or formal request or grievance to ICE/ERO.

Report to DHS or ICE Headquarters:

- Contact the ICE Community and Detainee Hotline, call the toll-free hotline at 1-888-351-4024
- Contact the ICE Office of Professional Responsibility (OPR) Joint Intake Center (JIC), call the toll-free hotline at 1-877-246-8253
- Write a letter to: P.O. Box 14475 1200 Pennsylvania Ave, NW Washington, D.C. 20044

You do not have to give your name to report sexual abuse or assault, but the more information you can provide, the easier it will be to investigate what happened. Staff members are required to keep the reported information confidential and only discuss it with the appropriate officials on a need-to-know basis.

## DEFINITIONS:
## DETAINEE ON DETAINEE SEXUAL ABUSE/ASSAULT

The definition of detainee-on-detainee sexual abuse/assault was expanded to include attempted sexually abusive contact in addition to completed sexually abusive contact. In addition, the qualification that "penetration, however slight, of the anal or genital opening of another person by hand or finger or by any object"...the act of "touching of the genitalia, anus, groin, breast,

19

PL000049

inner thighs or buttocks, either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person" was also added to the list of acts constituting detainee sexual abuse/assault when accomplished by force, coercion, or intimidation.

## STAFF ON DETAINEE SEXUAL ABUSE/ASSAULT

"Repeated verbal statements or comments of sexual nature to a detainee, including demeaning references to gender, derogatory comments about body or clothing, or profane or obscene language or gestures," Staff member engaging in, or attempting to engage in a sexual act with any detainee or the intentional touching of a detainee's genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desires of any person. Sexual abuse/assault of detainees by staff or other detainees is an inappropriate use of power and is prohibited by ICE policy and the law.

Sexual conduct of any type between staff and detainees amounts to sexual abuse, regardless of whether consent exists.

## PROHIBITED ACTS

This facility has a zero tolerance policy for sexual abuse and assault, which is prohibited by ICE policy and the law. A detainee or staff member who commits sexual assault shall be punished administratively and may be subject to criminal prosecution.

A detainee who engages in such behavior can be charged with the following Prohibited Acts under the Detainee Disciplinary Policy:

- Code 101: Sexual Assault
- Code 206: Engaging in a Sex Act
- Code 207: Making a Sexual Proposal or Threat
- Code 300: Indecent Exposure
- Code 404: Using Abusive or Obscene Language

Victimized detainees shall not be subject to disciplinary action for reporting sexual abuse or for participating in sexual activity as a result of force, coercion, threats, or fear of force. If you experience retaliation for reporting sexual abuse or for engaging in sexual activity as a result of In addition, consensual sexual conduct between detainees is also prohibited and subject to administrative and disciplinary sanctions.

## DETENTION AS A SAFE ENVIRONMENT

While you are detained, no one has the right to pressure you to engage in sexual acts or engage in unwanted sexual behavior. Regardless of your age, size, race, ethnicity, sexual orientation or gender identity, you have the right to be safe from unwanted sexual advances and acts.

## AVOIDING SEXUAL ASSAULT

Carry yourself in a confident manner at all times. Do not permit your emotions to be obvious to others.

Do not accept gifts or favors from others. Most gifts or favors come with strings attached to them.

Do not accept an offer from another detainee to be your protector.

Find a staff member with whom you feel comfortable discussing your fears and concerns. Report concerns!

Be clear, direct and firm. Do not be afraid to say "no" or "stop it now"

Be alert! Do not use substances such as drugs or alcohol. These can weaken your ability to stay alert and make good judgments.

Stay in well-lit areas of the institution.

Choose your associations wisely. Look for people who are involved in positive activities like educational programs or religious services. Get involved in these activities your self.

Trust your instincts. If you sense that a situation may be dangerous, it probably is. If you fear for your safety, report your concerns to staff.

