No. 22-01409

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Alejandro Menocal, *et al.,*

*Plaintiffs-Appellees,*

— v. —

The GEO Group, Inc.,

*Defendant-Appellant.*

On appeal from the United States District Court
for the District of Colorado, No. 1:14-cv-02887 (Hon. John L. Kane)

**APPELLANT'S APPENDIX
VOLUME II OF III**

Scott A. Schipma
Dominic E. Draye
GREENBERG TRAURIG, LLP
2101 L Street, N.W.
Washington, DC 20037
(202) 331-3100
schipmas@gtlaw.com
drayed@gtlaw.com

*Attorneys for Defendant-Appellant*

# INDEX
## VOLUME I

| Docket Number | Description | Appendix Page No. |
|---|---|---|
| | Civil Case Court Docket, Case No. 1:14-cv-02887-JLK-MEH | APP. 1 |
| 1 | Class Action Complaint for Unpaid Wages and Forced Labor, Filed October 22, 2014 | APP. 12 |
| 26 | Answer of GEO Group to Plaintiff's Complaint, Filed July 20, 2015 | APP. 33 |
| 260 | Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense, Filed on April 20, 2020 | APP. 50 |
| 261-8 | Performance-Based National Detention Standards 2011, Filed on April 29, 2020 | APP. 95 |
| 261-9 | Operations Manual ICE Performance Based National Detention Standards (PBNDS), Filed April 29, 2020 | APP. 160 |
| 261-17 | Aurora Ice Processing Center Detainee Handbook, Local Supplement, Filed April 29, 2020 | APP. 225 |

## VOLUME II

| Docket Number | Description | Appendix Page No. |
|---|---|---|
| 270 | Defendant The GEO Group, Inc.'s Response in Opposition to Plaintiffs' Motion for Summary Judgment on Defendant' Affirmative Defense, Filed June 5, 2020 | APP. 253 |
| 284 | Defendant The GEO Group, Inc.'s Cross-Motion for Summary Judgment, Filed June 25, 2020 | APP. 293 |
| 286 | Plaintiff's Reply in Support of Motion for Summary Judgment on Defendant's Affirmative Defense, Filed June 26, 2020 | APP. 322 |

| Docket Number | Description | Appendix Page No. |
|---|---|---|
| 298 | Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense, filed July 31, 2020 | APP. 438 |
| 305 | Defendant's Motion for Summary Judgment, Filed August 17, 2020 | APP. 491 |

**VOLUME III**

| Docket Number | Description | Appendix Page No. |
|---|---|---|
| 316 | Defendant The GEO Group, Inc.'s Reply in Support of Its Cross-Motion for Summary Judgment | APP. 530 |
| 336 | Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, Filed October 26, 2020 | APP. 551 |
| 350 | Defendant The GEO Group, Inc.'s Reply in Support of Motion for Summary Judgment, Filed November 18, 2020 | APP. 635 |
| 380 | Order on the Parties' Cross Motions for Summary Judgment (ECF Nos. 260, 284, & 305) And Defendant's Motions to Dismiss (ECF No. 307) And for Decertification of Class (ECF No. 312), Filed October 18, 2022 | APP. 717 |
| 387 | Notice of Appeal, Filed November 16, 2022 | APP. 793 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated*,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

### DEFENDANT THE GEO GROUP, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S AFFIRMATIVE DEFENSE

---

Defendant The GEO Group, Inc. ("Defendant" or "GEO"), by and through its undersigned

counsel, hereby submits its response in opposition to Plaintiffs' Motion for Summary Judgment

on Defendant's Affirmative Defense (ECF No. 260) ("Motion") and respectfully requests that this

Court deny Plaintiffs Motion and enter judgment in favor of GEO.

### I.    INTRODUCTION

The length of Plaintiffs' Motion obscures a simple fact: the U.S. Immigration and Customs

Enforcement ("ICE") *mandatory* performance standards provide for punishment up to and

**APP. 253**

including 72 hours of disciplinary segregation for a detainee's "[r]efusal to clean assigned living area." ICE also *requires* its contractors, including GEO, to notify detainees in writing of prohibited acts and the corresponding potential discipline. GEO's compliance with those *legal requirements* is what Plaintiffs allege amounts to a violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1589 *et seq.* ("TVPA"). Likewise, Plaintiffs' Motion ignores the fact that ICE's performance standards *required* a payment of exactly $1.00 per day for Voluntary Work Program ("VWP") participants for approximately half of the applicable three-year class period (October 22, 2011 through June 22, 2013). Immunity clearly applies during that time. For the VWP class period thereafter (June 23, 2013 through October 22, 2014), GEO continued to follow the explicit direction of ICE, that $1.00 per day was a permissible minimum payment for VWP participants. Accordingly, the doctrine of derivative sovereign immunity and the government contractor defense preclude Plaintiffs' claims in this action.

## II.    BACKGROUND

Plaintiffs have identified two distinct classes in this action: the "Forced Labor" class, whose claims allege a violation of the TVPA, and the "Voluntary Work Program Class," whose claims are styled as an unjust enrichment action. ECF 49 at 3; ECF 57 at 21.[1] Plaintiffs now move for summary judgment on GEO's immunity defenses in this action, specifically derivative sovereign immunity ("DSI"), on the alleged basis that ICE did not require or condone the policies underlying Plaintiffs' claims. *See generally* ECF 260. But, as the undisputed facts make clear, the two policies implemented at the Aurora ICE Processing Center ("AIPC") at issue in this case— (i)

---

[1] The Forced Labor Class period spans from October 22, 2004 to October 22, 2014 and the Voluntary Work Program Class period spans from October 22, 2011 to October 22, 2014, which will collectively be referred to in this motion as the "Class Period."

53343955;4

the disciplinary sanctions for a detainee's refusal to clean his or her living area and (ii) the VWP pay rate of one dollar per day—were explicitly authorized by ICE. Therefore, GEO is entitled to DSI, which applies whenever a federal contractor acts in accordance with authority validly conferred by the federal government. *See Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21-22 (1940); *see also Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672-73 (2016); *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 643 (4th Cir. 2018).

The Forced Labor Class alleges that GEO violated the TVPA by requiring detainees "to perform uncompensated janitorial labor under the threat of solitary confinement." ECF 49 at 3. To prevail on this claim, the Forced Labor Plaintiffs must prove that the *means* utilized to obtain their forced labor were unlawful. The TVPA prohibits the procurement of labor through force, threats of force, serious harm, or threats of serious harm. 18 U.S.C. § 1589(a). Here, Plaintiffs allege they were coerced into cleaning their living areas because they were informed (or "threatened") that the refusal to clean their living areas *could* result in the sanction of segregation for up to 72 hours. ECF 49 at 3. Even assuming *arguendo* that detainees were coerced into cleaning their living areas[2] under the "threat" of administrative or disciplinary segregation for up to 72 hours, and that the "threat" of that brief segregation constitutes serious harm under the TVPA, GEO is still entitled DSI. It is undisputed that ICE's disciplinary system, as set forth in ICE's Performance Based National Detention Standards ("PBNDS"), was expressly incorporated into GEO's contract with ICE and required GEO to provide notice to detainees that segregation for up to 72 hours was an authorized sanction for the refusal to clean their living areas. Further, the PBNDS explicitly require

---

[2] There can be no question that detainees are required to clean their living areas. ECF 260 (Plaintiffs' Undisputed Facts #31 and #62).

53343955;4

**APP. 255**

the ICE disciplinary severity scale that sets forth the sanction of segregation for the refusal to clean a living area be adopted by contractors without alteration. Because it is undisputed that ICE required and directed GEO to comply with the PBNDS (including its disciplinary system), and that in turn GEO complied with the PBNDS—GEO is entitled to summary judgment based upon DSI.[3]

The VWP Class alleges that GEO has been unjustly enriched by paying detainees who volunteer to participate in certain tasks as part of the VWP only $1.00 per day. The Department of Homeland Security ("<u>DHS</u>") and ICE, by contract, require that GEO administer the VWP at the AIPC. DHS and ICE validly conferred to GEO the authority to administer the VWP, in which detainees receive a $1.00 daily allowance for their participation. The $1.00 per day pay rate was set by Congress and adopted by ICE in the PBNDS.  Therefore, in this lawsuit where Plaintiffs' challenge the $1.00 per day pay rate under an unjust enrichment theory, GEO is entitled to DSI because the VWP is required by ICE and the $1.00 per day pay rate was explicitly set by Congress and adopted by ICE in the PBNDS. Accordingly, because GEO merely performed as the federal government lawfully directed, Plaintiffs' Motion should be denied. Furthermore, because the undisputed facts make clear that GEO has established the defense of DSI, this Court should enter summary judgment in GEO's favor on its DSI defense.

### III.   RESPONSE TO STATEMENT OF UNDISPUTED FACTS

In support of their Motion, Plaintiffs submitted 98 purportedly undisputed facts, most of which are immaterial to the issues before this Court. Thus, GEO identifies the relevant and material

---

[3] Furthermore, the fact that GEO was merely complying with the directives of ICE establishes that any alleged threat was not made "knowingly."

**APP. 256**

undisputed facts below, omitting impertinent information. Should the Court find any of Plaintiffs'

other submitted facts to be relevant and material, GEO has submitted its response to each fact, as

numbered in Plaintiffs' brief, as Exhibit A.[4] Insofar as the Court determines the disputed facts are

relevant to Plaintiffs' motion, which it should not, summary judgment in Plaintiffs favor would be

inappropriate.

### A.  Material Undisputed Facts from Plaintiffs' Motion

1.   ICE is a federal agency tasked with enforcing U.S. immigration laws. 6 U.S.C. § 542. ECF

260 (Plaintiffs' Undisputed Fact #1).

2.   ICE has the authority to detain foreign nationals suspected of entering the United States

unlawfully. Immigration and Nationality Act, codified at 8 U.S.C. §§ 1101 et seq. ECF 260

(Plaintiffs' Undisputed Fact #2).

3.   ICE contracts with GEO to house some of its detainees in detention facilities throughout the

country. See https://www.geogroup.com/Locations. ECF 260 (Plaintiffs' Undisputed Fact

#3).

4.   Among GEO's portfolio of ICE detention facilities is the Aurora Facility. ECF 260

(Plaintiffs' Undisputed Fact #4).

5.   GEO continuously operated the Aurora Facility, under contract[s] with ICE, from October

22, 2004 to October 22, 2014. ECF 260 (Plaintiffs' Undisputed Fact #5).

6.   The Contract may be modified during its term by mutual consent of GEO and ICE. ECF

260 (Plaintiffs' Undisputed Fact #8).

---

[4] All exhibits referenced herein have been filed concurrently as attachments to the declaration of
undersigned counsel.

**APP. 257**

7.    The Performance Based National Detention Standards ("PBNDS") are a series of minimum standards for detention facilities developed by ICE. ECF 260 (Plaintiffs' Undisputed Fact #24).

8.    The PBNDS are incorporated into the Contract. ECF 260 (Plaintiffs' Undisputed Fact #25).

9.    Pursuant to the Contract, GEO must abide by the PBNDS ECF 260 (Plaintiffs' Undisputed Fact #26)

10.   A modification to the 2011 Contract incorporated the 2011 PBNDS into that contract. ECF 260 (Plaintiffs' Undisputed Fact #27).

11.   The PBNDS authorize up to 72 hours of disciplinary segregation as punishment for certain offenses in what is designated as the "high moderate" offense category. ECF 260 (Plaintiffs' Undisputed Fact # 77). Among the "high moderate" offenses crafted by ICE is "Refusing to clean assigned living area." (Plaintiffs' Undisputed Fact # 79).

12.   The PBNDS Require that staff and detainees maintain a high standard of facility sanitation and general cleanliness . . . All horizontal surfaces shall be dampdusted daily with an approved germicidal solution used according to the manufacturer's directions.  Windows, window frames, and windowsills shall be cleaned on a weekly schedule. Furniture and fixtures shall be cleaned daily. Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions. A clean mop head shall be used each time the floors are mopped. Waste containers shall weigh less than 50 lbs., be non-porous and lined with plastic bags; the liner shall be changed daily. Waste containers shall be washed weekly at a minimum, or as needed when they become soiled. Cubicle curtains shall be laundered

53343955;4

**APP. 258**

monthly or during terminal cleaning following treatment of an infectious patient. ECF 260 (Plaintiffs' Undisputed Fact #31).

13. Like the PBNDS, GEO's Aurora Detainee Handbook states that detainees are "required to keep [their] personal living area clean and sanitary." ECF 260 (Plaintiffs' Undisputed Fact #62).

14. The Aurora Detainee Handbook is issued to all detainees entering Aurora. ECF 260 (Plaintiffs' Undisputed Fact #60).

15. All of GEO's policies are reviewed and approved by an on-site ICE official. ECF 260 (Plaintiffs' Undisputed Fact #43).

16. ACA Standard 4-ALDF-1A-04 requires that: "The facility is clean and in good repair. A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance." ECF 260 (Plaintiffs' Undisputed Fact #38).

17. ACA Standard 4-ALDF-5C-08 requires that: "Pretrial and unsentenced inmates are not required to work except to do personal housekeeping and to clean their housing area. Inmates are allowed to volunteer for work assignments." This standard is incorporated into the PBNDS. ECF 260 (Plaintiffs' Undisputed Facts #39 and #38).

18. ACA Standard 4-ALDF-1A-04 requires that: "The facility is clean and in good repair. A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance." ECF 260 (Plaintiffs' Undisputed Fact #33).

19. GEO's Sanitation Procedures do not specify which aspects of cleaning are the responsibility of HUSP workers and which are the responsibility of VWP workers. ECF 260 (Plaintiffs' Undisputed Fact #46).

53343955;4

20. The Voluntary Work Program ("VWP") section of the PBNDS provides that detainees "shall be provided the opportunity to participate in a voluntary work program." ECF 260 (Plaintiffs' Undisputed Fact #35)

21. GEO pays detainees who work in the VWP at the Aurora Facility $1.00 per day.  ECF 260 (Plaintiffs' Undisputed Fact #93).

22. ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP. ECF 260 (Plaintiffs' Undisputed Fact #94).

**B.  Statement of Additional Undisputed Facts.**

1. The United States Congress has delegated to DHS, and its agency ICE, the sole authority to arrange for all aspects of the detention of aliens pending the results of their immigration proceedings. *See* 8 U.S.C. § 1231(g)(1) ("The [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.").

2. In making these arrangements, ICE must consider the use of private contractors to detain aliens prior to constructing its own facilities. *See* 8 U.S.C. § 1231(g)(2) ("Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.").

3. As a result of Congress' directive, ICE neither constructs nor operates its own immigration detention facilities, Ex. B (Dec. of Tae Johnson), and therefore its state and private contractors are critical to carrying out the federal function of immigration detention.

4. Due to significant fluctuations in the number and location of removable aliens apprehended by DHS and subject to detention, it is important for ICE to maintain flexibility with regard to its immigration detention facilities. Otherwise, ICE could invest heavily in its own facilities only to have them stand idle if a particular geographic area later experiences a drastic decrease in demand for detainee housing. Ex. B.

## GEO's Contracts with ICE

5. Consistent with this overall policy, ICE chose to contract with the AIPC to detain aliens pending the resolution of their immigration proceedings. ECF 260 at 2 (Plaintiffs' Undisputed Facts # 3, 4, and 5). GEO owns and operates the AIPC, and has operated it pursuant to a series of direct contracts between GEO and ICE. *Id.* (Plaintiffs' Undisputed Fact # 5). ICE is authorized by DHS and Congress to enter into these contracts. *See*, *e.g.*, 8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g).

6. All immigration detention processing centers, including the AIPC, must adhere to ICE's standards. In 2000, the Immigration and Naturalization Service ("INS"), ICE's predecessor, adopted the original National Detention Standards (the "2000 NDS"). ICE promulgated subsequent versions of the PBNDS in 2008 (the "2008 PBNDS"), and 2011 (later updated in 2016) (the "2011 PBNDS") (the 2000 NDS are located at https://www.ice.gov/detention-standards/2000; the 2008 PBNDS are located at: https://www.ice.gov/detention-standards/2008; the 2011 PBNDS are located at: https://www.ice.gov/detention-standards/2011).

7. In each contract GEO entered into with ICE for the operation of the AIPC, the 2000 NDS, 2008 PBNDS, or the 2011 PBNDS, as applicable, were incorporated into the contract and

53343955;4

**APP. 261**

GEO was required to comply with the same. ECF 260 at 7 (Plaintiffs' Undisputed Facts # 25 and 26).

8.  GEO's contract with ICE, number ACD-3-C-0008, required it to comply with the 2000 NDS from March 27, 2003 to September 28, 2006. ECF 262-5, 12 (GEO_MEN 00059754).

9.  GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, similarly required it to comply with the 2000 NDS. ECF 24-4, 11 (GEO_MEN 00059644); *see also* ECF 260 at 3 (proffering as undisputed the fact that HSCEOP-06-D-00010 was one of GEO's contracts with ICE during the class period); ECF 262-4 (incorporating the 2000 NDS into the contract).

10. On April 28, 2010, GEO entered into a contract modification with ICE (HSCEOP-06-D-00010/P00018) which required it to comply with the 2008 PBNDS, effective immediately. Ex. C ; ECF 261-9 (2008 PBNDS).

11. GEO's subsequent contract with ICE, number HSCEDM-11-D-00003, required it to continue to comply with the 2008 PBNDS. That contract was effective September 15, 2011. ECF 262-2, 38 (incorporating the 2008 PBNDS into the contract); *see also* ECF 260 at 3 (proffering as undisputed the fact that HSCEDM-11-D-00003 was one of GEO's contracts with ICE during the Class Period).

12. On May 23, 2013, GEO entered into a contract modification with ICE (HSCEDM-11-D-00003/P00005) agreeing that, effective June 23, 2013, GEO would comply with the 2011 PBNDS. Ex. D;  ECF 262-3, 2 (GEO-MEN 00020406; *see also* ECF 260 at 3 (proffering as undisputed the fact that HSCEDM-11-D-00003/P00005 was one of GEO's contracts with ICE during the Class Period).

**APP. 262**

## **The ICE-Mandated Disciplinary Severity Scale**

13. The 2000 NDS and all applicable versions of the PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale. ECF 261-10 at 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8 at 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.").

14. The 2000 NDS and all versions of the PBNDS require GEO to provide notice to detainees, in the local detainee handbook, of the ICE-mandated disciplinary severity scale. ECF 261-10 at 10 (2000 NDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…").

15. Likewise, the 2000 NDS and all versions of the PBNDS explicitly provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); *see also* ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

**APP. 263**

16. The 2000 NDS and all versions of the PBNDS also explicitly provide a disciplinary severity
scale that lists "[r]efusing to obey the order of a staff member or officer" as an offense which
can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000
NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); *see also* ECF 260 at 17
(Plaintiffs' Undisputed Facts #77 and #79).

17. The AIPC's local detainee handbook's disciplinary severity scale does not deviate from the
2000 NDS or the applicable PBNDS. Ex. E (2005 Handbook); (GEO_MEN 00054151-222);
Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011
Handbook); ECF 261-17 (October 2013 Handbook) (Specifically identified in Plaintiffs
discovery responses as the basis for their claims); Ex. J, Kevin Martin Dep. 40:21-24 ("Q. Do
you know if there's any deviation from between the DB -- excuse me, between the GEO
Detainee Handbook and the PBNDS as far as disciplinary requirements? A. Not as far as
disciplinary requirements[.]").

18. The 2000 NDS and the applicable versions of the PBNDS provide for the exact graduated
scales of offenses and disciplinary consequences for dedicated facilities, such as the AIPC.
ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS).
The graduated scale of offenses (of which detainees must be made aware) are explicitly laid
out in the 2000 NDS and the applicable PBNDS, providing GEO no discretion whatsoever to
alter the disciplinary severity scale.

19. As required by the 2000 NDS and the applicable versions of the PBNDS, the disciplinary
severity scale is copied verbatim into the local detainee handbook at the AIPC. Ex. J, Kevin

53343955;4

**APP. 264**

Martin Dep. 40:13-16 ("And does the Detainee Handbook lay out these exact rules from the PBNDS for the detainees as far as discipline goes? A: Yes."); 83:17-22 (same).

20. In addition to the disciplinary severity scale, GEO has detailed a Sanitation Procedures document that contains a section entitled "Detainee Sanitation Procedures."  ECF 262-8; *see also* ECF 50-4 (the "Sanitation Procedures").

21. The Sanitation Procedures sets forth general standards for sanitation that must be followed by both GEO employees and detainees. *Id.* While the sanitation policies for detainees apply to those detainees housed at the AIPC who participate in cleaning tasks through the VWP or by cleaning their living area, ECF 50-1, 9 (Ceja Dep. 29:13-16), the Sanitation Procedures were not developed to assign tasks to specific individuals, but rather to detail the actual process for cleaning and materials and supplies to be used. Ex. J, Kevin Martin Dep. 208:6-11.

22. The Sanitation Procedures also contain a section detailing the consequences for non-compliance, stating: "The Dormitory/Unit Officer will inspect all living areas daily and report any infraction of these regulations to the immediate supervisor. The officer will notify detainees of unsatisfactory conditions, in cases of continued noncompliance, staff will issue an incident report." ECF 262-8, 4; *see also* ECF 50-4. The Sanitation Procedures do not provide for any other penalty for non-compliance. *Id.*

23. GEO has never maintained a separate policy or practice of placing a detainee in solitary confinement for the refusal to clean a living area. Ex. K (Amber Martin Dep., 134, 135.).

24. ICE audits GEO to ensure that GEO complies with all requirements of its contract, including its obligations under the PBNDS. Ex. L.

25. As part of each inspection, each audit reviews compliance with each PBNDS requirement. *Id.*

53343955;4                                                                                                          **APP. 265**

26. The materials provided to detainees at intake, including the handbook and orientation video, are regularly audited and have passed each audit since 2004. *Id.*

27. The audits specifically review intake procedures to ensure that the orientation information provides information about '[u]nacceptable activities and behavior, and corresponding sanctions" as well as the"detainee handbook." *Id.* (GEO-MEN 00131895).

28. The disciplinary severity scale is audited and has passed each audit since 2004. *Id.*

29. The audits review whether GEO provides notice of the disciplinary severity scale and have found GEO compliance based upon a review of its handbooks. *Id.* (GEO-MEN 00131936).

30. The VWP has been audited each year and has passed each audit since 2004. *Id.*

31. ICE has not only approved of the disciplinary severity scale but has also acted to implement and enforce the sanctions therein. One of the named Plaintiffs in this case—Demetrio Valerga—explained during his deposition that ICE officers also enforced the ICE sanctions. After claiming that one of GEO's corrections officers told Mr. Valerga that he could be placed in segregation if he did not help clean his own common area, Ex. M, Dep. of Demetrio Valerga, 135:15-137:19, Mr. Valerga then explained that ICE officers woke him up, pulled him out of his housing unit, and spoke to him directly. *Id.* at 138:2-13. During that conversation, ICE officers told Mr. Valerga that he could, in fact, be taken to segregation for refusing to help clean his living area. *Id.* at 138:15-23.[5]

**The VWP**

---

[5] Even after the ICE Officer's warning, Mr. Valerga refused to clean and later refused again several times. *See* Ex. M Dep. of Demetrio Valerga, 139:6-24, 140:2-20. Mr. Valerga was never placed in segregation for refusing to clean. *Id.*

53343955;4

**APP. 266**

32. The 2000 NDS and all applicable versions of the PBNDS require that GEO provide detainees the opportunity to participate in a VWP. (Plaintiffs' Undisputed Fact #35).

33. The 2000 NDS, with which the AIPC was contractually obligated to comply from March 27, 2003 to April 28, 2010, required GEO to provide "compensation" and explicitly directed that "the stipend is $1.00 per day, to be paid daily." ECF 261-10, 5 (2000 NDS).

34. Likewise, the 2008 PBNDS, with which the AIPC was contractually obligated to comply from April 28, 2010 to June 22, 2013, mandated that "the compensation is $1.00 per day." ECF 261-9 at 63 (2008 PBNDS).

35. Beginning on June 23, 2013, AIPC was bound by the 2011 PBNDS, which state that participants in the VWP will be compensated with "at least $1.00 (USD) per day." ECF 261-8 at 53 (2011 PBNDS). Thus, the "at least" language upon which the VWP Class relies was not implemented at the AIPC until approximately halfway through the VWP Class Period.

36. Before the 2011 PBNDS were implemented at the AIPC, GEO paid the amount it was explicitly directed by ICE to pay to VWP participants: $1.00 per day. (Plaintiffs' Undisputed Fact #93).

37. Thereafter, GEO continued to pay members of the VWP Class $1.00 per day the minimum payment explicitly permitted by the 2011 PBNDS. (Plaintiffs' Undisputed Fact #93).

**Plaintiffs' Allegations**

38. Plaintiffs allege that the PBNDS disciplinary severity scale forms the basis of their TVPA claim. ECF 50-3, 25; *see also* Ex. N (Plaintiffs' Sixth Supplemental discovery responses).

39. Plaintiffs claim that the Sanitation Procedures, when read together with the ICE-mandated disciplinary severity scale, violate the TVPA. *Id.*

**APP. 267**

40. Plaintiff Menocal was never threatened by a GEO employee with disciplinary or administrative segregation for the refusal to clean his living area. Ex. O (Plaintiffs' Second discovery responses Interrogatory No. 27). Rather, the only "threat" Menocal alleges was through the local AIPC detainee handbook and orientation video, which explained ICE's PBNDS disciplinary severity scale. Ex. N (Interrogatory No. 39).

41. The other named Plaintiffs likewise claim that ICE's PBNDS-mandated disciplinary severity scale in the local AIPC detainee handbook, as well as the same information provided to them during their AIPC orientation forms the basis for their TVPA claims. Ex. N; Ex. O.

42. In sum, Plaintiffs' TVPA claim is limited to the allegation that detainees cleaned their living areas "in order to avoid solitary confinement" or "segregation." ECF 47 at 7 (Plaintiffs' Class Certification Motion); *see also* ECF 1 at ¶¶ 6, 73 (Plaintiffs' Complaint).

43. Plaintiffs' claims do not rest on every single time they cleaned their living area, but rather, only those instances where cleaned up the tables in their living areas after meals.

44. The basis for Plaintiffs' unjust enrichment claim is that GEO was unjustly enriched by paying only $1.00 per day for completion of their VWP tasks. ECF 49 at 3.

## IV.   LAW AND ANALYSIS

### A.  Applicable Legal Standard.

In considering whether to grant a motion for summary judgment, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir.2008). Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled

to judgment as a matter of law. Fed.R.Civ.P. 56(c). *O'Connor v. Check Rite, Ltd.*, 973 F. Supp. 1010, 1014 (D. Colo. 1997) (Kane, J.). A fact is "material" if it "might affect the outcome of the suit under governing law*." Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a factual dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Id*. Although the motion for summary judgment before the Court was initiated by Plaintiffs, Fed. R. Civ. P. 56(f) allows the district court to grant summary judgment for a nonmovant where the material facts are undisputed.[6] Alternatively, GEO's opposition may be construed by this Court as a cross-motion for summary judgment and "assume that there is no evidence which needs to be considered other than that which has been filed by the parties." *Harrison W. Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir. 1981).

### B.  Derivative Sovereign Immunity.

The U.S. Supreme Court recently reaffirmed that under that doctrine of derivative sovereign immunity, government contractors may "obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) (internal quotation marks omitted) (*quoting Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)).[7] A federal government contractor is entitled to

---

[6] The nonmoving party may establish it is entitled to summary judgment in response to a moving party's motion. *See e.g. Int'l Tele-Marine Corp. v. Malone & Assocs., Inc.*, 845 F. Supp. 1427, 1435 (D. Colo. 1994) (Kane, J.) (considering nonmoving party's claim that it was entitled to summary judgment as raised in its opposition papers).

[7] To avoid any confusion, following the filing of this lawsuit and GEO's Answer, the Supreme Court decided *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016). In *Campbell-Ewald*, the Supreme Court made clear that derivative sovereign immunity is distinct and separate from the "government contractor defense" enumerated in *Boyle v. United Techs. Corp.*, 487 U.S. 500, 508, 108 S. Ct. 2510, 2516, 101 L. Ed. 2d 442 (1988). In *Boyle*, the Court examined when a federal contractor may be held liable under state law for work performed under a contract with the federal government. *Id.* The Court explained that the government contractor defense involves the limited issue of whether state law is displaced because it conflicts with a contractual term in an area of

53343955;4

**APP. 269**

DSI when it performs work "authorized and directed by the Government of the United States" and the contractor "simply performed as the Government directed." *Campbell-Ewald Co.*, 136 S. Ct. at 673. In that way, DSI ensures that "'there is no liability on the part of the contractor' who simply performed as the Government directed." *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019) (quoting *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21 (1940)). Authorization is "validly conferred" on a contractor if Congress authorized the government agency to perform a task and empowered the agency to delegate that task to the contractor, provided it was within the power of Congress to grant the authorization. *See Yearsley*, 309 U.S. at 20, 60 S.Ct. 413. Put another way, a government contractor that "violates both federal law and the government's explicit instructions" loses the shield of DSI and is subject to suit by those adversely affected by the contractor's violations. *Campbell-Ewald Co.*, 136 S. Ct. at 672. The only requirements for DSI to apply are (1) that the federal contractor "perform[] as the Government directed," *Campbell-Ewald*, 136 S.Ct. at 673, and (2) that "authority to carry out the project was validly conferred" by the government, *Yearsley*, 309 U.S. at 20-21.[8] As explained

---

federal interest. *Id.* In contrast, *Campbell-Ewald* made clear that derivative sovereign immunity applies where a government contractor merely acted as authorized by the federal government. *Campbell-Ewald* did not mention *Boyle*, nor the "government contractor defense," and *Boyle* does not mention "derivative sovereign immunity." Adding further clarity, despite pleas from the appellant, *Campbell-Ewald* did not apply or mention the test enumerated in *Boyle,* making clear the doctrines are distinct. *Campbell-Ewald* confirmed that derivative sovereign immunity applies more broadly to afford a federal government contractor immunity for both state and federal law claims without any requirement that the contractor establish the grounds for displacement of state law. Cases decided after the Court's 2016 *Campbell-Ewald* decision have likewise treated derivative sovereign immunity as its own distinct defense, separate from the government contractor defense under *Boyle. See, e.g., Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98 (D.D.C. 2017) (applying derivative sovereign immunity to state and federal law claims separate from government contractor defense); *cf. In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019) (drawing a distinction between the legal principles enumerated in *Boyle* and *Campbell-Ewald*). And, Plaintiffs agree that the two doctrines are distinct. ECF 260 at n.5.

[8] Unlike the "government contractor defense" in *Boyle*, DSI does not consider "discretion" in the design. *Compare Cunningham,* 888 F.3d 640, 643 *with Boyle*, 487 U.S. at 508.

below, both requirements are satisfied here.

Recently, the Fourth Circuit addressed facts analogous to those here. In *Cunningham v. General Dynamics Information Technology*, Greg Cunningham received an autodialed call from General Dynamics (a government contractor), advertising the commercial availability of health insurance. 888 F.3d 640, 643 (4th Cir.), *cert. denied*, 139 S. Ct. 417 (2018). Cunningham filed suit on behalf of a putative collective, arguing that because he had not provided his express consent, General Dynamics had violated the Telephone Consumer Protection Act ("TCPA"). *Id*. In response, General Dynamics claimed that it was immune from suit under the principle of DSI. *Id*. General Dynamics called Cunningham in connection with its contract with the Department of Health and Human Services ("DHHS") wherein General Dynamics was required to make calls informing individuals about their ability to buy health insurance created by the Affordable Care Act ("ACA").[9] *Id*. at 643. Under the contract, General Dynamics was required to make phone calls during a specified timeframe to inform individuals about their ability to buy health insurance through the health insurance exchanges created by the ACA. *Id*. at 644. DHHS authorized General Dynamics to use an autodialer to make the calls, provided a script for each call, and provided a list of phone numbers for each call. *Id*. The contract also required General Dynamics follow all applicable laws. *Id*. at 647. DHHS provided Cunningham's phone number to General Dynamics, indicating he was an individual who should be notified of his right to purchase health insurance through the exchanges. *Id*. However, Cunningham had previously opted out of the communications and the instruction to call him despite his prior opt-out gave rise to liability under the TCPA. *Id*. Interpreting *Campbell-Ewald* the Fourth Circuit concluded that governmental immunity was precluded only where a contractor violates its contract with the federal government. Thus, in assessing whether DSI applied, the Fourth Circuit concluded that General Dynamics did not violate

---

[9] DHHS was authorized to establish a system informing applicants about their eligibility for a qualified health plan pursuant to 42 U.S.C. § 18083(a), (b)(2), (e).

53343955;4

**APP. 271**

its contract when it made the call to Cunningham, because the call was ***explicitly authorized*** under the contract. *Id.*  In so holding, the Fourth Circuit made clear that General Dynamics' failure to obtain Cunningham's consent prior to placing the phone call –as mandated by the TCPA – was insufficient to show a violation of the contract which required it to comply with "all applicable laws," where its actions were otherwise directed by the contract. *Id*. Thus, General Dynamics was entitled to DSI. *Id*.

Here, the parties do not dispute the applicable law. Plaintiffs rely upon *Campbell-Ewald* and *Cunningham* in bringing their Motion. ECF 260 at 26-27. Rather, the parties only dispute the application of the law to the facts. When viewed in its totality, there is no question GEO has "simply performed as [ICE] directed" and that ICE's authority to delegate the care of detainees, and attendant discipline, was validly conferred by Congress.

### C.  ICE's Authority to Contract with GEO for the Care, Supervision, and Discipline of Detainees was Validly Conferred. [10]

Congress has validly conferred on ICE the authority to provide for the custodial supervision of detainees using private contractors like GEO. ICE has broad discretion to determine where to house ICE detainees. *See e.g., Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986) ("Congress . . . placed the responsibility of determining where aliens are detained within the discretion of the Attorney General."); *Rios–Berrios v. I.N.S.*, 776 F.2d 859, 863 (9th Cir. 1985) (a decision to detain an alien arrested in California at a facility in Florida was within the province of ICE); *Sasso v. Milhollan*, 735 F. Supp. 1045, 1048 (S.D.Fla. 1990) (a decision to transfer an alien from one locale to another is within the sound discretion of ICE); *c.f. Demore v. Kim*, 538 U.S.

---

[10] While GEO addresses this element of its defense, it is worth noting that Plaintiffs' do not dispute that it is within ICE's authority to set the methods of discipline for ICE detainees and provide a $1.00 per day stipend to detainees who participate in the VWP.

**APP. 272**

510, 523 (2003) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001) (Kennedy, J.,dissenting)) (Congress's "considerable authority over immigration matters" includes the "power to detain aliens in connection with removal."). *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens" is "exclusively entrusted to the" Federal Government.). The parties agree that Congress delegated to DHS and its agency, ICE, the authority to detain aliens placed into removal proceedings. *See* ECF 260 at 2 (Plaintiffs' Undisputed Facts # 1 and 2); *see also* 8 U.S.C. §§ 1103, 1226, 1231. In carrying out that mandate, ICE is directed by Congress to contract with state governments or private entities for the operation and lease of detention facilities before constructing or acquiring new facilities. 8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g). The ICE contract at issue here, between GEO and ICE for the operation of the AIPC, is therefore, authorized by Congress's valid delegation of authority. Moreover, the parties do not dispute that compliance with the 2000 NDS and all applicable versions of the PBNDS was contractually mandated by GEO's contracts with ICE (and a valid exercise of ICE's authority). ECF 260 at 7 (facts 25 & 26). Thus, the conduct about which Plaintiffs complain in this case has been prescribed by ICE as part of its validly conferred authority to provide for the custodial supervision of alien detainees. Moreover, there is no question that GEO has performed precisely as directed by ICE without violating its contractual obligations or exceeding its delegated authority.

### D.  2000 NDS and PBNDS Disciplinary Standards.

Whether an individual or entity is liable under the TVPA turns not on what *type* of labor an entity compels an individual to perform, but rather *the means used* to obtain the labor. If an individual obtained the labor of another through the means of persuasion or incentives, but with

53343955;4

**APP. 273**

inadequate payment, the remedy does not lie with the TVPA.[11] Rather, to be entitled to protection under the TVPA, the *means* through which labor is compelled must be explicitly enumerated as nd arunlawful under the TVPA. As is relevant here, for Plaintiffs to prevail on their TVPA claim, they must establish GEO <u>knowingly</u> obtained Plaintiffs' labor by:

> (a) means of force, physical restraint, or threats of force or physical restraint;
>
> (b) by means of serious harm or threats of serious harm;
>
> (c) by means of abuse of the law or threats of abuse of the law or legal process;
>
> (d) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or other person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). Here, Plaintiffs challenge ICE's disciplinary severity scale (incorporated into GEO's contracts with ICE through the 2000 NDS and applicable versions of the PBNDS) as constituting unlawful means under the TVPA. Plaintiffs claim that ICE's disciplinary severity scale unlawfully coerced detainees into cleaning their living areas because the possible sanction of 72 hours in segregation constitutes a threat of serious harm (as well as actual serious harm if the sanction is implemented, not just threatened). Even if Plaintiffs could prove that a brief (no more than 72 hour) stay in segregation (or a threat of the same) is prohibited by the TVPA as serious

---

[11] *See United States v. Toviave*, 761 F.3d 623, 625–26 (6th Cir. 2014) (holding that any construction of the TVPA must be "distinguishable from that of ordinary parents requiring chores"); *see also United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) ("To be sure, not all bad employer-employee relationships or even bad employer-immigrant nanny relationships will constitute forced labor.").

53343955;4

**APP. 274**

harm,[12] the sanctions for a detainee who refuses to clean his or her living area are explicitly authorized and required by ICE and therefore GEO is immune from liability.

It is undisputed that the 2000 NDS and applicable versions of the PBNDS are part of GEO's contractual agreements with ICE. ECF 260 at 7 (Plaintiffs' Undisputed Facts #25 and 26). The disciplinary practices Plaintiffs allege give rise to the "Forced Labor" Class are expressly directed and authorized by the 2000 NDS and applicable versions of the PBNDS (and are, therefore, incorporated as part of GEO's contractual agreement with ICE). GEO's Additional Undisputed Facts #7-19; Plaintiffs' Undisputed Facts #17, #24, #25, #77, #79, ECF 260 at 17. Further, ICE mandates that GEO incorporate the disciplinary severity scale, without modification, into its local handbooks and provide additional notice of the sanctions where possible. GEO's Additional Undisputed Fact #13; ECF 261-10 at 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8 at 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section."). Neither party disputes that these sanctions were drafted by ICE and incorporated into ICE's contract with GEO through the PBNDS. Plaintiffs' Undisputed Facts #25, 26; GEO's Additional Undisputed Fact #7. The 2000 NDS and applicable PBNDS disciplinary

---

[12] GEO disputes that a brief stay of 72 hours or less in segregation constitutes serious harm. A significant body of case law support's GEO's position. But, the exact contours of serious harm need not be resolved in this Motion in order for the Court to find in GEO's favor because, even assuming that Plaintiffs can meet their burden to show serious harm, the disciplinary severity scale was drafted, authorized, and required by ICE.

**APP. 275**

severity scales, mandated by ICE, authorize (and direct GEO to adopt) the following disciplinary measures for the infraction of "[r]efusing to clean assigned living area":

  1. Initiate criminal proceedings

  2. Disciplinary transfer (recommend)

  3. Disciplinary segregation (up to 72 hours)

  4. Make monetary restitution, if funds are available

  5. Loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.)

  6. Change housing

  7. Remove from program and/or group activity

  8. Loss of job

  9. Impound and store detainee's personal property

  10. Confiscate contraband

  11. Restrict to housing unit

  12. Reprimand

  13. Warning

ECF 261-10, 17 (2000 NDS); 261-8,45 (2008 PBNDS); 261-8, 9 (2011 PBNDS); ECF 260 at 17 (Plaintiffs' Undisputed Fact #80). There is no question that under both the PBNDS and the AIPC handbook detainees must keep their living area clean and sanitary. ECF 260 (Plaintiffs' Undisputed Fact #62). The failure to do so *could* result in disciplinary segregation as mandated by INS and ICE in the 2000 NDS and each version of the PBNDS to which the AIPC has been contractually bound throughout the entire Class Period. Plaintiffs' Undisputed Facts #26, #26; GEO's Additional Undisputed Facts #6, #7, #13. Plaintiffs claim that GEO threatened them with

53343955;4

**APP. 276**

segregation by listing the disciplinary severity scale in the AIPC local handbook. Ex. M (Plaintiffs'

discovery responses). Yet, that too was mandated by ICE. The 2000 NDS and all applicable

versions of the PBNDS require GEO to provide notice to detainees, in the local detainee handbook,

of the ICE-provided disciplinary severity scale. . ECF 261-10 at 10 (2000 NDS) ("The detainee

handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the

disciplinary severity scale…"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee handbook, or

supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary

severity scale…"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee handbook, or supplement,

issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity

scale…"). GEO complied, copying the scale verbatim. Ex. E (2005 Handbook); (GEO_MEN

00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I

(2011 Handbook); ECF 261-17 (October 2013 Handbook). Because all detainees are also required

to receive the local handbook under both the 2000 NDS and the applicable versions of the PBNDS,

to the extent the local handbook's section providing notice of the ICE disciplinary severity scale

constitutes a threat, the complained of "threat' was explicitly directed by ICE. Further, ICE

explicitly approved of GEO's handbook, orientation materials, and disciplinary scale year after

year through annual audits. Therefore, even assuming *arguendo* that Plaintiffs could establish that

the threat of solitary confinement for 72 hours or less is a threat of serious harm,[13] the sanction

---

[13] To date, no court has found that a mere 72 hours of disciplinary segregation would constitute
serious harm under the TVPA. To the contrary, the only circuit court to address the issue concluded
that the disciplinary sanctions, as enumerated in the PBNDS, would not (standing alone) give rise
to TVPA liability. *Barrientos v. CoreCivic, Inc.*, --- F.3d ----, 2020 WL 964358 at 7 n.5 (11th Cir.
Feb. 28, 2020) (finding that the disciplinary sanctions authorized by the PBNDS do not give rise
to TVPA liability). Similarly, a detainee's brief placement in segregation in and of itself is not a
violation of due process or a liberty interest—and therefore would be hard pressed to form the

was explicitly authorized and required by ICE.[14] Accordingly, GEO is entitled to DSI on any and all claims arising out of the disciplinary severity scale and/or sanctions which were mandated by the 2000 NDS or applicable versions of the PBNDS and incorporated verbatim into local handbooks. *See Campbell-Ewald Co.*, 136 S. Ct. at 673.

GEO anticipates that Plaintiffs' Reply will attempt to draw distinctions between different cleaning tasks detainee's performed while detained. For example, Plaintiffs may argue that they do not challenge being asked to make their bed every day (knowing the possible punishment of segregation exists for refusing to do so), but do take issue with mopping the floors (i.e., keeping them free from clutter) under the same circumstances—despite the fact that both tasks carry the same potential punishment under the ICE-mandated disciplinary severity scale. However, the undisputed facts make plain that detainees are **<u>required</u>** by the PBNDS to keep their living area clean. Plaintiffs Undisputed Fact # 62. There is no question that the entirety of where a detainee lives and sleeps is his or her "living area" while areas like the kitchen, library, or barbershop would be outside of a detainees "living area."

---

basis of a claim of "serious harm." *White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) ("the placement of an inmate in nonpunitive administrative segregation does not deprive him of a liberty interest protected by the Due Process Clause."). And, directly relevant here, a detention officer may require a civil detainee to clean any communal area he or she uses while detained under the threat of a brief period of solitary confinement and such an action is not punitive. *House v. Vaught*, 993 F.2d 1079, 1085-86 (4th Cir. 1993) (addressing a pre-trial detainee, the Fourth Circuit concluded that the threat of 48 hours of solitary confinement for the failure to clean a pod was not punitive and was instead permissible in the detention context).

[14] While Plaintiffs make varied allegations about the threat of possible solitary confinement for the refusal to clean their living areas, no detainee alleges that GEO has exceeded or surpassed its authority as enumerated in the PBNDS (i.e., threatening segregation for more than 72 hours, actually placing a detainee in segregation for more than 72 hours, etc.).

53343955;4

**APP. 278**

Further, the TVPA draws no such distinctions based upon the type of work performed as is at issue here,[15] and ICE has similarly not drawn such distinctions in its disciplinary severity scale. Nor was ICE required to draw such a distinction in developing the guidelines for detention facilities. Surely, there can be no question that if a detainee intentionally pours his or her milk on the floor, an officer could ask him or her to clean it up to maintain discipline and self-accountability in the facility. *Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978) ("deliberate untidiness compromises the health and safety of detainees and staff"). And, an officer could ask a detainee who left excessive crumbs after a meal to clean up after himself—all in the name of operating an orderly facility. *Weaver v. Petray*, No. CIV. 08-5195, 2010 WL 909589, at *6 (W.D. Ark. Mar. 11, 2010) ("A detention facility does not violate the Eighth Amendment standards by giving inmates access to cleaning supplies and requiring them to keep their own living areas clean"). Similarly, an officer can ask a civil detainee to clean up his or her communal living area as it becomes messy during the day. *Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993) ("Because none of the evidence indicates that the cleaning assignments here amounted to more than 'general housekeeping responsibilities,' we conclude the cleaning assignments were not inherently punitive. We also conclude that the cleaning assignments were related to the legitimate, non-punitive governmental objective of prison cleanliness."). To be sure, all of these activities would fall within the description of cleaning one's "assigned living area" [16] (a requirement for all

---

[15] Certainly, in other contexts, there are distinctions based upon work that involves coerced sexual acts but that is not at issue here.

[16] Had ICE wished to limit the sanction of segregation to only those situations where a detainee failed to clean only specific areas in the housing unit, it could have done so by addressing specifically the failure to participate in the specifically delineated "personal housekeeping" tasks set forth in Section 5.8 of the PBNDS or by enumerating the types of cleaning tasks that could be sanctioned. ICE chose not to do so, instead broadening the applicability of the sanction to

detainees under the PBNDS). ECF 260 (Plaintiffs' Undisputed Fact #62). Yet, none of these distinct scenarios would, in and of themselves, give rise to TVPA liability.  Rather, in order to fall within the purview of the TVPA, detainees who clean their living are must do so under the fear of the illegal means of coercion (including threats of serious harm). 15 U.S.C. § 1589 (requiring unlawful coercion  for liability); *Dann*, 652 F.3d at 1170 (TVPA liability requires more than allegations of unpaid work). That is where ICE steps in. Regardless of the exact factual scenario giving rise to the refusal to clean one's living area, ICE has directed GEO through the 2000 NDS and/or applicable versions of the PBNDS that 72 hours of disciplinary segregation is an authorized sanction (or possible sanction). It has further directed GEO to inform detainees of this possible consequence in advance of its imposition, specifically through the detainee handbook. Accordingly, because the sanction of disciplinary segregation for the refusal to clean one's living area is explicitly authorized  and directed by ICE, GEO is entitled to DSI as to the Forced Labor class' TVPA claim.[17]

### E.  VWP Stipend.

---

encompass all refusals to clean one's "living area." While the phrase "living area" is not defined in the PBNDS or the contract, it has a commonly accepted plain meaning in the detention context: a detainee's housing unit in which he or she occupies each day. *See e.g. VanPatten v. Allen Cty. Jail*, No. 1:11-CV-73-PPS, 2013 WL 2149447, at *2 (N.D. Ind. May 16, 2013) (describing the cleaning of "living areas" as including sweeping and wiping down tables); *Treadway v. Rushing*, No. 4:10 CV 2749, 2011 WL 13568, at *1 (N.D. Ohio Jan. 4, 2011) (describing civil pretrial detainees living area as their entire housing unit including sinks, drinking facilities, beds, and floors.); *Jones v. Wittenburg*, 509 F. Supp. 653, 702 (N.D. Ohio 1980) (describing the living area as all "modules and cells, including walls, ceiling, floor[s].."). Indeed, Section 2.13.V.A of the 2011 PBNDS describes a detainee's "pod" or entire living area including common areas as their "living area," indicating the two are synonyms. Ex. P.

[17] For the avoidance of doubt, GEO has never maintained a separate policy or practice of placing a detainee in solitary confinement for the refusal to clean. Ex. K (Amber Martin Dep., p. 134, 135.).

As detailed above, ICE is authorized to enter into contracts with private entities for the detention of individuals pending resolution of their immigration proceedings. Similarly, Congress has authorized ICE to provide for voluntary work programs that pay allowances to detainees of $1.00 per day. *See* 8 U.S.C. § 1555(d). In its contracts with GEO, ICE requires GEO to offer a VWP. ECF 260 (Plaintiffs' Undisputed Fact #35). ICE establishes the terms and conditions of the VWP, determines which detainees are eligible to participate and what work they are eligible to perform, and sets the maximum hours detainees are permitted to work. *Id.* ICE also determines the amount that it will pay detainees for participation in the VWP ($1.00) and a system for payment whereby GEO advances the allowance initially and is thereafter reimbursed by ICE. *Id.* From October 22, 2011 (the beginning of the VWP class period) to June 23, 2013, GEO was required by ICE to pay detainee participants in the VWP *exactly* $1.00 per day. ECF 261-10, 5 (2000 PBNDS); ECF 261-9, 63 (2008 PBNDS). GEO had no discretion. The PBNDS did not use the "at least" language that is contained in the 2011 version. ECF 261-9, 63 (2011 PBNDS). Plaintiffs do not allege that ICE's decision to set the payment amount at $1.00 per day is beyond the authority validly conferred upon ICE by Congress – nor could they: the $1.00 per day allowance is predicated on Congress's appropriation of $1.00 per day for ICE's payment of allowances to detainees for their work. *See* 8 U.S.C. § 1555(d).

In support of their Motion, however, Plaintiffs misleadingly cite only to a PBNDS section on VWP compensation that applied only from June 22, 2013 to October 22, 2014—less than half of the applicable class period, highlighting the "at least" language to argue that GEO had discretion to pay more than $1.00 per day. Plaintiffs make no mention of the prior versions of the PBNDS or how the language changed. Prior to June 23, 2013, the language of "at least" included in the 2011

**APP. 281**

PBNDS had not been incorporated into GEO's contract with ICE for the operation of the AIPC. Instead, under prior versions of the PBNDS (incorporated into the contract), GEO was required to pay exactly $1.00 per day. GEO had no discretion to pay more. When all applicable versions of the PBNDS are reviewed, it is clear that for the majority of the class period[18] there can be absolutely no factual dispute that GEO was required to pay exactly $1.00 per day to detainees participating in the VWP and that GEO complied with that directive. Thus, because GEO paid $1.00 per day to detainees participating in the VWP, as explicitly instructed by ICE, it is entitled to DSI.

The use of a minimum standard – at least $1.00 per day – does not obviate the determination by Congress and ICE that the payment of $1.00 per day is adequate. Nothing in the contract required GEO to pay more. In fact, GEO's contract provides that $1.00 per day must be the "***actual cost*** … per detainee," which GEO "***shall not exceed***" without the approval of ICE's Contracting Officer. ECF 262-2, 5 (GEO_MEN 00019616); (emphasis added). And, this exact amount was explicitly authorized by Congress when it set the rate for detainee allowances at "not in excess of $1 per day". Dep't of Justice Appropriations Act of 1979, Pub. L. 95-431, 92 Stat 1021, 1027 (Oct. 10, 1978). The later-adopted  "at least" language in the PBNDS, which sets the payment of $1.00 per day as a floor, does not preclude application of DSI with respect to allowances paid after June 23, 2013. There is no case law suggesting that the inclusion of minimum standards in a federal contract deprives a government contractor of claiming entitlement to DSI simply because the government contractor did not surpass those minimum standards by some undefined threshold. Indeed, under the precedent following *Campbell-Ewald* governmental immunity is precluded only

---

[18] The VWP class period spans from October 22, 2011 to October 22, 2014.

**APP. 282**

where a contractor **violates** the contract. *See Cunningham*, 888 F.3d 640, 643 (making clear that a violation is required to preclude the application of immunity).There is no legal authority to support Plaintiffs'' position that DIS is precluded where a contractor does not exceed minimum standards approved of and directed by the government. Here, there is no question that GEO has met the minimum standard of $1.00 per day. As a result, GEO is entitled to DSI as to Plaintiffs' unjust enrichment claim.

## V.   *BOYLE* CONTRACTOR DEFENSE

In addition to seeking summary judgment on GEO's DSI defense under *Campbell-Ewald*, Plaintiffs also seek summary judgment as to GEO's government contractor defense under *Boyle*— but only as to the VWP class. *Boyle*, 487 U.S. at 508; ECF 260 at 30. Plaintiffs argue that GEO cannot invoke the *Boyle* defense because the 2011 PBNDS added the language of "at least" in front of $1.00 per day when describing detainees' VWP stipends. In support of their argument, Plaintiffs ignore that ICE set the rate of compensation (even if it set a floor) and *specifically authorized a payment of $1.00 per day* – it simply cannot be disputed that a payment of $1.00 per day complies with a requirement to pay at least $1.00 per day. Thus, insofar as Plaintiffs' claim for unjust enrichment would require GEO to pay detainees a *higher* base payment than $1.00 per day, *Boyle* immunity applies.

Under *Boyle*, a government contractor is not liable for violations of state law where a significant conflict exists between the application of that state law and an identifiable federal policy or interest. *See Boyle*, 487 U.S. at 507. The Court explained that a conflict is significant when the state law is contrary to a specific contract term selected by the federal government. Recently, the Tenth Circuit examined and clarified the *Boyle* government contractor defense in *Helfrich v. Blue*

*Cross and Blue Shield Association*, 804 F.3d 1090 (10th Cir. 2015). In *Helfrich*, the plaintiff, a federal government employee, was in an automobile accident and suffered injuries for which she made claims to her insurance provider. *Id.*at 1095. Her insurance provider paid out her medical claims. *Id.* Thereafter, she entered into a settlement with the driver of the other vehicle for a separate sum of money. *Id.* After the plaintiff obtained the settlement, her insurer invoked a contractual provision seeking subrogation of the benefits it had paid her. *Id.* The plaintiff responded that under state law, subrogation provisions, like the one in her benefits package, were prohibited. *Id.* The insurer thereafter asserted that the state law did not apply because it was displaced by federal law under *Boyle* as conflicting with a contractual term with the government. *Id.* The Tenth Circuit sided with the insurer, concluding that *Boyle* applied and had the effect of displacing state law. *Id.* at 1099.

In reaching its conclusion, *Helfrich* explained that *Boyle* "contractor immunity would be available when the [violation of state law] was the product of a discretionary decision by the government" to select a contract term for a contract dealing with a subject of uniquely federal interest. *Id.* at 1098. Applying this test, the Tenth Circuit first concluded that the provision of affordable healthcare benefits to federal government employees was a uniquely federal interest because the government had an interest in recruiting employees to the federal workforce. *Id.* The court also recognized a strong federal interest in a uniform benefits subrogation policy in all states—regardless of the differences in state law. *Id.* at 1099. The court next concluded that the law significantly conflicted with a contractual term, by rewriting the reimbursement plan between the insurer and the employee for benefits paid out under the healthcare plan—which would increase the cost of health insurance to the federal government through higher premiums on its

53343955;4

**APP. 284**

employees' policies. *Id.* In sum, *Helfrich* concluded that "[s]tate law – whether tort law or otherwise – must yield if it conflicts with such a contractual term in an area of uniquely federal interests." *Helfrich*, 804 F.3d at 1098.

Consistent with *Helfrich*, there can be little debate that the contracts between GEO and ICE governing the operation of the AIPC are matters of uniquely federal interest. Indeed, Congress has delegated to DHS and its agency ICE responsibility for detaining aliens awaiting removal and the authority to exercise custodial supervision over those detainees. 8 U.S.C. §§ 1103, 1226, 1231. The detention and supervision of aliens is uniquely within the purview of the federal government and there is no authority to the contrary. Plaintiffs' state law claim for unjust enrichment presents a significant conflict with the terms of ICE's contracts with GEO by <u>requiring</u> that payments under the VWP be some amount more than $1.00 per day, resulting in increased costs like in *Helfrich*. ICE required that GEO provide detainees participating in the VWP a stipend of "at least $1.00 per day". Plaintiffs' state law unjust enrichment claim seeks to uproot and supplant ICE's decision to allow a payment of exactly $1.00 per day, in favor of their own VWP stipend. If ICE wanted to require some other VWP stipend – something far in excess of $1.00 per day – it could have stated as such in the 2011 PBNDS. It did not – and *Boyle* immunity provides that state law unjust enrichment actions cannot substitute for ICE's decision-making.

As the court in *Helfrich* explained, state law must yield if it conflicts with a term in a federal contract, selected as a matter of federal discretion in an area of uniquely federal interests. *Helfrich*, 804 F.3d at 1098. That is precisely the circumstance here. Plaintiffs' effectively seek a judgment that a payment of $1.00 per day for VWP participation is unlawful. ICE allows this very thing. If this Court were to apply the state law of unjust enrichment to circumvent the federal government's

determination of the allowance to be paid to detainees, it would create a significant conflict with federal immigration policy. Further, it would interfere with the federal government's interest in uniform treatment of ICE detainees, regardless of the state in which they are housed, like in *Helfrich*. Certainly, if courts in each state were to determine the allowance for VWP participation based upon principles of unjust enrichment, the rates would vary all over the country. Thus, GEO is entitled to the *Boyle* contractor defense because unjust enrichment would significantly interfere with a unique function of the federal government.

Additionally, Plaintiffs' reliance upon this Court's prior rulings is misplaced. This Court previously considered GEO's motion to dismiss based on the *Boyle* government contractor defense and concluded that based upon the pleadings alone, GEO had not met its burden.ECF 23, 13.  But the Court previously had available to it only the language of the 2011 PBNDS. The Court found that the language "at least" in front of $1.00 per day did not prohibit GEO from paying more and, therefore, presented no significant conflict with the Plaintiffs' state claims for unjust enrichment. *Id.*  In support of this Motion, GEO has filed the prior versions of the ICE PBNDS standards that governed GEO's operation of the AIPC from 2011 until June 23, 2013. Prior to June 23, 2013, the "at least" language upon which the Court relied was absent from the contracts and standards. *Id.* Instead, the language required GEO to pay $1.00 per day. GEO had no discretion to pay more. *Id.* Accordingly, to the extent the Court relied on the later-adopted language to conclude there is no significant conflict, that conclusion is unsupported with respect to the allowances paid from 2011-June 2013. *See Helfrich*, 804 F.3d at 1098.

Moreover, even the later-adopted language, which sets a minimum payment of $1.00 per day, does not preclude application of the government contractor defense with respect to allowances

paid after June 23, 2013. In *Glassco v. Miller Equipment Co., Inc.*, 966 F.2d 641 (11th Cir. 1992), the Eleventh Circuit held that the government contractor defense barred state law claims premised on the contention that a manufacturer under contract with the federal government should have used materials that exceeded minimum standards set forth in the federal contract. *Id.* Applying the significant conflict prong of the *Boyle* government contractor defense, the Eleventh Circuit concluded that the inclusion of minimum standards in a federal contract presents a significant conflict with state laws suggesting a higher standard should have been met. The fact that the federal government would not have objected if the contractor met a higher standard does not obviate the federal government's discretionary determination that the minimum standard was adequate. *See id.* at 643. The same is true here. The fact that ICE provided a minimum standard in its contract does not change that ICE clearly authorized the payment of $1.00 per day to detainees.  A state law unjust enrichment claim seeking to declare unlawful an amount *authorized* by ICE cannot withstand *Boyle* scrutiny. Thus, in addition to DSI, GEO is entitled to the *Boyle* government contractor defense as to the VWP class.

## VI.   WAIVER

Despite the fact that this matter is before the Court due to an affirmative motion by Plaintiffs that summary judgment should be granted <u>on the merits</u> of GEO's DSI defense, Plaintiffs assert in footnote 5 of their Motion that GEO has waived its affirmative defense[19] of DSI because

---

[19] GEO disputes that DSI is a defense rather than a jurisdictional bar. In *Cunningham*, after thorough analysis, the Fourth Circuit concluded that the *Yearsley* doctrine confers immunity from a suit, making it a jurisdictional bar rather than a defense to liability. *Cunningham*, 888 F.3d at 649–51. Thus, DSI may be raised under Rule 12(b)(1) at any time. *See id.* at 651; *see also* Fed. R. Civ. P. 12(h)(3).

**APP. 287**

it allegedly failed to plead it with sufficient specificity[20] in its Answer. ECF 260 at n.5. Yet, in their brief footnote, Plaintiffs admit that GEO raised the issue of DSI in its Rule 12 motion in a manner that was sufficient to place Plaintiffs on notice of GEO's defense (as is obvious from Plaintiffs' Motion which details the significant discovery Plaintiffs have conducted on GEO's DSI defense). *Id.* It is well-settled that raising a defense in a Rule 12 motion is sufficient to preserve it for review. *See Radio Corp. of Am. v. Radio Station KYFM, Inc.*, 424 F.2d 14, 17 (10th Cir. 1970). For that reason alone, GEO has not waived its defense.

Furthermore, "[u]nder Tenth Circuit authority, inclusion of affirmative defenses in pretrial orders satisfies Rule 8(c)." *Villescas v. Richardson,* 124 F. Supp. 2d 647, 653 (D. Colo. 2000); *see also Bentley v. Cleveland County Bd. of County Comm'rs*, 41 F.3d 600, 605 (10th Cir. 1994) (defendant "waived any limit on its liability afforded by that statute by failing to raise the issue in its answer, the Pre–Trial Order, or at trial.") (emphasis added); *Expertise, Inc. v. Aetna Fin. Co.*, 810 F.2d 968, 973 (10th Cir.1987) ("the [statute of] limitations defense was not waived because it was included in the pretrial order."). Nearly two years ago, GEO included its DSI defense in the Scheduling Order. ECF 149 at 5. Plaintiffs never sought to strike this claim from the Scheduling Order, nor did they otherwise raise the issue. Instead, they continued to conduct extensive discovery into GEO's defense. Thus, GEO has not waived its defense because it raised it in the Scheduling Order.

---

[20] Plaintiffs' claim rests on the theory that government contractor immunity has recently emerged as a distinct doctrine from derivative sovereign immunity. Not only did this distinction arise after GEO filed its Answer, the two terms are often used interchangeably, with courts often referring to *Campbell-Ewald* immunity as "contractor immunity." *See e.g. Adkisson v. Jacobs Eng'g Grp., Inc.*, No. 3:13-CV-505-TAV-HBG, 2017 WL 10188860, at *12 (E.D. Tenn. Feb. 15, 2017).

53343955;4

**APP. 288**

Finally, strict adherence to the pleading requirement is inappropriate when the purpose of the requirement has been fulfilled otherwise. *Ahmad v. Furlong*, 435 F.3d 1196, 1201 (10th Cir.2006). The purpose of pleading an affirmative defense is to place the opposing party on notice so that it can conduct discovery and raise the issue with the Court. As is clear from Plaintiffs' affirmative Motion, Plaintiffs were on notice of GEO's defense and conducted extensive discovery into the same. Thus, because Plaintiffs were clearly on notice of the defense, strict adherence to Rule 8(c) is inappropriate. *Id.* Accordingly, Plaintiffs' claim that GEO waived its right to assert DSI lacks merit.

## VII.   PLAINTIFFS' HAVE FAILED TO MEET THEIR BURDEN

Where, as here, the party moving for summary judgment "does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove." *Molina v. Ford Motor Co*., No. 18-CV-01954-MSK-KMT, 2020 WL 978742, at *4 (D. Colo. Feb. 28, 2020). Because GEO contends that all applicable policies were both authorized and directed by ICE, Plaintiffs bear the burden in their motion for summary judgment to show an absence of sufficient evidence to establish the government contractor and DSI defenses. In other words, Plaintiffs must demonstrate that there is <u>no</u> evidence that the policies at issue were expressly authorized by ICE. Plaintiffs have not met their burden.

Plaintiffs' claims cover a class period that spans from 2004 to 2014. In order to meet their burden they must establish that it is <u>undisputed</u> that the polices they allege form the foundation of their claims were applicable during the entirety of the class period <u>and</u> that there is no evidence those same policies were authorized by ICE. Plaintiffs have failed to do so here. Instead, they have provided two handbooks that purportedly contain the policies upon which they base their claims.

The handbooks do not span the entire class period, but instead consist of a handbook that was in place in 2002, a full two years before the class period began and a handbook which was implemented in October 2013, at best covering only a single year of the class period. ECF 261-17; ECF 262-9.  As to their TVPA claims, Plaintiffs argue that the ICE disciplinary severity scale which is incorporated into the October 2013 handbook contains a threat of solitary confinement for the failure to clean their assigned living area. ECF 260 at 36. Plaintiffs contend that this sanction is unauthorized because ICE only requires that GEO "maintain certain levels of sanitation and hygiene; [ICE does] not require it to use the threat of solitary confinement." *Id.*  As is clear from the undisputed facts before this Court, the sanction of solitary confinement is expressly authorized and directed by ICE and therefore, even assuming the 2013 handbook applies to the entire class period, Plaintiffs have failed to meet their burden. (Plaintiffs Undisputed Facts #25, #26, and #79).

The only other handbook Plaintiffs provide is from 2002 and is outside the class period. ECF 262-9. And, the 2002 handbook does not provide for the sanction of solitary confinement, a key allegation at the heart of Plaintiffs claims. Instead, it provides only for a "loss of privileges" including the loss of commissary, television, visitation, and telephone for up to five days. *Id.* at 45 (GEO-MEN 00040774). Thus, even if applicable, it would undermine the core of Plaintiffs allegations. Further, Plaintiffs have not established evidence that would show that by paying $1.00 per day to detainees, GEO violated its agreement with ICE or that they payment of $1.00 per day was not expressly authorized. To the contrary, the evidence submitted by Plaintiffs makes plain that the contract(s) and the PBNDS expressly authorized the payment of $1.00 per day. In short, Plaintiffs have failed to show "an absence of sufficient fact" that payment of $1.00 per day to VWP

53343955;4

**APP. 290**

detainees and the disciplinary policy were authorized and directed by ICE. To the contrary, and as detailed throughout this motion, there is ample evidence to support each element of GEO's DSI and Government Contractor defenses.

## VIII.    CONCLUSION

For the foregoing reasons, GEO respectfully requests that the Court deny Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense. Further, pursuant to Fed. R. Civ. P. 56(f)(1), GEO requests entry of judgment in its favor on GEO's of derivative sovereign immunity defense and government contractor defense.

Respectfully submitted, this 5th day of June, 2020.

**AKERMAN LLP**

*s/Adrienne Scheffey*
Colin L. Barnacle
Adrienne Scheffey
Christopher J. Eby
Melissa L. Cizmorris
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:(303) 260-7712
Facsimile: (303) 260-7714
Email: colin.barnacle@akerman.com
Email: christopher.eby@akerman.com
Email: melissa.cizmorris@akerman.com
Email: adrienne.scheffey@akerman.com

**BURNS, FIGA & WILL, P.C.**
Dana L. Eismeier
Michael Y. Ley
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, CO 80111
Phone: (303) 796-2626
Fax: (303) 796-2777
Email: deismeier@bfwlaw.com
Email: mley@bfwlaw.com
*Attorneys for Defendant The GEO Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify on this 5th day of June, 2020, a true and correct copy of the foregoing **DEFENDANT THE GEO GROUP, INC'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S AFFIRMATIVE DEFENSE** was filed and served electronically via the Court's CM/ECF system on the following:

### Counsel for Plaintiffs:

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
Towards Justice
1410 High St., Ste. 300
Denver, CO 80218
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Kelman Buescher Firm
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com

Hans C. Meyer
Meyer Law Office, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
Outten & Golden, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
Outten & Golden, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
Outten & Golden, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
Law Office of R. Andrew Free
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

R. Andrew Free
Law Office of R. Andrew Free
2004 8th Ave. South
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
Milstein Law Office
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

*s/ Nick Mangels*
Nick Mangels

53343955;4

**APP. 292**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated*,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

**DEFENDANT THE GEO GROUP, INC.'S CROSS-MOTION FOR
SUMMARY JUDGMENT**

---

      Defendant The GEO Group, Inc. ("Defendant" or "GEO"), by and through its undersigned

counsel, hereby submits this Cross-Motion for Summary Judgment[1] and respectfully requests this

Court enter judgment in GEO's favor as to all of Plaintiffs' claims.

---

[1] GEO has also filed its Opposition to Plaintiffs' Motion for Summary Judgment. ECF 270. In it, GEO advances similar arguments to the ones detailed herein. It remains GEO's position that the undisputed material facts that relate to GEO's immunity defense are appropriate for summary judgment, either under Fed. R. Civ. P. 56(f) as argued in its Opposition, or as relief for the instant cross-motion under Fed. R. Civ. P. 56(a).

**APP. 293**

## I.   INTRODUCTION

Plaintiffs seek to hold GEO responsible for simply performing the work and disclosing disciplinary measures it is directed to do under its contracts with the federal government. This Court has certified two distinct classes in this action. The Forced Labor Class alleges a GEO policy allowing disciplinary sanctions where a detainee refuses to clean his or her living area violates the Trafficking Victims Protection Act, 18 U.S.C. § 1589 *et seq.* ("TVPA"). ECF 49 at 3; ECF 57 at 21. Specifically, Plaintiffs allege GEO violated the TVPA by asking them to clean their living areas after informing them their refusal *could* result in segregation for *up to* 72 hours. ECF 49 at 3. The "Voluntary Work Program Class" alleges GEO has been unjustly enriched by ICE's mandatory program that provides detainees an allowance of $1.00 per day for work done under a voluntary work program.[2] Both classes' claims arise from GEO's operation of the Aurora ICE Processing Center ("AIPC"). Plaintiffs' claims against GEO are barred in full by the doctrine of derivative sovereign immunity ("DSI") and their unjust enrichment claims are specifically barred by GEO's government contractor affirmative defense.

First, GEO is entitled to DSI because it is a federal contractor and because both policies are conducted with authority validly conferred by ICE. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21-22 (1940); *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672-73 (2016); *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 643 (4th Cir. 2018). The Forced Labor Class alleges GEO violated the TVPA by requiring detainees "to perform uncompensated janitorial labor **under the threat of solitary confinement**." ECF 49 at 3 (emphasis added). The

---

[2] The Forced Labor Class period spans from October 22, 2004 to October 22, 2014 and the Voluntary Work Program Class period spans from October 22, 2011 to October 22, 2014, which will collectively be referred to in this motion as the "Class Period."

**APP. 294**

TVPA prohibits the procurement of labor through force, threats of force, serious harm, or threats of serious harm. 18 U.S.C. § 1589(a). Here, Plaintiffs allege they were coerced into cleaning their living areas because they were informed their refusal *could* result in segregation for *up to* 72 hours. ECF 49 at 3. Even assuming *arguendo* that (1) detainees were coerced into cleaning their living areas under the "threat" of administrative or disciplinary segregation for up to 72 hours, and (2) such brief segregation rises to the level of "serious harm" under the TVPA, GEO is immune from suit under DSI because the U.S. Immigration and Customs Enforcement's ("ICE") *mandatory* performance standards provide for punishment up to and including 72 hours of disciplinary segregation for a detainee's "[r]efusal to clean assigned living area." ICE also *requires* its contractors, including GEO, to notify detainees in writing of prohibited acts and the corresponding potential discipline. Because it is undisputed ICE required and directed GEO to comply with the PBNDS (including its disciplinary system), and because it is undisputed GEO complied with the PBNDS, GEO is entitled to summary judgment based upon DSI.

Similarly, ICE's performance standards *required* a payment of exactly $1.00 per day for AIPC Voluntary Work Program ("VWP") participants for approximately half of the applicable three-year class period (October 22, 2011 through June 22, 2013). GEO's compliance with this requirement clearly gives rise to immunity during that period. For the VWP class period thereafter (June 23, 2013 through October 22, 2014), GEO continued to follow the explicit direction of ICE: that $1.00 per day was a permissible minimum payment for VWP participants. ICE validly conferred the authority to administer the VWP on GEO. Further, the $1.00 per day pay rate was set by Congress and adopted by ICE in the PBNDS. Therefore, because the VWP is required by

ICE and the pay rate was explicitly set by Congress and adopted by ICE in the PBNDS, DSI shields GEO from liability.

Second, the government contractor defense applies to GEO here because there is a uniquely federal interest in ICE's ability to contract for the housing and supervision of detained aliens and the application of Plaintiffs' state law unjust enrichment claim significantly conflicts with that uniquely federal interest. Summary judgment in favor of GEO on that claim is appropriate.

Accordingly, because there is no genuine dispute of material fact, GEO merely performed as the federal government lawfully directed, and the undisputed facts make clear GEO has established the defense of DSI, this Court should enter summary judgment in GEO's favor, disposing of Plaintiffs' TVPA and unjust enrichment claims. The Court should also enter summary judgment on Plaintiffs' unjust enrichment claim for the independent reason that there is no genuine dispute of material fact regarding GEO's government contractor defense, and the defense bars the claim as a matter of law.

## II.    STATEMENT OF UNDISPUTED FACTS

1.    ICE is a federal agency tasked with enforcing U.S. immigration laws. 6 U.S.C. § 542. ECF 270 at 5 (Material Undisputed Fact #1).

2.    The United States Congress delegated to the Department of Homeland Security, and its agency ICE, the sole authority to arrange for all aspects of the detention of aliens pending the results of their immigration proceedings. 8 U.S.C. § 1231(g)(1) ("The [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.").

3.      ICE has the authority to detain foreign nationals suspected of entering the United States unlawfully. 8 U.S.C. §§ 1101 *et seq.*; ECF 270 at 5 (Material Undisputed Fact #2).

4.      In making these arrangements, ICE must consider the use of private contractors to detain aliens prior to constructing its own facilities. 8 U.S.C. § 1231(g)(2) ("Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.").

5.      As a result of Congress' directive, ICE neither constructs nor operates its own immigration detention facilities, ECF 271-2 (Dec. of Tae Johnson, cited as "Ex. B"), and therefore its state and private contractors are critical to carrying out the federal function of immigration detention.

6.      ICE contracts with GEO to house some of its detainees in detention facilities throughout the country. *See* https://www.geogroup.com/Locations. ECF 270 at 5 (Material Undisputed Fact #3).

7.      Among GEO's portfolio of ICE detention facilities is AIPC. ECF 270 at 5 (Material Undisputed Fact #4).

**GEO Operates the AIPC Pursuant to Contracts with ICE**

8.      ICE chose to contract with the AIPC to detain aliens pending the resolution of their immigration proceedings. ECF 270 at 9 (Additional Undisputed Fact #5).

9.      GEO owns and has continuously operated AIPC, under contracts with ICE from October 22, 2004 to October 22, 2014. ECF 270 at 5 (Material Undisputed Fact #5).

53635272;1

**APP. 297**

10. A contract between ICE and GEO may be modified during its term by mutual consent of GEO and ICE. ECF 270 at 5 (Material Undisputed Fact #6).

11. All immigration detention processing centers, including the AIPC, must adhere to ICE's standards. In 2000, the Immigration and Naturalization Service ("INS"), ICE's predecessor, adopted the original National Detention Standards (the "2000 NDS").

12. Subsequently, ICE promulgated similar standards in the form of the PBNDS in 2008 (the "2008 PBNDS") and 2011 (later updated in 2016) (the "2011 PBNDS"). (2000 NDS available at https://www.ice.gov/detention-standards/2000; 2008 PBNDS available at: https://www.ice.gov/detention-standards/2008; 2011 PBNDS available at: https://www.ice.gov/detention-standards/2011).

13. In each contract GEO entered into with ICE for the operation of the AIPC, the 2000 NDS, 2008 PBNDS, or the 2011 PBNDS, as applicable, were incorporated into the contract and GEO was required to comply with the same. ECF 270 at 9-10 (Additional Undisputed Fact #7).

14. GEO's contract with ICE, number ACD-3-C-0008, required it to comply with the 2000 NDS from March 27, 2003 to September 28, 2006. ECF 262-5 at 12 (GEO_MEN 00059754).

15. GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, similarly required it to comply with the 2000 NDS. ECF 24-4 at 11 (GEO_MEN 00059644); ECF 260 at 3 (proffering as undisputed the fact that HSCEOP-06-D-00010 was one of GEO's contracts with ICE during the class period); ECF 262-4 (incorporating the 2000 NDS into the contract).

16. On April 28, 2010, GEO entered into a contract modification with ICE (HSCEOP-06-D-00010/P00018) which required it to comply with the 2008 PBNDS, effective immediately.

53635272;1

**APP. 298**

ECF 270 at 10 (Additional Undisputed #10) (citing ECF 271-3, cited as "Ex. C"); ECF 261-9 (2008 PBNDS).

17.     GEO's subsequent contract with ICE, number HSCEDM-11-D-00003, required it to continue to comply with the 2008 PBNDS. That contract was effective September 15, 2011. ECF 262-2 at 38 (incorporating the 2008 PBNDS into the contract); ECF 270 at 10 (Additional Undisputed Fact #11, #12) (noting Plaintiffs proffer as undisputed the fact that HSCEDM-11-D-00003 was one of GEO's contracts with ICE during the Class Period).

18.     On May 23, 2013, GEO entered into a contract modification with ICE (HSCEDM-11-D-00003/P00005) agreeing that, effective June 23, 2013, GEO would comply with the 2011 PBNDS. ECF 270 at 10 (Additional Undisputed Fact #12) (citing ECF 271-4, cited as "Ex. D"); ECF 262-3, 2 (GEO-MEN 00020406; ECF 270 at 10 (Additional Undisputed Fact #11, #12) (noting Plaintiffs proffer as undisputed the fact that HSCEDM-11-D-00003/P00005 was one of GEO's contracts with ICE during the Class Period).

## The ICE-Mandated Disciplinary Severity Scale

19.     The 2000 NDS and all applicable versions of the PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale. ECF 261-10 at 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8 at 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.").

**APP. 299**

20.     The 2000 NDS and all versions of the PBNDS require GEO to provide notice to detainees, in the local detainee handbook, of the ICE-mandated disciplinary severity scale. ECF 261-10 at 10 (2000 NDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …").

21.     Likewise, the 2000 NDS and all versions of the PBNDS explicitly provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

22.     The 2000 NDS and all versions of the PBNDS also explicitly provide a disciplinary severity scale that lists "[r]efusing to obey the order of a staff member or officer" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

23.     The Aurora Detainee Handbook (the "AIPC Handbook") is issued to all detainees entering Aurora. ECF 270 at 7 (Material Undisputed Fact #14).

24.     The AIPC's Handbook's disciplinary severity scale does not deviate from the 2000 NDS or the applicable PBNDS. ECF 273-1 (2005 AIPC Handbook, cited as "Ex. E"); (GEO_MEN

00054151-222); ECF 273-2 (2007 AIPC Handbook, cited as "Ex. F"); ECF 273-3 (2008 AIPC

Handbook, cited as "Ex. G"); ECF 273-4 (2010 AIPC Handbook, cited as "Ex. H"); ECF 273-5

(2011 AIPC Handbook, cited as "Ex. I"); ECF 261-17 (October 2013 AIPC Handbook)

(Specifically identified in Plaintiffs discovery responses as the basis for their claims); ECF 271-5,

Kevin Martin Dep. 40:21-24 ("Q. Do you know if there's any deviation from between . . . the GEO

Detainee Handbook and the PBNDS as far as disciplinary requirements? A. Not as far as

disciplinary requirements[.]") (cited as "Ex. J" to ECF 270).

25.     All of GEO's policies are reviewed and approved by an on-site ICE official. ECF

270 at 7 (Material Undisputed Fact #15).

26.     The 2000 NDS and the applicable versions of the PBNDS provide for the exact

graduated scales of offenses and disciplinary consequences for dedicated facilities, such as the

AIPC. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011

PBNDS).

27.     The graduated scale of offenses (of which detainees must be made aware) are

explicitly laid out in the 2000 NDS and the applicable PBNDS, providing GEO no discretion

whatsoever to alter the disciplinary severity scale. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at

56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS).

28.     As required by the 2000 NDS and the applicable versions of the PBNDS, the

disciplinary severity scale is copied verbatim into the AIPC Handbook. ECF 271-5, Kevin Martin

Dep. 40:13-16 ("And does the Detainee Handbook lay out these exact rules from the PBNDS for

the detainees as far as discipline goes? A: Yes.") (cited as "Ex. J" to ECF 270); 83:17-22 (same).

**APP. 301**

29.     In addition to the disciplinary severity scale, GEO has detailed a Sanitation Procedures document that contains a section entitled "Detainee Sanitation Procedures." ECF 262-8; ECF 50-4 (the "Sanitation Procedures").

30.     The Sanitation Procedures set forth general standards for sanitation that must be followed by both GEO employees and detainees. *Id.*

31.     While the sanitation policies for detainees apply to those detainees housed at the AIPC who participate in cleaning tasks through the VWP or by cleaning their living area, ECF 50-1 at 9 (Ceja Dep. 29:13-16), the Sanitation Procedures were not developed to assign tasks to specific individuals, but rather to detail the actual process for cleaning and materials and supplies to be used. ECF 271-5, Kevin Martin Depo. 208:6-11 (cited as "Ex. J" to ECF 270).

32.     The Sanitation Procedures do not specify which aspects of cleaning are the responsibility of all detainees and which are the responsibility of VWP workers. ECF 270 at 7 (Material Undisputed Fact #19).

33.     The Sanitation Procedures also contain a section detailing the consequences for non-compliance, stating: "The Dormitory/Unit Officer will inspect all living areas daily and report any infraction of these regulations to the immediate supervisor. The officer will notify detainees of unsatisfactory conditions, in cases of continued noncompliance, staff will issue an incident report." ECF 262-8 at 4; ECF 50-4. The Sanitation Procedures do not provide for any other penalty for non-compliance. *Id.*

34.     GEO has never maintained a separate policy or practice of placing a detainee in solitary confinement for the refusal to clean a living area. Ex. _ (Amber Martin Dep., 134, 135).

**APP. 302**

35.     ICE audits GEO to ensure that GEO complies with all requirements of its contract, including its obligations under the PBNDS. ECF 270 at 13 (Additional Undisputed Fact #24) (citing ECF 273-6, cited as "Ex. L").

36.     As part of each inspection, each audit reviews compliance with each PBNDS requirement. *Id.*

37.     The materials provided to detainees at intake, including the handbook and orientation video, are regularly audited and have passed each audit since 2004. *Id.*

38.     The audits specifically review intake procedures to ensure that the orientation information provides information about '[u]nacceptable activities and behavior, and corresponding sanctions" as well as the detainee handbook. *Id.* (GEO-MEN 00131895).

39.     The disciplinary severity scale is audited and has passed each audit since 2004. *Id.*

40.     The audits review whether GEO provides notice of the disciplinary severity scale and have found GEO compliance based upon a review of its handbooks. *Id.* (GEO-MEN 00131936).

41.     ICE has not only approved of the disciplinary severity scale but has also acted to implement and enforce the sanctions therein. One of the named Plaintiffs in this case—Demetrio Valerga—explained during his deposition that ICE officers also enforced the ICE sanctions. After claiming that one of GEO's corrections officers told Mr. Valerga he could be placed in segregation if he did not help clean his own common area, ECF 272-7, Demetrio Valerga Dep., 135:15-137:19 (cited as "Ex. M" to ECF 270), Mr. Valerga then explained ICE officers woke him up, pulled him out of his housing unit, and spoke to him directly. *Id.* at 138:2-13. During that conversation, ICE

53635272;1

**APP. 303**

officers told Mr. Valerga that he could, in fact, be taken to segregation for refusing to help clean his living area. *Id.* at 138:15-23.[3]

### **The VWP**

42.    The 2000 NDS and all applicable versions of the PBNDS require that GEO provide detainees the opportunity to participate in a VWP. ECF 270 at 8 (Material Undisputed Fact #20).

43.    The 2000 NDS, with which the AIPC was contractually obligated to comply from March 27, 2003 to April 28, 2010, required GEO to provide "compensation" and explicitly directed that "the stipend is $1.00 per day, to be paid daily." ECF 261-10 at 5 (2000 NDS).

44.    Likewise, the 2008 PBNDS, with which the AIPC was contractually obligated to comply from April 28, 2010 to June 22, 2013, mandated that "the compensation is $1.00 per day." ECF 261-9 at 63 (2008 PBNDS).

45.    Beginning on June 23, 2013, AIPC was bound by the 2011 PBNDS, which state that participants in the VWP will be compensated with "at least $1.00 (USD) per day." ECF 261-8 at 53 (2011 PBNDS). Thus, the "at least" language upon which the VWP Class relies was not implemented at the AIPC until approximately halfway through the VWP Class Period.

46.    Before the 2011 PBNDS were implemented at the AIPC, GEO paid the amount it was explicitly directed by ICE to pay to VWP participants: $1.00 per day. ECF 270 at 15 (Additional Undisputed Fact #36).

---

[3] Even after the ICE Officer's warning, Mr. Valerga refused to clean and later refused again several times. ECF 271-7, Dep. of Demetrio Valerga, 139:6-24, 140:2-20 (cited as "Ex. M" to ECF 270). Mr. Valerga was never placed in segregation for refusing to clean. *Id.*

53635272;1

**APP. 304**

47.     Thereafter, GEO continued to pay members of the VWP Class $1.00 per day; the minimum payment explicitly permitted by the 2011 PBNDS. ECF 270 at 15 (Additional Undisputed Fact #37).

48.     ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP. ECF 270 at 8 (Material Undisputed Fact #22).

49.     The VWP has been audited each year and has passed each audit since 2004. ECF 270 at 14 (Additional Undisputed Fact #29) (citing GEO-MEN 00131936).

### III.     ARGUMENT

### A.     Summary Judgment Standard.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *O'Connor v. Check Rite, Ltd.*, 973 F. Supp. 1010, 1014 (D. Colo. 1997). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); Fed. R. Civ. P. 56 (d).

Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions

53635272;1

**APP. 305**

of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

> **B.**   **GEO is Immune from Plaintiffs' Claims Under the Doctrine of Derivative Sovereign Immunity.**

Under the doctrine of derivative sovereign immunity, government contractors may "obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co.*, 136 S. Ct. at 672 (internal quotation marks omitted) (*quoting Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)). DSI shields a contractor from liability when the contractor performs work "authorized and directed by the Government of the United States" and the contractor "simply performed as the Government directed." *Id.* at 673; *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019) (quoting *Yearsley*, 309 U.S. at 21).

A contractor asserting DSI must satisfy a two-part inquiry. First, the contractor must show it "performed as the Government directed." *Campbell-Ewald*, 136 S.Ct. at 673. Authorization is "validly conferred" on a contractor if Congress authorized the government agency to perform a task and empowered the agency to delegate that task to the contractor, provided it was within the power of Congress to grant the authorization. *Yearsley*, 309 U.S. at 20.

Second, the contractor must show the "authority to carry out the project was validly conferred" by the government. *Yearsley*, 309 U.S. at 20-21. Authority is "validly conferred" if Congress authorized the government agency to perform a task and empowered the agency to delegate that task to the contractor, and it was within Congress's power to grant such authority. *Yearsley*, 309 U.S. at 20. DSI does not shield a contractor that "violates ***both*** federal law ***and*** the

53635272;1                                                                    **APP. 306**

government's explicit instructions." *Campbell-Ewald Co.*, 136 S. Ct. at 672 (emphasis added); *Cunningham*, 888 F.3d at 648-69 (contractor must violate the law *and* its contract with the federal government before DSI is precluded).

The Fourth Circuit recently issued a decision analogous to the facts here. In *Cunningham v. General Dynamics Info. Technology*, Greg Cunningham received an autodialed call from General Dynamics (a government contractor), advertising the commercial availability of health insurance. 888 F.3d 640, 643 (4th Cir.), *cert. denied*, 139 S. Ct. 417 (2018). Cunningham filed suit on behalf of a putative collective, arguing that because he had not provided his express consent, General Dynamics violated the Telephone Consumer Protection Act ("TCPA"). *Id*. In response, General Dynamics claimed it was immune from suit under the principle of DSI because it contacted Cunningham in connection with its contract with the Department of Health and Human Services ("DHHS"). *Id.* The contract required General Dynamics to make calls during a specified time frame to inform individuals about their ability to buy health insurance exchanges created by the Affordable Care Act ("ACA"). *Id.* at 643-44. DHHS authorized General Dynamics to use an autodialer to make the calls, provided a script for each call, and provided a list of phone numbers for each call. *Id.* at 644. The contract also required General Dynamics follow all applicable laws. *Id*. at 647. DHHS provided Cunningham's phone number to General Dynamics, indicating he was an individual who should be notified of his right to purchase health insurance through the exchanges. *Id.* However, Cunningham had previously opted out of the communications and the instruction to call him despite his prior opt-out gave rise to liability under the TCPA. *Id.*

Interpreting *Campbell-Ewald*, the Fourth Circuit concluded governmental immunity was precluded only where a contractor violates its contract with the federal government. Thus, in

53635272;1

**APP. 307**

assessing whether DSI applied, the Fourth Circuit concluded General Dynamics did not violate its contract when it made the call to Cunningham, because the call was ***explicitly authorized*** under the contract. *Id.* In so holding, the Fourth Circuit made clear that General Dynamics' failure to obtain Cunningham's consent prior to placing the phone call –as mandated by the TCPA – was insufficient to show a violation of the contract which required it to comply with "all applicable laws," where its actions were otherwise directed by the contract. *Id*. Thus, General Dynamics was entitled to DSI. *Id*. Here, when the facts of this case are applied to the law of DSI, there is no question GEO has "simply performed as [ICE] directed" and that ICE's authority to delegate the care of detainees and their discipline to GEO was validly conferred by Congress.

### 1.    DSI Shields GEO from TVPA Liability.

#### a.    ICE validly conferred authority to GEO to discipline detainees.

Congress validly conferred authority to ICE to provide (and contract) for the custodial supervision of detainees using private contractors like GEO. ICE has broad discretion to determine where to house ICE detainees. *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986) ("Congress … placed the responsibility of determining where aliens are detained within the discretion of the Attorney General."); *Rios–Berrios v. I.N.S.*, 776 F.2d 859, 863 (9th Cir. 1985) (affirming ICE's decision to detain an alien arrested in California at a facility in Florida); *Sasso v. Milhollan*, 735 F. Supp. 1045, 1048 (S.D. Fla. 1990) (the decision to transfer an alien from one locale to another is within the sound discretion of ICE); *c.f. Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001) (Kennedy, J., dissenting)) (Congress's "considerable authority over immigration matters" includes the "power to detain

**APP. 308**

aliens in connection with removal."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens" is "exclusively entrusted to the" Federal Government).

The parties agree Congress delegated to ICE the authority to detain aliens placed in removal proceedings. 8 U.S.C. §§ 1103, 1226, 1231. In connection with that authority, Congress directed ICE to contract with state governments or private entities for the operation and lease of detention facilities before constructing or acquiring new ones. 8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g). ICE's contract with GEO for the operation of the AIPC was therefore a valid exercise of authority delegated by Congress.

The parties also agree GEO's contracts with ICE mandated compliance with the 2000 NDS and all applicable versions of the PBNDS. ECF 270 at 9-10 (Additional Undisputed Fact #7). Thus, the conduct about which Plaintiffs complain in this case has been prescribed by ICE as part of its validly conferred authority to provide for the custodial supervision of alien detainees. *Yearsley*, 309 U.S. at 20-21.

> **b.      The federal government directs GEO's use of detainee discipline.**
>
> > **i.      ICE explicitly authorized and directed the activities of which the Forced Labor class complains.**

Plaintiffs allege GEO knowingly obtained Plaintiffs' labor through unlawful means in violation of the TVPA because GEO adhered to ICE's disciplinary severity scale (incorporated into GEO's contracts with ICE through the 2000 NDS and applicable versions of the PBNDS) and communicated it to detainees. 18 U.S.C. § 1589(a). Specifically, Plaintiffs suggest ICE's disciplinary severity scale unlawfully coerced detainees into cleaning their living areas because

53635272;1                                                                          **APP. 309**

*one possible* sanction for noncompliance – 72 hours in segregation – constitutes serious harm.[4] But the possible sanctions for a detainee's refusal to clean his or her living area – and the *communication* of those possible sanctions to detainees – were explicitly authorized and directed by ICE.

It is undisputed that under both the PBNDS and the AIPC handbook, detainees must keep their living area clean and sanitary. ECF 270 at 7 (Material Undisputed Fact #13). Failure to do so *could* result in disciplinary segregation in accordance with the 2000 NDS and each version of the PBNDS to which GEO has been contractually bound throughout the Class Period. ECF 270 at 6 (Material Undisputed Fact #11). Through those same standards – which the parties do not dispute are part of GEO's contracts with ICE – ICE authorizes and directs GEO to adopt the following disciplinary measures for the infraction of "[r]efusing to clean assigned living area":

1. Initiate criminal proceedings
2. Disciplinary transfer (recommend)
3. Disciplinary segregation (up to 72 hours)
4. Make monetary restitution, if funds are available
5. Loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.)
6. Change housing
7. Remove from program and/or group activity
8. Loss of job
9. Impound and store detainee's personal property
10. Confiscate contraband
11. Restrict to housing unit

---

[4] GEO disputes that a brief stay of 72 hours or less in segregation constitutes serious harm; to date, no court has found that a mere 72 hours of disciplinary segregation would constitute "serious harm" under the TVPA. To the contrary, the only circuit court to address the issue concluded the disciplinary sanctions enumerated in the PBNDS, would not (standing alone) give rise to TVPA liability. *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1278 n.5 (11th Cir. 2020); *cf. White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) ("the placement of an inmate in nonpunitive administrative segregation does not deprive him of a liberty interest protected by the Due Process Clause."). That said, the exact statutory contours of "serious harm" are not at issue here because even if 72 hours of segregation constitutes "serious harm," that sanction was "authorized and directed by" ICE via its disciplinary severity scale. *Campbell-Ewald Co.*, 136 S. Ct. at 673.

**APP. 310**

    12. Reprimand
    13. Warning

ECF 261-10 at 17 (2000 NDS); 261-8 at 45 (2008 PBNDS); 261-8, 9 (2011 PBNDS); ECF 260 at

17.

    ICE also mandates GEO incorporate ICE's disciplinary severity scale, *without*

*modification*, into the AIPC Handbook. ECF 261-10 at 17 (2000 NDS) (Contract Detention

Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth

in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt,

without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF

261-8 at 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary

consequences as provided in this section.").

    Thus, the disciplinary practices of which Plaintiffs complain are expressly directed,

authorized, and required by ICE. *Campbell-Ewald Co.*, 136 S. Ct. at 673.

> **ii.    ICE explicitly authorized and directed GEO's communication of its disciplinary practices to AIPC detainees.**

    Plaintiffs allege GEO "threatened" them with segregation by simply listing the disciplinary

severity scale in the AIPC local handbook. ECF 271-8 (Plaintiffs' discovery responses)

(designated as "Ex. N" to ECF 270). Notwithstanding the issue of whether that notice constituted

a "threat," notice was mandated by ICE.[5] The 2000 NDS and all applicable versions of the PBNDS

---

[5] GEO disputes that the mere possibility of a sanction being described or written in a handbook constitutes a threat. To the contrary, Plaintiffs' own expert, Dr. Grassian, suggests it is better to inform individuals of possible consequences in advance, because such information would provide them with a "sense of order, of justice, of rules…" and prevent the perception that the "conditions of confinement [are] the product of the exertion of arbitrary power." Ex. A (Excerpt from Stuart

require GEO to provide notice to detainees of the ICE-provided disciplinary severity scale in the local detainee handbook. ECF 261-10 at 10 (2000 NDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of . . . the disciplinary severity scale …"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"). GEO complied, copying the scale verbatim into each version of the AIPC Handbook. ECF 273-1 (2005 Handbook, cited as "Ex. E"); (GEO_MEN 00054151-222); ECF 273-2 (2007 Handbook, cited as "Ex. F"); ECF 273-3 (2008 Handbook, cited as "Ex. G"); ECF 273-4 (2010 Handbook, cited as "Ex. H"); ECF 273-5 (2011 Handbook, cited as "Ex. I"); ECF 261-17 (October 2013 Handbook, cited as "Ex. W" to ECF 261). Further, ICE explicitly approved the AIPC Handbook, as well as GEO's orientation materials and disciplinary scale year after year through annual audits. ECF 270 at 14 (Additional Undisputed Fact #29) (citing GEO-MEN 00131936).

ICE authorized 72 hours of disciplinary segregation as one of thirteen possible sanctions for a detainee's refusal to clean his or her living area. ECF 270 at 6 (Material Undisputed Fact #11); *id.* at 11 (Additional Undisputed Fact #15). ICE further directed GEO to inform detainees of this possible consequence, specifically through the detainee handbook. ECF 270 at 11 (Additional Undisputed Fact #14). Because there are no genuine disputes of material fact and GEO is entitled

---

Grassian Report, May 1, 2020).  Nevertheless, it is not necessary to resolve this issue in order for GEO to prevail on the merits of the instant motion.

**APP. 312**

immunity under the doctrine of derivative sovereign immunity, GEO is entitled to summary judgment on the Forced Labor class's TVPA claim. *Campbell-Ewald Co.*, 136 S. Ct. at 673.[6]

> ### i. Because ICE directed GEO to impose the disciplinary severity scale, Plaintiffs cannot establish the scienter element of a TVPA claim.

The TVPA does not provide relief for all alleged threats, regardless of intent. Instead, the TVPA's scope is narrowed by the requirement of scienter. 18 U.S.C. § 1589(a). Thus, to establish a TVPA violation, the defendant must *intend* to cause the victim to believe that she would suffer serious harm if she did not continue to work. "In other words, under section 1589, the employer must not just threaten serious harm but have intended the victim to believe that such harm would befall her." *Garcia v. Curtright*, No. 6:11-06407-HO, 2012 WL 1831865, at *4, 2012 U.S. Dist. LEXIS 70454 (D. Or. May 17, 2012); *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) ("The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her.").

Here, Plaintiffs have provided no evidence whatsoever that GEO "intended [Plaintiffs] to believe that such harm" – that is, segregation – would befall them if they did not maintain the cleanliness of their living area. *Dann*, 652 F.3d at 1170. To the contrary, the evidence shows even a detainee who repeatedly refused to clean his living area was *not* placed in segregation. *See supra,* p. 12 n.4. The evidence also shows to the extent that detainee was "threatened" with segregation

---

[6] Plaintiffs have argued a component of DSI is whether the government contractor enjoys "discretion" in how it executes its contractual duties. ECF 260 at 16, ¶ 76. This is not part of the two-part DSI analysis. *Compare Cunningham*, 888 F.3d at 643 (DSI analysis) *with Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (government contractor defense).

**APP. 313**

for his noncompliance, any supposed "threat" came from ICE employees, not GEO. *Supra*, pp. 11-12.

Thus, Plaintiff have failed to carry their burden of establishing the TVPA's scienter requirement. Their TVPA claim therefore fails as a matter of law.

### 2.     DSI Shields GEO from Liability for Unjust Enrichment.

#### a.     ICE validly authorized GEO to create and administer the VWP.

As detailed *supra*, ICE is authorized to enter into contracts with private entities for the detention of individuals pending resolution of their immigration proceedings. ECF 270 at 9 (Additional Undisputed Fact #5) (citing 8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g).). Similarly, Congress authorized ICE to provide voluntary work programs that pay allowances to detainees of $1.00 per day. 8 U.S.C. § 1555(d). Moreover, Plaintiffs do not allege the payment amount of $1.00 per day is beyond the authority validly conferred upon ICE by Congress. *See generally* ECF 260. Accordingly, the authority to pay detainees $1.00 per day for participation in the VWP was validly conferred. *Yearsley*, 309 U.S. at 20-21.

#### b.     GEO performed as the federal government directed.

##### i.     ICE explicitly authorized and directed the activities of which the Voluntary Work Program Class complains.

ICE requires GEO to offer a voluntary work program in its contracts with GEO to operate the AIPC. ECF 270 at 15 (Additional Undisputed Fact #32). ICE establishes the terms and conditions of the work program offered, determines which detainees are eligible to participate, determines what work approved detainees are eligible to perform, and sets the maximum hours detainees are permitted to work. *Id.* ICE also determines the amount it will pay detainees for

53635272;1

**APP. 314**

participation in the VWP ($1.00) and authorizes a system for payment whereby GEO advances the allowance initially and is thereafter reimbursed by ICE. *Id.* From October 22, 2011 (the beginning of the VWP class period) to June 23, 2013, the 2008 PBNDS mandated that GEO pay detainee participants in the VWP *exactly* $1.00 per day. ECF 261-9 at 63 (2008 PBNDS). The 2008 PBNDS did not use the 2011 version's "at least" language. *Compare* ECF 261-9 at 63 (2008 PBNDS) *with* ECF 261-8 at 53 (2011 PBNDS).

As relevant here, the "at least" language only applied to ICE and GEO's contract from June 22, 2013 to October 22, 2014, a fraction of the class period. Thus, there can be no genuine dispute that ICE *required* GEO to pay *exactly* $1.00 per day to detainees participating in the VWP for the majority of the class period.[7] GEO complied with that directive.

Even so, nothing in the law requires preclusion of DSI where a contractor simply does not surpass *minimum* standards approved of and directed by the federal government by some undefined, *post facto*, subjective threshold set by a private litigant. In fact, ICE's contract with GEO for the AIPC still provides $1.00 per day must be the "*actual cost* … per detainee," which GEO "*shall not exceed*" without the approval of ICE's Contracting Officer. ECF 262-2, 5 (GEO_MEN 00019616); (emphasis added). This exact amount was explicitly authorized by Congress when it set the rate for detainee allowances at "not in excess of $1 per day." Dep't of Justice Appropriations Act of 1979, Pub. L. 95-431, 92 Stat 1021, 1027 (Oct. 10, 1978).

Further, in order to defeat DSI, the law requires a contractor actually *violate* its contract with the federal government. *Cunningham*, 888 F.3d at 643. The only way for GEO to violate its contract with ICE is to not provide a VWP at all or to pay detainees more than $1.00 per day. There

---

[7] The VWP class period spans from October 22, 2011 to October 22, 2014.

53635272;1                                                                                                      **APP. 315**

is no question GEO met the minimum standard and it did not violate the contract by failing to exceed that minimum standard. GEO is therefore entitled to summary judgment on the Voluntary Work Program Class's unjust enrichment claim.

**C.    GEO is Also Entitled to Summary Judgment on its Government Contractor Affirmative Defense.**

GEO is entitled to summary judgment on the Voluntary Work Program Class's unjust enrichment claims under its government contractor affirmative defense. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 508 (1988); ECF 260 at 30. Under *Boyle*, a government contractor is not liable for violations of state law where a "significant conflict" exists between the application of that state law and an identifiable federal policy or interest. *Boyle*, 487 U.S. at 507. A conflict is "significant" if the state law is contrary to a specific contract term selected by the federal government. *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090 (10th Cir. 2015).

In *Helfrich*, the plaintiff, a federal government employee, was in an automobile accident and suffered injuries for which she made claims to her insurance provider. *Id.* at 1095. The insurer paid out her medical claims. *Id.* Thereafter, she entered into a settlement with the driver of the other vehicle for a separate sum. *Id.* After the settlement, the plaintiff's insurer invoked a contractual provision seeking subrogation of the benefits it had paid her. *Id.* The plaintiff responded that state law prohibited such subrogation provisions. *Id.* The insurer thereafter asserted that the state law did not apply because it was displaced by federal law under *Boyle* as conflicting with a contractual term with the government. *Id.*

The Tenth Circuit agreed with the insurer, concluding that *Boyle* applied and had the effect of displacing state law. *Id.* at 1099. The court reasoned that under *Boyle*, "contractor immunity would be available when the [violation of state law] was the product of a discretionary decision by

24

**APP. 316**

the government" to select a contract term for a contract dealing with a subject of uniquely federal interest. *Id.* at 1098. Applying this test, the Tenth Circuit first concluded that the provision of affordable healthcare benefits to federal government employees was a uniquely federal interest. *Id*. The court also recognized a strong federal interest in a uniform subrogation policy in all states, regardless of the differences in state law. *Id.* at 1099. The court next concluded that the state law in question significantly conflicted with the federal interest because it effectively rewrote the reimbursement plan between the insurer and the employee—which would increase the cost of health insurance to the federal government through higher premiums on its employees' policies. *Id.* In sum, *Helfrich* concluded, "State law – whether tort law or otherwise – must yield if it conflicts with such a contractual term in an area of uniquely federal interests." *Helfrich*, 804 F.3d at 1098.

### 1. ICE's contracts with GEO involved an area of uniquely federal interest.

There can be little debate that the contracts between GEO and ICE governing the operation of the AIPC are matters of uniquely federal interest. Indeed, Congress delegated to ICE responsibility for detaining aliens awaiting removal and the authority to exercise custodial supervision over those detainees. 8 U.S.C. §§ 1103, 1226, 1231. The detention and supervision of aliens is uniquely within the purview of the federal government and there is no authority to the contrary.

### 2. There is significant conflict between application of Plaintiffs' state law unjust enrichment claim and the terms of ICE's contract with GEO.

Plaintiffs' state law claim for unjust enrichment presents a significant conflict with the terms of ICE's contracts with GEO because it would <u>require</u> VWP stipends to exceed the agreed-

**APP. 317**

upon minimum of $1.00 per day, resulting in increased costs like those in *Helfrich*. If ICE wanted to require a voluntary work program stipend far in excess of $1.00 per day – as Plaintiffs seek – it could have stated as much in the 2011 PBNDS. It did not.

State law must yield if it conflicts with a term in a federal contract, selected as a matter of federal discretion. *Helfrich*, 804 F.3d at 1098. That is precisely the circumstance here. Plaintiffs seek a judgment under state law that GEO's compliance with ICE's – and Congress's – explicitly authorized minimum voluntary work program stipend is unlawful. If this Court were to apply the state law of unjust enrichment to circumvent the federal government's determination of the allowance to be paid to detainees, it would create a significant conflict with federal immigration policy. Further, it would interfere with the uniformity of the federal government's treatment of ICE detainees, subjecting immigration policy to an inconsistent patchwork of state laws and regulations regarding the rate of VWP allowances all over the country. This is precisely the type of uniformity the court sought to protect in *Helfrich*.

Moreover, even the later-adopted language setting a $1.00 per day *minimum* does not preclude application of the government contractor defense with respect to allowances paid after June 23, 2013. In *Glassco v. Miller Equip. Co.*, the Eleventh Circuit held the government contractor defense barred state law claims premised on the contention that a manufacturer under contract with the federal government should have used materials that exceeded minimum standards set forth in the federal contract. 966 F.2d 641 (11th Cir. 1992). Addressing the "significant conflict" prong of the analysis, the court concluded the inclusion of *minimum* standards in a federal contract presents a significant conflict with state laws that suggest a *higher* standard should have been met. *Id.* at 643. The fact that the federal government would not have objected if the contractor

**APP. 318**

met a higher standard does not obviate the federal government's discretionary determination that the minimum standard was adequate. *Id.* The same is true here; the fact that ICE provided a *minimum* standard in its contract does not obviate Congress's and ICE's determination that $1.00 per day is adequate. Plaintiffs' state law unjust enrichment claim seeking to declare unlawful an amount *authorized* by ICE cannot withstand *Boyle* scrutiny. GEO is entitled summary judgment on its government contractor affirmative defense as to the Voluntary Work Program Class's unjust enrichment claim.

## IV.   CONCLUSION

Because GEO is immune from suit on the basis of derivative sovereign immunity and because Plaintiffs' unjust enrichment claims cannot withstand GEO's government contractor affirmative defense, GEO respectfully requests the Court grant its Motion for Summary Judgment.

Respectfully submitted, this 25th day of June, 2020.

**AKERMAN LLP**

*s/ Adrienne Scheffey*
Colin L. Barnacle
Adrienne Scheffey
Christopher J. Eby
Melissa L. Cizmorris
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  (303) 260-7712
Facsimile:   (303) 260-7714
Email: colin.barnacle@akerman.com
Email: christopher.eby@akerman.com
Email: melissa.cizmorris@akerman.com
Email: adrienne.scheffey@akerman.com

53635272;1

**APP. 319**

**BURNS, FIGA & WILL, P.C.**
Dana L. Eismeier
Michael Y. Ley
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, Colorado 80111
Telephone:  (303) 796-2626
Facsimile:   (303) 796-2777
Email: deismeier@bfwlaw.com
Email: mley@bfwlaw.com
*Attorneys for Defendant The GEO Group, Inc.*

53635272;1

**APP. 320**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify on this 25th day of June, 2020, a true and correct copy of the foregoing

**DEFENDANT THE GEO GROUP, INC.'S CROSS-MOTION FOR SUMMARY**

**JUDGMENT** was filed and served electronically via the Court's CM/ECF system on the

following:

<u>**Counsel for Plaintiffs:**</u>

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
Towards Justice
1410 High St., Ste. 300
Denver, CO 80218
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Kelman Buescher Firm
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com

Hans C. Meyer
Meyer Law Office, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
Outten & Golden, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
Outten & Golden, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
Outten & Golden, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
Law Office of R. Andrew Free
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

R. Andrew Free
Law Office of R. Andrew Free
2004 8th Ave. South
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
Milstein Law Office
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

*s/ Nick Mangels*
Nick Mangels

**APP. 321**

53635272;1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:14-cv-02887 JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT ON DEFENDANT'S AFFIRMATIVE DEFENSE**

---

## TABLE OF CONTENTS

I.   Reply Concerning Undisputed Material Facts ................................................ 1

    A.   GEO's Contract to Operate the Aurora Detention Facility ............................. 2

    B.   The Performance-Based National Detention Standards
       Govern GEO's Contract Performance ........................................... 19

    C.   The PBNDS and Incorporated ACA Standards Contain
       Housekeeping and Voluntary Work Program Requirements........................ 22

    D.   GEO's Housekeeping Unit Sanitation Policy Is Not
       Required or Administered by ICE ............................................. 27

    E.   GEO Tells Detainees That They Are Required to
       Clean Dorm Common Areas .................................................. 41

    F.   Solitary Confinement at Aurora. .............................................. 50

    G.   The PBNDS Provide GEO A Wide Range of
       Options to Punish Offenses. .................................................. 54

    H.   GEO Places Detainees in Solitary Confinement for
       Refusing to Clean the Facility ................................................ 57

    I.   GEO Has Discretion to Set Wages For the
       Voluntary Work Program..................................................... 64

II.  Response Concerning Additional Facts...................................................... 70

    A.   GEO's Contracts with ICE................................................... 72

    B.   The ICE-Mandated Disciplinary Severity Scale ............................... 76

    C.   The VWP.................................................................... 85

    D.   Plaintiffs' Allegations ..................................................... 88

III. The Undisputed Record Demonstrates that GEO Designed and Implemented the
    HUSP and VWP with Minimal Substantive Oversight from ICE............................ 91

    A.   Derivative Sovereign Immunity Applies Only Where
       the Government Directed the Alleged Violation ............................ 91

**APP. 323**

B.   The HUSP and its Corresponding Punishment Scheme
Was GEO's Own Invention ............................................................... 93

C.   The COTR and ICE Audits Provided Limited Monitoring of GEO's
Implementation of Specific Contractual Requirements. ................................. 98

D.   GEO Had Discretion Throughout the Class Period to
Pay VWP Workers More Than $1.00 A Day................................................. 101

IV. GEO's Arguments Under the Government Contractor Defense Fail for The Same
Reasons As Its Derivative Sovereign Immunity Arguments.................................... 104

V.   Conclusion ................................................................................................. 107

**APP. 324**

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Bijeol v. Nelson*,
    579 F.2d 423 (7th Cir. 1978) .......................................................................... 95

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) ................................................................. 104, 105, 106

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
    797 F.3d 720 (9th Cir. 2015) .......................................................................... 99

*Campbell-Ewald Co. v. Gomez*,
    136 S. Ct. 663 (2016).............................................................. 100, 101, 107

*Chao Chen v. Geo Grp., Inc.*,
    287 F. Supp. 3d 1158 (W.D. Wash. 2017) ................................................ 107

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ......................................................................................... 92

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
    888 F.3d 640 (4th Cir. 2018) .................................................................. 92, 93

*Glassco v. Miller Equip. Co., Inc.*,
    966 F.2d 641 (11th Cir. 1992) ............................................................. 106, 107

*Gomez v. Campbell-Ewald Co.*,
    No. 10 Civ. 2007, 2013 WL 655237 (C.D. Cal. Feb. 22, 2013) ................................ 101

*Hause v. Vaught*,
    993 F.2d 1079 (4th Cir. 1993) ...................................................................... 95

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
    804 F.3d 1090 (10th Cir. 2015) .......................................................... 104, 105

*In re Joint E. & S. Dist. N.Y. Asbestos Litig.*,
    897 F.2d 626 (2d Cir. 1990) ........................................................................ 106

*In re Kumar*,
    402 F. Supp. 3d 377 (W.D. Tex. 2019) ....................................................... 95

*Menocal v. GEO Grp., Inc.*,
    113 F. Supp. 3d 1125 (D. Colo. 2015) ............................................... 101, 106

**APP. 325**

*Montoya v. City of Albuquerque*,
    No. 03 Civ. 0261, 2004 WL 3426436 (D.N.M. May 10, 2004) .................................... 96

*Novoa v. GEO Grp., Inc.*,
    No. 17 Civ. 2514, 2018 WL 3343494 (C.D. Cal. June 21, 2018) .............................. 107

*Novoa v. GEO Grp., Inc.*,
    No. 17 Civ. 2514, 2018 WL 4057814 (C.D. Cal. Aug. 22, 2018) .............................. 102

*Nwauzor v. GEO Grp., Inc.*,
    No. 17 Civ. 5769, 2020 WL 1689728, (W.D. Wash. Apr. 7, 2020) ............. 93, 101, 102

*O'Melveny & Myers v. FDIC*,
    512 U.S. 79 (1994) .......................................................................................... 105

*Salim v. Mitchell*,
    268 F. Supp. 3d 1132 (E.D. Wash. 2017) .................................................... 96, 97

*Stevens v. United States Dep't of Homeland Sec., Immigration & Customs Enf't*,
    No. 14 C 3305, 2020 WL 1701882 (N.D. Ill. Apr. 8, 2020) ...................................... 107

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
    928 F.3d 42 (D.C. Cir. 2019) ..................................................................................... 92

*Weaver v. Petray*,
    No. 08 Civ. 5195, 2010 WL 909589 (W.D. Ark. Mar. 11, 2010) ................................ 95

## STATUTES

6 U.S.C. § 542 ................................................................................................................ 2

8 U.S.C. § 1101 .............................................................................................................. 2

8 U.S.C. § 1103 ..................................................................................................... 70, 72

8 U.S.C. § 1231 ............................................................................................... 70, 71, 72

8 U.S.C. § 1555 ..................................................................................... 67, 70, 107

Pub. L. No. 95-431, 92 Stat. 1021 (1978) ......................................................... 67

**APP. 326**

**RULES**

F.R.E. 802 ....................................................................................... 16, 17

F.R.E. 803 ............................................................................................. 18

Fed. R. Civ. P. 56 .................................................................................. 18

**REGULATIONS**

48 C.F.R. § 52.222-3 ............................................................................ 10

Federal Acquisition Regulation 52.222-50 .................................... 11, 12

GEO's opposition ("Opposition") to Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense ("Motion") relies upon a fundamental misunderstanding of Plaintiffs' claims, the facts in the record, and the governing law. The Court should grant Plaintiffs' Motion.

Plaintiffs allege, first, that GEO violated the Trafficking Victims Protection Act ("TVPA") by forcing detainees to clean common areas pursuant to GEO's Housing Unit Sanitation Policy ("HUSP"), and threatening them with solitary confinement if they did not comply. Complaint at ¶¶ 69-85. The HUSP – GEO's policy of requiring Plaintiffs and Class Members to perform unpaid janitorial work – was created by GEO without ICE involvement. It violates several explicit ICE standards, and is by no means a "legal requirement" with which GEO has to comply. GEO also chose, of its own discretion, to pay detainees $1.00 a day for their work under the Voluntary Work Program, *id.* ¶¶ 101-07, and GEO has pointed to no evidence to the contrary. Because ICE did not direct the legal violations Plaintiffs allege, neither derivative sovereign immunity nor the government contractor defense applies.

## I.      Reply Concerning Undisputed Material Facts

GEO's response to Plaintiffs' proposed Undisputed Facts attempts to conceal facts that are relevant to this Motion but harmful to GEO's position by burying GEO's response in an Appendix.[1] To facilitate the Court's ability to determine facts and whether

---

[1]      This violates the Court's Pretrial and Trial Procedures Memorandum for Civil Cases ("Civil Memo"), and constitutes adequate grounds for striking GEO's brief. *See* Civil Memo III.E.2.(d). Further violations of the Civil Memo include GEO's decision to (1) renumber Plaintiffs' proposed Undisputed Facts, (2) restate Plaintiffs' facts with

they are in fact materially disputed, Plaintiffs set forth all Undisputed Facts, along with GEO's response and, where relevant, Plaintiffs' reply, below.

**A.**   <u>**GEO's Contract to Operate the Aurora Detention Facility.**</u>

1.      ICE is a federal agency tasked with enforcing U.S. immigration laws.  6 U.S.C. § 542.

i.      **GEO's response**: Undisputed

2.      ICE has the authority to detain foreign nationals suspected of entering the United States unlawfully.  Immigration and Nationality Act, codified at 8 U.S.C. §§ 1101 *et seq.*

i.      **GEO's response:** Undisputed

3.      ICE contracts with GEO to house some of its detainees in detention facilities throughout the country.  *See* https://www.geogroup.com/Locations

i.      **GEO's response:** Undisputed

4.      Among GEO's portfolio of ICE detention facilities is the Aurora Facility.  *Id.*

i.      **GEO's response**: Undisputed

---

GEO's interpretation (rather than presenting that interpretation in the argument; (3) cite entire documents rather than specific page numbers; and (4) repeatedly use "formulaic explanations repeatedly incanted."  *Id.* at III.E.2.

**APP. 329**

5.      GEO continuously operated the Aurora Facility, under contract with ICE, from October 22, 2004 to October 22, 2014.  Ex. A (A. Martin Dep. 58:1-6); Ex. K (Ely Decl. ¶ 7)[2]

> i.      **GEO's response:** Undisputed

6.      Operations for the Aurora Facility are governed by a contract between GEO and ICE.  Ex. B (GEO_MEN 00019613 (2011 Contract)); Ex. C (GEO-MEN 00059635 (2006 Contract)); Ex. D (GEO-MEN 00059744 (2003 Contract)), (collectively "the Contract"); Ex. K (Ely Decl. ¶ 7))

> i.      **GEO's response**: Disputed. GEO does not dispute that operations are governed between a contract between GEO and ICE in part, but disputes that GEO's contract with ICE is the only instrument governing the operations of the AIPC.
>
> ii.     **Plaintiffs' reply**: GEO admits the substance of the stated fact and provides no contrary evidence.

7.      The Contract has been renewed over time by mutual consent of GEO and ICE.  Ex. A (A. Martin Dep. 58:1-10); *see also* Ex. I (Hill Dep. 29:22-30:6)

> i.      **GEO's response**: Disputed. GEO disputes that the contract has been "renewed over time." GEO has entered into a number of contracts with ICE during the class period, each

---

[2]     All exhibits referenced in Plaintiffs' Statement of Undisputed Facts are attached to the Declaration of Michael J. Scimone in Support of Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense, filed at ECF No. 261, or to the Notice of Filing of Restricted Exhibits, filed at ECF No. 262.

**APP. 330**

with unique terms. *See* ECF 262-2 (2011 contract); ECF 262-3 (modification of 2011 contract); ECF 262-4 (2006 contract); ECF 262-5 (2003 contract).

    ii.    **Plaintiffs' reply**: Plaintiffs agree with GEO's characterization, which is not substantively different from the stated fact.

8.    The Contract may be modified during its term by mutual consent of GEO and ICE.  Ex. A (A. Martin Dep. 17:13-17)

    i.    **GEO's response**: Undisputed.

9.    The Contract is a "performance-based contract."  Ex. B (GEO_MEN 00019625 (2011 Contract)); Ex. C (GEO-MEN 00059642 (2006 Contract)); Ex D (GEO-MEN 00059755 (2003 Contract)); Ex. K (Ely Decl. ¶ 1)

    i.    **GEO's response**: Disputed. GEO disputes this description of the contract. This term is not defined in the cited contracts, nor is it utilized to describe the contract as a whole. Instead, the contract is composed of mandatory objectives which constitute the performance required in exchange for the payments from ICE. *See* ECF 262-2 (2011 contract); ECF 262-3 (modification of 2011 contract); ECF 262-4 (2006 contract); ECF 262-5 (2003 contract).

    ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.  It cites no evidence that contradicts the Ely

4

**APP. 331**

declaration's statement that "ICE CDF contracts are performance-based contracts."  Plaintiffs' Ex. K, ECF No. 261-7 (Ely Decl. ¶ 4).[3]  GEO's statement that the cited term is not defined is not germane to the stated fact.

Moreover, GEO's statement is incorrect.  The 2011 Contract does in fact describe itself as "performance-based" and defines that term.  *See* Plaintiffs' Ex. B, ECF No. 262-2 (GEO_MEN 00019655) ("Under a performance-based contract, performance measures and metrics will be used extensively to monitor Contractor performance.  ICE and the Contractor shall monitor progress using agreed-upon performance metrics.")

10.    Performance-based contracting "is a results-oriented method of contracting focused on outputs, quality, and outcomes."  Ex. E (Declaration of Tae D. Johnson, *State of Washington v. GEO Group, Inc.*, Case No. 17-cv-05806 (W.D. Wash), ECF No. 91 at ¶ 8)

---

[3]    For ease of reference, all exhibits to the Declaration of Michael J. Scimone in Support of Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense, filed at ECF No. 261, are referred to as "Plaintiffs' Ex."  All exhibits to the Declaration of Adrienne Scheffey in Support of Defendant The GEO Group, Inc.'s Response in Opposition to Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense, filed at ECF No. 271, are referred to as "GEO's Ex."

i.    **GEO's response**: Disputed. To the extent GEO's contract with ICE is described by ICE as "performance-based" GEO notes that the contract is not merely "results oriented" but also provides specific performance requirements including metrics and methods of performance which GEO must meet to perform under the contract. *See* ECF 262-2 (2011 contract); ECF 262-3 (modification of 2011 contract); ECF 262- 4 (2006 contract); ECF 262-5 (2003 contract).

ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.

11.    "Performance-based contracts do not designate *how* a contractor is to perform the work, but rather establish[] the expected outcomes and results that the government expects.  It is then the responsibility of the contractor to meet the government's requirements at the price the vendor quoted."  *Id.*

i.    **GEO's response**: Disputed. GEO disputes that its contracts with ICE do not instruct it *how* to perform its work. Throughout the contract there are specific instructions, with granular detail, as to *how* GEO must perform its work. As one example, the contracts lay out specific requirements for each employee who works at the AIPC, including that each employee have a social security card. ECF 262-2 (GEO_MEN 000019664). The contracts also provide explicit

6

**APP. 333**

instructions for employee conduct. ECF 262-2 (GEO_MEN 000019664). Further, the contracts do not simply tell GEO to take care of the detainees without delineating *how* to do so, instead, they break down exactly how detainees must be cared for, including specific requirements for recreation opportunities, marriage, religious opportunities, work opportunities, and food service. *Id.* (GIEO_MEN 000019636-44). To put a finer point on it, the contract does not simply state that GEO must reduce idleness in the facility by providing for activities, but instead describes *how* GEO must reduce idleness: through the Voluntary Work Program.

    ii.    **Plaintiffs' reply**: Plaintiffs do not dispute the specific facts set forth by GEO in response to this statement; however, they do not contradict the stated fact.

12.    As a performance-based contract, the Contract requires GEO to develop "all plans, policies, and procedures" required by the Contract, and then submit them to ICE for "review and concurrence."  Ex. C (GEO-MEN 00059643 (2006 Contract); *see also* Ex. B (GEO_MEN 00019814 (2011 Contract) ("It is GEO's policy that each of our facilities develops a manual of uniform policies and procedures" which "appropriately reflect . . . contractual requirements.")); Ex. D (GEO-MEN 00059759 (2003 Contract) ("The Contractor shall prepare and submit all policies, plans, post orders and procedures to INS for review and approval."))

7

**APP. 334**

i.   **GEO's response**: Disputed. GEO does not dispute that the quotes appear in each contract, as reflected in the parentheticals, but disputes that the policies identified constitute all policies that govern GEO's performance under the contract. Instead, the contract is also governed by additional policies and regulations not drafted by GEO, including the PBNDS and the ACA. ECF 262-2(GEO-Menocal_00019656) (listing additional policies, regulations, and standards that apply to the AIPC.).

ii.   **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.  Plaintiffs admit that the contract is also governed by the PBNDS and the ACA to the extent set forth in the contract, but that is not germane to the stated fact.

13.   The Contract makes GEO "responsible for all costs associated with and incurred as part of providing the services outlined in this contract."  Ex. C (GEO-MEN 00059642 (2006 Contract)); *see also* Ex. B (GEO_MEN 00019614, 19657 (2011 Contract) (noting that ICE "shall provide fully burdened bed day rates only" and that any costs not covered by that rate are the contractor's to bear)); Ex. D (GEO-MEN 00059748 (2003 Contract) ("[T]he contractor shall provide a detention facility, and all labor, materials and equipment necessary to operate and maintain temporary residential care, and secure detention."))

**APP. 335**

     i.    **GEO's response**: Disputed. GEO does not dispute that the quoted language appears in the contracts as quoted, but does dispute that the quotes can be read in a vacuum, without the surrounding language for context.

     ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact and provides no contrary evidence.

14.    The Contract provides that detainee labor must be used "in accordance with the detainee work plan developed by" GEO.  Ex F ((Ragsdale 30(b)(6) Dep. 25:1-18); Ex. C (GEO-MEN 00059662 (2006 Contract)); Ex. G (GEO_MEN 00038529 (2004 Detainee Work Plan)); Ex. H (GEO_MEN 00038563 (2014 Detainee Work Plan))

     i.    **GEO's response**: Disputed. GEO does not dispute that it must operate a Voluntary Work Program, consistent with the PBNDS, and that it may develop a plan (which is approved by ICE) for what constitutes voluntary work as opposed to those tasks that constitute routine housekeeping.

     ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact; however, its responsive statement, which is not supported by evidence, is incorrect and misleading.  The requirement that GEO develop a Voluntary Work Program does not require GEO to define in that policy "what constitutes voluntary work as opposed to those tasks that

9

**APP. 336**

constitute routine housekeeping." In fact, there is no need for GEO to do so, because the PBNDS define "personal housekeeping." *See* Plaintiffs' Undisputed Fact No. 36. GEO's attempt to define personal housekeeping in a manner that is inconsistent with the standard required by ICE exceeds the authority that ICE allowed GEO under the contract, and is one of the issues at the heart of this motion. *See* Plaintiffs' Undisputed Fact No. 39 (detainees "are not required to work except to do personal housekeeping").

15. The Contract requires that the detainee work plan "must be voluntary." Ex. C (GEO-MEN 00059662 (2006 Contract)); *see also* Ex. B (GEO_MEN 00019643 (2011 Contract) ("Detainees will be able to volunteer for work assignments.")); Ex. D (GEO-MEN 00059796 (2003 Contract) (incorporating 48 C.F.R. § 52.222-3 into contract, which requires work by those in federal custody to be performed "on a voluntary basis."))

i. **GEO's response**: Disputed. GEO does not dispute that it must operate a Voluntary Work Program, consistent with the PBNDS. Further, GEO does not dispute that individuals may volunteer for positions within the Voluntary Work Program but are not required to do so. ECF 262-2 (GEOMenocal_00019643).

**APP. 337**

ii.     **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.

16.     The Contract prohibits GEO from using forced labor in performance of the Contract by incorporating Federal Acquisition Regulation 52.222-50.  Ex. B (GEO_MEN 00019697 (2011 Contract) (incorporating Federal Acquisition Regulation ("FAR") 52.222-50)); Ex. C (GEO-MEN 00059684 (2006 Contract) (same))[4]

i.     **GEO's response**: Disputed. GEO does not dispute that FAR 52.222-50 is listed in its 2011 and 2006 contracts but states that the contracts speak for themselves.

ii.     **Plaintiffs' reply**: GEO's response admits the substance of the stated fact and provides no contrary evidence.

17.     FAR 52.222-50(b) expresses "a policy prohibiting trafficking in persons," including the "[u]se [of] forced labor in the performance of [a government] contract."

i.     **GEO's response**: Plaintiffs' fact number 17 is merely a summary of a legal authority, not a statement of fact and is therefore improperly included as an "undisputed fact."

ii.     **Plaintiffs' reply**: GEO's response admits the substance of the stated fact and provides no contrary evidence.

---

[4]     FAR 52.222-50 (codified at 48 C.F.R. § 52.222-50) became effective on April 19, 2006 and was thus not incorporated into the 2003 Contract.

18.     This regulation reflects the federal government's intent to "protect vulnerable individuals" and enforce its "zero-tolerance policy regarding Government employees and contractor personnel engaging in any form" of forced labor.  *See* White House, Executive Order – Strengthening Protections Against Trafficking in Persons In Federal Contracts, No. 13627 (September 25, 2012), *available at*

https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/executive-order-strengthening-protections-against-trafficking-persons-fe

    i.     **GEO's response**: Plaintiffs fact number 18 purports to define the intent of the legislature in drafting FAR 52.222-50, as a matter of fact, not through a legal analysis. The intention of the legislature is not properly listed as an undisputed fact.

    ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact and provides no contrary evidence.  The cited regulation was promulgated by the Executive branch, not "the legislature," and the cited statement is a statement of the Executive branch describing the intent of its own regulation.

19.     GEO is responsible for the day-to-day performance of the Contract. Ex. F (Ragsdale 30(b)(6) Dep. 52:21-22)

    i.     **GEO's response**: Disputed. GEO does not dispute that it operates the AIPC and its day-to-day operations, but disputes that it alone is responsible for the operations as by contract, ICE is on-site and actively involved. ECF 262-2

**APP. 339**

(GEOMenocal_00019652) (describing the responsibilities of the on-site ICE employee referred to as a "COTR").

ii.   **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.  The cited page, which does not appear in the cited document, states that the COTR "is designated to coordinate the technical aspects of this contract and inspect items/services/invoices furnished hereunder; however, he/she will not be authorized to change any terms and conditions of the resultant contract, including price. . . . The COTR is responsible for *monitoring* the performance of work under this contract."  Reply Ex. 1[5] (GEO_MEN 00019652) (emphasis added).  The contract also states that "[t]o be valid, technical direction by the COTR [m]ust be consistent with the general scope of work set forth the [sic] in this contract[, and m]ay not constitute new assignment of work nor change the expressed terms, conditions or specifications of this contract . . . ."  *Id.*

20.   GEO receives a fixed dollar amount from ICE per detainee it houses, per day, under the Contract.  Ex. B (GEO_MEN 00019614 (2011 Contract)); Ex. C

---

[5]   All Reply Exhibits are attached to the Declaration of Michael J. Scimone in Support of Plaintiffs' Reply in Support of Motion for Summary Judgment on Defendant's Affirmative Defense ("Scimone Reply Decl."), filed concurrently with this Reply.

APP. 340

(GEO-MEN 00059636 (2006 Contract)); Ex. D (GEO-MEN 00059748 (2003 Contract));

Ex. F (Ragsdale 30(b)(6) Dep. 41:8-16 (defining "bed day rate" as "price per bed per day

at Aurora.")))

      i.    **GEO's response**: Disputed. GEO receives a set amount

under its contract with ICE for the "bed day rate." ECF 262-2

GEOMenocal_00019614). In its contract, ICE has agreed to a

minimum number of bed day rates it will pay per day,

regardless of actual occupancy. *Id.* GEO receives a different

amount for each bed that is occupied above the minimum

quantity. *Id.* at GEO-Menocal_00019615. GEO receives a

separate stipend for detainee medical care and a pass-through

reimbursement amount for the Voluntary Work Program. *Id.*

at GEOMenocal_00019616. Thus, there are a number of

components of GEO's compensation from ICE which cannot

simply be described as a "fixed dollar amount."

      ii.    **Plaintiffs' reply**: Plaintiffs do not dispute the additional facts

set forth by GEO, which do not directly contradict the stated

fact.

21.    The profit GEO receives from the Aurora Facility is the difference

between the amount it receives from ICE and the amount it spends, including on housing

detainees and running the facility.  Ex. I (Hill Dep. 59:18-24); Ex. J (Krumpelmann Dep.

23:23-24:4)

**APP. 341**

i.  **GEO's response**: Disputed. GEO Disputes Plaintiffs' characterization. As clearly stated in the deposition testimony of Mr. Hill, as cited by Plaintiffs, the **estimated profit** is calculated by taking the revenue that is **expected** and subtracting out the expenses that are listed. ECF 261-5 (Hill Dep. 59:18-24). This does not describe or purport to represent how actual profits would be determined.

ii.  **Plaintiffs' reply**: GEO's response argues the semantics of Mr. Hill's testimony but does not contradict the stated fact; and it does not rebut the cited testimony of Barbara Krumpelmann, which describes how GEO's *actual* profits from the Aurora facility are constituted: "Q: . . . the amount that GEO makes is the difference between whatever GEO spends and whatever they get from ICE; is that a fair characterization?  A: Yeah.  Their profit?  Q: Yeah.  A: Yes.").  Plaintiffs' Ex. J, ECF No. 261-6 (Krumpelmann Dep. 23:23-24:4); *see also* Reply Ex. 2 (Evans Dep. 101:19-102:7).

22.  On April 18, 2018, GEO submitted to ICE a request for an "equitable adjustment" of its compensation for the 2011 Contract on the basis that the "contract requirements are incomplete because GEO reasonably believed it could perform these specifications and contract requirements without incurring legal fees to defend such specifications and contract requirements."  Ex. K (Ely Decl. ¶ 27)

**APP. 342**

i.   **GEO's response**: Disputed. GEO disputes that the Ely declaration is admissible for summary judgment or trial purposes. Ms. Ely will not testify at trial, nor appear for a deposition, and therefore the declaration is inadmissible. F.R.E. 802. Further, the declaration does not contain any of the documents it allegedly references and Ms. Ely does not explain how she has personal knowledge of their contents, thus it is also inadmissible for lack of foundation and personal knowledge.

In any event, GEO disputes that the quotes divorced from any context can be considered to be "undisputed fact." GEO did request an equitable adjustment but the reasons for its request go far beyond the excerpted text provided by Plaintiffs. GEO does not further address the adjustment as it is both immaterial and irrelevant.

ii.  **Plaintiffs' reply**: GEO's response admits the substance of the stated fact – specifically that it requested an equitable adjustment, and that the stated reason appears in the text of that request.  GEO's attempt to dispute the admissibility of the Ely declaration fails to disclose the fact that the letter Ms. Ely describes has been produced in discovery and is known to GEO, which authored it; thus, its existence and contents are

16

APP. 343

not reasonably in dispute.  *See* Reply Ex. 3 (Request for

Adjustment).  As to Ms. Ely's description of the reasons GEO

cited in support of the requested adjustment, it is accurate,

and GEO does not cite evidence supporting its claim that

there were reasons for requesting the adjustment other than

those stated in the cited text.

23.     On June 21, 2018, ICE declined GEO's request for adjustment,

stating that "GEO's defense of [this lawsuit] is a defense of its contract performance."

*Id.* ¶ 28

      i.     **GEO's response**: Disputed. GEO disputes that the Ely

declaration is admissible for summary judgment or trial

purposes. Ms. Ely will not testify at trial, nor appear for a

deposition, and therefore the declaration is inadmissible.

F.R.E. 802. Further, the declaration does not contain any of

the documents it allegedly references and Ms. Ely does not

explain how she has personal knowledge of their contents,

thus it is also inadmissible for lack of foundation and personal

knowledge.

In any event, GEO disputes that the quotes divorced from any

context can be considered to be "undisputed fact." GEO did

request an equitable adjustment but the reasons for its request

**APP. 344**

go beyond the excerpted text provided as a double hearsay statement by Plaintiffs.

ii.   **Plaintiffs' reply**: GEO's response does not address the substance of the stated fact, and its attempt to dispute the admissibility of the Ely declaration fails on several levels. First, pursuant to Fed. R. Civ. P. 56(c)(4), the declaration is admissible because it states that it is made based on the declarant's "personal knowledge or information provided to [her] in [her] official capacity. *See* Plaintiffs' Ex. K, ECF No. 261-7, (Ely Decl. ¶ 1).  Second, the declaration falls under the hearsay exception in F.R.E. 803(8)(A)(i), as it is a record or statement of ICE, a public office, setting out the office's own activities, and ICE has shown no circumstances indicating a lack of trustworthiness.  Third, the letter referenced in the declaration – which also meets the hearsay exception in FRE 803(8) – has been produced by ICE in FOIA litigation.  *See* Reply Ex. 4 (redacted letter).  Although it is heavily redacted, including as to the quoted language, Plaintiffs are involved in an ongoing effort to obtain the letter in unredacted form.[6]

---

[6]      Plaintiffs have sought discovery from ICE by way of a subpoena.  ICE produced approximately 5,000 pages of documents in response to that subpoena on June 5, 2020. Scimone Reply Decl. ¶ 4.  The documents ICE produced are so heavily redacted that it is

**APP. 345**

And third, while GEO has failed to produce this letter in discovery, it was sent to GEO and is therefore in GEO's possession and control.  Accordingly, GEO's failure to admit this fact is in bad faith, as GEO is aware that the stated fact is true.

**B.**    **The Performance-Based National Detention Standards Govern GEO's Contract Performance.**

24.    The Performance Based National Detention Standards ("PBNDS") are a series of minimum standards for detention facilities developed by ICE.  Ex. L (GEO-MEN 00064019 (2011 PBNDS)); Ex. M (GEO-MEN 00062905 (2008 PBNDS)); Ex. N (GEO-MEN 00063383 (INS Detention Standards));[7] Ex. A (A. Martin Dep. 96:19-97:6; 99:5-101:9)

i.    **GEO's response**: Undisputed.

25.    The PBNDS are incorporated into the Contract.  Ex. A (A. Martin Dep. 94:21-95:5); Ex. B (GEO_MEN 00019655-56 (2011 Contract) (identifying the PBNDS as part of the "statutory, regulatory, policy, and operational considerations that will affect the Contractor.")); Ex. C (GEO-MEN 00059644 (2006 Contract) (same, referring to "ICE Detention Standards")); Ex. D (GEO-MEN 00059754 (2003 Contract)

---

unclear whether or not this letter is among the documents produced.  *Id.*  Plaintiffs intend to challenge ICE's redactions and seek the unredacted production of this letter.  *Id.*

[7]    The INS Detention Standard manual was the precursor to the PBNDS. https://www.ice.gov/factsheets/facilities-pbnds.  For ease of reference, "PBNDS" in this Motion is inclusive of the INS Detention Standards unless otherwise specified.

**APP. 346**

("[T]he contractor is required to perform in continual compliance with the most current editions of the INS Detention Standards."))

> i. **GEO's response**: Undisputed.

26.     Pursuant to the Contract, GEO must abide by the PBNDS.  *Id.*; *see also* Ex. P (Ceja 30(b)(6) Dep. 90:17-20)

> i. **GEO's response**: Undisputed.

27.     A modification to the 2011 Contract incorporated the 2011 PBNDS into that contract.  Ex. B.1 (GEO_MEN 00020406); Ex. P (Ceja 30(b)(6) Dep. 125:10-23)

> i. **GEO's response**: Undisputed.

28.     The PBNDS supersede other sources of authority for operating the Aurora Facility under ICE contract.  Ex. P (Ceja 30(b)(6) Dep. 90:10-16)

> i. **GEO's response**: Disputed. GEO disputes that the PBNDS "supersede" all other sources of authority that do not conflict with the PBNDS, as GEO is tasked with following all applicable standards incorporated into its contract. ECF 262-2 (GEOMenocal_00019656) (2011 Contract).  And, within the PBNDS certain ACA standards are incorporated, thus if a conflict arises, an individualized inquiry is necessary to identify which of the two standards controls. ECF 261-4 (Ragsdale 30(b)(6) 72-74). If there is no conflict between the standards, GEO must comply with both.

**APP. 347**

ii.    **Plaintiffs' reply**: GEO's argument that additional sources of authority may also apply to the extent that they do not conflict with the PBNDS does not contradict the stated fact.  In further support of the undisputed fact, the 2011 Contract GEO cites provides that "[i]n cases where other standards conflict with DHS/ICE policy or standards, DHS/ICE policy and standards prevail."  Plaintiffs' Ex. B, ECF No. 262-2 (GEO_MEN00019657).  GEO's cited testimony does not support the statement that "an individualized inquiry is necessary" in the case of a conflict.

29.    If there is a discrepancy between GEO's policy or practice and the PBNDS, the PBNDS control.  Ex. P (Ceja 30(b)(6) Dep. 90:10-16); Ex. F (Ragsdale 30(b)(6) Dep. 66:20-67:1)

i.    **GEO's response**: Disputed. Within the PBNDS certain ACA standards are incorporated, thus if a conflict arises, an individualized inquiry is necessary to identify which of the two standards controls. ECF 261-4 (Ragsdale 30(b)(6) 72-74).

ii.    **Plaintiffs' reply**: GEO's response does not address the substance of the stated fact, which concerns conflicts between GEO policies and the PBNDS, not conflicts within the PBNDS or between the PBNDS and incorporated ACA standards.  GEO's cited testimony does not support the

**APP. 348**

statement that "an individualized inquiry is necessary" in the case of the latter type of conflict.

30.     The Contract between ICE and GEO provides that "[i]n cases where other standards conflict with DHS/ICE policy or standards, DHS/ICE policy and standards prevail."  Ex. B (GEO_MEN 00019657 (2011 Contract)); Ex. C (GEO-MEN 00059644 (2006 Contract)); Ex. D (GEO_MEN 00059759 (2003 Contract))

       i.     **GEO's response**: GEO does not dispute that the quoted language appears in the 2011 GEO/ICE contract, but clarifies that the PBNDS are not the only DHS/ICE standards that apply to the facility.

      ii.     **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.

**C.     The PBNDS and Incorporated ACA Standards Contain Housekeeping and Voluntary Work Program Requirements.**

31.     In the "Environmental Health and Safety" section, under the heading "General Housekeeping," the PBNDS state:

> The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness.  When possible, the use of non-toxic cleaning supplies is recommended.
>
> a.     All horizontal surfaces shall be dampdusted daily with an approved germicidal solution used according to the manufacturer's directions.
> b.     Windows, window frames, and windowsills shall be cleaned on a weekly schedule.
> c.     Furniture and fixtures shall be cleaned daily.
> d.     Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital

**APP. 349**

disinfectant-detergent solution mixed according to the manufacturer's directions.

e.  A clean mop head shall be used each time the floors are mopped.

f.  Waste containers shall weigh less than 50 lbs., be non-porous and lined with plastic bags; the liner shall be changed daily.

g.  Waste containers shall be washed weekly at a minimum, or as needed when they become soiled.

h.  Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

Ex. L (GEO-MEN 00064042 (2011 PBNDS)); *see also* Ex. M (GEO-MEN 00062934-35 (2008 PBNDS)); Ex. N (GEO-MEN 00063790 (INS Detention Standard))

        i.  **GEO's response**: Undisputed.

32.  The Environmental Health and Safety section of the PBNDS references certain sections of the American Correctional Association ("ACA") Standards for Adult Local Detention Facilities.  *See, e.g.*, Ex. L (GEO-MEN 00064041 (2011 PBNDS)); Ex. M (GEO-MEN 00062933 (2008 PBNDS)); Ex. N (GEO-MEN 00063797 (INS Detention Standard))

        i.  **GEO's response**: Disputed. The standards mentioned are not simply referenced, but also incorporated into the standards. ECF 261-4 (Ragsdale 30(b)(6) 72-74).

        ii.  **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.  Plaintiffs do not dispute that the reference to the ACA standards operates to incorporate the specified sections into the PBNDS.

**APP. 350**

33.     ACA Standard 4-ALDF-1A-04 requires that: "The facility is clean and in good repair.  A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance."  Ex. Q (ALDF-1A-04); Ex. R (A. Martin 30(b)(6) Dep. 16:11-17:23)

  i.     **GEO's response**: Undisputed.

34.     ACA Standard 4-ALDF-1A-01 requires regular sanitation inspections of detention facilities.  Ex. Q (ALDF-1A-01); Ex. R (A. Martin 30(b)(6) Dep. 18:8-19:4)

  i.     **GEO's response**: Disputed. Standard 4-ALDF-1A-01 requires "A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance by assigning specific duties and responsibilities to staff and inmates." ECF 261-13, 10. It further provides that there must be a written policy and procedure which describes detainee responsibilities.

  ii.     **Plaintiffs' reply**: The language GEO quotes in its response does not appear in Standard 4-ALDF-1A-01 or at the cited docket number.  Standard 4-ALDF-1A-01 reads in full: "(MANDATORY) The facility complies with all applicable laws and regulations of the governing jurisdiction, and there is documentation by an independent, outside source that any

**APP. 351**

past deficiencies noted in annual inspections have been corrected.  The following inspections are implemented:

- weekly sanitation inspections of all facility areas by a qualified departmental staff member

- comprehensive and thorough monthly inspections by a safety/sanitation specialist

- at least annual inspections by federal, state, and/or local sanitation and health officials or other qualified person(s)."

Plaintiffs' Ex. Q, ECF No. ECF 261-13 (4-ALDF-1A-01).

35.    The Voluntary Work Program ("VWP") section of the PBNDS provides that detainees "shall be provided the opportunity to participate in a voluntary work program."  Ex. L (GEO-MEN 00064345 (2011 PBNDS))

i.    **GEO's response**: Undisputed.

36.    The VWP section of the PBNDS states: "Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.  Detainees are required to maintain their immediate living areas in a neat and orderly manner by: 1. making their beds daily; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture."  Ex. L (GEO-MEN 00064345 (2011 PBNDS); Ex. R (A. Martin 30(b)(6) Dep. 25:25-26:24);

**APP. 352**

*see also* Ex. M (GEO-MEN 00063294-95 (2008 PBNDS); Ex. N (GEO-MEN 00063672 (INS Detention Standard))

     i.    **GEO's response**: Undisputed that the quoted text appears in the 2011 PBNDS.

37.    The Voluntary Work Program section of the 2011 PBNDS requires that detainees in that program be paid "at least $1.00 (USD) per day."  Ex. L (GEO-MEN 00064347 (2011 PBNDS))

     i.    **GEO's response**: Disputed. Only the 2011 PBNDS contain the quoted text. All prior versions provided that compensation was exactly $1.00 per day. ECF 261-10, 5 (2000 NDS); ECF 261-9, 63 (2008 PBNDS).

     ii.    **Plaintiffs' reply**: GEO's response admits the substance of the fact.

38.    The Voluntary Work Program section of the PBNDS references certain sections of the ACA Standards.  Ex. L (GEO-MEN 00064345 (2011 PBNDS)); Ex. M (GEO-MEN 00063294 (2008 PBNDS)); Ex. N (GEO-MEN 00063677 (INS Detention Standard))

     i.    **GEO's response**: Undisputed.

39.    ACA Standard 4-ALDF-5C-08 requires that: "Pretrial and unsentenced inmates are not required to work except to do personal housekeeping and to clean their housing area.  Inmates are allowed to volunteer for work assignments."  Ex. S (4-ALDF-5C-08)

i.      **GEO's response**: Undisputed.

**D.      GEO's Housekeeping Unit Sanitation Policy Is Not Required or Administered by ICE.**

40.     GEO's Aurora Facility-level policies are developed by local GEO employees.  Ex. O (K. Martin Dep. 51:22-25)

i.      **GEO's response**: Disputed. All AIPC polices are developed by both GEO and ICE and ultimately approved of and signed off on by ICE. ECF 261-4 (Ragsdale 30(b)(6) 39:3-6; A63:6-8; 65:7-25; 66:1-10).

ii.     **Plaintiffs' reply**: GEO's response is incorrect and unsupported by the evidence it cites.  GEO provides no evidence for the contention that all Aurora Facility polices are developed by both GEO and ICE.  To the contrary, in the deposition testimony GEO cites,[8] Mr. Ragsdale testifies that "the facilities develop policies" and the ICE Contracting Officer's Technical Representative ("COTR") "review[s] and clear[s]" those policies.  GEO Ex. Q, ECF No. 271-11 (Ragsdale 30(b)(6) Dep. at 39:3-6).  Plaintiffs' Undisputed Fact No. 43, which GEO does not dispute, identifies the COTR's role.

---

[8]     GEO cites to the docket number for Plaintiffs' Ex. F (ECF No. 261-4), but the referenced pages appear to pertain to GEO's Ex. Q (ECF No. 271-11).

**APP. 354**

41.     These policies are reviewed and amended by local GEO employees at Aurora on an annual basis.  Ex. O (K. Martin Dep. 64:17-23); Ex. P (Ceja 30(b)(6) Dep. 33:22-34:1)

     i.    **GEO's response**: Disputed. All AIPC polices are amended by both GEO and ICE and ultimately approved of and signed off on by ICE. ECF 261-4 (Ragsdale 30(b)(6) 39:3-6; 63:6-8; 65:7-25; 66:1-10).

     ii.    **Plaintiffs' reply**: GEO's response is misleading and unsupported by the evidence it cites.  GEO attempts to conflate GEO's annual policy review and the COTR's "review[] and clear[ance]" of local Aurora policies.  GEO Ex. Q, ECF No. 271-11 (Ragsdale 30(b)(6) Dep. 39:3-6).  The cited testimony does not show that the COTR participates in the ongoing review or amendment of GEO policies. Plaintiffs' Undisputed Fact No. 43, which GEO does not dispute, identifies the COTR's role.

42.     The annual policy review is conducted by the Aurora Facility's Policy Review Committee, which is made up of local Aurora GEO staff.  Ex. A (A. Martin Dep. 70:20-25); Ex. P (Ceja 30(b)(6) Dep. 34:2-7)

     i.    **GEO's response**: Disputed. All AIPC polices are reviewed by both GEO and ICE and ultimately approved of and signed

**APP. 355**

off on by ICE. ECF 261-4 (Ragsdale 30(b)(6) 39:3-6; 63:6-8; 65:7-25; 66:1-10).

ii.    **Plaintiffs' reply**:  GEO's response is misleading and not supported by the evidence it cites.  GEO attempts to conflate GEO employees' annual policy review and the COTR's "review[] and clear[ance]" of local Aurora policies.  GEO Ex. Q, ECF No. 271-11 (Ragsdale 30(b)(6) Dep. 39:3-6).   GEO provides no evidence that the COTR participates in the ongoing amendment of GEO policies.  Plaintiffs' Undisputed Fact No. 43, which GEO does not dispute, identifies the COTR's role.

43.    Each policy is also reviewed and approved by an on-site ICE official called the Contracting Officer's Technical Representative ("COTR").  Ex. T (Nelson Dep. 150:22-151:2)

i.    **GEO's response**: Undisputed

44.    GEO's Policy Number 12.1.4 – AUR, titled "Sanitation Procedures," is intended to "provide staff and detainees with a clean sanitary living environment consistent with all applicable codes, standards and sound detention practices."  Ex. U (GEO_MEN 00038687 (2004); GEO_MEN 00038653 (2004-05); GEO_MEN 00038676 (2005-06); GEO_MEN 00038628 (2006-07); GEO_MEN 00038665 (2007-08); GEO_MEN 00038632 (2008-09) GEO_MEN 00038613 (2009-10); GEO_MEN

00038625 (2010); GEO_MEN 00007203 (2010-11); GEO_MEN 00038649 (2011-12); GEO-MEN 00099980 (2012-13); GEO-MEN 00088208 (2013-14))

> i.   **GEO's response**: Undisputed that the quoted text appears in the documents as quoted.

45.   GEO's Sanitation Procedures document requires that "[e]ach detainee will be responsible for the cleanliness of his or her cell or living area, including walls, floors, sink, toilet, windows, and other property within the cell, room, or living areas." *Id.*

> i.   **GEO's response**: Undisputed that the quoted text appears in the documents as quoted.

46.   GEO's Sanitation Procedures do not specify which aspects of cleaning are the responsibility of HUSP workers and which are the responsibility of VWP workers. *See generally* Ex. U ((GEO_MEN 00038687-98 (2004); GEO_MEN 00038653-64 (2004-05); GEO_MEN 0003967676-86 (2005-06); GEO_MEN 00038628-31 (2006-07); GEO_MEN 00038665-75 (2007-08); GEO_MEN 00038632-39 (2008-09) GEO_MEN 00038613-15 (2009-10); GEO_MEN 00038625-27 (2010); GEO_MEN 00007203-06 (2010-11); GEO_MEN 00038649-52 (2011-12); GEO-MEN 00099980-83 (2012-13); GEO-MEN 00088208-11 (2013-14))

> i.   **GEO's response**: Undisputed that the Sanitation Procedures do not specify which aspects of cleaning are assigned to VWP workers and which are the responsibility of detainees as part of cleaning their living area. GEO disputes that there is a

**APP. 357**

policy termed the "HUSP." Ragsdale 30(b)(6) 16:1-8 (Mr. Ragsdale had never heard of the 'HUSP' before this lawsuit.).

    ii.    **Plaintiffs' reply**: GEO's response does not dispute the substance of the stated fact.  That Mr. Ragsdale, an executive vice president who began working for the company in 2017, has never heard of the HUSP in one location (where it was in effect from, as relevant here, 2004-2014) does not demonstrate that no such policy existed.  GEO's own 30(b)(6) designee accepted the use of the term and testified about it extensively as one of the topics on which she was officially designated.  Reply Ex. 5 (Ceja 30(b)(6) Dep. 24:5-13).

47.    In addition to the sanitation procedures described in Policy Number 12.1.4 – AUR, GEO requires detainees to perform a general cleanup after each meal.  Ex. P (Ceja 30(b)(6) Dep. 37:5-9); Ex. O (K. Martin Dep. 142:24-143:1)

    i.    **GEO's response**: Disputed. GEO disputes that detainees are "required" to clean. Rather, most individuals volunteered to clean up after each meal, while a select few would be identified each day to clean and could choose not to participate if they wished. Ex. J Kevin Martin Dep. 143-145.

    ii.    **Plaintiffs' reply**: GEO's response mischaracterizes the cited testimony, which does not support the contention that "most

**APP. 358**

individuals volunteered to clean up" and does not state that detainees "could choose not to participate."[9]

48.      During a general cleanup, GEO requires detainees "clean up the tables, wipe down the tables, and sweep and mop the floors." Ex. P (Ceja 30(b)(6) Dep. 36:24-37:9)

      i.    **GEO's response**: Disputed. Detainees *could* participate in any of the items listed, but would likely not do each task in a day as the cleanup would take less than five minutes ager each meal. Ex. J Kevin Martin Dep. 143:3-8

      ii.    **Plaintiffs' reply:** GEO's response mischaracterizes the testimony of its own 30(b)(6) designee, Dawn Ceja, who admitted that the specified tasks were mandatory for all detainees at Aurora. Nothing in Ms. Ceja's testimony or the cited testimony of Kevin Martin suggests that such participation was optional, as suggested in GEO's response. Nor does the cited testimony of Kevin Martin support GEO's speculation that "Detainees . . . would likely not do each task in a day": Martin testified only that these job duties took 5 to 10 minutes. Moreover, it is not clear that Martin is competent

---

[9]      Page 145 of Mr. Martin's deposition does not appear in Plaintiffs' Exhibit J, although GEO's citation indicates that it does. For clarity, Plaintiffs have filed that page at Reply Ex. 7.

to testify to the duration of these tasks, because he went on to concede that he did not actually observe such meal cleanup in the ordinary course of his job duties, but "may have" observed the meal service that preceded cleanup in the course of conducting or facilitating audits.  Plaintiffs' Ex. O, ECF No. 261-11 (K. Martin Dep. 143:12-22).

49.     GEO also tells detainees that they have a "common obligation to clean . . . the communal areas," including the dayroom and bathrooms, on a rotating basis.  Ex. F (Ragsdale 30(b)(6) Dep. 16:14-18)

i.     **GEO's response**: Disputed. GEO disputes that the excerpted text is complete, as the entire quote from Mr. Ragsdale was as follows: "That folks will clean their immediate living area, meaning making their bed, dealing with their own personal property in their immediate living area. And they also share sort of a common obligation to clean, you know, where the microwave is, where the, you know, game boards are, video games, to keep things in place in a reasonable cleanliness; the bathroom, you know, the areas, the communal areas is the word I'm looking for." ECF 261-4, 6 (Ragsdale 30(b)(6) Dep. 16:14-18).

ii.     **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.

**APP. 360**

50.     The general cleanup is not listed among the facility's sanitation procedures.  *See generally* Ex. U ((GEO_MEN 00038687-98 (2004); GEO_MEN 00038653-64 (2004-05); GEO_MEN 0003967676-86 (2005-06); GEO_MEN 00038628-31 (2006-07); GEO_MEN 00038665-75 (2007-08); GEO_MEN 00038632-39 (2008-09) GEO_MEN 00038613-15 (2009-10); GEO_MEN 00038625-27 (2010); GEO_MEN 00007203-06 (2010-11); GEO_MEN 00038649-52 (2011-12); GEO-MEN 00099980-83 (2012-13); GEO-MEN 00088208-11 (2013-14))

    i.    **GEO's response**: Disputed. The sanitation procedures require detainees to engage in a general cleanup of their facilities under "Detainee Sanitation Responsibilities" stating that detainees are responsible for keeping clean their living areas, which includes their shared dining tables and floors. ECF 262-8.

    ii.    **Plaintiffs' reply**: GEO's response mischaracterizes the cited procedures.  The policy GEO cites makes no mention of a general cleanup and states only that detainees are "responsible for the cleanliness of his or her cell or living area, including walls, floors, sink, toilet, windows, and other property within the cell, room, or living area."  It does not define "cell, room, or living area" to include communal spaces such as shared dining tables and floors.  *See* Plaintiffs' Ex. U, ECF No. 262-8 (GEO_MEN 00038688 (2004);

34

**APP. 361**

GEO_MEN 00038654 (2004-05); GEO_MEN 0003967677

(2005-06); GEO_MEN 00038629 (2006-07); GEO_MEN

00038666 (2007-08); GEO_MEN 00038632 (2008-09)

GEO_MEN 00038613 (2009-10); GEO_MEN 00038625

(2010); GEO_MEN 00007203 (2010-11); GEO_MEN

00038649 (2011-12); GEO-MEN 00099980 (2012-13); GEO-

MEN 00088208 (2013-14)).

51.    The post-meal cleanup of tables, floors, and other communal areas

that GEO requires is called the Housing Unit Sanitation Policy, or HUSP.  Ex. F

(Ragsdale 30(b)(6) Dep. 15:24-16:25); Ex. P (Ceja 30(b)(6) Dep. 84:3-14); Ex. R (A.

Martin 30(b)(6) Dep. 11:4-19)

  i.    **GEO's response**: Disputed. The general clean-up is not

referred to as the "HUSP" internally by GEO, as it was a

construct created by Plaintiffs' counsel. ECF 261-4, 6

(Ragsdale 30(b)(6) 16:1-8) (Mr. Ragsdale had never heard of

the 'HUSP' before this lawsuit.).

  ii.    **Plaintiffs' reply**: That Mr. Ragsdale, an executive vice

president who began working for the company in 2017, has

never heard of the HUSP prior to this lawsuit does not

demonstrate that such terminology is not used at the facility

level or in other components of the company.  GEO's own

30(b)(6) designee accepted the use of the term and testified

**APP. 362**

about it extensively as one of the topics on which she was officially designated. Reply Ex. 5 (Ceja 30(b)(6) Dep. 24:5-13).

52.     GEO never verified with ICE whether communal areas are part of the "living area" described in the PBNDS. Ex. A (A. Martin Dep. 196:23-198:6)

i.     **GEO's response**: Disputed. All GEO policies are approved by ICE. Ragsdale 30(b)(6) 39:3-6. The sanitation procedures are no different and were signed off on by ICE. Ex. Q.

ii.     **Plaintiffs' reply**: GEO provides no evidence that contradicts Plaintiffs' Undisputed Fact. The sanitation procedures that GEO references do not specify that communal areas are part of the "cell, room, or living area," and GEO cites no evidence contradicting the testimony of its Vice President Amber Martin, who was responsible for GEO's policy and procedure committee, *see* Reply Ex. 6 (A. Martin Dep. 34:13-22), that GEO "never specifically sought to clarify [the definition of 'common living area'] because I thought it was clear through the review of the policy." Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Dep. 196:23-198:6); *see also* Plaintiffs' Reply re Undisputed Fact No. 50. In fact, a 2017 report by the Department of Homeland Security's Office of Inspector General concluded that requiring detainees to clean common

**APP. 363**

areas violated the PBNDS because common areas are distinct from detainees' "immediate living area."  Reply Ex. 17 at p. 6 (Theo Lacy OIG report).

53.     Detainees do not receive payment for their work under the HUSP. Ex. P (Ceja 30(b)(6) Dep. 84:8-24)

i.     **GEO's response**: Disputed. Detainees are not paid for the five minutes or so that they spend cleaning up after each meal unless they are a detainee trustee cleaning as part of their shift. Ex. J, Kevin Martin Dep. 143-146.

ii.     **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.  Plaintiffs do not concede GEO's added commentary that such tasks took "five minutes or so," because Kevin Martin, whose testimony GEO cites, is not a competent witness to that fact.  Plaintiffs' Ex. O, ECF No. 261-11 (K. Martin Dep. 143:12-22) (Mr. Martin concedes that he did not actually observe meal cleanup in the ordinary course of his job duties, but "may have" observed the meal service that preceded cleanup in the course of conducting or facilitating audits).  Detainee trustees perform work under the VWP, not the HUSP.  Reply Ex. 7 (K. Martin Dep. 145:12-15).

APP. 364

54.    The HUSP is a "GEO policy, created by GEO." Ex K (Ely Decl. ¶ 22); Ex. P (Ceja 30(b)(6) Dep. 27:6-28:1)

       i.    **GEO's response**: Disputed. GEO drafted the sanitation procedures policy in connection with ICE. (Ragsdale 30(b)(6) 39:3-6; 63:6-8; 65:7-25; 66:1-10). Ex. Q.

      ii.    **Plaintiffs' reply**: GEO's response conflates the sanitation procedures policy and the HUSP. The HUSP is a policy that requires detainees to perform cleaning tasks beyond the scope of the cleaning laid out in GEO's sanitation procedures policy. *See* Undisputed Fact Nos. 47-51.

           Furthermore, as discussed in greater detail in Plaintiffs' Reply re Undisputed Fact Nos. 40-42, GEO has provided no evidence to support its contention that any of its policies were drafted "in connection with ICE." The cited testimony of Daniel Ragsdale does not support this contention, as it describes only ICE approval of GEO policies.

55.    The HUSP is not created by ICE. Ex. K (Ely Decl. ¶ 22.)

       i.    **GEO's response**: Disputed. GEO drafted the sanitation procedures policy cooperatively with ICE, following all requirements and direction in the Contract, ACA Standards, and ICE directives. (Ragsdale 30(b)(6) 39:3-6; 63:6-8; 65:7-25; 66:1-10). Ex. Q.

**APP. 365**

**Plaintiffs' reply**: GEO's response conflates the sanitation procedures policy and the HUSP.  The HUSP is a policy that requires detainees to perform cleaning tasks beyond the scope of the cleaning laid out in GEO's sanitation procedures policy.  *See* Undisputed Fact Nos. 47-51.

Furthermore, as discussed in greater detail in Plaintiffs' Reply re Undisputed Fact Nos. 40-42, GEO has provided no evidence to support its contention that any of its policies were drafted "in connection with ICE."  The cited testimony of Daniel Ragsdale does not support this contention, as it describes only ICE approval of GEO policies.

56.     The HUSP is not required by the Contract.  *Id.*

   i.     **GEO's response**: Disputed. The contract requires performance with the ACA standards, which in turn require GEO to develop a housekeeping plan. ECF 262-2 (GEOMenocal_00019656); ECF 261-13 (ACA Standard 4-ALDF-1A-01).

   ii.    **Plaintiffs' reply**: GEO's response does not address the substance of the fact, which is that the HUSP – the specific policy that GEO developed – is not required by the Contract. Plaintiffs do not dispute that GEO is required to develop a

**APP. 366**

housekeeping plan, but this fact is immaterial to Plaintiffs'
claims.

57.     ICE did not draft or negotiate the HUSP.  *Id.*

i.     **GEO's response**: Disputed. GEO drafted the sanitation
procedures policy cooperatively with ICE, following all
requirements and direction in the Contract, ACA Standards,
and ICE directives. ECF 261-4 (Ragsdale 30(b)(6) 39:3-6;
63:6-8; 65:7-25; 66:1-10). Ex. Q.

ii.     **Plaintiffs' reply**: GEO's response conflates the sanitation
procedures policy and the HUSP.  The HUSP is a policy that
requires detainees to perform cleaning tasks beyond the scope
of the cleaning laid out in GEO's sanitation procedures
policy.  *See* Undisputed Fact Nos. 47-51

Furthermore, as discussed in greater detail in Plaintiffs' Reply
re Undisputed Fact Nos. 40-42, GEO has provided no
evidence to support its contention that any of its policies were
drafted "in connection with ICE."  The cited testimony of
Daniel Ragsdale does not support this contention, as it
describes only ICE approval of GEO policies.

APP. 367

E.   **GEO Tells Detainees That They Are Required to Clean Dorm Common Areas.**

58.   GEO's local detainee handbook for the Aurora facility sets out rules for detainees' conduct and privileges within the Aurora facility.  Ex. P (Ceja 30(b)(6) Dep. 29:19-24; 32:23-37:13); Ex. V (GEO_MEN 00040731-75 (Local Detainee Handbook (2002 version))); Ex. W (PL000029-55 (Local Detainee Handbook (2013 version)))

    i.   **GEO's response**: Disputed. GEO does not dispute that the detainee handbook sets forth standards for detainee conduct and privileges, but does dispute this fact to the extent that it purports to be the exclusive authority on detainee conduct. In connection with the ICE National Handbook and the PBNDS, the detainee handbook sets out rules for detainees' conduct within the AIPC. Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook).

    ii.   **Plaintiffs' reply**: GEO admits the substance of the stated fact.  Its purported "dispute" consists of a mischaracterization of the stated fact.

59.   The Aurora Detainee Handbook has been in effect since at least 1995.  Ex. P (Ceja 30(b)(6) Dep. 33:22-34:1)

**APP. 368**

i.    **GEO's response**: Disputed. GEO does not dispute that there have been handbooks in place since approximately 1995, but disputes that there has been a single handbook that has governed detainee conduct for the entire time period.

ii.   **Plaintiffs' reply**: Plaintiffs agree with GEO's characterization, which is not substantively different from the stated fact.

60.   The Aurora Detainee Handbook is issued to all detainees entering Aurora.  Ex. P (Ceja 30(b)(6) Dep. 29:21-24)

i.    **GEO's response**: Undisputed.

61.   The Aurora Detainee Handbook communicates the rules and policies of the Aurora Facility to detainees.  Ex. P (Ceja 30(b)(6) Dep. 29:19-24)

i.    **GEO's response**: Undisputed.

62.   Like the PBNDS, GEO's Aurora Detainee Handbook states that detainees are "required to keep [their] personal living area clean and sanitary."  Ex. V (GEO_MEN 00040757 (Local Detainee Handbook (2002 version))); Ex. W (PL000046 (Local Detainee Handbook (2013 version)))

i.    **GEO's response**: Undisputed.

63.   The Aurora Detainee Handbook defines "personal living area" as 1. the detainee's "bunk and immediate floor area around and under [the] bunk," 2. the detainee's locker, and 3. the detainee's personal items.  *Id*.

**APP. 369**

i.    **GEO's response**: Disputed. GEO disputes that the handbook cited by Plaintiffs in support of their motion for summary judgment is applicable to the present case. The handbook cited by Plaintiffs as "Exhibit V" is from February 25, 2002, over two years before the class period and during a period wherein different regulations applied. ECF 262-9 at 46 (GEO_MEN 00040734).  Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case.

The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook)

ii.    **Plaintiffs' reply**:  The language quoted in Plaintiffs' Undisputed Fact appears in identical form in every handbook cited by GEO, which GEO concedes cover the class period. *See* GEO Ex. E, ECF No. 273-1 (GEO_MEN 00054887 (Local Detainee Handbook (2005 version))); GEO Ex. F, ECF No. 273-2 (GEO_MEN 00054197 (Local Detainee

**APP. 370**

Handbook (2007 version))); GEO Ex. G, ECF No. 273-3

(GEO_MEN 00054240 (Local Detainee Handbook (2008

version))); GEO Ex. H, ECF No. 273-4 (GEO_MEN

00054267 (Local Detainee Handbook (2010 version))); GEO

Ex. I, ECF No. 273-5 (GEO-MEN 00056798 (Local Detainee

Handbook (2011 version))); *see also* Undisputed Fact No. 63

(citing Local Detainee Handbooks (2002 and 2013 versions)).

GEO does not substantively dispute this fact.

64.     The HUSP in GEO's Aurora Detainee Handbook also provides:

"Each and every detainee must participate in the facility's sanitation program.  A list of

detainees is developed each day by staff and is posted [daily] for viewing.  During a

general cleanup all detainees must participate.  The assigned Housing Unit [or Dorm]

Officer will be responsible for assuring this general cleanup is done on a regular basis."

Ex. V (GEO_MEN 00040758 (Local Detainee Handbook (2002 version) (under heading

"Dormitory Sanitation"))); Ex. W (PL000047 (Local Detainee Handbook (2013 version)

(under heading "Housing Unit Sanitation"))); *see also* Ex. X (GEO_MEN 00052387

(Detainee Orientation Video) at 2)

        i.     **GEO's response**: Disputed. GEO disputes that the handbook

cited by Plaintiffs as "Exhibit V," from February 25, 2002 is

applicable to the present case. The handbook is from over two

years before the class period and during a period wherein

different regulations applied. ECF 262-9 at 46 (GEO_MEN

00040734). Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case. The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook).

GEO does not dispute that the 2013 Detainee Handbook contains the following quoted text: "Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit Officer will be responsible for assuring this general cleanup is done on a regular basis." ECF 261-17, 20.

ii.     **Plaintiffs' reply**:  The language quoted in Plaintiffs' Undisputed Fact appears in nearly identical form in every handbook cited by GEO, with minor variations denoted in brackets.  *See* GEO Ex. E, ECF No. 273-1 (GEO_MEN 00054887 (Local Detainee Handbook (2005 version))); GEO

**APP. 372**

Ex. F, ECF No. 273-2 (GEO_MEN 00054198 (Local

Detainee Handbook (2007 version))); GEO Ex. G, ECF No.

273-3 (GEO_MEN 00054240 (Local Detainee Handbook

(2008 version))); GEO Ex. H, ECF No. 273-4 (GEO_MEN

00054268 (Local Detainee Handbook (2010 version))); GEO

Ex. I, ECF No. 273-5 (GEO-MEN 00056798 (Local Detainee

Handbook (2011 version))); *see also* Undisputed Fact No. 63

(citing Local Detainee Handbooks (2002 and 2013 versions)).

GEO concedes these handbooks cover the class period.  GEO

does not substantively dispute this fact.

65.      The Aurora Detainee Handbook states "[a]ll detainees in a housing

unit [or dorm] are required to keep clean and sanitary all commonly accessible areas of

the housing unit [or dorm], including walls, floors, windows, windows ledges, showers,

sinks, toilets, tables, and chairs."  Ex. V (GEO_MEN 00040759 (Local Detainee

Handbook (2002 version))); Ex. W (PL000047 (Local Detainee Handbook (2013

version))).

i.      **GEO's response**: Disputed. GEO disputes that the handbook

cited by Plaintiffs in support of their motion for summary

judgment is applicable to the present case. The handbook

cited by Plaintiffs as "Exhibit V" is from February 25, 2002,

over two years before the class period and during a period

wherein different regulations applied.  ECF 262-9 at 46

**APP. 373**

(GEO_MEN 00040734). Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case.

The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook)

Disputed. GEO does not dispute that the 2013 Detainee Handbook contains the following quoted text: "All detainees in a housing unit are required to keep clean and sanitary all commonly accessible areas of the housing unit, including walls, floors, windows, windows ledges, showers, sinks, toilets, tables, and chairs . . . . If detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit office of the problem. Action will be taken to resolve this problem." ECF 261-17, 20.

ii.   **Plaintiffs' reply**:  The language quoted in Plaintiffs' Undisputed Fact appears in nearly identical form in every handbook cited by GEO, with minor variations denoted in

**APP. 374**

brackets.  *See* GEO Ex. E, ECF No. 273-1 (GEO_MEN 00054887 (Local Detainee Handbook (2005 version))); GEO Ex. F, ECF No. 273-2 (GEO_MEN 00054199 (Local Detainee Handbook (2007 version))); GEO Ex. G, ECF No. 273-3 (GEO_MEN 00054240 (Local Detainee Handbook (2008 version))); GEO Ex. H, ECF No. 273-4 (GEO_MEN 00054268 (Local Detainee Handbook (2010 version))); GEO Ex. I, ECF No. 273-5 (GEO-MEN 00056798 (Local Detainee Handbook (2011 version))); *see also* Undisputed Fact No. 63 (citing Local Detainee Handbooks (2002 and 2013 versions)). GEO concedes these handbooks cover the class period.  GEO does not substantively dispute this fact.

66.     That section also states that "Detainees will take turns cleaning the [day space]" and the "day room area will be kept clean at all times."  *Id.*

    i.     **GEO's response**: Disputed. GEO disputes that the handbook cited by Plaintiffs as "Exhibit V," from February 25, 2002 is applicable to the present case. The handbook is from over two years before the class period and during a period wherein different regulations applied. ECF 262-9 at 46 (GEO_MEN 00040734). Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case.

**APP. 375**

The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook).

ii.    **Plaintiffs' reply**:  The language quoted in Plaintiffs' Undisputed Fact appears in identical form in every handbook cited by GEO, with minor variations denoted in brackets.  *See* GEO Ex. E, ECF No. 273-1 (GEO_MEN 00054887 (Local Detainee Handbook (2005 version))); GEO Ex. F, ECF No. 273-2 (GEO_MEN 00054199 (Local Detainee Handbook (2007 version))); GEO Ex. G, ECF No. 273-3 (GEO_MEN 00054240 (Local Detainee Handbook (2008 version))); GEO Ex. H, ECF No. 273-4 (GEO_MEN 00054268 (Local Detainee Handbook (2010 version))); GEO Ex. I, ECF No. 273-5 (GEO-MEN 00056798 (Local Detainee Handbook (2011 version))); *see also* Undisputed Fact No. 63 (citing Local Detainee Handbooks (2002 and 2013 versions)).  GEO concedes these handbooks cover the class period.  GEO does not substantively dispute this fact.

**APP. 376**

F.   **Solitary Confinement at Aurora.**

67.   GEO policy describes segregation as "[c]onfinement in a cell isolated from the general population."  Ex. Y (GEO-MEN 00037770 (Policy Number 10.2.11 – AUR))

> i.   **GEO's response**: Disputed. GEO does not dispute that the quoted text appears in the document, but notes that the document is signed by both GEO and ICE and is not properly described merely as a "GEO policy." ECF 262-11.
>
> ii.   **Plaintiffs' reply**: GEO admits the substance of the stated fact and provides no contrary evidence.  *See also* Plaintiffs' Reply re Undisputed Fact Nos. 40-42 (discussing the COTR's role in signing off on GEO policy).

68.   Disciplinary and administrative segregation are both forms of segregation used at the Aurora Facility.  *Id.*

> i.   **GEO's response**: Undisputed.

69.   According to ICE standards, administrative segregation should be used only when "restricted conditions of confinement are required [] to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility."  Ex. L (GEO_MEN 00064171 (2011 PBNDS)); Ex. M (GEO-MEN 00063097 (2008 PBNDS); *see also* Ex. N (GEO-MEN 00063863-64 (INS Standards))

> i.   **GEO's response**: Disputed. GEO disputes that the out-of-context quote fully describes when administrative segregation

**APP. 377**

is properly used. The PBNDS do not include the qualifiers added by Plaintiffs that the listed reasons constitute an exhaustive list of reasons why disciplinary segregation may be used. In direct contrast, the PBNDS state under "Reasons for Placement in Administrative Segregation" that a detainee may be placed in administrative segregation, for among other reasons, that the "detainee is awaiting an investigation or a hearing for violation of facility rules." ECF 261-8. The PBNDS further explain that the exemplars provided are nonexhaustive. *Id*.

ii. **Plaintiffs' reply**: GEO's response concedes that the stated fact describes permissible uses of administrative segregation; Plaintiffs do not dispute that the text quoted by GEO describes a specific application of those uses, but the text goes on to show that it is an example of maintaining "the security or good order of the facility," as it states that administrative segregation may be used when "[a] detainee is awaiting a violation or a hearing for a violation of facility rules. Pre-disciplinary hearing detention shall be ordered only as necessary to prevent further violation of those rules or to protect the security and orderly operation of the facility." Plaintiffs' Ex. L, ECF No. 261-8 (GEO_MEN 00064171-72

**APP. 378**

(2011 PBNDS)); Plaintiffs' Ex. M, ECF No. 261-9 (GEO-

MEN 00063097 (2008 PBNDS); Plaintiffs' Ex. N, ECF No.

261-10 (GEO-MEN 00063863-64 (INS Standards)).

70.    Administrative segregation may be used to confine detainees prior to

a hearing on whether disciplinary segregation will be imposed for a rule violation, but

"only as necessary to prevent further violation of those rules or to protect the security and

orderly operation of the facility."  Ex. L (GEO-MEN 00064172 (2011 PBNDS)); Ex. M

(GEO-MEN 00063097 (2008 PBNDS)); *see also* Ex. N (GEO-MEN 00063864 (INS

Standards)).

      i.    **GEO's response**: Disputed. GEO disputes the use of this

quote as setting forth a hard and fast rule. The section cited is

one example of when administrative segregation is

permissible but the list of exemplars is non-exhaustive. ECF

261-8.

      ii.    **Plaintiffs' reply**: GEO's response admits the substance of the

stated fact.  *See also* Plaintiffs' Reply re Undisputed Fact No.

69.

71.    Administrative segregation "is not to be used as a punitive measure."

*Id*.

      i.    **GEO's response**: Disputed. GEO disputes that this correctly

describes the use of administrative segregation. As explained

in the 2011 PBNDS, because of how it is designed,

**APP. 379**

"Administrative Segregation status is a nonpunitive status…" ECF 261-8. Thus, the use of administrative segregation is nonpuntitive.

    ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.

72.    Disciplinary segregation, which involves punitive segregation for disciplinary reasons, may only be administered after a detainee has received a disciplinary hearing and been found guilty of an offense authorizing such punishment. Ex. L (GEO-MEN 00064169 (2011 PBNDS)); Ex. M (GEO-MEN 00063090 (2008 PBNDS)); Ex. N (GEO-MEN 00063883 (INS Standards))

    i.    **GEO's response**: Disputed. GEO disputes that this accurately describes the cited material. As the PBNDS make clear, disciplinary segregation is only appropriate after a disciplinary hearing panel has determined that a detainee is guilty of a prohibited act for which the ICE disciplinary severity scale authorizes disciplinary segregation. ECF 261-8.

    ii.    **GEO's reply**: GEO's response admits the substance of the undisputed fact.

73.    Detainees in both administrative and disciplinary segregation are housed in a section of the detention facility called the Special Management Unit ("SMU").  Ex. L (GEO-MEN 00064169 (2011 PBNDS)); Ex. M (GEO-MEN 00063090 (2008 PBNDS)); Ex. N (GEO-MEN 00063863 (INS Standards))

**APP. 380**

       i.      **GEO's response**: Undisputed.

74.     The SMU at Aurora consists entirely of single-occupancy cells.  Ex. P (Ceja 30(b)(6) Dep. 54:17-55:6)

       i.      **GEO's response**: Undisputed.

**G.**    **The PBNDS Provide GEO A Wide Range of Options to Punish Offenses.**

75.     The PBNDS state that "each facility [shall] have graduated severity scales of prohibited acts and disciplinary consequences."  Ex. L (GEO-MEN 00064209 (2011 PBNDS)); Ex. M (GEO-MEN 00063138 (2008 PBNDS)); *see also* Ex. N (GEO-MEN 00063726 (INS Standards))

       i.      **GEO's response**: Disputed. The PBNDS not only require graduated severity scales of prohibited acts and disciplinary consequences, but they also set forth the appropriate scale for the same. ECF 261-10, 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9, 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8, 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.")

      ii.      **Plaintiffs' reply**: GEO admits the substance of the stated

fact.

76.     The PBNDS allow GEO discretion in determining the severity scales

that it applies to different offenses.  Ex. A (A. Martin Dep. 146:16-147:3); Ex. O (K.

Martin Dep. 73:12-80:8)

      i.      **GEO's response**: Disputed. GEO disputes that it has

discretion to determine its own severity scale. The 2000 NDS

and all applicable versions of the PBNDS require GEO to

adopt, without alteration, the ICE disciplinary severity scale.

ECF 261-10, 17 (2000 NDS) (Contract Detention Facilities

"shall adopt, without changing, the offense categories and

disciplinary sanctions set forth in this section."); ECF 261-9,

45 (2008 PBNDS) (Contract Detention Facilities "shall adopt,

without alteration, the offense categories and disciplinary

sanctions set forth in this section."); ECF 261-8, 39 (2011

PBNDS) ("All facilities shall have graduated scales of

offenses and disciplinary consequences as provided in this

section.").

      ii.      **Plaintiffs' reply**: Plaintiffs concede GEO's response.

77.     The PBNDS authorize up to 72 hours of disciplinary segregation as

punishment for certain offenses in what is designated as the "high moderate" offense

**APP. 382**

category.  Ex L (GEO-MEN 00064221 (2011 PBNDS)); Ex. M (GEO-MEN 00063153

(2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards))

> i. **GEO's response**: Undisputed.

78.     High moderate offenses are also referred to as "300-level" offenses

because the code numbers for these offenses are in the 300s.  Ex. L (GEO-MEN

00064220-21 (2011 PBNDS)); Ex. M (GEO-MEN 00063152-53 (2008 PBNDS)); Ex. N

(GEO-MEN 00063733-34 (INS Standards)); Ex. O. (K. Martin Dep. 75:3-76:15)

> i. **GEO's response**: Undisputed.

79.     "Refus[ing] to clean assigned living area" is among the 300-level

offenses.  Ex. L (GEO-MEN 00064220 (2011 PBNDS)); Ex. M (GEO-MEN 00063152

(2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards))

> i. **GEO's response**: Undisputed.  GEO notes that the sanction
> reads, without alteration, "Refusing to clean assigned living
> area." ECF 261-8 (GEO-MEN 00064220). Plaintiffs have
> incorrectly indicated that they have altered the text.

> ii. **Plaintiffs' reply**: The brackets in the undisputed fact reflect
> that the 2011 PBNDS say "Refusing" and earlier editions of
> the PBNDS say "Refusal."  *See* Plaintiffs' Ex. L, ECF No.
> 261-8 (GEO-MEN 00064220 (2011 PBNDS)); Plaintiffs' Ex.
> M, ECF No. 261-9 (GEO-MEN 00063152 (2008 PBNDS));
> Plaintiffs' Ex. N, ECF No. 261-10 (GEO-MEN 00063733
> (INS Standards)).

80.     The PBNDS list 13 different sanctions that could be applied to a high moderate offense: (1) initiate criminal proceedings; (2) recommend disciplinary transfer; (3) disciplinary segregation up to 72 hours; (4) make monetary restitution; (5) loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.); (6) change housing; (7) remove from program and/or group activity; (8) loss of job; (9) impound and store detainee's personal property; (10) confiscate contraband; (11) restrict to housing unit; (12) reprimand; (13) warning.  Ex. L (GEO-MEN 00064221-22 (2011 PBNDS); Ex. M (GEO-MEN 00063153 (2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards))

i.     **GEO's response**: Undisputed.

81.     The PBNDS provide that incidents involving "high moderate" offenses (i.e., 300-level offenses) shall be sent to a Unit Disciplinary Committee ("UDC").  Ex. L ((GEO-MEN 00064213-14 (2011 PBNDS); Ex. M (GEO-MEN 00063143 (2008 PBNDS)); Ex. N (GEO-MEN 00063721 (INS Standards))

i.     **GEO's response**: Undisputed.

**H.     GEO Places Detainees in Solitary Confinement for Refusing to Clean the Facility.**

82.     At orientation, detainees receive an overview of the Aurora Facility's disciplinary process, including examples of various offenses that could lead to discipline.  Ex. X (GEO_MEN 00052387 (Detainee Orientation Video) at 4-7); *see also* Ex. O (K. Martin Dep. 214:10-215:20 (noting that detainees received the orientation video reflecting the prevailing ICE standards throughout the class period))

**APP. 384**

i.   **GEO's response**: Disputed. GEO disputes that the orientation video provides any information about the types of discipline that may be imposed for any offense. Instead, it provides an overview and refers detainees to their handbook. ECF 262-10, 6.

ii.   **Plaintiffs' reply**: GEO admits the substance of the stated fact and provides no contrary evidence.  It mischaracterizes the stated fact, which refers to "examples of various offenses," and not "the types of discipline that may be imposed for any offense."

83.   One of the specific examples detainees receive of an offense that can lead to discipline is "failure to follow safety or sanitation rules."  Ex. X (GEO_MEN 00052387 (Detainee Orientation Video) at 7)

i.   **GEO's response**: Disputed. GEO's orientation video lists some of the "Low Moderate" offenses from the PBNDS in its orientation video.  ECF 262-10, 8. As an example, the video lists, among others, the ICE prohibited act number 410 "failing to follow safety or sanitation regulations," an offense for which disciplinary segregation is not listed. ECF 261-8, 49.

ii.   **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.

58

**APP. 385**

84.     According to the Aurora Detainee Handbook, if a dormitory officer determines the day room area is not sufficiently clean, he or she can instruct the detainees to clean it, and "[c]ontinued refusal to clean the area will result in further disciplinary action."  Ex. V (GEO_MEN 00040759 (Local Detainee Handbook (2002 version))); Ex. W (PL000047 (Local Detainee Handbook (2013 version)))

      i.   **GEO's response**: Disputed. GEO disputes that the handbook cited by Plaintiffs in support of their motion for summary judgment is applicable to the present case. The handbook cited by Plaintiffs as "Exhibit V" is from February 25, 2002, over two years before the class period and during a period wherein different regulations applied. ECF 262-9 at 46 (GEO_MEN 00040734.  Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case.

The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook)

GEO does not dispute that the 2013 Detainee Handbook contains the following quoted text, which is improperly excerpted in Plaintiffs proffered fact: "If detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit officer of the problem. Action will be taken to resolve this problem. The day room area will be kept clean at all times. Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean the area will result in further disciplinary action." ECF 261-17, 20.

ii.  **Plaintiffs' reply**: The language quoted in Plaintiffs' Undisputed Fact and GEO's Response appears in nearly identical form in every handbook cited by GEO, although some handbooks refer to a "detention officer" and others to a "housing officer," and some refer to the housing unit as a "dorm." *See* GEO Ex. E, ECF No. 273-1 (GEO_MEN 00054887 (Local Detainee Handbook (2005 version))); GEO Ex. F, ECF No. 273-2 (GEO_MEN 00054199 (Local

60

**APP. 387**

Detainee Handbook (2007 version))); GEO Ex. G, ECF No. 273-3 (GEO_MEN 00054240 (Local Detainee Handbook (2008 version))); GEO Ex. H, ECF No. 273-4 (GEO_MEN 00054268 (Local Detainee Handbook (2010 version))); GEO Ex. I, ECF No. 273-5 (GEO-MEN 00056798 (Local Detainee Handbook (2011 version))); *see also* Undisputed Fact No. 63 (citing Local Detainee Handbooks (2002 and 2013 versions)). GEO concedes these handbooks cover the class period. GEO does not substantively dispute this fact.

85.    The UDC has the discretion to choose whether to issue minor sanctions or refer the case to the Institution Disciplinary Panel for more serious sanctions. Ex. L (GEO-MEN 00064213-14 (2011 PBNDS); Ex. M (GEO-MEN 00063143 (2008 PBNDS)); Ex. N (GEO-MEN 00063721 (INS Standards)); Ex. O (K. Martin Dep. 73:12-80:8)

   i.    **GEO's response**: Disputed. The cited material does not provide for the discretion Plaintiffs describe. The 2011 and 2008 PBNDS explicitly state "The UDC Shall . . . refer to the IDP any incident involving a serious violation associated with an A-through-D range sanction. This includes code violations in the "greatest" and 'high' categories (100s and 200s)[.]" ECF 261-8, 41; ECF 261-9, 48[.]

APP. 388

    ii.    **Plaintiffs' reply**: GEO's response does not state any material difference from the fact as stated; this fact is undisputed.

86.    If the UDC chooses to issue sanctions, the UDC staff member has discretion to choose which sanction to issue for the offense based on his or her knowledge and experience.  Ex. O (K. Martin Dep. 77:8-80:8)

    i.    **GEO's response**: Disputed. All individuals participating in the disciplinary process are required to follow the disciplinary severity scale in the PBNDS. ECF 261-10, 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9, 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8, 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.").

    ii.    **Plaintiffs' reply**: Plaintiffs concede the substance of GEO's response.

87.    The UDC has the authority to impose disciplinary segregation as punishment for a 300-level offense.  Ex. O (K. Martin Dep. 76:16-77:1)

    i.    **GEO's response**: Disputed. Only the IDP has the authority to place a detainee in disciplinary segregation. ECF 261-8, 28

(2011 PBNDS); ECF 261-9, 38 (2008 PBNDS); ECF 261-10, 12 (2000 PBNDS).

ii.    **Plaintiffs' reply**: Plaintiffs concede the substance of GEO's response.

88.    GEO placed detainees in segregation many times during the class period for refusing to clean.  Ex. Z (GEO_MEN 00057697, GEO_MEN 00047810, GEO_MEN 00047812-17, GEO-MEN 00065434, GEO-MEN 00065393, GEO-MEN 00065211, GEO-MEN 00065032-33 (disciplinary charges and reports))

i.    **GEO's response**: Disputed. Placement in segregation was rare during the class period. Indeed, Plaintiff Valerga was never sent to segregation for failing to clean, nor did he know of anyone who was. Valerga Dep. 141:24-25, 142:1-2, 140:12-13. Plaintiff Menocal was never placed in segregation for failing to clean. ECF 49-2 ¶ 3. Plaintiff Argueta was never even threatened with segregation. Lourdes Argueta Second Set of Discovery, Interrogatory No. 27. Plaintiff Alexk[h]ina was never even threatened by GEO with segregation for failing to clean. Alexak[h]ina Second Set of Discovery, Interrogatory No. 27. Plaintiff Dagoberto Vizguerra was never placed in segregation, let alone for failing to clean. Dep. 42:5-7. Plaintiff Xahuentitla-Flores did not know anyone who was sent to segregation for the failure to clean,

**APP. 390**

nor was she sent there herself. Xahuentitla- Flores Dep. 70:11-17; 120:16-25; 121:1-15. Ex. R.

    ii.    **Plaintiffs' reply**: GEO does not provide any evidence to rebuts the specific examples of detainees being placed in segregation for refusing to clean.  Its response consists of a different characterization of the frequency of this occurrence, based on incomplete descriptions of the cited witnesses' testimony, which is not at issue in this Motion.

## I.    <u>GEO Has Discretion to Set Wages For the Voluntary Work Program.</u>

89.    GEO determines the types of jobs available in the VWP on a facility-by-facility basis, and the ICE COTR approves them at the facility level.  Ex. A (A. Martin Dep. 120:1-9)

    i.    **GEO's response**: Disputed. Ms. Martin testified that both ICE and GEO determine what type of jobs are available. ECF 261-2, 32 (Amber Martin Dep. 119:6-14).

    ii.    **Plaintiffs' reply**: GEO's response mischaracterizes the cited testimony.  Ms. Martin testified that determination of job assignments is "done at the facility level and approved by ICE COTR at the facility level," as reflected in Plaintiffs' stated fact.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Dep. 119:6-120:9).  For further discussion of the role of the ICE COTR, see Plaintiffs' Undisputed Fact Nos. 40-43.

**APP. 391**

90.     The Contract does not identify how many detainees will participate in the VWP.  Ex. R (A. Martin 30(b)(6) Dep. 72:13-72:25)

> i.   **GEO's response**: Disputed. The Contract provides a line item for the number of VWP shifts it will reimburse at the "actual cost of $1.00 per day," thereby noting an expected number of shifts. ECF 262-2, 8 (GEO_MEN 00019619).
>
> ii.  **Plaintiffs' reply**: GEO's response is not substantively different from the stated fact, which concerns the actual participation rate in the VWP, not the maximum reimbursement.  The contract line item GEO cites is a maximum VWP stipend, not an expected number of shifts: "Reimbursement for this line item will be at actual cost of $1.00 per day per detainee.  The contractor shall not exceed the quantity shown without prior approval by the Contracting Officer."  Plaintiffs' Ex. B, ECF No. 262-2 (GEO_MEN 00019619); *see also* Plaintiffs' Undisputed Fact No. 92.

91.     GEO has the discretion to develop the VWP based on its needs and the availability of detainee labor.  *Id.*

> i.   **GEO's response**: Disputed. GEO must offer a VWP, regardless of the number of individuals who wish to volunteer to participate. ECF 262-2, 32 (2011 contract requiring that GEO offer a VWP as a "specific objective) ECF 261-8, 50

APP. 392

(2011 PBNDS stating that detainees "shall" be given the opportunity to volunteer for work.). Because of this mandatory directive, GEO cannot eliminate the program based upon the unavailability of detainee labor. *Id.* Nor can expand the program beyond what is permitted by ICE. *Id.*

ii.   **Plaintiffs' reply**: GEO's response misrepresents Plaintiffs' undisputed fact and does not provide contrary evidence.  The stated fact does not refer to the existence of the VWP, but to the content of its design.

92.   The 2011 Contract provides that ICE will reimburse GEO $1.00 per day for each detainee working in the VWP.  Ex. B (GEO_MEN 00019616 (2011 Contract)).

i.   **GEO's response**: Undisputed.

93.   GEO pays detainees who work in the VWP at the Aurora Facility $1.00 per day.  Ex. A (A. Martin Dep. 104:23-25); Ex. AA (GEO_MEN 00057594 (Detainee Work Detail Application))

i.   **GEO's response**: GEO does not dispute that detainees who work in the VWP at the Aurora facility are paid $1.00 per day. However, GEO disputes that it pays detainees" as it merely serves as the middleman between ICE and detainees. GEO advances the payment authorized by ICE to detainees

**APP. 393**

and is thereafter reimbursed by ICE for the same. ECF 262-2,

5 (GEO_MEN 00019616).

    ii.    **Plaintiffs' reply**: GEO admits the substance of the stated fact

and provides no contrary evidence.

94.    ICE reimburses its contractors no more than $1.00 per day for work

performed in the VWP.  8 U.S.C. § 1555(d); Appropriations Act, Immigration and

Naturalization Service Salaries and Expenses, Pub. L. No. 95-431, 92 Stat. 1021 (1978)

    i.    **GEO's response**: Undisputed.

95.    ICE does not prohibit its contractors from *paying* more than $1.00

per day for work performed in the VWP.  Ex. A (A. Martin Dep. 106:11-19; 110:10-13);

Ex. L (GEO-MEN 00064347 (2011 PBNDS) (compensation for VWP work is "at *least*

$1.00 (USD) per day" (emphasis added)))

    i.    **GEO's response**: Disputed. The 2000 NDS, with which the

    AIPC was contractually obligated to comply from March 27,

    2003 to April 28, 2010, required GEO to provide

    "compensation" and explicitly directed that "the stipend is

    $1.00 per day, to be paid daily." ECF 261-10, 5 (2000 NDS).

    Likewise, the 2008 PBNDS, with which the AIPC was

    contractually obligated to comply from April 28, 2010 to June

    22, 2013, mandated that "the compensation is $1.00 per day."

    ECF 261-9, 63 (2008 PBNDS). There was no discretion for

    GEO to pay more.

**APP. 394**

ii.     **Plaintiffs' reply**: Disputed. Plaintiffs do not dispute that the 2000 NDS and the 2008 PBNDS state that the compensation for VWP work is $1.00 a day. However, GEO's contracts with ICE require GEO to continually comply with the most current editions of the NDS and PBNDS. ECF 262-5, 12 (GEO_MEN 00059754) (2003 contract); ECF 24-4, 11 (GEO_MEN 00059644) (2006 contract); ECF 262-2 (GEO-MEN 00059848-49) (2011 contract). The 2011 PBNDS were issued on February 27, 2012. Reply Ex. 8 at p. 9 (ICE report re PBNDS).  GEO does not dispute that the 2011 PBNDS states that compensation for VWP work is "at *least* $1.00 (USD) per day." Ex. L (GEO-MEN 00064347) (emphasis added).  In addition, GEO can and does request modifications of the Contract when it needs to.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Tr. 106:8-108:10).  GEO did not request a contract modification to pay detainees more than $1.00 per day.  *Id*. at 105:3-12.

96.     GEO pays detainees more than $1.00 per day at other ICE facilities, including $1.00 to $3.00 per day at its South Texas Detention Facility, $1.00 to $2.50 per day at its Folkston ICE Processing Center, $1.00 to $3.00 per day at its Joe Corley Detention Facility, and $1.00 to $4.00 per day at its LaSalle Detention Facility.  Ex. A (A. Martin Dep. 109:15-110:13); Ex. BB (GEO-MEN 00170339 (VWP Pay Rates))

**APP. 395**

     i.     **GEO's response**: GEO does not dispute that some facilities pay more than $1 per day to detainees. GEO notes that this is not relevant evidence because the contracts at other facilities are not at issue here. The evidence submitted by Plaintiffs does not indicate which version of the PBNDS apply at each facility. Nor does it establish the ICE communications at the other facilities.

     ii.    **Plaintiffs' reply**: GEO admits the substance of the stated fact and provides no contrary evidence.

97.    GEO pays detainees more than $1.00 per day at other facilities to incentivize detainee participation in the VWP, such as when the VWP is "undersubscribed." Ex. F (Ragsdale 30(b)(6) Dep. 155:5-17)

     i.    **GEO's response**: GEO does not dispute that this is one such reason it may work with ICE to pay a higher amount.

98.    In facilities where GEO pays detainees more than $1.00 per day for VWP work, it does so "on [its] own dime." Ex. A (A. Martin Dep. 107:18-22)

     i.    **GEO's response**: Disputed. Ms. Martin did not testify about facilities that would pay more than $1 per day, but instead, provided speculative testimony about how she believed a facility could accomplish paying more than $1.00 per day, testifying "I guess we could do it on our own dime." ECF 261-2, 27.

    ii.      **Plaintiffs' reply**: Ms. Martin went on to testify specifically that at the LaSalle detention facility in Louisiana, where GEO pays as much as $4.00 per day for VWP work, but is only reimbursed $1.00 per day by ICE, the difference in the daily rate is paid by GEO.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Dep. 109:1-112:2 (agreeing that at the LaSalle detention facility GEO opted to pay more than it was getting reimbursed by ICE)).

## II.      RESPONSE CONCERNING ADDITIONAL FACTS

    1.     The United States Congress has delegated to DHS, and its agency ICE, the sole authority to arrange for all aspects of the detention of aliens pending the results of their immigration proceedings. See 8 U.S.C. § 1231(g)(1) ("The [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.")

    i.      **Plaintiffs' response**: Admit that 8 U.S.C. § 1231(g) constitutes one source of the Secretary's detention authority. Dispute that it is the sole source, as other sources include 8 U.S.C. § 1103(a)(A)(11)(A) & (B), and 8 U.S.C. § 1555(d), and dispute that these enactments provide authority for ICE to arrange for "all aspects" of the detention of immigration detainees.  The text and history of 8 U.S.C. § 1555(d) and

**APP. 397**

subsequent appropriations bills withheld funds relating to

specific aspects of the detention of immigration detainees.

2.      In making these arrangements, ICE must consider the use of private

contractors to detain aliens prior to constructing its own facilities. See 8 U.S.C. §

1231(g)(2) ("Prior to initiating any project for the construction of any new detention

facility for the Service, the Commissioner shall consider the availability for purchase or

lease of any existing prison, jail, detention center, or other comparable facility suitable

for such use.").

      i.      **Plaintiffs' response**: Admit

3.      As a result of Congress' directive, ICE neither constructs nor

operates its own immigration detention facilities, Ex. B (Dec. of Tae Johnson), and

therefore its state and private contractors are critical to carrying out the federal function

of immigration detention.

      i.      **Plaintiffs' response**: Dispute.  ICE owns and operates, at

least in part, some of its own facilities, including the Krome

detention center in South Florida.  Reply Ex. 2 (Evans Dep.

48:13-49:6); GEO Ex. B, ECF No. 271-2 (Tae Johnson Decl.

¶ 6) ("The ICE detention system [includes] ICE-owned

facilities known as Service Processing Centers.")  The

evidence GEO provides neither supports the statement that

ICE does not construct or operate its own immigration

detention facilities, nor the statements that it does not do so as

**APP. 398**

"a result of Congress's directive," or that state and private

contractors are "critical."

4. Due to significant fluctuations in the number and location of removable aliens apprehended by DHS and subject to detention, it is important for ICE to maintain flexibility with regard to its immigration detention facilities. Otherwise, ICE could invest heavily in its own facilities only to have them stand idle if a particular geographic area later experiences a drastic decrease in demand for detainee housing. Ex. B.

      i. **Plaintiffs' response**: Admit.

### A.   <u>GEO's Contracts with ICE</u>

5. Consistent with this overall policy, ICE chose to contract with the AIPC to detain aliens pending the resolution of their immigration proceedings. ECF 260 at 2 (Plaintiffs' Undisputed Facts # 3, 4, and 5). GEO owns and operates the AIPC, and has operated it pursuant to a series of direct contracts between GEO and ICE. *Id.* (Plaintiffs' Undisputed Fact # 5). ICE is authorized by DHS and Congress to enter into these contracts. *See*, *e.g.*, 8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g).

      i. **Plaintiffs' response**: Admit.

6. All immigration detention processing centers, including the AIPC, must adhere to ICE's standards. In 2000, the Immigration and Naturalization Service ("INS"), ICE's predecessor, adopted the original National Detention Standards (the "2000 NDS"). ICE promulgated subsequent versions of the PBNDS in 2008 (the "2008 PBNDS"), and 2011 (later updated in 2016) (the "2011 PBNDS") (the 2000 NDS are

**APP. 399**

located at https://www.ice.gov/detentionstandards/2000; the 2008 PBNDS are located at:

https://www.ice.gov/detentionstandards/2008; the 2011 PBNDS are located at:

https://www.ice.gov/detentionstandards/2011).

> i.      **Plaintiffs' response**: Admit.

7.      In each contract GEO entered into with ICE for the operation of the

AIPC, the 2000 NDS, 2008 PBNDS, or the 2011 PBNDS, as applicable, were

incorporated into the contract and GEO was required to comply with the same. ECF 260

at 7 (Plaintiffs' Undisputed Facts # 25 and 26).

> i.      **Plaintiffs' response**: Admit.

8.      GEO's contract with ICE, number ACD-3-C-0008, required it to

comply with the 2000 NDS from March 27, 2003 to September 28, 2006. ECF 262-5, 12

(GEO_MEN 00059754).

> i.      **Plaintiffs' response**: Dispute.  Plaintiffs admit that GEO's
>
> contract with ICE, number ACD-3-C-0008, required that,
>
> "[u]nless otherwise specified by an authorized INS
>
> representative," GEO "perform in continual compliance *with*
>
> *the most current* editions of the INS Detention Standards and
>
> the American Correctional Association, Standards for Adult
>
> Local Detention Facilities (ACA ALDF)."  Plaintiffs' Ex. D,
>
> ECF 262-5, 12 (GEO_MEN 00059754) (emphasis added).
>
> Plaintiffs admit that the 2000 NDS were the most current

**APP. 400**

edition of the INS Detention Standards during the stated period.

9.      GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, similarly required it to comply with the 2000 NDS. ECF 24-4, 11 (GEO_MEN 00059644); *see also* ECF 260 at 3 (proffering as undisputed the fact that HSCEOP-06-D-00010 was one of GEO's contracts with ICE during the class period); ECF 262-4 (incorporating the 2000 NDS into the contract).

> i.      **Plaintiff's response**: Dispute. GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, does not explicitly incorporate the 2000 NDS.  Plaintiffs admit that GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, required that, "[u]nless otherwise specified by the CO," GEO "perform in accordance with the most current Functional Areas (as outlined in the Performance Requirement Summary), ICE Detention Standards, and American Correctional Association (ACA) Performance-Based Standards for Adult Local Detention Facilities (ALDF)."  Plaintiffs' Ex C., ECF 262-4 (GEO_MEN 00059644).  Plaintiffs admit that the 2000 NDS were the most current ICE Detention Standards at the time the contract was signed.

**APP. 401**

10.     On April 28, 2010, GEO entered into a contract modification with
ICE (HSCEOP-06-D-00010/P00018) which required it to comply with the 2008 PBNDS,
effective immediately. Ex. C; ECF 261-9 (2008 PBNDS).

i.     **Plaintiffs' response**: Admit.

11.     GEO's subsequent contract with ICE, number HSCEDM-11-D-
00003, required it to continue to comply with the 2008 PBNDS. That contract was
effective September 15, 2011. ECF 262-2, 38 (incorporating the 2008 PBNDS into the
contract); *see also* ECF 260 at 3 (proffering as undisputed the fact that HSCEDM-11-D-
00003 was one of GEO's contracts with ICE during the Class Period).

i.     **Plaintiffs' response**: Dispute.  HSCEDM-11-D-00003

incorporated the "DHS/ICE PBNDS (Performance Based

National Detention Standards)," and stated that "a copy of the

current version is obtainable on the internet Website:

http://www.ice.gov/detention-standards/2008/."  The contract

also required that "these constraints may change over time;

the Contractor shall be knowledgeable of any changes to the

constraints and perform in accordance with the most current

version of the constraints." ECF 262-2, 37-38 (GEO-MEN

00019655-56).  The 2011 PBNDS were published on

February 27, 2012, and were thus the "most current" version

of the PBNDS after that date.  Reply Ex. 8 at p. 9 (ICE report

re PBNDS).

**APP. 402**

12.     On May 23, 2013, GEO entered into a contract modification with ICE (HSCEDM-11-D-00003/P00005) agreeing that, effective June 23, 2013, GEO would comply with the 2011 PBNDS. Ex. D; ECF 262-3, 2 (GEO-MEN 00020406; *see also* ECF 260 at 3 (proffering as undisputed the fact that HSCEDM-11-D-00003/P00005 was one of GEO's contracts with ICE during the Class Period).

> i.     **Plaintiffs' response**: Admit. Plaintiffs note that GEO was required to remain aware of and perform in accordance with ongoing changes to the PBNDS under its existing contract, and in fact began implementing changes associated with the 2011 PBNDS long before the contract modification. Reply Ex. 9 (A. Martin 30(b)(6) Dep. 43:23-46:6) (describing an email sent April 4, 2012 that included an attachment regarding the major changes between the 2008 and 2011 PBNDS and explicitly mentioning the new language stating that compensation for VWP work is "at least $1.00").

## B.     The ICE-Mandated Disciplinary Severity Scale

13.     The 2000 NDS and all applicable versions of the PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale. ECF 261-10 at 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8 at 39 (2011

76

**APP. 403**

PBNDS)("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.").

       i.    **Plaintiffs' response**: Admit.

14.    The 2000 NDS and all versions of the PBNDS require GEO to provide notice to detainees, in the local detainee handbook, of the ICE-mandated disciplinary severity scale. ECF 261-10 at 10 (2000 NDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…").

       i.    **Plaintiffs' response**: Admit.

15.    Likewise, the 2000 NDS and all versions of the PBNDS explicitly provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); *see also* ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

       i.    **Plaintiffs' response**: Admit.

16.    The 2000 NDS and all versions of the PBNDS also explicitly provide a disciplinary severity scale that lists "[r]efusing to obey the order of a staff member or officer" as an offense which can be sanctioned by "[d]isciplinary segregation

(up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); *see also* ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

> i.   **Plaintiffs' response**: Admit.

17.   The AIPC's local detainee handbook's disciplinary severity scale does not deviate from the 2000 NDS or the applicable PBNDS. Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook) (Specifically identified in Plaintiffs discovery responses as the basis for their claims); Ex. J, Kevin Martin Dep. 40:21-24 ("Q. Do you know if there's any deviation from between the DB -- excuse me, between the GEO Detainee Handbook and the PBNDS as far as disciplinary requirements? A. Not as far as disciplinary requirements[.]").

> i.   **Plaintiffs' response**: Dispute. The severity scales listed in the GEO handbooks deviate from the NDS and PBNDS. For example, the 2005 Handbook adds additional possible sanctions for "greatest" offenses. *Compare* GEO Ex. E, ECF 273-1 (GEO_MEN 00054894 (Local Detainee Handbook (2005 version))) (listing seven potential sanctions for "greatest" offenses) *with* Plaintiffs' Ex. N, ECF 261-10 (GEO_MEN 00063729 (INS Standards)) (listing four potential sanctions for "greatest" offenses").

**APP. 405**

18.    The 2000 NDS and the applicable versions of the PBNDS provide for the exact graduated scales of offenses and disciplinary consequences for dedicated facilities, such as the AIPC. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS). The graduated scale of offenses (of which detainees must be made aware) are explicitly laid out in the 2000 NDS and the applicable PBNDS, providing GEO no discretion whatsoever to alter the disciplinary severity scale.

    i.    **Plaintiffs' response**: Admit.

19.    As required by the 2000 NDS and the applicable versions of the PBNDS, the disciplinary severity scale is copied verbatim into the local detainee handbook at the AIPC. Ex. J, Kevin Martin Dep. 40:13-16 ("And does the Detainee Handbook lay out these exact rules from the PBNDS for the detainees as far as discipline goes? A: Yes."); 83:17-22 (same).

    i.    **Plaintiffs' response**: Dispute. Kevin Martin's testimony is incorrect; the severity scales listed in the GEO handbooks deviate from the NDS and PBNDS. *Compare* GEO Ex. E, ECF 273-1 (GEO_MEN 00054894 (Local Detainee Handbook (2005 version))) (listing seven potential sanctions for "greatest" offenses) *with* Plaintiffs' Ex. N, ECF 261-10 (GEO_MEN 00063729 (INS Standards)) (listing four potential sanctions for "greatest" offenses").

**APP. 406**

20.     In addition to the disciplinary severity scale, GEO has detailed a Sanitation Procedures document that contains a section entitled "Detainee Sanitation Procedures." ECF 262-8; *see also* ECF 50-4 (the "Sanitation Procedures").

       i.      **Plaintiffs' response**: Admit that ECF 262-8 is a GEO document about Sanitation Procedures; it is entitled "Sanitation Procedures" and is a different document from ECF 50-4, which is a GEO policy describing the Voluntary Work Program.

21.     The Sanitation Procedures sets forth general standards for sanitation that must be followed by both GEO employees and detainees. *Id.* While the sanitation policies for detainees apply to those detainees housed at the AIPC who participate in cleaning tasks through the VWP or by cleaning their living area, ECF 50-1, 9 (Ceja Dep. 29:13-16), the Sanitation Procedures were not developed to assign tasks to specific individuals, but rather to detail the actual process for cleaning and materials and supplies to be used. Ex. J, Kevin Martin Dep. 208:6-11.

       i.      **Plaintiffs' response**: Admit.

22.     The Sanitation Procedures also contain a section detailing the consequences for noncompliance, stating: "The Dormitory/Unit Officer will inspect all living areas daily and report any infraction of these regulations to the immediate supervisor. The officer will notify detainees of unsatisfactory conditions, in cases of continued noncompliance, staff will issue an incident report." ECF 262-8, 4; *see also*

**APP. 407**

ECF 50-4. The Sanitation Procedures do not provide for any other penalty for non-compliance. *Id*.

      i.    **Plaintiffs' response**: Admit.

23.     GEO has never maintained a separate policy or practice of placing a detainee in solitary confinement for the refusal to clean a living area. Ex. K (Amber Martin Dep., 134, 135.).

      i.    **Plaintiffs' response**: Dispute.  GEO maintained a practice throughout the time period covered by this case of requiring detainees to clean the common living areas without pay, and of threatening them with solitary confinement if they did not comply.  GEO's own 30(b)(6) witness admitted the scope of the HUSP, and that solitary confinement was a possible sanction for noncompliance.  Plaintiffs' Ex. P, ECF No. 261-12 (Ceja 30(b)(6) Dep. 36:8-37:9; 84:3-85:15); Reply Ex. 5 (Ceja 30(b)(6) Dep. 79:19-25).  In fact, GEO did impose solitary confinement on detainees who refused to perform HUSP duties.  Plaintiffs' Ex. Z, ECF No. 262-12 (GEO_MEN 00057697, GEO_MEN 00047810, GEO_MEN 00047812-17, GEO-MEN 00065434, GEO-MEN 00065393, GEO-MEN 00065211, GEO-MEN 00065032-33 (disciplinary charges and reports)).  And GEO threatened detainees with solitary confinement on a regular basis when they refused to clean

**APP. 408**

pursuant to the HUSP.  *See, e.g.*, Reply Ex. 10 (Xahuentitla-

Flores Dep. 73:19-74:9; 83:7-19); Reply Ex. 11 (Hernandez-

Ceren Dep. (rough transcript) 70:7-18; 73:21-74:21).

24.   ICE audits GEO to ensure that GEO complies with all requirements

of its contract, including its obligations under the PBNDS. Ex. L.

      i.   **Plaintiffs' response**: Admit that ICE audits GEO to ensure

that it complies with certain requirements of its contract,

including PBNDS obligations, but dispute that these audits

review or capture all such requirements, or all aspects of the

PBNDS.  The audits review specific components of PBNDS

requirements, which are listed on the audit documents

themselves.  *See* GEO Ex L., ECF No. 273-6 (Denver

Contract Detention Facility Annual Review); Reply Ex. 12 at

36:1-38:10 (Ragsdale 30(b)(6) Dep.) (acknowledging that

ICE audits do not cover "the requirement that [detainees]

clean the common areas").

25.   As part of each inspection, each audit reviews compliance with each

PBNDS requirement. *Id.*

      i.   **Plaintiffs' response**: Admit that certain audits review

compliance with PBNDS requirements; however, Plaintiffs

dispute that the audits comprehensively review compliance

with "each" PBNDS requirement.  The audits review specific

**APP. 409**

components of PBNDS requirements, which are listed on the audit documents themselves. *See* GEO Ex L., ECF No. 273-6 (Denver Contract Detention Facility Annual Review); Reply Ex. 12 (Ragsdale 30(b)(6) Dep. 36:1-38:10).

26.　The materials provided to detainees at intake, including the handbook and orientation video, are regularly audited and have passed each audit since 2004. *Id.*

> i.　**Plaintiffs' response**: Admit; however, the audit reviews only whether the orientation includes: "Unacceptable activities and behavior; and corresponding sanctions; How to contact ICE; The availability of *pro bono* legal services, and how to pursue such services; Schedule of programs, services, daily activities, including visitation, telephone usage, mail service, religious programs, count procedures, access to and use of the law library and the general library; sick-call procedures, etc., and the detainee handbook." GEO Ex. L, ECF No. 273-6 (GEO-MEN 00131895 (10/5/2007); GEO_MEN 00014353 (10/22/2009); GEO_MEN 00058413 (10/21/2010); GEO_MEN 00014797 (9/29/2011)).

27.　The audits specifically review intake procedures to ensure that the orientation information provides information about '[u]nacceptable activities and

**APP. 410**

behavior, and corresponding sanctions" as well as the "detainee handbook." *Id.* (GEO-MEN 00131895).

    i.    **Plaintiffs' response**: Admit.

28.    The disciplinary severity scale is audited and has passed each audit since 2004. *Id.*

    i.    **Plaintiffs' response**: Dispute that the "disciplinary severity scale is audited."  The audit reviews whether the facility *has* a "written disciplinary system using progressive levels of reviews and appeals."  GEO Ex. L., ECF No. 273-6 (GEO-MEN 00131936 (10/5/2007); GEO_MEN 00014391 (10/22/2009); GEO_MEN 00058458 (10/21/2010); GEO_MEN 00014843 (9/29/2011); GEO-MEN 00165165 (9/29/2016)); *see also* Additional Fact No. 29.

29.    The audits review whether GEO provides notice of the disciplinary severity scale and have found GEO compliance [sic] based upon a review of its handbooks. *Id.* (GEO-MEN 00131936).

    i.    **Plaintiffs' response**: Admit.

30.    The VWP has been audited each year and has passed each audit since 2004. *Id.*

    i.    **Plaintiffs' response**: Admit.

31.    ICE has not only approved of the disciplinary severity scale but has also acted to implement and enforce the sanctions therein. One of the named Plaintiffs in

**APP. 411**

this case—Demetrio Valerga—explained during his deposition that ICE officers also enforced the ICE sanctions. After claiming that one of GEO's corrections officers told Mr. Valerga that he could be placed in segregation if he did not help clean his own common area, Ex. M, Dep. of Demetrio Valerga, 135:15-137:19, Mr. Valerga then explained that ICE officers woke him up, pulled him out of his housing unit, and spoke to him directly. *Id.* at 138:2-13. During that conversation, ICE officers told Mr. Valerga that he could, in fact, be taken to segregation for refusing to help clean his living area. *Id.* at 138:15-23.[10]

> i.   **Plaintiffs' response**: Admit the events stated above; however, Plaintiffs dispute that the ICE officers onsite at Aurora were authorized to condone acts that deviate from the requirements of the Contract, as GEO's use of the HUSP does.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Dep. 198:22-199:10); Reply Ex. 6 (A. Martin Dep. 81:22-82:13).

## C.   The VWP

32.   The 2000 NDS and all applicable versions of the PBNDS require that GEO provide detainees the opportunity to participate in a VWP. (Plaintiffs' Undisputed Fact #35).

> i.   **Plaintiffs' response:** Admit.

---

[10]   Even after the ICE Officer's warning, Mr. Valerga refused to clean and later refused again several times. *See* Ex. M Dep. of Demetrio Valerga, 139:6-24, 140:2-20. Mr. Valerga was never placed in segregation for refusing to clean. *Id.*

APP. 412

33.     The 2000 NDS, with which the AIPC was contractually obligated to comply from March 27, 2003 to April 28, 2010, required GEO to provide "compensation" and explicitly directed that "the stipend is $1.00 per day, to be paid daily." ECF 261-10, 5 (2000 NDS).

> i.     **Plaintiffs' response**: Admit except for GEO's use of the phrase "directed that," which implies that the quoted statement in the PBNDS is an instruction about how GEO must pay VWP workers, as opposed to a statement about the amount that ICE would reimburse GEO for VWP labor. Plaintiff Ex. A, ECF No. 261-2 (A. Martin Dep. 106:6-107:22).

34.     Likewise, the 2008 PBNDS, with which the AIPC was contractually obligated to comply from April 28, 2010 to June 22, 2013, mandated that "the compensation is $1.00 per day." ECF 261- 9 at 63 (2008 PBNDS).

> i.     **Plaintiffs' response**: Admit that the cited document contains the quoted text; however dispute GEO's statement that this constituted a "mandate[]," as opposed to a statement about the reimbursement offered from ICE to GEO.  GEO paid more than $1.00 a day to detainees at other ICE facilities, including paying up to $3.00 a day to detainees at its South Texas Detention Facility in 2009, and was therefore well aware that higher pay was an option.  Reply Ex. 13 (South

86

**APP. 413**

Texas 2009 detainee pay).  In addition, GEO can and does request modifications of the Contract when it needs to. Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Tr. 106:8-108:10).  GEO did not request a contract modification to pay detainees more than $1.00 per day.  *Id*. at 105:3-12.

35.    Beginning on June 23, 2013, AIPC was bound by the 2011 PBNDS, which state that participants in the VWP will be compensated with "at least $1.00 (USD) per day." ECF 261-8 at 53 (2011 PBNDS). Thus, the "at least" language upon which the VWP Class relies was not implemented at the AIPC until approximately halfway through the VWP Class Period.

i.    **Plaintiffs' response**: Admit the quoted content of the document, and that the 2011 PBNDS was incorporated into the Contract on June 23, 2013.  Plaintiffs do not agree with GEO's implication that the option to pay more than $1 per day did not exist prior to it formally agreeing to incorporate portions of the 2011 PBNDS into its contract.  GEO had an obligation under the relevant contract to be "knowledgeable of any changes to the [PBNDS] and perform in accordance with the most current version of the [PBNDS]." *See* Response to Additional Fact ¶ 11.  In addition, GEO can and does request modifications of the Contract when it needs to. Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Tr. 106:8-

**APP. 414**

108:10).  GEO did not request a contract modification to pay

detainees more than $1.00 per day.  *Id*. at 105:3-12.

36.     Before the 2011 PBNDS were implemented at the AIPC, GEO paid

the amount it was explicitly directed by ICE to pay to VWP participants: $1.00 per day.

(Plaintiffs' Undisputed Fact #93).

> i.     **Plaintiffs' response**: Admit that GEO paid VWP participants
>
> $1.00 prior to the implementation of the 2011 PBNDS;
>
> dispute that ICE "explicitly directed" GEO to pay this
>
> amount.

37.     Thereafter, GEO continued to pay members of the VWP Class $1.00

per day the minimum payment explicitly permitted by the 2011 PBNDS. (Plaintiffs'

Undisputed Fact #93).

> i.     **Plaintiff's response**: Admit.

**D.    <u>Plaintiffs' Allegations</u>**

38.     Plaintiffs allege that the PBNDS disciplinary severity scale forms the

basis of their TVPA claim. ECF 50-3, 25; *see also* Ex. N (Plaintiffs' Sixth Supplemental

discovery responses).

> i.     **Plaintiffs' response**: Dispute.  Plaintiffs allege that GEO
>
> misused the disciplinary scale in the PBNDS by applying it to
>
> work that the PBNDS did not authorize.

**APP. 415**

39.     Plaintiffs claim that the Sanitation Procedures, when read together with the ICE-mandated disciplinary severity scale, violate the TVPA. *Id.*

>    i.   **Plaintiffs' response**: Dispute.  Plaintiffs allege that GEO misused the disciplinary scale in the PBNDS by applying it to work that the PBNDS did not authorize.

40.     Plaintiff Menocal was never threatened by a GEO employee with disciplinary or administrative segregation for the refusal to clean his living area. Ex. O (Plaintiffs' Second discovery responses Interrogatory No. 27). Rather, the only "threat" Menocal alleges was through the local AIPC detainee handbook and orientation video, which explained ICE's PBNDS disciplinary severity scale. Ex. N (Interrogatory No. 39).

>    i.   **Plaintiffs' response**: Admit that Plaintiff Menocal was never personally threatened by a GEO employee in this manner; however, GEO guards told Menocal that other detainees had been sent to solitary confinement for refusing to clean, and he observed detainees being sent to solitary confinement on such occasions.  Reply Ex. 14 at p. 4 (Pl. Alex Menocal's Responses and Objections to Defendant's Second Set of Written Discovery).

41.     The other named Plaintiffs likewise claim that ICE's PBNDS-mandated disciplinary severity scale in the local AIPC detainee handbook, as well as the same information provided to them during their AIPC orientation forms the basis for their TVPA claims. Ex. N; Ex. O.

**APP. 416**

    **i.**    **Plaintiffs' response**: Dispute.  While Plaintiffs allege that the information in the AIPC handbook and orientation video form a part of GEO's "scheme, plan, or pattern intended to cause" the Class Members to work without pay, their claims are also based on the threats of solitary confinement that they either received or observed being directed by GEO guards to detainees.  Reply Ex. 15 at p. 4 (Pl. Grisel Xahuentitla Flores' Responses and Objections to Defendant's Second Set of Written Discovery); Reply Ex. 16 at p. 4 (Pl. Lourdes Argueta's Responses and Objections to Defendant's Second Set of Written Discovery).

42.    In sum, Plaintiffs' TVPA claim is limited to the allegation that detainees cleaned their living areas "in order to avoid solitary confinement" or "segregation." ECF 47 at 7 (Plaintiffs' Class Certification Motion); *see also* ECF 1 at ¶¶ 6, 73 (Plaintiffs' Complaint).

    i.    **Plaintiffs' response**: Dispute; while GEO's threats of solitary confinement were the principal means by which it violated the TVPA, detainees cleaned their living areas both to avoid solitary confinement and to avoid the possibility of adverse consequences for their immigration proceedings.  Reply Ex. 11 (Hernandez-Ceren Dep. (rough transcript) 160:7-18).

**APP. 417**

43.     Plaintiffs' claims do not rest on every single time they cleaned their living area, but rather, only those instances where cleaned up the tables in their living areas after meals.

      i.     **Plaintiffs' response**: Dispute.  There is no evidence cited for this statement, which appears to be an argumentative and inaccurate re-casting of Plaintiffs' claims.  Plaintiffs' claims allege recovery for all work performed under the HUSP.

44.     The basis for Plaintiffs' unjust enrichment claim is that GEO was unjustly enriched by paying only $1.00 per day for completion of their VWP tasks. ECF 49 at 3.

      i.     **Plaintiffs' response**: Admit.

**III.     The Undisputed Record Demonstrates that GEO Designed and Implemented the HUSP and VWP with Minimal Substantive Oversight from ICE.**

    **A.     <u>Derivative Sovereign Immunity Applies Only Where the Government Directed the Alleged Violation.</u>**

GEO's defense to summary judgment fundamentally misunderstands the law of derivative sovereign immunity.  For the government's sovereign immunity to attach to a private contractor, it is not enough that the contractor does not explicitly *violate* its contract with the federal government, *see* Opposition at 19, and GEO provides no legal authority for this proposition.  Certainly, acts that violate a government contract would not enjoy derivative sovereign immunity – and GEO did violate the terms of its contract, as argued in Part III.B below – but even acts that are not prohibited by a contract do not enjoy sovereign immunity unless they constitute one of those "special circumstances"

**APP. 418**

where "the government has directed a contractor to do the very thing that is the subject of the claim." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001); *see also In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.* ("*In re OPM*"), 928 F.3d 42, 71 (D.C. Cir. 2019) (noting that sovereign immunity is intended "to prevent the contractor from being held liable when the government is actually at fault but is otherwise immune from liability" (quoting *In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 560 (S.D.N.Y. 2006)).

GEO ignores this precedent, instead attempting to argue that ICE authorized its unlawful practices by delegating to GEO the authority to design them. *See* Opposition at 3, 18 n.8. In support of this position, it cites only to *Cunningham v. General Dynamics Information Technology, Inc.*, 888 F.3d 640, 647-49 (4th Cir. 2018), which does not support GEO's argument. As discussed in greater detail in Plaintiffs' Motion, *Cunningham* reflects that derivative sovereign immunity applies when the government *explicitly directs* the specific acts being challenged in a lawsuit against the contractor who implemented them. *See* Motion at 26-27. Nowhere does it state, as GEO claims, that "governmental immunity was precluded *only* where a contractor violates its contract with the federal government," *see* Opposition at 19 (emphasis added; no pincite provided), although that is one example of a situation where derivative sovereign immunity does not apply. As *Cunningham* itself recognizes, derivative sovereign immunity also does not apply when a contractor performs "acts 'over and beyond acts required to be performed'" by the government contract – *i.e.*, when the contractor's liability stems from acts that were neither required nor prohibited by the contract, but

**APP. 419**

were performed by the contractor in carrying out its duties.  888 F.3d at 647 (quoting *Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963)).  In fact, the court in *Nwauzor v. GEO Group, Inc.*, No. 17 Civ. 5769, 2020 WL 1689728, (W.D. Wash. Apr. 7, 2020), rejected this exact argument in denying GEO's motion for summary judgment on derivative sovereign immunity as to its VWP program because "GEO has not shown that it had 'no discretion in the design process and completely followed government specifications.'"  *Id.* at *9 (quoting *Cabalce v. Thomas E. Blanchard & Associates, Inc.*, 797 F.3d 720, 732 (9th Cir. 2015)).

**B.   The HUSP and its Corresponding Punishment Scheme Was GEO's Own Invention.**

Of course, GEO *did* violate its contract with ICE, because the HUSP does not comply with any version of the PBNDS.  GEO cannot enjoy derivative sovereign immunity as to Plaintiffs' TVPA claim for this reason alone.  GEO's opposition entirely ignores this problem, and focuses instead on the irrelevant argument that ICE mandated the disciplinary severity scale incorporated into GEO's policies.  In service of this strategy, GEO attempts to bury the Undisputed Facts establishing the core contention of Plaintiffs' Motion: that the scope of the cleaning GEO required under the HUSP went far beyond the limited personal housekeeping permitted under the PBNDS, and by doing so explicitly violated ICE directives against unpaid labor.

The PBNDS provide explicitly that "[w]ork assignments are voluntary." Statement of Undisputed Facts ("SUF") ¶ 36.  The sole exception to this rule is "personal

**APP. 420**

housekeeping," which the PBNDS defines as requiring detainees to "maintain their immediate living areas in a neat and orderly manner by:

1. making their beds daily;

2. stacking loose papers;

3. keeping the floor free of debris and dividers free of clutter; and

4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture."

*Id*.  In contrast to these limited requirements, GEO requires detainees to perform extensive janitorial labor under the HUSP, which imposes a "common obligation to clean . . . the communal areas," and "clean up the tables, wipe down the tables, and sweep and mop the floors" in the common dining area, and to clean the shared dorm showers.  *Id*. ¶¶ 48-49; 66.

GEO's conclusory arguments that the HUSP falls within the definition of personal housekeeping, and that it was therefore *required* to threaten detainees with solitary confinement for refusing to clean, are entirely unsupported by the Undisputed Facts.  For example, GEO argues without citation that "[t]here is no question that the entirety of where a detainee lives and sleeps is his or her 'living area,'" (excluding the word "immediate" that appears in the PBNDS) and – stretching credulity even further – argues that mopping floors is the same thing as "keeping them free from clutter."  Opposition at

**APP. 421**

26.[11]  These readings push the definition of "personal housekeeping" beyond its logical limits and well into the absurd.  Refraining from pouring milk or crumbs on the floor of one's cell is one thing; mopping pieces of other peoples' food off the floor of a dining room is something different.[12]  The PBNDS explicitly require that detainees do only the former, and explicitly *prohibit* GEO from requiring detainees to do the latter.  *See* Plaintiffs' Reply re SUF ¶ 52 (citing, at Reply Ex. 17, p. 6, the DHS OIG's conclusion that "requiring detainees to clean common areas used by all detainees is in violation of ICE standards, as detainees are only required to clean their immediate living area.").

Because refusing to participate in the extensive work required by the HUSP is distinct from "[r]efus[ing] to clean assigned living area" in the specific respects allowed by the PBNDS, it is not a 300-level offense.  *See* SUF ¶ 79; *see also* Additional Fact ¶ 15.[13]  And because an order to participate in the HUSP itself violates the PBNDS,

---

[11]    Even if this were a plausible understanding of how housekeeping works, the PBNDS require that detainees keep only *dividers* – not floors – free from clutter.  SUF ¶ 36.

[12]    The case law that GEO cites to support its proposition that compulsory cleaning work is permissible in civil detention is entirely inapposite, as it all addresses whether prisoners in pretrial detention can be required to perform housekeeping tasks under the United States Constitution.  *See Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978) (not reflecting the quote GEO attributed to it in is briefing and addressing claims only under the First, Fifth, Eighth, and Thirteenth Amendments); *Weaver v. Petray*, No. 08 Civ. 5195, 2010 WL 909589, at *6 (W.D. Ark. Mar. 11, 2010) (addressing Eighth Amendment claim); *Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993) (addressing Thirteenth Amendment claim).  Plaintiffs have not brought constitutional claims in this case.  Moreover, inmates in pretrial detention facing possible conviction for a crime are differently situated than immigrants in civil detention.  *See, e.g.*, *In re Kumar*, 402 F. Supp. 3d 377, 384 (W.D. Tex. 2019) (distinguishing immigration detention "from even pre-trial detention, where there is a possibility of incarceration").

[13]    GEO argues unpersuasively that the disciplinary infraction for "[r]efus[ing] to clean assigned living area" should be read separately from, and more broadly than, the

**APP. 422**

refusing to obey such an order is also not a sanctionable offense. *See* Additional Fact ¶ 16. The fact that ICE authorized solitary confinement for certain defined 300-level offenses is not *carte blanche* – much less a specific directive – to use the same punishment to enforce GEO policies that deviate from the PBNDS. *Cf. Montoya v. City of Albuquerque*, No. 03 Civ. 0261, 2004 WL 3426436, at *5 (D.N.M. May 10, 2004) ("A police officer cannot give an unlawful order and then base probable cause for an arrest on a citizen's refusal to obey that unlawful order."). ICE's specific disciplinary standards do not confer sovereign immunity if GEO places people in solitary confinement for any conceivable violation of any rule GEO might invent, much less one that violates ICE directives.[14]

Moreover, even if the Court were to conclude that refusing to participate in the HUSP were a 300-level offense, GEO does not and cannot argue that ICE ever specifically *directed* the use of solitary confinement for any given offense. Rather, the Undisputed Facts show that ICE allows but does not direct solitary confinement as a sanction for 300-level offenses. SUF ¶ 80; *see Salim v. Mitchell*, 268 F. Supp. 3d 1132,

---

section of the PBNDS that delineates the housekeeping tasks that detainees may be required to perform. *See* Opposition at 27 n.16. This reading does not make sense, as it would allow guards to place detainees in solitary confinement for refusing to perform work that the PBNDS explicitly states must be voluntary.

[14] Because Plaintiffs do not contest that ICE required the disciplinary severity scale, whether and when the disciplinary severity scale was incorporated into the Detainee Handbook is immaterial. *See* Opposition at 37-38 (arguing that Plaintiffs' Motion for fails because one of the handbooks Plaintiffs cited was from 2002 and did not incorporate ICE's disciplinary severity scale). GEO has not alleged and cannot allege that the material terms from the Handbooks that are cited in Plaintiffs' Undisputed Facts varied throughout the relevant time period. *See* SUF ¶¶ 63-66.

1150 (E.D. Wash. 2017) (derivative sovereign immunity did not apply where defendants did not act "merely and solely as directed by the Government," because they "had a role in the design of the [challenged] Program, trained interrogators for the Program, and exercised some discretion in the application of the Program."). The PBNDS also limits the use of solitary confinement regardless of the offense level to circumstances where it is necessary "to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility." SUF ¶ 69. Therefore, GEO cannot argue that it was simply complying with the contract when it threatened detainees with solitary confinement for refusing to clean under the HUSP.

Finally, GEO's argument that only the means used to obtain labor matters for a TVPA claim, and not the type of labor obtained, *see* Opposition at 27, misapprehends the nature of Plaintiffs' Motion. Plaintiffs are not seeking summary judgement on the merits of their claim; whether GEO used force, threats of force, or an abuse of legal proceedings to obtain detainee labor will be decided by a jury at trial. Plaintiffs' Motion seeks summary judgment only on the issue of whether GEO can hide behind derivative sovereign immunity or the government contractor defense to avoid liability. If Plaintiffs can show that the design and implementation of the HUSP, including the scope of labor performed, exceeded GEO's authority under its contract with ICE – and Plaintiffs have done so – then Plaintiffs prevail on summary judgment.

C.   **The COTR and ICE Audits Provided Limited Monitoring of GEO's**
   **Implementation of Specific Contractual Requirements.**

GEO fundamentally mischaracterizes ICE's role in directing its development of

the HUSP and the VWP.  As set forth in Plaintiffs' Undisputed Facts, GEO's facility-

level policies are developed and amended as needed by local GEO employees, not by

ICE.  SUF ¶¶ 40-41.  With respect to the HUSP, ICE has explicitly stated in a declaration

that the HUSP was not required by the contract between GEO and ICE; rather, it was a

"GEO policy, created by GEO."  SUF ¶ 54.

GEO attempts to muddy the waters by noting that an ICE representative, the

Contracting Officer's Technical Representative, signed off on GEO policies.  See SUF ¶¶

40-43, 89.  It also argues that GEO's policies were audited yearly by third-party auditors

who largely found them compliant.  Additional Facts ¶¶ 24-30.  But even taken as true,

neither of these facts establish that ICE had any role in directing the policies at issue in

this case.  The COTR "is designated to coordinate the technical aspects of this contract

and inspect items/services/invoices furnished hereunder."  See Reply to SUF ¶ 19 (citing

GEO_MEN 00019652).  However, the COTR "will not be authorized to change any

terms and conditions of the resultant contract."  Id.  "To be valid, technical direction by

the COTR [m]ust be consistent with the general scope of work set forth the [sic] in this

contract[, and m]ay not constitute new assignment of work nor change the expressed

terms, conditions or specifications of this contract . . . ."  Id.  This renders the COTR

powerless to authorize the HUSP, which is contrary to the PBNDS (and therefore, the

Contract).

**APP. 425**

Moreover, the evidence GEO cites does not support its claim that the COTR helped develop the policies Plaintiffs challenge – rather, that evidence is consistent with the COTR's limited inspection role described above. GEO's 30(b)(6) representative Daniel Ragsdale testified that GEO develops local policies at the facility level, and the COTR "review[s] and clear[s]" them once the policies are completed. SUF ¶¶ 40-42. That does not constitute the kind of active government direction that confers sovereign immunity. See, e.g., *Cabalce*, 797 F.3d at 732 (holding that derivative sovereign immunity "is limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications.'"). And even if there were evidence that the COTR helped GEO develop the challenged policies, that would not confer immunity, as the contract makes clear that policies that "constitute new assignment of work" or change the "terms, conditions or specifications of this contract" are beyond the COTR's authority. See Reply to SUF ¶ 19. Thus, GEO cannot rely on the COTR's approval as the basis for its argument that ICE directed the violations Plaintiffs seek to prove at trial.

Meanwhile, the audits GEO cites are cursory checklists, and none of the audits from within the class period make any mention of the specific policies at issue in this action. For example, the audit form GEO relies on to argue that "[t]he disciplinary severity scale is audited and has passed each audit since 2004" requires simply that "[t]he facility has a written disciplinary system using progressive levels of reviews and appeals" to get a passing grade. Additional Fact 28. And the VWP audit forms from within the class period make no mention of the rate of pay for VWP workers or the types of work

**APP. 426**

performed.  Additional Fact No. 30, GEO Ex. L, ECF No. 273-6 (GEO-MEN 0013923

(2007 audit); GEO_MEN 00014378 (2008 audit); GEO_MEN 00058508 (2010 audit);

GEO_MEN 00014908 (2011 audit)).15  Instead, the audit forms ask only general

questions such as, "Does the facility have a voluntary work program?" and "Detainee

housekeeping meets neatness and cleanliness standards."  Id.  These audits do not even

reach the policies Plaintiffs challenge in this lawsuit, much less require GEO to adopt

them.  And, as Plaintiffs set forth in the Motion, the scope of unpaid housekeeping work

that the HUSP required was not even evident on the face of GEO's formal written policy

documents.  Motion at 32.  Accordingly, even if the audits had required a substantive

review of the portions of the policies relevant to Plaintiffs' claims, a passing score would

not have indicated ICE's knowing participation in the alleged scheme.

　　　GEO concedes that derivative sovereign immunity is governed by the Supreme

Court's opinion in Campbell-Ewald, which reiterated the principle that derivative

sovereign immunity attaches to contractors who "simply performed as the Government

directed."  136 S. Ct. at 673.  Notably, the Campbell-Ewald Court held that the

contractor's use of phone numbers that were barred under the Telephone Consumer

Protection Act in a text message campaign was not subject to derivative sovereign

immunity because the selection of those specific phone numbers was not "authorized and

---

15       Exhibit L includes an excerpt from a September 29, 2016 audit that includes the
item: "Detainees shall receive monetary compensation for work completed in accordance
with the facility's standard policy of *at least* $1.00 (USD) per day."  GEO Ex. L, ECF
No. 273-6 (GEO-MEN 00165238) (emphasis added).  Not only is this audit from nearly
two years after the end of the class period in this case, but it clearly does not direct GEO
to pay only $1.00 per day for VWP work.  *See infra*, Section IV.

**APP. 427**

directed" by the government (specifically, the Navy).  Id. at 673-74.  And yet, a review of the district court record in that case demonstrates that the Navy "worked closely with [Campbell-Ewald] on the Navy's May 2006 text message recruiting campaign, and provided Navy oversight and approval."  *Gomez v. Campbell-Ewald Co.*, No. 10 Civ. 2007, 2013 WL 655237, at *2 (C.D. Cal. Feb. 22, 2013).  The Navy approved both Campbell-Ewald's text messaging plan and its use of the subcontractor that ultimately provided the unauthorized phone numbers to whom texts were sent.  Id.

The facts here bear substantial parallels to the facts in Campbell-Ewald: as in that case, ICE provided some level of "oversight and approval" as to the policies GEO developed.  2013 WL 655237, at *2.  And, as in that case, the specific practices for which Plaintiffs seek a recovery were GEO's alone.  These parallel facts compel a parallel result: GEO is liable for its legal violations, and ICE's oversight cannot shield it.

### D.   GEO Had Discretion Throughout the Class Period to Pay VWP Workers More Than $1.00 A Day

GEO does not dispute that the 2011 PBNDS, which require VWP workers to be paid "at least" $1 per day, were binding on it after May 23, 2013.  *See* GEO's Fact No. 12.  Its argument for derivative sovereign immunity falls apart in the face of this language, as this Court and every other court to have considered the defense have held. *See Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1135 (D. Colo. 2015) (holding that derivative sovereign immunity did not apply because GEO was not "*prohibit[ed]* . . . from paying detainees in excess of $1/day"); *Nwauzor v. GEO Grp., Inc.*, No. 17 Civ. 5769, 2020 WL 1689728, at *8-9 (W.D. Wash. Apr. 7, 2020) (denying GEO's motion for

**APP. 428**

summary judgment on derivative sovereign immunity and noting that "GEO has, in the past, paid workers more than $1 a day and has the ability to, and has requested, changes to the contracts"); *cf. Novoa v. GEO Grp., Inc.*, No. 17 Civ. 2514, 2018 WL 4057814, at *3 (C.D. Cal. Aug. 22, 2018) (noting that GEO's derivative sovereign immunity defense hinged on what "discretion GEO had, if any, in implementing and administering the Work Program").  The underlying legal argument GEO makes in support of this position – that derivative sovereign immunity only applies where a contractor violates a contract – is simply incorrect.  *Supra* Section III.A.  And indeed, GEO appears to concede that this Court's prior ruling governs at least the period that the 2011 PBNDS were in effect.  *See* Opposition Br. at 34 ("[T]he Court previously had available to it only the language of the 2011 PBNDS.").

GEO's primary argument with respect to the period prior to May 23, 2013 is that it was required to comply with the 2008 version of the PBNDS, which lacked the "*at least*" language, and therefore it had no discretion to pay VWP workers more than $1.00 per day.  This is wrong.  GEO's contract states that it incorporates "[t]he DHS/ICE PBNDS (Performance Based National Detention Standards)," and then provides that "a copy of the current version is obtainable on the internet Website: http://www.ice.gov/detention-standards/2008/."  Additional Fact No. 11.  The contract also states that "these constraints may change over time; the Contractor shall be knowledgeable of any changes to the constraints and perform in accordance with the most current version of the constraints."  *Id*.  At the time the 2011 Contract was executed, the 2008 version of the PBNDS was the most recent version.

**APP. 429**

In February 2012, however, the 2011 PBNDS were published. Additional Fact ¶ 11. While full compliance with the 2011 PBNDS was not explicitly incorporated into GEO's contract until May 23, 2013, GEO was on notice of the 2011 PBNDS in early 2012 at the latest, and was well aware of the new language regarding the VWP work. See Plaintiffs' Response Additional Fact ¶ 12. There is no support for the interpretation GEO urges, that it was not permitted to comply with the 2011 PBNDS until the formal contract modification. In fact, GEO began to discuss and implement changes right away. *Id.*

Moreover, Plaintiffs dispute GEO's contention that its contract prohibited it from paying more than $1.00 per day prior to the release of the 2011 PBNDS. Although the "at least" language did not appear in the PBNDS until 2011, the 2008 PBNDS stated that compensation was $1.00 per day but did not forbid payment at a higher rate. SUF ¶ 95. And at least one other GEO-operated detention processing center, the South Texas Detention Facility, paid detainees as much as $3.00 per day for VWP work as far back as 2009. *See* Additional Fact ¶ 34. Therefore, at least two years prior to the start of the class period and during the period in which the 2008 PBNDS were in effect, ICE permitted payments under the VWP of more than $1.00 per day, and GEO could and did make higher payments at other facilities. *Id.* It never even tried to do the same at Aurora. *Id.*

**APP. 430**

## IV.   GEO's Arguments Under the Government Contractor Defense Fail for The Same Reasons As Its Derivative Sovereign Immunity Arguments.

GEO's attempt to avoid summary judgment under the government contractor defense fares no better than its attempts to avoid summary judgment for its derivative sovereign immunity defense.[16]  As noted in Plaintiffs' Motion, the test for government contractor immunity – as applied in products liability cases – has three prongs, and applies only if "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).  In *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090 (10th Cir. 2015), the primary case on which GEO rests its argument, the Tenth Circuit noted that the defense applies "when state law [is] contrary to a contract term actually selected by the federal agency (a 'discretionary' decision)." *Id*. at 1098.  With respect to the contract at issue in *Helfrich*, the court found that the state law under which the plaintiff had brought her case "outright forbids [the defendant] from fulfilling its contractual obligation," which meant that the government contractor defense applied. *Id*. at 1099.  The *Helfrich* court also found that

---

[16]    GEO does not appear to disagree that the government contractor defense is unavailable as to Plaintiffs' TVPA claims.

APP. 431

there was a "strong federal interest in uniformity that is undermined by allowing state law to override the subrogation and reimbursement requirements of the federal contract." *Id.*

GEO faces no such conundrum here. As set forth above and in Plaintiffs' Motion, it is entirely possible for GEO to comply with its contract with ICE and also pay workers in the VWP an amount that is consistent with Colorado common law. *See supra* at Section III; Motion at 33-36. And in fact, ICE itself has rejected GEO's attempt to characterize its liability as stemming from the contract terms themselves, stating instead that GEO's defense of this case is a "defense of its contract performance." SUF ¶ 23. Furthermore, GEO's argument that Plaintiffs' position could lead VWP rates to vary all over the country is both disfavored as a federal interest and unpersuasive in light of the fact that VWP rates already vary. SUF ¶ 96; *see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 88 (1994) (calling an interest in uniformity "that most generic (and lightly invoked) of alleged federal interests").

To the extent that GEO argues that government contractor immunity should apply here because increased costs to the government could result if Plaintiffs prevail on their claims, this argument also fails. First, it is unsupported by the facts. When GEO does pay VWP workers more than $1.00 per day, it does so "on its own dime." SUF ¶ 98; *see also* Additional Fact ¶ 34 (showing, at Reply Ex. 13, separate entries for "ICE Pay" ($1.00) and "GEO Pay" (up to $2.00) for each day of detainee pay). And second, it is unsupported by the law. The Supreme Court itself observed in *Boyle* that the potential for increased costs in government contracting makes contractor tort liability an area of "uniquely federal interest," but that only "establishes a necessary, not a sufficient,

**APP. 432**

condition for the displacement of state law" and "does not . . . end the inquiry." *Boyle*, 487 U.S. at 507. *Boyle* rejected the idea that the possibility of increased costs *per se* compelled the application of the government contractor defense, noting that adoption of that rule would result in an overly broad ban on *all* claims against government contractors. *Id.* at 510 (rejecting the reasoning of lower courts that extended the government's blanket immunity to private contractors on the basis that allowing some contractor liability "would be added to the price of the contract"); *see also In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 631 (2d Cir. 1990) ("Although the desire to limit pass-through costs motivated the Court's decision in *Boyle* . . . it is not the dispositive consideration." (internal citation omitted)).

Finally, GEO again attempts to ignore that this Court has already concluded that the government contractor defense does not apply, because "there is no 'significant conflict' between a federal interest and state law as required for the assertion of the government contractor defense." *Menocal*, 113 F. Supp. 3d at 1135. Moreover, as the Court noted, "the contract specifically contemplates that the Defendant will perform under the contract in accordance with '[a]pplicable federal, state and local labor laws and codes.'" *Id.* As Plaintiffs establish above, this was the case throughout the VWP class period. [17] Therefore, GEO cannot rely on the government contractor defense.

---

[17]     Other than *Helfrich*, the only case GEO cites in support of its argument on the government contractor defense, *Glassco v. Miller Equip. Co., Inc.*, 966 F.2d 641 (11th Cir. 1992), is inapposite. *Glassco* is out-of-circuit and involved a failed tool belt that conformed to government specifications that exceeded 11 pages in length, plus detailed drawings. *Id.* at 643. In that context, the court held that "the mere fact that the figures for width and thickness are designated as minimums does not render the specifications

**APP. 433**

## V.   CONCLUSION

Despite GEO's best efforts, it cannot point to any explicit governmental command that it use threats of solitary confinement to force immigration detainees to work well beyond the limited "personal housekeeping" requirements of the PBNDS.  Nor can it identify such a command requiring it to pay only $1.00 per day for other work.  This leaves GEO unable to establish the core elements of its immunity defenses, and warrants summary judgment in Plaintiffs' favor. [18]

---

imprecise," and that "the contractor was required to conform to the width and thickness dimensions and in fact did so."  *Id.*  GEO has not made and cannot make any comparable showing here.

[18]   GEO's cross-motion for summary judgment, made in the course of its opposition brief, violates D.C. Colo. L. Civ. R. 56.1(b) ("A cross motion for summary judgment shall be filed as a separate motion").  The day prior to this filing, GEO filed a separate cross-motion in compliance with the Local Rules.  ECF No. 284.  That motion largely duplicates GEO's showing here, and should be denied for substantially the same reasons that this motion should be granted.  Moreover, GEO's argument regarding the language of the pre-2011 PBNDS implicates the question of whether the authority to pay $1 per day was *ever* "validly conferred" upon GEO.  *Campbell-Ewald Co.*, 136 S. Ct. at 672.  While the fact that GEO paid more than $1 per day at facilities other than Aurora (Additional Fact ¶ 34) calls this into question, and while it has always been questionable whether Congress's 1978 authorization of funds at 8 U.S.C. § 1555(d) conferred any authority upon the executive branch to set rates of pay in private contract detention facilities (*see* Opposition at 29); *see also Chao Chen v. Geo Grp., Inc.*, 287 F. Supp. 3d 1158, 1165-66 (W.D. Wash. 2017) ("Congress could delegate the authority to create a framework regulating detainee wages to ICE, but Defendant has not made this showing . . . . [T]he Voluntary Work Program is an ICE policy with *no preemptive force at law*." (emphasis added)); *Novoa v. GEO Grp., Inc.*, No. 17 Civ. 2514, 2018 WL 3343494, at *4 (C.D. Cal. June 21, 2018) ("Congress' abandonment of such appropriations refutes any reasonable inference that Congress left no room for states to supplement the field."), documents recently produced pursuant to FOIA, *see Stevens v. United States Dep't of Homeland Sec., Immigration & Customs Enf't*, No. 14 C 3305, 2020 WL 1701882, at *1 (N.D. Ill. Apr. 8, 2020)), show unequivocally that ICE itself recognized that it had no such authority given Congress's prerogative to control the expenditure of

**APP. 434**

Dated: New York, NY
       June 26, 2020

Respectfully submitted,

By: */s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
E-Mail: mscimone@outtengolden.com

Rachel Dempsey
Adam Koshkin
**OUTTEN & GOLDEN LLP**
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
E-Mail: rdempsey@outtengolden.com
E-Mail: akoshkin@outtengolden.com

David Lopez
**OUTTEN & GOLDEN LLP**
601 Massachusetts Avenue NW
Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
E-Mail: pdl@outtengolden.com

Alexander Hood
David Seligman
Andrew Schmidt
Juno Turner
**TOWARDS JUSTICE**
1410 High St., Suite 300
Denver, CO 80218
(720) 441-2236
alex@towardsjustice.org
david@towardsjustice.org

---

revenues. Plaintiffs will address this issue at greater length in their opposition to GEO's cross-motion for summary judgment.

**APP. 435**

andy@towardsjustice.org
juno@towardsjustice.org

R. Andrew Free
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
T: (844) 321-3221
Andrew@ImmigrantCivilRights.com

Brandt Milstein
**MILSTEIN LAW OFFICE**
1123 Spruce Street
Boulder, CO 80302
(303) 440-8780
brandt@milsteinlawoffice.com

Andrew Turner
**THE KELMAN BUESCHER FIRM,
P.C.**
600 Grant St., Suite 825
Denver, CO 80203
(303) 333-7751
aturner@laborlawdenver.com

Hans Meyer
**MEYER LAW OFFICE, P.C.**
P.O. Box 40394
Denver, CO 80204
(303) 831-0817
hans@themeyerlawoffice.com

*Class Counsel*

**APP. 436**

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 26, 2020, a copy of the foregoing document was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
E-Mail: mscimone@outtengolden.com

**APP. 437**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02887 JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

     Plaintiffs,

v.

THE GEO GROUP, INC.,

     Defendant.

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S AFFIRMATIVE DEFENSE

---

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................ 1

II.  Plaintiffs' Response to GEO's Proposed Undisputed Material Facts ...................... 1

    A.   ICE's Role in Contracting for Immigration Detention Services..................... 1

    B.   GEO's Contracts with ICE................................................... 4

    C.   GEO's Application of Disciplinary Policies.................................... 9

    D.   The VWP.................................................................. 19

III. Additional Facts that Preclude Summary Judgment in GEO's Favor....................... 22

    A.   The Housing Unit Sanitation Policy. .......................................... 22

    B.   The Voluntary Work Program. ............................................... 25

IV.  ARGUMENT................................................................... 26

    A.   Derivative Sovereign Immunity Does Not Protect Acts
        that the Government Did Not Direct........................................... 26

        1.   GEO's HUSP Required Work Prohibited by ICE. ........................... 30

        2.   ICE Did Not Direct the Dollar-A-Day Pay Rate Under the VWP....... 32

    B.   ICE Has No Authority to Require a $1/day Pay Rate.................................. 35

        1.   Federal Appropriations Law Requires Congress to Specifically
            Authorize Funds for a Given Purpose................................... 36

        2.   ICE Has No Authority to Set the VWP Rate. ............................. 38

    C.   GEO's Arguments Under the Government Contractor Defense Fail for The
        Same Reasons As Its Derivative Sovereign Immunity Arguments. .............. 40

    D.   Overwhelming Evidence Supports Plaintiffs' Contention that GEO's Threats
        of Solitary Confinement Were Intended to Compel Forced Work. .............. 42

V.   CONCLUSION ................................................................ 45

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                          **PAGE(S)**

*In re Aiken Cty.*,
725 F.3d 255 (D.C. Cir. 2013)......................................................... 38

*Alvarado Guevara v. Imm. and Naturalization Serv.*,
902 F.2d 394 (5th Cir. 1990) ......................................................... 40

*Babbitt v. Oglala Sioux Tribal Public Safety Dep't*,
194 F.3d 1374 (Fed. Cir. 1999) ..................................................... 38

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ........................................................................ 41

*California v. Trump*,
379 F.Supp.3d 928 (N.D. Cal. 2019)............................................. 40

*California v. Trump*,
963 F.3d 926 (9th Cir. 2020) ................................................... 37, 40

*Campbell-Ewald Co. v. Gomez*,
136 S. Ct. 663 (2016)............................................................... *passim*

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................ 42

*Chen v. GEO Group, Inc.*,
287 F. Supp. 3d 1158 (W.D. Wash. 2017) ................................... 39

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001) ......................................................................... 26

*Cunningham v. General Dynamics Info. Tech.*,
888 F.3d 640 (4th Cir. 2018) ............................................. 28, 29, 30

*Gomez v. Campbell-Ewald Co.*,
No. 10 Civ. 2007, 2013 WL 655237 (C.D. Cal. Feb. 22, 2013) ............... 28, 29

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
804 F.3d 1090 (10th Cir. 2015) .................................................... 41

*In re KBR, Inc., Burn Pit Litig.*,
744 F.3d 326 (4th Cir. 2014) ........................................................ 28

**APP. 440**

*Main Comm. Health Options v. United States,*
    140 S. Ct. 1308 (2020)..................................................................................36

*Menocal v. GEO Grp., Inc.,*
    113 F. Supp. 3d 1125 (D. Colo. 2015) ................................................33, 34, 42

*Novoa v. GEO Group, Inc.,*
    No. 17 Civ 2514, 2018 WL 3343494 (C.D. Cal. June 21, 2018) ...................39

*Novoa v. GEO Grp., Inc.,*
    No. 17 Civ 2514, 2018 WL 4057814 (C.D. Cal. Aug. 22, 2018) ...............33

*Nwauzor v. GEO Grp., Inc.,*
    No. 17 Civ 5769, 2020 WL 1689728 (W.D. Wash. Apr. 7, 2020) .............33

*In re Office of Pers. Mgmt. Data Sec. Breach Litig.,*
    928 F.3d 42 (D.C. Cir. 2019)......................................................................27

*Office of Pers. Mgmt. v. Richmond,*
    496 U.S. 414 ....................................................................................36, 37, 38

*O'Melveny & Myers v. FDIC,*
    512 U.S. 79 (1994) ......................................................................................41

*Paguirigan v. Prompt Nursing Emp't Agency LLC,*
    No. 17 Civ. 1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) ...............45

*Ramah Navajo Chapter v. Salazar,*
    644 F.3d 1054 (10th Cir. 2011) ........................................................36, 37, 39

*Star–Glo Assocs., LP v. United States,*
    414 F.3d 1349 (Fed. Cir. 2005) ..................................................................36

*U.S. Dep't of Navy v. FLRA,*
    665 F.3d 1339 (D.C. Cir. 2012)..................................................................36

*United States v. Ary,*
    518 F.3d 775 (10th Cir. 2008) ...............................................................33, 34

*United States v. Dann,*
    652 F.3d 1160 (9th Cir. 2011) .........................................................42, 43, 44

*Yearsley v. W.A. Ross Const. Co.,*
    309 U.S. 18 (1940) ................................................................................35, 40

**APP. 441**

**STATUTES**

6 U.S.C. § 542 ...................................................................................................... 1

8 U.S.C. § 1101 .................................................................................................... 2

8 U.S.C. § 1103 .................................................................................................... 1

8 U.S.C. § 1231 ............................................................................................... 1, 2

8 U.S.C. § 1555 ................................................................................ 1, 38, 39, 40

31 U.S.C. § 3729 ............................................................................................... 34

Pub. L. No. 95-431, 92 Stat. 1021 (1978) ........................................................ 40

U.S. Const. art. I, § 9, cl. 7 .............................................................................. 36

U.S. Const. art. II, § 3 ...................................................................................... 39

**RULES**

Fed. R. Civ. P. 56 ............................................................................................. 30

FRE 803 ...................................................................................................... 30, 34

FRE 807 ............................................................................................................ 34

**REGULATIONS**

48 C.F.R. 32.006-1 .......................................................................................... 34

**OTHER AUTHORITIES**

GAO, Principles of Federal Appropriations Law, 4th ed., 2016 rev., GAO-16-464SP
(Washington, D.C.: Mar. 2016) ................................................................... 36

## I.   INTRODUCTION

GEO's motion fails in multiple respects.  It proceeds from a misunderstanding of the law of sovereign immunity, mischaracterizes the facts in the record, and does not satisfy the standard for summary judgment.  It should be denied in its entirety.

## II.   Plaintiffs' Response to GEO's Proposed Undisputed Material Facts

### A.   ICE's Role in Contracting for Immigration Detention Services

1. ICE is a federal agency tasked with enforcing U.S. immigration laws.  6 U.S.C. § 542. ECF 270 at 5 (Material Undisputed Fact #1).

   i.   **Plaintiffs' response**: Admit.

2. The United States Congress delegated to the Department of Homeland Security, and its agency ICE, the sole authority to arrange for all aspects of the detention of aliens pending the results of their immigration proceedings. 8 U.S.C. § 1231(g)(1) ("The [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.").

   i.   **Plaintiffs' response:** Admit that 8 U.S.C. § 1231(g) constitutes one source of the Secretary's detention authority. Dispute that it is the sole source, as other sources include 8 U.S.C. § 1103(a)(A)(11)(A) & (B), and 8 U.S.C. § 1555(d), and dispute that these enactments provide authority for ICE to arrange for "all aspects" of the detention of immigration detainees.  The text and history of 8 U.S.C. § 1555(d) and subsequent appropriations bills show that Congress withheld

**APP. 443**

funds relating to specific aspects of the detention of immigration detainees.

3.    ICE has the authority to detain foreign nationals suspected of entering the United States unlawfully.  8 U.S.C. §§ 1101 *et seq.*; ECF 270 at 5 (Material Undisputed Fact #2).

      i.    **Plaintiffs' response:** Admit.

4.    In making these arrangements, ICE must consider the use of private contractors to detain aliens prior to constructing its own facilities. 8 U.S.C. § 1231(g)(2) ("Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.").

      i.    **Plaintiffs' response:** Admit that ICE is required to consider alternatives to building its own detention centers, and that these may include subcontracts with private entities.  Dispute that the text of 8 USC § 1231(g)(2) requires use of a private subcontractor in every instance, as ICE also enters into contracts with state and local governments.  Plaintiffs' Opp. Ex. 1 (Venturella Dep. 162:13-18).

5.    As a result of Congress' directive, ICE neither constructs nor operates its own immigration detention facilities, ECF 271-2 (Dec. of Tae Johnson, cited as "Ex. B"), and therefore its state and private contractors are critical to carrying out the federal function of immigration detention.

i.  **Plaintiffs' response**: Dispute.  ICE owns and operates, at least in part, some of its own facilities, including the Krome detention center in South Florida. Plaintiffs' Reply Ex. 2, ECF No. 287-2 (Evans Dep. 48:13-49:6); GEO Ex. B, ECF No. 271-2 (Tae Johnson Decl. ¶ 9) ("Service Processing Centers are owned by ICE and staffed by a combination of federal and contract employees.")  The evidence GEO provides does not support the statement that ICE does not construct or operate its own immigration detention facilities, or the statement that it does not do so as "a result of Congress's directive," or the statement that state and private contractors are "critical."  Moreover, ICE could operate detention centers itself if it so desired.  Plaintiffs' Opp. Ex. 1 (Venturella Dep. 190:13-18).

6.  ICE contracts with GEO to house some of its detainees in detention facilities throughout the country.  *See* https://www.geogroup.com/Locations. ECF 270 at 5 (Material Undisputed Fact #3).

i.  **Plaintiffs' response:** Admit.

7.  Among GEO's portfolio of ICE detention facilities is AIPC. ECF 270 at 5 (Material Undisputed Fact #4).

**APP. 445**

i.      **Plaintiffs' response**: Admit.[1]

**B.      GEO's Contracts with ICE**

8.      ICE chose to contract with the AIPC to detain aliens pending the resolution of their immigration proceedings. ECF 270 at 9 (Additional Undisputed Fact #5).

i.      **Plaintiffs' response:** Admit.

9.      GEO owns and has continuously operated AIPC, under contracts with ICE, from October 22, 2004 to October 22, 2014.  ECF 270 at 5 (Material Undisputed Fact #5).

i.      **Plaintiffs' response:** Admit.

10.      A contract between ICE and GEO may be modified during its term by mutual consent of GEO and ICE. ECF 270 at 5 (Material Undisputed Fact #6).

i.      **Plaintiffs' response:** Admit.

11.      All immigration detention processing centers, including the AIPC, must adhere to ICE's standards. In 2000, the Immigration and Naturalization Service ("INS"), ICE's predecessor, adopted the original National Detention Standards (the "2000 NDS").

i.      **Plaintiffs' response:** Admit.

12.      Subsequently, ICE promulgated similar standards in the form of the PBNDS in 2008 (the "2008 PBNDS") and 2011 (later updated in 2016) ("2011

---

[1]      GEO's motion defines "AIPC" to mean the Aurora ICE Processing Center.  Def.'s Mot. 2.

4

**APP. 446**

PBNDS"). (2000 NDS available at https://www.ice.gov/detention-standards/2000; 2008

PBNDS available at: https://www.ice.gov/detention-standards/2008; 2011 PBNDS

available at: https://www.ice.gov/detention-standards/2011).

      i.    **Plaintiffs' response:** Admit.

13.    In each contract GEO entered into with ICE for the operation of the

AIPC, the 2000 NDS, 2008 PBNDS, or the 2011 PBNDS, as applicable, were

incorporated into the contract and GEO was required to comply with the same. ECF 270

at 9-10 (Additional Undisputed Fact #7).

      i.    **Plaintiffs' response:** Admit.  The parties dispute the

mechanism by which the operative version of the PBNDS

were "incorporated" into the contract.  *See* Fact Nos. 14-15,

17-18.

14.    GEO's contract with ICE, number ACD-3-C-0008, required it to

comply with the 2000 NDS from March 27, 2003 to September 28, 2006. ECF 262-5 at

12 (GEO_MEN 00059754).

      i.    **Plaintiffs' response:** Admit.  GEO's contract with ICE,

number ACD-3-C-0008, required that, "[u]nless otherwise

specified by an authorized INS representative," GEO

"perform in continual compliance *with the most current*

editions of the INS Detention Standards and the American

Correctional Association, Standards for Adult Local

Detention Facilities (ACA ALDF)."  Plaintiffs' Ex. D, ECF

**APP. 447**

262-5 at 12 (emphasis added).  The 2000 NDS were the most current edition of the INS Detention Standards during the stated period.

15.     GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, similarly required it to comply with the 2000 NDS. ECF 24-4 at 11 (GEO_MEN 00059644); ECF 260 at 3 (proffering as undisputed the fact that HSCEOP-06-D-00010 was one of GEO's contracts with ICE during the class period); ECF 262-4 (incorporating the 2000 NDS into the contract).

          ii.     **Plaintiffs' response:** Dispute. GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, does not explicitly incorporate the 2000 NDS.  Plaintiffs admit that GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, required that, "[u]nless otherwise specified by the CO," GEO "perform in accordance with the most current Functional Areas (as outlined in the Performance Requirement Summary), ICE Detention Standards, and American Correctional Association (ACA) Performance-Based Standards for Adult Local Detention Facilities (ALDF)."  Plaintiffs' Ex. C., ECF 262-4 at 11. Plaintiffs admit that the 2000 NDS were the most current ICE Detention Standards at the time the contract was signed, but

**APP. 448**

other versions of the PBNDS were published during the term of the above-cited contract.

16.     On April 28, 2010, GEO entered into a contract modification with ICE (HSCEOP06-D-00010/P00018) which required it to comply with the 2008 PBNDS, effective immediately. ECF 270 at 10 (Additional Undisputed #10) (citing ECF 271-3, cited as "Ex. C"); ECF 261-9 (2008 PBNDS).

> i.      **Plaintiffs' response:** Admit.

17.     GEO's subsequent contract with ICE, number HSCEDM-11-D-00003, required it to continue to comply with the 2008 PBNDS. That contract was effective September 15, 2011. ECF 262-2 at 38 (incorporating the 2008 PBNDS into the contract); ECF 270 at 10 (Additional Undisputed Fact #11, #12) (noting Plaintiffs proffer as undisputed the fact that HSCEDM-11-D00003 was one of GEO's contracts with ICE during the Class Period).

> i.      **Plaintiffs' response:** Dispute.  HSCEDM-11-D-00003 incorporated the "DHS/ICE PBNDS (Performance Based National Detention Standards)," and stated that "a copy of the current version is obtainable on the internet Website: http://www.ice.gov/detention-standards/2008/."  The contract also required that "these constraints may change over time; the Contractor shall be knowledgeable of any changes to the constraints and perform in accordance with the most current version of the constraints."  ECF No. 262-2 at 37-38.  The

**APP. 449**

2011 PBNDS were published on February 27, 2012, and were thus the "most current" version of the PBNDS after that date. Reply Ex. 8, ECF No. 287-8 at 10 (ICE report re PBNDS).

18.   On May 23, 2013, GEO entered into a contract modification with ICE (HSCEDM11-D-00003/P00005) agreeing that, effective June 23, 2013, GEO would comply with the 2011 PBNDS. ECF 270 at 10 (Additional Undisputed Fact #12) (citing ECF 271-4, cited as "Ex. D"); ECF 262-3, 2 (GEO-MEN 00020406; ECF 270 at 10 (Additional Undisputed Fact #11, #12) (noting Plaintiffs proffer as undisputed the fact that HSCEDM-11-D-00003/P00005 was one of GEO's contracts with ICE during the Class Period).

i.   **Plaintiffs' response:** Admit.  Plaintiffs note that GEO was required to remain aware of and perform in accordance with ongoing changes to the PBNDS under its existing contract, and in fact began implementing changes associated with the 2011 PBNDS long before the contract modification. Reply Ex. 9, ECF No. 287-9 (A. Martin 30(b)(6) Dep. 43:23-46:6) (describing an email sent April 4, 2012 that included an attachment regarding the major changes between the 2008 and 2011 PBNDS and explicitly mentioning the new language stating that compensation for VWP work is "at least $1.00").

**APP. 450**

C.     **GEO's Application of Disciplinary Policies**

19.     The 2000 NDS and all applicable versions of the PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale. ECF 261-10 at 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8 at 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.").

i.     **Plaintiffs' response:** Admit.

20.     The 2000 NDS and all versions of the PBNDS require GEO to provide notice to detainees, in the local detainee handbook, of the ICE-mandated disciplinary severity scale. ECF 261-10 at 10 (2000 NDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …").

i.     **Plaintiffs' response:** Admit.

21.     Likewise, the 2000 NDS and all versions of the PBNDS explicitly provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living

**APP. 451**

area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

      i.      **Plaintiffs' response:** Admit.

22.     The 2000 NDS and all versions of the PBNDS also explicitly provide a disciplinary severity scale that lists "[r]efusing to obey the order of a staff member or officer" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

      i.      **Plaintiffs' response:** Admit.

23.     The Aurora Detainee Handbook (the "<u>AIPC Handbook</u>") is issued to all detainees entering Aurora. ECF 270 at 7 (Material Undisputed Fact #14).

      i.      **Plaintiffs' response:** Admit.

24.     The AIPC's Handbook's disciplinary severity scale does not deviate from the 2000 NDS or the applicable PBNDS. ECF 273-1 (2005 AIPC Handbook, cited as "Ex. E"); (GEO_MEN 00054151-222); ECF 273-2 (2007 AIPC Handbook, cited as "Ex. F"); ECF 273-3 (2008 AIPC Handbook, cited as "Ex. G"); ECF 273-4 (2010 AIPC Handbook, cited as "Ex. H"); ECF 273-5 (2011 AIPC Handbook, cited as "Ex. I"); ECF 261-17 (October 2013 AIPC Handbook) (Specifically identified in Plaintiffs discovery responses as the basis for their claims); ECF 271-5, Kevin Martin Dep. 40:21-24 ("Q. Do you know if there's any deviation from between . . . the GEO Detainee Handbook and the

**APP. 452**

PBNDS as far as disciplinary requirements? A. Not as far as disciplinary

requirements[.]") (cited as "Ex. J" to ECF 270).

> i.   **Plaintiffs' response:** Dispute. The severity scales listed in the
>
> GEO handbooks do deviate from the NDS and PBNDS.  For
>
> example, the 2005 Handbook adds additional possible
>
> sanctions for "greatest" offenses.  *Compare* GEO Ex. E, ECF
>
> No. 273-1 at 25 (Local Detainee Handbook (2005 version))
>
> (listing seven potential sanctions for "greatest" offenses) *with*
>
> Plaintiffs' Ex. N, ECF 261-10 at 20 (INS Standards) (listing
>
> four potential sanctions for "greatest" offenses").

25.   All of GEO's policies are reviewed and approved by an on-site ICE

official. ECF 270 at 7 (Material Undisputed Fact #15).

> i.   **Plaintiffs' response:** Admit.

26.   The 2000 NDS and the applicable versions of the PBNDS provide

for the exact graduated scales of offenses and disciplinary consequences for dedicated

facilities, such as the AIPC. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008

PBNDS); 261-8 at 47 (2011 PBNDS).

> i.   **Plaintiffs' response:** Admit.

27.   The graduated scale of offenses (of which detainees must be made

aware) are explicitly laid out in the 2000 NDS and the applicable PBNDS, providing

GEO no discretion whatsoever to alter the disciplinary severity scale. ECF 261-10 at 24

(2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS).

   i.  **Plaintiffs' response:** Admit.

28. As required by the 2000 NDS and the applicable versions of the

PBNDS, the disciplinary severity scale is copied verbatim into the AIPC Handbook. ECF

271-5, Kevin Martin Dep. 40:13-16 ("And does the Detainee Handbook lay out these

exact rules from the PBNDS for the detainees as far as discipline goes? A: Yes.") (cited

as "Ex. J" to ECF 270); 83:17-22 (same).

   i.  **Plaintiffs' response:** Dispute.  Kevin Martin's testimony is

      incorrect; the severity scales listed in the GEO handbooks

      deviate from the NDS and PBNDS.  *Compare* GEO Ex. E,

      ECF No. 273-1 at 25 (Local Detainee Handbook (2005

      version)) (listing seven potential sanctions for "greatest"

      offenses) *with* Plaintiffs' Ex. N, ECF No. 261-10 at 20 (INS

      Standards) (listing four potential sanctions for "greatest"

      offenses").

29. In addition to the disciplinary severity scale, GEO has detailed a

Sanitation Procedures document that contains a section entitled "Detainee Sanitation

Procedures." ECF 262- 8; ECF 50-4 (the "<u>Sanitation Procedures</u>").

   i.  **Plaintiffs' response:** Admit that ECF No. 262-8 is a GEO

      document about Sanitation Procedures; it is entitled simply,

      "Sanitation Procedures" and is a different document from

      ECF No. 50-4, which is a GEO policy describing the

      Voluntary Work Program.

**APP. 454**

30.     The Sanitation Procedures set forth general standards for sanitation that must be followed by both GEO employees and detainees. *Id.*

      i.     **Plaintiffs' response:** Admit as to ECF No. 262-8.

31.     While the sanitation policies for detainees apply to those detainees housed at the AIPC who participate in cleaning tasks through the VWP or by cleaning their living area, ECF 50- 1 at 9 (Ceja Dep. 29:13-16), the Sanitation Procedures were not developed to assign tasks to specific individuals, but rather to detail the actual process for cleaning and materials and supplies to be used. ECF 271-5, Kevin Martin Depo. 208:6-11 (cited as "Ex. J" to ECF 270).

      i.     **Plaintiffs' response:** Admit.

32.     The Sanitation Procedures do not specify which aspects of cleaning are the responsibility of all detainees and which are the responsibility of VWP workers. ECF 270 at 7 (Material Undisputed Fact #19).

      i.     **Plaintiffs' response:** Admit.

33.     The Sanitation Procedures also contain a section detailing the consequences for non-compliance, stating: "The Dormitory/Unit Officer will inspect all living areas daily and report any infraction of these regulations to the immediate supervisor. The officer will notify detainees of unsatisfactory conditions, in cases of continued noncompliance, staff will issue an incident report." ECF 262-8 at 4; ECF 50-4. The Sanitation Procedures do not provide for any other penalty for non-compliance. *Id.*

      i.     **Plaintiffs' response:** Admit.

13

**APP. 455**

34.    GEO has never maintained a separate policy or practice of placing a detainee in solitary confinement for the refusal to clean a living area. Ex. _ (Amber Martin Dep., 134, 135).

i.    **Plaintiffs' response:** Dispute.  Although not formally documented in a single written policy, GEO maintained a practice throughout the time period covered by this case of requiring detainees to clean the common living areas without pay (the "Housing Unit Sanitation Policy," or "HUSP"), and of threatening them with solitary confinement if they did not comply.  GEO's own 30(b)(6) witness admitted the scope of the HUSP, and that solitary confinement was a possible sanction for noncompliance.  Plaintiffs' Ex. P, ECF No. 261-12 (Ceja 30(b)(6) Dep. 36:8-37:9; 84:3-85:15); Reply Ex. 5, ECF No. 287-5 (Ceja 30(b)(6) Dep. 79:19-25).  Both the sanitation requirements and the penalties for noncompliance are referenced in the orientation video that GEO shows detainees when they arrive at the AIPC.  Plaintiffs' Ex. X, ECF No. 262-10 at 3, 8 (Detainee Orientation Video).  And in fact, GEO did impose solitary confinement on detainees who refused to perform HUSP duties.  Plaintiffs' Ex. Z, ECF No. 262-12 (disciplinary charges and reports).  GEO also threatened detainees with solitary confinement on a regular

14

basis when they refused to clean pursuant to the HUSP. *See, e.g.*, Reply Ex. 10, ECF No. 287-10 (Xahuentitla-Flores Dep. 73:19-74:9; 83:7-19); Plaintiffs' Opp. Ex. 2 (Hernandez-Ceren Dep. 74:23-75:11, 78:10-79:5); Plaintiffs' Opp. Ex. 3 (Hernandez-Torres Dep. 60:8-14).

35.     ICE audits GEO to ensure that GEO complies with all requirements of its contract, including its obligations under the PBNDS. ECF 270 at 13 (Additional Undisputed Fact #24) (citing ECF 273-6, cited as "Ex. L").

i.     **Plaintiffs' response:** Admit that ICE audits GEO to ensure that it complies with certain requirements of its contract, including PBNDS obligations, but dispute that these audits review or capture all such requirements, or all aspects of the PBNDS.  The audits review specific components of PBNDS requirements, which are listed on the audit documents themselves.  *See* GEO Ex L., ECF No. 273-6 (Denver Contract Detention Facility Annual Review); Reply Ex. 12, ECF No. 287-12 (Ragsdale 30(b)(6) Dep. 36:1-38:10) (acknowledging that ICE audits do not cover "the requirement that [detainees] clean the common areas").

36.     As part of each inspection, each audit reviews compliance with each PBNDS requirement. *Id.*

      i.      **Plaintiffs' response:** Admit that certain audits review compliance with certain PBNDS requirements; however, Plaintiffs dispute that the audits comprehensively review compliance with "each" PBNDS requirement.  The audits review specific components of PBNDS requirements, which are listed on the audit documents themselves.  *See* GEO Ex L., ECF No. 273-6 (Denver Contract Detention Facility Annual Review); Reply Ex. 12, ECF No. 287-12 (Ragsdale 30(b)(6) Dep. 36:1-38:10).

37.      The materials provided to detainees at intake, including the handbook and orientation video, are regularly audited and have passed each audit since 2004. *Id.*

      i.      **Plaintiffs' response:** Admit; however, the audit reviews only whether the orientation includes sections covering: "Unacceptable activities and behavior; and corresponding sanctions; How to contact ICE; The availability of *pro bono* legal services, and how to pursue such services; Schedule of programs, services, daily activities, including visitation, telephone usage, mail service, religious programs, count procedures, access to and use of the law library and the general library; sick-call procedures, etc., and the detainee

16

**APP. 458**

handbook." GEO Ex. L, ECF No. 273-6 at 3 (10/5/2007), 12 (10/22/2009), 26 (10/21/2010), 38 (9/29/2011).

38. The audits specifically review intake procedures to ensure that the orientation information provides information about '[u]nacceptable activities and behavior, and corresponding sanctions" as well as the detainee handbook. *Id.* (GEO-MEN 00131895).

 i. **Plaintiffs' response:** Admit.

39. The disciplinary severity scale is audited and has passed each audit since 2004. *Id.*

 i. **Plaintiffs' response:** Dispute that the "disciplinary severity scale is audited." The audit reviews whether the facility *has* a "written disciplinary system using progressive levels of reviews and appeals." GEO Ex. L., ECF No. 273-6 at 6 (10/5/2007), 14 (10/22/2009), 28 (10/21/2010), 40 (9/29/2011), 58 (9/29/2016).

40. The audits review whether GEO provides notice of the disciplinary severity scale and have found GEO compliance based upon a review of its handbooks. Id. (GEO-MEN 00131936).

 i. **Plaintiffs' response:** Admit.

41. ICE has not only approved of the disciplinary severity scale but has also acted to implement and enforce the sanctions therein. One of the named Plaintiffs in this case—Demetrio Valerga—explained during his deposition that ICE officers also

enforced the ICE sanctions. After claiming that one of GEO's corrections officers told

Mr. Valerga he could be placed in segregation if he did not help clean his own common

area, ECF 272-7, Demetrio Valerga Dep., 135:15-137:19 (cited as "Ex. M" to ECF 270),

Mr. Valerga then explained ICE officers woke him up, pulled him out of his housing unit,

and spoke to him directly. *Id.* at 138:2-13. During that conversation, ICE officers told Mr.

Valerga that he could, in fact, be taken to segregation for refusing to help clean his living

area. *Id.* at 138:15-23.[2]

      i.    **Plaintiffs' response:** Admit the events stated above;

however, Plaintiffs dispute that the ICE officers onsite at

Aurora were authorized to condone acts that deviate from the

requirements of the Contract, as GEO's implementation of the

HUSP does.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin

Dep. 198:22-199:10); Reply Ex. 6, ECF No. 287-6 (A. Martin

Dep. 81:22-82:13); GEO's Second Notice of Supplemental

Authority Ex. B, ECF No. 297-2 at 3-4 (Contracting Officer's

Representative ("COR") Appointment Letter) (listing

functions and actions the COR "shall not" undertake,

including "direct the contractor . . . to operate in conflict with

---

[2] [continued from GEO's Fact #41:] Even after the ICE Officer's warning, Mr. Valerga refused to clean and later refused again several times. ECF 271-7, Dep. of Demetrio Valerga, 139:6-24, 140:2-20 (cited as "Ex. M" to ECF 270). Mr. Valerga was never placed in segregation for refusing to clean. *Id.*

the contract terms and conditions" and "[c]hange or modify

any of the terms and conditions . . . of a contract").

**D.    The VWP**

42.    The 2000 NDS and all applicable versions of the PBNDS require

that GEO provide detainees the opportunity to participate in a VWP. ECF 270 at 8

(Material Undisputed Fact #20).

      i.    **Plaintiffs' response:** Admit.

43.    The 2000 NDS, with which the AIPC was contractually obligated to

comply from March 27, 2003 to April 28, 2010, required GEO to provide

"compensation" and explicitly directed that "the stipend is $1.00 per day, to be paid

daily." ECF 261-10 at 5 (2000 NDS).

      i.    **Plaintiffs' response:** Admit except for GEO's use of the

phrase "directed that," which implies that the quoted

statement in the PBNDS is an instruction about how GEO

must pay VWP workers, as opposed to a statement about the

amount that ICE would reimburse GEO for VWP labor.

Plaintiff Ex. A, ECF No. 261-2 (A. Martin Dep. 106:6-

107:22).  Plaintiffs also note that GEO was required to

comply with the 2008 PBNDS when they were published, *see*

Fact No. 15, which occurred during the stated period,

although the quoted text is nearly identical in both the 2000

NDS and the 2008 PBNDS.  *See* ECF 261-9 at 63 (2008 PBNDS) ("the compensation is $1.00 per day")

44.    Likewise, the 2008 PBNDS, with which the AIPC was contractually obligated to comply from April 28, 2010 to June 22, 2013, mandated that "the compensation is $1.00 per day." ECF 261-9 at 63 (2008 PBNDS).

      i.   **Plaintiffs' response:** Admit that the cited document contains the quoted text; however dispute GEO's statement that this constituted a "mandate[]," as opposed to a statement about the reimbursement offered from ICE to GEO.  GEO paid more than $1.00 a day to detainees at other ICE facilities, including paying up to $3.00 a day to detainees at its South Texas Detention Facility in 2009, and was therefore well aware that higher pay was an option.  Reply Ex. 13, ECF No. 287-13 at 7-13 (South Texas 2009 detainee pay).  In addition, GEO can and does request modifications of the Contract when it needs to.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Tr. 106:8-108:10).  GEO did not request a contract modification to pay detainees more than $1.00 per day at the AIPC.  *Id*. at 105:3-12.

45.    Beginning on June 23, 2013, AIPC was bound by the 2011 PBNDS, which state that participants in the VWP will be compensated with "at least $1.00 (USD) per day." ECF 261- 8 at 53 (2011 PBNDS). Thus, the "at least" language upon which the

**APP. 462**

VWP Class relies was not implemented at the AIPC until approximately halfway through the VWP Class Period.

        i.    **Plaintiffs' response:** Admit the quoted content of the document, and that the 2011 PBNDS was formally incorporated into the Contract on June 23, 2013. Plaintiffs do not agree with GEO's implication that the option to pay more than $1 per day did not exist prior to it formally agreeing to incorporate portions of the 2011 PBNDS into its contract. GEO had an obligation under the relevant contract to be "knowledgeable of any changes to the [PBNDS] and perform in accordance with the most current version of the [PBNDS]." *See* Response to Additional Fact ¶ 11. In addition, GEO can and does request modifications of the Contract when it needs to. Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Tr. 106:8-108:10). GEO did not request a contract modification to pay detainees more than $1.00 per day. *Id*. at 105:3-12.

46.    Before the 2011 PBNDS were implemented at the AIPC, GEO paid the amount it was explicitly directed by ICE to pay to VWP participants: $1.00 per day. ECF 270 at 15 (Additional Undisputed Fact #36).

        i.    **Plaintiffs' response:** Admit that GEO paid VWP participants $1.00 prior to the implementation of the 2011 PBNDS;

**APP. 463**

dispute that ICE "explicitly directed" GEO to pay this amount.

47.     Thereafter, GEO continued to pay members of the VWP Class $1.00 per day; the minimum payment explicitly permitted by the 2011 PBNDS. ECF 270 at 15 (Additional Undisputed Fact #37).

> i.      **Plaintiffs' response:** Admit.

48.     ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP. ECF 270 at 8 (Material Undisputed Fact #22).

> i.      **Plaintiffs' response:** Admit.

49.     The VWP has been audited each year and has passed each audit since 2004. ECF 270 at 14 (Additional Undisputed Fact #29) (citing GEO-MEN 00131936).

> i.      **Plaintiffs' response:** Admit.

## III.    Additional Facts that Preclude Summary Judgment in GEO's Favor.

### A.     The Housing Unit Sanitation Policy.

1.      The "HUSP is not created by ICE nor is it a requirement of the Contract."  Plaintiffs' Ex. K, ECF No. 261-7 ¶ 22 (Ely Decl.).

2.      "ICE did not draft or negotiate GEO's HUSP."  *Id.*

3.      The HUSP is "a GEO Policy, created by GEO."  *Id.*

4.      On February 14, 2018 GEO sent a letter to ICE requesting an equitable adjustment to its contract for the Aurora facility to assist it in paying its legal

**APP. 464**

fees in connection with this litigation.  Plaintiffs' Reply Ex. 3, ECF No. 287-3 (February 14 letter).

5.      The February 14 letter was signed by GEO's Senior Vice President of Business Development, David Venturella, and drafted in collaboration between Venturella, GEO's legal department and other GEO officials, including GEO's General Counsel or other representatives from the General Counsel's Office.  Plaintiffs' Opp. Ex. 1 (Venturella Dep. 61:1-21; 62:10-63:7).

6.      GEO did not disclose the full scope of the mandatory cleaning required under the HUSP in the February 14 letter, describing the policy as requiring only that detainees "perform basic housekeeping chores."  Plaintiffs' Reply Ex. 3, ECF No. 287-3 (February 14 letter).

7.      In a letter dated June 21, 2018, ICE denied GEO's request for an equitable adjustment, explaining that "GEO's defense of these private lawsuits is a defense of its contract performance."  Plaintiffs' Opp. Ex. 4 (GEO-MEN00186866 (June 21 letter)).

8.      The housing pods in the Aurora facility house up to 80 detainees. Plaintiffs' Opp. Ex. 5 (Pagan Dep. at 108:13-17)

9.      The Aurora housing pods include both cells where detainees sleep and common areas where they eat, use the phone, and shower.  Plaintiffs' Opp. Ex. 2 (Hernandez-Ceren Dep. at 25:3-17); Plaintiffs' Ex. P, ECF No. 261-12 (Ceja 30(b)(6) Dep. 36:25-37:4)

APP. 465

10.     GEO told detainees that they have a "common obligation to clean . . . the communal areas" of the housing pods, including the dayroom and bathrooms, on a rotating basis.  Plaintiffs' Ex. F, ECF No. 261-4 (Ragsdale 30(b)(6) Dep. 16:14-18)

11.     GEO guards threatened to send detainees to solitary confinement for failing to clean under the HUSP.  Plaintiffs' Opp. Ex. 2 (Hernandez-Ceren Dep. 74:23-75:11, 78:10-18); Plaintiffs' Reply Ex. 10, ECF No. 287-10 (Xahuentitla-Flores Dep. 73:19-74:9; 83:7-19)

12.     Sending detainees to solitary confinement for failing to clean under the HUSP was within the regular authority of GEO guards.  Plaintiffs' Opp. Ex. 5 (134:18-135:20)

13.     GEO placed detainees in segregation during the class period for refusing to clean.  Plaintiffs' Ex. Z, ECF No. 262-12 (disciplinary charges and reports); Plaintiffs' Opp. Ex. 3 (Hernandez-Torres Dep. 60:8-14); Plaintiffs' Opp. Ex. 5 (Pagan Dep. at 124:19-125:4)

14.     The HUSP requires detainees to "clean up the tables, wipe down the tables, and sweep and mop the floors" in the common areas, Plaintiffs' Ex. P., ECF No. 261-12 (Ceja 30(b)(6) Dep. at 36:24-37:9), as well as "clean the rec yard, wipe the [] phones, clean the microwave, change the garbage bag, clean the showers, disinfect the showers, [and] pick up all the trash."  Plaintiffs' Opp. Ex. 2 (Hernandez-Ceren Dep. at 163:3-6)

15.     These tasks go beyond the basic housekeeping chores permitted by the PBNDS, which states: "Work assignments are voluntary; however, all detainees are

24

responsible for personal housekeeping.  Detainees are required to maintain their *immediate* living areas in a neat and orderly manner by: 1. making their beds daily; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture."  *See* Plaintiffs' Ex. L, ECF No. 261-8 at 51 (GEO-MEN 00064345 (2011 PBNDS)) (emphasis added); *see also* Plaintiffs' Ex. M, ECF No. 261-9 at 61-62 (GEO-MEN 00063294-95 (2008 PBNDS)); Plaintiffs' Ex. N, ECF No. 261-10 at 3 (GEO-MEN 00063672 (INS Detention Standard))

16.     GEO never verified with ICE whether common areas of the housing pods are part of the "living area" described in the PBNDS.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Dep. 196:23-198:6)

17.     The Department of Homeland Security's Office of Inspector General concluded that "requiring detainees to clean common areas used by all detainees is in violation of ICE standards, as detainees are only required to clean their immediate living area."  Reply Ex. 17, ECF No. 287-17 at 8 (Theo Lacy OIG report)

**B.     The Voluntary Work Program.**

18.     The ICE/GEO contract incorporated the "DHS/ICE PBNDS (Performance Based National Detention Standards)," and stated that "a copy of the current version is obtainable on the internet Website: http://www.ice.gov/detention-standards/2008/."  The contract also required that "these constraints may change over time; the Contractor shall be knowledgeable of any changes to the constraints and perform in accordance with the most current version of the constraints." Plaintiffs' Ex. B,

25

**APP. 467**

ECF No. 262-2, 37-38 (GEO-MEN 00019655-56).  The 2011 PBNDS were published on

February 27, 2012, and were thus the "most current" version of the PBNDS after that

date.  Reply Ex. 8, ECF No. 287-8 at 8 (ICE report re PBNDS)

   19. GEO pays detainees more than $1.00 per day at other ICE facilities,

including $1.00 to $3.00 per day at its South Texas Detention Facility, $1.00 to $2.50 per

day at its Folkston ICE Processing Center, $1.00 to $3.00 per day at its Joe Corley

Detention Facility, and $1.00 to $4.00 per day at its LaSalle Detention Facility.

Plaintiffs' Reply Ex. 13, ECF No. 287-13 at 11 (South Texas Detention Center Invoices);

Plaintiffs' Ex. A, ECF No., 261-2 (A. Martin Dep. 109:15-110:13); Plaintiffs' Ex. BB,

ECF No. 261-18 (GEO-MEN 00170339 (VWP Pay Rates))

   20. In these facilities where GEO pays detainees more than $1.00 per

day for VWP work, it does so "on [its] own dime."  Plaintiffs' Ex. A, ECF No. 261-2 (A.

Martin Dep. 107:18-22; 109:15-110:13)

## IV. ARGUMENT

### A. Derivative Sovereign Immunity Does Not Protect Acts that the Government Did Not Direct.

  Derivative sovereign immunity applies only in those "special circumstances"

where "the government has directed a contractor to do the very thing that is the subject of

the claim."  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001); *see also*

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 671 (2016) (derivative sovereign

immunity applies to a contractor that "simply performed as the Government directed").

The "driving purpose" of the doctrine "is to prevent the contractor from being held liable

**APP. 468**

when the government is actually at fault but is otherwise immune from liability." *In re Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 70 (D.C. Cir. 2019) (quoting *In re World Trade Center Disaster Site Litig.*, 456 F. Supp. 2d 520, 560 (S.D.N.Y. 2006)); *see also* Plaintiffs' Motion for Summary Judgment ("Plaintiffs' MSJ"), ECF No. 260 at 23-27.

GEO argues for a much broader construction of derivative sovereign immunity, stating that it is "precluded only where a contractor violates its contract with the federal government." GEO's Motion for Summary Judgment ("GEO MSJ"), ECF No. 284 at 15. That is wrong. Certainly, as set forth in *Campbell-Ewald*, one way that a contractor may lose derivative sovereign immunity is where it "violates both federal law and the government's explicit instructions." *Campbell-Ewald Co.*, 136 S. Ct. at 672. And, as Plaintiffs explain in detail in their Motion for Summary Judgment and below, GEO did both in this case. *See infra* §IV.A.1-2; Plaintiffs' MSJ, ECF No. 260 at 27-33.

But while compliance with a contract is a necessary condition of derivative sovereign immunity, it is not sufficient, which renders GEO's major premise invalid: namely, that even if GEO did violate the TVPA and Colorado law, it would face no liability under the doctrine of derivative sovereign immunity so long as the specific acts leading to those violations were not explicitly prohibited by its contract with ICE. If this were correct, it would provide a free pass for a wide range of contractor misconduct that the government did not foresee and explicitly prohibit. That cannot be, and is not, the law. Rather, derivative sovereign immunity is available only to contractors who "simply performed as the Government *directed*." *Campbell-Ewald Co.*, 136 S. Ct. at 672

**APP. 469**

(emphasis added). It does not protect a contractor that takes steps "over and beyond acts required to be performed by it under the contract." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) (quoting *Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963)). Here, the undisputed facts show that both the VWP and the HUSP went "over and beyond" the requirements of GEO's contract with ICE. Therefore, there is no derivative sovereign immunity.

*Cunningham v. General Dynamics Information Technology*, 888 F.3d 640, 643 (4th Cir. 2018), does not direct a different result. To the contrary, as discussed in greater detail in Plaintiffs' motion for summary judgment, Plaintiffs' MSJ, ECF No. 260 at 32-33, *Cunningham* illustrates that derivative sovereign immunity applies only in the limited circumstance where the government *requires* a contractor to take an action that becomes the subject of a subsequent lawsuit. This distinction becomes clear when one compares the facts of *Campbell-Ewald* and *Cunningham*, both lawsuits against government contractors under the Telephone Consumer Protection Act ("TCPA"), which prohibits certain types of phone calls and text messages to people who have not opted into receiving them. In *Campbell-Ewald*, the Navy worked with a contractor to develop a text message campaign that was challenged by the plaintiff's lawsuit. 136 S. Ct. at 672; *see also Gomez v. Campbell-Ewald Co.*, No. 10 Civ. 2007, 2013 WL 655237, at *2 (C.D. Cal. Feb. 22, 2013) (the Navy "worked closely with [Campbell-Ewald] on the Navy's May 2006 text message recruiting campaign, and provided Navy oversight and approval"). But significantly, the specific action that allegedly violated the TVPA – the development of a contact list that included off-limits phone numbers – was delegated to

28

**APP. 470**

the contractor, so the government's oversight and approval did not confer immunity. *Campbell-Ewald*, 136 S. Ct. at 673-74. By contrast, in *Cunningham*, the government *provided* the list of phone numbers – which included numbers that could not be contacted under the TVPA – and explicitly required the contractor to call them. This did confer immunity. 888 F.3d at 647.

GEO argues that the kind of "oversight and approval" that was *insufficient* to support derivative sovereign immunity in *Campbell-Ewald*, 2013 WL 655237, at *2, is sufficient to immunize GEO's actions here. As the undisputed facts here demonstrate, nothing in GEO's contract with ICE required it to engage in the legal violations it is accused of. The best GEO can offer as to the HUSP is that ICE reviewed its policies, Fact No. 25; but it admits that those policies are not explicit about whether housing unit cleaning work was voluntary or mandatory. Fact No. 32. And while ICE audits GEO's facilities and communications, Facts No. 35-40, GEO can point to no part of those audits that identified the scope of mandatory cleaning duties, *see* Part IV.A.1. *infra*, and specifically approved them – much less explicitly *directed* them, as *Campbell-Ewald* requires. 136 S. Ct. at 673.[3] Regardless of whether ICE approved (or knew about)

---

[3]     Even if *Campbell-Ewald* allowed oversight (as opposed to direction) to confer immunity, GEO's argument would require the Court to draw an inference in GEO's favor, as it may not do on a motion for summary judgment: GEO argues that because ICE authorized a written policy, it must have had full knowledge of how that policy was implemented. This inference is not only impermissible as a legal matter; it is a stretch, as a factual matter. Nothing in the policies explicitly identifies the wide array of cleaning duties under the HUSP as mandatory requirements, Fact No. 32, making it unlikely that ICE would identify their inconsistency with the PBNDS. Add. Fact No. 15. In fact, the record shows that ICE's audits sometimes miss discrepancies between GEO policies and

GEO's legal violations, the fact that GEO, not ICE, drafted the policies, Add. Fact 2, makes this case "vastly distinguishable" from *Cunningham*.  888 F.3d at 648 (noting that in *Campbell-Ewald* the contractor, not the government, developed the list of numbers that formed the basis for liability).  The HUSP and the discipline used to enforce it was "a GEO policy, created by GEO," Add. Fact No. 3,[4] and GEO must face the legal consequences.

### 1.    GEO's HUSP Required Work Prohibited by ICE.

Just as in its opposition to Plaintiffs' motion for summary judgment, ECF No. 270, GEO's motion for summary judgment on Plaintiffs' TVPA claims hinges on a fundamental misunderstanding of what those claims are about.  As set forth in greater detail in Plaintiffs' reply to their summary judgment motion, ECF No. 286, ICE cannot have mandated that GEO threaten detainees with solitary confinement for failing to clean common areas, because ICE did not mandate that detainees clean the common areas in the first place.  Add. Fact No. 1.  To the contrary, ICE *prohibited* GEO from requiring detainees to clean all but a limited space directly around their beds.  Add. Fact No. 15.

---

ICE requirements.  *See* Facts No. 22, 24-28.  A jury could infer that the audits failed to identify the contract violation challenged by this case.

[4]     In opposing Plaintiffs' motion for summary judgment, GEO has argued that the Ely declaration is hearsay.  Putting aside that Fed. R. Civ. P. 56(c)(4) allows out-of-court statements in declarations to be used to support facts on summary judgment, the Ely declaration is a statement of a public office setting out the office's activities, and is thus excepted from the hearsay rule under FRE 803(8).  GEO's attempts to cast ICE's declaration as untrustworthy are unpersuasive.  *See* ECF No. 294 (Plaintiffs' Response to GEO's Notice of Supplemental Authority).

**APP. 472**

Under the PBNDS, all "[w]ork assignments are voluntary," except that "[d]etainees are required to maintain their *immediate* living areas in a neat and orderly manner by:

> 1. making their beds daily;
>
> 2. stacking loose papers;
>
> 3. keeping the floor free of debris and dividers free of clutter; and
>
> 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture."

*Id*. (emphasis added).

Work under the HUSP went far beyond these four enumerated categories, imposing a "common obligation to clean . . . the communal areas," "clean up the tables, wipe down the tables, and sweep and mop the floors" in the common dining area, and to clean the shared dorm showers.  Add Facts No. 10, 14.  Plaintiffs anticipate that GEO will argue on reply, as it did in opposing Plaintiffs' motion for summary judgment, that the "entirety of where a detainee lives and sleeps is his or her 'living area,'" and that mopping floors and scrubbing communal showers is the same as keeping them "free of clutter."  *See* GEO's Opposition to Plaintiffs' MSJ, ECF No. 270 at 26.  These positions are not reasonable.  Even if one ignored the word "immediate" and construed "living area" to mean the entirety of an 80-person dormitory, the structure of ICE's instructions leaves no room for doubt.  The instructions only allow GEO to require that detainees clean the immediate living area "by" doing four specific things – thus implicitly excluding mopping, scrubbing, and other deep cleaning that is typically done by full-time janitors.

**APP. 473**

Indeed, in a subsequent audit of another GEO facility in 2017, the Office of the Inspector General, a division of the Department of Homeland Security, identified a similar policy as a violation of ICE standards, stating that, "requiring detainees to clean common areas used by all detainees [such as showers] is in violation of ICE standards, as detainees are only required to clean their immediate living area."  *See* Add. Fact 17.

The unreasonableness of GEO's position is illustrated by the fact that its own Vice President, David Venturella, agreed that GEO's sanitation policy was inconsistent with the PBNDS when the policy was described to him last week in his deposition.  In a letter asking ICE to intervene in this case, Venturella characterized the required work as "basic housekeeping chores," Add. Fact 6, but when asked in his deposition if the PBNDS permitted GEO to require work beyond the four chores explicitly listed therein, he agreed with the statement that work assignments "have to be voluntary with the exception of these four [chores],"[5] Plaintiffs' Opp. Ex. 1 (Venturella Dep. 72:16-21).

## 2.    ICE Did Not Direct the Dollar-A-Day Pay Rate Under the VWP.

GEO's argument that it can enjoy derivative sovereign immunity for Plaintiffs' unjust enrichment claim repeats its mischaracterizations of the law, the facts of the case,

---

[5]     Venturella was not responsible for PBNDS compliance and evidently lacks firsthand knowledge of the facts on the ground at Aurora; however, the fact that GEO's letter to ICE mischaracterizes its policies illustrates the lengths to which it has gone to conceal its violations from the agency, which further undermines its argument that ICE authorized the policy.  GEO's general counsel also had input into the letter, Add. Fact No. 5, and by 2018 should have been well aware that the suit involved more than "basic housekeeping chores," given that this aspect of the case had been extensively explored in a 30(b)(6) deposition two years earlier.  Plaintiffs' Ex. P., ECF No. 261-12 (Ceja 30(b)(6) Dep. at 36:24-37:9).  A jury could infer from these facts that GEO deliberately sought to conceal the true scope of its policy from ICE because it feared ICE would not condone it.

32

**APP. 474**

and the nature of its relationship with ICE.  First, as noted above, there is no support for GEO's position that all government contractors who do not violate an explicit term of their contract enjoy the government's immunity.  *Supra* § IV.A.  Second, as Plaintiffs noted in their reply brief to their own motion for summary judgment, ECF No. 286 at 101-02, every court to have considered whether the 2011 PBNDS provide GEO with the immunity it seeks – including this one – has concluded they do not.  *See Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1135 (D. Colo. 2015) (holding that derivative sovereign immunity did not apply because GEO was not "*prohibit[ed]* . . . from paying detainees in excess of $1/day"); *Nwauzor v. GEO Grp., Inc.*, No. 17 Civ. 5769, 2020 WL 1689728, at *8-9 (W.D. Wash. Apr. 7, 2020) (denying GEO's motion for summary judgment on derivative sovereign immunity and noting that, "GEO has, in the past, paid workers more than $1 a day and has the ability to, and has requested, changes to the contracts"); *cf. Novoa v. GEO Grp., Inc.*, No. 17 Civ. 2514, 2018 WL 4057814, at *3 (C.D. Cal. Aug. 22, 2018) (noting that GEO's derivative sovereign immunity defense hinged on what "discretion GEO had, if any, in implementing and administering the Work Program").

The practice of the contracting parties supports this Court's (and others') interpretation.  GEO *did* pay more than $1 per day to detainee workers in other facilities: records from the South Texas Detention Facility, for example, show that detainees were paid as much as $3 per day there, with ICE reimbursing GEO for the first $1 per day and GEO footing the rest.  Add. Fact No. 19.[6]  This practice goes back to 2009.  *Id*.  This

---

[6]     Plaintiffs' Exhibit 13 to their reply in support of their Motion for Summary Judgment, ECF No. 287-13, showing the pay practices at the South Texas Detention

**APP. 475**

disposes of GEO's contention that the language of the 2008 PBNDS, which did not include the "at least" language present in the subsequent 2011 PBNDS, constitutes a specific command by ICE. Assuming that ICE *had* the authority to direct a particular pay rate – which it did not, *see* Section IV.C *infra* – this language does not prohibit GEO from paying more than $1 per day as needed to comply with the law of the localities in which it operates (the Colorado law of unjust enrichment, for the purposes of this case). *See Menocal*, 113 F. Supp. 3d at 1135.

Moreover, even if the 2008 PBNDS supported GEO's argument, it is not correct that GEO was required to follow those standards until June 23, 2013. The 2008 PBNDS were replaced by the 2011 PBNDS towards the beginning of the VWP class period, in February 2012. Add. Fact No. 18. And although the 2011 PBNDS were not *formally* incorporated into the contract between ICE and GEO until June 2013, that contract required GEO to remain aware of changes to the PBNDS and "perform in accordance with the most current version of the constraints." *Id.* Regardless of the fact that the 2011 contract cited the 2008 PBNDS as the version that was current at the time the contract

---

Facility, was authenticated as a GEO invoice submitted to ICE by David Venturella. Plaintiffs' Opp. Ex. 1 (Venturella Dep. at 86:11-87:1). Although Venturella claimed to lack sufficient knowledge to verify that the invoice met the criteria for a business record under FRE 803(6), it has equivalent guarantees of trustworthiness that weigh in favor of its admission under FRE 807(a). GEO is under a legal and contractual obligation to submit accurate invoices to the government pursuant to its contracts, *see* 48 C.F.R. 32.006-1(b) (allowing the government to suspend payments to a contractor when "the contractor's request for . . . payments is based on fraud"), and indeed, to do otherwise would expose it to liability under the False Claims Act, 31 U.S.C. § 3729 *et seq.* This kind of "business duty to provide accurate information" is a strong indicator of evidentiary reliability. *United States v. Ary*, 518 F.3d 775, 787 (10th Cir. 2008).

was executed, *id.*, the change in the language of the PBNDS after 2011 made clear that
GEO was not barred from paying more (as it already did in South Texas) where state law
required it to do so.  Even if GEO construed the 2008 PBNDS to command a $1/day rate
before the 2011 PBNDS were published (which it did not; GEO was already paying more
in the South Texas Detention Facility), the withdrawal of that command should have
caused GEO to take steps to follow its legal compliance obligations under the contract by
reevaluating its pay rate.  Thus, GEO's attempt to hide behind derivative sovereign
immunity for Plaintiffs' VWP claims fails.

**B.      ICE Has No Authority to Require a $1/day Pay Rate.**

Even assuming *arguendo* that GEO were correct that the 2008 PBNDS constituted
a command from ICE that it pay VWP workers $1 per day, it still would not enjoy
derivative sovereign immunity.  Its defense would fail at the first prong of the *Yearsley*
test, because the authority to set a specific rate of VWP wages was not "validly
conferred" by the government.  *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940).
This is true because ICE did not have – and has never had – the authority to set a specific
rate of pay for detainee labor.  Congress reserved that authority to itself and stopped
exercising it more than 30 years before Plaintiffs' claims accrued.  If the PBNDS were in
fact a command by ICE to pay a specific rate, that command would be *ultra vires* and
without valid Constitutional authority.

**APP. 477**

### 1.   Federal Appropriations Law Requires Congress to Specifically Authorize Funds for a Given Purpose.

The Appropriations Clause of the Constitution grants Congress the exclusive authority to make appropriations and bars the government from spending money except "in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  The "fundamental and comprehensive purpose" of the Appropriations clause "[i]s to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents."  *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427-28.

In accordance with this purpose, "Congress's control over federal expenditures is absolute."  *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (internal quotation marks omitted).  "[A]ll uses of appropriated funds must be affirmatively approved by Congress," and "the mere absence of a prohibition is not sufficient" to authorize a use of funds.  *FLRA*, 665 F.3d at 1348.  An "appropriation cannot be inferred or made by implication."  GAO, Principles of Federal Appropriations Law, 4th ed., 2016 rev., ch. 2, § B.4.d, at 2-23, GAO-16-464SP (Washington, D.C.: Mar. 2016) ("GAO Redbook") (citing 50 Comp. Gen 863 (1971)).[7]

---

[7]     "In considering the effect of appropriations language both the Supreme Court and [other] court[s] have recognized that the General Accounting Office's publication, Principles of Federal Appropriations Law . . . provides significant guidance."  *Star–Glo Assocs., LP v. United States,* 414 F.3d 1349, 1354 (Fed. Cir. 2005); *see also Main Comm. Health Options v. United States,* 140 S. Ct. 1308, 1320 (2020); *Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1064 n.5 (10th Cir. 2011).

**APP. 478**

Congress creates appropriations in a two-step process.  First, it authorizes the Executive Branch, via statute, to undertake certain activities that may involve spending funds, sometimes referred to as "budget authority."  GAO Redbook, ch. 2 § A.1, at 2-1, 2. This authorization is typically durable and persists from year to year.  *See Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1058-59 (10th Cir. 2011), *aff'd* 567 U.S. 182 (2012) (explaining permanence of Congressional authorization to fund "contract support costs"). Second, Congress appropriates funds to be used for that activity and directs their payment.  *See* GAO Redbook, ch. 2, § B.4.d, at 2-24 ("[A] specific direction to pay and a designation of funds to be used [] must be present.").  This step, appropriation, is just as important as the authorization of the agency action; Executive Branch agencies cannot spend funds when they are not appropriated for that purpose by Congress.  *See California v. Trump*, 963 F.3d 926 (9th Cir. 2020) (holding that Trump Administration could not spend funds appropriated to the Department of Defense on a wall along the U.S.-Mexico border because Congress had not appropriated them for that purpose).  Unlike authorization, appropriations are not durable; funding appropriated by Congress must be used within the time period for which it was appropriated.  GAO Redbook, ch 2, § B.5.c, at 2-29 ("[A]n appropriation 'dies' in a sense at the end of its period of obligational availability.").

What Congress can give, it can also take away.  "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury."  *Richmond*, 496 U.S. at 425.  One way that Congress can exercise its power of the purse is by choosing not to act

**APP. 479**

– by not appropriating funds – and that choice is binding on the other branches of government. *See Babbitt v. Oglala Sioux Tribal Public Safety Dep't*, 194 F.3d 1374, 1380 (Fed. Cir. 1999) ("Although [a government entity] may have expected to receive full funding . . . based on past experiences, . . . subject-to-availability-of-appropriations language . . . prevents [the entity] from asserting that it was entitled to full funding as a matter of right."); *In re Aiken Cty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[I]f Congress appropriates no money for a statutorily mandated program, the Executive obviously cannot move forward.").

### 2.    ICE Has No Authority to Set the VWP Rate.

Although Congress authorized payments for work programs in immigration detention in 1950, it reserved to itself the right to set the amount of those payments.  8 U.S.C. § 1555(d) provides that "[a]ppropriations now or hereafter provided for [ICE][8] shall be available for . . .  payment of allowances . . . to aliens, while held in custody under the immigration laws, for work performed."  8 U.S.C. § 1555(d).  But Congress limited that authorization by providing that those payments would be made "at such rate as may be specified from time to time in the appropriation Act involved."  *Id.*; *see Richmond*, 496 U.S. at 425 (acts of "Government [are] limited by a valid reservation of congressional control over funds in the Treasury").  By conditioning the rate of pay for detainees on the amount set "in the appropriation Act involved," and requiring that it be "specified from time to time," Congress rendered that rate of pay contingent on the

---

[8]    The statute references ICE's predecessor agency, Immigration and Naturalization Services.

amount specified in each year's appropriation – and withheld from ICE (then INS) the discretion to set that rate itself.  *See Ramah Navajo Chapter*, 644 F.3d at 1060 (language stating that, "[s]ubject to the availability of appropriations, the Secretary shall make available" certain payments only required those payments if Congress appropriated funds for that purpose); *cf.* U.S. Const. art. II, § 3 (requiring the President to provide information on the state of the union "from time to time," meaning annually).

After 1979, Congress exercised its reserved authority by declining to appropriate funds for VWP workers.  *See Chen v. GEO Group, Inc.*, 287 F. Supp. 3d 1158, 1165-66 (W.D. Wash. 2017) ("Congress has not specified any rate for detainee work since fiscal year 1979."); *Novoa v. GEO Group, Inc.*, No. 17 Civ. 2514, 2018 WL 3343494, at *4 (C.D. Cal. June 21, 2018) ("8 U.S.C. § 1555(d) permits appropriations for the payment of allowances for work performed.  Congress however, has not directly appropriated such funds since 1979.").  Once the 1979 appropriation expired at the end of that fiscal year, it ceased to exist.  *See* GAO Redbook, ch 2, § B.5.c, at 2-29.

But ICE continued to spend agency funds to reimburse contractors for detainee work programs for over 30 years, including during the period covered by Plaintiffs' claims here.  Although the source of the funds ICE spent is unclear, they were not appropriated for work programs, and ICE was not free to spend them as it saw fit.[9]  By

---

[9]     "Agencies may transfer funds only when expressly authorized by law."  *See* GAO Redbook, ch. 2, § B.7.a, at 2-38.  No such express authorization exists here.  Similarly, ICE also cannot reprogram funds into the VWP, as reprogramming of funds is only permissible if "the resulting obligations and expenditures are consistent with the purpose restrictions applicable to the appropriation."  *Id.* at 2-44.

doing so, ICE went "beyond what [8 U.S.C. § 1555] permits." *California v. Trump*, 379 F. Supp. 3d 928, 943 (N.D. Cal. 2019). When Congress exercises its Constitutional power to cut off funding, the Executive Branch is not free to ignore it – "'[n]o' means no." *Trump*, 963 F.3d at 949.

A comparison of the language in the 2011 PBNDS with the last Congressional authorization of funds illustrates that the latter provides no support for the former. The 1978 appropriations bill for fiscal year 1979 provides that allowances for work programs shall be "at a rate *not in excess of* $1 per day." PL 95–431 (HR 12934), PL 95–431, Oct. 10, 1978, 92 Stat 1021 (emphasis added). The 2011 PBNDS, in contrast, provides that the rate shall be "at least" $1 per day. Whatever authority ICE may claim for this provision, it cannot be the 1978 appropriations language – and no other source of valid authority from Congress has filled the gap.

Because ICE lacked authority to set VWP rates, it could not "validly confer[]" authority to pay such allowances onto GEO. *Yearsley*, 309 U.S. at 20. In the absence of such validly conferred authority, GEO's derivative sovereign immunity defense fails.[10]

### C.    GEO's Arguments Under the Government Contractor Defense Fail for The Same Reasons As Its Derivative Sovereign Immunity Arguments.

---

[10]    GEO may cite *Alvarado Guevara v. Imm. and Naturalization Serv.*, 902 F.2d 394, 396 (5th Cir. 1990) for the proposition that the detainee allowance rate set in the 1978 Appropriations Act confers authority on ICE to use appropriated funds to pay detainees $1 per day for their work. However, that case is not binding on this Court, and was wrongly decided. Although it reached the conclusion that the $1 per day rate set in 1978 authorized VWP work in 1990, it only cited the language of 8 U.S.C. § 1555(d); it did not analyze it or the appropriations acts that followed. *See id.*

GEO's argument that it can also avoid liability under the government contractor defense is a condensed version of the argument it set forth in its opposition to Plaintiffs' Motion for Summary Judgment, and fails for the same reasons Plaintiffs identified in their reply to that brief. *See* ECF No. 286 at 104-106. The government contractor defense applies where it is impossible for a contractor to "comply with both its contractual obligation and the state-prescribed duty" it is alleged to have violated. *Boyle v. United Techs. Corp*., 487 U.S. 500, 509 (1988). *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090 (10th Cir. 2015), on which GEO rests its argument, presented just such a situation: there, the state law under which the plaintiff had brought her case "outright forb[ade the defendant] from fulfilling its contractual obligation." *Id*. at 1099.

In contrast, as set forth above, nothing prevented GEO here from both fulfilling its contractual obligation to the federal government and following the law. ICE itself rejects GEO's argument that the VWP claims arise from an obligation set forth in GEO's contract with ICE. Add. Fact No. 1. GEO's purported concern that a favorable result for Plaintiffs could lead VWP rates to vary all over the country ignores that VWP rates already *do* vary all over the country. Add. Fact No. 19; *see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 88 (1994) (calling an interest in uniformity "that most generic (and lightly invoked) of alleged federal interests"). And the potential for increased costs, standing alone, is not enough to confer immunity from state-law claims. *See Boyle*, 487 U.S. at 507. Moreover, GEO's argument elides the fact that where VWP wages are more than $1 per day, it is GEO, not ICE, that foots the bill. Add. Fact No. 20; *see also* Add.

**APP. 483**

Fact No. 19 (showing, at Reply Ex. 13, separate entries for "ICE Pay" ($1.00) and "GEO Pay" (up to $2.00) for each day of detainee pay).

Finally, as with its argument on the derivative sovereign immunity defense, GEO neglects to mention that this Court has already considered whether GEO's contract with ICE presents a "significant conflict" with the law on which Plaintiffs base their claims, and concluded that it does not. *Menocal*, 113 F. Supp. 3d at 1135. For the reasons stated above, GEO's motion provides no basis to revisit this determination.

### D.   Overwhelming Evidence Supports Plaintiffs' Contention that GEO's Threats of Solitary Confinement Were Intended to Compel Forced Work.

GEO, somewhat puzzlingly, also seeks summary judgment on Plaintiffs' TVPA claims on the basis that Plaintiffs "have provided no evidence whatsoever" that they are able to meet the scienter requirement under the TVPA. GEO MSJ, ECF No. 284 at 21. This argument misconceives the standard on summary judgment; Plaintiffs do not bear the burden of production to prove their claims at this stage, and GEO's motion can only succeed by showing that Plaintiffs *cannot* meet an element of their claims at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). This argument appears suited to an *opposition* to a summary judgment motion on the scienter requirement, which Plaintiffs did not file. In any case, the record reveals an ample basis for a jury to conclude that GEO intended detainees to believe they could be placed in solitary confinement for refusing to clean.

To find for the plaintiff in a TVPA claim, the factfinder must determine "that the employer intended to cause the victim to believe that she would suffer serious harm –

**APP. 484**

from the vantage point of the victim – if she did not continue to work." *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011).  Evidence of intent can be inferred from the circumstances. *Id*. at 1171 (upholding jury's verdict based on "reasonable inferences" drawn from the evidence); *id.* 1173 (when there were "two reasonable interpretations" of a single statement – one threatening and one non-threatening – a juror could reasonably conclude that the defendant intended the threatening one).

Here, the record strongly supports the inference – which here must be drawn in favor of Plaintiffs, as the nonmoving party – that GEO intended its threats of solitary confinement to compel detainee labor.  GEO guards threatened on numerous occasions to put detainees in solitary confinement for refusing to clean.  For example, named Plaintiff Hugo Hernandez-Ceren described an incident where a GEO sergeant gathered detainees in his pod and told them "If you refuse to clean, you will be sent to the hole . . . And that's not a place where you want to be at because it's cold in there [and] you're going to lose your privileges."  Plaintiffs' Opp. Ex. 2 (Hernandez-Ceren Dep. 78:21-79:5).  Similarly, named Plaintiff Grisel Xahuentitla testified that she witnessed multiple such threats, including one incident where a fellow detainee was too sick to clean and the guard pointed to the solitary confinement unit and told the sick detainee "that if she didn't do the work, she was going to be sent to the hole."  Plaintiffs' Reply Ex. 10, ECF No. 287-10 (Xahuentitla-Flores Dep. 73:19-74:9).

Further, Class Member Plaintiff Alejandro Hernandez Torres was sent to the hole for refusing to clean.  He testified that after he told a guard, "No, I'm not going to clean,"

**APP. 485**

the guard "turned [Mr. Torres] by [his] shoulder, put the handcuffs on [him] and took [him] to segregation."  Plaintiffs' Opp. Ex. 3 (Hernandez-Torres Dep. 60:8-14).

Indeed, Luis Pagan, himself a GEO guard, admitted that guards made such threats to enforce compliance with facility rules, including the HUSP.  Plaintiffs' Opp. Ex. 5 (Pagan Dep. 122:3-125:4).  Mr. Pagan testified that guards who sent detainees to the hole for refusing to clean "didn't do anything wrong" and had acted "within their powers" as GEO guards.  *Id.*  This underscores the fact that the whole point of "disciplinary segregation" is the same as for all forms of discipline, which by definition is "the practice of training people to obey rules or a code of behavior, using punishment to correct disobedience."[11]  Intent is implicit in this definition.

Disregarding this evidence, GEO misleadingly suggests that the only evidence of a threat comes from the testimony of Named Plaintiff Demetrio Valerga, then mischaracterizes the testimony as reflecting that the threats of segregation came from ICE and not GEO employees.  In fact, Mr. Valerga testified that a GEO guard woke him up one morning with an order to clean, and when Mr. Valerga declined to do so, the guard "told me if I don't clean, he's going to take me to the hole."  GEO Ex. M, ECF No. 271-7 (Valerga Dep. 137:12-14).  When Mr. Valerga continued to resist, the guard involved ICE personnel.  *Id.* at 138:2-139:19.[12]  Although Mr. Valerga was not placed in the hole

---

[11]   Oxford University Press (2020 discipline in: Lexico.com) *available at*: https//www.lexico.com/definition/discipline (last accessed July 28, 2020).

[12]   To the extent ICE personnel stationed at Aurora also threatened detainees with solitary confinement for refusing to work, that does not affect the derivative sovereign immunity analysis.  ICE officers onsite at Aurora were not authorized to condone acts that deviate from the requirements of the ICE-GEO contract, as GEO's forced-cleaning

**APP. 486**

for refusing to clean that day, the undisputed evidence in the record shows that many of his fellow detainees were.  Add. Fact No. 13.[13]  A jury can infer GEO's knowledge from these facts.

## V.   CONCLUSION

GEO's motion for summary judgment founders on the law of derivative sovereign immunity, the facts of this case, and the summary judgment standard.  GEO cannot meet any element of the derivative sovereign immunity or government contractor defenses, and its motion should accordingly be denied.

Dated:   New York, NY
       July 31, 2020

Respectfully submitted,

By: */s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000

---

regime does.  *See* Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Dep. 198:22-199:10); Reply Ex. 6, ECF No. 287-6 (A. Martin Dep. 81:22-82:13); GEO's Second Notice of Supplemental Authority Ex. B, ECF No. 297-2 at 3-4 (Contracting Officer's Representative ("COR") Appointment Letter) (listing functions and actions the COR "shall not" undertake, including "direct the contractor . . . to operate in conflict with the contract terms and conditions," "[c]hange or modify any of the terms and conditions . . . of a contract," or "specify[] how the Contractor will accomplish performance").

[13]      GEO appears to suggest that this one instance, where threats of solitary confinement were unsuccessful in compelling detainee labor, proves conclusively that such threats did not constitute serious harm.  That argument is based on a misunderstanding of the TVPA, which "will not look at how each Plaintiff perceived the Defendants' actions or whether he or she subjectively felt compelled to work." *Paguirigan v. Prompt Nursing Employment Agency LLC*, No. 17 Civ. 1302, 2019 WL 4647648, at *16 (E.D.N.Y. Sept. 24, 2019) (quoting *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2011 WL 7095434, at *8 (C.D. Cal. Dec. 12, 2011)).  Rather, "the inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions." *Id.*

**APP. 487**

Facsimile: (646) 509-2060
E-Mail: mscimone@outtengolden.com

Rachel Dempsey
Adam Koshkin
**OUTTEN & GOLDEN LLP**
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
E-Mail: rdempsey@outtengolden.com
E-Mail: akoshkin@outtengolden.com

Alexander Hood
David Seligman
Juno Turner
**TOWARDS JUSTICE**
1410 High St., Suite 300
Denver, CO 80218
(720) 441-2236
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org

R. Andrew Free
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
T: (844) 321-3221
Andrew@ImmigrantCivilRights.com

Brandt Milstein
**MILSTEIN LAW OFFICE**
1123 Spruce Street
Boulder, CO 80302
(303) 440-8780
brandt@milsteinlawoffice.com

Andrew Turner
**THE KELMAN BUESCHER FIRM,
P.C.**
600 Grant St., Suite 825
Denver, CO 80203

**APP. 488**

(303) 333-7751
aturner@laborlawdenver.com

Hans Meyer
**MEYER LAW OFFICE, P.C.**
P.O. Box 40394
Denver, CO 80204
(303) 831-0817
hans@themeyerlawoffice.com

*Class Counsel*

**APP. 489**

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2020, a copy of the foregoing document was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
E-Mail: mscimone@outtengolden.com

APP. 490

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated*,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Defendant The GEO Group, Inc. ("Defendant" or "GEO"), by and through undersigned counsel, hereby moves for summary judgment on the merits of Plaintiffs' claims raised under the Trafficking Victims Protection Act ("TVPA") and unjust enrichment theory of liability.[1]

---

[1] Currently pending before the Court are cross-motions for summary judgment on GEO's defenses of derivative sovereign immunity and the federal contractor defense. ECF Nos. 260, 284. Should this Court enter judgment in GEO's favor, this motion will become moot. Alternatively, should the Court enter judgment in favor of GEO on the present motion, the pending cross-motions will become moot.

54238580;3

**APP. 491**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................ 7
II.     PROCEDURAL HISTORY ............................................................................ 8
III.    UNDISPUTED FACTS ................................................................................... 9
        A.    Policies Challenged By Plaintiffs. ....................................................... 9
        B.    Plaintiff's Experiences at the AIPC. ................................................... 12
        C.    GEO's Operations. .............................................................................. 15
IV.     LAW ............................................................................................................ 16
        A.    Summary Judgment Standard. ............................................................ 16
        B.    The Trafficking Victims Protection Act. ............................................ 17
        C.    Unjust Enrichment. ............................................................................. 22
V.      ANALYSIS ................................................................................................... 23
        A.    Plaintiffs' TVPA Claims. .................................................................... 23
        B.    The Disciplinary Severity Scale in the AIPC Handbook Constitutes Warnings
              of Legitimate Consequences, Not A Threat. ..................................... 28
        C.    Plaintiffs Cannot Show GEO Acted With the Specific Intent To Threaten. ........ 30
        D.    Plaintiffs Cannot Establish Causation. ............................................... 32
        E.    Claims That Accrued Before December 23, 2008 Are Time Barred. .................. 33
        F.    There is No Private Cause of Action For Injunctive Relief Under the TVPA. .... 34
        G.    Plaintiffs' Unjust Enrichment Claims. ................................................ 35
VI.     CONCLUSION .............................................................................................. 37
CERTIFICATE OF SERVICE ................................................................................. 39

54238580;3

**APP. 492**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abarca v. Little*,
    54 F. Supp. 3d 1064 (D. Minn. 2014) .......................................................................33

*Aguilera v. Aegis Communications Group*,
    LLC, 72 F. Supp. 3d 975 (W.D. Mo. 2014) .............................................................18

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...................................................................................................17

*Barnett v. Surefire Med., Inc.*,
    342 F. Supp. 3d 1167 (D. Colo. 2018) .....................................................................22

*Barrientos v. CoreCivic, Inc.*,
    951 F.3d 1269 (11th Cir. 2020) ....................................................................18, 19, 29

*Bayh v. Sonnenburg*,
    573 N.E.2d 398 (Ind. 1991) .......................................................................................29

*United States v. Bradley*,
    390 F.3d 145 (1st Cir. 2004), *overruled on other grounds*, 545 U.S. 1101, 125 S. Ct. 2543,
    162 L. Ed. 2d 271 (2005) ...............................................................................19, 21, 28

*c.f. Rossetti Assocs., Inc. v. Santa Fe 125 Denver, LLC*,
    No. 09–cv–0033–‒ ....................................................................................................23

*c.f. Velez v. Sanchez*,
    693 F.3d 308 (2d Cir. 2012) ......................................................................................33

*United States v. Calimlim*,
    538 F.3d 706 (7th Cir. 2008) .........................................................................19, 22, 28

*United States v. Callahan*,
    801 F.3d 606 (6th Cir. 2015) .....................................................................................27

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1985) ...................................................................................................16

*Channer v. Hall*,
    112 F.3d 214 (5th Cir. 1997) .....................................................................................29

**APP. 493**

*United States v. Dann*,
  652 F.3d 1160 (9th Cir. 2011) ..................................................................18, 21, 30

*David v. Signal Int'l, LLC*,
  No. CIV.A. 08-1220, 2012 WL 10759668 (E.D. La. Jan. 4, 2012).........................32

*United States v. Djoumessi*,
  538 F.3d 547 (6th Cir. 2008) .........................................................................26, 27

*Doe v. Siddig*,
  810 F.Supp.2d 127 (D.D.C. 2011) .........................................................................33

*Echon*, 2017 WL 4181417, at *13 (D. Colo. Sept. 20, 2017)................................19, 20

*Fort Peck Hous. Auth. v. United States Dep't of Hous. & Urban Dev.*,
  367 F. App'x 884 (10th Cir. 2010) .........................................................................35

*Garcia v. Curtright*,
  No. 6:11-06407-HO, 2012 WL 1831865 (D. Or. May 17, 2012).........................18, 20, 22, 30

*Garner v. FCA Chrysler*,
  No. 19-CV-00270-CMA-NYW, 2020 WL 1650450 (D. Colo. Apr. 3, 2020.........................36

*Gilbert v. United States Olympic Comm.*,
  423 F. Supp. 3d 1112 (D. Colo. 2019)...................................................................33

*United States ex rel. Hawkins v. ManTech Int'l Corp.*,
  No. CV 15-2105 (ABJ), 2020 WL 435490 (D.D.C. Jan. 28, 2020) ........................21

*Headley v. Church of Scientology Int'l*,
  687 F.3d 1173 (9th Cir. 2012) ..................................................................19, 28, 30

*Indian Mountain Corp. v. Indian Mountain Metro. Dist.*,
  2016 COA 118M..................................................................................................22, 35

*Jobson v. Henne*,
  355 F.2d 129 (2d Cir. 1966)...................................................................................29

*United States v. Kalu*,
  791 F.3d 1194 (10th Cir. 2015) .............................................................................20

*Lawry v. Palm*,
  192 P.3d 550 (Colo. App. 2008) ............................................................................22

*Lujan v. National Wildlife Federation*,
  497 U.S. 871 (1990)................................................................................................17

54238580;3

*Martinez-Rodriguez v. Giles*,
    391 F. Supp. 3d 985 (D. Idaho 2019) ...............................................20, 21, 25, 31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................................17

*Muchira v. Al-Rawa*f,
    850 F.3d 605 (4th Cir. 2017) ....................................................................... passim

*United States v. Nnaji*,
    447 F. App'x 558 (5th Cir. 2011) ........................................................................21

*O'Connor v. Check Rite, Ltd.*,
    973 F. Supp. 1010 (D. Colo. 1997).......................................................................16

*PayoutOne v. Coral Mortg. Bankers*,
    602 F. Supp. 2d 1219 (D. Colo. 2009)..................................................................36

*Pernick v. Computershare Tr. Co., Inc.*,
    136 F. Supp. 3d 1247 (D. Colo. 2015)......................................................23, 36, 37

*Pulte Home Corp. v. Countryside Cmty. Ass'n*,
    382 P.3d 821 (Colo. 2016)....................................................................................36

*Redd Iron, Inc. v. Int'l Sales & Servs. Corp.*,
    200 P.3d 1133 (Colo. App. 2008) .........................................................................22

*United States v. Rivera*,
    799 F.3d 180 (2d Cir. 2015)..................................................................................20

*Salzman v. Bachrach*,
    996 P.2d 1263 (Colo. 2000)..................................................................................22

*St. Charles Inv. Co. v. Comm'r*,
    232 F.3d 773 (10th Cir. 2000) ..............................................................................35

*United States v. Toviave*,
    761 F.3d 623 (6th Cir. 2014) ....................................................................... passim

*Villanueva Echon v. Sackett*,
    No. 19-1099, 2020 WL 1696854 (10th Cir. Apr. 8, 2020)...................................17

**Statutes**

8 U.S.C § 1589 *et seq.*...........................................................................................7

18 U.S.C. § 1589(a) ............................................................................................18

18 U.S.C § 1589(c) ...........................................................................................24

18 U.S.C. § 1589(c)(2) ........................................................................18, 21, 30

18 U.S.C. § 1595(a) .....................................................................................34, 35

18 U.S.C. § 1595(c) .....................................................................................33, 34

18 U.S.C § 1595A(a) ...................................................................................34, 35

Trafficking Victims Protection Act ........................................................................17

**Rules**

Fed. R. Civ. P. 23(a) ..............................................................................................8

Fed. R. Civ. P. 56(c) ...........................................................................................16

Fed. R. Civ. P. 56 (d) ..........................................................................................17

**Other Authorities**

H.R. Conf. Rep. 106–939, at 1 (2000) ................................................................19

54238580;3

**APP. 496**

## I.    INTRODUCTION

Plaintiffs are all former detainees who were held under the authority of Immigration and Customs Enforcement ("ICE") at the Aurora ICE Processing Center ("AIPC") between 2004 and 2014. Plaintiffs seek redress under the TVPA, 8 U.S.C § 1589 *et seq.*, and common law unjust enrichment. However, the facts presented in this case do not come close to the definition of human trafficking as used in the TVPA. Plaintiffs seek a precedential decision that would put every detention facility, jail, mental health facility, and juvenile detention center at risk of being credibly accused of forced labor by simply providing their residents with a listing of the facility's rules and regulations. Such a ruling would be contrary to all precedent. Indeed, Plaintiffs' claims rest on the allegation that the mere mention of 72 hours of segregation as one of many ICE-mandated potential sanctions in a facility handbook, constitutes a threat of serious harm. But a finding of serious harm requires more than a warning of legitimate consequences. Accordingly, summary judgment is appropriate as to Plaintiffs' TVPA claim.

Additionally, Plaintiffs seek redress under the common law principles of unjust enrichment, arguing that GEO profited off their labor by paying them a $1 per day stipend to participate in a Voluntary Work Program ("VWP") when GEO would have otherwise incurred higher costs. In making this argument, Plaintiffs rely upon the fundamentally flawed assumption that GEO would have seen a decrease in profits had it hired additional employees. To the contrary, uncontroverted evidence dispels this notion. Had GEO hired employees of its own choosing (and skill levels) to complete the tasks that are performed in the VWP, GEO would have made **additional** profit on that labor. Thus, Plaintiffs claim for unjust enrichment fails. Further, even if Plaintiffs could establish GEO was enriched by a program designed to keep detainees busy and

**APP. 497**

reduce disciplinary infractions, Plaintiffs claims are barred because a claim for unjust enrichment is improper where a valid contract exists. Here, all Plaintiffs signed a valid contract for their participation in the VWP. This Court should accordingly enter an order granting summary judgment in favor of GEO.

## II.   PROCEDURAL HISTORY

On May 6, 2016, Plaintiffs filed their Motion for Class Certification ("Certification Motion"). ECF 49. In their motion, they sought to certify two classes: (1) the "Forced Labor Class", alleging that that GEO violated the TVPA, and (2) the "VWP Class," which asserts a claim under the theory of unjust enrichment. In the Certification Motion, Plaintiffs alleged that Plaintiffs, and members of the Forced Labor Class, performed "uncompensated janitorial labor under the threat of solitary confinement." ECF 49, 3. They argued that Plaintiffs in the VWP Class performed work for $1.00 per day, unjustly enriching GEO by the "millions of dollars it would otherwise pay outside contractors." *Id.* at 4.

In support their TVPA claim, Plaintiffs argued that because the Aurora ICE Processing Center Handbook ("AIPC Handbook") was provided to every detainee the commonality prong of Fed. R. Civ. P. 23(a) was satisfied. ECF 49, 11. More specifically, Plaintiffs argued their case was suitable for classwide resolution because it was based upon a written policy—not the individual actions of different GEO employees or unique experiences of various detainees. ECF 49 at 11-12[2]. Similarly, Plaintiffs asserted that the VWP Class was suitable for classwide resolution because all

---

[2] "This case is about a **written** Forced Labor Policy set out clearly for the employees responsible for enforcing it and the detainees responsible for abiding by it. That policy provides that class members must perform housing unit sanitation work or be subject to an administrative legal process that could result in up to 72 hours in solitary confinement." (emphasis added).

54238580;3

detainees worked for a rate of $1 per day, regardless of the tasks they performed. *Id.* at 7. Based upon Plaintiffs' representations about their claims and the availability of classwide proof, this Court granted Plaintiffs' motion. ECF 57.

Following extensive discovery, Plaintiffs have failed to establish that the AIPC Handbook constitutes an improper means of coercion under the TVPA. Plaintiffs do not and cannot present sufficient evidence to meet their burden to show that: (1) their conditions of confinement were "sufficiently serious" to give rise to liability under the TVPA; (2) the disciplinary severity scale is not simply a warning of a legitimate consequence; (3) GEO acted knowingly; or (4) that the disciplinary severity scale was the driving factor in detainees deciding to clean-up after meals. As to the unjust enrichment claims, Plaintiffs have failed to present evidence that would support a claim of unjust enrichment based upon the VWP; GEO would have realized a higher profit if it had hired more employees in lieu of detainees and Plaintiffs signed contracts for participation in the VWP preclude any unjust enrichment claim.

## III.   UNDISPUTED FACTS

### A.   Policies Challenged By Plaintiffs.

1. At the class certification stage Plaintiffs cited to a Policy and Procedure Manual, titled "Sanitation Procedures" in support of their claims.[3] ECF 50-2.

2. The Sanitation Procedures were not developed to assign tasks to any specific individuals, but rather to detail the process for cleaning and materials to be used. ECF 289 (Undisputed Fact 31).

3. Detainees do not receive a copy of the Sanitation Procedures during their stay at AIPC. ECF 50-1, 29:13-18 (30(b)(6) Deposition of Ceja).

---

[3] Plaintiffs have renamed this document the "HUSP," but no formal GEO policy is designated or titled "HUSP." It appears that this phrase originates not from the Sanitation Procedures, but instead the detainee handbook which contains a subsection called "Housing Unit Sanitation." See ECF 260 at 7.

54238580;3

**APP. 499**

4. Plaintiffs no longer rely upon the Sanitation Procedures as a policy that underlies their TVPA claim. **Ex. A.** (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories, Responses to Interrogatory No. 39).

5. Plaintiffs also cited the AIPC Handbook at the class certification stage as support for their TVPA claims. ECF 50-3.

6. Unlike the Sanitation Procedures, the AIPC Handbook is issued to all detainees entering the facility. ECF 289 (Undisputed Fact 23).

7. The only classwide polices that Plaintiffs challenge as part of their TVPA claim are the AIPC Handbook and an Orientation video shown to detainees upon arrival. **Ex. A**. (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories Responses to Interrogatory No. 39).

8. More specifically, Plaintiffs challenge the meal clean-up policy in the AIPC Handbook whereby 6 detainees (2 of which are paid "Trustees" under the VWP) assist in cleaning up the housing unit after each meal. ECF 49; ECF 261-17, 20.

9. The meal clean up section of the handbook provides for the following sanction if not followed:

> If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean will result in further disciplinary action.

ECF 261-17, 20.

10. GEO is required to comply with ICE's PBNDS under its contract. ECF 289 (Undisputed Facts 11-14, 16,18).

11. All applicable versions of ICE's National Detention Standards ("NDS") and PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale and incorporate it into the AIPC Handbook. ECF 289 (Undisputed Fact 19).

12. All applicable versions of ICE's NDS and PBNDS require GEO to provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 289 (Undisputed Fact 21).

13. The ICE disciplinary severity scale included in the AIPC Handbook provides for up to 12 other sanctions as a possible consequence for refusing to clean one's living area. These sanctions include warning, reprimand, and loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.). ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17.

14. GEO included this sanction in the AIPC Handbook, as required by ICE. ECF 289 (Undisputed Facts 11-14, 16, 18, 19, 21).

15. The detainee orientation video provides:

> You will be protected from personal abuse, corporal punishment, personal injury, disease, and damage to your property and harassment to the fullest extent possible. Each and every detainee must participate in the sanitation program. A list of detainee's [sic] is developed each day and is posed for viewing. During a general clean-up all detainees must participate.
> *****
> Disciplinary Process[.] Refer to your local supplement for more detailed information about the rules infractions that you must avoid and the established disciplinary actions that will be taken.
> *****
> **High Moderate**- and a few examples are . . . Indecent exposure, staling, refusing to obey a staff member, insolence to staff member, lying or providing false statement to staff, being in an unauthorized area, not standing for count, interfering with count, gambling, destroying altering or damaging property"

*See* ECF 262-10 (emphasis in original).

16. In addition to the AIPC Handbook and orientation video, GEO is required to provide all detainees with the ICE National Handbook. Like the AIPC handbook', the ICE Handbook also warns detainees that they could face disciplinary consequences if they refuse to clean, stating "Will I get paid for keeping my living area clean? No. **You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined.**" **Ex. B**. (ICE National Handbook). Despite this being materially similar to the AIPC Handbook, Plaintiffs do not allege that ICE's National Handbook constituted a threat as defined by the TVPA. ECF 49; **Ex. A** (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories, Responses to Interrogatory No. 39) (omitting any reference to the ICE National Handbook).

54238580;3

**APP. 501**

17. Plaintiffs also challenge the VWP daily stipend. ECF 1, ECF 49,3.

18. All detainees are offered the opportunity to participate in the VWP. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17.

19. All detainees who participate in the VWP are told that their participation is voluntary. **Ex. C.** (Plaintiffs' VWP applications).

20. All detainees who participate in the VWP are told in advance that "compensation shall be $1.00 per day." **Ex. C.** (Plaintiffs' VWP applications.).

21. All detainees must sign an agreement to participate in the VWP, acknowledging that their compensation will be limited to $1 per day. **Ex. C.** (Plaintiffs' VWP applications).

22. Some VWP participants receive additional incentives for their participation including candy or ice cream. **Ex. D** (Ceja 30(b)(6) Dep.162-163).

**B.      Plaintiff's Experiences at the AIPC.**

23. Plaintiff Menocal described a typical day at AIPC as follows:
> I wake up, get dressed, do my bed, wait for breakfast, eat breakfast, clean up, maybe exercise, walk around, read a book, draw. It depends. Again, wait for lunch to eat, clean up, maybe shower, maybe do some sports, maybe talk on the phone with someone, maybe write a letter, walk around, exercise, wait for dinner. Same thing, eat dinner, relax a while, maybe watch TV, read a book, draw, and, you know, wait for bedtime.

**Ex. E** (Menocal Dep. 121:5-13).

24. While detained, Plaintiff Menocal described AIPC to a friend as follows:
> [T]hey've got pretty good grub, considering it's, you know, a detention center. And we got three televisions, a bunch of tables, a bunch of people, and we all get along. Pretty nice. I mean, it's -- for being incarcerated, it's not bad at all, not compared to -- not compared to Denver County or the other one where I was at. This is like Camp Snoopy. It's pretty easy.

**Ex. E** (Menocal Dep. 54:5-12).

25. Plaintiff Hugo Hernandez described a typical day as follows:
> I would wake up for breakfast at 5:00 in the morning. I will walk out, store my food, bring it back to the cell, and go to sleep only if it was not my time to clean. But if I was assigned to clean, I have to

stay outside and clean. I couldn't go back to sleep. So[,] I will store my food. I will wake up when I wake up, and brush my teeth, do my coffee, and make sure that all my cellies get the coffee because that's my one main thing. Then we will all sit at the table. I will do my legal work, go through my documents, and see what else I need to put in or something, watch a little bit of TV. I can go to the phone a little bit. If -- if I will get someone to answer, I will go to the phone. Wait for count time, wait for lunch. After lunch, I will do a cleanup again, which is cleanup time, and wait to see who's assigned for the cleanup, and if I'm not assigned, then I just go to my cell or I go against the wall just like everybody else. And once everything gets reopened, go back into the table again and do some workout while waiting -- doing my workout. I wait for chow again and wait for the cleanup, and, of course, shower. Yeah, after the workout, shower, get back. Wait for chow, clean up, and then eventually wait for the GEO guard, Officer Blacknick, to come and pick me up so we can go to the law library and collect all detainees who wanted to go to the library. We'll go to the law library, get a pat-down, go inside the law library.·And in there, I will help detainees with their documents, printouts, making sure they understood what the immigration judge was asking them to bring back, translations, looking for any specific application they were looking for. And then once we were done, like an hour later or an hour and a half later, I get another pat-down, get taken back to the cell, and wait for count time.

**Ex. F** (Hernandez Dep. 107-108).

26. While at AIPC, every detainee had the ability to communicate with ICE at any time. **Ex. B** (ICE Detainee Handbook, pg. 2) ("ICE officers will routinely visit the housing units at your facility. If you have questions about your case **or how the facility has treated you**, let the ICE officers know. . . [y]ou may also submit a request for information in writing."); **Ex. E** (Menocal Dep. 56:1-10); **Ex. F** (Hernandez Dep. 97:15-22).

27. Some detainees elected to be placed in segregation voluntarily, seeing it not as a punishment, but instead a location where they could receive peace and quiet. **Ex. D** (Ceja 30(b)(6) Dep. 55:7-19).

28. None of the named Plaintiffs were placed in segregation for refusing to clean. **Ex. A** (Brambila's Responses to GEO's Sixth Interrogatories); **Ex. E** (Menocal Dep. 100:16-19); **Ex. F** (Hernandez Dep. 181:1-7); **Ex. G** (Valerga Dep. 141:24-142:2, 140:12-13); **Ex. H** (Lourdes Argueta Second Set of Discovery, Interrogatory No. 27; Yepez Gaytan Second Set of Discovery, Interrogatory No. 27; Alexaklina Second Set of Discovery, Interrogatory No. 27); **Ex. I** (Vizguerra Dep. 42:5-7); **Ex. J** (Xahuentitla Dep 70:11-17).

54238580;3

**APP. 503**

29. Plaintiff Menocal did not receive direct threats for refusing to clean. **Ex. H** (Menocal's Second Set of Discovery, Interrogatory No. 27).

30. Plaintiff Olga Alexaklina was never threatened by GEO employees with disciplinary or administrative segregation for failing to clean. **Ex. H** (Alexaklina Second Set of Discovery, Interrogatory No. 27).

31. Upon being informed that he would be placed in segregation if he did not clean, Plaintiff Valerga responded with "go ahead." **Ex. G** (Valerga Dep. 136:16-137:19). Yet, Plaintiff Valerga was not placed in segregation on that occasion or any other occasion. *Id.* Valerga Dep. 141:24-142:2, 140:12-13.

32. Plaintiff Hernandez testified in his deposition that he did not, and does not, consider the AIPC Handbook to be threatening. **Ex. F** (Hernandez Dep. 58:12-24).

33. Plaintiff Dagoberto Vizguerra does not recall receiving the AIPC Handbook, let alone being threatened by it. **Ex. I** (Vizguerra Dep. 90:24-91:4).

34. Plaintiffs are not making a claim for "mental anguish, emotional distress, or other similar related conditions." **Ex. H** (Plaintiffs Responses to Interrogatory No. 32).

35. Plaintiffs' expert, Dr. Stuart Grassian, did not diagnose any of the plaintiffs with psychological conditions. **Ex. K** (Grassian Dep. 37:22-23; 237:20-238:24).

36. Detainees had varying motivations for cleaning:

   a. Plaintiff Menocal preferred to clean up after himself while living at AIPC because he preferred to "live and hang out in a clean environment." **Ex. E** (Menocal Dep. 81:6-10).

   b. Indeed, while living at AIPC Plaintiff Menocal asked for permission to clean the recreation area without an expectation of remuneration simply because he spent a lot of time there and wanted to "hang out in a clean environment." **Ex. E** (Menocal Dep. 86:22-87:5).

   c. Plaintiff Hernandez liked to keep his area clean. **Ex. F** (Hernandez Dep. 49:24-50:1).

   d. To avoid the loss of TV time, detainees would often volunteer to help clean up the living area, even if not asked or assigned by GEO officers. **Ex. F** (Hernandez Dep. 78:2-9).

54238580;3

**APP. 504**

    e. Plaintiff Gaytan received access to X-Box gaming systems, movies, and ice cream as an incentive to keep his dorm clean. **Ex. L** (Gaytan Dep. 124:3-16).

    f. During the meal clean-up, two trustees in each of the housing units would be paid under the VWP to assist with meal cleanup. **Ex. M** (Quezada Dep. 64:9-19).

    g. Once a week, the cleanest housing unit is rewarded with ice cream or cookies. **Ex. D** Dawn Ceja 30(b)(6) Dep. 163:12-16 (3/29/16).

37. Plaintiffs' expert, Dr. Grassian, is unaware of *any literature* that stands for the proposition that a threat of 72-hours in segregation could cause psychological harm. **Ex. K** (Grassian Dep. 243:14-21).

**C.**    **GEO's Operations.**

38. ICE's Disciplinary Severity Scale (incorporated into the AIPC Handbook) allows for a graduated scale of offenses. ECF 289 (Undisputed Fact 19).

39. The PBNDS instruct detention officers to resolve disciplinary infractions in an informal manner where possible. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17.

40. GEO's detention officers did not routinely or uniformly enforce segregation for the failure to clean. **Ex. N.**

41. It would be a very rare occurrence for a detention officer tell a detainee that they would be sent to segregation if they did not clean. **Ex. N.**

42. When a detainee was placed in segregation for the refusal to clean, it was typically because the refusal to clean was in concert with another disciplinary infraction. *Id.* **Ex. N.**

43. Consistent with the PBNDS, detention officers worked to resolve issues informally wherever possible. **Ex. N.**

44. Where formal sanctions were necessary, officers imposed lesser sanctions as permitted by the disciplinary severity scale wherever possible. *Id.*; **Ex. O** (Ceja 30(b)(6) Dep. 113:13-17).

45. The detention officers were not trained to tell detainees they could be sent to segregation or to utilize segregation as a response to the failure to clean absent additional disciplinary concerns. **Ex. N.**

46. Importantly, none of the detention officers intended to scare or intimidate any individual into performing labor. *Id.* **Ex. N.**

47. When a detainee would refuse to clean, the detention officers would typically ask another detainee to assist with cleaning instead. *Id.*

48. If no detainees performed any work in the Aurora facility, GEO would make more money, not less. **Ex. P** (Ragsdale 30(b)(6) Dep. 168:4-10).

49. At AIPC the $1.00 daily allowance is a pass through from the government at the actual rate. **Ex. P** (Ragsdale 30(b)(6) Dep. 166:20-167:6)

50. "[T]here's no incentive financially for GEO to use any voluntary work person to do anything, particularly when you have to, again, incentivize them . . . beyond a dollar a day. It's sort of cost neutral at a dollar a day but it gets — it becomes a cost to us if it goes beyond that." **Ex. P** (Ragsdale 30(b)(6) Dep. 168:12-17).

51. If ICE did not mandate the VWP as a requirement of its contracts, GEO would "build the staff [in]to [its] cost estimate and then [] mark that cost up." **Ex. Q** (Evans Dep. 75:3-10).

52. GEO's markup would be a fee of up to 15% of the labor cost. **Ex. Q** (Evans Dep. 29:2-21; 62:16-63:14).

## IV.   LAW

### A.   Summary Judgment Standard.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *O'Connor v. Check Rite, Ltd.*, 973 F. Supp. 1010, 1014 (D. Colo. 1997). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56 (d).

Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### B.    The Trafficking Victims Protection Act.

To prevail on their claim under the TVPA.[4] Plaintiffs must establish that:

(1)    [GEO] <u>knowingly</u> obtained Plaintiffs' labor by one of or combination of the following means:

(a)    means of force, physical restraint, or threats of force or physical restraint;
(b)    by means of serious harm or threats of serious harm;
(c)    by means of abuse of the law or threats of abuse of the law or legal process;
(d)    by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or other person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a) (emphasis added). The statute defines "serious harm" as:

[A]ny harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the

---

[4] As the Honorable Magistrate Judge Wang recently observed, "[t]here is limited case law from the Tenth Circuit discussing the types of acts and conduct that qualify as means of serious harm or abuse of law or legal process for purposes of TVPA liability. Therefore, the court considers cases from other jurisdictions that have encountered the question." *Echon*, 2017 WL 4181417, at *13 (D. Colo. Sept. 20, 2017), *report and recommendation adopted*, No. 14-CV-03420-PAB-NYW, 2017 WL 5013116 (D. Colo. Nov. 1, 2017), *aff'd sub nom. Villanueva Echon v. Sackett*, No. 19-1099, 2020 WL 1696854 (10th Cir. Apr. 8, 2020). For these same reasons, GEO relies upon case law from other jurisdictions throughout this motion.

54238580;3

**APP. 507**

> same circumstances to perform or to continue performing labor or services in order
> to avoid incurring that harm.

18 U.S.C. § 1589(c)(2). Under the statutory definitions, a court cannot simply conflate poor

working conditions with a TVPA violation. *Muchira v. Al-Rawaf*, 850 F.3d 605, 619-20 (4th Cir.

2017), as amended (Mar. 3, 2017) (affirming award of summary judgment to defendants where

plaintiff's claim of "forced labor" was "based solely upon her assertion that the Saudi cultural

'house rules,' coupled with her long work hours and verbal reprimands, caused her to experience

serious psychological harm in the form of depression, acute stress, and panic attacks."); *see also*

*United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) ("To be sure, not all bad employer-

employee relationships or even bad employer-immigrant nanny relationships will constitute forced

labor."); *Aguilera v. Aegis Communications Group*, LLC, 72 F. Supp. 3d 975, 978 (W.D. Mo.

2014) ("[N]ot all bad employer-employee relationships constitute forced labor."); *Garcia v.

Curtright*, No. 6:11-06407-HO, 2012 WL 1831865, at *4 (D. Or. May 17, 2012) ("[N]ot all bad

employer-employee relationships constitute forced labor."). Similarly, any construction must be

distinguishable "from that of ordinary parents requiring chores," *United States v. Toviave*, 761

F.3d 623, 625–26 (6th Cir. 2014). In the ICE detention context, any construction of the TVPA

should not "call into question longstanding requirements that detainees or inmates be required to

perform basic housekeeping tasks." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1278 (11th Cir.

2020). Likewise, the disciplinary severity scale in ICE's PBNDS, which provides sanctions for

detainees who "among other things, refuse to complete basic personal housekeeping tasks or

organize work stoppages . . . [does not on its] own, give rise to TVPA liability." *Id.* This is

consistent with longstanding TVPA case law which provides that an assessment of whether a

TVPA violation has occurred requires a court to differentiate between legitimate warnings of

possible consequences and "illicit threat[s]." *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) ("In applying the Act, we must distinguish between [i]improper threats or coercion and permissible warnings of adverse but legitimate consequences.");*United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) ("[W]arnings of legitimate but adverse consequences or credible threats of deportation, standing alone, are not sufficient to violate the forced labor statute."); *United States v. Bradley*, 390 F.3d 145, 151 (1st Cir. 2004), *overruled on other grounds*, 545 U.S. 1101, 125 S. Ct. 2543, 162 L. Ed. 2d 271 (2005).

Rather, in order to determine whether a certain set of circumstances constitutes "serious harm," courts consider whether considering all of the "surrounding circumstances" a reasonable person in the <u>same circumstances</u> would have felt compelled or coerced into providing labor or services. *Echon*, 2017 WL 4181417, at *13. "The harm or threat of harm, considered from the vantage point of a reasonable person in the place of the victim, must be sufficiently serious to compel that person to remain in her condition of servitude when she otherwise would have left." *Muchira*, 850 F.3d at 618 (quoting *Dann,* 652 F.3d at 1170). In considering all of the circumstances, courts have found "serious harm" for purposes of the TVPA where the conditions are inhumane—truly mirroring Congress' intention to eliminate "slavery[] and slavery-like conditions." H.R. Conf. Rep. 106–939, at 1 (2000). As the Fourth Circuit explained,

> Typically . . . forced labor situations involve circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are used to prevent [vulnerable] victims from leaving and to keep them bound to their captors.

*Muchira*, 850 F.3d at 618–19 (*quoting United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015) and collecting cases).

Although the statute does not use the word "cause" as an element for a § 1589 violation, Plaintiffs must prove that the unlawful means of coercion <u>caused them</u> to render labor. *See United States v. Kalu*, 791 F.3d 1194, 1211-12 (10th Cir. 2015) (affirming a jury instruction on § 1589 that advised the jury to consider whether "as a result of [the defendant's] use of . . . unlawful means, the [victim rendered labor] where, if [the defendant] had not resorted to those unlawful means, the [victim] would have declined to" (quotations omitted)). Importantly, it is not enough that an individual or entity obtain the labor of another through persuasion or compulsion, but rather the labor must be obtained through the illegal coercive means detailed in the statute. *Garcia*, 2012 WL 1831865, at *4 ("[N]ot all bad employer-employee relationships constitute forced labor.").

To determine whether a threat is "sufficiently serious," courts review each individual's claims on a case-by-case basis, considering the totality of the circumstances, including a plaintiff's unique vulnerabilities. *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 996 (D. Idaho 2019) ("Courts look to whether a defendant's 'misconduct has created a situation where ceasing labor would cause a plaintiff serious harm,' recognizing that what constitutes serious harm for that plaintiff must be determined by considering the totality of the circumstances presented."). To that end, in assessing an alleged threat of serious harm, courts must "consider the particular vulnerabilities of a person in the victim's position." *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015); *see also Muchira*, 850 F.3d at 618; *Echon*, 2017 WL 4181417, at *14. While the Fifth Circuit has previously held that serious harm can include "psychological coercion," *United States v. Nnaji*, 447 F. App'x 558, 559 (5th Cir. 2011), it is not sufficient to merely "present[] evidence

54238580;3

**APP. 510**

that [Plaintiffs'] employment environment caused [them] to experience psychological harm. Rather, [Plaintiffs] must present sufficient evidence upon which a jury could reasonably conclude that [GEO] knowingly or intentionally engaged in actions or made threats that were sufficiently serious to compel a reasonable person in [each individual plaintiff's] position to remain in [GEO's] employ, against [their] will and in order to avoid such threats of harm[.]" *Muchira*, 850 F.3d at 620. In considering the particular sensitivities of an individual, a finder of fact should consider whether the victim's acquiescence was objectively reasonable under the circumstances in light of the victim's unique vulnerabilities. *Id.*; *see also United States ex rel. Hawkins v. ManTech Int'l Corp.*, No. CV 15-2105 (ABJ), 2020 WL 435490, at *18 (D.D.C. Jan. 28, 2020). Of course, the vulnerabilities must be known to the defendant at the time the actions are taken. "[T]o rely upon some hidden emotional flaw or weakness unknown to the employer would raise various problems (e.g., scienter). But ... known objective conditions that make the victim especially vulnerable to pressure (such as youth or immigration status) bear on whether the employee's labor was obtained by forbidden means." *Bradley*, 390 F.3d at 153.

In addition to limiting liability to only those violations that are "sufficiently serious" to compel the individual to remain working, the scope of the statute is further narrowed by the requirement of scienter. 18 U.S.C § 1589(c)(2); *see also Dann* 652 F.3d at 1170 (*citing Calimlim*, 538 F.3d at 711–12); *Martinez-Rodriguez*, 391 F. Supp. 3d at 991 ("in order to show that someone violated the Federal Forced Labor Statute, it must be demonstrated that first, the threat of harm was serious; and second, that the defendant had the requisite scienter, or bad state of mind."). The defendant "must intend to cause the victim to believe that she would suffer serious harm if she did not continue to work. In other words, under section 1589, the [defendant] must not just threaten

serious harm but have intended the victim to believe that such harm would befall her." *Garcia*, 2012 WL 1831865, at *4. "A statement is a threat if a reasonable person would believe that the intended audience would receive it as a threat, regardless of whether the statement was intended to be carried out." *Calimlim*, 538 F.3d at 713.

### C.     Unjust Enrichment.

Unjust enrichment is a judicially created remedy designed "to avoid benefit to one to the unfair detriment of another." *Lawry v. Palm*, 192 P.3d 550, 564 (Colo. App. 2008). A person is unjustly enriched when he or she benefits as a result of an unfair detriment to another. *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000). The proper remedy when unjust enrichment occurs is to restore the harmed party "to the position he [or she] formerly occupied either by the return of something which he [or she] formerly had or by the receipt of its equivalent in money." Restatement (First) of Restitution § 1 cmt. a (Am. Law Inst. 1937); *see also Redd Iron, Inc. v. Int'l Sales & Servs. Corp.*, 200 P.3d 1133, 1136 (Colo. App. 2008) ("[T]he party who has received the benefit is ordinarily required to make restitution in the amount of the enrichment received."). "To succeed on a claim of unjust enrichment, the moving party must establish that (1) the nonmoving party received a benefit (2) at the moving party's expense (3) under circumstances that would make it unjust for the nonmoving party to retain the benefit without commensurate compensation to the moving party." *Indian Mountain Corp. v. Indian Mountain Metro. Dist.*, 2016 COA 118M, ¶ 28, 412 P.3d 881, 888, *as modified on denial of reh'g* (Oct. 20, 2016); *see also Barnett v. Surefire Med., Inc.*, 342 F. Supp. 3d 1167, 1175 (D. Colo. 2018). However, where a party has entered into an express contract, insofar as the unjust enrichment claim touches on the same subject matter, the express contract precludes a summary judgment claim. *Pernick v. Computershare Tr. Co., Inc.*,

136 F. Supp. 3d 1247, 1268 (D. Colo. 2015); *c.f. Rossetti Assocs., Inc. v. Santa Fe 125 Denver, LLC*, No. 09–cv–0033–-WJM–BNB, 2011 WL 834177, at *7 (D. Colo. March 4, 2011) (dismissing breach of contract claim and concluding that, "because there is an enforceable contract between the two parties, the express contract precludes the unjust enrichment claim").

## V.   ANALYSIS

### A.   Plaintiffs' TVPA Claims.

Plaintiffs contend that GEO violated the TVPA when it purportedly obtained Plaintiffs' labor "through threats that those who refused to perform such uncompensated work would be subjected to discipline, up to and including solitary confinement." ECF 1, ¶ 73. They claim that the "threats" came via the AIPC Handbook detailing that detainees could be disciplined for the refusal to clean their living area. [5] Putting aside the absurdity of Plaintiffs' claim that ICE engaged a contractor to purportedly violate the very statute which ICE is provided millions of dollars annually to enforce, the facts of this case do not rise to the level of a TVPA violation. AIPC is a lawfully run contract facility carrying out ICE-appointed duties, not a trafficking scheme.

Accordingly, Plaintiffs claims must fail for four principal reasons. First, there is no evidence that Plaintiffs were subjected to serious harm as defined by the statute. Second, legitimate warnings of disciplinary consequences for those in the custody of the federal government is not what Congress envisioned in enacting a statute to combat slavery and sex trafficking. Third, Plaintiffs cannot show that GEO acted "knowingly" as defined by the TVPA. Finally, Plaintiffs cannot establish that the sanctions in the AIPC Handbook resulted in detainees deciding to clean

---

[5] The Orientation video incorporates the AIPC Handbook by reference and does not provide any information that differs from the AIPC Handbook. Therefore, this motion treats them as one and the same.

54238580;3

**APP. 513**

the facility. In short, detainees' claims fall short of establishing human trafficking. The mere fact that detainees were held in an ICE processing center and asked to participate in basic tenets of cleanliness does not provide a basis to determine that standard principles of communal living coupled with disciplinary policies used in detention centers across the nation constitute the equivalent of modern-day slavery.

**(1)   Plaintiffs Cannot Establish They Suffered "Serious Harm" As Defined by the TVPA.**

The reasonable person standard for serious harm was codified in the 2008 amendments to the TVPA when Congress added a definition for "serious harm" to 18 U.S.C § 1589(c). Under this standard, in order to prevail on their claims, Plaintiffs must establish that the AIPC Handbook's meal clean-up policies including the warning that 72-hours of segregation is a **possible** sanction for failure to clean one's living area, was as an objective matter "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform and to continue performing labor or services in order to avoid incurring that harm." *Id.* Plaintiffs can make no such claim.

First, no factfinder could conclude that the statements in the AIPC Handbook, reviewed objectively, constitute threats of serious harm. The handbook indicates that detainees must help with meal clean-up. *Supra* Fact 8. Thereafter, it states that the failure to clean-up could result in the loss of television privileges until the living area is clean. *Supra* Fact 9. There can be no question that the temporary loss of television privileges is not a threat of "serious harm," in any sense of the word. To determine whether an action constitutes serious harm, "courts look to whether a defendant's misconduct has created a situation where ceasing labor would cause a plaintiff serious harm, recognizing that what constitutes serious harm for that plaintiff must be determined by

considering the totality of the circumstances presented." *Martinez-Rodriguez*, 391 F. Supp. 3d at 996 (internal quotations omitted). A temporary loss of television privileges is not a consequence that would lead a reasonable person to fear serious harm if he or she did not clean. To the contrary, it is a punishment frequently doled out by parents to young children. Certainly, there is no colorable argument that such a consequence is in contravention of the TVPA. *Toviave*, 761 F.3d at 625-26. Routine disciplinary practices that ensure that detainees complete their chores do not create liability under the TVPA. *Id.* And, the ICE-mandated disciplinary severity scale does not state that every single time a detainee refuses to clean, he or she will be subjected to segregation. *Supra* Facts 13, 39. Rather it sets forth no less than 13 possible sanctions, including a mere warning or a reprimand. *Id.* Fact 13. Thus, it would be unreasonable to believe every single refusal to clean would lead to segregation. Thus, the statements in the AIPC Handbook cannot objectively be construed as threats of serious harm.[6]

Second, the possibility of 72 hours in segregation is not sufficiently serious to compel a reasonable person to provide labor. In over six years of litigation, Plaintiffs have failed to uncover any evidence that the potential sanction of 72 hours in segregation constitutes a threat of serious harm. Likewise, they have failed to establish that their own experiences with segregation amount to serious harm. To the contrary, Plaintiffs concede their claims are not rooted in a claim for "mental anguish, emotional distress, or other similar related questions," eliminating a claim that the warning of segregation resulted in psychological harm. *Supra* Fact 34. And Plaintiffs' own

---

[6] Interestingly, none of the detainees allege that the ICE National Handbook which contains an unequivocal warning that detainees could be disciplined for refusing to clean their living area, including any common use areas, constitutes a threat. If GEO's handbook alone can be construed as a threat, it would defy logic and reason for ICE's near identical warning not to similarly constitute a threat.

54238580;3

expert has made no diagnosis of psychological harm for any of the Plaintiffs. *Supra* Fact 35. In fact, Dr. Grassian, is unaware of *any literature* that stands for the proposition that a threat of 72 hours in segregation could cause psychological harm—negating any claim that the class suffered from a known condition in the field of psychology. *Supra* Fact 37. Thus, Plaintiffs cannot meet their burden to establish that 72 hours in segregation (or the threat of the same) is sufficiently serious to constitute a violation of the TVPA. Additionally, Plaintiffs cannot establish that the use of segregation was so prevalent as to lead a reasonable person to believe it was a likely consequence. *Supra* Facts 40-47. To the contrary, most often the refusal to clean resulted in no consequence at all. *Supra* Facts 39, 45. Even where a sanction was imposed for the refusal to clean, it was rare that the sanction selected was segregation. *Supra* Facts 43,47. To that end, none of the detainees were sent to segregation, despite many of them refusing to clean on at least one occasion. *Supra* Fact 28. Without more evidence, their claims must fail. It is simply not enough to demonstrate that the meal clean-up was inconvenient, frustrating, tedious, or even unfair. Plaintiffs have the burden to establish "sufficiently serious harm," which they cannot do.

Third, Plaintiffs cannot rely upon the surrounding circumstances at AIPC to support their claims. To be sure, "other cases in which forced labor has been found in the household context are also distinguishable in crucial ways. Most involve defendants that subjected their victims to more extreme isolation [and mistreatment]." *Toviave*, 761 F.3d at 629. For example, in *United States v. Djoumessi*, 538 F.3d 547 (6th Cir. 2008), a family brought a fourteen-year-old Cameroonian girl to Detroit to work as a domestic servant. *Id*. at 549. The victim worked sixteen hours a day, did all of the housework, and provided all of the childcare for the defendants. *Id*. The defendants never paid the victim, allowed her to leave the home only as part of her childcare duties, beat her, and

54238580;3

**APP. 516**

even sexually abused her on three occasions. *Id*. In contrast, Plaintiffs at AIPC described their conditions of confinement as "pretty nice . . . for being incarcerated." *Supra* Fact 24. Indeed, it was better than a county detention center. *Id.*

Plaintiffs' daily routines were not defined by long periods of hard labor, a relative lack of freedom, or "squalid living conditions, extreme isolation, threat of legal process, and violence." *Callahan*, 801 F.3d at 606. Rather detainees' routines included three meals a day, time for exercise, television, and reading books supplied by GEO, and the opportunity to speak to their families on the phone, as well as access to legal materials in a law library. *Supra* Facts 23, 25. Detainees were largely free to do what they wanted during the day and were not deprived of social opportunities. *Id.* And, the fact that Plaintiffs claims here rest on an allegation that they allegedly cleaned the living areas routinely, Plaintiffs' own allegations belie any argument that AIPC could be fairly described as "squalid." Thus, the conditions of confinement fall far short of the coercive conditions found to be a violation of the TVPA.

Finally, there is no question that here, as in *Muchira*, Plaintiffs may have felt "legitimately anxious or fearful" while at AIPC because they did not have "assurances that they would be able to remain in the United States, and . . . faced the prospect of [deportation.]" *Muchira*, 850 F.3d at 624. However, that "pressure was not brought to bear by [GEO.]" *Id.* Instead, it was a result of the United States immigration laws and the enforcement authority of ICE and the immigration courts.[7] Like in *Muchira*, this general fear of deportation for not complying with GEO's facility rules is

---

[7] Indeed, to the extent the Plaintiffs at the facility had Orders of Removal while detained at Aurora, it was ICE, not GEO, who had informed detainees of this impending reality.

54238580;3

**APP. 517**

insufficient to establish that GEO knowingly coerced Plaintiffs into providing labor and services so as to withstand summary judgment. *Id.* Accordingly, summary judgment is appropriate.

**B.    The Disciplinary Severity Scale in the AIPC Handbook Constitutes Warnings of Legitimate Consequences, Not A Threat.**

Under the TVPA, a warning of a legitimate consequence is not actionable. *Headley*, 687 F.3d at1180; *see also Calimlim*, 538 F.3d at 714 (7th Cir. 2008) ("[W]arnings of legitimate but adverse consequences or credible threats of deportation, standing alone, are not sufficient to violate the forced labor statute."); *Bradley*, 390 F.3d at 151 (A Court must differentiate between legitimate warnings of possible consequences and "illicit threat[s]."). For example, the threat of deportation by ICE officials, where consistent with the law, is a legitimate consequence, not a threat under the TVPA. *Muchira*, 850 F.3d at 624. Likewise, even a parent who "demanded absolute obedience from [his] children and was quick to beat them . . . [hitting] the children with his hands, and with plunger sticks, ice scrapers, and broomsticks, often for minor oversights or violations of seemingly arbitrary rules" was found to have enforced legitimate consequences for household chores thereby not violating the TVPA. *Toviave*, 761 F.3d at 624. Accordingly, to prevail on their claims which stem from the disciplinary consequences laid out in the AIPC Handbook, Plaintiffs must establish that the handbook constitutes more than a warning of legitimate consequences. Because the threats alleged here fall well short of the circumstances in *Muchira* and *Toviave* which were found not to violate the TVPA, Plaintiffs cannot meet their burden.

Plaintiffs have provided no evidence that ICE's disciplinary severity scale is in any way "illegitimate" or a "threat." Indeed, they cannot make such a showing as the disciplinary severity scale is drafted and revised by the very agency tasked with enforcing the TVPA—ICE. Further, the Eleventh Circuit recently explained that in the ICE detention context, any construction of the

54238580;3

**APP. 518**

TVPA should not "call into question longstanding requirements that detainees or inmates be required to perform basic housekeeping tasks." *Barrientos*, 951 F.3d at 1278. Likewise, the disciplinary severity scale in the PBNDS, which provides sanctions for detainees who "among other things, refuse to complete basic personal housekeeping tasks or organize work stoppages . . . [does not on its] own, give rise to TVPA liability." *Id.*

Here, there can be no question that federal immigration detainees may be compelled to perform basic housekeeping tasks. *Channer v. Hall*, 112 F.3d 214, 218-19 (5th Cir. 1997) ("We hold that the federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks..."); *Jobson v. Henne*, 355 F.2d 129, 131-32 (2d Cir. 1966) (inmates in mental hospitals can be required to perform housekeeping chores); *Bayh v. Sonnenburg*, 573 N.E.2d 398, 410-12 (Ind. 1991) (reversing $28 million judgment in favor of mental hospital patients who performed work at facilities in the 1970s); *Supra* Fact 16. Under *Barrientos*, a warning of the potential consequence of a brief stay in segregation for failing to complete these basic cleaning tasks is not a threat under the TVPA. *Barrientos,* 951 F.3d at 1278. Rather, such a consequence is permissible in an immigration detention center.

To the extent Plaintiffs also claim their living environment involved strict disciplinary rules and verbal reprimands, *Muchira*, makes clear that such claims are insufficient to establish liability under the TVPA and that such claims can be resolved at summary judgment. 850 F.3d at 619-20. As a matter of logic and reason, detention facilities must have the ability to impose some level of discipline in order to preserve a safe and secure environment for those housed there. In this case, ICE has drafted the disciplinary severity scale and implemented it nationwide through its PBNDS. *Supra* Facts 10-14. In addition to being less severe than the physical beating described in *Toviave*,

the possible consequence of a brief period of segregation is much less severe than that in *Headley*, where the plaintiff faced the loss of all contact with her family and friends as a consequence for breaking the church's rules. *Headley*, 687 F.3d at 1180. And there, the rules involved the plaintiff's agreement to obtain an abortion, not to clean a table after eating. Therefore, if the unquestionably more severe consequences in *Hedley* did not violate the TVPA, a warning that a detainee faced the *possible* consequence of a brief stay in segregation does not violate the TVPA. Indeed, a detainee in segregation would remain able to contact his or her friends and family and would be restored to his or her prior housing status within 72 hours. No such opportunity was available in *Headley* or *Toviave*. Accordingly, Plaintiffs' claims are not sufficient to constitute a threat under the TVPA and summary judgment is appropriate.

### C.   Plaintiffs Cannot Show GEO Acted With the Specific Intent To Threaten.

In order to prevail on a claim under the TVPA, Plaintiffs bear the burden to establish GEO acted with knowledge. 18 U.S.C. § 1589(c)(2); *see also Dann*, 652 F.3d at 1170. "In other words, under section 1589, the employer must not just threaten serious harm but have intended the victim to believe that such harm would befall her." *Garcia*, 2012 WL 1831865, at *4; *Dann*, 652 F.3d at 1170 ("The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her."). Thus, Plaintiffs must show that in placing the disciplinary severity scale in the AIPC Handbook, GEO had a specific intent to threaten detainees. Plaintiffs cannot meet their burden.

It is undisputed that GEO did not draft the disciplinary severity scale. *Supra* Fact 10-13. It is also undisputed that GEO did not incorporate the disciplinary severity scale, including the possible sanction of segregation for failing to clean, into its handbook based upon its own

54238580;3

motivations. *Supra* Facts 10-13. Instead, it did so to fulfill a contractual obligation to ICE. Further, the GEO detention officers' testimony in this case has made clear that they did not have an intent to threaten detainees, but rather the opposite: they sought to resolve issues informally where possible. *Supra* Fact 43. There is no evidence in the record to the contrary. Accordingly, Plaintiffs cannot meet their burden.

GEO anticipates that Plaintiffs will argue in response that their claims are rooted in a "common plan or scheme" by GEO to coerce detainees to clean-up after their meals. This too fails to establish liability. Indeed, a mere belief that a defendant "pre-planned its scheme . . . intended to coerce" is insufficient to establish liability under the TVPA. *Martinez-Rodriguez*, 391 F. Supp.3d at 992. While Plaintiffs' claims may rely on a belief that there was a scheme or plan by GEO, all evidence points to the contrary. GEO detention officers are unaware of any uniform policy that would have served to coerce the labor of the detainees. *Supra* Facts 39-45. Instead, if a detainee did not want to clean, the most common response was to simply ask another detainee to clean instead. *Supra* Fact 47. The GEO detention officers shared a common goal to resolve all incidents informally where possible. *Supra* Facts 43. Further, because ICE was the entity which drafted and required the disciplinary severity scale, GEO had no input into its drafting. In enforcing the disciplinary severity scale, GEO did not do so with an intent to coerce detainees as part of a common or uniform practice. Rather, GEO's only intention was to follow the terms of its contact with ICE. Despite years of discovery, Plaintiffs have failed to uncover sufficient evidence to establish the scienter element of their TVPA claim, and summary judgment is appropriate.

54238580;3

### D.      Plaintiffs Cannot Establish Causation.

Even if Plaintiffs could establish that GEO acted knowingly, they would be unable to establish that GEO's actions caused them to actually render labor. "[T]he defendant's conduct must be the driving force behind the victim's 'choice' to render the labor." *David v. Signal Int'l, LLC*, No. CIV.A. 08-1220, 2012 WL 10759668, at *20 (E.D. La. Jan. 4, 2012). As applied here, Plaintiffs would have to show that the driving force behind their decision to clean-up after each meal was the AIPC Handbook. They cannot make such a showing. Indeed, some detainees did not feel threatened by the handbook. *Supra* Facts 32, 33. Other detainees made clear that they cleaned for reasons other than the possible sanctions in the handbook, including to preserve television privileges, that they personally enjoyed cleaning, and they wanted treats such as ice cream. *Supra* Facts 36a-g. Even assuming *arguendo* that Plaintiffs could convince this Court, despite all contrary evidence, that the placement in segregation for 72 hours (or the threat thereof) could constitute the type of harm that is akin to slavery or "dire consequences," their claims would still fail. The named Plaintiffs' evidence is insufficient to establish that the threats of a brief confinement in segregation provided the driving motivation for their participation in meal clean-up. Indeed, to prevail on their claims, Plaintiffs must establish that the alleged harm or threats are "sufficiently serious to compel that person to remain in her condition of servitude when she otherwise would have left." *Muchira*, 850 F.3d at 618 (quoting *Dann,* 652 F.3d at 1170). Despite nearly six years of discovery, Plaintiffs have not demonstrated that absent a fear of discipline, they would not have cleaned up after themselves for reasons other than the disciplinary policy. Thus, there is insufficient evidence to establish that the AIPC Handbook was the "driving force" behind detainees' decisions to clean and summary judgment should be granted in GEO's favor.

54238580;3

**E.**      **Claims That Accrued Before December 23, 2008 Are Time Barred.**

When Congress first enacted the TVPA in 2000, the statute provided for a four-year limitations period. On December 23, 2008, Congress amended the TVPA to include a ten-year limitations period for civil actions. 18 U.S.C. § 1595(c). "Congress did not expressly state or otherwise indicate that the [TVPA] limitations period applies retroactively." *Abarca v. Little*, 54 F. Supp. 3d 1064, 1068 (D. Minn. 2014). Further, the prior version of the TVPA did not provide for the same scope of civil liability, which was expanded under the 2008 amendments. *Id.* Indeed, Plaintiffs seek relief under the section of the TVPA that provides for liability based upon a "scheme, plan, or pattern[.]" **Ex. A.** This section and theory of liability was not added until the 2008 Amendments. For this reason, the instant case is distinguishable from *Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d 1112, 1130 (D. Colo. 2019), where the plaintiffs' claims were based upon the 2003 iteration of the TVPA and therefore there was no risk of new or expanded liability. Therefore, the statute cannot be applied retroactively. *Id.*; *see also Doe v. Siddig*, 810 F.Supp.2d 127, 135 (D.D.C. 2011) (rejecting proposed retroactive application of the TVPA because doing so would "increase a party's liability for past conduct"); *c.f. Velez v. Sanchez*, 693 F.3d 308, 325 (2d Cir. 2012) (holding that the TVPA does not apply retroactively because the amendments changed the substantive law). Accordingly, all individuals whose claims allegedly accrued prior to December 23, 2008 would have been subject to a four-year limitations period and could not have sought relief under the expanded causes of action added to the TVPA in the 2008 amendments. This lawsuit was filed on October 22, 2014, and therefore the claims of those detained before December 23, 2008, would have expired in 2012—over two years prior to the

54238580;3

**APP. 523**

filing of the lawsuit. Accordingly, those claims are time-barred, and summary judgment is appropriate.

### F.    There is No Private Cause of Action For Injunctive Relief Under the TVPA.

While it remains unclear the exact parameters of relief that Plaintiffs seek in this case, over the six years this litigation has been pending, it has become clear that Plaintiffs believe that in addition to monetary damages, they may seek injunctive relief as to the class's alleged TVPA violations. While GEO would argue Plaintiffs have waived this relief, as it was not stated in their Complaint, even if this Court were to consider such a request on the merits, injunctive relief is not available under the TVPA.

Under the TVPA, an individual may bring "a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney fees. 18 U.S.C. § 1595(a). The section establishing the right to bring a private civil action further provides for a 10-year limitations period. 18 U.S.C. § 1595(c). The section establishing the right to bring a private civil action does not include the right to injunctive relief. In contrast, 18 U.S.C § 1595A(a) provides that whenever a violation of the act has occurred, or is about to occur, "the Attorney General may bring a civil action in a district court of the United States seeking an order to enjoin such act." Section 1595A proceeds to explain the procedure should a criminal and civil case be brought simultaneously.

Under the principles of statutory construction, courts look to the plain language of the law to determine its meaning. *St. Charles Inv. Co. v. Comm'r*, 232 F.3d 773, 776 (10th Cir. 2000). "In

so doing, [courts] will assume that Congress's intent is expressed correctly in the ordinary meaning of the words it employs." *Id.* Here, the plain language of Section 1595A, permitting civil injunctions, provides only that the Attorney General may bring such an action. 18 U.S.C § 1595A(a). It does not provide for a private party to bring a case for injunctive relief. To the contrary, Congress set forth private right of action in Section 1589. That section provides only for monetary damages, including attorneys' fees. 18 U.S.C. § 1595(a). There is no ambiguity in the plain language of these provisions. *Fort Peck Hous. Auth. v. United States Dep't of Hous. & Urban Dev.*, 367 F. App'x 884, 889 (10th Cir. 2010) ("Statutory interpretation begins with the words Congress has chosen. The inquiry ends if that language is clear. We merely enforce the statute's plain meaning."). Therefore, it is clear that there is no private right of action for injunctive relief under the TVPA. Plaintiffs here are not represented by the Attorney General. Accordingly, insofar as Plaintiffs seek injunctive relief, it is unavailable under the TVPA and GEO is entitled to summary judgment.

### G.   Plaintiffs' Unjust Enrichment Claims.

#### (1)   Plaintiffs Cannot Establish That GEO Was Enriched By Their Participation in The VWP.

To prevail on their claim of unjust enrichment, as a threshold issue, Plaintiffs must establish that GEO received a benefit from the VWP. *Indian Mountain Corp*, 2016 COA 118M, ¶ 28. Plaintiffs claim they can establish this element by demonstrating that GEO realized cost savings by implementing the VWP rather than hiring additional employees. With discovery concluded, it is now clear that Plaintiffs' claim lacks any evidentiary support. Indeed, GEO does not gain a benefit from the VWP. Rather, it must implement the program (accounting for all costs associated with doing so) and provide the detainees with a pass-through stipend of $1 per day. *Supra* Fact 49.

54238580;3

**APP. 525**

In addition, GEO expends additional funds to provide supplemental incentives to those participating in the program. *Supra* Fact 22. If it instead hired employees to perform the work, it would be able to realize an additional profit of up to 15% of the increased labor costs. *Supra* Facts 50-52. Accordingly, summary judgment is proper because Plaintiffs cannot show GEO obtains benefit, much less under circumstances which would make it unjust for them to do so.

### (2)   Express Contract Bars Unjust Enrichment.

A party generally cannot recover for unjust enrichment—an equitable claim-- when there is "an express contract addressing the subject of the alleged obligation to pay." *Pulte Home Corp. v. Countryside Cmty. Ass'n*, 382 P.3d 821, 833 (Colo. 2016); *see also Pernick v. Computershare Trust Co.*, 136 F. Supp. 3d 1247, 1267–69 (D. Colo. 2015) (holding that the plaintiff's unjust enrichment claim was precluded by a written agreement). Under Colorado contract law, all that is required for a valid contract is an offer, acceptance, consideration, and "meeting of the minds." *Garner v. FCA US, LLC*, No. 19-CV-00270-CMA-NYW, 2019 WL 9240241, at *4 (D. Colo. Nov. 27, 2019), *report and recommendation adopted sub nom*, *Garner v. FCA Chrysler*, No. 19-CV-00270-CMA-NYW, 2020 WL 1650450 (D. Colo. Apr. 3, 2020); *PayoutOne v. Coral Mortg. Bankers*, 602 F. Supp. 2d 1219, 1224 (D. Colo. 2009). Plaintiffs here entered into valid contracts with GEO for participation in the VWP. At AIPC, all detainees are offered the opportunity to participate in the VWP on a voluntary basis. *Supra* Fact 18. Should a detainee choose to participate, he or she is provided with an agreement detailing the terms and conditions of the VWP. *Supra* Fact 19-21. The detainee is offered a stipend of $1 per day for his or her participation. *Supra* Fact 20. In return, GEO receives consideration as it is able to comply with its contract with ICE. GEO also obtains promises from each detainee who volunteers that their behavior will conform to certain

standards. A detainee who signs the agreement therefore expressly agrees to participate for $1.00 per day. Once a detainee signs the agreement, all elements of contract formation are met, and a valid contract is formed.

Named Plaintiffs entered into valid contracts for their participation in the VWP. *Supra* Fact 21. In so doing, they made clear that the appropriate remedy under that agreement was an action resting in contract law, not in equity. Accordingly, Plaintiff's unjust enrichment claims are precluded by their written contracts stating they would be paid $1 per day for participating in the VWP. *Pernick*, 136 F. Supp. 3d at 1247.

## VI.   CONCLUSION

In sum, for all the reasons stated herein, GEO respectfully requests the Court grant summary judgment in its favor as to all of Plaintiffs' claims.

Respectfully submitted, this 17th day of August, 2020.

**AKERMAN LLP**

*s/ Adrienne Scheffey*
Colin L. Barnacle
Adrienne Scheffey
Christopher J. Eby
Melissa L. Cizmorris
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  (303) 260-7712
Facsimile:   (303) 260-7714
Email: colin.barnacle@akerman.com
Email: christopher.eby@akerman.com
Email: melissa.cizmorris@akerman.com
Email: adrienne.scheffey@akerman.com

54238580;3

**APP. 527**

**BURNS, FIGA & WILL, P.C.**
Dana L. Eismeier
Michael Y. Ley
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, CO 80111
Telephone:  (303) 796-2626
Facsimile:   (303) 796-2777
Email: deismeier@bfwlaw.com
Email: mley@bfwlaw.com

*Attorneys for Defendant The GEO Group, Inc.*

54238580;3

**APP. 528**

### CERTIFICATE OF SERVICE

I hereby certify on this 17th day of August, 2020, a true and correct copy of the foregoing

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was filed and served

electronically via the Court's CM/ECF system on the following:

### Counsel for Plaintiffs:

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
TOWARDS JUSTICE
1410 High St., Ste. 300
Denver, CO 80218
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Matthew Fritz-Mauer
KELMAN BUESCHER FIRM
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com
mfritzmauer@laborlawdenver.com

Hans C. Meyer
MEYER LAW OFFICE, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
OUTTEN & GOLDEN, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
OUTTEN & GOLDEN, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
OUTTEN & GOLDEN, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
LAW OFFICE OF R. ANDREW FREE
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
MILSTEIN LAW OFFICE
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

*s/ Nick Mangels*
Nick Mangels

54238580;3

**APP. 529**