No. 22-01409

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Alejandro Menocal, *et al.*,

*Plaintiffs-Appellees,*

— v. —

The GEO Group, Inc.,

*Defendant-Appellant.*

On appeal from the United States District Court
for the District of Colorado, No. 1:14-cv-02887 (Hon. John L. Kane)

**APPELLANT'S APPENDIX
VOLUME III OF III**

Scott A. Schipma
Dominic E. Draye
GREENBERG TRAURIG, LLP
2101 L Street, N.W.
Washington, DC 20037
(202) 331-3100
schipmas@gtlaw.com
drayed@gtlaw.com

*Attorneys for Defendant-Appellant*

# INDEX
## VOLUME I

| Docket Number | Description | Appendix Page No. |
|---|---|---|
| | Civil Case Court Docket, Case No. 1:14-cv-02887-JLK-MEH | APP. 1 |
| 1 | Class Action Complaint for Unpaid Wages and Forced Labor, Filed October 22, 2014 | APP. 12 |
| 26 | Answer of GEO Group to Plaintiff's Complaint, Filed July 20, 2015 | APP. 33 |
| 260 | Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense, Filed on April 20, 2020 | APP. 50 |
| 261-8 | Performance-Based National Detention Standards 2011, Filed on April 29, 2020 | APP. 95 |
| 261-9 | Operations Manual ICE Performance Based National Detention Standards (PBNDS), Filed April 29, 2020 | APP. 160 |
| 261-17 | Aurora Ice Processing Center Detainee Handbook, Local Supplement, Filed April 29, 2020 | APP. 225 |

## VOLUME II

| Docket Number | Description | Appendix Page No. |
|---|---|---|
| 270 | Defendant The GEO Group, Inc.'s Response in Opposition to Plaintiffs' Motion for Summary Judgment on Defendant' Affirmative Defense, Filed June 5, 2020 | APP. 253 |
| 284 | Defendant The GEO Group, Inc.'s Cross-Motion for Summary Judgment, Filed June 25, 2020 | APP. 293 |
| 286 | Plaintiff's Reply in Support of Motion for Summary Judgment on Defendant's Affirmative Defense, Filed June 26, 2020 | APP. 322 |

| Docket Number | Description | Appendix Page No. |
|---|---|---|
| 298 | Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense, filed July 31, 2020 | APP. 438 |
| 305 | Defendant's Motion for Summary Judgment, Filed August 17, 2020 | APP. 491 |

**VOLUME III**

| Docket Number | Description | Appendix Page No. |
|---|---|---|
| 316 | Defendant The GEO Group, Inc.'s Reply in Support of Its Cross-Motion for Summary Judgment | APP. 530 |
| 336 | Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, Filed October 26, 2020 | APP. 551 |
| 350 | Defendant The GEO Group, Inc.'s Reply in Support of Motion for Summary Judgment, Filed November 18, 2020 | APP. 635 |
| 380 | Order on the Parties' Cross Motions for Summary Judgment (ECF Nos. 260, 284, & 305) And Defendant's Motions to Dismiss (ECF No. 307) And for Decertification of Class (ECF No. 312), Filed October 18, 2022 | APP. 717 |
| 387 | Notice of Appeal, Filed November 16, 2022 | APP. 793 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated*,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

### DEFENDANT THE GEO GROUP, INC.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

---

      Defendant The GEO Group, Inc. ("Defendant" or "GEO"), by and through its undersigned counsel, hereby submits its Reply in Support of its Cross-Motion for Summary Judgment and respectfully requests this Court enter judgment in GEO's favor as to all of Plaintiffs' claims.

### I.      INTRODUCTION

      Despite a lengthy Response, Plaintiffs fail to identify a material issue of disputed fact with respect to the dispositive issue; ICE instructed GEO to place the disciplinary sanctions (drafted by ICE) into the detainee handbook, including the sanction of up to 72 hours of segregation for the

refusal to clean. ECF 286 at 102 n.14 ("Plaintiffs do not contest that ICE required the disciplinary

severity scale . . .").  Without the sanctions required by ICE, there is no violation of the Trafficking

Victims Protection Act ("TVPA"). 18 U.S.C. § 1589(a), Despite conceding that the disciplinary

severity scale was required by ICE, Plaintiffs argue, without support that "ICE *prohibited* GEO

from requiring detainees to clean all but a limited space directly around their beds." ECF 298 at

35. There is simply no support for this position. To the contrary, ICE's own words belie Plaintiffs'

claim:

> Will I get paid for keeping my living area clean? No. **You must keep areas that
> you use clean, including your living area and any general-use areas that you
> use. If you do not keep your areas clean, you may be disciplined**.

ECF 310-1, 37 (ICE National Detainee Handbook) (emphasis added); ECF 262-2,62 (ICE contract

requiring each detainee to receive a copy of the ICE National Detainee Handbook). From there,

ICE's Performance Based National Detention Standards ("PBNDS") provide the specific

disciplinary severity scale which applies to a detainee who does not clean. This disciplinary scale

includes a list of possible sanctions for the refusal to clean, including the possibility of segregation.

(Undisputed Fact 21). Rather than limiting the discipline to situations where a detainee refuses to

clean certain areas in his or her living area or to only incidents involving to certain enumerated

tasks, the disciplinary severity scale provides for broad discipline related to a detainee's "refusal

to clean assigned living area." *Id.* There can be no question that a detainee who refuses to wipe

down a table after eating a meal is refusing to clean his or her assigned living area. Accordingly,

ICE's directives were clear and GEO merely carried them out. Plaintiffs cannot establish that there

is an issue of disputed fact as to whether ICE directed GEO to incorporate the disciplinary severity

scale into its local handbook. Accordingly, summary judgment is appropriate as to the TVPA claims.

As for Plaintiffs' Voluntary Work Program ("VWP") claims, Plaintiffs fail to present a colorable dispute of fact that ICE did not instruct GEO to pay detainees $1.00 per day. While Plaintiffs attempt to parse the date upon which the instruction changed to "at least" $1.00 per day, there is no genuine dispute of material fact that each of GEO's contracts with ICE instructed GEO to implement a program where $1.00 per day was a permissible stipend. Plaintiffs cannot unilaterally change the meaning of GEO's unambiguous contract with ICE by referring to extrinsic evidence. Without extrinsic evidence, Plaintiffs cannot point to a disputed material fact, as the interpretation of a contract is a question of law. Accordingly. summary judgment is equally appropriate as to the unjust enrichment claims.

## II.     RELEVANT FACTS

GEO has provided responses to Plaintiffs' additional facts and GEO's previously asserted facts, in the attached Exhibit A. That said, the relevant facts remain undisputed:

1.      ICE has authority to detain individuals pending the results of their immigration proceedings. (Undisputed Facts 1-3).

2.      ICE contracts with GEO to house detainees at the Aurora ICE Processing Center ("AIPC"). (Undisputed Facts 6-8).

3.      ICE required GEO to incorporate the disciplinary severity scale as it is written in the PBNDS into its handbooks, without alteration. (Undisputed facts 19-20).

4.      GEO incorporated the sanctions for the "refusal to clean assigned living area" into its handbooks without alteration. (Undisputed fact 21).

3

5.      Each year, GEO is audited by ICE and that audit specifically reviews the detainee handbook. (Undisputed fact 38).

6.      ICE's auditors reviewed whether GEO provided notice of its disciplinary severity scale in its handbooks.  (Undisputed fact 40).

7.      All applicable versions of the PBNDS require that GEO provide detainees with the opportunity to participate in the VWP. (Undisputed fact 42).

8.      The 2008 PBNDS mandated that "the compensation [for VWP participation] is $1.00 per day." (Undisputed fact 44).

9.      The 2011 PBNDS explicitly direct GEO that $1.00 per day may be paid to detainees who participate in the VWP. (Undisputed fact 44).

10.     ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP. (Undisputed fact 48).

11.     The VWP has been audited each year and has passed each audit since 2004. (Undisputed fact 49).

### III.     ADDITIONAL FACTS

It remains GEO's position that the fact that the federal government, through its contract with GEO, *expressly directed* GEO to implement the disciplinary severity scale exactly as listed in the PBNDS is sufficient to establish that GEO is entitled to derivative sovereign immunity. Nevertheless, in the unlikely event that this Court determines it is necessary to identify the scope of ICE's approval of GEO's policies, GEO provides the following additional facts which are directly responsive to the new facts raised in Plaintiffs' Response:

4

**APP. 533**

1.      ICE's National Detainee Handbook advises detainees that they will be disciplined for refusing to clean their living areas:

> Will I get paid for keeping my living area clean? No. **You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined**.

ECF 310-1, 37 (ICE National Handbook) (emphasis added).

2.      Dozens of ICE employees have offices at AIPC. ECF 308-1 ¶ 4.

3.      One such ICE employee reviewed GEO's policies for compliance with the PBNDS and the GEO-ICE contract. ECF 308-1 ¶ 12-13.

4.      During an audit, ICE's auditors are provided copies of all of GEO's policies and procedures. ECF 308-1 ¶ 6.

5.      Auditors have full access to the building and all detainees and may interview detainees about their experiences and observe any policy or practice as implemented. ECF 308-1 ¶ 8,9.

6.      ICE is sent a copy of all write-ups for discipline. Ex. B (Ceja 30(b)(6) 232:9-25-233:1-13 (8/5/20)).

7.      ICE attended weekly meetings with GEO's Assistant Facility Administrator and other GEO personnel where it could have raised any issue about the implementation of the disciplinary severity scale. Ex. B (Ceja 30(b)(6) 233:14-23 (8/5/20)).

8.      ICE reviewed the use of segregation as part of its Contractor Assessment Reports. Ex. C (Contractor Assessment Reports).

**APP. 534**

9.      Neither the on-site ICE representative nor the auditors have ever expressed the opinion that GEO's meal clean up policy was inconsistent with the directives in the PBNDS or the GEO-ICE contract. ECF 308-1 ¶ 11, 16.

### IV.     Derivative Sovereign Immunity

Under the doctrine of derivative sovereign immunity, government contractors may "obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) (internal quotation marks omitted) (*quoting Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)). Derivative sovereign immunity shields a contractor from liability when the contractor performs work "authorized and directed by the Government of the United States" and the contractor "simply performed as the Government directed." *Id.* at 673; *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019) (quoting *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21 (1940)). A contractor asserting derivative sovereign immunity must satisfy a two-part inquiry. First, the contractor must show it "performed as the Government directed." *Campbell-Ewald*, 136 S. Ct. at 673. Second, the contractor must show the "authority to carry out the project was validly conferred" by the government. *Yearsley*, 309 U.S. at 20-21.

Plaintiffs do not challenge the second prong in their Response. Instead, they concede that ICE had the authority to direct GEO to care for detainees who were detained pending resolution of their immigration proceedings. (Undisputed Facts 1-3; 6-8). As part of ICE's broad authority, ICE was authorized to direct GEO to implement the disciplinary severity scale contained within the PBNDS. Plaintiffs only challenge whether GEO "performed as the Government directed."

54306826;1

**A.    Plaintiffs Do Not Dispute That ICE Required GEO to Incorporate The Disciplinary Severity Scale Into Its Detainee Handbook.**

Whether GEO violated the TVPA turns on a simple inquiry: whether GEO threatened Plaintiffs by providing each with a list of rules and responsibilities governing AIPC. GEO reiterates that the means utilized to obtain labor are a critical element of Plaintiffs' claims. To prevail on a TVPA claim, at trial, Plaintiffs must show that the means used to compel the labor were unlawful—they cannot simply show that the labor was not adequately compensated. *See United States v. Kalu*, 791 F.3d 1194, 1211-12 (10th Cir. 2015) (affirming a jury instruction on § 1589 that advised the jury to consider whether "as a result of [the defendant's] use of . . . unlawful means, the [victim rendered labor] where, if [the defendant] had not resorted to those unlawful means, the [victim] would have declined to" (quotations omitted));  *see also Aguilera v. Aegis Communications Group, LLC*, 72 F. Supp. 3d 975, 978 (W.D. Mo. 2014) ("[N]ot all bad employer-employee relationships constitute forced labor."). Here, ICE clearly instructed GEO to place i the disciplinary severity scale in the AIPC Handbook, including a sanction that detainees could be placed in segregation for refusing to clean. ECF 286 at 102 n.14; ECF 262-2, 62. Thus, the means—the ICE disciplinary severity scale contained in the AIPC Handbook—were the result of an express direction from ICE and therefore GEO is entitled to derivative sovereign immunity.

In *Cunningham*, whether the contractor was entitled to immunity turned on whether the contractor was instructed to "generate a list of phone numbers" or whether the government provided the contractor with a list of numbers and instructed them to call everyone on the list. *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 648 (4th Cir. 2018), cert. denied, 139 S. Ct. 417 (2018). Where the government provided the list of phone numbers, immunity was proper. *Id.* But where the contractor was responsible for generating a list, there could be no

54306826;1                                                                    **APP. 536**

immunity as the government would not have instructed the contractor to call each number on an unknown list. *Id.* Like *Cunningham*, here, ICE did not simply tell GEO to develop and implement a disciplinary severity scale with unknown sanctions and consequences. Rather, it instructed GEO to implement the *exact* disciplinary severity scale that it had drafted. (Undisputed fact 19) (requiring GEO to adopt the disciplinary severity scale without alteration). Here, the circumstances are analogous to *Cunningham* because ICE provided the list of possible discipline. Thus, immunity is appropriate.

Plaintiffs have not raised a genuine issue of material fact as to whether the possible consequence of 72 hours in segregation was explicitly directed by ICE. Plaintiffs admit that ICE required GEO to implement the disciplinary severity scale. ECF 286 at 102 n.14.  They also admit that the scale was incorporated into GEO's handbooks. *Id.* (arguing that all handbooks contained the ICE disciplinary severity scale). Because they do not and cannot dispute this fact, Plaintiffs instead argue that GEO should have done more to make ICE aware of *how* it was implementing the disciplinary severity scale to ensure that in applying it as explicitly written, GEO was not misinterpreting the policy. There is no legal support for this new added obstacle to derivative sovereign immunity. All that GEO must show is that it did as the government directed. GEO has done so here.

Should this Court entertain Plaintiffs' argument that the scope of cleaning is relevant (which it should not), GEO is still entitled to summary judgment. Plaintiffs' interpretation of ICE's policies is in direct conflict with the written expectations from ICE.  Even if GEO had not provided its own handbook to detainees, detainees at the AIPC still would have been told that they would face discipline if they did not clean their living areas (including common areas) in the ICE National

**APP. 537**

Detainee Handbook. ECF 310-1, 37; ECF 262-2, 62 (requiring that all detainees receive a copy of the ICE National Detainee Handbook). Thus, there can be no doubt ICE instructed GEO to implement the policy that detainees could be disciplined for not cleaning their own "living area," including "any general-use areas" that a detainee used.  ECF 310-1, 37. ICE's PBNDS explicitly delineate what sanctions may apply if a detainee refuses to clean. Plaintiffs cannot simply take their own skewed interpretation and thrust the authority of ICE behind it. Instead, at the summary judgment stage, Plaintiffs must present evidence that could convince a reasonable jury of their position. At bottom, Plaintiffs cannot escape the fact that ICE's own words instruct GEO to do exactly the acts in question here: inform detainees that they must clean their living areas and are subject to ICE's disciplinary severity scale and ask detainees to clean-up their living areas. Plaintiffs' difference of opinion about how ICE's directives should be implemented at the AIPC is not enough to defeat summary judgment.

> **B.      Plaintiffs' Misrepresent ICE's Role at the AIPC.**

Acknowledging that the disciplinary severity scale was directed by ICE and incorporated without alteration by GEO, Plaintiffs instead argue that even though ICE directed GEO how to act—it simply did not provide *enough* direction as to how to act. Plaintiffs argue that under the doctrine of derivative sovereign immunity there is some nebulous requirement that the government not only direct the contractor to operate in a certain way, but also that the government contractor cannot obtain immunity unless the government explicitly condoned the actions of the contractor a second or third time—after the initial direction. This argument lacks both legal and factual support.

As an initial matter, there is no legal requirement that the government follow-up with the contractor about its performance to entitle the contractor to immunity. Plaintiffs have cited no such

**APP. 538**

law and GEO has not found any. Further, even if the law required such a showing, Plaintiffs cannot demonstrate as a factual matter, with evidentiary support, that ICE was unaware of the operations at the AIPC. Without pointing to evidence in support, Plaintiffs' motion argues that ICE's involvement in the AIPC operations was limited to a cursory review of its policies. ECF 298 at 34. It further argues that ICE was unaware of the meal clean-up policy and possible sanctions for the same. *Id.* However, the uncontroverted evidence demonstrates that ICE audited GEO's facility every year and conducted a review of its handbook. (Undisputed facts 38, 40). The AIPC handbook was consistent with the scope of cleaning in ICE's National Handbook and was never found to be noncompliant—further establishing that GEO acted as ICE directed. *Compare* ECF 310-1, 37 (ICE National Handbook) *with* ECF 261-17. Indeed, rather than constituting a reasonable inference in Plaintiffs' favor, it strains credulity to believe that ICE was unaware of the meal clean-up procedures that for years has taken place three times daily in multiple housing units. Dozens of ICE staff were on site each day, the on-site contracting representative was present, and the auditors observed the operations during their visits. ECF 308-1. Further, ICE was sent a copy of all write-ups for discipline which would have included any write up related to the meal clean-up policy. (GEO's Additional Fact 6). Thus, not only was ICE aware, but through its actions further acknowledged that the meal clean-up did not go beyond what ICE had explicitly authorized and directed GEO to do. *Id.* In short, the undisputed evidence shows that ICE was aware of the meal clean up policy and the disciplinary severity scale. ICE audited GEO's handbook once every year. (Undisputed Facts 38,40). In doing so, it reviewed the policies therein. *Id.* ICE never raised an issue with the meal clean up policy. (GEO's Additional Fact 9).

**APP. 539**

In any event, it is undisputed that ICE explicitly directed GEO to incorporate the disciplinary severity scale into its handbook. (Undisputed facts 19-20). GEO did just that. (Undisputed fact 21). Despite alleging that ICE's level of oversight over the AIPC was deficient, Plaintiffs have offered **no** evidence that GEO did not act exactly as ICE directed. Nor have they presented evidence that ICE directed GEO to act differently than it did. Because GEO incorporated the ICE disciplinary severity scale into its handbook, and that same disciplinary severity scale that is contained within the handbook now forms the basis for Plaintiffs' claim that they were threatened in violation of the TVPA, GEO is entitled to immunity.

**C.      Because ICE directed the Disciplinary Severity Scale, Plaintiffs Cannot Establish Scienter.**

In Plaintiffs' motion for class certification, Plaintiffs explained that the scienter element of their TVPA claim could be established on a classwide basis by "asking a factfinder whether GEO implemented the Forced Labor Policy to obtain labor from detainees, knowing or intending that a reasonable person in the detainees' position would feel compelled to provide that labor. That question would be answered based on a consideration of the <u>uniformly applicable Forced Labor Policy</u>." ECF 49 at 17 (emphasis added). Plaintiffs further explained that "[i]n this case, evidence that all class members were informed that they would be subject to the possibility of solitary confinement if they declined to labor for GEO gives rise, at the very least, to an inference that class members provided labor to GEO because of the possibility of solitary confinement." *Id.* at 18. Thus, the element of scienter turns on what GEO intended by "inform[ing detainees] that they would be subject to the possibility of [segregation] if they declined to [clean.]" It is undisputed here that ICE required GEO to inform detainees of the potential consequence of segregation for refusing to clean. ICE did not limit this consequence by providing further detail about what the

**APP. 540**

"refusal to clean" entailed and, consistent with its contractual obligations, neither did GEO.[1] In their response, Plaintiffs have failed to point to concrete evidence that would demonstrate GEO's knowledge that it was acting improperly when it implemented a written policy drafted by and required by ICE. While Plaintiffs indicate that the policy was implemented as written, they do not point to any evidence that GEO knew or should have known that the policy should not have been so implemented. For example, Plaintiffs have not pointed to a communication with ICE, or anyone else, indicating that GEO knew it should have acted differently but intentionally chose not to.[2] Instead, the best they can do is to state that GEO should have assumed that any review by ICE was cursory or ineffective. This is not enough to establish scienter under the TVPA.

Because Plaintiffs have already represented to this Court that their claims rest upon a written policy and not the individual decisions of GEO detention officers, they should not be permitted to change course now.[3] That said, even if the officers' actions are considered, GEO is still entitled to derivative sovereign immunity. That GEO officers occasionally implemented the disciplinary severity scale during meal clean-up or occasionally reminded detainees of the consequences for not cleaning does not defeat derivative sovereign immunity. Putting aside

---

[1] Plaintiffs cite to Section 5.8 of the PBNDS as support for their position that the disciplinary severity scale was limited in certain ways. Section 5.8 does not mention discipline and does not contain a cross-reference to the disciplinary severity scale despite having a specific section titled "References" which includes internal cross references to other sections of the PBNDS. There is no colorable argument that Section 5.8 instructs detainees that they can make a mess at each meal without the personal obligation to clean-up before moving on to their next activity without facing the potential consequence of a reprimand or warning.
[2] Indeed, even if the Ely Declaration were admissible (which it is not) it does not state that GEO was ever put on notice that ICE had concerns about any of its policies during the class period. Further, the declaration does not address the policies at issue, namely, the detainee handbook, so it does not provide helpful guidance regarding ICE's review and approval of the meal clean-up procedures. Ex. D.
[3] If the Plaintiffs are permitted to change course and focus on the individual decisions of GEO detention officers, the justification for class certification is eroded and the class should be decertified. *See* ECF 312 (Motion for Order to Decertify Class).

**APP. 541**

whether the acts of non-managerial employees could bind the company, because GEO's officers were merely acting as the government directed, Plaintiffs cannot show the element of scienter. There is no evidence that the GEO officers referenced in Plaintiffs' Response had any reason to believe that ICE had not authorized the disciplinary severity scale for use in connection with a detainee's refusal to clean after a meal. To the contrary, Plaintiffs concede that the officers did not believe any of their actions were wrong in any way. ECF 298 at 49 (discussing how Mr. Pagan did not believe other officers had done anything wrong); ECF 306-12 (declarations of GEO's officers). Thus, their actions could not have been knowing. *See e.g., U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 950 (10th Cir. 2008). Plaintiffs have failed to show that GEO's officers understood that the policies that were drafted by and implemented by ICE were in any way unlawful. Thus, Plaintiffs cannot show that those officers (or GEO) acted with reckless disregard in light of ICE's instructions. Indeed, the "driving purpose of derivative sovereign immunity 'is to prevent the contractor from being held liable when the government is actually at fault but is otherwise immune from liability.'" *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 70 (D.C. Cir. 2019). Therefore, GEO is entitled to derivative sovereign immunity.

### D.    ICE's Authority to Direct the Dollar a Day Rate

#### (1)    Waiver

As an initial matter, GEO notes that Plaintiffs waived the argument that ICE lacked authority to set the VWP rate by not raising it in its initial motion for summary judgment. ECF 260. Plaintiffs sought summary judgment on GEO's defenses far before discovery cutoff, risking that new theories and facts could arise that would change their strategy. When Plaintiffs filed their initial motion, they did not question ICE's authority, even though, at that time the appropriations

records were available to Plaintiffs as a matter of public record. To the contrary, Plaintiffs argued that ICE indeed had authority *which it delegated* to GEO. ECF 260 at 39 ("GEO's contract with ICE required it to have a VWP, but ICE delegated the authority to design that program at the Aurora Facility to GEO."). In fact, Plaintiffs sought to rely upon the very appropriations they now challenge to establish that ICE pays only $1.00 per day to detainees. *Compare* ECF 260 at 26 (citing to the Appropriations Act of 1978 as support for proposed Undisputed Fact Number 4) *with* ECF 298 at 45 ("Whatever Authority ICE may claim for this provision, it cannot be the 1978 appropriations language…"). Because Plaintiffs already represented to this Court that the 1978 appropriations act is a reliable source upon which they intend to prove their claims, they cannot now reverse course simply because it is expedient to do so. Thus, the Court should not address Plaintiffs' belated argument.

**(2)     ICE's Appropriations Authority.**

Even if the Court decides to address Plaintiffs claim that ICE lacked appropriations authority, it must fail because Plaintiffs' assertions are contrary to Congress' own appropriations history. Congress has repeatedly acknowledged the PBNDS in drafting its appropriations bills. Indeed, it has specifically ordered ICE to comply with various versions of the PBNDS on multiple occasions. *See e.g.,* H. Rept. 112-91 - Department Of Homeland Security Appropriations Bill, 2012; H. Rept. 112-492 - Department Of Homeland Security Appropriations Bill, 2013; H. Rept. 114-215 - Department Of Homeland Security Appropriations Bill, 2016 ("The Committee expects ICE to refrain from entering into new contracts or intergovernmental service agreements that do not require adherence to the PREA and 2011 PBNDS standards."). In instructing ICE to comply with the PBNDS at its facilities, Congress effectively instructed ICE to implement the VWP as

14

**APP. 543**

expressed in the PBNDS. There can be no argument that Congress would not have reviewed the PBNDS before incorporating them into its appropriations bills. Furthermore, members from both parties are well aware of the VWP and its requirements. Ex. E ; Ex. F; Ex. K. There is no authority to support Plaintiffs' argument that Congress was required to specifically appropriate funds for the VWP each year—rather than including it as part of its lump-sum amount earmarked for detention services.

Additionally, Plaintiffs arguement that ICE did not have authority to set the rate of reimbursement undermines their own argument as to this issue.  Plaintiffs argue that detainees should have been paid more than $1.00 per day because *ICE's PBNDS allowed for payments in excess of $1.00* per day. ECF 260.  But, to the extent ICE had *no authority* to set the detainee pay rate or reimburse GEO for the same, it would mean that detainees should have been paid *less* than they were paid for their participation, not more. Indeed, ICE would not have been authorized to pay anything for detainee's volunteer activities. Nor would it have been authorized to promulgate the section of the PBNDS which requires detainees to be compensated for their participation in the VWP (thus eliminating Plaintiffs ability to rely upon Section 5.8 to establish their TVPA claims). Instead, each activity would have simply been a way to pass the time or get an additional treat— not an activity that resulted in a stipend of $1.00 per day. Indeed, demonstrating the absurdity of Plaintiffs' argument, each detainee to have participated in the VWP since 1979 would have been enriched (at the taxpayers' expense) in the amount of $1.00 for each day they participated in the VWP—all without Congress's knowledge.  Such a conclusion would not only defy logic, but also the ample evidence that Congress was and is aware of the PBNDS, which contain the parameters of the VWP, and that Congress has explicitly expressed its desire to have the PBNDS control ICE

**APP. 544**

detention centers. Ex. F ; Ex. K. Accordingly, this Court should not adopt Plaintiffs argument that, at best, ICE acted without Congressional authority for decades and, at worst, ICE intentionally misled Congress.

**(3)   GEO is Not the Proper Party to Defend ICE's Appropriations Authority.**

Finally, as noted in GEO's recent Rule 19 motion, GEO is not the proper party to defend ICE's appropriations decisions. ECF 307. GEO does not have access to the information upon which ICE relied during ICE's appropriations process, the information that it submitted to Congress for approval, nor ICE's internal reasoning for what information it chose to submit to Congress in support of its appropriations. Further, the ramifications of such a finding as to ICE would stretch far beyond the instant case. Accordingly, the proper party to defend ICE's appropriations is not GEO, but ICE.

**E.   GEO's Contract With ICE Expressly Directed GEO to Pay Detainees One Dollar Per Day.**

Like with the TVPA claims, GEO is entitled to derivative sovereign immunity as to Plaintiffs' unjust enrichment claim because GEO simply did as ICE instructed in implementing the VWP. It is undisputed that ICE requires GEO to offer a voluntary work program in its contracts with GEO to operate the AIPC. ECF 270 at 15; (Undisputed fact 42). For a significant portion of the class period, the 2008 PBNDS mandated that "the compensation [for VWP participation] is $1.00 per day." (Undisputed fact 44). Thereafter, the 2011 PBNDS explicitly directed GEO that $1.00 per day may be paid to detainees who participate in the VWP. (Undisputed fact 44). Regardless of the version of the PBNDS that applied, ICE reimburses GEO no more than $1.00 per day for work performed in the VWP. (Undisputed Fact 48). More specifically, ICE's contract

16

**APP. 545**

with GEO for the AIPC still provides $1.00 per day must be the "***actual cost*** … per detainee," which GEO "***shall not exceed***" without the approval of ICE's Contracting Officer. ECF 262-2, 5 (GEO_MEN 00019616); (emphasis added). This exact amount was explicitly authorized by Congress when it set the rate for detainee allowances at "not in excess of $1.00 per day." Dep't of Justice Appropriations Act of 1979, Pub. L. 95-431, 92 Stat 1021, 1027 (Oct. 10, 1978). With these undisputed facts, this Court must determine whether GEO simply complied with the terms of its contract providing detainees with the ICE stipend of $1.00 per day for their participation in the VWP.

Under Colorado law, the purpose of contract interpretation is to ascertain the intent of the parties by ensuring that contracts are construed "consistently with the well-established principles of interpretation." *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 973 (Colo. 2005). As a starting point, courts examine the contractual terms in an attempt to determine the parties' intent. *Id.*; *see also Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008); *Pirkey v. Hosp. Corp. of Am.*, 483 F.Supp. 770 (D.Colo.1980). "The Court must construe a contract in a manner that avoids an absurd result and should avoid any interpretation that would be inconsistent with the purpose of the contract." *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1085 (D. Colo. 2013), aff'd, 841 F.3d 827 (10th Cir. 2016). When a contractual term "unambiguously resolves the parties' dispute, the interpreting court's task is over" because "in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence." *Level 3 Commc'ns, LLC,* 535 F.3d. at 1154.

Here, looking at GEO's contract with ICE, the clear intent was to have GEO implement and operate a VWP on ICE's behalf. (Undisputed Fact 42). GEO's contract anticipates that it will

**APP. 546**

facilitate this pass-through relationship between ICE and the detainees. Because this item was not one on which GEO could obtain a mark-up, but instead was a pass-through system for ICE to provide detainees with a stipend, the parties explicitly agreed to an "actual cost" for that contractual requirement: $1.00 per day. ECF 262-2, 5. There is no ambiguity that the "actual cost" represents the amount of ICE's stipend that GEO advanced to participating detainees. Indeed, this was the parties' intent, as evidenced by the fact that the VWP has been audited each year and has passed each audit since 2004. (Undisputed fact 49). Surely, had there been a misunderstanding, ICE would have raised its belief that GEO was not performing satisfactorily under the contract. Any interpretation that GEO was required to pay more for the VWP would be "inconsistent with the purpose of the contract." *SolidFX, LLC*, 935 F. Supp. 2d at 1085. Indeed, the purpose of the contract was for ICE to pay GEO to provide for the care of detainees, including the costs of all necessary services under a "fully burdened" rate. In contrast, the VWP line item is a "reimbursement" to GEO for advancing the actual cost of the stipend on ICE's behalf. To interpret the GEO-ICE contracts as stating that the parties intended to have GEO pay above and beyond the amount ICE agreed to pay for the VWP would therefore be inconsistent with the parties' intent. Accordingly, there can be no question that by entering into the contract, ICE instructed GEO to advance detainees $1.00 per day for their participation in the VWP.

Because there is no ambiguity in the contract, this Court should not turn to extrinsic evidence to interpret the meaning of ICE's directive to GEO. Furthermore, even if it did turn to extrinsic evidence, how the parties interacted as to different contracts for different facilities is not relevant here. Indeed, this Court does not have those contracts in front of it and the parties have not conducted discovery into why the different agreements may have been reached at those

54306826;1

**APP. 547**

facilities. There is no evidence in the record about how or why differences might exist among ICE facilities around the country. Thus, the mere fact that the terms were different at facilities that are not the subject of this lawsuit provides no insight into the specific contractual terms at issue here.

Accordingly, because GEO and ICE intended to contract for a VWP which would allow ICE to provide detainees who participated a stipend of $1.00 per day, Plaintiffs cannot show that GEO did not act exactly as the government directed or that it violated its contract in any way. Thus, GEO is entitled to immunity on Plaintiffs' unjust enrichment claim.

## IV.     CONCLUSION

Because GEO is immune from suit on the basis of derivative sovereign immunity and the government contractor defense, as set forth herein and in its initial motion, GEO respectfully requests the Court grant its Motion for Summary Judgment.

Respectfully submitted, this 21st day of August, 2020.

**AKERMAN LLP**

*s/ Adrienne Scheffey*
Colin L. Barnacle
Adrienne Scheffey
Christopher J. Eby
Melissa L. Cizmorris
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  (303) 260-7712
Facsimile:   (303) 260-7714
Email: colin.barnacle@akerman.com
Email: christopher.eby@akerman.com
Email: melissa.cizmorris@akerman.com
Email: adrienne.scheffey@akerman.com

54306826;1     **APP. 548**

**BURNS, FIGA & WILL, P.C.**
Dana L. Eismeier
Michael Y. Ley
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, Colorado 80111
Telephone:  (303) 796-2626
Facsimile:   (303) 796-2777
Email: deismeier@bfwlaw.com
Email: mley@bfwlaw.com
*Attorneys for Defendant The GEO Group, Inc.*

54306826;1

**APP. 549**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 21st day of August, 2020, a true and correct copy of the foregoing

**DEFENDANT THE GEO GROUP, INC.'S REPLY IN SUPPORT OF GEO'S CROSS-MOTION FOR SUMMARY JUDGMENT** was filed and served electronically via the Court's

CM/ECF system on the following:

### <u>Counsel for Plaintiffs:</u>

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
TOWARDS JUSTICE
1410 High St., Ste. 300
Denver, CO 80218
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Matthew Fritz-Mauer
KELMAN BUESCHER FIRM
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com
mfritzmauer@laborlawdenver.com

Hans C. Meyer
MEYER LAW OFFICE, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
OUTTEN & GOLDEN, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
OUTTEN & GOLDEN, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
OUTTEN & GOLDEN, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
LAW OFFICE OF R. ANDREW FREE
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
MILSTEIN LAW OFFICE
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

*s/ Nick Mangels*
Nick Mangels

54306826;1

**APP. 550**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02887 JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

  Plaintiffs,

v.

THE GEO GROUP, INC.,

  Defendant.

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................... 1

II.    PLAINTIFFS' RESPONSE TO GEO'S PROPOSED UNDISPUTED MATERIAL
       FACTS ................................................................................................... 1

III.   PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS ................................. 30

       A.     The Housing Unit Sanitation Policy ............................................. 30

       B.     Solitary Confinement ................................................................. 38

       C.     Conditions of Confinement at GEO ............................................. 39

       D.     GEO's Contracting Practices ..................................................... 44

IV.    LEGAL STANDARD ............................................................................... 46

       A.     Summary Judgment .................................................................. 46

       B.     The TVPA ................................................................................ 47

V.     ARGUMENT ........................................................................................ 48

       A.     Material Disputes of Fact Preclude Summary Judgment on the Class's
              TVPA Claims. ........................................................................... 48

              1.     GEO's Forced Labor Scheme Included Threats of Serious Harm and
                     Physical Restraint. ............................................................ 50

              2.     GEO's Threats of Serious Harm Were Pervasive. ..................... 53

              3.     Detainees' Uniform Conditions of Confinement Made them
                     Especially Vulnerable to Coercion. ....................................... 54

              4.     Placement in Solitary Confinement Is Not a "Legitimate
                     Consequence" of Refusing to Perform Unpaid Labor. .............. 57

              5.     A Jury Could Conclude That GEO Intended its Threats to Compel
                     Unpaid Labor. ................................................................. 60

**APP. 552**

6.    The Jury Can Infer That Class Members Cleaned Because of Fear of Solitary Confinement. ........................................................................ 63

B.    Class Members' TVPA Claims Benefit from the TVPA's 10-Year Statute of Limitations. ............................................................................. 64

C.    Plaintiffs Do Not Seek Injunctive Relief. ..................................................... 67

D.    Material Disputes of Fact Preclude Summary Judgment on Plaintiffs' Unjust Enrichment Claims. ............................................................. 67

1.    The Record Shows That GEO Obtained a Benefit From Paying Detainees $1 per Day for Their Labor. ............................................. 67

2.    GEO's Contract Defense Fails ............................................................ 70

i.    GEO Waived Its Contract Defense. ......................................... 70

ii.    The Contract GEO Relies On Is Unconscionable. ................. 70

VI.    CONCLUSION ....................................................................................... 74

**APP. 553**

## TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

*Abarca v. Little*,
   54 F. Supp. 3d 1064, 1069 (D. Minn. 2014)................................................................ 66

*Adler v. Wal-Mart Stores, Inc.*,
   144 F.3d 664 (10th Cir. 1998) ...................................................................................... 46

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...................................................................................................... 46

*Barrientos v. CoreCivic, Inc.*,
   951 F.3d 1269 (11th Cir. 2020) .............................................................................. 59, 60

*Bernall v. Burnett*,
   793 F. Supp. 2d 1280 (D. Colo. 2011)........................................................................ 72

*Bonanno v. Quizno's Franchise Co., LLC*,
   No. 06 Civ 2358, 2009 WL 1068744 (D. Colo. Apr. 20, 2009)................................... 72

*Bridges v. Poe*,
   No. 19 Civ. 1399, 2020 WL 5408915 (N.D. Ala. Sept. 9, 2020) ............................... 50

*Burke v. Regalado*,
   935 F.3d 960 (10th Cir. 2019) .................................................................................... 70

*Camayo v. John Peroulis & Sons Sheep, Inc.*,
   Nos. 10 Civ. 772, 11 Civ. 1132, 2013 WL 3927677 (D. Colo. July 20,
   2013) ........................................................................................................................65-66

*Contreras v. Corinthian Vigor Ins. Brokerage, Inc.*,
   25 F. Supp. 2d 1053 (N.D. Cal. 1998) ....................................................................... 73

*Cruz v. Maypa*,
   773 F.3d 138 (4th Cir. 2014) ................................................................................. 64, 65

*Davis v. M.L.G. Corp.*,
   712 P.2d 985 (Colo. 1986)............................................................................... 71, 72, 73

*DCB Const. Co. v. Cent. City Dev. Co.*,
   965 P.2d 115 (Colo. 1998)........................................................................................... 67

*Doe v. Siddig*,
   810 F.Supp.2d 127 (D.D.C. 2011) .............................................................................. 66

*Gilbert v. United States Olympic Comm.*,
      423 F. Supp. 3d 1112 (D. Colo. 2019) ........................................................................ 65

*Headley v. Church of Scientology Int'l,*
      687 F.3d 1173 (9th Cir. 2012) ..................................................................................... 58

*Hughes Aircraft Co. v. United States ex rel. Schumer*,
      520 U.S. 939 (1997) ..................................................................................................... 64

*Interbank Invests., LLC v. Eagle River Water & Sanitation Dist.*,
      77 P.3d 814 (Colo. App. 2003) ............................................................................... 70-71

*Lama v. Malik*,
      192 F. Supp. 3d 313 (E.D.N.Y. 2016) ........................................................................ 65

*Landgraf v. USI Film Prods.*,
      511 U.S. 244 (1994) ................................................................................................ 64, 66

*Lantec, Inc. v. Novell, Inc.*,
      306 F.3d 1003 (10th Cir. 2002) ................................................................................... 50

*Menocal v. GEO Grp., Inc.*,
      320 F.R.D. 258 (D. Colo. 2017) .................................................................................. 63

*Menocal v. GEO Grp., Inc.*,
      882 F.3d 905 (10th Cir. 2018) ............................................................................... 61, 63

*Muchira v. Al-Rawaf*,
      850 F.3d 605 (4th Cir. 2017) ......................................................................... 55, 56, 58

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
      790 F. Supp. 2d 1134 (C.D. Cal. 2011) ...................................................................... 51

*Radio Corp. Of Am. v. Radio Station KYFM, Inc.*,
      424 F.2d 14 (10th Cir. 1970) ....................................................................................... 70

*United States v. Bradley*,
      390 F.3d 145 (1st Cir. 2004) ................................................................................. 47, 57

*United States v. Callahan*,
      801 F.3d 606 (6th Cir. 2015) ................................................................................ 56, 59

*United States v. Calimlim*,
      538 F.3d 706 (7th Cir. 2008) ................................................................................ 57, 62

**APP. 555**

*United States v. Dann*,
    652 F.3d 1160 (9th Cir. 2011) ................................................ 47, 60

*United States v. Kozminski*,
    487 U.S. 931 (1988) ............................................................ 47, 59

*United States v. Thompson*,
    109 F.3d 639 (9th Cir. 1997) ...................................................... 50

*United States v. Toviave*,
    761 F.3d 623 (6th Cir. 2014) ................................................. 51, 59

*Velez v. Sanchez*,
    693 F.3d 308 (2d Cir. 2012) ....................................................... 66

*Williams v. Walker-Thomas Furniture Co.*,
    350 F.2d 445 (D.C. Cir. 1965) .................................................... 73

**Statutes**

8 U.S.C. § 1555 ...................................................................... 45

18 U.S.C. § 1589 ............................................................... *passim*

**Rules**

Fed. R. Civ. P. 56 .................................................................... 46

**Other Authorities**

H.R. Rep. No. 106-939, at 101 (2000) (Conf. Rep.),
    *as reprinted in* 2000 U.S.C.C.A.N. 1380, 1392-93 ............................ 47

Victims of Trafficking and Violence Protection Act of 2000, PL 106–386,
    tit. XVIII, § 1589, 114 Stat. 1464 (2000)..................................... 66

**APP. 556**

## I.      INTRODUCTION

Summary judgment is appropriate in cases where there are no genuine issues of material fact, making the role of a factfinder at trial unnecessary.  GEO's motion makes abundantly clear that this is not such a case.  To the contrary, GEO has identified numerous issues of material fact that are properly determined at trial by a jury, including but not limited to (1) whether a reasonable person would find placement in solitary confinement to be "serious harm" under the Trafficking Victims' Protection Act ("TVPA"), (2) whether threats of solitary confinement caused detainees to perform cleaning work for GEO, (3) whether detainees' uniform conditions of confinement made them more susceptible to coercion, (4) whether GEO financially benefited from paying detainees a dollar a day under the Voluntary Work Program ("VWP"), and (5) whether the agreement GEO required VWP workers to sign was an enforceable contract.  The Court should deny GEO's motion for summary judgment, and allow this case to proceed to trial.

## II.     PLAINTIFFS' RESPONSE TO GEO'S PROPOSED UNDISPUTED MATERIAL FACTS

### A.      Policies Challenged By Plaintiffs

1.      At the class certification stage Plaintiffs cited to a Policy and Procedure Manual, titled "Sanitation Procedures" in support of their claims.[1]  ECF 50-2.

---

[1]      [GEO's footnote] Plaintiffs have renamed this document the "HUSP," but no formal GEO policy is designated or titled "HUSP." It appears that this phrase originates

    i.   **Plaintiffs' Response:** Admit that the "Sanitation Procedures" section of the Aurora Policy and Procedure Manual was an exhibit to Plaintiffs' Motion for Class Certification.  Deny the contention in the footnote that Plaintiffs "have renamed this document the 'HUSP'" or that "no formal GEO policy is designated or titled 'HUSP.'"  As GEO acknowledges, the Housing Unit Sanitation policy ("HUSP") is set forth in the Detainee Handbook under the heading "Housing Unit Sanitation."

2.    The Sanitation Procedures were not developed to assign tasks to any specific individuals, but rather to detail the process for cleaning and materials to be used.  ECF 289 (Undisputed Fact 31).

    i.   **Plaintiffs' Response:** Admit.[2]

3.    Detainees do not receive a copy of the Sanitation Procedures during their stay at AIPC.  ECF 50-1, 29:13-18 (30(b)(6) Deposition of Ceja).

    i.   **Plaintiffs' Response:** Admit.

4.    Plaintiffs no longer rely upon the Sanitation Procedures as a policy that underlies their TVPA claim. Ex. A. (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories, Responses to Interrogatory No. 39).

---

not from the Sanitation Procedures, but instead the Detainee Handbook which contains a subsection called "Housing Unit Sanitation." *See* ECF 260 at 7.

[2]    ECF No. 289 is a notice filed by non-party ICE to correct inaccurate statements made about the conditions of Plaintiff Hugo Hernandez Ceren's confinement.  GEO's citations to ECF No. 289 appear to refer to ECF No. 298.

**APP. 558**

      i.  **Plaintiffs' Response:** Deny. The referenced interrogatory does not mention policies; rather, it states: "Describe all actions taken by GEO that You allege constitute force, threats of force, physical restraint, or threats of physical restraint" under 18 U.S.C. § 1589(a)(1).

5.      Plaintiffs also cited the AIPC Handbook at the class certification stage as support for their TVPA claims. ECF 50-3.

      i.  **Plaintiffs' Response:** Admit.

6.      Unlike the Sanitation Procedures, the AIPC Handbook is issued to all detainees entering the facility. ECF 289 (Undisputed Fact 23).

      i.  **Plaintiffs' Response:** Admit.

7.      The only classwide polices that Plaintiffs challenge as part of their TVPA claim are the AIPC Handbook and an Orientation video shown to detainees upon arrival. Ex. A. (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories Responses to Interrogatory No. 39).

      i.  **Plaintiffs' Response:** Deny.  Plaintiffs challenge GEO's classwide HUSP, which is described in the Detainee Handbook and orientation video.  The Detainee Handbook and orientation video contain evidence of that policy, but are not the only evidence of that policy. The referenced interrogatory does not mention policies; rather, it states: "Describe all actions taken by GEO that You allege constitute

**APP. 559**

force, threats of force, physical restraint, or threats of physical

restraint" under 18 U.S.C. § 1589(a)(1).

8.    More specifically, Plaintiffs challenge the meal clean-up policy in the AIPC

Handbook whereby 6 detainees (2 of which are paid "Trustees" under the

VWP) assist in cleaning up the housing unit after each meal. ECF 49; ECF

261-17, 20.

    i.  **Plaintiffs' Response:** Deny. Plaintiffs challenge the HUSP, which

provides:

> Each and every detainee must participate in the facility's
>
> sanitation program.  A list of detainees is developed each day
>
> by staff and is posted daily for viewing.  During a general
>
> cleanup all detainees must participate.  The assigned Housing
>
> Unit [or Dorm] Officer will be responsible for assuring this
>
> general cleanup is done on a regular basis.

ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-

96) at 18; ECF No. 273-2 (2007 Detainee Handbook, GEO_MEN

00054151-222) at 49; ECF No. 273-3 (2008 Detainee Handbook,

GEO_MEN 00054224-52) at 19; ECF No. 273-4 (2010 Detainee

Handbook, GEO_MEN 00054253-77) at 16-17; ECF No. 273-5

(2011 Detainee Handbook, GEO-MEN 00065783-808) at 17; ECF

APP. 560

No. 261-17 (2013 Detainee Handbook, PL000029-55) at 20.3  The evidence GEO cites does not support calling the policy a "meal clean-up policy" and does not support that 2 of the 6 detainees assigned to housing unit sanitation duties were VWP workers. Further evidence related to the HUSP is also set forth in Plaintiffs' Statement of Additional Facts ("SAF"), Nos. 1-13.

9.     The meal clean up section of the handbook provides for the following sanction if not followed:

> If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any - activities/programs until the housing unit is cleaned. Continued refusal to clean will result in further disciplinary action.
>
> ECF 261-17, 20.

i. **Plaintiffs' Response:** Admit that the Detainee Handbook includes the quoted language.  Deny that the quoted section of the handbook specifically references meal clean-up.

10.     GEO is required to comply with ICE's PBNDS under its contract. ECF 289 (Undisputed Facts 11-14, 16,18).

---

[3]     Minor variations between handbooks are noted in brackets.  In some versions of the handbook, this policy is referred to as Dormitory Sanitation and not Housing Unit Sanitation, but the substantive policy remains the same.

**APP. 561**

       i.   **Plaintiffs' Response:** Admit.

11.    All applicable versions of ICE's National Detention Standards ("NDS")

and PBNDS require GEO to adopt, without alteration, the ICE disciplinary

severity scale and incorporate it into the AIPC Handbook. ECF 289

(Undisputed Fact 19).

       i.   **Plaintiffs' Response:** Admit.

12.    All applicable versions of ICE's NDS and PBNDS require GEO to provide

a disciplinary severity scale that includes the "[r]efusal to clean assigned

living area" as an offense which can be sanctioned by "[d]isciplinary

segregation (up to 72 hours)." ECF 289 (Undisputed Fact 21).

       i.   **Plaintiffs' Response:** Admit.

13.    The ICE disciplinary severity scale included in the AIPC Handbook

provides for up to 12 other sanctions as a possible consequence for refusing

to clean one's living area. These sanctions include warning, reprimand, and

loss of privileges (e.g. commissary, vending machines, movies, recreation,

etc.). ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS);

261-8 at 47 (2011 PBNDS); ECF 260 at 17.

       i.   **Plaintiffs' Response:** Admit.

14.    GEO included this sanction in the AIPC Handbook, as required by ICE.

ECF 289 (Undisputed Facts 11-14, 16, 18, 19, 21).

       i.   **Plaintiffs' Response:** Admit.

15.    The detainee orientation video provides:

**APP. 562**

You will be protected from personal abuse, corporal punishment, personal injury, disease, and damage to your property and harassment to the fullest extent possible. Each and every detainee must participate in the sanitation program. A list of detainee's [sic] is developed each day and is posed for viewing. During a general clean-up all detainees must participate.

*****

Disciplinary Process[.] Refer to your local supplement for more detailed information about the rules infractions that you must avoid and the established disciplinary actions that will be taken.

*****

<u>High Moderate</u>- and a few examples are . . . Indecent exposure, staling [sic], refusing to obey a staff member, insolence to staff member, lying or providing false statement to staff, being in an unauthorized area, not standing for count, interfering with count, gambling, destroying altering or damaging property"

*See* ECF 262-10 (emphasis in original).

     i.   **Plaintiffs' Response:** Admit.

16.    In addition to the AIPC Handbook and orientation video, GEO is required to provide all detainees with the ICE National Handbook. Like the AIPC handbook, the ICE Handbook also warns detainees that they could face disciplinary consequences if they refuse to clean, stating "Will I get paid for keeping my living area clean? No. You must keep areas that you use clean,

**APP. 563**

including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined." Ex. B. (ICE National Handbook). Despite this being materially similar to the AIPC Handbook, Plaintiffs do not allege that ICE's National Handbook constituted a threat as defined by the TVPA. ECF 49; Ex. A (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories, Responses to Interrogatory No. 39) (omitting any reference to the ICE National Handbook).

    i. **Plaintiffs' Response:** Admit that the ICE National Handbook includes the quoted language.  Deny that cleaning general-use areas is the same as keeping general-use areas clean, or that the language in the ICE handbook is "materially similar" to the HUSP as set forth in the Detainee Handbook.  Compare ECF No. 310-1 (ICE Detainee Handbook, GEO-MEN 00141667-702) at 18 ("Will I get paid for keeping my living area clean? No. You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined.") with ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 49; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 16-17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20.

**APP. 564**

> ("Each and every detainee must participate in the facility's sanitation program.  A list of detainees is developed each day by staff and is posted daily for viewing.  During a general cleanup all detainees must participate.").

17.   Plaintiffs also challenge the VWP daily stipend. ECF 1, ECF 49,3.

> i.   **Plaintiffs' Response:** Admit.

18.   All detainees are offered the opportunity to participate in the VWP. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17.

> i.   **Plaintiffs' Response:** Admit.

19.   All detainees who participate in the VWP are told that their participation is voluntary. Ex. C. (Plaintiffs' VWP applications).

> i.   **Plaintiffs' Response:** Admit, but note that that the cited documents only do so by referring to the program as the "voluntary work program" and "the volunteer work program."

20.   All detainees who participate in the VWP are told in advance that "compensation shall be $1.00 per day." Ex. C. (Plaintiffs' VWP applications.).

> i.   **Plaintiffs' Response:** Admit.

21.   All detainees must sign an agreement to participate in the VWP, acknowledging that their compensation will be limited to $1 per day. Ex. C. (Plaintiffs' VWP applications).

      i.  **Plaintiffs' Response:** Admit, but dispute that the agreement is an

         enforceable contract. *See* § V.E.2, *infra*.

22.    Some VWP participants receive additional incentives for their participation

including candy or ice cream. Ex. D (Ceja 30(b)(6) Dep.162-163).

      i.  **Plaintiffs' Response:** Admit.

**B.**    **Plaintiff's Experiences at the AIPC.**

23.    Plaintiff Menocal described a typical day at AIPC as follows:

I wake up, get dressed, do my bed, wait for breakfast, eat breakfast, clean

up, maybe exercise, walk around, read a book, draw. It depends. Again,

wait for lunch to eat, clean up, maybe shower, maybe do some sports,

maybe talk on the phone with someone, maybe write a letter, walk around,

exercise, wait for dinner. Same thing, eat dinner, relax a while, maybe

watch TV, read a book, draw, and, you know, wait for bedtime.

Ex. E (Menocal Dep. 121:5-13).

      i.  **Plaintiffs' Response:** Admit.

24.    While detained, Plaintiff Menocal described AIPC to a friend as follows:

[T]hey've got pretty good grub, considering it's, you know, a detention

center. And we got three televisions, a bunch of tables, a bunch of people,

and we all get along. Pretty nice. I mean, it's – for being incarcerated, it's

not bad at all, not compared to – not compared to Denver County or the

other one where I was at. This is like Camp Snoopy. It's pretty easy.

Ex. E (Menocal Dep. 54:5-12).

**APP. 566**

    i.  **Plaintiffs' Response:** Admit, but deny that this statement accurately describes Plaintiff Menocal's experience at Aurora.  Plaintiff Menocal testified that this statement was not true, and that he told family and friends that GEO was a nice place and that the food was good only so his friends and family would not worry about him. Ex. 1 (Menocal Tr.) 48:20-24; 67:12-68:5; 167:17-168:6.  In response to this recording, Plaintiffs' expert Dr. Grassian stated: "A person can experience a sense of dread and fear and still try to present a good face to their friends and family and to themselves. You know, that doesn't change anything."  Ex. 2 (Grassian Tr.) 272:3-24.

25.    Plaintiff Hugo Hernandez described a typical day as follows:

> I would wake up for breakfast at 5:00 in the morning. I will walk out, store my food, bring it back to the cell, and go to sleep only if it was not my time to clean. But if I was assigned to clean, I have to stay outside and clean. I couldn't go back to sleep. So[,] I will store my food. I will wake up when I wake up, and brush my teeth, do my coffee, and make sure that all my cellies get the coffee because that's my one main thing. Then we will all sit at the table. I will do my legal work, go through my documents, and see what else I need to put in or something, watch a little bit of TV. I can go to the phone a little bit. If -- if I will get someone to answer, I will go to the phone. Wait for count time, wait for lunch. After lunch, I will do a cleanup

**APP. 567**

again, which is cleanup time, and wait to see who's assigned for the
cleanup, and if I'm not assigned, then I just go to my cell or I go
against the wall just like everybody else. And once everything gets
reopened, go back into the table again and do some workout while
waiting -- doing my workout. I wait for chow again and wait for the
cleanup, and, of course, shower. Yeah, after the workout, shower,
get back. Wait for chow, clean up, and then eventually wait for the
GEO guard, Officer Blacknick, to come and pick me up so we can
go to the law library and collect all detainees who wanted to go to
the library. We'll go to the law library, get a pat-down, go inside the
law library. And in there, I will help detainees with their documents,
printouts, making sure they understood what the immigration judge
was asking them to bring back, translations, looking for any specific
application they were looking for. And then once we were done, like
an hour later or an hour and a half later, I get another pat-down, get
taken back to the cell, and wait for count time.  Ex. F (Hernandez
Dep. 107-108).

i.   **Plaintiffs' Response:** Admit.  The above omits the last two
sentences of Plaintiff Hernandez Ceren's answer, which state: "And
after count time, the last count time, you have to be inside your cell
and the doors got to be locked in already.  And then it's another
day."

12

**APP. 568**

26.     While at AIPC, every detainee had the ability to communicate with ICE at

any time. Ex. B (ICE Detainee Handbook, pg. 2) ("ICE officers will

routinely visit the housing units at your facility. If you have questions about

your case or how the facility has treated you, let the ICE officers know. . .

[y]ou may also submit a request for information in writing."); Ex. E

(Menocal Dep. 56:1-10); Ex. F (Hernandez Dep. 97:15-22).

    i.   **Plaintiffs' Response:** Deny.  While Plaintiffs acknowledge that the

ICE Detainee handbook suggests that detainees should have

"routinely" had an opportunity to communicate with ICE officers,

the cited evidence does not establish that "every detainee had the

ability to communicate with ICE at any time." (emphasis added).

The documents do suggest that detainees would have the opportunity

to speak to ICE officials during their "routine[] visits" to the housing

units.  It is unclear what the handbook means by "submit a request

for information in writing."  The cited testimony from Plaintiffs

Menocal and Hernandez Ceren suggests that detainees could file a

complaint or "kite", though it is not clear whether the complaint

would go to ICE or GEO.  Plaintiff Menocal did not know if the

kites he filed went to ICE or GEO personnel.  Ex. 1 (Menocal Tr.)

56:16-20.  In Plaintiff Hernandez Ceren's deposition, a "kite" was

described as "a way that you could file a grievance or bring an issue

**APP. 569**

to the attention of the facility." Ex. 3 (Hernandez Ceren Tr.) 97:15-20.

27. Some detainees elected to be placed in segregation voluntarily, seeing it not as a punishment, but instead a location where they could receive peace and quiet. Ex. D (Ceja 30(b)(6) Dep. 55:7-19).

     i. **Plaintiffs' Response:** Deny. The cited testimony describes "protective custody," which is not synonymous with "segregation," despite the fact that both practices use the same space. Detainees who feel threatened, afraid, or unsafe in general population are placed in protective custody. Ex. 4 (Gallegos Tr.) 74:7-76:23; *see also* ECF No. 262-11 (Special Management Unit ("SMU") Operations policy, GEO_MEN00037770-84) at 3 ("Protective custody (PC) may be initiated at the detainee's request or ordered to protect the detainee from harm."). GEO's segregation logs show that the detainees who sought "peace and quiet" were sent to protective custody. Ex. 5 (Segregation Activity Sheet, GEO-MEN 00070692-93).

28. None of the named Plaintiffs were placed in segregation for refusing to clean. Ex. A (Brambila's Responses to GEO's Sixth Interrogatories); Ex. E (Menocal Dep. 100:16-19); Ex. F (Hernandez Dep. 181:1-7); Ex. G (Valerga Dep. 141:24-142:2, 140:12-13); Ex. H (Lourdes Argueta Second Set of Discovery, Interrogatory No. 27; Yepez Gaytan Second Set of

**APP. 570**

Discovery, Interrogatory No. 27; Alexaklina Second Set of Discovery,

Interrogatory No. 27); Ex. I (Vizguerra Dep. 42:5-7); Ex. J (Xahuentitla

Dep. 70:11-17).

    i.  **Plaintiffs' Response:** Admit.

29.    Plaintiff Menocal did not receive direct threats for refusing to clean. Ex. H

(Menocal's Second Set of Discovery, Interrogatory No. 27).

    i.  **Plaintiffs' Response:** Deny.  Plaintiff Menocal testified that GEO

guards, as well as other detainees, told him that he had to clean or be

sent to solitary confinement.  Ex. 1 (Menocal Tr.) 96:5-97:3.

Plaintiff Menocal also witnessed other detainees taken to solitary

confinement for refusing to clean and understood that refusal to

clean could lead him to the same fate.  *Id.* 102:14-25.

30.    Plaintiff Olga Alexaklina was never threatened by GEO employees with

disciplinary or administrative segregation for failing to clean. Ex. H

(Alexaklina Second Set of Discovery, Interrogatory No. 27).

    i.  **Plaintiffs' Response:** Admit.

31.    Upon being informed that he would be placed in segregation if he did not

clean, Plaintiff Valerga responded with "go ahead." Ex. G (Valerga Dep.

136:16-137:19).  Yet, Plaintiff Valerga was not placed in segregation on

that occasion or any other occasion. *Id.* Valerga Dep. 141:24-142:2,

140:12-13.

    i.   **Plaintiffs' Response:** Admit that Plaintiff Valerga testified to the incident above but deny that he was not sent to segregation on "any other occasion." Plaintiff Valerga spent three weeks in segregation at Aurora. Ex. 6 (Valerga Tr.) 8:22-9:13.

32.    Plaintiff Hernandez testified in his deposition that he did not, and does not, consider the AIPC Handbook to be threatening. Ex. F (Hernandez Dep. 58:12-24).

    i.   **Plaintiffs' Response:** Admit that Plaintiff Hernandez Ceren testified he did not find portions of the handbook threatening, but deny that he did not find the HUSP, which was described in the handbook, threatening. Plaintiff Hernandez Ceren testified that he knew cleaning was mandatory because "the GEO guard would tell you that it's in the handbook, and if you refuse, you were going to be sent to the hole." Ex. 3 (Hernandez Ceren Tr.) 159:10-15.

33.    Plaintiff Dagoberto Vizguerra does not recall receiving the AIPC Handbook, let alone being threatened by it. Ex. I (Vizguerra Dep. 90:24-91:4).

    i.   **Plaintiffs' Response:** Admit that Plaintiff Vizguerra does not recall receiving the handbook, but deny that he did not find the HUSP, which was described in the handbook, threatening. Plaintiff Vizguerra testified that he was aware of the cleaning requirement and its consequences because he saw a detainee get sent to

**APP. 572**

segregation on his second or third day at Aurora for refusing to clean. Ex. 7 (Vizguerra Tr.) 48:9-49:9. In addition, the record reflects that all detainees receive and acknowledge the handbook upon entry to the facility, regardless of Plaintiff Vizguerra's specific recollection. Ex. 8 (Ceja 30(b)(6) Tr. I) 88:7-23.

34.    Plaintiffs are not making a claim for "mental anguish, emotional distress, or other similar related conditions." Ex. H (Plaintiffs Responses to Interrogatory No. 32).

   i.    **Plaintiffs' Response:** Admit.

35.    Plaintiffs' expert, Dr. Stuart Grassian, did not diagnose any of the plaintiffs with psychological conditions. Ex. K (Grassian Dep. 37:22-23; 237:20-238:24).

   i.    **Plaintiffs' Response:** Admit. Issuing such diagnoses is beyond the scope of Dr. Grassian's report.

36.    Detainees had varying motivations for cleaning:

   a.    Plaintiff Menocal preferred to clean up after himself while living at AIPC because he preferred to "live and hang out in a clean environment." Ex. E (Menocal Dep. 81:6-10).

      i.    **Plaintiffs' Response**: Deny. GEO takes this testimony out of context: Plaintiff Menocal testified that generally he prefers a clean environment; the testimony was not specific to Aurora. Plaintiffs further

**APP. 573**

deny that this testimony expresses his motivation for cleaning up after others in the Aurora Facility.  Mr. Menocal testified that he cleaned because "we had to clean and if not . . . we would be punished. . . . The hole is not a pretty place."  Ex. 1 (Menocal Tr.) 104:25-105:3.

b.    Indeed, while living at AIPC Plaintiff Menocal asked for permission to clean the recreation area without an expectation of remuneration simply because he spent a lot of time there and wanted to "hang out in a clean environment." Ex. E (Menocal Dep. 86:22-87:5).

  i.    **Plaintiffs' Response**: Deny.  Plaintiff Menocal testified that he cleaned the rec yard as a precursor to obtaining a job in the VWP, and that he eventually was offered a job in the VWP because of this cleaning.  Ex. 1 (Menocal Tr.) 86:3-87:14.

c.    Plaintiff Hernandez liked to keep his area clean. Ex. F (Hernandez Dep. 49:24-50:1).

  i.    **Plaintiffs' Response**: Admit.  However, the cited testimony relates to Plaintiff Hernandez Ceren's time in a different facility.

18

**APP. 574**

d.   To avoid the loss of TV time, detainees would often volunteer to help clean up the living area, even if not asked or assigned by GEO officers. Ex. F (Hernandez Ceren Dep. 78:2-9).

    i.   **Plaintiffs' Response**: Admit, except as to GEO's characterization of this as "volunteer" work.  The threat of losing privileges, such as use of televisions and phones, preceded threats of solitary confinement, and the threats were often made together.  Ex. 3 (Hernandez Ceren Tr.) 74:22-77:13.

e.   Plaintiff Gaytan received access to X-Box gaming systems, movies, and ice cream as an incentive to keep his dorm clean. Ex. L (Gaytan Dep. 124:3-16).

    i.   **Plaintiffs' Response**: Admit.  These incentives were not his motivation for cleaning in the HUSP; Plaintiff Gaytan testified that he never complained about cleaning because he was afraid that if he did so "they will use that against me."  Ex. 9 (Gaytan Tr.) 37:5-9. He also understood from GEO's guards that if he did not follow the rules he would be sent to solitary confinement.  *Id*. 143:25-144:1.

**APP. 575**

f.      During the meal clean-up, two trustees in each of the housing units would be paid under the VWP to assist with meal cleanup. Ex. M (Quezada Dep. 64:9-19).

      i.    **Plaintiffs' Response**: Admit that these trustees worked alongside the six additional unpaid detainees that participated in the clean-up.  Ex. 10 (Pagan Tr.) 106:17-21; Ex. 11 (Vasquez Tr.) 75:12-17.

g.      Once a week, the cleanest housing unit is rewarded with ice cream or cookies. Ex. D Dawn Ceja 30(b)(6) Dep. 163:12-16 (3/29/16).

      i.    **Plaintiffs' Response:** Deny.  Ceja testified that VWP workers who have done the best work each week are rewarded with ice cream and cookies, not the entire housing unit for its performance in the HUSP.  Ex. 8 (Ceja 30(b)(6) Tr. I) 163:12-25.

37.   Plaintiffs' expert, Dr. Grassian, is unaware of any literature that stands for the proposition that a threat of 72-hours in segregation could cause psychological harm. Ex. K (Grassian Dep. 243:14-21).

      i.    **Plaintiffs' response:** Admit.  Dr. Grassian testified that the actual imposition of 72 hours in segregation could cause psychological harm.  Studies show a change in EEG readings after 72-hours in solitary confinement, and that many people experience severe psychological symptoms shortly after

**APP. 576**

placement in solitary confinement.  Ex. 2 (Grassian Tr.) 175:25-180:3, 209:13-211:10.

**C.    GEO's Operations.**

38.    ICE's Disciplinary Severity Scale (incorporated into the AIPC Handbook) allows for a graduated scale of offenses. ECF 289 (Undisputed Fact 19).

　　i.    **Plaintiffs' Response**: Admit.  The Disciplinary Severity Scale in some versions of the AIPC handbook differs from the scale as printed in the PBNDS.  *See* ECF No. 298 at 16 (Response to Fact 24).

39.    The PBNDS instruct detention officers to resolve disciplinary infractions in an informal manner where possible. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17.

　　i.    **Plaintiffs' Response**: Deny.  None of the citations offered include an instruction to resort to "informal" discipline.  Instead, GEO cites to the PBNDS' discussion of the High Moderate Offense Category, which states the types of offenses and sanctions available for such offenses, including "disciplinary segregation (up to 72 hours)" for "refusal to clean assigned living area."  ECF No. 261-10 (INS Detention Standard, GEO-MEN 00063671-4017 (excerpted)) at 24; ECF No. 261-9 (2008 PBNDS, GEO-MEN 00062905-298 (excerpted)) at 56; ECF No. 261-8 (2011 PBNDS, GEO-MEN 00064018-414 (excerpted)) at 47.

**APP. 577**

40.     GEO's detention officers did not routinely or uniformly enforce segregation for the failure to clean. Ex. N.

    i.   **Plaintiffs' Response**: Deny.  GEO guards sent detainees to solitary confinement for refusing to clean on multiple occasions.  ECF No. 262-12 (incident reports (compilation)); Ex. 12 (Hernandez Torres Tr.) 81:20-82:3; Ex. 4 (Gallegos Tr.) 170:13-191:23 (verifying that he wrote detainees up several times for "failure to obey my orders for cleaning details," resulting in their placement in segregation).  GEO guards also threatened to send detainees to solitary confinement on a regular basis if they did not clean.  Ex. 13 (Xahuentitla Tr.) 73:19-74:9, 83:7-19; Ex. 3 (Hernandez Ceren Tr.) 74:23-75:11, 78:10-79:5; Ex. 12 (Hernandez Torres Tr.) 60:8-14; *infra* at SAF No. 13.  The guards' testimony that cleaning was not mandatory is contradicted by that of GEO's 30(b)(6) designee, Assistant Warden Dawn Ceja, that officers were expected to enforce the rules in the handbook, and that detainees were expected to obey officers' commands.  Ex. 14 (Ceja 30(b)(6) Tr. II) 105:12-24, 138:6-139:12 (testifying that facility rules and the disciplinary severity scale were posted in every dorm, and that the "expectation is that those rules are going to be enforced").  Moreover, the guards' testimony that they enforced every single rule in the handbook except the one that is at issue in this litigation is implausible and

**APP. 578**

should be tested before a jury.  *See, e.g.*, Ex. 15 (Quezada Tr.) 84:21-92:4.

41.   It would be a very rare occurrence for a detention officer tell a detainee that they would be sent to segregation if they did not clean. Ex. N.

     i.   **Plaintiffs' Response**: Deny.  Detainees testified that guards threatened to send them to solitary confinement on a regular basis if they did not clean.  *See, e.g.*, Ex. 13 (Xahuentitla Tr.) 73:19-74:9, 83:7-19; Ex. 3 (Hernandez Ceren Tr.) 74:23-75:11, 78:10-79:5; Ex. 12 (Hernandez Torres Tr.) 60:8-14; *infra* at SAF No. 13.  The statements to the contrary in the declarations GEO has submitted contradict the guards' own testimony at their depositions, where they testified that they would explain to detainees that facility rules required them to clean and that detainees could be sent to solitary confinement for refusing.  Ex. 10 (Pagan Tr.) 174:2-175:6; *see also* Ex. 4 (Gallegos Tr.) 137:10-19 (testifying that he had never written anyone up for refusing to clean); 170:7-174:3; 179:15-187:14; 188:8-189:25; 192:5-8; 197:6-200:25; 203:4-206:25 (acknowledging that he had issued numerous write-ups for "failure to obey my orders for cleaning details").  The threats of solitary confinement were so pervasive and the knowledge that solitary confinement was the punishment for refusing to clean was so widespread that detainees communicated that information to one another.  *See, e.g.*, Ex. 1

(Menocal Tr.) 95:16-97:3; Ex. 6 (Valerga Tr.) 168:13-169:13 (testifying that his cellmate told him that the punishment for refusing to clean was solitary confinement).

42.   When a detainee was placed in segregation for the refusal to clean, it was typically because the refusal to clean was in concert with another disciplinary infraction. *Id*. Ex. N.

     i.   **Plaintiffs' Response**: Deny.  Some detainees were sent to solitary confinement only for refusing to clean.  ECF No. 262-12 (incident reports) at 2-3, 14.  Even where GEO sent detainees to solitary confinement for refusing to clean and other charges, the sole underlying conduct was refusal to clean.  For example, the record shows that GEO sent detainees to solitary confinement for refusing to clean and for refusing to obey an officer's order or "insolence" to staff members.  But in each of these incidents the order the detainees refused to obey was the order to clean and the insolence was the conduct used to express the refusal.  *Id*. at 4-10, 12.  In other incidents detainees were sent to solitary confinement for refusing to clean without being charged with that specific infraction, but the underlying conduct described in the incident report indicates the order not followed or insolence expressed was related to the refusal to clean.  *Id*. at 11, 13; *see also* Ex. 4 (Gallegos Tr.) 170:7-174:3, 179:15-187:14, 188:8-189:25, 192:5-8, 197:6-200:25, 203:4-206:25

**APP. 580**

(discussing incident in which he wrote up detainees for failing to "obey my orders for cleaning details").

43.    Consistent with the PBNDS, detention officers worked to resolve issues informally wherever possible. Ex. N.

> i.    **Plaintiffs' Response**: Admit.  Detention officers testified that they dealt with rule violations by explaining the infraction and potential consequences to detainees, and if the infraction persisted guards would issue a "write-up" which could lead to disciplinary segregation.  Ex. 4 (Gallegos Tr.) 121:21-122:20.  One of the potential consequences guards explained was that detainees could be sent to solitary confinement for failing to comply.  Ex. 10 (Pagan Tr.) 174:2-175:6.  This is reflected in the HUSP, which states that initial sanctions for refusal to clean include turning off the television and being prohibited from participating in activities, and that "[c]ontinued refusal to clean the area will result in further disciplinary action."  ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 50; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20.

44. Where formal sanctions were necessary, officers imposed lesser sanctions as permitted by the disciplinary severity scale wherever possible. *Id*.; Ex. O (Ceja 30(b)(6) Dep. 113:13-17).

> i. **Plaintiffs' Response**: Admit.  As relevant to the HUSP, the threat of losing privileges, such as use of televisions and phones, preceded threats of solitary confinement, and the threats were often made together.  ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 50; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20; Ex. 3 (Hernandez Ceren Tr.) 74:22-77:13; *see also* Plaintiffs' response to GEO's Undisputed Fact No. 43.

45. The detention officers were not trained to tell detainees they could be sent to segregation or to utilize segregation as a response to the failure to clean absent additional disciplinary concerns. Ex. N.

> i. **Plaintiffs' Response**: Deny.  The cited declarations are inconsistent with the guards' deposition testimony.  Guards were trained that the AIPC Handbook was a source of rules and discipline that apply when detainees refuse to act or commit a violation in the disciplinary scale.  Ex. 11 (Vasquez Tr.) 73:14-20, 82:5-23; Ex. 10 (Pagan Tr.) 95:15-21; Ex. 4 (Gallegos Tr.) 118:7-23, 121:1-122:25; Ex. 15

26

(Quezada Tr.) 19:15-20:13, 82:3-98:12.  Guards understood that the handbook established a rule requiring detainees to clean common areas.  Ex. 10 (Pagan Tr.) 104:21-105:16; Ex. 11 (Vasquez Tr.) 74:1-25, 105:10-106:7; Ex. 4 (Gallegos Tr.) 163:14-17; Ex. 15 (Quezada Tr.) 81:8-82:2, 101:20-102:23.  Guards were also trained to enforce facility rules by using the disciplinary measures set forth in the handbook.  Ex. 4 (Gallegos Tr.) 121:21-122:16; Ex. 10 (Pagan Tr.) 174:2-175:6.

46.     Importantly, none of the detention officers intended to scare or intimidate any individual into performing labor. *Id*. Ex. N.

    i.     **Plaintiffs' Response**: Admit, but deny this fact is material.  It is GEO's knowledge, not its employees' intent, that is material to TVPA claims.  *See* § V.B.3, *infra*.

47.     When a detainee would refuse to clean, the detention officers would typically ask another detainee to assist with cleaning instead. *Id*.

    i.     **Plaintiffs' Response**: Deny.  The cited declarations are inconsistent with the declarants' deposition testimony.  At deposition, the declarant guards testified that the Detainee Handbook was a source of rules to be enforced, including with respect to cleaning.  Ex. 10 (Pagan Tr.) 99:17-100:10, 104:21-105:16; Ex. 11 (Vasquez Tr.) 74:20-75:24, 105:11-106:7; Ex. 4 (Gallegos Tr.) 141:8-16; 161:16-164:7.  Joyce Quezada testified that she enforced the HUSP "as

**APP. 583**

written." Ex. 15 (Quezada Tr.) 102:1-23.  Luis Pagan admitted that

he enforced the HUSP by telling detainees that they could be sent to

solitary confinement if they did not comply.  Ex. 10 (Pagan Tr.)

174:2-175:6.  In fact, detainees were actually sent to solitary

confinement for refusing to clean.  ECF No. 262-12 (incident

reports); Ex. 12 (Hernandez Torres Tr.) 81:20-82:3; *infra*, SAF No.

13.  When one detainee, Grisel Xahuentitla, offered to clean in place

of a sick detainee who could not clean, she was told to go back to

her cell and that the sick detainee had to do the work or "be sent to

the hole."  Ex. 13 (Xahunetitla Tr.) 73:19-74:9.  Moreover, the cited

declarations are contradicted by GEO's 30(b)(6) witness Dawn Ceja,

who testified that there was no alternative discipline policy for

violations related to cleaning during the class period.  Ex. 14 (Ceja

30(b)(6) Tr. II) 170:13-174:20.

48.   If no detainees performed any work in the Aurora facility, GEO would

make more money, not less. Ex. P (Ragsdale 30(b)(6) Dep. 168:4-10).

   i.   **Plaintiffs' Response**: Deny.  GEO estimates that "replacing all GEO

ICE detainees with full-time employees" would cause it to incur a

substantial cost across its immigration detention business

nationwide.  Ex. 16 (GEO-MEN 00187770) (May 30, 2018 Letter).

Further, without detainee labor, the cost to the government for

GEO's services would increase.  If a contractor's bid to the

**APP. 584**

government is too high – even if there is no competition for the project – the government may not award the contract.  Ex. 17 (Venturella Tr.) 166:1-4.  The government will only award the contract to a contractor whose bid price is "reasonable" and not "too high."  *Id*. 165:5-23.

49.   At AIPC the $1.00 daily allowance is a pass through from the government at the actual rate. Ex. P (Ragsdale 30(b)(6) Dep. 166:20-167:6)

   i.   **Plaintiffs' Response**: Admit.

50.   "[T]here's no incentive financially for GEO to use any voluntary work person to do anything, particularly when you have to, again, incentivize them . . . beyond a dollar a day. It's sort of cost neutral at a dollar a day but it gets − it becomes a cost to us if it goes beyond that." Ex. P (Ragsdale 30(b)(6) Dep. 168:12-17).

   i.   **Plaintiffs' Response**: Admit.  *See* also Ex. 18 (A. Martin Tr.) 107:18-22 (if GEO had to pay more than $1/day to VWP workers, it would do so "on its own dime" because the government would not reimburse the added cost).

51.   If ICE did not mandate the VWP as a requirement of its contracts, GEO would "build the staff [in]to [its] cost estimate and then [] mark that cost up." Ex. Q (Evans Dep. 75:3-10).

   i.   **Plaintiffs' Response**: Admit that Evans made this hypothetical claim, but note that GEO has previously admitted that ICE mandates

**APP. 585**

that GEO operate a VWP.  ECF No. 286 (Pls.' DSI SJ Reply Br.) ¶ 35.

52.　　GEO's markup would be a fee of up to 15% of the labor cost. Ex. Q (Evans Dep. 29:2-21; 62:16-63:14).

　　　　i.  **Plaintiffs' Response:** Admit.

## III.　PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

### A.　The Housing Unit Sanitation Policy

1.　　All detainees at Aurora receive the Aurora ICE Processing Center Detainee Handbook Local Supplement ("Detainee Handbook") upon arrival at the Facility.  Ex. 8 (Ceja 30(b)(6) Tr. I) 29:19-24; *see also* ECF No. 286 (Pls.' DSI SJ Reply Br.) ¶¶ 60-61.

2.　　The Detainee Handbook states that detainees "will be held accountable for [their] actions while in custody at [Aurora]" and that "[t]herefore, it is each detainee's responsibility to become familiar with the contents of this handbook."  ECF No. 273-1 (2005 Detainee Handbook) at 3; ECF No. 273-2 (2007 Detainee Handbook) at 6; ECF No. 273-3 (2008 Detainee Handbook) at 3; ECF No. 273-4 (2010 Detainee Handbook) at 3; ECF No. 273-5 (2011 Detainee Handbook) at 3; ECF No. 261-17 (2013 Detainee Handbook) at 5.

3.　　GEO's detention officers are expected to enforce the rules set forth in the Detainee Handbook.  Ex. 14 (Ceja 30(b)(6) Tr. II) 139:2-12.

**APP. 586**

4.    The Detainee Handbook contains a "Housing Unit Sanitation" policy, which states:

> Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit [or Dorm] Officer will be responsible for assuring this general cleanup is done on a regular basis.

*See supra*, Plaintiffs' Response to GEO's Undisputed Fact No. 8.

5.    Immediately under the "Housing Unit Sanitation" heading, in a section titled "Day Space," the handbook provides:

> All detainees in a housing unit [or dorm] are required to keep clean and sanitary all commonly accessible areas of the housing unit [or dorm], including walls. floors, windows, window ledges, showers, sinks, toilets, tables, and chairs.

> Detainees will take turns cleaning the area [or day space]. If a detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit officer of the problem. Action will be taken to resolve this problem.

ECF No. 273-1 (2005 Detainee Handbook) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 49; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 16-17; ECF No. 273-5

**APP. 587**

(2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20 (emphasis added).

6.   The handbook then repeats that "[t]he day room area will be kept clean at all times," and sets forth a brief summary of the punishments that may be imposed on disobedient detainees under the facility's progressive discipline system:

> Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit [or dorm] do not clean the area after being instructed to do so, the televisions will be turned off and the detainees will not be permitted to participate in any activities/programs until the housing unit [or dorm] is cleaned. Continued refusal to clean the area will result in further disciplinary action.

*Id.*

7.   The Detainee Handbook also sets forth the disciplinary scale at the Aurora Facility, which defines "refusal to clean" as a 300-level, or high-moderate, offense.  ECF No. 273-1 (2005 Detainee Handbook) at 25-26; ECF No. 273-2 (2007 Detainee Handbook) at 68-69; ECF No. 273-3 (2008 Detainee Handbook) at 29; ECF No. 273-4 (2010 Detainee Handbook) at 23-24; ECF No. 273-5 (2011 Detainee Handbook) at 24-25; ECF No. 261-17 (2013 Detainee Handbook) at 27.

8.    Punishments for 300-level offenses include placement in solitary confinement.  *Id.*

9.    Pursuant to the HUSP, GEO guards in each housing unit developed a list of unpaid detainees each day, who were required to clean the housing unit common areas after each meal.  Ex. 8 (Ceja 30(b)(6) Tr. I) 36:13-37:20, 83:9-84:24.

10.   This work involved scrubbing tables and chairs, sweeping mopping floors, and cleaning common use equipment such as microwaves, phones, showers, and toilets.  *Id.* 36:24-37:9; Ex. 19 (Ragsdale 30(b)(6) Tr.) 16:14-18; Ex. 3 (Hernandez Ceren Tr.) 162:24-165:20.

11.   HUSP cleaning was distinct from the personal housekeeping requirements enumerated in the PBNDS, which require detainees to "maintain their immediate living area in a neat and orderly manner by 1. making their bunk beds daily; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture."  ECF No. 261-8 (2011 PBNDS) at 51; ECF No. 261-9 (2008 PBNDS) at 61-62; ECF No. 261-10 (2000 NDS) at 3; Ex. 20 (A. Martin 30(b)(6) Tr.) 25:25-26:24.

12.   The HUSP at the Aurora Facility is "a GEO policy, created by GEO.  The GEO HUSP is not created by ICE nor is it a requirement of the contract.

**APP. 589**

ICE did not draft or negotiate GEO's HUSP." ECF No. 261-7 (Ely Decl.) ¶ 22.

13.    Guards frequently threatened detainees with solitary confinement for refusing to clean. For example:

i.    A detainee in Hugo Hernandez Ceren's pod refused to clean, telling the guards that he was no janitor and that they needed to pay someone for that type of job. Ex. 3 (Hernandez Ceren Tr.) 74:16-77:19. In response, a guard took out a plastic trash bag and told the detainee "Just pack your stuff because you're going to go to the hole." *Id*. The detainee "started cleaning right away" in response to the threat. *Id*. On another occasion, one detainee in Hernandez Ceren's dorm refused to clean and others, including Hernandez Ceren and other named plaintiffs, supported him, leading the guard on duty to call a sergeant. *Id*. 78:10-80:12. The sergeant told everyone that if they continued refusing to clean, they would be sent to the hole, which he described as cold and lonely. *Id*. He also told them that GEO would inform the immigration court that they had been disobedient. *Id*. Hernandez Ceren testified that he witnessed similar threats "multiple times with multiple guards." *Id*. 161:13-19.

ii.    Dagoberto Vizguerra observed someone being sent to solitary confinement for refusing to clean on the second or third day he was at Aurora. Ex. 7 (Vizguerra Tr.) 48:9-22. He described the officer

**APP. 590**

in his dorm who enforced the HUSP as "screaming at the detainees in his pod about cleaning. *Id*. 97:20-98:10.

iii.   Grisel Xahuentitla saw a woman in her dorm try to refuse to clean because she was feeling ill.  The guard on duty told her that if she did not work she would be sent to the hole, and that "it wasn't going to be . . . pleasant." Ex. 13 (Xahuentitla Tr.) 73:19-75:22.  She explained that when guards threatened detainees with solitary confinement, "they're not – they're, of course, not – they're not whispering you to your ear.  They're loud, and so they – so you feel a little intimidated." *Id*. 137:4-13.

iv.   Alejandro Menocal was informed about the HUSP upon arrival at the Aurora Facility, and told by guards and other detainees that failure to clean could result in being placed in segregation.  Ex. 1 (Menocal Tr.) 95:16-97:3.  On one occasion, he witnessed other detainees being removed from an adjacent pod, and was told that they were being taken to segregation for that reason. *Id*. 100:16-109:2.

v.   Alejandro Hernandez Torres tried to resist HUSP cleaning, telling the guard on duty, "[W]hy should I clean all of the tables if I didn't use all of the tables?"  In response, the guard took him to segregation.  Ex. 12 (Hernandez Torres Tr.) 60:8-14, 81:20-82:3, 141:9-19.

     vi.    Jesus Yepez Gaytan testified that when new detainees arrived at the facility, they would often push back on the HUSP cleaning requirement, which frequently led to guards telling them that continued resistance would land them in solitary confinement.  Ex. 9 (Gaytan Tr.) 112:1-113:4, 142:23-144:1.

     vii.    Demetrio Valerga testified that when he first arrived at the Aurora facility, his cellmate told him that he had to participate in the HUSP or he would be put in solitary confinement.  Ex. 6 (Valerga Tr.) 168:13-169:12.  Towards the end of his stay, he resisted cleaning and was threatened with segregation and handcuffed by a guard, although he did not end up being taken there.  *Id*. 155:18-156:6.

14.    GEO guards were trained to enforce facility rules and to carry out the disciplinary scale as written in the Detainee Handbook.  Ex. 11 (Vasquez Tr.) 82:5-23; Ex. 10 (Pagan Tr.) 95:15-21; Ex. 4 (Gallegos Tr.) 118:7-23; Ex. 15 (Quezada Tr.) 81:8-83:9.

15.    It is "imperative" that detainees follow the commands of guards implementing the Detainee Handbook's rules, and GEO guards were trained to use progressive discipline to gain compliance from detainees who failed to do so.  Ex. 14 (Ceja 30(b)(6) Tr. II) 105:12-24, 205:1-206:6.

16.    At least one guard acknowledged that solitary confinement was a potential sanction for refusing to clean.  Ex. 10 (Pagan Tr.) 173:18-175:9.

**APP. 592**

17.   Guards further understood that threats of solitary confinement were an effective and legitimate way to gain compliance with facility rules, driven by detainees' fear of solitary confinement.  Ex. 15 (Quezada Tr.) 141:13-142:8; Ex. 10 (Pagan Tr.) 174:2-175:6; *see also* Ex. 4 (Gallegos Tr.) 121:21-122:16 (describing solitary confinement as a legitimate method for disciplining detainees).

18.   Detainees cleaned because of threats of solitary confinement.  Ex. 3 (Hernandez Ceren Tr.) 63:9-18 ("I cleaned because of fear."); Ex. 12 (Hernandez Torres Tr.) 77:25-78:13 (cleaned because "being that I had been through segregation, I didn't want to go through the same"); Ex. 1 (Menocal Tr.) 104:21-105:7 ("[W]e had to clean and if not we would be punished. . . . Everybody knew it."); Ex. 9 (Gaytan Tr.) 142:23-144:1 ("The procedure was if you don't follow [the rules], you go to the hole."); Ex. 13 (Xahuentitla Tr.) 137:14-19 ("[I]f they tell you 'clean, because you're going to the hole,' . . . I'm going to clean. I don't want to go to the hole."); Ex. 6 (Valerga Tr.) 168:13-169:13 (when he arrived at Aurora, he participated in the HUSP "[b]ecause my cellie told me if we didn't clean, we'd go to the hole").

19.   GEO followed through on these threats and sent detainees to solitary confinement for refusing to clean.  ECF No. 262-12 (incident reports); Ex. 4 (Gallegos Tr.) 170:13-191:23 (verifying that he wrote detainees up

**APP. 593**

several times for "failure to obey my orders for cleaning details," resulting in their placement in segregation).

**B.    Solitary Confinement**

20.    Solitary confinement "imposes a devastating triad of emotional and neuropsychiatric deprivations: social isolation, a barren perceptual environment, and deprivation of meaningful mental activity." Ex. 21 (Grassian Report) at 10.

21.    These deprivations can manifest in anxiety, depression, self-harm, stupor or delirium, impairments in thinking, concentration, and memory, hyper-responsivity to external stimuli, obsessive-compulsive behavior, hallucinations, paranoia, delusions, and problems with impulse control. *Id*. at 10-14.

22.    Although not everyone becomes "psychiatrically ill" from relatively short stays in solitary confinement, all people who experience solitary confinement "suffer from it." Ex. 2 (Grassian Tr.) 290:3-8. Put differently, solitary confinement causes "a certain baseline of psychiatric harm" in those who experience it. *Id*. 102:4-13.

23.    Peer-reviewed studies show that relatively short periods in solitary confinement – as little as 72 hours – can cause people to experience significant distress, including changes to brain-wave patterns and self-harm or suicide. Ex. 21 (Grassian Report) at 10 n.6 (citing Ex. 22 (Fatos Kaba, "Solitary Confinement and Risk of Self-Harm Among Jail Inmates") at

**APP. 594**

442-47 (finding that the risk of self-harm was strongly associated with being in solitary confinement, and that self-harm peaked around the time of entry to solitary confinement)); *id*. at 13 n.10 (citing Ex. 23 (Paul Gendreau, "Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement") at 56-57 (finding a consistent decline in EEG results of subjects in solitary confinement over the course of seven days, with 77% of the decline happening in the first four days)); *id*., Ex. D (Stuart Grassian, "Psychopathological Effects of Solitary Confinement") at 1451 (quoting one patient as saying "As soon as I got in, I started cutting my wrists.  I figured it was the only way to get out of here.").

24.   These effects can be long lasting and can include social withdrawal to "escape the buzzing confusion of life."  Ex. 21 (Grassian Report) at 15.

25.   Plaintiff Olga Alexakhina observed how solitary confinement affected other detainees, recounting that detainees returning from solitary confinement "would take a shower and just lay down.  They didn't want to talk to anyone, just laying down."  *Id*. at 25-26.  She remembered one woman in particular who was so depressed after returning from solitary confinement that other detainees consistently had to rouse her for meals.  *Id*.

**C.   Conditions of Confinement at GEO**

26.   Immigration detainees at GEO were taken from their homes and families and placed in a prison-like environment to await either deportation or the

**APP. 595**

outcome of immigration proceedings that could end in deportation.  ECF
No. 261-8 (2011 PBNDS) at 3.

27.   Detainees were allowed to keep only small photos of family members,
softbound reading material, wedding bands (but not engagement rings),
small religious items, one pair of glasses and dentures, and personal address
books.  All other personal items were considered illegal contraband.  ECF
No. 273-1 (2005 Detainee Handbook) at 6; ECF No. 273-2 (2007 Detainee
Handbook) at 14-15; ECF No. 273-3 (2008 Detainee Handbook) at 5; ECF
No. 273-4 (2010 Detainee Handbook) at 5-6; ECF No. 273-5 (2011
Detainee Handbook) at 6; ECF No. 261-17 (2013 Detainee Handbook) at 8.

28.   Detainees were housed in bunk beds either in windowless cells or in large
open rooms, alongside dozens or scores of strangers in front of whom they
had to eat, sleep, shower, and defecate.  Ex. 24 (ICE 0000123 (men's cell),
ICE 0000142 (women's unit)); Ex. 3 (Hernandez Ceren Tr.) 143:5-17:13.

29.   Showers were communal, and toilets were either located within detainees'
shared cells or in a designated bathroom area separated from the rest of the
room by a low wall.  Ex. 24 (ICE 0000128 (men's toilets), ICE 0000116
(men's showers), ICE 0000139 (women's toilets and showers)).

30.   Detainees had access to a single television set per dorm, which was
controlled by the guards.  ECF No. 273-1 (2005 Detainee Handbook) at 13-
14; ECF No. 273-2 (2007 Detainee Handbook) at 36-37; ECF No. 273-3
(2008 Detainee Handbook) at 14; ECF No. 273-4 (2010 Detainee

**APP. 596**

Handbook) at 12; ECF No. 273-5 (2011 Detainee Handbook) at 13; ECF
No. 261-17 (2013 Detainee Handbook) at 15.

31. Detainee contact with their spouses, children, friends, and family members
was limited to three hour-long non-contact visits per week.  ECF No. 273-1
(2005 Detainee Handbook) at 11-12; ECF No. 273-2 (2007 Detainee
Handbook) at 30-32; ECF No. 273-3 (2008 Detainee Handbook) at 11-12;
ECF No. 273-4 (2010 Detainee Handbook) at 10-11; ECF No. 273-5 (2011
Detainee Handbook) at 10-11; ECF No. 261-17 (2013 Detainee Handbook)
at 12-13.

32. Contact visitation, in which detainees could briefly hug their visitor upon
greeting them and saying goodbye, was available only upon special request.
ECF No. 273-1 (2005 Detainee Handbook) at 11; ECF No. 273-5 (2011
Detainee Handbook) at 11; ECF No. 261-17 (2013 Detainee Handbook) at
13.[4]

33. Detainees had access to telephones, but calls were limited to 20 minutes,
and had to be made from payphones located in the middle of dorm common
areas.  ECF No. 273-1 (2005 Detainee Handbook) at 12; ECF No. 273-2
(2007 Detainee Handbook) at 32-33; ECF No. 273-3 (2008 Detainee
Handbook) at 12-13; ECF No. 273-4 (2010 Detainee Handbook) at 11-12;

---

[4]   The 2007, 2008, and 2010 Detainee Handbooks included no information about
contact visitation.

ECF No. 273-5 (2011 Detainee Handbook) at 11-12; ECF No. 261-17 (2013 Detainee Handbook) at 14.

34.    Up to two 80-person pods shared a small concrete recreation space that had a single basketball hoop, and either one or two exercise machines.  Ex. 24 (ICE 0000102 (men's exercise room), ICE 0000152 (women's exercise room)); *see also* Ex. 3 (Hernandez Ceren Tr.) 144:5-13; Ex. 12 (Hernandez Torres Tr.) 50:21-51:14.

35.    Detainees found the experience of being in detention frightening and isolating.  *See* Ex. 9 (Gaytan Tr.) 28:22-29:2, 48:20-50:2 ("[I]t was scary to be in there . . . with a bunch of people you don't even know," many of whom were older than him); Ex. 13 (Xahuentitla Tr.) 137:4-19 (being in detention, "you feel this pressure, you feel . . . very depressed for the situation you're in at the moment"); Ex. 12 (Hernandez Torres Tr.) 29:1-6, 15:20-23 (being separated from his daughters caused "a lot of suffering."), 49:8-52:20 (explaining that the guards "would put us all together like animals, like shit. . . and they say, 'Well, now you do what I want,'" and noting that it was very stressful having to share small space with loud, messy strangers); Ex. 1 (Menocal Tr.) 48:13-24, 67:8-69:9 (told family members that conditions at Aurora were good, but in truth "it was not the prettiest place" – for example, the food made people ill and the showers were moldy).

**APP. 598**

36.     GEO did not always serve detainees enough food or provide them with

enough basic supplies, like toiletries, and detainees had to augment the

inadequate diet and supplies with purchases from the commissary.  Ex. 9

(Gaytan Tr.) 9:19-10:11; Ex. 3 (Hernandez Ceren Tr.) 148:24-149:21.

37.     The orientation video shown to detainees at least through 2007 informed

them that failure to follow facility rules could lead to disciplinary action

causing "a negative effect on your case before the government, <u>so the best</u>

<u>rule is to stay out of trouble during your stay here.</u>"  Ex. 25 (Orientation

Video Script, GEO_MEN 00056575-81) at GEO_MEN 00056576

(emphasis in original); Ex. 26 (Orientation Video Script, GEO-MEN

00075173-83) at GEO-MEN 00075174 (emphasis in original).  Although

this statement was removed from orientation materials, the threat remained

present throughout the class period.  Ex. 14 (Ceja 30(b)(6) Tr. II) 95:25-

96:10; *see also* Ex. 3 (Hernandez Ceren Tr.) 78:10-80:24 (describing an

incident where detainees refused to clean and a GEO sergeant threatened

that the refusal and resulting discipline was "not going to look good when

this gets to the judge").

38.     Detainees were aware that not following the rules could impact the outcome

of their immigration cases.  Ex. 3 (Hernandez Ceren Tr.) 167:1-170:13

(going to solitary confinement "was going to destroy my immigration case

if I went there"); Ex. 9 (Gaytan Tr.) 12:1-13 (avoided getting in trouble

**APP. 599**

because "I was afraid that it was going to be against my case for doing something against GEO").

**D.     GEO's Contracting Practices**

39.     When bidding a contract, GEO seeks to offer a price that is both fair to the government and less than it would cost the government to operate the facility itself.  Ex. 27 (Evans Tr.) 36:4-6, 50:18-21.  In other words, one of GEO's goals in developing its bid price is to offer a price the government is willing to pay.  *Id*. 72:13-16.

40.     GEO's total bid amount represents the costs to execute the contract as well as GEO's desired profit margin, typically an additional 15% of the total cost.  *Id*. 63:18-25.

41.     The largest of these costs is the labor required to operate the facility.  Ex. 17 (Venturella Tr.) 155:21-25.

42.     Cost is an important component of the contract because during the class period ICE's practice was to accept the lowest bid offered, provided the contractor had a satisfactory performance record.  *Id*. 154:6-16.

43.     Keeping costs, and thus the total bid price, low retains its importance even when GEO is the only entity bidding on the contract, as with the Aurora facility, because the government provides extra scrutiny to such "sole source bids."  Ex. 27 (Evans Tr.) 22:10-23:18, 24:3-17.

44.     Recognizing that keeping the total bid price low and offering the government a fair price is important even in the context of a sole source

**APP. 600**

bid, GEO uses the same pricing strategy regardless of whether the bid is sole source or competitive. Ex. 17 (Venturella Tr.) 164:23-165:23.

45.    When GEO wins a contract with ICE, the amount of money that ICE pays GEO during each year of the contract is set at the time the contract is executed. Ex. 27 (Evans Tr.) 74:10-21.

46.    Once the contract terms and pricing are set, GEO bears the risk of any increased costs to operating the facility beyond what is provided for in the contract, including increased costs of labor. *Id.* 76:11-22.

47.    This risk is to GEO's profit: for GEO to make the profit that it anticipates on a contract, it must maintain the costs of running the facility at the amount set forth in the contract at the time of execution. *Id.* 76:23-77:5.

48.    ICE will not reimburse GEO for more than $1 per day in detainee wages. 8 U.S.C. § 1555(d); Appropriations Act, Immigration and Naturalization Service Salaries and Expenses, Pub. L. No. 95-431, 92 Stat. 1021 (1978).

49.    ICE does not prohibit its contractors from paying more than $1.00 per day for work performed in the VWP. Ex. 18 (A. Martin Tr.) 106:11-107:22, 110:10-13; ECF No. 261-8 (2011 PBNDS) at 53 (compensation for VWP work is "at least $1.00 (USD) per day" (emphasis added)); *see also* ECF No. 261-18 (VWP Pay Rates, GEO-MEN 00170339); ECF No. 287-13 (VWP Pay Rates at GEO's South Texas Facility) at 11-12.

APP. 601

50.     As a result, GEO could pay detainees more than $1 per day but must bear
        the costs of doing so.  Ex. 18 (A. Martin Tr.) 107:18-22; Ex. 19 (Ragsdale
        30(b)(6) Tr.) 167:4-6.

51.     GEO estimates that replacing detainee labor with full time employees at all
        of its ICE-contracted facilities nationwide would cost a substantial amount
        of money.  Ex. 16 (GEO-MEN 00187770) (May 30, 2018 Letter).

52.     Detainees understood that once GEO set the rate of pay for the VWP at $1
        per day, the rate was not negotiable.  Ex. 3 (Hernandez Ceren Tr.) 158:10-
        15.

53.     The "Detainee Voluntary Work Program Agreement" is not an employment
        contract and does not create any rights or obligations for either GEO or the
        detainee who signs it.  Ex. 8 (Ceja Tr. I) 147:20-150:18.

## IV.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is proper where "the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  A fact is material when "under the substantive law it is essential to
the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670
(10th Cir. 1998).  A dispute of material fact is genuine and precludes summary judgment
where "the evidence is such that a reasonable jury could return a verdict for the
nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Courts
applying the summary judgment standard "view the factual record and draw all

**APP. 602**

reasonable inferences therefrom most favorably to the nonmovant." *Adler*, 144 F.3d at 670.

## B.    The TVPA

Congress enacted the Trafficking Victims' Protection Act in 2000 to combat the "increasingly subtle" means of coercion used to compel modern-day forced labor. *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting H.R. Rep. No. 106-939, at 101 (2000) (Conf. Rep.), *as reprinted in* 2000 U.S.C.C.A.N. 1380, 1392-93); *see also United States v. Bradley,* 390 F.3d 145, 150 (1st Cir. 2004) (noting that the statute encompasses "not only physical violence, but also more subtle psychological methods of coercion"), *judgment vacated on other grounds,* 545 U.S. 1101 (2005).  In furtherance of this goal, the TVPA prohibits defendants from "knowingly . . . obtain[ing] the labor or services of a person by means of" one or a combination of:

> (1) . . . force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) . . . serious harm or threats of serious harm to that person or another person;
> (3) . . . the abuse or threatened abuse of law or legal process; or
> (4) . . . any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).

The statute was enacted in response to the Supreme Court's holding in *United States v. Kozminski*, 487 U.S. 931 (1988), which had "limited the definition of involuntary servitude to 'physical' or 'legal' coercion." *Dann*, 652 F.3d at 1169 (quoting *Kozminski*, 487 U.S. at 952).  In accordance with the intent to broaden the definition of trafficking, the TVPA "defines harm broadly," *see id*, to include:

**APP. 603**

any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2).

## V.   ARGUMENT

### A.   Material Disputes of Fact Preclude Summary Judgment on the Class's TVPA Claims.

Throughout the class period, GEO systematically compelled detainee Class Members to perform unpaid janitorial work under its HUSP, using the threat of solitary confinement to ensure uniform compliance.  GEO guards in each housing unit developed a list of unpaid detainees each day who were required to clean the housing unit common areas after each meal.  SAF ¶ 9.  Class Members scrubbed tables and chairs, swept and mopped floors, and cleaned common-use equipment such as microwaves, phones, showers, and toilets.  *Id*. ¶ 10.  Despite GEO's attempts to muddle the record, the HUSP cleaning tasks are distinct from the personal housekeeping requirements in the PBNDS, which limit the unpaid tasks detainees may perform to "maintain[ing] their immediate living areas in a neat and orderly manner by" 1. making their beds; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.  *Id*. ¶ 11.  Plaintiffs' TVPA claims center on the

**APP. 604**

additional cleaning required by the HUSP, beyond those personal housekeeping requirements.[5]  ECF No. 1 (Complaint) at ¶ 54.

Although GEO persistently misrepresents in its motion that the sole evidence of the HUSP and attendant threats of solitary confinement is contained in the Detainee Handbook, *see, e.g.*, ECF No. 305 (Def.'s SJ Br.) at 23, that is just one piece of evidence of a broader course of conduct.  Detainees received the Detainee Handbook when they first arrived at Aurora.  SAF ¶ 1.  The Handbook describes the HUSP, telling detainees:

> Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit Officer will be responsible for assuring this general cleanup is done on a regular basis.

*Id.* ¶ 4.  It also sets forth a series of escalating punishments for non-participation, starting with a television shutoff and a prohibition on "any programs/activities."  Statement of Undisputed Facts ("SUF") ¶ 9.[6]  If that fails to gain compliance, detainees are told, "[c]ontinued refusal to clean will result in further disciplinary action."  *Id.*

Elsewhere, the handbook sets out the disciplinary scale, which makes clear that "further disciplinary action" includes placement in solitary confinement.  *Id.* ¶ 12.  Threats of solitary confinement for failure to clean were repeated by GEO guards, who

---

[5]      GEO attempts to sow confusion by also conflating the HUSP with work under the VWP, but these programs are distinct, and the TVPA claims do not concern VWP work. *See* ECF No. 1 (Complaint) ¶ 54.  Detainees participating in the VWP were part of a distinct work program where workers were paid $1/day, which Plaintiffs contend unjustly enriched GEO.  *Id.*

[6]      This sanction is specifically for refusal to clean up after other detainees, not VWP work or personal housekeeping work.

would, for example, pull out a roll of trash bags and tell non-compliant detainees, "pack your stuff. You're going to the hole." SAF ¶ 13.i. These threats were carried out in front of entire 80-bed dormitories, leaving detainees with little doubt that the threats had teeth. *See id.* ¶ 13. GEO guards were trained to carry out the disciplinary scale in the handbook. *Id.* ¶ 14.[7] Guards acknowledged in deposition testimony that threats of solitary confinement were a legitimate way to gain compliance from unwilling detainees, and that the mere threat of solitary confinement was sufficient to motivate detainees to follow facility rules, because they were afraid of it. *Id.* ¶ 17. These threats were not theoretical: GEO actually sent detainees to solitary confinement for refusing to clean under the HUSP throughout the class period. *Id.* ¶ 19.

### 1.   GEO's Forced Labor Scheme Included Threats of Serious Harm and Physical Restraint.

GEO's argument that Plaintiffs will be unable to show that they suffered "serious harm" under the TVPA misinterprets the law and misrepresents the facts. The TVPA requires some combination of serious harm *or* restraint, *or* threats of the same. 18 U.S.C. § 1589(a). GEO does not argue (and it is hard to imagine how it could) that solitary confinement does not constitute physical restraint. *See, e.g.*, *Bridges v. Poe*, No. 19 Civ. 1399, 2020 WL 5408915, at *7 (N.D. Ala. Sept. 9, 2020) ("'Confinement' to a jail cell that restricts an inmate's freedom of movement certainly meets the ordinary meaning of

---

[7]    To the extent that guards' rehabilitative declarations contradict this testimony, the declarations may be excluded under the sham affidavit rule. *See, e.g.*, *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1016 (10th Cir. 2002). However, since the declarations *themselves* create an issue of fact when held alongside the same witnesses' deposition testimony, they preclude summary judgment even if the Court chooses to consider them.

**APP. 606**

'physical restraint.'"); *see also United States v. Thompson*, 109 F.3d 639, 641 (9th Cir. 1997) ("physical restraint" as used in sentencing guidelines means, *inter alia*, "tied, bound, or locked up").  This alone is sufficient for the Court to deny GEO's Motion for Summary Judgment on this aspect of Plaintiffs' TVPA claims.

Even as to the one prong of the TVPA that GEO squarely addresses, disputes of material fact preclude summary judgment as to whether detainees suffered or were threatened with serious harm.  The TPVA provides a far more expansive definition of serious harm than GEO concedes: such harm can be "physical or non-physical, including psychological, financial, or reputational," as long as it would compel a reasonable person under similar circumstances to work.  18 U.S.C. § 1589(c)(2).  "[T]he extremity of force is . . . not a determinant of forced labor[.]"  *United States v. Toviave*, 761 F.3d 623, 626–27 (6th Cir. 2014).  As a result, courts routinely reject the argument GEO makes here, that the TVPA "only protects victims from the most heinous human trafficking crimes." *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1145 (C.D. Cal. 2011); *see also Toviave*, 761 F.3d at 626-27 ("[P]aradigmatic forced labor, such as prostitution, forced sweatshop work, or forced domestic service, may be federally criminal even though the force is not physical at all, but merely psychological, such as isolation and pretended threats to the victim's friends or relations.").

GEO's argument to the contrary conflates two prongs of the TVPA.  *See* ECF No. 306 (Def.'s SJ Br.) at 24.  A defendant violates the TVPA when they cause serious harm *or* when they threaten serious harm.  As noted above, serious harm is defined broadly under the TVPA as conduct that would cause a reasonable person to work to *avoid*

**APP. 607**

experiencing it; actually *suffering* serious harm is not a prerequisite for liability. 18 U.S.C. § 1589(c)(2). To prevail on their claims, what Plaintiffs must show is that solitary confinement *itself*, rather than threats of solitary confinement, is a serious harm.

Discovery has revealed more than enough evidence from which the jury can conclude that it is. GEO guards were trained to use escalating forms of persuasion and discipline to gain compliance from detainees. SAF ¶ 15. And detainees testified that they were frightened of being placed in solitary confinement for refusing to perform HUSP work, and that their fear motivated them to comply with guards' orders. *Id.* ¶ 18. As Grisel Xahuentitla testified: "they're, of course, not – they're not whispering you to your ear. They're loud, and so they – so you feel a little intimidated . . . . if they tell you 'clean, because you're going to the hole,' . . . I'm going to clean. I don't want to go to the hole." *Id*. Guards recognized the coercive effect of this fear. *Id.*

This fear of solitary confinement was objectively reasonable. Solitary confinement is associated with symptoms such as anxiety, depression, self-harm, stupor or delirium, impairments in thinking, concentration, and memory, hyper-responsivity to external stimuli, obsessive-compulsive behavior, hallucinations, paranoia, delusions, and problems with impulse control. *Id*. ¶ 21. Peer-reviewed studies show that many of these symptoms can appear within 72 hours or less of solitary confinement. *Id*. ¶ 23. Effects can be long-lasting, and can include social withdrawal to "escape the buzzing confusion of life." *Id.* ¶ 24. Plaintiff Olga Alexakhina witnessed these effects in other detainees whom GEO placed in solitary confinement; Dr. Grassian recounts that in her interview with him, she reported that detainees returning from confinement "would take a shower

**APP. 608**

and just lay down.  They didn't want to talk to anyone, just laying down." *Id.* ¶ 25.  She recalled that one woman who returned from solitary confinement was so depressed that other detainees consistently had to rouse her for meals.  *Id.*[8]

## 2.   GEO's Threats of Serious Harm Were Pervasive.

GEO also appears to argue that Plaintiffs and Class Members could not have been threatened with serious harm because they were only rarely placed in solitary confinement for refusing to clean.  ECF No. 306 (Def.'s SJ Br.) at 25-26.  This argument raises the key dispute of material fact that the jury must resolve at trial: whether Class Members worked to *avoid* solitary confinement.  *Supra*, § IV.A.1.  A reasonable jury could easily find that although most detainees were not placed in solitary confinement, they performed labor under the HUSP precisely because the threats worked.

Although GEO makes broad claims that refusal to clean "most often . . . resulted in no consequence," or that "none of the detainees were sent to segregation, despite many of them refusing to clean," ECF No. 306 (Def.'s SJ Br.) at 26, these contentions are misleading and, at the very least, in conflict with other facts in the record.  The testimony of GEO's guards is directly contrary to Plaintiffs' testimony.  Plaintiffs' Response to SUF ¶ 40; *see also* SAF ¶¶ 18-19.  And even the guards testified that they were trained to

---

[8]      After being detained at GEO, Olga Alexakhina was deported to Russia, which does not permit the taking of voluntary depositions of willing witnesses.  *See* https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/RussianFederation.html.  Efforts to depose Alexakhina in another country that is not subject to these logistical hurdles have been hindered by the COVID-19 pandemic.  Scimone Decl. ¶ 10.  GEO is aware of these circumstances and has not suggested alternatives.  *Id.* ¶¶ 9-11.  Plaintiffs remain prepared to present Alexakhina for deposition if and when it becomes possible.  *Id.* ¶ 12.

**APP. 609**

enforce the rules and punishments in the handbook, SAF ¶ 14, and applied the handbook's progressive discipline scale, starting with a verbal warning/reprimand or loss of privileges, when a detainee refused to clean.  *Id.* ¶ 15.  Their superior, Assistant Warden and 30(b)(6) witness Dawn Ceja, also testified that guards were expected to enforce the rules in the Detainee Handbook.  *Id.* ¶ 3.  The handbook itself says both that "The assigned Housing Unit [or Dorm] Officer will be responsible for assuring this general cleanup is done on a regular basis," *id.* ¶ 4, and that if detainees do not "do their share," then "Action will be taken to resolve this problem."  *Id.* ¶ 5.

Finally, documentary evidence makes clear that guards not only threatened but actually sent detainees to solitary confinement for refusing to clean throughout the class period.  *Id.* ¶ 19.  The record contains more than enough evidence for a reasonable jury to reject GEO's characterization of the facts.

### 3.     Detainees' Uniform Conditions of Confinement Made them Especially Vulnerable to Coercion.

The evidence that solitary confinement is a form of serious harm is bolstered by detainees' conditions of confinement.  Detainee Class Members were taken from their homes and families and placed in a prison-like environment to await possible deportation to countries to which they did not wish to return.  SAF ¶ 26.  They were housed in bunk beds either in windowless cells or in large open rooms, alongside dozens of strangers in front of whom they had to eat, sleep, shower, and defecate.  *Id.* ¶ 28.  All detainees in a dorm unit shared communal television sets, and a small recreation space containing a basketball hoop and one or two weight machines.  *Id.* ¶¶ 30, 34.  Although GEO argues

**APP. 610**

that detainees were "not deprived of social opportunities," *see* ECF No. 306 (Def.'s SJ Br.) at 27, they could socialize only with the other strangers with whom they were imprisoned.  SAF ¶¶ 28, 31-32, 35.  Their contact with the outside world, including their spouses, children, parents, and friends, was limited to one-hour non-contact visits three times a week and 20-minute phone calls made from communal payphones, which were located in the middle of the dorms and shared among all detainees.  *Id.* ¶¶ 31-33.  This environment took a toll.  Plaintiff Gaytan, who was arrested two weeks after graduating from high school and sent to Aurora shortly thereafter, testified that "it was scary to be in there . . . with a bunch of people you don't even know," many of whom were far older than him.  *Id.* ¶ 35.  Plaintiff Xahuentitla captured a similar sentiment, expressing that, "[w]hen you are inside, you . . . feel this pressure, you feel this emotional[] depress[ion]." *Id*.  And those feelings were exacerbated by the lack of connection to family: Class Member Alejandro Hernandez Torres testified about his efforts to keep his hope of release alive, saying "I made great efforts to be busy most of the time staying away from problems for people who had conflict in my wish and hope to be released.  I had the hope to see my family and my daughters."  *Id.*

In this context, GEO's contention that detainees were "largely free to do what they wanted during the day" is a subjective characterization that the jury should evaluate for itself.  *See* ECF No. 306 (Def.'s SJ Br.) at 27.  And contrary to GEO's argument that the conditions at Aurora are a far cry from the circumstances that the Fourth Circuit described as "[t]ypical[]" forced labor situations in *Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017), the analysis in that case is remarkably fitting:

**APP. 611**

> "[F]orced labor" situations involve circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are "used to prevent [vulnerable] victims from leaving and to keep them bound to their captors."

*Id.* at 618-19 (quoting *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015)). A jury could easily conclude that being forced to share a cramped cell with strangers is an "intolerable living condition[]"; or that being imprisoned constitutes "isolation []from family and the outside world." While none of these conditions is *necessary* under the TVPA for liability to attach, *see supra* § V.A.1, they all inform the analysis of whether hearing threats of solitary confinement was likely to keep detainees from resisting or refusing to perform unpaid labor.

In addition, all Detainee Class Members were exposed to the possibility of deportation by the nature of their confinement. The jury could conclude not only that this fact heightened their vulnerability to threats, but also that GEO knew of this vulnerability and specifically sought to exploit it. For example, until at least 2007, the video shown to detainees upon their arrival at the Aurora facility told them that failure to follow facility rules could lead to disciplinary action causing "a negative effect on your case before the government, so the best rule is to stay out of trouble during your stay here." SAF ¶ 37. Guards, too, ensured that detainees were acutely aware of the connection between discipline and deportation; Plaintiff Hernandez Ceren described an instance where a GEO sergeant told an entire housing pod that if detainees refused to clean, "I'm going to make sure that GEO sends their documents to the court . . . . and the judge is going to see if she

**APP. 612**

wants to leave you here in the country, so you can go back to your family . . . . you're not going to look good when this gets to the judge." *Id.*

### 4. Placement in Solitary Confinement Is Not a "Legitimate Consequence" of Refusing to Perform Unpaid Labor.

GEO's argument that a "warning of legitimate consequences" is not actionable under the TVPA fundamentally misinterprets legal precedent in an attempt to turn substantive law into a meaningless tautology. It is true that courts have observed that factual statements of lawful consequences for refusing to perform labor may not rise to the level of a TVPA violation, depending on the context. But whether or not a consequence is "legitimate" is a fact-bound determination that hinges on the way the threats are deployed as well as the surrounding circumstances – in other words, a quintessential jury question.

Indeed, many of the cases GEO relies on upheld a jury's verdict under the TVPA *despite* the defendants' protestations that they had merely given neutral warnings of potential negative outcomes. For example, while the court in *Bradley* noted that it might not violate the TVPA to inform workers that they will stop earning wages if they stop working, the panel rejected the defendant's argument that he had provided only "innocent warnings" where the record showed that he had taken his employees' passports, threatened them with violence, and restricted their local travel. 390 F.3d at 151-52 ("[I]n an appropriate case we think that the court *in instructing the jury* would be required to draw a line between improper threats or coercion and permissible warnings of adverse but legitimate consequences." (emphasis added)). Similarly, in *Calimlim*, the Seventh

**APP. 613**

Circuit upheld a jury verdict finding employers guilty of violating the TVPA for providing "warnings" to their employee that she was in the United States illegally and therefore subject to deportation.  538 F.3d 706, 714, 718 (7th Cir. 2008).  Although these statements were true, they could also "reasonably be viewed as a scheme to make [the employee] believe that she or her family would be harmed if she tried to leave."  *Id*. at 713.  The judgment as to whether the statements were threats was therefore properly left to the jury.  *Id*.

Courts that have granted summary judgment for defendants have done so where the negative consequences of failing to work were simply objective facts outside the employer's control, or were unrelated to the work itself.  For example, in *Muchira*, there was no evidence that the plaintiff's employers had even warned her of the possibility of deportation; she just understood that was a potential consequence under the terms of her visa.  850 F.3d at 624.  In *Headley v. Church of Scientology Int'l*, 687 F.3d 1173 (9th Cir. 2012), the record "overwhelmingly" showed that the plaintiffs worked for the Church of Scientology because "they believed that it was the right thing to do, because they enjoyed it, and because they thought that by working they were honoring the commitment that they each made and to which they adhered."  *Id*. at 1179-80.  The consequences of which they complained – that they would lose contact with family, friends, or each other – were associated with leaving their church, not their jobs, and were constitutionally protected as "shunning" under the Constitution's Free Exercise Clause.  *Id*. at 1180.

Moreover, the distinction between a "legitimate consequence" and a violation of the TVPA is not, as GEO would have it, a question of the severity of the punishment or

**APP. 614**

threatened punishment for refusing to work.[9]  This is made explicit in *Toviave*, which, contrary to GEO's position, "did *not* hold that household chores do not constitute labor or services."  *United States v. Callahan*, 801 F.3d 606, 620 (6th Cir. 2015), or that beating people with broomsticks (as the defendant did in that case) is a legitimate consequence for a violation of "seemingly arbitrary rules."  *See* ECF No. 306 (Def.'s SJ Br.) at 28.  Rather, *Toviave* held that the TVPA did not apply to matters implicating "the rights of parents and guardians to the custody of their minor children and wards," *id*. at 626 (quoting *Kozminski,* 487 U.S. at 944), which is not relevant to this case.

At its core, GEO's argument that solitary confinement is a legitimate consequence for failing to clean rehashes the argument it made in the context of the parties' cross-motions for summary judgment on the issue of derivative sovereign immunity: that the labor compelled under the HUSP was merely "basic housekeeping tasks" permitted under the PBNDS.  *See* ECF No. 260 (Pls.' DSI MSJ Br.), 284 (Def.'s DSI MSJ Br.).  As Plaintiffs set forth in detail in that briefing, undisputed evidence shows that the work compelled under the HUSP went far beyond the PBNDS, and was explicitly prohibited under GEO's contract.  ECF No. 260 (Pls.' DSI MSJ Br.) at 33-36.  The decision in *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269 (11th Cir. 2020), acknowledges the significance of the distinction between basic housekeeping and forced labor, holding that while the disciplinary measures set forth in the ICE disciplinary severity scale do not, "*on their own*," give rise to liability under the TVPA, *id*. at 1277 n.5 (emphasis added), a

---

[9]     Even if it were, substantial evidence supports Plaintiffs' position that solitary confinement is a severe punishment.  *Supra* § V.A.1.

**APP. 615**

government contractor may violate the TVPA if it forces detainees to perform forced labor beyond personal housekeeping tasks.  *Id*. at 1277.  Notably, the *Barrientos* court interpreted the PBNDS according to its plain meaning to limit permissible unpaid labor to "basic required tasks," such as detainees "'making their bunk beds daily,' 'stacking loose papers,' and 'keeping the floor free of debris.'"  *Id*. at 1272.  "Beyond these basic required tasks," the court noted, "detainees 'shall not be required to work.'"  *Id*. (quoting the PBNDS).

### 5.  A Jury Could Conclude That GEO Intended its Threats to Compel Unpaid Labor.

To prevail on claims under the "threats of serious harm" prong of the TVPA, plaintiffs must show that the defendant "not just threaten[ed] serious harm but . . . intended [detainees] to believe that such harm would befall [them]."  *Dann*, 652 F.3d at 1170.  There is ample evidence in the record from which a jury could conclude that GEO intended detainees to believe its threats of solitary confinement, because GEO actually *did* place detainees in solitary confinement for refusing to clean.  SAF ¶ 19.  Even when guards did not ultimately need to place resistant detainees in solitary, they made it clear that they would do so: Plaintiff Hugo Hernandez Ceren testified that when detainees refused to clean, he witnessed guards pull out a roll of trash bags and tell them to "pack your stuff.  You're going to the hole."  *Id.* ¶ 13.i.  Similar confrontations happened "multiple times with different guards."  *Id*.

While it may be true that guards sometimes did not *need* to impose – or even threaten – solitary confinement to compel detainees to work, this does not compel

**APP. 616**

summary judgment or absolve GEO of liability. To the contrary, it is entirely consistent

with Plaintiffs' theory of the case: detainees who refused to work were subject to a range

of discipline, including solitary confinement. *See* ECF No. 1 (Complaint) ; *Menocal v.*

*GEO Grp., Inc.*, 882 F.3d 905, 911 (10th Cir. 2018) ("Under the disciplinary system,

detainees who refused to perform their cleaning assignments faced a range of possible

sanctions."). The Detainee Handbook makes clear that if milder punishments, such as

turning off the television or prohibiting detainees from participating in activities, do not

compel detainees to work, then guards will resort to harsher punishments. SAF ¶ 6.

Solitary confinement was listed among those punishments. *Id*. ¶¶ 8-9. The Detainee

Handbook also states that detainees "will be held accountable for [their] actions while in

custody at [Aurora]" and that "[t]herefore, it is each detainee's responsibility to become

familiar with the contents of this handbook." *Id*. ¶ 2.

GEO guards and administrators confirmed that they intended detainees to believe

that facility rules – including that detainees could be placed in solitary confinement for

refusing to clean – would be enforced. GEO guards confirmed in their depositions that

solitary confinement was an appropriate punishment for continued noncompliance. *Id*. ¶

16; Plaintiffs' Response to SUF ¶ 43. And GEO's 30(b)(6) witness confirmed that it was

"imperative" that detainees "respond to every command and directive" made to them,

including respecting the commands of detention officers. *Id*. ¶ 15. In fact, in its own

motion, GEO states that "[a]s a matter of logic and reason, detention facilities must have

the ability to impose some level of discipline in order to preserve a safe and secure

environment for those housed there." ECF No. 306 (Def.'s SJ Br.) at 29. This statement

**APP. 617**

highlights the *illogic* of GEO's theory of the case – that the sanitation policy, despite the wording in the handbook, was optional, even though guards enforced every single other rule – underscoring the need to have a jury test the credibility of GEO's position.

To the extent that GEO's argument relies on the position that GEO subjectively did not intend detainees to find the looming threat of solitary confinement threatening, that is not a summary judgment issue.  In *Calimlim*, 538 F.3d at 713, the defendants argued on appeal that "nothing they said or did to [the victim] amounted to a threat.  To the contrary . . . they meant her no harm and were only telling her these things in her best interest."  *Id*.  The Seventh Circuit held that a "reasonable person" could have viewed the defendants' statements as a threat, and held: "Perhaps another jury might have accepted this story, but the one that heard their case did not."  *Id*.  The jury here deserves the opportunity to weigh the evidence and make that evaluation itself.

Finally, and once again: The HUSP was a GEO program, developed by GEO.  ICE did not draft or negotiate the HUSP, and it was not required by GEO's contract with ICE.  SAF ¶ 12.  Not only did ICE (via the PBNDS) not require that detainees be forced to clean common areas without pay, it prohibited such cleaning.  *Id*. ¶ 11.  GEO's argument that it was only following ICE's orders when it published and implemented the disciplinary severity scale is not only irrelevant to whether it intended detainees to believe serious harm might befall them, it is also controverted by undisputed evidence.

APP. 618

### 6.   The Jury Can Infer That Class Members Cleaned Because of Fear of Solitary Confinement.

This Court has previously held that, to prevail on their claims under the TVPA, Plaintiffs must demonstrate that "a reasonable person would respond [to threats] in a similar way as the victims" and that they must show that the victims "actually labored *because of* the perpetrator's conduct." *Menocal*, 320 F.R.D. at 266-67.[10]   The Tenth Circuit has made clear that the causation element is subject to classwide proof in the form of common circumstantial evidence.  *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 918 (10th Cir. 2018).  For example, the jury could conclude that threats of solitary confinement compelled detainees to work via evidence that: (1) detainees "received notice of the Sanitation Policy's terms, including the possible sanctions for refusing to clean," and (2) that detainees "performed housing unit cleaning work for GEO when assigned to do so."  *Id*. at 919-20.

There is evidence in the record both that detainees received notice of the HUSP and attendant consequences for refusing to participate, and that detainees participated in the HUSP.  SAF ¶¶ 1, 6-8, 18.   Moreover, as discussed in greater detail in Plaintiffs' contemporaneously-filed opposition to GEO's decertification motion, the testimony that GEO has cherry-picked from Plaintiffs' depositions does not show that they participated in the HUSP for reasons other than the fear that they would be placed in solitary

---

[10]      Recent authority since the Court's ruling on class certification calls into question the Court's prior conclusion that there is a subjective element to TVPA causation.  This argument is set forth in more detail in Plaintiffs' contemporaneously-filed opposition to GEO's decertification motion.  Pls.' Decert. Opp. Br. at 25-33.

**APP. 619**

confinement if they refused.  *See* Pls.' Decert. Opp. Br. at 39-45.  To the contrary, the named Plaintiffs testified uniformly that they performed HUSP work *because of* those threats.  SAF ¶ 18.  A jury is entitled to believe that testimony.

**B.      Class Members' TVPA Claims Benefit from the TVPA's 10-Year Statute of Limitations.**

GEO's attempt to shorten the class period misstates the law.  Retroactive application of a statute is only impermissible where "the new provision attaches new legal consequences to events completed before its enactment."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269-70 (1994).  In the civil context, retroactivity concerns are present when a statute creates a new cause of action, or eliminates a defense to a cause of action, holding civil defendants liable where previously they were not.  *See Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 948-51 (1997).  Where, as here, the amendments merely "increase[] [the] likelihood that an existing cause of action will be pursued," *id.* at 50, the amendment may be applied retroactively.

Here, GEO is correct that when Congress first enacted the TVPA in 2000, the statute provided for a four-year limitations period, and Congress amended the TVPA in 2008 to include a ten-year limitations period for civil actions.  *See* ECF No. 306 (Def.'s SJ Br.) at 33.  But this change affects only a two-month portion of the Class's claims.  Numerous courts have concluded that the TVPA's ten-year statute of limitations applies if the plaintiff's claims were live when Congress lengthened the statute of limitations on December 23, 2008.  *See, e.g.*, *Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014) ("We therefore hold that applying the TVPRA's extended limitations period to claims that were

**APP. 620**

unexpired at the time of its enactment does not give rise to an impermissible retroactive effect."); *Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d 1112, 1129 (D. Colo. 2019) ("By applying the ten-year statute of limitations, the Court does not expose [defendant] to any new legal consequences; it 'merely prolongs the time during which legal consequences can occur'" (quoting *Cruz*, 773 F.3d at 145)); *Lama v. Malik*, 192 F. Supp. 3d 313, 322-23 (E.D.N.Y. 2016) (collecting cases). Therefore, the claims of all Class Members that accrued after December 23, 2004 – four years prior to the 2008 amendments – are timely. Here, Plaintiffs have pled a class period running from October 22, 2004 to October 22, 2014. ECF No. 1 (Complaint) ¶ 55. Thus, only the first two months of the Class's claims are barred by the statute of limitations.

GEO's claim that this case is distinguishable from *Gilbert* because the *Gilbert* plaintiffs' claims arose under the 2003 amendments to the TVPA falls flat. *See* ECF No. 306 (Def.'s SJ Br.) at 33. Nothing in the *Gilbert* court's analysis hinged on the fact that the plaintiffs' claims fell within the 2003 amendments. The court concluded that "the TVPA's existing ten-year statute of limitations applies – even to claims based on conduct that allegedly occurred when the TVPA had a four-year limitations period (before December 23, 2008), so long as the claim had not yet been barred by the four-year limitation when the ten-year limitation was passed into law." 423 F. Supp. 3d at 1128; *see also Camayo v. John Peroulis & Sons Sheep, Inc.*, Nos. 10 Civ. 772, 11 Civ. 1132, 2013 WL 3927677, *2 (D. Colo. July 20, 2013) (applying amended limitations period since it "merely extended the time in which a plaintiff may assert claims for violations of already-existing rights").

GEO likewise errs by relying on inapposite cases where, at the time of the alleged violation, the TVPA contained no private right of action.  *See, e.g.*, *Velez v. Sanchez*, 693 F.3d 308, 324-25 (2d Cir. 2012) (rejecting retroactive application of TVPA's civil cause of action because "all of the alleged trafficking and forced labor took place before the [2003] civil cause of action under the TVPRA was enacted"); *Doe v. Siddig*, 810 F.Supp.2d 127, 135 (D.D.C. 2011) (same).[11]  Retroactive application of *that* change in the law, unlike the expansion of the statute of limitations, would "attach[] new legal consequences to events completed before" the amendments were enacted.  *See Landgraf*, 511 U.S. at 269-70.

Finally, to the extent GEO suggests that the 2008 Amendment created a new "section and theory of liability," it is mistaken.  *See* ECF No. 306 (Def.'s SJ Br.) at 33. Rather than provide for "new or expanded liability," the forced labor prohibition has always included "scheme, plan, or pattern" liability.  *See* Victims of Trafficking and Violence Protection Act of 2000, PL 106–386, tit. XVIII, § 1589, 114 Stat. 1464 (2000) (making it unlawful for anyone to "knowingly provide[] or obtain[] the labor or services

---

[11]      GEO also relies on *Abarca v. Little*, but in that case, although the statute of limitations was in question, the Plaintiff also sought to bring civil claims that were only added by the 2008 amendments, which "significantly broaden[ed] the basis for civil liability under the TVPRA."  54 F. Supp. 3d 1064, 1069 (D. Minn. 2014).  Those claims – for peonage, enticement into slavery, and involuntary servitude – are different from the forced-labor claim Plaintiffs bring here.  *See id.*  Even if the *Abarca* court's holding on the retroactivity of the statute of limitations had been the sole basis for its decision, Plaintiffs respectfully submit that the decision is poorly reasoned and not binding on this Court, and that the several decisions from this district cited above provide a more persuasive analysis of this question.

**APP. 622**

of a person … (2) by means of any scheme, plan, or pattern intended to cause the person to believe that . . . person or another person would suffer serious harm or physical restraint").

### C.   Plaintiffs Do Not Seek Injunctive Relief.

As GEO notes, Plaintiffs do not seek injunctive relief for their claims under the TVPA.  *See* ECF Doc. 305 at 34.  Plaintiffs' request for relief has not changed.  Because Plaintiffs are not seeking injunctive relief under the TVPA, the Court need not enter summary judgment on this question.

### D.   Material Disputes of Fact Preclude Summary Judgment on Plaintiffs' Unjust Enrichment Claims.

GEO offers two reasons that Plaintiffs' unjust enrichment claims should be disposed of on summary judgment: (1) that Plaintiffs cannot show that GEO benefitted from the $1/day program; and (2) that an express contract bars the unjust enrichment claim.  Each is subject to disputes of material fact that preclude summary judgment.

#### 1.   The Record Shows That GEO Obtained a Benefit From Paying Detainees $1 per Day for Their Labor.

To recover for unjust enrichment, a plaintiff must show that "(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying."  *DCB Const. Co. v. Cent. City Dev. Co.*, 965 P.2d 115, 119-20 (Colo. 1998).  GEO argues that Plaintiffs cannot, as a matter of law, satisfy the second element of this test, but its argument relies on a hypothetical that ignores the facts of the case, including its own witnesses' testimony.

GEO benefits from the $1/day program because limiting detainee wages to $1/day allows GEO to earn the return on investment it needs to make its Aurora contract viable from a business standpoint.  When developing its bid for a contract, GEO totals up the costs it would incur in executing the contract and adds the profit it desires on top of those costs, all of which it charges to the government.  SAF ¶ 40.  But GEO cannot include the cost of detainee wages above the $1/day reimbursement rate because that is all that ICE will pay; GEO must bear additional costs, if any, on its own.  *Id.* ¶¶ 48-50.  Were GEO to pay detainees more than $1/day for their labor and bear this cost, the cost to operate the facility would increase, cutting into GEO's return.  *Id.* ¶ 50.  Accordingly, GEO benefits from paying just $1/day to detainees for work in the VWP by keeping its costs low and maintaining its desired profit margins.

Additionally, GEO's hypothetical in which there was no VWP, ECF No. 306 (Def.'s SJ Br.) at 35-36, is at odds with how immigration detention works.  As GEO has argued in support of its Derivative Sovereign Immunity defense, ICE *requires* it to operate the VWP.  ECF No. 284 (Def.'s Cross DSI MSJ) at 12.  And Plaintiffs allege that GEO's practice of paying $1/day unjustly enriches the company, not that the *existence* of the VWP does so.  Evidence in the record shows that the VWP does *not* require GEO to pay detainees exactly $1/day, SUF ¶ 49, and that GEO could pay more at its own expense.  SAF ¶ 50.  But it is to GEO's benefit to keep detainee wages at $1/day because the amount ICE pays GEO during each year of the contract is set at the time the contract is signed.  *Id.* ¶ 45.  As a result, GEO bears the risk of having its profits offset by an increase in the cost of operating the facility, such as paying more for detainee labor.  *Id.* ¶

**APP. 624**

46.  This is confirmed by the testimony of GEO's 30(b)(6) witness Daniel Ragsdale, who explained that the VWP is "cost neutral at a dollar a day but it gets – it becomes a cost to us if it goes beyond that."  SUF ¶ 50.  Because an increase in cost causes a decrease in profit, GEO's decision to limit detainee pay to $1/day benefits and enriches the company.

Even if the Court were to entertain GEO's hypothetical where the VWP does not exist and GEO can mark up the cost of employee labor for additional profit, GEO would still benefit from building $1/day detainee labor into its contracts because doing so allows GEO to bid on the contract at a rate low enough for ICE to accept.  GEO strives to provide a fair price to the government for its services, and seeks to provide those services for less than it would cost the government to do so itself.  SAF ¶ 39.  The largest component of the price GEO charges ICE is labor, and using cheap detainee labor is one method of keeping prices down.  *Id.* ¶¶ 41, 51.  Even if GEO could profit more from additional employee labor billed to ICE at a markup, this would increase the total cost to the government, making GEO's bid less competitive.  *Id.* ¶ 42.  GEO's own estimates indicate that replacing all GEO ICE detainees with full-time employees nationwide would constitute a substantial cost.  *Id.* ¶ 51.  GEO's incentive to keep its bid down is true even to the extent GEO's Aurora contract bid is a "sole source bid" – i.e., where GEO is the only contractor that can provide the services – because the government applies extra scrutiny to a sole source bidder's prices and finances to ensure they are providing a fair price.  *Id.* ¶ 43.  Indeed, GEO uses the same pricing strategy for sole source and competitive bids.  *Id.* ¶ 44.  Put simply, GEO will always have an incentive to

APP. 625

use detainee labor to ensure that the price it charges the government is low enough to meet what the government is willing to pay.  *Id.* ¶¶ 42-44.

### 2.     GEO's Contract Defense Fails.

#### i.     GEO Waived Its Contract Defense.

GEO raises the affirmative defense that Plaintiffs' unjust enrichment claims are barred by a contract for the first time in its motion for summary judgment.  Because geo did not assert this affirmative defense in its answer, ECF No. 26 (answer) at 13-16 (listing affirmative defenses), the defense is waived.  *See Burke v. Regalado*, 935 F.3d 960, 1040 (10th Cir. 2019) ("As a general rule, a defendant waives an affirmative defense by failing to plead it."); *Radio Corp. Of Am. v. Radio Station KYFM, Inc.*, 424 F.2d 14, 17 (10th Cir. 1970) ("[D]efenses [that] are not affirmatively pleaded . . . are deemed to have been waived and may not thereafter be considered as triable issues in the case.").

Moreover, GEO could not plead the existence of a contract as an affirmative defense because it has admitted that the VWP forms signed by detainees are not a contract.  Dawn Ceja, one of GEO's 30(b)(6) witnesses, agreed that the document GEO now relies was not an employment contract and that it did not create any rights or obligations.  SAF ¶ 53.

#### ii.     The Contract GEO Relies On Is Unconscionable.

Even if GEO could argue that detainees signed a contract to participate in the VWP, it is not entitled to summary judgment because a contract does not bar an unjust enrichment claim when it is unenforceable.  *See Interbank Invests., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003).  Here, a jury could find

**APP. 626**

that the purported contract between GEO and detainees is unconscionable, rendering Plaintiffs' unjust enrichment claims triable.

Under Colorado law, a contract is unconscionable when there is "evidence of some overreaching on the part of one of the parties such as that which results from an inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties *together with* contract terms which are unreasonably favorable to that party." *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986) (emphasis added).  Courts weigh seven factors to guide their analysis of whether an overreach indicating unconscionability is present:

> [1] a standardized agreement executed by parties of unequal bargaining strength; [2] lack of opportunity to read or become familiar with the document before signing it; [3] use of fine print in the portion of the contract containing the provision; [4] absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated; [5] the terms of the contract, including substantive unfairness; [6] the relationship of the parties, including factors of assent, unfair surprise and notice; and [7] all the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect.

*Id.* (internal citations omitted).

The "contract" GEO cites – the form detainees sign to be eligible to work in the VWP – is a quintessential case of overreach by a party with far superior bargaining power.  The relationship of the "parties," where GEO maintains control over every aspect of Class Members' day-to-day existence, lends itself to perhaps the greatest disparity in bargaining power possible.[12]  Detainees were isolated from family, lived intimately with

---

[12]     A jury may evaluate this inquiry in light of the same facts that preclude summary judgment on the question of whether GEO threatened detainees, and whether such threats caused them to perform work in violation of the TVPA – e.g., that the Class Members

**APP. 627**

strangers, and relied on GEO for all of their basic necessities.  SAF ¶¶ 26, 28, 36.  These conditions deprived Plaintiffs of any meaningful choice: if they wanted to earn money while in GEO's custody for phone calls to their family or items from the commissary, there is no other option but to work in the $1/day program on GEO's terms.[13]  *Cf. Bernall v. Burnett*, 793 F. Supp. 2d 1280, 1287 (D. Colo. 2011) (finding the existence of a meaningful choice where the plaintiff school applicant could reject the contract terms and apply instead to another institution).  Refusal to accept GEO's terms does not lead to a negotiation; rather, it leads to the detainee losing the opportunity to earn money while jailed, a fact Class Members understood.  SAF ¶ 52; *see Bonanno v. Quizno's Franchise Co., LLC*, No. 06 Civ 2358, 2009 WL 1068744, at *18 (D. Colo. Apr. 20, 2009) (recognizing that the plaintiffs' inability to "truly negotiate or re-write any provisions of the franchise agreement" weighed in favor of finding unconscionability); *Bernall*, 793 F. Supp. 2d at 1287 (crediting plaintiffs' affidavits stating "they did not believe they had the ability to negotiate the terms of their contracts" as sufficient to establish the existence of an unconscionable form contract).  This imbalance in bargaining power alone could support a finding of unconscionability, but when combined with the fact that GEO used this bargaining advantage to impose a $1/day wage on detainees, it is clear that the terms of the contract are unconscionable as well.  *See Davis*, 712 P.2d at 991 (describing

---

faced deportation, a consequence that GEO explicitly reminded them of in telling them to do what they were told.  *See* § V.A.3, *supra.*

[13]     The jury could conclude that commissary items were not luxuries, but necessities caused by the inadequacy of the diet GEO provided detainees.  SAF ¶ 36.

**APP. 628**

"substantive unfairness" factor and citing *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 450 (D.C. Cir. 1965) for same).

Paying $1/day is, on its face, not "commercially reasonable." *See Davis*, 712 P.2d at 991. GEO may argue that $1/day wages are commercially reasonable because they are consistent with detainee wages set by ICE and serve a commercial purpose of keeping detainees active while in custody, but neither argument is persuasive. Though ICE will only reimburse GEO $1/day for detainee labor, it does not forbid GEO from paying more and leaves the determination of the appropriate wage to GEO. SAF ¶ 48-500 GEO chose not to pay more than $1/day and, as explained above, did so for its own benefit. *See* § V.D.1, *supra*. In addition, it may be the case that ICE's purpose in requiring the VWP is to decrease idleness, but making detainees easier to control is not a commercial purpose; it is a coercive one, i.e., one that is unconscionable. And GEO's real purpose in limiting detainee wages to $1/day is to save money. *See id*. Limiting business costs is, in general, a legitimate commercial purpose, but it ceases to be so when the method of limiting costs is exploiting a workforce. *See Contreras v. Corinthian Vigor Ins. Brokerage, Inc.*, 25 F. Supp. 2d 1053, 1056 (N.D. Cal. 1998) (recognizing public policy against "economic incentive" that "permits employers to underpay" workers).

In sum, the unconscionability analysis highlights what is apparent from the parties' relationship: at best, GEO, Plaintiffs' jailor, offered them an adhesive "contract" to work while jailed on the condition that they accept only $1/day for that work. This is the archetype of an unconscionable contract. And, because the contract is not enforceable, it does not preclude Plaintiffs' unjust enrichment claim.

APP. 629

## VI.    CONCLUSION

Because the record contains numerous disputes of material fact, the Court should

deny GEO's Motion for Summary Judgment in its entirety.

Dated: New York, NY                          Respectfully submitted,
         October 26, 2020

                                             By: */s/ Michael J. Scimone*
                                             Michael J. Scimone
                                             **OUTTEN & GOLDEN LLP**
                                             685 Third Avenue, 25th Floor
                                             New York, NY 10017
                                             Telephone: (212) 245-1000
                                             Facsimile: (646) 509-2060
                                             E-Mail: mscimone@outtengolden.com

                                             Rachel Dempsey
                                             Adam Koshkin
                                             **OUTTEN & GOLDEN LLP**
                                             One California Street, 12th Floor
                                             San Francisco, CA 94111
                                             Telephone: (415) 638-8800
                                             Facsimile: (415) 638-8810
                                             E-Mail: rdempsey@outtengolden.com
                                             E-Mail: akoshkin@outtengolden.com

                                             Alexander Hood
                                             David Seligman
                                             Juno Turner
                                             **TOWARDS JUSTICE**
                                             1410 High St., Suite 300
                                             Denver, CO 80218
                                             (720) 441-2236
                                             alex@towardsjustice.org
                                             david@towardsjustice.org
                                             juno@towardsjustice.org

**APP. 630**

R. Andrew Free
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
T: (844) 321-3221
Andrew@ImmigrantCivilRights.com

Brandt Milstein
**MILSTEIN LAW OFFICE**
1123 Spruce Street
Boulder, CO 80302
(303) 440-8780
brandt@milsteinlawoffice.com

Andrew Turner
**THE KELMAN BUESCHER FIRM, P.C.**
600 Grant St., Suite 825
Denver, CO 80203
(303) 333-7751
aturner@laborlawdenver.com

Hans Meyer
**MEYER LAW OFFICE, P.C.**
P.O. Box 40394
Denver, CO 80204
(303) 831-0817
hans@themeyerlawoffice.com

*Class Counsel*

**APP. 631**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 26, 2020, a copy of the foregoing document was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
E-Mail: mscimone@outtengolden.com

**APP. 632**

**List of Exhibits Attached to Opposition to Motion for Summary Judgment**

**Ex. 1**: Decl. of Michael J. Scimone ("Scimone Decl.") in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, dated October 26, 2020

**Ex. 2**: Att. 1 to Scimone Decl., Pls.' Opposition Ex. 1, excerpts from the July 22, 2020 deposition of Alejandro Menocal.

**Ex. 3**: Att. 2 to Scimone Decl., Pls.' Opposition Ex. 2, excerpts from the July 23, 2020 deposition of Stuart Grassian.

**Ex. 4**: Att. 3 to Scimone Decl., Pls.' Opposition Ex. 3, excerpts from the June 24, 2020 deposition of Hugo A. Hernandez Ceren.

**Ex. 5**: Att. 4 to Scimone Decl., Pls.' Opposition Ex. 4, excerpts from the June 30, 2020 deposition of Sergio Gallegos.

**Ex. 6**: Att. 5 to Scimone Decl., Pls.' Opposition Ex. 5, Segregation Unit Activity Sheet, Bates labeled GEO-MEN 00070692-93.

**Ex. 7**: Att. 6 to Scimone Decl., Pls.' Opposition Ex. 6, excerpts from the October 27, 2017 deposition of Demetrio Valerga.

**Ex. 8**: Att. 7 to Scimone Decl., Pls.' Opposition Ex. 7, excerpts from the February 21, 2018 deposition of Dagoberto Vizguerra.

**Ex. 9**: Att. 8 to Scimone Decl., Pls.' Opposition Ex. 8, excerpts from the March 29, 2016 30(b)(6) deposition of Dawn Ceja.

**Ex. 10**: Att. 9 to Scimone Decl., Pls.' Opposition Ex. 9, excerpts from the November 16, 2017 deposition of Jesus Yepez Gaytan.

**Ex. 11**: Att. 10 to Scimone Decl., Pls.' Opposition Ex. 10, excerpts from the July 8, 2020 deposition of Luis Pagan.

**Ex. 12**: Att. 11 to Scimone Decl., Pls.' Opposition Ex. 11, excerpts from the June 29, 2020 deposition of Martha Vasquez.

**Ex. 13**: Att. 12 to Scimone Decl., Pls.' Opposition Ex. 12, excerpts from the July 16, 2020 deposition of Alejandro Hernandez Torres.

**Ex. 14**: Att. 13 to Scimone Decl., Pls.' Opposition Ex. 13, excerpts from the October 26, 2017 deposition of Grisel Xahuentitla.

**Ex. 15**: Att. 14 to Scimone Decl., Pls.' Opposition Ex. 14, excerpts from the September 16, 2020 30(b)(6) deposition of Dawn Ceja.

**APP. 633**

**Ex. 16**: Att. 15 to Scimone Decl., Pls.' Opposition Ex. 15, excerpts from the July 28, 2020 deposition of Joyce Quezada.

**Ex. 17**: Att. 16 to Scimone Decl., Pls.' Opposition Ex. 17, excerpts from the July 21, 2020 deposition of David Venturella.

**Ex. 18**: Att. 17 to Scimone Decl., Pls.' Opposition Ex. 18, excerpts from the October 9, 2019 deposition of Amber Martin.

**Ex. 19**: Att. 18 to Scimone Decl., Pls.' Opposition Ex. 19, excerpts from the February 27, 2020 30(b)(6) deposition of Daniel Ragsdale.

**Ex. 20**: Att. 19 to Scimone Decl., Pls.' Opposition Ex. 20, excerpts from the February 28, 2020 30(b)(6) deposition of Amber Martin.

**Ex. 21**: Att. 20 to Scimone Decl., Pls.' Opposition Ex. 21, Psychiatric Report of Plaintiffs' expert Dr. Stuart Grassian, M.D.

**Ex. 22**: Att. 21 to Scimone Decl., Pls.' Opposition Ex. 22, Fatos Kaba, "Solitary Confinement and Risk of Self-Harm Among Jail Inmates," 104 Am. J. Pub. Health 442 (2014).

**Ex. 23**: Att. 22 to Scimone Decl., Pls.' Opposition Ex. 23, Paul Gendreau, "Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement," 79 J. Abnormal Psych. 54 (1972).

**Ex. 24**: Att. 23 to Scimone Decl., Pls.' Opposition Ex. 27, excerpts from the June 10, 2020 deposition of Brian Evans.

### List of Exhibits Attached to Notice of Restriction

**Ex. 1**: Att. 1 to Notice of Restriction, Pls.' Opposition Ex. 16, May 30, 2018 letter from GEO to ICE, Bates labeled GEO-MEN 00187770.

**Ex. 2**: Att. 2 to Notice of Restriction, Pls.' Opposition Ex. 24, photographs of the Aurora ICE Processing Center, Bates labeled ICE 0000102, 105, 116, 123, 128, 139, 142, 145, 152.

**Ex. 3**: Att. 3 to Notice of Restriction, Pls.' Opposition Ex. 25, Detainee Orientation Video Script 042705, Bates labeled GEO_MEN 00056575-81.

**Ex. 4**: Att. 4 to Notice of Restriction, Pls.' Opposition Ex. 26, Detainee Orientation Video Script 082507, Bates labeled GEO-MEN 00075173-83.

**APP. 634**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated,*

Plaintiffs,

v.

THE GEO GROUP, INC.,

Defendant.

---

## DEFENDANT THE GEO GROUP, INC.'S REPLY IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

Defendant The GEO Group, Inc. ("Defendant" or "GEO"), by and through its undersigned

counsel, hereby submits its Reply in Support of its Motion for Summary Judgment (ECF 305) and

respectfully requests this Court enter judgment in GEO's favor as to all of Plaintiffs' claims.

**APP. 635**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................ 1

II.     STATEMENT OF FACTS ............................................................................... 2

III.    ELEMENTS OF THE TRAFFICKING VICTIMS PROTECTION ACT ...................... 55

IV.     THE MEAL CLEANUP POLICY DOES NOT VIOLATE THE TVPA ...................... 57

        A.      The PBNDS Do Not Limit Detainee Cleanliness to Four Categories. ................ 58

        B.      Requiring Civilly Confined Individuals To Clean Up After Meals or Face
                Consequences is Legitimate.................................................................... 62

V.      PLAINTIFFS FAIL TO IDENTIFY EVIDENCE OF GEO'S SCIENTER.................... 67

VI.     72-HOURS OF SEGREGATION IS NOT SERIOUS HARM UNDER THE
        TVPA .......................................................................................................... 69

VII.    PLAINTIFFS' ADDITIONAL FACTS ARE NOT MATERIAL................................. 72

VIII.   PLAINTIFFS' UNJUST ENRICHMENT CLAIMS ARE BARRED BY
        EXPRESS CONTRACTS.................................................................................. 73

        A.      GEO Did Not Waive Its Defense........................................................... 73

        B.      Contracts of Adhesion are Not *Per Se* Unconscionable. ...................... 74

IX.     CONCLUSION............................................................................................... 76

CERTIFICATE OF SERVICE ................................................................................... 77

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ahmad v. Furlong,*
435 F.3d 1196 (10th Cir. 2006) .......................................................72

*Barrientos v. CoreCivic, Inc.,*
951 F.3d 1269 (11th Cir. 2020) .............................................61, 63, 64

*Bentley v. Cleveland Cnty. Bd. of Cnty. Cmmr's,*
41 F.3d 600 (10th Cir. 1994) ...........................................................72

*Bijeol v. Nelson,*
579 F.2d 423 (7th Cir.1978) ..........................................................62, 63

*Bridges v. Poe,*
No. 6:19-CV-01399-LSC, 2020 WL 5408915 (N.D. Ala. Sept. 9, 2020) ..................64, 67, 68

*Echon v. Sackett,*
No. 14-CV-03420-PAB-NYW, 2017 WL 4181417 (D. Colo. Sept. 20, 2017)......................54

*Expertise, Inc. v. Aetna Fin. Co.,*
810 F.2d 968 (10th Cir. 1987) .........................................................72

*Hause v. Vaught,*
993 F.2d 1079 (4th Cir.1993) ..........................................................61

*Headley v. Church of Scientology Int'l,*
687 F.3d 1173 (9th Cir. 2012) ...................................................54, 55, 61

*Jackson v. Siringas,*
No. 12–15474, 2013 WL 3810301 (E.D.Mich. July 23, 2013) ...............................62

*Jobson v. Henne,*
355 F.2d 129 (2d. Cir. 1966)..........................................................62

*Martinez-Rodriguez v. Giles,*
391 F. Supp. 3d 985 (D. Idaho 2019) ...........................................54, 65, 67

*Mendez v. Haugen,*
No. CV 14-4792.....................................................................61, 62

ii

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017), *as amended* (Mar. 3, 2017) .................................53, 61

*Roman v. Tyco Simplex Grinnell*, No. 8:16-CV-3449-T-33AEP, 2017 WL 3394295
    (M.D. Fla. Aug. 8, 2017), *aff'd*, 732 F. App'x 813 (11th Cir. 2018)................................55, 61

*United States v. Callahan*,
    801 F.3d 606 (6th Cir. 2015) ..........................................................................69, 70

*United States v. Kozminski*,
    487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988).........................................61

*United States v. Toviave*,
    761 F.3d 623 (6th Cir. 2014) ..........................................................................54, 61

*Vernon v. Qwest Communications Intern., Inc.*,
    925 F. Supp. 2d 1185 (D. Colo. 2013)................................................................73

*Villescas v. Richardson*,
    124 F. Supp. 2d 647 (D. Colo. 2000).................................................................72

*Weller v. HSBC Mortgage Services, Inc.*,
    971 F. Supp. 2d 1072 (D. Colo. 2013)...............................................................73

**Statutes**

U.S.C. § 1555(d) ..............................................................................................53

18 U.S.C. § 1589(a)(1)......................................................................................35

**Rules**

Federal Rules of Evidence 802 ...........................................................................35

Rule 8(c)........................................................................................................72

**Other Authorities**

Durango Herald, https://durangoherald.com/articles/59930
    (last visited November 15, 2020)........................................................................53

5 Fed. Prac. & Proc. § 1278 (3d ed. Sept. 2018) ....................................................72

iii

## I.      INTRODUCTION

Plaintiffs' response does not identify disputes of material fact that would prevent this Court from resolving the issues before it on the briefs. While Plaintiffs attempt to muddy the waters by reciting dozens of extraneous facts, they do not point to any genuine or material factual issues before this Court that would preclude it from holding that the meal cleanup at the Aurora ICE Processing Center ("AIPC") does not violate the Trafficking Victims Protection Act ("TVPA"). The undisputed facts make plain:

(1) The disciplinary severity scale contained within the Performance Based National Detention Standards ("PBNDS") and the Aurora ICE Processing Center Handbook ("AIPC Handbook"), as written, constitutes a warning of legitimate consequences, not a threat of serious harm under the TVPA;

(2) There is no evidence that GEO had the requisite scienter required for a TVPA violation;

(3) There is no evidence that, absent individual and unique circumstances, 72-hours of solitary confinement constitutes serious harm; and

(4) Written contracts exist and bar Plaintiffs' unjust enrichment claim.

Indeed, Plaintiffs concede that whether the PBNDS permit the meal clean up policy is a matter of "undisputed evidence." ECF 336 at 65. Plaintiffs do not point to any evidence suggesting the implementation of a government-mandated disciplinary policy that includes the potential sanction for 72-hours of segregation is in any way illegitimate. Based upon that fact alone, GEO is entitled to summary judgment. Insofar as the Court concludes that the PBNDS disciplinary severity scale, which is used at detention facilities nationwide, does not constitute a warning of legitimate consequences, Plaintiffs claims still fail. Despite reciting over 50 additional facts in their

**APP. 639**

Response, Plaintiffs cannot identify sufficient evidence that would permit a fact finder to resolve the case in their favor. Accordingly, summary judgment is appropriate.

## II.   STATEMENT OF FACTS

In accordance with this Court's practice standards, GEO provides the following responses to Plaintiffs' additional statement of facts and responses to GEO's proposed undisputed facts. For ease of the Court's review, GEO has included each fact in a table format.

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| 1. | At the class certification stage Plaintiffs cited to a Policy and Procedure Manual, titled "Sanitation Procedures" in support of their claims.[1] ECF 50-2. | Admit that the "Sanitation Procedures" section of the Aurora Policy and Procedure Manual was an exhibit to Plaintiffs' Motion for Class Certification. Deny the contention in the footnote that Plaintiffs "have renamed this document the 'HUSP'" or that "no formal GEO policy is designated or titled 'HUSP'. As GEO acknowledges, the Housing Unit Sanitation policy ("HUSP") is set forth in the Detainee Handbook under the heading "Housing Unit Sanitation." | Plaintiffs admit that the "Sanitation Procedures" document is no longer part of the term "HUSP" as they have defined it in this lawsuit. |
| 2. | The Sanitation Procedures were not developed to assign tasks to any specific individuals, but rather to detail the process for cleaning and materials to | Undisputed. | |

---

[1] Plaintiffs have renamed this document the "HUSP," but no formal GEO policy is designated or titled "HUSP." It appears that this phrase originates not from the Sanitation Procedures, but instead the detainee handbook which contains a subsection called "Housing Unit Sanitation." See ECF 260 at 7.

2

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | be used. ECF 289 (Undisputed Fact 31). | | |
| 3. | Detainees do not receive a copy of the Sanitation Procedures during their stay at AIPC. ECF 50-1, 29:13-18 (30(b)(6) Deposition of Ceja). | Undisputed. | |
| 4. | Plaintiffs no longer rely upon the Sanitation Procedures as a policy that underlies their TVPA claim. **Ex. A.** (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories, Responses to Interrogatory No. 39). | Deny. The referenced interrogatory does not mention policies; rather, it states: "Describe all actions taken by GEO that You allege constitute force, threats of force, physical restraint, or threats of physical restraint" under 18 U.S.C. § 1589(a)(1). | In Undisputed Fact #1, Plaintiffs admit that the "Sanitation Procedures" document is no longer part of the term "HUSP" as they have defined it in this suit. "[T]his interrogatory is phrased in terms of Plaintiffs' allegations, which are not styled as individual claims, but rather as classwide claims and allegations that **derive from GEO's policies and practices** that were common to the TVPA Class." ECF 306-1 at 3 (emphasis added). |
| 5. | Plaintiffs also cited the AIPC Handbook at the class certification stage as support for their TVPA claims. ECF 50-3. | Undisputed. | |
| 6. | Unlike the Sanitation Procedures, the AIPC Handbook is issued to all detainees entering the facility. ECF 289 (Undisputed Fact 23). | Undisputed. | |
| 7. | The only classwide polices that Plaintiffs challenge as part of their TVPA claim | Deny. Plaintiffs challenge GEO's classwide HUSP, which is described in the | Plaintiffs' response does not provide evidence of other policies which they |

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | are the AIPC Handbook and an Orientation video shown to detainees upon arrival. **Ex. A**. (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories Responses to Interrogatory No. 39). | Detainee Handbook and orientation video. The Detainee Handbook and orientation video contain evidence of that policy, but are not the only evidence of that policy. The referenced interrogatory does not mention policies; rather, it states: "Describe all actions taken by GEO that You allege constitute force, threats of force, physical restraint, or threats of physical restraint" under 18 U.S.C. § 1589(a)(1). | challenge, and therefore does not create a dispute of fact. Further, Plaintiffs' response inaccurately describes Plaintiffs' own interpretation of the interrogatories at issue as seeking information about what policies and practices Plaintiffs challenge:<br><br>"[T]his interrogatory is phrased in terms of Plaintiffs' allegations, which are not styled as individual claims, but rather as classwide claims and allegations that **derive from GEO's policies and practices** that were common to the TVPA Class." ECF 306-1 at 3 (emphasis added). |
| **8.** | More specifically, Plaintiffs challenge the meal clean-up policy in the AIPC Handbook whereby 6 detainees (2 of which are paid "Trustees" under the VWP) assist in cleaning up the housing unit after each meal. ECF 49; ECF 261-17, 20. | Deny. Plaintiffs challenge the HUSP, which provides:<br><br>Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit [or Dorm] Officer will be responsible for assuring this general cleanup is done on a regular basis. | Plaintiffs' denial is contrary to their prior representations to this Court.<br><br>Plaintiffs previously presented as undisputed:<br><br>"During a general cleanup, GEO requires detainees clean up the tables , wipe down the tables and sweep and mop the floors." ECF 260 at 18 (Fact #48).<br><br>After describing the general cleanup, Plaintiffs presented as undisputed: |

55424240;1

**APP. 642**

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | | ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 0005487196) at 18; ECF No. 273-2 (2007 Detainee Handbook, GEO_MEN 00054151-222) at 49; ECF No. 273-3 (2008 Detainee Handbook, GEO_MEN 00054224-52) at 19; ECF No. 273-4 (2010 Detainee Handbook, GEO_MEN 00054253-77) at 16-17; ECF No. 273-5 (2011 Detainee Handbook, GEO-MEN 00065783-808) at 17; ECF No. 261-17 (2013 Detainee Handbook, PL000029-55) at 20.3 The evidence GEO cites does not support calling the policy a "meal clean-up policy" and does not support that 2 of the 6 detainees assigned to housing unit sanitation duties were VWP workers.<br><br>Further evidence related to the HUSP is also set forth in Plaintiffs' Statement of Additional Facts ("SAF"), Nos. 1-13. | "The post-meal cleanup of tables, floors, and other communal areas that GEO requires is called the Housing Unit Sanitation Policy or HUSP." ECF 260 at 18 (Fact #51).<br><br>Plaintiff Menocal's testimony confirmed the same: "They had a schedule. You know, you would— after each meal, you know, people would clean up, but there was a rotation where (inaudible) – your cell we (inaudible) the areas three times a day, in the morning or after each meal, I should say. And—and, yeah. So one cell would do that one day. The next cell would do it the next day, and so on and so forth." ECF 339-7 at 7 (Menocal Dep. 95:16-25; 96:1-4).<br><br>The written policy to which Plaintiffs cite does not dispute this fact, but rather merely shows a difference between the policy in practice and the policy as written. This does not constitute a dispute of fact. |
| 9. | The meal clean up section of the handbook provides for the following sanction if not followed: | Admit that the Detainee Handbook includes the quoted language.<br><br>Deny that the quoted section of the handbook | GEO admits that the quoted section of the handbook does not specifically reference meal clean-up, but denies that the policy cited in the |

5

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean will result in further disciplinary action.<br><br>ECF 261-17, 20. | specifically references meal cleanup. | handbook does not refer to a meal cleanup.<br><br>Plaintiffs previously presented as undisputed:<br><br>"During a general cleanup, GEO requires detainees clean up the tables , wipe down the tables and sweep and mop the floors." ECF 260 at 18 (Fact #48).<br><br>After describing the general cleanup, Plaintiffs presented as undisputed:<br><br>"The post-meal cleanup of tables, floors, and other communal areas that GEO requires is called the Housing Unit Sanitation Policy or HUSP." ECF 260 at 18 (Fact #51). |
| 10. | GEO is required to comply with ICE's PBNDS under its contract. ECF 289 (Undisputed Facts 11-14, 16,18). | Undisputed. | |
| 11. | All applicable versions of ICE's National Detention Standards ("NDS") and PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale and incorporate it into the AIPC Handbook. ECF 289 (Undisputed Fact 19). | Undisputed. | |

55424240;1

**APP. 644**

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| **12.** | All applicable versions of ICE's NDS and PBNDS require GEO to provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 289 (Undisputed Fact 21). | Undisputed. | |
| **13.** | The ICE disciplinary severity scale included in the AIPC Handbook provides for up to 12 other sanctions as a possible consequence for refusing to clean one's living area. These sanctions include warning, reprimand, and loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.). ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17. | Undisputed. | |
| **14.** | GEO included this sanction in the AIPC Handbook, as required by ICE. ECF 289 (Undisputed Facts 11-14, 16, 18, 19, 21). | Undisputed. | |
| **15.** | The detainee orientation video provides:<br><br>You will be protected from personal abuse, corporal punishment, personal | Undisputed. | |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| injury, disease, and damage to your property and harassment to the fullest extent possible. Each and every detainee must participate in the sanitation program. A list of detainee's [sic] is developed each day and is posed for viewing. During a general clean-up all detainees must participate. *****  Disciplinary Process[.] Refer to your local supplement for more detailed information about the rules infractions that you must avoid and the established disciplinary actions that will be taken. ****  **<u>High Moderate</u>**- and a few examples are . . . Indecent exposure, staling, refusing to obey a staff member, insolence to staff member, lying or providing false statement to staff, being in an unauthorized area, not standing for count, interfering with count, gambling, destroying altering or damaging property"  *See* ECF 262-10 (emphasis in original). | | |

55424240;1

**APP. 646**

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| **16.** | In addition to the AIPC Handbook and orientation video, GEO is required to provide all detainees with the ICE National Handbook. Like the AIPC handbook', the ICE Handbook also warns detainees that they could face disciplinary consequences if they refuse to clean, stating "Will I get paid for keeping my living area clean? No. **You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined.**" **Ex. B**. (ICE National Handbook). Despite this being materially similar to the AIPC Handbook, Plaintiffs do not allege that ICE's National Handbook constituted a threat as defined by the TVPA. ECF 49; **Ex. A** (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories, Responses to Interrogatory No. 39) (omitting any reference to the ICE National Handbook). | Admit that the ICE National Handbook includes the quoted language.<br><br>Deny that cleaning general-use areas is the same as keeping general-use areas clean, or that the language in the ICE handbook is "materially similar" to the HUSP as set forth in the Detainee Handbook. Compare ECF No. 310-1 (ICE Detainee Handbook, GEO-MEN 00141667-702) at 18 ("Will I get paid for keeping my living area clean? No. You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined.") with ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 49; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 16-17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20.<br><br>("Each and every detainee must participate in the facility's sanitation | Plaintiffs admit that the language is contained within the cited document. Plaintiffs provide no evidence that the phrase "cleaning general-use areas" has a different meaning from "keeping general-use areas clean." |

9

**APP. 647**

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | | program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate."). | |
| 17. | Plaintiffs also challenge the VWP daily stipend. ECF 1, ECF 49,3. | Undisputed. | |
| 18. | All detainees are offered the opportunity to participate in the VWP. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17. | Undisputed. | |
| 19. | All detainees who participate in the VWP are told that their participation is voluntary. **Ex. C.** (Plaintiffs' VWP applications). | Admit, but note that the cited documents only do so by referring to the program as the "voluntary work program" and "the volunteer work program." | |
| 20. | All detainees who participate in the VWP are told in advance that "compensation shall be $1.00 per day." **Ex. C.** (Plaintiffs' VWP applications.). | Undisputed. | |

55424240;1

**APP. 648**

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| **21.** | All detainees must sign an agreement to participate in the VWP, acknowledging that their compensation will be limited to $1 per day. **Ex. C.** (Plaintiffs' VWP applications). | Admit, but dispute that the agreement is an enforceable contract. *See* § V.E.2, *infra*. | Plaintiffs dispute does not call into question the cited facts, but instead a legal conclusion. |
| **22.** | Some VWP participants receive additional incentives for their participation including candy or ice cream. **Ex. D** (Ceja 30(b)(6) Dep.162-163). | Undisputed. | |
| **23.** | Plaintiff Menocal described a typical day at AIPC as follows: I wake up, get dressed, do my bed, wait for breakfast, eat breakfast, clean up, maybe exercise, walk around, read a book, draw. It depends. Again, wait for lunch to eat, clean up, maybe shower, maybe do some sports, maybe talk on the phone with someone, maybe write a letter, walk around, exercise, wait for dinner. Same thing, eat dinner, relax a while, maybe watch TV, read a book, draw, and, you know, wait for bedtime. | Undisputed. | |

11

**APP. 649**

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| **24.** | While detained, Plaintiff Menocal described AIPC to a friend as follows: [T]hey've got pretty good grub, considering it's, you know, a detention center. And we got three televisions, a bunch of tables, a bunch of people, and we all get along. Pretty nice. I mean, it's -- for being incarcerated, it's not bad at all, not compared to -- not compared to Denver County or the other one where I was at. This is like Camp Snoopy. It's pretty easy. **Ex. E** (Menocal Dep. 54:5-12). | Admit, but deny that this statement accurately describes Plaintiff Menocal's experience at Aurora. Plaintiff Menocal testified that this statement was not true, and that he told family and friends that GEO was a nice place and that the food was good only so his friends and family would not worry about him. Ex. 1 (Menocal Tr.) 48:20-24; 67:12-68:5; 167:17-168:6. In response to this recording, Plaintiffs' expert Dr. Grassian stated: "A person can experience a sense of dread and fear and still try to present a good face to their friends and family and to themselves. You know, that doesn't change anything." Ex. 2 (Grassian Tr.) 272:3-24. | GEO denies that the testimony of Dr. Grassian can be used to change or alter Mr. Menocal's testimony. GEO does not dispute that Plaintiff Menocal tried to recharacterize his own recorded statements in his deposition. |
| **25.** | Plaintiff Hugo Hernandez described a typical day as follows: I would wake up for breakfast at 5:00 in the morning. I will walk out, store my food, bring it back to the cell, and go to sleep only if it was not my time to clean. But if I was assigned to clean, I have to stay outside and clean. I couldn't go back to sleep. So[,] I will store my food. I will wake up when I | Admit. The above omits the last two sentences of Plaintiff Hernandez Ceren's answer, which state: "And after count time, the last count time, you have to be inside your cell and the doors got to be locked in already. And then it's another day." | GEO does not dispute the additional information from Plaintiffs. |

55424240;1

**APP. 650**

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| wake up, and brush my teeth, do my coffee, and make sure that all my cellies get the coffee because that's my one main thing. Then we will all sit at the table. I will do my legal work, go through my documents, and see what else I need to put in or something, watch a little bit of TV. I can go to the phone a little bit. If -- if I will get someone to answer, I will go to the phone. Wait for count time, wait for lunch. After lunch, I will do a cleanup again, which is cleanup time, and wait to see who's assigned for the cleanup, and if I'm not assigned, then I just go to my cell or I go against the wall just like everybody else. And once everything gets reopened, go back into the table again and do some workout while waiting -- doing my workout. I wait for chow again and wait for the cleanup, and, of course, shower. Yeah, after the workout, shower, get back. Wait for chow, clean up, and then eventually wait for the GEO guard, Officer Blacknick, to come and pick me up so we can go to the law library and collect | | |

55424240;1

**APP. 651**

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | all detainees who wanted to go to the library. We'll go to the law library, get a pat-down, go inside the law library.· And in there, I will help detainees with their documents, printouts, making sure they understood what the immigration judge was asking them to bring back, translations, looking for any specific application they were looking for. And then once we were done, like an hour later or an hour and a half later, I get another pat-down, get taken back to the cell, and wait for count time. **Ex. F** (Hernandez Dep. 107-108. | | |
| **26.** | While at AIPC, every detainee had the ability to communicate with ICE at any time. **Ex. B** (ICE Detainee Handbook, pg. 2) ("ICE officers will routinely visit the housing units at your facility. If you have questions about your case **or how the facility has treated you**, let the ICE officers know. . . [y]ou may also submit a request for information in writing."); **Ex. E** (Menocal Dep. 56:1-10); **Ex. F** (Hernandez Dep. 97:15-22). | Deny. While Plaintiffs acknowledge that the ICE Detainee handbook suggests that detainees should have "routinely" had an opportunity to communicate with ICE officers, the cited evidence does not establish that "every detainee had the ability to communicate with ICE at any time." (emphasis added). The documents do suggest that detainees would have the opportunity to speak to ICE officials during their "routine[]" visits" to the housing units. | GEO disputes that detainee testimony can alter the written policies and practices at the AIPC.

GEO further disputes that Plaintiffs accurately characterize Plaintiff Menocal's testimony. **Ex. E** (Menocal Dep. 56:1-15).

Mr. Menocal testified:

"Q. Do you know if you could file a formal complaint with ICE while you were in the pod? |

14

**APP. 652**

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | | It is unclear what the handbook means by "submit a request for information in writing." The cited testimony from Plaintiffs Menocal and Hernandez Ceren suggests that detainees could file a complaint or "kite", though it is not clear whether the complaint would go to ICE or GEO. Plaintiff Menocal did not know if the kites he filed went to ICE or GEO personnel. Ex. 1 (Menocal Tr.) 56:16-20. In Plaintiff Hernandez Ceren's deposition, a "kite" was described as "a way that you could file a grievance or bring an issue to the attention of the facility." Ex. 3 (Hernandez Ceren Tr.) 97:1520. | …<br><br>A. Yeah, sure.<br><br>Q. How would you file a complaint with ICE?<br><br>A. By writing a kite, a complaint letter.<br><br>…<br><br>Q. But you can send it to ICE, right?<br><br>A. I believe so, yes, sir."<br><br>Likewise, Mr. Hernandez never testified that he did not know he could raise issues with ICE, as outlined in the handbook. |
| 27. | Some detainees elected to be placed in segregation voluntarily, seeing it not as a punishment, but instead a location where they could receive peace and quiet. **Ex. D** (Ceja 30(b)(6) Dep. 55:7-19). | Deny. The cited testimony describes "protective custody," which is not synonymous with "segregation," despite the fact that both practices use the same space. Detainees who feel threatened, afraid, or unsafe in general population are placed in protective custody. Ex. 4 (Gallegos Tr.) 74:7-76:23; see also ECF No. 262-11 (Special Management Unit ("SMU") | Plaintiffs do not cite to evidence that a detainee in "protective custody" is not a detainee living in the segregation unit voluntarily.<br><br>As Ms. Ceja explained, the Special management unit at AIPC is "one unit" with one side consisting of disciplinary segregation and the other administrative. ECF 339-2 at 9-10 (Ceja 55:2-6). Some detainees request to be placed in the segregation unit for peace |

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | | Operations policy, GEO_MEN00037770-84) at 3 ("Protective custody (PC) may be initiated at the detainee's request or ordered to protect the detainee from harm."). GEO's segregation logs show that the detainees who sought "peace and quiet" were sent to protective custody. Ex. 5 (Segregation Activity Sheet, GEO-MEN 00070692-93). | and quiet. *Id.* (Ceja 55:9-19). All detainees, whether they are in segregation for peace and quiet or disciplinary reason, are in the same housing unit. ECF 339-3 (Ceja Dep. 111:15-22).<br><br>The segregation logs which Plaintiffs refer to, also support GEO's position, showing that in keeping track of who is in segregation, GEO logs detainees who are in "protective custody" or "peace and quiet" as detainees in segregation. |
| 28. | None of the named Plaintiffs were placed in segregation for refusing to clean. **Ex. A** (Brambila's Responses to GEO's Sixth Interrogatories); **Ex. E** (Menocal Dep. 100:16-19); **Ex. F** (Hernandez Dep. 181:1-7); **Ex. G** (Valerga Dep. 141:24-142:2, 140:12-13); **Ex. H** (Lourdes Argueta Second Set of Discovery, Interrogatory No. 27; Yepez Gaytan Second Set of Discovery, Interrogatory No. 27; Alexaklina Second Set of Discovery, Interrogatory No. 27); **Ex. I** (Vizguerra Dep. 42:5-7); **Ex. J** | Undisputed. | |

16

**APP. 654**

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | (Xahuentitla Dep 70:11-17). | | |
| **29.** | Plaintiff Menocal did not receive direct threats for refusing to clean. **Ex. H** (Menocal's Second Set of Discovery, Interrogatory No. 27). | Deny. Plaintiff Menocal testified that GEO guards, as well as other detainees, told him that he had to clean or be sent to solitary confinement. Ex. 1 (Menocal Tr.) 96:5-97:3. Plaintiff Menocal also witnessed other detainees taken to solitary confinement for refusing to clean and understood that refusal to clean could lead him to the same fate. *Id.* 102:14-25. | Plaintiff not testify that a GEO officer directly threatened him with segregation for refusing to clean, instead stating only that he knew from other detainees that segregation was a possible consequence. ECF 336-2 at 19-20 (Menocal Dep 96:22-25, 96:1. As for the description of other detainees being taken to segregation, Mr. Menocal testified that his basis for believing the detainees were taken to segregation for not cleaning was not from his own first-hand knowledge, as he could not hear the incident transpire. Rather, he surmised the circumstances based upon hearsay statements from other individuals. ECF 336-2 (Menocal Dep. 104:1-25).

Further, Plaintiffs discovery responses are unambiguous, stating: "Plaintiff does not recall receiving direct threats from any GEO employee regarding administrative or disciplinary segregation for failing to clean." ECF 306-7 at 5 (Menocal's Second Set of Discovery, Interrogatory No. 27). |

17

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | | | |
| **30.** | Plaintiff Olga Alexaklina was never threatened by GEO employees with disciplinary or administrative segregation for failing to clean. **Ex. H** (Alexaklina Second Set of Discovery, Interrogatory No. 27). | Undisputed. | |
| **31.** | Upon being informed that he would be placed in segregation if he did not clean, Plaintiff Valerga responded with "go ahead." **Ex. G** (Valerga Dep. 136:16-137:19). Yet, Plaintiff Valerga was not placed in segregation on that occasion or any other occasion. *Id.* Valerga Dep. 141:24-142:2, 140:12-13. | Admit that Plaintiff Valerga testified to the incident above but deny that he was not sent to segregation on "any other occasion." Plaintiff Valerga spent three weeks in segregation at Aurora. Ex. 6 (Valerga Tr.) 8:22-9:13. | GEO does not dispute that Plaintiff Valerga was sent to segregation for an incident unrelated to cleaning. GEO clarifies that Plaintiff Valgera was never asked to clean at Aurora and does not know of anyone who was ever sent to segregation for not cleaning. ECF 306-6 at 12 (Valerga Dep. 141:13-142:2). |
| **32.** | Plaintiff Hernandez testified in his deposition that he did not, and does not, consider the AIPC Handbook to be threatening. **Ex. F** (Hernandez Dep. 58:12-24). | Admit that Plaintiff Hernandez Ceren testified he did not find portions of the handbook threatening, but deny that he did not find the HUSP, which was described in the handbook, threatening. Plaintiff Hernandez Ceren testified that he knew cleaning was mandatory because "the GEO guard would tell you that it's in the handbook, and if you refuse, you were going to be sent to the hole." Ex. 3 (Hernandez Ceren Tr.) 159:10-15. | Mr. Hernandez's testimony left no room for ambiguity as to whether he found the written policy in the handbook to be threatening: "Q. And so do you consider this policy [HUSP] to be threatening? A. No." ECF 306-5 at 13 (Hernandez Dep. 58:12-24). |

18

**APP. 656**

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| **33.** Plaintiff Dagoberto Vizguerra does not recall receiving the AIPC Handbook, let alone being threatened by it. **Ex. I** (Vizguerra Dep. 90:24-91:4). | Admit that Plaintiff Vizguerra does not recall receiving the handbook, but deny that he did not find the HUSP, which was described in the handbook, threatening. Plaintiff Vizguerra testified that he was aware of the cleaning requirement and its consequences because he say a detainee get sent to segregation on his second or third day at Aurora for refusing to clean. Ex. 7 (Vizguerra Tr.) 48:9-49:9. In addition, the record reflects that all detainees receive and acknowledge the handbook upon entry to the facility, regardless of Plaintiff Vizguerra's specific recollection. Ex. 8 (Ceja 30(b)(6) Tr. I) 88:7-23. | Plaintiff Vizguerra testified that an unidentified person was placed in administrative segregation for not cleaning, but never testified that he was aware of or was threatened by the AIPC Handbook. ECF 336-8 at 4-5 (Vizguerra Tr.) 48:9-49:9.<br><br>Indeed, his testimony makes clear he does not recall the detainee handbook:<br><br>"Q. Do you remember getting this [AIPC Handbook]?<br><br>A. I don't remember."<br><br>ECF 306-8 at 7 (Vizguerra Dep. 91:3-4). |
| **34.** Plaintiffs are not making a claim for "mental anguish, emotional distress, or other similar related conditions." **Ex. H** (Plaintiffs Responses to Interrogatory No. 32). | Undisputed. | |
| **35.** Plaintiffs' expert, Dr. Stuart Grassian, did not diagnose any of the plaintiffs with psychological conditions. **Ex. K** (Grassian Dep. 37:22-23; 237:20-238:24). | Admit. Issuing such diagnoses is beyond the scope of Dr. Grassian's report. | |

55424240;1

**APP. 657**

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| **36.** | Detainees had varying motivations for cleaning:<br><br>a.   Plaintiff Menocal preferred to clean up after himself while living at AIPC because he preferred to "live and hang out in a clean environment." **Ex. E** (Menocal Dep. 81:6-10<br><br>b. Indeed, while living at AIPC Plaintiff Menocal asked for permission to clean the recreation area without an expectation of remuneration simply because he spent a lot of time there and wanted to "hang out in a clean environment." **Ex. E** (Menocal Dep. 86:22-87:5).<br><br>c.   Plaintiff Hernandez liked to keep his area clean. **Ex. F** (Hernandez Dep. 49:24-50:1).<br><br>d. To avoid the loss of TV time, detainees would often volunteer to help clean up the living area, even if not asked or assigned by GEO officers. **Ex. F** (Hernandez Dep. 78:2-9).<br><br>e.   Plaintiff Gaytan received access to X-Box gaming systems, movies, | a.   Deny. GEO takes this testimony out of context: Plaintiff Menocal testified that generally he prefers a clean environment; the testimony was not specific to Aurora. Plaintiffs further deny that this testimony expresses his motivation for cleaning up after others in the Aurora Facility. Mr. Menocal testified that he cleaned because "we had to clean and if not . . . we would be punished. . . . The hole is not a pretty place." Ex. 1 (Menocal Tr.) 104:25-105:3.<br><br>b.   Deny. Plaintiff Menocal testified that he cleaned the rec yard as a precursor to obtaining a job in the VWP, and that he eventually was offered a job in the VWP because of this cleaning. Ex. 1 (Menocal Tr.) 86:3-87:14).<br><br>c.   Admit, however, the cited testimony relates to Plaintiff Hernandez Ceren's time in a different facility.<br><br>d.   Admit, except as to GEO's characterization of this as "volunteer" work. The threat of losing privileges, such as use of televisions and phones, preceded threats of solitary | a.   Plaintiff Menocal's testimony was specific to AIPC: "I just asked if I could clean the recreation area [at AIPC] … so I could hang out in a clean environment." ECF 306-4 at 12 (Menocal Dep. 86:22-87:5).<br><br>b. Plaintiff Menocal did not testify that he cleaned the rec yard as a precursor to obtaining a job, rather he asked to clean the yard "because I spend a lot of time there [in the recreation area.]" ECF 306-4 at 12 (Menocal Dep. 86:22-87:5).<br><br>c. [No reply]<br><br>d. GEO denies that there is any evidence the individuals who volunteered to help did so because of threats of any kind.<br><br>e. GEO denies the quoted text, changes the plain explanation from Mr. Gaytan about why he cleaned.<br><br>f. [No reply necessary]<br><br>g. Ms. Ceja testified that the <u>only</u> people who do <u>not</u> get the ice cream are the detainees "that don't like have good sanitation in their cells . . ." ECF 336-9 at 28 |

**APP. 658**

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| and ice cream as an incentive to keep his dorm clean. **Ex. L** (Gaytan Dep. 124:3-16.<br><br>f.  During the meal clean-up, two trustees in each of the housing units would be paid under the VWP to assist with meal cleanup. **Ex. M** (Quezada Dep. 64:9-19).<br><br>g.  Once a week, the cleanest housing unit is rewarded with ice cream or cookies. **Ex. D** Dawn Ceja 30(b)(6) Dep. 163:12-16 (3/29/16). | confinement, and the threats were often made together. Ex. 3 (Hernandez Ceren Tr.) 74:22-77:13)<br><br>e. Admit. These incentives were not his motivation for cleaning in the HUSP; Plaintiff Gaytan testified that he never complained about cleaning because he was afraid that if he did so "they will use that against me." Ex. 9 (Gaytan Tr.) 37:5-9. He also understood from GEO's guards that if he did not follow the rules he would be sent to solitary confinement. *Id.* 143:25-144:1.<br><br>f. Admit that these trustees worked alongside the six additional unpaid detainees that participated in the clean-up. Ex. 10 (Pagan Tr.) 106:17-21; Ex. 11 (Vasquez Tr.) 75:12-17.<br><br>g. Deny. Ceja testified that VWP workers who have done the best work each week are rewarded with ice cream and cookies, not the entire housing unit for its performance in the HUSP. Ex. 8 (Ceja 30(b)(6) Tr. I) 163:12-25. | (Ceja Dep. 164:1-3). As the transcript makes clear, she provided this testimony to clarify that the treats are provided to everyone, not just detainee workers. |
| **37.** | Plaintiffs' expert, Dr. Grassian, is unaware of *any literature* that stands | Admit.   Dr.   Grassian testified   that   the   actual imposition   of   72   hours   in | Plaintiffs additional cited testimony does not dispute the admitted fact. Nor does it |

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | for the proposition that a threat of 72-hours in segregation could cause psychological harm. **Ex. K** (Grassian Dep. 243:14-21). | segregation could cause psychological harm. Studies show a change in EEG readings after 72-hours in solitary confinement, and that many people experience severe psychological symptoms shortly after placement in solitary confinement. Ex. 2 (Grassian Tr.) 175:25-180:3, 209:13-211:10. | address the consequences of segregation up to the 72 hour mark. |
| **38.** | ICE's Disciplinary Severity Scale (incorporated into the AIPC Handbook) allows for a graduated scale of offenses. ECF 289 (Undisputed Fact 19). | Admit. The Disciplinary Severity Scale in some versions of the AIPC handbook differs from the scale as printed in the PBNDS. *See* ECF No. 298 at 16 (Response to Fact 24). | Plaintiffs have previously conceded that any minor differences are not material:<br><br>"Plaintiffs do not contest that ICE required the disciplinary severity scale, whether and when the disciplinary severity scale was incorporated into the Detainee Handbook is immaterial . . . . GEO has not alleged and cannot allege that the material terms from the Handbooks . . . varied throughout the relevant time period." ECF 286 at 102 n.14. |

55424240;1

**APP. 660**

| | | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|---|
| 39. | | The PBNDS instruct detention officers to resolve disciplinary infractions in an informal manner where possible. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17. | Deny. None of the citations offered include an instruction to resort to "informal" discipline. Instead, GEO cites to the PBNDS' discussion of the High Moderate Offense Category, which states the types of offenses and sanctions available for such offenses, including "disciplinary segregation (up to 72 hours)" for "refusal to clean assigned living area." ECF No. 261-10 (INS Detention Standard, GEO-MEN00063671-4017 (excerpted)) at 24; ECF No. 261-9 (2008 PBNDS, GEO-MEN 00062905-298. (excerpted)) at 56; ECF No. 261-8 (2011 PBNDS, GEO-MEN 00064018-414 (excerpted)) at 47. | The cited sections of the PBNDS all provide for informal resolution of disciplinary incidents, including through a "warning." Nevertheless, to the extent Plaintiffs argue that Section 3.1 of the PBNDS, does not include an instruction to use "informal" resolution, where possible, they are mistaken.

The 2011 PBNDS provide: "Where permitted by facility policy, staff shall informally settle minor transgressions through mutual consent, whenever possible." ECF 261-8 at 36.

The 2008 PBNDS provide: "Where permitted by facility policy, staff will informally settle minor transgressions by mutual consent, whenever possible." ECF 261-9 at 42.

The 2000 NDS provide: "*In SPCs/CDFs, minor transgressions will be settled informally, by mutual consent, whenever possible. If, however, the officer involved thinks an informal resolution inappropriate or unachievable, he/she shall prepare an Incident Report and Notice of Charges, forwarding it to the*" |

23

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | | | *appropriate supervisor before the end of the assigned shift.*" ECF 261-10 at 11 (emphasis in original). |
| **40.** | GEO's detention officers did not routinely or uniformly enforce segregation for the failure to clean. **Ex. N** | Deny. GEO guards sent detainees to solitary confinement for refusing to clean on multiple occasions. ECF No. 262-12 (incident reports (compilation)); Ex. 12 (Hernandez Torres Tr.) 81:20-82:3; Ex. 4 (Gallegos Tr.) 170:13-191:23 (verifying that he wrote detainees up several times for "failure to obey my orders for cleaning details," resulting in their placement in segregation). GEO guards also threatened to send detainees to solitary confinement on a regular basis if they did not clean. Ex. 13 (Xahuentitla Tr.) 73:19-74:9, 83:7-19; Ex. 3 (Hernandez Ceren Tr.) 74:23-75:11, 78:10-79:5; Ex. 12 (Hernandez Torres Tr.) 60:8-14; *infra* at SAF No. 13. The guards' | None of Plaintiffs' cited testimony indicates that GEO Officers routinely or uniformly enforced segregation. To the contrary, the cited testimony provides individualized evidence of isolated events. GEO's witnesses have testified in detail that these incidents are not representative of the general policy.

Indeed, not a single Plaintiff in this action was sent to segregation for refusing to clean. (GEO's Undisputed Fact #28).

Further, GEO's corporate and 30(b)(6) witnesses testified consistently with the cited declarations. GEO's 30(b)(6) witness testified that it is generally GEO's policy to resolve disciplinary issues |

55424240;1

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| | testimony that cleaning was not mandatory is contradicted by that of GEO's 30(b)(6) designee, Assistant Warden Dawn Ceja, that officers were expected to enforce the rules in the handbook, and that detainees were expected to obey officers' commands. Ex. 14 (Ceja 30(b)(6) Tr. II) 105:12-24, 138:6139:12 (testifying that facility rules and the disciplinary severity scale were posted in every dorm, and that the "expectation is that those rules are going to be enforced"). Moreover, the guards' testimony that they enforced every single rule in the handbook except the one that is at issue in this litigation is implausible and should be tested before a jury. *See, e.g.*, Ex. 15 (Quezada Tr.) 84:24-92:4. | informally, not with warnings or placement in segregation. ECF 306-13 at 9 (Ceja 30(b)(6) Dep. 113:13-17). Amber Martin, GEO's Executive Vice President of Contract Administration, also testified that it has always been an informal policy that GEO did not use segregation as a consequence for refusing to clean up their living area. ECF 271-6 at 8 (Amber Martin Dep. 134: 11-24).<br><br>To the extent Plaintiffs cite testimony from Plaintiffs that unnamed and unidentified officers told them that the refusal to clean could lead to segregation, these statements are inadmissible hearsay when offered to prove that GEO Officers routinely threatened detainees, as they are offered for the truth of the matter asserted. FRE 802. The analysis may be different if the statements were only offered to show the effect on the listener, which is not the case here.<br><br>To the extent that Plaintiffs cite to the incomplete incident reports at 262-12, they are not complete |

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | | | disciplinary reports and do not establish whether those detainees were ever actually sanctioned with segregation. Indeed, Ms. Ceja has noted that she reviewed the files of those detainees and only one was ultimately sanctioned with segregation. ECF 313-16 at ¶ 8. Further, the incident reports are inadmissible under the Parties' stipulation as none of the individuals therein have been made available for their deposition. ECF 228 (precluding witnesses from trial who are not presented for a deposition). |
| 41. | It would be a very rare occurrence for a detention officer tell a detainee that they would be sent to segregation if they did not clean. **Ex. N.** | Deny. Detainees testified that guards threatened to send them to solitary confinement on a regular basis if they did not clean. *See, e.g.,* Ex. 13 (Xahuentitla Tr.) 73:19-74:9, 83:7-19; Ex. 3 (Hernandez Ceren Tr.) 74:23-75:11, 78:10-79:5; Ex. 12 (Hernandez Torres Tr.) 60:8-14; *infra* at SAF No. 13. The statements to the contrary in the declarations GEO has submitted contradict the guards' own testimony at their depositions, where they testified that they | None of Plaintiffs' cited testimony indicates that GEO Officers routinely or uniformly enforced segregation. Ms. Quezada testified that when detainees did not want to work, she would simply tell them "[d]on't worry about it, I can do it. ECF 313-11 at 7-8 (Quezada Dep. 78:20-79:1). In her 19 years working at AIPC she never told a detainee they would go to segregation if they did not clean. *Id.* at 11-12(Quezada Dep. 149:1-3;150:7-15). In Ms. Vasquez's 19 year tenure, she only ever had one |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| | would explain to detainees that facility rules required them to clean and that detainees could be sent to solitary confinement for refusing. Ex. 10 (Pagan Tr.) 174:2-175:6; *see also* Ex. 4 (Gallegos Tr.) 137:10-19 (testifying that he had never written anyone up for refusing to clean); 170:7-174:3; 179:15-187:14; 188:8-189:25; 192:5-8; 197:6-200:25; 203:4-206:25 (acknowledging that he had issued numerous write-ups for "failure to obey my orders for cleaning details"). The threats of solitary confinement were so pervasive and the knowledge that solitary confinement was the punishment for refusing to clean was so widespread that detainees communicated that information to one another. *See, e.g.*, Ex. 1 (Menocal Tr.) 95:16-97:3; Ex. 6 (Valerga Tr.) 168:13-169:13 (testifying that his cellmate told him that the punishment for refusing to clean was solitary confinement). | detainee who did not want to clean, on that occasion she did not threaten to send the detainee to segregation. ECF 313-12 at 12(Vasquez Dep. 102-103). Officer Pagan testified that he "hardly ever" had to write up a detainee. ECF 339-10 at 30-31 (Pagan Dep. 75:10-20). Officer Gallegos testified that the occasions where he wrote up detainees were rare and did not relate to meal cleanup. ECF 339-11 at 37, 43 (Gallegos Dep 165:15-21;174:1-21).

To the extent Plaintiffs cite testimony from Plaintiffs that unnamed and unidentified officers or detainees told them that the refusal to clean could lead to segregation, these statements are inadmissible hearsay when offered to prove that GEO Officers told detainees of the consequences of segregation on multiple occasions, as they are offered for the truth of the matter asserted. FRE 802. |
| 42. | When a detainee was placed in segregation for the refusal to clean, it was typically because the refusal to clean was in | Deny. Some detainees were sent to solitary confinement only for refusing to clean. ECF No. 262-12 (incident reports) at 2-3, 14. Even | Officer Gallegos testified that the incidents about which he was asked involved more than simply a refusal to clean. In the highlighted |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| concert with another disciplinary infraction. *Id.* **Ex. N.** | where GEO sent detainees to solitary confinement for refusing to clean and other charges, the sole underlying conduct was refusal to clean. For example, the record shows that GEO sent detainees to solitary confinement for refusing to clean and for refusing to obey an officer's order or "insolence" to staff members. But in each of these incidents the order the detainees refused to obey was the order to clean and the insolence was the conduct used to express the refusal. *Id.* at 4-10, 12. In other incidents detainees were sent to solitary confinement for refusing to clean without being charged with that specific infraction, but the underlying conduct described in the incident report indicates the order not followed or insolence expressed was related to the refusal to clean. *Id.* at 11, 13; *see also* Ex. 4 (Gallegos Tr.) 170:7-174:3, 179:15-187:14, 188:8-189:25, 192:5-8, 197:6-200:25, 203:4-206:25 (discussing incident in which he wrote up detainees for failing to "obey my orders for cleaning details"). | instance, a detainee was not simply refusing to clean, but instead, "swinging a broom" and "yelling to all the detainees in there." ECF 313-10 at 29 (Gallegos Dep 192:9-25).<br><br>To the extent that Plaintiffs cite to the incomplete incident reports at 262-12, they are not complete disciplinary reports and do not establish whether those detainees were ever actually sanctioned with segregation. Indeed, Ms. Ceja has noted that she reviewed the files of those detainees and only one was ultimately sanctioned with segregation. ECF 313-16 at ¶ 8. Further, the incident reports are inadmissible under the Parties' stipulation as none of the individuals therein have been made available for their deposition. ECF 228 (precluding witnesses from trial who are not presented for a deposition). |

55424240;1

| | **GEO's Statement of Undisputed Facts** | **Plaintiffs' Response and Supporting Evidence** | **GEO's Reply to Plaintiffs' Response** |
|---|---|---|---|
| **43.** | Consistent with the PBNDS, detention officers worked to resolve issues informally wherever possible. **Ex. N.** Where formal sanctions were necessary, officers imposed lesser sanctions as permitted by the disciplinary severity scale wherever possible. *Id.*; **Ex. O** (Ceja 30(b)(6) Dep. 113:13-17). | Admit. Detention officers testified that they dealt with rule violations by explaining the infraction and potential consequences to detainees, and if the infraction persisted guards would issue a "write-up" which could lead to disciplinary segregation. Ex. 4 (Gallegos Tr.) 121:21-122:20. One of the potential consequences guards explained was that detainees could be sent to solitary confinement for failing to comply. Ex. 10 (Pagan Tr.) 174:2-175:6. This is reflected in the HUSP, which states that initial sanctions for refusal to clean include turning off the television and being prohibited from participating in activities, and that "[c]ontinued refusal to clean the area will result in further disciplinary action." ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 50; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20. | Because Plaintiffs admit the fact, GEO need not address the additional citations which Plaintiffs provide. |

55424240;1

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| 44. | Where formal sanctions were necessary, officers imposed lesser sanctions as permitted by the disciplinary severity scale wherever possible. *Id.*; **Ex. O** (Ceja 30(b)(6) Dep. 113:13-17). | Admit. As relevant to the HUSP, the threat of losing privileges, such as use of televisions and phones, preceded threats of solitary confinement, and the threats were often made together. ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 50; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20; Ex. 3 (Hernandez Ceren Tr.) 74:22-77:13; *see also* Plaintiffs' response to GEO's Undisputed Fact No. 43. | While Plaintiffs admit the fact, they improperly add additional extraneous facts. GEO denies that the additional facts are accurate. Indeed, there is no evidence in the handbook that phones would <u>ever</u> be turned off. Further, there is no evidence that detainees are sanctioned with "threats of solitary confinement." Further, the AIPC Handbook makes plain that the sanctions constitute a range of possible options, not an escalating disciplinary policy. ECF 261-17 at 25 ("[Sanctions] range from the withholding of privilege(s) to segregation."). Further, Officers cannot impose disciplinary segregation, only the IDP can. *Id.* at 24.<br><br>To the extent Plaintiffs cite testimony from Plaintiff Hernandez, these statements are inadmissible hearsay when offered to prove that GEO Officers told detainees of the consequences for not cleaning as they are offered for the truth of the matter asserted. FRE 802. |
| 45. | The detention officers were not trained to tell detainees they could be sent to segregation or to utilize segregation as a response to the failure to | Deny. The cited declarations are inconsistent with the guards' deposition testimony. Guards were trained that the AIPC | The officers declarations are not inconsistent with their deposition testimony and Plaintiffs do not specifically identify inconsistencies. Indeed, a review of the |

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | clean absent additional disciplinary concerns. **Ex. N.** | Handbook was a source of rules and discipline that apply when detainees refuse to act or commit a violation in the disciplinary scale. Ex. 11 (Vasquez Tr.) 73:14-20, 82:5-23; Ex. 10 (Pagan Tr.) 95:15-21; Ex. 4 (Gallegos Tr.) 118-7-23, 121:1-122:25; Ex. 15 (Quezada Tr.) 19:15-20:13, 82:3-98:12. Guards understood that the handbook established a rule requiring detainees to clean common areas. Ex. 10 (Pagan Tr.) 104:21-105:16; Ex. 11 (Vasquez Tr.) 74:1-25, 105:10-106:7; Ex. 4 (Gallegos Tr.) 163:14-17; Ex. 15 (Quezada Tr.) 81:8-82:2, 101:20-102:23. Guards were also trained to enforce facility rules by using the disciplinary measures set forth in the handbook. Ex. 4 (Gallegos Tr.) 121:21-122:16; Ex. 10 (Pagan Tr.) 174:2-175:6. | testimony cited by Plaintiffs does not support a conclusion that detention officers were trained to tell detainees that the refusal to clean alone could lead to a sanction of segregation.

It appears that Plaintiffs' denial is based upon a reading of the AIPC handbook that requires segregation to be the singular sanction for the failure to clean. This interpretation is inaccurate. The AIPC Handbook provides for multiple possible sanctions for the refusal to clean. ECF 261-17 at 27. It further instructs GEO staff to "informally resolve cases involving 'high moderate' or 'low moderate' charges [including the refusal to clean.]" ECF 261-17 at 25. |
| 46. | Importantly, none of the detention officers intended to scare or intimidate any individual into performing labor. *Id.* **Ex. N.** | Admit, but deny this fact is material. It is GEO's knowledge, not its employees' intent, that is material to TVPA claims. *See* § V.B.3, *infra.* | |
| 47. | When a detainee would refuse to clean, the detention officers would typically ask another detainee to assist with cleaning instead. *Id.* | Deny. The cited declarations are inconsistent with the declarants' deposition testimony. At deposition, the declarant guards | The officers declarations are not inconsistent with their deposition testimony and Plaintiffs do not specifically identify inconsistencies. Ms. Quezada testified that when |

31

**APP. 669**

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| | testified that the Detainee Handbook was a source of rules to be enforced, including with respect to cleaning. Ex. 10 (Pagan Tr.) 99:17-100:10, 104:21-105:16; Ex. 11 (Vasquez Tr.) 74:20-75:24, 105:11-106:7; Ex. 4 (Gallegos Tr.) 141:8-16; 161:16164:7. Joyce Quezada testified that she enforced the HUSP "as written." Ex. 15 (Quezada Tr.) 102:1-23. Luis Pagan admitted that he enforced the HUSP by telling detainees that they could be sent to solitary confinement if they did not comply. Ex. 10 (Pagan Tr.) 174:2-175:6. In fact, detainees were actually sent to solitary confinement for refusing to clean. ECF No. 262-12 (incident reports); Ex. 12 (Hernandez Torres Tr.) 81:20-82:3; *infra*, SAF No. 13. When one detainee, Grisel Xahuentitla, offered to clean in place of a sick detainee who could not clean, she was told to go back to her cell and that the sick detainee had to do the work or "be sent to the hole." Ex. 13 (Xahunetitla Tr.) 73:19-74:9. Moreover, the cited declarations are contradicted by GEO's 30(b)(6) witness Dawn Ceja, who testified that | detainees did not want to work, she would simply tell them "[d]on't worry about it, I can do it. CF 313-11 at 7-8 (Quezada Dep. 78:20-79:1). In her 19 years working at the AIPC she never told a detainee they would go to segregation if they did not clean. *Id.* at 11-1 (Quezada Dep. 149:1-3;150:7-15). In Ms. Vasquez's 19 year tenure, she only ever had one detainee who did not want to clean, on that occasion she did not threaten to send the detainee to segregation. ECF 313-12 at 12 (Vasquez Dep. 102-103). Officer Pagan testified that he "hardly ever" had to write up a detainee. CF 339-11 at 37,43 (Pagan Dep. 75:10-20). <br><br> It appears that Plaintiffs' denial is based upon a reading of the AIPC Handbook that requires segregation to be the singular sanction for the failure to clean. This interpretation is inaccurate. The AIPC Handbook provides for multiple possible sanctions for the refusal to clean. ECF 261-17 at 27. It further instructs GEO staff to "informally resolve cases involving 'high moderate' or 'low moderate' charges |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| | there was no alternative discipline policy for violations related to cleaning during the class period. Ex. 14 (Ceja 30(b)(6) Tr. II) 170:13-174:20. | [including the refusal to clean.]" ECF 261-17 at 25.<br><br>To the extent Plaintiffs cite testimony from detainees that unnamed and unidentified officers told them that the refusal to clean could lead to segregation, these statements are inadmissible hearsay when offered to prove that GEO Officers threatened detainees, as they are offered for the truth of the matter asserted. FRE 802.<br><br>To the extent that Plaintiffs cite to the incomplete incident reports at 262-12, they are not complete disciplinary reports and do not establish whether those detainees were ever actually sanctioned with segregation. Indeed, Ms. Ceja has noted that she reviewed the files of those detainees and only one was ultimately sanctioned with segregation. ECF 313-16 at ¶ 8. Further, the incident reports are inadmissible under the Parties' stipulation as none of the individuals therein have been made available for their deposition. ECF 228 (precluding witnesses from trial who are not presented for a deposition). |

55424240;1

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| **48.** | If no detainees performed any work in the Aurora facility, GEO would make more money, not less. **Ex. P** (Ragsdale 30(b)(6) Dep. 168:4-10). | Deny. GEO estimates that "replacing all GEO ICE detainees with full-time employees" would cause it to incur a substantial cost across its immigration detention business nationwide. Ex. 16 (GEO-MEN 00187770) (May 30, 2018 Letter). Further, without detainee labor, the cost to the government for GEO's services would increase. If a contractor's bid to the government is too high – even if there is no competition for the project – the government may not award the contract. Ex. 17 (Venturella Tr.) 166:1-4. The government will only award the contract to a contractor whose bid price is "reasonable" and not "too high." *Id.* 165:5-23. | Plaintiffs do not offer any evidence that GEO would make more money, not less, if detainees did not perform work in the VWP.

Plaintiffs misstate the evidence in the May 30, 2018 letter to ICE. The letter does not estimate a substantial cost to GEO, but rather, a cost to *ICE*. Indeed, rather than prove Plaintiffs' denial, it provides further support for GEO's position that it would make more money, not less, because the additional costs would be borne by ICE. ECF 337-1.

Furthermore, the letter undercuts Plaintiffs argument that the government would not award the contract at the higher price, as the letter makes clear that the lawsuits would result in changes to all 33,000 of ICE's beds nationwide. ECF 337-1. |
| **49.** | At AIPC the $1.00 daily allowance is a pass through from the government at the actual rate. **Ex. P** (Ragsdale 30(b)(6) Dep. 166:20-167:6). | Undisputed. | |

34

**APP. 672**

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| 50. | "[T]here's no incentive financially for GEO to use any voluntary work person to do anything, particularly when you have to, again, incentivize them . . . beyond a dollar a day. It's sort of cost neutral at a dollar a day but it gets − it becomes a cost to us if it goes beyond that." **Ex. P** (Ragsdale 30(b)(6) Dep. 168:12-17). | Admit. *See* also Ex. 18 (A. Martin Tr.) 107:18-22 (if GEO had to pay more than $1/day to VWP workers, it would do so "on its own dime" because the government would not reimburse the added cost). | |
| 51. | If ICE did not mandate the VWP as a requirement of its contracts, GEO would "build the staff [in]to [its] cost estimate and then [] mark that cost up." **Ex. Q** (Evans Dep. 75:3-10). | Admit that Evans made this hypothetical claim, but note that GEO has previously admitted that ICE mandates that GEO operate a VWP. ECF No. 286 (Pls.' DSI SJ Reply Br.) ¶ 35. | Plaintiffs do not dispute the fact as stated. |
| 52. | GEO's markup would be a fee of up to 15% of the labor cost. **Ex. Q** (Evans Dep. 29:2-21; 62:16-63:14). | Undisputed. | |

35

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| All detainees at Aurora receive the Aurora ICE Processing Center Detainee Handbook Local Supplement ("Detainee Handbook") upon arrival at the Facility. Ex. 8 (Ceja 30(b)(6) Tr. I) 29:19-24; see also ECF No. 286 (Pls.' DSI SJ Reply Br.) ¶¶ 60-61. | Admit.<br><br>GEO notes that the parties have already admitted this fact is undisputed. See ECF 298 at 15 (Undisputed Fact #23). |
| **2.** The Detainee Handbook states that detainees "will be held accountable for [their] actions while in custody at [Aurora]" and that "[t]herefore, it is each detainee's responsibility to become familiar with the contents of this handbook." ECF No. 273-1 (2005 Detainee Handbook) at 3; ECF No. 273-2 (2007 Detainee Handbook) at 6; ECF No. 273-3 (2008 Detainee Handbook) at 3; ECF No. 273-4 (2010 Detainee Handbook) at 3; ECF No. 273-5 (2011 Detainee Handbook) at 3; ECF No. 261-17 (2013 Detainee Handbook) at 5. | Admit. |
| **3.** GEO's detention officers are expected to enforce the rules set forth in the Detainee Handbook. Ex. 14 (Ceja 30(b)(6) Tr. II) 139:2-12. | GEO admits that Officers are expected to enforce the rules set forth in the AIPC Handbook and PBNDS, but denies that this statement indicates that minor infractions cannot be resolved informally, as stated in the handbook and PBNDS.<br><br>The 2011 PBNDS provide:<br>"Where permitted by facility policy, staff shall informally settle minor transgressions through mutual consent, whenever possible." ECF 261-8 at 36.<br><br>The 2008 PBNDS provide:<br>"Where permitted by facility policy, staff will informally settle minor transgressions by mutual consent, whenever possible." ECF 261-9 at 42. |

36

| | Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|---|
| | | The 2000 NDS provide:<br>"*In SPCs/CDFs, minor transgressions will be settled informally, by mutual consent, whenever possible. If, however, the officer involved thinks an informal resolution inappropriate or unachievable, he/she shall prepare an Incident Report and Notice of Charges, forwarding it to the appropriate supervisor before the end of the assigned shift.*" ECF 261-10 at 11 (emphasis in original). |
| **4.** | The Detainee Handbook contains a "Housing Unit Sanitation" policy, which states: Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit [or Dorm] Officer will be responsible for assuring this general cleanup is done on a regular basis.<br>See supra, Plaintiffs' Response to GEO's Undisputed Fact No. 8. | Admit that the handbook contains the quoted language but note that Plaintiffs previously presented as undisputed the following:<br><br>"During a general cleanup, GEO requires detainees clean up the tables , wipe down the tables and sweep and mop the floors." ECF 260 at 18 (Fact #48).<br><br>"The post-meal cleanup of tables, floors, and other communal areas that GEO requires is called the Housing Unit Sanitation Policy or HUSP." ECF 260 at 18 (Fact #51). |
| **5.** | Immediately under the "Housing Unit Sanitation" heading, in a section titled "Day Space," the handbook provides: All detainees in a housing unit [or dorm] are required to keep clean and sanitary all commonly accessible areas of the housing unit [or dorm], including walls. floors, windows, window ledges, showers, sinks, toilets, tables, and chairs. Detainees will take turns cleaning the area [or day space]. If a detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit officer of the problem. Action will be taken to resolve this problem. | GEO admits the quoted language appears in the AIPC Handbook (absent the bracketed alterations). GEO further states that Plaintiffs previously presented as undisputed:<br><br>"During a general cleanup, GEO requires detainees clean up the tables , wipe down the tables and sweep and mop the floors." ECF 260 at 18 (Fact #48).<br><br>"The post-meal cleanup of tables, floors, and other communal areas that GEO requires is called the Housing Unit Sanitation Policy or HUSP." ECF 260 at 18 (Fact #51). |

55424240;1

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| | ECF No. 273-1 (2005 Detainee Handbook) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 49; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 16-17; ECF No. 273-5. (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20 (emphasis added). | |
| 6. | The handbook then repeats that "[t]he day room area will be kept clean at all times," and sets forth a brief summary of the punishments that may be imposed on disobedient detainees under the facility's progressive discipline system: Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit [or dorm] do not clean the area after being instructed to do so, the televisions will be turned off and the detainees will not be permitted to participate in any activities/programs until the housing unit [or dorm] is cleaned. Continued refusal to clean the area will result in further disciplinary action. *Id.* | Admit that the handbook states:

"The day room area will be kept clean at all times. Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean the area will result in further disciplinary action."

GEO denies that the handbook contains a progressive disciplinary system. Rather, the AIPC handbook makes plain that the sanctions constitute a range of possible options, not an escalating disciplinary policy. ECF 261-17 at 25 ("[Sanctions] range from the withholding of privilege(s) to segregation."). Further, Officers cannot impose disciplinary segregation, only the IDP can. *Id.* at 24 |
| 7. | The Detainee Handbook also sets forth the disciplinary scale at the Aurora Facility, which defines "refusal to clean" as a 300-level, or high-moderate, offense. ECF No. 273-1 (2005 Detainee Handbook) at 25-26; ECF No. 273-2 (2007 Detainee Handbook) at 68-69; ECF No. 273-3 (2008 Detainee | GEO admits that the AIPC Handbook contains possible sanctions for the offense titled "refusal to clean assigned living area." |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| | Handbook) at 29; ECF No. 273-4 (2010 Detainee Handbook) at 23-24; ECF No. 273-5 (2011 Detainee Handbook) at 24-25; ECF No. 261-17 (2013 Detainee Handbook) at 27. | |
| **8.** Punishments for 300-level offenses include placement in solitary confinement. *Id.* | GEO admits that a 300 level offense may be sanctioned with up to 72-hours in segregation. |
| **9.** Pursuant to the HUSP, GEO guards in each housing unit developed a list of unpaid detainees each day, who were required to clean the housing unit common areas after each meal. Ex. 8 (Ceja 30(b)(6) Tr. I) 36:13-37:20, 83:9-84:24. | To the extent Plaintiffs deem the "HUSP" to refer to the "post-meal cleanup" as previously stated, ECF 260 at 18 (Fact #51), GEO admits that a list of detainees is created each day to help clean up after each meal. GEO denies that all detainees selected are unpaid, as Plaintiffs have themselves admitted that each day two of the detainees selected were paid trustees. Undisputed Fact #36(f). |
| **10.** This work involved scrubbing tables and chairs, sweeping mopping floors, and cleaning common use equipment such as microwaves, phones, showers, and toilets. Id. 36:24-37:9; Ex. 19 (Ragsdale 30(b)(6) Tr.) 16:14-18; Ex. 3 (Hernandez Ceren Tr.) 162:24-165:20. | Deny that the meal cleanup involves anything other than wiping tables, sweeping floors, and mopping.

Dan Ragsdale explicitly stated that he could not "vouch for the specifics [of the meal cleanup] at Aurora." ECF 336-19 at 5 (Ragsdale Dep. 17:10-11). He was not designated to testify to the specifics in his 30(b)(6) capacity. *Id.*

Witnesses have uniformly testified that the challenged policy in practice involves assigning six detainees per day to help wipe down tables and clean the floors after each meal, including GEO's 30(b)(6) witness on this topic, Ms. Ceja. ECF 339-2 at 9-10 (Ceja 30(b)(6) Dep. 36:13-25-37:1-17); ECF 339-10 (Vasquez Dep. 75:2-24); see also ECF 339-2 at 9-10 (Ceja 36:25-37:1-4) ("[Detainees have a] day room area, which is a common area, where all of the TVs and tables are located. They all eat at these tables, so after meal service, they will clean up the tables, wipe down the tables, and sweep and mop the floors."). This clean-up takes approximately 5 to 10 minutes after each meal. ECF 339-11 at 21 (Gallegos Dep. 130:25). |

| **Plaintiffs' Statement of Additional Facts** | **GEO Response** |
|---|---|
| | Plaintiffs have already offered as undisputed: "During a general cleanup, GEO requires detainees clean up the tables , wipe down the tables and sweep and mop the floors." ECF 260 at 18 (Fact #48). |
| **11.** HUSP cleaning was distinct from the personal housekeeping requirements enumerated in the PBNDS, which require detainees to "maintain their immediate living area in a neat and orderly manner by 1. making their bunk<br>beds daily; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing,<br>pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture." ECF No. 261-8 (2011 PBNDS) at 51; ECF No. 261-9 (2008 PBNDS) at 61-62; ECF No. 261-10 (2000 NDS) at 3; Ex. 20 (A. Martin 30(b)(6) Tr.) 25:25-26:24. | GEO denies this statement as seeking a legal interpretation of the PBNDS. Further, ICE's 30(b)(6) declarant has provided clarity on Section 5.8 of the PBNDS, which is "not intended by ICE to be an exhaustive list of facility scenarios in which a detainee may be expected to participate in housekeeping . . . there was no intent by the working group to establish a conclusive list of personal housekeeping activities or to preclude detainees from participating in maintaining the cleanliness of common or shared living areas. ECF 335-2 ¶ 14. |
| **12.** The HUSP at the Aurora Facility is "a GEO policy, created by GEO. The GEO HUSP is not created by ICE nor is it a requirement of the contract. ICE did not draft or negotiate GEO's HUSP." ECF No. 261-7 (Ely Decl.) ¶ 22. | GEO denies that Ms. Ely's declaration refers to the "HUSP" as defined in this lawsuit. As Plaintiffs admit in GEO's Undisputed Fact #1, the "HUSP" refers to the policy found within the detainee handbook. Ms. Ely did not review the detainee handbook to prepare her declaration. ECF 317-3 at 2. Therefore her use of the term "HUSP" is not consistent with the term as defined by Plaintiffs in this ligation. |
| **13.** Guards frequently threatened detainees with solitary confinement for<br>refusing to clean.<br><br>i. A detainee in Hugo Hernandez Ceren's pod refused to clean, telling the guards that he was no janitor and that they needed to pay someone for | Deny that employees "frequently threatened detainees with solitary confinement for refusing to clean." Plaintiffs' anecdotal accounts do not establish a "frequent" course of conduct.<br><br>As GEO stated in their Proposed Undisputed Material Facts, "it would be a very rare occurrence for a detention officer tell a detainee that they would be sent to segregation if they did not clean." *See* ECF 306-12 |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| that type of job. Ex. 3 (Hernandez Ceren Tr.) 74:16- 77:19. In response, a guard took out a plastic trash bag and told the detainee "Just pack your stuff because you're going to go to the hole." *Id*. The detainee "started cleaning right away" in response to the threat. *Id*. On another occasion, one detainee in Hernandez Ceren's dorm refused to clean and others, including Hernandez Ceren and other named plaintiffs, supported him, leading the guard on duty to call a sergeant. *Id*. 78:10-80:12. The sergeant told everyone that if they continued refusing to clean, they would be sent to the hole, which he described as cold and lonely. *Id*. He also told them that GEO would inform the immigration court that they had been disobedient. *Id*. Hernandez Ceren testified that he witnessed similar threats "multiple times with multiple guards." *Id*. 161:13-19.<br><br>ii. Dagoberto Vizguerra observed someone being sent to solitary confinement for refusing to clean on the second or third day he was at Aurora. Ex. 7 (Vizguerra Tr.) 48:9-22. He described the officer in his dorm who enforced the HUSP as "screaming at the detainees in his pod about cleaning. Id. 97:20-98:10.<br><br>iii. Grisel Xahuentitla saw a woman in her dorm try to refuse to clean because she was feeling ill. The guard on duty told her that if she did not work she would be sent to the hole, and that "it | (Gallegos Declaration ¶¶3-6); (Pagan Dec. ¶¶4-7) (Quezada Declaration ¶¶ 3-7) (Ceja Declaration ¶¶ 17-20)**.** When a detainee would refuse to clean, the detention officers would typically ask another detainee to assist with cleaning instead. *Id.* When a detainee was placed in segregation for the refusal to clean, it was typically because the refusal to clean was in concert with another disciplinary infraction. *Id.*<br><br>GEO's corporate and 30(b)(6) witnesses testified consistently with the cited declarations. GEO's 30(b)(6) witness testified that it is generally GEO's policy to resolve disciplinary issues informally, not with warnings or placement in segregation. ECF 306-13 at 9 (Ceja 30(b)(6) Dep. 113:13-17).   Amber Martin, GEO's Executive Vice President of Contract Administration, also testified that it has always  been an informal policy that GEO did not use segregation as a consequence for refusing to clean up their living area. ECF 271-6 at 8 (Amber Martin Dep. 134: 11-24). |

55424240;1

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| wasn't going to be . . . pleasant." Ex. 13 (Xahuentitla Tr.) 73:19-75:22. She explained that when guards threatened detainees with solitary confinement, "they're not – they're, of course, not – they're not whispering you to your ear. They're loud, and so they – so you feel a little intimidated." *Id*. 137:4-13.<br><br>iv. Alejandro Menocal was informed about the HUSP upon arrival at the Aurora Facility, and told by guards and other detainees that failure to clean could result in being placed in segregation. Ex. 1 (Menocal Tr.) 95:16-97:3. On one occasion, he witnessed other detainees being removed from an adjacent pod, and was told that they were being taken to segregation for that reason. Id. 100:16- 109:2.<br><br>vi. Jesus Yepez Gaytan testified that when new detainees arrived at the facility, they would often push back on the HUSP cleaning requirement, which frequently led to guards telling them that continued resistance would land them in solitary confinement. Ex. 9 (Gaytan Tr.) 112:1-113:4, 142:23- 144:1.<br><br>vii. Demetrio Valerga testified that when he first arrived at the Aurora facility, his cellmate told him that he had to participate in the HUSP or he would be put in solitary confinement. Ex. 6 (Valerga Tr.) 168:13-169:12. Towards the end of his stay, he resisted cleaning | |

55424240;1

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| and was threatened with segregation and handcuffed by a guard, although he did not end up being taken there. *Id.* 155:18-156:6. | |
| **14.** GEO guards were trained to enforce facility rules and to carry out the disciplinary scale as written in the Detainee Handbook. Ex. 11 (Vasquez Tr.) 82:5-23; Ex. 10 (Pagan Tr.) 95:15-21; Ex. 4 (Gallegos Tr.) 118:7-23; Ex. 15 (Quezada Tr.) 81:8-83:9. | Admit, but further state that the PBNDS instruct detention officers to resolve disciplinary infractions in an informal manner where possible.<br><br>The 2011 PBNDS provide:<br>"Where permitted by facility policy, staff shall informally settle minor transgressions through mutual consent, whenever possible." ECF 261-8 at 36.<br><br>The 2008 PBNDS provide:<br>"Where permitted by facility policy, staff will informally settle minor transgressions by mutual consent, whenever possible." ECF 261-9 at 42.<br><br>The 2000 NDS provide:<br>"*In SPCs/CDFs, minor transgressions will be settled informally, by mutual consent, whenever possible. If, however, the officer involved thinks an informal resolution inappropriate or unachievable, he/she shall prepare an Incident Report and Notice of Charges, forwarding it to the appropriate supervisor before the end of the assigned shift.*" ECF 261-10 at 11 (emphasis in original). |
| **15.** It is "imperative" that detainees follow the commands of guards implementing the Detainee Handbook's rules, and GEO guards were trained to use progressive discipline to gain compliance from detainees who failed to do so. Ex. 14 (Ceja 30(b)(6) Tr. II) 105:12-24, 205:1-206:6. | Deny characterization of training. AIPC detention officers "are instructed to resolve issues with detainees informally whenever possible." ECF 306-12 at 8 (Quezada Dec., at ¶ 4).<br><br>Where formal sanctions were necessary, officers imposed lesser sanctions as permitted by the disciplinary severity scale wherever possible. ECF 306-13 at 9(Ceja 30(b)(6) Dep. 113:13-17). |
| **16.** At least one guard acknowledged that solitary confinement was a potential sanction for refusing to clean. Ex. 10 (Pagan Tr.) 173:18-175:9. | Deny. The cited testimony does not support the alleged fact, but instead cites to repeated denials that Mr. Pagan ever raised the possible sanction of segregation with detainees in connection with their refusal to clean. |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| | Further, Officer Pagan testified that he never threatened to send a detainee to segregation for violating the cleaning rule. ECF 336-11 at 9 (Pagan Tr. 173:18-21.) |
| **17.** Guards further understood that threats of solitary confinement were an effective and legitimate way to gain compliance with facility rules, driven by detainees' fear of solitary confinement. Ex. 15 (Quezada Tr.) 141:13-142:8; Ex. 10 (Pagan Tr.) 174:2-175:6; see also Ex. 4 (Gallegos Tr.) 121:21-122:16 (describing solitary confinement as a legitimate method for disciplining detainees). | Deny. Officer Quezada testified that mentioning segregation could get detainees to follow the rules. ECF 336-16 at 142:3-8. But, she further testified that in her 19 years working at AIPC she never told a detainee they would go to segregation if they did not clean. ECF 339-12 at 49(Quezada Dep. 149:1-3;150:7-15).<br><br>The other cited testimony does not support Plaintiffs' asserted fact. |
| **18.** Detainees cleaned because of threats of solitary confinement. Ex. 3 (Hernandez Ceren Tr.) 63:9-18 ("I cleaned because of fear."); Ex. 12 (Hernandez Torres Tr.) 77:25-78:13 (cleaned because "being that I had been through segregation, I didn't want to go through the same"); Ex. 1 (Menocal Tr.) 104:21-105:7 ("[W]e had to clean and if not we would be punished. . . . Everybody knew it."); Ex. 9 (Gaytan Tr.) 142:23-144:1 ("The procedure was if you don't follow [the rules], you go to the hole."); Ex. 13 (Xahuentitla Tr.) 137:14-19 ("[I]f they tell you 'clean, because you're going to the hole,' . . . I'm going to clean. I don't want to go to the hole."); Ex. 6 (Valerga Tr.) 168:13-169:13 (when he arrived at Aurora, he participated in the HUSP "[b]ecause my cellie told me if we didn't clean, we'd go to the hole"). | Deny. Detainees had varying motivations for cleaning:<br><br>Plaintiff Menocal preferred to clean up after himself while living at AIPC because he preferred to "live and hang out in a clean environment." ECF 306-4 at 11(Menocal Dep. 81:6-10).<br><br>Indeed, while living at AIPC Plaintiff Menocal asked for permission to clean the recreation area without an expectation of remuneration simply because he spent a lot of time there and wanted to "hang out in a clean environment." ECF 306-4 at 12 (Menocal Dep. 86:22-87:5).<br><br>Plaintiff Hernandez liked to keep his area clean. ECF 306-5 at 11 (Hernandez Dep. 49:24-50:1).<br><br>Plaintiff Gaytan received access to X-Box gaming systems, movies, and ice cream as an incentive to keep his dorm clean. ECF 306-10 at 9 (Gaytan Dep. 124:3-16)<br><br>Plaintiff Valerga was told he could be sent to segregation if he refused to clean, but chose not to clean on |

55424240;1

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| | numerous occasions, unphased by the possible consequence. ECF 336-7 at 8 (Valerga Dep 155-156). |
| **19.** GEO followed through on these threats and sent detainees to solitary confinement for refusing to clean. ECF No. 262-12 (incident reports); Ex. 4 (Gallegos Tr.) 170:13-191:23 (verifying that he wrote detainees up several times for "failure to obey my orders for cleaning details," resulting in their placement in segregation). | Deny that detainees were sent to segregation for *only* refusing to clean their living area. Not a single Plaintiff in this action was sent to segregation for refusing to clean. (GEO's Undisputed Fact #28).<br><br>Further, GEO's corporate and 30(b)(6) witnesses testified consistently with the cited declarations. GEO's 30(b)(6) witness testified that it is generally GEO's policy to resolve disciplinary issues informally, not with warnings or placement in segregation. ECF 306-13 at 9 (Ceja 30(b)(6) Dep. 113:13-17). Amber Martin, GEO's Executive Vice President of Contract Compliance, also testified that it has always been a informal policy that GEO did not use segregation as a consequence for refusing to clean up their living area. ECF 271-6 at 8 (Amber Martin Dep. 134: 11-24).<br><br>To the extent that Plaintiffs cite to the incomplete incident reports at 262-12, they are not complete disciplinary reports and do not establish whether those detainees were ever actually sanctioned with segregation. Indeed, Ms. Ceja has noted that she reviewed the files of those detainees and only one was ultimately sanctioned with segregation. ECF 313-16 at ¶ 8. Further, the incident reports are inadmissible under the Parties' stipulation as none of the individuals therein have been made available for their deposition. ECF 228 (precluding witnesses from trial who are not presented for a deposition). |
| **20.** Solitary confinement "imposes a devastating triad of emotional and | GEO admits that Dr. Grassain's report contains the quoted text but denies that it is an undisputed fact. As Dr. Kropf has explained while there is a "growing body |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| neuropsychiatric deprivations: social isolation, a barren perceptual environment, and deprivation of meaningful mental activity." Ex. 21 (Grassian Report) at 10. | of empirical evidence indicating that … placement in solitary confinement for periods of years can cause psychological harm . . [t]here is no empirical evidence indicating that the placement in a segregated housing unit with or without solitary confinement for a period 72 hours or less causes serious psychological harm" ECF 339-20 at 14,15. |
| **21.** These deprivations can manifest in anxiety, depression, self-harm, stupor or delirium, impairments in thinking, concentration, and memory, hyperresponsivity to external stimuli, obsessive-compulsive behavior, hallucinations, paranoia, delusions, and problems with impulse control. Id. at 10-14. | GEO admits that Dr. Grassain's report contains the quoted text but denies that it is an undisputed fact. As Dr. Kropf has explained while there is a "growing body of empirical evidence indicating that … placement in solitary confinement for periods of years can cause psychological harm . . [t]here is no empirical evidence indicating that the placement in a segregated housing unit with or without solitary confinement for a period 72 hours or less causes serious psychological harm" ECF 339-20 at 14,15. |
| **22.** Although not everyone becomes "psychiatrically ill" from relatively short stays in solitary confinement, all people who experience solitary confinement "suffer from it." Ex. 2 (Grassian Tr.) 290:3-8. Put differently, solitary confinement causes "a certain baseline of psychiatric harm" in those who experience it. Id. 102:4-13. | GEO admits that Dr. Grassain's report contains the quoted text but denies that it is an undisputed fact. As Dr. Kropf has explained while there is a "growing body of empirical evidence indicating that … placement in solitary confinement for periods of years can cause psychological harm . . [t]here is no empirical evidence indicating that the placement in a segregated housing unit with or without solitary confinement for a period 72 hours or less causes serious psychological harm" ECF 339-20 at 14,15. |
| **23.** Peer-reviewed studies show that relatively short periods in solitary confinement – as little as 72 hours – can cause people to experience significant distress, including changes to brain-wave patterns and self-harm or suicide. Ex. 21 (Grassian Report) at 10 n.6 (citing Ex. 22 (Fatos Kaba, "Solitary Confinement and Risk of Self-Harm Among Jail Inmates") at 442-47 (finding that the risk of self-harm was strongly associated with | Deny. As Dr. Kropf has explained while there is a "growing body of empirical evidence indicating that … placement in solitary confinement for periods of years can cause psychological harm . . [t]here is no empirical evidence indicating that the placement in a segregated housing unit with or without solitary confinement for a period 72 hours or less causes serious psychological harm" ECF 339-20 at 14,15. |

55424240;1

| | **Plaintiffs' Statement of Additional Facts** | **GEO Response** |
|---|---|---|
| | being in solitary confinement, and that self-harm peaked around the time of entry to solitary confinement)); id. at 13 n.10 (citing Ex. 23 (Paul Gendreau, "Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement") at 56-57 (finding a consistent decline in EEG results of subjects in solitary confinement over the course of seven days, with 77% of the decline happening in the first four days)); id., Ex. D (Stuart Grassian, "Psychopathological Effects of Solitary Confinement") at 1451 (quoting one patient as saying "As soon as I got in, I started cutting my wrists. I figured it was the only way to get out of here."). | |
| **24.** | These effects can be long lasting and can include social withdrawal to "escape the buzzing confusion of life." Ex. 21 (Grassian Report) at 15. | GEO admits that Dr. Grassain's report contains the quoted text but denies that it is an undisputed fact. As Dr. Kropf has explained while there is a "growing body of empirical evidence indicating that … placement in solitary confinement for periods of years can cause psychological harm . . [t]here is no empirical evidence indicating that the placement in a segregated housing unit with or without solitary confinement for a period 72 hours or less causes serious psychological harm" ECF 339-20 at 14,15. |
| **25.** | Plaintiff Olga Alexakhina observed how solitary confinement affected other detainees, recounting that detainees returning from solitary confinement "would take a shower and just lay down. They didn't want to talk to anyone, just laying down." Id. at 25-26. She remembered one woman in particular who was so depressed after returning from solitary confinement that other detainees | Deny. Plaintiff Alexaklina's testimony is uncorroborated hearsay. Indeed, it is unclear how Dr. Grassian could obtain any reliable testimony from Ms. Alexaklina given her whereabouts and her home country's rules regarding civil litigation abroad. See ECF 339-1 at 2, Decl. of Scimone (noting that even voluntary depositions are not permitted under any circumstances in Russia and providing no information about otherwise participating in discovery abroad). As Plaintiffs concede, Ms. Alexakhina cannot give sworn testimony from her current location. Id. Further, her |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| consistently had to rouse her for meals. *Id.* | testimony is currently subject to exclusion under the Parties' stipulation as she has not yet been made available for a deposition. ECF 228 (precluding witnesses from trial who are not presented for a deposition). As Mr. Scimone concedes in his declaration, GEO has diligently sought Ms. Alexaklina's deposition but been denied the same due to her country of residence. ECF 339-1 at 3 -4 (Decl. of Scimone). |
| **26.** Immigration detainees at GEO were taken from their homes and families and placed in a prison-like environment to await either deportation or the outcome of immigration proceedings that could end in deportation. ECF No. 261-8 (2011 PBNDS) at 3. | Deny. First, GEO was not responsible for any of the circumstances or details surrounding each Plaintiffs' arrival at AIPC. That said, there is no way to state that all "immigration detainees" at AIPC had the same experience, as each individual had a unique circumstances relating to their detention. Indeed, even among the named Plaintffs, their reasons for arriving at AIPC differed. For example, Plaintiff Xahuentitla was not "taken from" her home and family, but rather was detained after the attempted murder of her children. *See* Shane Benjamin, Woman to face attempted murder charges, Durango Herald, https://durangoherald.com/articles/59930 (last visited November 15, 2020). In contrast, Plaintiff Hernandez's stay in AIPC came his first removal from the country. **Exhibit R** (Hernandez Dep. 14-16). After he was removed he "reentered the country, ICE picked me up and put me in a removal proceedings and started transferring me around, and finally I reached Colorado." *Id.* As for whether Plaintiffs were facing deportation, there are no facts in the record as Plaintiffs have declined to provide any such information in discovery. **Exhibit S** (Plaintiffs' Responses to Discovery, Interrogatory 1(c)). |
| **27.** Detainees were allowed to keep only small photos of family members, softbound reading material, wedding bands (but not engagement rings), small religious items, one pair of glasses and dentures, and personal address books. All other personal items were considered illegal contraband. ECF | GEO admits that the personal effects that detainees may keep on their person, but denies that these limits apply uniformly and categorically. As the AIPC Handbook states, detainees may also keep other items so long as they are "authorized" by the Chief of Security. ECF 261-17 at 8. |

48

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| No. 273-1 (2005 Detainee Handbook) at 6; ECF No. 273-2 (2007 Detainee Handbook) at 14-15; ECF No. 273-3 (2008 Detainee Handbook) at 5; ECF No. 273-4 (2010 Detainee Handbook) at 5-6; ECF No. 273-5 (2011 Detainee Handbook) at 6; ECF No. 261-17 (2013 Detainee Handbook) at 8. | |
| **28.** Detainees were housed in bunk beds either in windowless cells or in large open rooms, alongside dozens or scores of strangers in front of whom they had to eat, sleep, shower, and defecate. Ex. 24 (ICE 0000123 (men's cell),ICE 0000142 (women's unit)); Ex. 3 (Hernandez Ceren Tr.) 143:5-17:13. | GEO admits that detainees lived in communal living situations, but states that the photos speak for themselves. |
| **29.** Showers were communal, and toilets were either located within detainees' shared cells or in a designated bathroom area separated from the rest of the room by a low wall. Ex. 24 (ICE 0000128 (men's toilets), ICE 0000116 (men's showers), ICE 0000139 (women's toilets and showers)). | GEO states that the photos speak for themselves. |
| **30.** Detainees had access to a single television set per dorm, which was controlled by the guards. ECF No. 273-1 (2005 Detainee Handbook) at 13-14; ECF No. 273-2 (2007 Detainee Handbook) at 36-37; ECF No. 273-3 (2008 Detainee Handbook) at 14; ECF No. 273-4 (2010 Detainee Handbook) at 12; ECF No. 273-5 (2011 Detainee Handbook) at 13; ECF No. 261-17 (2013 Detainee Handbook) at 15. | Deny. Detainees have access to multiple televisions, as is depicted in the photo located at ECF 337-2 at 9. |
| **31.** Detainee contact with their spouses, children, friends, and family members was limited to three hour-long non-contact visits per week. ECF No. 273- | Deny. Detainee visitation was authorized from 8 A.M. to 9 P.M. seven days per week. ECF 261-17 at 13; 273-1 at 11. Detainees could have one visit per day for up to an hour. ECF 261-17 at 13; 273-1 at 11. Contact visits |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| 1 (2005 Detainee Handbook) at 11-12; ECF No. 273-2 (2007 Detainee Handbook) at 30-32; ECF No. 273-3 (2008 Detainee Handbook) at 11-12; ECF No. 273-4 (2010 Detainee Handbook) at 10-11; ECF No. 273-5 (2011 Detainee Handbook) at 10-11; ECF No. 261-17 (2013 Detainee Handbook) at 12-13. | were limited to 30 minutes per visit. ECF 261-17 at 13; 273-1 at 11. Any detainee could get approval for additional visitation time from the Chief of Security. ECF 261-17 at 13; 273-1 at 11. Additionally, detainees could correspond with their families via mail, ECF 261-17 at 11, 273-1 at 10. Further, Detainees were permitted to call their families at any time other than count or during an emergency. ECF 261-17 at 14; 273-1 at 12. |
| **32.** Contact visitation, in which detainees could briefly hug their visitor upon greeting them and saying goodbye, was available only upon special request. ECF 273-1 (2005 Detainee Handbook) at 11; ECF No. 273-5 (2011 Detainee Handbook) at 11; ECF No. 261-17 (2013 Detainee Handbook) at 13.4 | Deny. Detainee visitation was authorized from 8 A.M. to 9 P.M. seven days per week. ECF 261-17 at 13; 273-1 at 11. Detainees could have one visit per day for up to an hour. ECF 261-17 at 13; 273-1 at 11. Contact visits were limited to 30 minutes per visit. ECF 261-17 at 13; 273-1 at 11. Any detainee could get approval for additional visitation time from the Chief of Security. ECF 261-17 at 13; 273-1 at 11. All visits, contact or not, were approved by ICE. ECF 261-17 at 13; 273-1 at 11 |
| **33.** Detainees had access to telephones, but calls were limited to 20 minutes, and had to be made from payphones located in the middle of dorm common areas. ECF No. 273-1 (2005 Detainee Handbook) at 12; ECF No. 273-2 (2007 Detainee Handbook) at 32-33; ECF No. 273-3 (2008 Detainee Handbook) at 12-13; ECF No. 273-4 (2010 Detainee Handbook) at 11-12; ECF No. 273-5 (2011 Detainee Handbook) at 11-12; ECF No. 261-17 (2013 Detainee Handbook) at 14. | Deny. Calls were only limited to 20 minutes per detainee "[d]uring times of high use by housing unit residents." 273-1 at 12. By way of example, Plaintiff Hernandez's call log shows that he frequently spent more than 20 minutes on the phone. **Exhibit T** (Hernandez Deposition Exhibit 12) (Entries 26 and 42). |
| **34.** Up to two 80-person pods shared a small concrete recreation space that had a single basketball hoop, and either one or two exercise machines. Ex. 24 (ICE 0000102 (men's exercise room), ICE 0000152 (women's exercise room)); see also Ex. 3 (Hernandez Ceren Tr.) 144:5-13; Ex. 12 (Hernandez Torres Tr.) 50:21-51:14. | GEO states that the photos speak for themselves. |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| **35.** Detainees found the experience of being in detention frightening and isolating. See Ex. 9 (Gaytan Tr.) 28:22-29:2, 48:20-50:2 ("[I]t was scary to be in there . . . with a bunch of people you don't even know," many of whom were older than him); Ex. 13 (Xahuentitla Tr.) 137:4-19 (being in detention, "you feel this pressure, you feel . . . very depressed for the situation you're in at the moment"); Ex. 12 (Hernandez Torres Tr.) 29:1-6, 15:20-23 (being separated from his daughters caused "a lot of suffering."), 49:8-52:20 (explaining that the guards "would put us all together like animals, like shit. . . and they say, 'Well, now you do what I want,'" and noting that it was very stressful having to share small space with loud, messy strangers); Ex. 1 (Menocal Tr.) 48:13-24, 67:8-69:9 (told family members that conditions at Aurora were good, but in truth "it was not the prettiest place" – for example, the food made people ill and the showers were moldy). | GEO admits that the quoted text is in Plaintiffs' depositions but denies that it describes the entirety of their experience. While detained, Plaintiff Menocal described AIPC to a friend as follows: [T]hey've got pretty good grub, considering it's, you know, a detention center. And we got three televisions, a bunch of tables, a bunch of people, and we all get along. Pretty nice. I mean, it's -- for being incarcerated, it's not bad at all, not compared to -- not compared to Denver County or the other one where I was at. This is like Camp Snoopy. It's pretty easy. ECF 306-4 at 9 (Menocal Dep. 54:5-12). |
| **36.** GEO did not always serve detainees enough food or provide them with enough basic supplies, like toiletries, and detainees had to augment the inadequate diet and supplies with purchases from the commissary. Ex. 9 (Gaytan Tr.) 9:19-10:11; Ex. 3 (Hernandez Ceren Tr.) 148:24-149:21. | Deny. For example, Plaintiff Menocal described a typical day at AIPC as follows: "I wake up, get dressed, do my bed, wait for breakfast, eat breakfast, clean up, maybe exercise, walk around, read a book, draw. It depends. Again, wait for lunch to eat, clean up, maybe shower, maybe do some sports, maybe talk on the phone with someone, maybe write a letter, walk around, exercise, wait for dinner. Same thing, eat dinner, relax a while, maybe watch TV, read a book, draw, and, you know, wait for bedtime." *See* GEO's Statement of Undisputed Material Facts, 23. |
| **37.** The orientation video shown to detainees at least through 2007 informed them that failure to follow | Deny. This document has not been authenticated as applicable during the class period. As Ms. Ceja testified in her deposition, the VHS transcript which refers to her |

| **Plaintiffs' Statement of Additional Facts** | **GEO Response** |
|---|---|
| facility rules could lead to disciplinary action causing "a negative effect on your case before the government, so the best rule is to stay out of trouble during your stay here." Ex. 25 (Orientation Video Script, GEO_MEN 00056575-81) at GEO_MEN 00056576 (emphasis in original); Ex. 26 (Orientation Video Script, GEO-MEN00075173-83) at GEO-MEN 00075174 (emphasis in original). Although this statement was removed from orientation materials, the threat remained present throughout the class period. Ex. 14 (Ceja 30(b)(6) Tr. II) 95:25-96:10; see also Ex. 3 (Hernandez Ceren Tr.) 78:10-80:24 (describing an incident where detainees refused to clean and a GEO sergeant threatened that the refusal and resulting discipline was "not going to look good when this gets to the judge"). | as "Captain Ceja" (ECF 337-3) would have been used prior to August 2005, but no later, more likely it was used in the "early 2000s." ECF 339-3 at 7-9 (Ceja Dep. 91-93). Plaintiffs did not introduce GEO-MEN0007517 in Ms. Ceja's deposition and it has not been authenticated as a document that was used during the class period. |
| 38. | Detainees were aware that not following the rules could impact the outcome of their immigration cases. Ex. 3 (Hernandez Ceren Tr.) 167:1-170:13 (going to solitary confinement "was going to destroy my immigration case if I went there"); Ex. 9 (Gaytan Tr.) 12:1-13 (avoided getting in trouble because "I was afraid that it was going to be against my case for doing something against GEO"). | Admit that Gayatan and Hernandez so testified but deny that they represent all detainees housed at AIPC. |
| 39. | When bidding a contract, GEO seeks to offer a price that is both fair to the government and less than it would cost the government to operate the facility itself. Ex. 27 (Evans Tr.) 36:4-6, 50:18-21. In other words, one of | GEO admits that it strives to provide a fair price to the government. ECF 336-24 at 9 (Evans Dep. 36:4-6). GEO admits it strives to provide "better quality services at the same price or lower cost than the government can, especially in the state side of our business." ECF 336-24 at 24 (Evans Dep. 50:18-22). GEO admits that one of its goals is to offer a price the government is willing to pay. |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| GEO's goals in developing its bid price is to offer a price the government is willing to pay. *Id.* 72:13-16. | |
| **40.** GEO's total bid amount represents the costs to execute the contract as well as GEO's desired profit margin, typically an additional 15% of the total cost. *Id.* 63:18-25. | Deny. The quoted text does not describe how GEO builds up a bid, but rather how to meet its "ROI at the facility level." ECF 336-24 at 15 (Evans Dep. 63:9-10).When looking at ROI targets, GEO seeks to support "13 to 15 percent ROI." *Id.* at 63:23-24. |
| **41.** The largest of these costs is the labor required to operate the facility. Ex. 17 (Venturella Tr.) 155:21-25. | Deny. The quoted paragraph refers to the largest portion of the "bed day rate" and did not ask Mr. Venturella about the largest portion of all of GEO's costs, including acquisition and maintenance of property. ECF 336-17 at 7. |
| **42.** Cost is an important component of the contract because during the class period ICE's practice was to accept the lowest bid offered, provided the contractor had a satisfactory performance record. *Id.* 154:6-16. | Deny. Mr. Venturella testified "in the proposals that we've submitted, we don't believe that the price was based on lowest, it was based on competitive, and again being able to meet all the criteria in the RFP." ECF 336-17 at 5 (Venturella dep. 153:8-11). |
| **43.** Keeping costs, and thus the total bid price, low retains its importance even when GEO is the only entity bidding on the contract, as with the Aurora facility, because the government provides extra scrutiny to such "sole source bids." Ex. 27 (Evans Tr.) 22:10-23:18, 24:3-17. | Deny. The cited portion refers to a definition of a "sole source bid' which Mr. Evans testifies GEO has not had "any recent sole source bids." Mr. Evans did not testify that the Aurora contract was a sole source bid. Further, Mr. Evans did not testify about the need to keep the Aurora price "low." |
| **44.** Recognizing that keeping the total bid price low and offering the government a fair price is important even in the context of a sole source bid, GEO uses the same pricing strategy regardless of whether the bid is sole source or competitive. Ex. 17 (Venturella Tr.) 164:23-165:23. | Deny. The cited text does not support the proposition or even mention sole source bids. |
| **45.** When GEO wins a contract with ICE, the amount of money that ICE pays GEO during each year of the contract is set at the time the contract is executed. Ex. 27 (Evans Tr.) 74:10-21. | Deny. The cited text explicitly says "the amount the government pays us could fluctuate up and down." ECF 336-24 (Evans Dep. 74:12-14). |

55424240;1

| **Plaintiffs' Statement of Additional Facts** | **GEO Response** |
|---|---|
| **46.** Once the contract terms and pricing are set, GEO bears the risk of any increased costs to operating the facility beyond what is provided for in the contract, including increased costs of labor. *Id.* 76:11-22. | Deny. The cited text states that GEO bears the risk that their profit or fee could fluctuate compared to what they proposed. It does not state GEO would bear the risk of <u>any</u> increased costs. |
| **47.** This risk is to GEO's profit: for GEO to make the profit that it anticipates on a contract, it must maintain the costs of running the facility at the amount set forth in the contract at the time of execution. *Id.* 76:23-77:5. | Deny. The cited text does not support the proposition and does not discuss whether GEO can modify the contract after execution. |
| **48.** ICE will not reimburse GEO for more than $1 per day in detainee wages. 8 U.S.C. § 1555(d); Appropriations Act, Immigration and Naturalization Service Salaries and Expenses, Pub. L. No. 95-431, 92 Stat. 1021 (1978). | No response required. Legal conclusions are not appropriate for undisputed facts. |
| **49.** ICE does not prohibit its contractors from paying more than $1.00 per day for work performed in the VWP. Ex. 18 (A. Martin Tr.) 106:11-107:22, 110:10-13; ECF No. 261-8 (2011 PBNDS) at 53 (compensation for VWP work is "at least $1.00 (USD) per day" (emphasis added)); *see also* ECF No. 261-18 (VWP Pay Rates, GEO-MEN 00170339); ECF No. 287-13 (VWP Pay Rates at GEO's South Texas Facility) at 11-12. | GEO admits that it is not aware of a *categorical* prohibition on paying more than $1.00 per day to detainee VWP participants. |
| **50.** As a result, GEO could pay detainees more than $1 per day but must bear the costs of doing so. Ex. 18 (A. Martin Tr.) 107:18-22; Ex. 19 (Ragsdale 30(b)(6) Tr.) 167:4-6. | The statement which Plaintiffs offer is a hypothetical, not a fact. That said, GEO does not deny that Ms. Martin testified GEO would bear the costs over $1.00 under its current agreements with ICE. |
| **51.** GEO estimates that replacing detainee labor with full time employees at all of its ICE-contracted facilities nationwide would cost a substantial | GEO admits that it estimates that the cost *to* ICE would be substantial if the VWP were replaced with non-detainee employees and the attendant costs of employees (including GEO's fee). GEO denies that the costs would be borne by GEO, if no detainees performed |

55424240;1

| Plaintiffs' Statement of Additional Facts | | GEO Response |
|---|---|---|
| | amount of money. Ex. 16 (GEO-MEN 00187770) (May 30, 2018 Letter). | any work in the Aurora facility, GEO would make more money, not less. ECF 306-14 at 9 (Ragsdale 30(b)(6) Dep. 168:4-10). |
| 52. | Detainees understood that once GEO set the rate of pay for the VWP at $1 per day, the rate was not negotiable. Ex. 3 (Hernandez Ceren Tr.) 158:10-15. | Deny. Plaintiff Hernandez's testimony is not representative of all detainees or all circumstances. |
| 53. | The "Detainee Voluntary Work Program Agreement" is not an employment contract and does not create any rights or obligations for either GEO or the detainee who signs it. Ex. 8 (Ceja Tr. I) 147:20-150:18. | GEO does not respond as legal conclusions are not appropriately dressed up as facts for dispute. Whether a document constitutes a contract is a question of law. |

## III.   ELEMENTS OF THE TRAFFICKING VICTIMS PROTECTION ACT

Plaintiffs bear the burden to present evidence sufficient to establish a violation of the TVPA. *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017), *as amended* (Mar. 3, 2017). To do so, Plaintiffs must first establish that GEO had the requisite scienter. "The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the [defendant] intended the victim to believe that such harm would befall her . . . ." *Id.* (emphasis added) (internal quotations omitted). The issue of scienter turns not on whether a TVPA violation should be assessed under an objective, subjective, or hybrid standard, but instead on the sufficiency of Plaintiffs' evidence that GEO acted knowingly. In addition to scienter, Plaintiffs must establish that the harm or threat of harm relayed by the defendant was "sufficiently serious" to compel the victim to provide his or her labor. *Id.* The second prong is assessed by considering the totality of a victim's circumstances from the vantage point of a reasonable person in the place of the victim.

55424240;1

*Id.* This second element has been described as requiring a "hybrid" test, wherein the victim's decision to provide his or her labor must be "*objectively reasonable* under the circumstances," *Id.* Courts in this District have determined that, in assessing the second prong of the TVPA analysis, "recognizing that what constitutes serious harm for that plaintiff must be determined by considering the totality of the circumstances presented." *Echon v. Sackett*, No. 14-CV-03420-PAB-NYW, 2017 WL 4181417, at *14 (D. Colo. Sept. 20, 2017), report and recommendation adopted, No. 14-CV-03420-PAB-NYW, 2017 WL 5013116 (D. Colo. Nov. 1, 2017), *aff'd sub nom. Villanueva Echon v. Sackett*, 809 F. App'x 468 (10th Cir. 2020) (emphasis added). As such, in considering the totality of the circumstances presented, a factfinder must consider the subjective element of the particular vulnerabilities of a person in the victim's position. *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 996 (D. Idaho 2019).

A warning of a legitimate but adverse consequence is not a threat under the TVPA. *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012). Therefore, in determining whether harm is "sufficiently serious," a plaintiff must show conduct that goes beyond legitimate but adverse consequences and instead constitutes an improper threat or coercive measure. *United States v. Toviave*, 761 F.3d 623, 626 (6th Cir. 2014). Whether particular conduct constitutes a warning of an adverse but legitimate consequence as opposed to a threat under the TVPA is a decision for the Court that can be resolved at the summary judgment phase. *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 992 (D. Idaho 2019) (stating that "it is the Court's responsibility to distinguish between improper threats or coercion and permissible warnings of adverse but legitimate consequences.") (quotations omitted); *see also Headley*, 687 F.3d at 1180 (dismissing at summary judgment a TVPA claim and finding that a statement that church members would lose

56

access to their friends and families and would be ex-communicated from the church if they did not continue their work was a warning of a legitimate consequence); *Roman v. Tyco Simplex Grinnell*, No. 8:16-CV-3449-T-33AEP, 2017 WL 3394295, at \*5 (M.D. Fla. Aug. 8, 2017), *aff'd*, 732 F. App'x 813 (11th Cir. 2018) (accepting all of plaintiff's allegations as true and finding no violation of the TVPA because the purported threat was merely a warning of a legitimate consequence that the employee would be fired if he did not complete his job tasks). As applied here, whether ICE's PBNDS disciplinary severity scale, <u>as written</u>, constitutes a warning of legitimate consequences does not turn on detainees' specific experiences with GEO Officers. Nor does it turn on how detainees perceived the warnings in the context of their surroundings. Rather, this court must determine whether, in the context of a detention facility generally, an operator can implement a government-mandated disciplinary scale that includes the consequence of up to 72-hours of segregation. If the disciplinary policy within the PBNDS is legitimate, then its implementation does not violate the TVPA.

## IV.   THE MEAL CLEANUP POLICY DOES NOT VIOLATE THE TVPA

Central to Plaintiffs' claims is their allegation that the meal cleanup rotation or, as they call it, the "HUSP," violates the TVPA. GEO argued that the disciplinary policy a legally permissible warning of a legitimate consequence. In their Opposition, plaintiffs disagree based upon a strained, and impractical, construction of the PBNDS. Specifically, Plaintiffs argue that detainees in an ICE detention facility cannot be asked broadly to clean up after themselves or be subject to consequences. Instead, Plaintiffs argue that detainees can only be subject to discipline for failing to clean *some* portions of their living areas, as are listed in PBNDS § 5.8. The PBNDS contain no such limitation on cleaning. Indeed, beyond the PBNDS, policies requiring civil detainees to

participate in cleaning their own living areas are permissible under longstanding federal court precedent. Thus, Plaintiffs cannot establish the meal cleanup is unlawful.

### A.        The PBNDS Do Not Limit Detainee Cleanliness to Four Categories.

Plaintiffs have long argued for a narrow and unreasonable construction of Section 5.8 of the PBNDS. Plaintiffs claim that Section 5.8, which describes the Voluntary Work Program ("VWP"), limits the tasks that detainees may perform without compensation and subject to the disciplinary severity scale prescribed by ICE. ECF 336 at 65. Specifically, Plaintiffs claim that Section 5.8 of the PBNDS, which sets forth the contours of the VWP, prescribes an exhaustive list of tasks that may be compelled as part of a detainee's "personal housekeeping" obligation. ECF 260 at 35; ECF 336 at 39 (Plaintiffs' Additional Fact 11). There is no support for this interpretation. Plaintiffs' reading of the PBNDS first requires the reader to ignore that, on its face, Section 5.8 does not cross-reference to the disciplinary policy. Next, one must ignore that Section 5.8 mentions "personal housekeeping," while the provisions of the disciplinary policy at issue refers to "assigned living area." Further, one must ignore the fact that there is no definition section that provides that "personal housekeeping" is synonymous with "living area." Only after one clears these hurdles can they reach Plaintiffs' conclusion that detainees may only be subject to sanctions for "refusal to clean assigned living area" if the task they were asked to perform in their living area is explicitly enumerated in Section 5.8. Under this theory, any task other than (1) making beds daily, (2) stacking loose papers, (3) keeping the floor free of debris and the dividers free of clutter, and (4) refraining from hanging clothing or objects in housing units, is exempt from all possible sanctions, including a reprimand. ECF 261-8 at 51 (PBNDS 5.8 V.C). Put differently, despite the broad language in the violation of "refusing to clean assigned living area," Plaintiffs state that its

**APP. 696**

breadth is limited by the four items enumerated in Section 5.8, even though the two sections are wholly unrelated.

Plaintiffs' interpretation cannot gain traction because it (i) ignores the plain language of the PBNDS, (ii) ignores the construction of the PBNDS, and (iii) creates an unworkable standard.[2] First, Plaintiffs' assumption that "personal housekeeping" is synonymous with "living area" ignores the plain language of the PBNDS. Had the PBNDS intended to limit discipline to only those instances of personal housekeeping listed in Section 5.8, it would have so stated. At a minimum, the drafters would have used consistent language and definitions. Instead, they chose to use divergent language: "personal housekeeping" versus "assigned living area." Further, it is clear that the drafters did not intend to narrow the personal cleaning tasks for which detainees are responsible. In addition to the sanction for "refusal to clean assigned living area," the PBNDS also provide sanctions for "failing to follow safety or sanitation regulations" and "being unsanitary or untidy; failing to keep self and living area in accordance with posted standards." ECF 261-8 at 49. Had the drafters intended discipline to be limited to the four items in Section 5.8, they could have simply replaced "posted standards" with a reference to Section 5.8 of the PBNDS or a recitation of the four limitations therein. It is unlikely the drafters would have permitted sanctions for the broad category of "sanitation regulations," which are not in any way tied to one's bunk or personal items.  But they did not do so, instead choosing to use different terminology throughout, providing

---

[2] Plaintiffs attempt to cast their interpretation of the PBNDS as a matter of fact, not law. ECF 336 at 39 (Plaintiffs' Additional Fact 11); ECF 336 at 63 (describing the issue as "a fact-bound determination that hinges on the way threats are deployed"). This is inaccurate. Whether the PBNDS limit the areas in which detainees may clean, subject to potential discipline, may be resolved as a matter of law, as Plaintiffs have already argued in their own affirmative motion for summary judgment (ECF 260 at 35). Plaintiffs make the same argument in the instant motion, ECF 336 at 63, which presents a similar contradictory argument that "undisputed evidence shows that the work compelled under the HUSP went far beyond the PBNDS, and was explicitly prohibited under GEO's contract."

55424240;1

for sanctions through multiple different phraseologies for refusing to clean. Thus, any argument that the term "living area" is synonymous with "personal housekeeping" cannot stand.

Second, under Plaintiffs' construction of the PBNDS, multiple sections would be rendered meaningless. PBNDS Section 5.8(IV) explicitly provides for a listing of cross-references of standards that are related or impacted where the drafted listed other sections of the PBNDS that were affected by the standards in Section 5.8. ECF 261-8. The "References" Section identifies PBNDS Section 1.2 "Environmental Health and Safety" and PBNDS 4.1 "Food Service." It does not list Section 3.1—the disciplinary severity scale:

### IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-5C-06, 5C-08, 5C-11(M), 6B-02.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "1.2 Environmental Health and Safety"; and
- "4.1 Food Service."

ECF 261-8 at 51. There is no evidence this was an oversight. Instead, it is clear that the drafters intentionally excluded any reference to Section 3.1 because they did not intend Section 5.8 to have any impact on Section 3.1. Likewise, the "References" Section in 3.1, the disciplinary severity scale, does not include any cross-reference to Section 5.8:

### IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-3A-01, 3A-02, 6B-05, 6C-01 through 6C-19.

55424240;1

**APP. 698**

ECF 261-8 at 37. Because the drafters intentionally excluded any cross reference between the two sections, despite a clear mechanism for doing so, reading in such a reference would be inconsistent with the plain language and standard construction of the PBNDS.

Indeed, Plaintiffs' interpretation of the PBNDS would create an unworkable standard. Plaintiffs allege that it is permissible under the PBNDS to require detainees to make their beds subject to the disciplinary policy in Section 3.1, but that asking the same detainee to clean up milk that he spilled next to his bed, under the same circumstances, would violate the TVPA. Indeed, a detainee could pour milk on the floor every day simply to watch others clean it up—without consequence. Likewise, a detainee who consistently did not rinse his or her toothpaste down the sink could not be verbally reprimanded (a sanction under Section 3.1) that when living in a communal living environment, it is best to clean up any mess you make. Such a construction would lead to a deterioration in personal hygiene and sanitation; surely that would not effectuate the aims of the PBNDS.

In fact, Plaintiffs' proposed interpretation is inconsistent with ICE's understanding of the PBNDS. ECF 335-2.[3] Ms. Jay Brooks, one of the members of the ICE working group that drafted the PBNDS, makes clear that PBNDS Section 5.8 V(C) was never intended by ICE to be an exhaustive list of scenarios in which a detainee may be expected to participate in cleaning his or

---

[3] Plaintiffs recently filed an argumentitive response to GEO's notice of supplemental authority, disclosing the declaration of Jay Brooks, which counsel for Plaintiffs, Andrew Free, obtained. ECF 335-1; 335-2. In it, Plaintiffs argue that the Brooks declaration is hearsay because it is based upon Ms. Brooks' personal knowledge *and* information provided to Ms. Brooks in her official capacity. ECF 335-2 at ¶10. Plaintiffs' position that this constitutes hearsay is inconsistent with their prior assertion that the Ely declaration is *not* hearsay, despite also being based upon information she received in her official capacity. *Compare* ECF 335-2 at ¶10; *with* ECF 261-7 at ¶1. To the extent the Court considers the Ely declaration (Plaintiffs' Additional Fact # 12), must also consider the Brooks declaration. To the extent Plaintiffs claim the declaration is not relevant to the claims at issue, the instant motion makes the relevance clear.

her assigned living area without compensation. ECF 335-2 ¶ 14. Rather, Section 5.8 serves to "emphasize that irrespective of whether a detainee chooses to join a work program, all detainees must participate in personal housekeeping and maintaining clean and orderly living areas." *Id.* To that end, Section 5.8 "provides examples of personal housekeeping, but there was no intent by the working group to establish a conclusive list of personal housekeeping activities or to preclude detainees from participating in maintaining the cleanliness of common or shared living areas." *Id.* Ms. Brooks clarifies that, in ICE's view, "[e]veryone living in a group housing unit shares a co-responsibility to keep the dormitory, dayroom, shower and bathroom areas tidy and clean." *Id.* at ¶ 17.

Accordingly, because the PBNDS provide for broad sanctions for refusing to clean one's living area, and those sanctions are not limited to the items in Section 5.8, the meal cleanup policy at issue in this lawsuit is in accord with the PBNDS. Thus, Plaintiffs cannot establish that the PBNDS preclude consequences related to a detainees' refusal to participate in meal cleanup. Nor can they rely upon an argument of noncompliance with the PBNDS to establish that the disciplinary severity scale is not a legitimate warning of consequences.

**B.      Requiring Civilly Confined Individuals To Clean Up After Meals or Face Consequences is Legitimate.**

The disciplinary severity scale contained in PBNDS Section 3.1 is a warning of an adverse but legitimate consequence, not a threat of serious harm under the TVPA. Just as a "church is entitled to stop associating with someone who abandons it," *Headley*, 687 F.3d at 1180, or an employer can fire an employee for refusing to perform his or her work, *Roman*, 732 F. App'x at 817; an immigration detention facility can implement the "basic disciplinary measures" in PBNDS

55424240;1

**APP. 700**

Section 3.1 without giving rise to TVPA liability. *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1278 at n.5 (11th Cir. 2020).

Indeed, the TVPA was "passed to implement the Thirteenth Amendment against slavery or involuntary servitude." *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017), *as amended* (Mar. 3, 2017). In enacting the TVPA, Congress did not intend to overturn longstanding precedent under the Thirteenth Amendment that certain actions are permissible and do not constitute human trafficking, such as parents who require their children to perform household chores. *United States v. Kozminski*, 487 U.S. 931, 944, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988); *see also United States v. Toviave*, 761 F.3d 623, 628 (6th Cir. 2014).

Here, extensive precedent makes clear that civil detainees' housekeeping duties fall outside of the bounds of the Thirteenth Amendment and, in turn, outside of the TVPA. Under federal precedent, the requirement that a detainee clean his or her housing unit, subject to potential disciplinary sanctions is one of "the type[s] of normal housekeeping duties that fall outside the Thirteenth Amendment." *Mendez v. Haugen*, No. CV 14-4792 ADM/BRT, 2015 WL 5718967, at *5 (D. Minn. Sept. 29, 2015), aff'd (Feb. 22, 2016); *see Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) (explaining that pretrial detainees may be compelled, under threat of administrative segregation, "to perform general housekeeping chores"); *Channer v. Hall*, 112 F.3d 214, 219 (5th Cir. 1997) ("[T]he federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks...."); *Hause v. Vaught*, 993 F.2d 1079, 1081, 1085 (4th Cir.1993) (holding that pretrial detainees may be required to "assist in cleaning the common areas of their cell-block"); *Bijeol v. Nelson*, 579 F.2d 423, 424–25 (7th Cir.1978) (holding that a pretrial detainee may be compelled to perform "general housekeeping responsibilities" in his own cell and

55424240;1

**APP. 701**

community areas); *Jobson v. Henne*, 355 F.2d 129, 131–32 (2d. Cir. 1966) (explaining that committed mental patients may be required to perform "chores of a normal housekeeping type and kind," provided that they are not "so ruthless in the amount of work demanded, and in the conditions under which the work must be performed, ... that a court justifiably could conclude that the inmate had been subjected to involuntary servitude"); *Jackson v. Siringas*, No. 12–15474, 2013 WL 3810301, at *10 (E.D.Mich. July 23, 2013) ("[R]equiring a pretrial detainee to help clean his living unit, including common areas, does not amount to involuntary servitude as prohibited by the Thirteenth Amendment."). As the District of Minnesota recently recognized, a claim that "pretrial and civil detainees may not be required to perform any type of work outside their own cells or immediate living quarters is not supported by existing precedent." *Id.*

In *Mendez,* the plaintiff claimed "that his Thirteenth Amendment rights were violated when he was forced, under threat of administrative segregation, to clean communal restrooms in his housing unit." *Mendez*, 2015 WL 5718967 at *3. The court disagreed, finding that as a civilly detained individual, "Mendez can be directed to perform general housekeeping duties, including those at communal areas beyond the confines of his cell." *Id.* at *1. The Court clarified that "[g]eneral housekeeping chores have been deemed to include fixing and distributing meals, scrubbing dishes, laundering the sheets and clothing of other inmates, cleaning communal bathrooms and shower stalls, removing trash from common areas, and sweeping, mopping, and vacuuming general-use hallways and rooms." *Id.* at *5.

In a similar case, the Seventh Circuit found that a detainee who was required to perform certain housekeeping tasks or be subject to discipline could not state a plausible claim under the Thirteenth Amendment. *Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978). In *Bijeo*l, "[i]n

addition to keeping their own room clean, pretrial detainees were assigned one regular chore in the common areas. The possible assignments included dusting, vacuuming, or emptying ashtrays in the television area three times daily; setting up and cleaning tables after meals; and vacuuming the general purpose area after each meal and prior to retiring." *Id.* The plaintiff claimed that the policy violated the Thirteenth Amendment. The court disagreed, finding that pretrial detainees could be required to perform housekeeping tasks while detained. *Id.* This requirement, among other things, allowed detention centers to maintain "some stability and discipline." *Id.*

Indeed, Plaintiffs mischaracterize the holding in *Barrientos*, arguing that Eleventh Circuit adopted Plaintiffs' interpretation of the PBNDS as limiting detainees' responsibilities to clean their living areas to the four items enumerated in Section 5.8 of the PBNDS. ECF 336 at 66. *Barrientos* made no such finding. Instead, the Eleventh Circuit held that the "nothing in the text of the statute excludes federal contractors providing immigration detention services from liability under the TVPA, even when that liability might arise out of the operation of a federally mandated work program." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1277 (11th Cir. 2020). To avoid "unintended consequences" of its holding, the court limited its scope: "To be clear, our opinion should not be read to call into question the legality of voluntary work programs in federal immigration detention facilities, **or to call into question longstanding requirements that detainees or inmates be required to perform basic housekeeping tasks**." *Id.* at 1277–78 (emphasis added). Contrary to Plaintiffs' briefing, the court did <u>not</u> limit its definition of "basic housekeeping tasks" to those enumerated in Section 5.8. Instead, the court included a footnote directly following the phrase "basic housekeeping tasks." The footnote made plain that the Court's ruling could not be read as questioning the legitimacy of the disciplinary severity scale included

55424240;1

**APP. 703**

in the PBNDS: "As discussed above, in the interest of maintaining order in an immigration detention facility, the PBNDS authorize punishments for detainees who, among other things, refuse to complete basic personal housekeeping tasks or organize work stoppages. *See generally* PBNDS § 3.1. Our decision should likewise not be read to imply that these basic disciplinary measures, on their own, give rise to TVPA liability." *Id.* at n.5.

Thus, the weight of authority makes clear that disciplinary policies that apply to civil detainees in the context of keeping their living area clean constitute legitimate warnings of consequences, not threats of serious harm in violation of the TVPA. Plaintiffs have not pointed to any caselaw to the contrary. Nor have they identified any authority that would support the proposition that segregation is not a legitimate consequence in the detention context. Thus, the disciplinary consequences that a detainee may face for not participating in the meal cleanup do not violate the TVPA.

To be sure, this construction does not mean that all housekeeping would be permissible, regardless of the consequence. Indeed, if a facility were to develop a disciplinary policy that was not consistent with the PBNDS, such a policy may not be legitimate. For example, in *Bridges*, female inmates alleged that they were told they would lose their positions in the facility's work program if they did not provide sexual favors to the guards working there. *Bridges v. Poe*, No. 6:19-CV-01399-LSC, 2020 WL 5408915, at *7 (N.D. Ala. Sept. 9, 2020). Such a consequence is not only clearly illegitimate, but also unlawful. Yet, here there is no air of illegitimacy or illegality the challenged disciplinary policies were drafted by ICE employees and stakeholders and published by the federal agency that has been tasked by Congress to enforce violations of the TVPA. ECF 261-8 at 3. Indeed, the PBNDS were drafted in accordance with a "commitment to

55424240;1

**APP. 704**

transform the immigration detention system" and detain individuals "in the most humane manner possible." *Id.* Plaintiffs have offered no evidence to the contrary. Thus, this Court should find that the disciplinary policy, which includes a sanction of up to 72-hours in segregation for the refusal to clean one's assigned living area, is a warning of a legitimate consequence and therefore not actionable under the TVPA.

## V.     PLAINTIFFS FAIL TO IDENTIFY EVIDENCE OF GEO'S SCIENTER

To create a triable issue for a jury, Plaintiffs must point to sufficient evidence to establish that GEO "intended to deceive the group collectively from the beginning in furtherance of a forced labor scheme." *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 992 (D. Idaho 2019). Plaintiffs fail to present evidence from which a jury could conclude GEO acted knowingly.

In their Response, Plaintiffs admit that none of GEO's detention officers intended to intimidate detainees such that they would perform labor. GEO's Undisputed Fact #46. Plaintiffs attempt to limit the application of this fact by arguing that GEO's officers' knowledge is not imputed to the company. GEO agrees. Nevertheless, Plaintiffs argue that the element of scienter can be met because GEO officers intended for detainees to believe that the facility rules would be enforced. ECF 336 at 67.  Plaintiffs want it both ways, arguing on one hand that GEO Officers' isolated acts satisfy the scienter element of a TVPA claim, while on the other hand arguing that "it is GEO's knowledge, not its employee's intent, that is material to the TVPA claims." ECF 336 at 33, Fact 46 (Plaintiffs' response to Fact 46). Plaintiffs cannot have it both ways.

Plaintiffs also point to evidence that some detainees were, in fact, sent to segregation for refusing to clean. ECF 339 at 66 (citing to Plaintiffs' Additional Fact #16). But the fact that detainees were placed in segregation briefly does not provide any insight into GEO's reasons for

**APP. 705**

doing so. It does not explain <u>why</u> detainees were placed in segregation. The evidence before this Court is clear that, when detainees were sent to segregation, GEO was motivated by a concern that the detainees posed a threat to the safety and security of other detainees and GEO employees—not that GEO was motivated to obtain uncompensated help cleaning up the dorm. GEO's Undisputed Fact 42; *see also* ECF 339-11 at 37,43 (Gallegos Dep 165:15-21;174:1-21).

To be sure, Plaintiffs provide <u>no</u> evidence of GEO's knowledge. Nor do they point to any evidence of how GEO implemented the polices in the PBNDS with the intention of obtaining detainee labor. After years of discovery, it is clear that no such evidence exists. To the contrary, GEO's corporate and 30(b)(6) witnesses testified that GEO's policy is to resolve disciplinary issues involving the refusal to clean informally, not with warnings or placement in segregation. ECF 306-13 at 9 (Ceja 30(b)(6) Dep. 113:13-17). Amber Martin, GEO's Executive Vice President of Contract Administration, also testified that it has always been an informal policy that GEO did not use segregation as a consequence for refusing to clean up their living area. ECF 271-6 at 8 (Amber Martin Dep. 134: 11-24). Plaintiffs do not point to evidence to rebut this testimony.

Furthermore, even if the Court were inclined to consider the GEO officers' actions to be probative of GEO's scienter, the officers' actions were so varied that they fail to establish a unified motivation for imposing discipline other than to maintain order and security within AIPC. GEO's Officers testified that each disciplinary incident was handled on its own merits. GEO's Undisputed Facts 43,44. Thus, each decision as to what sanction was appropriate was unique to each person's situation and how the detainee's reaction impacted other detainees who lived with them. Further, Plaintiffs do not provide evidence that GEO ratified the specific actions of any of its employees which Plaintiffs challenge. Thus, the evidence Plaintiffs cite fails to establish that because in <u>some</u>

situations GEO officers found segregation to be appropriate, those situations amounted to a forced labor scheme. *Giles*, 391 F. Supp. 3d at 992 (D. Idaho 2019) ("[T]he reasons Funk Dairy withheld some of these benefits were unique to each person's situation. The Court cannot make the leap from the idea that just because certain Plaintiffs did not receive all of the promised benefits to the idea that Funk Dairy intended to deceive the group collectively from the beginning in furtherance of a forced labor scheme.").

## VI.   72-HOURS OF SEGREGATION IS NOT SERIOUS HARM UNDER THE TVPA

In their Response, Plaintiffs argue, somewhat incredulously, that the consequence of segregation violates the TVPA because it constitutes a threat of "restraint." ECF 336 at 56. In support, Plaintiffs cite to a case that holds that confinement to a jail cell constitutes "physical restraint." *Id.* Yet, Plaintiffs were already confined within AIPC, a government detention facility. Thus, they were already under "physical restraint," regardless of whether they chose to clean up their living area. Further, the case to which Plaintiffs cite does not provide a basis for liability in this case. In *Bridges v. Poe*, No. 6:19-CV-01399-LSC, 2020 WL 5408915, at *7 (N.D. Ala. Sept. 9, 2020), an incarcerated woman was told by a guard that if she did not perform sex acts, he would remove her from her position as a trustee who was able to work and earn money. *Id.* The court concluded at the motion to dismiss stage, that these allegations were sufficient to state a claim of a TVPA violation. *Id.* The facts are relevant because not every physical restraint or threat violates the TVPA; rather, only those that are "sufficiently serious" violate the statute. Here, unlike in *Bridges*, there is no evidence that the use of segregation as prescribed by the PBNDS would constitute a "sufficiently serious" threat. Thus, Plaintiffs cannot prevail based upon the theory that they can show that solitary confinement constitutes "physical restraint."

69

55424240;1

**APP. 707**

Additionally, whether a warning of 72-hours of segregation constitutes serious harm for *any* civilly confined individual can be resolved without turning to Plaintiffs newly recited, disputed facts.[4] To meet their burden, Plaintiffs must show that to the average person, a warning of 72-hours in segregation was so psychologically coercive as to make them more likely to labor than risk segregation. Plaintiffs themselves seem to agree with this burden, arguing that "[t]he fear of solitary confinement was objectively reasonable." ECF 336 at 58. But, as support, Plaintiffs point not to evidence that people generally fear a brief period of segregation or even that the circumstances of segregation are well enough understood by an average person to invoke a uniform or similar response. To the contrary, Plaintiffs' expert, Dr. Grassian, concedes that he is unaware of <u>any</u> literature that stands for the proposition that a threat of 72-hours in segregation could cause psychological harm. GEO's Undisputed Fact # 32. Plaintiffs do not dispute this fact. Thus, absent an assessment of individualized perceptions of segregation,[5] Plaintiffs cannot present any evidence that a reasonable person, in the detainees' circumstances, would feel compelled to labor to avoid segregation.

Plaintiffs' reliance *United States v. Callahan*, 801 F.3d 606 (6th Cir. 2015), does not change the inquiry. Indeed, in *Callahan* the threatened consequences did not require expert testimony to understand. Instead, they could be understood by any juror. In *Callahan*, two individuals, a developmentally disabled woman and her toddler daughter, were locked in a basement by their

---

[4] Indeed, to the extent this Court entertains Plaintiffs' argument that individualized circumstances or allegations that are not common to the class create disputes of fact that preclude summary judgment, the Court should likewise grant GEO's motion to decertify (ECF 312) such that each Plaintiff's individual claims can be tried on their own merits.

[5] Plaintiffs are steadfast that this case does not present individualized issues. Yet, they have not provided any evidence that Plaintiffs experiences are similar to others in the class. Thus, they cannot rely upon Plaintiffs' own subjective impressions of the possibility of segregation to prove their point on a classwide basis.

55424240;1

**APP. 708**

roommates and forced to clean the apartment, perform yardwork, routinely clean dog feces and urine, suffer beatings to obtain prescription narcotics from physicians, and perform other tasks at their captor's will. *Id* at 614. If the woman refused, her captors would shove her face in dog urine and feces, stab between her fingers with knives, hold her at gunpoint, and otherwise beat her. *Id*. In addition, they forced her to beat her daughter while they took a video of the beating— threatening to show the video to the authorities if she spoke with any strangers. *Id.* at 620. Her daughter would be locked in a dog cage and forced to eat dog food—if she didn't comply, she was shot with a BB gun. *Id.*at 614. Even if they obeyed the individuals who held them, their living conditions were inhumane: the two slept on the concrete floor with dirty blankets. The two were rarely allowed to bathe and only received one meal per day—typically unheated canned food. *Id*

   While there is no ambiguity that people may fear physical harm to themselves or their loved ones when faced with a threat of physical violence, a gun, or a raised fist as in *Callahan*; here, the purported threat is more nuanced. Indeed, Plaintiffs point to EEG readings and studies of psychological symptoms of those who are placed in segregation as evidence of harm. Plaintiffs' Response to GEO's Undisputed Fact #32; Plaintiffs Additional Disputed Facts 20-23. The average layperson has no perception of what it means to have an abnormal EEG reading resulting from segregation. Acknowledging that a layperson would not readily understand or conceptualize these purported harms, Plaintiffs present this evidence in the form of expert testimony (thereby conceding that it is not commonly known to an average layperson). *Id.* Other than the report of GEO's expert, Dr. Kropf (ECF 339-20), the record is silent as to the average person's perception of segregation. And, many detainees prefer to be in segregation for the peace and quiet or

**APP. 709**

protection from others in the housing units. GEO's Undisputed Fact #29.[6] Thus, there is no evidence on which a factfinder could conclude that a warning of segregation would lead an average person to labor to avoid the consequence.

## VII.   PLAINTIFFS' ADDITIONAL FACTS ARE NOT MATERIAL

By Plaintiffs' own admission, they claim that they can prove the existence of a TVPA violation based upon two considerations (1) that detainees were informed of the meal clean-up and disciplinary policy; and (2) detainees performed meal clean up when assigned to do so. ECF 336 at 69. Thus, under Plaintiffs' own theory, any additional circumstances or considerations are not necessary for a finding that GEO violated the TVPA. Accordingly, here, the only factual issues before the Court are: (1) whether detainees performed meal cleanup services; and (2) whether detainees received the detainee handbook which enumerated the policies for discipline and general cleanup. The parties do not dispute that every detainee receives the AIPC Handbook. ECF 270 (Fact 14); ECF 260 (Fact #60). The parties also do not dispute that this handbook contains the consequences for refusing to clean. GEO's Undisputed Fact #9. Nor do they dispute that the PBNDS authorize up to 72-hours of disciplinary segregation as a sanction for refusing to clean one's assigned living area. ECF 270 at 6 (Fact #11); ECF 260 (Fact #79). While GEO disputes that detainees cleaned on every occasion they were asked, GEO does not dispute that, after each meal, detainees helped clean the tables and floors on a rotating basis. GEO's Undisputed Fact #8. Thus, under Plaintiffs' own theory (one which they insist confirms the propriety of class certification, ECF 339), no additional facts are necessary to determine whether GEO has violated the TVPA.

---

[6] *See also* Corey Devon Arthur, I Hate My Prison Dorm So Much, I Enjoyed COVID-19 Quarantine in the Box, The Marshall Project, *available at* https://www.themarshallproject.org/2020/09/24/i-hate-my-prison-dorm-so-much-i-enjoyed-covid-19-quarantine-in-the-box (last visited November 12, 2020).

55424240;1

**APP. 710**

This Court must look only to the enumerated policies and determine whether those polices constitute a threat in violation of the TVPA. Accordingly, Plaintiffs' additional facts have no bearing on the case.[7] Regardless of the number of visits each detainee had with their family, how many phone calls they made each day, or their general comfort in a group living environment, what matters is whether the written policies themselves constituted a threat of serious harm. This lawsuit is not about challenging the conditions of confinement in ICE detention centers generally, but instead, about a specific meal cleanup policy. As discussed *supra*, the policies do not constitute a threat but instead a warning of a legitimate consequence. Summary judgment is warranted.

## VIII.   PLAINTIFFS' UNJUST ENRICHMENT CLAIMS ARE BARRED BY EXPRESS CONTRACTS

### A.      GEO Did Not Waive Its Defense.

First, Plaintiffs argue that GEO waived its contract defense by failing to raise it in its Answer.  ECF 336 at 76. Plaintiffs cannot show waiver because GEO raised its contract defense in the parties scheduling order over two years ago. ECF 146 at 20. Notwithstanding a party's failure to plead an avoidance or affirmative defense, Tenth Circuit courts have held that there is no waiver if the defense is included in a pretrial order.  *Bentley v. Cleveland Cnty. Bd. of Cnty. Cmmr's*, 41 F.3d 600, 605 (10th Cir. 1994) (noting the defendant waived potential immunity defense "by failing to raise the issue in its answer, the Pre-Trial Order, or at trial"); *Expertise, Inc. v. Aetna Fin. Co.*, 810 F.2d 968, 973 (10th Cir. 1987) ("When an issue is set forth in a pretrial order, it is not necessary to amend previously filed pleadings."); *Villescas v. Richardson*, 124 F. Supp. 2d 647,

---

[7] To the extent the Court determines Plaintiffs additional proposed facts preclude summary judgment, such a finding would provide additional support for GEO's motion to decertify the class. Indeed, how much contact each detainee received with their family, their immigration status, and how they came to be at AIPC, whether they had criminal history, all vary depending upon their individual history. No single set of circumstances applied to all detainees.

55424240;1

653 (D. Colo. 2000) (citing *Bentley* and *Expertise* and stating that "[u]nder Tenth Circuit authority, inclusion of affirmative defenses in pretrial orders satisfies Rule 8(c)").  Additionally, Wright & Miller note that "the substance of many unpleaded Rule 8(c) affirmative defenses may be asserted by pretrial motions, particularly in the absence of any showing of prejudice to the opposing party and assuming it has had an opportunity to respond."  5 Fed. Prac. & Proc. § 1278 (3d ed. Sept. 2018).

Where a party is put on notice of a defense with sufficient time before trial, the defense is not waived. *Ahmad v. Furlong*, 435 F.3d 1196, 1201-02 (10th Cir. 2006) (affirmative defense is not waived when the plaintiff is put on notice sufficiently in advance of trial) (compiling cases). Plaintiffs have been on notice of this defense since, at the latest, September 11, 2018. ECF 146 at 20.  In the parties' amended scheduling order, GEO explicitly stated that "GEO may file a dispositive motion arguing that express contracts preclude Plaintiffs' unjust enrichment claim." *Id*. That is exactly what GEO has done here. Thus, there can be no question that the defense was not waived.

**B.      Contracts of Adhesion are Not *Per Se* Unconscionable.**

Plaintiffs' claim is essentially that the VWP contracts are unenforceable because they are contracts of adhesion; however, contracts of adhesion "are not per se unconscionable" under Colorado law.  *Weller v. HSBC Mortgage Services, Inc.*, 971 F. Supp. 2d 1072, 1081 (D. Colo. 2013) (emphasis in original). The existence of a "standardized agreement between parties with unequal bargaining power . . . by itself is not enough for a finding of procedural unconscionability." *Vernon v. Qwest Communications Intern., Inc.*, 925 F. Supp. 2d 1185, 1195 (D. Colo. 2013) (contracts offered on a "take it or leave it basis" do not without more make agreements

unenforceable). Plaintiffs argue that, because the terms of VWP contract were not negotiable and because the individuals who chose to participate in the voluntary program were detained, the contracts were unconscionable because of the uneven bargaining power between GEO and detainees, as detainees were under GEO's care at AIPC. Yet, Plaintiffs provide no legal support that a detainee is unable to enter into a valid contract with a detention facility where they are housed.[8] And, Plaintiffs concede that all detainees who chose to participate in the VWP are told their participation is voluntary. Undisputed Fact #19. Thus, any detainee who does not want to participate does not have to. This alone undermines any claim that the contracts are unenforceable simply because of the unequal bargaining power.

Acknowledging that participation was voluntary, Plaintiffs also argue that detainees had no source of income other than the VWP and therefore their decision to enter into the contract indicates that it was unconscionable. Yet, Plaintiffs cite no evidence to support this claim. ECF 336 at 78. Indeed, to the contrary, each detainee's financial circumstances were different. For example, Plaintiff Hernandez testified that the VWP was not his only source of commissary funding, but that he also received funds from his family and friends. ECF 336-4 at 22 (Hernandez Dep. 147:7-10). Further, despite having months to file their response, Plaintiffs have failed to provide evidence from even *one* Plaintiff about the reason he or she chose to participate in the VWP. To the contrary, the detainees' applications show they genuinely wanted the opportunity, with some detainees applying multiple times until they were selected for a position. ECF 306-2. Thus, Plaintiffs have failed to present an issue of disputed fact as to whether the contracts are

---

[8] As for Plaintiffs' claim that any agreement to pay an ICE detainee $1 per day is "commercially unreasonable," the argument ignores ample federal law to the contrary. *See Channer v. Hall*, 112 F.3d 214, 219 (5th Cir. 1997) ("[T]he federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks...."); 8 U.S.C. § 1555(d).

55424240;1

unconscionable. Accordingly, Plaintiffs' unjust enrichment claims are barred by the contracts that detainees signed to participate in the VWP.

## IX.    CONCLUSION

Because the issues raised in GEO's motion for summary judgment are ripe for adjudication and there are no disputed issues of *material* fact that preclude their resolution, this Court should enter summary judgment in GEO's favor.

Respectfully submitted, this the 18th day of November, 2020.

**AKERMAN LLP**
*s/ Adrienne Scheffey*
Colin L. Barnacle
Adrienne Scheffey
Christopher J. Eby
Melissa L. Cizmorris
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  (303) 260-7712
Facsimile:   (303) 260-7714
Email: colin.barnacle@akerman.com
Email: adrienne.scheffey@akerman.com
Email: christopher.eby@akerman.com
Email: melissa.cizmorris@akerman.com

**BURNS, FIGA & WILL, P.C.**
Dana L. Eismeier
Michael Y. Ley
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, CO 80111
Telephone:  (303) 796-2626
Facsimile:   (303) 796-2777
Email: deismeier@bfwlaw.com
Email: mley@bfwlaw.com

*Attorneys for Defendant The GEO Group, Inc.*

55424240;1

**APP. 714**

## CERTIFICATE OF SERVICE

I hereby certify on this 18th day of November, 2020, a true and correct copy of the foregoing **DEFENDANT THE GEO GROUP, INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was filed and served electronically via the Court's CM/ECF system on the following:

### Counsel for Plaintiffs:

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
TOWARDS JUSTICE
PO Box 371680
PMB 44465
Denver, CO 80237-5680
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Matthew Fritz-Mauer
KELMAN BUESCHER FIRM
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com
mfritzmauer@laborlawdenver.com

Hans C. Meyer
MEYER LAW OFFICE, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
OUTTEN & GOLDEN, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
OUTTEN & GOLDEN, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
OUTTEN & GOLDEN, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
LAW OFFICE OF R. ANDREW FREE
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
MILSTEIN LAW OFFICE
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

_s/ Nick Mangels_
Nick Mangels

77

55424240;1

**APP. 715**

**LIST OF EXHIBITS TO GEO'S REPLY IN SUPPORT OF**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**ECF No. 351**: Declaration of Adrienne Scheffey dated November 18, 2020

**Ex. R**: Att. 1 to Scheffey Declaration – Excerpts of Deposition of Hugo Hernandez Ceren dated June 24, 2020

**Ex. S**: Att. 2 to Scheffey Declaration – Plaintiffs' Responses to GEO's First Set of Written Discovery Requests

**Ex. T**: Att. 3 to Scheffey Declaration – Exhibit 12 to the Deposition of Hugo Hernandez Ceren dated June 24, 2020

55424240;1

**APP. 716**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALEGRA,
on their own behalf and on behalf of all others similarly situated,

       Plaintiffs,

v.

THE GEO GROUP, INC.,

       Defendant.

---

**ORDER ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 260, 284, & 305) AND DEFENDANT'S MOTIONS TO DISMISS (ECF NO. 307) AND FOR DECERTIFICATION OF CLASS (ECF NO. 312)**

---

Kane, J.

      Plaintiffs in this case are former immigration detainees at the Aurora Detention Facility

in Aurora, Colorado, a private immigration detention center owned by Defendant The GEO

Group, Inc. ("GEO") and operated pursuant to a contract with U.S. Immigration and Customs

Enforcement ("ICE"). The parties have filed a handful of motions related to the sufficiency and

type of the evidence supporting Plaintiffs' claims, GEO's status as a government contractor, and

ICE's role in the challenged conduct. After wading through the parties' exhaustive arguments, I

determine GEO's motions are without merit and find neither derivative sovereign immunity nor

the government contractor defense protect it from liability.

**APP. 717**

## I. Background

Plaintiffs originally brought three claims against GEO for: (1) noncompliance with the Colorado Minimum Wages of Workers Act, Colo. Rev. Stat. § 8-6-101, *et seq*.; (2) violations of the forced labor provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589, 1595; and (3) unjust enrichment. GEO filed a motion to dismiss, and I granted its motion as to the Colorado minimum wage claim. *Menocal v. GEO Grp., Inc.*, 113 F.Supp.3d 1125, 1135 (D. Colo. 2015) ("*Menocal I*"). Plaintiffs remaining claims challenge two separate policies implemented by GEO at the Aurora Detention Facility (the "Facility"). First, Plaintiffs assert that, by forcing detainees at the Facility to clean up the common areas and after other detainees under the threat of segregation, GEO has violated the TVPA. Second, Plaintiffs claim that GEO has been unjustly enriched by paying detainees only $1.00 per day for their participation in the Facility's Voluntary Work Program (the "VWP").

Plaintiffs sought to proceed with their TVPA and unjust enrichment claims on behalf of two classes of similarly situated individuals. I granted Plaintiffs' request, finding both proposed classes fulfilled the requirements set out in Federal Rule of Civil Procedure 23. *Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258, 270 (D. Colo. 2017) ("*Menocal II*"). For Plaintiffs' claim brought under the TVPA, the certified class includes: all persons detained in the Facility in the ten years preceding the filing of this action, i.e., from October 22, 2004, to October 22, 2014. *Id.* at 262. For Plaintiffs' unjust enrichment claim, the certified class includes: all people who performed work at the Facility under GEO's VWP in the three years preceding the filing of this action, i.e., from October 22, 2011, to October 22, 2014. *Id.* Convinced certification of the two classes was in error, GEO filed an interlocutory appeal of the Certification Order, which the Tenth Circuit affirmed, *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 927 (10th Cir. 2018) ("*Menocal III*").

APP. 718

## A. Specific Motions at Issue

This Order addresses four motions filed by GEO and a single motion filed by Plaintiffs:

- The parties' cross motions for summary judgment on GEO's assertion of derivative sovereign immunity and its government contractor defense (ECF Nos. 260 & 284);

- GEO's Motion to Dismiss (ECF No. 307) based on Plaintiffs' purported failure to join ICE, which GEO contends is a necessary and indispensable party;

- GEO's Motion for Summary Judgment (ECF No. 305), in which it argues that judgment as a matter of law on Plaintiffs' TVPA and unjust enrichment claims is appropriate because Plaintiffs cannot establish the requisite elements of their claims; and

- GEO's Motion for Decertification of Class (ECF No. 312), asserting that the TVPA class should be decertified because the evidence in the record demonstrates that class members' individual circumstances predominate.

## B. GEO's Operation of the Aurora Detention Facility

### 1. The Relevant Contracts

During the period covering the certified classes, the Facility was operated by GEO pursuant to a series of three contracts with ICE: the first in effect from March 27, 2003 (the "2003 Contract"), the second from September 29, 2006 (the "2006 Contract"), and the third from September 15, 2011 (the "2011 Contract"). *See* 2003 Contract, ECF No. 262-5; 2006 Contract, ECF No. 262-4; 2011 Contract, ECF No. 262-2.[1] ICE is an agency within the Department of

---

[1] The docket in this case became so cluttered with declarations and exhibits that I directed the parties to follow a specific procedure for future filings. *See* Order re: Mots. to Restrict at 2, ECF No. 320. Still, some of the parties' later filings reflected old habits and continued to make review of the submitted evidence an unnecessarily tedious task. *See, e.g.*, ECF Nos. 326, 351, 353.

**APP. 719**

Homeland Security that is primarily tasked with enforcing the nation's immigration laws. One aspect of ICE's responsibility is arranging for the detention of individuals who are awaiting the results of their immigration proceedings or removal. ICE frequently contracts with private entities to house these individuals in privately owned facilities, like the Aurora Detention Facility.

The relevant ICE-GEO contracts provide that GEO is to receive payment for a certain number of beds, regardless of actual occupancy, and an additional rate for each bed that is occupied above that minimum number. 2003 Contract, ECF No. 262-5 at 6; 2006 Contract, ECF No. 262-4 at 3-4; 2011 Contract, ECF No. 262-2 at 3-4. GEO's profits are the difference between what it spends and the payments it receives from ICE under their contracts. Krumpelmann Dep. 23:23-24:4, ECF No. 261-6.

GEO produced Dan Ragsdale, Executive Vice President for Contract Compliance, as its corporate designee under Federal Rule of Civil Procedure 30(b)(6) to testify about its contracts with ICE as they relate to GEO's policies at issue in this case. Mr. Ragsdale explained that detention facilities develop policies and ICE "review[s] and clear[s]" those policies. Ragsdale Dep. 39:3-6, ECF No. 271-11. ICE does so through its on-site Contracting Officer's Technical Representative ("COTR").[2] Nelson Dep. 150:18-151:2, ECF No. 261-16. The ICE-GEO contracts specify that, "[t]o be valid, technical direction by the COTR [m]ust be consistent with the general scope of work set forth . . . in th[e] contract" and it "[m]ay not . . . change the

---

[2] Apparently, this title was used interchangeably with "Contracting Officer's Representative" for the individual who held the position for the Facility during the relevant contract periods. GEO Second Notice of Suppl. Auth. at 2, ECF No. 297. The letter appointing that Contracting Officer's Representative states that the Representative shall not "[c]hange or modify any of the terms and conditions . . . of a contract" and shall not "direct the contractor . . . to operate in conflict with the contract terms and conditions." COR Appointment Letter at 3-4, ECF No. 297-2.

**APP. 720**

expressed terms, conditions or specifications of th[e] contract." 2011 Contract, ECF No. 288-1 at 41. ICE also has annual reviews of the Facility conducted to determine whether it meets specific standards imposed by the contracts. *See* Annual Review Mems., ECF No. 273-6. Over the periods covered by the certified classes, ICE rated the Facility as acceptable or as meeting the assessed standards. *See id.*

 The ICE-GEO contracts reference and incorporate many external policies and standards. As relevant here, Federal Acquisition Regulation 52.222-50, relating to the U.S. Government's "policy prohibiting trafficking in persons," is incorporated into the 2006 and 2011 Contracts. 2006 Contract, ECF No. 262-4 at 21; 2011 Contract, ECF No. 262-2 at 51. The Regulation states: "Contractors, contractor employees, and their agents shall not . . . [u]se forced labor in the performance of the contract." 48 C.F.R. § 52.222-50(b). Additionally, the contracts reference the American Correctional Association ("ACA") standards. 2003 Contract, ECF No. 262-5 at 12; 2006 Contract, ECF No. 262-4 at 11; 2011 Contract, ECF No. 262-2 at 38. ACA Standard 4-ALDF-5C-08 provides that: "Pretrial and unsentenced inmates are not required to work except to do personal housekeeping and to clean their housing area." ACA Performance-Based Standards, ECF No. 261-15 at 10.

 Most significantly, the contracts require compliance with the ICE Performance Based National Detention Standards ("PBNDS")[3] and clarify that ICE policies and standards prevail if ever other standards conflict with them. 2003 Contract, ECF No. 262-5 at 12, 15, 17; 2006 Contract, ECF No. 262-4 at 11; 2011 Contract, ECF No. 262-2 at 38-39. Three versions of the PBNDS are relevant in this case: those promulgated in 2000, 2008, and 2011.

---

[3] Before 2008, these were known as just the National Detention Standards. *See* 2003 Contract, ECF No. 262-5 at 15. For simplicity, I refer to them all as the PBNDS.

The parties dispute when GEO was required to comply with the 2011 PBNDS, which were published on February 27, 2012, ICE Report on 2011 PBNDS, ECF No. 287-8 at 8. The 2011 ICE-GEO Contract cites to the 2008 PBNDS, stating "[a] copy of the current version is obtainable on the Internet website: http://www.ice.gov/detention-standards/2008/." 2011 Contract, ECF No. 262-2 at 38. But the Contract explains that the listed "constraints may change over time" and "the Contractor shall be knowledgeable of any changes to the constraints and perform in accordance with the most current version of the constraints." 2011 Contract, ECF 262-2 at 37. After the 2011 PBNDS were published, GEO and ICE executed a contract modification, specifically incorporating into their contract the 2011 PBNDS, among other policies. 2013 Contract Modification, ECF No. 262-3 at 2. The modification provides that "[w]ithin 30 days of [its] execution . . . the facility shall be compliant with all PBNDS 2011 Standards stated herein." 2013 Contract Modification, ECF No. 262-3 at 3.[4]

### 2. The Voluntary Work Program

Under the ICE-GEO contracts and the PBNDS, GEO is required to administer a Voluntary Work Program for detainees. *See* 2000 PBNDS, ECF No. 261-10 at 2-3; 2008 PBNDS, ECF No. 261-9 at 60; 2011 PBNDS, ECF No. 261-8 at 50. The 2011 Contract, which covers the period of the unjust enrichment class, provides a stipend for the Program, under which GEO is to be reimbursed at "actual cost" of $1.00 per day of detainee labor provided under the Program and is not to seek reimbursement for more than the specified total amount. 2011

---

[4] GEO contends it was not required to comply with the 2011 PBNDS until the 2011 contract was modified in 2013. Plaintiffs say immediate compliance was required based on the language in the Contract requiring the Contractor to "perform in accordance with the most current version of the constraints." 2011 Contract, ECF 262-2 at 37. Plaintiffs also point to an email sent April 4, 2012, mentioning the new language regarding reimbursement for VWP work. Amber Martin Dep. 44:10-46:6, ECF No. 287-9. My rulings below obviate the need to resolve this dispute.

APP. 722

Contract, ECF No. 262-2 at 5. For at least the first part of the 2011 Contract's term, the 2008 PBNDS applied and directed that, for detainees who perform work in accordance with a facility's standard policy, "the compensation is $1.00 per day." 2008 PBNDS, ECF 261-9 at 63. As mentioned, the parties dispute when GEO was required to comply with the 2011 PBNDS under its contract. At some point, though, the 2011 PBNDS required that detainees who participated in the VWP receive compensation of "at least $1.00 (USD) per day." 2011 PBNDS, ECF No. 261-8 at 53.

The PBNDS lists a handful of "expected outcomes" or "objectives" of the VWP. *See* 2000 PBNDS, ECF No. 261-10 at 3; 2008 PBNDS, ECF No. 261-9 at 60; 2011 PBNDS, ECF No. 261-8 at 50. The applicable versions of the PBNDS describe the following as ICE's expected outcomes of the VWP, among others: (1) "[d]etainees may have opportunities to work and earn money while confined"; (2) "[e]ssential operations and services will be enhanced through productivity from detainees"; (3) "[t]he negative impact of confinement will be reduced through less idleness, improved morale and fewer disciplinary incidents"; and (4) "[d]etainee working conditions will comply with all applicable federal, state, and local work safety laws and regulations." 2008 PBNDS, ECF No. 261-9 at 60; *see also* 2011 PBNDS, ECF No. 261-8 at 50.

Over the relevant period, GEO paid participants in the VWP at the Facility $1.00 per day. Participants in the VWP signed a document that indicated they would be compensated this amount. *See* Detainee VWP Agreement, ECF No. 306-2 at 3. Dawn Ceja, the Assistant Warden at the Facility and GEO's corporate designee, stated that this document was not an employment contract and did not create any rights for the detainee who signed it. Ceja Dep. 149:25-150:11, ECF No. 336-9. In addition to the $1.00-per-day compensation, some VWP participants received extra rewards, like candy or ice cream. *Id.* 162:14-163:25, ECF No. 306-3.

**APP. 723**

GEO has paid detainees more than $1.00 per day at some of its other facilities, but the record does not establish that those other facilities are subject to identical contract terms. At the LaSalle Processing Center—an ICE detention facility operated by GEO where the same PBNDS provisions have applied—GEO has paid as much as $4.00 per day to VWP participants, even though GEO is only reimbursed $1.00 per day by ICE. Amber Martin Dep. 109:1-110:6, ECF No. 261-2. When asked how GEO could pay detainees more than $1.00 per day under the VWP, Amber Martin, GEO's Executive Vice President of Contract Administration, stated: "I guess we could do it on our own dime." *Id.* 107:22, ECF No. 261-2.

Mr. Ragsdale testified that there was no financial incentive for GEO to use detainees through the VWP to do anything because their work is cost neutral at a dollar a day but becomes a cost to GEO when detainees have to be incentivized beyond that. Ragsdale Dep. 168:12-17, ECF No. 306-14. He explained that GEO would make more money if it could charge ICE an additional margin for employees on its staffing plan. *Id.* 168:4-10, ECF No. 306-14. But there is other testimony in the record that, even if there is no competition, GEO might not be awarded a contract if its price was set too high. Venturella Dep. 165:25-166:4, ECF No. 336-17.

### 3.  Policies Relevant to Plaintiffs' TVPA Claim

Several policies written and/or implemented by GEO are relevant to Plaintiffs' TVPA claim. First, the PBNDS incorporated into the controlling ICE-GEO contracts listed circumstances in which detainees were expected to clean and provided a disciplinary framework. The PBNDS explained:

> [A]ll detainees are responsible for personal housekeeping. . . . [D]etainees are required to maintain their immediate living areas in a neat and orderly manner by:
>
> 1. making their bunk beds daily;

**APP. 724**

    2. stacking loose papers;

    3. keeping the floor free of debris and dividers free of clutter; and

    4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects
       from beds, overhead lighting fixtures or other furniture.

2000 PBNDS, ECF No. 261-10 at 3; 2008 PBNDS, ECF No. 261-9 at 61-62; 2011 PBNDS, ECF No. 261-8 at 51.[5] The Declaration of Jay Brooks, an ICE supervisory detention and deportation officer, asserts that the tasks set out above were "not intended by ICE to be an exhaustive list of facility scenarios in which a detainee may be expected to participate in housekeeping." Brooks Decl. ¶ 14, ECF No. 335-2.[6] ICE did not, however, specify any other housekeeping tasks detainees were expected to perform.

    The ICE National Detainee Handbook, which is provided to detainees at the Facility, includes the following question and response: "Will I get paid for keeping my living area clean? No. You must keep areas that you use clean, including your living area and any general use areas that you use. If you do not keep your areas clean, you may be disciplined." 2013 ICE Handbook, ECF No. 310-1 at 18.

    Additionally, GEO was obligated to adopt ICE's disciplinary severity scale found in the PBNDS and to provide notice of that scale to detainees through the local detainee handbook.

---

[5] Although the three PBNDS versions contain slightly different wording, the language quoted throughout this Order is materially the same in each of the PBNDS, unless it is otherwise noted.
[6] Ms. Brooks' Declaration was submitted in response to an information request in another case—*Novoa v. GEO Grp., Inc.*, No. 17-cv-2514 (C.D. Cal.). GEO filed Ms. Brooks' Declaration with its October 26, 2020 Notice of Supplemental Authority (ECF No. 335). Plaintiffs object to Ms. Brooks' interpretation of this section of the PBNDS because she only participated in drafting the 2011 PBNDS and the language she describes was present in the prior versions as well. Resp. to Notice of Supp. Auth. at 5, ECF No. 345. Plaintiffs request that, to the extent I find Ms. Brooks' Declaration probative, I grant them "leave to depose Ms. Brooks, at GEO's expense, to eliminate any prejudice caused by GEO's disclosure of her declaration after the close of discovery." *Id.* at 9 n.4. While Ms. Brooks' Declaration provides useful background information, I agree with Plaintiffs that it does not conclusively provide support for any of GEO's Motions, and thus I deny without prejudice Plaintiffs' request to depose Ms. Brooks.

**APP. 725**

2000 PBNDS, ECF No. 261-10 at 9-10, 17; 2008 PBNDS, ECF No. 261-9 at 44-45; 2011

PBNDS, ECF No. 261-8 at 38-39. Under the PBNDS disciplinary scale, "[r]efusal to clean

assigned living area" and "[r]efusing to obey a staff member/officer's order" were both

considered "high moderate" offenses subject to the following sanctions:

     A. Initiate criminal proceedings

     B. Disciplinary transfer (recommend)

     C. Disciplinary segregation (up to 72 hours)

     D. Make monetary restitution, if funds are available

     E. Loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.)

     F. Change housing

     G. Remove from program and/or group activity

     H. Loss of job

     I. Impound and store detainee's personal property

     J. Confiscate contraband

     K. Restrict to housing unit

     L. Reprimand

     M. Warning

2000 PBNDS, ECF No. 261-10 at 24; 2008 PBNDS, ECF No. 261-9 at 56-57; 2011 PBNDS,

ECF No. 261-8 at 47-48. Disciplinary segregation involves segregating detainees from the

general population for punitive reasons and may only be imposed after a disciplinary hearing

panel has found a detainee is guilty of a prohibited act or violation for which disciplinary

segregation is an authorized punishment. 2000 PBNDS, ECF No. 261-10 at 70; 2008 PBNDS,

ECF No. 261-9 at 28; 2011 PBNDS, ECF No. 261-8 at 27. Disciplinary segregation differs from

**APP. 726**

administrative segregation, which may be used for protective custody or when a detainee is an immediate safety threat. *See, e.g.*, 2011 PBNDS, ECF No. 261-8 at 22. The PBNDS disciplinary scale also included the offenses of "[f]ailure to follow safety or sanitation regulations" and "[b]eing unsanitary or untidy, failing to keep self and living area in accordance with posted standards," which were classified as "low moderate" offenses for which segregation was not a potential sanction. 2000 PBNDS, ECF No. 261-10 at 27-28; 2008 PBNDS, ECF No. 261-9 at 58-59; 2011 PBNDS, ECF No. 261-8 at 49.

Pursuant to the PBNDS, Officers who witnessed a prohibited act were to complete an incident report. 2000 PBNDS, ECF No. 261-10 at 11; 2008 PBNDS, ECF No. 261-9 at 45; 2011 PBNDS, ECF No. 261-8 at 39. Minor transgressions were to be settled informally whenever possible, unless the involved officer believed informal resolution was inappropriate or unachievable. 2000 PBNDS, ECF No. 261-10 at 11; 2008 PBNDS, ECF No. 261-9 at 46; 2011 PBNDS, ECF No. 261-8 at 39. After an incident report was investigated, the Unit Disciplinary Committee ("UDC") conducted hearings and, for low moderate and high moderate offenses, again attempted to accomplish an informal resolution. 2000 PBNDS, ECF No. 261-10 at 12; 2008 PBNDS, ECF No. 261-9 at 47; 2011 PBNDS, ECF No. 261-8 at 40-41. The UDC could not impose disciplinary segregation. 2000 PBNDS, ECF No. 261-10 at 13; 2008 PBNDS, ECF No. 261-9 at 47; 2011 PBNDS, ECF No. 261-8 at 41. If a matter was not resolved by the UDC or involved serious charges, it was forwarded to the Institutional Disciplinary Panel ("IDP"), which held a more formal hearing. 2000 PBNDS, ECF No. 261-10 at 12, 15-16; 2008 PBNDS, ECF No. 261-9 at 47-51; 2011 PBNDS, ECF No. 261-8 at 41-43. Only the IDP could place a detainee in disciplinary segregation. 2000 PBNDS, ECF No. 261-10 at 15; 2008 PBNDS, ECF No. 261-9 at 50; 2011 PBNDS, ECF No. 261-8 at 43.

**APP. 727**

ICE's annual reviews of the Facility assessed the PBNDS requirements listed on the review forms. *See* Annual Review Mems., ECF No. 273-6. The forms included whether the facility had a "written disciplinary system using progressive levels of reviews and appeals," *id.*, ECF No. 273-6 at 6, 14, 28, 40, 58, 75, but they did not cover "the requirement that [detainees] clean the common areas," Ragsdale Dep. 38:7-8, ECF No. 287-12.

The Facility's Detainee Handbook (the "Handbook") provides the foundation for Plaintiffs' TVPA claim. The Handbook communicated the rules and policies of the Facility, including ICE's disciplinary severity scale as well as GEO's own cleaning requirements, and it was issued to all detainees at the Facility. Ceja Dep. 29:21-23, ECF No. 336-9; *see* 2005 Handbook, ECF No. 273-1 at 24; 2007 Handbook, ECF No. 273-2 at 64; 2008 Handbook, ECF No. 273-3 at 25-26; 2010 Handbook, ECF No. 273-4 at 21-22; 2011 Handbook, ECF No. 273-5 at 22; Oct. 2013 Handbook, ECF 261-17 at 26. GEO expected that detainees would review the Handbook for the rules and regulations they were required to follow. Ceja Dep. 100:8-11, ECF No. 339-3. The Handbook put detainees "on notice" that if they did not clean as directed, they could be taken to segregation. Ceja Dep. 79:19-25, 80:20-25, ECF No. 339-2.

Specifically, the Handbook required detainees "to keep [their] personal living area clean and sanitary," which included their "bunk and immediate floor area around and under [their] bunk, locker, and any personal items." 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 48; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 16; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 19.[7] The Handbook's cleaning requirements did not stop there, though. The Handbook also stated: "[a]ll

---

[7] As with the PBNDS, the wording in the Facility's Detainee Handbooks differs slightly, but the language quoted throughout this Order is materially the same in each Handbook, unless it is otherwise noted.

**APP. 728**

detainees in a housing unit are required to keep clean and sanitary all commonly accessible areas of the housing unit, including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs." 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 50; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. The Handbook went on to explain:

> The day room area will be kept clean at all times. Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean the area will result in further disciplinary action.

2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 50; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20.

> Then, under the heading "Housing Unit Sanitation,"[8] the Handbook instructed:

> Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit Officer will be responsible for assuring this general cleanup is done on a regular basis.

2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 49; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. The Declaration of Shannon Ely, an ICE contracting officer, states that the "Housing Unit Sanitation Policy . . . is a GEO policy, created by GEO" and "is not created by ICE nor is it a requirement of the contract." Ely Decl. ¶¶ 2, 22,

---

[8] The title in the 2007 and 2008 Handbooks is "Dormitory Sanitation."

**APP. 729**

ECF No. 261-7.[9] In contrast, Ms. Brooks' Declaration explains that, at other facilities, "ICE [wa]s not the initial drafter of the GEO [Housing Unit Sanitation Policy]," but "ICE may have had some input and may have reviewed [the Housing Unit Sanitation Policy]." Brooks Decl. ¶ 10.

Ms. Ceja described the "general cleanup," in which detainees were obligated to participate, as occurring after meal service and involving "clean[ing] up the tables, wip[ing] down the tables, and sweep[ing] and mop[ping] the floors" in the day room area. Ceja Dep. 36:24-37:4, ECF No. 261-12. But, again, the Handbook mandated that detainees "keep clean and sanitary all commonly accessible areas of the housing unit, including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs." 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 50; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. In line with these specifications, Plaintiff Hugo Hernandez testified that detainees were expected to "clean the rec yard, wipe the []phones, clean the microwave, change the garbage bag, clean the showers, disinfect the showers, pick up all the trash, like the toothpaste, []the shampoo bottles." Hugo Hernandez Dep. 162:24-163:7, ECF No. 336-4; *see also* Vizguerra Dep. 106:19-22 (reporting that he "[c]leaned the whole pod and the restrooms"), ECF No. 339-6. Similarly, Mr. Ragsdale confirmed that the detainees "share sort of a common

---

[9] Plaintiffs are correct that Ms. Ely's Declaration falls under the hearsay exception in Federal Rule of Evidence 803(8)(A)(i), as it sets out ICE's activities. GEO argues that Ms. Ely's Declaration is untrustworthy because the COTR "signed off on the GEO housekeeping policy" each year. GEO Notice of Suppl. Auth. at 2, ECF No. 291; 4/13/17 ICE Email at 2, ECF No. 291-1; GEO Second Notice of Suppl. Auth. at 2-3, ECF No. 297. The COTR's review does not establish that Ms. Ely's Declaration is untrustworthy since ICE could have known about the policy and still not created it or required it as part of the ICE-GEO contracts. Likewise, Ms. Brooks' declaration is insufficiently definite to establish that Ms. Ely's Declaration is untrustworthy. *See* Brooks Decl. ¶ 10.

obligation to clean . . . where the microwave is, where the . . . game boards are, video games, to keep things in place in a reasonable cleanliness; the bathroom, you know, . . . the communal areas." Ragsdale Dep. 16:14-18, ECF No. 336-19.[10]

In addition to providing copies of the Detainee Handbook, GEO communicated many of its policies to detainees by showing them a video or a slideshow upon their arrival at the Facility. The video stated: "[w]hile you are here, you are not required to work, **except** in the dormitories where you will be assigned clean-up duties by staff in rotation with other detainees." Orientation Video 1 Tr., ECF No. 337-3 at 3; Orientation Video 2 Tr. ECF No. 337-4 at 3. The video cautioned that failure to respect the property of other detainees and that of the Facility "may result in disciplinary action being taken against you and that could have a negative effect on your case before the government—so the best rule is to stay out of trouble during your stay here." *Id.*; Orientation Video 1 Tr., ECF No. 337-3 at 3. Similarly, the slideshow advised: "Each and every detainee must participate in the sanitation program. A list of detainee's [sic] is developed each day and is posted for viewing. During a general clean-up all detainees must participate." Orientation Slideshow, ECF No. 340-4 at 35. The slideshow also informed detainees that refusing to obey a staff member was a high moderate offense, and "[t]o avoid placement into disciplinary housing segregation, [they should] read the local supplement detainee handbook section regarding 'Disciplinary Process.'" *Id.*, ECF No. 340-4 at 62, 68.

Separate from the PBNDS and the Handbook but also relevant is the Sanitation Section of the Facility's Policy and Procedure Manual. *See* 2004 Sanitation Policy, ECF No. 262-8 at 2; 2004-05 Sanitation Policy, ECF No. 262-8 at 14; 2005-06 Sanitation Policy, ECF No. 262-8 at 26; 2006-07 Sanitation Policy, ECF No. 262-8 at 37; 2007-08 Sanitation Policy, ECF No. 262-8

---

[10] GEO disputes that the tasks—beyond just wiping down tables and cleaning the floors—were performed by unpaid detainees.

**APP. 731**

at 41; 2008-09 Sanitation Policy, ECF No. 262-8 at 52; 2009-10 Sanitation Policy, ECF 262-8 at

60; 2010 Sanitation Policy, ECF No. 262-8 at 63; 2010-11 Sanitation Policy, ECF No. 262-8 at

66; 2011-12 Sanitation Policy, ECF No. 262-8 at 70; 2012-13 Sanitation Policy, ECF No. 262-8

at 74; 2013-14 Sanitation Policy, ECF No. 262-8 at 78. The Policy applied to detainees at the

Facility but was not provided to them. Ceja Dep. 29:13-18, ECF No. 50-1. It was purportedly

developed to identify the materials to be used for cleaning. Kevin Martin Dep. 208:6-11, ECF

No. 271-5. Nevertheless, it commanded: "Each detainee will be responsible for the cleanliness of

his or her cell or living area, including walls, floors, sink, toilet, windows, and other property

within the cell, room, or living area." 2004 Sanitation Policy, ECF No. 262-8 at 3. And, pursuant

to the Sanitation Section, daily inspections were to take place, and staff were to issue an incident

report "in cases of continued noncompliance." *Id.*, ECF No. 262-8 at 4.


### 4. The Imposition of Segregation for Detainees' Failure to Clean

During the TVPA class period, detainees at the Facility were threatened with being sent

to segregation when they refused to clean as directed. *See, e.g.*, Xahuentitla Dep. 73:19-74:9;

83:14-19, ECF No. 287-10; Hugo Hernandez Dep. 70:7-18; 73:21-74:21, ECF No. 287-11. And

some were placed in segregation for refusing to clean. *See* Incident Reports at 3-10, 12-14, ECF

No. 262-12; Ceja Decl. ¶¶ 4-8, ECF 313-16.

It was expected that the disciplinary scale and associated rules set forth in the Facility's

Detainee Handbook would be enforced. Ceja Dep. 139:2-12, ECF No. 336-15. However, Amber

Martin testified that it has always been an informal policy for GEO not to use segregation as a

consequence for detainees' refusal to clean up their living area. Amber Martin Dep. 134:11-

135:8, ECF No. 271-6. The Declarations of GEO Officers Sergio Gallegos, Luis Pagan, and

**APP. 732**

Joyce Quezada support this claim. Officer Declarations, ECF No. 306-12 at 3, 5, 8.[11] According to Ms. Martin, GEO formalized the policy a few years ago. Amber Martin Dep. 134:20-21, ECF No. 271-6.

In August 2014, there was an incident in which multiple detainees refused to clean. Ms. Ceja reported that she reviewed the files of the detainees involved and only one was sent to segregation. Ceja Decl. ¶¶ 4-8, ECF 313-16. Ms. Ceja also described how some detainees elected to be placed in protective custody or administrative segregation where they could receive "peace and quiet." Ceja Dep. 55:7-19, ECF No. 306-3. As clarified above, administrative segregation is distinct from disciplinary segregation, but detainees subject to either are placed in the same housing unit at the Facility. Ceja Dep.111:15-22, ECF No. 339-3.

A handful of GEO's Officers provided deposition testimony regarding their experiences. Officer Martha Vasquez testified that, on the one occasion she encountered a detainee who did not want to clean, she just skipped to the next person. Vasquez Dep. 76:20-77:11, ECF No. 313-12. Officer Quezada testified that, in her 19 years of working at the Facility, she never told a detainee they would go to segregation if they did not clean. Quezada Dep. 149:1-3, ECF No. 313-11. She claimed that instead she would tell detainees who did not want to clean, "[d]on't worry about it, I can do it." *Id.* 78:20-79:1, ECF No. 313-11. There were not, however, any other rules in the Handbook that she remembered being told not to enforce. *Id.* 96:23-97:3, ECF No. 339-12. And Ms. Quezada acknowledged that detainees were afraid of segregation and that it was an effective way to get detainees to follow the Facility's rules. *Id.* 141:17-142:8, ECF No. 336-16.

---

[11] Plaintiffs assert that these declarations should be excluded under the sham affidavit rule. Pls.' Resp. to Mot. for Summ. J., ECF No. 336 at 56 n.7 (citing *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1016 (10th Cir. 2002)). I consider the declarations and afford them the appropriate weight given the context.

**APP. 733**

Other officers also recognized that segregation could be used to encourage compliance. Officer Pagan testified that he may have explained to detainees that they were required to clean and could be sent to segregation because it was in the Facility's Detainee Handbook. Pagan Dep. 174:19-175:6, ECF No. 336-11. Officer Gallegos testified that, when someone did not want to clean, he would just move on to the next detainee or even do it himself. Gallegos Dep. 165:12-25, ECF No. 339-11. Yet, he accepted that he wrote up a few detainees for "failure to obey [his] orders for cleaning details" resulting in the detainees being placed in segregation. *Id.* 170:13-205:25, ECF No. 336-5.

### 5. The Potential Effects of Segregation

To describe the potential effects of segregation, Plaintiffs submitted the expert opinions of Dr. Stuart Grassian, and GEO submitted those of Dr. Jeffrey Kropf. *See* Grassian Report, ECF No. 336-21; Kropf Report, ECF No. 339-20. According to Dr. Grassian's Report, solitary confinement "imposes a devastating triad of emotional and neuropsychiatric deprivations: social isolation, a barren perceptual environment, and deprivation of meaningful mental activity." Grassian Report, ECF No. 336-21 at 11. His Report explains that, even in the first days of solitary confinement, suicide is much more common than in the general population and people often develop "severe panic attacks, marked by intense fear, dread of impending death, and with somatic manifestations that include tachycardia (racing pulse), diaphoresis (intense sweating), shortness of breath, and tremulousness." *Id.* at 11-12. Dr. Grassian specifically testified that the imposition of 72 hours in segregation can cause psychological damage. *See, e.g.*, Grassian Dep. 216:2-5, ECF No. 336-3 ("[T]here are individuals who become quite ill quite quickly, and other individuals who can tolerate three days of solitary confinement with less[] damage being done.").

**APP. 734**

In contrast, Dr. Kropf's report states: "There is no empirical evidence indicating or even implying that placement in a segregated housing unit with or without solitary confinement for a period of 72 hours or less causes serious psychological harm." Kropf Report, ECF No. 339-20 at 4.

**C. Detainee Experiences at the Facility**

During the period covered by the classes, detainees at the Facility were housed in windowless cells or in large open rooms with bunk beds. Facility Photos, ECF No. 337-2 at 6, 8. Detainees were generally strangers and had no privacy, even when using the restroom. Gaytan Dep. at 29:1-2, ECF No. 336-10; Hugo Hernandez Dep. 143:5- 17, ECF No. 336-4. Unless detainees received authorization for other items, detainees were only allowed to keep legal documents, 5x7 or smaller family photos, a pair of prescription glasses, dentures, a personal address book, a wedding band, a small religious item, and softbound reading material. 2005 Handbook, ECF No. 273-1 at 6; 2007 Handbook, ECF No. 273-2 at 14-15; 2008 Handbook, ECF No. 273-3 at 5; 2010 Handbook, ECF No. 273-4 at 6; 2011 Handbook, ECF No. 273-5 at 6; Oct. 2013 Handbook, ECF 261-17 at 8. Without approval for additional visitation time, detainees were permitted one visit per day for 30 minutes or an hour. 2005 Handbook, ECF No. 273-1 at 11; 2007 Handbook, ECF No. 273-2 at 31; 2008 Handbook, ECF No. 273-3 at 11; 2010 Handbook, ECF No. 273-4 at 10; 2011 Handbook, ECF No. 273-5 at 10-11; Oct. 2013 Handbook, ECF 261-17 at 12-13. Detainees were otherwise permitted to use the phone for calls lasting less than 20 minutes. 2005 Handbook, ECF No. 273-1 at 12; 2007 Handbook, ECF No. 273-2 at 33; 2008 Handbook, ECF No. 273-3 at 12; 2010 Handbook, ECF No. 273-4 at 11; 2011 Handbook, ECF No. 273-5 at 12; Oct. 2013 Handbook, ECF 261-17 at 14.

**APP. 735**

Plaintiff Alejandro Menocal described his typical day at the Facility:

> I wake up, get dressed, do my bed, wait for breakfast, eat breakfast, clean up, maybe exercise, walk around, read a book, draw. It depends. Again, wait for lunch to eat, clean up, maybe shower, maybe do some sports, maybe talk on the phone with someone, maybe write a letter, walk around, exercise, wait for dinner. Same thing, eat dinner, relax a while, maybe watch TV, read a book, draw, and, you know, wait for bedtime.

Menocal Dep. 121:5-13, ECF No. 306-4. While detained, Mr. Menocal summarized his experience in the Facility to a friend, stating:

> [T]hey've got pretty good grub, considering it's, you know, a detention center. And we got three televisions, a bunch of tables, a bunch of people, and we all get along. Pretty nice. I mean, it's—for being incarcerated, it's not bad at all, not compared to—not compared to Denver County or the other one where I was at. This is like Camp Snoopy. It's pretty easy.

*Id.* 54:5-12, ECF No. 306-4. But Mr. Menocal explained that he only told his friends and family that it was nice there so that they would not worry about him. *Id.* 48:20-24, 67:12-23, ECF No. 336-2. In fact, he testified that "[t]he food was very awful" and "[p]eople got sick in groups lots of times." *Id.* 67:24-25, ECF No. 336-2. He remembered that four or five of the maybe 20 officers he interacted with at the Facility had bad attitudes, were rude, or were on a power trip. *Id.* 64:11-65:2, ECF No. 313-3.

When he first arrived at the Facility, Mr. Menocal was informed about the detainee schedule for how the day area would be cleaned and was told by officers and other detainees that if he did not clean as ordered he would be put in isolation. *Id.* 95:16-97:3, ECF No. 336-2. Mr. Menocal knew if he did not clean he would be punished and "would go to the hole," which "is not a pretty place." *Id.* 104:25-105:7, ECF No. 336-2. On one occasion, he witnessed other detainees being taken away by officers and put in isolation and was told it was because the detainees did not do their daily cleanup. *Id.* 100:20-106:23, ECF No. 336-2. However, Mr. Menocal "does not recall receiving direct threats from any GEO employee regarding

**APP. 736**

administrative or disciplinary segregation for failing to clean." Menocal Responses to Second

Disc. Requests, ECF No. 287-14 at 5. Mr. Menocal generally cleans up after himself as a matter

of habit because he likes "to live and hang out in a clean environment." Menocal Dep. 81:6-10,

ECF No. 306-4. He testified that he spent between a half hour and an hour[12] each day cleaning

up his cell or sleeping area, specifically if he was drawing or had made a mess. *Id.* 115:10-15,

116:24-25, ECF No. 313-3. He also began cleaning the recreation area because he spent a lot of

time there and wanted to hang out in a clean space. *Id.* 86:24-87:5, ECF No. 336-2. This cleaning

led to him being offered a job in the VWP. *Id.* 87:6-14, ECF No. 336-2.

> Plaintiff Hugo Hernandez described his typical day at the Facility, stating:
>
> I would wake up for breakfast at 5:00 in the morning. I will walk out, store my
> food, bring it back to the cell, and go to sleep only if it was not my time to clean.
> But if I was assigned to clean, I have to stay outside and clean. I couldn't go back
> to sleep.
>
> So I will store my food. I will wake up when I wake up, and brush my teeth, do my
> coffee, and make sure that all my cellies get the coffee because that's my one main
> thing.
>
> Then we will all sit at the table. I will do my legal work, go through my documents,
> and see what else I need to put in or something, watch a little bit of TV.
>
> I can go to the phone a little bit. If—if I will get someone to answer, I will go to the
> phone. Wait for count time, wait for lunch.
>
> After lunch, I will do a cleanup again, which is cleanup time, and wait to see who's
> assigned for the cleanup, and if I'm not assigned, then I just go to my cell or I go
> against the wall just like everybody else.
>
> And once everything gets reopened, go back into the table again and do some
> workout while waiting—doing my workout. I wait for chow again and wait for the
> cleanup, and, of course, shower. Yeah, after the workout, shower, get back.

---

[12] GEO misstates this testimony, asserting that Mr. Menocal "spent between an hour and an hour
and a half each day cleaning up his cell." Mot. for Decertification, ECF No. 312 at 17 (citing
Menocal Dep. 115:11-15). Likewise, GEO claims Mr. Menocal stated that "[o]n occasion, he
would make his cellmates['] beds," *id.* (citing Menocal Dep. 116:17-18), when the testimony is
that he would occasionally make a single cellmate's bed, Menocal Dep. 116:14-18, ECF No.
313-3.

**APP. 737**

> Wait for chow, clean up, and then eventually wait for the GEO guard, Officer Blacknick, to come and pick me up so we can go to the law library and collect all detainees who wanted to go to the library.
>
> We'll go to the law library, get a pat-down, go inside the law library. And in there, I will help detainees with their documents, printouts, making sure they understood what the immigration judge was asking them to bring back, translations, looking for any specific application they were looking for.
>
> And then once we were done, like an hour later or an hour and a half later, I get another pat-down, get taken back to the cell, and wait for count time.
>
> And after count time, the last count time, you have to be inside your cell and the doors got to be locked in already. And then it's another day.

Hugo Hernandez Dep. 107:2-108:22, ECF No. 306-5.

Hugo Hernandez testified that he knew cleaning the common area was mandatory "[b]ecause the GEO guard would tell you that it's in the handbook, and if you refuse, you were going to be sent to the hole." *Id.* 159:8-12, ECF No. 336-4. He avoided going to the hole because he was afraid it would destroy his immigration case. *Id.* 166:4-15, 167:19-168:1, 170:10-13, ECF No. 336-4. Nevertheless, he stated that he did not consider the language in the Facility's Detainee Handbook under the heading "Housing Unit Sanitation" to be threatening. *Id.* 58:12-24, ECF No. 306-5. Hugo Hernandez recalled one detainee telling the officers that he was not going to clean because he was not a janitor and that they needed to hire someone to do that. *Id.* 74:23-75:2, ECF No. 336-4. A GEO officer then took out a trash bag and said, "Just pack your stuff because you're going to go to the hole. . . . Just here's your bag and go to the hole." *Id.* 75:3-11, ECF No. 336-4. But the detainee was not sent to segregation because he "started cleaning right away." *Id.* 77:4-7, ECF No. 336-4. Hugo Hernandez testified that he witnessed the garbage bag routine "multiple times with different guards." *Id.* 161:15-19, ECF No. 336-4. He recounted another incident in which one detainee refused to clean and other detainees, including himself

APP. 738

and Plaintiffs Alejandro Menocal, Marcos Brambila, and Demetrio Valerga, then refused as well. *Id.* 78:15-18, 80:9-20, ECF No. 336-4. In response, a GEO sergeant was called, and the sergeant advised that if they refused to clean, they would be sent to the hole, which he said was not a place they wanted to be because it was cold and they would lose their privileges and be lonely. *Id.* 78:19-79:5, ECF No. 336-4. The sergeant also told the detainees that GEO would make sure the judge received documents showing they were "coming from the hole." *Id.* 79:6-18, ECF No. 336-4. Hugo Hernandez also remembered that other detainees would sometimes jump in to help clean in order for everyone to have access to the TVs and phones. Hugo Hernandez Dep. 78:2-9, ECF No. 336-4.

Plaintiff Jesus Gaytan testified that it was scary and intimidating to be in the Facility with a bunch of people he did not know and who were older than him. Gaytan Dep. 28:11-29:2, 48:20-50:2, ECF No. 336-10. He was also afraid of getting in trouble there because he thought it would hurt his immigration case. *Id.* 12:1-13, ECF No. 336-10. Mr. Gaytan explained that new detainees at the Facility often refused to clean and the officers would tell them if they did not clean the pod they would have to go to solitary confinement. *Id.* 113:5-17, 142:23-144:1, ECF No. 336-10. As incentives to clean, Mr. Gaytan received Xboxes, ice cream, and other treats. *Id.* 124:3-16, ECF No. 306-10.

When Plaintiff Valerga first arrived at the Facility, his cellmate informed him that he could be put in solitary confinement if he did not clean. Valerga Dep. 168:20-169:6, ECF No. 339-16. A GEO officer later told Mr. Valerga the same. *Id.* 135:15-20, 137:12-14, ECF No. 271-7. Mr. Valerga nevertheless refused to clean. *Id.* 137:8-9, ECF No. 271-7. Yet, he was not taken to segregation. *Id.* 138:2-5, ECF No. 271-7. Instead, ICE officers woke him up, pulled him out of the unit, and advised him that GEO could put him in segregation if he did not clean. *Id.* at 138:9-

23, ECF No. 271-7. Despite these warnings, Mr. Valerga was never sent to segregation for refusing to clean. *Id.* 140:8-13, ECF No. 271-7.

Plaintiff Dagoberto Vizguerra does not remember receiving the Facility's Detainee Handbook or viewing the orientation video. Vizguerra Dep. 90:24-91:22, 92:1-5, ECF No. 313-8. But the second or third day he was at the Facility he saw a detainee being placed in administrative segregation for refusing to clean. *Id.* 48:9-19, ECF No. 336-8. He also described how officers sometimes screamed at detainees about not cleaning and being sent to segregation. *Id.* 98:2-10, ECF No. 336-8.

Plaintiff Grisel Xahuentitla similarly testified:

> When you are inside, you—you have—you feel this pressure, you feel this emotionally depressed, besides me suffering from depression. Besides that, you feel very depressed for the situation where you're in at the moment. And—And they tell you, "This is what you have to do." And they're not—they're, of course, not— They're not whispering you to your ear. They're loud, and so they—so you feel a little intimidated. Of course, it is their job, and so you feel like you don't have rights in there. You—Like I said, you feel intimidated. And if they tell you "clean, because you're going to the hole," first, I'm going to clean. I don't want to go to the hole.

Xahuentitla Dep. 137:4-19, ECF No. 336-14. Additionally, Ms. Xahuentitla recalled how a woman in her dorm was assigned to clean but was sick, and so she offered to clean for the woman. *Id.* 73:19-25, ECF No. 336-14. But a GEO officer told them that the woman had to clean and, if she did not, she would be sent to segregation, which "wasn't going to be . . . pleasant." *Id.* 74:4-9, ECF No. 336-14. In the end, the woman was not placed in segregation, and Ms. Xahuentitla did not experience anyone else being sent there. *Id.* 120:23-121:15, ECF No. 313-9.

When class member Alejandro Hernandez was detained at the Facility, he asked a GEO officer, "[W]hy should I clean all of the tables if I []did not use all of the table[s]?" Alejandro

**APP. 740**

Hernandez Dep. 60:8-12, ECF No. 336-13.[13] He then stated he would only clean the area where he ate. *Id.* As a result, he was handcuffed and taken to segregation. *Id.* 60:12-14, 81:22-82:3, 141:15-19, ECF No. 336-13.

I am guided by this careful review of the record as I analyze the pending motions, which again are: (1) the parties' Cross Motions for Summary Judgment on GEO's assertion of derivative sovereign immunity and its government contractor defense; (2) GEO's Motion to Dismiss for Plaintiffs' failure to join ICE as a party; (3) GEO's Motion for Summary Judgment on the merits of Plaintiffs' claims; and (4) GEO's Motion for Decertification of the TVPA class.

## II. Cross Motions for Summary Judgment on GEO's Assertion of Derivative Sovereign Immunity and Government Contractor Defense (ECF Nos. 260 & 284)[14]

GEO generally argues that its policies at issue in this case were required by its contract with ICE and, as a result, that it should be covered by the government's sovereign immunity. The

---

[13] In a footnote, GEO argues "Plaintiffs should be estopped from introducing individual experiences of class members who are not named Plaintiffs to avoid trial devolving into a number of smaller mini-trials and to avoid undue prejudice to GEO." Mot. for Decertification ECF No. 312 at 16 n.8. Plaintiffs respond that they "never represented that they did not intend to introduce *any* testimony from detainees; to the contrary, they argued that testimony from class representatives (as well as from three detainees who provided declarations in support of class certification) would be sufficient." Resp. to Mot. for Decertification, ECF No. 339 at 10 n.11 (citing Pls.' Discovery Order Br., ECF No. 144 at 12-13). At this time, I will not rule that Plaintiffs are estopped from presenting the testimony of class members who are not named Plaintiffs, as Plaintiffs did not definitively state that no such testimony would be relied on at trial. However, this issue may be more appropriate for a motion *in limine*.

[14] GEO's Response to Plaintiffs' Motion for Summary Judgment is ECF No. 270, and Plaintiffs' Reply in Support of their Motion is ECF No. 286. As Plaintiffs note, GEO's Opposition Brief should be stricken since its response to Plaintiffs' statement of the undisputed material facts fails to follow my practice standards. *See* Pls.' Reply in Supp. of Mot. for Summ. J. at 7 n.1, ECF No. 286. However, Plaintiffs' Reply sufficiently corrects for GEO's error and clearly sets out the parties' disputes. Plaintiffs' Response to GEO's Cross Motion is ECF No. 298, and GEO's Reply in Support of its Cross Motion is ECF No. 316. GEO has filed two related Notices of Supplemental Authority (ECF Nos. 291 & 335), and Plaintiffs have responded to those Notices (ECF Nos. 294 & 345). GEO also filed a "Second Notice of Supplemental Authority" (ECF No. 297) to clarify its earlier Notice (ECF No. 294). Plaintiffs, for their part, have filed three

APP. 741

parties' related cross motions for summary judgment dispute whether both of Plaintiffs' claims are barred by derivative sovereign immunity[15] and whether Plaintiffs' unjust enrichment claim is barred by GEO's government contractor defense. I find that GEO cannot avail itself of the protection of either legal theory because they each require government direction for the allegedly unlawful activity, not simply acquiescence.

## A. Legal Standards

The United States and its agencies enjoy unqualified sovereign immunity from civil actions absent an express waiver. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Those who contract with the United States are not encompassed within the definition of a federal agency, 28 U.S.C. § 2671, and federal contractors therefore do not share the government's absolute immunity from liability, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016). However, "government contractors obtain [some] immunity in connection with work which they do pursuant to their contractual undertaking with the United States." *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943). This immunity, known as "derivative sovereign immunity," protects

---

pertinent Notices of Supplemental Authority (ECF Nos. 367, 374, & 378). GEO has responded to Plaintiffs' most recent Notices (ECF Nos. 375 & 379) but filed a Motion to Strike the first of Plaintiffs' Notices (ECF No. 368). None of my reasoning in this order relies on the disputed authority attached to Plaintiffs' first Notice (ECF No. 367-1), and so I deny GEO's Motion as moot.

[15] Plaintiffs argue in passing that by failing to specifically plead the affirmative defense of derivative sovereign immunity, GEO has waived it. Pls.' Mot. for Summ. J., ECF No. 260 at 29 n.5. I disagree. First, I question whether derivative sovereign immunity is an affirmative defense. *See Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650 (4th Cir. 2018) (holding derivative qualified immunity operates "as a jurisdictional bar to suit and not as a merits defense to liability"). Second, GEO included derivative sovereign immunity in the Scheduling Order issued in October 2018, *see* Am. Stipulated Scheduling & Disc. Order at 5, 19, ECF No. 149, and Plaintiffs did not seek to strike that aspect of the Order. Plaintiffs have since conducted discovery related to derivative sovereign immunity and filed an associated Motion for Summary Judgment. Thus, a finding that GEO waived its ability to raise derivative sovereign immunity is not appropriate.

**APP. 742**

government contractors, as agents of the government, from liability for actions that were directed or required by the federal government, so long as the government's authority to carry out the contracted-for services was validly conferred by Congress. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20-22 (1940). In other words, a contractor cannot be held liable for executing the government's will. *Id.* at 21. But, when a contractor's actions were neither directed nor required by the government, the contractor will not be shielded by derivative sovereign immunity and can be held liable under state or federal law for conduct causing injury. *Campbell-Ewald*, 577 U.S. at 166-67.

Similarly, but distinctly, the government contractor defense is grounded in principals of federalism. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988). Just as government actors are protected from liability when federal common law preempts state law to protect in areas of "uniquely federal interests," *id.* (citation omitted), contractors are protected by the government contractor defense for violations of state law "[w]here the government has directed a contractor to do the very thing that is the subject of the claim," *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001). As justification for the defense, the Supreme Court has explained that "an independent contractor performing its obligation under a . . . contract, rather than an official performing his duty as a federal employee, . . . obviously implicate[s] the same interest in getting the Government's work done." *Boyle*, 487 U.S. at 505. The defense is only proper when the operation of state law results in either (1) a "significant conflict" with "an identifiable federal policy or interest," *id.* at 507 (quotation marks omitted) (quoting *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68 (1966)), or (2) the frustration of "specific objectives of federal legislation," *id.* (quotation marks omitted) (quoting *U.S. v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979)).

A party asserting the defense must first show that a contract concerns an area of "uniquely federal interests." *Id.* at 504 (citation omitted). Next, it must establish a clash between a state law and a federal policy or objective. *Id.* at 507. Finally, the party seeking its protection must satisfy "the three limiting criteria for contractor immunity." *Id.* at 510. To do so, the contractor must prove that "(1) the government approved reasonably precise specifications; (2) the contractor's performance conformed to those specifications; and (3) the contractor alerted the government to dangers known to the contractor but not to the United States." *Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 255 (4th Cir. 2021) (quotation marks, brackets, and citation omitted).

## B. Analysis

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For purposes of the present analysis, the parties have filed cross motions for summary judgment, so I am "entitled to assume that no evidence needs to be considered other than that filed by the parties." *James Barlow Fam. Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997). Because I find ICE neither directed nor required GEO to improperly compel detainees' labor or to compensate VWP participants only $1.00 per day, an extension of the government's immunity through either derivative sovereign immunity or the government contractor defense is inappropriate as a matter of law.

**APP. 744**

### 1. Derivative Sovereign Immunity

The derivative sovereign immunity analysis articulated in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. at 20-22, can be reduced to the following two inquiries: First, was the authority exercised by ICE in contracting with GEO validly conferred on ICE by Congress? Second, were GEO's challenged actions required by its contractual obligations?

*TVPA Claim*

For Plaintiffs' TVPA claim, the first of the two inquiries for derivative sovereign immunity can be answered in the affirmative. *See* 8 U.S.C. §§ 1103, 1226, 1231. On the second inquiry, however, I come to the opposite conclusion.

GEO claims it is protected by derivative sovereign immunity because its disciplinary practices and purported threats were required by ICE's PBNDS. But GEO's cleaning policies, which it independently developed and implemented, far exceeded its contractual obligations with ICE. Under GEO's policies, all detainees were required to regularly clean "all commonly accessible areas" in their housing units. *See, e.g.*, 2005 Handbook, ECF No. 273-1 at 18. Those areas included "walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs." *Id.* The day room area was to be "kept clean at all times." *Id.* If detainees refused to participate in this effort, they faced disciplinary segregation. *See, e.g.*, *id.*

In comparison, the relevant ICE-GEO contracts, through their incorporation of the PBNDS, only required detainees to tend to their "personal housekeeping." *See, e.g.*, 2000 PBNDS, ECF No. 261-10 at 3. By that, it meant keeping any "immediate living areas . . . neat and orderly" through simple tasks such as making beds, stacking papers, and removing clutter

**APP. 745**

from the floor. *Id.*[16] ICE's National Detainee Handbook similarly limited the scope of a detainee's cleaning duties to only those areas that a detainee used himself, informing detainees: "[Y]ou must keep areas that *you* use clean, including *your* living area and any general-use areas that *you* use." 2013 ICE Handbook, ECF No. 310-1 at 18 (emphasis added). And by distinguishing between a detainee's living area and "any general-use areas," the ICE Handbook confirms the phrase "living area" does not encompass the entire pod. *Id.* The enforcement mechanism for these provisions is found in the PBNDS' disciplinary scale, which references "[r]efusal to clean assigned living area" as a "high moderate" offense for which disciplinary segregation is a potential sanction. 2000 PBNDS, ECF No. 261-10 at 24; 2008 PBNDS, ECF No. 261-9 at 56-57; 2011 PBNDS, ECF No. 261-8 at 47-48.

GEO attempts to stretch the meaning of "living area" so that its policies fit within the PBNDS. Specifically, GEO contends, "[w]hile the phrase 'living area' is not defined in the PBNDS or the contract, it has a commonly accepted plain meaning in the detention context: a detainee's housing unit in which he or she occupies each day." Resp. to Pls.' Mot. for Summ. J. at 27-28 n.16, ECF No. 270; *see also id.* at 26 ("There is no question that the entirety of where a detainee lives and sleeps is his or her 'living area.'"). In support of this expansive definition, GEO cites several cases in which courts describe prisoner and pretrial detainee living areas to include common areas. *See id.* at 27-28 (citing *VanPatten v. Allen Cty. Jail*, No. 1:11-CV-73-

---

[16] The parties dispute the extent of personal housekeeping requirement found within the PBNDS. Plaintiffs seek to limit such housekeeping to the four tasks specifically mentioned, while Defendants argue the four tasks constitute a non-exclusive list. The scope of the government-directed personal housekeeping requirement is significant because GEO may be entitled to derivative sovereign immunity for its enforcement of that requirement. This dispute need not be resolved, however, because Plaintiffs do not make the claim that detainees' personal housekeeping tasks constitute forced labor in violation of the TVPA. Resp. to Mot. for Decertification, ECF No. 339 at 59. Thus, the fact of any derivative sovereign immunity against such a claim is irrelevant.

PPS, 2013 WL 2149447, at *2 (N.D. Ind. May 16, 2013); *Treadway v. Rushing*, No. 4:10 CV

2749, 2011 WL 13568, at *1 (N.D. Ohio Jan. 4, 2011); *Jones v. Wittenburg*, 509 F. Supp. 653,

702 (N.D. Ohio 1980); *Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993)). But none of the

cited cases concern the PBNDS or a privately run ICE detention facility, so they have little

relevance to an interpretation of the ICE-GEO contract.

GEO also points to a provision of the PBNDS that states: "The same information shall be

posted in the living areas (or 'pods') of the facilities." 2011 PBNDS, ECF No. 271-10 at 3. But

this use of "living areas" is not proceeded by the word "your," "assigned," or "immediate" as

when it is used in the disciplinary scale and in discussing the cleaning requirements. If anything,

the PBNDS's requirement that information be posted in the "pods" for widespread

communication draws further distinction between the housekeeping of the detainees' personal

living areas and general housekeeping in the common areas. *See, e.g.*, 2000 PBNDS, ECF No.

261-10 at 3 ("Work assignments are voluntary. However, all detainees are responsible for

personal housekeeping.").

The PBNDS did not mandate that detainees clean the common areas or clean up after

others. Yet, GEO's policies clearly did, and GEO extended the PBNDS disciplinary scale to

cover its expanded cleaning mandates. As Plaintiffs state: "The fact that ICE authorized solitary

confinement for certain defined [high moderate] offenses is not *carte blanche*—much less a

specific directive—to use the same punishment to enforce GEO policies that deviate from the

PBNDS." Pls.' Reply in Supp. of Mot. for Summ. J., ECF No. 286 at 102. One can imagine a

situation in which solitary confinement may be an appropriate sanction for a detainee who

obstinately refuses to tend to his personal space and, by doing so, places Facility staff and other

detainees at risk. Such a situation falls far afield of the Facility's desire to have detainees clean

**APP. 747**

up after others, and its corresponding threats of punishment for detainees who refuse to assist in efforts to clean common areas. GEO likewise cannot claim it is protected simply because ICE officials "reviewed and cleared" its policies. *See* Ragsdale Dep. 39:3-6, ECF No. 271-11. The audit forms used by ICE are not specific enough to show that it directed or required GEO's cleaning policies and their implementation. And the COTR did not have the authority to approve changes to the ICE-GEO contracts.

To derive sovereign immunity from the federal government, GEO must prove it was "simply perform[ing] as the Government directed." *Campbell-Ewald Co.*, 577 U.S. at 167; *see also Cabalce v. Thomas E. Blanchard & Associates*, 797 F.3d 720, 732 (9th Cir. 2015) (holding derivative sovereign immunity "is limited to cases in which a contractor 'had no discretion . . . and completely followed government specifications'" (citation omitted)). GEO's arguments and citations to case law do not carry it far enough to place it within the penumbra of ICE's sovereign immunity for purposes of this suit.


*Unjust Enrichment Claim*

GEO asserts ICE's sovereign immunity bars Plaintiffs' unjust enrichment claim because ICE required it to pay "exactly $1.00 per day" from October 22, 2011, to June 22, 2013, while the 2008 PBNDS was in force, and then established $1.00 per day as a minimum from June 22, 2013, through the end of the class period. GEO's Cross Mot. for Summ. J. at 22-23, ECF No. 284. In essence, GEO claims it simply did as it was told or complied with the "minimum standards . . . directed by the federal government." *Id.* at 23 (emphasis omitted).

To begin, GEO's statement of the law on derivative sovereign immunity is incorrect. It states that "the law requires a contractor [to] actually *violate* its contract with the federal

**APP. 748**

government" for the contractor to lose its derivative immunity. *Id.* (citing *Cunningham*, 888 F.3d at 643). At no point does the Fourth Circuit in *Cunningham*—much less the Supreme Court— suggest an injured party must prove a contractual violation as a prerequisite to overcoming a government contractor's derivative sovereign immunity. Instead, the *Cunningham* Court describes a violation of "both federal law and the Government's explicit instructions" as a sufficient, but not necessary, condition for finding that a contractor is not entitled to derivative sovereign immunity. *Cunningham*, 888 F.3d at 647 (quoting *Campbell-Ewald*, 577 U.S. at 166). So, even if I were to conclude GEO did not violate its contract with ICE, as GEO insists, my inquiry would not be over.

To enjoy the vast protection of derivative sovereign immunity, GEO must show (1) ICE was authorized by Congress to dictate compensation for VWP participants (2) GEO's challenged actions were required by its contractual obligations. Plaintiffs dispute whether ICE's authority was validly conferred. I find GEO has not satisfied the second showing, and so decline to address Plaintiffs' arguments related to the first.

GEO must establish that it acted as ICE's agent in paying VWP class members $1.00 per day during the class period. *Yearsley*, 309 U.S. at 20-21 ("The action of the agent is the act of the government." (quotation marks and citation omitted)). Put differently, if GEO's agency did not require it to pay VWP class members only $1.00 per day, then GEO can be held liable for any consequential injury to the class. *See Campbell-Ewald*, 577 U.S. at 167.

The 2011 contract did not direct or require GEO to compensate VWP workers $1.00 per every eight hours worked under the program. Rather, it set the outer boundaries of the program and permitted GEO to implement the program through its discretionary decision-making within those boundaries. Among the boundaries enumerated by ICE were the requirements that GEO

**APP. 749**

was to: (1) permit detainees to work no longer than "8 hours daily, 40 hours weekly," 2008 PBNDS, ECF No. 261-9 at 63; (2) provide compensation for which it would be reimbursed at $1.00 per day per detainee, 2011 Contract, ECF No. 262-2 at 5; and (3) comply with "[a]pplicable federal, state and local labor laws and codes," 2011 Contract, ECF No. 262-2 at 38. While this distinction is nuanced and perhaps difficult to parse at first blush, it is nevertheless significant: it is the distinction between the government expressing its will in the form of a contractual directive and the government permitting GEO to determine what is appropriate as an exercise of discretion. In other words, it is the distinction between an agent and an independent contractor. "[U]nder the agency principles underlying *Yearsley* immunity, courts have looked to see if the contractor is hired as an 'independent contractor,' expected to use its expertise and discretion to decide how best to get the job done, or as something more akin to an agent of the United States, just following orders." Kate Sablosky Elengold & Jonathan D. Glater, *The Sovereign Shield*, 73 Stan. L. Rev. 969, 1001 (2021). Here, GEO was not just following orders.

GEO disagrees, claiming its hand was forced by the terms of its contract with ICE, but there is no evidence that ICE prohibited GEO from compensating its workers more than $1.00 per day. Instead, the evidence suggests the participants' compensation was left to GEO's discretion.

By listing the "actual cost" of $1.00 per day for reimbursement purposes, ICE was setting out one of the defining features of the VWP: its willingness to reimburse GEO $1.00 per day for detainees' participation. The 2008 PBNDS stated an amount of $1.00 per day, and later the 2011 PBNDS provided "at least $1.00 (USD) per day," as an appropriate minimum to bring about ICE's desired outcomes: the enhancement of essential operations and services and the reduction of "[t]he negative impact of confinement . . . through less idleness, improved morale and fewer

**APP. 750**

disciplinary incidents." 2008 PBNDS, ECF No. 261-9 at 60; *see also* 2011 PBNDS, ECF No. 261-8 at 50. But GEO provides no reason for its suggestion that ICE directed it to pay *no more than* $1.00 per day. ICE's decision to permit GEO to establish specific VWP compensation terms is logical. The government has no interest in directing a private entity to maximize its profits, and the amount paid to VWP workers directly affected GEO's profits.[17] Krumpelmann Dep. 23:23-24:4, ECF No. 261-6; Amber Martin Dep. 107:22, ECF No. 261-2.

As before, GEO cannot assert derivative immunity simply because ICE officials "reviewed and cleared" its policies. *See* Ragsdale Dep. 39:3-6, ECF No. 271-11. The audit forms do not mention the rate of pay, the hours, works, or whether the compensation terms applied with state and local laws and regulations. And again, the COTR did not have the authority to approve changes to the ICE-GEO contract.

I conclude ICE left the payment amount to GEO's discretion, and "nothing in *Yearsley* extended immunity to [government] contractors exercising a discretionary governmental function," *Cabalce*, 797 F.3d at 732 (brackets and citation omitted). The Supreme Court has described the critical aspect of *Yearsley's* derivate qualified immunity as a "contractor's performance in compliance with all federal directions." *Campbell-Ewald*, 577 U.S. at 167 n.7. Because GEO was not complying with any federal direction or contractual requirement to

---

[17] Mr. Ragsdale, GEO's Executive Vice President for Contract Compliance, testified the detainees' work through the VWP is cost neutral at $1.00 per day—that its profits would go down if it paid VWP workers more and that they would go up if it added additional cleaning staff. Ragsdale Dep. 167:24-168:17, ECF No. 306-14. But the 2008 and 2011 PBNDS do not envision VWP participants serving as a substitute for cleaning staff. Instead, they are meant to "enhance[]" the "[e]ssential operations and services" provided by GEO. 2008 PBNDS, ECF No. 261-9 at 60; 2011 PBNDS, ECF No. 261-8 at 50. Mr. Ragsdale's testimony further supports my determination that ICE's interest in requiring the VWP is separate and apart from GEO's profitability concerns.

compensate VWP participants $1.00 per day and no more, but was instead exercising its discretion, GEO cannot escape liability on the grounds that it is immune from suit.

## 2. Government Contractor Defense

Having found that derivative sovereign immunity does not bar either of Plaintiffs' claims, I turn to GEO's government contractor defense. GEO initially raised the defense in a Motion to Dismiss. At that time, I found that for the period in which the 2011 PBNDS were applicable to the ICE-GEO contract, "there is no 'significant conflict' between a federal interest and state law as required for the assertion of the government contractor defense." *Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1135 (D. Colo. 2015). I now consider GEO's arguments regarding the 2008 PBNDS and extend my previous holding to the time covered by the earlier PBNDS.

Before applying *Boyle's* three-part test, I must first decide whether the contract between GEO and ICE involves "uniquely federal interests." *Boyle*, 487 U.S. at 504. If it does, then I must determine whether GEO has established a significant clash between state law and a federal policy objective. A conflict between state law and federal policy is significant "when state law [is] contrary to a contract term actually selected by [a] federal agency." *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1098 (10th Cir. 2015). The detention of immigrants in removal proceedings is undoubtedly a uniquely federal interest as a necessary part of the government's efforts to enforce immigration laws and regulations. However, GEO cannot properly avail itself of the government contractor defense because it cannot prove that the operation of state law results in a "significant conflict" with federal policy or that it frustrates some specific federal objective. *Boyle*, 487 U.S. at 507.

**APP. 752**

In arguing that Plaintiffs' unjust enrichment claim poses a conflict between Colorado law and the federal government's interest in detaining immigrants in removal proceedings, GEO primarily relies on the Tenth Circuit's opinion in *Helfrich v. Blue Cross & Blue Shield Association*. GEO's Cross Mot. for Summ. J. at 24-26, ECF No. 284. In that case, the plaintiff was a federal employee who received benefits through her federal health insurance plan for treatment related to injuries sustained in a car accident. *Helfrich*, 804 F.3d at 1094. After settling with the other driver, her insurer sought reimbursement for benefits it had paid in accordance with a subrogation provision in the contract governing her health care plan. *Id.* The plaintiff filed suit on the grounds that Kansas law prohibited subrogation and reimbursement clauses in insurance contracts. *Id.* The Tenth Circuit held that federal common law preempted the Kansas antisubrogation regulation because the regulation conflicted with uniquely federal interests. *Id.* at 1098-99. The court emphasized two particularly adverse outcomes if it were to allow Kansas state law to override the health care plan's subrogation provision: (1) the plan premiums, which were "paid largely by the government," were likely to increase, and (2) it "would create unfairness within the ranks of government employees." *Id.* at 1099. The *Helfrich* Court noted that the force of the interests was "especially strong" because the insurer "act[ed] as only a service agent between the federal government and its own employees." *Id.* at 1100.

In stark contrast to the significant conflict between state law and federal policy in *Helfrich*, the application of Colorado unjust enrichment law to GEO's VWP (1) will not have a direct impact on government expenditures; (2) will have no significant impact on the government's contractual obligations and rights; and (3) will not affect the government's interest in detaining certain immigrants during the pendency of their immigration court proceedings.

First, the only pecuniary interests directly implicated in the decision to pay more than $1.00 per day are GEO's profit margins. *See* Krumpelmann Dep. 23:23-24:4, ECF No. 261-6; Amber Martin Dep. 107:22, ECF No. 261-2. GEO may argue that the increased costs will be passed on to the government, but GEO has managed to pay its workers as much as $4.00 per day at another detention facility—while being reimbursed only $1.00 per day. Amber Martin Dep. 109:15-110:13, ECF No. 261-2. And if GEO tried to pass a significant increase in cost on to the government, the ICE-GEO contract might not be renewed. *See* Venturella Dep. 165:25-166:4, ECF No. 336-17.

Second, there is no basis to conclude Plaintiffs' unjust enrichment claim will impact ICE because the VWP does not concern federal employees and additional compensation under the VWP does not affect federal contractual rights or obligations. GEO states that it would "violate its contract with ICE" if it "pa[id] detainees more than $1.00 per day," but GEO does not explain how that violation would impact ICE's contractual rights. In any case, GEO contradicts itself by admitting—in response to Plaintiffs' assertion that "ICE does not prohibit its contractors from paying more than $1.00 per day for work performed in the VWP"—that is not aware of a *categorical* prohibition on paying more than $1.00 per day to detainee VWP participants." GEO's Reply in Supp. of Mot. for Summ. J., ECF No. 350 at 58.

Third, the federal interests expressed in the form of ICE's stated objectives can all be accomplished with payments greater than $1.00 per day, and likely to a greater extent. *See* 2008 PBNDS, ECF No. 261-9 at 60; 2011 PBNDS, ECF No. 261-8 at 50. In short, GEO's potential compliance with state law would not have generated a conflict with federal policy or the frustration of federal objectives because ICE did not mandate a pay rate for VWP participants.

APP. 754

GEO also mentions the interest in "the uniformity of the federal government's treatment of ICE detainees." GEO's Cross Mot. for Summ. J. at 26. However, the language of the ICE-GEO contract does not indicate that uniformity in participant compensation was an important federal objective. Instead, independent contractors such as GEO have varying obligations in their administration of the VWP, depending on the states and localities in which they operate. In making the VWP a contractual requirement, ICE listed objectives such as enhancing essential operations and improving morale that are inherently context-specific and bound to differ based on the needs of a particular facility. If, in its discretion, ICE considered uniformity in VWP worker conditions to be important, it could have provided more granular guidance for the terms of the program. Moreover, ICE explicitly instructed that the program was required to comply with the varying obligations of state and local labor laws. The inclusion of that condition in both the contract and the PBNDS is evidence that ICE envisioned the "inconsistent patchwork of state laws and regulations" that GEO urges this court to protect against. *Id.* The evidence shows the government merely determined the minimum compensation adequate for contracting purposes but did not go so far as to confirm that compensation complied with all applicable laws or to mandate uniformity across all federal detention facilities. It is no surprise, then, that VWP rates do vary from facility to facility. *See* Amber Martin Dep. 109:1-110:6, ECF No. 261-2.

Even if I were to conclude Plaintiffs' unjust enrichment claims clashed with the relevant ICE-GEO contract provisions, application of *Boyle's* three-part test would lead me to the same conclusion. I have already found GEO's contract with ICE granted it discretion regarding the amount and terms of payment under the VWP. It follows that the government did not approve "reasonably precise specifications" as to those aspects of the VWP. *Express Scripts*, 996 F.3d at 255 (citation omitted).

**APP. 755**

Although the ICE-GEO contract required some compensation and prescribed that GEO would be reimbursed $1.00 per day, it did not require any specific work schedule or payment. In other words, the details of the VWP compensation scheme were not contract terms "actually selected by [ICE]." *Helfrich*, 804 F.3d at 1098. "[S]tripped to its essentials," the argument that *Boyle's* three-part test does not limit a contractor's immunity "is fundamentally a claim that '[t]he Government made me do it.'" *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 465 (5th Cir. 2010) (quoting *In re Joint E. & S. Dist. New York Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990)); *see also Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1482 (5th Cir. 1989) ("[T]he purpose of the [*Boyle*] test is to deny the defense to a government contractor that is itself ultimately responsible for the []defect.") (quotation marks and citation omitted)). GEO cannot show that the government made it pay VWP workers $1.00 per day and no more.

Consequently, I find that while federal interests are clearly implicated by the ICE-GEO contract, there is no obvious clash between federal policies or objectives and the state law underlying Plaintiffs' unjust enrichment claim. Nor was GEO required by ICE to pay only $1.00 per day. The government contractor defense is therefore inapplicable and cannot shield GEO from liability.

## C.  Ruling on Cross Motions for Summary Judgment

The record shows that GEO has not simply performed as ICE directed. GEO went beyond its contract with ICE in requiring detainees to clean up all common areas and after other detainees under the threat of segregation. And GEO's contract with ICE gave GEO discretion to decide how much to pay VWP participants at the Facility. Thus, GEO is not entitled to derivative

**APP. 756**

sovereign immunity, and its government contractor defense fails. As a result, Plaintiffs' Motion

for Summary Judgment is granted, and GEO's Cross Motion is denied.

### III. GEO's Motion to Dismiss for Failure to Join a Required Party (ECF No. 307)[18]

GEO's Motion to Dismiss for Failure to Join a Required Party argues that, even if GEO is

not entitled to derivative sovereign immunity or protection as a government contractor,

Plaintiffs' claims should be dismissed because ICE was not joined as a party. I find ICE is not a

necessary party under Federal Rule of Civil Procedure 19(a), and therefore deny the Motion.

### A. Legal Standard

Federal Rule of Civil Procedure 19 governs when a party must be joined. The Rule

provides that joinder is necessary if:

> (A)   in that person's absence, the court cannot accord complete relief among
> existing parties; or
> (B)   that person claims an interest relating to the subject of the action and is so
> situated that disposing of the action in the person's absence may:
>> (i)   as a practical matter impair or impede the person's ability to protect
>> the interest; or
>> (ii)   leave an existing party subject to a substantial risk of incurring double,
>> multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a). If a required party cannot be joined, the court then determines "whether, in

equity and good conscience, the action should proceed among the existing parties or should be

dismissed." Fed. R. Civ. P. 19(b). In effect, the analysis involves two questions: First, is the party

necessary to the suit? And if so, is the party indispensable? *Rishell v. Jane Phillips Episcopal*

*Mem'l Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir. 1996). If the absent party is both necessary and

---

[18] Plaintiffs' Response to GEO's Motion to Dismiss is ECF No. 338, and GEO's Reply in
Support of its Motion is ECF No. 348. GEO has filed a related Notice of Supplemental Authority
(ECF No. 361), and Plaintiffs have responded to that Notice (ECF No. 362).

indispensable but cannot be joined, "the suit must be dismissed." *Id.* "The moving party has the burden of persuasion in arguing for dismissal." *Id.* (citation omitted). I find ICE is not a necessary party and therefore need only conduct the initial inquiry to determine that dismissal is not proper in this case.

### B. Analysis

To determine whether ICE is a necessary party under Rule 19(a), I must assess three factors: "(1) whether complete relief would be available to the parties already in the suit, (2) whether [ICE] has an interest related to the suit which as a practical matter would be impaired, and (3) whether a party already in the suit would be subjected to a substantial risk of multiple or inconsistent obligations." *Rishell*, 94 F.3d at 1411. GEO argues all three of these factors render ICE a necessary party. But for the same reasons GEO is not protected by derivative sovereign immunity or the government contractor defense, GEO's arguments for dismissal miss the mark.

### 1. Complete Relief is Available to the Parties

GEO characterizes the ICE-GEO contracts as being "at the heart of Plaintiffs' claims" because GEO's allegedly unlawful actions were made in the course of its performance under the contracts. Mot. to Dismiss, ECF No. 307 at 21. Without ICE's joinder, GEO contends, there will be no accountability for ICE's involvement in any violations of the TVPA.

But as I explained in my analysis of GEO's claims to derivative sovereign immunity and the government contractor defense, the ICE-GEO contracts did not direct or require GEO's challenged actions. Consequently, the cases cited by GEO in which the contract is central to the

**APP. 758**

dispute are inapposite. *See Travelers Indem. Co. v. Household Int'l, Inc.*, 775 F. Supp. 518 (D. Conn. 1991) (finding contracting party indispensable in breach of contract action); *Rivera Rojas v. Loewen Group Int'l, Inc.*, 178 F.R.D. 356 (D.P.R. 1998) (subsidiary was a necessary party where plaintiffs alleged parent corporation used subsidiary to breach contract); *Ente Nazionale Idrocarburi v. Prudential Sec. Grp., Inc.*, 744 F. Supp. 450 (S.D.N.Y. 1990) (holding contracting party indispensable in tortious interference claim due to possibility of inconsistent adjudications in suits pending elsewhere and because absent party had "real interests that [were] clearly at stake").

Plaintiffs do not seek to set aside or recover under the ICE-GEO contracts. Instead, they challenge GEO's interpretation of and performance outside the contract. They allege GEO unlawfully employed ICE's disciplinary scale to implement a cleaning policy that GEO devised without ICE's involvement (i.e. the TVPA claim), and they allege GEO was unjustly enriched by its failure to appropriately compensate participants of its VWP (i.e. the unjust enrichment claim). Plaintiffs do not challenge any actions taken by ICE or assert that the contract itself is the source of their harm.

GEO accurately points out that Plaintiffs seek a legal determination that it is obligated to pay more than $1.00 per day to detainees participating in the VWP, but GEO is wrong that such a determination would "invalidat[e] a portion of ICE's contract with GEO that sets the payment of $1.00 as a permissible floor." Mot. to Dismiss, ECF No. 307 at 23. While the contractual provision mentions $1.00 as a minimum compensation amount, it is not the only applicable provision. Instead, it is one aspect of the program's required framework within which GEO was expected to exercise its discretion. Other provisions of the relevant contract required compliance with federal and state labor laws. *See* 2011 Contract, ECF No. 262-2 at 38. Likewise, I have no

43

occasion to "invalidate a portion of ICE's disciplinary severity scale as violating the TVPA, despite the fact that GEO is contractually obligated to comply with the scale." Mot. to Dismiss, ECF No. 307 at 23. Plaintiffs do not claim the personal housekeeping tasks constitute forced labor, and ICE's disciplinary severity scale only applies to those tasks. *See* Resp. to Mot. for Decertification, ECF No. 339 at 59. While the terms of the ICE-GEO contracts are relevant, they are nevertheless peripheral to Plaintiffs' claims. Thus, complete relief is available to Plaintiffs despite ICE's absence.

### 2.   ICE Has No Legally Protected Interest in the Suit

GEO primarily relies on three interests that could be impaired if ICE is not a party to the suit: (1) ICE's interest in defending against allegations that its policies violate federal law; (2) ICE's contracts with other private parties; and (3) ICE's reputational interests. But Plaintiffs' claims do not depend on a finding that ICE's policies violated federal law. Instead, they allege GEO's interpretation and expansion of the policies violate federal law. Similarly, ICE's contracts with other parties are not impacted by a judicial determination that GEO's actions—which were neither required nor directed by ICE—violated state or federal law. Finally, GEO has identified no specific legal protections to any reputational interests ICE may have. *Cf. Burger King Corp. v. Am. Nat. Bank & Tr. Co. of Chicago*, 119 F.R.D. 672, 677 (N.D. Ill. 1988) (finding subtenant's "ability to protect his interests obviously could be severely impaired by this lawsuit"); *see also Ward v. Apple Inc.*, 791 F.2d 1041, 1053 (9th Cir. 2015). GEO has failed to identify any legally protected interest ICE has that relates to the subject matter of the present action.

**APP. 760**

On the other hand, ICE is a governmental entity that does have a clear interest in the enforcement of federal laws. That interest, however, is protected without ICE joining the suit as a party.[19] Moreover, even if ICE's legally protected interests were somehow implicated, ICE is aware of the claims in this case and has not affirmatively asserted any interest. Instead, it has only participated in discovery proceedings and to intervene in opposition to a motion for writ of habeas corpus filed by one of the named Plaintiffs. *See, e.g.*, ICE Mot. for Reconsideration, ECF No. 281.

GEO articulates a sweeping rule that "[w]here a contract between a sovereign entity and a defendant is implicated in a lawsuit, the sovereign entity is a necessary party under Rule 19(a)." Mot. to Dismiss, ECF No. 307 at 21 (citing *U.S. ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 479 (7th Cir. 1996)). There is no such rule. In *U.S. ex. Rel. Hall v. Tribal Dev. Corp.*, the plaintiffs alleged that a contract for goods and services between the Menominee Tribe and a private corporation violated several federal statutes, but the Tribe was unwilling to join the suit. 100 F.3d at 478. The Seventh Circuit affirmed the district court's dismissal of the action under Rule 19 based on the reasoning that "a judgment in favor of the plaintiffs undoubtedly would be prejudicial to the [sovereign entity] while the plaintiffs' interest in the subject matter of the action was tenuous and indirect." *Id.* (quotation marks and citation omitted). Here, the opposite is true. A judgment in Plaintiffs' favor would have no bearing on ICE's rights or obligations. Also, Plaintiffs in this case have an interest that is anything but tenuous and indirect: they allege they have been the victims of forced labor in violation of federal law while held in federal

---

[19] There is merit to GEO's contention that a judicial determination that ICE acted without Congressional authority would directly implicate ICE's legal interests, but thus far I have had no need to make any findings regarding ICE's authorization from Congress for any aspect of the VWP.

APP. 761

immigration custody and that a large private corporation was unjustly enriched by labor performed on a voluntary basis.

GEO insists I must determine "whether the PBNDS . . . violate state and federal laws," reinforcing its argument by pointing to Plaintiffs' assertion that GEO's challenged cleaning policies violate its contract with ICE. Mot. to Dismiss, ECF No. 307 at 22 (citing Pls.' Mot. for Summ. J., ECF No. 260 at 33-35). However, GEO's cleaning policy was "not created by ICE." Ely Decl. ¶ 22, ECF No. 261-7.[20] GEO unilaterally extended the PBNDS disciplinary scale to cover cleaning mandates that were not required by ICE, and it made the discretionary decision to reimburse VWP workers only $1.00 per day.

In a similar argument, GEO maintains that the practices Plaintiffs challenge under the TVPA "are required by GEO's contract with ICE and the PBNDS." Mot. to Dismiss, ECF No. 307 at 25. GEO relies heavily on *Boles v. Greenville Housing Authority*, 468 F.2d 476 (6th Cir. 1972). In *Boles*, the Sixth Circuit determined that it could not grant the relief sought without a concomitant holding that the Department of Housing and Urban Development "misinterpret[ed] its own guidelines . . . [and] misconceived its function and prerogatives under the Urban Renewal Act." 468 F.2d at 479. Because GEO's challenged policies were not required by ICE, *Boles* provides no legal support to GEO's contention that ICE has any legally protected interest in this suit.

As Plaintiffs have made clear, their claims in this case "do not challenge ICE's rules or decisions, but rather GEO's policies that skirt those rules." Resp. to Mot. to Dismiss, ECF No. 338 at 20. Moreover, the determination that ICE did not require or direct GEO's cleaning

---

[20] GEO contends Ms. Ely's "use of the term 'HUSP' is not consistent with the term as defined by Plaintiffs in this litigation." GEO Reply in Supp. of Mot. for Summ. J., ECF No. 350 at 40. However, no evidence in the record contradicts Ms. Ely's assertion that ICE did not draft the policies relevant to Plaintiffs' claims, other than as set out in this Order.

policies or the associated use of the disciplinary scale fortifies ICE's rights. ICE's interests are not directly implicated by Plaintiffs' claims, and any interests ICE does have in the outcome of the suit are not impaired by its absence.

### 3. GEO Would Not Be Subjected to a Risk of Multiple or Inconsistent Obligations

GEO contends a judgment in Plaintiffs favor may subject it to inconsistent obligations because (1) GEO may be found guilty of violating the TVPA while "simultaneously contractually required by ICE to continue implementing the very policies that resulted in the TVPA violation," and (2) a determination that ICE has acted *ultra vires* in carrying out the VWP would obligate GEO to comply with a program that lacks Congressional authorization. Mot. to Dismiss, ECF No. 307 at 31-33. I dispensed with both contentions above. First, the ICE-GEO contracts do not require GEO to implement the disciplinary policies in the manner alleged. On the contrary, GEO's contract with ICE requires it to comply with the law. *See, e.g.*, 2011 Contract, ECF No. 262-2 at 38. Any doubt on this point is resolved by GEO's decision to formalize an internal policy against placing detainees in solitary confinement for refusing to clean. *See* Amber Martin Dep. 134:13-21, ECF No. 271-6. Second, Plaintiffs' claims do not necessitate a finding regarding ICE's Congressional authorization. As such, there is no risk that GEO will be subjected to inconsistent obligations based on the outcome of the present lawsuit.

### C. Ruling on GEO's Motion to Dismiss

GEO has failed to demonstrate that ICE is a necessary party to this litigation, and thus, its Motion to Dismiss pursuant to Federal Rule of Civil Procedure 19 is denied.

**APP. 763**

### IV. GEO's Motions for Summary Judgment[21] and for Decertification of Class[22]
### (ECF Nos. 305 & 312)

I turn now to GEO's motions relating to the merits of Plaintiffs' claims: its Motions for Summary Judgment and for Decertification. GEO's Motion for Summary Judgment argues that judgment as a matter of law is appropriate on both Plaintiffs' unjust enrichment claim and TVPA claim. GEO asserts Plaintiffs' unjust enrichment claim must fail because a valid contract existed between GEO and VWP participants and GEO actually lost profits due to the mandated VWP. Regarding Plaintiffs' TVPA claim, GEO insists Plaintiffs cannot show: (1) they were subjected to serious harm under the Act; (2) that GEO possessed the requisite mental state; and (3) that GEO's purported threats caused the detainees to clean. Additionally, GEO contends Plaintiffs' TVPA claim is partially barred by the applicable statute of limitations.[23]

GEO's Motion for Decertification maintains—just as its opposition to Plaintiffs' Motion for Certification did—that Plaintiffs TVPA claim cannot be prosecuted on behalf of the certified class because individual issues predominate. Specifically, GEO argues class members were not subjected to a uniform forced-labor policy, had various motivations for cleaning other than any threats GEO made, and performed various types of cleaning tasks, some permissible under the TVPA and some impermissible. GEO's Decertification Motion also repeats two of the points raised in GEO's Motion for Summary Judgment, namely that Plaintiffs cannot establish they

---

[21] Plaintiffs' Response to GEO's Motion for Summary Judgment is ECF No. 336, and GEO's Reply in Support of its Motion is ECF No. 350. The Notice of Supplemental Authorities GEO filed in ECF No. 335 pertains to its Motion for Summary Judgment as well. GEO later filed another Notice of Supplemental Authorities (ECF No. 361), and Plaintiffs responded to that Notice (ECF No. 362).

[22] Plaintiffs' Response to GEO's Motion for Decertification is ECF No. 339, and GEO's Reply in Support of its Motion is ECF No. 352.

[23] Another argument GEO raises is that Plaintiffs cannot seek injunctive relief under the TVPA. In their Response to GEO's Motion, Plaintiffs confirm that their TVPA claim does not seek injunctive relief.

were subjected to serious harm or that GEO acted knowingly. Lastly, the Motion seeks exclusion of female detainees from the class, claiming that no female segregation unit existed at the Facility.

GEO's TVPA-related arguments in its Summary Judgment and Decertification Motions substantially overlap, and so I consider them first. I conclude Plaintiffs have put forward sufficient evidence to establish the disputed elements of their TVPA claim and common issues continue to predominate such that decertification is not warranted. I then evaluate GEO's contentions regarding Plaintiffs' unjust enrichment claim. I determine that whether GEO benefited from the VWP involves genuine disputes of material fact and that the VWP agreement does not prohibit Plaintiffs' claim.

## A. TVPA Claim and Class

GEO's overall premise is that Plaintiffs cannot prove specific elements of their TVPA claim without relying on evidence that is unique to individual Plaintiffs, undermining the basis for certification. The majority of GEO's objections to certification are ones it raised previously that were rejected both in my Certification Order and in the Tenth Circuit's opinion affirming that Order. The few new developments it highlights are exaggerated and insufficient to warrant decertification. After a thorough review of the transcripts, declarations, and documents submitted by the parties, I find Plaintiffs can sustain their TVPA claim with common and representative evidence.

## 1. The TVPA

The forced labor provision of the TVPA makes it unlawful for anyone to:

knowingly provide[] or obtain[] the labor or services of a person. . .

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). Plaintiffs' TVPA claim asserts that GEO obtained detainees' labor by physical restraint or threatening physical restraint, by causing them serious harm or threatening serious harm, and via a scheme, plan, or pattern intended to cause them to believe that they would suffer serious harm or physical restraint if they did not labor. Compl. ¶¶ 76-78, ECF No. 1.

## 2. Summary Judgment Standard

As already stated, summary judgment is appropriate when a party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if a reasonable jury could return a verdict for Plaintiffs. *Id.* In determining whether such genuine disputes of material fact exist, I must view the facts recited above in the light most favorable to

**APP. 766**

Plaintiffs and resolve all disputed facts in their favor. *See McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018).


### 3. Decertification Standard

The order granting class certification in this case may be altered or amended at any time before final judgment. Fed. R. Civ. P. 23(c)(1)(C). However, "decertification is a drastic step, not to be taken lightly." 3 Newberg on Class Actions § 7:37 (6th ed.) (quotation marks omitted).

Proceeding with the class action is appropriate when the party seeking certification can establish the four threshold requirements set forth in Federal Rule of Civil Procedure 23(a) and fulfillment of at least one of the provisions in Rule 23(b). Under Rule 23(a), the party requesting certification must first show that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). If successful, the party must then demonstrate, one of the Rule 23(b) factors. Here, Plaintiffs relied on and I certified the classes under Rule 23(b)(3), which requires a showing that common questions of law or fact predominate over any individual questions and that a class action is the superior method for "fairly and efficiently adjudicating the controversy." I found that some of the common questions in this case were: whether GEO employed policies that constituted an improper means of coercion under the forced labor statute and whether GEO knowingly obtained detainees' labor using those policies. *See Menocal II*, 320 F.R.D. at 264-65.

GEO contends discovery has revealed that common questions do not predominate over individual concerns for the TVPA class and that the class consequently fails to meet the

**APP. 767**

requirements of Rule 23. I address GEO's enmeshed decertification and summary judgment arguments jointly, applying the relevant standard to each.

### 4. Existence of a Uniform Policy

The first question that must be answered based on the parties' framing of the issues is whether there was a uniform policy applicable to the detainees. GEO asserts the policy on which Plaintiffs' TVPA claim is founded is a "contrived policy, which disregards key language in the written policies" and "does not exist." Reply in Supp. of Mot. for Decertification, ECF No. 352 at 12. Considering GEO's policies as a whole, I find Plaintiffs have sufficiently shown the existence of a uniform policy, plan, or scheme. That this policy is made up of portions of various documents and materials is inconsequential because its message was conveyed to detainees and GEO officers.

GEO insists that, although the constituent policies were universally provided to officers and detainees as set out in the Background Section above, they should be disregarded based on the Facility's unwritten policies and practices. To establish that its challenged policies were not applied uniformly (if at all), GEO repeatedly cites its employees' testimony that, when detainees refused to clean, the officers simply asked other detainees to help and that segregation was never imposed for such refusals. *See, e.g.*, Mot. for Decertification, ECF No. 312 at 44 ("GEO officers did not use segregation, or a warning or threat of segregation, as a typical response to a detainee declining to clean."). But Plaintiffs' experiences paint a different picture, one in which the threat of segregation was made both via the written policies and verbally—and was always looming.

GEO is dismissive of Plaintiffs' accounts, stating: "Plaintiffs' experiences, which point to isolated experiences during their stay, fail to establish a classwide policy whereby every detainee

**APP. 768**

was regularly warned that segregation was a potential consequence for not participating in post-meal clean-up." Reply in Supp. of Mot. for Decertification, ECF No. 352 at 28-29. GEO's policies are not established by Plaintiffs' testimony, though; the policies are documented. Plaintiffs' reports of their individual experiences are used to counter GEO's arguments, based on the testimony of its employees and officers, that the policies are not applied. Moreover, regularly warning every detainee of the consequences for not laboring is not a requirement of the TVPA.

Viewing the evidence in the light most favorable to Plaintiffs, GEO's policies threaten detainees with 72 hours in segregation if they refuse to participate in the general cleanup or fail to clean as directed by a GEO staff member or officer. GEO contends the threat of segregation is not clear because the portion of the Facility's Detainee Handbook that discusses cleaning the day room area states only that "the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs" if the detainees do not clean as instructed. 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 50; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. GEO disregards key language in the written policy. Immediately after warning that the televisions will be turned off, the Handbook states "[c]ontinued refusal to clean the area will result in further disciplinary action." 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 50; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. Logically, "further disciplinary action" covers the disciplinary scale included in the Handbook. As Plaintiffs assert, "[t]he [H]andbook and orientation materials are not ambiguous about the fact that [cleaning common areas] is mandatory, specifically emphasizing that there are consequences for noncompliance, ranging from eliminating

**APP. 769**

recreational activities up through solitary confinement." Resp. to Mot. for Decertification, ECF No. 339 at 40.

Any defense GEO raises as to how its policies were implemented involves disputes of material facts that must be resolved by a jury. And Plaintiffs' reliance on individual testimony to counter GEO's defenses does not undermine the grounds for class certification.[24]

### 5. Serious Harm and Physical Restraint

As set out above, the TVPA makes it unlawful for anyone to knowingly obtain the labor of a person by physically restraining or threatening to physically restrain the person, by causing the person serious harm or threatening serious harm, or via a scheme, plan, or pattern intended to cause the person to believe he would suffer serious harm or physical restraint if he did not perform the labor. 18 U.S.C. § 1589(a). The TVPA defines "serious harm" as:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

*Id.* § 1589(c)(2). The serious-harm standard "is a hybrid: it permits the jury to consider the particular vulnerabilities of a person in the victim's position but also requires that [his or] her

---

[24] GEO asserts that "Plaintiffs seek a precedential decision that would put every detention facility, jail, mental health facility, and juvenile detention center at risk of being credibly accused of forced labor by simply providing their residents with a listing of the facility's rules and regulations." GEO's Mot. for Summ. J. at 7, ECF No. 305. Plaintiffs' goals beyond the relief requested in this case are irrelevant to my rulings. But if a facility's rules and regulations improperly compel individuals in its custody to provide labor, credible accusations of forced labor may follow.

acquiescence be objectively reasonable under the circumstances." *United States v. Rivera*, 799 F.3d 180, 186–87 (2d Cir. 2015). [25]

*Summary Judgment*

GEO insists Plaintiffs were merely warned of legitimate consequence sand therefore cannot establish "serious harm," as it is defined in the TVPA. However, the statute makes clear that a showing of serious harm is not required to prove a violation; physical restraint and threats of physical restraint are sufficient. *See* 18 U.S.C. § 1589(a)(1), (a)(4). Increasing the level of confinement for already detained individuals—as Plaintiffs allege GEO's policies threaten to do—can constitute physical restraint. *See Bridges v. Poe*, 487 F. Supp. 3d 1250, 1261 (N.D. Ala. 2020). In *Bridges v. Poe*, a guard at the jail where the plaintiff was held threatened to revoke her status as a trustee worker if she failed to perform sex acts with him. *Bridges*, 487 F. Supp. 3d at 1261. If her trustee status was revoked, she would have been confined to her cell for twenty-three hours a day. *Id.* The court held that "[c]onfinement to a jail cell that restricts an inmate's freedom of movement certainly meets the ordinary meaning of physical restraint." *Id.* (quotation marks omitted). Attempting to distinguish *Bridges*, GEO contends Plaintiffs were already confined within the Facility and so were already under physical restraint. GEO's Reply in Supp. of Mot. for Summ. J., ECF No. 350 at 73. But the plaintiff in *Bridges* was as well. GEO then suggests

---

[25] In describing Plaintiffs' burden under this standard, GEO doctors a sentence from *Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017). GEO quotes the court as stating: "[Plaintiffs] must present sufficient evidence upon which a jury could reasonably conclude that [GEO] knowingly or intentionally engaged in actions or made threats that were sufficiently serious to compel a reasonable person in [each individual plaintiff's] position to remain in [GEO's] employ, against [their] will and in order to avoid such threats of harm[.]" Mot. for Decertification, ECF No. 312 at 40 (alterations in original) (ostensibly quoting *Muchira*, 850 F.3d at 620). The actual text in *Muchira* says nothing about "each individual plaintiff's" position or the necessity of an individualized inquiry, and GEO's insertion of this language is deceptive.

that the threats of physical restraint must be "sufficiently serious" and argues that the threats in *Bridges* were more serious than those here. *Id.* I see no appreciable difference in the threats. The imposition of segregation is physical restraint. Plaintiffs' TVPA claim may therefore be proven based on physical restraint and threats of physical restraint without a showing of serious harm.

Still, Plaintiffs allege that threats of 72 hours in solitary confinement constitute threats of serious harm. To establish their claim based on this theory, Plaintiffs' must show that the harm incurred or threatened was "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). I cannot find as a matter of law that 72 hours in solitary confinement is not a serious harm.

Plaintiffs have presented evidence that the threat of 72 hours in segregation would compel a reasonable person in the detainees' position to perform labor. Specifically, Dr. Grassian testified that 72 hours in segregation can cause psychological damage. *See, e.g.*, Grassian Dep. 216:2-5.[26] And his Report explains how solitary confinement "imposes a devastating triad of emotional and neuropsychiatric deprivations: social isolation, a barren perceptual environment, and deprivation of meaningful mental activity." Grassian Report, ECF No. 336-21 at 11. The testimony in the record from Plaintiffs as well as GEO's officers supports the conclusion that detainees sought to avoid time in segregation. *See* Hugo Hernandez Dep. 166:4-15, 167:19-168:1, 170:4-13, ECF No. 336-4; Xahuentitla Dep. 137:4-19, ECF No. 336-14; Quezada Dep. 141:17-142:8, ECF No. 336-16. Plaintiffs also underscore the detainees' circumstances that

---

[26] GEO criticizes Dr. Grassian for not pointing to any Plaintiff who suffered psychological harm. Plaintiffs are correct, however, that "actually *suffering* serious harm is not a prerequisite for liability." Pls.' Resp. to Mot. for Summ. J., ECF No. 336 at 58.

could make them more vulnerable to threats of segregation: they were confined to the Facility,

unable to leave, separated from their family and loved ones, and facing removal.

In reviewing GEO's arguments regarding serious harm, I must first comment that GEO's

tone and arrogance are not well taken. GEO ignores the circumstances of its detainees and offers

flippant comparisons. An example:

> Plaintiffs' daily routines were not defined by long periods of hard labor, a relative
> lack of freedom, or squalid living conditions, extreme isolation, threat of legal
> process, and violence. Rather detainees' routines included three meals a day, time
> for exercise, television, and reading books supplied by GEO, and the opportunity
> to speak to their families on the phone, as well as access to legal materials in a law
> library. Detainees were largely free to do what they wanted during the day and were
> not deprived of social opportunities. And, the fact that Plaintiffs claims here rest on
> an allegation that they allegedly cleaned the living areas routinely, Plaintiffs' own
> allegations belie any argument that [the Facility] could be fairly described as
> squalid. Thus, the conditions of confinement fall far short of the coercive conditions
> found to be a violation of the TVPA.

GEO's Mot. for Summ. J. at 27, ECF No. 305 (quotation marks and citations omitted).  This

view blinds GEO from honest argument.

GEO discounts the threatened harm in this case, stating: "While there is no ambiguity

that people may fear physical harm to themselves or their loved ones when faced with a threat of

physical violence, a gun, or a raised fist . . .; here, the purported threat is more nuanced." GEO's

Reply in Supp. of Mot. for Summ. J., ECF No. 350 at 75. But that is exactly why the TVPA was

enacted—to combat the more nuanced ways in which labor may be coerced today. *See United

States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (explaining that Congress "enacted § 1589

to address 'traffickers [who] use more subtle means'" (quoting H.R. Rep. No. 106-939, at 101

(2000) (Conf. Rep.), as reprinted in 2000 U.S.C.C.A.N. 1380, 1393)).

Digging itself deeper, GEO insinuates that its policies resemble "ordinary parents

requiring chores." GEO's Mot. for Summ. J. at 18 (quoting *United States v. Toviave*, 761 F.3d

APP. 773

623, 625-26 (6th Cir. 2014)). Certainly, though, it would be improper for any parent to place a child in segregation for 72 hours or to even threaten to do so. Moreover, the Facility is not a household, and GEO is not in a familial relationship with the detainees. In *United States v. Toviave*, the Sixth Circuit stated: "[W]e should not—without a clear expression of Congressional intent—transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse a federal crime." 761 F.3d at 629. The court's emphasis was not on the nature of the work performed, i.e., household chores, but on the relationship between the party compelling the labor and the laborer. *Id.* at 625-626. In fact, in *United States v. Callahan*, the Sixth Circuit later clarified: "In *Toviave*, we held that a parent or guardian who requires children to perform household chores and also abuses the children does not necessarily violate the forced labor statute; we did not hold that household chores do not constitute labor or services." 801 F.3d 606, 620 (6th Cir. 2015).

GEO also looks for support in *Headley v. Church of Scientology International*, 687 F.3d 1173 (9th Cir. 2012). There, two ministers of the Church of Scientology claimed that the Church forced them to provide labor in violation of the TVPA. *Id.* at 1174. In addition to experiencing verbal and physical abuse, one plaintiff testified that she had two abortions because she was told, if she did not, she would be required to perform manual labor and face other consequences. *Id.* at 1176. The Ninth Circuit, however, found that "the record contain[ed] little evidence that the defendants obtained the [plaintiffs] labor 'by means of' serious harm, threats, or other improper methods." *Id.* at 1179. Instead, the record supported the conclusion that plaintiffs' labor was voluntarily given due to their belief that involvement in the church "was the right thing to do," and that the "discipline, lifestyle, and familial constraints" the plaintiffs' attacked were what

caused them to leave the organization and stop providing their labor. *Id.* at 1179-80. The court held that the potential consequences plaintiffs faced in leaving—being declared "suppressive persons" and losing contact with their friends and family—did not constitute serious harm or a related threat under the TVPA. *Id.* at 1180.

GEO argues that, "if the unquestionably more severe consequences in *Hedley* [sic] did not violate the TVPA, a warning that a detainee faced the *possible* consequence of a brief stay in segregation does not violate the TVPA." GEO's Mot. for Summ. J. at 30. Ignoring GEO's comment that 72 hours in segregation is a "brief stay," it still misconstrues the analysis in *Headley*. Other than the potential to be declared "suppressive persons," the Ninth Circuit did not consider whether the consequences plaintiffs faced were serious enough that they could have coerced the plaintiffs to labor. The court merely concluded that those consequences were not the cause of the plaintiffs' decision to labor. *Headley*, 687 F.3d at 1176. The focus of the court's analysis is the plaintiffs' freedom to leave. *Id.* at 1180 ("We emphasize that the [plaintiffs] had innumerable opportunities to leave the defendants.").[27] Detainees at the Facility had no such freedom.

In reaching its conclusion, the court in *Headley* explained that it must "distinguish between [i]mproper threats or coercion and permissible warnings of adverse but legitimate consequences." *Headley*, 687 F.3d at 1180 (citation omitted). GEO makes this principle the theme of its argument, reciting that the detainees at the Facility faced only legitimate consequences. But what makes consequences legitimate? That they are lawful, if nothing else.

---

[27] The plaintiff's ability to leave was similarly emphasized by the Fourth Circuit in *Muchira v. Al-Rawaf. See, e.g.*, 850 F.3d at 621 ("[The plaintiff] had innumerable opportunities to walk out of the Saudi home without triggering the alarm.").

APP. 775

GEO cannot avoid liability under the TVPA by declaring its consequences to be legitimate when Plaintiffs have presented evidence showing the opposite.

Because a jury could conclude that the threat of 72 hours in segregation would compel a reasonable person in the detainees' position to provide labor in order to avoid that harm, Plaintiffs have sufficiently demonstrated that detainees labored under the threat of serious harm.

*Decertification*

In its Decertification Motion, GEO argues that serious harm cannot be shown on a class-wide basis because (1) 72 hours of segregation is not likely to have the same impact on all individuals, (2) the class members' particular vulnerabilities must be considered, and (3) each had different interactions with GEO's officers. GEO is wrong on all accounts.

GEO claims that, per Dr. Grassian's opinion, the potential harm caused by 72 hours of segregation is dependent on an individual's unique circumstances. Although individuals are likely to have varying responses to segregation, the pertinent question for Plaintiffs' TVPA claim is not whether each individual would be sufficiently harmed by 72 hours in segregation. The standard is whether a reasonable person would be compelled to provide labor in order to avoid 72 hours in segregation. The analysis cannot be based on a prediction of the extent to which each class member would be harmed by actually suffering the consequence of segregation. It bears further comment that the gravamen, i.e., the material part, of  the class members' grievance is the threat of isolation and not the perhaps idiosyncratic harms suffered as a consequence. All class members claim the same threat.

As explained above, in addition to the objective question, the serious-harm standard permits the jury to consider the particular vulnerabilities of a person in the victim's position.

**APP. 776**

*Rivera*, 799 F.3d at 186–87. GEO contends that Plaintiffs' sensitivities cannot be extrapolated to the entire class, as the class members differed significantly in that they speak different languages, were detained for various lengths of time, and came from distinct environments. First, consideration of the victims' particular circumstances for the purposes of the serious harm inquiry is permitted but not mandatory. *New York State Nurses Ass'n v. Albany Med. Ctr.*, 473 F. Supp. 3d 63, 69 (N.D.N.Y. 2020) (referencing the Second Circuit's opinion in *Rivera*, 799 F.3d at 186-87). And second, the class members have many shared vulnerabilities that can be presented to a jury via class-wide evidence. For example, all of the class members were detained in the same institution subject to universal policies; they were fighting immigration cases; they were not free to leave; they lived in the company of mostly strangers; their ability to see and communicate with their family and loved ones was restricted; and they had little—if any—privacy. A jury could find that these class-wide characteristics made the class members more vulnerable to the threatened harm. As such, the subjective analysis of the serious-harm standard does not support decertification.

Each class member, of course, had different experiences with GEO's officers. GEO downplays the class members' experiences, insisting "a jury would need to assess whether the offhand comments by some officers were reasonably considered a threat in light of the conflicting behavior of other officers." Mot. for Decertification, ECF No. 312 at 51-52. Again, the question is whether a reasonable person would have been compelled to provide his labor under all the surrounding circumstances. Plaintiffs' allegations describe a systematic effort on the part of the officers to force compliance with their cleaning demands, not "offhand" comments. What is more, any comments made by GEO's officers were underwritten by its

APP. 777

universally distributed policies. GEO raised this same argument before the Tenth Circuit, and the court was unambiguous:

> The only factual differences among the class representatives' experiences pertain to their specific interactions with Aurora Facility guards and whether they witnessed firsthand other individual detainees being sanctioned or threatened with solitary confinement for refusal to clean. But these factual differences do not defeat typicality because the class members' legal theory—that GEO knowingly obtained their labor through the uniform Sanitation Policy—does not change based on their personal interactions with GEO staff or their knowledge of specific instances in which GEO threatened or carried out the threat of solitary confinement.

*Menocal III*, 882 F.3d at 917 n.5. It likewise does not matter that segregation was rarely imposed or that on occasion class members faced no consequences for refusing to clean, as GEO's policies ensured the threat was pervasive.

The serious harm element, therefore, presents a common question that can be answered with class-wide evidence.

### 6. Causation

Another element Plaintiffs must prove for their TVPA claim is causation, or that GEO obtained the detainees labor "by means of" its improper coercive conduct. *See* 18 U.S.C. § 1589(a). In my Order certifying the classes, I resolved that there is both an objective and subjective component to the forced labor statute's causation requirement. *Menocal II*, 320 F.R.D. at 266-67. I explained: "The subjective component is whether the victims actually labored because of the perpetrator's conduct, while the objective component is whether a reasonable person would respond in a similar way as the victims." *Id.* at 267. In reaching this conclusion, I considered the case law cited by the parties and relied heavily on the analysis in *David v. Signal International, LLC*, No. 08-1220, 2012 WL 10759668 (E.D. La. Jan. 4, 2012). Additionally, I determined the causation element can be satisfied by class-wide circumstantial evidence, noting

APP. 778

that, "[g]iven the climate in which [Plaintiffs and class members] were detained, it is possible that an inference of causation would be appropriate even despite some class members' purported willingness to work for reasons other than GEO's improper means of coercion." *Menocal II*, 320 F.R.D. at 267. On appeal, the Tenth Circuit declined to decide whether such a subjective showing is necessary, but if it is required, the court found—as I did—that it can be demonstrated through class-wide, circumstantial evidence. *Menocal III*, 882 F.3d at 918 ("But we need not decide which of these standards applies to § 1589's causation requirement in resolving the class certification question. Even assuming GEO's proposed standard applies, the causation element is susceptible to class-wide proof and thus does not preclude the TVPA class from satisfying the predominance requirement.").

Plaintiffs now ask me to reconsider my determination that the causation element requires a subjective showing. Misinterpreting Plaintiffs' request, GEO argues that the Fourth Circuit set out the appropriate legal standard in *Muchira v. Al-Rawaf*. According to GEO, that standard involves two inquiries:

> First, the TVPA includes an express scienter requirement, and therefore a party must present evidence from which the fact finder could conclude that the defendant *intended* the victim to believe harm would befall the victim if he or she did not work . . . . Second, the factfinder must determine that the harm or threat of harm relayed by the defendant was 'sufficiently serious' to compel the victim to continue to work, from the vantage point of a reasonable person in the place of the victim.

Reply in Supp. of Mot. for Decertification, ECF No. 352 at 6 (citing *Muchira*, 850 F.3d at 618). GEO explains the second element is a "hybrid" test because it requires that the victim's decision to provide his labor be objectively reasonable but also takes into account the particular vulnerabilities of a person in the victim's position. *Id.*

Contrary to GEO's rendering, Plaintiffs do not ask that I disregard this hybrid standard for serious harm, the second part of which I have already applied. Their reconsideration request

instead relates to causation and whether they are required to establish why the class members provided their labor. Admittedly, this distinction is tricky. The definition of serious harm includes a causation component—the threatened harm must be sufficiently serious to compel a reasonable person in the victim's circumstances to provide his labor. But the causation element I described in the Certification Order derives from the "by means of" language in the statute and covered not just serious harm but the other improper means of compelling labor under the TVPA (i.e., physical restraint and abuse of law or legal process).

I have reconsidered the analysis in *David* and studied the more recent cases cited by Plaintiffs. While the reasoning in *David* remains valid, most of the cases Plaintiffs cite conflate the serious harm and causation elements and consequently are of little value. *See, e.g.*, *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-01302 (NG) (JO), 2018 WL 4347799, at *8 (E.D.N.Y. Sept. 12, 2018); *N.Y. State Nurses Ass'n*, 473 F. Supp. 3d at 69; *Owino v. CoreCivic, Inc.*, No. 17-cv-01112 JLS (NLS), 2020 WL 1550218, at *27 (S.D. Cal. Apr. 1, 2020). Without any other basis for reconsideration, I stand by my previous statement of the law on causation.[28] However, I remain convinced that the subjective component may be satisfied via circumstantial evidence and that it can be proven on a class-wide basis in this case.

*Summary Judgment*

GEO's arguments regarding causation implicate obvious disputes of material fact such that summary judgment is inappropriate. According to GEO, "Plaintiffs have not demonstrated that absent a fear of discipline, they would not have cleaned up after themselves for reasons other

---

[28] Despite this conclusion, I agree that perpetrators of forced labor should not benefit from fortuitously choosing the "right" victim, one who, despite the perpetrator's coercive intent, labors for unrelated reasons. Further, it cannot be expected or required that all victims of forced labor be available to provide direct evidence of their subjective reasons for laboring.

**APP. 780**

than the disciplinary policy." GEO's Mot. for Summ. J. at 32. As I have explained throughout this order, the labor at issue is not just Plaintiffs "clean[ing] up after themselves." The consideration is whether detainees would have cleaned up the common areas and after other detainees absent the ever-present threat of segregation. Plaintiffs have presented evidence that they would not have done so. GEO's arguments and evidence in opposition are issues for the jury.

*Decertification*

GEO maintains the causation element mandates individualized inquiries because some class members were not compelled to work by the threat of segregation and some provided their labor for other reasons personal to them. GEO contends that some detainees actually preferred segregation for peace and quiet and some liked to clean to stay busy, to help others, or for the incentives they received. The Tenth Circuit specifically considered Ms. Ceja's testimony that detainees may clean because they prefer to stay busy and determined it was "conjectural" and "d[id] not raise concerns about individual issues predominating because GEO could introduce th[e] same testimony against all class members at trial." *Menocal III*, 882 F.3d at 921 n.12. That reasoning applies to all similar evidence GEO has submitted in support of decertification.

Pointing to portions of Plaintiffs' testimony, GEO argues that all class members did not know about the written policies or uniformly view the Facility's Detainee Handbook as threatening and some may have cleaned before being warned of the possible sanction of segregation. For Plaintiffs to succeed on their TVPA claim, they are not required to show that each class member labored as a result of a direct threat, either from an officer or via the Handbook or Orientation Videos. A reasonable jury could find the looming threat of segregation

**APP. 781**

created by GEO's policies is sufficient to infer causation. The inference is permitted even if a class member does not remember explicitly being warned of the possible threat of segregation before cleaning. Class members may have perceived the threat without remembering when or how it was made or they may have continued to clean after the threat was made known. Regardless, as I found in certifying the TVPA class initially, an inference of causation might still be appropriate even if some class members purportedly labored for reasons other than GEO's improper coercion. *See Menocal II*, 320 F.R.D. at 267.

GEO also claims that, because Plaintiffs performed much of the same work voluntarily under the VWP, they cannot say it was GEO's cleaning policies that compelled them to do the work. The Tenth Circuit addressed this exact argument and found there was no inconsistency in Plaintiffs' position. *Menocal III*, 882 F.3d at 921 n.12.

Twisting Plaintiffs' contentions once again, GEO criticizes Plaintiffs for focusing on the coercive nature of segregation when a lesser sanction would usually be imposed if a detainee refused to clean. GEO claims:

> Plaintiffs argue that because *one* of the *many* possible sanctions for the refusal to clean is 72 hours in segregation, that a reasonable construction of the post-meal cleanup procedure in the handbook is that any and all times that a detainee refuses to clean, segregation, and not the lesser sanctions such as a warning, reprimand, or loss of privileges would apply—creating an inherently coercive environment.

Mot. for Decertification, ECF No. 312 at 43 (citing Mot. for Class Certification, ECF No. 49 at 17). But GEO's citation for that claim states nothing of the sort. Instead, Plaintiffs assert that the inference could be made that class members labored because of "the possibility of solitary confinement" and that "[t]he choice between solitary confinement and work is no choice at all." Mot. for Class Certification, ECF No. 49 at 18. The TVPA does not require that the serious harm or physical restraint be likely; the threat of it need only be sufficient to compel a victim to

provide labor. To the extent GEO contends the possibility of segregation was so unlikely that it could not have compelled class members to clean, it can make that case to the jury.

GEO's last challenge asserts that Plaintiffs do not represent a diverse cross-section of the certified class, and so a class-wide inference of causation cannot be made based on their testimony. For support, GEO cites *Cruz v. Dollar Tree Stores, Inc.*, Nos. 07-2050 SC & 07-4012 SC, 2011 WL 2682967 (N.D. Cal. July 8, 2011). But *Cruz* is distinguishable because the plaintiffs in the case admitted that the evidence they intended to rely on as common proof was "wrought with problems and . . . provided an unreliable basis by which to establish eligibility for class membership." *Id.* at *7 (citation omitted). Besides, the inference of causation does not depend solely on Plaintiffs' testimony; the jury may consider evidence of GEO's universal policies and the class members' common circumstances.

### 7. Knowingly

The final disputed element of Plaintiffs' TVPA claim is whether GEO acted knowingly. *See* 18 U.S.C. § 1589(a). "The scienter element requires proof that the defendant knew (1) that the enumerated 'circumstance existed' and (2) that the defendant was obtaining the labor in question as a result." *Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1156 (9th Cir. 2022) (quoting *United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008)). As GEO explains, "Plaintiffs must show that [it] was aware that the policy would coerce labor from detainees." Reply in Supp. of Mot. for Decertification, ECF No. 352 at 45. GEO "may be charged with the combined knowledge of its employees and agents." 3 Fletcher Cyc. Corp. § 807. Whether this knowledge should be imputed to GEO depends on a "highly fact-intensive analysis." *Id.*

**APP. 783**

*Summary Judgment*

GEO insists Plaintiffs cannot show it acted knowingly since it only sought to fulfill its contractual obligations with ICE. I have already explained how GEO's actions went beyond its contracts with ICE; it did not just fulfill the obligations of its contracts. The testimony from GEO's representatives, including Dawn Ceja, Amber Martin, and Dan Ragsdale, substantiates that they had detailed knowledge of the ICE-GEO contracts and GEO's independent policies. GEO identified these individuals as its representatives who could testify regarding its contractual obligations and policies. Based on the contents of GEO's written policies and the testimony of its agents, a reasonable jury could find that it acted knowingly.

GEO claims that its informal policy of not imposing segregation for detainees' refusal to clean shows that it lacked the requisite scienter. GEO uses knowledge and intent interchangeably in referring to this state of mind. Under the text of the forced labor statute, knowledge is required for any violation, while a showing of intent is only necessary for violations of the scheme, plan, or pattern provision. 18 U.S.C. § 1589(a); *see also United States v. Dann*, 652 F.3d 1160, 1169-70 (9th Cir. 2011). Nonetheless, I agree with Plaintiffs: "To the extent that GEO's argument relies on the position that [it] subjectively did not intend detainees to find the looming threat of solitary confinement threatening, that is not a summary judgment issue." Pls.' Resp. to Mot. for Summ. J., ECF No. 336 at 68.

*Decertification*

Once more, GEO's arguments on decertification point to the interactions between its officers and individual class members. GEO contends that an individualized, fact-intensive inquiry is necessary for any of the officer's actions to be imputed to it. As GEO would have it,

the jury would need to assess whether the actions of each officer were subject to supervisory review and whether each officer had contact with a substantial percentage of the class over the relevant 10-year period. Because evidence in the record shows GEO's agents drafted and had knowledge of the responsible policies, individualized review of each officers' specific actions is not required. The knowledge element of Plaintiffs' TVPA claim continues to involve a common question, making decertification inappropriate.

### 8. Specific Tasks Performed

GEO's arguments on serious harm, scienter, and causation under the TVPA give rise to another of its challenges to Plaintiffs' claim—GEO contends the statute does not distinguish between acceptable labor and unacceptable labor, and if a line can be drawn between the two, it would necessitate individual inquiries into what tasks each class member performed. According to GEO, the TVPA requires only that labor be obtained or provided through coercion, and therefore, liability under the statute does not turn on the specific type of labor performed. Plaintiffs describe their claim as pertaining to the labor "performed in commonly accessible areas of the housing unit, and requir[ing] detainees to sweep, mop, and clean tables." Resp. to Mot. for Decertification, ECF No. 339 at 59 (quotation marks and citations omitted). I question whether the personal housekeeping required by the PBNDS constitutes labor under the TVPA. But, because Plaintiffs' claim does not allege that the PBNDS' personal housekeeping tasks violate the TVPA, it is not necessary to determine whether those tasks, if coerced, would be permissible under the statute or if liability turns on the type of labor performed.[29] Still, Plaintiffs

---

[29] I note, however, that I am not persuaded by GEO's claim that "keeping the floor free of debris" is the same as "mopping or sweeping the floor." *See* Mot. for Decertification, ECF No. 312 at 58.

**APP. 785**

should more clearly articulate the limits of their claim before trial. The line need not be a physical boundary based on the dorm layout and the location of the detainees' beds, as GEO suggests. The claim might simply be confined to the labor detainees performed in cleaning up after others (as opposed to cleaning up after themselves).

However the labor in Plaintiffs' TVPA claim is defined, individual inquiries into whether each class member performed the challenged tasks will not be necessary because, as I have already explained, there was a uniform policy. All detainees were required to "keep clean and sanitary all commonly accessible areas of the housing unit, including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs." 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 50; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. And "[e]ach and every detainee" was obligated to participate in the Facility's sanitation program and general cleanups. 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 49; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. The fact that detainees may have performed labor not covered by Plaintiffs' claim does not justify decertification of the TVPA class.

### 9. Claim Time Barred

In both its Motion for Summary Judgment and Motion for Decertification, GEO argues that any part of Plaintiffs' TVPA claim accruing before December 23, 2008, is time barred for two reasons: First, GEO alleges the "scheme, plan, or pattern" theory of liability was not added to the statute until that time. Second, GEO contends that all claims accruing before December 23,

2008, would have been subject to a four-year limitations period, not the current 10-year period, and this case was not filed until 2014. The "scheme, plan, or pattern" language, however, was always included in the forced-labor statute. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 112, 114 Stat. 1464 (2000).[30] Thus, Plaintiffs' claims are not barred on that basis.

On December 23, 2008, Congress extended the statute of limitations for TVPA claims from four to ten years. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 221, 122 Stat. 5044 (2008). As explained in *Gilbert v. United States Olympic Committee*, 423 F. Supp. 3d 1112, 1129 (D. Colo. 2019), the existing ten-year statute of limitations applies to Plaintiffs' TVPA claim, to the extent the claim was alive when Congress amended the limitations period. In other words, claims within the four-year statute of limitations on December 23, 2008, are still valid, and claims accruing before that time are barred. Consequently, summary judgment will enter on Plaintiffs' TVPA claims accruing before December 23, 2004, and the TVPA class will be limited to all persons detained in the Facility from December 23, 2004, to October 22, 2014.[31]

### 10. Exclusion of Female Detainees from Class

The final argument GEO makes regarding the substance of Plaintiffs' TVPA claim is that female detainees should be excluded from the TVPA class because there was no segregation unit for female detainees at the Facility. According to GEO, if there was no place to segregate female detainees, any related warnings could not have been perceived as a reasonable threat. Yet,

---

[30] GEO does not provide any reply to Plaintiffs' response on this matter. If and when a party discovers it is mistaken in its argument to the Court, withdrawal or concession of the point is obligatory and appreciated. *See, e.g.*, Fed. R. Civ. P. 1.

[31] Appropriately, Plaintiffs concede that this ruling is justified.

**APP. 787**

Officer Quezada testified that there is in fact a female segregation unit, just in a different area of the Facility. Quezada Dep. 112:16-113:24, ECF No. 339-12. And, regardless, GEO led female detainees to believe they could be sent to segregation, which is sufficient for them to remain part of the TVPA class.

After considering GEO's decertification and summary judgment arguments related to Plaintiffs' TVPA claim, I find the predominance requirement continues to be satisfied by common questions, such as whether GEO's policies amounted to improper coercion under the TVPA, whether threats of 72 hours in segregation constituted threats of serious harm, and whether GEO knowingly obtained labor under those policies. Plaintiffs have presented sufficient evidence for those questions to be answered affirmatively. Consequently, both Plaintiffs' TVPA claim and the associated class survive.

**B. Unjust Enrichment Claim**

GEO seeks summary judgment on Plaintiffs' unjust enrichment claim as well. To succeed on their claim, Plaintiffs must prove: (1) GEO received a benefit (2) at their expense (3) "under circumstances that would make it unjust for [GEO] to retain the benefit without commensurate compensation." *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (citing *Salzman v. Bachrach*, 996 P.2d 1263, 1266-67 (Colo. 2000)).

**1. Benefit Received from Voluntary Work Program**

GEO argues Plaintiffs cannot establish it received a benefit from the VWP because the program in fact caused it to lose profits. Under GEO's theory, if it did not have to operate the VWP, it would have hired additional employees and been able to realize a profit of up to 15% on

**APP. 788**

the increased labor costs. Plaintiffs poke holes in this theory by pointing out that GEO's contract with ICE requires GEO to implement the VWP and it is not certain that ICE would accept a contract with additional labor costs and baked-in profits. Plaintiffs present evidence that paying detainee participants more than $1.00 per day would result in additional costs to GEO. This conflicting evidence amounts to genuine disputes of material fact that prevent summary judgment.

Plaintiffs state that trial of their unjust enrichment claim is to the Court, while GEO requests a jury trial on all claims. *See* Am. Stipulated Scheduling & Disc. Order at 20. Unjust enrichment is an equitable claim and thus is generally decided by the Court. *See Lewis*, 189 P.3d at 1141. In this case, however, I find the assistance of a jury would be beneficial and so order that Plaintiffs' unjust enrichment claim will be heard by the jury on an advisory basis. *See* Fed. R. Civ. P. 39(c).

### 2. Existence of a Valid Contract

GEO also asserts Plaintiffs' unjust enrichment claim is not viable because participants' work in the VWP was covered by an express contract.[32] Unjust enrichment is not available as "a mere alternative legal theory when the subject is covered by an express contract." *West Ridge Group, LLC v. First Trust Co. of Onaga*, 414 F. App'x 112, 120 (10th Cir. 2011) (unpublished); *see also Pulte Home Corp., Inc. v. Countryside Cmty. Ass'n, Inc.*, 382 P.3d 821, 833 (Colo.

---

[32] Plaintiffs contend GEO waived this defense to their unjust enrichment claim because it is not asserted in GEO's Answer. However, GEO expressly included the defense in the Scheduling Order issued in October 2018. *See* Am. Stipulated Scheduling & Disc. Order at 5 ("[T]he existence of an express contract precludes Plaintiffs' unjust enrichment claim."); *id.* at 19 ("GEO may file a dispositive motion arguing that express contracts preclude Plaintiffs' unjust enrichment claim."). Plaintiffs have, therefore, had sufficient notice of the defense, and I find GEO has not waived it.

2016). Pointing to the document VWP participants must sign, GEO argues the detainees expressly agreed to be compensated only $1.00 per day and any remedy available to them would have to be under that agreement. *See* Detainee VWP Agreement, ECF No. 306-2 at 3. In response, Plaintiffs insist that the signed documents are unconscionable and not enforceable contracts.

Whether a contract is unconscionable is a question of law, decided based on state law. *Mullan v. Quickie Aircraft Corp.*, 797 F.2d 845, 849-50 (10th Cir. 1986). In *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986), the Colorado Supreme Court set out the applicable standard for unconscionability. *Davis* instructs:

> [T]o support a finding of unconscionability, there must be evidence of some overreaching on the part of one of the parties such as that which results from an inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to that party.

*Id.* Thus, for a contract to be unconscionable, it must be both procedurally and substantively so. The *Davis* court identified the following factors as relevant to the unconscionability determination:

> a standardized agreement executed by parties of unequal bargaining strength; lack of opportunity to read or become familiar with the document before signing it; use of fine print in the portion of the contract containing the provision; absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated; the terms of the contract, including substantive unfairness; the relationship of the parties, including factors of assent, unfair surprise and notice; and all the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect.

*Id.* (internal citations omitted)

Plaintiffs' examination of these factors is persuasive. The procedural unconscionability of the Detainee VWP Agreement (the "Agreement") is apparent from the VWP participants' unequal bargaining strength, their status as detainees, and the fact that they had a single method

APP. 790

of earning money in the Facility. It does not matter that participation in the VWP was not mandatory or that detainees wanted the opportunity to work. The only way they could participate was to sign GEO's standardized Agreement and earn $1.00 per day. GEO argues that the unconscionability of the Agreement depends on the particular financial circumstances of each detainee. Perhaps a financially well-off detainee would be less likely to participate in the VWP, but a detainee's additional resources do not give that detainee any more bargaining power in this context and there is no meaningful alternative.

Plaintiffs stress that the Agreement is also substantively unconscionable because paying VWP participants $1.00 per day is commercially unreasonable. GEO reasons that, since the federal government is entitled to require ICE detainees to perform housekeeping tasks without pay, paying $1.00 a day for work cannot be commercially unreasonable. GEO's Reply in Supp. of Mot. for Summ. J., ECF No. 350 at 79 n.8 (citing *Channer v. Hall*, 112 F.3d 214, 219 (5th Cir. 1997); ); 8 U.S.C. § 1555(d)). GEO's reasoning is incongruous. A communal contribution by a detainee is not a commercial transaction. Moreover, participants in the VWP perform more than just housekeeping tasks. I agree with Plaintiffs that, on its face, the $1.00 per day provision of the agreement, without any variation for the type, timing, duration, or other specifics of the work performed, is commercially unreasonable.

Consequently, I find the VWP Agreement does not bar Plaintiffs' unjust enrichment claim because it does not constitute an enforceable contract covering the subject matter of that claim.

APP. 791

**C. Rulings on GEO's Motions for Summary Judgment and for Decertification**

GEO has not shown that judgment as a matter of law is appropriate on Plaintiffs' TVPA claim. Despite GEO's many protests, common questions predominate such that certification of the TVPA class continues to be appropriate. Also, whether GEO lost profits due to the VWP involves genuine disputes of material fact that preclude summary judgment on Plaintiffs' unjust enrichment claim. And no enforceable contract dictated that Plaintiffs could only be paid $1.00 per day, so Plaintiffs are not limited to remedies under contract law. GEO's Motions for Summary Judgment and for Decertification of Class are, therefore, denied.

## VI.  Conclusion

Accordingly, Plaintiffs' Motion for Summary Judgment on GEO's Affirmative Defense (ECF No. 260) is GRANTED. GEO's Cross Motion for Summary Judgment (ECF Nos. 284), Motion to Dismiss (ECF No. 307), and Motion for Decertification of Class (ECF No. 312) are DENIED. GEO's Motion for Summary Judgment (ECF No. 305) is GRANTED IN PART in that the TVPA class is narrowed to beginning on December 23, 2004, and the Motion is otherwise DENIED. GEO's Motion to Strike (ECF No. 368) is DENIED at moot.

DATED this 18th day of October, 2022.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE

**APP. 792**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL, MARCOS BRAMBILA, GRISEL XAHUENTITLA, HUGO
HERNANDEZ, LOURDES ARGUETA, JESUS GAYTAN, OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and DEMETRIO VALEGRA, on their own behalf and on behalf
of all others similarly situated,

     Plaintiffs,

v.

THE GEO GROUP, INC.,

     Defendant.

---

**NOTICE OF APPEAL**

---

     Defendant, The Geo Group, Inc., ("GEO") appeals to the United States Court of Appeals

for the Tenth Circuit from this Court's Order on the Parties' Cross Motions for Summary Judgment

and for Defendant's Motion to Dismiss and for Decertification of Class (ECF No. 380) entered

Oct. 18, 2022.  In particular, Defendant appeals the grant of Plaintiffs' Motion for Summary

Judgment on GEO's Affirmative Defenses (ECF No. 260) and denial of GEO's Cross Motion for

Summary Judgment (ECF No. 284).

*ACTIVE 683329807v1*

**APP. 793**

Date: November 16, 2022

By:     */s/* Naomi Beer
David G. Palmer
Naomi Beer
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
(303) 572-6500
palmerdg@gtlaw.com
beern@gtlaw.com

Scott Schipma
Dominic Draye (Of Counsel)
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
(202) 331-3141
schipmas@gtlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November, 2022, I electronically filed the foregoing **NOTICE OF APPEAL** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following or deposited a copy of the filing in the United States mail, postage prepaid, addressed as follows:

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
TOWARDS JUSTICE
PO Box 371680
PMB 44465
Denver, CO 80237-5680
(alex@towardsjustice.org, david@towardsjustice.org
juno@towardsjustice.org, andy@towardsjustice.org)

R. Andrew Free
LAW OFFICE OF R. ANDREW FREE
P.O. Box 90568
Nashville, TN 37209
(andrew@immigrantcivilrights.com)

Adam L. Koshkin
OUTTEN & GOLDEN, LLP
One California St., 12th Fl.
San Francisco, CA 94111 (akoshkin@outtengolden.com,
rdempsey@outtengolden.com)
Hans C. Meyer
MEYER LAW OFFICE, P.C.
P.O. Box 40394
Denver, CO 80204
(hans@themeyerlawoffice.com)

P. David Lopez
OUTTEN & GOLDEN, LLP
601 Massachusetts Ave. NW
2nd Floor  West Suite
Washington, DC 20001
(pdl@outtengolden.com)

Matthew  Fritz-Mauer
KELMAN BUESCHER FIRM
600  Grant St., Ste. 825
Denver, CO 80203
(aturner@laborlawdenver.com
mfritzmauer@laborlawdenver.com)

Brandt P. Milstein
MILSTEIN LAW OFFICE
1123 Spruce St.
Boulder, CO 80302
(brandt@milsteinlawoffice.com)
Michael J. Scimone
Ossai Miazad
OUTTEN & GOLDEN, LLP
685 Third St., 25th Fl.
New York, NY 10017
(mscimone@outtengolden.com
om@outtengolden.com)

By: /s/ Naomi Beer
Naomi Beer