**ORAL ARGUMENT REQUESTED**
**No. 22-1409**

**In the United States Court of Appeals**
**for the Tenth Circuit**

ALEJANDRO MENOCAL, MARCOS BRAMBILA, LOURDES ARGUETA, HUGO HERNANDEZ, GRIZEL XAHUENTITLA, JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO VIZGUERRA, AND DEMETRIO VALERGA,
*Plaintiffs-Appellees,*

v.

THE GEO GROUP, INC.,
*Defendant-Appellant.*

On Appeal from the United States District Court,
for the District of Colorado (Denver) (Hon. John L. Kane)
No. 1:14-cv-02887-JLK-MEH

**PLAINTIFFS-APPELLEES' ANSWER BRIEF**

JUNO TURNER
DAVID SELIGMAN
ALEXANDER HOOD
RACHEL DEMPSEY
TOWARDS JUSTICE
PO Box 371680
Denver, CO 80237
(720) 248-8426

MICHAEL SCIMONE
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
(212) 658-0137

JENNIFER D. BENNETT
GUPTA WESSLER PLLC
100 PINE STREET
SUITE 1250
SAN FRANCISCO, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

ROBERT D. FRIEDMAN
GUPTA WESSLER PLLC
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

*(Additional counsel listed on inside cover)*

March 24, 2023                    *Counsel for Plaintiffs-Appellees*

HANS MEYER
MEYER LAW OFFICE
901 West 10th Ave, Suite 2A
Denver, CO 80204
(303) 831-0817

BRANDT MILSTEIN
ANDREW HESS TURNER
MILSTEIN TURNER
1490 Lafayette Street, Suite 304
Denver, CO 80218
(303) 440-8780

ADAM KOSHKIN
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
(415) 727-2237

# TABLE OF CONTENTS

Table of authorities............................................................................ iii

Statement of related cases..............................................................viii

Introduction.......................................................................................... 1

Jurisdictional statement .................................................................... 3

Statement of the issues.................................................................... 3

Statement of the case ....................................................................... 3

    I.    Factual background ........................................................... 3

    II.    Legal background ...............................................................11

Standard of review.............................................................................18

Summary of argument......................................................................19

Argument...............................................................................................20

    I.    This Court lacks jurisdiction over GEO's interlocutory appeal. ........ 20

    II.    GEO is not entitled to the government's sovereign immunity. .......... 29

        A.    The *Yearsley* defense applies only when the government both validly authorizes and directs the challenged conduct. ................................................................... 29

        B.    GEO isn't entitled to a *Yearsley* defense for its forced sanitation program.....................................................38

        C.    GEO isn't entitled to the *Yearsley* defense for its decision to pay detained workers $1 a day. ...................................48

Conclusion..............................................................................................51

Statement regarding oral argument ...........................................54

Certificate of compliance ........................................................................ 55

Certificate of service ............................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*Al Shimari v. CACI Premier Technology, Inc.*,
  775 F. App'x 758 (4th Cir. 2019).........................................................28

*Alaska v. United States*,
  64 F.3d 1352 (9th Cir. 1995)...............................................................24

*Allegheny Airlines, Inc. v. LeMay*,
  448 F.2d 1341 (7th Cir. 1971)..............................................................27

*Bell & Son v. Kidd & Roberts*,
  63 S.E. 607 (Ga. App. 1909) ...............................................................15

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
  403 U.S. 388 (1971)..........................................................................18

*Boyle v. United Technologies Corp.*,
  487 U.S. 500 (1988)..........................................................15, 16, 17, 35

*Brady v. Roosevelt S.S. Co.*,
  317 U.S. 575 (1943) ....................................................12, 13, 15, 32

*Broidy Capital Management LLC v. Muzin*,
  12 F.4th 789 (D.C. Cir. 2021)............................................................35

*Cabalce v. Thomas E. Blanchard & Associates, Inc.*,
  797 F.3d 720 (9th Cir. 2015) .......................................................30, 35

*Childs v. San Diego Family Housing, LLC*,
  2020 WL 12689448 (S.D. Cal. Sept. 15, 2020) .....................................37

*Childs v. San Diego Family Housing LLC*,
  22 F.4th 1092 (9th Cir. 2022) ............................................................28

*Cobbledick v. United States*,
  309 U.S. 323 (1940)......................................................................21, 26

*Correctional Services Corp. v. Malesko*,
  534 U.S. 61 (2001) .......................................................................17, 18

*Coyoy v. CoreCivic, Inc.*,
  2022 WL 18034487 (W.D. Tex. Oct. 11, 2022) ........................................................ 51

*Crystal Clear Communications, Inc. v. Southwestern Bell Telephone Co.*,
  415 F.3d 1171 (10th Cir. 2005) ................................................................................ 27

*Daegling v. Gilmore*,
  49 Ill. 248 (1868) ...................................................................................................... 15

*Daigle v. Shell Oil Co.*,
  972 F.2d 1527 (10th Cir. 1992) ................................................................................ 40

*Digital Equipment Corp. v. Desktop Direct, Inc.*,
  511 U.S. 863 (1994) ............................................................ 21, 22, 23, 24, 25

*Foster v. Day & Zimmermann, Inc.*,
  502 F.2d 867 (8th Cir. 1974) ............................................................................. 29, 30

*Geo Group, Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) .................................................................................. 36

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ................................................................................................. 50

*Hatch v. Trail King Industries, Inc.*,
  656 F.3d 59 (1st Cir. 2011) ...................................................................................... 15

*Helfrich v. Blue Cross & Blue Shield Association*,
  804 F.3d 1090 (10th Cir. 2015) .............................................................................. 32

*Houston Community Hospital v. Blue Cross Blue Shield of Texas, Inc.*,
  481 F.3d 265 (5th Cir. 2007) ................................................................................... 24

*In re U.S. Office of Personnel Management Data Securities Breach Litigation*,
  928 F.3d 42 (D.C. Cir. 2019) ................................................................................... 29

*Keifer & Keifer v. Reconstruction Finance Corp.*,
  306 U.S. 381 (1939) .................................................................................................. 11

*Leone v. Owsley*,
  810 F.3d 1149 (10th Cir. 2015) ............................................................................ 18, 19

*Lewis v. Babcock Industries, Inc.*,
  985 F.2d 83 (2d Cir. 1993) ........................................................ 17

*Martin v. Halliburton*,
  618 F.3d 476 (5th Cir. 2010) .................................................... 28

*Midland Asphalt Corp. v. United States*,
  489 U.S. 794 (1989) ................................................................. 21

*Nettles v. GTECH Corp.*,
  606 S.W.3d 726 (Tex. 2020) ..................................................... 30

*Novoa v. GEO Group, Inc.*,
  2022 WL 2189626 (C.D. Cal. Jan. 25, 2022) ............................. 51

*Nwauzor v. GEO Group, Inc.*,
  2020 WL 1689728 (W.D. Wash. Apr. 7, 2020) ........................... 51

*Portis v. Folk Construction Co.*,
  694 F.2d 520 (8th Cir. 1982) .................................................... 15

*Pullman Construction Industries, Inc. v. United States*,
  23 F.3d 1166 (7th Cir. 1994) .................................................... 24

*Richardson v. McKnight*,
  521 U.S. 399 (1997) ................................................................. 25

*Sloan Shipyards Corp. v. U.S. Shipping Board Emergency Fleet Corp.*,
  258 U.S. 549 (1922) ........................................................ 2, 11, 12

*Snell v. Bell Helicopter Textron, Inc.*,
  107 F.3d 744 (9th Cir. 1997) .................................................... 17

*Swint v. Chambers County Commission*,
  514 U.S. 35 (1995) ................................................................... 23

*Taylor Energy Co., L.L.C. v. Luttrell*,
  3 F.4th 172 (5th Cir. 2021) ...................................................... 34

*Trevino v. General Dynamics Corp.*,
  865 F.2d 1474 (5th Cir. 1989) .................................................. 17

*Universal Money Centers, Inc. v. American Telephone & Telegraph Co.*,
    22 F.3d 1527 (10th Cir. 1994) ..................................................................18

*W.A. Ross Construction Co. v. Yearsley*,
    103 F.2d 589 (8th Cir. 1939) ...................................................................30

*Washington v. GEO Group, Inc.*,
    2019 WL 3565105 (W.D. Wash. Aug. 6, 2019) .......................................51

*Will v. Hallock*,
    546 U.S. 345 (2006) .................................................................22, 24, 25, 27

*Williams Petroleum Co. v. Midland Cooperatives, Inc.*,
    539 F.2d 694 (10th Cir. 1976) ..................................................................42

*Wong Wing v. United States*,
    163 U.S. 228 (1896) ................................................................................48

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ................................................................................50

*Yearsley v. W.A. Ross Construction Co.*,
    309 U.S. 18 (1940) ................................2, 14, 15, 19, 23, 30, 31, 32, 46, 47, 48

## Statutes

6 U.S.C. § 112 ......................................................................................47, 50

6 U.S.C. § 457 ............................................................................................50

8 U.S.C. § 1103 .........................................................................................47

8 U.S.C. § 1226 .........................................................................................47

8 U.S.C. § 1231 .........................................................................................47

8 U.S.C. § 1555 .........................................................................................50

28 U.S.C. § 1291 ...................................................................................19, 21

28 U.S.C. § 1292 .......................................................................................26

**Regulations**

FAR § 52.222-50 ................................................................................7, 38

**Other Authorities**

Restatement (Second) Torts § 404 cmt. (1965)............................................15

2011 Operations Manual ICE Performance-Based National Detention
    Standards, https://perma.cc/Y7EY-72MJ ........................................ 47

## STATEMENT OF RELATED CASES

This case is related to a prior appeal in the same case, No. 17-1125. The decision in the prior appeal is available at *Menocal v. The GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018).

