**No. 22-1409**

**In the United States Court of Appeals
for the Tenth Circuit**

ALEJANDRO MENOCAL, MARCOS BRAMBILA, LOURDES ARGUETA, HUGO
HERNANDEZ, GRIZEL XAHUENTITLA, JESUS GAYTAN, OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, AND DEMETRIO VALERGA,
*Plaintiffs-Appellees,*

v.

THE GEO GROUP, INC.,
*Defendant-Appellant.*

On Appeal from the United States District Court,
for the District of Colorado (Denver) (Hon. John L. Kane)
No. 1:14-cv-02887-JLK-MEH

**PLAINTIFFS-APPELLEES' SUPPLEMENTAL APPENDIX: VOLUME II**

JUNO TURNER
DAVID SELIGMAN
ALEXANDER HOOD
RACHEL DEMPSEY
TOWARDS JUSTICE
PO Box 371680
Denver, CO 80237
(720) 248-8426

MICHAEL SCIMONE
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
(212) 658-0137

JENNIFER D. BENNETT
GUPTA WESSLER PLLC
100 Pine Street
Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

ROBERT D. FRIEDMAN
GUPTA WESSLER PLLC
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

*(Additional counsel listed on inside cover)*

March 24, 2023                    *Counsel for Plaintiffs-Appellees*

HANS MEYER
MEYER LAW OFFICE
901 West 10th Ave, Suite 2A
Denver, CO 80204
(303) 831-0817

BRANDT MILSTEIN
ANDREW HESS TURNER
MILSTEIN TURNER
1490 Lafayette Street, Suite 304
Denver, CO 80218
(303) 440-8780

ADAM KOSHKIN
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
(415) 727-2237

# INDEX

| VOLUME I | | | |
|---|---|---|---|
| **ECF No.** | **Date** | **Document** | **Page** |
| – | – | District Court Docket | 1 |
| 51-3 | June 1, 2016 | Enforcement and Removal Operations National Detainee Handbook: Detention Management Division | 40 |
| 261-3 | April 29, 2020 | Declaration of Tae D. Johnson | 61 |
| 261-7 | April 29, 2020 | Declaration of Shannon Ely | 69 |
| 261-12 | April 29, 2020 | Excerpts from Deposition of Dawn Ceja | 76 |
| 261-18 | April 29, 2020 | ICE Facility Voluntary Work Program Pay Rates between 2011 and 2014 | 104 |
| 287-9 | June 26, 2020 | Excerpts of Deposition of Amber Martin | 105 |
| 287-17 | June 26, 2020 | Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange, California | 115 |
| 299-1 | July 31, 2020 | Excerpts from Deposition of David Venturella | 133 |

| 299-2 | July 31, 2020 | Excerpts of Deposition of Hugo A. Hernandez-Ceren | 159 |

| **VOLUME II** | | | |
| ECF No. | Date | Document | Page |
| --- | --- | --- | --- |
| 336-2 | October 26, 2020 | Excerpts from Deposition of Alejandro Menocal | 1 |
| 336-4 | October 26, 2020 | Excerpts from Deposition of Hugo A. Hernandez-Ceren | 38 |
| 336-8 | October 26, 2020 | Excerpts from Deposition of Dagoberto Vizguerra | 78 |
| 336-10 | October 26, 2020 | Excerpts from Deposition of Jesus Yepez Gaytan | 88 |
| 336-13 | October 26, 2020 | Excerpts from Deposition of Alejandro Hernandez Torres | 118 |
| 336-14 | October 26, 2020 | Excerpts from Deposition of Grisel Xahuentitla | 147 |
| 336-21 | October 26, 2020 | Psychiatric Report of Plaintiffs' Expert Dr. Stuart Grassian, M.D. | 160 |

| **VOLUME III (SEALED)** | | | |
| ECF No. | Date | Document | Page |
| --- | --- | --- | --- |
| 262-2 | April 29, 2020 | Excerpts from 2011 Contract Between GEO and ICE | 1 |

| 262-4 | April 29, 2020 | Excerpts from 2006 Contract Between GEO and ICE | 61 |
|---|---|---|---|
| 262-5 | April 29, 2020 | Excerpts from 2003 Contract Between GEO and ICE | 105 |
| 262-6 | April 29, 2020 | 2004 Detainee Work Plan | 131 |
| 262-7 | April 29, 2020 | 2014 Detainee Work Plan | 138 |
| 310-1 | August 17, 2020 | ICE National Detainee Handbook | 143 |
| 311-1 | August 17, 2020 | Excerpts from 2011 Contract Between GEO and ICE | 179 |

Alejandro Menocal  07/22/2020
ALEJANDRO MENOCAL vs GEO GROUP

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 1:14-cv-02887-JLK-MEH
 3    _____

 4              VIDEOTAPE DEPOSITION OF:
            ALEJANDRO MENOCAL - July 22, 2020
 5                 Via RemoteDepoTM
      _____
 6
      ALEJANDRO MENOCAL, MARCOS BRAMBILA,
 7    GRISEL XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA,
      JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO VIZGUERRA,
 8    and DEMETRIO VALERGA, on their own and on behalf of
      all others similarly situated,
 9
      Plaintiffs,
10
      v.
11
      THE GEO GROUP, INC.,
12
      Defendant.
13    _____

14              PURSUANT TO NOTICE, the videotape
      deposition of ALEJANDRO MENOCAL was taken on behalf of
15    the Defendant in Denver County, Colorado, on July 22,
      2020, at 3:32 p.m. GMT, 9:32 a.m. MDT, before Tracy C.
16    Masuga, Registered Professional Reporter, Certified
      Realtime Reporter, and Notary Public within Colorado
17    appearing remotely from Arapahoe County, Colorado.

18

19

20

21

22

23

24

25
```

Alejandro Menocal  07/22/2020                          Page 47
ALEJANDRO MENOCAL vs GEO GROUP

```
 1           A.   Sure.

 2           Q.   Okay.  Let's do that just so we're on

 3    the same page.  That's great.  So the sleeping living

 4    area and the pod or the day living area, good?  Okay.

 5                So let me -- let's take it one at a

 6    time.  In the -- in the cell, or the sleeping living

 7    area, were any of the class representatives in this

 8    lawsuit in the sleeping living area or the cell with

 9    you?

10           A.   No.

11           Q.   No.  Okay.  Let's -- then I'm going to

12    go back to the pod, the bigger area with the tables

13    and everything, okay?

14           A.   Okay.

15           Q.   All right.  So -- so if I mention

16    Mr. Brambila, he was in the pod at A2?

17           A.   I believe so.

18           Q.   Okay.  And there weren't any women in

19    your pod.  I'm pretty sure of that.  So let's skip to

20    the next one.  How about Mr. Hugo Hernandez, was he --

21           A.   No.

22           Q.   How about Jesus Gaytan?

23           A.   I -- he could have been.  I don't

24    recall.  The only person I recall being there is the

25    first name you mentioned.
```

2 Supp. App. 2

Alejandro Menocal  07/22/2020                    Page 48
ALEJANDRO MENOCAL vs GEO GROUP

 1          Q.   Marcos Brambila?

 2          A.   Yes, sir.

 3          Q.   All right.  Was -- how about Demetrio

 4   Valerga, was he --

 5          A.   He could have been.  I don't recall,

 6   sir.  Like I said, the only person I recall being in

 7   the pod is Marcos.

 8          Q.   Great.  Do you recall the name Dagoberto

 9   Vizguerra?

10          A.   No, sir.

11          Q.   You don't recall if he was in the pod?

12          A.   No.

13          Q.   All right.  Since you were at least for

14   a period of time in different correctional facilities

15   in Denver and Adams and Jefferson County, would you

16   believe that the conditions at the Aurora Detention

17   Center were better than they were in those jails?

18          A.   No, on the contrary.

19               MR. MILSTEIN:  Object to form.

20          Q.   (BY MR. EISMEIER)  Okay.  Didn't you

21   tell people that the conditions at GEO were better

22   than they were in jail?

23          A.   To my family so they wouldn't worry

24   about me, but I don't recall telling anybody else.

25          Q.   Okay.  You recall that while you were at

2 Supp. App. 3

Alejandro Menocal  07/22/2020                                        Page 49
ALEJANDRO MENOCAL vs GEO GROUP

1    GEO that you made some phone calls?

2            A.   Yes.

3            Q.   And so what I'm going to do is at

4    various times I may put up a record of a phone call,

5    okay?

6            A.   Okay.

7            Q.   And then we'll listen to it, and then I

8    may ask you a question about it and I may not, but I

9    would like to listen to it and see if it either sparks

10   a recollection or else prompts another question, okay?

11           A.   Okay.

12           MR. EISMEIER:  Okay.  So I'm going to

13   take -- drop Exhibit 2 into the chat room, and that --

14   and I'll just explain -- I've already talked about

15   this with Tracy, our court reporter, but, Brandt, all

16   these will be in the record, but I'm going to play it

17   here, parts of it, for Mr. Menocal, okay?

18           MR. MILSTEIN:  Dana, these are all

19   recordings that you have identified to us?

20           MR. EISMEIER:  Yes, yeah.  Every one of

21   these was identified previously -- previously per our

22   agreement to get them to you over a week in advance.

23           MR. MILSTEIN:  When you put them up, can

24   you identify them by either Bates number or recording

25   number?

Alejandro Menocal  07/22/2020                              Page 55
ALEJANDRO MENOCAL vs GEO GROUP

1   technical difficulties also about ICE, ICE being

2   located at the Aurora facility.

3          A.   Yes.

4          Q.   Okay.  And I asked you if ICE officials

5   ever came to the pod where you were staying.  Do you

6   recall?

7          A.   Yes, sir.

8          Q.   And do you recall any ICE officials

9   coming to the pod?

10         A.   Very seldom.  Maybe once or twice, from

11  what I could recall.

12         Q.   Okay.  What do you recall about those

13  instances?

14         A.   I just saw people in uniform, not like

15  the guards, so I figured they were ICE employees or

16  ICE members or ICE.

17         Q.   What was it about them that led you to

18  believe they were ICE?

19         A.   A different uniform.  They had a badge,

20  and they did not wear the regular uniforms that the

21  guards wear.

22         Q.   So you assumed that they were ICE?

23         A.   Yes, sir, or non-GEO employees, somebody

24  else.

25         Q.   Did you ever talk to them?

Alejandro Menocal  07/22/2020
ALEJANDRO MENOCAL vs GEO GROUP                                    Page 56

```
 1          A.   I don't recall talking to them, no, sir.
 2          Q.   Do you know if you could file a formal
 3   complaint with ICE while you were in the pod?
 4          A.   Okay.
 5          Q.   Well, do you know if you could?
 6               MR. MILSTEIN:  Form.
 7          A.   Yeah, sure.
 8          Q.   (BY MR. EISMEIER)  How would you file a
 9   complaint with ICE?
10          A.   By writing a kite, a complaint letter.
11          Q.   Okay.  You mentioned a kite?
12          A.   Yes, sir.  That is a piece of paper that
13   goes to whoever you are, you know, sending it to.
14          Q.   But you can send it to ICE, right?
15          A.   I believe so, yes, sir.
16          Q.   Do you think you ever sent a kite to
17   ICE?
18          A.   I'm not sure if it was to ICE who I sent
19   it to or GEO personnel, but, yes, sir, I sent several
20   kites.
21          Q.   Okay.  All right.  I want to go back to
22   the break, just a few minutes ago.  You were talking
23   on a phone to someone.  Do you remember who you were
24   talking to?
25          A.   To Ly Warren, you mean?
```

Alejandro Menocal  07/22/2020                          Page 57
**ALEJANDRO MENOCAL vs GEO GROUP**

1          Q.   No, no, no.  I'm sorry.  You had a cell

2     phone sitting at your desk here.

3          A.   Yes, sir.

4          Q.   Who were you talking to?

5          A.   Just earlier?  Now I'm -- I'm not sure

6     if I was talking or lowering the volume -- I'm not

7     sure -- or turning it up.

8          Q.   I lost -- I'm sorry.  There was a

9     glitch.  You kind of froze there for a second.

10          MR. MILSTEIN:  Dana, I'll represent to

11    you that I called him.  He was making notes, and I

12    instructed him not to make notes during the

13    deposition.

14          MR. EISMEIER:  Okay.  Thank you for

15    clarifying, Counsel.  Okay.

16          Q.   (BY MR. EISMEIER)  Let's go -- let's go

17    back to kites.  How did you know what a kite was?

18          A.   I was told that if I sent a kite, I

19    would get a response -- a response or a request,

20    whatever the kite was about, yes, sir.

21          Q.   Do you remember who told you that?

22          A.   I do not.  One of the detainees, I'm

23    sure, or one of the guards.  I don't recall.

24          Q.   Okay.  Do you call them "guards" or

25    "detention officers"?

2 Supp. App. 7

Alejandro Menocal   07/22/2020                                    Page 66
ALEJANDRO MENOCAL vs GEO GROUP

```
 1                    MR. MILSTEIN:  Object to the form,
 2    foundation.
 3           Q.   (BY MR. EISMEIER)  Can you explain why?
 4                    MR. MILSTEIN:  Same objection.
 5           A.   Maybe their attitudes, maybe their
 6    language.  I'm not sure, but, yeah, I'm sure that
 7    they -- they got along better with others, sure.
 8           Q.   (BY MR. EISMEIER)  Is it fair to say
 9    that some detainees got along better with the
10    detention officers than maybe you did -- or strike
11    that.
12           A.   Of course, yes.
13                    MR. MILSTEIN:  Object to form.
14           Q.   (BY MR. EISMEIER)  People are different.
15           A.   That, they are.
16           Q.   Right.  The detainees were different,
17    so --
18           A.   Sure.  So were the guards, yes, sir.
19                    MR. MILSTEIN:  Same objection.
20           Q.   (BY MR. EISMEIER)  So were the guards.
21    Okay.  Can you tell me what your daily recreational
22    activities were while you were in detention?
23           A.   Get up, eat breakfast, walk around, read
24    a book, draw, watch TV, communicate with other
25    detainees, eat lunch, clean up a little, and either
```

Alejandro Menocal  07/22/2020
ALEJANDRO MENOCAL vs GEO GROUP                      Page 67

1   work out at the rec area or draw or read a book, walk

2   around, talk to the detainees, see them at dinner, you

3   know, maybe take a nap, then again, you know, eat

4   dinner, clean up, et cetera, hang out with detainees

5   and try to make the best of the time in there.

6        **Q.   Great.  Was the food okay?**

7        A.   No, not at all, sir.

8        **Q.   Did you ever tell people that the food**

9   **was good?**

10       A.   People that I talked to on the phone?

11       **Q.   Yeah.**

12       A.   Yeah, because they're my friends and

13   family, and I don't -- I didn't want them to worry

14   about me, so I, you know, presented it to be real nice

15   in there when it really wasn't.

16            I just didn't want to -- because I

17   love -- like my friend Ly Warren, I love the guy and

18   he loves me, and I don't want him worried about me.

19   And the same with Tom and the same with my family.

20   You know, I told them it was great in there so they

21   wouldn't, you know, worry about me and be concerned of

22   my staying there.  So I pictured it real pretty when

23   it really wasn't.

24            The food was very awful.  People got

25   sick in groups lots of times.  We would complain and

Alejandro Menocal  07/22/2020

ALEJANDRO MENOCAL vs GEO GROUP

Page 68

 1   nothing would really change.  The moldy shower

 2   curtains, I sent them several kites telling them they

 3   were unhealthy, et cetera, et cetera, and they never

 4   responded.  And I could go on and on, but, yeah, it

 5   was not the prettiest place.

 6        **Q.   You're saying that you sent kites to ICE**

 7   **about the showers?**

 8             MR. MILSTEIN:  Objection.

 9        A.   I don't know if it was ICE or the guards

10   from GEO, but almost every day, I would send a kite

11   complaining about the moldy showers, about the bad

12   food.  And, of course, nothing got done.

13        **Q.   (BY MR. EISMEIER)  However --**

14        A.   In the three months I was there, they

15   never replaced the moldy shower curtains.  Very

16   unhealthy.

17        **Q.   I just want to clarify.  You're saying**

18   **you sent a written complaint almost every day; is that**

19   **right?**

20        A.   Yes, sir.  And not just myself but other

21   detainees.  We would sit down and make a complaint

22   about "Please change the shower curtains.  Somebody is

23   going to get real sick, if they already aren't."  And

24   nothing got done.  I believe their response was

25   "They're on back order."  And for the three months I

**2 Supp. App. 10**

Alejandro Menocal  07/22/2020                                    Page 69
ALEJANDRO MENOCAL vs GEO GROUP

1    was there, I've never seen a new -- new curtain being

2    installed.

3           Q.    Okay.

4           A.    So we've got to shower in pretty bad

5    situations.

6           Q.    But you recall making a written

7    complaint about the showers, specifically, on many

8    occasions, right?

9           A.    Yes, sir, and the food.

10          Q.    Okay.  Let's go back -- let's go back to

11   the food for a second.  Let's look -- let's listen to

12   another recording.

13               (Deposition Exhibit 5 was remotely

14   introduced.)

15               (At this time an audiotape was played.)

16               TELMATE OPERATOR:  This is a Telmate

17   automated operator with a free call from --

18               MR. MENOCAL:  Alex Menocal.

19               TELMATE OPERATOR:  -- a detainee at

20   Aurora ICE Processing Center.  This call is subject to

21   recording and monitoring.  Press 1 or star to accept

22   the call.  To . . .  Thank you for using Telmate.

23               MR. MENOCAL:  Hello.

24               MS. ALEXIS MENOCAL:  Hello.

25               MR. MENOCAL:  Hi.

Alejandro Menocal   07/22/2020                                    Page 85
ALEJANDRO MENOCAL vs GEO GROUP

1        Q.    Okay.

2              MR. MILSTEIN:  Foundation.

3        Q.    (BY MR. EISMEIER)  Mr. Menocal, we've

4    been going a while.  I know we've had a couple of

5    breaks.  Do you want to take a break?

6        A.    I'm okay.  I mean, if you guys want one,

7    that's okay with me.

8        Q.    I'm more concerned about our court

9    reporter than anybody else because she has to --

10       A.    Well, there you go.  Ask her.

11             MR. EISMEIER:  How are you doing, Tracy?

12             THE REPORTER:  I'm fine.

13             MR. EISMEIER:  Let's keep going, then.

14       Q.    (BY MR. EISMEIER)  I would like to ask

15   you about the Voluntary Work Program.  I dropped in

16   Exhibit 8.  Mr. Menocal, I'm going to try to bring it

17   up on your screen.  All right.

18             (Deposition Exhibit 8 was remotely

19   introduced.)

20       Q.    Mr. Menocal, can you --

21       A.    Yes, sir.

22       Q.    -- can you see the document on your

23   screen now?

24       A.    No, sir.

25       Q.    Let's try it now.  See if it comes up.

Alejandro Menocal  07/22/2020                                Page 86
ALEJANDRO MENOCAL vs GEO GROUP

1    Tell me if you can -- hopefully you can see it.

2            A.   I see a document now, yes.

3            Q.   Okay.  Thank you.  All right.  You see

4    this says "Detainee Voluntary Work Program Agreement."

5    Do you see that?

6            A.   Yes, sir.

7            Q.   All right.  Have you ever seen this

8    document before?

9            A.   Yes, sir.

10           Q.   Where did you see it?

11           A.   Probably when I was detained at GEO.

12           Q.   All right.  Did you sign a document like

13   this to join the Voluntary Work Program?

14           A.   Probably, yes, sir.

15           Q.   All right.  When you signed up for the

16   Voluntary Work Program, I believe you signed up in the

17   middle of July.  Does that sound right?

18           A.   Yeah.

19           Q.   And so you had been there for, what, a

20   month and ten days or something at that point?

21           A.   Probably, yes.

22           Q.   All right.  And when you signed up for

23   it, you -- why did you sign up for it?

24           A.   First, I just asked if I could clean the

25   recreation area, and I didn't sign any kind of paper.

U.S. LEGAL SUPPORT, INC
303-832-5966

Alejandro Menocal  07/22/2020                                        Page 87
ALEJANDRO MENOCAL vs GEO GROUP

1    They asked me why.  I said because I spend a lot of

2    time there, and I want to exercise, walk around, jog,

3    and clean the area, so they allowed me to, you know,

4    wipe down bars, wipe down doorknobs, sweep, et cetera,

5    so I could hang out in a clean environment.

6            **Q.    Okay.  And then eventually you got a job**

7    **at the Voluntary Work Program as a trustee; is that**

8    **right?**

9            A.    Yes.  I believe somebody got released,

10   went somewhere else, and they asked me, since I was

11   already volunteering to clean the recreation yard, if

12   I was interested in serving food or -- or, I believe,

13   either clean up for the detainees after they ate or

14   set up, and I said -- I accepted.

15           **Q.    Okay.  And you were -- is it fair to say**

16   **you were pleased to get -- to get that job?**

17           A.    I don't know about pleased, but, you

18   know, it made time in there go quicker.  And, yeah, I

19   was doing my everyday regular routine.  I would do

20   something different, like serve food or whatever I was

21   assigned to do.

22           **Q.    And when you signed up, did you**

23   **understand that you would get paid a dollar a day?**

24           A.    Yes, sir.  And that's not why I did it.

25   I mean, I had money on my books.  I didn't do it for

**2 Supp. App. 14**

Alejandro Menocal 07/22/2020                                    Page 88
ALEJANDRO MENOCAL vs GEO GROUP

1    the money.  I just, like I said, did it to pass time

2    so it could go by quicker and, you know, break the

3    old routine of everyday routine.

4           **Q.   Okay.  Okay.  I'm going to take this**

5    **document down.**

6               **Okay.  And I'm going to play a few phone**

7    **calls now which had to do with -- it's around July 27**

8    **or 28.  Do you -- do you recall actually becoming a**

9    **trustee around July 27 or 28 of 2014?**

10          A.   If that's what they call the employees

11   that serve food, yeah, I guess I was a trustee.  I

12   don't recall the date, but, yeah, somewhere around

13   that area.

14          **Q.   I'm going to just play a couple of**

15   **recordings just to see if that -- if this confirms**

16   **that recollection, okay?**

17          A.   Sure.

18              (Deposition Exhibit 9 was remotely

19   introduced.)

20          **Q.   I'm going to play Exhibit 9, which is**

21   **from July 27, 2014, which is denominated No. 30.**

22              (At this time an audiotape was played.)

23              TELMATE OPERATOR:  This is a Telmate

24   automated operator with a free call from --

25              MR. MENOCAL:  Alex Menocal.

Alejandro Menocal  07/22/2020                                   Page 94
ALEJANDRO MENOCAL vs GEO GROUP

1              (At this time the audiotape was

2     concluded.)

3              Q.   (BY MR. EISMEIER)  Mr. Menocal, is that

4     you in this recording, which is Exhibit 11?

5              A.   Yes, sir.

6              Q.   And who were you talking to?

7              A.   I have no idea.  I couldn't recognize

8     the voice.

9              Q.   Okay.  But not -- it's not a family

10    member?

11             A.   No, sir.

12             Q.   Okay.  Is it fair to say based on

13    Exhibit 11 --

14             MR. MILSTEIN:  Objection.  Can we go off

15    the record for a second?

16             THE VIDEOGRAPHER:  Going off the record.

17    The time is 5:39 p.m. Greenwich Mean Time, 11:39 a.m.

18    Mountain Time.

19             (Recess taken, 5:39 p.m. to 6:02 p.m.

20    GMT; 11:39 a.m. to 12:02 p.m. MDT.)

21             THE VIDEOGRAPHER:  We are back on the

22    record.  The time is 6:02 p.m. Greenwich Mean Time,

23    12:02 p.m. Mountain Time.

24             Q.   (BY MR. EISMEIER)  Hello, Mr. Menocal.

25             A.   Hello, sir.  I'm back.

Alejandro Menocal  07/22/2020                           Page 95
ALEJANDRO MENOCAL vs GEO GROUP

1          Q.   We're back.  Did you talk to anybody

2    over the break?

3          A.   Very little.  Just my daughter to switch

4    computers, but that's all.

5          Q.   Okay.  You didn't talk about this

6    lawsuit?

7          A.   Oh, no, not at all.

8          Q.   Okay.  Let's switch topics a little bit.

9    And remember at the beginning of the deposition we

10   talked about how you got a sleeping living area and a

11   day living area, right?

12         A.   Yes, sir.

13         Q.   And the day living area is where the

14   tables are and the TVs and that sort of thing, right?

15         A.   Yes, correct.

16         Q.   When you first got to the GEO Aurora

17   facility, what were you told about how the day living

18   area would be cleaned?

19         A.   They had a schedule.  You know, you

20   would -- after each meal, you know, people would clean

21   up, but there was a rotation where (inaudible) -- your

22   cell we (inaudible) -- the area three times a day, in

23   the morning -- or after each meal, I should say.

24   And -- and, yeah.  So one cell would do that one day.

25   The next cell would do it the next day, and so on and

Alejandro Menocal  07/22/2020                                    Page 96
**ALEJANDRO MENOCAL vs GEO GROUP**

1   so forth.  And that's where if we didn't do the work

2   that they told us to do, then they would put us in

3   isolation.  And that's why I thought it was very

4   unfair.

5          **Q.   Let me ask you a question.  When you**

6   **first got to GEO, what were you told by anyone at ICE**

7   **or anybody at GEO about cleaning the day living area?**

8                MR. MILSTEIN:  Object to form, asked and

9   answered.

10               THE REPORTER:  Mr. Menocal, could I

11  please have you get closer to the microphone?

12               THE DEPONENT:  Yeah.  I'm sorry.  Yes.

13         A.   But, yeah, that's what I was told

14  that -- that, you know, we rotate, and each cell has

15  to clean the area when it's their turn, and if you

16  guys didn't do it, you would go to the hole,

17  isolation.

18         **Q.   (BY MR. EISMEIER)  Who told you that?**

19         A.   The detainees, and I'm sure the guards

20  too, but for sure the detainees told me that.  You

21  know, it's not like you have a choice not to do it.

22         **Q.   You don't recall specifically a guard**

23  **telling you that, do you?**

24         A.   It could have been, but I know for sure

25  one of -- you know, some of the detainees, we all knew

Alejandro Menocal  07/22/2020                                    Page 97
ALEJANDRO MENOCAL vs GEO GROUP

 1    that -- you know, that it was a rotation thing, and if

 2    one or the whole cell did not do their cleaning, they

 3    would be punished.

 4         Q.   Okay.  Did you see an orientation video

 5    when you arrived at the GEO facility?

 6         A.   No, sir, I don't recall seeing a video.

 7    I recall seeing a handbook, a rule book, but I don't

 8    recall seeing a video.

 9         Q.   Okay.  Here.  Let's -- I'm going to show

10    you a handbook here, and I want to see if you

11    recognize it, so give me a second.

12              (Deposition Exhibit 13 was remotely

13    introduced.)

14         Q.   Mr. Menocal, tell me when you can see a

15    document on your screen.

16         A.   I do see it, yes, sir.

17         Q.   Okay.  And there's a picture -- I'm

18    showing you a picture right now, and I'm scrolling

19    down, and it says "National Detainee Handbook."  Do

20    you see that?

21         A.   I do.

22              MR. MILSTEIN:  Dana, could you scroll

23    down further?  I can't see if this is marked.

24              MR. EISMEIER:  Deposition Exhibit 13.

25              MR. MILSTEIN:  Okay.

Alejandro Menocal  07/22/2020                                          Page 98
ALEJANDRO MENOCAL vs GEO GROUP

1          Q.    (BY MR. EISMEIER)  Do you see that,

2     Mr. Menocal?

3          A.    I do.

4               MR. EISMEIER:  And, Brandt, you should

5     be able to open it in the chat room.

6               MR. MILSTEIN:  Yeah.  I'm hesitant to

7     because I -- it's glitched my computer if I open any

8     of the files you put in chat.

9               MR. EISMEIER:  Okay.  But you can see --

10    you can see it on the screen share now?  Can you see

11    that?

12              MR. MILSTEIN:  I can, thank you, yeah.

13              MR. EISMEIER:  Okay.  Good.

14         Q.    (BY MR. EISMEIER)  All right.

15    Mr. Menocal, do you recognize Exhibit 13?

16         A.    Yes.

17         Q.    Is this the detainee handbook you

18    mentioned a bit ago?

19         A.    Yeah.  Yes, sir, it is.

20         Q.    And were you given this when you arrived

21    at the GEO facility?

22         A.    I believe so, yes, sir.

23         Q.    Did you -- when you -- you got it, did

24    you read it?

25         A.    Yes.

2 Supp. App. 20

Alejandro Menocal 07/22/2020
ALEJANDRO MENOCAL vs GEO GROUP
Page 99

1        Q.    Okay.  And you received it in English,

2    right?

3        A.    Yes, sir, I believe so.

4        Q.    And you read -- you read and write

5    English, right?

6        A.    Yes, sir.

7        Q.    And was there -- did you believe that

8    there was anything in this particular handbook that

9    provided any possible discipline for failing to clean

10   in the day living area?

11       A.    I don't recall specifically.  I remember

12   reading it, but I don't recall it saying that or not.

13       Q.    Sitting here today, do you recall

14   anything in here having to do with discipline for

15   failing to clean a day living area?

16       A.    Yeah.  Like I said, everybody knew that

17   if we didn't follow the procedures, we would be -- you

18   know, we would be put in the hole if we didn't do what

19   we were told, basically.

20       Q.    Okay.  But is it fair to say what you

21   knew about that came from other detainees and not from

22   this handbook?

23            MR. MILSTEIN:  Object to form.

24       A.    I recall the detainees telling me, yeah,

25   what I just told you.  I don't recall the book stating

Alejandro Menocal  07/22/2020                                    Page 100
ALEJANDRO MENOCAL vs GEO GROUP

 1    any of that, no.

 2           Q.   (BY MR. EISMEIER)  Okay.  Just a second.

 3                Is there anything in this particular

 4    handbook that you saw that was threatening to you,

 5    Mr. Menocal?

 6           A.   Can you repeat that, please?

 7           Q.   Sure.  Was there anything in this

 8    handbook that was threatening to you?

 9                MR. MILSTEIN:  Objection.  He hasn't had

10    a chance to look through the whole handbook today.

11           A.   Yeah, I don't recall exactly what it

12    said, and I don't recall what I thought about it at

13    the time, to be honest with you.  It's been a long

14    time.  And I know I read it, but I don't recall if I

15    agreed with whatever they wrote in there or not.

16           Q.   (BY MR. EISMEIER)  Okay.  Were you

17    personally ever disciplined for failing to clean in

18    the day living area?

19           A.   Not personally, no.

20           Q.   Okay.  Were you aware of anyone who was

21    disciplined for failing to clean in the day living

22    area?

23           A.   Yes.  I actually witnessed a group of

24    people that did not follow the procedure, the rules,

25    and they were taken away, and they were put in

U.S. LEGAL SUPPORT, INC
303-832-5966

**2 Supp. App. 22**

Alejandro Menocal  07/22/2020                                    Page 101
**ALEJANDRO MENOCAL vs GEO GROUP**

1    isolation.  And they came back, I believe, a week

2    later, with a different colored uniform.  And I asked

3    people what's up, and they said that they got a new

4    charge for not obeying or following the rules, I

5    believe a higher risk detainee and different colors,

6    whatever it was, from green to red, and I do recall

7    that.  I witnessed it through a glass window from one

8    pod to the other.  I noticed when they took them away

9    and I noticed when they came back.

10           **Q.   Okay.  You've just said a lot, so can we**

11   **break that down a little bit?**

12           A.   What --

13           **Q.   I can take the handbook off here --**

14           A.   Oh.

15           **Q.   -- by the way, so that, yeah, we can see**

16   **better.**

17           **Okay.  So can you tell me who was**

18   **involved that was -- that you say was taken away?  Do**

19   **you remember any of the names?**

20           A.   I do not know.  Like I said, it was a

21   different pod.  I didn't know any of them or knew

22   their names.  I never even talked to them because

23   there was glass partitions or walls in between us, but

24   you could see through the window what was going on in

25   the other pod.

Alejandro Menocal  07/22/2020                                    Page 102
ALEJANDRO MENOCAL vs GEO GROUP

 1          Q.   Okay.  So you were in -- in your pod,

 2    right?

 3          A.   Correct.

 4          Q.   And you saw through the glass to a

 5    different pod, right?

 6          A.   Yes, sir.

 7               MR. MILSTEIN:  Objection, cumulative.

 8          Q.   (BY MR. EISMEIER)  And could you --

 9    could you hear through the glass pod [sic] what was

10    being said?

11          A.   No, sir.

12          Q.   Okay.  So tell me what you -- tell me --

13    just bit by bit, tell me exactly what you saw.

14          A.   I saw a group of people.  I saw the

15    guards come in and take a group of four people,

16    maybe -- it could have been six.  You know, they put

17    them together and then they took them away, and I

18    asked, you know, people in there what's going on.

19    They said the reason they're taking them away is

20    because they didn't do their daily cleanup.  And, you

21    know, you're supposed to do it, so they put them in

22    isolation to make an example, I guess, out of them,

23    so, you know, we would notice or we would know that --

24    you know, that it's part of the procedure to clean or

25    be sent to the hole, basically.

Alejandro Menocal  07/22/2020                                    Page 103
ALEJANDRO MENOCAL vs GEO GROUP

1        Q.    Okay.  You said someone said this to

2   you, right?

3        A.    Yeah, one of the detainees.  I don't

4   recall their name or which one it was, but yeah.

5        Q.    Okay.

6        A.    But everybody knew after a while when

7   you're in there, you know, and word gets around that,

8   you know (inaudible), and obviously, that was a big

9   one, to do it or go to the hole.

10       Q.    So all of your knowledge on this point

11   was what someone said happened in this incident,

12   right?  Another detainee said?

13       A.    Yeah.  And, again, like I said,

14   everybody knew, you know, and the word gets around.

15   You know, important stuff like that, you know, going

16   to the hole is not a pretty place to go, so,

17   obviously, you know, it takes to (inaudible) but,

18   yeah, that's a no-no, or, you know, you better comply

19   or --

20       Q.    Okay.

21             THE REPORTER:  I'm sorry.  I'm having a

22   really hard time hearing you, Mr. Menocal.

23             THE DEPONENT:  I'm sorry.

24       A.    Yeah, that's the reason we all did it,

25   because we all knew that if we didn't follow the

Alejandro Menocal  07/22/2020
ALEJANDRO MENOCAL vs GEO GROUP                                    Page 104

```
 1   rules, that would happen to us, so . . .

