No. 22-01409

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

Alejandro Menocal, *et al.*,

*Plaintiffs-Appellees,*

— v. —

The GEO Group, Inc.,

*Defendant-Appellant.*

On appeal from the United States District Court
for the District of Colorado, No. 1:14-cv-02887 (Hon. John L. Kane)

## APPELLANT'S REPLY BRIEF
(Oral Argument Requested)

Scott Schipma
THE GEO GROUP, INC.
4955 Technology Way
Boca Raton, FL  33431
(561) 999-7615
scott.schipma@geogroup.com

Dominic E. Draye
GREENBERG TRAURIG, LLP
2101 L Street, N.W.
Washington, DC 20037
(202) 331-3100
drayed@gtlaw.com

*Attorneys for Defendant-Appellant*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................... ii

STATEMENT OF RELATED CASES ..................................................v

GLOSSARY........................................................................ vi

INTRODUCTION ....................................................................1

ARGUMENT .........................................................................3

I.      The Denial of Immunity Is a Textbook Application of the Collateral Order Doctrine.................................................................................3

II.     ICE Authorized and Directed Payment for Participants in the Voluntary Work Program....................................................................................7

    A.    To Obscure the Government's Direction and Oversight, Plaintiffs Attempt to Change the Law. ...............................................................8

    B.    GEO Paid a $1-Per-Day Stipend, as Directed. .........................................14

III.    ICE Authorized and Directed GEO's Housekeeping and Disciplinary Policies. .........................................................................................17

CONCLUSION ....................................................................24

CERTIFICATE OF SERVICE .................................................26

CERTIFICATE OF COMPLIANCE ...................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*ACT v. Worldwide Interactive Network, Inc.*,
  46 F.4th 489 (6th Cir. 2022) ................................................................3

*Alvarado Guevara v. I.N.S.*,
  902 F.2d 394 (5th Cir. 1990) .............................................................16

*Astoria Federal S. L. Ass'n. v. Solimino*,
  501 U.S. 104 (1991)............................................................................14

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988)........................................................................5, 11

*Butters v. Vance Int'l*,
  225 F.3d 462 (4th Cir. 2000) ............................................................1, 5

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
  797 F.3d 720 (9th Cir. 2015) ...........................................................2, 11

*Campbell-Ewald Co. v. Gomez*,
  577 U.S. 153 (2016)................................... 1, 2, 5, 7, 9, 12, 13, 14, 17

*Chavez v. Singer*,
  698 F.2d 420 (10th Cir. 1983) .............................................................7

*Christensen v. Harris Cnty.*,
  529 U.S. 576 (2000)............................................................................22

*Cohen v. Beneficial Indus. Loan Corp.*,
  337 U.S. 541 (1949).............................................................................5

*Creek Nation Indian Housing Auth. v. United States*,
  905 F.2d 312 (10th Cir. 1990) ...........................................................11

*Crowson v. Wash. Cnty. Utah*,
  983 F.3d 1166 (10th Cir. 2020) ...........................................................6

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
    888 F.3d 640 (4th Cir. 2018) ...............................................2, 3, 9, 15

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
    No. 1:16-cv-00545, 2017 WL 1682534 (E.D.Va. May 1, 2017) ........................9

*Demore v. Kim*,
    538 U.S. 510 (2003).......................................................................16, 23

*Fiallo v. Bell*,
    430 U.S. 787 (1977).........................................................................16

*Filarsky v. Delia*,
    566 U.S. 377 (2012).......................................................................5, 6

*Franco v. Bd. of Cnty. Comm'rs*,
    609 F. App'x 957 (10th Cir. 2015).........................................................6

*Houston Cmty. Hosp. v. Blue Cross*,
    481 F.3d 265 (5th Cir. 2007) ..............................................................7

*Estate of Jensen v. Clyde*,
    989 F.3d 848 (10th Cir. 2021) .............................................................6

*Estate of Lockett v. Fallin*,
    841 F.3d 1098 (10th Cir. 2016) ...........................................................6

*Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*,
    885 F.3d 659 (10th Cir. 2018) .............................................................4

*McMahon v. Pres. Airways*,
    502 F.3d 1331 (11th Cir. 2007) ...........................................................3

*Mitchell v. Forsythe*,
    472 U.S. 511 (1985).........................................................................4

*Pullman Constr. Indus., Inc. v. United States*,
    23 F.3d 1166 (7th Cir. 1994) ..............................................................7

*Richardson v. McKnight*,
    521 U.S. 399 (1997).........................................................................6

*Steinle v. City & County of San Francisco*,
   919 F.3d 1154 (9th Cir. 2019) .............................................................................15

*Taylor Energy Co., L.L.C. v. Luttrell*,
   3 F.4th 172 (5th Cir. 2021) ....................................................................2, 10, 21

*Will v. Hallock*,
   546 U.S. 345 (2006)..............................................................................................5

*In re World Trade Ctr. Disaster Site Litig.*,
   521 F.3d 169 (2d Cir. 2008) ............................................................................3, 7