**If you become a victim:**

- Report it immediately to staff.
- Protection from assailants will be offered.
- You will be referred for a medical exam.
- Although you do not have to identify your assailants, the information will make it easier to protect you and others.
- Even if you do not name your attacker, you will continue to receive protection.
- It is extremely important to see Medical before you shower, shave, wash, drink or eat, change clothing or use the bathroom.
- Medical staff will examine you for injuries.
- You may also be tested for sexually transmitted diseases and evidence may be gathered.
- The exam will be conducted privately and professionally by a physician.

**What will happen:**

- An investigation will be conducted to determine the nature and extent of the misconduct.
- You may be asked to give a statement.
- You may be asked to testify.
- You will be offered protection.
- You will receive a medical examination.
- You will be offered counseling by: The Mental Health staff
  Community resources if appropriate.

**Help Available:**

- Most people need help to recover from the emotional effects of sexual assault.
- This is true whether it occurred recently or in the past.
- Mental Health staff are available.

20

If you feel you might hurt someone else:

- If you feel you need help to keep from sexually assaulting someone else, psychological services are available to help you gain control.
- Ask Medical Staff for a referral.

How to report an incident of sexual assault:

- Notify any staff member immediately.
- If you do not wish to notify a staff member, you may write the Warden, Assistant Warden, or Health Services Administrator confidentially.
- You may also notify ICE according to the procedures outlined in your detainee handbook or call the DHS/OIG hotline at 1-800-323-8603.

Remember:

- It is every staff member's responsibility to ensure your safety.
- You will receive protection.
- Confidentiality will be maintained.

### THE EMOTIONAL CONSEQUENCES OF SEXUAL ASSAULT

It is common for victims of sexual assault to have feelings of embarrassment, anger, guilt, panic, depression and fear several months or even years after the attack. Other common reactions include loss of appetite, nausea or stomach aches, headaches, loss of memory and/or trouble concentrating, and changes in sleep patterns. Emotional support is available from the facility's mental health and medical staff, and from the chaplains. Also, many detainees who are at high risk of sexually assaulting others have often been sexually abused themselves. Mental health services are available to them also so that they can control their actions and heal from their own abuse.

Sexual assaults can happen to anyone, any gender, age, race, ethnic group, socio-economic status and to an individual with any sexual orientation or disability. Sexual assault is not about sex; it's about power and control. All reports are taken seriously. Your safety and the safety of others is the most important concern. For everyone's safety, all incidents, threats, or assaults must be reported.

### SECTION VIII    DISCIPLINARY PROCEDURE

To provide a safe and orderly living environment, facility authorities will impose disciplinary sanctions on any detainee whose behavior is not in compliance with facility rules and procedures.

### INVESTIGATION

When an alleged rule violation is reported, an appropriate investigation will begin within 24 hours of the time the violation is reported and is completed without unreasonable delay, unless there are exceptional circumstances for delaying the investigation.

### UNIT DISCIPLINARY COMMITTEE (UDC)

The UDC shall be comprised of one to three members, at least one of who is a supervisor.

The UDC will conduct hearings and, to the extent possible, informally resolve cases involving "high moderate" or "low moderate" charges, in accordance with the list of charges and related sanctions. Unresolved cases and cases involving serious charges are forwarded to the Institutional Disciplinary Panel (IDP).

**The UDC shall have authority to:**

- Conduct hearings and informally resolve incidents involving High Moderate or Low Moderate charges.
- Consider written reports, statements, and physical evidence.
- Hear pleadings on the part of the detainee.
- Make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.
- Impose minor sanctions "E" through "M" in accordance with the table of prohibited acts and associated sanctions.

**The detainee in UDC proceedings shall have the right to:**

- Remain silent at any stage of the disciplinary process
- Due process, including a UDC hearing within 24 hours of the end of the investigation,
    a. To attend the entire hearing (excluding committee deliberations); or
    b. To waive the right to appear.
    c. If security considerations prevent the detainee's attendance, the committee must document the security considerations.
- Present statements and evidence in his/her own behalf.
- Appeal the committee's determination through the detainee appeal process.

### INSTITUTIONAL DISCIPLINARY PANEL (IDP)

This facility has a disciplinary panel to adjudicate detainee incident reports. Only the disciplinary panel can place a detainee in disciplinary segregation.