**INTRODUCTION**

GEO is a private, for-profit company that operates detention facilities. Managing a detention facility, of course, requires work: food preparation, sanitation, laundry for hundreds of people. And the government pays GEO to perform that work—millions of dollars a year. But at the Aurora Immigration Processing Center, GEO has devised a way to avoid having to do much of the work it contracted to perform: impose it on those who are detained.

GEO forces those detained at Aurora to serve as its janitorial staff, threatening that if they refuse, they will be sent to "the hole"—solitary confinement. And, for the rest of the work of running the Center, GEO operates a "voluntary" work program, in which detained workers do everything from preparing food to waxing the floors to doing the laundry. For hours of arduous, daily labor—labor that GEO often requires be undertaken in the middle of the night—GEO pays these detained workers just $1 a day.

Neither forced labor, nor paying workers $1 a day, is legal. And the Aurora Center is a civil detention center, not a criminal one. There is, therefore, no argument that this labor is punishment for committing a crime. GEO does not contend otherwise. Instead, the company argues that because it sells its detention services to the government, it's immune from liability. But, as the Supreme Court has held for over a century, the government's sovereign "immunity does not extend

to those that act[ ] in its name." *Sloan Shipyards Corp. v. U.S. Shipping Bd. Emergency Fleet Corp.*, 258 U.S. 549, 567-68 (1922). GEO is no different. Nevertheless, GEO asks this Court to overturn the district court's decision rejecting the company's contention that it is entitled to "derivative sovereign immunity."

GEO's appeal fails from the outset because this Court lacks jurisdiction. The district court's decision was interlocutory. It rejected GEO's "derivative sovereign immunity" defense; it did not end the case. As every other circuit to have considered the issue—and the federal government—has concluded, there is no exception to the final judgment rule for contractors' claims that their work for the government shields them from liability.

GEO's appeal also fails on the merits. What GEO calls "derivative sovereign immunity" is not, in fact, *sovereign* immunity at all. Private companies do not, by working for the government, somehow "acquire the Government's embracive immunity." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016). There is, however, a more limited defense, established by the Supreme Court in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), which shields contractors from claims based on conduct that the government "authorized and directed." But the government did not "direct" GEO to force those detained in the Aurora Center to labor on its behalf. Nor did it require the company to pay those who voluntarily worked for it only a dollar a day. GEO alone chose to use forced labor, and GEO alone chose to unjustly

enrich itself at the expense of its detained workers. The *Yearsley* defense, therefore, does not apply.

## JURISDICTIONAL STATEMENT

As explained below and in the motion to dismiss this appeal, this Court lacks appellate jurisdiction.

## STATEMENT OF THE ISSUES

1.      Does this Court have jurisdiction over GEO's interlocutory appeal of the district court's order rejecting its assertion of the *Yearsley* defense, even though that order is not a final decision?

2.      Did the district court properly reject GEO's assertion that the *Yearsley* defense shields it from liability for its decision to force those detained in the Aurora Center to serve as its janitorial staff on pain of solitary confinement?

3.      Did the district court properly reject GEO's assertion that the *Yearsley* defense shields it from liability for its decision to pay its detained workers just $1 a day?

## STATEMENT OF THE CASE

## I.    Factual background

GEO Group is a publicly traded, for-profit corporation that operates detention facilities throughout the country. One of the facilities GEO manages is the Aurora Immigration Processing Center in Aurora, Colorado. App. Vol. 2 at 257. The Center provides civil, not criminal, detention: It houses people awaiting resolution

of their immigration proceedings. App. Vol. 2 at 399. GEO receives millions of dollars a year from Immigration and Customs Enforcement to operate the facility. Supp. App. Vol. 3 at 105.[1]

During the class period, GEO accomplished much of the day-to-day work of operating the Aurora Center—cleaning, maintenance, preparing food, doing laundry—by assigning it to the people detained there. It did so in two ways. *First*, it forced them to perform unpaid janitorial work, threatening that if they did not comply, they would be sent to solitary confinement. And, *second*, it ran a "voluntary work program" under which people detained in the facility "volunteered" to work for GEO and be paid only $1 a day.[2]

***Forced labor.*** GEO required everyone detained at the Center to perform janitorial work without any payment at all—on pain of solitary confinement. Every day, GEO staff would post a list of people assigned to its "sanitation program" that day. App. Vol. 1 at 244. And those people would be required to perform much of the janitorial work of the facility: cleaning the tables, sweeping and mopping the floors, cleaning the recreation yard, cleaning the bathrooms, disinfecting the showers, and

---

[1] During the period relevant here, the contract was renewed twice—once in 2006 and once in 2011—but each contract contains materially the same terms. *See* Supp. App. Vol. 3 at 105-130 (2003 contract); *Id.* at 61-104 (2006 contract); *Id.* at 1-60; 179-256 (2011 contract).

[2] Unless otherwise specified, all internal quotation marks, citations, and alterations are omitted from quotations throughout the brief.

picking up trash. App. Vol. 1 at 244; Supp. App. Vol. 1 at 87-88; Supp. App. Vol. 2 at 67-70.

To ensure "participation" in its "sanitation program," App. Vol. 1 at 244, GEO threatened those who refused with solitary confinement. The record contains numerous examples:

- Hugo Hernandez-Ceren testified that when "[o]ne detainee refused to clean," telling the guard that GEO should hire someone to do its janitorial work, the guard responded: "Just pack your stuff because you're going to go to the hole." Mr. Hernandez-Ceren recounted another incident in which some people objected to doing GEO's janitorial work. But a GEO "sergeant came in" and said: "If you refuse to clean, you will be sent to the hole. . . . And that's not a place you want to be." Supp. App. Vol. 1 at 165-66.

- One day, Alejandro Torres objected to having to clean the entire dining area, and a guard immediately handcuffed him and took him to solitary— a tiny, cold steel room with a steel bed, where the light was always on. Supp. App. Vol. 2 at 133, 144-45.

- Alejandro Menocal had only just arrived at the Center when he was told that failing to clean would land him in solitary confinement. He quickly

saw that this was no idle threat, when he witnessed guards putting multiple people in solitary for doing just that. *Id.* at 18, 22-23.

- Dagoberto Vizguerra watched as one new arrival at the Center, there just two or three days, was sent to solitary confinement for not cleaning. And, he testified, a guard would scream at those detained in his pod, threatening solitary if they did not clean. *Id.* at 80, 85.

- When a woman on Grisel Xahuentitla's sanitation shift was too sick to clean, an officer told her to get to work or "be sent to the hole," which, in the officer's words, "wasn't going to be . . . pleasant." *Id.* at 150.

Over and over again, guards threatened anyone who refused to do GEO's cleaning with solitary confinement—and made good on that threat. *See* App. Vol. 3 at 679-80; ECF 262-12 (compiling disciplinary reports).

It's well-established that solitary confinement has a "profoundly deleterious effect on both mental and physical functioning." Supp. App. Vol. 2 at 166. Among other things, it can lead to serious depression (even for people without a history of mental illness), panic attacks, paranoia, and suicidality. *Id.* at 169, 190. "The hole" at Aurora was no different. *See id.* People came back from solitary at the Center "skinny," "afraid," and "antisocial"—unable to "talk to other people." *Id.* at 74, 184 ("They didn't want to talk to anyone, just laying down. It was very scary."). People

detained at the Center complied with GEO's "sanitation program" because they were afraid that they, too, would be sent to "the hole." *Id.* at 190.

And to make these threats even more potent, GEO officers threatened people's immigration status, warning those reluctant to participate in the company's mandated janitorial work that GEO would tell the immigration judge they'd been to solitary. Supp. App. Vol. 1 at 79 (threatening to "make sure" that GEO informs the immigration court, "and you're fighting your cases, so you do not want to look bad"); *see also* Supp. App. Vol. 2 at 71, 75 (going to solitary confinement "was going to destroy my immigration case if I went there"); *Id.* at 93 ("I was afraid that it was going to be against my case for doing something against GEO.").

This forced sanitation work was, in the words of ICE's contracting officer, a "GEO policy, created by GEO"; it was not "a requirement of the contract" with ICE. Supp. App. Vol. 1 at 73. To the contrary, the contract with ICE—and ICE's national detention standards—*prohibit* GEO from forcing those detained at Aurora to do anything other than "*personal* housekeeping." App. Vol. 1 at 144 (emphasis added); Supp. App. Vol. 3 at 31; *see also id.* at 50 (incorporating FAR § 52.222-50, which prohibits government contractors from using forced labor). As the Department of Homeland Security's Office of Inspector General has warned, "requiring detainees to clean common areas used by all detainees is in violation of ICE standards." Supp. App. Vol. 1 at 121.

***Dollar-a-day program.*** In addition to its mandated janitorial work, GEO fulfilled its other staffing needs through a "voluntary work program." Although technically voluntary, many people detained at the Center had little choice but to participate. Working for GEO was the only way they could earn money to buy food and toiletries from the commissary or make phone calls while detained. These were not luxuries: Several people at the Center reported that the meals GEO provided were "inadequate," leaving them "chronically hungry." Supp. App. Vol. 2 at 90, 183, 185.

Under the auspices of this program, GEO tasked those detained at the Center with virtually all of the non-security-related work needed for it to function. Detained workers were responsible for janitorial work (including cleaning the bathrooms, waxing the floors, and cleaning the carpets), building maintenance, laundry for the entire facility, food preparation, running the library, and running a barbershop. *See, e.g.*, Supp. App. Vol. 3 at 131, 138; Supp. App. Vol. 2 at 136-37, 182 ("We ran the facility - the landscape, the laundry, the kitchen; we washed the floor. They were using us like slaves."). Work was "often" scheduled for "the middle of the night, and might take up to 6 hours or more, depriving" the detained workers "of any normal nighttime sleep." Supp. App. Vol. 2 at 141, 180. Many of the jobs were grueling or even degrading. One worker, for example, recounted having to clean up "semen" and "pubic hair," in communal showers used by eighty people, while being

"mock[ed]" by the guards. *Id.* at 137, 184 (describing "very hard work" the "laundry job" entailed).