 2        Q.   (BY MR. EISMEIER)   Okay.   And just to be

 3   clear, you didn't know any of the people in the other

 4   pod who were taken away, right?

 5        A.   Right.

 6             MR. MILSTEIN:  Objection, asked and

 7   answered.

 8        Q.   (BY MR. EISMEIER)   And you couldn't hear

 9   anything having to do with that particular incident,

10   right?

11             MR. MILSTEIN:  Objection, cumulative,

12   asked and answered.

13             MR. EISMEIER:  Let's please keep the

14   speaking objections down.

15        Q.   (BY MR. EISMEIER)   And so the knowledge

16   that you have is based upon what other detainees told

17   you as opposed to what a guard told you or someone

18   from ICE or GEO; is that right?

19             MR. MILSTEIN:  Objection, compound,

20   asked and answered.

21        A.   Again, from what I can recall, yeah,

22   the -- everybody knew that that was the procedure, so,

23   yeah, I don't know if it was the guards or both the

24   detainees and the guards told me, and that's how I

25   found out where they were headed or why -- we had to
```

Alejandro Menocal  07/22/2020                              Page 105
ALEJANDRO MENOCAL vs GEO GROUP

 1   clean and if not, you know, we would be punished.  So
 2   like I said, everybody knew it, you know.
 3               The hole is not a pretty place, so, you
 4   know people would basically do everything, and, you
 5   know, if you didn't, you would go to the hole, so,
 6   yeah, it was very well known that, you know, you had
 7   to follow the rules or you would be punished.
 8        **Q.   (BY MR. EISMEIER)  And -- okay.  And you**
 9   **don't know if the people who were -- that you saw**
10   **through the glass were being taken away because they**
11   **were in a fight, right?**
12               MR. MILSTEIN:  Objection.
13        A.   No, they were -- it was their turn to
14   clean, and they didn't do it, and so they took them
15   away to isolation, basically.
16        **Q.   (BY MR. EISMEIER)  But you didn't have**
17   **personal knowledge of it.  You didn't watch through --**
18   **you didn't watch through the walls.  You couldn't hear**
19   **what was going on in the other pod, correct?**
20        A.   Through the glass window.
21               MR. MILSTEIN:  Objection, compound.
22        A.   You could see the guards come in.  I
23   could see the guys being gathered.  I could see the
24   guards take those detainees that didn't do their work
25   away.  And, yeah, maybe a week or some days later,

Alejandro Menocal  07/22/2020

**ALEJANDRO MENOCAL vs GEO GROUP**                    Page 106

1    they came back, and I could see them through the glass

2    wall -- window, I'm sorry.  And they were back, and

3    like I said, they were in different suits -- colored

4    suits.  And, again, I asked somebody, and they told me

5    that, yeah, the reason they're in different suits is

6    because they -- they got a new charge, I believe, and

7    that's why they put them in, you know, red suits,

8    higher risk detainees, is what I was told.

9         Q.    (BY MR. EISMEIER)   Okay.  Did you

10   witness the four people who were taken away before the

11   guards took them out?

12              MR. MILSTEIN:  Objection, misstates

13   prior testimony.

14              MR. EISMEIER:  Brandt, really, please,

15   it's coaching.

16              MR. MILSTEIN:  Well, you're telling him

17   four, and he testified earlier it was either four or

18   six.

19        A.    There might have -- there were some

20   cells that had four people in it; there were some

21   cells that have six to eight and maybe even more.

22   But, yeah, that's -- I just said a number four because

23   I do not recall if it was four or six or eight.

24        Q.    (BY MR. EISMEIER)   Right.  Did you spend

25   a lot of time seeing what went on in other dorms?

Alejandro Menocal  07/22/2020                                    Page 107
ALEJANDRO MENOCAL vs GEO GROUP

 1          A.    I walked around a lot.  You know, I
 2   cleaned the rec yard, so I could see.  Yeah, I -- I
 3   would notice other pods.  And the way the building is
 4   laid out, like an octagon, almost, and you could see
 5   more than one pod from your pod.
 6          **Q.    Right.  Was -- now, you understand that**
 7   **a detainee could be sent to segregation for fighting,**
 8   **right?**
 9          A.    Of course, for fighting, for, yeah,
10   different situations, sure.
11          **Q.    For being insolent or insulting to**
12   **others?**
13                MR. MILSTEIN:  Compound.
14          A.    Or a threat or having contraband, sure,
15   there's a number of things why they would send you to
16   isolation.
17          **Q.    (BY MR. EISMEIER)  Right.  And, in fact,**
18   **I think you became a trustee when one of the other**
19   **trustees got in a fight, right?**
20          A.    Yes, sir.
21          **Q.    Okay.  And in your lawsuit, you're not**
22   **complaining that sending someone to segregation for**
23   **getting in a fight is wrong; is that correct?**
24                MR. MILSTEIN:  Objection.
25          A.    I don't know about isolation, but, yeah,

U.S. LEGAL SUPPORT, INC
303-832-5966

**2 Supp. App. 29**

Alejandro Menocal  07/22/2020                                   Page 108
**ALEJANDRO MENOCAL vs GEO GROUP**

 1   I'm sure that we have to be reprimanded if -- if part

 2   of the rule is not to fight or not to do something,

 3   I'm sure they're going to, you know, follow the -- the

 4   procedure, so yeah.

 5          **Q.   (BY MR. EISMEIER)   That's not part of**

 6   **the class action lawsuit, detainees that were sent to**

 7   **segregation for fighting or being insolent; is that**

 8   **right?**

 9          A.   Yeah.  From what I recall, no, that --

10   that is not part of the lawsuit, no.

11          **Q.   It's -- instead it's about failure to**

12   **clean; is that your understanding?**

13          MR. MILSTEIN:  Objection, misstates the

14   prior testimony.

15          A.   Basically, yeah, the -- I don't think

16   it's fair that if we didn't do what you were told, you

17   would be sent to isolation.  You know, it's a private

18   company.  Why do we have to do the cleaning?  I think

19   it's very unfair, and that's why we're suing them for

20   unfairness.  We are not slaves.  We are detainees.

21   And we should be not forced to clean.  That's wrong.

22   If I don't want to clean, I don't want to clean.

23   Don't send me to isolation.  You know, I'm sure

24   there's other ways of trying to make us do what

25   they're supposed to do, but, yeah, isolation is not

Alejandro Menocal  07/22/2020                                              Page 109
ALEJANDRO MENOCAL vs GEO GROUP

1    the answer.  It's horrible in there.  It's inhumane.

2    It's -- it's not right.

3          Q.   (BY MR. EISMEIER)  Let me ask you a

4    question about that.  You were never sent to

5    segregation; is that right?

6          A.   The hole?  Like I said, I believe it's

7    the same thing, medical isolation and, you know,

8    regular isolation.  It's a room with a window looking

9    to the hallway where no one walks, and you have

10   nothing, no book, no television, no -- no contact with

11   anybody.  Maybe you'll see a guard once in a while to

12   drop your meal off, but it's pretty -- pretty lonely,

13   pretty -- pretty hard.

14         Q.   Let's put aside the medical facility,

15   okay?

16         A.   Sure.

17         Q.   Okay.  Putting aside the medical

18   facility, you were never in segregation.  I say

19   "segregation"; you say "the hole."  You were never in

20   segregation; is that right?

21         A.   No.

22              MR. MILSTEIN:  Object, misstates

23   testimony.

24         A.   Well, solitary confinement, I believe,

25   is the same cell where they keep medical isolation

U.S. LEGAL SUPPORT, INC
303-832-5966

**2 Supp. App. 31**

Alejandro Menocal  07/22/2020

**ALEJANDRO MENOCAL vs GEO GROUP**

Page 110

1    people.  I think it's the same thing as -- you know,

2    whether you did something wrong or got in a fight or

3    didn't follow the rules, it's in the same area.  It's

4    just, like I said, a cell with a window and a bed and

5    maybe a toilet and a sink, and that's all.

6          **Q.   (BY MR. EISMEIER)   Okay.  Well, you**

7    **talked about the medical facilities earlier, right?**

8          A.   The medical isolation where I was held,

9    yeah.

10         **Q.   If you got in a fight, you wouldn't be**

11   **sent to the medical unit for isolation, correct?**

12         A.   Like I said, I think they're the same

13   thing.  Maybe across -- in the same hallway you've got

14   all these rooms that are isolation rooms and, you

15   know, more than one person.  So one guy could be there

16   for a medical reason and another guy could be there

17   for a fight.  But, again, you don't see each other.

18   They're isolated.

19         **Q.   You don't -- I'm sorry.**

20         **You don't know if -- if medical**

21   **isolation and segregation are the same thing, do you?**

22         MR. MILSTEIN:  Objection, argumentative,

23   asked and answered.

24         A.   I think that's what I was trying to say,

25   that it's the same thing.  You know, it's just a room

Alejandro Menocal   07/22/2020                                    Page 166
ALEJANDRO MENOCAL vs GEO GROUP

1              (At this time an audiotape was played.)

2              TELMATE OPERATOR:   This is a Telmate

3    automated operator with a free call from --

4              MR. MENOCAL:   Alex Menocal.

5              TELMATE OPERATOR:   -- a detainee at

6    Aurora ICE Processing Center.   This call is subject to

7    recording and monitoring.   Press 1 or star to accept

8    the call.   To deny this call, press 2.   Thank you for

9    using Telmate.

10             MR. JONES:   Hey, what's up, bro?

11             MR. MENOCAL:   Nothing.   What the hell

12   are you doing?

13             MR. JONES:   I just got my hair cut.

14   I've got my 30-year reunion coming up this weekend.

15             MR. MENOCAL:   Nice.

16             (At this time the audiotape was

17   concluded.)

18        **Q.   (BY MR. EISMEIER)   Mr. Menocal, who --**

19   **was that your voice?**

20        A.   That is my voice.

21        **Q.   And who are you talking to?**

22        A.   Sounds like my good friend Chad Jones.

23        **Q.   Chad Jones?   Okay.   I'm going to go up**

24   **to minute 3:25 to 3:47.**

25             (At this time an audiotape was played.)

U.S. LEGAL SUPPORT, INC
303-832-5966

Alejandro Menocal  07/22/2020
ALEJANDRO MENOCAL vs GEO GROUP                                     Page 167

 1            MR. MENOCAL:  And I did a month in

 2   Jeffco, a month in Adams, and here I am doing a

 3   month -- three weeks here so far.  But, yeah, like I

 4   said, there's no niggers, no white boys, and the grub

 5   is good, and --

 6            MR. JONES:  You don't -- you don't --

 7   not (inaudible).  I believe 10 bucks, maybe 20 bucks

 8   on Thursday.

 9            MR. MENOCAL:  Whatever you can.  But

10   write me a letter too and you just --

11            (At this time the audiotape was

12   concluded.)

13            MR. EISMEIER:  All right.

14            MR. MILSTEIN:  I'll put an objection on

15   the record as to the relevancy of this recording,

16   obviously prejudicial, and we'll move to strike.

17       **Q.   (BY MR. EISMEIER)  Mr. Menocal, would**

18   **you agree with me that at least you were telling third**

19   **parties and nonfamily members that the grub was good?**

20       A.   Again, I did, but the reason I told him

21   that is so they wouldn't worry about me.  I consider

22   Mr. Chad Jones like a brother to me.  I love him, he

23   loves me a lot, and I don't want him to be worried.

24   I'm not going to tell him that I get sick every time I

25   eat the food, or the other detainees the same.  So of

2 Supp. App. 34

Alejandro Menocal 07/22/2020                                        Page 168
ALEJANDRO MENOCAL vs GEO GROUP

1    course I smother and tell him I'm doing great in

2    there.  I don't want him to be worried about me.  I

3    really love my family and my close friends, so that's

4    the reason I -- you know, I painted that picture so

5    pretty, so they could think I'm doing well in there,

6    sir.

7            MR. EISMEIER:  It's -- we've been going

8    about an hour.  Let's take a break.  I'm going to wrap

9    up here before much longer.  So I'll see what I've got

10   and then we'll come back.  I don't think it will be a

11   whole lot longer, okay?

12           MR. MILSTEIN:  How much time do you

13   need, Dana?

14           MR. EISMEIER:  Let's take ten minutes.

15           MR. MILSTEIN:  Okay.

16           THE VIDEOGRAPHER:  Going off the record.

17   The time is 8:26 p.m. Greenwich Mean Time, 2:26 p.m.

18   Mountain Time.

19           (Recess taken, 8:26 p.m. to 9:05 p.m.

20   GMT; 2:26 p.m. to 3:05 p.m. MDT.)

21           THE VIDEOGRAPHER:  We are back on the

22   record.  The time is 9:05 p.m. Greenwich Mean Time,

23   3:05 p.m. Mountain Time.

24       Q.   (BY MR. EISMEIER)  Okay.  Mr. Menocal, I

25   just want to clear up something related to what your

Alejandro Menocal  07/22/2020                                    Page 169
ALEJANDRO MENOCAL vs GEO GROUP

1   attorney and I talked about a little bit ago.  Earlier

2   today we reviewed a discovery response from you which

3   you had signed.  Do you recall that?

4        A.   Yes.

5        Q.   And in that one -- I read you this.  In

6   that one, that discovery response that you signed, you

7   said that you did not have a mental injury and aren't

8   making a claim for mental injury, right?

9        A.   Like I said, maybe it's not in the

10  lawsuit, but it sure -- it -- that time I did spend in

11  there, it did disturb me, and I'm sure I'll never

12  forget about it, so there is something there.

13       Q.   All I'm asking you to do is confirm what

14  your attorney --

15       A.   It just -- yeah, it will be with me

16  forever.

17       Q.   I'm just asking you to confirm what your

18  attorney and I stipulated to, that you're not making a

19  claim in this lawsuit for mental injury.  Can you

20  confirm that?

21       A.   Yes.

22       Q.   All right.  Thank you.

23            All right.  During the various breaks

24  today and having talked about the various class

25  representatives and any of the names, you remember all

1           REPORTER'S CERTIFICATE

2    STATE OF COLORADO   )
                         )  ss.
3    ARAPAHOE COUNTY     )

4

5           I, TRACY C. MASUGA, Registered
     Professional Reporter, Certified Realtime Reporter,
6    and Notary Public 19924005553, State of Colorado, do
     hereby certify that previous to the commencement of
7    the examination, the said ALEJANDRO MENOCAL declared
     his testimony in this matter is under penalty of
8    perjury; that the said examination was taken in
     machine shorthand by me remotely and was thereafter
9    reduced to typewritten form; that the foregoing is a
     true transcript of the questions asked, testimony
10   given, and proceedings had.
     I further certify that I am not employed
11   by, related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of
12   this litigation.

13          IN WITNESS WHEREOF, I have affixed my
     signature this 27th day of July, 2020.
14
     My commission expires April 24, 2024.
15

16   ___X___ Reading and signing was requested.

17   _____ Reading and signing was waived.

18   _____ Reading and signing is not required.

19

20                     [signature]

21          _____
            Tracy C. Masuga
22          Registered Professional Reporter
            Certified Realtime Reporter
23

24

25

                 U.S. LEGAL SUPPORT, INC
                     303-832-5966

2 Supp. App. 37

Hugo Hernandez-Ceren  06/24/2020                    Non-Confidential
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 1:14-cv-02887-JLK-MEH
3    _____

4                  VIDEOTAPE DEPOSITION OF:
             HUGO A. HERNANDEZ-CEREN - June 24, 2020
5                     Via RemoteDepoTM
              (NONCONFIDENTIAL ONLY TRANSCRIPT)
6    _____

7    ALEJANDRO MENOCAL, MARCOS BRAMBILA,
     GRISEL XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA,
8    JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO VIZGUERRA,
     and DEMETRIO VALERGA, on their own and on behalf of
9    all others similarly situated,

10   Plaintiffs,

11   v.

12   THE GEO GROUP, INC.,

13   Defendant.
     _____

14
                 PURSUANT TO NOTICE, the videotape
15   deposition of HUGO A. HERNANDEZ-CEREN was taken on
     behalf of the Defendant in La Salle Parish, Louisiana,
16   on June 24, 2020, at 3:11 p.m. GMT, 9:11 a.m. MDT,
     before Tracy C. Masuga, Registered Professional
17   Reporter, Certified Realtime Reporter, and Notary
     Public within Colorado appearing remotely from
18   Arapahoe County, Colorado.

19

20

21

22

23

24

25

Hugo Hernandez-Ceren   06/24/2020          Non-ConfidentialPage 62
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1    detainee who were to testify that they did clean the

2    dorm as a trustee, is it possible that you could be

3    mistaken or you might not have known that that was

4    their job?

5          A.   I know that there were no trustees.

6          Q.   Okay.  Did you ever clean outside of

7    your pod?

8          A.   I'm sorry?

9          Q.   As part of this policy that we have up

10   on the screen, did you ever clean outside of your pod?

11         A.   Yes.  Outside of my -- no.  Outside of

12   my pod, my dorm?

13         Q.   Yeah.  Outside your dorm --

14              Let's describe it one by one.  Did you

15   ever clean your cell as part of the policy?

16         A.   Yes.

17              MR. FREE:  Object to the form.  I'm

18   sorry.

19         Q.   (BY MS. SCHEFFEY)  And then did you ever

20   clean the tables in the area you describe as the

21   common area?

22         A.   Yes.

23         Q.   Okay.  And then did you ever clean any

24   other dorms or any area outside of your dorm where you

25   lived?

Hugo Hernandez-Ceren   06/24/2020          Non-ConfidentialPage 63
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1          A.    No.

2          Q.    Okay.  And so about how many times did

3    you remember participating in this housing unit

4    sanitation program?

5          A.    Every time I was -- I was assigned to by

6    the GEO guard.

7          Q.    Was that every day?

8          A.    That was maybe twice a week.

9          Q.    Okay.  And when you were assigned to

10   clean the areas in the housing unit sanitation, not in

11   any other areas that you might have done as part of

12   the Voluntary Work Program, why did you clean?

13         A.    I cleaned because of a fear.

14         Q.    Okay.  So were you afraid that the TVs

15   would be turned off, as you described earlier?

16         A.    That would be one part, but a fear

17   because if you refused, you were going to be sent to

18   the hole.

19         Q.    Okay.  And did you have the same fear at

20   all other facilities?

21         A.    No.

22         Q.    Okay.  And so the areas you were asked

23   to clean, those were areas you used frequently,

24   correct?

25         A.    Correct.

Hugo Hernandez-Ceren   06/24/2020          Non-ConfidentialPage 64
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
1           Q.   Did you expect someone else to clean up

2    after you?

3           A.   No.

4           Q.   Okay.  I'm going to go to the next

5    document.  I'm going to close this one.  I'm going to

6    send it to be marked here.  Tell me when you're able

7    to see the screen share.

8                (Deposition Exhibit 6 was remotely

9    introduced.)

10               MR. KOSHKIN:  Is this 6?  Is that right?

11               MS. SCHEFFEY:  I have 6.  Is that

12   correct?

13               THE REPORTER:  Yes.

14               MS. SCHEFFEY:  Thank you.

15          Q.   (BY MS. SCHEFFEY)  Okay.  Can you see

16   the document, Mr. Hernandez?

17          A.   Yes.

18          Q.   And just looking at this portion, have

19   you ever seen this document before?

20          A.   Can I read it?

21          Q.   Yeah, of course.  I don't -- let me make

22   sure you have the remote control.  Try now.

23               And as you review this, I can tell you

24   that it will be similar because it's the similar

25   document for a different year.
```

Case 1:14-cv-02887-JLK-MEH   Document 336-4   Filed 10/26/20   USDC Colorado   Page 6 of 41

Appellate Case: 22-1409   Document: 38-2   Date Filed: 03/24/2023   Page: 47

Hugo Hernandez-Ceren   06/24/2020   Non-ConfidentialPage 73
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1                    MS. SCHEFFEY:  Yeah.

 2          Q.    (BY MS. SCHEFFEY)  I want to know if you

 3    can confirm your signatures at the bottom, that it's

 4    your signature, and that you've seen these documents

 5    before.

 6                    MR. FREE:  Okay.  Thanks.

 7                    MS. SCHEFFEY:  And then everything else

 8    will be pretty quick.  And thank you to everyone for

 9    being patient with the technology.

10          Q.    (BY MS. SCHEFFEY)  And, Mr. Hernandez, I

11    can point you to the parts I want to talk to you about

12    if you want to scroll through and just see if you

13    recognize it and if it's your signature on the bottom.

14          A.    I just want to make sure that I'm

15    understanding --

16          Q.    That's fine.

17          A.    -- if that's fine.

18          Q.    Yep.

19          A.    Yes.

20          Q.    Okay.  So is this your signature?

21          A.    Yes.

22          Q.    And have you seen this document before?

23          A.    Yes.

24          Q.    Okay.  And your understanding -- what is

25    your understanding of your signature on this
```

Hugo Hernandez-Ceren   06/24/2020              Non-ConfidentialPage 74
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1   verification?

 2        A.   That I agree.

 3        Q.   Okay.  And are the representations in

 4   this document accurate, to the best of your knowledge?

 5        A.   Yes.

 6        Q.   Okay.  I want to go to a specific one.

 7   So I'm going to go to Interrogatory No. 27, which you

 8   should be able to see on your screen.  This

 9   interrogatory asks you to describe with as much

10   specificity as possible each circumstance in which a

11   GEO employee threatened you with administrative or

12   disciplinary segregation for failing to clean any area

13   of the Aurora Detention Facility.  Did I read that

14   correctly?

15        A.   Yes.

16        Q.   You responded, "Plaintiff does not

17   recall specific dates, but recalls one instance in

18   which a GEO employee threatened Plaintiff with

19   solitary confinement for failure to clean . . . ."

20   Did I read that correctly?

21        A.   Yes.

22        Q.   Can you describe that one instance?

23        A.   One detainee refused to clean and told

24   the GEO guard that he was going to not clean because

25   he was no janitor and that he was not being paid for
```

Hugo Hernandez-Ceren   06/24/2020      Non-Confidential Page 75
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1    that type of job and that they had to hire someone to

2    do that.

3               And the GEO guard took out a bag, a

4    trash bag, and shown it to him and rolled it out the

5    roll, and stretched it out, and said, "Well, let's

6    make it easier.  Here's your bags," trying to give it

7    to him.  And he said, "Just pack your stuff because

8    you're going to go to the hole.  Because this is on

9    the handbook.  This is on the handbook, so it's not

10   something that you can fight for.  Just here's your

11   bag and go to the hole."  And --

12        Q.   What was the name of the detainee?

13               MR. FREE:  Counsel, I don't think he was

14   finished with his answer.

15               MS. SCHEFFEY:  Okay.  I'm sorry.

16        A.   And there was actually a second time

17   where --

18        Q.   (BY MS. SCHEFFEY)  Can you -- can we

19   table the second time so we can just go through the

20   first one and then we'll go to the second one?

21        A.   Okay.

22        Q.   Because I want to just talk about this

23   one instance here where it says there's one instance.

24   So what was the name of the detainee at that one

25   instance?

Hugo Hernandez-Ceren   06/24/2020                    Non-ConfidentialPage 76
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

 1          A.   I don't remember.

 2          Q.   Was it Mr. Valerga?

 3          A.   No.

 4          Q.   Was it Mr. Menocal?

 5          A.   No.

 6          Q.   Was it Mr. Brambila?

 7          A.   No.

 8          Q.   Okay.  And do you know the name of the

 9   guard or officer?

10          A.   Yeah.  The name of the guard is Officer

11   Sanchez.

12          Q.   Okay.  Is that the same Mr. Sanchez you

13   mentioned earlier?

14          A.   Yes.

15          Q.   Do you know his first name?

16          A.   No.  They only carry their last names.

17   We don't know their first names.

18          Q.   Could you describe him to me?

19          A.   He's Mexican.  He's like about

20   five-four, light-skinned, kind of chunky.

21          Q.   Okay.

22          A.   Yeah.

23          Q.   Were there any other Officer Sanchezes

24   that you remember?

25          A.   No.

Hugo Hernandez-Ceren   06/24/2020   Non-ConfidentialPage 77
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1              Q.   I asked just because that's a, you know,
 2     maybe a common last name.
 3              A.   Yeah.
 4              Q.   So it was Mr. Sanchez.  Was the detainee
 5     sent to segregation?
 6              A.   No, because he started cleaning right
 7     away.
 8              Q.   Okay.  And did Mr. Sanchez threaten to
 9     turn off the TV before or any other threatened
10     punishment before threatening segregation?
11              A.   Yes.  I mean, the TVs don't go on.  If
12     the detainee doesn't start cleaning or doesn't -- they
13     refuse to clean, the TVs and the phones don't go on.
14              Q.   Okay.  So after everyone finishes
15     cleaning, then they turn on the TVs and you can watch?
16              A.   Yes, correct.
17              Q.   Were there certain shows that you liked
18     to watch?
19              MR. FREE:  Objection, relevance.
20              A.   No, just any random thing on TV.
21              Q.   (BY MS. SCHEFFEY)  Okay.  So was there a
22     rush to get, you know -- I don't know, Judge Judy is
23     on at 9:00, and everyone wants to get in.
24              A.   No.
25              Q.   No?
```

Hugo Hernandez-Ceren   06/24/2020          Non-ConfidentialPage 78
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1          A.    No.  Not like that, no.  But --

2          **Q.    Okay.  Would other detainees volunteer**

3     **to clean, if someone refused, in order to get the TVs**

4     **turned on?**

5               MR. FREE:  Objection, form.

6          A.    To the best of my knowledge, yeah,

7     sometimes they will -- somebody will jump in just so

8     we can get the TVs on and phones and, you know,

9     take -- take care of it.

10         **Q.    (BY MS. SCHEFFEY)  Okay.  So then I know**

11    **you wanted to tell me about a second instance.  Can**

12    **you tell me what happened on that instance, and if**

13    **possible, tell me the name of the detainee, if you**

14    **remember, and the name of any officers.**

15         A.    Well, there was this other incident with

16    this detainee where he was refusing, and then everyone

17    got involved, and it was like, oh, well, nobody really

18    wants to clean, and the GEO guard felt like he -- he

19    didn't know what to do, so he called a sergeant.  And

20    this is a GEO sergeant.

21              And the sergeant came in and called a

22    meeting for everyone and got everybody together, and

23    stated that, "Okay.  If you refuse to clean, you will

24    be sent to the hole.  If you refuse to listen to the

25    guard, you will be sent to the hole.  And that's not a

Hugo Hernandez-Ceren   06/24/2020                    Non-ConfidentialPage 79
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

 1   place where you want to be at because it's cold in

 2   there.  You're going to lose your privileges.  No

 3   commissary, no visitation, no rec yard.  You're not

 4   going to get enough showers in there.  You're going to

 5   be lonely.  It's pretty cold.

 6            "But the most important thing about this

 7   is that I'm going to make sure that GEO sends their

 8   documents to the court, and you're fighting your

 9   cases, so you do not want to look bad.  Already you

10   look bad with the red uniform on, and now you're going

11   to look even worse because you're coming from the

12   hole.

13            "And we're going to make sure that those

14   documents get there to the judge, and the judge is

15   going to see if she wants to leave you here in the

16   country, so you can go back to your family, or they

17   can remove you.  But you're not going to look good

18   when this gets to the judge."

19        **Q.   And I don't want to cut you off.  Is**

20   **that it?  I have a few follow-ups.**

21        A.   Yeah, yeah, that's it.

22        **Q.   What was the name of the officer in that**

23   **instance, do you recall?**

24        A.   That's a -- that's a sergeant.  I don't

25   remember --

Hugo Hernandez-Ceren   06/24/2020         Non-ConfidentialPage 80
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1              Q.   Well, you described an officer first who
 2    called the sergeant.  Do you remember that name?
 3              A.   Yeah, that was Sanchez.
 4              Q.   Okay.  So that was Sanchez again?
 5              A.   Yeah.
 6              Q.   And do you know the name of the sergeant
 7    who was called?
 8              A.   No, I don't remember his name.
 9              Q.   And do you know the name of any of the
10    detainees who were refusing to clean?
11              A.   Well, it was mostly everyone.  Everyone
12    just felt that they didn't want to clean.
13              Q.   Was Mr. Menocal refusing to clean?
14              A.   Yes.
15              Q.   Was Mr. Brambila refusing to clean?
16              A.   Yes.
17              Q.   Was Mr. Valerga refusing to clean?
18              A.   Yes.
19              Q.   Were you refusing to clean?
20              A.   Yes.
21              Q.   Okay.  And that was a time when you guys
22    all were housed together in the A Pod; is that
23    correct?
24              A.   Yes.
25              Q.   So we went over a little bit here that
```

Hugo Hernandez-Ceren   06/24/2020            Non-ConfidentialPage 81
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1    you had agreed to, you know, provide full and accurate

2    answers in these interrogatories.  Can you tell me why

3    you didn't put that description in response to

4    Interrogatory No. 27 here?

5                MR. FREE:  Objection, misstates

6    testimony.  Also, for the record, these interrogatory

7    responses have been supplemented.

8                You can answer without revealing

9    attorney-client communications.

10               MS. SCHEFFEY:  Yeah.  And, Andrew, can

11   you also put on the record the date they were

12   supplemented so that I know what you're referring to?

13               MR. FREE:  I believe we served his

14   signed rogs on Monday pursuant to the parties'

15   stipulation.

16               MS. SCHEFFEY:  Yeah, those are for a

17   different set of interrogatories.

18          Q.   (BY MS. SCHEFFEY)  You can answer why --

19   why you did not put that description in here in

20   response to Interrogatory No. 27.

21          A.   The reason why is because, I mean, I

22   wasn't remembering everything.  You know, at that --

23   at that moment, I didn't remember everything.

24          Q.   Okay.  Then I'm going to ask you about

25   one more question before we take a break, one more

Hugo Hernandez-Ceren   06/24/2020          Non-ConfidentialPage 96
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1          A.   No.

 2          Q.   Okay.  So then No. 43, there's another

 3   description here of a meeting with a sergeant.  Is

 4   that the same meeting you described earlier?

 5          A.   Yes.

 6          Q.   So this meeting, to your knowledge, only

 7   happened on one occasion?

 8          A.   Yes.

 9          Q.   And was there a reason that everyone was

10   refusing to clean at that point?

11          A.   I don't remember the reason why.  They

12   just -- they were just refusing.  I believe they were

13   new detainees that had come in brand-new, and most of

14   them didn't want to clean, and then everybody just

15   joined in, and just everybody didn't want to clean.

16          Q.   And do you know if that was before or

17   after this lawsuit was filed?

18          A.   To the best of my recollection, it was

19   before.

20          Q.   Okay.  And approximately what month do

21   you think this happened?

22          A.   Maybe a month or two when I got there.

23          Q.   Okay.  So about a month or two after you

24   got there, there was a meeting where you were told of

25   this consequence?
```

```
 1            A.   Yes.

 2            Q.   And on that occasion, you refused to

 3     clean?

 4            A.   Yes.

 5            Q.   And were you placed in solitary

 6     confinement or segregation?

 7                 MR. KOSHKIN:   Objection, asked and

 8     answered.

 9            A.   No.

10            Q.   (BY MS. SCHEFFEY)   Okay.   And I think we

11     can be done with this document for now, then.

12                 So I'm going to just talk to you for a

13     minute and get away from documents because I'm sure

14     you've had enough of seeing them for a bit.

15                 While you were detained, was there a way

16     that you could file a grievance or bring an issue to

17     the attention of the facility?