## Federal Statutes

8 U.S.C. § 1231 ...............................................................................1, 3, 6, 16

8 U.S.C. § 1555 ...........................................................................................16

28 U.S.C. § 2680 ........................................................................................11

42 U.S.C. § 1983 ..........................................................................................6

Department of Justice Appropriation Act,
   1979, Pub. L. No. 95–431, 92 Stat. at 1027........................................................16

## Other Authorities

H.R. 4431 § 221, 117th Cong. (2021) ....................................................................16

Progress in Implementing 2011 PBNDS Standards at 5 (Jan. 17, 2017)
   *available at* https://tinyurl.com/y9uvzaf4 ...........................................................14

U.S. Immigration and Customs Enforcement, *Traffickers and Victims
Under the Radar*, https://tinyurl.com/32v7ej6c (last visited Apr.
14, 2023) ..............................................................................................23

## STATEMENT OF RELATED CASES

This appeal is related to a previous appeal on an unrelated issue in *Menocal v. The GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018).

# GLOSSARY

| | |
|---|---|
| AIPC | Aurora Immigration Processing Center |
| DSI | Derivative Sovereign Immunity |
| ICE | Immigration and Customs Enforcement |
| FTCA | Federal Tort Claims Act |
| GEO | Defendant-Appellant The GEO Group, Inc. |
| NDS | National Detention Standards |
| PBNDS | Performance Based National Detention Standards |
| TVPA | Trafficking Victims Protection Act |
| VWP | Voluntary Work Program |

## INTRODUCTION

"[I]mmunity reduces the risk that contractors will shy away from government work." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016) (discussing qualified immunity). The rationale behind derivative sovereign immunity ("DSI") flows from "the government's unquestioned need to delegate governmental functions and the acknowledgement that imposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work." *Butters v. Vance Int'l*, 225 F.3d 462, 466 (4th Cir. 2000) (quotations and modification omitted).

Plaintiffs disagree with current federal immigration law and seek to hinder its enforcement by discouraging contractors from working with Immigration and Customs Enforcement ("ICE"). Whatever the merits of their policy position, Plaintiffs' chosen method of redress is precisely what DSI exists to prevent. And its application is especially appropriate in this case, where Congress has expressly directed ICE to use contractors where possible. 8 U.S.C. § 1231(g)(2). Consistent with that mandate, ICE directed GEO to implement a housekeeping policy enforceable through the ICE disciplinary scale and likewise directed GEO to adopt a voluntary work program ("VWP") that paid participants a minimum stipend of $1 per day—the exact amount appropriated by Congress.

1

To avoid the straightforward application of DSI, Plaintiffs' brief resorts to straw-man arguments, misstatements of law and fact, and emotional hyperbole. Noticeably absent is the application of the Supreme Court's two-prong DSI standard: whether the work that "'was done was within the constitutional power of Congress'" and whether the contractor "performed as the Government directed." *Campbell-Ewald*, 577 U.S. at 167 (quoting *Yearsley v. W. A. Ross Constr. Co.*, 309 U.S. 18, 20 (1940)). Two circuits to apply this test since *Campbell-Ewald* have both found DSI applicable in cases remarkably similar to this one. *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018); *Taylor Energy Co., L.L.C. v. Luttrell,* 3 F.4th 172, 175–76 (5th Cir. 2021). In fact, *Taylor Energy* even rejected the central argument against DSI embraced by the district court below. That argument would strip away immunity whenever a contractor had any "leeway"— that is, discretion—in discharging its assignments. *Id.* at 174; *but see* APP. Vol. III at 748 (embracing the Ninth Circuit's idiosyncratic zero-discretion standard from *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720 (9th Cir. 2015)).

The undisputed facts in this case confirm that GEO performed as directed by ICE. Its actions implementing ICE's policies also comport with common sense and long-standing practice in both state and federal detention settings: giving institutionalized persons an opportunity to pass the time productively and expecting capable adults to tidy up the place where they live. Congress has made clear that

immigration enforcement must depend on contractors.  8 U.S.C. § 1231(g).  That congressional policy becomes impossible if Plaintiffs succeed in rewriting the law of DSI.

## **ARGUMENT**

### I.    **The Denial of Immunity Is a Textbook Application of the Collateral Order Doctrine.**

Plaintiffs have now filed a *third* brief challenging this Court's jurisdiction to hear a collateral order appeal.   Their desire to avoid judicial review is understandable, but their arguments miss the mark for reasons explained in GEO's brief in opposition to Plaintiffs' motion to dismiss ("MTD Op.").

Plaintiffs assert that every circuit to have considered application of the collateral order doctrine to DSI has rejected it.  Appellee's Answering Br. ("AB") 20.  That is inaccurate.  MTD Op. 6.  Candidly, the circuit courts are split on whether denials of DSI are immediately appealable.  *Id.*  Plaintiffs accurately identify the two courts that have agreed with their position.  AB 23–24 (citing *Houston Cmty. Hosp. v. Blue Cross*, 481 F.3d 265 (5th Cir. 2007); *Pullman Constr. Indus., Inc. v. United States*, 23 F.3d 1166 (7th Cir. 1994)).  On the other side of the split are three circuits, all postdating the two cases on which Plaintiffs rely.  *ACT v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 496–98 (6th Cir. 2022); *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 192–93 (2d Cir. 2008); *McMahon v. Pres. Airways*, 502 F.3d 1331, 1340 (11th Cir. 2007); *see also Cunningham*, 888 F.3d at 649 ("[W]e

treat the *Yearsley* doctrine as derivative sovereign immunity that confers jurisdictional ***immunity from suit***.").