The IDP refers either one to a three-person panel appointed by the Warden, or a one-person disciplinary hearing officer.

The panel shall not include the reporting officer, the investigating officer, and any member of the referring UDC, or anyone who witnessed or was directly involved in the incident. Only if virtually every available officer witnessed or was directly involved in the incident shall an exception to this rule occur.

**The IDP shall have authority to:**

- Conduct hearings on all charges and allegations referred by the UDC.
- Call witnesses to testify.
- Consider written reports, statements, physical evidence, and oral testimony.
- Hear pleadings by detainee and staff representative.

APP. 248

- Make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.
- Impose sanctions as listed and authorized in each category.

**The IDP shall:**

- Verify that the detainee has been advised of, and afforded, his/her rights, as provided above.
- Remind the detainee of his/her right to a staff representative, providing one if requested.
- Advise the detainee of his/her right to waive the hearing and admit having committed the offense.
- Conduct the hearing on the first business day after receiving the UDC's referral, unless the detainee waives the 24-hour notification provision, requesting an immediate hearing. In cases where a hearing is delayed, the reason(s) must be documented (e.g., a continuing investigation of facts, the unavailability of one or more essential witnesses, etc.) and approved by the Warden. If the detainee is being held in segregation, the delay shall not exceed 72 hours, barring an emergency. Prepare a written record of its proceedings. This record must show that the detainee was advised of his/her rights. It must also document the evidence considered by the Panel and subsequent findings; the decision and sanctions imposed, along with a brief explanation.
- Forward the entire record to the Warden, who may (a) concur; (b) terminate the proceedings; or (c) impose more severe or more lenient sanctions.
- Serve the detainee with written notification of the decision.

**STAFF REPRESENTATION**

The Warden or designee shall, upon the detainee's request, assign a staff representative to help prepare a defense. This help will be automatically provided for illiterate detainees, detainees with limited English-language skills; detainees without means of collecting and presenting essential evidence and detainees in administrative or disciplinary segregation.

- A staff representative must be a full-time employee.
- Because of the potential conflict of interest, the Warden, members of the IDP and of the UDC initially involved in the case, eyewitnesses, the reporting and investigating officers, and anyone else with a stake in the outcome shall not act as staff representative.
- The detainee may select his/her staff representative, barring anyone identified in #2, above.
- The IDP shall arrange for the presence of the staff representative selected by the detainee. If that staff member declines or is unavailable, the detainee has three choices. He/she may select a different representative; wait for the unavailable staff member to become available (within a reasonable period); or proceed without a staff representative.
- A staff member declining to serve as a detainee's representative must state the reason on the staff representative form.
- If several officers decline, the Warden shall assign a staff member to serve as that detainee's staff representative.
- The staff representative shall be free to speak to witnesses and to present evidence in the detainee's behalf, including any mitigating circumstances.

- The IDP shall allow the staff representative enough time to speak with the detainee and interview witnesses. The standard pre-hearing preparation time will suit most cases. However, the IDP may grant a delay if required for an adequate defense.
- The IDP shall establish the reliability of information provided by a confidential informant before considering it in the disciplinary proceedings.
- The IDP may withhold the confidential informant's identity from the staff representative. While the staff representative may challenge the substance of any confidential information the IDP discloses, he/she may not question its reliability (pre-established by the IDP).
- When the detainee cannot effectively present his/her own case, the Warden shall appoint a staff representative, even if not requested by the detainee.

**POSTPONEMENT OF DISCIPLINARY PROCEEDINGS**

The facility shall permit hearing postponements or continuances under certain circumstances.

Circumstances justifying the postponement or continuance of a hearing might include: defense preparation, physical or mental illness, security, escape, disciplinary transfer, deportation, or pending criminal prosecution.

An uncooperative detainee may also cause a delay in the proceedings, either because of inappropriate behavior during the hearing process or a refusal to participate in a productive manner.

**DURATION OF PUNISHMENT**

The duration of punishment shall be within established limits. Neither the panel recommending sanctions nor the Warden making the final decision shall impose sanctions arbitrarily, outside these limits.