GEO paid detained workers next to nothing for their labor. Initially, the company paid them "$1.00 per day, to be paid daily and a bottle of soda once a week." Supp. App. Vol. 3 at 134. But GEO later reduced even that to just $1 a day. *Id.* at 140.

Although GEO's contract required it to provide "opportunities" for people to "work and earn money while confined," it did not require the company to pay so little. *See id.* at 37. For most of the class period, ICE's national detention standards stated that "compensation is *at least* $1.00 (USD) per day." App. Vol. 1 at 147 (emphasis added). Before February 27, 2012, the standards stated that "compensation is $1.00." *Id.* at 222. But this, too, set a floor, not a ceiling. As GEO admitted in its summary judgment briefing, there was no "prohibition on paying more." App. Vol. 3 at 692.

GEO's conduct supports this admission: Previously, the company paid detained workers at Aurora additional compensation in the form of a soda. Supp. App. Vol. 3 at 134. Even if priced at only $1.00 in the commissary, that would be a 20% increase in weekly wages. And in four of the nine other facilities that GEO operated, it paid more than $1.00 a day, while subject to the same national standards. Supp. App. Vol. 1 at 104; ECF 287-13, at 11-13. Yet, here, it paid its detained workers just $1.

9

***This lawsuit.*** This lawsuit was filed over eight years ago by people who had been subjected to GEO's forced labor and dollar-a-day practices. App. Vol. 1 at 14, 19-28. As relevant here, the complaint alleged that GEO's system of forced labor violated the Trafficking Victims Protection Act and that its choice to pay detained workers only $1 a day violated Colorado law on unjust enrichment. *Id.*

Following years of motions practice, discovery, and a prior interlocutory appeal—in which this Court affirmed class certification—the parties filed cross-motions for summary judgment. GEO filed two motions, one on the merits of the plaintiffs' claims and one on its affirmative defenses, both of which were based on its status as a government contractor. *See* A-76. The plaintiffs filed a single motion, asking for partial summary judgment rejecting GEO's defenses. *See id.*

In a thorough, 76-page opinion, the district court granted the plaintiffs' motion and denied GEO's motions. A-1-76. The only issue GEO appeals here is the court's rejection of its *Yearsley* defense. As it does on appeal, GEO had argued that it was entitled to the defense unless it "actually violate[d] its contract with the federal government." *Id.* (cleaned up). That assertion, the district court held, is "incorrect." A-32. To the contrary, a contractor is only entitled to the defense if its challenged conduct was "required by its contractual obligations." A-29. The court held that neither GEO's forced sanitation program nor its practice of paying detained workers a dollar a day met this standard.

10

After examining in detail each document GEO relied on, the court found no evidence in the record that ICE required GEO to use solitary confinement to force those detained at Aurora to serve as its janitorial staff. A-29-32. GEO's sanitation program, the court concluded, was "independently developed and implemented." A-29.

The court's careful review of the factual record yielded the same conclusion for the $1-a-day policy: GEO chose to pay its detained workers $1 a day. A-33-35. "[T]here is no evidence that ICE prohibited GEO from compensating its workers more than $1.00." A-34. Instead, ICE's national detention standards "stated an amount of $1.00 per day, and later ... 'at least $1.00 (USD) per day,' as an appropriate minimum." *Id.* Leaving GEO to decide for itself what to pay workers, the court reasoned, was "logical." A-35. "The government has no interest in directing a private entity to maximize its profits." *Id.*

## II.    Legal background

The Supreme Court has long held that the United States' sovereign "immunity does not extend to those that act[ ] in its name." *Sloan Shipyards*, 258 U.S. at 567-68; *see, e.g.*, *Keifer & Keifer v. Reconstruction Fin. Corp.*, 306 U.S. 381, 388 (1939) ("[T]he government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work."); *Campbell-Ewald*, 577

U.S. at 166 ("Do federal contractors share the Government's unqualified immunity from liability and litigation? We hold they do not.").

Over a century ago, in *Sloan Shipyards*, the Court rejected a plea for immunity from the Emergency Fleet Corporation—a public corporation created to "purchase, construct[] and operat[e] merchant vessels" on behalf of the federal government. 258 U.S. at 564. In response to claims that it breached its contract with its suppliers and unlawfully forced them to enter a new contract, the corporation argued that the "enormous powers" granted to it by Congress "so far put [it] in place of the sovereign as to share the immunity of the sovereign." *Id.* at 566. The Supreme Court disagreed. "[S]uch a notion," the Court explained, "is a very dangerous departure from one of the first principles of our system of law": "that any person within the jurisdiction always is amenable to the law." *Id.* at 566-67. Although the United States is immune, the corporations that carry out its work are not. *See id.* at 566-68. "An instrumentality of Government he might be and for the greatest ends, but the agent, because he is agent, does not cease to be answerable for his acts." *Id.* at 567.

While *Sloan Shipyards* involved a public corporation, the Court reached the same conclusion with respect to private corporations. *See Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 580-84 (1943). In *Brady*, a private company operating government-owned ships under a contract with the United States Maritime Commission was sued for negligence when a ship ladder broke, killing the person climbing it. *Id.* at 576. The

company argued that its contract with the government immunized it from suit because the government had agreed to indemnify the contractor—and therefore any damages would ultimately be paid by the government. *Id.* at 583-84.

Even under those circumstances, the Court held, the contractor was not entitled to share in the government's immunity. *Id.* The Court reiterated "the general rule" that "any person within the jurisdiction"—including government contractors—may be held liable for the harm they cause, unless they can point to some "constitutional rule of law," such as preemption, "that exonerates" them. *Id.* Congress, of course, may choose to enact a statute granting immunity to its contractors. *See id.* at 580. But a contractor does not obtain immunity simply "by reason of concessions made by contracting officers of the government." *Id.* The power to enact "such a basic change in one of the fundamentals of the law," the Court emphasized, belongs to Congress, not the employees who happen to oversee government contracts. *See id.* at 580-81, 584.

The Supreme Court recently reaffirmed this principle in *Campbell-Ewald*. There, a private contractor hired by the Navy to develop a recruitment campaign argued that it was entitled to "derivative sovereign immunity" from claims that it violated the Telephone Consumer Protection Act by texting people who had not agreed to receive texts. 577 U.S. at 157, 166. Again, the Court rejected the notion that

13

"private persons performing Government work acquire the Government's embracive immunity." *Id*. at 166.

While the Court has long rejected the claim that government contractors enjoy sovereign immunity, it has established two much more limited defenses applicable to contractors: the *Yearsley* defense (what GEO calls derivative sovereign immunity) and the *Boyle* defense (often called the government contractor defense).

As its name suggests, the *Yearsley* defense stems from the Supreme Court's decision in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940). The plaintiffs in that case sued a construction company that had built dikes on the Missouri River, washing away some of the plaintiffs' land in the process. *Id.* at 19. The company's work was performed under a contract with the government, which itself was authorized by statute. *Id.* The contractor's work was "all authorized and directed" by the government, and the authority granted to perform that work was "validly conferred" by Congress. *Id.* at 20. The erosion of the plaintiffs' land was an unfortunate but "inevitable" consequence of the work the government had directed. *Id.* The Supreme Court held that, under these circumstances, the contractor "had no liability" for simply "executing [the government's] will." *Id.*

The *Yearsley* defense thus shields government contractors from liability for the "inevitable" consequences of work they perform for the government if: (1) the government "validly" authorized the contractor's work; and (2) the government

14

"directed" the challenged conduct. *Id.*; *accord Campbell-Ewald*, 577 U.S. at 153. In other words, the defense is, essentially, "the government made me do it."

The contractor is free from liability for "injuries *necessarily* involved in the performance of the contract," but not "for acts done for [the contractor's] own convenience or not as an essential part of the contract." *Portis v. Folk Const. Co.*, 694 F.2d 520, 524 (8th Cir. 1982) (emphasis added); *see, e.g.*, *Brady*, 317 U.S. at 583-84 (explaining that *Yearsley* defense shields contractors from liability for merely "executing [the government's] will," but it is not a defense to negligence in doing so). This conclusion tracks longstanding tort doctrine, which provides a defense for contractors when the challenged conduct was not the contractor's choice, but that of the principal that hired them. *See, e.g.*, *Hatch v. Trail King Indus., Inc.*, 656 F.3d 59, 68 (1st Cir. 2011) (collecting cases); *Bell & Son v. Kidd & Roberts*, 63 S.E. 607, 608 (Ga. App. 1909); *Daegling v. Gilmore*, 49 Ill. 248, 249 (1868); Restatement (Second) Torts § 404 cmt. (1965) (contractor who follows another's specifications is not liable unless defect in specifications is obvious).

Decades after *Yearsley*, the Supreme Court established a second defense for government contractors in *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988). While the claims in *Yearsley* were based on harm caused by what the government instructed the contractor to do, in *Boyle*, the claims were based on an alleged defect in the contractor's own designs. The plaintiff alleged that a military contractor's negligent

15

design of a Marine helicopter's escape hatch caused his son's death. *Id.* at 503. Even in the military context, the Court held, displacement of state law requires "a significant conflict" between "an identifiable federal policy or interest and the operation of state law." *Id.* at 507. Because the Federal Tort Claims Act preserves the government's immunity when it exercises discretionary functions—such as choosing how to design a military helicopter—the Court concluded that this "significant conflict" exists where a state-law claim against a federal contractor would effectively seek to hold it liable for the government's discretionary choices. *Id.* at 511-12.