18            A.   Yes.

19            Q.   And is that called a kite?

20            A.   Yes.

21            Q.   Did you ever file any kites?

22            A.   Yes.

23            Q.   Why did you file kites?

24            A.   Kites is when you're requesting like

25     paper, batteries, you want postage to be placed on
```

Hugo Hernandez-Ceren   06/24/2020          Non-ConfidentialPage 98
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1    your mail, or when you're asking for information.

 2           Q.   When you say "asking for information,"

 3    what -- what would that entail?  What kind of

 4    information would you be asking for?

 5           A.   Let's say when you needed, like, an

 6    address, and you -- like you need an address or for a

 7    court or something, and they will write you back with

 8    an address on it.

 9           Q.   Okay.  Did you ever file a kite to

10    complain about being required to clean up after

11    yourself?

12           A.   No.

13           Q.   Did you ever file a kite to complain

14    about having to clean up after meals?

15           A.   No.

16           Q.   Did you ever file a kite about the

17    amount you were paying -- being paid in the Voluntary

18    Work Program?

19           A.   No.

20           Q.   Okay.  And what about medical care:  Did

21    you receive medical care while you were detained?

22           A.   Yes.

23           Q.   Okay.  What kind of medical care did you

24    get?

25           A.   I have asthma, so I will get my inhaler;
```

Hugo Hernandez-Ceren   06/24/2020        Non-ConfidentialPage 142
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1    you know that you -- you're going to be here for a

2    minute, right?  This is going to take a minute."

3                 And when you ask them, "What's a

4    minute?" they're already telling you it's going to be

5    at least a year, because red suits automatically do a

6    year because they don't have no, like, easy, when you

7    go to the judge, you see the judge.  With this type of

8    uniform, it makes it harder for you to get, like, a

9    bond.

10              Q.   Was your immigration case pending at the

11   time that you were in the Aurora facility?

12              A.   Yes.

13              Q.   Were you fighting it like the guard

14   suggested?

15              A.   Yes.

16              Q.   Did you know that if you lost your case,

17   you could be deported from the United States?

18              A.   Yes.

19                 MS. SCHEFFEY:  Object to form and

20   leading.

21              A.   Yes.

22              Q.   (BY MR. KOSHKIN)  Did you know whether

23   you would be deported?

24              A.   No.

25              Q.   Did you think about your immigration

Hugo Hernandez-Ceren   06/24/2020          Non-ConfidentialPage 143
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

 1    proceedings while you were in Aurora?

 2         A.   Yes.

 3         Q.   How often?

 4         A.   Every day.  Every day.

 5         Q.   You described the layout of your cell

 6    earlier today, and you mentioned that there were three

 7    other detainees in the cell with you as well as a

 8    toilet, beds.  Was there any privacy in the cell?

 9              MS. SCHEFFEY:  Object to form.

10         A.   No.

11         Q.   (BY MR. KOSHKIN)  Was there any privacy

12    when you used the restroom?

13         A.   No.

14         Q.   Did you -- do you know the other

15    detainees that were in the cell with you before you

16    came to Aurora?

17         A.   No.

18         Q.   Earlier today you also described a

19    common area.  Where was the common area relative to

20    the cell where you slept?

21              MS. SCHEFFEY:  Object to form.  You may

22    answer.

23         A.   The common area is right outside the

24    cell.  That's where you have the tables, TVs, phones,

25    microwave, the kiosk for commissary, your shower, and

Hugo Hernandez-Ceren   06/24/2020   Non-ConfidentialPage 144
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1   your rec -- your rec yard.

 2           Q.   (BY MR. KOSHKIN)  What was in the -- oh,

 3   I'm sorry.  Go ahead.

 4           A.   No, I was done.

 5           Q.   Okay.  What was in the rec yard?  What

 6   did -- what did it look like?

 7           A.   The rec yard is a white box just like

 8   this where I'm at right now.  It is all concrete.  It

 9   only has one basketball court.  On the top you can get

10   air because it's open.  It has bars and squares, so

11   you can get air, but it's just extremely cold, so you

12   don't want to be there neither.  It only has one

13   pullup bar, one basketball court, and that's about it.

14           Q.   How often -- how often could you access

15   the common area?

16           A.   As long as your door was open, when

17   there was no count, you can go to the common area.

18           Q.   How often was your door open?

19           A.   The door opens -- usually opens up for

20   breakfast between 5:00 and 5:30, I believe.

21           Q.   And when does it close?

22           A.   I believe it's during the last count,

23   which is 9:00 to 10:00, and then it closes.

24           Q.   What is count?

25           A.   Count is when you have to be inside, and
```

Hugo Hernandez-Ceren   06/24/2020         Non-ConfidentialPage 145
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1   the officer -- the GEO guard passes by and counts each

 2   detainee door by door.

 3           Q.   And did you have to be in your cell

 4   during that time?

 5           A.   Correct.

 6           Q.   Could you leave your cell during that

 7   time?

 8           A.   I'm sorry, I didn't --

 9           Q.   Could you leave your cell during the

10   count time?

11           A.   No.

12           Q.   How did you use the common area?

13           A.   I'll use a table to watch TV, do my

14   legal paperwork, sometimes use the phone.  I will go

15   ahead and check for updates on commissary, see if they

16   added a new -- like a new product.  So I used a

17   microwave for my coffee, and again, used the -- used

18   the table to conversate with other detainees.

19           Q.   You mentioned checking to see if there

20   were new items in commissary.  What is commissary?

21           MS. SCHEFFEY:  Object to form.

22           A.   Commissary is -- it's a kiosk where you

23   can buy like Hot Cheetos, pork rinds, honey buns,

24   candy, coffee, creamer, sugar, tortillas, hot sauce,

25   hot pickles.  Sometimes you can buy shorts, a shirt,
```

U.S. LEGAL SUPPORT, INC.
303-832-5966

Hugo Hernandez-Ceren   06/24/2020   Non-Confidential   Page 147
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1    money but weren't able to purchase commissary?

2          A.    Yes, because GEO uses money orders, and

3    money orders usually take a long time.  Sometimes they

4    don't make it in time through the mail, so you're --

5    you skip the commissary because they don't get there

6    in time.

7          Q.    Now, where did you get the money to

8    purchase goods from commissary?

9          A.    Through family, friends, and working at

10   the library.

11         Q.    So earlier when you were talking with

12   Ms. Scheffey, you -- you went through sort of what a

13   typical -- a typical day looked like.  I just wanted

14   to ask you about a couple parts of your day.

15               So you mentioned that you would start

16   your day at 5:00 a.m. with breakfast.  What time did

17   you usually eat breakfast?

18         A.    Between 5:00, 5:30.

19         Q.    Would you ever eat breakfast later?

20               MS. SCHEFFEY:  Object to form.

21         A.    Well, I usually store my food, but -- I

22   will store my food for later.

23         Q.    (BY MR. KOSHKIN)  Why would you store it

24   for later?

25         A.    Because it was just way too early to eat

Hugo Hernandez-Ceren   06/24/2020           Non-ConfidentialPage 148
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1    at that time, 5:30 in the morning, so I just stored it

2    for later.

3              Q.    What time was lunch?

4              A.    I believe it was around 12:00.

5              Q.    And what about dinner, what time was

6    dinner?

7              A.    Dinner, I believe it was like around

8    5:00.  Sometimes it varies because it wasn't normally

9    at times that it was supposed to be.  Sometimes we

10   would get it 5:00, 5:30, sometimes 6:00.  Sometimes it

11   will take more than that.

12             Q.    Do you know why it varied so much?

13             A.    Because sometimes the kitchen will be

14   off or sometimes the count messed it up or they had to

15   do recount, so it messed everything up for everybody

16   else.  It kept messing it up.

17             Q.    How did the variability of the timing of

18   dinner impact you?

19             A.    Well, typically -- it made a difference

20   because, I mean, I would wait for my law library time,

21   but at that time, I wouldn't go exactly at the time

22   because sometimes we have to go at 7:00, so it kind

23   of -- it did throw it off.

24             Q.    When -- for these meals, how much food

25   were you allowed to take?

Hugo Hernandez-Ceren  06/24/2020          Non-ConfidentialPage 149
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1                    MS. SCHEFFEY:  Object to form.

 2           A.   Only one tray.

 3           Q.   (BY MR. KOSHKIN)  Was the amount on the

 4    tray enough to fill you up?

 5                    MS. SCHEFFEY:  Object to form.

 6           A.   Not really.

 7           Q.   (BY MR. KOSHKIN)  Could you take more if

 8    you were still hungry?

 9           A.   No.

10           Q.   What would you do if you were still

11    hungry?

12           A.   Go see if you -- if you had any

13    commissary, then you would go cook something from your

14    commissary box.

15           Q.   What kind of food did they serve you?

16           A.   Sometimes burgers, hot dogs, meatballs,

17    spaghetti, beans, potato, sometimes cake.  You always

18    get a milk, fruit.  Normally you get a milk and, I

19    believe, a banana and some overcooked veggies.

20           Q.   Did you like the food?

21           A.   Sometimes, not always.

22           Q.   You also -- when you talked about, you

23    know, a typical day, you mentioned that there were --

24    there was a guard in your -- in your dorm; is that

25    right?
```

Hugo Hernandez-Ceren   06/24/2020   Non-ConfidentialPage 150
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1          A.   Yes.

2          Q.   **How many guards were stationed in your**

3     **dorm?**

4          A.   Just one.

5          Q.   **Was it the same guard every day?**

6          A.   No.

7          Q.   **How many different guards supervised the**

8     **dorm while you were in Aurora?**

9               MS. SCHEFFEY:  Object to form.

10         A.   Usually it's one, but sometimes they

11    would cover them for breaks or restroom breaks, and

12    then you would get another one to come in, but it

13    changes every day.

14         Q.   **(BY MR. KOSHKIN)  And so because it**

15    **changed every day, were there many different guards**

16    **that supervised your dorm?**

17         A.   Yes.

18         Q.   **And do you remember every single one of**

19    **those guards?**

20         A.   No.

21         Q.   **How often did you interact with the**

22    **guard supervising your dorm?**

23         A.   Maybe once or twice.

24         Q.   **Per day, per week?**

25         A.   Per day, when they were on shift.

U.S. LEGAL SUPPORT, INC.
303-832-5966

**2 Supp. App. 61**

Hugo Hernandez-Ceren   06/24/2020                    Non-ConfidentialPage 157
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1    a Marine, and he's a veteran from Vietnam.  And when I

2    told him I wanted to be a Marine, and he started

3    explaining to me about the military and, you know,

4    that it's good that I want to be in the military and

5    fight for the country.  And we became real close

6    because of the military, you know.  And he would tell

7    me most of the time good luck with my case and

8    hopefully I get out and -- and, you know, become

9    military, you know.

10        Q.   (BY MR. KOSHKIN)  Why did you want to

11   join the military?

12        A.   The reason why I wanted to join the

13   military is because to -- to me, I mean, I've been

14   here since I was a baby, and to me, this is my

15   country, and all I want is to serve my country and

16   be -- be part of my country because I believe this is

17   my country, you know.

18        Q.   So when you were -- why did you take the

19   job in the library?

20        A.   Give me a second, please.

21        Q.   Take your time.

22        MS. SCHEFFEY:  I'm also going to object

23   that this is asked and answered.

24        A.   Can you repeat the question, please?

25        Q.   (BY MR. KOSHKIN)  Why did you take the

Hugo Hernandez-Ceren   06/24/2020          Non-ConfidentialPage 158
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1   job working in the library?

2          A.   Because I was afraid of getting

3   deported, and I needed access to legal materials.

4          Q.   How did it make you feel that you were

5   only paid a dollar a day for your work there?

6               MS. SCHEFFEY:  Object to form.

7          A.   It made me feel angry because I know

8   that paralegals and any librarian out there is not

9   getting paid a dollar a day for what they're doing.

10         Q.   (BY MR. KOSHKIN)  Did you ever complain

11   about the wage?

12              MS. SCHEFFEY:  Object to form and asked

13   and answered.

14         A.   No, because the one dollar is not

15   negotiable.

16         Q.   (BY MR. KOSHKIN)  You also talked

17   throughout the day today, and you mentioned in your --

18   when you explained a typical day at the facility, how

19   you spent some time cleaning up the common area; is

20   that right?

21         A.   Correct.

22              MS. SCHEFFEY:  Object to form.

23         Q.   (BY MR. KOSHKIN)  How did you know that

24   you had to clean the common area?

25         A.   Because the GEO guard will tell you by

2 Supp. App. 63

Hugo Hernandez-Ceren   06/24/2020                    Non-ConfidentialPage 159
**ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.**

 1    choosing the cells, and that's how you know that you

 2    had to go and clean the common area.

 3         **Q.   Did you say -- when the GEO guard told**

 4    **you you had to clean, did you say no?**

 5         A.   No.

 6              MS. SCHEFFEY:  Object to form.

 7         A.   No, because it was mandatory.

 8         **Q.   (BY MR. KOSHKIN)  How did you know that**

 9    **it was mandatory?**

10         A.   Because the GEO guard would tell you

11    that it's in the handbook, and if you refuse, you were

12    going to be sent to the hole.  And the first thing to

13    that is he's going to show you that two bags or give

14    you a bag so you can pack your stuff and go to the

15    hole.  So it's mandatory.

16         **Q.   Did you ever see a guard bring out the**

17    **trash bag like you just described?**

18         A.   Yes.

19              MS. SCHEFFEY:  Object to form.

20         A.   Yes.

21         **Q.   (BY MR. KOSHKIN)  What did the guard say**

22    **when he did that?**

23         A.   Well, when one of the detainees said,

24    "No, I'm not a janitor.  I'm not doing this because

25    I'm not a janitor," well, one of the GEO guards said,

Hugo Hernandez-Ceren   06/24/2020          Non-ConfidentialPage 160
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1    "Okay.  Well, let's not argue anymore.  Let's make it

2    easy.  And here, here you go," and just stretched out

3    two bags, the big garbage bags, and said, "Here."

4    Ripped them off and then said, "Here.  Then let's make

5    it easier.  I mean, you don't want to do it, you can

6    just go to the hole.  It's -- it's simple."  And the

7    detainee eventually started just cleaning.

8         Q.    What was the guard's tone like when he

9    told the detainee?

10            MS. SCHEFFEY:  Object to form.

11        A.    He was like -- like sort of angry, but

12   more like -- like when someone is, like, being

13   sarcastic and, like, "Here," aggressive.

14        Q.    (BY MS. SCHEFFEY)  Was the guard -- was

15   the guard looking at the detainee when he said that?

16        A.    Yes, yes.

17        Q.    How was he looking at him?

18        A.    Well, he will point him out, like

19   saying, "Okay.  Well, here -- here's your bag, and

20   pack it up," and like, "We're not going to argue

21   anymore.  We're not going to argue.  Let's just make

22   it easy.  Either you start or the common area will not

23   open until it's done."

24            So -- and then other detainees will

25   start complaining and start telling you, "Just go

2 Supp. App. 65

Hugo Hernandez-Ceren   06/24/2020   Non-ConfidentialPage 161
**ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.**

1   ahead.  Just do it.  Do it," and, you know, fall in

2   and start cleaning.  Eventually you'll start cleaning

3   because, I mean, now you have not only that, that the

4   GEO guard is telling you, but now you have everybody

5   else on you, telling you that you have to clean it and

6   just go forward.

7        **Q.   When the GEO guard showed you the trash**

8   **bag, what was he implying?  What was your**

9   **understanding of what the guard was implying?**

10          MS. SCHEFFEY:  Object to form.

11       A.   The bag simply means, "Pack your stuff.

12   You're going to the hole."  That's what that means.

13       **Q.   (BY MR. KOSHKIN)  Was the time you just**

14   **described with the detainee that didn't want to be --**

15   **that he wasn't a janitor, was that the only time you**

16   **ever saw the guard bring out the trash bag?**

17       A.   I saw it multiple times with different

18   guards where they -- where they show the bag or they

19   at least will show you the roll.

20       **Q.   Well, what did they say?  Can you**

21   **describe another incident?  What did the guard say?**

22       A.   Another guard said, "Okay.  Well, here,"

23   and just put the entire roll on top of the -- his

24   desk.  He said, "Hey, if you don't -- if you don't

25   want to do it, well, let's just start counting," and

Hugo Hernandez-Ceren   06/24/2020        Non-ConfidentialPage 162
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1   put the -- put the roll right on top.  And, you know,

2   the roll means the garbage bag and the garbage bag

3   means the hole.  So we all knew what was that roll

4   about or the garbage bag.

5        **Q.   And was there any other way that you**

6   **knew that the cleaning was mandatory?**

7             MS. SCHEFFEY:  Object to form.

8        A.   Just by the GEO guard and the handbooks

9   and --

10       **Q.   (BY MR. KOSHKIN)  You mentioned earlier**

11  **today a story where a sergeant came and spoke to your**

12  **pod.  Did the sergeant tell you that -- in that story**

13  **you mentioned, the sergeant told you that if you**

14  **didn't clean, you would go to the hole.  From that,**

15  **did you understand that you had to clean or otherwise**

16  **go to the hole?**

17       A.   Yes.

18            MS. SCHEFFEY:  Object to form, leading,

19  and misstates prior testimony.

20       A.   Yeah, that will be -- that will tell you

21  completely that it was mandatory, because now it's --

22  it's a sergeant telling you, and that -- that will

23  definitely show you that it's really mandatory.

24       **Q.   (BY MR. KOSHKIN)  When you had to clean**

25  **due to this mandatory cleaning, what did you clean?**

2 Supp. App. 67

Hugo Hernandez-Ceren   06/24/2020          Non-ConfidentialPage 163
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1                MS. SCHEFFEY:  Object to form.

2          A.    You have to grab anything.  Either you

3    wipe the tables, you mop, you sweep, you squeegee, you

4    clean the rec yard, wipe the -- the phones, clean the

5    microwave, change the garbage bag, clean the showers,

6    disinfect the showers, pick up all the trash, like the

7    toothpaste, the shampoo -- the shampoo bottles.  And

8    that's -- that's about it.  That's all the things.

9    That's about it.

10         **Q.    (BY MR. KOSHKIN)  When you say you**

11   **cleaned the rec yard, for example, what did -- what**

12   **did that entail?**

13         A.    The rec yard, you have to sweep it, just

14   pick up any -- any trash, mostly sweep it.

15         **Q.    Was it a large space?**

16         A.    Not that much.  It was -- it was a small

17   space, just similar to this, just way bigger.  You can

18   probably fit probably maybe 10, 15 people in there,

19   but it's -- it's a small, little box.

20         **Q.    What material is the floor that you were**

21   **sweeping?**

22         A.    Concrete.

23         **Q.    Was there usually a lot of trash?**

24                MS. SCHEFFEY:  Object to form.

25         A.    Sometimes.

**2 Supp. App. 68**

Hugo Hernandez-Ceren   06/24/2020                    Non-Confidential Page 164
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1              Q.   (BY MR. KOSHKIN)  What about cleaning

 2     the phones:  What did you have to do to clean the

 3     phones?

 4              A.   You have to disinfect the phones and

 5     wipe the phones and wipe the stalls too.  Like the

 6     dividers, you have to wipe those too.

 7              Q.   What did you use to wipe those?

 8              A.   Usually, you'll get the -- the -- the

 9     window cleaner, and that will be -- that same cleaner

10     will be for tables, microwave, everything.  That

11     window cleaner was for everything.

12              Q.   And you mentioned the microwave again.

13     What did you -- what did cleaning the microwave

14     require?

15              MS. SCHEFFEY:  Object to form.

16              A.   You have to disinfect the microwave,

17     spray the inside and wipe it and then close it and

18     then spray the outside and wipe it.

19              Q.   (BY MR. KOSHKIN)  You also mentioned

20     sweeping, mopping, and squeegeeing the floor.  Can you

21     describe what those terms mean?

22              A.   Well, first you've got to sweep the

23     entire floor, and then -- then you've got to mop it,

24     and then since it's dry and that type of floor doesn't

25     dry that fast, because it's full of wax, so it won't
```

Hugo Hernandez-Ceren   06/24/2020                    Non-ConfidentialPage 165
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1    dry fast, so then you have to squeegee the water to

 2    one of the drains and then let it -- let it dry.

 3           Q.   You also mentioned cleaning the showers.

 4    Can you describe what that process was like?

 5           A.   The showers -- the showers have

 6    curtains.  You have to spray the showers to disinfect

 7    the curtains, and you have to spray the showerheads,

 8    the buttons, the little space where you put your soap,

 9    and then you've got to -- you've also got to sweep it,

10    pick up all the empty shampoo bottles, toothbrushes,

11    stuff like that.

12           Q.   Were these all messes that you made?

13                MS. SCHEFFEY:  Object to form.

14           A.   No.

15           Q.   (BY MR. KOSHKIN)  Were they messes that

16    other detainees in the dorm made?

17           A.   Yes.

18           Q.   How long did all this cleaning take?

19           A.   About an hour -- about an hour to an

20    hour 30 minutes sometimes.

21           Q.   Were you able to use the common area if

22    you weren't cleaning, during the cleanup time?

23           A.   No.

24           Q.   And how often did you participate in the

25    cleanup?
```

**2 Supp. App. 70**

Hugo Hernandez-Ceren   06/24/2020          Non-ConfidentialPage 166
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1          A.   About twice a week, depending on the --

2   on the -- on the size of the dorm.  If it was full,

3   maybe once.  If it's not full, twice.

4          **Q.   Why did you do this cleaning?**

5          A.   Because I was afraid about my

6   immigration case.  I was afraid about my immigration

7   case, so I wouldn't -- you know, I believe that I had

8   to because of my immigration case.

9          **Q.   What was the connection between your**

10   **immigration case and the cleaning?**

11          A.   Well, like the sergeant said, if you go

12   to the hole, that's going to follow you to the

13   immigration judge, so I was avoiding going to the hole

14   or getting any new write-ups or, you know, getting in

15   trouble.

16          **Q.   Were you ever sent to the hole in**

17   **Aurora?**

18          A.   No, no.

19          **Q.   Were you aware of what the hole was?**

20          A.   No.

21          **Q.   You weren't aware of what the hole was?**

22   **Is that what you said?**

23          MS. SCHEFFEY:  Object to form, and asked

24   and answered.

25          A.   What was the question?

**2 Supp. App. 71**

Hugo Hernandez-Ceren   06/24/2020      Non-ConfidentialPage 167
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
1              Q.    (BY MR. KOSHKIN)  Were you aware of what

2    the hole was?

3              A.    Yes.

4              Q.    How did you know what the hole was?

5              A.    By other detainees and GEO guards.

6              Q.    What did the guards tell you about the

7    hole?

8              A.    They would tell you how you don't want

9    to be in there because it's cold; you're going to be

10   lonely; you're going to lose commissary; you're going

11   to lose rec yard; you were going to lose visitations;

12   and you were not going to be able to sleep; you were

13   not going to be able to talk to others, sort of thing,

14   yeah; and that it was a terrible place to go to.

15             Q.    What was your reaction to the guards

16   telling you this?

17             A.    It was -- it was a place where I'm -- I

18   wasn't going to try to go to, you know.

19             Q.    Why not?

20             A.    Well, because it was going to damage my

21   immigration case.  If -- if I went to the hole, it was

22   just going to damage my immigration case, and that's

23   something that I don't want.  I mean, I do want to

24   fight my case and be released to my family.  That's

25   not something I want to do where I want to get in
```

Hugo Hernandez-Ceren   06/24/2020     Non-ConfidentialPage 168
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1    trouble.
 2          Q.   We talked earlier about a couple people
 3    that you knew who went to the hole for fighting.  And
 4    did you interact with those people regularly in the
 5    dorms?
 6          A.   Yes.  We talked.
 7          Q.   Did you know that they were -- when they
 8    were sent to the hole?
 9          A.   Yes.
10          Q.   Did they return back to the dorm after
11    they were sent to the hole?
12          A.   Yes.
13          Q.   Did you interact with them after they
14    returned from the hole?
15          A.   Yes.
16          Q.   Did you discuss their experience in the
17    hole with them?
18          A.   Yes.
19          Q.   What did they tell you about the hole?
20          A.   They said it was a lonely place.  They
21    were scared of being there.  That you were going to be
22    starving; that you didn't have no commissary; you
23    didn't get no visits; and you feel like you're losing
24    your mind because you're -- you can't go out from your
25    cell.  So you've got to be locked in in your cell, so
```

U.S. LEGAL SUPPORT, INC.
303-832-5966

**2 Supp. App. 73**

Hugo Hernandez-Ceren   06/24/2020        Non-ConfidentialPage 169
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1    it's -- that they were losing their mind in there.

 2    And that you were not going to sleep because the light

 3    was, like, bright, so you can't sleep in there, and

 4    it's cold.

 5         Q.    How did hearing about that experience

 6    make you feel about the hole?

 7              MS. SCHEFFEY:  Object to form and object

 8    that it calls for hearsay.

 9         A.    Same.  I mean, it's -- it's a place

10    where I don't want to go to.

11         Q.    (BY MR. KOSHKIN)  Did you -- you said

12    earlier that you -- you interacted with them after

13    they returned from the hole.  Did you observe any

14    changes in their behavior?

15              MS. SCHEFFEY:  Object to form.

16         A.    Yes.

17         Q.    (BY MR. KOSHKIN)  What sort of changes?

18         A.    I seen it how they were really skinny;

19    they had lost a lot of weight.  They wouldn't talk to

20    other people anymore.  They seemed afraid.  They --

21    they became antisocial.  They were -- they were not

22    trying to be violent anymore or trying to cause any --

23    any fights.  They were just trying to go by the rules

24    now.

25         Q.    How did seeing these behavioral changes
```

Hugo Hernandez-Ceren  06/24/2020          Non-ConfidentialPage 170
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1   make you feel?

2        A.   It's -- it's enough for me not to want

3   to go to the hole.

4        Q.   Yeah, what -- and so what was your kind

5   of overall impression of the hole itself as a place

6   based on, you know, what you heard from these guards,

7   from these other detainees, and what you observed?

8        MS. SCHEFFEY:  Object to form, asked and

9   answered, and specifically calls for hearsay.

10       A.   I was afraid and, of course, it was a

11  place where I was trying to avoid.  I mean, that --

12  that was -- that was going to destroy my immigration

13  case if I went there.

14       MR. KOSHKIN:  All right.  I think that's

15  everything that I have.  Could we just take a quick

16  break so that I can confer with Andrew for a second to

17  see if there's anything else?

18       MS. SCHEFFEY:  Yeah.  And then

19  afterwards, I'm going to want to recross.

20       THE VIDEOGRAPHER:  The time is 8:36 p.m.

21  GMT, and we are off the record.

22       (Recess taken, 8:36 p.m. to 8:46 p.m.

23  GMT; 2:36 p.m. to 2:46 p.m. MDT.)

24       THE VIDEOGRAPHER:  The time is 8:46 p.m.

25  GMT, and we are back on the record.

Hugo Hernandez-Ceren   06/24/2020          Non-ConfidentialPage 171
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1          Q.   (BY MR. KOSHKIN)  All right.

2    Mr. Hernandez, I just have one more -- a couple quick

3    more questions for you.

4               I'm going to start by introducing an

5    exhibit.  I'm going to upload it to the chat, and then

6    bear with me while I do the screen share piece as I

7    don't think I practiced this as much as Adrienne may

8    have.

9               MS. SCHEFFEY:  If I can help, let me

10   know.

11              MR. KOSHKIN:  No, I'm good.  I think

12   I -- you guys see it in the chat?

13              MS. SCHEFFEY:  No, not yet.  Oh, it's a

14   screen share?  Oh, in the chat first.

15              MR. KOSHKIN:  Just for you guys, it's in

16   the chat now.

17              MS. SCHEFFEY:  Hang on.  Let me --

18              (Deposition Exhibit 14 was remotely

19   introduced.)

20              MR. KOSHKIN:  And you can see I'm, like,

21   scrolling the document.  This is working correctly?

22              MS. SCHEFFEY:  Correct.

23              THE DEPONENT:  Yes.

24         Q.   (BY MR. KOSHKIN)  Okay.  So I'm

25   introducing a document which is Exhibit -- I don't

Hugo Hernandez-Ceren   06/24/2020   Non-ConfidentialPage 214
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
1                    REPORTER'S CERTIFICATE

2    STATE OF COLORADO          )
                                )  ss.
3    ARAPAHOE COUNTY            )

4
                    I, TRACY C. MASUGA, Registered
5    Professional Reporter, Certified Realtime Reporter,
     and Notary Public 19924005553, State of Colorado, do
6    hereby certify that previous to the commencement of
     the examination, the said HUGO A. HERNANDEZ-CEREN
7    declared his testimony in this matter is under penalty
     of perjury; that the said examination was taken in
8    machine shorthand by me remotely and was thereafter
     reduced to typewritten form; that the foregoing is a
9    true transcript of the questions asked, testimony
     given, and proceedings had.
10
                    I further certify that I am not employed
11   by, related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of
12   this litigation.

13                  IN WITNESS WHEREOF, I have affixed my
     signature this 30th day of June, 2020.
14
                    My commission expires April 24, 2024.
15

16   __X__ Reading and Signing was requested.

17   _____ Reading and Signing was waived.

18   _____ Reading and Signing is not required.

19

20

21                        _____
                          Tracy C. Masuga
22

23

24

25
```

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLORADO

 3

 4   ALEJANDRO MENOCAL, MARCOS
     BRAMBILA, GRISEL XAHUENTITLA,
 5   HUGO HERNANDEZ, LOURDES
     ARGUETA, JESUS GAYTAN, OLGA
 6   ALEXAKLINA, DAGOBERTO           No. 14-CV-02887-JLK
     VIZGUERRA, and DEMETRIO
 7   VALERGA, on their own behalf
     and on behalf of all others
 8   similarly situated,

 9                Plaintiffs,

10        vs.

11   THE GEO GROUP, INC.,

12                Defendant.
     _____/
13

14

15

           DEPOSITION OF DAGOBERTO VIZGUERRA
16
                 Mexico City, Mexico
17
             Wednesday, February 21, 2018
18

19

20

21

22

23   REPORTED BY:

24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25   Pages 1 - 110
```

 1      Q.  Do you recall if anybody else was there with you
 2  when Alejandro was talking about this lawsuit -- or
 3  bringing the lawsuit?
 4          MR. FREE:  Object to form.
 5          THE WITNESS:  Because --                          10:06:55
 6      Q.  BY MR. DEACON:  Who?
 7      A.  I don't know.
 8      Q.  You don't know.
 9      A.  Can you rephrase the question?  I didn't --
10      Q.  Yeah.  Who was there -- when Alejandro Menocal    10:07:04
11  was talking about bringing this lawsuit for more money,
12  for the voluntary work program, getting paid $1 a day,
13  who else was with you -- who else was he telling this do?
14          MR. FREE:  Object to form.
15          THE WITNESS:  I don't remember.                   10:07:20
16      Q.  BY MR. DEACON:  Was it more than just you?
17      A.  Yes.
18      Q.  Did you ever know Marcos Brambila?
19      A.  No, I don't remember.
20      Q.  How about Grisel -- I won't even try to           10:07:30
21  pronounce her last name.  Do you know a Grisel?
22      A.  No.
23      Q.  Did we decide it was "Z"?  How do you pronounce
24  it?  You're not going to help me.
25          How about Hugo Hernandez?                         10:07:44

```
 1       A.   I don't know.
 2       Q.   Okay.  Did you know Lourdes?
 3       A.   No.
 4       Q.   And you know Jesus.  How about Olga?  Did you
 5   know Olga Alexaklina?                                    10:07:59
 6       A.   No.
 7       Q.   And you don't know Demetrio?
 8       A.   I don't remember.
 9       Q.   Now, you mentioned that you -- you recall
10   somebody being placed in administrative segregation for  10:08:19
11   not cleaning.
12       A.   Yes.
13       Q.   But you don't remember their name?
14       A.   No.
15       Q.   When did this happen?                           10:08:28
16       A.   It was, like, the second or the third day I was
17   in there.
18       Q.   The second or third day you were there?
19       A.   Yes.
20       Q.   Okay.  So -- all right.  Do you know how long   10:08:40
21   they stayed there?
22       A.   For a month.
23       Q.   A month?
24            Do you remember the guard that told them they
25   had to go to segregation?                                10:08:57
```

```
 1        A.   There was different ones.

 2        Q.   You don't remember which one it was?

 3        A.   No.

 4        Q.   Other than that one individual that you said was

 5   placed in segregation two days after you got there, that        10:09:11

 6   you don't remember the name of, or the guard that you

 7   don't know, anybody else placed in segregation?

 8             MR. FREE:  Object to form.

 9             THE WITNESS:  Not that I know.

10        Q.   BY MR. DEACON:  Okay.  Under the next section,        10:09:28

11   Number 11 says, "Disciplinary Process."  Second paragraph

12   says, "If you are facing possible disciplinary action

13   involving a violation of the administrative rule, you

14   have a right to due process, including the right to have

15   any disciplinary matter resolved promptly."                    10:09:42

16             Did you understand that if you were placed in

17   segregation you had a right to an appeal?

18        A.   No.

19        Q.   All right.  You don't remember going through the

20   process, if you had any --                                     10:09:55

21        A.   No.

22        Q.   -- beef with anybody?

23        A.   No.

24        Q.   Do you know if this individual even exercised

25   his due process rights?                                        10:10:04
```

```
 1        A.  I don't know.

 2        Q.  Did you ever talk to this individual after he

 3 went to the segregation?

 4        A.  No.

 5        Q.  Did he ever return to your pod?          10:10:12

 6        A.  Once.

 7        Q.  Okay.  But you never spoke to him?

 8        A.  No.

 9        Q.  If you turn to 83 -- turn a couple pages.  It's

10 Bates labeled 83.  It says, "Communication with Staff,"   10:10:39

11 Number 13.

12        Do you see that?

13        A.  Uh-huh.

14        Q.   It says, "You are encouraged to speak informally

15 with staff about everyday concerns and for information   10:10:49

16 about facility, policies and procedures."

17        Did you ever speak to the staff informally about

18 any of that?

19        MR. FREE:  Object to form.

20        THE WITNESS:  No.                              10:11:00

21        Q.  BY MR. DEACON:  "Once each week ICE/ERO staff

22 will visit the facility and talk with detainees."

23        Did you ever speak to any ICE staff while you

24 were there?

25        A.  No.                                        10:11:14
```

```
 1      Q.  Okay.  Did any of the requests you had for

 2  dental needs, were they taken care of at Aurora?

 3      A.  No.  It was in Adams County.

 4      Q.  Pardon me?

 5      A.  I think it was in Adams County where I had my      11:30:05

 6  tooth pulled out.

 7      Q.  I showed you one where you actually had it done

 8  in Aurora.  Do you remember that?

 9      A.  No.

10          MR. FREE:  Object to form.                          11:30:19

11      Q.  BY MR. DEACON:  Okay.  Did you ever have reason

12  to sit down with a mental health professional, like a

13  counselor or anything like that?

14      A.  No.

15      Q.  Who were some of the detainees that shared a       11:30:57

16  room with you at Aurora?

17      A.  Jesus and some other ones.

18      Q.  Who?

19      A.  Jesus.

20      Q.  Jesus?                                              11:31:05

21      A.  Yes.

22      Q.  Anybody else you can remember?

23      A.  No.  I don't remember their names.

24      Q.  Do you remember the names of any of the officers

25  at Aurora, other than Officer Anderson?                    11:31:28
```

```
 1      A.  No, I don't remember.

 2      Q.  Pardon me?

 3      A.  No.

 4      Q.  Have you been in communication with any of the

 5 people that worked at Aurora since you left?         11:31:48

 6      A.  No.  No.

 7      Q.  Okay.  What was -- what was it that you told me

 8 about Officer Anderson?  What did he do, or what did you

 9 give him?

10          MR. FREE:  Object to the form.              11:32:02

11      Q.  BY MR. DEACON:  Do you remember?

12          MR. FREE:  Same question -- or same objection.

13          THE WITNESS:  I don't know.  I didn't understand

14 what you said.

15      Q.  BY MR. DEACON:  Bad question.  Thank you for   11:32:10

16 asking me to repeat it.

17          What do you remember about Officer Anderson?

18      A.  He was the laundry supervisor.

19      Q.  Laundry supervisor.  Thank you.  Okay.

20          Do you remember any of the officers that were in  11:32:32

21 your pod area?

22      A.  One, but I don't -- I don't remember his name.

23      Q.  Okay.  It was a male?

24      A.  Yes.

25      Q.  But you don't remember his name?           11:32:46
```

1    A.  No.

2    Q.  Is there anything about that officer that is

3  relevant to the claims you're making in this case.