This Court should join the group of circuits that permits collateral-order appeal of orders denying DSI.  An order denying DSI satisfies all three of the conditions for immediate appellate review: it "(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." *Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*, 885 F.3d 659, 664 (10th Cir. 2018) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)).

Plaintiffs have never contested the first factor.  MTD Op. 8.  Regarding the second factor, the district court denied DSI "as a matter of law."  APP. Vol. III at 744.  This Court has held that "the collateral order doctrine's second condition is more likely to be satisfied where purely legal matters are at issue." *Los Lobos*, 885 F.3d at 665 (quotation omitted).  Indeed, the Supreme Court has held that immunity questions are separate from the merits, even if they require consideration of facts. *Mitchell v. Forsythe*, 472 U.S. 511, 528 (1985); *see also* MTD Op. 8–13.  Finally, the third factor strongly favors review because "a defendant's claim of right not to stand trial . . . cannot be effectively vindicated after the trial has occurred." *Mitchell*, 472 U.S. at 525; MTD Op. 13–16.

Plaintiffs base their opposition on a fourth factor not included in *Los Lobos* or *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949). They insist that collateral order review is only available if the otherwise-appealable order implicates sufficiently important policy concerns. MTD 11–13; AB 24–26. GEO has already explained that DSI easily satisfies that additional criterion, relying on the Supreme Court's many statements that withholding DSI "threaten[s] disruption of governmental functions." *Will v. Hallock*, 546 U.S. 345, 352 (2006); MTD Op. 17. This is no less true for contractors than for employees: "an independent contractor performing its obligation under a . . . contract, rather than an official performing his duty as a federal employee, . . . obviously implicate[s] the same interest in getting the Government's work done." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 505 (1988); *see also Butters*, 225 F.3d at 466.

The mechanism for disrupting the government's work by withholding DSI is the same as withholding qualified immunity from government employees and contractors. As Justice Ginsburg succinctly expressed it in *Campbell-Ewald*, losing immunity means that "contractors will shy away from government work." 577 U.S. at 167. In *Filarsky v. Delia*, 566 U.S. 377, 390 (2012), the Court likewise relied on the common "purpose" underlying qualified immunity and a contractor's DSI: "Affording immunity not only to public employees but also to others acting on behalf of the government similarly serves to ensure that talented candidates are not

deterred by the threat of damages suits . . . ." (quotations and alterations omitted).[1] "Indeed, it is often when there is a particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals." *Id.*

As if there was any doubt about the policy importance of attracting capable contractors to run immigration detention facilities, this case involves an express instruction from Congress to use contractors.  8 U.S.C. § 1231(g)(2).  That congressional instruction strengthens the policy justification even beyond *Mitchell*, *Filarsky*, or any of the circuit cases identified above.  It also creates a unique class of DSI cases—those based on congressional directives to utilize contractors—that are especially deserving of immediate review, even if this Court were somehow

---

[1] Plaintiffs dispute the similarity between government employees and contractors, arguing that it is "all but foreclosed" by *Richardson v. McKnight*, 521 U.S. 399, 409 (1997). AB 25 n.3.  That argument suffers from myriad flaws.  First, *Filarsky* was decided 15 years later and cabined *Richardson* to the particular circumstance of individual guards asserting full-blown qualified immunity in response to suit under 42 U.S.C. § 1983.  566 U.S. at 392–93.  Second, this Court has noted "the limited nature of the Supreme Court's holding in *Richardson*."  *Crowson v. Wash. Cnty. Utah*, 983 F.3d 1166, 1182 n.9 (10th Cir. 2020).  In the years since *Richardson*, it has extended qualified immunity to individual contractors serving as doctors (*Estate of Lockett v. Fallin*, 841 F.3d 1098 (10th Cir. 2016)), psychiatrists (*Estate of Jensen v. Clyde*, 989 F.3d 848 (10th Cir. 2021)), and probation officers (*Franco v. Bd. of Cnty. Comm'rs*, 609 F. App'x 957 (10th Cir. 2015)).  Contrary to Plaintiffs' assertion, *Richardson* barely constrains contractors from enjoying qualified immunity, let alone DSI.

disinclined to join the Second, Sixth, and Eleventh Circuits in recognizing DSI for all contractors who satisfy the two conditions in *Campbell-Ewald*.

The two circuits that deny collateral order review for denials of DSI do so on the premise that federal sovereign immunity is a nullity. *Pullman*, 23 F.3d at 1168; *Houston Cmty. Hosp.*, 481 F.3d at 280. This Court has never endorsed that view, and the Second Circuit dismissed *Pullman* as a "sweeping and entertaining analysis." *World Trade Ctr.*, 521 F.3d at 191. In fact, this Court has recognized the immediate appealability of denials of absolute immunity, which share the key characteristic of DSI: a right not to be sued. *Chavez v. Singer*, 698 F.2d 420 (10th Cir. 1983). The Court's own precedent, the weight of recent decisions from other circuits, and congressional intent that stands to be thwarted by the burdens of litigation all weigh in favor of hearing this appeal.