1. Punishments range from the withholding of privilege(s) to segregation. Time in segregation after a hearing will generally not exceed 60 days.

2. Time served in segregation pending the outcome of the proceedings may be credited to the number of days to be spent in the segregation unit after the decision is announced.

3. The disciplinary report and accompanying documents are not placed in the file of a detainee who is found not guilty. However, the facility may retain the material in its own files for institutional uses (statistical, historical, etc.).

4. A detainee may be removed from segregation if a healthcare professional concludes that continued segregation is detrimental to the detainee's medical or mental health.

**DOCUMENTS**

All documents relevant to the incident, subsequent investigation, hearing(s), etc., will be completed and distributed in accordance with facility procedures.

**Incident Report/Notice of Charges**

The officer shall prepare a report and submit it to the Warden immediately after the incident takes place. If the incident is resolved informally, the officer will so note on the original report, which will then be forwarded to the Chief of Security via the shift supervisor.

**APP. 249**

If the UDC is to be involved, the supervisor shall serve the detainee with a copy of the Notice of Charges upon completion of the investigation, no less than 24 hours before the UDC hearing.

The UDC receives the original copy.

If the UDC hears the matter, the ranking member of that committee shall serve the detainee with a copy of the Incident Report/Notice of Charges indicating their decision. The UDC, upon conclusion of its proceedings, will forward the entire record to Classification.

## CONFIDENTIAL INFORMATION

When a decision relies on information from a confidential informant, the UDC or IDP shall include in the hearing record the factual basis for finding the information reliable.

Prohibited acts are divided into four categories: "Greatest", "High", "Moderate", and "Low Moderate". The sanctions authorized for each category will be imposed only if the detainee is found to have committed a prohibited act.

**"Greatest" offenses:** The IDP shall impose and execute at least one sanction in the A through E range. Additional sanctions (A through G) may be imposed and either executed or suspended, at the discretion of the panel. The IDP may impose and execute sanctions F and G only in conjunction with sanction A, B, C, D, and/or E.

**"High" offenses:** The IDP shall impose and execute at least one sanction in the A through M range. Additional sanctions (A through M) may be imposed, and either executed or suspended, at the discretion of the panel.

**"High Moderate" offenses:** The IDP shall impose at least one sanction in the A through M range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.

**"Low Moderate" offenses:** The IDP shall impose at least one sanction in the E through M range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.

## DISCIPLINARY SEVERITY SCALE AND PROHIBITED ACTS

## CODE: "GREATEST" OFFENSE CATEGORY

| | |
|---|---|
| 100 | Killing |
| 101 | Assaulting any person (includes sexual assault) |
| 102 | Escape from escort; escape from a secure facility |
| 103 | Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of Greatest Severity, i.e. a riot or an escape; otherwise the charge is classified as Code 218 or 321) |
| 104 | Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous commissary, movies, chemical, explosive, escape tool, device or ammunition |
| 105 | Rioting |
| 106 | Inciting others to riot |
| 107 | Taking hostage(s) |

| | |
|---|---|
| 108 | Assaulting a staff member or any law enforcement officer |
| 109 | Threatening a staff member or any law enforcement official with bodily harm |
| 198 | Interfering with a staff member in the performance of duties (conduct must be of the Greatest Severity nature). This charge is to be used only if another charge of Greatest Severity is not applicable |
| 199 | Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the Greatest Severity nature). This charge is to be used only if another charge of greatest severity is not applicable |

## SANCTIONS

| | |
|---|---|
| A. | Initiate criminal proceedings |
| B. | Disciplinary transfer (recommend) |
| C. | Disciplinary segregation (up to 60 days) |
| D. | Make monetary restitution, if funds are available |
| E. | Loss of privileges, i.e. commissary, etc. |
| F. | Change housing |
| G. | Remove from program and/or group activity |