Because this defense protects the government's decisionmaking, the Court held that it applies only where three criteria are satisfied: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512. The first two requirements "assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself." *Id.* And the third ensures that the contractor provides the government with the information necessary to make its decision. *Id.*

*Boyle* offers a defense to government contractors when—even though a contractor itself created a design—the choice to employ that design was a deliberate one made by a government official, the contractor merely executed that choice, and

16

complying with both state law and the government's choice would have been impossible. *See id.* It does not apply when the decision to engage in the challenged design was the contractor's and not the government's. *Id.* at 512.

In the years since *Boyle*, courts have rigorously enforced the requirement that the challenged design be the government's decision—that rubberstamping the contractor's choice is not enough. "The mere signature of a government employee on the 'approval line' of a contractor's working drawings, without more, does not establish the government contractor defense." *See Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir. 1989); *see, e.g.*, *Lewis v. Babcock Indus., Inc.*, 985 F.2d 83, 87 (2d Cir. 1993); *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744, 748 (9th Cir. 1997).

*Boyle* and *Yearsley* are thus complementary defenses: *Yearsley* applies when the government requires a contractor to undertake the challenged conduct, and *Boyle* applies where the contractor itself proposes the challenged conduct, but the government deliberately chooses to adopt this proposal as its own. In both cases, the core of the defense is "the government made me do it"—that is, the government directed the contractor to take the action the plaintiff alleges violated the law.

Following *Boyle* and *Yearsley*, the Supreme Court addressed the availability of remedies against private contractors operating federal detention facilities in *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001). In that case, the plaintiff asked the Court to extend the implied damages cause of action for constitutional violations

committed by government employees, recognized in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), to a private corporation operating a federal halfway house. *Malesko*, 534 U.S. at 63. The Court refused, resting its decision in part on the availability of state-law claims against private corporations. *Id.* at 72-74. The plaintiff had argued that such claims may not be available where the government authorized the challenged conduct. *See* Resp't Br., *Correctional Servs. Corp. v. Malesko*, 2001 WL 883679, at *37 (July 20, 2001). In response, the Court stated that it is a "special circumstance" in which government contractors may have a defense to state-law claims. 534 U.S. at 74 n.6. That circumstance, the Court explained, is "[w]here the government has directed a contractor to do the very thing that is the subject of the claim." *Id.*

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's grant of summary judgment to determine whether any disputed material facts exist and, if not, whether the [moving party] [is] entitled to judgment as a matter of law." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015). Because GEO's motion concerned an affirmative defense, it bears the burden of proof. *Johnson v. Riddle*, 443 F.3d 723, 724 n.1 (10th Cir. 2006). So the plaintiffs, to prevail on their motion for summary judgment, need only show "an absence of evidence to support [GEO's] case." *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994). Conversely, GEO, to prevail on its cross-

motion, must provide affirmative evidence of its defense and demonstrate "that no disputed material fact exists." *Johnson*, 443 F.3d at 724 n.1.

## SUMMARY OF ARGUMENT

**I.** GEO's appeal fails from the start because this Court lacks appellate jurisdiction. This Court has jurisdiction only over "*final* decisions of the district courts." 28 U.S.C. § 1291 (emphasis added). And as every other court to have considered the issue has concluded, decisions rejecting a contractor's assertion of the *Yearsley* defense do not satisfy the requirements for treating interlocutory orders as "final." There is no reason a decision rejecting a *Yearsley* defense cannot be effectively reviewed upon final judgment. And reviewing such a decision would require the Court to examine the same evidence it would examine in reviewing a decision on the merits. So it is in no way collateral. Because the decision from which GEO appeals is not final, this Court should dismiss this appeal.

**II.** If this Court does reach the merits, it should reject GEO's contention that it is entitled to the government's sovereign immunity.

**A.** As the Supreme Court has made clear, the *Yearsley* defense does not transfer the government's immunity to its contractors. Instead, it offers a limited defense to liability where: (1) the government "directed" the contractor's misconduct; and (2) the authority to engage in that conduct was "validly conferred." *Yearsley*, 309 U.S. at 20-21. GEO's attempt to expand the defense to provide absolute immunity to private

contractors for any misconduct they may commit, unless they actually violate their contract with the government, conflicts with over a century of Supreme Court precedent, the precedent of other circuits, and common sense.

**B.** ICE did not direct GEO to force those in its care to serve as its janitorial staff; it prohibited GEO from doing so. Indeed, even if ICE had wanted to, it could not validly require (or permit) GEO to use forced labor. Congress has never given the agency the authority to direct contractors to violate the Trafficking Victims Protection Act. GEO cannot rely on *Yearsley* to shield a practice that ICE did not and could not have directed it to undertake.

**C.** The same is true of GEO's decision to pay its detained workers just $1 a day. That decision was GEO's and GEO's alone. ICE set a floor, but it did not mandate that the company pay its workers so little. GEO is not entitled to the *Yearsley* defense for its own choice to unjustly enrich itself in violation of Colorado law.

## ARGUMENT

### I.  This Court lacks jurisdiction over GEO's interlocutory appeal.

To even reach the merits of GEO's appeal, this Court must do what every other circuit to have considered the issue has refused to do: authorize private companies to avoid the final judgment rule and immediately appeal orders rejecting a *Yearsley* defense. But there is no reason the *Yearsley* defense should be treated differently from any other defense a corporation might assert. To the contrary,

allowing companies like GEO to delay litigation for potentially a year or more, just so they can take an appeal that could readily be resolved at the end of the case, would "damage[] the efficient and congressionally mandated allocation of judicial responsibility" the final judgment rule protects. *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 873 (1994).

**1.** "Finality as a condition of review is an historic characteristic of federal appellate procedure." *Cobbledick v. United States*, 309 U.S. 323, 324-25 (1940). "To be effective," Congress recognized, judicial administration must not be "enfeebl[ed]" by "permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise." *Id.*

Since the Judiciary Act of 1789, therefore, Congress has "forbidd[en] piecemeal disposition on appeal of what for practical purposes is a single controversy." *Id.* Instead, Congress has mandated that an appeal may be taken only from a "final decision[ ]." 28 U.S.C. § 1291. This requirement "has been departed from only when observance of it would practically defeat the right to any review at all." *Cobbledick*, 309 U.S. at 324-25.

Ordinarily, a final decision is "deemed not to have occurred" unless it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798 (1989). But there is "a narrow class of decisions that do not terminate the litigation, but are sufficiently

important and collateral to the merits that they should nonetheless be treated as final" for purposes of allowing an immediate appeal. *Will v. Hallock*, 546 U.S. 345, 347 (2006).

This "narrow" class includes only those orders that: (1) "conclusively determine the disputed question"; (2) "resolve an important issue completely separate from the merits of the action"; and (3) are "effectively unreviewable on appeal from a final judgment." *Id.* at 349. The Supreme Court has warned that these requirements "are stringent" and must be "kept so." *Id.* at 349-50. Otherwise, what is meant to be a "narrow exception" will undermine the important interests served by the final judgment rule: judicial efficiency and preventing parties from "saddling" their opponents with the "cost and delay" of multiple appeals. *Digit. Equip.*, 511 U.S. at 873. Indeed, that's exactly what's happened here: GEO filed this appeal—its second trip to this Court before final judgment—on the eve of trial, eight years into the litigation.

Whether an order falls within the collateral order doctrine is evaluated on a categorical basis. *Id.* at 868. "[T]he issue of appealability . . . is to be determined for the entire category to which a claim belongs, without regard to the chance that the litigation at hand might be speeded, or a particular injustice averted." *Id.* So the question here is not whether *this* appeal satisfies the standard, but rather whether orders denying the *Yearsley* defense *generally* do so. They do not.

**2.** Indeed, the third and most important requirement—that the decision resolve an "important question" that is "effectively unreviewable upon final judgment"—is "in itself suffic[ient] to foreclose immediate appeal" of *Yearsley* orders. *Digit. Equip.*, 511 U.S. at 869. An order rejecting a defense to liability is the quintessential example of a decision that can be reviewed effectively after judgment. *See, e.g.*, *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 43 (1995). If the district court gets it wrong, the court of appeals can simply reverse; the defendant's right to avoid liability remains intact.

GEO asserts that the *Yearsley* defense is not a defense to liability, but rather an immunity from suit—a right not to stand trial that will be lost if it must wait until after trial to appeal. Opp'n Mot. Dismiss 13. This argument fails twice over. *First*, the *Yearsley* defense is not, in fact, a right to avoid trial; it is a right to avoid liability at trial. *Cf. Digit. Equip.*, 511 U.S. at 873 ("[W]e have held that § 1291 requires courts of appeals to view claims of a 'right not to be tried' with skepticism, if not a jaundiced eye."). Although the defense is sometimes colloquially called an immunity, *Yearsley* makes plain that it is a defense to liability, not an immunity from suit: "[T]here is no *liability* on the part of the contractor for executing [the government's] will." *Yearsley*, 309 U.S. at 21 (emphasis added). Nowhere does *Yearsley* even mention immunity, let alone afford government contractors a right not to stand trial. Merely calling something an immunity does not make it so. *See, e.g.*, *Pullman Const. Indus., Inc. v. United*

*States*, 23 F.3d 1166, 1169 (7th Cir. 1994) (explaining that "sometimes the word" immunity "connotes a right not to be tried," but "[s]ometimes the word means only a right to *prevail* at trial—a right to win, indistinguishable from all the other reasons why a party may not have to pay damages").

But even if the *Yearsley* defense were truly a form of derivative sovereign immunity, as GEO contends, it still would be an immunity from liability, not an immunity from suit. After all, a contractor cannot derive more immunity from the government than the government itself possesses. And "federal sovereign immunity is a defense to liability rather than a right to be free from trial." *Alaska v. United States*, 64 F.3d 1352, 1356 (9th Cir. 1995); *accord Houston Cmty. Hosp. v. Blue Cross Blue Shield of Tex., Inc.*, 481 F.3d 265, 280 (5th Cir. 2007); *Pullman*, 23 F.3d at 1169.