4         MR. FREE:  Object to the form.

5         THE WITNESS:  They were sometimes screaming          11:33:00

6  about going to segregation.

7    Q.  BY MR. DEACON:  To who?

8    A.  To all of us.

9    Q.  For what?

10   A.  For not cleaning.                                     11:33:07

11   Q.  But to your knowledge, only one person ever --

12   A.  Yes.

13   Q.  -- went?

14       And that was the second day you were there?

15   A.  Yes.                                                  11:33:18

16   Q.  And at no time do you remember them ever turning

17  off the TV because people failed to clean; correct?

18   A.  I don't remember.

19   Q.  Okay.  But you don't remember this guard's name?

20   A.  No.                                                   11:33:33

21   Q.  Do you remember what he looked like?

22   A.  Yes.

23   Q.  What did he look like?

24   A.  He always wore a hat, and he was a tall white

25  dude?                                                      11:33:42

```
 1      Q.  Tall white dude?

 2      A.  Yes.

 3      Q.  When you say "tall," are you talking about over

 4  six feet?

 5      A.  A little bit shorter.                          11:33:47

 6      Q.  Pardon me?

 7      A.  A little bit shorter.

 8      Q.  Okay.  How tall are you?

 9      A.  5'4''.

10      Q.  5'4''.  Okay.                                 11:33:54

11          So he was something under six feet.  Do you

12  remember his age, approximate age?

13      A.  No.

14      Q.  Did -- do you remember the color of his hair?

15      A.  No.  He always wore a hat.                    11:34:05

16      Q.  A baseball cap?

17      A.  Yes.

18      Q.  Do you remember his size, build?  Was he heavy?

19  Was he skinny?  Was he medium build?

20      A.  Medium build.                                 11:34:16

21      Q.  Do you remember any of the other officers?

22      A.  No.

23      Q.  Do you remember any of the people that were

24  above the officers?

25          MR. FREE:  Object to the form.                11:34:37
```

```
1  STATE OF CALIFORNIA      ) ss:

2  COUNTY OF MARIN          )

3

4          I, LESLIE ROCKWOOD ROSAS, CSR NO. 3452, do

5  hereby certify:

6          That the foregoing deposition testimony was

7  taken before me at the time and place therein set forth

8  and at which time the witness was administered the oath;

9          That testimony of the witness and all objections

10 made by counsel at the time of the examination were

11 recorded stenographically by me, and were thereafter

12 transcribed under my direction and supervision, and that

13 the foregoing pages contain a full, true and accurate

14 record of all proceedings and testimony to the best of my

15 skill and ability.

16         I further certify that I am neither counsel for

17 any party to said action, nor am I related to any party

18 to said action, nor am I in any way interested in the

19 outcome thereof.

20         IN WITNESS WHEREOF, I have subscribed my name

21 this 1st day of March, 2018.

22

23

24         _____

25              LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Appellate Case: 22-1409     Document: 38-2     Date Filed: 03/24/2023     Page: 93

# MENOCAL

# VS.

# THE GEO GROUP

### Deposition

## JESUS YEPEZ GAYTAN

*11/16/2017*

---

## AB Court Reporting & Video
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

*AB Court Reporting & Video*

1    A    The money didn't have -- it didn't show

2  up in the computers when it was supposed to.

3    Q    You got paid the next day --

4    A    No.

5    Q    -- $1.

6    A    No.  And it wasn't the next day that

7  you get paid.  It was each Friday.

8    Q    Each Friday you got paid?

9    A    Yeah.

10    Q    Okay.  And you're saying --  Is there

11  any time you didn't get paid when you were

12  supposed to be paid?

13    A    Yeah.

14    Q    When was that?

15    A    Three --  Three times.  I don't recall

16  the dates, but it was three times.

17    Q    Three times you didn't get your $1 a

18  day that -- when you were supposed to.

19         Is that what you're saying?

20    A    Uh-huh.

21    Q    Yes?

22    A    Yeah.

23    Q    Okay.  But you didn't have to work if

24  you didn't want to, right?

25    A    No.

1    Q    Right?

2    A    I didn't have to work?

3    Q    Right.

4    A    No.

5    Q    You're agreeing with me, right?

6    A    That I didn't have to work?

7    Q    Yeah.

8    A    I had to --  I had to work for --

9  for -- at --  I have to get some money to feed

10  myself in there.

11    Q    Well, you got -- you got meals each --

12  You got three meals a day, correct?

13    A    Not enough for the whole day.

14    Q    But you could get extra if you wanted

15  it.  You asked for it.

16    A    No, you can't.

17    Q    You can't ask for it?

18    A    For it, no.

19    Q    Was the food good?

20    A    Not really.

21    Q    What would you buy with the $1 a day?

22    A    Nutrients, soups to eat -- you know, to

23  eat.

24    Q    Soups?

25    A    Yeah, to eat, to feed myself.

1     Q     Anything else?

2     A     Indigents (sic) and stuff like that.

3           THE REPORTER:  I'm sorry.  I didn't

4     hear you.

5     A     Indigents, like shampoos and stuff that

6     I have to get clean.  Sometimes we didn't have

7     supplies there, so I had to buy it by myself.  And

8     I had to -- had to work somehow for it, so I

9     joined the laundry, thinking that they were going

10    to pay me and I wasn't going to get treated good,

11    treated right and everything.

12    Q     (By Mr. Deacon)  But they --  But when

13    you signed up, it said you would be paid $1 a day.

14    A     But if it said there, how come they

15    didn't pay the $1?

16    Q     Well, they did.  You said there were

17    three times you didn't get it when you were

18    supposed to get it, but you were paid for it,

19    right?

20    A     Huh-uh.

21    Q     You never got the money?

22    A     Huh-uh.  They said that we were going

23    to get chips and stuff like that, sodas.  It never

24    came.  So, yeah, it was always an excuse.

25    Q     Okay.  So there were three times where

JESUS YEPEZ GAYTAN 11/16/2017                    **2 Supp. App. 91**

10

1  you didn't get paid at all --

2      A    Uh-huh.

3      Q    You have to say yes or no --

4      A    Uh-huh.

5      Q    -- for --

6           MS. TURNER:  You have to give a verbal

7  answer for the court reporter.

8      Q    (By Mr. Deacon)  Yeah.  I'm --  I'm

9  sorry, Mr. Yepez.  You need to give a verbal

10 answer to everything I ask you, because this young

11 lady can only take --

12     A    Okay.

13     Q    -- down my questions and your answers,

14 okay?

15     A    Okay.

16     Q    All right.  So it's your sworn

17 testimony there were three times when you were

18 working under the voluntary work program where you

19 did not get paid $1 a day?

20     A    Uh-huh.

21     Q    You have to say yes or no.

22     A    Yes.

23     Q    Okay.  And is it your sworn testimony

24 you never got paid for that?

25     A    Yeah.

*AB Court Reporting & Video*

1    Q    Did you ever fill out any grievance or

2    anything saying that?

3    A    No, I never did, because I was afraid

4    of getting in trouble -- more in trouble than I

5    was already in in there.  I was afraid that it was

6    going to be against my case for doing something

7    against Geo.  That's why I never say nothing.

8    Q    You never said anything?

9    A    Until people came -- people --  Well,

10   yeah.  I started doing -- started seeing -- I

11   started the same thing that was happening to me,

12   so --  Yeah, that's why I --  Well, yeah, that's

13   why I did the lawsuit with Geo.

14   Q    What do you mean you started seeing

15   stuff that was happening to you?

16   A    The same thing that was happening to

17   me, the no $1 compensation, how -- how they said

18   that it was going to be, like, for the work that

19   we did and they were going to reward us with it.

20   They never came.  And, yeah, that's why.

21   Q    What do you mean, "reward" you it with?

22   A    Like, they always said --  Like, when

23   they said they were not going to pay us with

24   dollars, they were going to pay us with chips or,

25   like -- like $1 -- like $2 worth of things --

1    right? -- but they never did.

2           Q     Who didn't?

3           A     The people from the laundry.

4           Q     From the laundry?  Who in the laundry?

5           A      The -- The owner --  Well, the

6    owner --  The officer there was with us.

7           Q     Who?

8           A     Ander- -- Anderson.  Anderson.

9    Anderson.

10          Q     Anderson?

11          A     I think that's his name --

12          Q     In the --

13          A     -- last name.

14          Q     -- laundry?

15          A     Yeah.

16          Q     Do you remember --  It is a male or a

17   female?

18          A     A male.

19          Q     A male?

20          A     Yeah.

21          Q     Do you remember his first name?

22          A     No, I don't recall that.

23          Q     How long did you work in the laundry?

24          A     I worked there from May to October

25   27th -- October 27th, I think.

1   Q   How many days a week?

2   A   From Monday through Saturday.

3   Q   Monday to Saturday?

4   A   Yeah.

5   Q   Six days a week, or . . .

6   A   Six days a week.

7   Q   Six days a week.  How many hours each

8   day?

9   A   Eight.

10   Q   Eight?

11   A   Yeah.

12   Q   You worked more than 40 hours?

13   A   Yeah.  Well, yeah.  If you add it up,

14   yeah, it was kind of eight -- 40 hours or more.

15   Q   Did you have to fill out little sheets

16   when you got there --

17   A   No.

18   Q   -- and when you left?

19       Was --  What was Mr. Anderson's

20   position?  Do you know?

21   A   Just he supervises -- supervises doing

22   our work.

23   Q   How many employees --  How many people

24   from The Geo Group were in the laundry?

25   A   There was seven.

1   have that much money to be using the phone.

2       Q      Did you ever call your family?

3       A      Yeah.  Two, three times, like not --

4   When I was there, like three or four times.

5       Q      Total?

6       A      Yeah.

7       Q      In all that time you were there?

8       A      Yeah.  My lawyer --  My lawyer was the

9   one communicating for them.

10      Q      Okay.  But your lawyer, was he calling

11  you on the phone or you calling the lawyer?

12      A      The --  He was using the --  They have

13  a personal phone for lawyers --

14      Q      Okay.

15      A      -- when they call.

16      Q      How did you get in touch with your

17  lawyer when you wanted to get in touch with him?

18      A      He'll call me or he'll come and visit

19  me.

20      Q      Okay.  He'll call you where?

21      A      In the phone -- the phone -- the lawyer

22  phone.  They have a phone for lawyers.

23      Q      But how did you know to go get that

24  phone call?

25      A      The officer had --  They send the

1   officer supervising us, and he's the one that has

2   that phone there.

3        Q     Okay.  But you know there's phones in

4   your pod --

5        A     Yeah.

6        Q     -- right?

7              All right.  And right next to those

8   phones is a big old bulletin board, right?

9        A     I don't --  I don't know.

10       Q     You don't remember that?

11       A     I'm a kid --  I'm a person that stays

12   for -- like, to himself.  So I don't --  I

13   wasn't --  I was younger than the people that were

14   there, so I was more in my room.  I was --  Yeah,

15   it was intense in there, you know.  I just . . .

16       Q     So you stayed in your room?  You didn't

17   go out and have your meal?

18       A     No.

19       Q     Where did you have your meal?

20       A     Well, yeah, I had my meal.  I'd go and

21   get my meal, but I'd go back to my room.  That

22   place wasn't suited for me.  And it was scary to

23   be in there, you know.  People be --  Like, people

24   that are in there --  It's kind of intimidating to

25   be in there, and -- and for a first-time arrest,

*JESUS YEPEZ GAYTAN 11/16/2017*          **2 Supp. App. 97**

28

1    yeah, it is intimidating to be, like, with a bunch

2    of people that you don't even know there, yeah.

3              So I wasn't --  For your answer, I

4    wasn't looking around for signs of -- or for

5    anything to call or whatever.

6        Q    But you were there from May to October?

7        A    Yeah.

8        Q    And you don't recall seeing the big old

9    bulletin board with all those things up --

10       A    No.

11       Q    -- on there?

12             MS. TURNER:  Objection, asked and

13   answered.

14             THE REPORTER:  And can I just -- Can

15   you wait for him to finish before you start

16   speaking?  Or if our attorney's objecting, just

17   let her object and then answer, please.

18             THE DEPONENT:  Okay.

19             THE REPORTER:  Thank you.

20       Q    (By Mr. Deacon)  Did you ever have to

21   clean that area outside your -- your room?

22       A    Yeah.

23       Q    Okay.  How often?

24       A    Every day.

25       Q    You had to clean it every day?

1    A    Not every day, but, like, every day

2  that I had to clean it -- I had to clean it.  It

3  was two turns each week.  They had --  They had

4  brooms, and each room had to do it one day at a

5  time.  And we had to do it twice a week.  It was

6  twice a week that we had to clean the whole pod.

7    Q    Okay.  "We" --  I'm asking about you.

8    A    Yeah, I cleaned --

9    Q    How many times did you actually clean

10  the pod?

11    A    All the time that I was there, twice a

12  week.

13    Q    Twice a week?

14    A    Yeah.  Twice, three -- three times a

15  week.  It was --  It was --  It was my role -- the

16  role of the room.

17    Q    Right.  And so how many people were in

18  your pod?

19    A    Four --  I mean, four --  I mean, in

20  the room is four, and there was, like, more than

21  70, 80 --

22    Q    And how --

23    A    -- people.

24    Q    -- many people were selected each day

25  to clean the pod?

1    person.

2        Q    But you're saying that yours never came

3    to you?

4        A    No.  Because I -- I wouldn't ask that

5    much --  Like, I wouldn't ask questions.  I

6    wouldn't ask for -- like, to get -- like, to

7    talk --  You know, like, I wouldn't ask people to

8    talk to-you, know.  I would just stay to myself,

9    because my lawyer would tell me just --

10            MS. TURNER:  I don't want you to say --

11       Q    (By Mr. Deacon)  Yeah.

12            MS. TURNER:  -- what your lawyer told

13   you.

14       Q    (By Mr. Deacon)  That's right.  I don't

15   want to hear what your lawyer said, okay?

16       A    Okay.  So, yeah.

17       Q    Okay.  Let's go back to grievances.

18   You said you didn't want to tell anybody about any

19   complaints you had, but there was a box for you to

20   fill out a form and put it in for grievances,

21   correct?

22       A    Yeah.

23       Q    Did you ever do that?

24       A    No.

25       Q    Never?

1      A       I did for -- because -- just for the --

2   There was a problem in the pod for the -- just a

3   ball.

4      Q       The ball?

5      A       Yeah.  But the other stuff for the

6   cleaning or for -- like, for something that I was

7   mad about, I wouldn't -- I wouldn't put a kite in

8   or nothing, because I would be afraid that they

9   will use that against me or something.

10      Q       Okay.

11      A       So I never say nothing about it.

12      Q       You --  You could communicate directly

13   with Immigration and Customs Enforcement right

14   there.  They had their own mailbox, right?  You

15   could just slide it in there, and it's called a

16   kite form.

17          Did you ever do that?

18      A       No.

19      Q       You never filled out a kite form?

20      A       A kite form for medical.

21      Q       Medical?

22      A       Yeah.

23      Q       What was that for?

24      A       Just for a cut that I -- that happened

25   in the bathroom.  That was it.

1      Q      How did you cut yourself in the

2  bathroom?

3      A      There was a slit -- like, a little --

4  I fell --  Like, I kind of fell, and I slid, and

5  there was a little mark.  So I just went and

6  made -- take a look at it -- for it.  And they

7  just gave me cream for infection and stuff like

8  that.

9      Q      Where did you fall?

10     A      In the bathroom.

11     Q      In the bathroom, okay.

12     A      Yeah.

13     Q      And where did you cut yourself?

14     A      On the leg by -- by the side -- by the

15  leg.  Like, by the side of my leg.

16     Q      Okay.  What were you doing when you

17  fell?

18     A      Well, taking a shower.

19     Q      A shower?

20     A      Yeah.

21     Q      Okay.  And you went to go to medical --

22     A      Yeah.

23     Q      -- for that?

24            All right.  Did you ever fill out a

25  kite form directed to Immigration and Customs

1      A      The -- I use tractors for my

2  construction company.  I have all that for

3  driving -- driving tractors and all that.

4      Q      Okay.  You actually have a

5  certificate --

6      A      Yeah.

7      Q      -- that says you're qualified --

8      A      Yeah.

9      Q      -- to drive a tractor?

10      A      Yeah, but --

11              THE REPORTER:  I'm sorry, but you're

12  going to have to start your --  I didn't get the

13  end of your question.

14              MR. DEACON:  Okay.  Sorry.

15      Q      (By Mr. Deacon)  Do you have a

16  certificate that -- that says you're -- you're --

17  you're qualified to operate this --

18      A      Yeah.

19      Q      -- equipment?

20      A      Yeah.

21              MS. TURNER:  Let him finish.

22              THE DEPONENT:  Excuse me.  I'm sorry.

23      Q      (By Mr. Deacon)  Do you have any other

24  certificates?

25      A      No.

1    Q    You have a driver's license, right?

2    A    I'm working on that right now.

3    Q    Oh, you don't have a driver's license?

4    A    Yeah.  That's why I'm -- I'm fixing my

5    problems --  With ICE --  Now that I'm done with

6    ICE, I'm fixing all that from my -- I got working

7    for my work permit and my license -- getting my

8    license back.  I'm getting my -- getting my whole

9    life back together.

10   Q    Okay.  So you had a license to drive at

11   one time.  And why did it --  Do you know --

12   A    My -- I was -- I was getting DACA --

13   I was going to get on DACA, but when I got

14   arrested the first time, that's -- it destroyed my

15   whole -- it stopped me -- it stopped me from

16   getting all my -- all my things, my permit and all

17   that.

18        So I've been working, fighting for,

19   like, to get my -- all my stuff back.

20   Q    Okay.  How old were you when you were

21   arrested?

22   A    I was 18.  I was going to be 19 at the

23   time.

24   Q    Okay.  When you got arrested, where

25   were you?

1       A       I was going to school.

2       Q       So you were still in high school?

3       A       Yeah.

4       Q       Okay.  So you got arrested at high

5  school?

6       A       It was on --  It was the end of -- end

7  of, like --  It was the end of the year.  It was

8  on May -- like, when --  It was the last day of

9  school, saying goodbyes and stuff like that.  And

10  that's when it happened.

11       Q       Okay.  Did you actually graduate, then?

12       A       Yeah, from --  Yeah.

13       Q       You did?

14       A       Yeah.  But, like I said, I got arrested

15  after -- after and stuff.  The --  The --  How do

16  you --  It was for two weeks after.

17       Q       Two weeks after?

18       A       Yeah.

19       Q       After you graduated?

20       A       Yeah, that I got arrested.

21       Q       Okay.  So it wasn't the last day of

22  school?

23       A       No.  It was --  You know how they do

24  the ceremony, you know, and stuff, and you go back

25  to school, say your goodbyes to your teachers, get

1    your stuff and everything.   Yeah, that's what

2    happened.

3        Q     But you were already finished?

4        A     Uh-huh.

5        Q     You have to say yes or no.

6        A     Yeah.

7        Q     Okay.  Did --  Did you keep any notes

8    or diaries while you were at the Aurora ICE

9    Processing Center?

10       A     I did.

11       Q     You did?

12       A     Yeah.

13       Q     And where are those?

14       A     We don't have them.   There were

15   letters, but we don't have them any- . . .

16       Q     Pardon me?

17       A     There were letters.

18       Q     Yes.

19       A     I sent them to my girlfriend and stuff,

20   but I can't find them.

21       Q     You can't find them?

22       A     No.

23       Q     Okay.  So these were letters that you

24   sent to your girlfriend?

25       A     Yeah.

1   Q       And did your girlfriend keep them?

2   A       Yeah, but she can't find them.

3   Q       Okay.  Did she ever write to you?

4   A       She did.

5   Q       Did you keep those?

6   A       Yeah.

7   Q       Okay.  Is there anything about your

8   experiences at the Aurora ICE Processing Center in

9   any of those letters?

10  A       Not the ones with my girlfriend.

11  Q       Not with your girlfriend?

12  A       No.

13  Q       Okay.  Did you write any letters or

14  write any notes to anyone regarding your

15  experience at the Aurora ICE Processing Center?

16  A       I did, but the letters --

17  Q       You what?

18  A       I did, but we can't find the letters

19  somewhere.

20  Q       Okay.  And who were those to?

21  A       My mom.

22  Q       Okay.  But your mother can't find them?

23  A       No.

24  Q       All right.  When did you look for them?

25  A       Like --  Well, because I -- I take care

1           MS. TURNER:  And during that time, they

2    would choose those individuals.

3           MR. DEACON:  And --

4           MS. TURNER:  This paragraph is not

5    speaking about the time after, when he began to

6    work in the voluntary work program.

7           MR. DEACON:  Well, but it says --

8    You're ignoring the next sentence.  It says,

9    "Every day, the guards would call on six of the

10   detainees who didn't have a job in the voluntary

11   work program."

12          MS. TURNER:  Right.  During this period

13   in the initial part of his detention.  So it

14   doesn't speak to the part after he started working

15   there.

16          MR. DEACON:  Oh, come on.  That's

17   not --  That's not a fair reading.

18          MS. TURNER:  I think --  I mean,

19   that's my reading --

20          MR. DEACON:  That is --  No.

21          MS. TURNER:  -- of this document.

22          MR. DEACON:  The problem is this is

23   consistent with all the other ones, the same ones,

24   the same language, and that would make no sense.

25      Q     (By Mr. Deacon)  Well, let's ask you

1   this:   Who told you that you would have to go to

2   solitary confinement if you didn't do the

3   cleaning?

4        A      The officers.

5        Q      Who?

6        A      The officer that was --

7        Q      Name one.

8        A      I don't remember.

9        Q      You don't remember?

10       A      No.

11       Q      What'd they look like?

12       A      Just officers.  I'm not --

13       Q      Were they short?  Tall?

14       A      I don't know.

15       Q      You don't know?

16       A      (Deponent shook head.)

17       Q      You can't tell me what --  You can't

18   describe one of them that told you you'd have to

19   do that?

20       A      There was different officers all the

21   time when detained.

22       Q      And I don't want to know about the

23   different officers.  I want to know about the one

24   who told you that you would have to go to solitary

25   confinement if you didn't do the cleaning.

1          A      Well, there was --  They would say

2     every -- every day -- every --  There was new

3     people there every day, and they would tell us the

4     same thing.

5          Q      So every day that someone was selected

6     to clean the pod, they would be told if you don't

7     clean the pod, you'd have to go to solitary

8     confinement?

9          A      Yeah.

10         Q      That's your sworn testimony?

11         A      Because some --  Yeah, somebody would

12    be --  People would get there new --  There

13    would --  They would be people new, and people

14    could get mad because -- they would get mad for

15    cleaning.  So the people --  There would be an

16    argument, and that's when the officer would tell

17    us what would happen.

18         Q      But --  And make sure you -- you

19    understand my question.  Are you telling me that

20    every time the officers came in and named those

21    six people, they were told that if they didn't do

22    it, they'd have to go to solitary confinement?

23         A      It was four people.

24         Q      Four people.  So when it said they

25    called up six people, that's not correct.

1    A    That's the six people for the laundry.

2  They'd call the six people to take them to the

3  laundry.  Those six peoples are the ones that take

4  them to the laundry at 7:00 in the morning.

5    Q    No.  No.  It says, "Every day, the

6  guards would call on six of the detainees who" did

7  not "have a job in the voluntary work program.

8  Those six individuals had to clean."

9    A    You are talking about the -- the --

10  when we had to clean the whole pod, and that was

11  only four -- in our pod -- in our room, there was

12  only four people.

13    Q    Mr. Yepez, I can only go on what your

14  declaration says, all right.  Now, your -- your

15  testimony here today says that only four would

16  clean the pod, correct?

17    A    Yeah.

18    Q    Okay.  But this, that was filled out

19  November 2, 2015, said that they would come in and

20  pick six people.

21    A    They would --  They would choose --

22  Because there was not enough people.  In our room,

23  there was only four people --

24    Q    Well --

25    A    -- and those --  They would pick people

Appellate Case: 22-1409   Document: 38-2   Date Filed: 03/24/2023   Page: 117

```
1    When I got pulled over --  When I got pulled over,

2    there was drugs in the car.  And I stayed there --

3    I stayed there four months fighting it.  I beat

4    the case, but the judge --  And, yeah, that's --

5    They let me go.

6         Q     Okay.  So you said there were drugs in

7    the car.  Were they yours?

8         A     No.

9         Q     So you were --  Were you driving the

10   car?

11        A     No.

12        Q     You were traveling in someone else's

13   car?

14        A     Yeah.

15        Q     And --  And someone else in the car was

16   in possession of drugs?

17        A     Yes.

18        Q     Okay.  And you said that you fought the

19   case?