## II.    ICE Authorized and Directed Payment for Participants in the Voluntary Work Program.

DSI attaches when "what was done was within the constitutional power of Congress" and the contractor "performed as the Government directed." *Campbell-Ewald*, 577 U.S. at 167 (quotation omitted). Nothing in the Supreme Court's test requires a complete elimination of all discretion on the part of the contractor. Each of GEO's contested actions meets the Supreme Court's standard, so Plaintiffs and the district court attempt to redefine DSI to require that a government contract remove all discretion. *See* APP. Vol. III. at 749–52 (denying DSI for the sin of GEO

"exercising its discretion"). That might have been the rule in the Ninth Circuit before *Campbell-Ewald*, but other circuits have expressly rejected it, and this Court should do the same.

### A. To Obscure the Government's Direction and Oversight, Plaintiffs Attempt to Change the Law.

The root of Plaintiffs' error—which persuaded the district court—is that DSI is unavailable if a contractor has *any discretion* in performing its work. Plaintiffs' brief makes a habit of quoting precedent and then "rephrasing" it in ways that transform the meaning. For example, after quoting the actual standard from *Yearsley*—"the government 'directed' the challenged conduct"—Plaintiffs declare that "[i]n other words" the standard is "the government made me do it." AB 15. They likewise transform *Campbell-Ewald*'s authorized-and-directed test: "[t]hat is, the plaintiff's harm was the government's fault." AB 31. The objective of all this "rephrasing" is to justify the Ninth Circuit's *Cabalce* standard, which treats *any* discretion as incompatible with DSI. Plaintiffs have now cast their lot with this Court adopting that approach. AB 35 ("the Ninth Circuit has it exactly right").

But Plaintiffs' zero-discretion standard departs from *Yearsley* and *Campbell-Ewald*, and two circuits to have considered the question since the Supreme Court's opinion in *Campbell-Ewald* have rejected Plaintiffs' approach.

In *Cunningham*, for example, the U.S. Department of Health and Human Services hired a contractor to contact a list of individuals and provide information

about the commercial availability of health insurance. 888 F.3d at 644. It authorized but did not require the contractor to use an autodialer, which would be illegal under the Telephone Consumer Protection Act ("TCPA") absent the prior consent of each recipient. *Id.* When the contractor opted to use an autodialer without obtaining the consent of recipients, the plaintiff brought suit, "alleg[ing] . . . this call was made using an automatic telephone dialing system" in violation of the TCPA. *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, No. 1:16-cv-00545, 2017 WL 1682534, at *2 (E.D.Va. May 1, 2017). The Fourth Circuit concluded that the contractor was entitled to DSI, notwithstanding the fact that the government authorized but *did not require* use of an autodialer. *Cunningham*, 888 F.3d at 647.

Plaintiffs' assertion that "[n]othing in *Cunningham* suggests [DSI] encompasses conduct the contractor was not required to engage in," AB 34, is flat wrong. The government *did not require* use of an autodialer. Yet when the contractor used an autodialer in violation of the TCPA, its actions were still "directed" by the government and therefore eligible for DSI. Of course, the contractor in *Cunningham* could have taken additional actions to comply with the TCPA, but then there would not have been a lawsuit—or need for immunity.[2] So

---

[2] Interestingly, *Campbell-Ewald* was also a TCPA case. The different outcome in that case reflects different directions from the government. In *Campbell-Ewald*, the Navy explicitly instructed its contractor to obtain prior consent before using an autodialer. 577 U.S. at 168.

too here, GEO could have paid a stipend to VWP participants in excess of $1 per day, but its immunity from suit did not depend on doing so.

Plaintiffs' attempt to distinguish *Taylor Energy* is little more than declaring in conclusory fashion that the government "ordered" all of the contractor's work. AB 34–35. To the contrary, the entire case was about the contractor's *discretion* in developing a project management plan and designing a method for containing oil. *Taylor Energy*, 3 F.4th at 176. The plaintiff in that case made precisely the argument that Plaintiffs make here: defendant's "contract with the Coast Guard lacks details and gives [the contractor] leeway in deciding how to run the capture and cleanup operation," thus disqualifying it from DSI. *Id.* at 174. If anything, the "leeway" in *Taylor Energy* was greater than whatever discretion GEO had in identifying the specific chores that would comprise ICE-mandated housekeeping or paying the VWP stipend. The Fifth Circuit's conclusion that contractor "leeway" is consistent with DSI is an exact rejection of the argument Plaintiffs successfully presented to the district court.