## CODE: "HIGH" OFFENSE CATEGORY

| | |
|---|---|
| 200 | Escape from unescorted activities, open or secure facility, without violence |
| 201 | Fighting, boxing, wrestling, sparring, and any other form of physical encounter, including horseplay that causes or could cause injury to another person; except when part of an approved recreational or athletic activity |
| 202 | Possession or introduction of an unauthorized tool |
| 203 | Loss, misplacement, or damage of any restricted tool |
| 204 | Threatening another with bodily harm |
| 205 | Extortion, blackmail, protection: demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm, or avoiding a threat of being informed against |
| 206 | Engaging in sexual acts |
| 207 | Making sexual proposals or threats to another |
| 208 | Wearing a disguise or mask |
| 209 | Tampering with or blocking any lock device, includes keys |
| 210 | Adulteration of food or drink |
| 211 | Possession, introduction, or use of narcotics, narcotic paraphernalia, or drugs not prescribed for the individual by the medical staff |
| 212 | Possessing any officer's or staff clothing |
| 213 | Engaging in, or inciting a group demonstration |
| 214 | Encouraging others to participate in a work stoppage or refusing to work |
| 215 | Refusing to provide a urine sample or otherwise cooperate in a drug test |
| 216 | Introducing alcohol into the facility |
| 217 | Giving or offering an official or staff member a bribe or anything of value |
| 218 | Giving money to, or receiving money from, any person for an illegal or prohibited purpose, or introducing/conveying contraband |
| 219 | Destroying, altering, or damaging property (facility or another person's) worth more than $100, or destroying altering, or damaging life-safety devices, i.e. fire alarm, regardless of financial value |
| 220 | Being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days |
| 221 | Signing, preparing, circulating, or soliciting support for prohibited group petitions |
| 222 | Possessing or introducing an incendiary device, i.e. matches, lighter, etc. |

| 223 | Any act that could endanger person(s) and/or property |
| *298 | interfering with a staff member in the performance of duties (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. |
| *299 | Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. |

*When the prohibited act is interfering with a staff member in the Performance of duties (Code 198, 298, 398, or 498) or conduct that disrupts (Code 199, 299, 399, or 499), the Disciplinary Committee should specify in Its findings the severity-level of the conduct, citing a comparable offense in that category. For example, "We find the act to be of high severity, most comparable to Code 213, "engaging In a group demonstration".

## SANCTIONS

A.   Initiate criminal proceedings
B.   Disciplinary transfer (recommend)
C.   Disciplinary segregation (up to 30 days)
D.   Make monetary restitution, if funds are available
E.   Loss of privileges: commissary, etc.
F.   Change housing
G.   Remove from program and/or group activity
H.   Loss of job
I.   Impound and store detainee's personal property
J.   Confiscate contraband
K.   Restrict to housing unit
L.   Reprimand
M.   Warning

## CODE: "HIGH MODERATE" OFFENSE CATEGORY

| 300 | Indecent exposure |
| 301 | Stealing (theft) |
| 302 | Misuse of authorized medication |
| 303 | Loss, misplacement, or damage of a less restricted tool |
| 304 | Lending property or other item of value for profit/increased return |
| 305 | Possession of item(s) not authorized for receipt or retention; not issued through regular channels |
| 306 | Refusal to clean assigned living area |
| 307 | Refusing to obey a staff member/officer's order (may be categorized and charged as a greater or lesser offense, depending on the kind of disobedience: continuing to riot is Code 105-Rioting; continuing to fight is Code 201-Fighting; refusing to provide a urine sample-Code 215) |
| 308 | Insolence toward a staff member |
| 309 | Lying or providing a false statement |
| 310 | Counterfeiting, forging, or other unauthorized reproduction of money or other official document, or item, i.e. security document, identification card, etc. (may be categorized as greater or lesser offense, depending on the nature and purpose of the reproduction, i.e. counterfeiting release papers to effect escape-Code 102 or 200) |
| 311 | Participating in an unauthorized meeting or gathering |
| 312 | Being in an unauthorized area |

| 313 | Failure to stand count |
| 314 | Interfering with count |
| 315 | Making, possessing, or using intoxicant(s) |
| 316 | Refusing a breathalyzer test or other test of alcohol consumption |
| 317 | Gambling |
| 318 | Preparing or conducting a gambling pool |
| 319 | Possession of gambling paraphernalia |
| 320 | Unauthorized contact with public |
| 321 | Giving money or another item of value to, or accepting money or another item of value from anyone |
| 322 | Destroying, altering, or damaging facility or another person's property worth less than $100 |
| *398 | interfering with a staff member in the performance of duties (offense must be of high moderate severity). This charge is to be used only when no other charge in this category is applicable. |
| *399 | Conduct that disrupts or interferes with the security or orderly operation of the facility (offense must be of high moderate severity). This change is to be used only when no other charge in this category is applicable. |