*Second*, even if the *Yearsley* defense were a right not to stand trial, the Supreme Court has repeatedly rejected the contention that every order denying a right to avoid litigation warrants interlocutory appeal. *See, e.g.*, *Will*, 546 U.S. at 352. "[I]t is not mere avoidance of a trial, but avoidance of a trial *that would imperil a substantial public interest*, that counts when asking whether an order is effectively unreviewable if review is to be left until later." *Id.* (emphasis added).

The cases that satisfy this high burden are few and far between and involve the weightiest of public interests. *Id.* at 352-53. Even where the right to avoid litigation has been granted by statute to government employees, the Supreme Court has held

that, in and of itself, is not enough. *Id.* "[S]imply abbreviating litigation troublesome" to the government or its employees, the Court explained, is not "important enough" to warrant collateral order appeal; there must be some "compelling public" interest at stake. *Id.* Here, it is not even the government claiming a right to avoid litigation; it is a private company. GEO identifies no compelling public interest that would be imperiled by treating the *Yearsley* defense the same way every other defense a private company might assert is treated.

GEO's sole argument to the contrary is an assertion that the government has an important interest in the "safe and secure operation" of immigration detention facilities. Opp'n Mot. Dismiss 17. That's undoubtedly true. It's also irrelevant. Again, the question isn't whether *GEO* can assert that it serves some public interest or whether authorizing immediate appeal in this case would do so. It's whether the "entire *category*" of *Yearsley* orders—that is, every order denying any government contractor the *Yearsley* defense—warrants interlocutory review. *Digit. Equip.*, 511 U.S. at 868 (emphasis added). GEO hasn't offered a single compelling public interest that would be compromised if private companies are unable to automatically appeal orders denying them the *Yearsley* defense.[3]

---

[3] GEO's contention (at 14) that private contractors are no different from government employees—and therefore the *Yearsley* defense is akin to qualified immunity for government officials—is all but foreclosed by Supreme Court precedent. *See Richardson v. McKnight*, 521 U.S. 399, 409 (1997) (rejecting qualified immunity for guards at privately-operated prison because "the most important

Nor could it. Government contractors do all sorts of things from operating detention facilities to sending text messages advertising the Navy. Unlike, for example, Double Jeopardy claims, where there is—categorically—a strong public interest in avoiding unconstitutionally subjecting a person to the "enormous prosecutorial power of the Government," or Eleventh Amendment immunity, where the dignity of the states as co-equal sovereigns is always at stake, *id.*, there is no overriding public interest in fast-tracking *Yearsley* appeals.[4]

And even if GEO's case-specific plea that operating an immigration detention center is in the public interest were relevant, GEO doesn't even attempt to explain how the lack of interlocutory appeal here would imperil that interest. Indeed, we are eight years into this litigation, and there is no sign of any danger to the safety or security of the Aurora Center. GEO can, and surely will, obtain full and effective review after final judgment.

**3.** GEO's request thus fails the fundamental requirement of collateral order review: that the lack of immediate appeal "practically defeat the right to any review at all," *Cobbledick*, 309 U.S. at 324-25. But it also fails another requirement: that the

---

special government immunity-producing concern—unwarranted timidity—is less likely present, or at least is not special, when a private company subject to competitive market pressures operates a prison.").

[4] Of course, this doesn't mean defendants can *never* seek an interlocutory appeal of an order denying a *Yearsley* defense. A defendant could request permission to file an immediate appeal under 28 U.S.C. § 1292(b) or it could seek mandamus.

order be truly collateral. As explained above, in addition to being "effectively unreviewable on appeal from a final judgment," the order must also "resolve an important issue *completely* separate from the merits of the action." *Will*, 546 U.S. at 349 (emphasis added).

To allow interlocutory appeals "enmeshed in the merits" would "waste judicial resources" the final-judgment rule exists to protect. *Biard*, 486 U.S. at 528; *cf. e.g.*, *id.* (forum non conveniens not immediately appealable because it entails overlap of factual and legal issues); *Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 415 F.3d 1171, 1179 (10th Cir. 2005) (order staying case under "primary jurisdiction" doctrine not immediately appealable because it requires court to "examine factual and legal issues underlying the dispute"); *see also* =*Allegheny Airlines, Inc. v. LeMay*, 448 F.2d 1341, 1346 (7th Cir. 1971) (immediately appealable cases involve "no duplication of appellate court effort since the same evidence will not be relevant to the disputed order and to the claim for relief").

Review of the *Yearsley* defense necessitates exactly the duplication of effort that the collateral-order doctrine forbids. The defense requires a comparison of the contractor's allegedly unlawful conduct with the actions the government directed the contractor to take. To undertake this comparison, the court will inevitably have to review the same evidence the parties will rely on at trial on the merits: the evidence

demonstrating what the contractor did and why it was (or wasn't) unlawful, its contract with the government, and any relevant policies or procedures.

Here, for example, GEO's argument on the merits of the plaintiffs' forced-labor claim is that the terms of its contract and ICE's national detention standards demonstrate that the company's threats of solitary confinement were not an unlawful attempt to coerce labor, but instead a lawful attempt to comply with its contract with ICE. *See* Mot. Dismiss 14-15. But the company relies on those very same documents to try to establish that ICE directed its conduct, and that it is therefore entitled to the *Yearsley* defense. *Id.*

\*      \*      \*

Every circuit that has considered the issue has concluded that the *Yearsley* defense is not immediately appealable. *See Childs v. San Diego Fam. Hous. LLC*, 22 F.4th 1092, 1098 (9th Cir. 2022); *Martin v. Halliburton*, 618 F.3d 476, 485 (5th Cir. 2010); *see also Al Shimari v. CACI Premier Tech., Inc.*, 775 F. App'x 758, 760 (4th Cir. 2019) ("[F]ully developed rulings denying sovereign immunity (or derivative claims thereof) may not be immediately appealable."). The federal government agrees. *See* Br. for the U.S. as Amicus Curiae, *Morales Posada v. Cultural Care, Inc.*, No. 21-1676 (1st Cir. Nov. 23, 2022). This Court should do the same.[5]

---

[5] GEO claims that three courts have held otherwise. But none of the cases GEO cites actually does so.

## II.    GEO is not entitled to the government's sovereign immunity.

If this Court chooses to split with the other circuits and consider GEO's defense on the merits, it should reject the company's attempt to cloak itself in the government's sovereign immunity. Over and over again, the Supreme Court has held that private companies do not acquire the United States' "embracive immunity," simply because they contract with the government. *Campbell-Ewald*, 577 U.S. at 166. GEO argues that it is nevertheless entitled to immunity based on the *Yearsley* defense. But that defense—as explained in *Yearsley* itself and reiterated in *Campbell-Ewald*—applies only where the government directed the contractor to undertake the challenged conduct. That didn't happen here. The government did not direct GEO to force people to perform janitorial work on pain of solitary confinement. Nor did it mandate that GEO pay those who chose to work only $1 a day. The *Yearsley* defense, therefore, does not apply.

### A.    The *Yearsley* defense applies only when the government both validly authorizes and directs the challenged conduct.

**1.** The *Yearsley* defense shields government contractors from liability "when the government is actually at fault." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 70 (D.C. Cir. 2019); *see supra* pages 14-15. But this shield from liability does not extend "to cover the fault of a private corporation, no matter how intimate its connection with the government." *Foster v. Day & Zimmermann, Inc.*, 502 F.2d 867, 874 (8th Cir. 1974). This principle has deep roots: For over a hundred years, the Supreme

Court has consistently held that private companies are not immune from liability for their own choices, simply because they contract with the government. *See supra* pages 11-15.

Thus, courts have long precluded claims against government contractors only when the government required the contractor to engage in the conduct that injured the plaintiff—not when the contractor itself chose to do so. *See, e.g., Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720 (9th Cir. 2015) (no defense where injury resulted from contractor's discretionary decision for how to destroy fireworks); *Foster*, 502 F.2d at 874 (no defense where injury resulted from defective manufacturing, not from government mandate); *Nettles v. GTECH Corp.*, 606 S.W.3d 726, 735 (Tex. 2020) (no defense to claim of misleading lottery tickets where contractor had "discretion regarding the conduct at issue: choosing the wording of the [lottery] game instructions").

Indeed, *Yearsley* itself makes this distinction. The plaintiff there argued that the contractor there was not entitled to a defense because the contractor's own choices in building the contracted-for dikes had caused the plaintiff's harm. *See* 309 U.S. at 20; *W.A. Ross Const. Co. v. Yearsley*, 103 F.2d 589, 591 (8th Cir. 1939). The Court rejected that argument, but not because a contractor can escape liability for its own choices. *See Yearsley*, 309 U.S. at 20. It rejected the argument because, as a factual matter, the harm to the plaintiff's land was an "inevitable" consequence of the dikes the

government contracted for—*not* the contractor's choices in building those dikes. *See id.* The work that had harmed the plaintiff, the Court explained, was "all authorized and directed" by the government. *Id.* That is, the plaintiff's harm was the government's fault. Where that is so, the Court held, if the "authority" to do the work was "validly conferred," the contractor is shielded from liability. *Id.*

Thus, the *Yearsley* defense has two requirements: First, the government must have "authorized and directed" the challenged conduct; and, second, the authority to engage in that conduct must have been "validly conferred." *Id.* at 20-21; *accord Campbell-Ewald*, 577 U.S. at 167. In other words, if an agency has the authority to tell a contractor to do something, and the contractor does so, it will not be held liable for simply "executing [the government's] will." *Yearsley*, 309 U.S. at 21.

**2.** GEO asks this Court to expand this narrow, judge-made defense far beyond what the Supreme Court—in *Yearsley* or in any other case—has ever recognized. According to GEO (at 28-29), this Court should shield government contractors from liability even when it is the contractor's *own* choices, not the government's requirements, that harmed the plaintiff and violated the law. In GEO's view, a contractor has immunity for any actions it decides to take in performing a government contract, unless it violates that contract. But that view runs headlong into *Yearsley* and *Campbell-Ewald*, not to mention over a century of other precedent.