20        A     I fought the case.

21        Q     Okay.  Did you plead guilty?

22        A     No.

23        Q     You pled not guilty?

24        A     Not guilty.

25        Q     Okay.  And you said that you beat the
```

1   case.  What happened that resulted in you beating

2   the case?

3        A      The statement of the cop wasn't --  It

4   was in --  Well, it was in the paper, but it

5   wasn't with the thing he was saying in trial.

6        Q      So the police officer made an

7   inconsistent statement in his written report and

8   in his live testimony --

9        A      Yes.

10       Q      -- is that correct?

11              Okay.  And was there a trial before a

12   jury, or was it a hearing before the judge?

13       A      A hearing before a judge.

14       Q      Okay.  And is it your understanding

15   that after that hearing, the charges against you

16   were dismissed?

17       A      He --  The judge told me that they were

18   dropped, that I got nothing against me, yeah.

19       Q      Okay.  And during the time that that

20   case was pending, that's when you were in

21   Jefferson County Jail?

22       A      Yes.

23       Q      Okay.  Earlier you testified that you

24   heard the guards at Geo tell detainees that they

25   would be sent to what you referred to as "the

1  hole" if they didn't clean the pod.

2         Do you remember that testimony?

3     A    Yes.

4     Q    Okay.  And you --  When --  Like, under

5  what circumstances would the guards tell the

6  detainees that?

7     A    When --  It was a situation of anger.

8  Everybody was screaming and stuff, and that's when

9  he said -- that's when he said that if they don't

10 follow the procedures, this is what's going to

11 happen.

12    Q    And did that occur --  I --  I think

13 earlier you testified that typically it was new

14 detainees who arrived in the pod who would be

15 angry; is that correct?

16    A    Yes.

17    Q    And can you explain sort of how that

18 would happen?

19    A    So each Wednesday --  Each --  Well,

20 each two days -- or one day, there would be a lot

21 of people come, detainees.  They wouldn't --  They

22 wouldn't know the rules, so they would get asked

23 to do stuff and they would get mad.

24         So that's how everything would start.

25 And that's how the officer --  The procedure was

Appellate Case: 22-1409   Document: 38-2   Date Filed: 03/24/2023   Page: 120

1   if you don't follow them, you go to the hole.

2       Q     Okay.  And I know you said that you

3   don't know the names of any of the officers.  Can

4   you describe any of them physically?

5       A     There's four.  One was Salva- --

6   Salvadoran.

7             THE REPORTER:  I'm sorry.  I didn't

8   understand --

9             MS. TURNER:  Salvadoran.

10            THE REPORTER:  Thank you.

11      A     One was white.  They were white.  One

12  was black -- yeah, black.  Tall --  The black guy

13  was taller.  The Salvadoran was -- he had hair

14  combed back -- hair combed back.  He was built --

15  Like, he was built.

16            There was girls, but we can't ask -- we

17  can't talk to the girl officers, but there were

18  girls there, too.  There was two girls.  One was

19  blonde and the other one was brunette, so, yeah.

20      Q     (By Ms. Turner)  Two --  So two female

21  guards?

22      A     Yeah.

23      Q     And were --  What was the race of the

24  female guards?

25      A     One looked like she was Asian -- Asian,

**AB Court Reporting & Video**

1   and the other one was white.

2        Q    Okay.  And you mentioned that the

3   Salvadoran guy was built.  Do you mean, like, he

4   was strong looking?

5        A    Yeah, he was -- he was tall, built.

6   Yeah, he --  You guys would notice him in jail,

7   so . . .

8             MR. DEACON:  I'm sorry.  I didn't hear

9   your last part.

10            THE DEPONENT:  Like, you guys would

11  notice who -- who's the Salvadoran.  Right away

12  you can spot him.

13       Q    (By Ms. Turner)  And why -- why could

14  you spot him right away?

15       A    Because of his greasy hair.

16       Q    And you had mentioned earlier that you

17  and the other guys who worked in the laundry

18  called each other by nicknames.  Do you

19  remember what any of the nicknames were?

20       A    Wedo, Chapin --  Well, Diego.  And the

21  other one was Pelon, because he was bald.  That

22  was all the names.

23       Q    What about you?  Did you have a

24  nickname?

25       A    Chewy.

1    STATE OF COLORADO)

2                    )ss.    REPORTER'S CERTIFICATE

3    COUNTY OF DENVER )

4         I, Tracy L. Harris, do hereby certify that I

5    am a Certified Realtime Reporter, Registered Merit

6    Reporter, and Notary Public within the State of

7    Colorado; that previous to the commencement of the

8    examination, the deponent was duly sworn to

9    testify to the truth.

10        I further certify that this deposition was

11   taken in shorthand by me at the time and place

12   herein set forth, that it was thereafter reduced

13   to typewritten form, and that the foregoing

14   constitutes a true and correct transcript.

15        I further certify that I am not related to,

16   employed by, nor of counsel for any of the parties

17   or attorneys herein, nor otherwise interested in

18   the result of the within action.

19        In witness whereof, I have affixed my

20   signature this 29th day of November, 2017.

21        My commission expires July 30, 2021.

22

23

24                    _____
                      Tracy L. Harris, CRR, RMR, RPR
                      216 - 16th Street, Suite 600
25                    Denver, Colorado  80202

Alejandro Torres  07/16/2020
ALEJANDRO MENOCAL vs GEO GROUP

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLORADO

3    Civil Case No. 1:14-cv-02887-JLK-MEH

     _____
4
     ALEJANDRO MENOCAL,
5    MARCOS BRAMBILA,
     GRISEL XAHUENTITLA,
6    HUGO HERNANDEZ,
     LOURDES ARGUETA,
7    JESUS GAYTAN,
     OLGA ALEXAKLINA,
8    DAGOBERTO VIZGUERRA, and
     DEMETRIO VALERGIA,
9    on their own and on behalf of all others similarly
     situated,
10
     Plaintiffs,
11
     v.
12
     THE GEO GROUP, INC.,
13
     Defendant.
14   _____

15

16         VIDEOTAPED REMOTEDEPO™ DEPOSITION OF

17             ALEJANDRO HERNANDEZ TORRES

18              APPEARING REMOTELY FROM

19                  TOLUCA, MEXICO

20          July 16, 2020 - 9:00 a.m.

21

22   REPORTED BY:

23   Teresa Lynne Cardenas, RPR, CRR

24   APPEARING REMOTELY FROM DENVER, COLORADO

25

Alejandro Torres  07/16/2020                                    Page 14
ALEJANDRO MENOCAL vs GEO GROUP

| 09:59:52 | 1 | A. | No. |

09:59:54    2         Q.    Okay.  Do you have any social medial

09:59:57    3    accounts?

10:00:04    4         A.    I have Facebook, and that's all.

10:00:08    5         Q.    What is your Facebook name?

10:00:14    6         A.    Alejandro Hernandez.

10:00:18    7         Q.    Have you posted anything about this

10:00:20    8    litigation on your Facebook?

10:00:29    9         A.    No.

10:00:32    10        Q.    Have you posted anything about your time

10:00:34    11   at the Aurora facility on your Facebook?

10:00:46    12        A.    No, because it's a very bad memory for

10:00:50    13   me.

10:00:51    14        Q.    Have you used Facebook to communicate

10:00:53    15   with anyone who you lived with at the Aurora facility?

10:01:09    16        A.    No, I have no communication with anyone.

10:01:14    17   I know nothing about them.  No one.

10:01:20    18        Q.    Are you married?

10:01:23    19        A.    I am.

10:01:24    20        Q.    What's your spouse's name?

10:01:26    21        A.    Maria de Los Angeles Romero Camacho.

10:01:43    22        Q.    And when were you married?

10:01:52    23        A.    I don't recall the date, but we've been

10:01:55    24   married for about 30 years.

10:01:58    25        Q.    And did you have any conversations with

Case 1:14-cv-02887-JLK-MEH   Document 336-13   Filed 10/26/20   USDC Colorado   Page 4 of 30

Appellate Case: 22-1409   Document: 38-2   Date Filed: 03/24/2023   Page: 125
Alejandro Torres  07/16/2020                                    Page 15
ALEJANDRO MENOCAL vs GEO GROUP

10:01:59  1   your wife about this case?

10:02:07  2            MR. MILSTEIN:  I'll instruct him not to

10:02:09  3   answer any questions about the content of his

10:02:11  4   communications with his wife.

10:02:24  5            THE DEPONENT:  Okay.

10:02:25  6        Q.   (BY MS. SCHEFFEY)  You can still answer

10:02:26  7   whether you spoke with her, though.

10:02:41  8        A.   Yes, I did talk to her about my court;

10:02:44  9   but I did not go into details.

10:02:48  10       Q.   Do you have any other family members?

10:02:59  11       A.   Excuse me?  I did not quite understand.

10:03:02  12       Q.   Do you have any children?

10:03:17  13       A.   Yes, I have two girls.  One is 21, and

10:03:22  14  she's going to be 17 -- excuse me -- she's going to --

10:03:27  15  her birthday is on the 17th, she's going to be 21.

10:03:31  16  And I have another girl.  She is ten years old.

10:03:36  17       Q.   Did you talk to either of them about this

10:03:38  18  lawsuit?

10:03:42  19       A.   No.

10:03:44  20       Q.   Did you talk to your daughters while you

10:03:46  21  were detained?

10:04:03  22       A.   They used to come visit every eight days,

10:04:06  23  but it was -- there was a lot of suffering.

10:04:12  24       Q.   When they visited, did you talk to them

10:04:14  25  about this lawsuit?

Alejandro Torres  07/16/2020                                    Page 16
ALEJANDRO MENOCAL vs GEO GROUP

| | | |
|---|---|---|
| 10:04:20 | 1 | A.    No. |
| 10:04:22 | 2 | Q.    **Who else did you speak with while you** |
| 10:04:23 | 3 | **were detained?** |
| 10:04:38 | 4 | A.    I would talk to the people there in the |
| 10:04:41 | 5 | yard, but nothing about the lawsuit. |
| 10:04:47 | 6 | Q.    **And do you remember the names of the** |
| 10:04:48 | 7 | **people there in the yard?** |
| 10:05:05 | 8 | A.    I am going to say this again.  Those are |
| 10:05:09 | 9 | very difficult memories, and I really don't want to -- |
| 10:05:12 | 10 | wish I didn't have to remember. |
| 10:05:17 | 11 | Q.    **I understand.  I -- I think, as we** |
| 10:05:21 | 12 | **discussed earlier today, if there were any reasons you** |
| 10:05:23 | 13 | **couldn't give me your full testimony today.  Is this** |
| 10:05:27 | 14 | **feeling of sadness going to affect your ability to** |
| 10:05:29 | 15 | **remember today?** |
| 10:05:49 | 16 | MR. MILSTEIN:  Object to form. |
| 10:05:56 | 17 | THE INTERPRETER:  Was there an objection? |
| 10:05:57 | 18 | This is the interpreter. |
| 10:05:59 | 19 | MR. MILSTEIN:  Object to form. |
| 10:06:01 | 20 | THE INTERPRETER:  Was there an objection? |
| 10:06:01 | 21 | This is the interpreter. |
| 10:06:03 | 22 | MR. MILSTEIN:  Object to form. |
| 10:06:04 | 23 | THE INTERPRETER:  Can we -- how would you |
| 10:06:05 | 24 | guys like to handle the objections?  Would you like |
| 10:06:09 | 25 | first to counsel finish answering the question and the |

Alejandro Torres  07/16/2020                                                    Page 28
ALEJANDRO MENOCAL vs GEO GROUP

10:34:00   1   **Can you tell me about the programs that you**

10:34:02   2   **participated in in jail?**

10:34:12   3             MR. MILSTEIN:  Object to form.

10:34:30   4        A.   Okay.  In GEO -- GEO didn't have any

10:34:33   5   programs with which will help you to be released

10:34:37   6   earlier.  All you could do is work in the kitchen and

10:34:40   7   clean the floors.

10:34:41   8        **Q.   (BY MS. SCHEFFEY)  Okay.  I understand**

10:34:42   9   **that that is GEO, and we'll get to that later.  But**

10:34:46   10  **I'm talking about in jail, you said you participated**

10:34:50   11  **in programs.  I'm trying to figure out what programs**

10:34:53   12  **those were.**

10:35:01   13            MR. MILSTEIN:  Object to form.

10:35:53   14            MS. SCHEFFEY:  Can you translate that

10:35:56   15  part now, and we'll get the --

10:35:58   16       A.   Well, I took courses on anger management.

10:36:00   17  I got a GED.  I started to work.  I work in the

10:36:04   18  kitchen.  I cleaned the library and take

10:36:07   19  self-improvement -- a course of self-improvement and a

10:36:10   20  course about what were your goals once you've been

10:36:16   21  released.  I also participated in -- I also included

10:36:34   22  in a group called Faith Path.  We studied the Bible,

10:36:38   23  and I would also lecture.

10:36:40   24       **Q.   (BY MS. SCHEFFEY)  Okay.  And that's your**

10:36:43   25  **full answer?  I don't want to interrupt you.**

| | | |
|---|---|---|
| 10:37:09 | 1 | A.   So I learned paper crafts.  I used to do |
| 10:37:12 | 2 | scenes out of toothpaste boxes.  And so I take -- so I |
| 10:37:53 | 3 | made great efforts to be busy most of the time staying |
| 10:37:57 | 4 | away from problems for people who had conflict in my |
| 10:38:04 | 5 | wish and hope to be released.  I had the hope to see |
| 10:38:07 | 6 | my family and my daughters. |
| 10:38:11 | **7** | **Q.   I understand.  So you mentioned you** |
| 10:38:13 | **8** | **worked in the kitchen.  How much were you paid for** |
| 10:38:15 | **9** | **working in the kitchen?** |
| 10:38:56 | 10 | A.   So at the DOC, I don't recall how much |
| 10:38:59 | 11 | they paid; but I had no one to help me so I could get |
| 10:39:04 | 12 | food.  I would support myself with the paper crafts. |
| 10:39:10 | 13 | Sometimes I would clean the other inmates' rooms or I |
| 10:39:16 | 14 | would help people so I would have something to eat. |
| 10:39:21 | **15** | **Q.   Were you paid to clean the other inmates'** |
| 10:39:24 | **16** | **rooms?** |
| 10:39:29 | 17 | A.   Soup. |
| 10:39:32 | **18** | **Q.   Like a Ramen noodle?** |
| 10:39:36 | 19 | A.   Yes.  It's cold.  Marucha in Spanish. |
| 10:39:45 | **20** | **Q.   And did you clean -- were you paid to** |
| 10:39:46 | **21** | **clean the library?** |
| 10:40:09 | 22 | A.   They did pay me, but I don't recall how |
| 10:40:11 | 23 | much.  But mainly I would do it to make time go by and |
| 10:40:17 | 24 | stay away from all the problems. |
| 10:40:26 | **25** | **Q.   Do you like cleaning?** |

Alejandro Torres  07/16/2020
ALEJANDRO MENOCAL vs GEO GROUP                                   Page 30

| | | |
|---|---|---|
| 10:40:32 | 1 | A.   I clean -- I am used to it because I |
| 10:40:36 | 2 | clean my house daily. |
| 10:40:40 | **3** | **Q.   Cleaning -- was cleaning a good way to** |
| 10:40:43 | **4** | **take your mind off your problems?** |
| 10:40:45 | 5 | MR. MILSTEIN:  Object to form. |
| 10:40:46 | 6 | A.   Well, I wanted to stay away from all the |
| 10:41:24 | 7 | problems.  Life at DOC, it's very difficult, and you |
| 10:41:28 | 8 | learn things, and you see things that honestly I don't |
| 10:41:32 | 9 | wish that on anybody. |
| 10:41:36 | **10** | **Q.   (BY MS. SCHEFFEY)  Okay.  And I'm not** |
| 10:41:37 | **11** | **asking you about that here, so I appreciate you** |
| 10:41:40 | **12** | **sharing that with me.  Do you have any lawsuit pending** |
| 10:41:43 | **13** | **against the DOC?** |
| 10:41:54 | 14 | MR. MILSTEIN:  Object to the form of the |
| 10:41:56 | 15 | prior commentary. |
| 10:42:02 | 16 | A.   No, none. |
| 10:42:06 | **17** | **Q.   (BY MS. SCHEFFEY)  Okay.  All right.  I'm** |
| 10:42:08 | **18** | **going to shift gears a little bit and start talking** |
| 10:42:10 | **19** | **about Aurora now.** |
| 10:42:16 | 20 | A.   Very well. |
| 10:42:18 | **21** | **Q.   I understand it was a long time ago, but** |
| 10:42:20 | **22** | **do you remember the dorms where you lived at the** |
| 10:42:24 | **23** | **Aurora facility?** |
| 10:42:43 | 24 | A.   So obviously when I was released from |
| 10:42:47 | 25 | DOC, I believed -- I thought my suffering was over. |

Alejandro Torres  07/16/2020                                    Page 31
ALEJANDRO MENOCAL vs GEO GROUP

| | | |
|---|---|---|
| 10:43:10 | 1 | But honestly, it was a very, very hard time.  And I do |
| 10:43:15 | 2 | believe I am one of the people who lasted the longest |
| 10:43:18 | 3 | in Aurora. |
| 10:43:20 | **4** | **Q.   While you were in Aurora, did you live in** |
| 10:43:22 | **5** | **the A dorm?** |
| 10:43:30 | 6 | A.   Yes. |
| 10:43:32 | **7** | **Q.   Did you live in the B dorm?** |
| 10:43:41 | 8 | THE INTERPRETER:  Repetition, please. |
| 10:43:42 | **9** | **Q.   (BY MS. SCHEFFEY)  Did you live in the B** |
| 10:43:44 | **10** | **dorm?** |
| 10:44:03 | 11 | A.   Well, like I stated before, it's hard to |
| 10:44:06 | 12 | remember the small details; but they would change. |
| 10:44:12 | 13 | Like when they would take me to another county.  When |
| 10:44:16 | 14 | I would come back, they would put me in a different |
| 10:44:18 | 15 | dorm. |
| 10:44:19 | **16** | **Q.   Okay.  Let's introduce Exhibit 2.  I will** |
| 10:44:28 | **17** | **also share it on my screen.  Okay.  Let's see if I --** |
| 10:44:53 | **18** | **I understand that you have an eye problem, so I will** |
| 10:44:56 | **19** | **try to read this to you.  If your attorneys think I am** |
| 10:45:02 | **20** | **misreading it, they can say something as well.** |
| 10:45:04 | 21 | (Deposition Exhibit 2, remotely produced |
| 10:45:04 | 22 | and provided electronically to the reporter.) |
| 10:45:11 | 23 | MR. MILSTEIN:  Adrienne, does this have a |
| 10:45:13 | 24 | Bates stamp on it? |
| 10:45:14 | 25 | MS. SCHEFFEY:  I don't believe so, but I |

U.S. LEGAL SUPPORT, INC
303-832-5966

**2 Supp. App. 125**

| 11:45:51 | 1 | slept. |
| 11:45:53 | **2** | **Q.   I just want to make sure.  Are we still** |
| 11:45:56 | **3** | **talking --** |
| 11:45:57 | 4 | MR. MILSTEIN:  He's not testifying. |
| 11:45:58 | 5 | MS. SCHEFFEY:  I know.  I just want to |
| 11:45:59 | 6 | make sure he's still talking about the housing unit |
| 11:46:01 | 7 | sanitation -- |
| 11:46:03 | 8 | MR. MILSTEIN:  Let him speak, please. |
| 11:46:05 | 9 | THE INTERPRETER:  May I interpret? |
| 11:46:08 | 10 | MS. SCHEFFEY:  Yes. |
| 11:46:24 | 11 | A.   I understand that we needed to clean the |
| 11:46:27 | 12 | area where we slept.  So inside the cell, there is a |
| 11:46:44 | 13 | table and then there is a toilet.  And it is made of |
| 11:46:55 | 14 | steel. |
| 11:47:19 | 15 | So I personally wanted to make sure that |
| 11:47:22 | 16 | both the table and the toilet were perfectly clean. |
| 11:47:26 | 17 | And on occasion, I would place rags at the entrance |
| 11:47:30 | 18 | because I would tell people it needs to be clean. |
| 11:47:59 | 19 | So, you know, so I spent most of time |
| 11:48:03 | 20 | inside staying away from all of the problems, and |
| 11:48:06 | 21 | that's why I had to clean and maintain, clean the |
| 11:48:11 | 22 | table or my bed or the floor where I would do |
| 11:48:16 | 23 | exercise.  That's all. |
| 11:48:22 | **24** | **Q.   So you were cleaning for yourself?** |
| 11:48:28 | 25 | MR. MILSTEIN:  Object to form. |

11:48:29   1          A.   So I would clean the area where I would

11:49:02   2    sleep.  And I would take care of my health because I

11:49:09   3    had been there I would clean my bed in my room.  And

11:49:13   4    also -- thinking of my health because I had been there

11:49:18   5    for quite a while already, and it's very difficult to

11:49:20   6    be -- to live in a place where so many people with so

11:49:25   7    many different moods live together.

11:49:29   **8          Q.   (BY MS. SCHEFFEY)  Can you tell me about**

11:49:33   **9    -- what about living with so many people is -- is**

11:49:37   **10   hard?**

11:50:19   11         A.   So it's difficult to live with so many

11:50:21   12   people because, like I said before, there was only one

11:50:25   13   microwave for so many people.  There are only four

11:50:28   14   phones.  Then the library is a very small room, like 3

11:50:36   15   by 1 1/2 meters.  People would get -- you would want

11:50:39   16   to be there to stay tranquil.  People would get there

11:50:43   17   and start screaming or start hitting the glass.  Some

11:50:47   18   were screaming, some were crying, or they were

11:50:49   19   fighting with their family.

11:51:07   20              So, you know, there are people who don't

11:51:09   21   care about anything.  Like, for instance, you are

11:51:11   22   eating at a table or you are watching TV, and then

11:51:14   23   they -- they expel a gas.  There are people who prefer

11:51:41   24   their food in the microwave, and they throw their

11:51:45   25   food, they don't clean after them, many people who

Alejandro Torres  07/16/2020
Page 50
ALEJANDRO MENOCAL vs GEO GROUP

| | | |
|---|---|---|
| 11:51:50 | 1 | spit on the floor. |
| 11:51:55 | 2 | Some people spit in their phone headset. |
| 11:52:23 | 3 | There is all the time you hear all of these problems. |
| 11:52:25 | 4 | And then you have your own pressures, the pressure |
| 11:52:28 | 5 | with a court hearings, the pressure with the welfare |
| 11:52:33 | 6 | of your family.  It's very difficult. |
| 11:52:36 | 7 | THE INTERPRETER:  Correction for the |
| 11:52:37 | 8 | record.  "They spit on their handset in the phone." |
| 11:53:12 | 9 | A.  So, you know, it's very difficult to live |
| 11:53:14 | 10 | with so many people.  I recall when there were, like, |
| 11:53:17 | 11 | 40 people, it was quiet, it was better.  There are no |
| 11:53:21 | 12 | people screaming all the time. |
| 11:53:27 | 13 | MS. SCHEFFEY:  Wasn't there something |
| 11:53:29 | 14 | about gritos, I heard? |
| 11:53:33 | 15 | THE INTERPRETER:  Are you addressing the |
| 11:53:34 | 16 | interpreter, Counsel? |
| 11:53:36 | 17 | MS. SCHEFFEY:  Yes. |
| 11:53:38 | 18 | THE INTERPRETER:  He said that people |
| 11:53:39 | 19 | were screaming all the time. |
| 11:53:42 | 20 | MS. SCHEFFEY:  Okay.  You can keep going. |
| 11:54:06 | 21 | A.  When you go out into the recreation area, |
| 11:54:10 | 22 | there is only one exercise bar, and it's just for two |
| 11:54:14 | 23 | people.  And the basketball basket, there is a wall, |
| 11:54:32 | 24 | and we used to play handball there.  When we were |
| 11:54:49 | 25 | still playing -- when we still were playing handball, |

Alejandro Torres  07/16/2020
ALEJANDRO MENOCAL vs GEO GROUP
Page 51

| | | |
|---|---|---|
| 11:54:54 | 1 | someone else would come back with a basketball, and he |
| 11:54:59 | 2 | would start playing. |
| 11:55:34 | 3 | So, you know, for instance, if one was |
| 11:55:36 | 4 | exercising at the exercise bar, someone would come |
| 11:55:40 | 5 | over -- someone would take a basketball ball and throw |
| 11:55:44 | 6 | it below the bar so -- because we all came out at the |
| 11:55:48 | 7 | same time, there would be over 40 people, and the |
| 11:55:52 | 8 | space is very limited. |
| 11:56:15 | 9 | So, you know, in the afternoons, that's |
| 11:56:19 | 10 | when it was quiet.  But when I felt overstressed and |
| 11:56:23 | 11 | would start hitting the handball because -- until I |
| 11:56:30 | 12 | started to cry because I couldn't take it anymore. |
| 11:56:42 | 13 | For me, that was very difficult.  And you're asking |
| 11:56:46 | 14 | how come it's so hard to live with so many people. |
| 11:56:53 | **15** | **Q.   And I'm sorry, I'll give you a moment to** |
| 11:56:56 | **16** | **take a breath.  Yeah, I understand it was difficult.** |
| 11:57:18 | **17** | **I'm going to ask a few more questions.  I'm sorry for** |
| 11:57:22 | **18** | **that.** |
| 11:57:30 | 19 | A.   Don't worry.  You can ask me anything you |
| 11:57:32 | 20 | want. |
| 11:57:35 | **21** | **Q.   So it sounds like some of the problems** |
| 11:57:37 | **22** | **you had is that people didn't have respect for one** |
| 11:57:39 | **23** | **another; is that correct?** |
| 11:57:48 | 24 | MR. MILSTEIN:  Objection. |
| 11:57:49 | 25 | A.   So, you know, I don't know if it's a |

U.S. LEGAL SUPPORT, INC
303-832-5966

**2 Supp. App. 129**

Alejandro Torres  07/16/2020                                    Page 52
ALEJANDRO MENOCAL vs GEO GROUP

| | | |
|---|---|---|
| 11:58:29 | 1 | matter of respect.  I think that they would put us all |
| 11:58:32 | 2 | together like animals, like shit.  I don't know if the |
| 11:58:38 | 3 | right word is animals.  It's like they would put us |
| 11:58:42 | 4 | all together in a room and they say, Well, now you do |
| 11:58:45 | 5 | what I want.  And on top of it, you have to put up |
| 11:58:48 | 6 | with the messiness of the guards.  And the rest is the |
| 11:58:57 | 7 | foul language against you. |
| 11:59:31 | 8 | So, for instance, when we were in the |
| 11:59:32 | 9 | recreation area or we were watching TV -- because they |
| 11:59:37 | 10 | have three TVs, one is in English, one is for soap |
| 11:59:41 | 11 | operas or shows and movies.  And I like to watch |
| 11:59:47 | 12 | movies in English.  So while I was sitting totally |
| 12:00:30 | 13 | calm watching TV, I would look up towards my room, and |
| 12:00:34 | 14 | I would see the guard undoing my bed, throwing my food |
| 12:00:40 | 15 | everywhere, moving around the pictures of my wife and |
| 12:00:47 | 16 | children, and he would throw my mattress down.  All of |
| 12:00:58 | 17 | that is very difficult.  And many of the things I |
| 12:01:18 | 18 | lived through like the first time I was in jail marked |
| 12:01:24 | 19 | me for life, and I don't believe that's something I'll |
| 12:01:29 | 20 | ever forget. |
| 12:01:30 | **21** | **Q.   (BY MS. SCHEFFEY)  Did you have the same** |
| 12:01:31 | **22** | **problems when you were in the Department of** |
| 12:01:33 | **23** | **Corrections?** |
| 12:01:38 | 24 | A.   No, never.  So at DOC, I would take care |
| 12:02:29 | 25 | of my bed, I would clean my toilet.  I was very busy |

Alejandro Torres  07/16/2020                                              Page 53
ALEJANDRO MENOCAL vs GEO GROUP

12:02:35    1    exercising, taking my courses.  And at the DOC, there

12:02:40    2    are also many gangs.  It's very violent.  So best

12:02:44    3    thing is to stay away from all of that.

12:03:26    4              So, you see, at DOC, I would try to talk

12:03:30    5    to people who had been there for a long time.  I

12:03:33    6    wanted to learn from them in order to stay away from

12:03:38    7    problems.  And even though I didn't understand a lot

12:03:41    8    because of English, I tried to talk to them and have

12:03:47    9    conversations with them.  At GEO, it's not -- that's

12:03:53   10    not possible.  It's unbearable.

12:03:57   **11         Q.   So you didn't have any conversations with**

12:03:59   **12    any of the other people who were detained with you**

12:04:02   **13    while at GEO?**

12:04:33   14              A.   So, you know, at GEO, I tried to talk to

12:04:37   15    some -- to some people.  You know, it's very difficult

12:04:42   16    to live with so many people.  So many people come from

12:04:48   17    many different places with different characteristics,

12:04:52   18    different frames of mind.  Some of them are very rude,

12:04:57   19    some of them are very tyrant -- they are very despots.

12:05:02   20    It's very difficult to live with them.  They are all

12:05:11   21    waiting for the court, the court's decision.

12:05:53   22              So, you know -- and even the fact that

12:05:57   23    you need to see your family through the glass, you

12:06:02   24    cannot see your kids, see your spouse, you cannot

12:06:05   25    touch them, you cannot feel them, you cannot feel

Alejandro Torres  07/16/2020
ALEJANDRO MENOCAL vs GEO GROUP                                    Page 59

| | | |
|---|---|---|
| 12:19:31 | 1 | And that is way out of line, Adrienne. |
| 12:19:35 | 2 | MS. SCHEFFEY:  What question is he not |
| 12:19:36 | 3 | answering?  I'm -- I'm trying to get a sentence out to |
| 12:19:38 | 4 | him which you won't let me say which is the question |
| 12:19:41 | 5 | is about this document.  That's all I wanted to say, |
| 12:19:44 | 6 | and you won't let me say that. |
| 12:19:47 | 7 | MR. MILSTEIN:  You have cut him off, and |
| 12:19:48 | 8 | you have disrupted his testimony.  And it is |
| 12:19:50 | 9 | objectionable, and it's a problem.  And we'll be going |
| 12:19:53 | 10 | to the judge on this. |
| 12:19:56 | 11 | MS. SCHEFFEY:  Okay. |
| 12:19:57 | **12** | **Q.   (BY MS. SCHEFFEY)  Mr. Hernandez, what I** |
| 12:19:58 | **13** | **was trying to say is I want to hear your story, but I** |
| 12:20:02 | **14** | **also want to make sure we're talking about this** |
| 12:20:02 | **15** | **document in front of you, okay?** |
| 12:20:04 | 16 | MR. MILSTEIN:  He testified that this |
| 12:20:06 | 17 | document instructed him to do some activities in the |
| 12:20:08 | 18 | dorm.  And then he described those activities and what |
| 12:20:10 | 19 | the guard told him he had to do.  And you didn't like |
| 12:20:13 | 20 | the sound of that, and you stopped his testimony, and |
| 12:20:15 | 21 | you have interrupted him and -- |
| 12:20:16 | 22 | MS. SCHEFFEY:  No, I want to ask him if |
| 12:20:18 | 23 | what the guard him told him to do is stated in here. |
| 12:20:21 | 24 | That's what I want to know. |
| 12:20:23 | 25 | MR. MILSTEIN:  You can ask him that after |

Alejandro Torres  07/16/2020                              Page 60
ALEJANDRO MENOCAL vs GEO GROUP

| 12:20:25 | 1 | he finishes answering your prior question. |

12:20:28   2                MS. SCHEFFEY:  Okay.  You may finish,

12:20:30   3   Mr. Hernandez.

12:20:34   4                THE INTERPRETER:  I need definition

12:20:39   5   interpreting, I believe.  This is the interpreter

12:20:40   6   speaking.

12:20:41   7                MS. SCHEFFEY:  Okay.

12:20:41   8           A.   So I said, No, why should I clean all of

12:20:45   9   the tables if I -- I did not use all of the table?  So

12:20:59  10   he said, Are you not going to clean?  I said, No, I'm

12:21:01  11   not going to clean.  I'm going to clean the area where

12:21:06  12   I ate, but not everything.  He turned me by my

12:21:25  13   shoulder, put the handcuffs on me and took me to

12:21:29  14   segregation.

12:21:31  15                In there, it also state time -- the visit

12:21:59  16   schedule, calls schedule, a commissary schedule.  So

12:22:31  17   the paper had religion, sometimes whether there would

12:22:35  18   be a congregation, sometimes there was a priest,

12:22:38  19   sometimes there was a pastor.  And I would attend

12:22:41  20   both.  For me, what was important is to be near God

12:22:53  21   and to give me strength to stay at that place.

12:23:14  22                I remember it said something else.  It

12:23:17  23   also says something about attorney -- attorneys visit.

12:23:33  24   And it said something else in the letters, but I think

12:23:39  25   I don't remember quite clearly

Alejandro Torres  07/16/2020
ALEJANDRO MENOCAL vs GEO GROUP                           Page 61

12:23:41    1          Q.   (BY MS. SCHEFFEY)  Is that it?

12:23:42    2          A.   Yes.

12:23:44    3               MS. SCHEFFEY:  Teresa, could you read

12:23:45    4    back the question, the original question?

12:24:21    5               THE COURT REPORTER:  Sure.  I'm looking

12:24:21    6    for the question.  Hold on.

12:24:22    7               (The last question was read back as

12:24:22    8    follows:  "Do you remember this document being

12:24:22    9    threatening in any way?")

12:24:27   10          A.   No.  No, that document didn't say

12:24:38   11    anything like that, just everything I told you.  And

12:24:42   12    also that you had to obey the orders that the guards

12:24:50   13    gave you.

12:24:51   14          Q.   (BY MS. SCHEFFEY)  Thank you.

12:24:54   15               MS. SCHEFFEY:  I'm also going to -- as

12:24:56   16    we've now reread the question and gotten the answer,

12:24:58   17    I'm going to move to strike the entire portion as

12:25:02   18    nonresponsive.  That will be for the record.  As

12:25:05   19    Mr. Milstein said that he is going to bring it before

12:25:07   20    the judge, now we have a clear record.

12:25:31   21          Q.   (BY MS. SCHEFFEY)  The handbook that you

12:25:33   22    described earlier, what you called earlier the housing

12:25:36   23    unit sanitation program --

12:25:45   24               MR. MILSTEIN:  Object to form.  Misstates

12:25:46   25    prior testimony.

U.S. LEGAL SUPPORT, INC
303-832-5966

**2 Supp. App. 134**

Alejandro Torres  07/16/2020                                    Page 76
ALEJANDRO MENOCAL vs GEO GROUP

01:34:38   1          A.    The job when I was paid for $1 a day, my

01:34:46   2    job consisted on polishing and cleaning and waxing all

01:34:49   3    of the floors in the dorms and the hallway.  I never

01:34:55   4    cleaned the bathrooms.

01:34:59   **5          Q.    Okay.  And when you signed this document,**

01:35:01   **6    you understood that the work you did under this**

01:35:03   **7    program would be paid at $1 a day; is that correct?**

01:35:18   8          A.    Yes, it was $1 a day.

01:35:21   **9          Q.    Okay.  And was there a position you could**

01:35:23   **10   apply for to clean only in the pod, to your knowledge?**

01:35:45   11         A.    Ma'am, with all due respect, you are

01:35:48   12   confused.  When the application says cleaning the

01:36:02   13   dorm -- I will not say this again -- for the officers,

01:36:12   14   the dorm means every single one of the dorms.  It

01:36:23   15   never specified the dorm where I lived, where I spend

01:36:28   16   my time when I was detained.  Because for them, the

01:36:44   17   dorms mean where people dressed in blue are, the

01:36:50   18   marshals, and the women.  That's all.

01:36:56   **19         Q.    Okay.  So I appreciate you explaining to**

01:36:58   **20   me what you believed to be GEO's position, but I'm**

01:37:02   **21   going to go through this document, okay?  And I want**

01:37:04   **22   your understanding.**

01:37:25   23         A.    On the document, it states cleaning the

01:37:33   24   dorm.  But when I realized, and it was already too

01:37:42   25   late, that for the officers the dorm meant all of the

2 Supp. App. 135

Alejandro Torres 07/16/2020
ALEJANDRO MENOCAL vs GEO GROUP
Page 77

01:37:46  1  other dorms -- because when I say I wanted to clean

01:38:01  2  the dorm, I believed it was the dorm where I was

01:38:04  3  detained.

01:38:05  **4**  **Q.  I understand.  Can I ask my question now,**

01:38:07  **5**  **Mr. Hernandez?**

01:38:10  6  MR. MILSTEIN:  Let me just note for the

01:38:11  7  record that that's yet another time that counsel has

01:38:14  8  interrupted the client mid answer.

01:38:19  **9**  **Q.  (BY MS. SCHEFFEY)  May I ask my question**

01:38:20  **10**  **please, Mr. Hernandez?**

01:38:26  11  A.  Yes, tell me.

01:38:28  **12**  **Q.  When you wrote housekeeping, what job**

01:38:31  **13**  **were you applying for?**

01:38:51  14  A.  To clean the dorm -- when I said to clean

01:39:06  15  the dorm, I understood it to be mopping and sweeping,

01:39:13  16  not to clean the tables, the windows, the mirrors, and

01:39:16  17  the bathrooms.

01:39:19  **18**  **Q.  Okay.  So when you volunteered here, you**

01:39:21  **19**  **were volunteering to mop and sweep the dorm; is that**

01:39:24  **20**  **correct?**

01:39:25  21  A.  So -- but I never got to mop or sweep.  I

01:39:51  22  only cleaned the bathrooms.  And that only happens

01:39:54  23  because the officer assigned me to clean the bathrooms

01:39:58  24  when he realized they were dirty.

01:40:01  **25**  **Q.  Okay.  Who did you think should clean up**

Alejandro Torres  07/16/2020
ALEJANDRO MENOCAL vs GEO GROUP
Page 78

01:40:05    1    the bathrooms?

01:40:21    2         A.   I did not realize that they were dirty to

01:40:24    3    such an extent.  And being that I had been through

01:40:34    4    segregation, I didn't want to go through the same.

01:40:46    5    When I realized that I found gloves that had semen on

01:40:52    6    them and plastic packs with semen, with pubic -- pubic

01:41:03    7    hair -- and so I was disgusted.  And so the guard was

01:41:32    8    looking at me with his eyes looking up, and he was

01:41:36    9    mocking me.  And so I finished in the bathrooms, and I

01:42:03    10   cleaned one of them extremely well because I felt

01:42:09    11   filthy, I felt I had been humiliated in the worst

01:42:23    12   possible way that a human being can be humiliated.

01:42:26    13   It's just not fair.

01:42:30    **14        Q.   I understand.  I'm going to ask you about**

01:42:32    **15   the timing of that incident, okay?  The time you just**

01:42:41    **16   discussed when you cleaned the showers, do you**

01:42:44    **17   remember the date?**

01:42:52    18        A.   No, I do not remember.

01:42:55    **19        Q.   Do you remember how soon after you**

01:42:56    **20   arrived at the facility that it occurred?**

01:43:29    21        A.   You know, there is one thing I can tell

01:43:31    22   you.  Good memories, I do not have.  And the bad

01:43:36    23   memories -- the bad memories -- correction for the

01:43:38    24   record -- I remember them vividly, and they are

01:43:41    25   harmful.

Alejandro Torres  07/16/2020                                Page 79
ALEJANDRO MENOCAL vs GEO GROUP

01:44:00   1              So I arrived to GEO, I had some paper.

01:44:04   2    And I would ask the guard to give me some paper

01:44:08   3    because I was writing down everything that was

01:44:11   4    happening, everything that I was doing every single

01:44:15   5    day.  And my intention was either to put a book

01:44:32   6    together during my life of the suffering I went

01:44:35   7    through.

01:44:43   8              And a guard that checked me down, he

01:44:50   9    spoke Spanish, everything I had with my daughters'

01:45:00   10   pictures, he tore all of the papers as well as a

01:45:11   11   picture of my daughter.  It was -- for him, there was

01:45:19   12   contraband.

01:45:24   **13       Q.   Okay.  And I understand that's hard.**

01:45:25   14            MS. SCHEFFEY:  Can the court reporter

01:45:26   15   please read back the question.

01:45:39   16            (The last question was read back as

01:45:39   17   follows:  "Do you remember how soon after you arrived

01:45:39   18   at the facility that it occurred?")

01:45:41   19            MS. SCHEFFEY:  And I'm going to object to

01:45:43   20   the rest as nonresponsive.  The questions are --

01:45:45   21   sorry.

01:45:54   22       A.   I don't remember.  Those are memories,

01:46:06   23   but that happened after I was taken to segregation.

01:46:09   **24       Q.   (BY MS. SCHEFFEY)  Okay.  How many times**

01:46:12   **25   were you taken to segregation?**

Alejandro Torres  07/16/2020                                        Page 80
ALEJANDRO MENOCAL vs GEO GROUP

01:46:16    1         A.    Four times.

01:46:21    2         Q.    When was the first time?

01:46:26    3         A.    The time I did not clean.

01:46:30    4         Q.    How soon after you arrived at the

01:46:32    5    facility was that?

01:46:41    6         A.    About three days.

01:46:43    7         Q.    Three days after you arrived at the

01:46:46    8    facility?

01:46:47    9         A.    Yes.

01:46:50   10         Q.    Was that in 2009 or in 2012?

01:46:59   11         A.    2012.

01:47:02   12         Q.    Were you sent to segregation any of the

01:47:06   13    times during your stay in 2009?

01:47:17   14         A.    No, I was there for a very short period

01:47:32   15    of time until it was under construction.  Apparently I

01:47:37   16    arrived to the old one.

01:47:40   17         Q.    So the answer is, no, you were not sent

01:47:42   18    to segregation in 2009?

01:47:48   19         A.    In 2009.

01:47:50   20         Q.    And for how long were you in segregation

01:47:53   21    the first time you went?

01:47:59   22         A.    15 days.

01:48:03   23         Q.    And did you have medical issues that

01:48:05   24    required you to go to the hospital at that point?

01:48:17   25         A.    No, I had another problem later on.

Alejandro Torres  07/16/2020                                   Page 81
ALEJANDRO MENOCAL vs GEO GROUP

01:48:21   1          Q.   We'll get to that.

01:48:31   2          A.   No, I was -- I had a problem later on

01:48:36   3   that required them taking me to the hospital because

01:48:39   4   in 2007 or '8, I had a heart attack.

01:48:44   5          Q.   Okay.  So when was the second time you

01:48:47   6   went to segregation?

01:48:47   7               (The court reporter interrupted for the

01:48:47   8   clarity of the record.)

01:49:03   9          A.   Another time when I was tired, and I did

01:49:06   10   not want to clean the floor.

01:49:11   11               THE COURT REPORTER:  Thank you.

01:49:11   12          Q.   (BY MS. SCHEFFEY)  So both times were

01:49:12   13   when you did not want to clean the floors?

01:49:20   14               MR. MILSTEIN:  Objection, misstates the

01:49:22   15   testimony.

01:49:49   16          A.   There was two times when I didn't want to

01:49:52   17   clean the floors.  One time where they accused me of a

01:49:56   18   fight where I did not participate.  And the first time

01:50:00   19   because I didn't want to clean the tables.

01:50:03   20          Q.   (BY MS. SCHEFFEY)  Okay.  So I just want

01:50:06   21   to make sure it's clear for me so I can ask you good

01:50:10   22   questions.  So I'm talking about the first time.  And

01:50:16   23   that was about three days after you arrived, and you

01:50:18   24   said you were sent for 15 days; is that correct?

01:50:33   25          A.   No, they left me there for 15 days.

U.S. LEGAL SUPPORT, INC
303-832-5966

**2 Supp. App. 140**

Alejandro Torres 07/16/2020
ALEJANDRO MENOCAL vs GEO GROUP
Page 82

| 01:50:37 | 1 | Q. And what was the infraction that you |
| 01:50:40 | 2 | committed? |
| 01:50:45 | 3 | A. For not cleaning the tables. |
| 01:50:47 | 4 | Q. Okay. And then the next time, how |
| 01:50:54 | 5 | quickly after was that -- did that occur? |
| 01:51:01 | 6 | A. The second time -- the next time was when |
| 01:51:13 | 7 | I was already polishing the floors, and we had worked |
| 01:51:21 | 8 | all night two nights in a row. They would take us out |
| 01:51:31 | 9 | of our dorms around 7:30 in the evening until 7:30 in |
| 01:51:36 | 10 | the morning. I hadn't slept. And during the daytime, |
| 01:51:48 | 11 | I couldn't sleep because of all of the noise and all |
| 01:51:50 | 12 | of the yelling. |
| 01:51:59 | 13 | So when they told me to go clean the |
| 01:52:02 | 14 | floors, I told the guard I wasn't going to go. I was |
| 01:52:06 | 15 | tired. And he said to me, There is an inspection. I |
| 01:52:15 | 16 | don't care. Let's go. I did not want to, so he went |
| 01:52:27 | 17 | down the stairs. And a little time later, I don't |
| 01:52:41 | 18 | know how much time lapsed, because I was doing my |
| 01:52:46 | 19 | paper craft to tire out so I could sleep despite the |
| 01:52:54 | 20 | noise. |
| 01:53:02 | 21 | He arrived, called me to the door, |
| 01:53:04 | 22 | handcuffed me, and took me to segregation. That was |
| 01:53:12 | 23 | the second time. |
| 01:53:14 | 24 | Q. And I believe the question was how soon |
| 01:53:17 | 25 | after you arrived did that happen? |

Alejandro Torres  07/16/2020                                    Page 83
ALEJANDRO MENOCAL vs GEO GROUP

| | | |
|---|---|---|
| 01:53:32 | 1 | A.   I don't recall.  Honestly, I don't |
| 01:53:34 | 2 | recall. |
| 01:53:35 | 3 | Q.   And was that for not cleaning as part of |
| 01:53:37 | 4 | the $1-a-day program? |
| 01:53:47 | 5 | A.   Yes.  I had worked for two nights in a |
| 01:53:59 | 6 | row. |
| 01:54:00 | 7 | Q.   And those two occasions, the 2012 |
| 01:54:02 | 8 | occasion where you didn't clean the table and the |
| 01:54:04 | 9 | other occasion where you didn't clean the floors, were |
| 01:54:07 | 10 | those before or after the shower incident? |
| 01:54:29 | 11 | A.   The thing with the shower happened |
| 01:54:32 | 12 | before. |
| 01:54:38 | 13 | Q.   So the thing with the shower happened in |
| 01:54:40 | 14 | the first three days you were at Aurora? |
| 01:54:57 | 15 | A.   Can't be, because the very first time I |
| 01:55:00 | 16 | was taken for 15 days.  I want to clear something up. |
| 01:55:15 | 17 | (The court reporter interrupted for the |
| 01:55:15 | 18 | clarity of the record.) |
| 01:55:15 | 19 | A.   When you're taken to segregation, the |
| 01:55:30 | 20 | time is a really hard time. |
| 01:55:33 | 21 | Q.   I understand.  And we're going to get to |
| 01:55:35 | 22 | that; but right now, I'm just trying to get a |
| 01:55:37 | 23 | timeline, okay? |
| 01:55:56 | 24 | A.   But I want you to understand that I |
| 01:55:58 | 25 | cannot tell you the time period when it happened |

| 05:04:59 | 1 | And there was a person who helped me, and I worked in |
| 05:05:02 | 2 | yard keeping.  And that same person asked me if I knew |
| 05:05:13 | 3 | how to drive a rig.  And that's the way I was driving |
| 05:05:25 | 4 | the rig, the trailer.  Those the two jobs I had. |
| 05:05:31 | **5** | **Q.   Do you have family in the United States?** |
| 05:05:38 | 6 | A.   My wife and two daughters. |
| 05:05:41 | **7** | **Q.   Were you deported from the United States?** |
| 05:05:47 | 8 | A.   Yes. |
| 05:05:48 | **9** | **Q.   And your family, did they go with you?** |
| 05:06:00 | 10 | A.   No, I'm on my own here in Mexico, and my |
| 05:06:03 | 11 | wife and daughters are in Denver. |
| 05:06:05 | **12** | **Q.   Do you get to see them ever?** |
| 05:06:15 | 13 | A.   My daughter Nelly has come down three |
| 05:06:20 | 14 | times.  She's a U.S. citizen. |
| 05:06:22 | 15 | (The court reporter interrupted for |
| 05:06:22 | 16 | clarification of the record.) |
| 05:06:22 | 17 | A.   My daughter Nelly has come -- has been |
| 05:06:34 | 18 | here for three times.  She is a U.S. citizen.  And my |
| 05:06:42 | 19 | other daughter is ten years old. |
| 05:06:55 | 20 | THE INTERPRETER:  I need correction for |
| 05:06:56 | 21 | the record.  Counsel, it is not clear to the |
| 05:07:04 | 22 | interpreter who is a citizen who has come down three |
| 05:07:08 | 23 | times. |
| 05:07:09 | **24** | **Q.   (BY MR. MILSTEIN)  Tell us your two** |
| 05:07:11 | **25** | **daughters' names and their ages and which one, if** |

Alejandro Torres  07/16/2020                                    Page 141
ALEJANDRO MENOCAL vs GEO GROUP

05:07:14   1    either, is a citizen.

05:07:16   2              MS. SCHEFFEY:  Object to form.

05:07:28   3         A.   My daughter Nelly, she is ten years old.

05:07:34   4    Excuse me.  She's going to turn ten in October.  She

05:07:40   5    is a citizen.  And my daughter Diana is going to turn

05:07:50   6    21 tomorrow.  And Diana has come once to see me, and

05:08:04   7    Nelly has come three times.  My wife has come once to

05:08:12   8    see me.

05:08:15   9         Q.   Were you detained at the GEO detention

05:08:18   10   center in Aurora?

05:08:24   11        A.   Yes.

05:08:27   12        Q.   Were you ever sent to solitary

05:08:29   13   confinement during your time there?

05:08:39   14        A.   Yes, four times.

05:08:48   15        Q.   You've told us before that one of those

05:08:50   16   times you were sent because you refused to do the work

05:08:53   17   without pay, right?

05:09:05   18             MS. SCHEFFEY:  Object to form.

05:09:06   19        A.   Yes.

05:09:09   20        Q.   (BY MR. MILSTEIN)  Mr. Hernandez Torres,

05:09:11   21   tell us about segregation at GEO in Aurora.

05:09:36   22        A.   It is a room -- it is a meter -- 10 or 8

05:09:39   23   meters wide by 3 1/2 meters.  And there is a bed.

05:09:55   24   It's made of steel.  A toilet and a wash basin.  Above

05:10:10   25   the wash basin, there is a square -- there is a square

Alejandro Torres 07/16/2020                                    Page 142
ALEJANDRO MENOCAL vs GEO GROUP

05:10:25    1   opening and -- I need look for the word.  There is

05:10:33    2   square -- it's like -- there is a square bar that --

05:10:40    3   where the air conditioning is coming through -- a

05:10:44    4   vent, a square vent where the air-conditioning is

05:10:47    5   coming through, and it's always very cold.  The door

05:10:55    6   is made of steel.  And it has glass for about half a

05:11:11    7   meter and with 3 or 4 inches where all the guards have

05:11:25    8   a bell.  So every 15 or 20 minutes, they will drag

05:11:44    9   this device through the door until it rings.  There's

05:11:47   10   no way you can go to sleep because the light is always

05:11:55   11   on.  That's segregation.

05:12:02   **12        Q.   How many hours per day do you spend in**

05:12:04   **13   that cell when you're in segregation?**

05:12:12   14        A.   All the time.

05:12:17   **15        Q.   How did you stay warm if the AC was on**

05:12:21   **16   all of the time?**

05:12:55   17        A.   So, you know, when you -- when they think

05:12:59   18   that they give you a -- some linen, one.  And they

05:13:03   19   give you like a vinyl pillow.  So when you cannot

05:13:09   20   withstand the cold anymore, I would wrap myself with

05:13:12   21   the sheet, and then I would kind of curl myself up so

05:13:26   22   that I could warm up my body with my own breathing.

05:13:40   23   On one occasion, I was in that position.  And the

05:13:53   24   guard, when he saw I was covered up, opened the door

05:14:01   25   up, took the sheet from me, and left me there with

Alejandro Torres  07/16/2020                                   Page 155
ALEJANDRO MENOCAL vs GEO GROUP