What *Cunningham* and *Taylor Energy* have in common is their recognition that the Supreme Court's "authorized and directed" standard does not require the government to extinguish all possible contractor discretion. In contrast, the district court in this case required GEO to show that it had "*no discretion*," in reliance on the Ninth Circuit's decision in *Cabalce*. APP. Vol. III at 748–49. This legal error

led the court to demand that GEO's contracts with ICE expressly foreclose every possible exercise of discretion: "to enjoy the vast protection of derivative sovereign immunity," GEO must show its "challenged actions were required by its contractual obligations."  APP. Vol. III at 749; *id.* at 745 ("[W]ere GEO's challenged actions *required* by its contractual obligations?").  The district court then concluded that because there was no "*contractual requirement* to compensate VWP participants $1.00 per day *and no more*," GEO's discretion to pay more erases DSI.  APP. Vol. III at 751–52 (emphasis added).

No other circuit has embraced *Cabalce*'s approach to DSI.  As explained in GEO's Opening Brief, *Cabalce*'s zero-discretion standard derives from the dissenting opinion in a Supreme Court case related to a specific statute, the Federal Tort Claims Act ("FTCA"), and one of its enumerated exceptions—the "discretionary function" exception.  Appellant's Opening Br. ("OB") 22–25 (discussing 28 U.S.C. § 2680(a) and *Boyle*).  Plaintiffs' attempt to make *Boyle*, 487 U.S. 500 relevant is baffling.  AB 15–17.  By its own terms, *Boyle* is specific to the FTCA.  487 U.S. at 511.  And that is exactly how this Court has applied it.  *See e.g., Creek Nation Indian Housing Auth. v. United States*, 905 F.2d 312, 313 (10th Cir. 1990) (applying *Boyle* to FTCA discretionary function exception).  No court has ever embraced Plaintiffs' theory that *Boyle* creates a complement to *Yearsley* for DSI cases in which the contractor proposes a course of action rather than the

government.  And Plaintiffs cite none.  Their best efforts at a salvage operation of the Ninth Circuit's mistake serve only to highlight how far that court departed from existing law.

Plaintiffs elsewhere respond by downplaying the district court's legal error as "quibbles with the Ninth Circuit's citation practices."  AB 36.  That is, frankly, remarkable.  This appeal turns on applying the correct legal standard for DSI— "authorized and directed" versus zero-discretion.  The lower court's mistaken embrace of the latter breaks with a consensus that includes the two circuits that have addressed this issue since the Supreme Court affirmed the authorized-and-directed standard in *Campbell-Ewald*.  Incidentally, even the three dissenting justices in *Campbell-Ewald* dissented on mootness grounds, not over a substantive disagreement like Plaintiffs' and the district court's.  577 U.S. at 175 (Roberts, C.J., dissenting).

Apart from unconvincing attempts to distinguish precedent, Plaintiffs' only response is to attack a pair of straw men.  First, they assert that GEO believes DSI "provide[s] absolute immunity to private contractors for any misconduct they may commit, unless they actually violate their contract with the government."  AB 19– 20; *see also id.* 31–32, 38.  That, of course, is not GEO's position.  Rather, as explained in the Opening Brief, DSI asks "whether the contractor complied with the terms of its contract and the directions actually provided."  OB 29.  A contract is one

mechanism through which the government provides direction, but it is not the exclusive means.  Nor is it an absolute shield for everything the contractor does (*e.g.,* actions wholly outside the contract's scope).  Here, there can be no dispute that GEO complied with ICE's direction in the contract and the various incorporated documents.  *Id.*

In a similar vein, Plaintiffs assert that "private companies do not acquire the United States' 'embracive immunity,' simply because they contract with the government."  AB 29 (citing *Campbell-Ewald*, 577 U.S. at 166).  Of course not.  The issue is whether the government directed the tasks that give rise to Plaintiffs' claims and whether GEO complied with those directions.  *See Campbell-Ewald*, 577 U.S. at 167 ("'there is no liability on the part of the contractor' who simply performed as the Government directed." (quoting *Yearsley*, 309 U.S. at 20–21)).

Not only is the zero-discretion rule far removed from anything the Supreme Court has endorsed, but it is a recipe for paralyzing the government.  It puts an unreasonable burden on the government to explicitly foreclose every way in which contractors could do something extra to appease a future plaintiff.  And for contractors, the incentive is exactly what the Supreme Court noted in *Campbell-Ewald*: "contractors will shy away from government work."  577 U.S. at 167.  Especially in cases like this one, where Congress has expressly instructed an agency to use contractors rather than perform the work in-house, Plaintiffs' transformation

13

of DSI is an affront to the separation of powers. *See Astoria Federal S. L. Ass'n. v. Solimino*, 501 U.S. 104, 108 (1991) ("Congress is understood to legislate against a background of common law adjudicatory principles.").

### B. GEO Paid a $1-Per-Day Stipend, as Directed.

There is a reason Plaintiffs rewrite the standard for DSI and mischaracterize GEO's recitation of the actual law. Correctly understood, DSI attaches as long as GEO complied with the government's direction to pay VWP participants a minimum stipend of $1.00 per day. Some amount of discretion—or "leeway," as *Taylor Energy* called it—is consistent with DSI, provided the contractor "performed as the government directed." *Campbell-Ewald*, 577 U.S. at 167.