Note:   Any combination of high moderate and low moderate offenses during a 90-day period shall constitute a high offense.

## SANCTIONS

A.   Initiate criminal proceedings
B.   Disciplinary transfer (recommend)
C.   Disciplinary segregation (up to 72 hours)
D.   Make monetary restitution, if funds are available
E.   Loss of privileges: commissary, etc.
F.   Change housing
G.   Remove from program and/or group activity
H.   Loss of job
I.   Impound and store detainee's personal property
J.   Confiscate contraband
K.   Restrict to housing unit
L.   Reprimand
M.   Warning

CODE: "LOW MODERATE" OFFENSE CATEGORY

| | |
|---|---|
| 400 | Possession of property belonging to another person |
| 401 | Possessing unauthorized clothing |
| 402 | Malingering, feigning illness |
| 403 | Smoking where prohibited |
| 404 | Using abusive language or obscene language |
| 405 | Tattooing, body piercing, or self-mutilation |
| 406 | Unauthorized use of mail or telephone (with restrictions or temporary suspension of the abused privileges often the appropriate sanction) |
| 407 | Conduct with a visitor in violation of rules and regulations (with restriction or temporary suspension of visiting privileges often the appropriate sanction) |
| 408 | Conducting a business |
| 409 | Possession of money or currency, unless specifically authorized |
| 410 | Failure to follow safety or sanitation regulations |
| 411 | Unauthorized use of equipment or machinery |
| 412 | Using equipment of machinery contrary to posted safety standards |
| 413 | Being unsanitary or untidy, failing to keep self and living area in accordance with posted standards |
| *498 | interfering with a staff member in the performance of duties (offense must be of low moderate severity).  This charge is to be used only when no other charge in this category is applicable. |
| *499 | Conduct that disrupts or interferes with the security or orderly operation of the facility (offense must be of low moderate severity).  This charge is to be used only when no other category is applicable. |

SANCTIONS

| | |
|---|---|
| A. | Make monetary restitution |
| B. | Loss of privileges i.e. commissary |
| C. | Change housing |
| D. | Remove from program and/or group activity |
| E. | Loss of job |
| F. | Impound and store detainee's personal property |
| G. | Confiscate contraband |
| H. | Restrict to housing unit |
| I. | Reprimand |
| J. | Warning |

APPEAL PROCEDURE

A detainee who has been found guilty of a rules violation of this facility shall have the right to appeal his or her case to the Warden.  Detainees are advised of their right to appeal decisions of the disciplinary hearing officer at the time they are provided the decision.

If a detainee wishes to appeal his/her case, he/she must so indicate by signing the Appeal Form (on the back of a grievance form) in the appropriate space and submit written reason (s) for his/her appeal.

The sanctions imposed by the hearing officer will remain in effect pending the outcome of the appeal.

The Warden will review the final appeal as soon as possible, but no later than five (5) days, including weekends and holidays, after the final appeal has been received.  The Warden will notify the detainee in writing of his decision.

ADMINISTRATIVE SEGREGATION ORDER

A written order shall be completed and approved by a supervisory officer before a detainee is placed in administrative segregation, except when exigent circumstances make this impracticable.  In such cases, an order shall be prepared as soon as possible.  A copy of the order shall be given to the detainee within 24 hours, unless delivery would jeopardize the safety, security, or orderly operation of the facility.  No Administrative Segregation Order is required for a detainee awaiting removal, release, or transfer within 24 hours.

Reviewed _____ Warden _____ Date

**APP. 252**