*Yearsley* is very specific: A contractor has no liability for "executing [the government's] will." 309 U.S. at 21; *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1096 (10th Cir. 2015). Or, as *Campbell-Ewald* puts it, a contractor is not liable where the government has "directed" its conduct. 577 U.S. at 167. By definition, a contractor that makes its own choice is not merely executing the government's will; the government has *not* directed its conduct. GEO's contention that the *Yearsley* defense immunizes a contractor for its own decisions, therefore, is foreclosed by the language of *Yearsley* itself.

And if that weren't enough, not long after deciding *Yearsley*, the Supreme Court rejected the contention that *Yearsley* provides a broad shield from liability for a private company's own choices in performing a government contract. *See Brady*, 317 U.S. at 583. The Court reiterated that *Yearsley* shields contractors from liability for executing the government's will. *Id.* But, the Court held, a contractor is not immune from liability simply because the government delegated it authority, when the contractor's own choices in exercising that authority caused harm. *See id.*

The *Yearsley* defense is a narrow exception to decades of case law reaffirming the rule that government contractors—like any other private company—are subject to liability when they violate the law. *See supra* pages 11-15. It is not a broad shield from liability for anything a contractor might do, so long as the government does not affirmatively prohibit it from doing so. If it were, the Supreme Court's decision in

32

*Boyle* could have been a single sentence: *Yearsley* controls. After all, there was no dispute in that case that the federal government *authorized* the allegedly defective design. But because it was the contractor that created the design, not the government, *Yearsley* did not apply: The contractor was not merely executing the government's will.

If Congress wanted to, it could grant federal contractors the broad immunity GEO seeks. But Congress has not done so. This Court should decline GEO's request that it do what Congress has chosen not to.

**3.** In arguing otherwise, GEO doesn't cite a single case in which the Supreme Court or this Court has ever allowed a government contractor to escape liability for its own choices. Nor does it address the years of Supreme Court precedent holding otherwise. Instead, the company relies entirely on two out-of-circuit lower court decisions, neither of which supports its claim—and pages of criticism of the Ninth Circuit's case law.[6] None of this, however, solves the company's basic problem: Contractors just aren't entitled to the government's immunity.

---

[6] GEO also embarks (at 31-34) on a four-page detour criticizing the district court for distinguishing between "agents" and "independent contractors." The district court devoted two sentences in its 76-page order to this distinction and referenced it only as consistent with its key holding: that what matters is whether "the government express[ed] its will in the form of a contractual directive" or whether "the government permit[ed] GEO . . . discretion." A-34; *see also McMahon*, 502 F.3d at 1343 ("[T]o make out a claim of derivative sovereign immunity in this circuit, the entity claiming the immunity must at a bare minimum have been a common law agent of the government.").

Start with the Fourth Circuit's decision in *Cunningham*. In that case, the government *required* the contractor to call a list of specific telephone numbers, and the plaintiff claimed that the Telephone Consumer Protection Act *prohibited* the contractor from calling those same numbers if the recipients hadn't consented. *Cunningham*, 888 F.3d at 644-45, 647. The Fourth Circuit explained that the contractor was not authorized to obtain consent, nor could it do so without deviating from the script the government specifically required that it follow. *See id.* In other words, the conduct the plaintiff claimed violated the law was mandated by the government. That's precisely the situation in which the *Yearsley* defense, by its terms, applies. Nothing in *Cunningham* suggests the defense encompasses conduct the contractor was not required to engage in.

Similarly, the Fifth Circuit's decision in *Taylor Energy Co., L.L.C. v. Luttrell*, 3 F.4th 172 (5th Cir. 2021) offers little support for GEO's expansive view. There, the plaintiff claimed that a government contractor incurred unnecessary expenses to inflate its bill, but the government "authorized and directed" every aspect of the contractor's work. *See id.* at 175. The contractor was only permitted to "proceed with work *as ordered* by" a government official. *Id.* at 174 (emphasis added). Thus, all the expenses the contractor undertook were at the government's command. *See id.* As in

34

*Cunningham*, the basis of the plaintiff's claims was conduct the government mandated.[7]

Finally, GEO attacks the Ninth Circuit's case law, but the Ninth Circuit has it exactly right: The *Yearsley* defense does not apply where the contractor had discretion to avoid harming the plaintiff or violating the law; it applies only where doing so was an inevitable consequence of the government's mandate. *Cabalce*, 797 F.3d at 732; *accord, e.g.*, *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 803 (D.C. Cir. 2021); *Vangjeli v. Banks*, 2020 WL 5880131, at *5 (E.D. Pa. Oct. 2, 2020) (collecting cases). GEO spends a whole section of its brief trying to discredit this conclusion. But ultimately its entire argument boils down to the complaint that in discussing *Yearsley*, one Ninth Circuit case cites Justice Brennan's description of *Yearsley* in his dissent in *Boyle*. Opening Br. 23-26 (discussing *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008)).

But the *Boyle* majority did not dispute the dissent's reading of *Yearsley*—that the case "has never been read to immunize the discretionary acts of those who perform service contracts with the government," *Boyle*, 487 U.S. at 525 (Brennan, J., dissenting). The disagreement in *Boyle* was about whether, *in addition* to the *Yearsley*

---

[7] Because the contractor in *Taylor* proposed the designs and then the government ordered them, the contractor's defense was perhaps more properly analyzed under *Boyle*, rather than *Yearsley*. But either way, nothing in *Taylor* supports GEO's contention that a contractor is entitled to immunity for its own choice to violate the law.

defense, there should also be a defense when the government asks a contractor to design specifications, and then adopts those specifications as its own.

In any event, quibbles with the Ninth Circuit's citation practices aside, its rule does exactly what *Yearsley* says to do: shield contractors from liability when—and only when—the alleged harm was the government's fault. Ultimately, GEO's argument on the merits echoes its jurisdictional argument: It asks this Court to split from the other circuits and adopt a broad rule that would undermine years of well-established precedent.

**3.** GEO offers a parade of horribles that it claims will result if this Court does not accede to its request. But its policy arguments are no more convincing than its legal ones. For example, the company speculates (at 29) that "the district court's rule" will "open[ ] a geyser of liability that would discourage any rational business from contracting with the government." But, as GEO itself emphasizes, the Ninth Circuit has precisely the same rule. And there is no evidence that rational businesses have stopped contracting with the government there. To the contrary, GEO just sued for (and won) the right to continue operating there. *See Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022).

The *Yearsley* defense has maintained its narrow scope for over eighty years, and there is no shortage of government contractors. The absence of a *Yearsley* defense

36

doesn't mean that a contractor will necessarily face liability; it merely means that they will be held responsible for their own misconduct, just like everyone else.

Unable to show any real-word negative consequences, GEO resorts (at 29-30) to a series of implausible hypotheticals. But its hypotheticals only highlight the flaws of its rule. Absent the federal government mandating otherwise, GEO offers no reason why a highway builder should escape liability if someone is injured or dies because of its dangerously negligent guardrail placement. And the relevant question for determining whether the federal minimum wage statute GEO cites (at 30) displaces state law should be whether *Congress* intended it to do so. If so, state law is preempted. If not, GEO does not explain why state law should be required to give way, simply because a company happened to contract with the federal government—especially since the Supreme Court has repeatedly held otherwise.

On the other hand, granting contractors immunity for violating the law or injuring someone, simply because the federal government didn't tell them not to, would have obvious perverse consequences. To take just one recent example: A contractor that manages military housing could seek immunity for failing to properly treat mold, endangering military families, on the argument that the federal government did not prohibit it from doing so. *See Childs v. San Diego Fam. Hous., LLC*, 2020 WL 12689448, at *1 (S.D. Cal. Sept. 15, 2020) (rejecting this assertion even though the government had approved the general mold plan drafted by the contractor,

because the government did not require the negligent actions the contractor took—they were discretionary). Nothing in *Yearsley* or *Campbell-Ewald* supports that result. What's more, GEO's assertion that private contractors have absolute immunity, so long as they do not violate their contract, would grant contractors greater immunity than federal employees. That "cannot possibly be the law." *McMahon*, 502 F.3d at 1345.

Whatever the merits of GEO's policy arguments, it should direct them to Congress. The law as it stands is this: GEO is only entitled to the *Yearsley* defense for executing the government's will—that is, only if it can show that the government required it to engage in forced labor or mandated that it pay its detained workers only $1 a day. It cannot do so.

### B.   GEO isn't entitled to a *Yearsley* defense for its forced sanitation program.

GEO concedes that, at the very least, the *Yearsley* defense does not apply where a contractor violates its contract with the government. That concession is dispositive here. GEO's contract with ICE prohibits forced labor. Both the contract and the national detention standards it incorporates explicitly state that "[d]etainees will . . . not be required to work, except to do *personal* housekeeping." Supp. App. Vol. 3 at 31 (emphasis added). And the contract requires GEO to comply with Federal Acquisition Regulation § 52.222-50, which bars contractors from "obtaining the labor or services of a person . . . by threats of serious harm to, or physical restraint against,

38

that person or another person." *Id.* at 50; *see also id.* at 37, 222, 239, 250 (contractual requirements to comply with federal law, as well as specifically "labor law").[8]

The plaintiffs claim that GEO did exactly that: It violated the Trafficking Victims Protection Act by using threats of serious harm and physical restraint—solitary confinement and damage to their immigration cases—to force them to do the company's sanitation work. In other words, the plaintiffs claim that GEO did precisely what the government prohibited. Even on GEO's mistaken view of *Yearsley*, the defense does not apply.