```
 1

 2                     REPORTER'S CERTIFICATE

 3    STATE OF COLORADO          )
                                 ) ss.
 4    CITY AND COUNTY OF DENVER  )

 5             I, TERESA LYNNE CARDENAS, Registered
      Professional Reporter, Certified Realtime Reporter,
 6    and Notary Public ID 19994013288, State of Colorado,
      do hereby certify that previous to the commencement of
 7    the examination, the said ALEJANDRO HERNANDEZ TORRES
      was duly sworn or affirmed by me to testify to the
 8    truth in relation to the matters in controversy
      between the parties hereto; that the said deposition
 9    was taken in machine shorthand by me remotely and was
      thereafter reduced to typewritten form; that the
10    foregoing is a true transcript of the questions asked,
      testimony given, and proceedings had.
11
               I further certify that I am not employed by,
12    related to, nor counsel for any of the parties herein,
      nor otherwise interested in the outcome of this
13    litigation.

14             IN WITNESS WHEREOF, I have affixed my
      signature this 20th day of July,
15    2020.

16             My commission expires May 24, 2023.

17

18

19    ___X_ Reading and Signing was requested.

20    _____ Reading and Signing was waived.

21    _____ Reading and Signing was not required.

22
                 Teresa Lynne Cardenas
23             _____
                 TERESA LYNNE CARDENAS
24               Registered Professional Reporter
                 Certified Realtime Reporter
25
```

Appellate Case: 22-1409   Document: 38-2   Date Filed: 03/24/2023   Page: 152

*MENOCAL*

*VS.*

*THE GEO GROUP*

**Deposition**

*GRISEL XAHUENTITLA*

*10/26/2017*

_____

**AB Court Reporting & Video**
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

1    disciplinary segregation?

2              MR. HOOD:  Objection.

3    A     Not while I was detained.

4    Q     (By Mr. Deacon)  Okay.

5    A     Not that I know of.

6    Q     All right.  Nobody you knew of while

7    you were at Aurora was placed in either

8    administrative segregation or disciplinary

9    segregation, correct?

10   A     You mean at the hole, right?

11   Q     Pardon me?  Yeah.

12   A     When you say --  All that means the

13   hole?

14   Q     I don't know.  What is the hole?

15   A     El hoyo.

16   Q     Huh?  Have you ever seen the hole?

17   A     No.  They just used to point at it.

18   Q     Okay.  Who used to point at it?

19   A     The guards.

20   Q     Okay.  Did you ever go in the hole?

21   A     No.

22   Q     Were you ever assigned to the hole?

23   A     No.

24             MR. HOOD:  Objection.

25   Q     (By Mr. Deacon)  Did you ever --  Did

1    you ever know anybody who was placed in the hole?

2        A     No.

3        Q     Okay.  So you don't have any --  I

4    can't ask you any information about what it

5    consisted of or what was inside there --

6        A     What it looked like, no.

7        Q     All right.  What guard pointed out the

8    hole to you?

9        A     I don't remember the names of the

10   guards.

11       Q     Okay.  Was it male?  Was it female?

12       A     We always got females.

13       Q     Okay.  So you only had female guards?

14       A     Yes, sir.

15       Q     Okay.  And do you recall any guard ever

16   threatening to put somebody in the hole?

17       A     About three times.

18       Q     And who was --  When was that?

19       A     One time this lady was sick -- well, a

20   girl, not a lady -- this girl was sick, and her

21   name was on the board to clean -- to clean the --

22   I --  I --  I don't remember if it was sweeping or

23   mopping.  And so she had a really bad abdominal

24   pain, and -- and so another girl and I volunteered

25   to do the work for her.  And the guard said -- she

1    said "No."  She said that we had to go back to our

2    beds and she had to do the job, because her name

3    was on the board.  She was in real bad pain.

4           And so that's when -- that's when the

5    guard said that if she didn't do the work, she was

6    going to be sent to the hole.  And so she was

7    pointing at it like (indicating) -- like it was

8    right next to our dorm.  And --  And she said that

9    it wasn't going to be any pleasant.

10          That's all I know.

11    Q     Do you know if there's any -- where the

12    medical facilities are at Aurora?

13    A     Who is the what?

14    Q     Medical --  Where you receive medical

15    care, do you know where that's located at Aurora?

16    A     In the same --  In the same Geo

17    detention.

18    Q     Yes.  But in terms of where the guard

19    was pointing, do you know where the medical center

20    is in relationship to what you called the hole?

21    A     Oh, yes.  So you get out of the dorms,

22    and you walked to your -- to your left, and then

23    you walked to your right, and then I think you

24    again walked to the right, and then you wait for

25    the medical.

1      Q      Okay.

2      A      And she was pointing just at the right,

3  that there was a -- like a single dorm.

4      Q      Okay.  Well, a dorm that you never saw?

5      A      No.

6      Q      All right.  Who --  Who was the

7  detainee that had this stomachache that you were

8  describing?

9      A      I don't know her name.  She was either

10 from Honduras or El Salvador.

11     Q      How do you know that?

12     A      Because I --  I don't really remember

13 her name right now, but she -- she, in fact, ended

14 having a stone in her kidney.

15     Q      A kidney stone?

16     A      Yes, sir.

17     Q      How do you know she had a kidney stone?

18     A      Because she -- she got extremely sick

19 the next day.

20     Q      Okay.

21     A      And she --  So she was --  They took

22 her to the hospital.

23     Q      Outside of Aurora?

24     A      Yes, sir.

25     Q      Okay.  Do you remember if that was at

*AB Court Reporting & Video*

1  the beginning of your stay, toward the end of your

2  stay, in the middle of your stay, or do you

3  recall?

4      A      No.

5      Q      Okay.  Describe for me the guard that

6  allegedly said that if she didn't work, she'd be

7  sent to the hole?

8          MR. HOOD:  Objection.

9      A      She was tall.  She only spoke English.

10  Short hair.  And she had --  She was, like, your

11  skin color.

12     Q      Do you know what approximate age she

13  would be?

14     A      Between her 20s and 30s, like late 20s.

15     Q      Late 20s or early 30s?

16     A      Yes.

17     Q      Do you know what color her hair was?

18     A      She called it red.

19     Q      So it was --  It was colored red?

20     A      Barely.

21     Q      A lighter --

22     A      Kind of --

23     Q      A lighter --

24     A      Kind of brownish-red.

25     Q      Brownish-red, okay.  And was she a

**2 Supp. App. 152**

AB Court Reporting & Video

1    probably don't know this, but do you know what

2    they were looking for, why they had the shakedown?

3        A       Once in a while, you had the shakedown.

4        Q       But do you know what prompts a

5    shakedown?

6                MR. HOOD:  Objection.

7        A       No.  We just --  They clearly said that

8    we were not allowed to keep food, like lunch food

9    or something.  There's salt in big bowls in

10   commissary, so you think that you can save some

11   food from lunch for later, and they will throw

12   away everything; like, you're not allowed to have

13   that, or a -- the little -- your little milk.

14               Or like I repeat again, simply sugar or

15   anything like that.  That's all they were looking

16   for.  That's --  That's what I believe they were

17   all looking for

18       Q       (By Mr. Deacon)  Did anyone get in

19   trouble as a result of that shakedown?

20       A       No.

21       Q       Was anybody sent to administrative

22   segregation or disciplinary segregation?

23       A       You mean sent to the hole?

24       Q       Yeah.  Anybody sent there?

25       A       No, sir.

*AB Court Reporting & Video*

1    Q      Okay.  Let's talk about the second

2   time.  Describe for me the second time that

3   somebody mentioned that you could be sent to

4   administrative segregation or disciplinary

5   segregation?

6          MR. HOOD:  Objection.

7    A      Just simply --  The guards simply

8   telling us, like, we had to follow the rules.  We

9   had to clean the pod.  There were three different

10   names on the board daily to -- without including

11   the $1 say day pay -- that you had to clean the

12   dorms.  You either cleaned the tables, swept or

13   mopped the floors.

14          And so she was kind of being clear on

15   what the rules were.  "You have to do" --  "You

16   have to do the work" -- "the part of the work that

17   it says on the board no matter" -- "no matter

18   what.  And if you don't do it, you're going to be

19   sent to the hole."

20    Q      (By Mr. Deacon)  And do you remember

21   the name of this person?

22    A      No, sir.

23    Q      And I apologize.  Did you remember the

24   name of the lieutenant that you described for me?

25    A      No.

1    Q    And when I say "name," even if -- the

2  first name, nickname; anything like that?

3    A    No.  She had a Spanish last name.

4    Q    The lieutenant?

5    A    The lieutenant.  They mostly went by

6  their -- by their last names.

7    Q    And going to the second incident, this

8  person -- this guard, do you remember what she

9  looked like?

10   A    I don't remember.

11   Q    Okay.  You don't remember if she's

12 tall, short, medium?  You don't remember the color

13 of her hair?

14   A    I just remember she was speaking

15 English.

16   Q    Okay.  Do you know if she was able to

17 speak Spanish?

18   A    I do remember that she did not spoke

19 (sic) Spanish.

20   Q    Was she one of the regular guards

21 there, to your knowledge?

22   A    Yes, sir.

23   Q    Okay.  And she referred to a list of

24 what -- what needed to be done to clean the pods

25 and told you that you had to do those -- that list

1        A       Where?

2        Q       Right here on Page 2.  If you go down

3    to the third paragraph.

4        A       It does say that, uh-huh.  Yes.

5        Q       And does Page 6 outline the

6    disciplinary process at Item No. 11 on Page 6?

7                MR. HOOD:  Objection.

8        A       Page 6, 11?

9        Q       (By Mr. Deacon)  Yeah.  Do you see

10   where it says 11?  Does that start where it

11   discusses the disciplinary process?

12       A       Yes, sir.  I'm reading it.

13       Q       And if you turn the page, you'll see on

14   the right-hand side it lists seven items that you

15   have a right to.  And does it outline all the

16   different steps that can be taken if you disagree

17   with the actions being taken?

18               MR. HOOD:  Objection.

19       A       I am reading it, too.

20       Q       (By Mr. Deacon)  There are steps that

21   are -- you're supposed to know about that you take

22   if you disagree with actions being taken, correct?

23               MR. HOOD:  Objection.

24       A       Correct.  There are quite a few steps.

25       Q       (By Mr. Deacon)  If my client is

1  following the guidelines and requirements of the

2  federal government, why are you suing them?

3          MR. HOOD:  Objection.

4      A     When you are inside, you -- you have --

5  you feel this pressure, you feel this emotionally

6  depressed, besides me suffering from depression.

7  Besides that, you feel very depressed for the

8  situation where you're in at the moment.  And --

9  And they tell you, "This is what you have to do."

10  And they're not -- they're, of course, not --

11  They're not whispering you to your ear.  They're

12  loud, and so they -- so you feel a little

13  intimidated.

14          Of course, it is their job, and so you

15  feel like you don't have rights in there.  You --

16  Like I said, you feel intimidated.  And if they

17  tell you "clean, because you're going to the

18  hole," first, I'm going to clean.  I don't want to

19  go to the hole.

20      Q     Do you know, if you do not clean your

21  room, if there's a host of other actions that can

22  be taken in discipline as opposed to sending you

23  to administrative segregation?

24          MR. HOOD:  Objection.

25      A     Can you repeat that again?

1   Q      (By Mr. Deacon)   Yeah.   Probably a bad

2   question.   In your employee -- detainee handbook,

3   it outlines certain things that can be taken

4   against you for a particular offense, and one of

5   them might be if you don't clean up, you -- you

6   lose your right to use the commissary or go to --

7   your movie pass.

8           Why would you assume that you're

9   immediately going to the hole for not cleaning

10  your bedroom?

11  A      Well, like I said, the two different

12  guards told us that --   One of them said, "If you

13  refuse to do your work" --   "If you refuse to do

14  the part that you're supposed to do, we're going

15  to send you to the hole" (indicating).

16          The second time, we are at the

17  basketball court, and we're all intimidated

18  because she's really loud and she's -- she's

19  telling us that if she finds anything illegal,

20  such and such, she's going to send us to the hole,

21  so . . .

22  Q      Do you know if --   Go ahead.   I

23  apologize.

24  A      Sorry.   So, of course, I'm not

25  expecting to get -- to get the -- to get -- to get

1    STATE OF COLORADO)

2                     )ss.   REPORTER'S CERTIFICATE

3    COUNTY OF DENVER )

4        I, Tracy L. Harris, do hereby certify that I

5    am a Certified Realtime Reporter, Registered Merit

6    Reporter, and Notary Public within the State of

7    Colorado; that previous to the commencement of the

8    examination, the deponent was duly sworn to

9    testify to the truth.

10       I further certify that this deposition was

11   taken in shorthand by me at the time and place

12   herein set forth, that it was thereafter reduced

13   to typewritten form, and that the foregoing

14   constitutes a true and correct transcript.

15       I further certify that I am not related to,

16   employed by, nor of counsel for any of the parties

17   or attorneys herein, nor otherwise interested in

18   the result of the within action.

19       In witness whereof, I have affixed my

20   signature this 6th day of November, 2017.

21        My commission expires July 30, 2021.

22

23

24                        _____
                          Tracy L. Harris, CRR, RMR, RPR
                          216 - 16th Street, Suite 600
25                        Denver, Colorado  80202

**Stuart Grassian, M.D.**
401 Beacon Street
Chestnut Hill, MA 02467
(617) 244-3315; fax (617) 244-2792
stgrassian@gmail.com

In re:   ***Menocal et al. v. The GEO Group, Inc.***
US Dist Ct., Colorado. Civ. No. 1:14-cv-02887-JLK

### Psychiatric Report of Stuart Grassian, M.D.

I am a Board-certified psychiatrist, licensed to practice medicine in the Commonwealth of Massachusetts.  In December 2018, attorneys for the Plaintiffs in the above-captioned matter contacted me.  They asked me to provide an expert opinion regarding individuals in immigration detention in Aurora, Colorado who allege that they had been forced to clean the housing area in the facility under the threat that they would otherwise be punished by being "sent to the hole" – that is, placed in solitary confinement.  I was retained to provide an expert opinion as to the psychiatric effects of this form of threatened punishment, and to evaluate the psychiatric impact on these detainees as they experienced this threat, including their experience and perception of the threat as they encountered other detainees who returned to their housing unit after being confined in solitary.

The sources of information I reviewed for this purpose are typical of the types of information that form the basis of such psychiatric evaluations.  They include a number of documents, a list of which is attached, and also interviews of the following individuals who had been confined at the Aurora facility: Alejandro Menocal; Jesus Gaytan; Grisel Xahuentitla; Olga Alexakhina; Hugo Hernandez; and Alejandro Hernandez Torres.  These interviews provided both

factual information and also the opportunity to clinically appreciate their psychiatric experience of the coercive threat of solitary confinement.

My professional fee is $500/hour.  My compensation is not contingent on my opinions or on the outcome of this case.  A copy of my c.v. and a testimony list are attached.

## 1. Qualifications.

### 1.1.  Clinical

As noted in my c.v., attached, I have had a full-time clinical practice in psychiatry since completing my residency in 1977.  My clinical experience has included evaluation and treatment in both outpatient and inpatient settings.  I have also provided supervision to other clinicians in inpatient, outpatient and emergency room settings.

### 1.2.   Regarding Psychiatric Effects of Solitary Confinement

During the course of my professional career, I have had extensive experience evaluating people in confinement who were experiencing, or had experienced, confinement in solitary.  In 1983, I published an article in the American Journal of Psychiatry ("AJP") describing a particular psychiatric syndrome associated with solitary confinement.[1]  My article noted that this syndrome had been previously described in the psychiatric literature.  That article is attached hereto and incorporated herein.

My observations and conclusions generally regarding the psychiatric effects of solitary confinement have been cited in a number of federal court decisions, including: *Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir. 1988); *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995); *Brown v. Plata*, 131 S. Ct. 1910 (2011); *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal.

---

[1] Grassian, S., *Psychopathological Effects of Solitary Confinement*, Am. J. Psychiatry, 140:1450-1454 (1983).

1995); in the concurring opinion of Justice Kennedy in *Davis v. Ayala*, 135 S. Ct. 2187 (2015); and in the statement of Justice Sotomayor concurring with the denial of certiorari in *Apodaca v. Raemisch*, 586 U.S. ____ (2018).  I prepared a written declaration for *Madrid* describing the medical literature and historical experience concerning the psychiatric effects of restricted and isolated conditions of confinement as well as of other conditions of restricted environmental and social stimulation, and subsequently compiled the general (non-institution, non-inmate specific) portions of that declaration into an article published in 2006.[2]  This article is also attached hereto and incorporated herein.  This article describes the extensive body of literature, including clinical and experimental literature, regarding the effects of decreased environmental and social stimulation, especially in relation to the effects of segregated confinement on prisoners.

I have given lectures and seminars regarding these issues.  Although I do not have a complete list of those lectures and seminars, they include, but are not limited to, lectures at Harvard Law School and Harvard Medical School-Beth Israel Hospital in Boston, Harvard Medical School-Center for Bioethics, at meetings of the Nova Scotia, Virginia and New York State Bar Associations, the Office of Military Commissions of the U.S. Department of Defense (regarding Guantánamo detainees), the Federal Capital Defenders Habeas Unit, the John Jay College of Criminal Justice, and the American Correctional Association.  I have also been invited to provide testimony before state legislative hearings in New York, Massachusetts and Maine.

In the United States I have been retained as an expert in class-action investigations and lawsuits regarding the psychiatric consequences of solitary confinement in Massachusetts (2),

---

[2] Grassian, S., *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. Journal of Law & Policy, 327-383 (2006).

New Jersey, New York (3), California (2), Kentucky, Michigan, Ohio (2), Pennsylvania, Texas, Florida, Wisconsin and Iowa, as well as in individual cases in other states, including Alaska, Arizona, California, Connecticut, Florida, Georgia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Mississippi, New Mexico, New York, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Vermont, Virginia and the State of Washington.  These latter include evaluations of a number of individuals who were then, or had been in the past, confined in solitary on death row.

In addition, I have been retained and have testified in several class-action lawsuits regarding solitary confinement in Canada involving the federal prison system and Ontario's Provincial System, including the major federal court ruling in *British Columbia Civil Liberties Assn. and The John Howard Society of Canada v. Attorney General of Canada* (SCBC Vancouver Registry No. S-150415).

I have also been consulted by federal public defenders regarding the confinement of a number of individuals who were deemed to be "enemy combatants" and/or were either charged with or convicted of conspiring against the United States.  These include individuals who were confined in Guantánamo, in the Navy Brig in Charleston, S.C., in the federal ADX prison in Florence, Colorado, and in the SeaTac facility in Seattle, Washington, as well as in federal detention centers in New York City and Miami, Florida.

More recently, I have been retained as an expert regarding the psychiatric effects of the imprisonment and solitary confinement of several individuals of American or Iranian-American joint citizenship, three of whom (Jason Rezaian, Saeed Abedini, Amir Hekmati) were released in 2015 with the passage of the U.S.-Iran nuclear treaty.

**2 Supp. App. 163**

I have been consulted on issues concerning the psychiatric effects of solitary confinement by a variety of public advocacy groups in the United States, including the Legal Aid Society of New York, Prisoner's Legal Services of New York, the Center for Constitutional Rights, The Massachusetts Correctional Legal Services, the Massachusetts Civil Liberties Union, the National Prison Project of the American Civil Liberties Union, the United States Department of Justice, the Juvenile Justice Law Center, Children's Rights, Inc., Disability Rights Iowa, Disability Rights New York, the Department of Corrections of the State of Florida, and various religious organizations.

I also serve on the Advisory Committee of the New York State Commission on Quality of Care & Advocacy for Persons with Disabilities, and have served on the Advisory Board of the Correctional Association of New York.

## 2. Solitary Confinement, Generally.

### 2.1. Conditions of Confinement in Solitary.

Solitary confinement is variously designated as "Segregation," "Disciplinary Segregation," "Administrative Segregation," "Protective Custody," "Behavior Management Unit," and "Psychiatric Observation."   From the interviews I conducted with named plaintiffs in the present lawsuit, I conclude that the conditions prevailing in segregated confinement experienced by these plaintiffs are consistent with the following general description:

Conditions in solitary confinement generally comprise the housing of an individual alone in a relatively small cell (usually in the range of 80-100 square feet) for upwards of 22-23 hours a day, with minimal opportunity for mental activity or for social and perceptual stimulation. Generally the confined person is allowed out to exercise one or two hours a day.  Outdoor exercise is generally alone, usually in a small area enclosed by concrete walls or chain link

fencing.  The chain link fenced areas are typically long and narrow; they are often described as being like "a dog run."  In such an arrangement, if more than one person is allowed out at the same time, they can speak with each other through the chain link fencing.  In inclement weather, exercise is indoors, and generally there is some minimal opportunity for large muscle and aerobic exercising.

The walls, floor and ceiling of such cells generally are of cement and concrete.  The cell usually contains a sink and toilet (most often a stainless steel sink and toilet combination) and a platform (either a concrete slab or a metal frame) on which is placed a relatively thin mattress.  There is usually a narrow window looking out onto the outside world.  In particularly harsh conditions of confinement, either there is no such window or the window is frosted/painted or otherwise altered so that the inmate cannot see through the window.  The segregation cells in Aurora have no window to the outside world.

The door is typically a solid steel door on a sliding track; the door typically contains a horizontal slot in which food may be passed and hands shackled, and a second small window facing onto the tier.  The food slot is typically closed and opened with latch outside the cell, and in particularly harsh conditions of confinement, the window facing the tier may also have a cover that can be latched from outside the cell.

There is often, but not always, a stainless steel shelf/small desk that is bolted to the wall, and a stool or other place to sit by the shelf/desk.  Other than the thin mattress, pillow and bedding, which are almost always provided, items allowed in the cell vary.  People confined to such cells generally are allowed some legal material and a limited amount of other reading material in their cell.  Television and/or radio and/or personal devices (e.g. video games, iPods, etc.) may or may not be allowed, though the number of television and/or radio stations available

6

is generally limited.  Almost always paper, a writing instrument, envelopes and stamps are permitted.  Other personal items (e.g. clothing, photographs and so on) may or may not be allowed.  Social phone calls to family are almost always allowed, though with limits on their frequency and duration.

In short, solitary confinement imposes harsh and sterile conditions which provide extremely little stimulation or opportunity for productive engagement.  They impose perceptual deprivation,[3] forced idleness and social isolation.

Not surprisingly, people exposed to such conditions experience such confinement as punitive, cruel, even sadistic.  As a psychiatric matter, solitary confinement inevitably creates feelings of helplessness, powerlessness, as well as intense fear and paranoia.  The experience of being so totally overpowered and helpless inevitably also creates a deep sense of shame and humiliation, feelings that will lead to some combination of depression and rage.

### 2.2.  The Historical Experience with Solitary Confinement.

It has long been known that severe restriction of environmental and social stimulation has a profoundly deleterious effect on both mental and physical functioning.  A discussion of literature regarding such conditions of restricted environmental stimulation is found in the

---

[3] The term "sensory deprivation" has sometimes been used to describe the perceptual deprivation associated with such conditions, but that term is actually a misnomer. What is lacking in solitary is *not* the absence of *all* stimulation, but rather the lack of *meaningful*, *anchoring*, stimulation.  The stimulation of, for example, steel doors banging and people yelling does *not* ameliorate the effects of environmental deprivation, nor do the brief interactions through the cell door with staff making rounds or providing meal trays.  Indeed, noxious stimulation has been shown to *worsen* the effects of perceptual deprivation.  For example, in various interrogation situations, such as that used by the British in interrogating suspected IRA members, and that used by the United States military and CIA in interrogation at Guantánamo, noxious stimulation – especially high decibel noise – was intentionally used to worsen the psychiatric effects of solitary confinement.

Appendices of the article cited above that was published in the Washington University legal journal.

The United States introduced prolonged incarceration and solitary confinement as a means of dealing with criminal behavior, introducing the penitentiary system in the early nineteenth century.  This system, originally embodied as the "Philadelphia System," involved almost an exclusive reliance upon segregated confinement as a means of incarceration and also became the predominant mode of incarceration in several European prison systems emulating the American model at the time.

The results were catastrophic.  The incidence and severity of mental disturbances among prisoners so detained was so great that the system fell into disfavor and was ultimately abandoned.  During this process, a major body of clinical literature was developed that documented the psychiatric disturbances created by such stringent conditions of confinement. The paradigmatic disturbance was an overt disruption of brain function – an agitated confusional state, which, in more severe cases, had the characteristics of a florid psychotic delirium, characterized by severe confusion, paranoia, and hallucinatory features, and also by intense agitation and random, impulsive violence – whether directed at others or self-directed.

As noted, the American system was emulated in a number of other countries, and its impact became a major administrative and medical problem in prisons employing it.  Between 1854 and 1909, thirty-seven articles appeared in the German medical literature describing thousands of cases of psychotic illnesses that emerged during incarceration in solitary confinement.[4]  And even though psychiatric diagnosis was still in its infancy during that period,

---

[4] Nitsche, P. & Wilmanns K., *The History of the Prison Psychoses*, New York, Nervous and Mental Disease Publishing Company (1912).

clinicians were very aware that these psychiatric disturbances had "a particular stamp" – they were different from the disturbances seen in psychiatric clinical practice.  As described in Appendix B of my Washington University article, descriptions of the psychiatric disturbances in the nineteenth century literature were strikingly consistent with the clinical observations made more recently.  These clinical observations were set forth in my AJP article.

The disruption of brain function and consequent psychiatric harm caused by solitary confinement became exceedingly apparent during the nineteenth century.  Indeed, by 1890, in *In re Medley*, 134 U.S. 160, 168 (1890), the United States Supreme Court explicitly recognized the massive psychiatric harm caused by solitary confinement:

> This matter of solitary confinement is not ... a mere unimportant regulation as to the safekeeping of the prisoner .... [E]xperience [with solitary confinement] demonstrated that there were serious objections to it.  A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

Concerns about the profound psychiatric effects of such conditions of isolated confinement continued into the twentieth century, giving rise to a major body of medical and scientific literature concerning the effects of sensory deprivation and social isolation, including a substantial body of experimental research.  This research was funded by the U.S. Central Intelligence Agency and the Canadian Department of Defense, and was conducted at Harvard and McGill Universities.  The research model utilized briefly imposed profound sensory deprivation (soundproof, lightproof rooms, cushioning of limbs and body, etc.) for a relatively short period of time (in the range of hours).  The findings from this experimental research (described in Appendix C of my Washington University article) are consistent with those in the

**2 Supp. App. 168**

more recent medical literature studying the effects of solitary confinement.  These observations from such disparate sources all comport with the findings regarding the effects of solitary confinement among political prisoners and prisoners of war.[5]

### 2.3.  The Psychiatric Effects of Solitary Confinement.

Solitary confinement imposes a devastating triad of emotional and neuropsychiatric deprivations: social isolation, a barren perceptual environment, and deprivation of meaningful mental activity.  The effect of these deprivations will be heightened if the individual subjected to them perceives his conditions of confinement as the product of the exertion of arbitrary power.  Such perception deprives the individual of any sense of order, of justice, of rules that might protect him.  Thus, such perception will inevitably magnify the individual's experience of fear and humiliation.  Although it is clear that longer exposure to solitary will increase the severity of psychological harm, I have observed such harm in the course of my psychiatric work regarding the effects of solitary confinement– including overt delirium and suicidality – occurring within hours of such confinement.

### 2.3.1.   Affective Disturbances: Anxiety, Depression and Self-Harm.

Individuals in solitary confinement often become seriously depressed.  There is overwhelming empirical evidence that solitary confinement causes many people – even those with no prior history of mental illness – to become suicidal and/or self-destructive, especially in the first days of such confinement.[6]

---

[5] *See* Appendix D of my Washington University article.

[6] Statistical studies have shown that suicide among those in solitary confinement is seven times as common as it is among those in general population.  One major study (Kaba, F., et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, Am. J. Public Health, 104(3):442-447 (2014)) analyzed medical records of 244,699 incarcerations in New York City jails and found that of 2,182 acts of self-harm, approximately 50% occurred among the 7% of inmates housed in

In addition, people placed in solitary confinement often develop, even within hours or days, severe panic attacks, marked by intense fear, dread of impending death, and with somatic manifestations that include tachycardia (racing pulse), diaphoresis (intense sweating), shortness of breath, and tremulousness.  Sleep disorders, disruption of circadian rhythm and headaches are also common.  In addition, individuals in solitary soon become intolerant of ordinary levels of stimulation.[7]

### 2.3.2.  Characteristic Neuropsychiatric Syndrome:  Stupor and Delirium

In addition to the physical and psychiatric effects mentioned above, there is also a unique neuropsychological syndrome associated with solitary confinement, a syndrome not seen in the ordinary course of clinical psychiatric practice.  It is instead a syndrome more typically seen among severely medically ill patients in the Intensive Care Unit (patients with sepsis, severe hypoxia or heart failure, kidney or liver failure, and so on).

---

solitary confinement.  Another study (Haney, C. & Lynch, M., *Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement*, NYU Review L. and Soc. Change 23, 477-570 (1997)) analyzed episodes of self-mutilation in North Carolina's prisons, revealing that nearly 50% occurred among the small proportion of inmates housed in solitary; similarly, 51% of self-mutilating behaviors in Virginia prisons occurred among inmates in solitary.  In Texas solitary confinement units, suicide is five times more likely than in the general prison population, and self-harm is eight times more likely than it is in the community outside prison. (American Civil Liberties Union of Texas, *A Solitary Failure: The Waste, Cost and Harm of Solitary Confinement in Texas* (2015): https://www.aclutx.org/sites/default/files/field_documents/SolitaryReport_2015.pdf.)