As a preliminary matter, ICE used different language in the 2008 PBNDS and 2011 PBNDS regarding VWP stipends. The former specifies that "the compensation is $1.00 per day," APP. Vol. I at 222, while the latter adds that compensation shall be "at least $1 (USD) per day," ECF 271-4 at 2, 3; App. Vol. I at 147.[3] In both cases, Plaintiffs confirm their reliance on the theory that DSI is only available if the

---

[3] Plaintiffs misstate the effective date of the later formulation. AB 49 n.17. The 2011 PBNDS and several other modifications were added to GEO's contract through "Modification 5, dated May 23, 2013." SUPP. APP. Vol. I at 72. As ICE further explained, "[t]he application of new detention standards at any given detention facility requires negotiation with the contractor or locality operating the facility, and execution of a separate contract modification incorporating the standards into the facility's agreement with ICE." Progress in Implementing 2011 PBNDS Standards at 5 (Jan. 17, 2017) *available at* https://tinyurl.com/y9uvzaf4.

government affirmatively extinguishes all discretion: ICE "did not *prohibit* GEO from paying more." AB 48–49. That is not the law. As summarized above, the Supreme Court's standard for DSI is whether the government has authorized and directed the contractor's actions. *See* Part II.A *supra*. The VWP stipend illustrates why the district court followed Plaintiffs' suggestion to adopt the flawed *Cabalce* analysis. Only if DSI requires the elimination of all discretion does Plaintiffs' argument make sense. Fortunately, as *Cunningham* and *Taylor Energy* illustrate, courts outside of the Ninth Circuit have rejected *Cabalce*'s mistaken reasoning.

Confronted with ample evidence that GEO performed as ICE directed, Plaintiffs attempt to argue *Yearsley*'s authorization prong—that is, Plaintiffs argue "ICE *could not* have validly conferred on GEO the authority to [pay $1 per day] because Congress did not authorize the agency to do so." AB 49; *see also id.* at 47 (regarding housekeeping, "ICE could not have validly conferred on GEO the authority to violate the Trafficking Victims Protection Act.").

"Authorization is 'validly conferred' on a contractor if Congress authorized the government agency to perform a task and empowered the agency to delegate that task to the contractor, provided it was within the power of Congress to grant the authorization." *Cunningham*, 888 F.3d at 646–47. The federal government has "plenary or near plenary power over immigration issues." *Steinle v. City & County of San Francisco*, 919 F.3d 1154, 1165 (9th Cir. 2019). Indeed, "over no

15

conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quotation marks omitted). This authority includes the "power to detain aliens in connection with removal." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quotation marks omitted).

Congress authorized ICE to enter into contracts for the performance of detention functions, 8 U.S.C. § 1231(g), and to pay "allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed." 8 U.S.C. § 1555. Congress last specified that rate in the Department of Justice Appropriation Act, 1979, Pub. L. No. 95–431, 92 Stat. at 1027. In that statute, Congress authorized payment of allowances "at a rate not in excess of $1 per day." *Id.* Although it has considered changing the rate since then, *see, e.g.*, H.R. 4431 § 221, 117th Cong. (2021) (bill approved by the House Appropriations Committee proposing to raise allowances to a rate determined by the Secretary of Homeland Security and not less than the federal minimum wage of $7.25 per hour), it has not yet done so. As it stands, Congress has authorized a maximum rate of payment for "work performed" by "aliens, while held in custody under the immigration laws," of $1 per day. *See Alvarado Guevara v. I.N.S.,* 902 F.2d 394, 396 (5th Cir. 1990) (noting that "one dollar ($1.00) per day for [immigration detainees'] participation" in voluntary work program "was set by congressional act").

16

Plaintiffs might be correct that a higher stipend is good policy, but they cannot use the courts to effect a change that the elected branches of government have declined to adopt—particularly through the mechanism of DSI, which depends on governmental direction. By definition, when Plaintiffs' claims run up against extant legislation, their argument that GEO is not acting as currently directed by the government must fail.

Congress acted within its constitutional powers to authorize reimbursement for VWP participants at $1 per day, and ICE directed GEO to do just that. These are the circumstances for which DSI exists to immunize those who "performed as the government directed." *Campbell-Ewald*, 577 U.S. at 167.

## III.  ICE Authorized and Directed GEO's Housekeeping and Disciplinary Policies.

Reading Plaintiffs' brief, a person could be forgiven for incorrectly thinking that the housekeeping policy at issue extended beyond detainees' assigned living areas or that detainees routinely faced solitary confinement for refusing to clean. To the contrary, detainees' housekeeping obligations are modest and specifically required by ICE. On the other hand, Plaintiffs' sweeping claims of "forced labor" would forbid even a policy requiring detainees to make their own beds—after all, the same ICE disciplinary scale would apply, including up to 72 hours of isolation as the second-most severe punishment. APP. Vol. I at 215. Plaintiffs' arguments

prove too much and engage the record too little.  The undisputed facts show that GEO did what the government directed.