In arguing otherwise, GEO contends that—despite the government's repeated insistence that labor be voluntary—ICE, in fact, directed the company to use threats of solitary confinement to force those detained at Aurora to perform sanitation work. In support of this surprising assertion, GEO relies on three documents: (1) ICE's national detention standards, which GEO's contract requires the company to obey; (2) ICE's National Detainee Handbook, a handbook created by ICE that is given to those in immigration detention; and (3) an Aurora-specific handbook GEO itself

---

[8] These quotations are from the 2011 contract, but GEO has never seriously disputed that its earlier contracts—and the detention standards they incorporate—similarly require that labor be voluntary. *See, e.g.,* Supp. App. Vol. 3 at 27 (2006 contract requiring that "detainee work plan must be voluntary"); *id.* at 80 (requiring GEO comply with Federal Acquisition Regulation § 52.222-50); ECF 261-9, at 60 (2008 detention standards prohibiting "[d]etainees" from being "required to work," except for "personal housekeeping"); ECF 261-10, at 3 (2000 National Detention Standards requiring that work assignments be "voluntary," with the exception of "personal housekeeping").

created. But none of these documents do what GEO claims: mandate a violation of the Trafficking Victims Protection Act. Nor could they. ICE has no authority to create exceptions to federal statutes.

**1.** The national detention standards are the only requirements GEO cites that the company is actually contractually required to follow. Contrary to GEO's contention, those standards demonstrate that ICE *prohibited* the company from pressing those in its care into its service. The standards expressly mandate that work assignments be "voluntary"—and that people in the Center "shall not be required to work." App. Vol. 1 at 144-45. The only unpaid cleaning the standards require—*or allow*—is "personal housekeeping." *Id.* at 145. The standards explain that this means exactly what it sounds like: keeping one's "*immediate* living areas in a neat and tidy manner" by, for example, making the bed and putting away one's belongings—not sanitizing the facility. *Id.* (emphasis added); *cf. Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1535 (10th Cir. 1992) (explaining that where specific examples are listed, the category includes only things of a "similar type").

Even GEO does not seriously argue that its facility sanitation program constitutes "personal housekeeping."[9] Instead, GEO suggests (at 41) that the

_____

[9] GEO criticizes (at 46) the district court for allowing claims based on personal housekeeping to go forward. But the district court expressly recognized that the plaintiffs are not pressing any such claim. App. Vol. 3 at 746 n.16; *see also* ECF 339 at 59 (plaintiffs expressly disclaiming such a claim).

standards state that detained people must also clean their "living unit" and "general use areas." But the standards don't use the phrase "living unit" at all. And the only mention of "general use areas" is a requirement that detained workers in the *voluntary* work program be given safety instructions for working with cleaning products in those areas. App. Vol. 1 at 100, 166. That is, it makes clear that the janitorial work of cleaning "general use areas" must be voluntary—and paid.

GEO also asserts (at 43) that the standards "use[ ] the term 'housing unit' interchangeably with 'living areas.'" The single sentence it cites doesn't actually say that. GEO Br. 43 (citing App. Vol. 1 at 145, which states "Generally, high custody detainees shall not be given work opportunities outside their housing units/living areas."). But even if it did, that wouldn't support GEO's argument that the standards require the company to force those detained at the Center to perform janitorial work. Again, the only unpaid cleaning the standards even allow is "*personal* housekeeping" of "*immediate* living areas"—not general sanitation of *all* living areas. App. Vol. 1 at 145 (emphasis added).

Finally, GEO repeatedly invokes (at 39-40, 45) the standards' disciplinary scale, which outlines the minimum and maximum punishments for a range of offenses, App. Vol. 1 at 140-43. But the company doesn't explain how this scale supports its argument. Perhaps GEO is intending to point out that the scale includes "refusal to clean assigned living area" as a "high moderate offense," a category for

which solitary confinement is listed as a potential sanction, *Id.* at 215-16. But, again, the standards themselves carefully define the scope of this cleaning requirement: "personal housekeeping." *Cf. Williams Petroleum Co. v. Midland Coops., Inc.*, 539 F.2d 694, 696 (10th Cir. 1976) ("Contracts are to be construed as a whole, with each clause helping to interpret others."). Anything beyond that is forbidden, not required.

Indeed, GEO's own vice president testified that the national standards require any other work to be "voluntary." Supp. App. Vol. 1 at 142. The Department of Homeland Security's Inspector General has said the same. *Id.* at 121 ("[R]equiring detainees to clean common areas used by all detainees is in violation of ICE standards.").[10] Put simply, the national standards require those detained at immigration detention centers to clean up after themselves. They do not establish a federal policy of forced labor.

**2.** GEO fares no better trying (at 38) to seek refuge in ICE's National Detainee Handbook. The hanadbook is consistent with the contract and the detention

---

[10] GEO cites (at 42) a last-minute declaration from an ICE employee—whom the plaintiffs were unable to depose because GEO submitted it after summary judgment briefing, A-9 n.6—that states that she believes those living in an immigration detention center have a "co-responsibility to keep the dormitory, dayroom, shower and bathroom areas tidy and clean." This general statement is perfectly consistent with the plain-text reading of the national detention standards: Those detained in immigration detention facilities share a responsibility to pick up after themselves. That does not mean that ICE allows—let alone requires—the contractors operating those facilities to force detained people to do the facility's janitorial work.

standards: It notes that people in immigration detention facilities will not be paid for picking up after themselves; it does not direct (or allow) GEO to force them to choose between serving as GEO's janitorial staff or solitary confinement.

> The handbook says:
>
> You are not entitled to compensation for tasks that involve maintaining *your personal area* or *cleaning up after yourself* in general use areas. You are required to perform basic cleaning tasks within your living unit, regardless of where you are held. For example. you could be disciplined if you refuse to *make your bed* or otherwise refuse to *clean up after yourself*.

Supp. App. Vol. 1 at 57 (emphasis added).[11] GEO seizes (at 38) on the phrase "basic cleaning tasks within your living unit," but the context makes clear that this is, again, about personal housekeeping—"cleaning up after yourself." It is not a mandate that GEO forcibly enlist those detained at the Center into its general sanitation work.

**3.** Unable to demonstrate that anything ICE wrote permits, let alone directs, GEO's forced sanitation program, the company argues that it is entitled to the *Yearsley* defense because it documented its use of forced labor in the handbook it wrote itself. Opening Br. 39-45. But a contractor cannot shield itself from liability

---

[11] GEO also cites the 2013 version of the handbook, which states that people detained will not be paid to "keep areas that *you use* clean, including *your living area* and any general use areas *that you use*." ECF 310-1 at 18 (emphasis added). This is just another version of the same point. Its focus on areas that "you use" demonstrates the requirement is to pick up after oneself, not a requirement that detained people serve without pay as the facility's general janitorial staff.

simply by writing down that it's violating the law. GEO's contrary arguments fail several times over.

*First*, GEO asserts (at 39-40) that its handbook was not, in fact, "independently developed" because ICE directed it to "develop and issue to each newly admitted detainee" a facility-specific handbook. But even if ICE told GEO to write a handbook, there is no evidence that it told GEO to include forced labor. As ICE's contracting officer explained, GEO's forced sanitation program was a "GEO policy, created by GEO." Supp. App. Vol. 1 at 73.

*Next*, GEO repeatedly emphasizes (at 37-38, 45) that ICE reviewed its "housekeeping and disciplinary policies," but it's not clear what the company means by that. GEO maintained a policy document called "Sanitation Procedures," which had an accompanying "Housekeeping Plan," but neither of these documents said that GEO would force everyone detained at the Center to perform janitorial work on pain of solitary confinement. *See generally* ECF 262-8; App. Vol. 2 at 302 (GEO conceding that the "Sanitation Procedures do not specify which aspects of cleaning are the responsibility of all detainees and which are the responsibility of VWP [voluntary work program] workers."). And the only disciplinary policy GEO discusses is the disciplinary scale in ICE's national detention standards, which, as explained above, also does not direct that those who decline to participate in forced sanitation work be put in solitary confinement. Whatever GEO might mean, while

44

it's undisputed that ICE signed off on the company's *policy* documents, GEO offers no evidence that anyone from the agency ever officially signed off on its self-authored handbook.[12]

*Third*, even if an ICE employee—called the Contracting Officer's Technical Representative—signed off on GEO's handbook, that wouldn't shield the company from liability. For one thing, the handbook didn't disclose that the company was enforcing its sanitation program with solitary confinement. App. Vol. 2 at 244. It says that "televisions will be turned off," "detainees will not be permitted to participate in any activities/programs," and "further" unspecified "disciplinary action" may result—nothing about threatening to send people to "the hole." *Id.* Moreover, the technical representative is authorized "to coordinate the technical aspects" of the contract, "*consistent*" with its terms; they may not "change any terms and conditions." Supp. App. Vol 3 at 218 (emphasis added). GEO's contract with ICE prohibits forced labor. The technical representative had no authority to change that.

*Finally*, at bottom, GEO's argument is that—despite ICE's explicit and repeated insistence that all work except personal housekeeping be voluntary—as

---

[12] To the extent GEO is relying on the "audits" of its compliance with national detention standards, there is no evidence that those audits—themselves performed by a private contractor, *see* ECF 273-6, at 19—even considered this issue. The audits consisted of checking off a list of specific items, none of which even suggested review of the company's practice of forcing people detained in the Center to serve as its janitorial staff or face solitary confinement. *See, e.g.*, *id.* at 22-31.

long as an agency employee signed off on a document the company itself drafted saying otherwise, that's sufficient to immunize it from liability. On that view, GEO's handbook could say that the company need not provide medical care or that it can hold people in solitary confinement indefinitely for no reason. And so long as the company managed to slip it by a single ICE employee, GEO would be immune from liability. That's not how the *Yearsley* defense works. *Yearsley* requires that the alleged harm be an "*inevitable*" consequence of conduct the government "*directed*"—not something the contractor itself chose. *Yearsley*, 309 U.S. at 20 (emphasis added).[13]

Contrary to GEO's contention (at 37), this conclusion does not virtually "eliminate" the *Yearsley* defense; it faithfully adheres to the Supreme Court's requirements for applying that defense. If the plaintiffs sued GEO for something the government, in fact, requires it to do—for example, "search[ing] all arriving detainees' personal property"—*Yearsley* would apply (so long as ICE had authority to impose the requirement). *See* 2011 Operations Manual ICE Performance-Based

---

[13] As explained above, there is a defense that applies when it is the contractor that proposes plans to the government. That's the *Boyle* government contractor defense, which GEO does not argue here. But, as explained, to take advantage of that defense, the government has to do more than rubberstamp the contractor's proposal. *See supra* page 17. That's because, again, the point of both defenses is to shield a contractor from liability for the *government's* decisions. *See id.* And a rubberstamp does not transform the contractor's decision into that of the government. GEO has offered no evidence that the technical representative approved its handbook at all, let alone that any such approval was anything more than a rubberstamp.