[7] Several other medical problems have been observed with longer-term isolation. These include visual impairment, gastrointestinal disorders, urological difficulties, and orthopedic problems (weakness, spasticity, chronic pain conditions, arthralgias and myalgias).  Solitary confinement has been shown to be a major risk factor for the development of hypertension, dyslipidemia and cardiovascular disease.  *See* Williams, B., et al., *The Cardiovascular Health Burdens of Solitary Confinement,* J. Gen. Intern. Med., 34(10):1977-80 (2019).  There is also evidence that it is a significant risk factor for the development of dementia.

Medical and experimental literature, as well as my own experience and observations, demonstrates that even within a few hours individuals subject to solitary confinement typically become incapable of maintaining an adequate state of alertness and attention to the environment. Their thinking and reactions become clouded, their actions either lethargic or agitated. Electroencephalogram ("EEG") studies have provided corroboration of this impairment, showing that even a few days of solitary confinement will shift an individual's brain wave pattern into an abnormal pattern characteristic of stupor and delirium.  In other words, solitary confinement will demonstrably harm an individual's brain patterns.  Individuals subjected to solitary confinement often suffer from a syndrome characterized by several symptoms that are not typical of the psychiatric symptoms found in ordinary clinical practice.[8]  They include, among others: (i) impairments in thinking, concentration and memory; (ii) hyper-responsivity to external stimulation; (iii) hallucinations; (iv) obsessive ruminations; and (v) paranoia, delusions and problems with impulse control.  I discuss each of these symptoms in turn below.

### 2.3.3.   Impairments in Thinking, Concentration and Memory.

After even a relatively brief period in segregation, individuals will typically begin to descend into a mental torpor – a "fog" – in which alertness, attention and concentration all become impaired.  In particularly severe cases, these impairments can result in massive confusion and disorientation, and in some cases, this can develop even within hours of confinement in solitary.[9]  Even individuals less severely affected typically experience difficulties with thinking, concentration, and memory.

---

[8] *Supra*, note 2.

[9] *Id.*

### 2.3.4.   Hyper-Responsivity to External Stimulation.

Over time, the restriction of environmental stimulation in solitary confinement tends to cause the brain to become increasingly incapable of processing external stimuli.  In such a setting, individuals become "hyper-responsive" to even ordinary levels of stimulation; for example, a sudden noise or light jars the individual and becomes intensely unpleasant.

In my experience with individuals who have been released from solitary confinement into general population or back into the community at large, I have found that this hyper-responsivity to external stimulation persists after release from solitary.  It becomes a major source of functional impairment for such individuals.  Individuals who have been confined in solitary have great difficulty managing external stimulation.  Social stimulation is perhaps the most complex and difficult of all.  Individuals tend to withdraw from social engagement.  Even formerly gregarious individuals can become loners, withdrawing into themselves and almost recreating the barren solitude of their former confinement.[10]

### 2.3.5.   Obsessive Compulsive Symptoms.

An adequate state of responsiveness to the environment requires both the ability to focus attention and the ability to shift attention.  The impairment of alertness and concentration in solitary confinement leads to two related abnormalities.  One, the inability to focus attention is

---

[10] EEG studies have findings consistent with these clinical observations.  Experimental studies have demonstrated not only that solitary confinement causes a generalized slowing of the brain wave patterns, but also that when exposed to a visual stimulus, individuals who have been confined in solitary show an abnormally sharp spike in electrical discharges in the region of the brain that processes visual stimuli.  In some cases, this has persisted even many months after release.  Gendreau, P., et al., *Changes in EEG Alpha Frequency and Response Latency During Solitary Confinement,* J. Abnormal Psych., 79(1):54-59 (1972); Vrca, A., et al., *Visual Evoked Potentials in Relation to Factors of Imprisonment in Detention Camps,* Int. J. Legal Med., 109(3):114-117 (1996).

**2 Supp. App. 172**

experienced as the mental "fog" described above.   Two, some people subjected to solitary confinement develop a coping strategy of maintaining a rigid routine of mental and physical activity in an effort to ward off this mental torpor, but this strategy creates its own burdens.   The confined person becomes unable to shift away from those routines; their thinking pattern becomes obsessional, and their daily routine becomes compulsive.

Moreover, the inability to shift attention results in a kind of "tunnel vision" in which the individual's attention becomes obsessively stuck – often on something intensely unpleasant – and he cannot stop thinking about that matter.   Instead, he obsessively fixates on it.   Individuals in solitary confinement easily become preoccupied with some thought or irritation that becomes overwhelmingly painful or maddening.[11]

### 2.3.6.   Hallucinations.

It is well-known that situations of restricted environmental stimulation such as solitary confinement can cause hallucinations.   Even when an individual is aware that he is hallucinating, he may still experience the hallucination as something real and coming from outside his own head.   Such experiences are often terrifying for individuals housed in solitary confinement.   This phenomenon is also well-known among critically ill patients experiencing delirium.

### 2.3.7.   Paranoia, Delusions, Problems with Impulse Control.

In the context of a fearful situation, and with so little to keep the individual anchored to reality, many people in solitary confinement develop paranoid thoughts, and some develop delusional beliefs.   Those in solitary confinement also often have increasing difficulty maintaining impulse control.   Chaotic, often violent and often self-destructive behaviors are one

---

[11] Such obsessional symptoms are manifest in EEG studies as repetitive circular electrical brain discharges involving subcortical regions.

14

of the most serious management problems observed by staff working with people in solitary confinement.

### 2.4. Increasing Recognition of the Psychiatric Toxicity of Solitary Confinement.

During the course of my four decades of professional life, I have had the opportunity to interview and evaluate a number of individuals who had been transferred back into general population or released to the community after serving time in solitary confinement. They universally described continuing psychological impairments as a result of their confinement in solitary, impairments that render them incapable of accommodating to life in the larger community. Individuals describe themselves as unable to tolerate ordinary levels of stimulation they encounter in everyday life. They cannot tolerate the noise, the bustle, the constant stream of stimuli that one normally experiences. Social stimulation is perhaps the most complex of all, and it is the most difficult for such individuals. I have evaluated individuals – even formerly gregarious individuals – who, after release from prison, literally spent almost all of their time alone in their room. Unable to even join their family for a meal, they venture into the kitchen only to fill their plate and then disappear again to eat their meal alone, sitting on their bed in their room – the only place they can escape the buzzing confusion of life. Similarly, I have evaluated individuals who were released from solitary confinement into the general population and could not manage to integrate into this larger community; they ended up spending almost all of their time alone in their cell. Families suffer greatly, wanting so much to embrace their loved one but unable to reach him.

In the course of my professional work, I have seen many individuals whose experience of solitary confinement was so psychologically traumatic that they were left suffering chronic Post-Traumatic Stress Disorder ("PTSD"). Other researchers have reached similar conclusions,

finding that prolonged solitary confinement may cause psychological damage severe enough to cause near-permanent mental and emotional damage.[12]  Many prisoners who have experienced solitary confinement continue to experience enormous anxiety being around other people, to the extent that their adjustment is severely impaired even to being in the prison's general population, let alone their adjustment back to the community at large after release from prison.[13]  A Canadian study found that over 50% of formerly isolated people experienced at least some of these long-term psychological impairments.[14]

There has, indeed, been a great deal of research in the medical literature, as well as articles in law journals, court opinions, and position papers of medical organizations and international organizations, all reaching similar conclusions, that solitary confinement is psychologically toxic.  A handful of articles claim to demonstrate no substantial harm from solitary.  But those articles have been severely criticized because their methodology is fatally flawed, and in some cases, their conclusions are inconsistent with the actual data upon which the article is based.[15]

---

[12] Vasiliades, E., *Solitary Confinement & International Human Rights: Why the U.S. Prison System Fails Global Standards*, 21 Am. Univ. Int'l L. Rev. 71, 76-77 (2005).

[13] *Id*.

[14] Martel, J., *Solitude and Cold Storage: Women's Journeys of Endurance in Segregation*, Elizabeth Fry Society of Edmonton 85-86 (1999).

[15] There are basically three such articles.  Of these, one is not itself a direct study but purports to analyze twenty-four research articles.  (Morgan, R., et al., *Quantitative Syntheses of the Effects of Administrative Segregation on Inmates' Well-Being,* Psychology, Public Policy, and Law (2016), on-line publication http://dx.doi.org/10.1037/law0000089).  The Morgan article selection criteria for the articles to analyze is questionable.  Most of the articles cited are either *irrelevant* to the issue of whether solitary causes psychiatric harm (11 articles – e.g., discussing the personal characteristics of individuals who end up in solitary or the recidivism rate of various groups) or actually *support* the conclusion that solitary is harmful (8 articles, or arguably 10 articles – the other two being Gendreau's EEG studies, discussed below).  Thus, only three of the twenty-four articles relied upon could be said in some fashion to support the idea that solitary is not harmful,

and they are all enormously flawed.

The article most critical to the conclusions drawn in the Morgan paper is a study from Colorado: O'Keefe, M., et al., *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*, www.ncjrs.gov/pdffiles1/nij/grants/232973.pdf (2010), later published in hard copy as O'Keefe, et al., *A Longitudinal Study of Administrative Segregation*, J. Am. Acad. Psychiatry & Law, 41(1):49-60 (2013). Morgan cites this as "the most scientifically rigorous" and "the most sophisticated longitudinal study" in this field. Indeed, that *one* article accounted for about two-thirds of all of the "effect sizes" calculated by Morgan.

But that article has been widely discredited as fatally flawed in its methodology. I published a critique of the article, *"Fatal Flaws" in the Colorado Solitary Confinement Study*, Solitary Watch (2010), http://solitarywatch.org/2010/11/15/fatal-flaws-in-the-colorado-solitary-confinement-study, that identifies these flaws, such as that an unknown number of inmates were classified as though they were still in administrative segregation even though they were transferred out of segregation during the study period. However, the most serious flaw is that the study employed self-report rating scales and there was little to no reason to believe that they were a valid measure of actual – objective – psychiatric status. To the extent that the article had data in it that *was* objective, that data squarely contradicted the data from the self-reports. For example, it demonstrated that, comparing those in solitary to those in general population, it was seven times as likely for an individual in solitary to have a psychiatric crisis during the study period than it was for those who were not.

There are two other studies purporting to support Morgan's conclusions. The first article, Suedfeld, P., et al., *Reactions and Attributes of Prisoners in Solitary Confinement,* Crim. Justice Behav. 9(3):303-340 (1982), is similarly flawed. For example, like O'Keefe, Suedfeld also used self-reports not validated by any objective measure. His subjects were inmate volunteers who were no longer in solitary, and in the article he actually acknowledges that they might well have been motivated to give invalid responses, minimizing the psychiatric distress they experienced in solitary: "The interviewers reported that many of the respondents spoke about … their adjustment to [administrative segregation] with some pride, and indicated that having been sent to [administrative segregation] and dealing with it successfully would add to their status among the other inmates." In fact, it is extremely common for inmates to understate the psychological suffering they experienced in solitary.

Moreover, Suedfeld biased his sample because he actually *excluded* inmates from his study "who were completely unable to adapt to [administrative segregation]." Lastly, his results did *not* demonstrate a lack of harm; he found that those who spent more time in solitary were "inhibited, anxious, cautious, dissatisfied, dull, submissive to authority and lacking in self insight," and, moreover, that they "scored higher on depression … and hostility."

The remaining article purporting to support Morgan's conclusions (Zinger, I., et al., *The Psychological Effects of 60 Days in Administrative Segregation,* Can. J. of Criminology 47-83 (2001)) is similarly flawed. It also uses self-report rating scales without any attempt at external validation. Moreover, Zinger mixed together data from inmates who were involuntarily housed in administrative segregation with those who had volunteered to be so housed (*e.g.*, out of fear of

**2 Supp. App. 176**

As noted before, medical research has confirmed the observations that solitary confinement is toxic to brain function.  After even a few days of solitary confinement, the brain wave (EEG) becomes deranged, demonstrating the slowing of brain activity that is characteristic of the stupor and delirium seen in extremely medically ill patients, and an exaggerated electrical response (spike discharges) to external stimuli.[16]

Advances in brain research have shown that solitary confinement may fundamentally and permanently alter brain function.  Dr. Huda Akil has studied the effects of emotions and stress on brain function and structure.  She reports that, separately, each characteristic of solitary confinement (lack of physical activity and lack of environmental, occupational and social

---

harm by other inmates).  Yet he acknowledges that this latter group would have a major incentive to minimize the harm they reported experiencing in administrative segregation (because of their fear of the alternative).  Moreover, of the 91 inmates in administrative segregation whom Zinger approached for the research, only 51 consented, and of these 51, nine became belligerent or refused to continue with the study, while another 32 left administrative segregation (for some other unit, for protective custody, or for general population – no figures are provided) before the completion of the study.  In the end, only 10 inmates involuntarily housed in administrative segregation (about 11% of those approached) actually completed the Zinger study.

[16] Gendreau, P., et al., *Changes in EEG Alpha Frequency and Response Latency During Solitary Confinement,* J. Abnormal Psych., 79(1):54-59 (1972).  A study of former prisoners of war in the Balkan conflict reached similar conclusions.  *See* Vrca, A., et al., *Visual Evoked Potentials in Relation to Factors of Imprisonment in Detention Camps,* Int. J. Legal Med., 109(3):114-117 (1996).  Gendreau found that the EEG of individuals who had spent significant time in solitary confinement demonstrated abnormal, hyper-responsive (spike discharges) in the EEG to visual stimuli.  The only other experience that predicted this hyper-responsivity to external stimulation was overt brain injury, reflected as a history of head trauma to the point of unconsciousness.  Other factors, such as length of imprisonment, semi-starvation, beatings, and so forth were not predictive of this EEG abnormality.

**2 Supp. App. 177**

stimulation) is sufficient to dramatically alter brain function.[17]  The neurotoxic effects of solitary confinement may create permanent damage to brain function.[18]

As discussed briefly earlier in this report, and in more detail in my Washington University article, the fact that solitary confinement has a particular, severe psychiatric toxicity was clearly known well before the end of the nineteenth century, and became a source of international alarm in the 1950s.

### 3.  The Aurora Detention Facility.

Information regarding the Aurora Facility comes from depositions, photographs and other documents, as well as from my interviews with plaintiffs in this matter.

The Aurora Facility houses individuals who are facing possible deportation.  During the class period, the facility had the capacity for up to 525 detainees.  The main living areas for male ICE detainees are two "pods," each of which are separated into dormitories arrayed around a central control tower.  The dormitories are comprised of 4 and 8-person bunk-bedded cells arranged around a central area filled with tables.  Each of the tables has four chairs bolted to it.

---

[17] Ramlagan, N., *Solitary Confinement Fundamentally Alters the Brain, Scientists Say*, American Academy for the Advancement of Science (2014), https://www.aaas.org/news/solitary-confinement-fundamentally-alters-brain-scientists-say.

[18] Among other findings, Dr. Akil's studies reveal that chronic stress can shrivel the brain – including the hippocampus, the part of the brain responsible for memory and involved in emotional control.  There is also evidence that this brain damage may become permanent; studies have shown that individuals who have experienced chronic stress have an increased likelihood of developing dementia in later years.  As described in Appendix A of my Washington University article, there have been a number of experimental animal studies where rats, mice, or monkeys have been subjected to settings of social and environmental deprivation.  In those studies, the subjects have been found to have both "simpler" neurons with fewer synaptic connections and also atrophied cerebral cortices as compared with controls.  *See also,* American Civil Liberties Union, *Briefing Paper: The Dangerous Overuse of Solitary Confinement in the United States* (2014), https://www.aclu.org/report/dangerous-overuse-solitary-confinement-united-states.  In short, after solitary confinement the brain shrinks and the neural connectedness essential for brain functioning is substantially reduced.

Recreation areas are shared by two dormitories each.  One dormitory can be out in the recreation area during the morning, the other in the afternoon.

Women are housed in a separate, smaller unit, comprised of a single large room with bunk beds in one area and tables in another area.  Each of the tables has six chairs bolted to it. The women's unit also has an attached recreation area.

Interviews with the detainees reflect that for the most part, they either sit in their cell or on their bed, or congregate in the central area, sitting at the tables.

The ICE facility also contains a medical unit and administrative offices.

There is also a segregation wing with cells on both sides of a hallway, and a small exercise yard.  One side is denoted as "administrative segregation," the other as "disciplinary segregation."  The physical features are the same on the two sides.  The cells are typically small (the tour notes estimate that they are approximately 6 feet x 12 feet) and quite barren, lacking any window to the outside world, and containing only a metal frame bed attached to the wall, a toilet and sink, and two small shelves.  There are televisions in the hallway facing the cells; detainees may have to peer out of their cell to be able to view the screen.  Detainees in administrative segregation are allowed to have social phone calls but detainees in disciplinary segregation are not.  Only attorney phone calls are allowed for detainees in disciplinary segregation.

On either side of the segregation wing, facility policies require that the detainee is allowed one to two hours per day in a small exercise yard.  The policy provides that staff may at times allow two detainees in administrative segregation to be in adjacent exercise yards simultaneously, while use of the exercise yard is always alone for those in disciplinary segregation.

Detainees who refused to clean were typically confined in administrative segregation, under conditions that were marginally less harsh than those prevailing in disciplinary segregation. However, from the interviews that I conducted, it was clear that the detainees were generally unaware that there was any difference between the (administrative) segregation of a detainee for not cleaning and the (disciplinary) segregation of a detainee who, for example, was confined as a form of punishment.

Detainees were involved in two different work situations:

• On some form of rotating basis, a group of detainees was forced to clean the common living area of the pod – the tables, chairs, floor – three times a day, after meals. According to the people I interviewed, this work in total took about 3-4 hours a day. In my conversations with detainees, they indicated that generally this demand would be imposed on an individual about twice a week. Detainees reported that they were told by the guards they had no choice but to comply and they were told by the guards that if they refused, they would be sent to "the hole" – that is, to solitary confinement.

• A detainee could "volunteer" for a work assignment that might be for example doing the laundry for the facility or cleaning the floors and walls of the administrative area of the detention center. Such work was often done in the middle of the night, and might take up to 6 hours or more, depriving the detainee of any normal nighttime sleep. For this work, the detainee would be paid $1.00 a day. During the early years, a detainee who "volunteered" to work would not be forced to be on rotation for cleaning the pod, but according to detainees whom I interviewed, this accommodation was eliminated later on.

**4. The Experience of and Impact on the Detainees.**

**2 Supp. App. 180**

In what follows I describe how several detainees learned about solitary and how this knowledge impacted them.  Information regarding the experience of the detainees is primarily based upon the interviews listed at the beginning of this report, as well as information contained in the materials that I reviewed, including declarations and depositions.

One of the detainees whom I interviewed had been confined in solitary as a consequence of refusing to clean the living area, and all interviewees were very aware of the threat that a detainee who refused to do that work would be sent to "the hole."  They and their fellow detainees were intimidated by the threat.

## A.  Hugo Hernandez

In my interview with him, Hugo Hernandez recalled that the detainees were told by the guards that if anyone refused to do the cleaning, his belongings would be thrown into a garbage bag and he would be sent to "the hole," where he would lose all his privileges.  There would be no visits, no commissary, no phone calls, no exercise yard, no daily shower.  Detainees were told that they would be confined in a small box and fed cold food, and would not see any daylight.  Mr. Hernandez understood that in "the hole," a detainee would be stressed out, all by himself with no one to talk to: "The point was to get you all scared, and it worked.  People would protest, say they wouldn't do it.  But then they [the guards] would bring out a roll of garbage bags, and no one would refuse."  He recalled that the detainees were always angry about it but felt powerless to refuse: "It was humiliating.  We were powerless.  It was so much worse because we were there facing possible deportation.  We were scared."

Mr. Hernandez did know of detainees who were sent to the hole for fighting.  He recalled that they lost weight while in solitary confinement.  They seemed scared.  They would talk about their experience in the hole, about how cold and dark it was: the light in the cells was a small

light instead of a regular light, and they had only a small blanket to cover themselves.  Detainees who returned to the general population would describe how stressed they were; Mr. Hernandez recalled observing: "It messes you up mentally, makes you think different.  They would just go around in circles.  Sometimes they would want to bang their heads on the walls because they had nothing to do."

### B.  Alejandro Menocal

When Alejandro Menocal first arrived at the Aurora facility, he was very ill and was placed into medical isolation, a cell within the medical unit of the facility.  He remained there for almost two days.  He saw no one but the nurse.  There was no window to the outside world, just a window to hallway, facing nothing.  Mr. Menocal described his cell as a barren 10 x 10 foot cell, with only a metal frame mattress, very thin pillow, sheets and a thin blanket, a toilet and a sink.  He had nothing to distract myself.  There were no other people around; he could not hear anything.  There was nothing for him to do.  He would pace back and forth in the cell, whistling or singing to himself.

Mr. Menocal said that especially because of this experience the threat of solitary caused fear, forcing him and others to comply with the cleaning assignments.  He spoke about the intense feelings of helplessness, fear and humiliation caused by the forced cleaning, and even by the "voluntary" work.  He stated that people complied because they were afraid of isolation.  He recalled that many times his fellow detainees would say that it was not right for them to have to clean, but they still did because of their fear of being sent to isolation.  He expressed his anger to me in our interview: "It wasn't fair.  We ran the facility – the landscape, the laundry, the kitchen; we washed the floor.  They were using us like slaves.  One dollar a day.  Unfair.  Treating us like dirt."

Although Mr. Menocal himself was never confined in solitary for refusing to work, in his declaration, he stated that he did see others punished in this way. He did witness a group of six detainees who refused to clean the common living areas and were put into the hole for refusing to work.

### C.  Jesus Yepez Gaytan

Jesus Gaytan stated in his interview that he complied with the demands to clean the pod because of his fear of "the hole." This forced cleaning required several hours each day for those who were picked by the guards for this assignment. Mr. Gaytan recalled how powerful the message was – that you either clean or you would be confined in solitary. People would tell him: "You don't want to go there, so just do what they say." He recalled one detainee who refused to do the cleaning; the guards took him out and he never came back to their pod. Other detainees, including two people who had been in the hole before Mr. Gaytan arrived at the detention facility, told him that it was dark in the hole, and they didn't have contact with anybody while they were in there. They didn't know when they were going to get out, and all they could do was sleep. Mr. Gaytan recalled that he was frightened by these descriptions and didn't want to be by himself in solitary. And so he, and almost all others, complied with the cleaning requirement. He felt that it wasn't right. The detainees were angry about it, but they had their immigration cases to fight; they did not feel that they could afford to fight the guards.

Several detainees experienced the voluntary work and the forced work as being two forms of a similar abuse. Several described the food provided by the detention center as inadequate, leaving them chronically hungry. The voluntary work was effectively coercive for those who had no money to buy food from commissary. Mr. Gaytan felt he had no choice; his family did not have the resources to help him and he had no other source of money; he had to

**2 Supp. App. 183**

work to feed himself, and to buy other necessities such as shampoo and cleaning supplies.  He recalled that the meals the facility provided were inadequate, and he was hungry much of the time.

Mr. Gaytan worked in the laundry, which he recalled as being very hard work.  The laundry job entailed getting the dirty clothes from the pods, washing, drying and folding them.  Mr. Gaytan described himself and his fellow detainees as angry and humiliated, but helpless.  They would complain to each other that they were doing a lot of work for one dollar a day, and realized they were being taken advantage of, but they were powerless to protest.  Mr. Gaytan noted that this sense of powerlessness made him feel bad about and mad at himself, describing it as humiliating.  It would go through his mind that the guards were laughing at the detainees.  As he noted: "It got stuck in my head that we were getting mistreated because we were in a situation where we could lose everything."

Even though Mr. Gaytan took part in the voluntary work program, he still was forced to do the unpaid cleaning about twice a week.  He observed that early on only those who were not working voluntarily were forced to clean for free, but this changed during his detention at Aurora.

### D.  Olga Alexakhina

Olga Alexakhina's fear of the hole was all the worse because she knew people who had been confined in the hole and came back injured and changed.  Her description was very powerful: "I knew several people who they sent to the hole.  You are just sitting there without seeing the sun.  It's a hole.  It was horrible. … Some were there for 1, or 3, or 5 days.  When they came back they would take a shower and just lay down.  They didn't want to talk to anyone, just laying down.  It was very scary.  I was scared of going to the hole.  Being in detention is already

**2 Supp. App. 184**

scary and hole is so much worse – without talking to each other or seeing light or the sun."

In her interview, Ms. Alexakhina recalled one woman in particular who was sent to the hole for refusing to clean.  The woman had said she was not going to clean that day because she had just cleaned the previous day.  Ms. Alexakhina recalled that when this woman finally returned to the pod from the hole, she was so depressed that other detainees had to help get her up just so that she would eat.  This woman described the hole as a very small, dark room, with only a bed and toilet.  Ms. Alexakhina remarked that the fear of being sent to the hole was always there – that fear of the hole was their biggest weapon.  She was always scared, tense: "You could never be at peace."

During her detention at Aurora, Ms. Alexakhina came to believe that the guards hated the detainees.  She recalled that once a month, a particular, high-ranked guard would come to the pod.  This guard seemed particularly eager to find fault, to punish.  For example, if it was really cold and a detainee had two blankets instead of just one, this guard would send the detainee to the hole.  Olga stated that she witnessed many detainees being punished by being sent to the hole for almost anything at all.  Olga stated that everyone who had been confined in the hole came back depressed, crying, withdrawn, just laying in their bed for days.  She could see the fear in them.

Ms. Alexakhina also described the coercive effect of not having enough food to eat.  Detainees who agreed to work would receive sandwiches and sometimes some fruit.  If the detainees didn't clean, they would be hungry; the meals they were provided were not enough.  Those who did the work shared the food they received with others.  Ms. Alexakhina recalled that the work was hard, such as cleaning the halls from midnight to 6:30 in the morning.  She noted again that the detainees had no choice but to do this work because there was not enough food.

### E.  Grisel Xahuentitla

In her deposition in this case, Grisel Xahuentitla described an incident where a young woman was on the daily list of detainees required to perform involuntary cleaning.  The young woman was in bad pain with a kidney stone.  Ms. Xahuentitla and another detainee both volunteered to work in place of the young woman, but the guard refused because the woman's name was on the board.

Ms. Xahuentitla described other instances where guards would perform periodic shakedowns, confiscating anything they declared to be contraband – even such benign items as an extra sugar packet from breakfast a detainee kept for later, or salt packets, or some paper.  She described the fear and helplessness this induced, which was compounded because guards told the detainees that they were not welcome in the United States, warned them not to feel comfortable, and threatened them against thinking they would be able to remain in the country.  She also reported that the threats of being sent to the hole were constant.

### F.  Alejandro Hernandez Torres

Alejandro Hernandez Torres was detained at the Aurora facility for three years, from 2012 to 2015.  He has limited English proficiency and was interviewed with the help of an interpreter.  During our interview, he stated that he was confined in solitary four times while detained at the Aurora facility.  His experience of solitary was severe and destructive.

The first of Mr. Hernandez Torres's periods in solitary confinement followed his refusal to clean and polish the facility floors one night.  He stated that the demand to clean and polish the floors was constant, and that detainees had to work every day.  He explained that there was always a reason that the facility had to be cleaned, such as an inspection of the facility once a month, or visitation every weekend.  Mr. Hernandez Torres stated that immigration detainees

also had to polish the floors for the federal detainees, who were housed in a separate area of the facility.  All this was in addition to having to clean the dormitory after the meals about once a week.

Mr. Hernandez Torres explained that in this instance, he refused to clean the floors, and as a result was handcuffed and taken into solitary confinement, where he remained for eight days.  He became tearful during our interview as he recounted the experience, especially when he described how cold he was while housed there.  He described the cell as small, with only a bed, table and a toilet.  The air conditioning was on all the time and all he had to cover himself with was one sheet; the mattress was plasticized and very thin, and he could feel the metal of the bed frame through the mattress.  He recalled how inadequate the food was.  Mr. Hernandez Torres cried as he recalled that he was there for eight days, that the light was kept on all day, and that there was not even a window to see the outside world.