Every contract GEO entered with ICE incorporated the applicable detention standards—the 2000 NDS, 2008 PBNDS, or the 2011 PBNDS—and required that GEO comply with those standards.  APP. Vol. II at 261–62 (Additional Undisputed Fact #7).  Those contracts and standards in turn provide that "all detainees are responsible for personal housekeeping. *** Detainees are required to maintain their immediate living areas in a neat and orderly manner . . . ."  APP. Vol. I at 220; *accord id.* at 145 (same in 2011 PBNDS).  They also expressly "obligated"—the district court's word, APP. Vol. III at 725—GEO to punish "***[r]efusal to clean assigned living area***" according to a scale of 13 disciplinary sanctions, which included "disciplinary segregation (up to 72 hours)."  APP. Vol. I at 215–16 (emphasis added).  To repeat: ICE, through the contracts and national detention standards, both authored the disciplinary scale and required its application to detainees who refused to clean their assigned living areas.  *Id.*

ICE provided further direction to GEO in the National Detainee Handbook, which the PBNDS requires be distributed to all detainees.  APP. Vol. I at 203, 223.  Any uncertainty that might exist in the PBNDS regarding the scope of detainee housekeeping obligations disappears upon consulting the Handbook: "You are required to perform ***basic cleaning tasks within your living unit***, regardless of where

you are held."  ECF 51-3 at 19 (2008 Handbook) (emphasis added); ECF 310-1 at

18 (same in 2013 edition) ("[Y]ou must keep areas that you use clean, including your

living area and *any general use areas that you use*.  If you do not keep your areas

clean, *you may be disciplined*." (emphasis added)).  Under Plaintiffs' definition of

"forced labor," this language belies their incredulous assertion that "there is no

evidence that [ICE] told GEO to include forced labor."  AB 44.  Even if Plaintiffs

were correct on the meaning of "forced labor," the National Detainee Handbook

directed exactly that approach.  As a result, GEO is immune from suit.

GEO's local supplement to the National Detainee Handbook, which ICE

required, reviewed, and approved, further elucidates these requirements.  APP. Vol.

I at 132; APP. Vo. II at 259 (Material Undisputed Fact #15); ECF 271-11 at 8-10;

ECF 261-16 at 5-6; ECF 291-1.  The supplement expounded a more detailed list of

the National Detainee Handbook's "basic cleaning tasks" and their connection to the

living unit: "[a]ll detainees are required to keep clean and sanitary all commonly

accessible areas of the housing unit including walls, floors, windows, window

ledges, showers, sinks, toilets, tables, and chairs."  APP. Vol. I at 244.  Not only

does this document add nothing to the requirements that ICE already imposed, but

ICE reviewed and approved it.  APP. Vol. II at 259 (Material Undisputed Fact #15)

("All of GEO's policies are reviewed and approved by an on-site ICE official.").

Lacking any meaningful response to these undisputed facts, Plaintiffs attempt to sow confusion. They first attempt to conflate the ICE-approved AIPC supplemental handbook with various distinct internal "procedure" documents and testimony regarding the lack of ICE involvement with those internal documents. AB 43–44. To that end, Plaintiffs selectively and misleadingly quote statements from a declaration regarding the so called "Housing Unit Sanitation Policy" or "HUSP." AB 7, 44; SUPP. APP. Vol. I at 73. The "HUSP" is an invention of the Plaintiffs; there are no documents with that title. More importantly, the fact that the ICE contracting officer described those assorted internal plans and procedures as "GEO policy created by GEO" is irrelevant. It is designed to distract this Court from the fact that GEO's actions comported with the contract, PBNDS, and National Detainee Handbook—and a local supplement that ICE reviewed and approved. APP. Vol. II at 259 (Material Undisputed Fact #15). Those documents are more than sufficient to establish that ICE "authorized and directed" GEO's actions. That other internal documents were not reviewed by ICE is a red herring.

In another attempt to avoid the voluminous and undisputed evidence, Plaintiffs adopt a different strategy than the district court. They argue that only the national detention standards matter because those are the "only" documents GEO "is actually contractually required to follow." AB 40. This is another subtle but incorrect twist on the law. DSI depends on whether the contractor's actions were

"directed" by the government.  Direction need not take the form of a contractual provision. *See, e.g., Taylor Energy*, 3 F.4th at 174 (citing, *inter alia*, Coast Guard administrative order and memoranda from oil-spill response coordinator).  The National Detainee Handbook—which, incidentally, GEO is contractually bound to distribute—is another source of direction for contractors housing ICE detainees.  If circumstances were reversed and GEO was not providing a benefit enumerated in the Handbook, Plaintiffs would surely cry foul.

Further illustrating the error in their understanding of DSI and government direction, Plaintiffs cannot articulate a boundary around permissible and impermissible housekeeping.  Their mechanical insistence that any chore undertaken under threat of punishment is "forced labor" would apply to a requirement that detainees make their own beds or sweep the floor around their bunks.  In fact, the Complaint asserts just that.  APP. Vol. I at 24.  Indeed, Plaintiffs' theory would allow an individual to intentionally make a mess and later refuse to clean it up— undermining order and discipline in the facility.  Not only is that consequence nonsensical on the merits, but it is impossible to argue that ICE did not authorize and direct mandatory housekeeping for these areas.  Plaintiffs' undefined line between permissible housekeeping (if any) and "forced labor" reflects their failure to consider all sources of direction from ICE.  Looking to the National Detainee Handbook and the ICE-approved local supplement leaves no doubt that ICE required

detainees to perform basic housekeeping in their housing units or face the ICE-mandated escalating schedule of punishments[4]