46

National Detention Standards 91, https://perma.cc/Y7EY-72MJ. Even if GEO had discretion about how to conduct the search, *Yearsley* would still apply if the alleged harm was an "inevitable" result of the search itself, and not an optional choice GEO made in executing that search. *See Yearsley*, 309 U.S. at 20. And that's exactly how it should be: If someone sues GEO for searching their property, even though the government told the company to do so, it makes sense that GEO would not be held liable for doing what it was required to do. But if GEO chooses to conduct a search in a manner that, say, damages the property or is unnecessarily physically invasive, there is no basis to shield GEO from liability for its own choices.

**4.** There's another reason to reject GEO's attempt to invoke *Yearsley* to shield its forced sanitation program: The second prong of the *Yearsley* test asks whether the government "*validly* conferred" on the contractor the authority to engage in the challenged conduct. 309 U.S. at 20 (emphasis added). ICE could not have validly conferred on GEO the authority to violate the Trafficking Victims Protection Act. The agency had no power to do so.

In holding otherwise, the district court cited statutes authorizing ICE to detain immigrants, App. Vol. 3 at 745, but nothing in those statutes empowers ICE to violate other federal laws—or require (or permit) its contractors to do so. *See* 8 U.S.C. §§ 1103, 1226, 1231. ICE may "make contracts . . . necessary and proper" to executing its statutory responsibilities. *See* 6 U.S.C. § 112(b)(2). But it's hard to understand—and

GEO has never explained—how mandating forced labor in violation of federal law could possibly be "necessary" to detaining immigrants, let alone "proper."[14]

That, in and of itself, is dispositive of GEO's *Yearsley* defense. But it's also further reason to reject GEO's assertion that ICE directed it to engage in forced labor. Put simply, GEO has come forth with no evidence that ICE directed it to engage in forced labor, let alone did so validly. It is not, therefore, entitled to the *Yearsley* defense.[15]

### C.    GEO isn't entitled to the *Yearsley* defense for its decision to pay detained workers $1 a day.

The choice to pay detained workers just $1 a day was GEO's, not ICE's. GEO could have paid more. That forecloses GEO's *Yearsley* defense. GEO's argument to the contrary fails on both the facts and the law.

On the facts, GEO contends that paying $1 a day wasn't always its choice. But GEO concedes that for most of the class period, ICE's national detention standards (the 2011 standards) were explicit that pay must be "*at least* $1.00 (USD) per day"— not *exactly* $1.00 a day. App. Vol. 1 at 147 (emphasis added). And although the prior standards did not expressly contain the "at least" language, they, too, did not *prohibit*

---

[14] Mandating forced labor in civil immigration detention would not only violate the TVPA, but could also violate the Thirteenth Amendment. *See Wong Wing v. United States*, 163 U.S. 228, 229 (1896).

[15] If this Court disagrees, that would mean only that there is a dispute of fact on this point. And so the Court should at least affirm the denial of GEO's summary judgment motion.

GEO from paying more.[16] *See id.* at 222. In fact, GEO previously admitted that there was no "prohibition on paying more than $1.00 per day." App. Vol. 3 at 692. And it has done exactly that—repeatedly. *See supra* page 9.[17]

Moreover, for the entire class period, GEO's contract *required* it to comply with state law. Supp. App. Vol. 3 at 239, 250 (requiring that contractor "shall comply with all applicable" state law and that facility be "operated" and "maintained" in accordance with state law). Thus, GEO was not only permitted but mandated to pay more than $1 a day.

ICE *could not* have validly conferred on GEO the authority to do otherwise because Congress did not authorize the agency to do so. The power to displace state law is "an extraordinary power in a federalist system." *Gregory v. Ashcroft*, 501 U.S. 452,

---

[16] GEO also observes (at 27) that its contract stated that ICE would reimburse it at an "actual cost" of $1 per day per person, but GEO never even asserts that this constituted a command to pay only $1—let alone explain how it could.

[17] Even if GEO were correct that the pre-2011 standards prohibited the company from paying more than $1 a day, those standards were only in effect until February 27, 2012—not, as GEO claims (at 30), until June 23, 2013. GEO's contract with ICE provided that the national detention standards operated as a "constraint," that "constraints may change over time," and that "the Contractor shall be knowledgeable of any changes to the constraints and *perform in accordance with the most current version of the constraints*." Supp. App. Vol. 3 at 36 (emphasis added). So, as soon as the new version—and the "at least $1 per day" language—took effect on February 27, 2012, GEO was required to "perform in accordance" with it. Indeed, the record shows that GEO understood as much and began internally flagging changes in the national standards—including the compensation provision—almost as soon as they came out. *See* Supp. App. Vol. 1 at 109-11. So, at the very least, GEO's dollar-a-day payment was its own choice, beginning February 27, 2012.

460 (1991). And it is a power that belongs to Congress, not agencies. *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Congress can, of course, authorize an agency to displace state law. But GEO points to no statute that empowers ICE to mandate detained workers' wages, let alone one that authorizes it to override state law to do so.[18] If anything, Congress has made clear that ICE may *not* use its contracting power to displace state law: The chapter that authorizes ICE to make contracts, 6 U.S.C. § 112(b)(2), also provides that it "preempts no State or local law," 6 U.S.C. § 457(b). ICE could not—and did not—require GEO to unlawfully pay its detained workers only $1 a day. GEO chose to do so.

GEO's sole argument that it should nevertheless be shielded from liability again rests on its misguided understanding of the *Yearsley* defense. On GEO's view (at 29), so long as it "complied with the terms of its contract" with ICE, it could violate state law with impunity. As explained above, GEO is mistaken. A century of Supreme Court precedent makes clear that a contractor is not shielded from liability unless it was simply "executing" the government's "will," *Yearsley*, 309 U.S. at 20. As

---

[18] In passing in its background section, GEO cites 8 U.S.C. 1555(d), a 1950 statute that says that "[a]ppropriations" will be made "available" for what was then the Immigration and Naturalization Service—now ICE—to purchase horses, pay interpreters, distribute citizenship textbooks, and pay allowances to those in its custody "for work performed" "at such rate as may be specified from time to time in the appropriation Act involved," *id.* Nothing in that statute grants ICE the authority to set the wages private contractors pay detained workers.

even GEO concedes for at least part of the class period (at 30), it was not *ICE*'s will that detained workers be paid no more than $1 a day; it was GEO's.

For that reason, every court that has considered GEO's $1-a-day program has rejected the company's *Yearsley* defense. *See, e.g.*, *Novoa v. GEO Grp., Inc.*, 2022 WL 2189626, at *21 (C.D. Cal. Jan. 25, 2022); *Nwauzor v. GEO Grp., Inc.*, 2020 WL 1689728, at *9 (W.D. Wash. Apr. 7, 2020); *Washington v. GEO Grp., Inc.*, 2019 WL 3565105, at *5 (W.D. Wash. Aug. 6, 2019); *see also Coyoy v. CoreCivic, Inc.*, 2022 WL 18034487, at *8 (W.D. Tex. Oct. 11, 2022) (rejecting argument that mere fact that contractor constructed facility "under ICE's authority" conferred immunity because "courts have held that derivative immunity, as discussed in *Yearsley* and *Boyle*, is limited to cases in which a contractor had no discretion in the design process and completely followed government specifications").

This Court should do the same.

## CONCLUSION

This Court should dismiss this appeal. But, if it decides the merits, it should affirm.

March 24, 2023                    Respectfully submitted,

                                 */s/ Jennifer D. Bennett*
                                 JENNIFER D. BENNETT
                                 GUPTA WESSLER PLLC
                                 100 Pine Street, Suite 1250
                                 San Francisco, CA 94111

(415) 573-0336
jennifer@guptawessler.com

ROBERT D. FRIEDMAN
GUPTA WESSLER PLLC
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741

JUNO TURNER
DAVID SELIGMAN
ALEXANDER HOOD
RACHEL DEMPSEY
TOWARDS JUSTICE
PO Box 371680
Denver, CO 80237
(720) 248-8426

MICHAEL SCIMONE
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
(212) 658-0137

ADAM KOSHKIN
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
(415) 727-2237

HANS MEYER
MEYER LAW OFFICE
901 West 10th Ave, Suite 2A
Denver, CO 80204
(303) 831-0817

BRANDT MILSTEIN
ANDREW HESS TURNER
MILSTEIN TURNER
1490 Lafayette Street, Suite 304
Denver, CO 80218

(303) 440-8780

*Counsel for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested because of the importance of the issues in this case. Argument will enable the Court to ask questions of counsel to facilitate the resolution of these important issues.

## CERTIFICATE OF COMPLIANCE

This answer brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,943 words. It complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

March 24, 2023                          */s/ Jennifer D. Bennett*
                                        Jennifer D. Bennett

                                        *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2023, I electronically filed the foregoing brief with Clerk of the Court for the U.S. Court of Appeals for the Tenth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jennifer D. Bennett*
Jennifer D. Bennett