He said that whether he got a chance to exercise depended upon the guard on duty, and that if a guard did allow him out, it was for only for 20 to 30 minutes in a room that was about 3 to 4 meters square. Even there, he was all alone, with no one to talk with.  All he had in his cell was a Bible, and he got through the day by trying to read the Bible and to exercise in his cell. Sometimes he was so desperate to find something to do that he would count the blocks on the cell wall.  Mr. Hernandez Torres stated that on the administrative segregation half of the wing, there were televisions in the hallway, but it depended upon the guard whether the television would be turned on.  He stated that mostly they were off, and that even when they were on, it was difficult – or in some cases impossible – to see what was on the screen or to hear the audio. He was offered a shower daily, but it was at 7 a.m., and he had to undress in front of guards, some of whom were female.  If he accepted the shower, he would be cuffed, first the right hand

to the right foot, so that he could only clean one side of his body, and then the left hand to the left foot, so that he could then clean the other side of his body.  Due to the humiliation of forced nudity before female guards, and the degradation associated with cleaning himself in view of guards while cuffed hand-to-foot, he usually refused to shower.

During that first period of confinement, Mr. Hernandez Torres spent some of his eight days in solitary on the disciplinary side, as punishment for becoming so desperate that he started kicking his cell door and yelling.  He said he believes that the disciplinary side was even colder than the administrative segregation side.  There, there was no exercise yard, no television, and just a sheet to cover himself, with no blanket even though it was winter.  Mr. Hernandez Torres stated that the guards banged on the doors every half hour or so, even throughout the night, making sleep almost impossible.  He stated that this was worse on the disciplinary side, but occurred on both sides.

In the interview, Mr. Hernandez Torres explained the circumstances of the other three times he was confined in solitary at the Aurora facility.  One of these was after he was so tired from working every day that one day he paid another detainee to take his place polishing the floors that night.  A guard came in and demanded he go to work.  He explained that he paid this other person to work for him.  Mr. Hernandez Torres stated that without any further discussion – without then giving him a chance to agree to do the cleaning, and despite his protestation that he would do the work – the guard handcuffed him and took him to solitary, where he remained for twelve days.

The other two times Mr. Hernandez Torres was sent to solitary had nothing to do with cleaning.  One had to do with two detainees getting into a fight.  Mr. Hernandez Torres said he stayed off to the side and did not participate, but a guard came in, handcuffed him and took him

**2 Supp. App. 188**

to solitary.  In the interview, he stated that he was there for one month.[19]  The other time he went to solitary was when another detainee in his four-person room was found with a cell phone, which counted as contraband in the facility.  Despite no evidence that Mr. Hernandez Torres had anything to do with its presence, he was again handcuffed and confined in solitary for a month.

Mr. Hernandez Torres has suffered continuing harm from his experience of solitary at Aurora.  He explained that after release from the facility, he was so burdened by intrusive images of his ordeal that he became distraught, tried to take his own life, and was psychiatrically hospitalized.  During our interview, he repeated several times how hard it was for him to have those memories of being confined in solitary at Aurora.  And, indeed, he was crying during much of the interview as he spoke of his experience.[20]

**5.  Conclusions.**

As described in the body of this report, solitary confinement is a very harsh, psychiatrically toxic form of punishment.  It can have severe psychiatric effects within hours, and one to three days of solitary confinement will certainly have a major psychiatric impact.

From my clinical interviews with detainees, it was clear that the threat of solitary was extremely coercive and frightening for them, and not less so for those who had never been housed in solitary – or even seen the segregation wing.  Indeed, being threatened with a punishment they could not fully understand, if anything, increased their fear.

---

[19]  Documents in Mr. Hernandez Torres' detention file suggest that he was in segregation for around two weeks before being released from segregation.  It is not unusual for people who have experienced traumatic situations to misremember details such as lengths of time.  Indeed, one of the defining characteristics of Post-Traumatic Stress Disorder concerns memory – both hypermnesia for some details, and amnesia for others.

[20]  These reactions are typical of people who are experiencing Post-Traumatic Stress Disorder.

**2 Supp. App. 189**

The detainees whom I interviewed consistently described that they performed the cleaning chores as a direct result of their fear of being sent to "the hole." Even for detainees who never experienced solitary, the descriptions of solitary they were given by the guards and by fellow detainees, as well as in some cases the observation of other detainees who had come back from solitary, meant that the threat of being sent to "the hole" created a great feeling of helplessness and fear.

Clinical interviews of the detainees revealed that the context of this threat greatly magnified its psychological effects. The detainees were in a situation in which they were virtually without any sense of personal "agency" – powerless and faced with the possibility of a catastrophic change in their lives. "Learned helplessness," a term introduced by Dr. Martin Seligman,[21] is a much-researched concept in psychiatry that describes well the experience of the detainees whom I interviewed. Research regarding this phenomenon has shown that where an individual experiences himself as powerless to prevent aversive consequences, this may produce in him the loss of will to resist negative consequences. The resulting feelings of paralysis, passivity, anxiety and depression have neurobiological correlates.[22] But when combined with emotional abuse and dehumanization from those in power, as was experienced by those detainees I interviewed, those effects would be, and were, far worse. And people in such a situation of powerlessness are exceedingly vulnerable to being abused and coerced by those who do have

---

[21] Seligman, M., *Learned Helplessness,* Ann. Rev. Med. 23:407-412 (1972).

[22] *See e.g.*, Hammack, S., et al., *Overlapping Neurobiology of Learned Helplessness and Conditioned Defeat; Implications for PTSD and Mood Disorders*, Neuropharmacology 62, 565-575 (2012); Maier, S. & Seligman, M., *Learned Helplessness at Fifty: Insights from Neuroscience*, Psych. Rev 123(4):349-367 (2016).

2 Supp. App. 190

power.  Incarceration itself will tend to create a pattern of learned helplessness.[23]  But when combined with emotional abuse and dehumanization by those in power, its effects will be far worse.[24]

The detainees whom I interviewed described the threat of solitary confinement as being imbedded in a situation that they experienced as overwhelmingly frightening, coercive, and humiliating.[25]  From the interviews I conducted, I learned as well that the detainees experienced the guards as using their fear and helplessness as a form of intense coercive pressure to comply.

The detainees whom I interviewed described their situation as one of utter desperation. They were faced with possible deportation, being separated from their families and all they had in their lives.  In many cases, they faced deportation to a country they were entirely unfamiliar with, even, for some, with a language they did not speak.  In the context of such a fearful situation, the detainees were so primed with fear and a pervasive sense of helplessness that they were exquisitely vulnerable to any additional threat or coercion.  They revealed how terrified they were of those in authority, fearing even that their disciplinary records during detention could affect the ultimate disposition of their deportation hearing.

---

[23] Schill, R. & Marcus, D., *Incarceration and Learned Helplessness*, Int'l J. Offender Therapy & Comp. Criminology, 42(3):224-232 (1998).

[24] *See, e.g.*, Bastian, B., *A Dehumanization Perspective on Dependence in Low-Satisfaction (Abusive) Relationships*, J. of Soc. & Personal Rels., 36(5):1421-1440 (2019).

[25] Psychiatrically, humiliation – shame – is one of the most destructive of human emotions. "Shame" is often confused with "guilt," but in fact shame is far more shattering.  Guilt is the experience of having made the choice to do something wrong – there was a *choice* made; the decision was under the person's control.  Shame is the experience of having no control, no autonomy, no personal integrity at all.  The experience of shame is the experience of being laughed at, made into a mockery.

**2 Supp. App. 191**

Their fear and helplessness was compounded by the fact that many of the detainees came to believe that the guards felt malice towards them, dehumanized them, and hated them as foreigners, telling them that they were not welcome in "our country." Several detainees believed that the guards enjoyed the exercise of arbitrary power and even cruelty. Many experienced the guards as treating the detainees with contempt.

The detainees described being in a situation where all they could do was to try to survive day by day. They were truly helpless; they had no power to resist coercive treatment and humiliation. Their daily lives in detention were barren, affording almost no opportunity to distract themselves from their fears or to restore their sense of self. Even the "voluntary" work had aspects that were coercive (it was often the only way to deal with chronic hunger) and being paid a dollar a day for many hours of hard work was something that they experienced as deeply humiliating and dehumanizing.

As revealed in the interviews, the detainees' experience was one that would crush the spirit of a person of ordinary mental fitness; facing the possibility that their entire lives would be upended, they were already very frightened and basically helpless. And then, in that context, they experienced the guards as cruel, exploitative, and degrading, forcing them to do work at the guards' bidding. They described an experience of utter helplessness, fear and humiliation.

Signed this 1st day of May, 2020.

Stuart Grassian, M.D.

33

# Psychopathological Effects of Solitary Confinement

## Stuart Grassian, M.D.

*Psychopathological reactions to solitary confinement were extensively described by nineteenth-century German clinicians. In the United States there have been several legal challenges to the use of solitary confinement, based on allegations that it may have serious psychiatric consequences. The recent medical literature on this subject has been scarce. The author describes psychiatric symptoms that appeared in 14 inmates exposed to periods of increased social isolation and sensory restriction in solitary confinement and asserts that these symptoms form a major, clinically distinguishable psychiatric syndrome.*

(Am J Psychiatry 140:1450–1454, 1983)

There have been several legal challenges to the use of solitary confinement in the United States penal system based on allegations that such confinement can cause serious psychopathological reactions (1–3). The present article describes clinical observations of 14 prisoner plaintiffs in a lawsuit alleging that the conditions they were exposed to in solitary confinement were violations of Eighth Amendment protection against "cruel and unusual punishment."

## REVIEW OF THE LITERATURE

Despite the obvious legal and humanitarian importance of this issue, there has been a scarcity of recent medical literature on the subject beyond a flurry of theoretical interest generated by concerns about "brainwashing" of American prisoners of war in Korea and the experimentation on profound sensory deprivation precipitated by those concerns (4–8). In the recent literature, reports of clinical observations of prisoners in solitary confinement have been virtually nonexistent. However, with the exception of the only

Received Oct. 24, 1980; revised March 5 and Oct. 20, 1982; accepted Nov. 30, 1982. From the Department of Psychiatry, New England Memorial Hospital, Stoneham, Mass.; Tufts University School of Medicine, Boston, Mass.; and Harvard Medical School, Boston. Address reprint requests to Dr. Grassian, 401 Beacon St., Chestnut Hill, MA 02167.

The author thanks Dr. Dan Buie for his review of the manuscript. Dr. Frank Rundle conducted half of the psychiatric evaluations on which this report is based.

Copyright © 1983 American Psychiatric Association.

*experimental* study in the literature (9), these reports (10–12) have indicated psychopathological effects. One report noted "restlessness, yelling, banging and assaultiveness" in some prisoners and in others "a kind of regressed, dissociated, withdrawn hypnoid state" (10). Another report cited two cases of reactive psychosis marked by initial agitation and behavioral dyscontrol, leading to a hallucinatory, incoherent, confusional state (11).

There was, however, extensive interest in the problem of psychopathological syndromes among prisoners in late nineteenth- and early twentieth-century Europe. During that period, solitary confinement was extensively used in both Europe (13) and the United States (14); in many prisons it was the exclusive mode of incarceration. Indeed, the American penitentiary became world famous; important visitors journeyed to the United States specifically to observe this system and bring it back to Europe for emulation. Perhaps the best known of these visits, that of Alexis de Tocqueville, gave rise to a classic study of American social institutions (15).

This enchantment with solitary confinement was relatively short-lived, however. As early as the 1830s statistical evidence began to indicate an increased incidence of physical morbidity and mortality, as well as of insanity, among prisoners exposed to especially rigid forms of solitary confinement (14, p. 87). The system's openness to public scrutiny brought forth vivid descriptions of the effects of such confinement. Charles Darwin, for example, observed inmates "dead to everything but torturing anxieties and horrible despair. . . . The first man . . . answered . . . with a strange kind of pause . . . [he] fell into a strange stare as if he had forgotten something. . . . [Of another] Why does he stare at his hands and pick the flesh open, . . . and raise his eyes for an instant . . . to those bare walls? (8, p. 66). By 1890, the United States Supreme Court entered an opinion explicitly condemning solitary confinement on psychiatric grounds, indicating that "a considerable number of prisoners . . . fell into a semi-fatuous condition . . . and others became violently insane" (1).

In the United States, unfortunately, these experiences did not give rise to a body of clinical literature. However, in Germany, whose penal system had emulated the American model, major clinical concern developed about the incidence of psychotic disturbances among prisoners. Between 1854 and 1909, 37 articles on this subject appeared in German journals,

STUART GRASSIAN

collectively describing hundreds of cases of psychoses that were deemed to be reactive to the conditions of imprisonment. A review of this literature appeared in 1912 (13) and will be only summarized here.

The literature described a hallucinatory, paranoid, confusional psychosis in which characteristic symptoms included 1) extremely vivid hallucinations in multiple sensory modalities, including the visual, auditory, tactile, and olfactory; 2) dissociative features, including sudden recovery "as from a dream," with subsequent amnesia for the events of the psychosis; 3) agitation and "motor excitement" with aimless violence; and 4) delusions, usually described as persecutory. Onset was often described as sudden and, in some reports, as precipitating at night. In other cases, initial manifestations included "humming and buzzing, unpleasant noises and inarticulate sounds [leading to] hallucinations." Rarer, only occasionally noted symptoms included *Vorbereiden* ("the symptom of approximate answers," usually associated with Ganser [16], although described as well by others) and hysterical conversion symptoms.

Of this large body of literature, only Ganser's contribution (16) remains well-known, and Ganser failed to comment on the form of imprisonment to which his prisoner subjects were exposed. However, in more than half the total body of literature, solitary forms of confinement were specifically cited as responsible for precipitating the psychosis, and rapid recovery was often noted when the prisoner's solitary confinement was terminated.

CIRCUMSTANCES OF THE CLINICAL OBSERVATIONS

The present observations developed as a consequence of a court order mandating psychiatric evaluation of 15 inmates at the Massachusetts Correctional Institution at Walpole, all of whom were plaintiffs in a class action suit against the Department of Corrections that alleged violations of Eighth Amendment protection against "cruel and unusual punishment" because of the conditions to which the prisoners were exposed in solitary confinement.

The correctional institution at Walpole is the maximum security state prison for the Commonwealth of Massachusetts. It is divided into 13 cell blocks. Block 10 is reserved for solitary confinement and is divided into four tiers, each housing 15 cells approximately 1.8 m × 2.7 m in size, each cell containing an open toilet and sink, a steel bed, and a small, fixed steel table and stool. The cells in the lower tiers have double doors. The inner door is barred; the outer door is solid steel except for a small Plexiglas window. There are no other windows in the cells; each cell has one 60-watt light bulb to provide light.

While these structural features have remained constant, administrative decisions have determined other features of the confinement. Until August 20, 1979, the outer steel doors were left open, permitting natural light and air to enter the cell and permitting inmates to speak with other inmates in adjoining cells; on August 20 the steel doors were closed on the cells of all inmates in isolation. At the same time, correctional officers removed personal belongings from these cells, including radios, television sets, and all reading materials except a Bible.

Suit was brought not against the conditions in Block 10 generally but specifically against the conditions prevailing in the lower tiers since August 20, 1979. Of the 15 plaintiffs in the suit, 14 were interviewed; the 15th was no longer in Block 10 at the time of the interviews and was not available. All of the plaintiffs were men, and their mean age was 28 years (range, 22–38 years). Median duration of confinement in isolation was 2 months (range, 11 days to 10 months). Each prisoner was interviewed for approximately one-half hour by one of two psychiatrists, with the exception of one prisoner who, because of concern over his clinical state, was seen twice over a 3-week period. History was obtained of incarcerations, previous experience with solitary confinement, and previous and current psychiatric symptoms and treatment. Due to the pressure of time, we made no active attempt to cover other areas of a full clinical history, e.g., assessment of object relations, defenses, and family history.

In the interviews, conducted in an open-ended manner, careful attention was paid so that suggesting possible symptoms was avoided. The circumstances of the interviews, however, were clearly seen by the prisoners and guards as adversarial. Access to the prisoners for the interviews was obtained only through court order; all prisoners interviewed were informed of the purpose of the interviews and told that data from them might be used in court testimony. In addition, there were several guards stationed just outside the interview room, prompting several prisoners to resort to whispering as a means of avoiding being overheard.

FINDINGS

It might be expected that the adversarial circumstances of the interviews would have biased the prisoners' reports in the direction of exaggeration of whatever symptoms they might have experienced. Such was not the case. In fact, contrary to expectation, the prisoners appeared to mobilize multiple defensive operations—rationalization, avoidance, denial, distortion, and repression—in an effort to minimize the quality of their reactions to isolation. The interviewer was required, therefore, actively to encourage disclosure of information, to provide reassurance, and persistently to confront and explore gaps in the reported accounts. Numerous interviews began with statements such as "Solitary doesn't bother me" or "Some of the guys can't take it—not me," or even with the mention of a symptom and simultaneous denial of its significance: "As soon as I got in, I started cutting my wrists. I figured it was the only way to get out of here." As the

EFFECTS OF SOLITARY CONFINEMENT

interviews progressed, these facile, superficial accounts gave way to descriptions of experiences that were troublesome. For example, one inmate was unable to describe the events of the several days surrounding his wrist slashing, nor could he describe his thoughts or feelings at the time. His overt anxiety increased markedly upon questioning, and only after some time was he able to describe the apparent acute confusional state, panic, and subsequent partial amnesia for those events. Similarly, the prisoner who said he could "take it" eventually came to describe panic, fears of suffocation, and paranoid distortions while he had been in isolation.

Indeed, the general pattern was for inmates initially to downplay reactions to the solitary confinement situation, then, after being carefully questioned, to become overtly anxious and, frequently, overtly reluctant to elaborate on significant details. Upon confrontation, several inmates acknowledged the reasons for their reluctance. They feared that the guards would discover their primitive fantasies of revenge or that the guards were waiting to see a weakness that they could exploit to make the inmate "crack up." Furthermore, in several cases, the inmate's dread was that he was in fact going insane.

The specific psychiatric symptoms reported were strikingly consistent among the inmates.

### Perceptual Changes

*Generalized hyperresponsivity to external stimuli.* This symptom was most commonly associated with dysesthetic responses to certain stimuli (11 prisoners). Instances of this included "You get sensitive to noise—the plumbing system. Someone in the tier above me pushes the button on the faucet, the water rushes through the pipes—it's too loud, gets on your nerves. I can't stand it—I start to holler. Are they doing it on purpose?" "Everything gets exaggerated. After a while, you can't stand it. Meals—I used to eat everything they served. Now I can't stand the smells—the meat—the only thing I can stand to eat is the bread." "What really freaks me out is when a bee gets into the cell—such a small thing." "Difficult to breathe, stale, awful smell from the toilets—the stench starts to feel unbearable." All 11 inmates denied ever having experienced such symptoms except during confinement in isolation.

*Perceptual distortions, hallucinations, and derealization experiences.* These symptoms were experienced by seven prisoners and are grouped together because under the peculiar circumstances of solitary confinement there were often inadequate means to distinguish them. Thus, experiences described by five of these seven prisoners included hearing voices—often in whispers, often saying frightening things to them—but usually the prisoners had no means by which to corroborate what they thought they heard; for example, "I hear sounds—guards saying, 'They're going to cut it [his nerve-damaged leg] off.' I'm not sure. Did

they say it, or is it my imagination?" If they did say it, the prisoner is suffering from derealization; if they said something else, or something not directed at him, he is suffering a (paranoid) perceptual distortion; if they said nothing, he is having a hallucination. There is no independent corroboration. Another inmate described the dilemma poignantly: "I overhear the guards talking. Did they say that? Yes? No? It gets confusing. I tried to check it out with ___ [the prisoner in the adjoining cell]; sometimes he hears something and I don't. I know one of us is crazy, but which one? Am I losing my mind?"

There were, in addition, two reports of noises taking on increasing meaning and frightening significance; for example, "I hear noises, can't identify them—starts to sound like sticks beating men. But I'm pretty sure no one is being beaten. . . . I'm not sure."

Perceptual illusions with loss of perceptual constancy were more readily identifiable in the visual sphere (three cases), and there were reports such as "The cell walls start wavering," and "Melting, everything in the cell starts moving; everything gets darker, you feel you are losing your vision."

In one of the prisoners the illusions became more complex and personalized: "They come by [for breakfast] with four trays; the first has big pancakes—I think I'm going to get them. Then someone comes up and gives me tiny ones—they get real small, like silver dollars. I seem to see movements—real fast motions in front of me. Then seems like they're doing things behind your back—can't quite see them. Did someone just hit me? I dwell on it for hours." This prisoner also described overt, frightening, visual hallucinations: "There's a guard in my cell; he's holding a noose." He acknowledged having experienced perceptual distortion with psychedelic drug abuse. Otherwise, all seven inmates denied ever experiencing perceptual symptoms like those they described, except during confinement in isolation.

### Affective Disturbances

Ten prisoners described massive free-floating anxiety during their incarceration in solitary, accompanied in eight cases by recurrent acute episodes of tachycardia, diaphoresis, shortness of breath, panic, tremulousness, and dread of impending death. One prisoner reported "shortness of breath a lot. My heart pumps real fast. I feel like I don't get enough oxygen. Get frantic." Another said, "I start to feel dizzy. I can't breathe," and another, "I start to dwell on things—too many roaches—get scared one might get into my ear. Start to feel hot—extreme heat—then I can barely breathe, start sweating, heart races, can't sit still, shaking, get a headache—real bad."

Of these 10 prisoners, three had experienced acute anxiety reactions prior to confinement in isolation, and they reported intensification of symptoms. The other seven denied any previous history of such symptoms.

STUART GRASSIAN

## Difficulties With Thinking, Concentration, and Memory

Of the eight inmates who mentioned these symptoms, four reported acute confusional states with subsequent partial amnesia for events during the episode. There was, again, a problem with independent corroboration of these symptoms, especially important because the prisoners were only vaguely aware of what had happened to them. However, one prisoner slashed his wrists during such a state, and thus his confusion and disorientation were noted in the prison medical record.

One prisoner's description particularly suggested dissociative features with mutism: "I went to a standstill psychologically once—lapse of memory. I didn't talk for 15 days. I couldn't hear clearly. You can't see—you're blind—block everything out—disoriented, awareness is very bad. Did someone say he's coming out of it? I think what I'm saying is true—not sure. I think I was drooling—a complete standstill."

Four others reported milder symptoms of difficulty in concentration and memory; for example, "I can't concentrate, can't read. . . . Your mind's narcotized . . . sometimes can't grasp words in my mind that I know. Get stuck, have to think of another word. Memory is going. You feel you are losing something you might not get back."

Several described attempts they made to focus their concentration by self-discipline: "Got to try to concentrate. Remember list of the presidents. Memorize the states, capitals, five boroughs, seven continents, nine planets."

## Disturbances of Thought Content

*Emergence of primitive, ego-dystonic fantasies.* Six prisoners reported the emergence of primitive aggressive fantasies of revenge, torture, and mutilation of the prison guards. In each case, the fantasies were described as ego-dystonic, frightening, and uncontrollable; for example, "I try to sleep 16 hours a day, block out my thoughts—muscles tense—think of torturing and killing the guards—lasts a couple of hours. I can't stop it. Bothers me. Have to keep control. This makes me think I'm slipping my mind. Lay in bed too much—scare yourself with thoughts in bed. I get panicky—thoughts come back—picture throwing a guard in lime—eats away at his skin, his flesh—torture him. Try to block it out, but I can't."

*Ideas of reference, paranoia.* Six prisoners reported ideas of reference associated with persecutory fears; e.g., "Sometimes get paranoid—think they meant something else. Like a remark about Italians. Dwell on it for hours. Get frantic. Like when they push the buttons on the sink. Think they did it just to annoy me." The prisoner's reality testing in this instance was especially shaky: "Spaced out. Hear singing, people's voices—'Cut your wrists and go to Bridgewater and the Celtics are playing tonight.' I doubt myself—is it

real? . . . I suspected they're putting drugs in my cell. . . . the reverend, the priest—even you—you're all in cahoots in the Sacred Straight program. Drive them crazy."

## Problems With Impulse Control

Five prisoners reported episodes of lack of impulse control with random violence. One prisoner said, "I snap off the handle over absolutely nothing. Have torn up mail and pictures, throw things around. Try to control it. Know it only hurts myself." Three of these prisoners reported impulsive self-mutilation; for example, "I cut my wrists—cut myself many times when in isolation. Now, it seems crazy. But every time I did it, I wasn't thinking—lost control—cut myself without knowing what I was doing."

## Rapid Subsidence of Symptoms on Termination of Isolation

The legal statute in Massachusetts requires relief from isolation status with closed solid steel doors for at least 24 hours each 15 days. Certain prisoners had additional periods of relief for medical consultation and, in one case (peroneal nerve injury), hospitalization.

All prisoners interviewed reported a very rapid (usually within the first few hours) diminution of their symptoms during periods of relief. No correlation was apparent between severity of symptoms and the time required for them to subside.

## DISCUSSION

The observations reported here suggest that rigidly imposed solitary confinement may have substantial psychopathological effects and that these effects may form a clinically distinguishable syndrome. The full syndrome described here has not been previously reported in the recent medical literature, although there have been observations consistent with those that I have reported.

The present observations are, however, strikingly consistent with earlier German reports. The German literature reported only on prisoners who suffered gross psychotic symptoms, some of whom were observed in hospitals or "insane departments" of prisons. The Walpole population, on the other hand, was not preselected by overt psychiatric status. Despite this, all of the major symptoms reported by the German clinicians, except *Vorbereiden* and hysterical conversion symptoms, were observed in the Walpole population. In addition, less severe forms of this solitary confinement syndrome were observed in the Walpole population, including 1) sensory disturbances: perceptual distortions and loss of perceptual constancy, in some cases without hallucinations; 2) ideas of reference and paranoid ideation short of overt delusions; 3) emer-

EFFECTS OF SOLITARY CONFINEMENT

gence of primitive aggressive fantasies, which remained ego-dystonic and with reality-testing preserved; 4) disturbances of memory and attention short of overt disorientation and confusional state; and 5) derealization experiences without massive dissociative regression.

The observations at Walpole also suggest that solitary confinement cannot be viewed as a single entity. The effects of solitary confinement situations vary substantially with the rigidity of the sensory and social isolation imposed.

## CONCLUSIONS

The present observations, coupled with those in the earlier German literature, suggest strongly that the use of solitary confinement carries major psychiatric risks. I have not attempted in this paper to define or classify this psychopathological syndrome, but, as mentioned earlier, there have been speculations in the literature linking solitary confinement with the formal experiments on profound sensory deprivation. A review of this literature and an elaboration of the variables that may explain the particular pathogenicity of rigidly imposed solitary confinement will be presented in another paper.

### REFERENCES

1. In Re Medley, 134 US 160, 167–168 (1890)
2. Bono v Saxbe, 450 F Supp 934–948 (1978)
3. Libby v Hogan, Suffolk Superior Ct, Mass, Civil No 37699 (1979)
4. Brownfield C: Isolation: Clinical and Experimental Approaches. New York, Random House, 1965
5. Biderman A, Zimmer H (eds): The Manipulation of Human Behavior. New York, John Wiley & Sons, 1961
6. Solomon P, Kubzansky P, Liederman P, et al: Sensory Deprivation: A Symposium Held at Harvard Medical School. Cambridge, Mass, Harvard University Press, 1961
7. Scott GD, Gendreau P: Psychiatric implications of sensory deprivation in a maximum security prison. Can Psychiatr Assoc J 14:337–341, 1969
8. Liederman P: Man alone: sensory deprivation and behavior change. Correctional Psychiatry and Journal of Social Therapy 8:64–74, 1962
9. Walters RH, Callagan JE, Newman AF: Effect of solitary confinement on prisoners. Am J Psychiatry 119:771–773, 1963
10. Meltzer M: Solitary confinement, in Group for the Advancement of Psychiatry Symposium Number 3: Factors Used to Increase the Susceptibility of Individuals to Forceful Indoctrination, Observations and Experiments. New York, GAP, 1956
11. Suedfeld P, Roy C: Using social isolation to change the behavior of disruptive inmates. International Journal of Offender Therapy and Comparative Criminology 19:90–99, 1975
12. Kaufman E: The violation of psychiatric standards of care in prisons. Am J Psychiatry 137:566–570, 1980
13. Nitsche P, Williams K: The History of the Prison Psychoses, Nervous and Mental Disease Monograph Series, number 13. New York, Journal of Nervous and Mental Disease Publishing Co, 1913
14. Rothman D: The Discovery of the Asylum. Boston, Little, Brown and Co, 1971
15. de Tocqueville A: Democracy in America. New York, Vintage Books, 1945
16. Ganser J: Uber einen eigenartigen hysterischen dammerzustand. Arch Psychiatr Nervenkr 30:633–640, 1898