At two points in the Answering Brief, Plaintiffs quote a statement from the Department of Homeland Security Inspector General ("IG") purporting to disapprove of cleaning anything beyond a detainee's own bunk.  AB 7, 42.  That opinion, provided in a "management alert" to the Theo Lacy Facility in Orange, California, is mistaken and, in any event, does not change the government's explicit and repeated directions to the contrary.  Courts have long recognized that IG opinions do not receive judicial deference but are only valuable to the extent those interpretations are persuasive.  *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).  Here, the IG's wayward comment is unpersuasive for all the reasons traced above.  It also contradicts unrebutted testimony in the district court from individuals in ICE with substantive expertise.  *See, e.g.,* ECF 335-2 at 4-6 (testimony of Jay Brooks, who oversaw the ICE Detention Standards Compliance Unit and participated in drafting the PBNDS housekeeping requirements, that the housekeeping tasks listed in the PBNDS were "examples" and not intended to "preclude detainees from participating in maintaining the cleanliness of common or

---

[4] Occasionally, Plaintiffs' brief reads as if GEO required detainees to clean areas *beyond* their housing unit.  That is not correct.  Any work beyond housekeeping in one's own housing unit would occur through the Voluntary Work Program, which is the subject of Plaintiffs' discrete unjust enrichment claim.  *See* Part II *supra.*

shared living areas," including "the dormitory, dayroom, shower and bathroom"). The IG's mistaken comment directed to a specific California state facility does not create a genuine dispute as to the fact that ICE required detainees at AIPC to clean their "assigned living area" or face discipline according to ICE's scale. APP. Vol. I at 215–16.

Finally, Plaintiffs attempt a half-hearted argument that ICE could not validly authorize housekeeping subject to discipline for refusal. AB 47. No court has ever accepted that theory. As explained above, Congress has plenary power over the detention of aliens and has delegated that authority to ICE, including determination of which labor is eligible for compensation and which is not. *Supra* at 15–16; *Demore*, 538 U.S. at 523. Indeed, ICE is also one of the agencies responsible for investigating and enforcing the TVPA. U.S. Immigration and Customs Enforcement, *Traffickers and Victims Under the Radar*, https://tinyurl.com/32v7ej6c (last visited Apr. 14, 2023). Unsurprisingly, ICE sees no tension between that statute and the requirement that detainees tidy up their own housing units. Congress validly authorized ICE to direct GEO to require housekeeping subject to its disciplinary scale.

Under the correct legal standard, there is no question that ICE authorized and directed GEO to implement a housekeeping policy that, in ICE's words, "required [detainees] to perform basic cleaning tasks within [their] living unit." ECF 51-3 at

19.   There is likewise no contest that ICE directed GEO to apply ICE's own disciplinary scale for "[r]efusal to clean assigned living area."  APP. Vol. I at 215–16; *see also* APP. Vol. III at 725.  In fact, that direction appeared in the national detention standards, which even Plaintiffs concede GEO was "contractually required to follow."  AB 40.  Additionally, ICE reviewed and approved GEO's specific list of chores comprising "clean[ing] assigned living area."  APP. Vol. II at 259, 453.  Under the correct standard, there is no genuine dispute that ICE authorized and directed the housekeeping policies at issue.  GEO is therefore entitled to derivative sovereign immunity.

## **CONCLUSION**

Plaintiffs' Answering Brief resorts to straw-men arguments, misstatements of law and fact, and emotional hyperbole rather than engaging the law as articulated in *Yearsley* and *Campbell-Ewald* or engaging the voluminous record evidence demonstrating that the federal government authorized and directed GEO to require housekeeping under threat of discipline and to pay VWP participants a minimum stipend of $1 per day.  This Court should confirm that the relevant standard for DSI is the one announced by the Supreme Court and the Fourth and Fifth Circuits, not the zero-discretion rule in the Ninth Circuit and the court below.  Applying the correct standard to the facts before the district court compels summary judgment in

favor of GEO on Plaintiffs' unjust enrichment claims (VWP claims) and Trafficking

Victims Protection Act claims (housekeeping claims).


April 14, 2023                                    Respectfully submitted,

                                                 */s/ Dominic E. Draye*
                                                 Dominic E. Draye
                                                 GREENBERG TRAURIG, LLP
                                                 2101 L Street, N.W.
                                                 Washington, DC 20037
                                                 (202) 331-3100
                                                 drayed@gtlaw.com

                                                 *Attorneys for Defendant-Appellant*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on April 14, 2023, a copy of the foregoing brief was filed

on CM/ECF and service was thereby electronically delivered to all counsel of record.


April 14, 2023                                    */s/ Dominic E. Draye*
                                                 Dominic E. Draye

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because, excluding the portions of the document exempted by Fed. R. App. 32(f) and L.R. 32(B), this document contains 5,839 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word with Times New Roman in 14-point.


April 14, 2023                                    */s/ Dominic E. Draye*
                                                 Dominic E. Draye